UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

v.                                    **DECISION AND ORDER**

JOHN THOMAS ERMIN,                    1:23-MR-00552 EAW
a/k/a "Tommy O",

                 Defendant.

───────────────────────────────


I.      **INTRODUCTION**

        Defendant John Thomas Ermin a/k/a "Tommy O" (hereinafter "Defendant") has

been charged by way of a criminal complaint with violating 18 U.S.C. § 922(g)(3) by

possessing firearms while being an unlawful user of controlled substances. (*United States*

*v. Ermin*, Case 1:23-mj-00167-HKS, Dkt. 1 (W.D.N.Y. Dec. 7, 2023) (hereinafter "Case

No. 23-mj-167")).[1]  Upon his arrest on December 7, 2023, Defendant appeared before

United States Magistrate Judge H. Kenneth Schroeder, Jr., and the government moved for

detention. (*Id*. at 12/7/2023 Minute Entry).

        A detention hearing was held before Magistrate Judge Schroeder on December 12,

2023, at which time the government's request for detention was denied and Defendant was

ordered released subject to conditions, including electronic monitoring at the discretion of

───────────────────

[1]      The maximum statutory penalty if convicted of this crime is 15 years in prison.  18
U.S.C. § 924(a)(8).  The government has estimated that the Sentencing Guidelines would
recommend an approximate three-year prison sentence.

the United States Probation Office ("USPO").  (*Id.* at 12/12/2023 Minute Entry; Dkt. 2 (Transcript) at 48-60[2])).

The government filed an appeal which was assigned to United States District Judge John L. Sinatra, Jr., who issued a stay of the release order pending further determination by the district court.  (Dkt. 1; Dkt. 2).  The case was subsequently reassigned to the undersigned (Dkt. 4), and the appeal was heard on December 19, 2023, and continued on December 27, 2023, at which time the Court reserved decision (Dkt. 6; Dkt. 7).  After carefully considering the record and the factors as set forth at 18 U.S.C. § 3142(g), the Court hereby revokes the release order and orders Defendant detained pending trial, based on its findings that there are no conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community.

---

[2]     When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

II.    **BACKGROUND**[3]

A.    Peter Gerace, Crystal Quinn, Pharaoh's, and the Outlaws

To fully understand the background of this matter, it is necessary to first discuss another case—*United States v. Joseph Bongiovanni and Peter Gerace, Jr.*, Case No. 1:19-cr-00227-LJV-MJR, currently pending in this District before United States District Judge Lawrence J. Vilardo.  Joseph Bongiovanni ("Bongiovanni"), a former agent of the Drug Enforcement Administration ("DEA"), was initially charged by way of an indictment returned on October 31, 2019, with various crimes related to his alleged obstruction of justice, acceptance of bribes, and drug trafficking.  (*United States v. Bongiovanni*, Case No. 1:19-cr-00227-LJV-MJR, Dkt. 1 (W.D.N.Y. Oct. 31, 2019) (hereinafter "Case No. 19-cr-227")).  On February 25, 2021, a second superseding indictment was returned in that

---

[3]    The information set forth herein is a summary of the factual background compiled from the record before the Court, including the almost 7 hours of argument before the undersigned on December 19 and 27, 2023, the numerous exhibits offered by the government, the transcript of the detention hearing held before Magistrate Judge Schroeder on December 12, 2023, the information set forth in the Pretrial Services Report prepared by the USPO, and the criminal complaint filed against Defendant in Case No. 23-mj-167. It should be noted that at the same time the Court was hearing the government's appeal concerning the release order pertaining to Defendant, it also heard the government's appeals from release orders pertaining to Scott J. Barnes ("Barnes") (*see United States v. Barnes*, Case No. 1:23-mr-00551-EAW, Dkt. 1 (W.D.N.Y. Dec. 12, 2023)), and Michael Roncone ("Roncone") (*see United States v. Roncone*, Case No. 1:23-mr-00566-EAW, Dkt. 1 (W.D.N.Y. Dec. 19, 2023)).  Some of the information proffered during those latter two cases overlapped with the information pertaining to Defendant, and in fact, during the proceedings on December 27, 2023, with the consent of defense counsel, the arguments concerning Defendant were heard at the same time as those pertaining to Barnes.  By separate Decision and Order, the Court will address the appeal pertaining to Barnes.  The Court previously denied the government's appeal pertaining to Roncone and ordered him released subject to conditions.  (*See United States v. Roncone*, Case No. 1:23-mj-00168-HKS, Dkt. 9; Dkt. 10; Dkt. 11 (W.D.N.Y. Dec. 21, 2023)).

case and Peter Gerace, Jr. ("Gerace"), was added as a defendant. (*Id*. at Dkt. 89). Among the charges against Gerace were allegations of drug trafficking and sex trafficking at Pharaoh's Gentlemen's Club ("Pharaoh's"), owned and operated by Gerace and located at 999 Aero Drive, Cheektowaga, New York. (*Id*.). Defendant is the General Manager of Pharaoh's.

The indictment against Gerace was unsealed on March 1, 2021 (*id*. at Dkt. 91), at which time Gerace appeared before a magistrate judge in the Southern District of Florida, where he had been arrested, and was ordered released subject to conditions. (*Id*. at Dkt. 95). Gerace subsequently filed a motion before Judge Sinatra—the district judge assigned to the case at that time—to modify his conditions of release. (*Id*. at Dkt. 108). In support of that motion, Gerace submitted a declaration signed by Defendant stating, among other things, that Gerace handled all the banking transactions at Pharaoh's and ensured that the ATM machine at Pharaoh's had sufficient cash. (*Id*. at Dkt. 108-2 at ¶¶ 3-4).[4] The government opposed the motion. (Dkt. 110).[5] Judge Sinatra ultimately modified some of the conditions. (Dkt. 111; Dkt. 112).

---

[4]     Defendant states in the declaration that he has served as General Manager of Pharaoh's since in or around 2016. (Case No. 19-cr-227, Dkt. 108-2 at ¶ 1). According to Defendant's counsel, Defendant has worked as the General Manager for 10 years, and began working at Pharaoh's performing maintenance work three years before becoming General Manager. Defendant's counsel proffered that Defendant was initially collecting social security disability payments, but was able to work enough so that he no longer collects those payments. The government argues that once it began investigating Pharaoh's and seizing evidence, Defendant ceased collecting disability payments so as to avoid government scrutiny.

[5]     The government's response in opposition to Gerace's motion to modify his conditions of release was recovered during execution of the search warrant at Defendant's

On March 23, 2023, another indictment was returned against Gerace charging various counts of witness tampering.  (*United States v. Gerace*, Case No. 23-cr-037-LJV-MJR, Dkt. 1 (W.D.N.Y. March 23, 2023) (hereinafter "Case No. 23-cr-37")).   After a detention hearing conducted on March 24, 2023, and continued on March 27, 2023, Judge Sinatra ordered that Gerace be detained pending trial  (*Id*. at Dkt. 4; Dkt. 7).

Almost two months before Gerace was detained, on February 3, 2023, Crystal Quinn ("Quinn") was charged by criminal complaint with various acts related to witness intimidation and threats and making false statements.  (*United States v. Quinn*, Case No. 1:23-mj-00011-HKS, Dkt. 1 (W.D.N.Y. Feb. 3, 2023) (hereinafter "Case No. 23-mj-11")).   On April 6, 2023, an Order of Dismissal was issued pursuant to Federal Rule of Criminal Procedure 48(a) due to Quinn's agreement to enter into pre-trial diversion.  (*Id*. at Dkt. 8).   Quinn was cooperating with the government, and providing information against Gerace, Bongiovanni, and members of the Outlaws Motorcycle Club ("Outlaws MC").   Quinn identified Defendant as the president of the Outlaws MC.[6]   Quinn told law enforcement that she had used cocaine at the Outlaws MC Clubhouse and gone into a seizure.   Quinn

---

residence, with yellow highlighting added to parts referencing Defendant.  (*See* Govt. Ex. 1AK through 1AP).  In that response, the government argued that Defendant's statements in his declaration filed at Docket 108-2 in Case No. 19-cr-227 conflicted with statements he made to law enforcement during an interview on December 12, 2019.  (*See* Case No. 19-cr-227, Dkt. 110 at 10-11).

[6]     The government has proffered that other witnesses have also identified Defendant as the president of the Outlaws MC, and Defendant has admitted his role as president to at least one witness.   While not admitting his role as president, Defendant's counsel essentially conceded at the appearance on December 27, 2023, that Defendant has a leadership role within the organization.

expressed fear of the Outlaws MC to the FBI and the United States Attorney's Office, stating that they would kill her, her mother, and her dogs.  The government has proffered that dead rats were found by Quinn once she started working with the government.

The government has proffered background information concerning the Outlaws MC, which it describes as a "racist, para-military organization" that is "highly structured and very dangerous."  The government has described criminal proceedings pursued nationally against its leaders, the fact that it is considered a criminal enterprise by the Department of Justice, its reach in that it is located in 19 countries (including Russia, Serbia, Brazil, and the Czech Republic) and it has approximately 136 chapters in this country, and historical acts of violence (including the 1994 bombing of a Hell's Angels Clubhouse in Chicago, the largest domestic bombing in U.S. history up until that point). The government has also provided instances that it claims support a conclusion that the Outlaws MC has interfered with criminal prosecutions involving its members, so as to cause the cases to be discontinued.[7]  Among the information proffered by the government

---

[7]     One example provided by the government concerns a prosecution in Florida of four members of the Outlaws MC, relating to the death of a member of the Kingsmen Motorcycle Club named Gutter Donovan on April 29, 2017.  On December 20, 2019, the charges were dismissed because the witnesses changed their stories.  Shortly before that, high-ranking members of the Kingsmen Motorcycle Club who were not from the area were in Western New York.  A Christmas card addressed to Defendant and recovered at the Outlaws MC Clubhouse during the search on December 7, 2023, discussed the Florida case.  (Govt. Ex. 15I).

about the Outlaws MC was an overdose death by a Pharaoh's dancer and the disposition of her body by members of the Outlaws MC.[8]

After Quinn testified before the grand jury, Gerace was indicted in Case No. 23-cr-37, and the government submits that Gerace knew about Quinn's cooperation based on the government's proffer during his detention hearing on March 24 and March 27, 2023, before Judge Sinatra.  Gerace was provided a copy of the criminal complaint against Quinn by an investigator.  Shortly after Judge Sinatra detained Gerace—on April 4, 2023—Defendant visited him at the Niagara County Jail.  Defendant again visited Gerace on July 6, 2023.  Defendant has only visited Gerace on those two occasions.  Less than a month after the second visit, Quinn was dead.

According to the government, Gerace was "furious" about the fact that he had been detained, he complained about Quinn, and he threatened that he had "a long reach and people who could tie up his loose ends."  He made those threats before Defendant's first jail visit, on April 4, 2023.

In mid-July 2023, Quinn suddenly reconnected with a friend from high school who she had not seen in about 10 years, Simon Gogolack ("Gogolack").[9]  Gogolack was attempting to lure Quinn to come to Wellsville, New York, where Gogolack lived.  At

---

[8]     According to the government, Gerace admitted this to a witness who the government anticipates will testify at his trial.

[9]     Gogolack has been indicted on drug, firearms, kidnapping, and tampering with witness charges.  *See United States v. Gogolack*, Case No. 1:23-cr-00099-JLS-JJM, Dkt. 18 (W.D.N.Y. Sept. 20, 2023).

around the same time, he was communicating with a drug dealer offering up his services as a hitman.  Gogolack was successful in his efforts to convince Quinn to visit Wellsville, and upon their arrival on July 27, 2023, they went directly to a poker game run by the Rare Breed Motorcycle Club ("RBMC"), a support club of the Outlaws MC which also has links to Pharaoh's.  At the poker game, Gogolack connected with Howard Hinkle ("Hinkle"),[10] an individual with connections to the RBMC.

Between the hours of 3:30 a.m. and 6:00 a.m. on July 28, 2023, while at Gogolack's residence, Quinn sent text messages expressing fear of both Gogolack and "the bikers."  It appears that Gogolack ultimately took steps to assuage Quinn's fears.  Then, around 6:30 p.m. on July 31, 2023, Quinn's phone stopped being utilized by a human.  Approximately 24 hours later, on August 1, 2023, Gogolack called in her body, which had been stiff for upwards of 24 hours or more.  According to the government, Gogolack's hand was forced because Quinn's mother was threatening to call law enforcement.

An autopsy revealed that Quinn had enough fentanyl in her system to kill 400 people.  The amount revealed by the autopsy was 1,200 ng/ml, whereas 3 ng/ml may be enough to cause an individual's death, and the most that the medical examiner had ever previously observed was 80 ng/ml.  The government contends that Quinn's death was staged to look like an overdose.  The autopsy determined that the cause of Quinn's death was a fentanyl overdose, and the manner of death was undetermined.

---

[10]     Hinkle has been charged with various drug and firearms charges by way of a criminal complaint.  *See United States v. Hinkle*, Case No. 1:23-mj-05219-MJR, Dkt. 1 (W.D.N.Y. Oct. 24, 2023).

B.     Search of Defendant's Residence

A search warrant was executed at Defendant's residence at 41 Richmond Avenue, Lancaster, NY 14086, on December 7, 2023.  Among the items recovered were sixteen firearms, ammunition, dozens of blunt instruments and cutting weapons, a cross bow, brass knuckles,[11] and marijuana that Defendant admitted he personally used for recreational purposes (*i.e.*, it was not medically prescribed).  In his interview with the USPO after his arrest, Defendant stated that he uses marijuana on a weekly basis to help him sleep.

Also recovered at Defendant's residence was a significant amount of legal paperwork, supporting the government's position that the Outlaws MC, and more specifically Defendant, regularly monitor court proceedings and law enforcement activity around the country.[12]  The legal paperwork included the sealed indictment against Gerace in Case No. 19-cr-227; a search warrant executed in March 2021 at 19 Grattan Street in Cheektowaga, New York[13] and a listing of the items seized from 19 Grattan with yellow highlighting added to one of the items seized (one piece of mail addressed to Raslawsky from Pharaoh's) (*see* Govt. Ex. 1AH); and various internal law enforcement documents

---

[11]     Brass knuckles are illegal under New York law.  *See* N.Y. Penal Law § 265.01(1).

[12]     The Outlaws MC has a PACER account that the government has attempted to subpoena.

[13]     19 Grattan Street is represented to be the residence of Paul Raslawsky a/k/a PJ Raslawsky ("Raslawsky"), a cook at Pharaoh's who is also charged by criminal complaint with a violation of 18 U.S.C. § 922(g)(3).  (*See United States v. Raslawsky*, Case No. 1:23-mj-01180-JJM, Dkt. 1 (W.D.N.Y. Nov. 29, 2023)).  Barnes previously resided at 19 Grattan Street.

(including a Report of Investigation that purports to identify a confidential informant by name using his ATF CI number) (*see* Govt. Ex. 1AF).

The search of Defendant's residence also recovered a list of members of the Outlaws MC imprisoned around the country, including Edgar Dekay, II a/k/a Special Ed ("Dekay"), who was indicted in this District for a RICO conspiracy and other crimes involving the Kingsmen Motorcycle Club ("KMC").  (*See United States v. Pirk et al.*, 1:15-cr-00142-EAW-MJR, Dkt. 33 (W.D.N.Y. March 16, 2016) (hereinafter "Case No. 15-cr-142")).  Dekay's plea agreement in Case No. 15-cr-142 was also found at Defendant's residence.  (Govt. Ex. 1S).  Also found was a letter from Anthony Dloniak[14] ("Dloniak") addressed to the Outlaws MC Clubhouse on Northumberland Street in Buffalo (but recovered at Defendant's residence), wherein Dloniak states, among other things, that Dekay "was good" in his opinion and is "standing tall" (*i.e.*, not cooperating), that Defendant told

---

[14]     Dloniak was prosecuted in this District for drug crimes and ultimately sentenced by the undersigned after a guilty plea to 78 months in prison.  (*United States v. Dloniak*, 1:18-cr-00059-EAW-HKS, Dkt. 37 (W.D.N.Y. Dec. 17, 2018)).

"Pirk"[15] that he could "patch over when ever he wanted," and that "Flip"[16] claimed that Dekay "told."  (Govt. Ex. 1Y).

Also recovered from Defendant's residence were handwritten notes with comments like "nobody talks everybody walks" and that "dry snitching" includes "pillow talking, discussing in front of citizens, cunts," and instructions on how to plan a meeting without disclosing its location.  (Govt. Ex. 2A and 2B).  The government contends that these are Defendant's handwritten notes.

The government proffered photographs of vests of Defendant seized from his residence, with certain insignia, including a reference to the "BBT" and a red slash on a patch that reads "Brothers Inside and Out."  (Govt. Ex. 20C).  The government submits that the BBT references the Baseball Bat Team, which is a violent subgroup of the Outlaws MC, and one can only receive such a patch after committing acts of violence.  The government proffered that Defendant has BBT tattooed on his left arm.  According to an

---

[15]    The government proffered and the Court agrees that "Pirk" refers to David Pirk ("Pirk"), who served as president of the KMC, and who was prosecuted in Case No. 15-cr-142 for various crimes, including two execution-style murders occurring on September 6, 2014.  The undersigned presided over the trial of Pirk and two of his co-defendants, lasting from January 17, 2018, and continuing through May 18, 2018, when a verdict of guilty was returned as to all counts as to each defendant.  (*See United States v. Pirk et al.*, 1:15-cr-00142-EAW-MJR, Dkt. 1252; Dkt. 1258 (W.D.N.Y. May 18, 2018)).  Pirk is currently serving three consecutive life sentences.  (*Id*. at Dkt. 1972).

[16]    The government proffered, and the Court agrees, that "Flip" references Gregory Willson a/k/a Flip ("Willson") who was prosecuted in Case No. 15-cr-142 for various crimes related to the KMC.  Willson ultimately pleaded guilty to a RICO conspiracy and other crimes, and he was sentenced to 15 years in prison.  (*See United States v. Willson*, 1:15-cr-00142-EAW-MJR, Dkt. 1494 (W.D.N.Y. Dec. 20, 2018)).

expert witness referenced by the government, the red slash signifies violent acts in Defendant's history and is reflective of Nazi symbolism.  That same vest contains a patch with "OAA" standing for, according to the government, "Only Aryans Allowed," as well as a patch that states "God Forgives Outlaws Don't."  At least one of the vests has a reference to "United States" on the back (Govt. Ex. 20F), meaning that Defendant has a national role in the organization.  Another vest contained a national pin (Govt. Ex. 20G), again signifying Defendant's national role.

The government also seized from Defendant's residence records concerning monetary donations that Defendant received from Outlaws MC members all around the world.  (*See* Govt. Ex. 1H through 1L).  According to the defense, these donations were sent at a time that Defendant was hospitalized with COVID in the March/April 2020 time frame.

Photographs recovered from Defendant's residence show Defendant wearing a t-shirt about freeing "Taco" (Govt. Ex. 2C), a reference to the former president of the Outlaws MC Harry "Taco" Bowman ("Bowman"), who died in prison in April 2019. Defendant attended Bowman's funeral and texted Gerace photographs, indicating that he respected the amount of people who showed up at the funeral.  At his residence, Defendant had what the government characterized as a "shrine" to Bowman.  (*See* Govt. Ex. 5A).

Another photograph recovered from Defendant's home shows the tattoo on his stomach which the government proffers is the acronym for the Outlaws MC national motto "God Forgives.  Outlaws Don't."  (Govt. Ex. 2D).  The government also proffered a photograph of Defendant at a party at Gerace's house on Labor Day 2022, sitting next to

Barnes and wearing a shirt with the acronym "GFOD."   (Govt. Ex. 6A and 6B).   The government proffered that Corey Benson ("Benson"), another Outlaws MC member, was also photographed at the party.

According to the government, another moniker that the Outlaws MC promotes is "snitches are a dying breed."   A t-shirt with that moniker was recovered from Defendant's residence, along with a photograph of him wearing a t-shirt with that moniker.   (Govt. Ex. 2E and 2F).

Another former Outlaws MC national president is Jack Rosga a/k/a "Milwaukee Jack" ("Rosga"), who also is currently in prison.   The search of Defendant's residence revealed communications with Rosga.   (Govt. Ex. 1AA).

Recovered at Defendant's residence as well was an ode to the Outlaws, which reads in part:

> Many brothers have come and gone, some gave their lives, some their freedom for who & what we are today because they believed in the Outlaws true 1%er Brotherhood. . .
> There isn't nobody worth a fuck that wants to be part of being punked out. . .
> Outlaws Forever Forever Outlaws.

(Govt. Ex. 1T).

C.     The Outlaws MC Clubhouse

On the same date that the search warrant was executed at Defendant's residence, a search warrant was executed at the Outlaws MC Clubhouse on Northumberland Street in the City of Buffalo.   A skeleton of a dead rat with a noose around its neck hangs behind the bar at the Clubhouse.   (Govt. Ex. 17A).   Also at the Clubhouse were hats and t-shirts promoting the premise that snitches are not tolerated.   (*See* Govt. Ex. 17B through 17D).

- 13 -

Flags from Outlaws MC chapters throughout the country were displayed in the Clubhouse. (Govt. Ex. 15A and 15B).  Signs are posted in the Clubhouse warning:  "ABSOLUTELY NO CELL PHONE USE IN THE CLUB HOUSE!"  (Govt. Ex. 15C).  The sign instructs that if one needs to use a cell phone, permission must be requested from a member to go outside because, according to the government, one cannot touch the door or leave a Clubhouse without permission.  (Govt. Ex. 15E).

Also found at the Clubhouse were items linked to Pharaoh's, including a t-shirt and banner.  (Govt. Ex. 12A and 12B).  Other legal documents were found at the Clubhouse, such as the transcript of Dekay's plea hearing with a cover page that says "READ."  (Govt. Ex. 1AU).  Also recovered from the Clubhouse were lists of all Outlaws MC members in jail (Govt. Ex. 13A), and numerous instances of Nazi and racist symbolism (*see*, *e.g.*, Govt. Ex. 16A; Govt. Ex. 16B).  There was also an empty envelope recovered that was marked "Burn Bag!!"  (Govt. Ex. 15H).

Various weapons were also recovered at the Clubhouse, including a loaded Glock handgun that the government reports was stolen.  (Govt. Ex. 9A through 9G).

The government proffered that it had information that people have been beaten up at the Clubhouse, including one instance where Defendant assaulted an individual.  The government also proffered that it had evidence that dancers from Pharaoh's would be sent to work at the Outlaws MC Clubhouse as punishment, and that it had information about women being assaulted at the Clubhouse.  The government proffered that it has evidence

that Defendant provided Lortab pills to at least one dancer, and it has information concerning drug use at the Clubhouse.[17]

A sign posted at the Clubhouse reads, in part:

Women!
Unlike the outside world, we don't want any of your pussy!!!
You will be treated like the person you act:
· act like a CUNT, then you'll be treated like a CUNT
· act like a MAN, then you will be dealt with like a MAN
· act like a LADY, we will treat you like one

(Govt. Ex. 14A and 14B).  Another sign at the Clubhouse reflects what the government proffers is the Outlaws MC mission statement, reading in part:

This is not a family club or a social riding club, we are men who ride and take our colors seriously. . . .  We stand up and take care of business when need be. . . .  Your brother isn't always right but he is always your brother. . . . God forgives Outlaws Don't.  If you don't think this way, then walk away, because you are a citizen and don't belong with us.  We are Outlaws 1%ers and members will follow the AOA way or Get Out.

(Govt. Ex. 15M).

D.     USPO Interview of Defendant

After his arrest, Defendant was interviewed by the USPO and a Pretrial Services Report ("Bail Report") was prepared recommending that Defendant be released subject to conditions.  The Bail Report identifies Defendant as 54 years old, married to his second wife for 20 years,[18] and that he has lived at his current address in Lancaster for 24 years.

---

[17]     The government proffered that it has jail calls from individuals expressing fear of telling the government what was actually transpiring at the Clubhouse.

[18]     According to the proffer from defense counsel, Defendant's first wife died in a motorcycle accident, which also resulted in Defendant losing part of one leg.  Other

He has a positive relationship with his immediate and extended family, the latter of whom reside in Pennsylvania.  Although Defendant possesses a U.S. Passport, he "indicated that he has not traveled internationally," and Defendant's wife stated that Defendant has not travelled internationally in "many years."  However, the government produced an exhibit detailing Defendant's international travel, which includes international travel to Mexico as recently as January 2023, and reflects international travel to such places as Ireland, Spain, and Antigua on almost a yearly basis since 2014.[19]  (Govt. Ex. 24).

In fact, on August 10, 2021, when Defendant was returning from a trip to Spain with several other members of the Outlaws MC, he and some of his travelling companions were referred for secondary inspection at the JFK Airport by United States Customs and Border Protection.  (Govt. Ex. 23).  The phone of Outlaws MC member Keith Bikes was seized and revealed a group message communication with 10 Outlaws MC members—one for each region (as reflected by another document contained on the phone) and Defendant. The HSI Report of Investigation concludes that the "group chat is consistent with being a leadership forum between [Defendant] and the 9 Outlaws MC regional Presidents."  (*Id*.). Also referenced in that Report are images depicting Defendant "front and center during large gatherings of Outlaws MC members both internationally and domestically."  (*Id*.).

---

medical and mental health issues are identified in the Bail Report, including planned prostrate surgery that was cancelled because of Defendant's custody status.

[19]     According to the government's evidence, Defendant has travelled internationally every year since 2014, except during 2016, 2018 (when he was scheduled to travel to Berlin, Germany, but the trip was cancelled), and 2022.  In addition, prior to 2014, the chart produced by the government reflects international travel in 2005, 2006, 2009, and 2010.

The Bail Report does not identify Defendant as possessing any financial assets—including cash or any bank accounts.  At the appearance on December 27, 2023, the UPSO officer who conducted the interview confirmed that Defendant did not identify any bank accounts.  The government proffered that information was found during execution of the search warrant relating to an account with Alden bank.  In addition, approximately $40,000 in cash was recovered during execution of the search warrant at Defendant's residence.  Defendant's counsel proffered that this was his life savings.  Another $10,000 in cash was recovered during execution of the search warrant at the Outlaws MC Clubhouse.

The Bail Report reflected that Defendant has no prior criminal record.  Nonetheless, other information was revealed reflecting Defendant's encounters with law enforcement.  Specifically, according to reports recovered from Defendant's residence, he was involved in an alleged gang assault in the Village of Lancaster on April 15, 2010.  (Govt. Ex. 7A).  The supporting deposition sworn to by one of the alleged victims states that Defendant assaulted the alleged victim and his girlfriend's friend.  The alleged victim also identifies Benson, Chris Marchewka, and Dennis Falt, as all being involved in the incident with Defendant, and they were all wearing Outlaws MC jackets or vests.  The alleged victim's girlfriend also supported his statement with a statement of her own.  Defendant's counsel proffered that he represented Defendant in connection with the incident, and contrary to the alleged victims' statements, Defendant actually assisted one of the women by picking her up out of a bush—in other words, according to defense counsel, Defendant acted in defense of another woman.

Separate and apart from the alleged gang assault in April 2010, Defendant was also involved in another law enforcement incident in February 2015, in Columbus, Ohio. According to a Columbus Ohio Police Report, on February 21, 2015, Columbus Ohio Police gang unit detectives responded to a call of a road rage incident, and upon arriving at the scene, a vehicle with a New York license plate was observed with four white males, including Defendant, Dekay, Joseph Matthews,[20] and Eric Richardson. Recovered from the vehicle, among other things, were 4 grams of methamphetamine, firearms and ammunition, knives, brass knuckles, and three Outlaws MC vests. Although Defendant was arrested, he was not convicted, and according to the government, Dekay took responsibility for all the items, and then was promoted to a full patch Outlaws MC member. About a year following that incident, Dekay was indicted for a RICO conspiracy and other crimes involving the KMC in Case No. 15-cr-142.

E.    Video Evidence

The government proffered various video exhibits at the hearing. One was video evidence that the government submits represents the attendees at a hastily-convened leadership meeting of the Outlaws MC held for four hours at the Hilton Inn at the Buffalo Airport on February 11, 2023. Approximately 30 members of the Outlaws MC holding various leadership ranks within the organization were in attendance. Those in attendance reflected individuals from different parts of the country (as depicted by the geographical

---

[20]    Joseph Matthews is also known as Lucky, and the government has represented that he is currently employed at Pharaoh's.

location reflected on their jackets or vests).  Defendant attended the meeting, and entered the hotel with Barnes right behind him.

The government also showed a video of an incident at Halligan's Bar in Lockport, New York, occurring on or about November 25, 2022, when approximately 16 members of the Outlaws MC—including Barnes, Keith Elsaesser ("Elsaesser"),[21] Benson (who is holding a cane with what appears to be baseball bat at the end), and Eugene Mike Marcaccio ("Marcaccio")[22]—converge upon the bar as a show of force to confront the cook who worked there and who was displaying KMC colors without authorization in Outlaws MC territory.  Barnes is the last Outlaws MC member to enter the bar, and the last one to leave—reflecting according to law enforcement his highest rank among those in attendance and the purpose of the visit.

## II.     LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal.  The procedures

---

[21]     Elsaesser was present in the courtroom for the proceeding involving Barnes on December 18, 2023.  Elsaesser also owns the home that is proposed for Barnes' release.  Elsaesser regularly attended the KMC trial over its 4-month time span, and appeared to be taking copious notes throughout the trial.  At one point he was confronted by the FBI about the notes, and he claimed (falsely according to the government) that he was writing articles for the "Aging Rebel."   After being identified by name at the court proceedings on December 18, 2023, Elsaesser has not appeared again at any further proceedings.

[22]     In the video, Marcaccio appears to be the individual who sits the cook down and confronts him.  Marcaccio appeared in court at the proceedings involving Defendant on December 19, 2023, but after being identified by the government, he did not appear again at the proceeding on December 27, 2023.  The government has proffered that Marcaccio is either the new Buffalo chapter president of the Outlaws MC or the new Blue Regional president.

and standards for release or detention of a person pending trial are set forth at 18 U.S.C. § 3142.  A defendant awaiting trial must be released unless the release will present a risk of flight or danger, or both, and no set of conditions can reasonably protect against those risks.  *See United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (explaining that the Bail Reform Act codified "traditional presumption favoring pretrial release for the majority of Federal defendants" (quotation omitted)).

The government bears the burden of proof to establish risk of flight and/or danger, and that no conditions can reasonably protect against those risks.  The burden of proof with respect to risk of flight is preponderance of the evidence.  *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).  On the other hand, the Government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger.  *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).  Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'"  *Id.*  In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty."  *Id.*

Although there is "only a limited group of offenders who should be denied bail pending trial," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted), when there is "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," *Chimurenga*, 760 F.2d at 403 (quotations omitted).  While a prior record of violence or dangerous conduct "eases the government's burden of showing dangerousness, it is not essential.  The government's

burden is only to prove dangerousness by clear and convincing evidence." *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991). Moreover, in assessing a risk of danger, the inquiry is not limited to potential acts of violence. The potential for obstruction of justice or witness tampering may constitute a "threat to the integrity of the trial process, rather than more generally a danger to the community," and be sufficient to detain a defendant pending trial. *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (finding that pretrial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness).

Danger may be established by clear and convincing evidence even when a defendant has not personally participated in any violent acts, but where that defendant plays a leadership role in a criminal enterprise engaged in violent acts at the direction of the defendant. *See, e.g.*, *United States v. Ciccone*, 312 F.3d 535, 543 (2d Cir. 2002) (affirming detention order of a defendant who was the *de facto* leader of the Gambino Crime Family where evidence proffered suggested the defendant directed violent activities of the organization); *United States v. Orena*, 986 F.2d 628, 632-33 (2d Cir. 1993) (district court erred in setting bail for defendants who were indicted as playing leadership roles in the Colombo Family of La Cosa Nostra, where the predicate acts included conspiring to commit murder, murder, and illegal possession of weapons); *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985) (although the defendant did not directly participate in any of the crimes alleged, he was the leader of the criminal enterprise that carried out criminal activities at his direction, and therefore district court erred in ordering his release).

Therefore, for instance, in *United States v. Palermo*, No. 99 CR. 1199 (LMM), 2000 WL 5023, at *1 (S.D.N.Y. Jan. 5, 2000), even though the evidence linking the defendant to the murder and conspiracies to murder alleged in the indictment was thin, the court ordered the defendant detained because his leadership role in an enterprise and power to direct criminal activity supported a finding by clear and convincing evidence of danger.

Similarly, a defendant's "alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction" and favors denying bail. *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

Moreover, a court is not limited to only considering the charges pending against a defendant when "assessing the degree of danger posed by a defendant's release." *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (reversing release and ordering detention while rejecting "requirement that the violent conduct . . . be connected to the activity charged in the indictment"); *United States v. Barone*, 387 F. App'x 88, 90 (2d Cir. 2010) (affirming detention order based, in part, on a number of past uncharged crimes); *United States v. Bellomo*, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996) ("Nor is the dangerousness of a defendant determined solely by looking at the acts charged in the indictment.  There is no requirement of a nexus between the charged conduct and the basis of a court's conclusion that a defendant is a serious danger to the community." (citations omitted)).  As summed up by the court in *United States v. Gotti*:

The Second Circuit has clearly held that "[l]eaders of criminal gangs who direct the commission of violent crimes by others can be detained prior to trial under the circumstances prescribed in the [Bail Reform] Act." Moreover, the defendant need not be shown to have personally engaged in acts of physical violence before being found to be a danger to the community. "[T]he leader of a criminal enterprise with the ability to order members of that enterprise to engage in criminal actions may be a danger to the community despite the lack of evidence that he directly participated in many, if any, of the charged crimes." The courts have also made it clear that "the dangerousness of the defendant [is not] determined solely by looking at the acts charged in the indictment. There is no requirement of a nexus between the charged conduct and the basis of a court's conclusion that a defendant is a serious danger to the community. . . . This Court therefore may look beyond the charged conduct to assess the degree of danger that the defendant poses."

No. 02 CR 606 (ILG), 2002 WL 31946775, at *4 (E.D.N.Y. June 10, 2002) (citations omitted), *aff'd*, 219 F. Supp. 2d 296, 300 (E.D.N.Y. 2002), *aff'd sub nom. United States v. Ciccone*, 312 F.3d 535 (2d Cir. 2002).

The statutory factors that a court must consider in making any detention decision are as follows:

(1)    the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance, firearm, explosive, or destructive device;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including—

(A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial,

> sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).  "A district court has broad discretion to determine how much weight to assign the factors listed in § 3142(g) based on the circumstances of a particular case." *United States v. Zhang*, 55 F.4th 141, 144 (2d Cir. 2022).  As explained by the Second Circuit in *Zhang*:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant.  That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight.  What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*Id*. at 149-50 (citation omitted).

In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions.  *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).  "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence."  *United States v. Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001).  "The rules of evidence do not apply in a detention hearing" and "the government may proceed by proffer."  *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).  But "[w]hether presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the Government's

proof." *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016) (quoting *United States v. Goba*, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003)); *see also United States v. Martir*, 782 F.2d 1141, 1145-46 (2d Cir. 1986) (Court "retains the responsibility for assessing the reliability and accuracy of the government's information, whether presented by proffer or by direct proof."). However, "a detention hearing is not to serve as a mini-trial . . . or as a discovery tool for the defendant . . . [and therefore] a government proffer need not always spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *Martir*, 782 F.2d at 1145.

## III.   <u>ANALYSIS</u>

The posture of this case is unique, because the crime with which Defendant is charged—a single count of violating 18 U.S.C. § 922(g)(3) by possessing firearms while being a recreational user of marijuana—would likely not typically prompt the government to move for detention. Rather, it is Defendant's role with the Outlaws MC and his possible involvement in the death of a federal witness that has driven the government's position concerning detention. But as of now, Defendant has not been charged with any crimes directly linked to the Outlaws MC or the death of that witness.

Nonetheless, in assessing Defendant's risk of danger and flight risk, the Court is not constrained to consider only the pending charge against Defendant. Here, considering the totality of the evidence proffered by the government over the two days of arguments, the Court easily concludes that Defendant presents both a risk of danger and flight risk, and no conditions could reasonably protect against those risks.

In terms of the nature and circumstances of the offense with which Defendant is charged, it involves a firearm, and the penalties that Defendant faces are not insignificant. And no question, under some circumstances, possession of a firearm by an unlawful user of drugs would present real and significant risks of danger. But here, Defendant is alleged to have primarily possessed long guns—not assault or semi-automatic weapons. While the number of firearms possessed by Defendant was not trivial, and the collection of other weapons recovered at Defendant's residence was considerable, when viewed solely through the lens of the offense charged, the Court cannot conclude they raise significant concerns about danger so as to justify detention. That is particularly the case in view of the type of drugs that Defendant is alleged to have used—recreational amounts of marijuana. It is only when one ventures outside the context of the pending charge, as discussed below, that the nature of the risks are revealed.

With respect to the strength of the evidence, there does not appear to be any factual dispute that Defendant possessed firearms at the same time he was recreationally using marijuana—and marijuana is illegal under federal law. Indeed, a legal challenge may be the greatest impediment to the government's efforts to obtain a conviction, as opposed to any factual dispute. As Defendant's counsel pointed out, the Fifth Circuit has held that 18 U.S.C. § 922(g)(3) violates the Second Amendment as applied under circumstances similar to those present here. *See United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023), *petition for cert pending*, No. 23-376 (Oct. 10, 2023). The Second Circuit has not reached the issue. *See United States v. Stephenson*, No. 21-74-CR, 2023 WL 3402310, at *1 (2d Cir. May 12, 2023) (declining to reach issue of whether charge against defendant of

possessing firearms while using marijuana in violation of 18 U.S.C. § 922(g)(3) was unconstitutional because issue had not been raised before district court).

That said, on the whole, just considering the first and second factors § 3142(g) from the perspective of the offense with which Defendant is charged—a violation of 18 U.S.C. § 922(g)(3)—the Court would be hard-pressed to conclude that Defendant should be detained. But that is not where the Court's inquiry ends. A consideration of the third and fourth factors leads to the inescapable conclusion that Defendant must be detained.

As an initial matter, the Court concludes based on the evidence proffered by the government that Defendant is the president of the Outlaws MC—the government has established this clearly and convincingly through its proffer of witness statements, including Defendant's purported admission; the evidence recovered at both Defendant's residence and the Outlaws MC Clubhouse, including correspondence to Defendant which reflects his leadership position within the organization; the photographs depicting Defendant front and center; the insignia of a leadership role on Defendant's vests recovered from his residence; the text messages recovered in August 2021 from the phone of Keith Bikes; and the video evidence of the meeting of Outlaws MC leadership held at the Hilton Inn at the Buffalo Airport in February 2023. Like most motorcycle gangs, the Outlaws MC operates through a strict chain of command and established hierarchy. This means that Defendant is in charge of and controls legions of members.

The government has also established by clear and convincing evidence that there is not only a close relationship between Defendant and Gerace, but there is a symbiotic connection between the Outlaws MC and Pharaoh's. Through the proffer of witness

interviews, the indictment in Case No. 19-cr-227, and evidence recovered from the search warrants, the government has established that both the Outlaws MC and Pharaoh's are drug premises.  The government has also similarly established that the Outlaws MC Clubhouse is a place where assaults against women and other acts of violence occur, including where dancers from Pharaoh's are sent as punishment.  The government has shown that Outlaws MC members are frequently employed at Pharaoh's, where Defendant serves as the General Manager and has so served during the time period of the alleged criminal conduct for which Gerace is indicted.  Given Defendant's role as president of the Outlaws MC and the nature of the organization's hierarchical structure, his role with Pharaoh's and the infiltration of the Outlaws MC within that establishment, and the proffer of witness interviews and the search warrant evidence, the Court concludes that Defendant is responsible for the illegal events occurring at the Outlaws MC Clubhouse, including the use of dancers from Pharaoh's and treatment of women.  In other words, even if Defendant did not personally engage in the acts,[23] his leadership role within the Outlaws MC and the nature of that organization demonstrate that he controls and directs its activities.

With respect to the allegations concerning Quinn, the Court concludes that the government has established with its proffer that her death occurred under suspicious circumstances and was likely the result of foul play.  While the foul play may have been undertaken by Gogolack and Hinkle, neither of those individuals had any apparent motive

---

[23]    As noted in the Background section of this Decision and Order, the government did proffer certain evidence of Defendant's personal acts of violence and promotion of drug use, but the Court is not limited to only considering those acts in assessing Defendant's risk of danger.

to harm Quinn.  But Gerace plainly did—and it seems likely that "bikers" were involved in the circumstances surrounding Quinn's death.  Given Defendant's role with the Outlaws MC, his close connections with Gerace, the timing of his jail visits to Gerace, the evidence that Defendant was scrupulously monitoring the proceedings against Gerace, the rats left for Quinn once she started cooperating with the government (the same animal whose skeleton hangs with a noose at the Outlaws MC Clubhouse), the Outlaws MC's disdain for "snitches," and Quinn's expressed fear of the Outlaws MC, it is not unreasonable to conclude that Defendant had a role in Quinn's death.  But the Court is not prepared to reach that conclusion at this point based on the evidence disclosed by the government (which it admittedly has not fully revealed).  Importantly, the Court need not reach that issue because the question is not whether Defendant has obstructed justice, but rather whether the government has established by clear and convincing evidence that Defendant would present a risk of obstruction of justice if released, for which no conditions can reasonably protect.  The Court concludes that the government has plainly met its burden.

Defendant has been regularly monitoring court proceedings on behalf of the Outlaws MC around the country and requiring reports about Outlaws MC members' allegiance to the mantra that cooperation with law enforcement will not be tolerated.  And the evidence before the Court demonstrates that the Outlaws MC proactively deploys a network of members to monitor legal proceedings.  The Court takes Dekay as one example. Based on the evidence recovered, including the plea transcript and agreement and the letter from Dloniak, Defendant was investigating Dekay—who became a full patch Outlaws MC member after taking responsibility for the items recovered during the incident involving

Defendant in Ohio in 2015.  Dloniak was reporting to Defendant that his opinion was that Dekay had not become a snitch.  Of note, Dloniak also confirmed that Defendant had offered Pirk—convicted of two execution-style murders—full patch membership within the Outlaws MC.

This fits squarely within the perverse nature of the Outlaws MC code of conduct—violence and stymying law enforcement efforts are rewarded.  The organization makes no secret of the fact that snitches are not tolerated, and above all a member of the Outlaws MC should not cooperate with the government.  Loyalty to each other as opposed to fidelity to the law is their creed.  And Defendant is their leader.  Defendant's own handwritten notes recovered during execution of the search warrant at his residence reflect his adherence to this code.  Indeed, across his stomach Defendant has tattooed the acronym for "God Forgives.  Outlaws Don't."  This is the philosophy of this underworld organization that Defendant leads, and the evidence proffered by the government demonstrates that members of the Outlaws MC faithfully adhere to it.  Based on the totality of the evidence proffered by the government, the Court concludes by clear and convincing evidence that if released, Defendant would present a serious risk of obstruction of justice, and no conditions could reasonably protect against that risk.

Separate and apart from the obstruction, there are acts of violence that lead to the conclusion by clear and convincing evidence that if released, Defendant would present a risk of danger that could not be reasonably protected through the imposition of conditions. Based on the government's proffer, including witness interviews, the tattoos on Defendant's body, the patches on his Outlaws MC vests, Defendant's documented prior

encounters with law enforcement, and his leadership role within an organization that the evidence shows (including video evidence) engages in acts of and threats of violence, the Court concludes that Defendant has previously engaged in acts of violence on behalf of the Outlaws MC, and he has directed others to engage in this conduct.  It seems apparent that Barnes is one of Defendant's primary enforcers, as evidenced by—among other things— Barnes' living arrangements and his close physical presence near Defendant at both the Outlaws MC leadership meeting in February 2023, and the party at Gerace's house during Labor Day weekend of 2022.  Barnes played a key role, as reflected by the video evidence, in the encounter with the KMC member at Halligan's Bar in November 2022.  Benson, an individual who had been involved in a physical altercation with Defendant some 12 years earlier, was also part of the show of force at Halligan's Bar.  In other words, the evidence demonstrates that in his role as president of the Outlaws MC, Defendant controls legions of members who are willing to engage in threats of violence over issues as insignificant as whether a member of a rival motorcycle gang is wearing clothing viewed as disrespectful by the Outlaws MC.

In terms of Defendant's encounters with law enforcement, the Court recognizes that Defendant has no prior criminal convictions.  Moreover, Defendant's counsel has proffered that he represented Defendant in connection with the events of 2010, and Defendant simply assisted another woman.  However, the Court does not find this particularly persuasive given the two witness statements presented by the government who—unlike Defendant's counsel—were actually present during the events in question.  Moreover, while Defendant was not convicted of any crime related to the 2010 charges, the Court agrees with the

government that this is consistent with Defendant's position within the organization.  For instance, no conviction transpired from the events in Ohio in 2015, because Dekay apparently took responsibility and afterwards was promoted to a full patch Outlaws MC member.  Thus, based on the totality of the evidence proffered by the government, the Court concludes that the government has established by clear and convincing evidence that Defendant's release would pose a risk of danger that could not be adequately protected by reasonable conditions.

Separate and apart from the risks of danger posed by Defendant's release, there is the flight risk that, in and of itself, would justify Defendant's detention.  The Court recognizes that Defendant has lengthy and deep ties to the area, no prior criminal convictions, and physical impediments that on their surface appear to hinder his ability to easily flee the Court's jurisdiction.  But Defendant and his wife both seemingly lied to the USPO when asked about his history of international travel.  Defendant's apparent efforts to conceal his international travel are deeply troubling to the Court, and underscore the Court's conclusion that he is a serious flight risk.  The most logical explanation for being untruthful about Defendant's international travel is that Defendant (and his wife) were attempting to hide his international connections.  And the reality is that the Court has no way of ascertaining the extent of Defendant's financial resources.   Defendant's representation that he has no bank accounts demonstrates his ability to operate in a manner that cannot easily be traced or detected.  With a network as wide and vast as the Outlaws MC that includes convicted felons and a deep reach within the Bureau of Prisons and around the world—reflected by the financial donations received by Defendant while

hospitalized in 2020 with COVID—it is apparent that Defendant would have resources available to assist with any flight that could not be adequately addressed through reasonable conditions.

Of course, if charges are ultimately pursued based on Defendant's role in the Outlaws MC, he certainly cannot be convicted based on his mere association with criminals or adherence to inflammatory speech.  But it is not the Court's role here to assess guilt or innocence.  Defendant is presumed innocent, and he has the right to engage in speech that may be vile but is nonetheless protected by the First Amendment.  However, at this juncture, the Court is charged with assessing whether Defendant's release would present a risk of danger and/or flight and, if so, whether conditions could be put in place that would reasonably protect against those risks.  Given the totality of the evidence proffered by the government, the Court concludes that the answer to that question requires Defendant's detention.

## CONCLUSION

For the foregoing reasons, the government's appeal of the magistrate judge's release order is granted, and the Court hereby orders pursuant to 18 U.S.C. § 3142(e) that the defendant John Thomas Ermin a/k/a "Tommy O" be detained pending trial.  Defendant shall be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal.  The Court further orders that Defendant be afforded reasonable opportunity for private consultation with counsel.  Finally, the Court directs that, on order of the Court of the United States or on request of an attorney for the

government, the person in charge of the corrections facility in which Defendant is confined shall deliver the Defendant to a United States Marshal for the purposes of his appearance in connection with any court proceeding.

      SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      January 3, 2024
            Rochester, New York