IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

            v.                               23-CR-99-LJV

SIMON GOGOLACK, et al.,

                Defendants.

_____

## RESPONSE IN OPPOSITION TO DEFENDANT GOGOLACK'S MOTION TO REOPEN DETENTION HEARING

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, of counsel, hereby submits the following response in opposition to defendant Simon Gogolack's motion to reopen the detention hearing.  ECF No. 55, (dated Feb. 02, 2024).

### I.    INTRODUCTION

"I'll fucking kill him," Simon Gogolack declared during a discussion with girlfriend Cortnie Barber about a biker—"Kingsmen or Rare Breed"—who Mr. Gogolack believed was keeping Ms. Barber "close."  That single statement illustrates what the evidence against Mr. Gogolack conclusively proves: he is a danger to the community.  Fortunately for the community, Mr. Gogolack's threats came from behind bars, where this Court correctly sent him following the first detention hearing in this matter.

There is no need to give Mr. Gogolack a second bite at the apple.  Mr. Gogolack's purported basis for reopening the detention hearing—an FBI laboratory report—<u>corroborates</u>

statements made by his kidnapping victims that this Court expressly declined to consider during the initial detention hearing.  Accordingly, as a matter of both logic and law, the laboratory report cannot materially call into question the bases for Mr. Gogolack's detention.  Even if the Court had considered the then-uncharged kidnapping conduct, the laboratory report's information neither "increase[s] the likelihood that [Mr. Gogolack] will appear at trial" nor "show[s] that [he] is less likely to pose a danger to the community."  *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012) (unpublished).  To the contrary, because it is consistent with the victims' accounts, the laboratory report hurts—not helps—Mr. Gogolack's bid for pretrial release.

And even then, the facts for Mr. Gogolack—which at the initial detention hearing were already bad—have only gotten worse: on January 5, 2024, he was indicted for, among other offenses, conspiring to kill a federal witness and distributing fentanyl that resulted in a death; he has conspired to traffic narcotics from prison; and he discussed with Ms. Barber his intention to flee to Canada.  The law, the facts, principles of judicial economy, and the interests of society dictate one conclusion: that Mr. Gogolack continue to be detained pending trial.  Accordingly, this Court should deny the motion to re-open the detention hearing.

## II.   Factual Background

### A.   The Complaint and the First Indictment

On August 17, 2023, Mr. Gogolack was charged in a five-count Criminal Complaint with violations of Title 18, United States Code, Section 922(g)(1) (felon in possession of firearm and ammunition); Title 18, United States Code, Section 924(c)(1)(A)(i) (possession of firearms in furtherance of drug trafficking); Title 18, United States Code, Section 922(g)(3) (unlawful user of controlled substances in possession of firearm and ammunition); Title 21, United States

Code, Section 856(a)(1) (maintaining a drug-involved premises); and Title 21, United States Code, Section 846 (narcotics conspiracy).   Less than a month later, on September 13, 2023, a grand jury sitting in the Western District of New York returned a five-count Indictment against Mr. Gogolack.   *See* Indict., ECF No. 12, (dated Sept. 13, 2023).   The Indictment charged Mr. Gogolack with violations of 21 U.S.C. §§ 846 and 856(a)(1), and 18 U.S.C. §§ 924(c)(1)(A)(iii), 922(g)(1), and 922(g)(3).

### B.  The Government's Detention Proffer

The next day, this Court held a detention hearing.   *See* Minute Entry, ECF No. 15, (dated Sept. 14, 2023).   The government moved for detention under 18 U.S.C. §§ 3142(f)(1)(E) (felony offense involving a firearm), 3142(f)(2)(A) (serious risk of flight), and 3142(f)(2)(B) (serious risk of attempting to obstruct justice).   *See* Det. Hr'g Tran. at 8–10, (dated Sept. 14, 2023).   Owing to Mr. Gogolack's charges under Title 21 carrying a maximum penalty of twenty years, as well as his § 924(c) charge, a statutory rebuttable presumption in favor of detention required him to make a limited showing that he was neither a danger to the community nor a flight risk.   *See* §§ 3142(e)(3)(A) and 3142(e)(3)(B); *see* Det. Hr'g Tran. at 8–10.

The government argued that the § 3142(g) factors militated in favor of detention.   *See id.* at 10.   Looking first to the nature and circumstances of the offense, the government proffered that, following the execution of a federal search warrant, agents recovered a loaded tactical shotgun and body armor from Mr. Gogolack's residence.   *See id.*   When paired with information obtained from Mr. Gogolack's cell phone—which was replete with evidence of drug-trafficking—the firearm possession established that Mr. Gogolack engaged in dangerous and violent crime as recently as July 21, 2023.   *See id.*   Excerpts from the government's presentation are depicted below:













The shotgun depicted in the photograph on the defendant's phone, from July 21, 2023, is the same shotgun recovered by law enforcement from the defendant's house on August 8, 2023.





Search Warrant of Defendant's Residence on August 8, 2023.



*See also* Det. Hr'g Tran., at 10 ("Here we have the possession of a loaded shotgun in furtherance of drug trafficking, which is an inherently dangerous and violent crime."); *id*. at 10–11 ("[T]he defendant's cell phone is chock-full of text messages and photographs that make it clear that he's a drug trafficker."); *id*. at 13 (discussing a photograph showing "hypodermic needles, a semi-automatic firearm with a laser on it, which the defendant text messages with various people about trying to sell"); *id*. at 16 (discussing a text-exchange for "3 Gs" of "boi"); *id*. (proffering that "boi" is slang in Western New York for heroin and fentanyl); *id*. ("What's particularly disturbing . . . are the text messages that [Mr. Gogolack] has to [sic] a person named Clinic Shawn [sic], . . . it's apparent that the defendant is picking his customer base from people that are going to methadone clinics trying to get sober."); *id*. at 17 (proffering that Mr. Gogolack attempted to sell a "high point . . . semi-automatic pistol" to a drug dealer); *id.* at 21 (proffering that a shotgun was discovered in the attic during the execution of the search warrant).

Mr. Gogolack's dangerousness was rivaled only by his risk of obstructing justice and fleeing the court's jurisdiction if released.  On those scores, the government proffered it received

reports that, after the search of his residence, Mr. Gogolack "attempted to intimidate and threaten" two individuals to deter them "from communicating with law enforcement." *Id.* at 24.   Though these acts of witness tampering were sufficient to establish Mr. Gogolack's serious risk of obstructing justice, the government further proffered that law enforcement discovered numerous identification documents of other individuals inside of the house.   *See id.* at 26 ("During the search on August 8, [law enforcement] found numerous identification documents of other individuals inside the defendant's residence.   These IDs included someone else's license to carry firearms, someone else's medical marijuana card, someone else's driver's license, all in the names and bearing photographs of other individuals" who "share common physical characteristics . . . with the defendant").   Not only was this evidence probative to Mr. Gogolack's capacity—and risk—for obstructive conduct, but it also underscored his risk of flight.

Compounding these concerns—as well as the government's well-founded belief that Mr. Gogolack posed a serious danger to the community—were Mr. Gogolack's false statements to law enforcement regarding the death of government witness Crystal Quinn.    Again, the government proffered:



8

## Defendant's actions surrounding the death of a government witness, C.Q., which is currently under investigation.

- The defendant initially told local law enforcement that he was not present with C.Q. at the time of her death. The defendant claimed he lived in the upstairs of the residence.

- The defendant later told the FBI, during a recorded interview, that he was sleeping next to C.Q. and did not realize that she had died.

- It is impossible to believe that the defendant was unaware that C.Q. was dead, given the state of her body at the time law enforcement responded to the scene.  (Photos available in hard copy to show to Court).

- The defendant also did not live in the upstairs of the residence, as demonstrated by his subsequent statements to FBI and by photographs of the upstairs of the house, which make it clear no one lives there.

## Defendant's actions surrounding the death of a government witness, C.Q., which is currently under investigation.

- The defendant was deceptive with law enforcement regarding the timeline of events that led to C.Q.'s death.  During an interview with the FBI, the defendant provided a completely conflicting account of his actions in the 24 hours leading up to her death and law enforcement's response.

- The defendant took evidence from the scene of her death, including the comforter from the bed, and had it staged in a firepit by the time FBI responded to search the residence days later.



## Defendant's actions surrounding the death of a government witness, C.Q., which is currently under investigation.

- Although law enforcement would generally expect to find packaging, paraphernalia, and other items consistent with opiate use near a person's body if they suffered an accidental overdose, those items were not present by the time law enforcement responded to the 911 call.  It is suspected that the defendant hid items, including firearms and controlled substances, before calling 911.

- After being arrested in Depew on August 2, 2023, the defendant made unsolicited statements to the local law enforcement officer about C.Q.'s death.  The defendant claimed that he heard C.Q. on the phone with her lawyer and that she was telling her lawyer she intended to kill/harm herself.

- The government has spoken with C.Q.'s attorney, who acknowledged that he spoke with C.Q. but indicated that C.Q. in no way mentioned harming herself and that she planned to attend a meeting with her attorney and the government later that week.

- This establishes that this defendant is lying about statements C.Q. made before her death.

*See* Det. Hr'g Tran. at 27–34 (proffering about Mr. Gogolack's false statements and misleading conduct as to the then-nascent investigation into Ms. Quinn's death).

Other then-uncharged conduct featured in the government's proffer, as well.  To further establish Mr. Gogolack's dangerousness, the government proffered details regarding its investigation into his kidnapping of two individuals.  Specifically, the government proffered:

```
 8              Judge, before I get to the burden, there's
 9    additional newly developed information, and again,
10    because the way this works, we don't always get the
11    information the same day that a person is charged by a
12    complaint.  This is not charged in the indictment,
13    yet, but I'm going to proffer to you now that there
14    are multiple witnesses to an incident where the
15    defendant used the same shotgun that you've seen in
16    those pictures to hold a drug user against his will in
17    the defendant's basement for upwards of three hours,
18    that he struck that person with the spikes on the
19    front of that shotgun.
20              That incident was witnessed by another
21    individual.  Both of those individuals corroborate
22    each other and describe the defendant whose wrapped
23    himself in plastic from head to toe holding a drug
24    user captive in his basement for over three hours.
25    The Government is continuing to investigate that
```

1     information.

2            However, after the information came to the

3     Government, we rereviewed the photos from the search

4     warrant conducted at the defendant's house, and sure

5     enough, the photos from the defendant's basement show

6     plastic um drop cloth, essentially what painters would

7     use, and a white plastic chair.  Now, that's exactly

8     what was described by this witness who essentially

9     says the defendant lured him to the house by offering

10    him drugs and then brought him down into the basement

11    where the defendant was -- had set-up plastic from

12    floor to ceiling in a little like on three sides and a

13    white chair and that he then shoved the person into

14    the chair, struck the person with the shotgun and held

15    the person against their will for hours in his

16    basement.

17           The same plastic -- or the plastic chair

18    that was described by the witnesses and the plastic

19    drop cloth that was described by witnesses is still in

20    the basement when law enforcement goes and photographs

21    the house.  They didn't even know that they were

22    looking for it, but afterwards while interviewing

23    people who've purchased drugs from the defendant, the

24    Government becomes aware of this incredibly disturbing

25    conduct where the defendant has used that shotgun to

```
 1    beat someone and essentially kidnap them by holding
 2    them against their will using the instrumentality of
 3    commerce which would be a cell phone to lure them to
 4    the house.
 5            So the defendant poses an obvious danger to
 6    the community.  The pictures, the text messages, the
 7    threats over CashApp should all convince this Court of
 8    that by clear and convincing evidence.  The defendant
 9    also imposes a risk of flight.  The Court should be
10    convinced of that by the defendant's possession of
11    numerous IDs, the defendant's willingness to use the
12    identity of another individual repeatedly based on
13    both witness testimony and the text messages in his
14    own phone.
15            But I would point out that the burden first
16    here is with the defendant to overcome the two
17    presumptions that apply in this case, and I don't
18    believe he could even get that far, but if the Court
19    does believe the presumptions have been overcome, the
20    Government has proven anyway by clear and convincing
21    evidence that he's a danger and a flight risk.
22            THE COURT:  Okay.  Thank you.  Mr. Bagley?
```

*Id.* at 34–36.

Following the government's presentation, even counsel for Mr. Gogolack conceded that

he was "not asking that Mr. Gogolack be released . . . on his own recognizance" but, rather,

that he be "detain[ed] . . . only until the point that a bed becomes available at one of these treatment facilities." *Id.* at 41.

## C. The Original Detention Decision

This Court rejected that invitation after considering evidence that (i) Mr. Gogolack preyed upon vulnerable drug users when selling narcotics; (ii) unlawfully possessed firearms that he attempted to sell to fellow drug dealers; and (iii) attempted to conceal some of his crimes. Instead, the Court ordered Mr. Gogolack detained pending trial, concluding that he "ha[d] not rebutted the presumption" under the Bail Reform Act that he is both a flight risk and a danger to the community. *Id.* at 50; *see* Minute Entry, ECF No. 15, (dated Sept. 14, 2023). Additionally, the Court "f[ound] by clear and convincing evidence that there is no condition or combination of conditions which would reasonably assure [it] that if released [Mr. Gogolack] would not pose a danger to the community, and [] f[ound] by a preponderance of the evidence that there is no condition or combination of conditions which would reasonably assure [it] that if released [Mr. Gogolack] would not pose a risk of flight." Det. Hr'g Tran. at 50–51.

Critically, the Court arrived at these conclusions only after "confin[ing]" its evaluation of the "proffer relative to what's been charged." *Id.* That is, though the Court recognized that the government's "proffer of uncharged events" was serious, it advised the parties that its "focus w[ould] be on what has been charged," which the Court aptly characterized as "very troublesome." *Id.* at 37.

## D. The First and Second Superseding Indictments

The Court's detention determination was vindicated just six days later when the grand jury returned a 13-count Superseding Indictment incorporating the existing charges and further

charging several additional counts, including two counts of kidnapping and six counts of witness tampering.  *See generally* Super. Indict., ECF No. 18, (dated Sept. 20, 2023).

The grand jury subsequently returned a 28-count Second Superseding Indictment charging nine individuals, including Mr. Gogolack, on January 5, 2024.  *See* Sec. Super. Indict., ECF No. 24, (dated Jan. 5, 2024).   As to Mr. Gogolack, the Second Superseding Indictment incorporates the charges contained in the First Superseding Indictment.  Of particular relevance to his detention status, the Second Superseding Indictment charged Mr. Gogolack with several offenses related to Ms. Quinn's death, including obstruction of justice conspiracy (Count 1); witness tampering conspiracy (Count 2); witness retaliation conspiracy (Count 3); and distribution of fentanyl resulting in death (Count 4).   As presently charged, Counts 2 and 3 merit a mandatory minimum—and maximum—of life imprisonment.  *See United States v. Miller*, 954 F.3d 551, 566 (2d Cir. 2020) (concluding that a term of life imprisonment was the "statutory minimum" for committing witness tampering by killing).

### E.  Mr. Gogolack's Motion to Reopen the Detention Hearing & the FBI Lab Report

Notably absent from the foregoing is any evidence regarding the FBI's DNA testing of Mr. Gogolack's basement.  That is because the government did not rely on laboratory testing when moving for Mr. Gogolack's detention; indeed, the FBI laboratory report (the "Lab Report") Mr. Gogolack invokes to re-start the detention process did not even exist at the time of the initial detention hearing.  Nevertheless, Mr. Gogolack argues that the Lab Report entitles him to a second round of detention litigation.[1]  *See* Mot. to Reopen, at 3 ¶ 7.

---

[1]     The government provided Mr. Gogolack's counsel with the FBI laboratory report on December 26, 2023.

First, Mr. Gogolack contends that the FBI laboratory "could not link any of the material that 'lit up' to either of [Mr. Gogolack's] two alleged [kidnapping] victims."  *Id.* at 4 ¶ 12.  He also faults the government for not informing the Court that "no blood at all was detected on several of the locations where th[e] [BlueStar chemical] re-agent lit up, and that in other locations the only thing these lab results could conclude was that blood 'may be present.'"  *Id.* In his view, "[t]his alone entitles Mr. Gogolack to a renewed hearing."  *Id.* at ¶ 13.

The FBI laboratory examined samples taken from, in relevant part, the following persons and locations:



| | | |
|---|---|---|
| FBI Laboratory Evidence Designator(s): | | |
| Item 34 | Buccal sample from VICTIM 1 | |
| Item 36 | Buccal sample from VICTIM 2 | |
| Item 40 | Two swabs from top of wall one in Room A at | House 1 |
| Item 41 | Two swabs from middle of wall one in Room A at | House 1 |
| Item 42 | Two swabs from bottom of wall one in Room A at | House 1 |
| Item 43 | Two swabs from top of wall behind stairs in Room A at | House 1 |
| Item 44 | Two swabs from bottom of wall behind stairs in Room A at | House 1 |
| Item 45 | Four swabs from side of stairs in Room A at | House 1 |

Page 1 of 5

UNCLASSIFIED

| | | |
|---|---|---|
| Item 46 | Two swabs from bottom step in Room A at | House 1 |
| Item 47 | Two swabs from beam support in Room A at | House 1 |
| Item 48 | Two swabs from vertical beam in Room A at | House 1 |
| Item 49 | Chair from floor in Room A at | House 1 |
| Item 50 | Liquid blood sample from Crystal Quinn | |

15

*Id.*, Ex. A at 2–3.

The Report further states that "[b]lood was indicated on items 40, 41, 42, 43, and 47," as pictured below:

**Items 40, 41, 42, 43, and 47 (swabs from top of wall one, middle of wall one, bottom of wall one, top of wall behind stairs, and beam support)**

Blood was indicated on items 40, 41, 42, 43, and 47.[5]

*Id.* at 4. Additionally, "[b]lood was indicated on item 49," a chair discovered in Mr. Gogolack's basement. *Id.* Footnote 5 of the Report notes that the conclusion that "[b]lood was indicated" on the walls, a beam, and a chair in Mr. Gogolack's residence was "based on a positive presumptive test." *Id.*

A "presumptive test" is "[a] screening test that indicates the possible presence of a material of interest." *Presumptive Test*, Nat'l Institute of Standards & Technology, (dated June 12, 2023), https://www.nist.gov/glossary-term/12236#:~:text=A%20screening%20test%20that%20indicates,not%20confirmation%20of%20its%20absence, (last visited Feb. 5, 2024). Accordingly, though a "positive presumptive test" cannot "constitute an identification of blood," Mot. to Reopen, Ex. A., at 5, it is evidence—consistent with the representations of Mr. Gogolack's victims—that blood was found on multiple walls and items within Mr. Gogolack's residence.[2]

_____

[2] The FBI uses what is called a "phenolphthalein test," which, though highly sensitive to blood, is not specific to human blood. *See, e.g.*, *United States v. Fell*, No. 5:01-CR-12, 2017 WL 10809984, at *2 (D. Vt. Feb. 8, 2017). Nevertheless, as other courts have recognized, "[t]here is no dispute that, with the exception of some faint blood stains that are below the detection limit (sensitivity) of the test, every time phenolphthalin is exposed to human blood in the presence of hydrogen peroxide, it will catalyze into phenolphthalein (which is pink)," and produce a positive test result. *Id.* Thus, though "not a perfectly specific test . . . . it is entirely

### III.   Legal Framework

Under the Bail Reform Act, a court has discretion to reopen a bail hearing if information comes to light that is both new and material to the detention question.  *See United States v. Zhang*, 55 F.4th 141, 148 (2d Cir. 2022) ("As an initial matter, we emphasize that the Bail Reform Act states only that a hearing 'may' be reopened if new and material information is presented.  The Act therefore leaves the decision to reopen a hearing to the sound discretion of the district court." (internal citations omitted)).  Specifically, a "hearing" "may be reopened" if:

> the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a *material* bearing on the issue of whether there are conditions of release that will reasonably assure the *appearance of such person as required* and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2)(B) (emphases added); *see United States v. Havens*, 487 F. Supp. 2d 335, 339 (W.D.N.Y. 2007) (McCarthy, J.).  The statute thus proposes two necessary conditions—(1) new evidence that is (2) material—a defendant (or the government) must satisfy prior to the Court reopening a detention hearing.  *See United States v. Maxwell*, 527 F.Supp.3d 659, 663 (S.D.N.Y. 2021).

Relevant here is the "materiality inquiry," which does not unfold within a vacuum but, rather, is tethered to "those facts that the court found consequential to its earlier detention decision."  *Zhang*, 55 F. 4th at 148.  Not only is the materiality inquiry cabined to the Court's prior detention decision, but it excludes from consideration the "defendant's own evaluation of

---

reliable" and "demonstrates that the stain may be human blood."  *Id.* at *2–3.  *Cf. United States v. Christensen*, No. 17-CR-20037-JES-JEH, 2019 WL 651500, at *3 (C.D. Ill. Feb. 15, 2019) ("Given the corroborating evidence suggesting the presence of blood in the locations where preliminary testing was conducted, the preliminary test results are relevant and not substantially more prejudicial than probative.").  Due to the phenolphthalein test's sensitivity to blood and reliability, the FBI no longer conducts confirmatory tests as a matter of course.

his character or the strength of the case against him." *United States v. Quinones*, No. 13 CR 83S, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016) (emphasis added) (quoting *United States v. Jerdine*, No. 08 CR 0481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009)).   Stated otherwise, the materiality inquiry is satisfied not by a small, contested quantum of novel information but "truly changed circumstances, something unexpected, or [ ] significant event[s]," *id.*, that "increase the likelihood that the defendant will appear at trial" or "show that the defendant is less likely to pose a danger to the community," *Watson*, 475 F. App'x at 600. *See also United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1 (6th Cir. May 21, 2020) (unpublished) ("Courts . . . requir[e] a showing of truly changed circumstances or a significant event.").

## IV.   ANALYSIS

This Court should deny Mr. Gogolack's motion for four reasons.

*First*, the Lab Report has no material bearing on this Court's detention decision, which was premised upon a finding that Mr. Gogolack failed to rebut the applicable statutory presumptions and, based on evidence unconnected to the report, was both a danger to the community and a flight risk.

*Second*, the Report cannot "show that [Mr. Gogolack] is less likely to pose a danger to the community" or more likely to appear at trial because it corroborates information about a victim bleeding in his basement following a violent assault and is utterly silent as to his risk of flight. *Watson*, 475 F. App'x at 600.

*Third*, insofar as Mr. Gogolack thinks the government's detention proffer as to Ms. Barber bears on the bases for his own detention, his argument misstates the law, throws logic to the

18

wind, and is divorced from the facts establishing his own dangerousness, risk of flight, and propensity to obstruct.

*Fourth*, and finally, though already strong, the evidence of Mr. Gogolack's dangerousness, risk of flight, and risk of obstructing justice has significantly strengthened since the initial detention hearing. Indeed, a grand jury found probable cause to determine that he conspired to kill a federal witness and distributed the fentanyl resulting in her death. Reopening the detention hearing would only permit Mr. Gogolack to expend valuable judicial resources and, contrary to Congressional design, impermissibly wield the proceeding "as a discovery tool." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). Accordingly, this Court should deny Mr. Gogolack's motion.

### 1. The Lab Report Has No Material Bearing on the Court's Initial Detention Decision

At the outset, the motion to reopen fails because the Lab Report was not "consequential to [this Court's] earlier detention decision"—nor could it be. *Zhang*, 55 F.4th at 148. The Court premised its detention determination on the finding that Mr. Gogolack "ha[d] not rebutted the [statutory] presumption[s]" of dangerousness to the community and flight. Det. Hr'g Tran. at 50. And, to the extent the Court considered the evidence of Mr. Gogolack's dangerousness, risk of flight, and risk of obstructing justice, it cabined its analysis to the drug and firearms offenses charged. The Lab Report is wholly inapposite to both components of the Court's decision: it does not—and cannot—help Mr. Gogolack carry his limited burden rebutting the statutory presumptions and supports—not refutes—the then-uncharged criminal conduct the Court excluded from its "focus." Det. Hr'g Tran. at 37 ("I think my focus will be on what has been charged which in and of itself seems to me to be very troublesome.") (Statement of the Court).

Though Mr. Gogolack might have it otherwise, the Second Circuit's decision in *Zhang* illustrates the controlling principle that a court's "prior detention determination is a natural reference point against which to measure the materiality of new information for the purpose of reopening the hearing."  55 F. 4th at 148.  There, the defendant was indicted for participating in a successful murder-for-hire scheme.  55 F. 4th at 144.  During the detention hearing, the district court considered the § 3142(g) factors, "including the government's proffer of strong evidence that [the defendant] committed the charged capital offense."  *Id.*  Noting the current moratorium on federal executions, however, the district court "assumed . . . that the government would not seek the death penalty."  *Id.*; *see id.* at 145 ("[T]he court noted its understanding that, as matter of policy, 'this Justice Department was not pursuing the death penalty in any case,' and stated its belief that appointing the additional counsel required for a death penalty case would therefore be 'wasting the court's time and taxpayers' money.'").

After the government confirmed the district court's assumptions, the defendant moved to reopen his detention hearing, arguing that the "government's formal decision not to seek the death penalty was information that was both new and material to the question of whether he should be released or detained."  *Id.* at 144.  Both the district court and the Second Circuit rejected that argument.  "As the district court made clear, it declined to reopen the detention hearing because the Attorney General's decision was not material" to the issue of the defendant's detention.  *Id.* at 148.  The Second Circuit further observed that, in anticipating that the Department of Justice would decline to seek the death penalty, the district court had not considered the availability of capital punishment at all during its initial detention decision.  *See id.* at 148.  For that reason, the Attorney General's decision could not be "consequential to [the

court's] earlier detention decision" and the district court did not err in denying the defendant's motion to reopen.  *Id.*

Mr. Gogolack's motion simultaneously runs headlong into this binding precedent and ignores this Court's prior holdings.  Specifically, Mr. Gogolack entirely overlooks the "natural" and logical starting point for any motion to reopen: the Court's conclusion that he failed to rebut the statutory presumptions, its determination of his dangerousness, and its common-sense acknowledgment that a drug-addicted individual possessing multiple identification documents belonging to other persons and facing a significant term of incarceration is a flight risk.  *Id.* at 148.  As a result, Mr. Gogolack fails to explain how, if at all, the Lab Report helps him rebut the statutory presumption; how, if at all, it mitigates the danger he poses to the community; and how, if at all, it lessens his likelihood of flight.  *Cf. United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991) (noting that, in a presumption cases, detention hearings may be reopened upon a showing of new and material information that "is relevant to the rebuttable presumption").  The Court should deny Mr. Gogolack's motion on this basis alone.

But there is more.  Mr. Gogolack seems to labor under the misapprehension that the then-uncharged kidnapping offenses for which he is now indicted factored into this Court's detention decision.  Indeed, the Lab Report's most obvious relevance is that it further substantiates the then-uncharged kidnapping conduct proffered by the government during the initial detention hearing.  *See* Det. Hr'g Tran. at 34 (proffering that the "same shotgun" featured in some of the government's proffer photos was used "to hold a drug user against his will in the defendant's basement for upwards of three hours, that he struck that person with the spikes on the front of that shotgun"); *id.* (proffering that both of the individuals held in Mr. Gogolack's basement "corroborate each other and describe the defendant who[] wrapped himself in plastic from head

to toe"); *id.* at 35 (proffering that photographic evidence "from the defendant's basement show plastic [] drop cloth, . . . and a white plastic chair," which was "exactly what was described by" the kidnapping victim).

Mr. Gogolack's position is irreconcilable with the Court's explicit ruling that it was "confin[ing]" itself "to the proffer relative to what's been charged." Det. Hr'g Tran. at 50. And the government's proffer just to the charged conduct, as well as the exhibited evidence, "strongly suggest[ed] that [Mr. Gogolack] was dealing in both drugs and firearms"; "made [some effort] to conceal his involvement in the dealing"; and could not be placed "in a treatment facility" without sacrificing "society's best interest". *Id.* Thus, because the government's proffer as to the then-uncharged kidnapping offenses was never material to the Court's detention determination on the frontend, the Lab Report corroborating the government's proffer is not material "for the purpose of reopening the hearing—that is, revisiting [the] earlier decision" on the backend. *Zhang*, 55 F. 4th at 148. Accordingly, the motion to reopen lacks a material basis to cause this Court to reconsider its earlier detention determination and should be denied.

## 2. The Lab Report Cannot Be Used to Reopen the Detention Hearing Where it Does Not Show that Mr. Gogolack is Less Likely to Flee, Pose a Danger to the Community, or Obstruct Justice

Even if the Court had considered evidence related to Mr. Gogolack's uncharged conduct, the Lab Report would not do him any good because it does not constitute the kind of information "that would increase the likelihood that [he] will appear at trial and would show that [ ] [he] is less likely to pose a danger to the community." *Watson*, 475 F. App'x at 600; *see Havens*, 487 F. Supp. 2d at 339 (McCarthy, J.) (declining to reopen a detention hearing based upon newly discovered information that had no material bearing on whether pretrial detention was warranted).

Effectively applying this standard, this Court, in *United States v. Havens*, denied a defendant's motion to reopen after the government filed a letter correcting erroneous information it had proffered.  487 F. Supp. 2d at 339.  Specifically, the government proffered that the defendant "was personally involved in the production of child pornography," a serious offense by any measure.  *Id.*  In its corrective letter, however, the government advised that the "defendant did not himself produce pornographic images of children, but instead merely copied pre-existing images."  *Id.* (internal quotations omitted).  Notwithstanding this new information, the Court denied the defendant's request to reopen his detention hearing.  *See id.*  In the Court's view, "[t]he possibility that [the] defendant produced child pornography was but one of several factors which led [it] to conclude that pretrial detention was warranted, and its absence from the equation would not change [the court's] mind."  *Id.*   In other words, that the defendant "merely", *id.*, copied existing images of exploited children did not show that he was materially "less likely to pose a danger to the community," especially when viewed against the other "factors" the Court relied on in ordering him detained.  *Watson*, 475 F. App'x at 600.

That logic applies with even greater force here.  Just as copying child pornography did not materially lessen the *Havens* defendant's danger to the community, the Lab Report does not mitigate either Mr. Gogolack's danger to the community, risk of flight, or risk of obstructing justice.  *See Watson*, 475 F. App'x at 600.  To the contrary, because it corroborates victim accounts that Mr. Gogolack assaulted an individual in his basement with his shotgun, causing him to bleed, it strengthens the basis for his continued detention.

As noted, during Mr. Gogolack's detention hearing, the government proffered that Mr. Gogolack "struck [a victim] with the spikes on the front of [a] shotgun."  Det. Hr'g Tran. at 34.  The Lab Report, in turn, reflects that swabs of surfaces from within Mr. Gogolack's basement

tested presumptively positive for blood on the top of a wall, the middle of a wall, the bottom of a wall, the top of a wall behind the stairs, and a support beam. *See id.*, Ex. A, at 4. Moreover, the swabs presumptively tested positive for blood on a chair. *Id.*

Consistent with this, the government proffered at Mr. Gogolack's detention hearing that his victim reported that Mr. Gogolack "brought him down into the basement where the defendant had set-up plastic from floor to ceiling . . . and a white chair and that he then shoved the person into the chair, struck the person with the shotgun and held the person against their will." Det H'rg Tran. at 35. Accordingly, the presumptively positive finding of blood on the walls, chair, and a support beam significantly corroborate both victims' accounts, even if it does not conclusively prove that the blood found belongs to one of the victims.

By that measure, the Lab Report does not contain information "that would increase the likelihood that [Mr. Gogolack] will appear at trial and would show that [ ] [he] is less likely to pose a danger to the community," *Watson*, 475 F. App'x at 600, let alone a "truly changed circumstance[]" that could merit reopening his detention hearing, *Quinones*, 2016 WL 1694998, at *1. *See United States v. Belmar*, No. 21 CR. 16 (KMW), 2021 WL 5911123, at *2 (S.D.N.Y. Dec. 11, 2021) ("Instead, the movant must present new information that bears on truly changed circumstances, something unexpected, a significant event, or the like." (internal quotations omitted)); *United States v. Bobbitt*, No. 09-CR-331A, 2013 WL 3049167, at *3 (W.D.N.Y. June 17, 2013) (same); *United States v. Speed*, No. 09-CR-329A, 2013 WL 1221479, at *3 (W.D.N.Y. Mar. 25, 2013), aff'd, No. 09-CR-329, 2013 WL 6531950 (W.D.N.Y. Dec. 12, 2013) (same); *United States v. Rodriguez*, No. 09-CR-331A, 2012 WL 6690197, at *8 (W.D.N.Y. Dec. 21, 2012) (same). Accordingly, for this reason as well, the motion should be denied.

### 3.  The Government's Proffer Regarding Mr. Gogolack's Co-Defendant is Irrelevant

The Court should further reject Mr. Gogolack's arguments insofar as they concern the government's proffer during co-defendant Cortnie Barber's detention hearing.  Insofar as the government can tell, Mr. Gogolack notes—with sometimes specious insinuation—that the government did not provide its proffered laboratory report to Ms. Barber prior to the detention hearing.  Not only is this complaint inapposite to the question before the Court, but it finds no audience in the Second Circuit caselaw governing detention hearings.

On that score, it is well-settled that the government may support its motion for pre-trial detention with a proffer, and that it need not submit direct proof to establish that the defendant is a flight risk, danger to the community, or at risk of obstructing justice.  *See Martir*, 782 F.2d at 1145 ("Of course, a detention hearing is not to serve as a mini-trial, as discussed above, or as a discovery tool for the defendant.  Accordingly, a government proffer need not always spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." (internal citations omitted)).  Undeterred, Mr. Gogolack invokes *United States v. LaFontaine*, for the dubious proposition that the government must, at the detention hearing, "produce 'sufficient evidentiary support' for its proffer."  Mot. to Reopen at 4 ¶ 16 (quoting 210 F.3d 125, 132 (2d Cir. 2000)).

*LaFontaine* makes no such claims.  Rather, *LaFontaine* instructs that "the question [in a detention hearing] . . . is whether the government has produced sufficient evidentiary support for its *motion*" to detain the defendant.  210 F.3d at 132 (emphasis added).  And the proffer, as the Second Circuit advised in no uncertain terms, is an "acceptable method of proof" to carry that burden.  *Id.*  To embrace Mr. Gogolack's mistaken reading—that the government must present direct evidence at the detention hearing in support of its proffer—would turn *LaFontaine*

on its head, as the proffer alone cannot, on the one hand, be an "acceptable method of proof", *id.*, and, on the other hand, require evidentiary supplementation for the government to carry its burden of production. *See id.* (holding that the district court did not abuse its discretion "in accepting the government's proffer").

At bottom, Mr. Gogolack's argument is that the government's failure to produce the Lab Report to *Ms. Barber* entitles *him* to a new detention hearing. That inexplicable suggestion is unmoored from law, logic, or fact, and advances little more than *ipse dixit*. The facts are that the Lab Report (1) did not exist at the time of Mr. Gogolack's initial detention hearing; (2) Mr. Gogolack has possessed the Lab Report since December 2023; and (3) the Lab Report corroborates the victims whom Mr. Gogolack is alleged to have kidnapped. Ms. Barber's detention hearing has no bearing whatsoever on these truths and is no basis to reopen Mr. Gogolack's detention hearing.

### 4. The Case for Mr. Gogolack's Continued Detention Has Only Strengthened

Even if the Lab Report is material, this Court should nevertheless exercise its discretion against re-opening the detention hearing. *See Zhang*, 55 F.4th at 148 ("The [Bail Reform] Act . . . leaves the decision to reopen a hearing to the sound discretion of the district court. Accordingly, even if Zhang's arguments were otherwise correct, the district court could still decide, in its discretion, not to reopen the detention hearing." (internal citations omitted)). That is principally because the evidence the government has already proffered—and exhibited through its PowerPoint presentation—conclusively establishes that Mr. Gogolack is a flight risk, a danger to the community, and a serious risk of obstructing justice. However, should the Court be inclined to re-open the hearing, the government will proffer the following evidence:

1. Mr. Gogolack's statements from intercepted jail calls, including statements expressing his: (i) desire to kill other individuals, *see supra*; (ii) plans to flee the jurisdiction; (iii) efforts to traffic narcotics from prison; and (iv) attempts to obstruct justice and tamper with witnesses; and

2. Additional evidence corroborating accounts provided by Mr. Gogolack's kidnapping victims, including a second laboratory report, that offers some support for a finding that a victim's DNA was discovered on a wallet in Mr. Gogolack's basement; and a recently identified text message sent from Mr. Gogolack to a co-defendant in this case that alludes to the kidnapping.

Though the government does not believe that Mr. Gogolack is entitled to a new detention hearing, the evidence the government would proffer erases any doubt that he is a flight risk, a profound danger to the community, and a serious risk of obstructing justice.

## V.    CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny Mr. Gogolack's Motion to Reopen the Detention Hearing (ECF No. 55).


DATED:  Buffalo, New York, February 6, 2024.


TRINI E. ROSS
United States Attorney


BY:    s/ CASEY L. CHALBECK
       s/ JOSEPH M. TRIPI
       s/ NICHOLAS T. COOPER
       Assistant United States Attorneys
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       (716) 843-5881
       Casey.Chalbeck@usdoj.gov