1                 **UNITED STATES DISTRICT COURT**
                  **WESTERN DISTRICT OF NEW YORK**
2

3   UNITED STATES OF AMERICA,        )
                                     ) Case No. 1:23-CR-00099-4
4                                    )              (LJV)(JJM)
                     Plaintiff,      )
5                                    )
    vs.                              ) January 10th, 2024
6                                    )
    MICHAEL RONCONE,                 )
7                                    )
                     Defendant.      )
8
                    **TRANSCRIPT OF DETENTION HEARING**
9          **BEFORE THE HONORABLE JEREMIAH J. MCCARTHY**
                  **UNITED STATES MAGISTRATE JUDGE**
10

11  <u>APPEARANCES</u>:

12  For the Plaintiff:    TRINI E. ROSS
                          UNITED STATES ATTORNEY
13                        BY:  CASEY CHALBECK, ESQ.
                               NICHOLAS COOPER, ESQ.
14                        ASSISTANT UNITED STATES ATTORNEYS
                          138 Delaware Avenue
15                        Buffalo, NY 14202

16  For the Defendant:    LAW OFFICE OF PAUL G. DELL
                          BY:  PAUL G. DELL, ESQ.
17                        70 Niagara Street
                          Buffalo, NY 14202
18
    Audio Recorder:       ERIC GLYNN
19
    Other witness:        JOHN RONCONE, Father of Defendant
20
    Transcriber:          MEGAN E. PELKA, RPR
21                        Robert H. Jackson US Courthouse
                          2 Niagara Square
22                        Buffalo, NY 14202
                          (716) 229-0880
23
             Proceedings recorded with electronic sound recording,
24  transcript prepared with computer-aided transcription.

25

 1          THE CLERK:  On the record in criminal proceeding

 2    23-CR-99, United States v. Michael Roncone, for a detention

 3    hearing.  Present in the courtroom are Assistant US Attorneys

 4    Casey Chalbeck and Nicholas Cooper, Defendant Mr. Roncone with

 5    Attorney Paul Dell.  United States Probation Officer Brian

 6    Mamizuka.  The Honorable Jeremiah J. McCarthy presiding.

 7          THE COURT:  Good afternoon again, everyone.  Counsel,

 8    have you both received or have you all received the updated

 9    Pretrial Services report dated today's date?

10          MR. DELL:  Yes, Your Honor.

11          MS. CHALBECK:  Yes, Your Honor.

12          THE COURT:  Okay.  Now, just, in the interest of

13    proceeding, not reinventing the wheel, I recognize we do have

14    new charges.  But, Mr. Cooper, I appreciate your providing me

15    with the transcript of the argument before Judge Wolford on

16    December 21st of last year.  That was an unofficial

17    transcript, but close enough, I think.

18          MR. COOPER:  That's correct, Judge, and I included

19    Mr. Dell on the email.  He was present for the argument,

20    obviously.  And then, we gave the Court all the exhibits that

21    were in front of Judge Wolford.

22          THE COURT:  Yes.  Yes.  Right.  So, I have reviewed

23    that transcript.  I also reviewed the transcript of the

24    detention hearing before Judge Schroeder.  So, as I see

25    things, and I am open to somebody telling me differently, but

1   the difference between then and now is, essentially, that we

2   now have an indictment, which adds the conspiracy charge,

3   Count 1, but the other two charges are similar to what he was

4   charged with at the complaint stage.

5          MS. CHALBECK:  That's correct, Your Honor.  One of

6   the changes is that there has been an indictment.  That

7   indictment does charge an obstruction of justice conspiracy.

8          THE COURT:  Right.

9          MS. CHALBECK:  But, in addition to just that charge

10  from the indictment, we also have more specific evidence,

11  evidence that we were not necessarily able to proffer to Chief

12  Judge Wolford in the last proceeding, that stems from a search

13  of Mr. Roncone's phone.

14      And so, that evidence, coupled with the charge -- and

15  then, I would submit additional evidence regarding the

16  specific transaction of calls or nature of calls between

17  Mr. Roncone and other individuals pertinent to this

18  investigation would be the new and arguably material

19  information that we think justifies reopening the detention

20  hearing.

21         THE COURT:  Okay.  But just -- I understand, and

22  you'll have that right, but I just want to focus our

23  presentation today on the new evidence.  Because, in front of

24  Judge Wolford, and I believe in front of Judge Schroeder, at

25  least in front of Judge Wolford, there was considerable

1  argument by the Government about the alleged murder and his

2  involvement in that.  So, she considered that.

3      Now, if you're telling me you have new evidence, you know,

4  that can be part of your proffer, and we'll take it from

5  there.  What I didn't want is a presentation to me as though

6  we're starting from scratch.

7          MS. CHALBECK:  Absolutely, Your Honor.  And one of

8  the goals behind giving the transcript and also the exhibits

9  is just so that you would be -- the Court would be informed of

10 the prior proceeding.

11         THE COURT:  And I appreciate that.

12         MS. CHALBECK:  And that we wouldn't have to go

13 through extensive proceedings in this round.

14         THE COURT:  Right.

15         MR. DELL:  And, Judge, I would also just like to note

16 that much of the hearing in front of Judge Wolford was about

17 his speculation of Mr. Roncone's involvement in the death of

18 Crystal Quinn.  I would note that he wasn't even charged with

19 that in this indictment.  It charges obstruction of justice.

20 There's no allegation that he was involved in her death at all

21 in the indictment.

22         THE COURT:  Okay.  Well, yeah.  We'll take that up, I

23 guess.  And, counsel, you can present from counsel table or

24 from the podium, whichever you prefer.

25         MS. CHALBECK:  May I use the podium?

1          THE COURT:  Sure.

2          MS. CHALBECK:  So, Your Honor, I want to set the

3   table a little bit with respect to the proceeding before

4   Chief Judge Wolford.

5      In pages 82 through 84 of the draft transcript, and

6   understanding for the record that this is not the official

7   transcript, Chief Judge Wolford honed her analysis on

8   Mr. Roncone's risk of flight and his danger to the community.

9   But, of course, the government here, in moving to reopen the

10  detention hearing, also is -- one of the bases for detention

11  the government is alleging is that he presents a serious risk

12  that he will obstruct justice if released on conditions.

13      I believe that that is a basis that was alleged in the

14  prior detention hearing.  However, Chief Judge Wolford

15  believed that, because the conduct going to obstruction was

16  uncharged, the conduct that is now charged in the indictment,

17  that she was only going to consider risk of flight and danger

18  to the community.  And those specific comments are on page 82

19  of the draft transcript.  So, I kind of just want to set the

20  table here for you --

21          THE COURT:  Well, I don't -- I mean, as I read it, I

22  thought she had some concerns about danger.  She -- at the

23  bottom of page 82, for example, she said the most troubling

24  aspect about it is the death of Ms. -- and, in my transcript,

25  there's a lot of abbreviations that -- but we know who we're

1   talking about.  She was somewhat troubled by that, but she

2   also imposed conditions, and I think Judge Schroeder did.  But

3   at least she did say, for example, that he can have no

4   affiliation with the motorcycle club, any motorcycle club.  He

5   can't have any contact with any other defendant.

6       And all of this is secured by significant amounts of

7   money, as I see it; the posting of the father's property in

8   the amount of $100,000, and then, on top of that, another

9   $100,000 cash.  So, I didn't view this as solely a risk of

10  flight analysis.

11          MS. CHALBECK:  That's correct, Your Honor.  And I'm

12  sorry.  I thought I had mentioned that she also focused on

13  risk of danger to the community.

14          THE COURT:  Right.

15          MS. CHALBECK:  But my point in setting the table that

16  way was to tee up this point, which is that, Chief Judge

17  Wolford did not consider the serious risk of obstruction of

18  justice, which is a basis for the conclusion, that the

19  government certainly is moving for today.

20          THE COURT:  Okay.

21          MS. CHALBECK:  And the reason why she -- as I

22  understand it from the transcript, that she did not give much

23  weight to evidence going to obstruction was because she

24  thought that doing so would be a misapplication of the Bail

25  Reform Act.  And those comments are detailed, I think, on

1  pages --

2          THE COURT:  Yeah.  She said a couple times turning it

3  on its head or something to that effect.  By the way, were you

4  at that argument or Mr. Cooper argued that?  Were you there as

5  well or no?

6          MS. CHALBECK:  I was not there, Your Honor.

7          THE COURT:  Okay.  Okay.

8          MS. CHALBECK:  And so, the problem -- just assuming

9  arguendo that it is a problem, the problem that Chief Judge

10  Wolford identified in that last detention hearing doesn't

11  exist anymore because the obstruction offense is now charged

12  in the second superseding indictment.  So, I just kind of

13  wanted to get that teed up and the legal framework established

14  for Your Honor's consideration.

15          THE COURT:  Okay.

16          MS. CHALBECK:  There are two -- three dates, really,

17  that I want to focus this presentation on; August 2nd and

18  August 3rd and then, October 24th.  One of Mr. Roncone's co-

19  defendants, Frank Knight, late into the evening on August 2nd,

20  reached out to Mr. Roncone and indicated to him that he wanted

21  to speak on the phone.  This was through a text message.

22     He says to Mr. Roncone -- he indicates that something

23  happened in Wellsville.  He says, quote, a lot at first, but

24  nothing major.  That's something that he says after a woman

25  died across the street from his house.  And then, quote, give

1    me a call when you can if you have a free minute.  Phone

2    records then show that Mr. Roncone and Mr. Knight had a phone

3    call.  Now, I want to move to August 3rd.  August 3rd --

4              THE COURT:  August 3rd?

5              MS. CHALBECK:  Yes.  So that --

6              THE COURT:  So, the first day was August 2nd?

7              MS. CHALBECK:  The first day is August 2nd.

8              THE COURT:  Right.

9              MS. CHALBECK:  That exchange that I just proffered

10   about occurred late into the evening on August 2nd.

11             THE COURT:  All right.

12             MS. CHALBECK:  Now, I want to move to August 3rd.

13   August 3rd is an important day because the FBI goes to

14   Wellsville and interviews a number of individuals, including

15   Frank Knight.  After that interview, Mr. Knight called

16   Mr. Roncone at approximately 4:30 p.m.  That's a 14-minute

17   phone call.  And the times are important.  I'll get to why.

18       Within minutes of that call's conclusion, Mr. Roncone

19   called an individual.  I am not going to proffer this

20   individual's name.  He called an individual who, at minimum,

21   is associated with multiple members of the Rare Breed

22   Motorcycle Club.

23       At 5:18, so we're still within an hour from when

24   Mr. Knight called Mr. Roncone, Mr. Roncone called a number

25   that law enforcement believes, based off of database

1   inquiries, is associated with an identified RBMC member.

2       So, just so that the record is clear, and so everyone

3   understands kind of the timeline, Mr. Knight is interviewed by

4   the FBI.  What happens in an interview?  In the FBI asks

5   someone questions, they give answers.  Those questions, of

6   course, are important to understanding what the FBI might be

7   thinking about.  And, as I think Mr. Cooper proffered

8   previously, some of those questions, most of them, involve the

9   death of this federal witness, Crystal Quinn.  It's why the

10  FBI was there.

11      So, that interview occurs.  Mr. Knight then calls

12  Mr. Roncone.  As alleged in the indictment, he also goes to

13  Howard Hinkle's home to have an in-person conversation with

14  him.  Then, Mr. Roncone calls someone associated with the RBMC

15  or with members of RBMC.  And just so that the record is

16  clear, RBMC refers to the Rare Breed Motorcycle Club.

17      And then, after that call, he calls an identified member

18  of the Rare Breed Motorcycle Club.  That first call, based on

19  the call details records, it does not appear that that call

20  was answered.  So, then, Mr. Roncone called another

21  individual.  The name of that individual is -- that individual

22  has the same last name as the identified RBMC member that

23  Mr. Roncone had, just moments earlier, attempted to call.

24      So, Your Honor can infer that that's the same person as he

25  had previously attempted to call.  And they have a call that

1  lasts about 12 minutes.  So, recall that the conversation,

2  initial conversation with Mr. Knight and Mr. Roncone, lasted

3  14 minutes.  Then, we have a 12-minute conversation, roughly

4  the same amount of time.

5      Then, at 5:43 p.m., so we're now out, like, an hour and 15

6  minutes after that night call, Mr. Roncone called his father.

7  His father, as Your Honor knows, is a member of the RBMC.  He

8  is believed to be the Buffalo Chapter president of the RBMC;

9  certainly, has leadership in that organization.  After that

10 call, Mr. Roncone calls a number associated with another

11 identified member of the RBMC.

12     At 6:03 p.m., Mr. Roncone sends a text message to Frank

13 Knight.  And that text message is important.

14          THE COURT:  Is this in the folder that --

15          MS. CHALBECK:  It is, Your Honor, and I provided

16 Mr. Dell a copy of this exhibit.

17     Mr. Roncone sent a text message to Mr. Knight

18 screenshotting Crystal Quinn's social media profile and asking

19 him, is this the girl?  This is Government Exhibit Number 1,

20 labelled January 10th, 2024.  Just going to show you this

21 exhibit, and I want to assume that something (inaudible) a

22 screenshot.  What's the time there?  It's 5:45.

23     So, 5:43, Mr. Roncone calls his father.  At 5:45, he's

24 looking at Crystal Quinn's social media, screenshots it 6:03.

25 He sends it to Frank Knight.  And just so that the record is

1    clear about these timelines, submitting into evidence

2    Government Exhibit 2 that's labelled January 10th, 2024, you

3    can see here there is a number identified as belonging to

4    Mr. Roncone.  The contact is labelled, Cone Money.  That

5    refers to Mr. Roncone.

6        The time stamp is 6:03 p.m., and it includes Frank Knight

7    was calling and texting that looks here from the cell phone

8    extraction it has been filed.  But we know from further

9    investigation into the phones that that is the screenshot that

10   Mr. Roncone sent to Mr. Knight.  How does Mr. Knight respond?

11   He says, yes, that's the girl.

12           THE COURT:  Wait, wait, wait.  Where does he -- is

13   this on Exhibit 2?

14           MS. CHALBECK:  It is on Exhibit 2, Your Honor.  It is

15   at the very bottom.

16           THE COURT:  Okay.  Okay.  So, Mr. Roncone is texting

17   Mr. Knight with an attached picture of Crystal Quinn and he

18   says, is this the girl?  And then, Mr. Knight responds, yes.

19           MS. CHALBECK:  That's correct, Your Honor.

20           THE COURT:  Correct?  Okay.

21           MS. CHALBECK:  Or at least that is what the phone

22   evidence shows.  That is what law enforcement believes to be

23   correct.

24           THE COURT:  Okay.

25           MS. CHALBECK:  Then, at 6:11, it looks like

1    Mr. Roncone and Mr. Knight have a call.  They speak for

2    approximately two minutes.

3         Then, following this conversation, Mr. Roncone calls

4    another number associated with somebody identified as, like, a

5    family member.  Law enforcement, at this time, does not know

6    who specifically in the Roncone family that number belongs to.

7    However, I'll proffer before you today that multiple members

8    of Mr. Roncone's family are members of the Rare Breed

9    Motorcycle Club.  Following that call, which appeared to go

10   unanswered, at 7 p.m., a number associated with another RBMC

11   member, one of the ones that Mr. Roncone had spoken to

12   previously in this period, called him.

13        So, let's just look big picture.  Frank Knight and Michael

14   Roncone have a phone call.  That phone call lasted 14 minutes.

15   Within the next hour and a half or so -- excuse me -- between

16   like, the next two and a half hours, sorry about that, who

17   does Mr. Roncone call?  He calls multiple members of the RBMC.

18   And, as he's calling multiple members of the RBMC, within two

19   minutes after calling one particular member of the RBMC, his

20   father, he's going on Crystal Quinn's social media,

21   screenshotting it, texting it later to Frank Knight.  That's

22   August 3rd.

23             THE COURT:  That's, I'm sorry, what?

24             MS. CHALBECK:  And what's August 3rd.

25             THE COURT:  All right.  Okay.

1          MS. CHALBECK:  That conduct, that close nexus between

2    Frank Knight and Michael Roncone, when something occurs in the

3    investigation into Crystal Quinn's death continues.  So --

4    and, Your Honor, I mentioned three dates.  I'm going to add a

5    fourth date, August 8th.  August 8th is an important day in

6    the investigation because the FBI executes a federal search

7    warrant on the Gogolack residence.  The Gogolack residence is

8    across the street from the Knight residence.

9        That -- the execution of that search warrant occurs in the

10   early morning hours, roughly around 6 o'clock a.m.  And who

11   does Frank Knight text and otherwise tell phonically

12   communicate with?  Michael Roncone.  And we see that

13   throughout.  When there is a pertinent event occurring in this

14   investigation, Frank Knight generally is there.  And one of

15   the first people he consistently contacts is Michael Roncone.

16       Now, law enforcement has not done, at this point, a deep

17   dive into the contacts for each pertinent date.  Like -- which

18   is to say, after Frank Knight calls Michael Roncone, then who

19   does he call -- like, they've done for August 3rd?

20   August 3rd, I proffer to you, I think you could infer is a

21   microcosm of what we see, and we see it again on October 24th.

22       So, let's go to October 24th.  The FBI has two interviews

23   with Frank Knight the morning, and kind of extending into the

24   afternoon, of October 24th.  Just so that Your Honor kind of

25   understands, there was one interview.  The interview

1    concluded.  There was a small gap of time.  Then, the FBI re-

2    interviewed Frank Knight.  So, that's why there were two.

3        One of the principle pieces of information that law

4    enforcement did not have was then discovered through the

5    search -- had at the prior detention proceedings was then

6    discovered through the search of Mr. Roncone's phone.  We were

7    unable -- law enforcement was unable to get into that phone, I

8    believe, until last week, and that's when a lot of this

9    information came to light.

10       So, at 11:12 a.m., Mr. Roncone received a Facebook

11   Messenger audio call from Scott Knight.

12           THE COURT:  This is on October --

13           MS. CHALBECK:  This is October 24th.

14           THE COURT:  Okay.

15           MS. CHALBECK:  And, Your Honor, I should give some

16   background as to the relevance of October 24th.  On

17   October 24th, the FBI executed search warrants on Mr. Knight's

18   residence as well as it was a warrant to seize his cell phone;

19   and then, also on co-defendant Howard Hinkle's residence, also

20   to his seize his cell phone.

21       Mr. Hinkle and another individual were arrested that day

22   due to drug and firearm evidence that was discovered in the

23   course of executing the search warrant in plain view.  So,

24   Howard Hinkle is somebody who is alleged as participating in

25   the conspiracy counts, the conspiracy to tamper with, and to

 1  retaliate against Crystal Quinn.  And so, he is an important

 2  person.  And this is an important day in the investigation.

 3  So, that's the background to the FBI's two interviews with

 4  Frank Knight.

 5      At 11:12 a.m., Mr. Roncone received a Facebook Messenger

 6  audio call from Scott Knight.  Now, I just mentioned, Your

 7  Honor, that part of that warrant on Frank Knight's residence

 8  is cell phone.  So, the FBI has informed me that at or around

 9  11:12 a.m., that would be -- that would coincide with about

10  the end of that first interview.

11      And so, you could infer that, shortly after the conclusion

12  of that first interview, somebody associated with Frank

13  Knight, Scott Knight is his son, used his Facebook Messenger

14  to call Michael Roncone.  And that call lasts approximately

15  three minutes.

16      Now, that call could have occurred because Frank Knight no

17  longer had a phone.  It could have occurred because Frank

18  Knight knew that law enforcement was investigating him and

19  searching his phone and just took his cell phone, and his

20  using Facebook Messenger, which is a more surreptitious means

21  to communicate, to make contact.  And I think you could infer,

22  Your Honor, that the substance of that call related to the

23  FBI's interview with Mr. Knight.

24      So, soon thereafter, there is another Facebook call

25  between Roncone and Scott Knight.  It is at approximately

1    11:38 a.m.

2              THE COURT:  A.m.?

3              MS. CHALBECK:  A.m.  And there's more.  There's

4    another call at approximately 11:59, and that one lasts about

5    two minutes.  That could be the time or around the time where

6    the FBI realized it needed to re-interview Frank Knight.

7    Frank Knight catches wind of this and calls Mr. Roncone.

8         This is really important.  It's not something -- this next

9    call, it's not something that law enforcement knew until last

10   week, and it's not alleged in the indictment, because I

11   believe law enforcement was not aware of this until after the

12   Grand Jury returned the indictment on Friday evening.

13        At 3:10 p.m. on October 24th, there's a 14-minute call,

14   approximately 14-minute call, from Scott Knight to Michael

15   Roncone.  So, at -- that would coincide with about the

16   conclusion of the second interview.  And who does Mr. Roncone

17   call?  He calls co-defendant John Ermin, also known as

18   Tommy O.  That's, for the record --

19             THE COURT:  Roncone calls Ermin?

20             MS. CHALBECK:  Mr. Roncone calls John Ermin.

21             THE COURT:  After the call from Scott Knight?

22             MS. CHALBECK:  After the call from Scott Knight.

23             THE COURT:  Okay.

24             MS. CHALBECK:  This is before Frank Knight then

25   obtains a burner phone.  So, when law enforcement is reviewing

1    call detail records, those records don't show Facebook calls.

2    It's not a call that anyone knew existed until getting into

3    the phone itself.

4        And it's hugely important because it supports the

5    inference that Frank Knight called Michael Roncone, told him

6    about the second FBI interview, and then, when Mr. Roncone had

7    a more fulsome idea of what occurred, what transpired in

8    Wellsville on October 24th, which is a place of interest at

9    least in terms of this investigation only because of the nexus

10   to Crystal Quinn's death, Mr. Roncone calls John Ermin, the

11   national or international president of the Outlaws motorcycle

12   club, and somebody who, as Chief Judge Wolford acknowledged in

13   her order detaining him, had a motive to kill Crystal Quinn.

14       This is the obstructive conduct that Chief Judge Wolford

15   could not have considered in the last hearing, in part because

16   we didn't know it, but also, that would have been inconsistent

17   with her interpretation of the Bail Reform Act, and, in our

18   view, is really material to the issue of detention.

19       He actually calls John Ermin in two different numbers.

20   The first call doesn't seem that it goes through, so he

21   contacts his cousin, John Roncone, or someone law enforcement

22   believes to be his cousin, John Roncone, through Facebook, and

23   asks him what Tommy O's -- that's Mr. Ermin's nickname -- what

24   his number is.  He gets the number from John Roncone.  And

25   then, he calls Mr. Roncone at the second number shortly

1   thereafter.

2       Those are the three -- four dates that I think illustrate

3   and elucidate for this Court the obstructive conduct; the

4   obstructive conduct that the Grand Jury, at least in

5   considering some of the information, found merited Count 1 of

6   the second superseding indictment.

7       But I would say, Your Honor, that the obstructive conduct

8   that was charged in Count 1, and the dishonest conduct charged

9   elsewhere in the indictment, has only continued.  And to see

10  the basis of that, Your Honor need not look further than the

11  Pretrial Services report.  So, I would turn the Court's

12  attention to -- and this is the old report.  I have the new

13  report with me.  Just want to make sure the pages are the

14  same.  I would turn the Court's attention to page 3.

15          THE COURT:  Of today's report?

16          MS. CHALBECK:  Of today's report.

17          THE COURT:  Okay.

18          MS. CHALBECK:  Page 3 on the bottom left-hand corner,

19  under the section substance abuse.

20          THE COURT:  Wait a second.  Page 3.  Oh, I see it.

21  Okay.  It's more in the middle of the page, right?

22          MS. CHALBECK:  Yes.  I'm sorry, Your Honor.  I was --

23          THE COURT:  Okay.

24          MS. CHALBECK:  -- saying that page 3 is noted in the

25  bottom left-hand corner.  Under this -- in the middle of the

1    page, under the section substance abuse.

2            THE COURT:  Right.

3            MS. CHALBECK:  There is evidence that Mr. Roncone

4    reported to Probation that he consumed cocaine approximately

5    six months ago, and indicated that he only consumed said

6    substance socially a few times in his life.  The government

7    has since developed, not since receiving this report, but

8    since receiving initial information, that Mr. Roncone was

9    making statements about his casual cocaine use or his rare

10   cocaine use, that, in fact, and in truth, his cocaine use is

11   more recent and more frequent, and the government has obtained

12   that information from multiple sources.

13       And I would proffer to you today, Your Honor, that the

14   government developed information that, when Mr. Roncone

15   assumed a leadership role in the RBMC Wellsville Chapter

16   clubhouse, the amount of cocaine flowing through that

17   clubhouse increased dramatically.

18       And I guess that maybe some courts would say lying to

19   probation, it happens, but maybe it's not a big deal.  It

20   absolutely is a big deal.  It's actionable under 18 USC 1001

21   for false statement.  Other circuit courts have recognized

22   that and have also recognized that that in itself constitutes

23   obstructive conduct under 18 USC 1503.

24       So, throughout Mr. Roncone's involvement in this case,

25   there has been a pattern of obstruction.  It has continued

1  until he has faced charges in this court.

2      And finally, Your Honor, I would conclude by raising, I

3  would say, a very serious and troubling concern that the

4  government just recently learned of.  I think, as the Court

5  knows, there have been multiple search warrants executed in

6  this case.  And so, there has been a deluge of information.

7  But one of the things that the government has obtained is that

8  on October 24th, again, a pertinent date in this

9  investigation, Mr. Roncone sent an individual connected to

10  this investigation a Facebook Messenger friend request.

11          THE COURT:  I'm sorry, a Facebook message what?

12          MS. CHALBECK:  Excuse me.  A Facebook friend request.

13          THE COURT:  Okay.

14          MS. CHALBECK:  And Mr. Roncone has known this

15  individual for a long time, never had been friends on

16  Facebook.  In that message, rather the message sent by that

17  friend request, is unmistakable.  It's, I'm watching you.

18  That is an issue that has animated this case.  It goes to the

19  heart of this case from its inception.  It's why we're here;

20  witness intimidation, escalating into witness retaliation,

21  escalating into murder.  And knowing that the FBI was

22  investigating this person, Mr. Roncone made a decision to send

23  a Facebook friend request to give that unmistakable message.

24      And I think that when you consider conduct on August

25  3rd -- August 2nd and August 3rd, August 8th, and October

1   24th, including that Facebook friend request, as well as

2   Mr. Roncone's obstructive conduct to this Court in false

3   statements made to the probation office, there is not a

4   condition or combination of conditions that can ameliorate his

5   serious risk of obstructing justice.

6       I think Chief Judge Wolford even recognized that when

7   there was a back and forth between Chief Judge Wolford and

8   Mr. Cooper regarding Mr. Roncone's access to cell phones.  And

9   she acknowledged it's -- prohibiting him from accessing an

10  internet device is not a 100 percent guarantee.  And that

11  comment was made in the context of not considering all of the

12  evidence of obstruction of justice that the government has

13  proffered before Your Honor today.

14      And so, for those reasons, we would submit Mr. Roncone

15  should be detained.  There is no condition or combination of

16  conditions that can assuage, at least our concern, that he

17  will continue to obstruct justice if he remains out on

18  release.

19          THE COURT:  Okay.  Thank you.  Before I hear from

20  Mr. Dell, I just -- I have a question.  Count 1, the

21  conspiracy count with which he is charged, among others, at

22  page 10 of the second superseding indictment, paragraph 5AI --

23  excuse me.  I'm sorry.  Page 11, paragraph 5A roman numeral 4,

24  alleges that one of the acts of the conspiracy to obstruct

25  justice was causing the death of Crystal Quinn.  Do you see

 1    that?

 2            MS. CHALBECK:  Yes, Your Honor.

 3            THE COURT:  Is it your position that -- I know your

 4    investigation is still underway, but are you contending right

 5    now that Mr. Roncone himself was directly involved in her

 6    death?

 7            MS. CHALBECK:  May I consult with a colleague, Your

 8    Honor?

 9            THE COURT:  Yeah.

10            MS. CHALBECK:  Your Honor, today I'll note that he's

11    charged in the conspiracy, but we're not contending that he

12    took a specific action that caused Ms. Quinn's death.

13            THE COURT:  Okay.  All right.  Thank you.  Mr. Dell?

14            MR. DELL:  Thank you, Your Honor.  This is the first

15    I heard of any Facebook request.  I'm not really sure what

16    she's referring to.  I am not in possession of anything with

17    regard to that.

18        And with regard to the government looking at my client's

19    phones, the first time I spoke to him several weeks ago, one

20    of the first things I asked was whether he had a pass code.

21    And he said, I don't have a pass code, and they're welcome to

22    look in my phone.  There's nothing in there to connect me to

23    this.  So, I don't know why the government couldn't get into

24    his phone last week.  It's my understanding, through my

25    client, that there's no pass code or anything like that.

1      So, what we have here is the government looking at his

2  call logs, and looking at his Facebook messages.  But what we

3  don't have is the substance of any of these calls.  And I

4  would submit that it's all speculation and guesswork as to

5  what those calls were about.

6      And I would submit that it is not at all unusual for

7  friends to talk to each other about shocking events, such as

8  the death of Ms. Quinn across the street from Mr. Knight,

9  about the FBI talking to Mr. Knight.  I think it would be

10  unusual if friends didn't talk to each other about such

11  events.  And it is pure just guesswork to infer that that

12  means that Mr. Roncone is obstructing justice in any way.  And

13  that's my response to the proffer.

14      Now, under the law, the Court knows Mr. Roncone must be

15  released unless he presents a risk of flight or danger.  He's

16  already released on conditions, As the Court indicated,

17  significant conditions.  I have never seen such severe

18  conditions in my cases.  One hundred thousand dollars equity

19  of his father's home, where they're both living right now, and

20  his father is in the courtroom along with his mother, and an

21  additional $100,000 cash.

22      His internet usage and communications are limited and

23  monitored.  And he's not allowed to have a cell phone.  And

24  he's not allowed to talk to anybody involved in this case.

25  He's not even allowed to talk to anybody who is a member of a

1   motorcycle club.  He has a GPS ankle bracelet on monitoring

2   his location.  He's on home detention.  He needs Probation's

3   permission to leave his house.  For three weeks now --

4           THE COURT:  He is allowed to work; correct?

5           MR. DELL:  Yes.  Yes.  He's going to work.  For three

6   weeks now, according to Probation, he's been totally

7   compliant.  And these conditions, as you know, were set by the

8   Honorable Elizabeth Wolford after about four and a half hours

9   of hearing.  Almost all of it dealt with allegations contained

10  in the new indictment, and you just heard from the government

11  that there's no allegation that Mr. Roncone was involved or

12  caused Ms. Quinn's death.  I know you --

13          THE COURT:  Well, I think that, you know, in

14  fairness, what they're saying now, as I understand it, is they

15  don't have any direct evidence right now.

16          MR. DELL:  Right.

17          THE COURT:  They may in the future, they may not, but

18  I take -- that's where I leave things.

19          MR. DELL:  Oh.  My point was, this was fully covered

20  before the conditions of release were set.  He was told to go

21  to Probation yesterday and he went.  And he was held for the

22  arraignment yesterday afternoon, and then you released him

23  yesterday afternoon, and we thank you.  Notably, he came back

24  today on time.  He actually came back early knowing that he

25  might be locked up today.  So, he's not a flight risk.

1      And he does not have a history of violence.  He doesn't

2  have a criminal history.  There's no violence from him alleged

3  in the indictment.  He was not present at the poker game.  He

4  was not present at Gogolack's residence.  The case against

5  him, it's guilt by association and guesswork; guesswork about

6  the substance of phone calls with friends about shocking

7  events and these phone calls were found in his logs.

8      He's been released under very stringent conditions since

9  December 21st.  The conditions are clearly working.  He's 40

10  years old.  He's got no history.  He's a lifelong resident.

11  He's employed.  His family retained an attorney.  They posted

12  everything.  I am asking the Court to continue the conditions,

13  which are working.

14          MR. COOPER:  Judge, can we just respond really

15  briefly to one of the points?

16          THE COURT:  Yeah.

17          MR. COOPER:  With respect to the comment that friends

18  talk about shocking events, I think, first of all, what I

19  would point out for the Court is that it's an incredibly

20  generous view of the evidence here.  And I want to focus just

21  on that 10/24 date.

22      October the 24th, as Ms. Chalbeck spoke about, warrants

23  were executed at Knight's residence and Hinkle's residence.  I

24  think it's an important fact to know for the Court that those

25  were actually staggered in a way that the Hinkle search

1   warrant was executed early in the morning, and then later in

2   the morning, the Knight search warrant is executed.  So

3   they're not simultaneous.

4       At the time that the Hinkle search warrant is being

5   executed, Frank Knight is home.  And, at this point, he's had

6   no law enforcement contact that day.  He learns of the warrant

7   being executed at Hinkle's residence.  He communicates with

8   Hinkle's wife who is at the residence.  And then what does

9   Frank Knight do?  He screenshots his communications with the

10  wife and he sends them to this defendant, Mike Roncone.  So,

11  he's -- it's this conveyance of information tracking the FBI's

12  investigation from Knight to Roncone.

13      What I think is also a pertinent fact to consider is that

14  the evidence that the government has developed is that, at the

15  same time that that search warrant is being executed at the

16  Hinkle residence, that's the time that this friend request is

17  sent over Facebook.  So, it's like the FBI is going, they're

18  doing the search.  People are being arrested.  And this

19  defendant is sending Facebook friend requests to people that

20  are popping up in the FBI's investigation.  It should be clear

21  to the Court what's going on there.

22      And I think that, in the context of all the phone calls

23  and the kind of chains of communication that Ms. Chalbeck has

24  laid out, that the evidence the government has developed of

25  that Facebook friend request, it stands, I think, starkly for

1   what is going on there.  FBI shows up.  They're searching the

2   house.  People are being arrested.  And there's a clear

3   message being sent.  Frank Knight sends the communication,

4   hey.  Here's what's going on at Hinkle's residence.  And then,

5   this defendant kind of closes that loop sending the Facebook

6   friend request.

7       So, I -- friends talking about shocking events is one

8   thing.  But when you learn information from a person close to

9   a murder investigation and you convey it up to the national

10  president of the Outlaws, I think that that speaks

11  differently.

12      And, as Judge Wolford noted, and, as Ms. Chalbeck noted,

13  the person that he's conveying this information back to, John

14  Ermin, is a person who had an obvious motive to see Crystal

15  Quinn dead.  He's sending screenshots of Crystal Quinn's

16  social media.  These are things that were not lost on Judge

17  Wolford.  And I know Your Honor read the transcript, and so

18  you are familiar.

19      I think it would be a very generous view to say this was

20  friends talking about shocking events.  In fact, about two

21  weeks after that October 24th date, after these chains of

22  communication, the Rare Breed Motorcycle Club in Wellsville

23  suspends its Wellsville chapter, shuts it down.  And this

24  defendant becomes the vice president in Buffalo.  And that's

25  reflected in minutes that were seized from the Rare Breed

1  clubhouse in Buffalo on December 7th.

2      And so, the information is being used in a way to

3  obfuscate the investigation being conducted by law

4  enforcement.  It's not just friends talking about shocking

5  events.  That's all from the government.  Thank you, Judge.

6          THE COURT:  Okay.  Anything further, Mr. Dell, or no?

7          MR. DELL:  Just to add that it's also not necessarily

8  obstruction, either.  I mean, at this point, we're just

9  speculating and guessing.  And it is friends talking to

10  friends about shocking events, you know?  As far as what

11  they're talking about, none of that has been proffered.

12          MR. COOPER:  A Grand Jury disagreed with that.

13          THE COURT:  Well --

14          MS. CHALBECK:  May I make -- I'm sorry, Your Honor.

15  May I make --

16          THE COURT:  One final thing and then -- yeah.  Go

17  ahead.

18          MS. CHALBECK:  I just want to note that that is

19  somewhat belied by the text message Frank Knight made to

20  Mr. Roncone the evening of August 2nd.  Frank Knight says, and

21  I think law enforcement's view of this is that this is a coded

22  message, that nothing major happened.

23      So, it's a little inconsistent for Frank Knight to kind of

24  convey that nothing major has occurred; perhaps intimating

25  that a law enforcement investigation into Crystal Quinn's

 1  death is not pointing back to the RBMC or the Outlaws on the

 2  one hand and then, on the other hand, to argue that it is just

 3  friends talking about shocking major developments or events.

 4  That's all, Your Honor.

 5          THE COURT:  Okay.  Thank you.  As you all know,

 6  Mr. Roncone's legally presumed innocent of the charges at this

 7  time, but I do consider the weight of the evidence as I am

 8  obligated to do under the Bail Reform Act.  And I am also

 9  obligated to consider all the other factors under the Bail

10  Reform Act, including the fact that has he has no prior

11  criminal record.

12     He is under a series of very stringent conditions right

13  now.  He's currently charged now under three counts.  Counts

14  25 and 26 were not even discussed today, nor would I expect

15  them to be, because they're essentially the same charges as

16  were lodged in the complaint.

17     The difference between then and now is the conspiracy

18  count in Count 1.  He may have been involved in the

19  conspiracy.  The government is going to have to prove that.

20  I'm not saying he wasn't.  But one thing that, I think -- one

21  of my major concerns, and one of everyone's major concerns, is

22  who, if anyone, was involved in the death of Crystal Quinn?

23     And Government Exhibit 2, which is submitted today by the

24  government, I find interesting in that regard because,

25  according to the government's proffer, Mr. Knight called

1    Mr. Roncone on August 2nd and said a woman died.  And on

2    August 3rd, the next day, he sends -- Mr. Roncone sends

3    Mr. Knight a picture of Crystal Quinn and says, is this the

4    woman?  That suggests to me he didn't know who it was.

5         I am not determining guilt or innocence.  That will be up

6    to the jury.  I am only deciding whether the government has

7    shown by clear and convincing evidence that there's a danger

8    to the community or by a preponderance of the evidence that

9    there is a risk of flight.

10        Given that he is -- his release has been secured by

11   $100,000 cash, and by an additional $100,000 equity in his

12   father's home, that he's residing in his father's home, that

13   he can't do anything other than go to work, he can't have any

14   membership in any motorcycle organization, he can't have any

15   communication with any other co-defendant in this case, I

16   presume, other than through counsel for purposes of defense, I

17   don't find that those conditions, which have already been

18   imposed, are unsatisfactory to assure me -- reasonably assure

19   me.

20        Nobody is required to guarantee the Court under the Bail

21   Reform Act.  It's a -- reasonably assurance me that, if

22   released, he will not pose a risk of flight or danger to the

23   community.  I think his hands are sufficiently tied by the

24   conditions that have been imposed that he's got going to be

25   able to engage in any further obstruction of justice, if

1  indeed, he has in the past.  And I'm not saying he has or has

2  not, I don't know that.

3      But that's -- the Bail Reform Act requires the Court to

4  look forward, not to look at the past.  And, looking forward,

5  under the conditions that have been imposed, I am satisfied

6  that he can be continued to be released on those conditions.

7      One thing I need to address, though, because his father is

8  in the courtroom, and he is surety, and has posted his

9  property, now we have an indictment.  And I need to make sure

10  that his father is aware of the indictment and is still

11  willing to abide by the conditions previously imposed,

12  including the security that's been posted, Mr. Dell.

13      So, I am going to ask you if Mr. Roncone is willing to do

14  that, and I am going to ask him.

15          MR. DELL:  Yes, Your Honor.  You can certainly

16  address him.

17          THE COURT:  Can you step forward, sir?  Right up to

18  the podium, please.  State your name, please.

19          THE WITNESS:  John Roncone.

20          THE COURT:  And your relation to the defendant?

21          THE WITNESS:  I am his father.

22          THE COURT:  Okay.  And you were present at the prior

23  hearings involving the complaint lodged against your son;

24  correct?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  And you agreed to post your property to

2     the extent of $100,000 in equity as security; correct?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Where did the other $100,000 cash come

5     from?

6          THE WITNESS:  That came from my son.

7          THE COURT:  Okay.  Now, he is charged no longer in a

8     complaint, but in an indictment returned by a Grand Jury last

9     Friday.  And, in addition to the charges which were lodged

10    against him in the complaint, he's now also been charged in

11    Count 1 of the indictment with conspiracy to obstruct justice.

12    That's a significant addition to the charges that were

13    previously posted.

14       And, being aware of that, if you'd like to see the second

15    superseding indictment if you haven't seen it, or perhaps

16    Mr. Dell has known you, are you still willing to abide by the

17    previously-imposed conditions of release and post that

18    security and act as a custodian of him to advise Pretrial

19    Services and the Court if he violates any of his conditions of

20    release?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  You are?

23          THE WITNESS:  Yeah.

24          THE COURT:  Okay.  All right.  Then on those -- on

25    the continued conditions of release, I will release him again.

1      Now, Judge Wolford signed a release order in the

2   underlying case on December 21st.  Those conditions are

3   summarized in today's bail report.  Do we need to have a new

4   order of release?  I would think that the previously-imposed

5   order can continue in effect.

6           P.O. MAMIZUKA:  Judge, I did fill out a new order

7   yesterday.  I had Your Honor sign, as well as the defendant,

8   just stating that he was previously -- or that he was ordered

9   released on the previously imposed conditions.

10          THE COURT:  Okay.  Okay.  And, Mr. Roncone, you

11  executed a bond previously, so you are willing to stand by the

12  that bond; correct?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Okay.  Is there anything else I need to

15  address today, counsel?

16          MS. CHALBECK:  No, Your Honor.

17          MR. DELL:  No, Your Honor.

18          THE COURT:  All right.  Thank you.  Thank you, sir.

19          MR. COOPER:  Oh, Judge, maybe just the exclusion of

20  time.  Earlier --

21          THE COURT:  Yes.  Paul, I don't know if you were in

22  the courtroom.

23          MR. DELL:  No, I wasn't.  We would waive a

24  preliminary hearing.  I think we have had a more thorough --

25          THE COURT:  Well, you can't have a preliminary

1   hearing where there's been an indictment anyway.  But, no,

2   Speedy Trial Act -- I've set another proceeding for -- what

3   did I say, January 31st?

4           MS. CHALBECK:  January 31st, Your Honor.

5           THE COURT:  And that's to set a scheduling order

6   because some of the other counsel are -- the representation

7   situation hadn't been finalized.

8           MR. DELL:  You said January 31st?

9           THE COURT:  Yeah.  What time did we say, Eric?

10          THE CLERK:  Two p.m., Judge.

11          MR. DELL:  That's fine.

12          THE COURT:  And Mr. Roncone is entitled to be here if

13  he wants, or you can waive his appearance.  That's up to you.

14  All right.  So, time is excluded through the 31st as to the

15  co-defendants and, therefore, it's also excluded as to

16  Mr. Roncone.  Do you agree?

17          MR. DELL:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          MR. DELL:  Thank you.

20          THE COURT:  Thank you, all.

21          MS. CHALBECK:  Thank you, Your Honor.

22          MR. COOPER:  Thank you, Judge.

23  (Proceedings concluded.)

24

25

1                    <u>CERTIFICATE OF TRANSCRIBER</u>

2

3          In accordance with 28, USC, 753(b), I certify that

4    this is a true and correct record of the proceedings held in

5    the United States District Court for the Western District of

6    New York before Honorable Magistrate Judge Jeremiah J.

7    McCarthy, on January 10th, 2024.

8

9

10                              <u>s/ Megan E. Pelka, RPR </u>

11                              Megan E. Pelka, RPR

12                              Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25