IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

              v.                              23-CR-99-LJV

SIMON GOGOLACK, et al.,

              Defendants.

_____

## RESPONSE IN OPPOSITION TO DEFENDANT HINKLE'S MOTION TO REOPEN DETENTION HEARING

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, of counsel, hereby submits the following response in opposition to defendant Simon Gogolack's motion to reopen the detention hearing.  ECF No. 98, (dated Mar. 15, 2024).

### I.  INTRODUCTION

On February 2, 2024, the United States Court of Appeals for the Second Circuit denied defendant Howard Hinkle's motion for release pending trial and affirmed U.S. District Judge John L. Sinatra's detention order.  *See* Order at 1, *United States v. Hinkle*, Case No. 23-7823, (dated Feb. 2, 2024) ("Upon due consideration, it is hereby ORDERED that Hinkle's motion under docket number 23-7823 for release pending trial is DENIED and the district court's order entered November 3, 2023 is AFFIRMED.").  Without so much as even mentioning the Second Circuit's affirmance, Mr. Hinkle has once again moved for his release, this time citing that he is housed in the "trustee honor dorm" at the Chautauqua County jail.  Mot. for Release of the

Def. on Reasonable Conditions, at 4 ¶ 10.  This Court should deny Mr. Hinkle's motion, as the "new" information identified neither bears on his risk of flight or, more importantly, the danger he poses to the community.

## II.   Factual Background

### A.   The Complaint

On October 24, 2023, pursuant to a federal search warrant, the Federal Bureau of Investigation conducted a search of Mr. Hinkle's residence at 4290 Donovan Road in Alma, New York in connection with the death of Crystal Quinn.  Owing to the FBI's (well-founded) concerns that Mr. Hinkle would be armed and dangerous, an FBI SWAT team cleared Mr. Hinkle's residence.  Mr. Hinkle initially failed to follow the SWAT team's instructions and acted in a manner consistent with that of someone contemplating an armed standoff.  When Mr. Hinkle finally surrendered, the SWAT team discovered approximately 19 firearms—some of which were loaded—through his residence, in additional to a stockpile of ammunition, a large storage container of marijuana, and over 100 marijuana plants.

That same day, Mr. Hinkle was charged in a four-count Criminal Complaint. Specifically, Mr. Hinkle was charged with: (1) unlawfully possessing a firearm in violation of 18 U.S.C. § 922(g)(1); (2) maintaining a drug involved premises in violation of 21 U.S.C. § 856; (3) possession of marijuana with intent to distribute, and to distribute, 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii); and (4) possessing a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A).

### B.  Judge Sinatra's Detention Decision

Following a lengthy detention hearing, Judge Sinatra ordered Mr. Hinkle detained pending trial.  Judge Sinatra expressly considered, among other items of evidence, the following:

1. The "quantities of the plants and firearms" found in Mr. Hinkle's residence;

2. "[T]he SWAT team's effort to clear the residence" and the "difficult circumstances to clear the house," as well as "the danger that [Mr. Hinkle's] actions in sequence created";

3. "[T]he placement of [Mr. Hinkle's] weapons";

4. "[T]he firearms in conjunction with the marijuana sales and in conjunction with the growing of marijuana," both of which were in "conjunction with the felony" Mr. Hinkle had previously been convicted of;

5. Mr. Hinkle's "questionable employment situation;"

6. Mr. Hinkle's "mental health and substance abuse;" and

7. Mr. Hinkle's prior "threat to kill his wife and himself."

Det. Hr'g Tran. at 59–60 (attached as Exhibit A).

In view of the evidence proffered, Judge Sinatra found "by clear and convincing evidence that Mr. Hinkle's release would pose a danger to the safety of others in the community, and that no condition or combination of conditions will assure the safety of others or the community if Mr. Hinkle were released pending trial." *Id.* at 60–61.

**C. The Second Superseding Indictment**

On January 5, 2024, a Grand Jury sitting in the Western District of New York found probable cause to believe that Mr. Hinkle conspired with others to obstruct justice; conspired to tamper with a federal witness; and conspired to retaliate against a federal witness. *See* Sec. Super. Indict., at 1–34, ECF No. 24 (dated Jan. 5, 2024). In addition, the Grand Jury found probable cause to believe that Mr. Hinkle committed the four narcotics and firearms offenses outlined in his Complaint. *See id.* at 43–45.

### III.   LEGAL FRAMEWORK

Under the Bail Reform Act, a court has discretion to reopen a bail hearing if information

comes to light that is both new and material to the detention question.  *See United States v. Zhang*,

55 F.4th 141, 148 (2d Cir. 2022) ("As an initial matter, we emphasize that the Bail Reform Act

states only that a hearing 'may' be reopened if new and material information is presented.  The

Act therefore leaves the decision to reopen a hearing to the sound discretion of the district

court." (internal citations omitted)).  Specifically, a "hearing" "may be reopened" if:

> the judicial officer finds that information exists that was not known to
> the movant at the time of the hearing and that has a *material* bearing on
> the issue of whether there are conditions of release that will reasonably
> assure the *appearance of such person as required* and the safety of any other
> person and the community.

18 U.S.C. § 3142(f)(2)(B) (emphases added); *see United States v. Havens*, 487 F. Supp. 2d. 335,

339 (W.D.N.Y. 2007) (McCarthy, J.).  The statute thus proposes two necessary conditions—(1)

new evidence that is (2) material—a defendant (or the government) must satisfy prior to the

Court reopening a detention hearing.  *See United States v. Maxwell*, 527 F.Supp.3d 659, 663

(S.D.N.Y. 2021).

Relevant here is the "materiality inquiry," which does not unfold within a vacuum but,

rather, is tethered to "those facts that the court found consequential to its earlier detention

decision." *Zhang*, 55 F. 4th at 148.  Not only is the materiality inquiry cabined to the Court's

prior detention decision, but it excludes from consideration the "defendant's own evaluation of

his character or the strength of the case against him." *United States v. Quinones*, No. 13 CR 83S,

2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016) (emphasis added) (quoting *United States v.

Jerdine*, No. 08 CR 0481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009)).  Stated

otherwise, the materiality inquiry is satisfied not by a small, contested quantum of novel

information but "truly changed circumstances, something unexpected, or [ ] significant event[s]," *id.*, that "increase the likelihood that the defendant will appear at trial" or "show that the defendant is less likely to pose a danger to the community," *Watson*, 475 F. App'x at 600. *See also United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1 (6th Cir. May 21, 2020) (unpublished) ("Courts . . . requir[e] a showing of truly changed circumstances or a significant event.").

## IV.   ANALYSIS

This Court should deny Mr. Hinkle's motion because his membership in the trustee dorm does not "show that the defendant is less likely to pose a danger to the community," *Watson*, 475 F. App'x at 600. Stated otherwise, though Mr. Hinkle's "good behavior" in jail relates to his personal history and characteristics, it does not "relate in some *significant* or *essential* way to the decision" undergirding his detention—i.e., that Mr. Hinkle posed an unmitigable danger to the community. *United States v. Padilla*, No. CR 21-214 (JDB), 2023 WL 1964214, at *8 (D.D.C. Feb. 13, 2023) (quoting *United States v. Worrell*, No. 1:21-CR-00292-RCL, 2021 WL 2366934, at *8 (D.D.C. June 9, 2021) (emphases added)).

Put simply, that Mr. Hinkle has behaved well in jail does not mean that, in the absence of constant monitoring, he will cease to pose a danger to others. This is especially true given that a Grand Jury found that *outside* the confines of detention, Mr. Hinkle conspired with others to tamper with and retaliate against Crystal Quinn; unlawfully possessed firearms; and possessed a firearm in furtherance of drug trafficking, among other offenses. Because the Bail Reform Act is ultimately concerned on the safety risk the defendant poses to the public—as opposed to the prison community—other district courts have expressed doubt that a defendant's "good behavior" while incarcerated is sufficient to re-open a detention hearing. *See, e.g., United States*

*v. Griswold*, No. 19-00032-01-CR-W-DGK, 2022 WL 3587359, at *2 (W.D. Mo. Aug. 22, 2022) ("The Court finds the newly proffered information concerning an alleged mistake regarding the amount of PCP found on Defendant at the time of arrest and Defendant's "good behavior" while detained does not provide a sufficient basis to reopen the detention hearing.  Further, the newly proffered information has no material bearing on whether conditions exist that would reasonably assure the safety of the community or Defendant's appearance in Court.  Defendant is charged with serious offenses in the instant matter and faces a lengthy period of incarceration if convicted."); *United States v. Crandell*, No. 19-CR-255 (JNE/TNL), 2020 WL 1873047, at *2 (D. Minn. Apr. 15, 2020) ("Defendant also argues the fact that he now intends to plead guilty, combined with his good behavior while at the Sherburne County Jail, constitute changed circumstances that warrant his release under Section 3142(f)(2)(B). The Court disagrees. . . . Even if it did, his good behavior during the brief period in which he has been detained does not outweigh his extensive history of failing to appear for other court appearances. Defendant has therefore failed to meet his burden to justify reconsideration of his detention order under Section 3142(f)(2)(B)."); *Padilla*, No. CR 21-214 (JDB), 2023 WL 1964214, at *8 n.4 ("It is also worth noting that this circumstance is true for every defendant who exhibits good behavior in custody. Every defendant's family suffers in some way or another due to that defendant's incarceration. But the Court certainly cannot grant every such defendant pretrial release from custody.").

Moreover, Mr. Hinkle's risk of flight has increased dramatically in the wake of the Second Superseding Indictment.  Specifically, the lengthy prison sentence (life) Mr. Hinkle faces on the witness tampering and retaliation counts creates what the Second Circuit has recognized as a potent incentive to flee.  *See, e.g.*, *Zhang*, 55 F.4th at 150–51 ("Regarding the nature and circumstances of the offense charged, the district court observed that Congress has set a

mandatory minimum of life in prison for murder-for-hire, which creates an "extraordinary" risk of flight, particularly for a 34-year-old defendant such as Zhang. The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (unpublished) ("[E]ven if, as a practical matter, [the defendant's] maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); *United States v. Jackson*, 823 F.2d 4, 6–7 (2d Cir. 1987) (concluding that "indictment under which the defendant faces at least ten years of imprisonment" created risk of flight).

Considering the above, and in light of the Second Circuit's recent denial of Mr. Hinkle's release motion and Judge Sinatra's well-reasoned detention decision, this Court should conclude that Mr. Hinkle has failed to meet his burden to reconsider Judge Sinatra's detention order under § 3142(f).

## V.   CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny Mr. Hinkle's Motion for Release (ECF No. 98).


DATED:  Buffalo, New York, March 19, 2024.


                              TRINI E. ROSS
                              United States Attorney


                    BY:   s/ CASEY L. CHALBECK
                          s/ JOSEPH M. TRIPI
                          s/ NICHOLAS T. COOPER
                          Assistant United States Attorneys
                          United States Attorney's Office

Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov

Exhibit A

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


    UNITED STATES OF AMERICA,   *        Docket Number:
                                         1:23-MR-00469-JLS-1
                                *
                                *        Buffalo, New York
                  v.            *        November 3, 2023
                                *        3:03 p.m.
                                *
    HOWARD HINKLE, JR.,         *        ORAL ARGUMENT
                                *
              Defendant.        *
                                *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JOHN L. SINATRA, JR.
                    UNITED STATES DISTRICT JUDGE



   APPEARANCES:

   For the Government:          TRINI E. ROSS,
                                UNITED STATES ATTORNEY,
                                By CASEY L. CHALBECK, ESQ.,
                                   JOSEPH M. TRIPI, ESQ.,
                                   NICHOLAS COOPER, ESQ.,
                                Assistant United States Attorney,
                                Federal Centre,
                                138 Delaware Avenue,
                                Buffalo, New York  14202,
                                Appearing for the United States.



   For the Defendant:          FRANK M. BOGULSKI, ATTORNEY AT LAW,
                                By FRANK M. BOGULSKI, ESQ.,
                                286 Delaware Avenue,
                                Suite B,
                                Buffalo, New York  14202



   The Courtroom Deputy:       KIRSTIE L. HENRY
```

```
 1   The Court Reporter:          BONNIE S. WEBER, RPR,
                                  Notary Public,
 2                                Robert H. Jackson Courthouse,
                                  2 Niagara Square,
 3                                Buffalo, New York  14202,
                                  Bonnie_Weber@nywd.uscourts.gov.
 4


 5
                    Proceedings recorded by mechanical stenography,
 6                        transcript produced by computer.


 7


 8


 9                  (Proceedings commenced at 3:03 p.m.)


10


11          THE CLERK:  All rise.

12          The United States District Court for the Western

13   District of New York is now in session.  The Honorable John

14   Sinatra presiding.

15          THE COURT:  Please be seated.

16          THE CLERK:  United States versus Howard Hinkle, Jr.,

17   Case Number 23-MR-469.  We're here for oral argument.

18          Counsel, please state your appearances for the record.

19          MS. CHALBECK:  Casey Chalbeck, Nicholas Cooper, and

20   Joseph Tripi for the United States.

21          MR. BOGULSKI:  Good afternoon, Judge.  Frank Bogulski

22   representing Howard Hinkle, Jr.

23          THE COURT:  Okay.  Good afternoon, Counsel.  Good

24   afternoon, Mr. Hinkle.

25          MS. CHALBECK:  Good afternoon, Your Honor.
```

1          **MR. BOGULSKI:**  Good afternoon, Judge.

2          **THE COURT:**  These are the pictures that came through

3    this afternoon by e-mail, Ms. Chalbeck?

4          **MS. CHALBECK:**  Yes, Your Honor.

5          **THE COURT:**  All right.  We'll get to them when you

6    want me to get to them.  We're here today on the Government's

7    motion to revoke Judge Roemer's release order.

8          My review is de novo.  I have some questions, and

9    then, obviously, if you've got the need to go beyond any of my

10   questions, feel free to do that when it's appropriate, okay?

11         Let me start with the first question, in no particular

12   order, really.  But, Ms. Chalbeck, does the presumption apply in

13   this case?  And if so, why?

14         **MS. CHALBECK:**  Yes, Your Honor.  The presumption

15   applies because Mr. Hinkle is charged with two offenses under

16   the controlled substances act that carry a maximum term of

17   imprisonment greater than ten years.

18         In addition, it applies because he faces a lifetime

19   term of imprisonment on the charge under 18 U.S.C. 924(c).

20         **THE COURT:**  Mr. Bogulski --

21         **MR. BOGULSKI:**  Judge, I did argue this before

22   Magistrate Roemer.  I believe that the case is overcharged, Your

23   Honor.

24         I think that -- I agree if it's a 924(c) as charged,

25   however --

1          **THE COURT:**  Well, that's why I'm asking.  I read the

2     transcript.  And so -- you know, I have some follow-up questions

3     based on how you argued it.

4          **MR. BOGULSKI:**  Sure, Judge.  But, yes.  I agree that

5     there is a presumption, which is a rebuttable presumption, as

6     the Court is aware.

7          But, yes, that's my interpretation of the statute.

8          **THE COURT:**  While we're on that topic, what is your

9     way to rebut that presumption?

10          **MR. BOGULSKI:**  Well, I mean, obviously, Judge Roemer

11     did agree with me previously, Your Honor.

12          This case, when I think about it, I was driving --

13     when I drive in -- I live in Hamburg.  And when I drive in on

14     Route 5 every day, I see at least three dispensaries.

15          I know that marijuana is still illegal in the Federal

16     system.  There is one on Clover -- on Route 5 in Clover Bank

17     Road, right across from a daycare center.

18          Now, whether that's a good idea, I don't know.  But

19     there is one.  And my children's school is a quarter mile from

20     that.  You can see the dispensary from Clover Bank Elementary

21     School on Route 5.

22          Then I go through Woodlawn and there is another

23     dispensary close, I believe, to some other schools.  And then I

24     drive through Lackawanna.  It takes me about, you know, 15,

25     20 minutes depending on traffic.

1      There is other one in Lackawanna right by a gas

2   station.  So, when I think about this case -- I've practiced law

3   over 20-some years, I don't see a lot of 924(c) charges that

4   pertain to marijuana, Your Honor.

5      And I don't think that -- there are some other text

6   messages here that I received from the Government, that this is

7   really a classic 924(c) case.

8      My client had some muskets, some other guns.  I argued

9   previously that basically a lot of people in Allegany County

10  possess guns.

11     And I think the local law enforcement knew that my

12  client was an avid sportsman.  So, it's not just simply

13  possessing guns.

14     It's also using those guns in furtherance of a

15  conspiracy, Judge.  Or possession with intent to distribute.

16  And I don't think that that's applicable here, Your Honor.

17     And I also believe that there are conditions or

18  combinations of conditions that would secure my client's

19  presence in Court.

20     He doesn't have a passport, so he's not a flight risk.

21  He's lived his whole life in the Wellsville area.  And there are

22  conditions that this Court set or that Magistrate Roemer set

23  that are appropriate that would protect the public.

24     Other than a -- there was like a -- it looks like

25  there was like a petty larceny or something pertaining to

 1  cigarettes that I read in the Government's papers, my client had

 2  16 or 17 years of law abiding life.

 3          He hadn't had any charges, and I think, you know, the

 4  probation department got it right when they recommended for his

 5  release.

 6          I believe that -- and the Government has made it

 7  clear, they do -- are interested in my client for unrelated

 8  matters.

 9          And that's clear in the filings that I've seen, but

10  that's not what is properly before this Court.  My client is not

11  charged in any other case other than what is the case before

12  this Court.

13          And we don't see a lot of Federal prosecutions for

14  marijuana with a 924(c).  At least I don't.  Maybe they -- maybe

15  they did in the past, but mostly it's cocaine, meth, Fentanyl,

16  things like that.

17          And I point out the dispensaries because -- I haven't

18  researched this, Judge, but I'm going to have to, obviously.

19  But there is no lab report, number one, indicating, you know,

20  they said there was a 130 plants.

21          I saw pictures of some plants.  And speaking to my

22  client and his family, he is a known user of marijuana, which it

23  doesn't seem like this is a significant grow operation.

24          I can go in any one of those dispensaries, I presume,

25  and find a lot more marijuana than was found in Mr. Hinkle's

1    trailer.

2          So, from my perspective -- I think, you know, the

3    Government may have charged him with this because of the other

4    matters, likely, in my view, but that's not what's before this

5    Court.  And that's not what is being litigated here.

6          So, based on my client's prolonged period of law

7    abiding life, I don't think he's any danger to the public.

8          I think the Wellsville police knew that my client was

9    an avid sportsman.  And if any given time they wanted to arrest

10   him for possessing a gun, because it's also illegal in New York

11   to be a felon in possession, they could have arrested him.

12         And I would argue, Judge, that if they thought that he

13   was a danger to the public, that my client in the small

14   community like that, would have been brought in and charged with

15   this, because it was probably common knowledge that my client

16   had had guns.

17         Now, there has been a lot of a laser or something like

18   that on a gun relative to an FBI or Government informant.

19         And my understanding is that is a flashlight on that

20   gun that is used to illuminate predators.  It's not a laser.

21   There is a difference.

22         I mean, I'm not a gun expert, Judge.  I have some

23   limited military experience, but not a gun expert by any

24   stretch.

25         But when I looked at the photos, Judge, this was a

1    flashlight -- like a red flashlight.  And my client has pigs and

2    peacocks and other animals in that area.

3           And even in Hamburg, I've seen coyotes at night.  I've

4    heard them, you know, in the creek behind my house.

5           And I don't have any pigs, but I could foresee a

6    circumstance if you were involved in farming that -- you know,

7    like, there is a reason why wolves are pretty much extinct or

8    they are reintroducing them is they -- you know, my uncle has

9    chickens and they eat chickens and people that live in country

10   areas have farms and things like that.

11          And they will possess guns, not for selling marijuana

12   or drugs, but either for hunting purposes -- very common in

13   Allegany County, a lot of hunting camps there.

14          Or for the purpose of protecting their livestock and

15   their pigs and so forth.

16          So I know somehow there is a hearsay statement or a

17   statement about this laser, but if you look at the photo that

18   the law enforcement had illuminated, it's a flashlight.

19          That case is not before this Court.  So I believe that

20   there are less restrictive means of handling this without

21   putting my client in jail.

22          And those would be home incarceration or home

23   detention, which Judge Roemer had ordered.  And I know he

24   thought very carefully about his decision, Judge, because I

25   remember -- and I believe I put it in my papers that he had

1    asked the probation officer to come into his chambers.

2             He had called a ten-minute recess and he had talked to

3    the probation officer about her report, which was recommending

4    release.

5             And what was said, obviously, I don't know.  I wasn't

6    privy to that.  But when he came out after talking extensively

7    to the probation department, he decided that my client should be

8    released.

9             And, obviously, there was a stay granted so we could

10   talk about it further, but I don't think that decision should

11   change.

12            And I know having appeared before Judge Roemer many

13   times, just like Your Honor, he takes these matters very

14   seriously -- very carefully.

15            And I would not say that he is easy -- when I mean

16   easy, he detains people quite a bit.  I've had him detain a lot

17   of my clients.

18            Not always, but he is certainly not -- no one would

19   ever say that Judge Roemer is a magistrate that routinely

20   releases people.

21            I know -- you know, I won't get into specific names,

22   but certain judges in State court, they have a reputation where

23   they are very lenient, whether it be with sentencing or whether

24   it be with release, even before bail reform in New York.

25            And that is not the case with Judge Roemer.  I have a

1   lot of respect for Judge Roemer, but he's not someone that is --

2   would -- anyone would say has a reputation that is going to

3   release people all the time.

4         He had asked pointedly to the Government, when the

5   Government stood up and they were talking about the other

6   case -- it's very important to the Government, because I read

7   about it and I'm going to have to start to learn about it.

8         It's a very big case for everybody, I guess, but he

9   had said, what does that have to do with this case here for

10  Mr. Hinkle?

11        And I would argue that -- and I don't know, it seemed

12  like he didn't give that a lot of thought -- or not a lot of

13  thought.

14        He gave it a lot of thought, but didn't give it a lot

15  of credence because my client is not charged with that.

16        And I hope that he isn't charged with anything related

17  to the other case that the Government has been talking about,

18  about the informant.

19        So, from our perspective, the decision should stay.

20  Judge thought about it carefully.  The probation department made

21  a recommendation that my client be released.

22        If my client's released, Judge, he has stability.  As

23  far as rebutting the presumption, he's not a risk of flight.

24        He's been with the same woman for many years.  They

25  have a son, and his son is to be married and he wants

1   grandchildren.  And our view is that is a very reasonable

2   request that he be under home incarceration.

3           I know how hard the probation department is on these

4   matters, because I've had many clients violate those terms.

5           And I always tell them -- because there was another

6   case I had a week or so ago that Judge Roemer let my client out.

7   He had been charged with selling pills and the allegation was

8   that two people died from Fentanyl, and Judge Roemer had let him

9   out.

10          And I told my client, don't mess this up because it

11  was a tough call for the judge.  And I said, if you mess this

12  up, like -- I know, like, in a second, like, he's going to put

13  you in jail, in a second.  And -- because it was a hard

14  decision.

15          And that's the same thing here, Judge.  This is always

16  a hard decision for any judge to make, but my client is

17  afforded, number one, the presumption of innocence in this case,

18  which I think is overcharged.

19          I think it's a 922(g), that the Government could

20  probably convict him of.  But who knows, there may be more

21  defenses.

22          But I think that if he's given a chance -- I've had an

23  opportunity to talk to my client.  He was in tears yesterday

24  about this.  He was crying.  He wants to be with his common law

25  wife.

 1           He knows this is a very difficult circumstance for

 2      him.  He knows the Government is looking at him.  And I know the

 3      Government's looking at him.

 4           You know the Government's looking at him.  So he is in

 5      a very difficult spot.  And so for him to try -- he's not a risk

 6      of any harm, especially with the strict conditions that the

 7      Court would set.

 8           He's not opposed to those.  That there would be no

 9      risk to the public, because there would be electronic

10      monitoring.

11           There would be strict requirements as far as home

12      inspections and things that the probation department does prior

13      to putting someone on home incarceration, so the Court does not

14      have to worry about that.

15           And the fact that there was 16 years before that

16      Pennsylvania cigarette incident was larceny, my client paid

17      restitution.  I believe it was approximately $9,800.

18           There is no risk to the public and he is no flight

19      risk, because he doesn't go anywhere.  He has no passport.  He

20      has no real means to leave the area.  And he wants to be with

21      his family and his son.

22           So for that reason, I believe that the -- I argued

23      that the presumption continues to be rebutted.  Nothing has

24      really changed since we appeared before Judge Roemer.

25           And I wanted to be here today.  I had a seminar,

1   because I want to try to get my client out of jail and do my

2   job, Judge.

3        And I think that you should accept Magistrate Roemer's

4   recommendation and release my client on those conditions that

5   are very strict and see what -- you know, see what happens,

6   obviously, but he is going to toe the line, Judge.

7        This is a very, very serious matter and he knows that.

8   And he would be a fool to think otherwise.

9        **THE COURT:**  So you've been, Mr. Bogulski, watching

10  judges over time and a pretrial detention decision of a person

11  who is innocent until proven guilty competes with a difficult

12  sentencing decision all the time in terms of the hardest thing

13  that we do here from the bench.

14       Because, here, you have got a situation where the

15  Government is asking me to take someone's liberty away before

16  they are guilty, and I have got to do that based on the

17  considerations in the statute.  I'm ultimately backstopped by

18  the Constitution, right?

19       And a couple of times I've heard separate -- maybe

20  it's related -- separate considerations, something that you said

21  here today and something that you said in front of Judge Roemer,

22  regarding interest that the Government might have in your client

23  separate and apart from what's going on here.

24       And I have to say this:  Look, we don't, as judges

25  here, don't and shouldn't and don't think about collateral

1    consequences.

2          In other words, this decision is going to get made on

3    the record that's in front of me.  And it's not going to be --

4    I'm not going to weigh, gee, does this give the Government an

5    advantage or does this give the defendant an advantage maybe

6    later for plea negotiations, for example.

7          Not relevant to me.  What's relevant to me is the

8    factors in the statute and whether there's a concern about

9    safety or flight or nonappearance.

10          Okay.  So that being said, I've got more questions for

11    both of you.  And there is a lot there, Mr. Bogulski, so it kind

12    of covers the waterfront on your end.  But, obviously, chime in

13    as we go here.

14          Should I be concerned about the threat that your

15    client made to kill his wife and then kill himself?

16          Because I've got to worry about nonappearance for him

17    and I've got to worry about danger to the community vis-à-vis

18    other people that he might threaten to shoot.

19          **MR. BOGULSKI:**  Judge, I spoke to my client about that.

20    Finally had a chance to speak to him, because when I first came

21    on this case, I wasn't aware of that, Judge.

22          And I looked at that very carefully.  And my client

23    was -- he was put in a psychiatric hold for 72 hours at Olean

24    Hospital, is my understanding in speaking to him.

25          And I was concerned about that, too, because I know

1   that -- I figured you were going to ask me about that because it

2   jumped out at me when I saw the Government papers.

3          So I made some changes to my schedule and I went to

4   talk to him yesterday, because I figured, you know, I better

5   have an answer for the judge, because he's going to probably ask

6   me about that.

7          And my client's father died a couple years ago and,

8   you know, he had a hard time with that.  And when we were

9   talking, he said there was a lot of support that he had from

10  other people and he wasn't spending a lot of time with his wife.

11         And so he was released from Olean Hospital and he was

12  put into counselling.  And he sees -- I don't know if it's a

13  psychiatrist.  I haven't had a chance to get a HIPAA signed.

14  But he goes to counselling, Judge.

15         And, you know, obviously, there were no charges

16  brought in that situation.  I think that if there were charges

17  that could have been brought, I mean, probably if that was true,

18  my client said he -- he denies the -- the details of those, but

19  certainly the fact that he is in counselling; that he was

20  released; that he was found to be not a danger to himself or

21  others by a medical doctor, Judge, should alleviate any concerns

22  that the Court would have.

23         Because there's -- the doctor -- you know, they are

24  not going to release someone if they feel that they are an

25  imminent threat to the public.

1        So he was released, and I think it's good news for him

2   that he is getting counselling.  We talked about it yesterday.

3        Now, obviously if you release him, he's going to have

4   to sign a release and there will be no -- first of all, there

5   will be no guns in the house, number one.

6        Number two, he will be in counselling.  I know when

7   people are released they are -- they are often required to

8   undergo a drug or substance abuse evaluation and a mental health

9   evaluation.  And, obviously, his wife and child support him.

10       Now, people go through different times -- difficult

11  times and handle grief differently, but I think, from my

12  perspective, it's positive that he's in counselling.

13       And I asked him yesterday -- I said, so, did you do,

14  like, anything after that -- you are in counselling?  And he

15  said, yes.  He said, I'm still in counselling.

16       And I think that's a good thing.  And the fact that

17  there will be no guns or anything around, I think that would

18  allay any concerns.

19       And the fact that he's been cleared by at least one

20  medical doctor, I don't know if it's still the law, like, I

21  haven't practiced -- like, Article 81, mental hygiene law.

22       I'm sure you remember, obviously, from private

23  practice, Judge.  But I think it's two doctors have to sign

24  off -- or at least one, medical doctors to release him.

25       So he was put in a 72-hour hold.  He was released and

1    he is involved in counselling.

2          So that, to me, is a positive thing rather than a

3    negative.  Because we have a lot of people walking around that

4    are crazy.

5          And I see it every day when I go see clients in jail

6    or in Court and they are not under the care of a medical doctor,

7    they are not getting counselling.

8          The fact that my client has been, as he's reported to

9    me, and I haven't corroborated this, active and compliant with

10   his mental health treatment, should be reassuring to the Court,

11   because that means that he is being proactive in dealing with

12   what he needs to deal with.

13          **THE COURT:**  Ms. Chalbeck, what about this extraneous

14   or collateral concern that Mr. Bogulski points out that the

15   Government has related to the witness who died and had --

16   allegedly had a price on her head, does that bear on release

17   versus detention here?

18          And if so, why?

19          **MS. CHALBECK:**  Your Honor, you were absolutely correct

20   earlier when you stated that your considerations are determined

21   by the statute.

22          However, in interpreting the statute, the Bail Reform

23   Act 18 U.S.C. 3142, the Second Circuit has rejected at this

24   point multiple times the argument that you may not consider

25   uncharged conduct.

 1          And I would point the Court in the direction of United

 2   States versus Rodriguez, that's 950 F.2nd 85 and 88, Second

 3   Circuit 1999 -- 1991, excuse me, where the Second Circuit

 4   reserved a District Court's release while rejecting the argument

 5   that courts are limited to considering only that conduct, quote,

 6   connected to the activity charged, end quote.

 7          And likewise, a panel of the Second Circuit affirmed a

 8   detention order based in part on uncharged criminal conduct in

 9   United States versus Barone --

10          **THE COURT:**  I know that I can consider it.  Why is it

11   relevant here?

12          **MS. CHALBECK:**  It flows directly from the history and

13   characteristics of the defendant.

14          So, in particular, Your Honor, I can just provide a

15   little bit more factual background without getting too much into

16   the facts, because the investigation into Ms. Quinn's death

17   remains ongoing and is very sensitive.

18          During an FBI interview, Simon Gogolack, who has been

19   indicted separately before Your Honor, Simon Gogolack told the

20   FBI that Mr. Hinkle told Ms. Quinn at a card game that there was

21   money on her head.  In other words, a bounty on her life.

22          And the Government's view that underscores

23   Mr. Hinkle's connection to a dangerous criminal underworld, to

24   include motorcycle clubs, we would proffer, and it evidences his

25   knowledge of plots to kill Federal witnesses.

1          And what does he do with that knowledge?  He doesn't

2   report it to the police.  He discloses it to a Federal witness,

3   and just days later, she dies.

4          We think that that bears on the history and

5   characteristics of the defendant.  That he has this knowledge.

6   That he has the social connections to give him this knowledge,

7   and that instead of reporting it to the police, he says to the

8   witness what he says.

9          **THE COURT:**  So, Mr. Bogulski, why doesn't that fact

10  pattern go into the scales of justice, if you will, on one side

11  or the other?

12          **MR. BOGULSKI:**  Judge, if it was true, then I think

13  absolutely it goes to your consideration, as you pointed out

14  correctly, you can.

15          But you have to consider the source of that.  Simon

16  Gogolack was the one who woke up dead.  Or not dead.  Woke up

17  next to the witness that was dead.

18          And people -- and I've heard the Government make this

19  argument many times, whether it's State Court or Federal Court.

20          He wakes up with a Federal witness, who is dead.  And

21  he is likely to say, Gogolack is going to try to deflect blame

22  from himself, right?

23          He doesn't take responsibility and say that he's

24  responsible for that.  It's easy to blame someone else.

25          My understanding, Judge, from talking to some

1    different people, is that there was a card game and that my

2    client was, I believe, present with Gogolack and the decedent,

3    but there was nothing talked about as far as anyone being a

4    witness.

5            And that Gogolack and the decedent were high on many

6    drugs at that time.  They were drinking heavily, which would be

7    consistent with the Wellsville police chief.

8            I read the Buffalo News article today, and I don't

9    know, that's hearsay.  And I haven't talked to the Wellsville

10   police chief.

11           But the Wellsville police chief was quoted in the

12   Buffalo News saying that there was nothing suspicious about the

13   death of the witness, okay?

14           So, this person and -- is probably in a very good

15   position, being a local police chief, to know best what's going

16   on in his community.

17           And now, the Government -- obviously, they have a

18   right to differ.  That's their case.  And that's fine.  But I

19   dispute -- my client disputes the veracity of that statement.

20           Because when you charge a jury, you talk about an

21   interested witness.  There is a jury charge.  Does the witness

22   have an interest in the outcome of the case?

23           If Mr. Gogolack takes the witness stand here, okay,

24   and I'm cross-examining him, I'm going to ask him about the girl

25   that woke up dead.

1          And I'm going to ask him about whether he used drugs.

2     And I'm going to ask him if he used drugs with the witness, and

3     I'm going to ask him if he has an interest in his testimony.

4          And I would argue he's an interested witness.  And I

5     have never met him, but I imagine that he has an interest in

6     deflecting blame from himself from the situation that he finds

7     himself in.

8          And it would not be unusual for him or any other

9     person that has an interest to misrepresent the facts.

10         My client denies pointing a gun at anyone.  He denies

11    being involved in any of this.  He's not charged with it.  And I

12    certainly question the veracity of that witness.

13         And I do point out the Buffalo News article, where I

14    think it was -- where it was said that the Wellsville police

15    chief said that the person died of Fentanyl or drugs.  I don't

16    remember, because I was at a seminar today, Judge, before I came

17    here.

18         And I remember being in the National Guard and going

19    to the ice storm in the north country, rural area like

20    Wellsville.

21         And one of the first things, Judge, I did was I talked

22    to all the fire chiefs in every town, whether it be Chateaugay

23    or Bombay, because those people, in my experience, could tell me

24    where the families that need help, who needs food, who needs

25    shelter, who is dangerous, who is this, who is that.

1          So every one of our squads would be sent to a fire

2    chief and I'd say, work with that fire chief.

3          And I bring that to the Court's attention because the

4    Wellsville police chief, I imagine, cares very deeply for his

5    community.  He cares very deeply for the people that he serves.

6          And you don't -- you go into being a police chief or

7    law enforcement, I believe, 99 percent of the people that are

8    involved in law enforcement are in it for the right reasons.

9          The same way the FBI, the same way that the Government

10   is.  And I have no reason to believe that that police chief in

11   his small community, when he knows everyone's looking at him, is

12   going to go on record to the Buffalo News and say that he

13   believes that that witness died of Fentanyl or whatever, and

14   that there were no suspicious circumstances.

15         Now, obviously, the Government disagrees with the

16   Wellsville police chief, but the question you asked me is

17   considering what the Government has said about my client's

18   purported involvement in the death of this witness.

19         I talked to him yesterday and he -- he was surprised,

20   the best way I could say it, because he thought it was a

21   marijuana case and now I'm talking to him about something else.

22         He denies involvement in that.  He knows Gogolack, and

23   he's done work with him.  He also denies being in a biker gang.

24   I'm looking at him -- I mean, I don't see any gang tattoos on

25   his arms.

1          He tells me he inherited or his father gave him a

2     Harley Davidson when he died or something like that.  He's not

3     in a biker gang.

4          He has the same spouse for 25 years and a son.  He's

5     not traveling around with the Hells Angels and going to biker

6     fest and concerts or whatever these biker guys do.

7          He's a guy that sticks around Wellsville.  Biker gangs

8     travel and do biker gang stuff.  And that -- our view, because

9     they found a motorcycle at his house?

10          I think Warren Buffet owns a motorcycle and is an avid

11     motorcyclist, so that doesn't make him like a biker gang guy.

12          **THE COURT:**  All right.

13          Ms. Chalbeck, anything else I need to think about

14     regarding this issue about the bounty before we move on to drugs

15     and guns?

16          **MS. CHALBECK:**  Your Honor, I would like to put up

17     Exhibit No. 35 on the Elmo, and just provide a little bit

18     additional context to the Government's investigation in this

19     regard.

20          **THE COURT:**  Go ahead.

21          **MS. CHALBECK:**  When Simon Gogolack -- he brought her

22     directly to a card game, which Hinkle was present.

23          And then during that card game -- apologies -- during

24     that card game or shortly after, Gogolack and Hinkle left,

25     leaving Ms. Quinn behind.

1              I'll state for the record, Your Honor, that this is

2    Government's Exhibit 35.  And it contains two photographs taken

3    from a security camera footage.

4         **THE COURT:**  Are these filed for the docket for going

5    forward purposes?

6         **MS. CHALBECK:**  Yes, Your Honor.  We will publically

7    file them on the docket.

8         **THE COURT:**  All right.  Well, they need to be filed

9    under seal at a minimum, so if the Circuit ever looks at this,

10   it's got to be on the -- okay.  Under seal is fine as long as

11   they are filed.

12        **MR. BOGULSKI:**  Thank you.

13        **THE COURT:**  All right.  Go ahead.

14        **MS. CHALBECK:**  So these images show Hinkle and

15   Gogolack on the right.  This is the top image that I'm

16   describing.

17             Quinn is left behind in the grass.  And then the

18   bottom image shows just around the corner of this red trailer

19   shows Hinkle and Gogolack walking and discussing with each

20   other -- I presume, while Quinn is behind, some distance away.

21             And this occurred right after Mr. Gogolack brought

22   Ms. Quinn to Wellsville.

23             And just on the issue of Ms. Quinn's death, she died

24   with 1200 nanograms per milliliter of Fentanyl in her system.

25   That is 400 times the legal dose of Fentanyl.

1      It is enough to kill everybody in this Courtroom.

2  Probably everyone in this building multiple times over.

3      She was not known to be a heroin user or Fentanyl

4  user.  She was not known to be suicidal when this occurred.  And

5  Mr. Hinkle was one of the last people to see Ms. Quinn.

6      And video footage shows him having a private

7  conversation with Mr. Gogolack.  I cannot offer any additional

8  details into the investigation at this moment, but we think that

9  this goes to the history and characteristics of Mr. Hinkle.

10      And, Your Honor, I'm sorry, I -- just one additional

11  detail.  A second witness has corroborated Mr. Hinkle having

12  disclosed that there was money on Crystal Quinn's head.

13      **THE COURT:**  All right.  Who is -- hold on a second,

14  Mr. Bogulski.

15      Who is telling us who each of these people is in this

16  picture?  Is there an agent that is telling us that through your

17  proffer or is Mr. Gogolack telling us who each of these three

18  people is?

19      **MS. CHALBECK:**  That would be an FBI agent, Your Honor.

20      **THE COURT:**  All right.  Mr. Bogulski, regarding the

21  second person corroborating the price on this witness's head?

22      **MR. BOGULSKI:**  Judge, I mean, it's the first that I

23  heard that.  I don't know who that person is.  That person's not

24  here.

25      **THE COURT:**  Well, neither do I, Frank, but it's a

1    proffer from the Government, right?

2         **MR. BOGULSKI:**  Well, if someone were to say that, that

3    by itself is not illegal, Judge.

4         If someone were to say that the Government is looking

5    to prosecute Al Capone and that some gangster had a price on Al

6    Capone's head, because he's a rival gang -- I'm just giving a

7    hypothetical here, Judge -- that by itself is not illegal.

8         If someone said to, you know, Mr. Hinkle that this

9    witness has a price on her head and he says that, it may even be

10   argue -- he denies saying it, but this is for a hypothetical

11   because he denies saying that, he is not -- the Government isn't

12   proffering that my client is saying, we put a price, you know, a

13   price on your head.

14        It could be friendly.  It could be get out of town.

15   There is a -- you know what I'm saying?

16        So the way that I -- look, there is two ways to look

17   at it.  The nefarious way to look at it is the way the

18   Government has proffered it, is that my client said this:  That

19   there is a price on your head and he has some interest in that.

20   That's number one.

21        Number two, the other way to look at it is, wow, you

22   should be careful.  There is a price on your head.  And it's all

23   in the delivery, Judge.

24        But I will acknowledge that in that photo -- because I

25   just asked my client as I'm sitting here, Judge -- you know,

1  because that's a good question, because when I saw that, is that

2  him?

3          My understanding is yes.  There was a game.  And my

4  client's father and uncle had owned a junkyard for 30 years, and

5  my client is mechanically inclined.

6          And Gogolack said the young lady's brakes were

7  rattling, so they went out to take a look at the brakes, because

8  my client has mechanical knowledge.

9          And to me, that is not illegal.  If you took a picture

10  of someone at a fire hall -- because it's obviously a fire hall

11  with the baseball diamond, there is nothing nefarious about the

12  picture.

13          He has mechanical knowledge.  He said she had, like, a

14  small car of some sort.  To me, he's looking at a car.

15          And the death was on a Tuesday.  This was on a

16  Thursday, Judge.  So there is a card game -- I guess a

17  longstanding card game at this fire hall on a Thursday.

18          The death is on a Tuesday.  So there is no allegation

19  that my client sold any drugs.  The Government hasn't proffered

20  that.

21          We have -- there is a First Amendment freedom of

22  association, Judge, that really has to be strongly considered

23  here.

24          And my client has not been charged with that.  And

25  they are not saying that he made that threat that I can see.

1          **THE COURT:**  All right.  We've been going on some

2     tangents in a couple of different ways.

3          Back to the -- this is the Government's motion.  Why,

4     Ms. Chalbeck, in your view did -- why are the conditions that

5     Judge Roemer imposed insufficient to protect the community,

6     insufficient to make sure that this defendant appears in Court

7     going forward?

8          **MS. CHALBECK:**  Your Honor, in the transcript, Judge

9     Roemer applied a location restriction program to Mr. Hinkle, but

10    Mr. Hinkle's base of criminality is his home.

11         It is his community in Wellsville.  We see that in the

12    exhibits that the Government has offered.

13         Mr. Hinkle has used his home as the base for his drug

14    distribution operation, which he protects with 19 firearms, some

15    of which were loaded and that are strategically or were

16    strategically located at points of ingress and egress.

17         And perhaps defense will argue, well, all of his

18    marijuana was seized, but there -- the text messages show that

19    Mr. Hinkle has extensive drug contacts.

20         He could easily get marijuana, start -- resume his

21    growing operation.  And his property is situated in such a way

22    that it would be difficult to detect whether Mr. Hinkle was

23    actually complying with any condition to avoid drug behavior.

24         And we also know that he has associates with people

25    like Mr. Gogolack, who have sold firearms or put themselves out

1    to sell firearms unlawfully.

2          We know that despite being a felon, he has been able

3    to acquire 19 firearms.

4          And so, given that his home is the base of his

5    criminality, putting him on home confinement or home detention,

6    restricting his activity to the home area is not a condition or

7    a set of conditions that will mitigate the danger that comes

8    from him being in the home.

9          One second, Your Honor.  In addition, Mr. Hinkle's

10   conduct with law enforcement also gives us concern that he could

11   pose a threat to probation.

12          And in kind of elucidating that concern, I would like

13   to provide some context into the execution of the search warrant

14   here.

15          The FBI, owing to their concern that Mr. Hinkle would

16   be armed and dangerous, used a SWAT team to do a clearance of

17   the residence at 4290 Donovan Avenue at 6:00 a.m. on the 24th.

18          Mr. -- the SWAT team, excuse me, used flash grenades

19   and announced their presence over a loud megaphone.

20          Despite that, there was an appreciable period and

21   multiple flash grenades that had to be used before Mr. Hinkle

22   finally emerged from the residence.

23          When he did finally emerge, he made furtive gestures,

24   suspicious movements.  At one point it appears that he tried to

25   take control of an FBI drone that was used to kind of ensure

1    agent safety.

2          And in particular, he made a movement towards the

3    inside of his residence before ultimately deciding against that.

4          When the SWAT team later cleared the residence they

5    found, just feet away from where Mr. Hinkle was, a firearm by

6    the door.  Again, strategically located at a point of ingress

7    and egress.

8          And I spoke with one of the SWAT team members, Agent

9    Thomas Weiss, who is sitting behind me.  He has engaged in

10   between 50 and 100 SWAT operations.

11         I asked him what he made of Mr. Hinkle's movements,

12   his behavior during this, like, tense period.  Agent Weiss

13   advised me that Mr. Hinkle's movements were consistent with that

14   of somebody contemplating an armed standoff with the FBI.

15         And that was not the end of Mr. Hinkle's noncompliant

16   and vulgar behavior with law enforcement that day.

17         At another point, Mr. Hinkle asked a -- or solicited a

18   young female agent, younger than me, Your Honor, he asked her to

19   hold his penis to help him urinate.

20         And I think that that evidences his -- his disdain or

21   his noncompliant approach with law enforcement, and goes to the

22   concerns that we have for probation in conducting home

23   inspections and trying to ensure that he is complying with the

24   conditions of his release.

25         **THE COURT:**  Tell me more.  The one new thing that I've

1    heard here that I didn't see already in the transcript and in

2    your papers is about the drone.

3           What are we talking about there?  What did I miss?

4           **MS. CHALBECK:**  There -- I reviewed the body camera

5    footage, which I am not proffering today, but the -- or the

6    footage itself.

7           At one point an agent says:  He's got my drone.  Tell

8    him to let my drone go.  Something to that effect, in sum and

9    substance.

10          **MR. BOGULSKI:**  Judge, I just spoke to my client about

11   that and he said the drone hit him in the head.

12          So if the drone was flying around and it hit him in

13   the head -- so I think anyone -- it's a natural reaction if you

14   had a drone hit you in the head, you're going to swat at it.

15          **THE COURT:**  All right.  I understand your -- and I

16   remember when you said it to Judge Roemer that if they came to

17   clear your house, it might take you some time to amble out of

18   bed and get to the front door.

19          Okay.  I get that part.  Maybe your first movements

20   wouldn't be right towards the front door, I think is what you

21   said, something along those lines.  All right.  I get it, okay?

22          But what about this hesitation at the door and this

23   maybe half motion back in -- inside?

24          **MR. BOGULSKI:**  Judge, I mean, that's a subjective

25   analysis.  I mean, these things happen pretty quickly.

1          I know, like, if you are to come to someone's house,

2    you know, his wife is there.  You know -- I don't know, like, I

3    didn't ask him, but it's his wife, you know, what's going on?

4          I mean, anyone -- any person at 5:00 or 6:00 in the

5    morning, if there is a flash grenades that get thrown in

6    anyone's house, they are going to be scared out of their mind.

7          This is not like a Waco, Texas thing.  The Government

8    said my client made furvative (sic) movements.  They never said

9    he walked out with a gun.

10          His house is under one thousand square feet, so the

11    Government has made a big tadoo about guns placed strategically.

12          He has a small house, okay?  It's not the Taj Mahal.

13    It's a not a 6,000 square foot mansion.  It is a small home.  He

14    lives in a rural area.

15          So if there is a flash grenade, it takes a couple

16    minutes or whatever to come to the door.  And his wife or

17    whatever may have said something -- I think in the state of

18    confusion -- that's why tactically, Judge, I mean, they -- you

19    know, that SWAT or an Army, it's military operations in urban

20    terrain, they are trained to hit someone when they do a raid to

21    catch someone off guard.

22          That's the reason why law enforcement or FBI does

23    that, because they don't want any resistance.

24          And clearly -- clearly, any one -- and my client

25    included, any one of us is caught off guard, the first reaction

1  is not to run out with your hands up when someone throws a flash

2  grenade.

3        He doesn't know that he's under investigation.  They

4  didn't call him up and say:  Hey, can you come down and talk to

5  us?

6        They would have had -- I think the Government's

7  argument would be stronger if they showed that he knew that he

8  was under investigation.  That he refused to talk to them.

9        Then maybe they knew they were at his house or at his

10  door with a flash grenade, or maybe if he grabbed a gun, but

11  they're not saying that he did any of that.  And that's a

12  subjective analysis.

13        And I'm not blaming the SWAT officer, because a lot of

14  times hindsight is 20/20.  You will see a police involved

15  shooting and you will see a policeman that shoots someone

16  because they misinterpreted a furtive movement, they are

17  grabbing a phone or whatever and you have an officer whose heart

18  rate is elevated.

19        Because I've read studies about that, the higher

20  someone's heart rate is, the more likely for police involved

21  shooting, because their adrenaline is high, too.

22        So I know they're highly trained, but that's their

23  objective, is to catch you off guard.  He got caught off guard.

24        He didn't come out shooting.  He didn't -- you know,

25  the Government's argument is he has so many guns, he's

1  dangerous.

2         Well, he didn't throw a gun to his wife and he didn't

3  pull one on the FBI and start shooting and engage in a standoff

4  like they had in Waco with ATF.

5         He came out.  A drone hit him in the head, you know.

6  I think it went very well for the FBI, actually.

7         I mean, they did a good job.  They got him out of the

8  house.  Nobody got hurt.  Fortunately, the drone hit him in the

9  head, but he came out.  He's here, in one piece.

10         He didn't get hurt.  The police didn't get hurt.  That

11  is a good thing, I think.

12         **THE COURT:**  Ms. Chalbeck, it looked like you were

13  going to respond to that.  Go ahead.

14         **MS. CHALBECK:**  Thank you, Your Honor.  In Agent

15  Weiss's experience -- and again, he's done over 50 to a hundred

16  SWAT operations, Mr. Hinkle took an appreciable and unusual

17  amount of time to exit the residence.

18         And when he did exit the residence, he was not

19  complying with police or SWAT demands.  They were demanding that

20  he put his hands up; that he step out of the residence.  He was

21  not doing that.

22         They directed him to keep his hands in the air.  He

23  put his hands down.  That behavior, in the agent's view -- in

24  the agent's experience and in training was unusual.

25         And the situation on the ground was so tense that

1   another agent asked if he had a shot on him.  They were

2   concerned -- appreciably concerned that Mr. Hinkle was

3   contemplating an armed standoff.  And indeed, a weapon was just

4   feet away.

5          In addition, Your Honor, I would like to state that

6   when Mr. Hinkle was later interacting with law enforcement, he

7   made a comment that kind of undercuts defense counsel's argument

8   that he did not suspect that he was under investigation.

9          That comment specifically was unprompted.  It was

10  unsolicited.  No one had brought the -- Ms. Quinn's name up at

11  this point in the affair.

12         Mr. Hinkle stated something to the effect of, or in

13  sum and substance of:  I didn't even know that girl.  I met her

14  once.

15         And that evidences that he was considering that he

16  could be under investigation in connection with her death.  He

17  brought it up unsolicited to law enforcement.

18         **THE COURT:**  All right.  Last word, Mr. Bogulski, then

19  we're moving on to marijuana.

20         **MR. BOGULSKI:**  Pardon me, Judge?

21         **THE COURT:**  Last word on that topic, and then we're

22  moving on to marijuana.

23         **MR. BOGULSKI:**  Sure, Judge.  My client was just

24  whispering to me, you saw, when they were talking about him

25  coming out of the house.

1          He said he sleeps, like, naked.  His wife had very

2     little clothes on.  People -- you know, I guess if you look at

3     the night before Christmas, we read to our kids, mamma in her

4     kerchief and I in my cap, he said he didn't have a lot of

5     clothes on or he was naked.

6          There is a flash grenade.  He's there with his wife.

7     I mean, people don't come running to the door very quickly and

8     he said he was scared.  And I believe that he was scared.

9          So relative to that, it's a subjective point of the

10    FBI.  There's no allegation that he grabbed a gun.  He could

11    have grabbed a lot of guns.

12         There's no allegation that he threatened anyone with a

13    gun.  It's an agent's interpretation of how he came out of the

14    house, which I think should be given very little consideration

15    by the Court, because if he's released, he's gonna -- look, if

16    he had -- if there was a time when he was going to use a gun,

17    Judge, it's not going to be when he's out, when he's under

18    supervision of the probation department, when they were doing a

19    home visit.  It's when the SWAT team is there, Judge.

20         So that should allay any concerns of safety to the

21    public.  And that certainly would explain his behavior and

22    reluctance to come out of the house.

23         I think any reasonable person that gets flash grenades

24    and, as the Government acknowledges, a very tense situation,

25    they have to confront that.  They are going to be scared.  And I

1    think that it's great that no one was hurt.

2        **THE COURT:**  So 134 marijuana plants, Mr. Bogulski, is

3    this his last grow?  Is that what I'm supposed to believe?

4        That he's grown all he needs for the rest of his life

5    now and then he's good?

6        What are you doing with 134 plants?

7        **MR. BOGULSKI:**  Judge, I liken it to tomatoes or

8    peppers that people grow.

9        You grow tomato plants and people grow vegetables, and

10   sometimes they are bountiful -- or raspberries or strawberries.

11       Number one, my client disputes the amount of plants

12   that were grown.  It just depends on how you define that.

13       A lot of times in these cases, Judge, we'll have a lab

14   report from the -- from a lab indicating the amount or the

15   weight of marijuana.

16       Clearly, my client has an interest in growing

17   marijuana.  There is no question about it.  But number -- I

18   mean, and there are -- to me, I'd like to see what the lab

19   report is, as I wrote in my papers.

20       He had some jars and I think that -- you know, from my

21   perspective, it's a small community.  The Wellsville police -- I

22   looked at the photos of some of the plants in his yard.  It

23   didn't look like he was trying to hide them in any type of way.

24       And there are Constitutional issues now, I would

25   argue, Judge, with 924(c).

1          Let's say he was involved in selling marijuana, like,

2     as I said, I drive down -- I mean, I drive down Route 5 and I

3     see at least three dispensaries.

4          When I go to the Cattaraugus Community Center to take

5     my son to hockey practice, my kids ask me what's a dispensary?

6          And my point is is there are -- there's far more in

7     any given dispensary than whatever plants were in his trailer, I

8     would argue.

9          **THE COURT:**  Well, maybe so, Mr. Bogulski, but Congress

10    gets to decide what's on the books in terms of the Federal drug

11    laws, doesn't it?

12         **MR. BOGULSKI:**  Absolutely, 100 percent agree with you,

13    Judge.

14         But I do think there are going to be -- I mean,

15    obviously, we will be litigating this in the future.

16         Hopefully not in this case, Judge, the Constitutional

17    considerations based on the legalization of marijuana.  And I'm

18    sure Congress will have to look at that as well, because we have

19    a disparity in states.  You know, some states have legal

20    marijuana, some don't.

21         But yes, I agree.  I don't think that it's a classic

22    case of a 924(c), as I previously argued, Judge, where it's

23    usually Fentanyl or cocaine or other drugs, but my client is an

24    avid marijuana user.

25         You know, I don't think there is any allegation that

1   he has got kilos of this stuff that he's moving.  I would like

2   to see the lab report after this is done.

3        **THE COURT:**  Ms. Chalbeck, there is something in the

4   pictures you probably want to show me.  I was looking at the

5   pictures.

6        And there is pictures of marijuana -- I guess,

7   marijuana plants, marijuana -- harvested marijuana, et cetera.

8        But there are also some text messages and I'm assuming

9   that's what we're going to hear about next, but is he selling

10  marijuana?

11       Is that what you're telling us?

12       **MS. CHALBECK:**  Yes, Your Honor.  We have ample

13  evidence that he distributes marijuana.  That this is not all

14  for personal consumption.

15       **THE COURT:**  All right.  So what's he's doing?

16       **MS. CHALBECK:**  I just want to note, Your Honor, this

17  is Government's Exhibit Number 7.  This is a strain of

18  marijuana, apparently candy chunks that Mr. Hinkle has labeled.

19       We have evidence to believe that -- or reason to

20  believe that he labels this as part of the marketing scheme to

21  market and sell his products.

22       This is Government's Exhibit Number 9.  As you can see

23  in this photo, there are multiple marijuana plants pictured.

24       There was, in fact, so much marijuana recovered from

25  Mr. Hinkle's property, and marijuana throughout the property,

1    marijuana on the hillside, where it actually is difficult to

2    detect from plain view what is going on in the property, that

3    the FBI needed a large truck and cart to haul all of the

4    marijuana out from 4290 Donovan Road.

5           Mr. Hinkle took several photos of the marijuana that

6    he was drying and growing.  This is one from the cell phone.

7    Government secured a search warrant to search his cell phone.

8    This is Government's Exhibit 12, for the record.  And he took

9    those photos because he wanted to sell the marijuana.

10          This, turning to Government's Exhibit Number 16.  This

11   is a screenshot of a text message that Mr. Hinkle wrote to

12   someone else, one of his associates.

13          This text message shows -- it's a list, essentially,

14   of the different marijuana strains that he has available.  At

15   the end of the screenshot he writes:  Am I missing anything on

16   that list that you can think of?

17          These are -- this is Government's Exhibit 15.  It's a

18   photograph of dozens of marijuana plants.

19          And so, what these photographs illustrate is that

20   Mr. Hinkle has a business distributing marijuana.  In fact,

21   other people know him to have a business distributing marijuana.

22          This is Government's Exhibit 17:  Hey, you still

23   running a tree business?  Tree or trees is drug slang for

24   marijuana.

25          **THE COURT:**  Who responds LOL?

1           **MS. CHALBECK:**  I believe that's Mr. Hinkle, Your

2    Honor.  But there are other text messages indicating that he

3    sells marijuana.

4           This is Government's Exhibit 18.  This is the text

5    message conversation of that prior exhibit of the screenshot

6    listing the different strains available.

7           And then at the end of the text message conversation,

8    the list, there is a photograph that looks like -- potentially

9    of a marijuana plant.

10          Government's Exhibit 19.  This is a continuation of

11   that same conversation.  Someone writes:  Ten more gone.  Nice.

12   I got rid of six more.

13          Whether Mr. Hinkle is the person in green or the

14   person -- the text bubble in green or the text bubble in dark

15   gray or black, both of these people are communicating about

16   selling what's listed in the exhibit, the different strains of

17   marijuana.

18          Government's Exhibit Number 20 -- Government's Exhibit

19   Number 20, this is a continued conversation.

20          Mr. Hinkle and his associate are talking about other

21   vendors looking to sell clones, and they are clones of marijuana

22   plants.

23          And they are trying to devise a way to make their

24   plants more marketable.  Mr. Hinkle's associate offers:  I think

25   having natural soil shit will help draw people to us -- to us.

1    I might even borrow my daughter's auto plant for display.

2         Hinkle responds:  Nice.  I'm getting stuff around now

3    too.

4         This is a continuation.  This is Government's Exhibit

5    Number 21.  Mr. Hinkle's associate says:  I'll bring the label

6    maker.  I'm not going to have time for potting.

7         Potting what?

8         Marijuana.

9         We have got plenty for tomorrow, so if we sell weed --

10   a reference to marijuana -- the spot costs more.

11        Are you wanting to try selling bud?  It's another

12   reference to marijuana.

13        I'm not planning to.  Then Mr. Hinkle responds -- he

14   references clones.  Clones of marijuana.

15        He also says:  Sell some preroles, got some edibles.

16   Edibles of marijuana.

17        **THE COURT:**  So where is he selling this stuff, at a

18   flea market, where he's got to pay for a spot or a booth or

19   something like that?

20        **MS. CHALBECK:**  Your Honor, I don't know the answer to

21   that question right now.

22        **THE COURT:**  I don't expect you to know it, but that's

23   the question I've got.

24        Maybe Mr. Bogulski will tell me.

25        **MR. BOGULSKI:**  Judge, my understanding is there is a

1    flea market or something in Salamanca on the Indian reservation,

2    and that most of those text messages are attributable to a

3    person that sells seeds or plants, and not to my client.

4           But I point this out -- this is very important, Judge,

5    because this case -- I've had it for, I don't know, it seems

6    like forever already.

7           And it's a little more than I expected when I took it

8    on, to be candid with you, but here I am.

9           There is not one person that they talked to that said

10   they have bought -- they have got some phones.  They haven't

11   verified these phones, whose message.  They don't even know who

12   it came from.

13          There is not one affidavit.  We have the best law

14   enforcement agency in the world, arguably, or one of the best in

15   the FBI, and they don't have one person that has an affidavit

16   that they can proffer to this Court that said, I bought, like, a

17   nickel bag of weed or whatever they sell it in.

18          You know, I'm not too familiar with marijuana, but

19   that I bought -- like, controlled buy.

20          So many of the drug cases I have when there is a

21   complaint, there is a controlled buy or there is an informant or

22   something like that.

23          Obviously, he's an avid marijuana grower.  I don't

24   think I could talk a jury out of that.  But is this a 924(c)?

25          Is this really what this is?  I don't think so.  So

1    they don't have any customers of my client.  I mean, I think it

2    has a lot to do with other matters, as I've indicated, Judge.

3         So from our perspective, it's not a risk.  It

4    doesn't -- and we're looking at why we're here.

5         If this is true -- let's say it's true that he went

6    with the guy who he gets his seeds from to grow marijuana, there

7    are different types of it.

8         I suppose it gives you a different feeling when you do

9    it.  And they went to some convention that's in the open in

10   Salamanca.  And the public -- like, assuming everything they say

11   with a common law demurrer, does that make him dangerous?  I

12   don't think so.

13        And then I was just looking at his record again from

14   the probation department.  He has a nonviolent misdemeanor

15   welfare fraud conviction from 2008.

16        And that was when he was 31 years old.  He's almost

17   50 years old sitting here, Judge.  And there is a very low rate

18   of crime at that age.

19        And the fact that -- I think it's a stronger argument

20   that we have, that the FBI came to his house and he didn't pull

21   a gun and no one was hurt.

22        And if he's released, there will be a home inspection.

23   There will be electronic monitoring, and the public will be

24   protected and he's going nowhere.

25        **THE COURT:**  So looking at his record, and looking at

1  his bail report now, October 25, 2023, he's got a lot of arrests

2  while he was on bail.

3          Which to me, even if he was younger, it's still

4  telling me something about an attitude toward compliance and his

5  attitude towards law enforcement.

6          In 2005, a bench warrant and a violation of

7  probation --

8          **MR. BOGULSKI:**  Well, he was in his 20s, Judge.  And

9  I -- I joke around, the paralegal that works for me turning 25

10  tomorrow, and I said, well, that's probably the only birthday

11  you can really look forward to, because at 25, you can rent a

12  car.

13          And there is data on these things, Judge.  So when you

14  look at a man before he has kids -- before he has children, when

15  you're on probation or you're 25 or compared to 47, 2005, Judge,

16  is almost 20 years ago.

17          And people -- people are different in their 20s.  And

18  that's why, I guess, even some places your car -- might not be

19  able to rent a car until you are 30, but I know 25 for sure.  I

20  know your car insurance goes down when you are 30.

21          His last -- I mean, 2008, he's 31.  And there is

22  significant data that I keep referencing about what types of --

23  how dangerous people are.

24          They are far more dangerous when they are in their

25  20s.  But my client wants to have an opportunity to be on

1    probation, Judge, and be with his wife.

2              And his son lives a mile from him, works at a Napa

3    Auto Parts store, and be with his family.

4              I think that if the Wellsville police had a problem

5    with my client, or Allegany County sheriffs, small areas, people

6    can't hide there, Judge.  And I think you would have seen some

7    other arrests there that he doesn't have.

8         **THE COURT:**  But what you are telling me, Mr. Bogulski,

9    is I got to -- I can't look at all these things together.

10             He's got a felony, but he's got weapons.  But he's --

11   you know, in the country and he should be able to have weapons.

12   Those two things are mutually exclusive.

13             Maybe he's selling marijuana, so he's not dangerous,

14   but when you add the weapons to that, that becomes new felonies.

15             So if I put all of these things together, don't I have

16   a problem?

17        **MR. BOGULSKI:**  Judge, I disagree.  I mean, I agree

18   with Judge Roemer.  I mean, I think -- and I agree with the

19   probation department.

20             When you look at the context of weapons, they are not

21   saying that he's a gang banger.  Typical 924(c) that I see or

22   that I represent someone on is a guy driving around with a 9

23   milliliter high point that is using his gun to intimidate people

24   for street -- you know, gang warfare that you see that you are

25   on my corner, or you are with my crew.

1          And that's why they try to portray my guy as a

2   motorcycle gang guy.  He's not.  They have no evidence of that.

3          They have no evidence that -- they didn't bring any

4   pictures of any motorcycle Harley Davidson jackets and vests

5   that these guys wear with their patches on them and things like

6   that.

7          I've seen that in detention hearings.  And I've seen

8   photos of guys at Kingsman biker clubs and things like that.

9          My view, Judge, is that he's not dangerous.  It was

10  2008, when he was 31 years old.

11          So you can look at someone in their 20s and you can

12  look at someone where they are now, but there is no allegation

13  that -- there's a case I had, the public defender was Tracy

14  Hayes and he defended it successfully almost 15 years ago now.

15          And the police came knocking on the door and they

16  kicked the door in.  And the guy had drugs in the house.  And

17  Tracy Hayes argued to the jury, he lives in the inner city.

18          When he pulled the gun -- the defendant on the police,

19  a knock on the door is not actually a welcomed guest coming in

20  that neighborhood.

21          The Government in a 924(c), it's not strict liability

22  like the labor law 240 case.

23          They have to prove that he possessed those guns with

24  the intent to advance his marijuana distribution business.  And

25  there is no evidence of that, number one.

1          There is no evidence that he sold marijuana.  They

2     can't bring in one person that bought the drugs from him, so

3     that's what they have to prove to sustain a 924(c) conviction.

4          **THE COURT:**  Some day?  Some day, right?  But we are

5     doing pretrial detention right now.  So either I make these

6     connections or I don't, right?

7          **MR. BOGULSKI:**  But there is nothing to make the

8     connection.  There is no allegation that he used -- he's a

9     hunter, and everyone knows it.

10          And the police could have arrested him in Wellsville

11     anytime he went -- I believe he hunted with muskets, which would

12     be legal for him.

13          But, regardless, there is no allegation that he is

14     using these guns to threaten other gang members or to harm

15     anyone in the public.

16          **THE COURT:**  But, Mr. Bogulski, even if we were just

17     here on a single felony of felon in possession of a firearm,

18     shouldn't I have some problems about a concern for the

19     community, based on all of the other facts that we have heard

20     here today?

21          **MR. BOGULSKI:**  I disagree.  Because in 2008, when he's

22     31, it's a nonviolent misdemeanor conviction that he has.  That

23     is a nonviolent A misdemeanor.

24          He was sentenced to a conditional discharge, which is

25     either, in my practice, a fine.  There was no probation that he

1   was sentenced to.

2          So I -- you know, from my perspective, yes, if he had

3   a violent felony conviction from 2008 or 2009 or 2010 or 2011 or

4   2012, you get the point.

5          There is many years that have gone by without any

6   violent convictions.  And then, yes.  Of course you would have a

7   concern.

8          But to look at what has transpired over many years,

9   Judge, I think my client certainly is not any risk of danger.

10          And with the resources of the Federal Government and

11   the probation department and electronic monitoring and home

12   search, that should allay the concerns that this Court has.

13          **THE COURT:**  Ms. Chalbeck --

14          **MS. CHALBECK:**  Your Honor, can I respond to all of

15   that, please?

16          **THE COURT:**  Of course.

17          **MS. CHALBECK:**  Okay.  Counsel has repeatedly brought

18   up the lack of controlled buys.

19          I just want to underscore that the search warrant

20   authorizing the search and seizure of evidence in Mr. Hinkle's

21   residence wasn't related to guns and drugs.

22          A Federal magistrate judge found probable cause to

23   believe that there was evidence of a conspiracy to retaliate

24   against a dead Federal witness.

25          Conspiracy to retaliate; conspiracy to tamper with

1    that witness, so that's point number one.

2         The second point is that the standard for 924(c) is

3    not is my client a gang banger.  It is are firearms used or

4    possessed in a way that confers, quote, an advantage relevant to

5    the vicissitudes of drug trafficking.  That's from United States

6    versus Snow, Second Circuit.

7         And in making that determination under the 3142(g)

8    factors as to whether there is -- in making that determination,

9    you can consider the weight of the evidence.

10        And here, this is Government's Exhibit 29.  In between

11   a scale pictured on the desk and a storage bin full of marijuana

12   behind a window overlooking marijuana plants are two firearms.

13        And that is just in addition to the 17 other firearms

14   located in the residence, many of which were located

15   strategically at points of ingress and egress, by doorways and

16   hallways.

17        Ammunition by marijuana.  Ammunition by the growth

18   operation.  That is in the exhibits that we offered to you.

19        Also, with regards -- I'm sorry.

20        **THE COURT:**  A home -- not too long ago I talked to

21   someone who scattered his weapons around the house for home

22   defense purposes only, no drugs at all.

23        What's wrong with that?

24        **MS. CHALBECK:**  Well, the connection here is that

25   Mr. Hinkle has a drug distribution operation.

1          And counsel's initial argument was, my client doesn't

2     sell drugs.  Then it's, well, my client's not a gang banger.

3          But we know that he does sell drugs.  He's selling

4     drugs to people who want to give them to their granddaughters.

5          This is Government's Exhibit 24.  He has security

6     cameras in his residence -- or excuse me -- on the outside of

7     his residence.

8          And that further supports the inference that he is

9     preparing, or fortifying himself against a drug conflict,

10     because most of his money probably comes from the 134 marijuana

11     plants found on his residence.

12          Counsel also said, in relation to the standard:  Well,

13     my client is not a gang banger.  That he doesn't have any

14     contacts with a biker gang.  He's not going to biker conventions

15     or biker meet ups, biker gang meet ups.  Something to that

16     effect.

17          We would be willing to proffer, Your Honor, that

18     contrary to counsel's representation, there is photographic

19     evidence, not included in the exhibits we sent to the Court or

20     gave to counsel -- there is photographic evidence in

21     Mr. Hinkle's phone in which he is associating; he is taking

22     pictures of members in a known biker gang in Wellsville, and is

23     associating with these people.

24          So even if that were the standard, which it isn't,

25     there is evidence of association here that supports a finding of

1    dangerousness under 3142(g).

2        **MR. BOGULSKI:**  Judge, being in a biker -- I mean, my

3    client is not in a biker gang, but that does not -- and people

4    have a right to associate with people in a small community.

5        Again, I see a couple text messages.  They don't

6    identify who made those text messages.  My client denies selling

7    any drugs.

8        They have no one here that can come in and say that

9    they bought marijuana from this man.  Not one person.  And they

10   have had many days to get affidavits.

11       The Government has vast resources, as you are aware.

12   My client is presumed innocent of these charges.  There are

13   conditions that will protect the public.

14       There are -- there will be a home inspection, if you

15   order it.  Obviously, it would be a condition of his release.

16   And we feel that that's more than reasonable under the

17   circumstances.  And it's the least restrictive means.

18       It seems like my client -- this case can go on for a

19   period of time and to have him locked up, when he hasn't had

20   any -- anything on his record since 2008, would be a miscarriage

21   of justice, when he is presumed to be innocent, when he doesn't

22   have a passport, when the probation department has recommended

23   his release, and when Magistrate Roemer had also indicated the

24   support of that recommendation.

25       There are reasonable conditions which would be very

1    restrictive, which would be home confinement, that would require

2    him to do everything and anything to keep himself on the

3    straight and narrow, Judge.

4            And I think that's reasonable under the circumstances,

5    especially based on the strong presumption of innocence.

6            **MS. CHALBECK:**  May I respond to that, Your Honor?

7            **THE COURT:**  Yes, briefly.  And then I will give

8    Mr. Bogulski the last word, if he wants it, or it sounds like he

9    just had it.  We'll see.

10           **MS. CHALBECK:**  I just want the record to reflect that

11   the last known conviction is not from 2008.  It was not 16 years

12   ago.

13           It was August 9th of this year, when he pleaded guilty

14   to retail theft in Pennsylvania after stealing over a hundred

15   dollars worth of cigarettes.

16           In addition, Mr. -- counsel continues to beat the drum

17   that his client did not sell marijuana.  There is ample text

18   message evidence where people are asking to buy marijuana from

19   him.

20           This is Government's Exhibit 25:  Hey, when the plants

21   are ready, I'm also going to need a couple of ounces.

22           I have some ready.  That's for sure.  Sounds like a

23   drug dealer to me.

24           I also want to turn to Government's Exhibit 27.  This

25   goes to dangerousness, Your Honor.

1        Hey, just a heads up -- this is someone texting
2  Mr. Hinkle -- Hey, just a heads up, I'm all out.  Kids took what
3  I had home.  Let me know when good for you to get in touch.
4  Looking for couple of ounces.  Thanks, Howie.
5        Mr. Hinkle responds, is looking to sell drugs.
6        So this notation that there is not an affidavit
7  because the Government is in the middle of investigating the
8  death of a Federal witness in prosecuting Mr. Hinkle on four
9  counts charged in this complaint, it's not needed right now.
10        There is ample evidence that he is a drug distributor.
11  There is ample evidence that he uses firearms to protect his
12  drugs.
13        He keeps them located right in between a scale and a
14  bin full of marijuana overlooking pots of marijuana.
15        So, Your Honor, for those reasons, as well as those
16  reasons stated in our brief, we would -- we would urge the Court
17  to find that, one, Mr. Hinkle has not rebutted the presumption.
18        But even if he has, we've shown, I believe, by clear
19  and convincing evidence that he poses a danger to the community.
20        That he is a flight risk owing to the strong incentive
21  he has to flee, and that there is also a risk of obstruction
22  here, that we could prove by a preponderance of the evidence.
23        **THE COURT:**  Are we at that point, Mr. Bogulski, where,
24  you know, no amount of marijuana sales is a danger to the
25  community?

1          In other words, I have got defendants who come in here

2   and tell me that their judgment is constantly impaired by

3   marijuana, or they are diagnosed with Cannibis use disorder,

4   which is just another way of saying they can't stop using it.

5          **MR. BOGULSKI:**  Judge --

6          **THE COURT:**  Is that where we are?  It doesn't matter?

7   Marijuana is good?

8          **MR. BOGULSKI:**  That's not my argument, Judge, at all.

9          As I indicated, and then I think -- I know where

10  you're going with this, as I drive by dispensaries.

11         I mean, personally I like the old law.  Up to an ounce

12  in New York was, I think, a hundred dollar fine, mostly an ACD.

13  And if you smoked it in public, then it was a B misdemeanor up

14  to 90 days.

15         I'm really tired of walking around smelling marijuana.

16  Honestly, I don't care if people do it, but I don't want to

17  smell it.  The old law was pretty good, but it's not up to me.

18         What you have to decide, is does that make him

19  dangerous.  And, you know, do I like the dispensaries?  No, not

20  really.

21         But does -- with all that being said, that anyone can

22  walk anywhere within ten minutes of me coming here to buy all

23  this marijuana, does it make him, like, this dangerous guy?

24         If you -- they are speaking, the Government, in

25  generalities.  They are not saying that he, as I said, typical

 1    924(c), that he's threatening anyone with guns.

 2            They are not saying that he's using these guns to --

 3    like, who is he going to compete with?  The dispensary in

 4    Salamanca with his hunting rifles?

 5            I mean, he's going to intimidate them to say stop

 6    selling legal marijuana?  Anyone and anywhere can buy marijuana,

 7    Judge, whether we like it or not.

 8            But that strengthens my argument because it doesn't

 9    make it him dangerous, because he has nothing to protect but his

10    family or whatever.

11            He's not involved in violent drug distribution.  There

12    is no allegation of that.  And you have had many cases -- we all

13    have had, where the allegation is that the individuals are

14    involved in gang activity where they use their guns -- usually

15    handguns, to intimidate other individuals to protect their drug

16    turf.

17            When -- assuming, again, he denies selling it, but

18    assuming if he did sell a small amount, does that make him a

19    danger to the community, when you can go to a dispensary?

20            And is he using those guns to protect that limited

21    amount of marijuana that they found?  I think it does not make

22    him dangerous, Judge.

23            I think the argument is strong, regardless of how I

24    feel about smelling marijuana, when I walk down the street.

25            **THE COURT:**  Ms. Linton, is there anything other than

1   what's in the bail report that you wish to add?  I've got your

2   release recommendation here.

3          **PROBATION OFFICER:**  No, Your Honor.  The only other

4   thing I would add is we can't consider the weight of the

5   evidence or the nature and circumstances of the crime itself.

6          We give a very small weight to it, so our report and

7   recommendation is based on simply the characteristics of the

8   defendant.

9          **THE COURT:**  All right.  Under 18 United States Code

10  3142(e), I must independently determine if a condition or

11  combination of conditions will reasonably assure Mr. Hinkle's

12  appearance, as required, and the safety of any other person and

13  the community.

14         If I find that no such condition or combination of

15  conditions exist, I must order Mr. Hinkle detained pending

16  trial.

17         I have given these arguments and facts a lot of

18  consideration sitting up here and in the last several days

19  leading up to now.

20         Two of the offenses that he's charged with carry

21  maximum terms of imprisonment of ten years or more.  Under the

22  Controlled Substance Act, those are Counts Two and Three.

23         In addition, one of the charges falls under 924(c),

24  possession of a firearm in furtherance of drug trafficking.

25         Pursuant to 3142(e)(3), a rebuttable presumption

1  applies if probable cause exists to believe that Mr. Hinkle

2  committed at least one of these offenses.

3          And because he has not been indicted, I must make a

4  probable cause determination myself.  I have carefully

5  considered everything that has been presented to me in writing

6  and here today by proffer, as well as what I've read on the

7  transcript from Judge Roemer and the affidavit of Special Agent

8  Adam Pena (phonetic) submitted in support of the criminal

9  complaint.

10         Based on all of that, I find that for the reasons set

11 forth in the Pena affidavit and, again, what I've heard,

12 submitted to me already here, on this motion by the Government,

13 that probable cause exists to believe that Mr. Hinkle maintained

14 a drug involved premises; possessed marijuana with intent to

15 distribute, and 100 more -- 100 or more marijuana plants, and

16 possessed firearms in furtherance of drug trafficking crimes, so

17 that means the rebuttable presumption applies.

18         I further find that he has, like Judge Roemer has, he

19 has introduced evidence to rebut the presumption that no

20 condition or combination of conditions will reasonably assure

21 his presence in Court or the safety of the community if he was

22 released pending trial.

23         I've considered all of the factors in the 3142(g),

24 including all subsections, specifically the nature and

25 circumstances of the offense, weight of the evidence,

1    Mr. Hinkle's history and characteristics and the danger to the

2    community.

3         In particular, regarding the 3142(g) factors, I'm

4    considering the charges themselves and what I have heard about

5    them.

6         I'm considering the quantities of plants and firearms.

7    I'm considering the SWAT team's effort to clear the residence;

8    the difficult circumstances to clear the house, and the danger

9    that his actions in sequence created.

10        I'm considering the placement of his weapons, and all

11   of this bears on danger to the community as well.

12        Regarding weight of the evidence, I'm considering the

13   proffers regarding the marijuana, the text messages, the sales,

14   et cetera, and the firearms in conjunction with the marijuana

15   sales and in conjunction with the growing of marijuana and in

16   conjunction with the felony.

17        And I'm considering his questionable employment

18   situation, as well, in terms of where is the money coming from

19   to support himself month to month.

20        I'm considering the criminal history.  I'm considering

21   his family and community ties and everything that we have heard

22   from Mr. Bogulski on that front here and in front of Judge

23   Roemer.

24        I'm considering his mental health and his substance

25   abuse.  I'm also considering his intent to self harm, which is

1    the December of 2021 threat to kill his wife and himself.

2            The threat to his wife is a community danger concern.

3    The threat to kill himself is a nonappearance concern, so I'm

4    considering those topics as well.

5            The Crystal Quinn proffers are worth considering, even

6    if they are not independently sufficient to detain the

7    defendant, but they are not irrelevant, for sure.

8            Regarding the danger to the community, there is the

9    grow operation that I'm considering.  Also, the firearms.  And I

10   mentioned the threat to kill his wife or his common law wife.

11           And I'm considering the -- for what it is worth,

12   the -- what I've heard here today regarding the death of Crystal

13   Quinn and the statement about her having a bounty on her life,

14   which is corroborated by someone other than Mr. Gogolack.

15           I've considered also his conduct when the agents were

16   clearing his house.  My analysis of these factors is based on

17   consideration of everything that has been presented to me,

18   including the transcript in front of Judge Roemer from October

19   26th.

20           I've considered the pretrial services report from

21   October 25; the criminal complaint and the accompanying

22   affidavit.

23           I find by clear and convincing evidence that

24   Mr. Hinkle's release would pose a danger to the safety of others

25   in the community, and that no condition or combination of

1   conditions will assure the safety of others or the community if

2   Mr. Hinkle were released pending trial.

3           I based that conclusion on all of the facts and

4   factors that I just discussed.

5           Because I found that the Government established

6   Mr. Hinkle's danger to the community by clear and convincing

7   evidence, I need not decide whether his release would pose a

8   risk of flight.

9           And I think it's worth noting -- and I've given in

10  this some thought throughout the days and also sitting here,

11  too, that in my judgment, the outcome here today, which is

12  detention pending trial, would be the same outcome even if there

13  were no presumption under all the facts and circumstances.

14          The transcript of my oral ruling will constitute my

15  written findings and the decision on the Government's motion.

16          The Government's motion is granted and Judge Roemer's

17  release order is revoked.  Mr. Hinkle is remanded to the custody

18  of the U.S. Marshals Service.

19          But hang for just a minute, folks, we're going to talk

20  about some housekeeping while we're here.

21          If there is ever a CR case here, Ms. Chalbeck, there

22  should be a case related form, per clerk's office policy, so

23  that the time that one District judge invests in a case isn't

24  wasted if it is assigned inadvertently to another District

25  judge, which sometimes happens.  So a case related form would be

1   called for, if there is a CR case ultimately.

2        Is there -- where is Mr. Hinkle housed right now?

3        **MR. BOGULSKI:**  Chautauqua County, Judge.  Mayville.

4        **THE COURT:**  Chautauqua County.  And do I need to be

5   concerned or does anybody need to be concerned, the Marshal

6   Service, for example, about placement of this defendant,

7   Mr. Gogolack, a defendant in another case, where that other

8   person was supposed to be a witness up in Niagara County, et

9   cetera?

10       Should all three of these folks be held in separate

11   places?  Are they currently held in separate places?

12       **MS. CHALBECK:**  Judge, I believe we've addressed that

13   concern.  Thank you.

14       **THE COURT:**  All right.  Very well.  Anything further

15   from the Government?

16       **MS. CHALBECK:**  No, thank you, Your Honor.  And your

17   note regarding the case related form is taken.

18       **THE COURT:**  All right.  We will issue the proper text

19   order under Subsection I, after we're done here today or

20   tomorrow morning.

21       Mr. Bogulski, anything further from the defendant?

22       **MR. BOGULSKI:**  No.  Have a good weekend, everybody.

23       **THE COURT:**  All right.  Thank you, everybody.

24              (Proceedings concluded at 4:31 p.m.)

25                        *   *   *

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3   original notes are a true and correct record of proceedings in

4    the United States District Court for the Western District of

5        New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10   _s/ Bonnie S. Weber_              December 18, 2023
        Signature                         Date

11

12   BONNIE S. WEBER, RPR

13   Official Court Reporter
     United States District Court
14   Western District of New York

15

16

17

18

19

20

21

22

23

24

25