IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

-vs-

PETER GERACE, JR.,

Defendant.

_____

## SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER

Docket No. 23-CR-99

**Related Submissions**
Original Memorandum in Opposition (Dkt. # 153)
Exhibit A: Government's Proposed Protective Order, with numbering (Dkt. # 153-1)
Exhibit B: Defendant's Proposed Protective Order (Dkt. # 153-2)
Exhibit C: Criminal Complaint (Attached)


Respectfully submitted on July 12, 2024, by:

Mark A. Foti, Esq.
The Foti Law Firm, P.C.
16 West Main Street, Suite 100
Rochester, New York 14614
Phone: (585) 461-1999
Fax: (585) 491-6512
E-mail: mark@fotilaw.com

Defendant Peter Gerace, Jr., by and through counsel, Mark A. Foti, Esq., provides the following <u>supplemental</u> memorandum in response to the government motion for a protective order. This submission supplements the prior Response filed on June 26, 2024, at Docket Entry 153.[1]

The Table of Contents is as follows:

I.     Introduction ........................................................................................................... 3

II.    Background ........................................................................................................... 4

III.   Discussion ........................................................................................................... 9

   A.     The Government's Comments on *Bongiovanni et al* Is a Restatement of False Allegations Asserted in the Second Superseding Indictment ................... 10

   B.     The Government Also Presents Allegations about Other Cases Without Essential Context ....................................................................................................... 17

   C.     The Government's Attacks on Defense Counsel are Baseless and Reckless 21

   D.     The Government's Submission Actually Provides Support for the Arguments Made by the Defense in Favor of Its Proposed Protective Order .. 25

   E.     The Government Provides No Valid Explanation for Why Its Proposed Protective Order Is Necessary as Opposed to the Defense Proposed Protective Order 26

IV.    Conclusion ........................................................................................................... 27

---

[1] Authorization to file a supplemental response is provided by Text Order. Dkt. # 152, 159.

## I.   INTRODUCTION

The defense filed its Response to the Government's Motion for a Protective Order on June 26, 2024. Dkt. # 153. The defense agreed to the imposition of a protective order but argued that the government's proposed protective order (Dkt. # 153-1) was inappropriate and contained several provisions that were superfluous and/or improper. The defense has proposed an alternative protective order that has been endorsed by the majority of co-defendants. Dkt. # 153-2.

On June 28, 2024, the government filed a redacted version of an affidavit it previously filed *ex parte*. Dkt. # 156. The affidavit fails to substantively address why the government's proposed protective order is necessary, and instead favors conclusory allegations, often without appropriate context, aimed at the defendants and defense counsel. The defense has been permitted to submit this Supplemental Memorandum in Response to the government's affidavit.

The defense adopts and incorporates its Response to the Government's Motion for a Protective Order (Dkt. # 153), and for reasons discussed therein, and reasons discussed below, it is respectfully requested that the government's motion for a protective order be denied, the current restriction limiting discovery to "Attorney's Eye's Only" be vacated, and the defense's proposed protective order be instituted upon agreement to an Addendum identifying items that actually require protection.

## II. BACKGROUND

At the status conference on February 23, 2024, this Court indicated that a discovery deadline would be set. Feb. 23, 2024 Transcript at 3. This Court agreed to grant a request by the government for an extensive 90-day deadline. However, this Court specified that to the extent possible, the discovery should "be produced sooner than that date" and it should be produced "[o]n a rolling basis so that people can hit the ground running in terms of what they think they need to do." Feb. 23, 2024 Transcript at 12.[2]

No discovery was provided by May 23, 2024, the deadline to conclude disclosure.

On May 29, 2024, after the deadline to complete discovery disclosure had passed, the government sent an email to the defendants' attorneys stating, for the first time, that it intended to withhold discovery until a "protective order is authorized by the Court."

The government's email attached a 5-page proposed protective order.[3] Even though the government tried to quickly elicit consent from defense counsel for its proposed protective order, the document included several provisions that the government could not have possibly believed all defense counsel would consent to.

---

[2] Before this Court decided whether to grant the government's request, it asked the government if it was possible to do "rolling production during the 90 day period" and the government responded: "I certainly think so, Judge. I think that there's material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment." Feb. 23, 2024 Transcript at 10.

[3] The protective order that the government proposed appears to be the same as the exhibit filed at Docket Entry 129-1. A version with numbered paragraphs was filed by the defense as Exhibit A to the original Response to the Government's Motion for a Protective Order. Dkt. # 153-1.

Over the next two days, communication between the defense attorneys resulted in most of defense counsel deciding to meet to collectively to review the protective order. Because the government had waited until only a few business days before a status conference that had been scheduled for June 3, 2024, the attorneys could not realistically meet before that date.

On June 3, 2024, the majority of defense attorneys met before the status conference to review the proposed protective order in an effort to establish a collective position regarding whether they would consent to a protective order and if so, which provisions would be agreeable. The attorneys came to a consensus regarding which provisions were agreeable and which ones were inappropriate and/or redundant.

At the status conference, the defense indicated that by the following evening, it would provide a proposed protective order with input and/or edits from most or all of the attorneys. The defense requested a deadline be set for the government to file a motion for a protective order if the parties could not reach an agreement.

On June 4, 2024, counsel for Mr. Gerace sent an email to the government with an attachment containing a proposed protective order.

The proposed protective order was drafted with input and/or edits from the majority of attorneys. Counsel for at least six of the defendants had weighed in that they would stipulate to this protective order if it was acceptable to the government.

The morning of June 5, 2024, the government sent a reply email indicating that they would "take a look and get back to" the defense. Despite the comments that the government had wanted to work towards an agreement on the protective order, the government never made any further effort to discuss a compromise.

On June 10, 2024, six days after the defense had provided a proposed protective order, the government sent an email indicating that it is going to file a motion for a protective order.

The clear implication of the government's email was that because defense counsel had not agreed to a large enough percentage of the government's proposed protective order, it would file a motion instead of engaging in further discussion.

Without first seeking permission to do so, the Government opted to file its motion *ex parte* to avoid having its argument tested by the adversarial process. Dkt. # 129.

In response to the government's decision to file the motion, *ex parte*, without first seeking permission to do so, this Court issued a Text Order directing the government to provide authority for its attempt to file *ex parte*.

| 06/12/2024 | 134 | TEXT ORDER as to Simon Gogolack, Peter Gerace, Jr, John Thomas Ermin, Michael Roncone, Frank Knight, Howard Hinkle, Jr., Cortnie Barber, Bernard Byrd, III, Scott Barnes: By June 13, 2024 the government shall supplement its motion for a protective order [129] with authority for its submission of an *ex parte* Affidavit in support of the motion. Defendants' deadline to respond to the motion [129], as supplemented, is extended from June 14, 2024 (see June 3, 2024 Text Order [122]) to June 19, 2024. |

| | | SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 6/12/24. (MDY) |
|---|---|---|

On June 13, the defense provided a memorandum related to the *ex parte* submission issue, which "respectfully requested that this Court reject the government's attempt to file its motion *ex parte* and allow the defense to review the government's motion so that the content of a protective order can appropriately be the product of the adversarial process, ensuring that the defendants' rights to properly prepare a defense are not improperly hindered." Dkt. # 136 at 8.

Later that day, the government filed its memorandum which provided no explanation for why it did not first seek permission leave to file *ex parte* other than to argue in a footnote that it is "common practice in this district that the government files applications for protective orders *ex parte* without first moving for leave under the local rules," and "this practice encourages efficiency and affords defendants more timely access to discovery, and thus is not commonly subject to the scorched earth litigation tactics that Gerace appears ready to embrace here." Dkt. # 138 at 2.

On June 20, the defense sought permission to file its response *ex parte*. Dkt. # 149. The government opposed. Dkt. # 151.

The following week, the Court determined that the *ex parte* motion practice was not going to be permitted for either party.

| | | |
|---|---|---|
| 06/24/2024 | 152 | TEXT ORDER as to Simon Gogolack, Peter Gerace, Jr, John Thomas Ermin, Michael Roncone, Frank Knight, Howard Hinkle, Jr., Cortnie Barber, Bernard Byrd, III, Scott Barnes: Before the court is defendant Gerace's motion [149] for permission to file his response to the government's motion for a protective order [129] ex parte. Having reviewed that motion [149] and the government's response [151], it is denied. Gerace's response shall be publicly filed by June 26, 2024. Also before the court is the government's Memorandum of Law regarding its authority to file an ex parte Affidavit in support of its motion for a protective order [138]. Having reviewed that submission [138] and the defendants' opposition [136,146], in fairness to defendants, they are entitled to a meaningful opportunity to respond to the government's motion. Therefore, by June 28, 2024, the government shall either publicly file a redacted version of the Affidavit, with the defendants' reserving their right to challenge the propriety of those redactions, or withdraw the ex parte Affidavit in lieu of a publicly filed submission. Defendants may file any supplemental responses to the government's motion for a protective order [129] by July 3, 2024. Oral argument of that motion [129], as well as the other pending motions [123, 131, 132], is rescheduled from June 27, 2024 [122] to July 11, 2024 at 1:00 p.m. The time from June 27, 2024 through July 11, 2024 is excluded from the Speedy Trial Act calendar pursuant to 18 U.S.C. Section 3161(h)(1)(D) due to the pendency of motions, and in the interest of justice pursuant to 18 U.S.C. Section 3161(h)(7)(A) and (h)(7)(B)(iv), insofar as this additional period will afford the parties reasonable time to brief the relevant issues in this case and the ends of justice served by granting this continuance outweigh the best interests of the public and the defendants in a speedy trial. Whether the filing of the government's motion to exclude time from the Speedy Trial Act calendar [123] automatically excluded time to June 27, 2024, when I previously declined to enter |

| | | an interest of justice exclusion for that period [122], remains an open question. SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 6/24/24. (MDY) |
|---|---|---|

The defense filed a response for Gerace, publicly, on June 26, 2024, as directed. Dkt. 153.

The government was directed to "either publicly file a redacted version of the Affidavit… or withdraw the *ex parte* Affidavit in lieu of a publicly filed submission." On June 28, 2024, the government filed what appears to be a redacted version of the original Affidavit. Dkt. # 156.[4]

Now having had the opportunity to review the redacted version of the affidavit in support of the government's motion, the defense submits the following supplemental response.

### III. DISCUSSION

The government's affidavit directly and indirectly attacked and denigrated defense counsel in this District.

Paragraph 16 of the government's affidavit claimed, "the problems with dissemination of certain material to the defense have occurred in several contexts in

---

[4] Although the government's submission appears to be a redacted version of the original Affidavit, as authorized by Text Order 152, the government signed and notarized the Affidavit on June 28, 2024.

various cases" and proceeds to briefly discuss five cases that presumably offer the most concerning examples of "problems with dissemination of certain material" out of the hundreds, if not thousands, of cases where a protective order existed.[5]

The first case discussed was *United States v. Bongiovanni et al*, where the government echoed demonstratively false allegations included in the Second Superseding Indictment. Significant factual context is omitted from discussion of other cases, including *United States v. Parks* and *United States v Martinez*.

The government's attacks on defense counsel, including the comments related to a Facebook post made in paragraph 43 of the government's Affidavit, discussed below, actually demonstrate why the government's proposed protective order should be denied and why the defense's proposed protective order is far more appropriate.

A. The Government's Comments on *Bongiovanni et al* Is a Restatement of False Allegations Asserted in the Second Superseding Indictment

In regard to *Bongiovanni et al*, the government made the following comments:

> *United States v. Bongiovanni, et al.*, Case Nos. 19-CR-227, 23-CR-37, involved charges of witness tampering, public corruption, sex trafficking, drug trafficking, and obstruction of justice. A protective order was issued. See id. Doc. No. 347. Nevertheless, counsel for Peter Gerace, including one of his present attorneys in that case, Eric Soehnlein, listed government witness Crystal Quinn as a defense witness. Although the protective order prevented defense counsel from disclosing to the defendant the names of witnesses on

---

[5] It is not clear how far back the government looked to locate examples, but at least one of the five examples is from a jury trial that occurred over four years ago.

the government's witness list until a certain number of days before trial, it did not prevent defense counsel from listing the government's witnesses on the defendant's own list and then reviewing the defense witness list with the defendant, potentially circumventing the protective order, and identifying government witnesses to the defendant in a roundabout way. Crystal Quinn was ultimately murdered, and defendants Gerace, Ermin, Hinkle, and Gogolack have been indicted by a grand jury for Witness Tampering Conspiracy surrounding her murder. *See United States v. Gogolack et. al.*, 23-cr-99, Doc. No. 25, Second Superseding Indictment, Count 2.

Dkt. # 156 at 11-12.

The government's comments regarding the sealed defense witness list[6] echo the

alleged overt act included in paragraph 25 in the Second Superseding Indictment:

The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names and from providing GERACE with the government's witness list.

Dkt. # 24 at 16.

This submission provides the first opportunity to address the falsity of one of the

alleged overt acts in the Second Superseding Indictment, which is now being used by the

government to attempt to procure an inappropriate protective order.

_____

[6] Although the government's Affidavit does not mention this, it should be noted that the defense witness list, referred to in the Government's Affidavit was filed under seal and never made available to the public.

The allegation that the Mr. Gerace's defense team placed Ms. Quinn on the defense witness list to "reveal[] to [Mr. Gerace] the government's witnesses' names" calls for a total suspension of disbelief, requiring the Court to believe (1) that Mr. Gerace would have had no reason to place Ms. Quinn on the witness list himself; and (2) that Mr. Gerace did not already know that the government intended to call Mr. Quinn as a witness. To advance those conclusions, the government ignores its own public comments and submissions made prior to the filing of the defense witness list.

*There Is Information in the Public Record Establishing Why the Defense Needed to Reserve Its Right to Call Ms. Quinn as a Witness List*

On February 3, 2023, the government filed a Criminal Complaint against Crystal Quinn with three counts related to allegations of threatening and tampering with a witness. Case no. 23-mj-011, Dkt. # 1 (attached as Exhibit C[7]).

The Court granted the government's request to unseal the Complaint on February 8, 2023. *See* Case no. 23-mj-011, unnumbered Minute Entry filed February 8, 2023.

The Complaint was primarily based on an incident from November 19, 2019. That incident had been the subject of multiple public proffers by the government, as far back

---

[7] Exhibit C is a continuation of the exhibit numbering from the first Response to the Government's Motion for a Protective Order.

as May 4, 2021[8], but the government did not provide Ms. Quinn with a target letter until January 24, 2023.[9] *See* Exhibit C at 16, ¶ 39.

The government's complaint acknowledged an association and friendship between Ms. Quinn and Mr. Gerace, including:

- PERSON 1 was interviewed under the terms of a proffer agreement. During this interview, PERSON 1 confirmed that PERSON 1 is friends with QUINN, and further confirmed QUINN and P.G. have been friends for a long time. (¶ 33); and

- PERSON 1 explained that due to QUINN, P. G., and PERSON 1 's friendship, it was not uncommon for QUINN to be at P.G.'s residence. (¶ 34).

*See* Exhibit C at 15; *See also* page 9, ¶ 22 (referring to Ms. Quinn as a "longtime associate" of Mr. Gerace).

It stands to reason that Mr. Gerace would have wanted Ms. Quinn included on his witness list based on a belief that she could provide favorable information to Mr. Gerace in the event that the government did not call her.

That is especially true because Ms. Quinn's initial comments to the government agents contradicted the narrative that the government sought to advance. The publicly

---

[8] The government publicly proffered in May 2021 that they had "obtained search warrants for his Facebook account. There has been a witness that received threats through a Facebook account during a scenario where Mr. Gerace was present with the person who was -- we're still investigating it… that that occurred in or about November of 2019." Dkt. # 118 at 6-7.

[9] The November 2019 incident had occurred over three years earlier. The target letter for Ms. Quinn was not issued until January 2023, after a trial date had already been set for Mr. Gerace.

available information provided in the Complaint, drafted by a Federal agent, included

the following allegations:

- I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name. (¶ 46)

- QUINN stated that she recalled this instance, which is detailed supra, and confirmed that she was with PERSON 1 and P .G. when the messages were sent to VICTIM. *QUINN further stated that the messages were sent via Facebook messenger, and that QUINN stated that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account*. (¶ 47)(emphasis added)

- Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account, is false, fraudulent, and fictitious. (¶ 48)

*See* Exhibit C at 17-18.

Regardless of whether the government felt Ms. Quinn's comments were false, she

provided statements to agents contradicting the government's narrative of what occurred

on November 19, 2019, which the government included in a publicly filed complaint,

unsealed four months before the defense witness list was filed.

The idea that defense counsel would include Ms. Quinn on the witness list to

reveal her identity as a cooperating witness is utter nonsense. Mr. Gerace would have had

a substantial interest in calling Ms. Quinn as a witness to elicit the factual information

that he believed she could provide, which may have included, but would not be limited

14

to, the statements she made to the government agents, contradicting the government's narrative.

Even if the defense, or Mr. Gerace, had learned that Ms. Quinn ultimately agreed to cooperate with the government, the defense would have had an interest in preserving its right to call her as a witness, because the fact that she voluntarily provided information to the government that contradicted its narrative, but she was then charged and compelled to cooperate, would make her a potentially valuable witness to the defense as it relates to the government's tactics and the credibility of the investigation.

Thus, the suggestion that the defense would include Ms. Quinn with the purpose of revealing her cooperation is not only illogical as a general premise, but it attempts to lodge allegations, primarily directed at defense counsel, based on conjecture that is contradicted by facts.

*The Insinuation That the Defense Witness List Revealed Mr. Quinn's Cooperation Attempts to Ignore the Government's Public Proffer of Information Establishing Her Cooperation Months Earlier*

The allegation that including Ms. Quinn on the defense witness list would reveal Ms. Quinn as a cooperating witness asks this Court to believe that Mr. Gerace, and the public, did not already know of her cooperation. In order to encourage that false premise, the government avoids acknowledging that the government made public comments in March 2023, that established Crystal Quinn to be a cooperating witness.

In March 2023, only three months before Mr. Gerace was scheduled to go to trial, the government obtained a new indictment related to the incident in November 2019. The government used the indictment as a vehicle to move for detention despite the fact that Pretrial recommended Mr. Gerace's continued release.

During the detention proffer on March 24, 2023, the government spent a considerable amount of time proffering to the allegations related to the incident in November 2019. The government acknowledged that the defense would be able to argue that the government "knew about this for three years." [3/24/23 Transcript at 31]. The government argued "truth does not equal proof." [3/24/23 Transcript at 31]. Specifically, the Government indicated that as of 2021, it had two witnesses who described the interaction in November 2019, and although the "initial information was similar in nature," in March or early February of 2023, the Government "got a third witness." [3/24/23 Transcript at 38].

The government's public comments abandoned any secrecy as to Ms. Quinn's expected cooperation. Setting aside Mr. Gerace's knowledge of the incident and who was present, any member of the public or the media could have easily reviewed the government's public comments in context of the Complaint filed against Ms. Quinn regarding the November incident, unsealed in early February of 2023:

> VICTIM stated that after receiving the Facebook Messenger message from the account of PERSON 1, VICTIM researched PERSON 1's account and determined, based on a picture posted in PERSON 1's Facebook account, that PERSON 1 and

QUINN were together at the time that the message from PERSON 1's account arrived in VICTIM's Facebook Messenger inbox. Moreover, based on the background of the picture depicting PERSON 1 and QUINN, VICTIM knew that PERSON 1 and QUINN were at P.G's home at the time VICTIM received the threats in her Facebook Messenger inbox. As described herein, VICTIM was a close associate of P.G., has been to P.G.'s home and thus was familiar with his residence.

Exhibit C at 12, ¶ 26.

In the government's affidavit, it claims the inclusion of Ms. Quinn on the defense witness list, filed in June 2023, is an example of "problems with dissemination of certain material to the defense." The government's commentary on the defense witness list falsely suggests that the defense would not have had a reason to reserve its right to call Ms. Quinn as a witness, which it clearly did, and that it "potentially circumvent[ed] the protective order," which it clearly did not. Moreover, the government falsely insinuates that the defense witness list was the reason that the defense learned that Ms. Quinn was expected to testify, even though that was publicly established by the government's proffer months earlier in furtherance of a motion to detain Mr. Gerace in the lead-up to trial.

B.      The Government Also Presents Allegations about Other Cases Without Essential Context

Of the four other examples provided, the government presents a brief, limited overview of the circumstances related to the alleged "problems with dissemination of

certain material to the defense," but a closer examination of those cases reveals additional context.

*United States v. Lavon Parks*

Regarding *US v Parks*, the government alleged that "a defendant who was released pending trial following disclosure of pre-trial submissions, including disclosure of the government's witness list. The defendant was subsequently remanded after contacting a government witness following his release." Dkt. # 156 at 14.

While this may be technically true, the communication with a government witness was not the result of the government's witness list. It involved communication between the defendant and his ex-girlfriend, who reported that she did not feel threatened.

The circumstances were addressed in a motion by the defense, later that year, asking for the Court to reconsider the release of the defendant.

> On July 28, 2022, the Government filed a motion to revoke his release after meeting with his ex-girlfriend for trial preparation. She admitted she had spoken on the phone once with Lavon Parks for about ten minutes a few days after his release. Lavon had been speaking to her mother and she then got on the phone. Lavon also sent her several Biblical passages by text message from a phone that the Probation Office had not approved for his use. Despite presumably being told by the prosecutor not to speak to Lavon, the families have been friends for a number of years and the witness did not report the contact when it occurred. *According to a report of her meeting with the Government, the witness did not express that she felt threatened.*
>
> Case No. 19-cr-087, Dkt. # 778 at 6.

Although the violation had resulted in the defendant being remanded in July 2022, and the government included the Minute Entry from July 29, 2022, documenting the remand, the government omitted the Minute Entry from December 15, 2022, less than five months later, which states, in part:

> Oral Argument re 778 MOTION for Reconsideration *of Detention Order* filed by Lavon Parks held on 12/15/2022. Court reviewed submissions, and finds circumstances have changed as stated on the record. Defendant Lavon Parks' motion is granted. Upon completion of probation's home inspection, defendant Lavon Parks shall be released on home incarceration on the same conditions previously imposed

> Case No. 19-cr-087, Dkt. # 796.

Indeed, the government's affidavit not only omitted that the witness did not feel threatened, but it ignored the fact that the defendant was subsequently released again and remained out of custody until December 2023 following the conclusion of his trial.

*United States v. Luis Martinez*

The allegations regarding *US v Martinez* are that a protective order prohibited defense counsel[10] from making or providing copies of the protected materials to the defendant and some of the prohibited materials were found in the defendant's jail cell.

---

[10] The government's affidavit identified defense counsel as Eric Soehnlein even though it omitted the name or redacted the name of defense counsel in other paragraphs. It appears that because Mr. Soehnlein continues to represent Mr. Gerace in *Bongiovanni et al*, that he continues to be targeted by the government's ad hominem attacks.

Counsel "ultimately attributed responsibility for this violation of the protective order to a miscommunication with his support staff." Dkt. # 156 at 12.

Upon information and belief, there is truth to the fact that when counsel was advised that his client was in possession of prohibited materials, he attempted to determine what occurred, and after speaking to his support staff, he surmised that the materials may have been inadvertently sent to Mr. Martinez.

However, the allegations omit significant details which were addressed, on the record, following the purported disclosure. The discussion involved the attorney who took over the case, the prosecutor handling the case, and the District Court Judge presiding over the case.

> **MR. BOGULSKI:** Judge, I know very little about this case, obviously, and I just received some information. I've just been getting up to speed. A lot of times I see -- I don't know exactly what happened here, but is the protected material -- they put, like, stamps on it on the paper that will say -- I've seen that in some cases where they stamp it, so that there is no mistake.

> **THE COURT**: Right. My understanding is that that did not occur in this case. Mr. Glaberson, is that correct?

> **MR. GLABERSON**: That's right. It should be stamped with the 3500 number, but there is no additional stamp on those materials.

> **THE COURT**: Right. Sometimes in the footer of the document, at least, I used to put lots of things in the footer of the document in civil practice at least.

> **MR. GLABERSON**: Sure.

> **MR. BOGULSKI**: That's what I'm saying -- just so I'm saying, because mistakes happen, right? Like, you know how much paper lawyers deal with, so --
>
> **THE COURT**: It sounds like that is what happened here.
>
> Case no. 21-cr-00089-JLS-MJR, Dkt. # 141 at 13-14.

The government's affidavit omitted that the District Court reviewed the circumstances and agreed that it sounded like a "mistake" as opposed to an intentional or willful violation of a protective order. It also omitted that the mistake was made, in part, because the material excluded watermarks or any footer identifying the material as protected, something defense counsel, and support staff, were accustomed to seeing and is often helpful to identify material that requires special care.

C.   <u>The Government's Attacks on Defense Counsel are Baseless and Reckless</u>

In addition to the omission of significant, and arguably essential, details of what occurred in the cases discussed above, the government's affidavit made a particularly bizarre allegation directed at defense counsel in paragraph 43 as part of the assertion that "The proper handling of confidential material has already arisen in this case." Dkt. # 156 at 26.

Specifically, the government alleges:

> For example, in or about April 2024, I learned that an individual on Facebook *claimed to "live" with one of the attorneys in this matter.* The individual claims that "[t]he dude [Crystal Quinn] was with had pressed Xanax bars and she took 1 that had felt in it and she wasn't used to any opiates. It was not

enough to kill 400 people but yea, trust the feds." Upon information and belief, the government has never proffered publicly that Ms. Quinn "took 1" of the purportedly "pressed Xanax bars" this individual refers to, *which suggests that this individual learned of a defendant's potential defense through his or her counsel.*

*Id*. (emphasis added).

The government then includes a screenshot of the Facebook post, including the claim that an individual "live[s] with the attorney for someone on the case." Dkt. # 156 at 27. Even though the Facebook conversation was public, the government inexplicably redacted the name of the individuals who chose to make those public posts.

There are only two probable reasons that the government would redact the names of the individuals who publicly posted those comments: (1) it would foster speculation that the individual is indeed someone living with one of the attorneys, even though that does not appear to be the case; and/or (2) the government wanted to make it more challenging to locate the comments on-line.

In regard to the latter point, it seems the government may have wanted the comments to remain concealed, because of the comment that individual made immediately before the one the government quoted.

A full screenshot of the public comments is presented below, next to the screenshot that the government provided to this Court.



The Facebook user, Sean Conley, first claimed that he had knowledge because he "kn[ew] the dude she was with," and then proceeded to claim his source of knowledge was that he "live[ed] with the attorney for someone on that case."

It is extraordinarily problematic and reckless for the government to present the second comment, initially in an *ex parte* submission, without the preceding statement, and then allege that the Facebook user "learned of a defendant's potential defense through his or her counsel."

The user's first comment, omitted from the government's affidavit, suggests that the user, like a lot of people on the internet, is merely bloviating, suggesting a connection to the case that likely does not exist, and if it does exist, it does not involve "learn[ing] of a defendant's potential defense through his or her counsel."

If the government actually investigated the post and they obtained information suggesting that Mr. Conley has an actual connection to one of the attorneys in this case, it would have likely identified the connection, but it did not.

Furthermore, to the extent that this allegation was made in regard to "confidential material," it is unclear how the government was attempting to make a connection to the disclosure of "confidential material" when the post in April 2024 was made several weeks before the government made discovery available.

The inclusion of this allegation, in an *ex parte* submission was particularly reckless and inflammatory. If the government has information that Mr. Conley is connected to one of the attorneys, it should be required to so state and identify what confidential material was improperly handled.

Until it does so, it appears that the only reasonable conclusion is that the government is so engaged in its role as advocates that it forgets that it is obligated to tether its allegations, including those made against defense counsel, to some semblance of reality.

D.    <u>The Government's Submission Actually Provides Support for the Arguments
Made by the Defense in Favor of Its Proposed Protective Order</u>

The defense's original Response discussed the true objectives of the government's
proposed protective order: "(1) limit dissemination of information to the public and/or
third parties; (2) broaden and expand options for the government to attack defense
counsel; and (3) provide the government with insight into defense strategy that the
government is not legally entitled to." Dkt. 153 at 4.

The Response went into detail why the government's proposed provisions
primarily attempt to accomplish those objectives, as opposed to advancing any concern
of witness safety.

The defense addressed the government's attempts to curate allegations and
position itself as the "sole gatekeeper as to what information is available to the public."
Dkt. 153 at 6. Indeed, the government's curated presentation of facts is demonstrated in
the manner in which it withheld context for the referenced cases, including most
importantly the details of what occurred in *Bongiovanni et al*, and the allegations it made
regarding the Facebook post, which was conveniently cropped to exclude the Facebook
user's prior statement.

The defense noted that "[t]his US Attorney's Office has demonstrated a practice of
attacking defense counsel and alleging violations of ethical rules where none exist. That
should provide additional reason to deny the government's inappropriate request to
include these rules within a Court-issued protective order." Dkt. 153 at 13. Not

surprisingly, the now disclosed *ex parte* submission was filled with direct and indirect attacks at defense counsel, including the insinuation that defense counsel had improperly handled "confidential material" in this case, without anything more than a Facebook post from a random user. The government's submission demonstrates why the government should not be provided the authority it seeks to broaden its ability to prosecute defendants and defense counsel for conduct which is prohibited by state ethical rules and would be subject to sanctions elsewhere if legitimately violated. The government will likely claim violations where none exists, regardless of whether the evidence supports the claim or not.

The disclosure of the *ex parte* affidavit, even in its redacted form, reveals that the defense was is correct to oppose the inappropriate and superfluous provisions contained in the government's proposed protective order. Those provisions would allow the government to create issues where none should exist and would give the government and uncanny strategic edge over the defense, which it will undoubtedly wield even when inappropriate to do so.

E.   <u>The Government Provides No Valid Explanation for Why Its Proposed Protective Order Is Necessary as Opposed to the Defense Proposed Protective Order</u>

The government's affidavit did little to compare its proposed protective order with that proposed by the defense. The submission utterly fails to justify why the excessive provisions are justifiable.

The government argues that "[a]ssuming that all attorneys are responsible for abiding by the Rule of Professional Conduct, tying such rules to the provisions of a protective order imposes no additional burden."

Except, a more appropriate way to look at the issue is that assuming that all attorneys are responsible for abiding by the Rule of Professional Conduct, then they will be subject to sanctions by an appropriate agency if those rules are violated, so tying such rules to the provision of a protective order imposes no additional benefit. At least not to anyone other than the government, who is comfortable making allegations against defense counsel for strategic advantage.

In particular, the government offered absolutely no explanation for why it feels that paragraph 17 of its proposed protective order would be appropriate, or even legal, given the insight it would provide into defense strategy and work product.

The government's submission demonstrates that there is truly no basis to support its proposed protective order over that proposed by the defense.

## IV. CONCLUSION

For all of the reasons set forth above, and for the reasons addressed in the defense's original Response to the Government's Motion for a Protective Order (Dkt. # 156), it is respectfully requested that the government's motion for a protective order be denied, the current restriction limiting discovery to "Attorney's Eye's Only" be vacated, and the

defense's proposed protective order be instituted upon agreement to an Addendum identifying items that actually require protection.

Dated: July 12, 2024

s/ Mark A. Foti
Mark A. Foti, Esq.