AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America<br>v.<br>**CRYSTAL QUINN**<br>*Defendant* | Case No. 23-mj-11 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of November 19, 2019, in the County of Erie, in the Western District of New York, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| (Count 1)<br>18 U.S.C. §§ 1512(b)(1) and 2 | knowingly uses intimidation threatens, or corruptly persuades another person, or attempts to do so, with intent to influence, delay, or prevent the testimony of any person in an official proceeding |
| (Count 2)<br>18 U.S.C. §§ 1512(b)(2)(B) and 2 | tampering with a witness by intimidation, threats, corrupt persuasion, or misleading conduct |
| (Count 3)<br>18 U.S.C. §§ 1512(b)(3) and 2 | tampering with a witness- hinder, delay, prevent, communication to law enforcement officer |

On or about the date of January 24, 2023, in the County of Erie, in the Western District of New York, the defendant violated:

| | |
|---|---|
| (Count 4)<br>18 U.S.C. § 1001(a)(2) | material false statements to the executive branch of the United States |

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
Complainant's signature

JASON KAMMERAAD
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION
*Printed name and title*

Sworn to before me telephonically.

Date: February 3, 2023

_____
Judge's signature

City and State: Buffalo, New York

HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK )
COUNTY OF ERIE        ) SS:
CITY OF BUFFALO     )

JASON A. KAMMERAAD, being duly sworn, deposes and says:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2017. I am currently assigned to the Buffalo Field Office and to the White Collar Crime Squad within that office. My duties include the investigation of public corruption offenses. As such, I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. Prior to becoming a Special Agent, I was employed as a Sheriff's Deputy for approximately 12 years in Collier County, Florida.

2. I, along with other agents of the FBI and Homeland Security Investigations ("HSI") are investigating crimes related to public corruption, bribery, drug trafficking, and sex trafficking. To date, the investigation has resulted in several indictments, including a pending Second Superseding Indictment in Case No. 19-CR-227-LJV, which charges an individual, "P.G.", with violations of federal law consisting of: conspiracy to defraud the

United States, in violation of 18 U.S.C. § 371 (Count 2), bribing a public official, in violation of 18 U.S.C. § 201(b)(1)(A) and (b)(1)(C) (Count 6), maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count 7), conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count 8), and conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c) (Count 9). See Dkt. No. 89, which is attached hereto and incorporated herein by reference as **Exhibit A**.

3.  As set forth in the above-referenced Second Superseding Indictment, the investigation and charges include, among other things: drug and sex trafficking activities that have occurred in and around Pharaohs Gentlemen's Club.

4.  The information contained in this affidavit is based upon your affiant's personal knowledge as well upon reports, charging documents, and information received from other law enforcement officers. Because this Affidavit is being submitted for a limited purpose, that is, a probable cause determination, I have not presented all of the facts of this investigation to date. I have set forth only the information I believe to be necessary to establish probable cause.

5.  This affidavit is submitted in support of a Criminal Complaint charging CRYSTAL QUINN ("QUINN") with violations of Title 18, United States Code, Sections 1512(b)(1) (knowingly uses intimidation threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding);

2

1512(b)(2)(B) (tampering with a witness by intimidation, threats, corrupt persuasion, or misleading conduct); 1512(b)(3) (tampering with a witness- hinder, delay, prevent, communication to law enforcement officer); 1001(a)(2) (false statements) and 2 (aiding and abetting).

## THE RELEVANT STATUTES

6. Title 18, United States Code, Section 1512(b)(1) provides that whoever knowingly uses intimidation threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding [shall be guilty of a crime].

7. Title 18, United States Code, Section 1512(b)(2)(B) provides that whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to cause or induce any person to withhold testimony, or withholding a record, document, or other object from an official proceeding [shall be guilty of a crime].

8. Title 18, United States Code, Section 1512(b)(3) provides that whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense [shall be guilty of a crime].

9. Title 18, United States Code, Section 1001(a)(2) makes it a federal crime to "knowingly and willfully make[] any materially false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive branch … of the Government of the United States." The FBI is part of the executive branch of the Government of the United States.

## PROBABLE CAUSE

## BACKGROUND OF INVESTIGATION

10. On October 31, 2019, a federal grand jury in the Western District of New York returned an eleven-count indictment against an individual, "J.B.", for violations of Title 21, United States Code, Section 846, and Title 18, United States Code, Sections 371, 201(b)(2)(A), 201(b)(2)(C), 1001(a)(2), and 1519. See Case No. 19-CR-227, Doc. No. 1. The Indictment contained references to, among other things, unindicted Coconspirator 1 and Pharaohs Gentlemen's Club (PGC), located at 999 Aero Drive, Cheektowaga, New York.

11. On November 29, 2019, law enforcement applied for and received search warrants authorizing the searches of a residence associated with "P.G.", who was then only referenced as unindicted Conspirator 1, and PGC.

12. On December 12, 2019, law enforcement executed the search warrants at both locations. Thereafter, there was significant media coverage of these search warrants, including about P.G. and PGC.

4

## **INTIMIDATION, THREATS, AND CORRUPT PERSUASION AGAINST VICTIM**

13. Before and after the December 12, 2019, federal search warrants executed at P.G.'s residence and at PGC, law enforcement interviewed numerous individuals regarding the investigation of J.B., P.G., and conduct occurring in and around PGC.

14. One individual, VICTIM, is a former dancer at PGC who has spent time in an intimate relationship with P.G.

15. In or about April 2019, prior to federal search warrants executed at P.G.'s residence and at PGC, VICTIM provided information to federal law enforcement about P.G. and PGC. VICTIM had been arrested by local authorities for allegedly stealing a watch that belonged to P.G., and through his interactions with a member of the local police agency, P.G. knew that VICTM had been arrested relative to the watch.

16. After VICTIM was arrested, federal agents responded to the local police department and interviewed VICTIM.[1] The information VICTIM provided was relevant to the ongoing federal investigation into P.G. and PGC, and the investigation that was being conducted before a Federal Grand Jury, which would later result in the filing of the Indictment in Case No. 19-CR-227-JLS, which was a predecessor to the Second Superseding Indictment attached hereto and incorporated herein by reference as **Exhibit A**.

---

[1] VICTIM did not receive any benefit from federal agents for speaking to them, and the federal government played no role in any disposition relating to the watch as that was purely a state/local matter.

5

17. Shortly after speaking with federal agents at the local police department, VICTIM reported being assaulted by an associate of P.G. In particular, VICTIM reported, in sum and substance, that in July 2019, shortly after she provided information to federal authorities in April 2019, another female associate of P.G. and former PGC employee threatened and assaulted VICTIM. Specifically, VICTIM was placed in a headlock and P.G.'s associate stated that she heard that VICTIM was speaking to federal law enforcement officers and that she was, "going to fucking kill [VICTIM]." VICTIM reported that the bar's bouncers physically intervened in order to remove P.G.'s associate from VICTIM. VICTIM believes P.G.'s associate assaulted VICTIM in retaliation for VICTIM's cooperation with law enforcement in the investigation regarding P.G. and others.

18. This investigation has confirmed that P.G. has acquaintances in the local police department where federal agents interviewed victim, and the circumstances indicate that P.G. and others associated with him formed a belief that VICTIM was cooperating with federal authorities who were investigating P.G. and PGC.

19. On October 17, 2019, VICTIM testified before the Federal Grand Jury, which later returned the Indictment in Case No. 19-CR-227-JLS on October 31, 2019.

20. On November 19, 2019, at approximately 12:34 a.m. (EST), following VICTIM testimony before the Federal Grand Jury, as referenced above, VICTIM received threatening messages directly to her Facebook account that referenced VICTIM's cooperation with law enforcement. In particular, VICTIM received messages via Facebook Messenger

from an account operated under the username of an individual, PERSON 1, whom the VICTIM knows based upon previous experiences.

21. PERSON 1 was a close associate of P.G. and was previously engaged to and living with P.G. at the time the VICTIM received the Facebook threats.

22. The investigation has established that CRYSTAL QUINN, a longtime associate of P.G., made the threats to VICTIM using PERSON 1's Facebook account.

23. In particular, CRYSTAL QUINN stated the following to VICTIM in messages VICTIM received via Facebook Messenger using PERSON 1's account. The VICTIM took screenshots of the messages sent via Facebook Messenger and provided them to law enforcement. The screenshots provided by the VICTIM is below and typed as follows (complete with typographical errors):



Hay u [ ]² ass bitch

It crystal

*I'm good g to see u and when I do well use your imagination bitch u snitch junkie cunt*

Ur a fucking a funny cunt you would

---

² "[ ]" is VICTIM's former last name, which your affiant has removed to protect the identity of the VICTIM.

8

> do whatever for drugs in filling char in on how much of a scum bag u are like u wanted to claim peters home like u deserved it bitch u deserve nothing u nasty cunt learn how to be a mother cause your husband was just at my place filling me in how my h of a pull head junkie u are too bad u couldn't take char down oops she is to smart cause you are the biggest piece of shit I've ever met that why nina was fucking your husband and being a mother to your daughter u junkie ass pond scum
>
> *Plan on nothing peter knows better u fucking nark*
>
> *Girl h don't want to fuck with me u know how I get down*
>
> I hope u fucking is cunt
>
> Od bitch.ckme het ur shampoo bitch
>
> Haha your a joke go kill yourself u dirty com gussling whore

(Emphasis added).

24. VICTIM indicated that, prior to VICTIM receiving the Facebook Messenger message from PERSON 1's account, in approximately January of 2019, VICTIM purposefully blocked QUINN from contacting VICTIM via Facebook. Therefore, VICTIM stated that the only way that QUINN could contact VICTIM on Facebook was by using someone else's account.

25. VICTIM further indicated that, based upon the content and comments in the messages, that CRYSTAL QUINN was the source of the Facebook message described above,

9

and that based on QUINN's relationship with P.G, the reference within the threatening Facebook Messenger message to "[P]eter" is a reference to P.G.

26. VICTIM stated that after receiving the Facebook Messenger message from the account of PERSON 1, VICTIM researched PERSON 1's account and determined, based on a picture posted in PERSON 1's Facebook account, that PERSON 1 and QUINN were together at the time that the message from PERSON 1's account arrived in VICTIM's Facebook Messenger inbox. Moreover, based on the background of the picture depicting PERSON 1 and QUINN, VICTIM knew that PERSON 1 and QUINN were at P.G's home at the time VICTIM received the threats in her Facebook Messenger inbox. As described herein, VICTIM was a close associate of P.G., has been to P.G.'s home and thus was familiar with his residence.

27. VICTIM researched P.G.'s Facebook account and learned that P.G. had returned from a trip and was back at his home in Clarence at the time the threat arrived in VICTIM's Facebook Messenger inbox. Thus, VICTIM concluded that QUINN sent the message via PERSON 1's account while QUINN, PERSON 1, and P.G. were all at P.G.'s residence.

28. VICTIM stated that based on the previous physical assault, see ¶ 17, above, of VICTIM by an associate of P.G., and the threatening Facebook messages VICTIM received

on or about November 19, 2019, in combination with P.G.'s connections to Outlaws MC[3] and others, VICTIM is fearful for VICTIM's health and safety.[4]

29. In particular, VICTIM advised that the Facebook Messenger messages describes others' knowledge of her cooperation with law enforcement (e.g., *"use your imagination bitch u snitch junkie cunt"* and *"Plan on nothing peter knows better u fucking nark"*) (emphases added). VICTIM stated that VICTIM is familiar with the negative connotations

---

[3] The international president of the Outlaws Motorcycle Club, and several Outlaws MC members are employed at Pharaoh's. See **Exhibit A**, Second Superseding Indictment, Introduction at ¶4. Law enforcement considers the Outlaws MC to be a dangerous and violent criminal organization, and there have historically been a myriad of Outlaws MC prosecutions nationally. See, e.g., United States v. Starrett, 55 F.3d 1525, 1533 (11th Cir. 1995) ("The Outlaw Motorcycle Club (the "Outlaws") is one of the four largest national 'one-percenter' motorcycle clubs. Witnesses testified that the term 'one-percenter'—usually depicted by the symbol '1% er'—is motorcycle gang parlance meaning that the club is comprised of the one percent of the overall biker population who maintain total independence from society, and who are known to cause the most trouble, or 'raise the most hell.'"); see also United States v. Bowman, 302 F.3d 1228, 1231 (11th Cir. 2002) (former international president of the Outlaws convicted of racketeering, conspiracy to murder, and various other offenses); United States v. Lawson, 535 F.3d 434, 438 (6th Cir. 2008), as amended (Oct. 9, 2008) (RICO prosecution relating to Outlaws MC "Green Region", including a murder at a strip club.).

[4] Subsequent to the events referenced herein, VICTIM has been arrested several times and VICTIM's drug use seems to have increased. VICTIM's arrests include the following: 10/27/2022-PL 220.1- Criminal Possession of Controlled Substance, 09/10/2022- PL 155.4- Grand Larceny-2nd, 9/2/2022-PL 220.0- Criminal Possession of Controlled Substance, 7th, PL 155.2 Petit Larceny, 8/11/2022-PL 220.1 Narcotic Drug INT/Sell, 3rd, 5/18/2022 -PL 220.1 Narcotic Drug INT/Sell, PL 220.0 Criminal Possession Narc Drug, 4th, PL 220.0 Criminal Possession Controlled Substance, 7th, PL 220.5 Criminal Use Drug Paraphernalia, 2nd, PL 220.1 Narcotic Drug INT/Sell, PL 220.1 Criminal Possession Controlled Substance, PL 220.0 Criminal Possession Narcotic Drug, 4th, PL 220.0 Criminal Possession Controlled Substance, 7th, PL 220.5 Criminal Use Drug Paraphernalia, 2nd, PL 220.5 Criminal Use Drug Paraphernalia, 2nd, 10/22/2021- PL 220.1 Narcotic Drug INT/Sell, PL 220.1 Criminal Possession of a Controlled Substance/Narcotic, PL 220.0 Criminal Possession of Narcotic, 4th, PL 220.0 Criminal Possession Controlled Substance, 7th, PL 220.0 Criminal Use Drug Paraphernalia, PL 220.0 Criminal Use Drug Paraphernalia, 2/14/2008- PL 215.5 Criminal Contempt, 2nd, 10/28/2007 PL 240.2 Harassment, 2nd.

and implications of the terms "snitch" and "nar[c]," as used in the Facebook threats she received on November 19, 2019, from QUINN.

30. Based upon my training and experience, the terms "snitch" and "narc" are commonly used by targets of investigation, defendants, and/or their proxies to label and describe people cooperating with law enforcement in investigations. Moreover, such terms are often used to intimidate witnesses and to advise victims and/or witnesses that their cooperation with law enforcement has been discovered and exposed in an effort to chill victim/witness cooperation and to dissuade such victim/witnesses from cooperating with authorities, testifying in court, or otherwise from following through with cooperation if it has been commenced.

31. Additionally, VICTIM proffered that VICTIM believes the threatening messages reference a threat of physical violence against her (e.g., "Girl h don't want to fuck with me *u know how I get down*") (emphasis added) and interprets them as a threat towards VICTIM's physical health and safety.

32. As set forth above, VICTIM has testified before a Federal Grand Jury. The VICTIM has expressed fear for their health and safety, and mentioned their fear of the associates of P.G. Specifically, the VICTIM stated their fear of being in public and being physically harmed by associate(s) of P.G. to include members of the Outlaw MC.

33. Further, PERSON 1 was interviewed under the terms of a proffer agreement. During this interview, PERSON 1 confirmed that PERSON 1 is friends with QUINN, and further confirmed QUINN and P.G. have been friends for a long time.

34. PERSON 1[5] explained that due to QUINN, P.G., and PERSON 1's friendship, it was not uncommon for QUINN to be at P.G.'s residence.

35. PERSON 1 confirmed that PERSON 1, QUINN and P.G. were present together in P.G.'s basement on November 19, 2019. PERSON 1 stated that P.G. and QUINN began speaking negatively about the VICTIM which PERSON 1 initially thought stemmed from an incident involving the alleged theft of property belonging to P.G. by the VICTIM.

36. PERSON 1 stated P.G.'s and QUINN's anger toward the VICTIM evolved into both P.G. and QUINN identifying the VICTIM as a "snitch." Furthermore, PERSON 1 stated P.G. "revved up" QUINN and referred to the VICTIM as a "snitch-bitch." Based upon the context and circumstances, and my training and experience, P.G. and QUINN's use of the term snitch in this context related to their belief that VICTIM 1 had, or was about to, cooperate with federal law enforcement investigating P.G. and the activities at PGC.

37. PERSON 1 advised that QUINN utilized PERSON 1's cellphone and accessed PERSON 1's Facebook account to contact the VICTIM and to send the messages described above.

---

[5] PERSON 1 has admitted prior cocaine use, including with P.G.

13

38.     PERSON 1 stated she deleted the messages sent to the VICTIM by QUINN sometime after November 19, 2019.

## QUINN'S FALSE STATEMENT TO THE FBI

39.     On January 24, 2023, FBI SA Anthony Butera and I ("interviewing agents") proceeded to QUINN's residence in order to interview and serve a target letter upon QUINN related to her conduct towards VICTIM 1.

40.     Prior to interviewing agents approaching QUINN's residence, other FBI agents were conducting surveillance in the vicinity of QUINN's address. At that time, QUINN, who was in her vehicle, observed one of the FBI SAs parked on the street, pulled up next to the FBI SA, and photographed the FBI SA's vehicle.

41.     Interviewing agents approached QUINN's residence and advised they had a court document [target letter] they needed to provide QUINN. QUINN invited the interviewing agents into her residence and advised, in sum and substance, that her mom already ran the agent's license plate and that she has nothing to say. It should be noted that, at the time, QUINN's mother was employed by the Depew Police Department as a clerk.

42.     Unprompted, QUINN advised that she had mental health letters from her doctor that state she cannot testify in court. Notably, neither of the interviewing agents had mentioned anything about the possibility of QUINN testifying in a court proceeding.

43. QUINN continued and stated that her attorney works in the same office as P.G.'s attorney, and further stated that QUINN and P.G. went their separate ways a couple months ago. QUINN also stated that P.G. had recently been texting QUINN asking bout how she is doing or how her family is doing.

44. QUINN then asked why the interviewing agents were at her residence, and I provided QUINN the target letter and explained what it was. QUINN appeared to read the target letter, and then asked the interviewing agents what the referenced charges in the target letter meant.

45. I then asked QUINN if she recalled a time when she, [PERSON 1], and [P.G.] were in [P.G.]'s basement together. QUINN stated that she cleaned [P.G.]'s home for years and would often hang out with [P.G.], [PERSON 1], and others in [P.G.]'s basement and did so "a lot" in 2019.

46. I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name.[6]

47. QUINN stated that she recalled this instance, which is detailed *supra*, and confirmed that she was with PERSON 1 and P.G. when the messages were sent to VICTIM. QUINN further stated that the messages were sent via Facebook messenger, and that

---

[6] Brackets indicate true names were used when speaking with QUINN.

[PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account.

48. Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account, is false, fraudulent, and fictitious. In truth and in fact, and as QUINN then and there well knew, QUINN sent the above-described messages to VICTIM using PERSON 1's Facebook messenger account while in the presence of P.G. and PERSON 1 in P.G.'s basement. Moreover, as set forth above, the messages were intended to intimidate, influence, dissuade, threaten, and retaliate against VICTIM and/or to induce VICTIM to cease cooperating with federal authorities.

49. QUINN made other statements and volunteered additional information and then her attorney called her. I spoke on the phone with QUINN's attorney, and I explained the purpose and that a target letter was issued to QUINN. QUINN's attorney advised, in sum and substance, that he told QUINN not to make further statements and asked that I cease questioning, and I agreed.

50. After QUINN finished speaking with her attorney, and briefly before interviewing agents left her residence, QUINN asked me an additional question and began voluntarily making additional statements about her knowledge about one of P.G.'s friends,

who is now deceased. The interviewing agents finished listening to what QUINN volunteered, and then left the residence without asking additional questions.[7]

## CONCLUSION

51. Based upon the foregoing, there is probable cause to believe that on or about November 19, 2019, CRYSTAL QUINN violated the following statutes:

    (i)    1512(b)(1) (knowingly uses intimidation threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding);

    (ii)    1512(b)(2)(B) (tampering with a witness by intimidation, threats, corrupt persuasion, or misleading conduct);

    (iii)    1512(b)(3) (tampering with a witness- hinder, delay, prevent, communication to law enforcement officer); and,

    (iv)    2 (aiding and abetting).

52. Additionally, based upon the foregoing, there is probable cause to believe that on or about January 24, 2023, CRYSTAL QUINN violated the following statute:

    (i)    Title 18, United States Code, Section 1001(a)(2) (false statements).

---

[7] Not all of QUINN's statements are documented in this affidavit.

Accordingly, I respectfully request issuance of the attached Criminal Complaint and further request that this complaint and supporting affidavit and exhibit remain sealed until further Order of the Court.

JASON A. KAMMERAAD
Special Agent
Federal Bureau of Investigation

Sworn to and signed telephonically
this 3rd day of February, 2023.

HONORABLE H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

18