IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————————

UNITED STATES OF AMERICA,

v.                                    23-CR-99-LJV-JJM

SIMON GOGOLACK, ET AL.,
                    Defendants.

———————————————————————————

## REPLY IN SUPPORT OF GOVERNMENT'S REVISED AND SUPERSEDING MOTION FOR A PROTECTIVE ORDER

The government submits this reply to the defendants' various submissions (Doc. Nos. 158, 160, 161, 162, and 164) opposing the government's revised and superseding motion for a protective order (*see* Doc. No. 156).  For all the reasons stated below, the Court should grant the government's revised and superseding motion for a protective order (Doc. No. 156, Exhibit A).

## PRELIMINARY STATEMENT

A general protective order— governing all material provided in voluntary discovery and restricting its dissemination to uninvolved or inappropriate third parties— is hardly an unprecedented or monumental request.  *See, e.g.*, Protective Order, *United States v. Gendron*, 22-CR-109-V, (Doc. No. 27).  And it should not be treated as much here.

The instant case centers around the illicit efforts, undertaken by various defendants named in this indictment, to silence Crystal Quinn before she could testify and to obstruct the subsequent investigation into her death.  The government's request for a protective order in this case is motivated entirely by the government's earnest desire to fulfill its obligation to

1

keep witnesses safe and prevent investigative material from floating around in the public, in short—to ensure that criminal cases are contested and determined in the light of a courtroom, based upon facts and law, and not in the shadows of the street, based upon power, violence, threats, and intimidation.

The Court need not look far to see how this case could compromise those vital societal interest. The Outlaws Motorcycle Club adorned their Buffalo clubhouse with a rat skeleton hanging from a noose. The Outlaws Motorcycle Club wears apparel warning that "Snitches Are a Dying Breed". Defendant Gogolack previewed his intention to "sell the names of [his] fucking victims" to the media and to widely disseminate his discovery material. Defendant Gerace, already indicted for witness tampering in Case No. 23-cr-37, is charged *in this case* with conspiring to obstruct justice by arranging to murder the chief witness against him *in that case*.

The defendants would have this Court bury its head in the sand or be distracted from these realities. The government urges this Court not to do so. The government's proposed protective order permits the defendants and their attorneys to review the discoverable material and to enlist the assistance of legitimate[1] experts and investigators in doing so. This Court should grant the government's motion and enact the government's proposed protective order.

## ARGUMENT

### I.   DEFENDANT BARBER'S OBJECTIONS TO THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER.

---

[1] By legitimate investigators and experts, the government means not members or associates of the same criminal gangs as the defendants.

Defendant Barber, through her attorney, raises six (6) concerns with the government's proposed protective order (Doc. No. 158 at ¶ ¶ 7(a) – 7(d)).  First, defendant Barber's counsel expresses concern that, were his client to impermissibly republish material governed by the protective order, he, as the attorney, may be in violation of the terms of the protective order. Doc. No. 158 at ¶ 7(a).

The government does not believe this to be the case.  In the event of any breach of the terms of the protective order, it would be this Court (or the District Court assigned to this case) making a determination as to (1) whether the terms of the order were violated; and (2) who is responsible.  In a case where a defense attorney permissibly shares discoverable material with his or her client, and where the client subsequently violates the terms of the protective order by impermissibly disseminating the material, the attorney has committed no violation.  The government will defer to the Court on whether additional language in the protective order would be necessary to make that concept explicit.

Second, counsel for defendant Barber raises concerns regarding the provision of the government's proposed protective order requiring that copies of all protected materials be returned to the government at the conclusion of the case because counsel has ethical obligations to maintain records and documents as a part of his file.  *Id.* at ¶ 7(b).  The defendant goes on to acknowledge that, were this Court to order such a provision, that counsel's ethical obligations would be relieved.  *Id.*  The government agrees with defendant Barber. As such, granting the government's motion for a protective order would moot the attorney's concern that returning the discovery would put him in violation of his ethical obligations.

Third, Counsel for defendant Barber expresses concerns with Page 4, ¶ 2 of the

government's proposed protective order, and requests that the language be amended to read ". . .shall not cause the contact of a witness or suspected witness **known to be** represented by counsel . . ." *Id.* at ¶ 7(c) (defendant's proposed additions in bold). The government agrees with this recommendation by counsel for defendant Barber and consents to amending the language in the government's proposed protective order (Doc. No. 156, Exhibit A) accordingly.

Fourth, Counsel for defendant Barber expresses similar concerns with Page 4, ¶ 3 of the government's proposed protective order, and requests that the language be amended to read ". . . shall neither contact nor cause the contact of a co-defendant **known to be** represented by counsel . . ." *Id.* at ¶ 7(d). While the government feels that it is apparent that all co-defendants in this case are already *known to be* represented by counsel, in the spirit of compromise the government consents to amending the language in the government's proposed protective order (Doc. No. 156, Exhibit A) accordingly.

Fifth, Counsel for defendant Barber requests that the reference in the government's proposed protective order to specific rules of professional conduct be removed in favor of a general reference to the rules of professional conduct. *Id.* at ¶ 7(e). The government consents to amending the language in the government's proposed protective order (Doc. No. 156, Exhibit A) accordingly.

Sixth, Counsel for defendant Barber expresses concern with the final paragraph in the government's proposed protective order, which requires that defense counsel provide the government with a list of each person on the defense team who has been permitted to review the subject materials. *Id.* at ¶ 7(f). The defendant worries that this would "provide the Government an improper view of the inner-workings of the defense team." *Id.* The

4

government has no interest in gaining insight into the "inner-workings of the defense team" and only wishes to ensure that the proposed protective order is enforced. The government proposes, as a compromise, that the list be provided to the Court instead of the government. Such a compromise protects the governments interest in ensuring the enforceability of the protective order and also protects the defendants' interests in protecting the "inner-workings of the defense team."

In sum, if the negotiations regarding the protective order had been solely between the government and Counsel for defendant Barber, the parties would very likely have been able to compromise and agree to a protective order on consent. For the reasons addressed below, involving the remaining defendants, that was not the case.

## II. DEFENDANT ERMIN'S OBJECTIONS TO THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER.

Defendant Ermin argues, generally and without citation to specific provisions of the protective order or the law, that the government's proposed protective order is "overly broad" and that it "prohibits this attorney from adequately preparing for trial" and representing his client. Doc. No 160 at ¶ 3.

In attempting to justify his position that the government's proposed protective order should be rejected, Counsel for defendant Ermin explains how the jail copies all documents that an attorney brings to his client, and how such a process creates "a potential for leaking some of this protected material." *Id.* at ¶ 5. The government is genuinely confused by this argument as the defendant fails to tether it to any specific provision of the government's proposed protective order. It appears that defendant Ermin argues to this Court that a protective order should not be put in place because he anticipates that protected materials will

inevitably be "leaked" anyway.  This argument turns logic on its head.  The potential for protected materials to end up in the wrong hands, whether in a jail or on the street, is exactly why a protective order is necessary in the first place.

Next, defendant Ermin argues that the government's proposed protective order prevents him (or a member of his defense team) from interviewing members of the Outlaws Motorcycle Club in an effort to vigorously represent his client.  *Id.* at ¶ 6.  It doesn't.

Page 2, ¶ 2 of the government's proposed protective order prevents the defendants from employing members of, *inter alia*, the Outlaws Motorcycle Club, from acting as agents of defense counsel and, for example, being sent out to conduct witness interviews.  The government invites the court to consider how, in the absence of this provision in the protective order, a chilling scenario might play out.

> *Defendant Ermin, the reputed international president of the Outlaws Motorcycle Club, "hires" OUTLAW 1, a member of his motorcycle gang, to act as his "private investigator" in this case.  OUTLAW 1 then takes possession of the discovery, and heads out to interview witnesses and victims referenced in the discoverable materials.  These witnesses are then approached by OUTLAW 1, who attempts to question them about their statements or their knowledge of the facts of this case.  The witnesses, perhaps aware that OUTLAW 1 is a member of the defendant's motorcycle gang, are placed in a perilous situation.  Would such a witness tell the truth to OUTLAW 1, who is no doubt wearing his "Snitches are a dying breed" T-Shirt?*

This scenario, and other similar scenarios, are what the government seeks to prevent in its proposed protective order.  Where, as here, a defendant belongs to a gang which proudly proclaims the motto "Snitches are a dying breed", that defendant should not be able to share his discoverable material with other members of his gang and send them out to "interview" witnesses or otherwise deputize them as agents of his defense team.  Such conduct will not be consented to by the government and should not be countenanced by this Court.  *Cf.* 18 U.S.C. § 1512(b) (criminalizing the knowing use of intimidation and corrupt persuasion aimed to

influence, delay, or prevent the testimony of any person in an official proceeding).

Counsel for defendant Ermin expresses concerns that if he "ask[s] a member of the club to get me the names and addresses of [] people that may have been involved in a matter . . . and they do provide these names to me, are they now my agent?" *Id.* at ¶ 6. The government thinks there is a clear distinction between the scenario offered by Ermin's counsel – where an attorney asks a witness to provide the attorney with contact information for other witnesses – and the scenario contemplated by the government's proposed protective order – where a defendant labels members of his gang as members of his defense team, or deputizes them as such, so that he can provide them with discoverable material and/or engage them in interviewing (or intimidating) witnesses.

Moreover, the term "agent" is a legal term of art governed by the law of agency. *See* AGENT, BLACK'S LAW DICTIONARY, (12th ed. 2014) ("Someone who is authorized to act for or in place of another."). Thus, an agent might include a paralegal or legal assistant. *See* In re Tanner, No. 22-53852-WLH, 2023 WL 6884714, at *8 (Bankr. N.D. Ga. Oct. 18, 2023) ("Generally, the acts of a paralegal working on behalf of a lawyer who is representing a client will be imputed to the affiliated attorney." (collecting cases)); *see generally Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n. 1 (2d Cir. 1983) ("It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the principal."); *cf. Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, No. 3:10CV60(JBA), 2011 WL 12910725, at *6 n.5 (D. Conn. Dec. 30, 2011) ("Non–lawyers who have acquired confidential information also are held to the same conflict of interest provisions as applicable to attorneys."). A private investigator. *See Sealey v. C.R. England, Inc.*, No. 21CV3189FBTAM, 2021 WL 5409893, at *5 (E.D.N.Y. Oct. 8, 2021) (private investigator

hired by defense attorney is an agent of the attorney); *cf.* Restatement (Third) of the Law Governing Lawyers § 99 cmt. b (2000) ("The [no-contact rule] also applies to nonlawyer employees and **other agents of a lawyer, such as an investigator**." (emphasis added)); N.Y. R. Prof. Conduct § 4.2 com. 11 (recognizing that investigators are "[a]gents for lawyers").  Or any other person who "acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person."  Restatement (Third) Of Agency § 1.01 (2006).

Next, Counsel for defendant Ermin alleges that, due to the volume of the discoverable material in this case, it would be "nearly impossible" for him to supervise his private investigator and ensure that the protected documents are handled in accordance with the protective order.  *Id.* at ¶ 7.  Although the government does not know which provision of the government's proposed protective order the defendant objects to (because he does not specify) the government contends that it is counsel's responsibility, when hiring and utilizing a private investigator, to ensure that such investigator complies with the provisions of any order imposed by this Court governing use and dissemination of discoverable materials.  In fact, the New York Rules of Professional Conduct already require lawyers to adequately supervise non-lawyers.  *See generally* N.Y. R. Prof. Conduct § 5.3; *see id.* at com. 2 ("With regard to nonlawyers, who are not themselves subject to these Rules, the purpose of the supervision is to give reasonable assurance that the conduct of all nonlawyers employed by or retained by or associated with the law firm, including nonlawyers outside the firm working on firm matters, is compatible with the professional obligations of the lawyers and firm. Lawyers typically employ nonlawyer assistants in their practice, including secretaries, investigators,

law student interns and paraprofessionals. Such nonlawyer assistants, whether they are employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. . . . A law firm must ensure that such nonlawyer assistants are given appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose confidential information.").

That counsel is advertising that he will not be able to abide by the existing rules should give this Court significant pause. The Court should not—and, in the government's view, cannot—allow counsel for either party to effectively bargain or contract out of existing ethical obligations.  A single meeting between a defense attorney and a legitimate private investigator, where the attorney educates the investigator on the provisions of the Court's protective order, would sufficiently ensure compliance with the order.  And to the extent that any ambiguity existed in the minds of counsel or the investigator, the Court would doubtless make itself available to mediate such situations.

None of the arguments raised by defendant Ermin should prevent this Court from granting the government's motion and enacting the government's proposed protective order.

## III.   DEFENDANT HINKLE'S OBJECTIONS TO THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER.

Defendant Hinkle does not raise a single specific objection to any of the provisions in the government's proposed protective order, choosing instead to refer to it generally as "restrictive" and expressing a preference for the version drafted by defendant Gerace.  Doc.

No. 165, pg. 4.  The majority of defendant Hinkle's response is spent attempting to dispute facts alleged by the government in its filing.  *Id.* at pgs. 1–4.

For example, counsel for defendant Hinkle argues that "no defense attorney would have had the knowledge concerning the pressed Xanax bars before [June 4, 2024]."  *Id.* at pg. 3.  This is not necessarily the case.  Defendant Gogolack has previously claimed, in an interview with law enforcement, that Crystal Quinn took Xanax before her death.  It is not hard to imagine that Gogolack, who on Facebook proclaimed his intention to sell his discovery, would have shared his self-serving exculpatory claims regarding Quinn's death with others, including his prior or current attorneys.  All the government knows about this is that a seemingly random individual on Facebook essentially espoused Gogolack's explanation for Quinn's death and attributed the source of their knowledge to one of the attorneys in this matter.  It is obviously pertinent information to bring before the Court, which can choose to attribute it with whatever weight it deems appropriate.

Defendant Hinkle's contention that the government's proposed protective order should not be enacted because, according to Hinkle, he is not a member of the RBMC or Italian Organized Crime, should fail to convince this Court.  Regardless of the veracity of Hinkle's claim, he is at a minimum an associate of the RBMC.  The dangers of leaked discovery material and witness tampering is at its zenith in cases involving large-scale, far-reaching criminal organizations, as this case does.

Defendant Hinkle contends that his association with members of the RBMC does not make him "dangerous" or "violent".  *Id.* at pg. 4.  In hearing defendant Hinkle's detention appeal, District Judge John L. Sinatra heard lengthy proffers about the facts of this case and about Hinkle's history and characteristics and determined "by clear and convincing evidence

that Mr. Hinkle's release would pose a danger to the safety of others in the community, and that no condition or combination of conditions will assure the safety of the others or the community if Mr. Hinkle were released pending trial."  *See* Transcript of Oral Argument on November 3, 2023 (Case No. 23-MR-00469).   The Second Circuit later affirmed Judge Sinatra's determination.  *See* Case No. 23-7823, Doc. No. 29.1 (2d Cir. February 2, 2024).

In sum, defendant Hinkle raises no specifically articulated objections to the government's proposed protective order, other than to generally call it restrictive and express his preference for defendant Gerace's version.   The government will address, *infra*, why defendant Gerace's proposed "protective order" should be rejected by this Court.

## IV.   DEFENDANT GOGOLACK'S OBJECTIONS TO THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER.

Defendant Gogolack publicly boasted on Facebook in January 2024 about his intention to disseminate his discovery.  *See* Doc. No. 78 at pg. 3.  Even worse, in several separate recorded jail calls Gogolack has previously stated that he intended to "**sell the names of my fuckin' victims**" and "**I'm gonna sell the names in discovery and the media is gonna pay for this shit.**"  *Id* (emphasis added)*.*  As a reminder, defendant Gogolack is currently indicted for 17 felonies including, among other things, Obstruction of Justice Conspiracy (Count 1), Witness Tampering Conspiracy (Count 2), Witness Retaliation Conspiracy (Count 3), Kidnapping (Count 11), Kidnapping (Count 12), Tampering with a Witness (Count 13), Tampering with a Witness (Count 14), Tampering with a Witness (Count 15), Tampering with a Witness (Count 16), Tampering with a Witness (Count 17) and Tampering with a Witness (Count 18).  *See* Doc. No. 24.

In light of the foregoing, it is hard to comprehend how protests raised by defendant Gogolack against the imposition of a protective order can be taken seriously. Nevertheless, and perhaps unsurprisingly, defendant Gogolack objects strenuously to the government's proposed protective order. *See* Doc. No. 162. After all, the government's proposed protective order would prohibit him from "sell[ing] the names of [his] fucking' victims" or otherwise inappropriately disseminating his discoverable material.

First, defendant Gogolack objects to the "scope" of the government's proposed protective order, which governs all material provided. Doc. No. 162 at pg. 1. Defendant Gogolack advocates for a protective order that provides a nuanced index of which documents and items need be protected and which do not. *Id.* In a case where discovery is as voluminous as it is in this case, such a nuanced, item-by-item listing of which items need be covered by a protective order and which may not, is incredibly impractical. On the one hand, defendant Gogolack and his fellows complain that the government took so long to gather, organize, process and produce the discoverable material in this case. On the other hand, defendant Gogolack and his fellow defendants demand that the government spend the immense amount of time that would be required to present an itemized list among the thousands of documents, hundred of photos, dozens of videos, and voluminous electronically stored information to determine which specific items need to be governed by a protective order. Such a task would take a considerable amount of time, which would, in turn, delay the defendant's access to the discoverable material. The government's proposal, for a general protective order, expedites the process and grants the defendants access to the discovery more quickly.

Additionally, it is optimistic to the point of parody to expect that the government would reach an agreement with Counsel for all nine of the defendants on each individual

item.  This would result in time-consuming litigation where the parties would need to involve this Court to make individualized determinations about what material needs to be governed by the protective order and why.  In the alternative, the government proposed a general protective order, governing all material provided in discovery, which allows for defendants to freely access and review the discoverable material and discuss it with their attorneys.  *United States v. Smith*, 985 F. Supp. 2d 506, 545 (S.D.N.Y. 2013) ("Blanket or umbrella protective orders can be 'useful and expeditious in large scale litigation[.]'" (quoting *Int'l Equity Inv., Inc. v. Opportunity Equity Partners Ltd.*, No. 05–CV–2745, 2010 WL 779314, at *4 (S.D.N.Y. Mar. 2, 2010))).

Second, defendant Gogolack opposes ¶ 2 of the government's proposed protective order because he claims that it would prevent him from "show[ing] potential witnesses their statements or other relevant information, as may be required to effectively interview or prepare a witness."  Doc. No. 162 at pg. 2.  This Court should carefully examine ¶ 2 of the government's proposed protective order, which expressly states "ORDERED, that the material set forth above shall not be disclosed to either third parties or the public by the defendants, counsel, or any agent of counsel or the defendants, or the defendant **except as necessary in connection with pretrial proceedings, trial preparation or other proceedings in this action**".  Doc. No. 156, Exhibit A at pg. 2.  The defendant's claim that this paragraph somehow prevents him from investigating his case or preparing witnesses is not based in reality.

Third, defendant Gogolack objects to ¶ 3 of the governments proposed protective order, claiming that the government has not established "good cause" as to why defendants in this case should not be permitted to utilize members of a motorcycle gang as their agents

or private investigators.  Doc. No. 162 at pg. 2.  The government would direct this Court to the Second Superseding Indictment, which charges members and associates of two distinct motorcycle gangs with conspiring to obstruct justice involving the murder of a federal witness. Additionally, the Court can no doubt contemplate how an amateur private investigator, interviewing witnesses while wearing an Outlaws Motorcycle Club vest and a t-shirt that reads "Snitches are a dying breed" may raise issues with the integrity of the judicial process.

Defendant Gogolack next demands that the government unredact some of the facts contained in its Revised Motion for a Protective Order so that the defense can "fully reply". The government disagrees.  The defendant has a full opportunity to engage with the proposed provision of the protective order, cite to the law, and argue why it is necessary or unnecessary. The defendant could, for example, take any of the following positions (1) I don't intend to hire a member of a biker gang as a private investigator in this case, so I have no objection to that provision; (2) I do, in fact, intend to hire a member of a biker gang as a private investigator or defense agent in this case, so please strike that provision; or even (3) While I do not have any intention of hiring a member of a biker gang to work as a member of the defense team in this case, I'd like to preserve my client's right to do so, so please strike that provision.  The redacted portions of the government's revised motion, which the government contends are law enforcement sensitive and properly redacted, in no way prevent the defendants from engaging with the substance of this issue.

Fourth, defendant Gogolack contests ¶ 4 of the government's proposed protective order which would prevent defendants from retaining copies of laboratory reports pertaining to victims.  The government contends that such provision is necessary to secure the dignity of privacy and dignity of victims in this case.  Defendant Gogolack offers a perfect example of

14

why such a provision *is* necessary.  Were he to retain possession of an autopsy report, or a lab report with personal identifying information of a victim, and then make good on his promise to sell it to the media or some other third party, it would violate the privacy and dignity of a victim, and invite harassment the deceased victim's family.  Under the Crime Victim's Rights Act (CVRA), crime victims have a right be treated with fairness and with respect for the victim's dignity and privacy.  *See* 18 U.S.C. § 3771(a)(8).  Where, as here, a victim such as Crystal Quinn is deceased, her rights under the CVRA are assumed by her legal guardian or representative of her estate.  *See* 18 U.S.C. § 3771(e)(2)(B).  The government included ¶ 4 in an effort to maintain the dignity and privacy of the deceased victim, Crystal Quinn, and her family.  The defendant objects to it for the sake of objecting.

Next, counsel for defendant Gogolack objects to the paragraphs in the government's proposed protective order which address the attorney-of-record's supervision of other members of the defense team, including support staff.  Doc. No. 162 at pg. 3.  The defendant seems amenable to "a paragraph that requires defense counsel to inform support staff and others handling discovery to be aware of the order."  *Id.*  The government agrees with the spirit of this proposal and is equally amenable to a revised paragraph which makes general reference to the rules of professional conduct and orders that attorneys for the defendants educate any support staff or members of the defense team handling the protected materials about the terms governing the protective order.

In sum, defendant Gogolack, the defendant who has repeatedly expressed an intent to disseminate his discoverable material and "sell the names" of his "victims" now seeks a less restrictive protective order than that posed by the government.  This Court should take

defendant Gogolack seriously when he discusses his intent to publicize the identities of his victims and disseminate his discovery, especially when coupled with the numerous witness tampering crimes for which he has been indicted, and it should grant the government's motion.

## V.  DEFENDANT GERACE'S PROPOSED PROTECTIVE ORDER AND HIS OBJECTIONS TO THE GOVERNMENT'S PROPOSED PROTECTIVE ORDER.

Defendant Gerace, after rejecting the government's proposed protective order, offered up a "defense version" of a protective order to be used instead.  *See* Doc. No. 153-2.  Allowing defendant Gerace to construct the terms of a protective order required to prevent witness tampering and intimidation is the equivalent of allowing the proverbial fox to stand guard over the hen house.  The defendant's version of the protective order, for the reasons discussed *infra*, should be rejected by this Court.  The defendant spends much of his supplemental filing (Doc. No. 164) attempting to engage in a paper trial of the merits of allegations contained in the Second Superseding Indictment in this case.  *See e.g.* Doc. No. 164 at pgs. 10-17.  The government, while it disagrees strongly with the assertions made by the defendant, does not intend to use its reply brief to address such arguments, but rather to address the reasons why defendant Gerace's proposed protective order is insufficient and why the government's proposed protective order (with the concessions and compromises noted herein) should be enacted.  However, where the defendant makes blatantly inaccurate representations regarding the government's filings regarding this protective order, the government is compelled to respond.

As an example, when addressing the Facebook post by an individual who claimed to

16

learn information from a defense attorney in this case, counsel for defendant Gerace asserts that it is "extraordinarily problematic and reckless for the government to present the second comment [of the Facebook post] initially in an *ex parte* submission, without the preceding statement."  Doc. No. 164 at pg. 24.  But the defendant has created that accusation out of whole cloth.  As this Court is well aware – because it has actually seen the government's *ex parte* submission – the government did not include information about that Facebook post in its *ex parte* submission.  The government included that information for the first time in its revised motion.  The defendant's outrage over something he considers to be "extremely problematic" and "reckless" turns out, upon inspection, to be a figment of his imagination.[2]

The purpose of the present litigation is to determine what terms are required in a protective order.  The government submitted, for the Court's consideration, publicly-made claims that an attorney involved in this case disseminated information about the case.  The information that the poster represented happens to be consistent with self-serving exculpatory claims made by defendant Gogolack, seemingly lending some credence to the claim.  The defendant's outrage that the government would present such material to the court, amid a variety of other bases in support of the protective order, is likely performative and certainly misplaced.

---

[2]    Similarly, the defendant speculates as to why the government might have redacted a private citizen's name in the motion he demanded the government file.  None of his specious speculation is accurate.  Rather, as the District Court recently recognized in *United States v. Gerace*, 1:19-CR-227, private citizens "'have a compelling privacy interest' in their names remaining sealed" when their unsealing does nothing to advance the public's understanding of the litigation.  Text Order, ECF No. 1066 (quoting *Richmond v. Montefiore Med. Ctr.*, 2023 WL 6211978, at *5 (S.D.N.Y. Sept. 25, 2023)); *see Richmond*, 2023 WL 6211978, at *5 (concluding that third-parties "who are not parties to th[e] case" have a privacy interest in sealing their names); *Rowe v. Google LLC*, No. 19 CIV. 8655 (LGS), 2022 WL 4467628, at *4 (S.D.N.Y. Sept. 26, 2022) ("This information is unrelated to the resolution of this case and implicates the privacy interests of non-parties*."); United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("We have previously held that '[t]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation.'" (quoting *Gardner v. Newsday, Inc*., 895 F.2d 74, 79–80 (2d Cir. 1990)).  It should disturb this Court that in some of the most publicized, covered litigation in this district, Gerace cavalierly unmasked the identity of a private citizen to advance his grudge against the government, after having just litigated the scope of sealing provisions applicable to other private citizens, instead of asking the Court to unseal his name.

Defendant Gerace objects to the scope of the protective order, opposing a blanket protective order and requesting instead an itemized index of specific items and documents which will be subject to the Court's ultimate protective order.  *See* Doc. No. 153 pgs. 10-11. For the reasons stated *supra* (*see* § IV) such a requirement is unrealistic and unnecessary in this case.  If the terms of the government's proposed protective order sought to limit the sharing of material with defendants under an "attorney's-eyes-only provision", it would be reasonable to restrict such provision narrowly, allowing for defendants themselves to access as much material as possible.

However, the government's proposed protective order allows for defendants to possess nearly all[3] material, and to review all material with their attorneys.  In light of the fairly un-restrictive terms of the protective order, a general protective order is appropriate and reasonable given the circumstances and the volume of the discovery.  In a case with similarly voluminous discovery (although undoubtedly more) and even more serious charges, the government and the defendants in *United States v. Gendron* (Case No. 22-CR-109-LJV) ***agreed*** to a general protective order governing all discoverable material.  Here, as in *Gendron*, such a general protective order served to expedite the process of sharing discovery (by preventing the government from spending excessive time redacting material before sharing it) and limit the inevitable litigation over disagreements as to what should and should not be governed by the protective order.

> Although the scope of the protective order in this case is expansive, its breadth is appropriate to the circumstances because it allowed the U.S. Attorney's Office to expeditiously disclose information beyond its discovery obligations and without first redacting privileged material and protected personal information. *See Smith*, 985 F. Supp. at 546 (broad protective order appropriate given the monumental burden required to review and redact the vast amount

---

[3] With the very narrowly-tailored sole exception – lab reports pertaining to victims – which would include the autopsy of Quinn and other highly sensitive PII.

and array of discovery materials involved in case); *Cf. Calderon,* 2017 WL 6453344, at *3 ("Blanket protective orders tend to be overinclusive and may cover documents that a party would have been required to disclose without a protective order.").

*United States v. Gendron*, No. 22-CR-109V(SR), 2023 WL 4530591, at *6 (W.D.N.Y. July 13, 2023)

What follows is a paragraph-by-paragraph comparison of the government's proposed protective order (Doc. No. 156, Exhibit A) and defendant Gerace's proposed protective order (Doc. No. 153-2).  The government will reference each of the "ORDERED" paragraphs as a numbered paragraph going in order and using the government's proposed protective order. Paragraphs outlined in green are the same in both versions, paragraphs outline in orange contain disputed language but exist in both versions, and paragraphs outlined in red were removed by defendant Gerace in their entirety.

1.

> **ORDERED**, that the material set forth above shall be used by counsel for the defendants, the defendants, and other attorneys, interns, clerks, licensed investigators, and/or expert witnesses, solely in connection with pretrial, trial or other proceedings in this action, including any appeals; and it is further

With respect to ¶ 1, the two versions of the proposed protective order are identical and the parties appear to agree.

2.

> **ORDERED**, that the material set forth above shall not be disclosed to either third parties or the public by the defendants, counsel, or any agent of counsel or the defendants or the defendant except as necessary in connection with pretrial proceedings, trial preparation or other proceedings in this action; and it is further

The parties agree in part on this paragraph.  The defendant seeks to add a footnote preserving the defendants' rights to disclose discoverable material to "any potential witness" that they seek to interview in connection with this action (*see* Doc. No. 153-2, FN 2).  The government consents to such footnote with the limitation that it permit the defense to "review" the discoverable material with "any potential witness . . . in connection with this action" but not permitting such person to possess, photograph, copy, or otherwise retain access to.  Next, the defendant seeks to expand this paragraph in unprecedented fashion to apply to both the government and the defense.  Here, the government strenuously objects.  Gerace effectively asks this Court to enjoin the government from sharing discovery with federal law enforcement agents.  This Court should reject that request.  As the Supreme Court has recognized, it is important to encourage cooperation between law enforcement.  *Cf. Elkins v. United States*, 364 U.S. 206, 221 (1960) ("Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged.").  Moreover, a panel of the Eleventh Circuit unanimously rejected an argument similar to that adopted by Gerace approximately two years ago in *Trump v. United States*, where the district court enjoined the United States from using discoverable materials in a criminal investigation.  No. 22-13005, 2022 WL 4366684, at *1 (11th Cir. Sept. 21, 2022).  In reversing that decision, the panel explained that "[i]t is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions," which are the domain of the Executive Branch.  *Id.* at *9 (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 163 (1943)).  The Ninth Circuit, too, has observed that "[f]ederal courts traditionally have refused, except in rare instances, to enjoin federal criminal prosecutions."  *United States*

*v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016).  Unsurprisingly, "in no case that we have been able to discover has a federal court enjoined a federal prosecutor's investigation or presentment of an indictment."  *Deaver v. Seymour*, 822 F.2d 66, 69 (D.C. Cir. 1987).  Yet, Gerace---a federal felon subject to four indictments---would have this Court defy the separation of powers and ignore its common sense by preventing federal prosecutors from sharing discoverable information with federal law enforcement agents, irrespective of its value to other investigations.  Gerace's unprecedented provision would have an equally unparalleled effect of grinding ongoing criminal investigations to a halt. The government and the defense exist in largely different roles within the criminal justice system.   The government, who already possesses this material through the course of its investigation, must retain the ability to use evidence and material (otherwise subject to this protective order) to fulfill its lawful functions.  It would be an inappropriate breach of the separation of powers to restrict the government's use of its own evidence – across the board – due to a protective order designed and enacted to prevent *defendants* from witness tampering and otherwise misusing the material *provided by the government*.  It is the government's position that the defendant's tit-for-tat attempt to inject the government into the protective order is unprecedented in this District.  The defendant injects this "poison pill" throughout five of the 12 paragraphs contained in his version of the proposed protective order.  It serves no purpose, other than to allow the defendant to vent his obvious animus towards the government.  It violates the separation of powers which allows the executive branch of government to investigate and prosecute crimes, and turns reality on its head.  The purpose of the protective order is primarily to ensure

witness security and to prevent the chilling effect of the discoverable materials floating around in the public.  It is many of the defendants, not the government, who are indicted for witness tampering.  And it is one of the defendants, not the government, who proclaimed his intent to sell names of victims and disseminate his discovery at will.

3.

> **ORDERED** that no member or associate of the Outlaws Motorcycle Club, Rare Breed Motorcycle Club, Chosen Few Motorcycle Club, Kingsmen Motorcycle Club, Nomad Motorcycle Club, or any support club of the Outlaws Motorcycle Club may serve as a defendant or counsel's agent; and it is further

The defendant would remove this paragraph in its entirety.  The government provided its argument in support of this paragraph *supra* at § II and § IV and relies on those arguments in favor of this paragraph here.

4.

> **ORDERED**, that copies of any laboratory reports regarding **any** victim shall not be provided to the defendants, however, counsel for the defendants may review those materials with the defendants during in-person meetings; and it is further

The defendant would remove this paragraph in its entirety.  The government provided argument in support of this paragraph *supra* at § IV and relies on those arguments in favor of this paragraph here.  In sum, defendants (Gogolack in particular) should not be provided with the opportunity to publicize and redistribute lab reports with victim information on them, including Quinn's autopsy.  This Court should order that those materials remain solely in the possession of the attorneys.

5.

> **ORDERED**, that the unauthorized copying, dissemination, and/or posting of copies, or the contents, of the above material on the internet or through any form of social media, or through any other means, shall constitute a violation of the terms of this order; and it is further

The government and the defendant largely agree to the terms of this paragraph with two exceptions. First, the defendant broadened the paragraph to include the words "not otherwise publicly available". The government objects to this edit. This Court should not countenance the defendants' seeming desire to publish investigative materials to the internet, as such an action would serve no legitimate purpose in litigating this case. Second, the defendant included a footnote clarifying that this paragraph does not bar the defense from using video-conferencing software. *See* Doc. No. 153-2, FN 3. The government consents to the addition of that footnote.

6.

> **ORDERED**, that no defendant, attorney, or agent thereof shall supply any third parties or the public with any written summaries pertaining to the above-referenced material; and it is further

Again, the parties largely agree to the terms of this paragraph with two important exceptions. First, the defendant once again attempts to take the unprecedented and illogical step of binding the government to the terms of the protective order governing the use of its own material. For the reasons addressed above, that should be summarily rejected. Second, the defendant (once again) seeks to interject the words "not otherwise publicly available". For the reasons stated above, the Court should not include this edit which would permit the defendants to publish material provided to them as discovery on the internet, so long as they claim it was already "publicly available".

7.

> **ORDERED**, that nothing in this order shall preclude counsel for the defendants or the defendants from disclosing the material during the course of the litigation of this action in pretrial proceedings, in memoranda filed, at trial or in post-trial proceedings, except that any identifying information should be redacted from any public filings; and it is further

The parties largely agree to the terms of this paragraph with two exceptions.  First, the defendant (once again) attempts to take the unprecedented and illogical step of binding the government to the terms of the protective order governing the use of its own material.   For the reasons addressed above, that should be summarily rejected. Second, the defendant proposes a footnote which would define the term "identifying information".  *See* Doc. No. 153-2, FN 4.  The government generally consents to this footnote, but requests the definition include "names, aliases, or other information reasonably expected to identify an individual".

8.

> **ORDERED**, that any unredacted filings shall not be disclosed to either third parties or the public by the defendants, counsel, or any agent of counsel or the defendants except as necessary in connection with pretrial proceedings, trial preparation or other proceedings in this action; and it is further

The parties generally agree to the terms of ¶ 8, with one exception.  The defendant again attempts to inappropriately add the government to the terms of the protective order.  For the reasons stated above, this unprecedented and illogical request should be denied.  This paragraph presents an obvious example as to why the protective order can not and should not limit the government's use of its own material.  In case number 23-cr-99, certain court filings are referenced as overt acts.  The government's use of court filings during the investigatory phase on another hypothetical investigation can

not and should not be curtailed by the terms of a protective order in this case.

> **ORDERED**, that in the event a defendant moves to suppress evidence obtained as a result of the search warrant, counsel may refer to the search warrant application and affidavit filed under seal as necessary to the resolution of the motion, but shall not attach copies of any search warrant applications or affidavits to any publicly filed pleading and shall not disclose the names of any uncharged individuals, confidential sources, or suspected confidential sources by name in any publicly-filed document;

9.

The parties largely agree on the terms of ¶ 9.  The defendant's version changes the group "uncharged individuals" to the less broad 'unindicted co-conspirators".  The government contends that, to the extent that search warrant affidavits may list the names of "uncharged individuals", even those who do not qualify as "unindicted co-conspirators", those individuals should not be named publicly in Court filings.  Here, the Court should select the government's version.  Secondly, where the government refers to "confidential sources, or suspected confidential sources" the defendant seeks to limit the reference to "identified confidential sources".  Again, the Court should elect to use the government's version.  The protective order, as drafted by the government, would prevent the defendants from opining in Court filings as to who they believe un-identified confidential sources to be.  The protective order, as edited by the defense, would permit such an action.

> **ORDERED**, that counsel for the defendants or the defendants may apply to the Court for an order specifically permitting public disclosure of the above-mentioned material; and it is further

10.

The government and the defendant present the Court with widely different versions of

25

¶ 10.   The defendant's version adds the phrase "and no presumption against modification [of the order] shall apply".   The defendant seeks to dispose of the applicable legal standard regarding the modification of protective orders.   The government objects, but in reality, the government's lack of consent to this provision is immaterial.   Parties cannot "stipulate or bind [the court] to . . . an incorrect legal standard."   *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009); *Sinicropi v. Milone*, 915 F.2d 66, 68 (2d Cir. 1990) ("A court . . . is not bound to accept stipulations regarding questions of law."); *Moore v. Mitchell*, 708 F.3d 760, 782 (6th Cir. 2013) ("[I]t is well established that parties may not stipulate to a standard of review." (citation omitted)); *Regional Airport Authority of Louisville v. LFG, LLC*, 460 F.3d 697, 712 n.10 (6th Cir. 2006) ("Of course, the parties may not stipulate to the standard of review." (citation omitted)); *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996) ("The parties . . . cannot determine this court's standard of review by agreement.   Such a determination remains for this court to make for itself."); *cf. Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 211 (2d Cir. 2021) ("Courts may decline to enforce contracts in certain circumstances, such as when the contract is in violation of public policy." (cleaned up)).   Here, the law – not the parties – dictates the standards applicable for modifying protective orders:

> Although the Court of Appeals for the Second Circuit has yet to address the "good cause" standard in the context of modification of a protective order in a criminal case, district courts have generally applied the same standard utilized in civil cases. *United States v. Ngono*, 16 Cr. 367, 2021 WL 2850626, at *1 (S.D.N.Y. July 8, 2021); *United States v. Calderon*, No. 15 Cr. 25, 2017 WL 6453344, at *2 (D. Conn. Dec. 1, 2017). In civil cases, the Court of Appeals has opined that where there has been reasonable reliance upon the protective order, a district court should not modify the protective order absent a showing of improvidence in the grant of the protective order or some extraordinary circumstance or

compelling need. *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001) ("It is ... presumptively unfair for courts to modify protective orders which assure confidentiality and upon which the parties have reasonably relied."). In assessing whether a protective order reasonably invited reliance, courts consider, *inter alia*, the following factors: (1) the scope of the protective order; (2) the express language of the protective order; (3) the level of inquiry by the court prior to granting the protective order; (4) the nature of the reliance; and (5) the type of materials that the party seeking modification is attempting to access. *Ngono*, 2021 WL 2850626, at *2. Modification of a protective order is left to the discretion of the Court. *Jose Luis Pelaez, Inc. v. Scholastic, Inc.*, 312 F. Supp.3d 413, 416-17 (S.D.N.Y. 2018).

United States v. Gendron, No. 22-CR-109V(SR), 2023 WL 4530591, at *6 (W.D.N.Y. July 13, 2023); *see Smith*, 985 F. Supp. 2d at 523 ("Indeed, good cause remains the standard 'even where parties consent to a stipulated protective order.'" (quoting *United States v. Luchko*, No. 06–CR–319, 2006 WL 3060985, at *3 (E.D.Pa. Oct. 27, 2006))).

> **ORDERED,** that any continuing discovery provided pursuant to Rule 16(c) of the Federal Rules of Criminal Procedure shall be governed by the terms of this Order; and it is
>
> 3
>
> ---
>
> 11.   further

The parties take a widely different view on ¶ 11.  The defendant seeks to add additional layers of litigation surrounding any additional, ongoing discovery provided by the government, by requiring the defense to agree that future disclosures be governed by the same protective order.  The Court should impose the government's reasonable protective order and similarly order that any additional material disclosed as voluntary

discovery to the defendants be governed by the same order.  Doing so will expedite the defendants review of all discoverable material in this case.

12.

> **ORDERED**, that at the conclusion of the litigation of this action, including any direct appeal, counsel for the defendant and the defendant shall return all copies of the above-mentioned material to the government immediately upon request of the government, or certify to the government that such material has been destroyed; and it is further

The parties largely agree on the content of ¶ 12, with one exception.  The defendant seeks to add "or collateral challenges" to the language.  The government proposes, as a compromise to address the defendants' concerns, that the paragraph be amended to remove the words "including any direct appeal [or collateral challenges]" and replace them with "not to exceed 1 year after any resulting conviction becomes final."  This compromise accounts for the statutory period within which a defendant may lodge a collateral challenge while preventing a defendant from retaining the material indefinitely on the basis that he or she may, in the future, lodge a collateral challenge.

13.

> **ORDERED**, that a defendant, counsel, and agent thereof shall neither contact nor cause the contact of a witness or suspected witness represented by counsel but, rather, shall communicate with any represented witness or suspected witness through that individual's counsel; and it is further

The defendant seeks to remove this paragraph from the protective order in its entirety.  The Court should impose this paragraph as it is amply supported by good cause.  The Court need look no further than the instant indictment, which alleges, as an overt act, that this exact circumstance played out and interfered with a witness who was represented by counsel.  *See* Doc. No. 24 at pg. 14.  That same witness was later killed.

28

The idea that this paragraph is even in dispute should cause this Court concern.  As indicated *supra* at § I, the government would consent to the amendment proposed by Counsel for defendant Barber that the language read "known to be represented by counsel".

14.

> **ORDERED**, that a defendant, counsel, and agent thereof shall neither contact nor cause the contact of a co-defendant represented by counsel but, rather, shall communicate with any represented defendant through that individual's counsel; and it is further

Again, the defendant seeks to remove this paragraph in its entirety.  And—again—the Court should impose it anyway.  For the same reasons stated above, and because it is amply supported by good cause on the face of the indictment, this Court should include this provision.  Again, this paragraph is benign and non-controversial.

15.

> **ORDERED**, that all counsel adequately supervise any lawyers, agents, and/or staff members consistent with Rules 5.1, 5.2, and 5.3 of the New York Rules of Professional Conduct; and it is further

The government includes this paragraph to ensure that all members of the defense team, including non-lawyers who are entrusted to handle protected materials, are educated and aware of the terms of the proposed protective order.  Defendant Gerace would have it removed entirely.   Defendant Barber proposes instead a general reference to the New York Rules of Professional Conduct without specifying individual rules.  Defendant Gogolack proposes (or at least indicates that he would prefer) a provision which merely orders attorneys for the defendants to educate any support staff or other members of the defense team handling protected materials about the terms of the protective order.  The government is amenable to the proposal by

29

Counsel for defendant Barber, and is also amenable to the preference expressed by Counsel for defendant Gogolack.  The government objects to removing the paragraph in its entirety.  Good cause exists for this paragraph, or some version of it, as was demonstrated in the government's filing at Doc. No. 156 ¶ ¶ 16 – 18.

16.

> **ORDERED**, that counsel for the defendants and any agent thereof shall comply with Rule 1.6 of the New York Rules of Professional Conduct and, specifically, shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure or use of, unauthorized access to, information protected by Rules 1.6, 1.9(c), or 1.18.

Defendant Gerace would have this Court remove ¶ 16 in its entirety.  For the reasons stated in support of ¶ 15 above, the Court should impose ¶ 16 as well.

17.

> **ORDERED**, that counsel for the defendants shall ensure compliance with this Order by each member of the defense team, and provide a certification to the U.S. Attorney's Office listing the name of each person on the defense team who has been permitted to review the materials.

Defendant Gerace would have the court eliminate ¶ 17 from the protective order.  The government objects to this paragraph being removed.  As an alternative, and in reply to the defendants' arguments that this would give the government some sort of access into the inner-workings of the defense team (of which the government has no interest), the government would propose editing this paragraph to require that the list be instead provided to this Court.  This compromise would document the compliance with this Court's order and would facilitate the Court's review of any potential violation of the order.

**CONCLUSION**

The charges in the instant case include nine separate counts of witness tampering, witness relation, and obstruction offenses related to witness tampering and retaliation spread among six of the nine charged defendants.  Defendants Ermin and Barnes are members of a biker gang with the motto "God Forgives, Outlaws Don't", a gang which prominently displayed a rat skeleton hanging from a noose in its clubhouse, and a gang which frequently wears apparel professing its views towards witnesses – "Snitches are a Dying Breed".  Defendant Gogolack has repeatedly stated his intention to "sell the names of [his] fucking victims" to the media and to widely disseminate his discovery material.  Defendant Gerace, in addition to being charged with three counts related to witness tampering in this case, is indicted for witness tampering in an entirely separate case as well (23-CR-37-LJV).  A critical witness against Gerace in that case, Crystal Quinn, was subsequently murdered, resulting in the instant indictment.

The government provided expansive and voluminous material as a part of the voluntary discovery process, including material exceeding the scope set forth in Rule 16.  In an effort to expedite the production and review process of the voluminous discovery, the government did not individually redact information from the vast majority of the material provided.  The government proposed a general protective order with terms that should be largely uncontroversial and most of which are frequently contained in protective orders utilized in this district.  The provisions of the government's proposed protective order are based upon the facts proffered by the government, supported by good cause, and consistent with common sense.  The Court should grant the government's motion, subject to the compromises and concessions made *supra*, and keep this case progressing towards trial.

DATED:  Buffalo, New York, July 18, 2024.

> TRINI E. ROSS
> United States Attorney
>
>
> BY:   s/NICHOLAS T. COOPER
>       Assistant United States Attorney
>       United States Attorney's Office
>       Western District of New York
>       138 Delaware Avenue
>       Buffalo, New York 14202
>       716/843-5830
>       Nicholas.Cooper@usdoj.gov