UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――

UNITED STATES OF AMERICA

       v.                                      **23-CR-99-LJV**

SIMON GOGOLACK,

              Defendant.

―――――――――――――――――――――

**DEFENDANT SIMON GOGOLACK'S MEMORANDUM IN SUPPORT OF GOVERNMENT SANCTIONS**

**INTRODUCTION**

The government's bad-faith decision to disregard the Court's discovery order must be viewed in multiple contexts. First, it is part of the government's continued efforts to usurp the Court's authority over the proceedings and dictate outcomes in this and related cases at the expense of defendants' constitutional rights. Second, it represents a continuation (and escalation) of the government's years-long pattern of discovery violations. In these contexts, the proper sanction is dismissal with prejudice.

**FACTS**

Mr. Gogolack was indicted on September 13, 2023. Dkt. 12. The Court issued a scheduling order two days later setting the discovery deadline as October 16, 2023. Dkt. 17.

The government filed a superseding indictment on September 20, 2023. Dkt. 18. The discovery deadline remained October 16, 2023. Dkt. 21. Upon defense motion, that scheduling

order was adjourned but the new scheduling order did not include an adjourned discovery deadline. Dkt. 23.

On January 5, 2024, the government filed the second superseding indictment, which first alleged the conspiracy to obstruct justice. Dkt. 24.

On February 23, 2024, the Court granted the government's request for a 90-day discovery deadline but ordered rolling discovery to the extent possible. Dkt. 73.

The government did not provide any rolling discovery or move to adjourn the deadline.

The government did not provide any discovery or contact defense counsel on May 23, 2024, the discovery deadline.

Six days after the deadline, the government reached out to defense counsel and said that they would release discovery upon a protective order being authorized. Dkt. 123-1 at ¶ 15.

At the June 3, 2024 status, the government agreed to release discovery when defendants agreed to a temporary attorneys'-eyes-only protective order. Dkt. 122.

On June 5, 2024, counsel for Mr. Gogolack picked up a hard drive containing Mr. Gogolack's discovery in this matter.

On July 29, 2024, the Court found that the government made a bad-faith decision to violate its February 23, 2024 discovery order and invited briefing in sanctions. Dkt 173 at 5-6.

## ARGUMENT

The Court should exercise its supervisory power to dismiss the indictment with prejudice. The government's misconduct strikes at the Court's authority to govern the proceedings and Mr. Gogolack's constitutional rights to defend himself against the charges. As the government's

conduct across this and other cases show, anything less than dismissal with prejudice will not deter the government from doing this again.

The Court's supervisory power provides authority to dismiss this case with prejudice. Courts exercise that power to 1) deter future illegal conduct; 2) preserve judicial integrity by ensuring convictions rest upon appropriate considerations; and 3) remedy violations of statutory and constitutional rights. *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010). That supervisory power allows courts to preserve their integrity and prevent them from being accomplices in willful disobedience of the law. *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020).

Naturally, that can include prosecutorial misconduct. Dismissing an indictment due to prosecutorial misconduct is justified to eliminate prejudice to a defendant in criminal proceedings or to help translate the assurance of the United States Attorneys into consistent performance by their assistants. *United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978). Dismissal can be used "to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct." *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979).

Generally, dismissal requires that the prosecution had engaged in egregious and deliberate misconduct or had acted flagrantly, willfully, and in bad faith. *United States v. Mangano*, No. 16-CR-540 (JMA), 2022 WL 59697, at *3 (E.D.N.Y. Jan. 6, 2022). This Court has already made that finding.

A.  **The government acted in bad faith.**

This Court knows that the government asked for 90 days to produce discovery so that it would "save time on the back end." Dkt. 124 at 7. When asked about rolling discovery, the

3

government responded: "I think that there's material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment." The Court ruled: "I want the discovery to be produced sooner than that date as best you can." *Id.*

The Court now knows that:

(1) the government ignored the rolling discovery order;

(2) it decided at some point to not even attempt to produce all the discovery until the very last minute, or did not in fact have any discovery "close to ready to go" contrary to its assertion at the February status conference. *Id.*

(3) it committed at least a "grossly negligent" oversight in failing to notify the defendants that it was going to require a certain size hard drive, which it did not do until May 20, 2024 and which it said may take "2-3 days" after the drive is provided to complete the upload;

(4) it ignored the Court's May 23, 2024 deadline, and

(5) it held the discovery hostage by insisting on an unprecedented and untenable protective order.

Often, motions to dismiss fail because the defense cannot establish bad faith. *E.g.*, *United States v. Espinal*, 96 F. Supp. 3d 53, 71 (S.D.N.Y. 2015) (no dismissal when the Court did "not believe the government acted flagrantly, willfully, or in bad faith."). Here, the Court already found that the government acted in bad faith when "the government made a calculated decision to disobey [the Court's] order to produce." Dkt. 173 at 5.

B. **The government's decision to violate the Court's discovery order, and then use its withholding as leverage in requesting a protective order, usurped the Court's authority and warrants dismissal.**

The Court determines how and when parties receive discovery. *See* Fed. R. Crim. P. 16(d). But the government believed that decision belonged to it. It told defense counsel "we will release" discovery once the protective order was agreed upon. Prosecutors told the Court the same: "[t]he government advised the Court that it intended to provide the discoverable material as soon as the terms of a protective order were agreed upon." Dkt. 123-1 at ¶ 24. The Court tells the government when to produce discovery, not the other way around.

The government then used its decision to withhold discovery to target another area of judicial oversight— the existence and terms of a protective order. Six days after the Court's discovery deadline, the government said they would comply with the deadline, but only on the condition that a protective order be in place: "Once the protective order is authorized, we will release the discoverable material." Dkt. 123-1 at 7. The government proposed a protective order and attempted to quickly secure consent: "I am hoping that this protective order can be instituted on consent without the need for litigation. Does everyone agree with the terms of this proposed protective order?" *Id*.

The Court determines whether a party has shown good cause for a protective order and its terms. *United States v. Jackson*, 2022 WL 582700, at *2 (S.D.N.Y. Feb. 25, 2022). A stipulated protective order, however, would not receive the same scrutiny as a contested one.

The government had good reason to avoid judicial scrutiny on their proposed protective order: it violated the defendants' constitutional rights. *See generally* Dkts. 142, 162. In unprecedented fashion, it sought to limit whom defense counsel may use as an investigator, and

5

would require defense counsel to affirmatively notify the government whom counsel had shared discovery with. Dkt. 129-1 at 2, 6.

The government's withholding of discovery as a tactic to negotiate the terms of a protective order and further delay disclosure demonstrates that dismissal with prejudice is appropriate. The government knows defense counsel needed and wanted the discovery. Dkt. 100 at 3 ("[W]hile the government appreciates that Mr. Gogolack is eager to receive the discovery in this matter, the Court's February 23, 2024 Order provides the government 90 days to complete that task."). It knows that timely disclosure of discovery implicates constitutional rights, such as the defendant's due process right to conduct a timely investigation. But it withheld that discovery, essentially holding it hostage, until the defense acquiesced to the terms of an overly-restrictive protective order. The government knew its proposal was untenable, and would further delay the production of discovery. It did. To this day, 356 days since Simon Gogolack was charged in a placeholder complaint with charges meant only to detain him while the government worked on its death-results charge, 322 days after the superseding indictment and 215 days since the second (and now operative) superseding indictment, no defendant in this case has been able view *any* discovery relative to most serious charges in the operative indictment.

Even now, the government continues to use the belated discovery as a means to argue for their preferred protective order. The government says its order "expedites the process and grants the defendants access to the discovery more quickly" without reminding the Court that defendants do not have access to the discovery because of the government's bad-faith breach of the Court's discovery order and "grossly negligent" delay in requesting a protective order. Dkts. 167 at 12; 173 at 4.

6

The openness with which the government violated the Court's order shows that it did not think they were doing anything wrong (or that it did not care). It—not the Court—would determine when defense counsel received discovery. Anything other than dismissal with prejudice shows them that they were right.

C.  **The government intrusion into defendants' counsel warrants dismissal.**

The government has sought to dictate who can represent the defendants and what they can say and do as part of their defense. The government's effort to insert themselves into the defendants' decision about whom can represent them and the Court's decision about whether a waivable conflict exists, is the source of much litigation in one of Mr. Gerace's other cases, 19-CR-227. Among other things, there the government moved to disqualify Mr. Soehnlein in a motion that was poorly researched and factually incomplete, and ultimately denied.

As to the government's effort to limit how defense counsel can defend their client, the Court need look no further than this case.

In the second superseding indictment, the government alleges that the defendants and Gerace's previous counsel were part of a conspiracy to obstruct justice in cases 19-CR-227 and 23-CR-37. Dkt. 24 at ¶ 5(a). At that conspiracy's core, the government alleged that the defendants killed Crystal Quinn to prevent her from testifying.

The defendants have a constitutional right to effective counsel and the right to present a defense. U.S. const. amend. V; *Washington v. Texas*, 388 U.S. 14, 19 (1967). The right to present a defense includes the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington*, 388 U.S. at 19.

But the government has included actions previous defense counsel for Gerace took as part of the charged conspiracy. For instance, an attorney's motion to re-open a detention hearing and request release—a common and benign act of representation— was an overt act of this conspiracy. *Id*. at ¶ 20. This allegation chills any defense effort to secure pretrial release.

Later, they allege that Gerace's argument in court that Crystal Quinn had killed herself because of pressure put on by the government was "intended to advance the false narrative that Crystal Quinn's death was a suicide" and part of the conspiracy. *Id*. at ¶ 68.

The defendants stand accused of killing Crystal Quinn. Disproving the government's theory on that death—including its cause—is an essential part of any defense. Paragraph 68 in the indictment puts defense counsel on notice that if they attempt to advance certain exonerating narratives—even if they believe it to be a legitimate defense and the best way to defend their client—they are part of a conspiracy to obstruct justice and potentially subject to criminal charges.

These concerns do not just exist in defense attorneys' imaginations. This prosecuting office has investigated a co-defendant's attorney for obstruction of justice for "putting the name of an individual who has been disclosed in the government's discovery on a witness list." *See* 19-CR-227, Dkt, 889 at 8-9. In its order, the Court noted that the government's theory would destroy the Sixth Amendment:

> Rather than ask the question that they are duty-bound by the Constitution to consider—What is in my client's best interest— defense attorneys would have to ask a second question: What if the government thinks I have a corrupt motive for making this decision? In the moment when the attorney pauses to ask that second question, the defendant's Sixth Amendment right disintegrates because the attorney is now thinking about himself or herself instead of the client.

8

*Id*. at 2.

The government's criminalization of potential defenses has the same effect.

The government's proposed protective order furthered the government's intrusion into defense counsel's role. Under the proposed protective order, unnamed members/associates of certain motorcycle groups and their unnamed support groups could not be a part of the defense team. Defense counsel decides who is part of the defense team, not the government. Under the proposed protective order, the government would know who defense counsel has shared discovery with. Defense counsel must be free to make that decision free from the government's prying eyes.

The government has used conspiracy and obstruction of justice charges to turn trial rights and advocacy on its head. Normally, the defendants would be presumed innocent of Crystal Quinn's death, and defense counsel would take actions to maintain that presumption through a trial. But under the government's conspiracy and obstruction theory, the government's inculpatory narrative is presumed true and pursing the constitutional right to present a certain defense proves (and drafts defense counsel into) the conspiracy.

D. **This is not the first time that the government has not complied with discovery orders in this case.**

Upon defense motion, the Court had re-opened Mr. Gogolack's detention hearing and ordered that "the government shall produce to defendant all evidence that it intends to rely upon at the detention hearing." Dkt. 61. Prior to that hearing, the defense alerted the Court that government had produced no additional discovery. Dkt. 77 at ¶ 6.  The government responded by saying it would proceed by proffer, opposing any further discovery, and then proceeded to quote

from Mr. Gogolack's alleged jail calls that they had failed to turn over in violation of the Court's explicit Order. Dkt. 78 at 2.

The Court then issued an order "question[ing] whether the government has complied" with its discovery order. Dkt. 80. Following a hearing, the government agreed to produce the jail calls, and the Court granted leave for Mr. Gogolack to move for specific discovery. Dkt. 85.

Mr. Gogolack did so, identifying eight groups of documents that the government had previously relied upon and not produced, including any medical examiner and coroner reports regarding the death of Crystal Quinn. Dkt. 96. Despite the fact Ms. Quinn's death occupied the center of the government's conspiracy charge, and the government had spoken publicly about her autopsy results, the government had not discovered those reports. *Id.*

Rather than reveal or produce or provide those materials, the government said that it now "intend[ed] to rely on already-produced material." Dkt. 100 at 3. As a result, the Court did not require additional discovery. Dkt. 105.

True to form, the government disregarded their previous concession and the Court's orders. Their argument's main thrust was that this Court should detain Mr. Gogolack because he has been charged with new, and more serious crimes. It went full steam ahead, proffering evidence that it had willfully not provided to the defense.  The government spent the first 10 minutes of its 17-minute proffer highlighting the new indictment's most serious new charges. For example, the government argued that Mr. Gogolack provided Crystal Quinn a lethal dose of fentanyl, and that his role was "two-fold; his role involved luring Crystal Quinn" to Wellsville and "then dosing her with lethal fentanyl in the context of the conspiracy to knock off a federal

witness in a pending federal case."[1] The government argued that "it doesn't get more serious that; it doesn't get more risk of society and danger to the community than that."

The Court did what it could to police the government's continued disregard of the Court's wishes and orders by informing the parties that the jail calls were the principal issue it was concerned with. But it should not have had to go to such lengths after having already ordered the government to produce discovery relative to its proffer.

The government then doubled down on its non-disclosure, arguing to the Court at the hearing that the defense was hiding from the Court that we had access to Crystal Quinn's phone: "I've heard nothing about the fact that the defense has had Crystal Quinn's phone; did he talk to you about that? How long he has had the particular phone?" the government rhetorically asked. The government was as wrong as it was indignant. The government had not yet released the contents of Crystal Quinn's phone at that point.  And while it had provided Simon's texts as part of the discovery at the complaint stage, the defense had no access to or any ability to rebut accusations made about texts that Ms. Quinn sent to people other than Simon.

E. **This is not the first time the government has not complied with discovery orders in other cases.**

The government's issues with discovery began long before this case. United States District Judge Lawrence Vilardo recently detailed those issues in sanctioning the government in *United States v. Parks*, 1:19-cr-00087-LJV-JJM. There, precluding the government from offering certain evidence as a result of its dilatory disclosure, Judge Vilardo noted that the government's

---

[1]     Quotations from this hearing are taken from the official court audio recording and will be provided under separate cover.

mantra that it understands its discovery obligation is, "in some cases little more than empty words." (Decision and Order, Dkt. 872 at 3.)

Nor was *Parks* the "first case in recent memory to call into question the government's discovery practices in this district." *Id*. As Judge Vilardo noted, a major 62-count indictment was dismissed without prejudice in *United States v. Morgan,* 18-CR-108-EAW, as a result of the government's discovery failures. In *United States v. Padua*, 20-CR-191-LJV, Judge Vilardo dismissed the indictment with prejudice due to prosecutorial misconduct related to sanctions imposed for violations of government's discovery obligations. In *United States v. Tyshawn Brown*, 19-CR-222-EAW, Judge Wolford dismissed the indictment on the government's motion related to Brady/Giglio disclosure issues.

### F.   **Sanctions short of dismissal with prejudice will not work.**

The government has shown that it will not get the message unless the Court dismisses the case with prejudice. It has had repeated issues complying with its discovery orders. It has repeatedly said it would do better. The opposite has come to bear. The sanctions in *Parks*, *Morgan*, and *Padua* have not worked. The government disobeyed yet another discovery order. Not out of accident, negligence, or recklessness—they did so on purpose. The Court cannot reverse this pattern with less severe sanctions than in those cases.

In this case, the government has resisted sanctions. For instance, when the Court declined the government's request to exclude speedy trial time between June 2, 2024, and June 27, 2024, the government simply waited a couple days and filed a motion to exclude that time. Dkt. 123. That motion arguably stopped the speedy trial clock, neutering any sanction the Court sought to

impose. *See* 18 U.S.C. § 3161(h)(1)(D). Should Mr. Gogolack dare to enforce the Court's
discovery order and object, the government threatened to file a motion to set the case for trial.
Dkt. 123-1 at ¶ 34.

The possibility of sanctions also inspired the government's effort to re-write the history
of their missed discovery deadline. After the June 2, 2024 status, the government shifted the
blame to defense counsel for the discovery being late and the protective order remaining
outstanding. *See generally* Dkt. 123-1. The government's failure to meet the discovery deadline
now took a backseat to the fact it took Mr. Gogolack two days to procure a 3-terabyte hard drive
when the government requested one two days before the discovery deadline (and four days after
learning that would be the required hard drive) or that defense counsel did not email the
government back fast enough about their post-deadline request for a protective order. *See* 123-1
at ¶¶ 12-23.

Even the government's unambiguously belated request for a protective order was now
partially defense counsels' fault: "While the government acknowledges that it could have sought
to address the issue of a protective order sooner, it did so before it had received hard drive
capable of receiving the discovery from 3 of the 9 defendants." *Id*. at ¶ 16.

This revisionist history continued in their later response to defendants' motions for
sanction:

- After previously telling the Court that they would release discovery after their post-
  deadline protective order was addressed, the government now claimed "[t]his is not a
  situation where the government made a conscious decision to ignore deadlines or orders."
  Dkt. 142 at 19;
- After citing the Court's February 23, 2024 discovery order as a reason not to disclose Mr.
  Gogolack discovery for his re-opened detention order, the government now claimed that

13

it did not "refuse any defense requests to review materials at the U.S. Attorney's Office while the discovery project was being processed" and actually cited Mr. Gogolack's detention hearing litigation as proof of their pro-discovery disposition. *Id*. at 3;

- After previously telling the Court they have "obviously been working on it [discovery] since the return of the indictment," the government now presented February 23, 2024 until May 23, 2024 as the only relevant timeframe. Tr. Feb. 23, 2024 at 10; Dkt. 142 at 17;

- After the government sent an email explicitly terminating negotiations about the protective over and indicating that they would file a motion for a protective order on the day such a motion was due, it then faulted defense counsel for not continuing negotiations: "[n]otably, no defendant expressed a desire to continue negotiation in response to the government's email." *Id*. at 25-26;

Ultimately, the Court saw through these efforts. *See* Dkt. 173 at 4 (characterizing the government's failure to request a protective order as "grossly negligent"), *id*. at 5 (noting that while the government "that '[t]his is not a situation where the government made a conscious decision to ignore deadlines or orders' that is *exactly* what it did) (internal citation omitted, emphasis original).

After attempting to undo the Court's sanction that would have rescinded the exclusion of time between June 3 and June 27, 2024, the government now suggested a entirely meaningless 12-day speedy trial "sanction" based on the failure to provide discovery from May 23, 2024 until June 4, 2024. *Id*. at 20. This, of course, is not a sanction at all. But rather would occur naturally by operation of law.

But then the government appeared to back away from its proposed sanction. After proposing the 12-day sanction, the defense requested to adjourn an oral argument date based on counsel's availability. Dkt. 154. The government opposed that request. Dkt. 157. When explaining their opposition, the government explained that defendants have objected to speedy trial exclusions from May 23, 2024 through June 5, 2024. That was the government's own

14

proposed sanction. The government's own proposed sanction had been weaponized into a reason that the Court should have oral argument on a day Mr. Gogolack's lead counsel was unavailable.

G. **If the Court does not dismiss with prejudice, it should impose other sanctions.**

If the Court does not dismiss with prejduce, it should order preclusion of any evidence discovered after the discovery deadline. *See* Fed. R. Crim. P. 16(d)(2)(C). Rule 16 contemplates such a remedy, and the government's bad-faith decision to violate the Court's order justifies it.

Alternatively, this Court should disqualify the current trial team. Disqualification of specific prosecutor based on prosecutorial misconduct is an available sanction. *See United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1440 (D. Md. 1986). For the reasons dismissal would be appropriate, so would disqualification of the current trial team.

Alternatively, this Court should rescind the speedy trial time exclusion from February 23, 2024 through June 3, 2024. While counsel agrees with the Court that this sanction alone is insufficient (*see* Dkt. 173 at 2), it remains appropriate if they case is not dismissed. *See United States v. Graham*, 2022 WL 2873876, *4 (W.D.N.Y.) (Roemer, M.J.), adopted, 2022 WL2872652 (W.D.N.Y. 2022) (Vilardo, J.).

H. **If the Court does not dismiss with prejudice, it should compel further discovery and order a hearing**.

In addition, should the Court not dismiss with prejudice, defense counsel requests the following:

1) *ex-parte* inspection of the government's communications regarding any work taken to comply with the Court's February 23, 2023 order, the government's decision to violate the Court's order, and seek a protective order; and discovery of any relevant material to defendants;

2) Modification of the temporary protective order;

   a. As it currently stands, the protective order is preventing counsel from fully investigating this issue. Defense counsel cannot consult with experts or other people who may be able to better interpret the index files provide as part of the belated disclosure. Such consultation could yield information relevant to determining the appropriate sanction.

3) Explanations of the labels of the columns and fields on the index file;

   Should those disclosures yield information relevant to potential sanctions, Mr. Gogolack's reserves his right to seek further sanctions.

4) A hearing to explore the extent of the government's bad faith. *See United States v. Morgan*, 18-CR-108 EAW (dismissing without prejudice the indictment after a hearing where the court heard testimony on the government's efforts to comply with missed discovery deadlines).

**CONCLUSION**

When finding the government acted in bad faith, the Court noted that the government made a "calculated decision" to violate the discovery order. Dkt. 173 at 5. That is, the government considered the costs and benefits of violating that order. Since the benefits

outweighed the costs, they violated it. While the Court may not be able to change the root problem—that the government may disobey an order if it believes it is worth it—the Court can at least make the government's decision easy in the future. By dismissing the case, the government will know the costs. A discovery deadline will be an order, not a suggestion.


        DATED:        Buffalo, New York, August 7, 2024

        Respectfully submitted,

        ***/s/ John J. Morrissey***
        John J. Morrissey


        ***/s/ Jeffrey T. Bagley***
        Jeffrey T. Bagley

        Assistant Federal Public Defenders
        Federal Public Defender's Office
        300 Pearl Street, Suite 200
        Buffalo, New York 14202
        (716) 551-3341;(716) 551-3346(Fax)
        john_morrissey@fd.org
        jeffrey_bagely@fd.org
        *Counsel for Defendant*