IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-                                                          Case No.: 23-CR-99

PETER GERACE, JR.,

                          Defendant.
_____


### MEMORANDUM RECOMMENDING THE IMPOSITION A SANCTION OF DISMISSAL WITH PREJUDICE, OR ALTERNATIVELY, A DECISION TO DISMISS WITH A HEARING TO DETERMINE WHETHER IT SHOULD BE WITH OR WITHOUT PREJUDICE


Dated: August 7, 2024

s/ Mark A. Foti, Esq.
Mark A. Foti, Esq.
The Foti Law Firm, P.C.
16 W Main Street, Suite 100
Rochester, NY 14614
(585) 461-1999

Defendant Peter Gerace, Jr., by and through counsel, Mark A. Foti, Esq., provides the following memorandum in response to this Court's Decision and Order at Docket Entry 173, and hereby recommends the sanction of dismissal with prejudice, or alternatively, a decision to dismiss with a hearing to determine whether it should be with or without prejudice.

The Table of Contents is as follows:

**I. INTRODUCTION** ...........................................................................................................................4

**II. RELEVANT BACKGROUND** ....................................................................................................5

    A. HISTORICAL MISCONDUCT REGARDING DISCLOSURE ........................................................5

    *United States v. Morgan, 18-CR-108-EAW*...........................................................................6

    *United States v. Parks, 19-cr-87 LJV* ...................................................................................10

    B. THE PROSECUTIONS OF PETER GERACE, JR. ....................................................................13

    *General Background of US v Bongiovanni et al* ..................................................................13

    *The Government Charges and "Flips" Crystal Quinn*........................................................14

    *The Government Publicly Reveals that it "Got" Ms. Quinn* ...............................................15

    *Gerace Had Reason to Believe that Quinn Would Have Provided Testimony Favorable to Him* ..........................................................................................................................................17

    *The Reporting of Ms. Quinn's Death* .................................................................................18

    *US v Gogolack et al* ............................................................................................................20

    *Status Conference on February 23, 2024* ..........................................................................23

    *Status Conference on June 3, 2024* ....................................................................................28

**III. DISCUSSION** ...................................................................................................**31**

    A. The Government's Delay in Disclosure Implicated other Misconduct

    Prior to the Filing of the Second Superseding Indictment ............................31

    B. Even When Considered in Isolation, the Discovery Violation Was

    Egregious ....................................................................................................37

    C. The Violation of the Discovery Order Should Be Considered in

    Conjunction with Other Government Misconduct .........................................39

    D. This Record Supports the Conclusion that the Government Has Made

    Misrepresentations Regarding its Discovery Efforts ....................................41

    E. The Indictment Itself is Littered With Falsehoods .....................................45

**IV. CONCLUSION** ..............................................................................................**49**

# I. INTRODUCTION

*[A]lthough I had unequivocally ordered production of voluntary discovery by May 23, 2024, the government deliberately decided not to comply with that order… The government's willful violation of my order constitutes bad faith.*

*Dkt. # 173 at 5.*

The government had multiple opportunities to explain its conduct, but instead of detailing its purported efforts to produce discovery, it repeatedly deflected to allegations against the defendants, or in some instances, defense counsel.

Now, having found misconduct, the Court has permitted the defense to recommend a sanction, and for reasons discussed herein, the defense recommends the only sanction that will appropriately address the government's misconduct and deter further willful violations of court orders and discovery violations.

The violation is egregious in its own right, but it should not be considered in isolation. This case follows multiple other cases in this District where the government was warned about violations of its discovery obligations. And the present violation is compounded by misrepresentations made to this Court regarding discovery and other aspects of this case.

The defense recommends dismissal, with prejudice, recognizing that it is an extraordinary remedy, but warranted under the circumstances here.

## II. RELEVANT BACKGROUND

There are two distinct areas of factual background relevant to the determination of an appropriate sanction in this case: (1) the historical misconduct regarding disclosure perpetuated by the US Attorney's Office in other cases preceding this one; and (2) the factual misrepresentations in this case related to the misconduct.

Each of those two categorical areas of factual background are discussed below.

### A. HISTORICAL MISCONDUCT REGARDING DISCLOSURE

---

*"[T]here is a problem with the way the USAO-WDNY understands and handles its discovery obligations in this District—a problem that, based on the violations and arguments made here, the USAO-WDNY still has not addressed, let alone fixed."*

*US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt.# 972 at p. 8.

---

The government's misconduct regarding disclosure is not an isolated incident. It is an example of willful misconduct that follows a series of discovery abuses in other cases.

There are an increasing number of cases there the government's failure to properly engage in discovery and disclosure as directed by the Court, relevant caselaw, and statutory authority impacts defendants' liberty interests, speedy trial, and the proper and fair administration of justice.

5

Two of those cases, *United States v. Morgan* and *United States v. Parks*, are discussed below. *Morgan* demonstrates the need for the Court to engage in its supervisory function to resolve issues of discovery and misrepresentation by the government made to the Court. *Parks* represents a similar point, with a specific emphasis on the pattern of discovery issues that have emerged in this District.

<u>United States v. Morgan, 18-CR-108-EAW</u>

Defendants were accused by way of a 114-count Superseding Indictment, filed May 21, 2019, with a scheme spanning over a decade to defraud financial institutions and government-sponsored enterprises Freddie Mac and Fannie Mae. *United States v. Morgan*, 493 F. Supp. 3d 171, 179-80 (W.D.N.Y. 2020).

All parties to the case conceded the breadth and scope of discovery was complex and voluminous. It appears that both the size and complexity of discovery in Morgan was far greater than that presented in this case.

In *Morgan*, after the defendants sought dismissal of the indictment on statutory speedy trial grounds, the District Court granted the motion in October 2020. *United States v. Morgan*, Case No. 18-cr-108-EAW-HKS, Dkt. # 468.

The Court "recognize[d] at the outset that the government has mishandled discovery in this case," but the Court noted that it was "not clear whether the government's missteps are due to insufficient resources dedicated to the case, a lack of

experience or expertise, an apathetic approach to the prosecution of this case, or perhaps a combination of all of the above." *United States v. Morgan*, 493 F. Supp. 3d at 180.

At that time, the Court found that "the government's mistakes, while negligent, do not constitute willful misconduct undertaken in bad faith." *Id*.

The Court did find that "it would have been much more prudent if the government… had utilized a competent vendor to process the [electronic discovery]" *Id*. at 203.

However, the Court ultimately found, at that time, that the government's disclosure failure was not in bad faith, the Court imposed the sanction of dismissal of the case without prejudice.  *Id*. at 215. The decision to dismiss without prejudice was made based on multiple considerations, including the fact that none of the defendants in that case had been in custody while awaiting for trial. *Id*.

As expected, the government simply responded to the dismissal by filing a new indictment, resetting the speedy trial clock, and presumably cleansing itself of any meaningful sanction for its misconduct.

However, after a new indictment was filed, the defendants moved for reconsideration of the dismissal of the prior indictment without prejudice, arguing that dismissal with prejudice was warranted based on newly-discovered evidence that the government had engaged in misconduct, including making intentionally misleading statements and omissions to the court.

The district court directed the government to respond, in affidavit form, to the allegations and, during oral argument on the motion, concluded that an evidentiary hearing was necessary to address the district court's concerns regarding the government's conduct and its prior representations to the court.

The defendants pled guilty before the hearing occurred and, under their plea agreements, withdrew their motions for reconsideration.

However, on April 22, 2022, the District Court entered an Order explaining that there remained "unresolved facts in the record" as to whether "representatives of the United States intentionally misrepresented information" during the course of this criminal action. (*United States v. Morgan*, Case No. 18-cr-108-EAW-HKS, Dkt. # 613 at 3). Pursuant to its inherent authority to supervise conduct of the members of its bar, the Court indicated it was considering "additional fact-finding" to determine "if government lawyers intentionally made a misleading statement to the Court." (*Id.* at 2-3)

Specifically, the District Court considered "whether the Court, on its own, should resolve those factual disputes, notwithstanding the withdrawn motions" by the defendants. *Id.* at 3. The District Court ordered that, if the government took the position that no further misconduct inquiry by the district court was necessary, it could file a submission setting forth the basis for that position, including any potential "plans the government has to pursue the issues on its own internally." *Id*.

The Government's represented that a hearing was not necessary.

As set forth above, OPR has initiated an inquiry into this case and, consistent with its function within the Department, will review not only the matters which the Court has identified as relevant to a further hearing, but also will review the entire record for violations of rules of procedure, regulations, court orders, rules of professional responsibility, Department standards of conduct, discovery, and the Constitution. This review will proceed after proceedings in this Court are concluded. Thus, this Court need not duplicate those efforts and expend its own judicial resources in the process. In addition, the USAO/WDNY has taken important steps, including collaborating with Department discovery experts, creating uniform discovery procedures coordinated by the LSU, and increasing training for AUSAs and management, all directed toward preventing the recurrence of the problems that occurred in this case.

*United States v. Morgan*, Case No. 18-cr-108-EAW-HKS, Dkt. # 624 at 12-13.

Various submissions in this case were initially under seal, but the local newspaper, the Democrat and Chronicle, through its parent company, Gannet Media Corporation, sought the unsealing of the records. The Second Circuit weighed in, addressing the issue of sealing, but also providing some particularly instructive language as it pertains to the obligations of the US Attorney's Office.

There is a strong public interest in the manner in which criminal cases are conducted, including the handling of any allegations of prosecutorial misconduct during the discovery phase of the case. It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. **The court expects all attorneys who appear before it to conduct themselves with the utmost candor, but that expectation is particularly keen when it comes to**

**attorneys representing the United States of America because they are guardians of the public interest**.

Gannett Media Corp. v. United States, 2022 U.S. App. LEXIS 35099, *1 (emphasis added).

<u>United States v. Parks, 19-cr-87 LJV</u>

The passage quoted at the beginning of this section (Historical Misconduct), was from a decision by the District Court in *United States v. Parks*, Case No. 19-cr-87.

After the defense in *Parks* uncovered issues related to the government violating its discovery violations, the Court precluded the government from offering certain evidence at trial.

The Court noted in its preclusion decision that there are multiple cases which raise serious concerns of the discovery practices of the US Attorney's Office in this District.

> And this is not the first case in recent memory to call into question the government's discovery practices in this District. See United States v. Morgan, 18-CR-108-EAW (indictment dismissed without prejudice due to government's violations of its discovery obligations); United States v. Padua, 20-CR191-LJV (indictment dismissed with prejudice due to prosecutorial misconduct related to sanction imposed for violations of government's discovery obligations); United States v. Tyshawn Brown, 19-CR-222-EAW (indictment dismissed on government's motion related to Brady/Giglio disclosure issues); United States v. Coleman, 19-CR-221-RJA (Brady/Giglio disclosure issues).
>
> …

> [T]his Court cannot look the other way and permit such
> discovery violations—at best serious errors in judgment by
> the government—to persist when liberty interests are at stake.

*US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt. # 966 at 2.

The Court further noted that while the government "often repeats the mantra that

it takes its discovery obligations seriously and understands its ongoing disclosure

requirements," in light of "the history noted above, in some cases that mantra seems to

be little more than empty words." *US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt. # 966

at 2-3.

The Court declined to dismiss the indictment, but strongly suggested that

dismissal should be expected as a possible sanction for future violations.

> Dismissal is not the appropriate sanction here. But it may be
> the next time. And so this Court strongly encourages the
> United States Attorney's Office to honor the assurances it
> offered in United States v. Morgan: "a focus and commitment
> by [the United States Attorney's Office's] leadership to take
> necessary and appropriate steps, including increased
> supervision and training, to ensure that such failures are
> addressed and do not occur in the future." See United States
> v. Morgan, 18-CR-108-EAW, Docket Item 647 at 2.

*US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt. # 966 at 30.

The government seeking to avoid the compounding effect of multiple disclosure

violations over the course of multiple cases, filed a motion in Parks, seeking to "Correct

and Clarify the Record" *US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt. # 968. The

Government requested "the Court remove from its Decision and Order the citations to

the Brown, Coleman, Morgan, and Padua cases as support for the Court's conclusion that they are similar to the instant case and that they demonstrate a history by the USAO-WDNY of failing to comply with its disclosure obligations." *US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt. # 968 at 13.

While the Court could have likely denied the government's motion with a short Text Order, the Court granted the government's request to clarify the Court's decision and offered the government a further explanation, observing that the history of the cited cases "demonstrate a fundamental misconception by prosecutors in the USAO-WDNY about what their discovery obligations are." *United States v. Parks*, Case No. 19-cr-87, Dkt.# 972 at 3. Ultimately, "[t]he point is that the government seems to approach its discovery obligations by finding ways not to disclose evidence and excuses for not disclosing it sooner or at all." *United States v. Parks*, Case No. 19-cr-87, Dkt.# 972 at 11.

Now, even with those concerns fully clarified, this District is again confronted with blatant disclosure violation, but in this instance, it is one that has been marked by bad faith. Dkt. # 172 at 5. And moreover, in this case, there is a slew of misconduct by the government in its prosecution of this case and related cases, and there are deliberate misrepresentations by the government regarding the facts associated with the misconduct.

### B. THE PROSECUTIONS OF PETER GERACE, JR.

<u>General Background of US v Bongiovanni et al</u>

Case no. 19-cr-227 commenced with the indictment of Joseph Bongiovanni. Peter Gerace was charged in the Second Superseding indictment in February, 2021, over three years ago.

The case was originally schedule for trial at a status conference on November 30, 2022.

Mr. Gerace had already been on home confinement for nearly two years at that point, Judge Sinatra indicated that he would consider a motion to downgrade Mr. Gerace's electronic monitoring to curfew. Case No. 19-cr-227, Dkt. # 363 at 21-22.

The defense filed a motion to modify the conditions of release. Case No. 19-cr-227, Dkt. # 337. The government opposed. Case No. 19-cr-227, Dkt. # 350 at 13. Over the government's objection, the Court issued a Modification Order on January 19, 2023, granting the portion of the defense's motion that sought a downgrade to a curfew. Case No. 19-cr-227, Dkt. # 361.

The government did not appeal the decision. Instead, it chose to pursue a new indictment against Mr. Gerace, which it would use as a vehicle to pursue a motion to detain Mr. Gerace.

In order to do that, the government decided to target Peter Gerace's close friend, Crystal Quinn.

<u>The Government Charges and "Flips" Crystal Quinn</u>

On January 24, 2023, only five days after the Court downgraded Mr. Gerace to curfew, the government provided Ms. Quinn with a target letter.

The subject of the target letter was an incident from November 19, 2019, over three years earlier. That incident had been the subject of multiple public proffers by the government, as far back as May 4, 2021.[1] Only after a trial date had been scheduled and Mr. Gerace had been downgraded to curfew, did the government decide to pursue Ms. Quinn.

Almost immediately following the issuance of the target letter, agents went to Ms. Quinn's home and spoke to her, without counsel present. During the course of this discussion, Ms. Quinn contradicted the government's narrative regarding what occurred in November 2019.

On February 3, 2023, the government filed a Criminal Complaint against Crystal Quinn with three counts related to allegations of threatening and tampering with a witness. Case no. 23-mj-011, Dkt. # 1.[2]

---

[1] The government publicly proffered in May 2021 that they had "obtained search warrants for his Facebook account. There has been a witness that received threats through a Facebook account during a scenario where Mr. Gerace was present with the person who was -- we're still investigating it... that that occurred in or about November of 2019." Case No. 19-cr-227, Dkt. # 118 at 6-7.

[2] A copy of the complaint, without exhibits, is available on this docket at Dkt. # 164-1.

The Court granted the government's request to unseal the Complaint on February 8, 2023. *See* Case no. 23-mj-011, unnumbered Minute Entry filed February 8, 2023.

Over the following few weeks, with the criminal charges as leverage, Ms. Quinn agreed to proffer. Once the charges had served their purpose to leverage Ms. Quinn into agreeing to the government's narrative, the government agreed to dismissal of charges.

<u>The Government Publicly Reveals that it "Got" Ms. Quinn</u>

In March 2023, only three months before Mr. Gerace was scheduled to go to trial, the government obtained a new indictment related to the incident in November 2019. The government used the indictment as a vehicle to move for detention despite the fact that Pretrial recommended Mr. Gerace's continued release.[3]

During the detention proffer on March 24, 2023, the government spent a considerable amount of time proffering to the allegations related to the incident in November 2019. The government acknowledged that the defense would be able to argue that the government "knew about this for three years." [Case No. 19-cr-227, 3/24/23 Transcript at 31]. The government argued "truth does not equal proof." [Case No. 19-cr-

---

[3] On March 24, 2023, Mr. Gerace's probation officer stated: "He is on GPS. He is monitored 24/7. We've done unannounced home contacts; unannounced work contacts; unannounced drug and alcohol tests. All have been negative. We view his maps daily, weekly, monthly, in terms of his GPS mapping. He was on home detention, and then he was switched over to curfew. Since he's been on curfew and even home detention, there's been no occasion of violations, where he's stepped out of the house or had any curfew violations. All tests have been negative, and he's followed all release conditions in terms -- as they've been set forth by this Court. So there has been no non-compliance on our end in terms of his supervision and following the rules set forth by Your Honor." [Case No. 19-cr-227, 3/24/23 Transcript at 46-47].

227, 3/24/23 Transcript at 31]. Specifically, the Government indicated that as of 2021, it had two witnesses who described the interaction in November 2019, and although the "initial information was similar in nature," in March or early February of 2023, the Government "got a third witness." [Case No. 19-cr-227, 3/24/23 Transcript at 38].

The government's public comments abandoned any secrecy as to Ms. Quinn's expected cooperation. Setting aside Mr. Gerace's knowledge of the incident and who was present, any member of the public or the media could have easily reviewed the government's public comments in context of the Complaint filed against Ms. Quinn regarding the November incident, unsealed in early February of 2023:

> VICTIM stated that after receiving the Facebook Messenger message from the account of PERSON 1, VICTIM researched PERSON l's account and determined, based on a picture posted in PERSON 1 's Facebook account, that PERSON 1 and QUINN were together at the time that the message from PERSON l's account arrived in VICTIM's Facebook Messenger inbox. Moreover, based on the background of the picture depicting PERSON 1 and QUINN, VICTIM knew that PERSON 1 and QUINN were at P.G's home at the time VICTIM received the threats in her Facebook Messenger inbox. As described herein, VICTIM was a close associate of P.G., has been to P.G.'s home and thus was familiar with his residence.

> Dkt. # 164-1 at 12, ¶ 26.

Despite the fact that the government revealed that it "got" Ms. Quinn, and despite the fact that the government used Ms. Quinn to support its efforts to detain Mr. Gerace, the defense would still have had reason to believe that favorable testimony could be procured by Ms. Quinn from the witness stand.

<u>Gerace Had Reason to Believe that Quinn Would Have Provided Testimony Favorable
to Him</u>

It stands to reason that Mr. Gerace, who considered Ms. Quinn a friend, and believed her capable of rebutting many of the government's evidence, including the credibility of many of the government's witnesses, would have wanted Ms. Quinn to be called as a witness if the government did not call her.

That is especially true because Ms. Quinn's initial comments to the government agents contradicted the narrative that the government sought to advance regarding November 2019. The publicly available information provided in the Complaint, drafted by a Federal agent, included the following allegations:

- I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name. (¶ 46)

- QUINN stated that she recalled this instance, which is detailed supra, and confirmed that she was with PERSON 1 and P .G. when the messages were sent to VICTIM. QUINN further stated that the messages were sent via Facebook messenger, and that QUINN stated that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account. (¶ 47)(emphasis added)

- Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account, is false, fraudulent, and fictitious. (¶ 48)

*See* Dkt. # 164-1 at 17-18.

Mr. Gerace would have had a substantial interest in calling Ms. Quinn as a witness to elicit the factual information that he believed she could provide, which may have included, but would not be limited to, the statements she made to the government agents, contradicting the government's narrative.

Even if the government had Ms. Quinn as a witness, the defense believed that she could have provided helpful testimony, because she voluntarily provided information to the government that contradicted its narrative, but then after being charged, she was compelled to cooperate and agree to the government's narrative.

<u>The Reporting of Ms. Quinn's Death</u>

After Ms. Quinn died, the mother of Ms. Quinn spoke out, primarily blaming the government for her daughter's death in an interview with the Buffalo News and in affidavits provided to former counsel, Steven Cohen.

> "In my heart, I cannot believe she would commit suicide, but I know that is a possibility," said Sharon Quinn, who works as a clerk with the Depew Police. "Crystal was under tremendous pressure, extreme pressure from the FBI to testify. *They told her they would put her in prison if she didn't testify against Peter*. She was so scared that when somebody would knock on our front door, she would run out our back door and hide somewhere."
>
> Dan Herbeck, *Witness who died was under 'extreme pressure' to testify against strip club owner, her mom says*, Aug. 20, 2023, The Buffalo News (available at https://tinyurl.com/BN082023) (emphasis added).

The government pursued a claim that Sharon Quinn had her affidavits altered by Mr. Cohen[4], but the government has consistently ignored that Sharon Quinn spoke to The Buffalo News about her opinions as well.

The government was clearly concerned about public perception of the witness death. Within weeks of the article featuring quotes from Ms. Quinn's mother accusing the government of "extreme pressure," and coercion with threats of prison, the government moved for unprecedented relief of intradistrict transfer. Case No 19-vr-227, Dkt. # 619.

That motion was ultimately denied. Case No. 19-vr-227, Dkt. # 663. But while the government's discomfort with those headlines did not result in intradistrict transfer as it had hoped, the backdrop to this entire case (*Gogolack et al*) is an investigation that was motivated to present a public rebuttal to allegations that the government was responsible for the witness's death.

The government repeatedly used the early court appearances and public filings for the defendants in this case to sway public opinion with the dissemination of limited curated information starting in September 2023. Dan Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, Sept. 14, 2023, The Buffalo News (available at https://tinyurl.com/BN091423); see also Patrick Lakamp, *Pharaoh's witness overdosed on*

---

[4] Discussions with Mr. Cohen's counsel reveal there is strong proof establishing these allegation to be false.

*enough fentanyl to kill hundreds*, Nov. 3, 2023, The Buffalo News (available at https://tinyurl.com/BN110323).

These efforts were consistent with this trial team's historical practice of making carefully selected inflammatory allegations at public appearances and in its public submissions knowing its statements will attract media attention. In an Editorial, the Buffalo News noted "defense lawyers and anonymous sources made up a smidgen of that coverage, compared to the deluge of information mined from the government's public filings." Editorial Board, Thanks for the compliment, feds – and the stories, Sept. 12, 2023, The Buffalo News (available at https://tinyurl.com/BN091223).

In some instances, the information provided to the Courts and the public was admittedly inaccurate. See e.g. Letter from Joesph M. Tripi, Dkt. # 34. In other instances, the record has never been corrected. Many of the allegations presented in the early court appearance and submissions were clearly presented at a time when the defense had not been provided discovery and could not rebut or clarify the record.

<u>US v Gogolack et al</u>

Defendant Simon Gogolack was indicted on September 13, 2023. Dkt. # 12. This Court issued a Scheduling Order on September 15, 2023, that ordered "All voluntary discovery shall be completed by October 16, 2023." Dkt. # 17 at 1.

Five days later, on September 20, 2023, a superseding indictment was filed against Gogolack. Dkt. # 18. This Court issued a Scheduling Order on the Superseding

Indictment. Dkt. # 21. The discovery deadline remained the same. Dkt. # 21 at 1 ("All voluntary discovery shall be completed by October 16, 2023.") The government never requested an extension of this deadline.

Meanwhile, other defendants were charged, individually by separate complaints, including: Howard Hinkle (Magistrate no. 23-mj-05219-MJR); Michael Roncone (Magistrate no. 23-mj-00168-HKS); Scott Barnes (Magistrate no. 23-mj-00166-HKS); and John Ermin (Magistrate no. 23-mj-00167-HKS).

Notably, the individual cases were assigned different judges as the courts were not advised that these individuals were part of the same investigation and were being sought in relation to Peter Gerace.

On January 5, 2024, a Second Superseding Indictment was filed charging Mr. Gogolack and all of the aforementioned defendants and including Mr. Gerace for the first time. Dkt. # 24.

At the arraignment for Mr. Gerace on January 10, 2024, counsel appeared provisionally, and although not yet retained or appointed on this case, counsel made a request for initial discovery disclosure. Dkt. # 46 at 13-14 ("So, I would ask that at least some preliminary disclosure be provided, beyond the indictment, to give counsel an idea of what's going to be involved here in terms of the defense of this case, in terms of motion practice, in terms of the timeframe associated with a trial.")

The government opposed any disclosure claiming that because counsel was not yet confirmed and that disclosure would somehow "build[] delay into this case." Dkt. # 46 at 14.

The government made no comment about how long the discovery process would take, or that hard drives would have to be provided by the defendants, or that it would be seeking a protective order at some point.

At the next status conference, three weeks later, Mr. Gogolack made a detailed request regarding the need for a discovery deadline:

> Mr. Gogolack has been on the complaint since August. We don't have basic discovery in the case.
>
> I know the Government has made several representations at various detention hearings about discovery that they have, but we're in a position where we're unable to evaluate any of that because we don't have it, Judge.
>
> So I'd ask that you set a discovery deadline before you set any other scheduling order and we can come back at a status conference at some point in the future and set motions deadlines, but I would ask for a discovery deadline first.
>
> Dkt. 66 at 30.

Even though by January 31, 2024, 26 days had already passed since the filing of the indictment, and 167 days had passed since Mr. Gogolack was initially charged, the government opposed setting a discovery deadline unless the Court was also going to set

a deadline for motions, even though there was no explanation for why those two deadlines would need to be set at the same time.[5] Dkt. 66 at 30-31.

<u>Status Conference on February 23, 2024</u>

On February 23, 2024, 49 days after the filing of the second superseding indictment, this Court held a status conference. The government had still not provided a single page or a single byte of discovery to Mr. Gerace.

At the status conference, this Court proposed that a discovery deadline be set. Feb. 23, 2024 Transcript at 3. This Court proposed a generous 60-day deadline.[6] Feb. 23, 2024 Transcript at 6.

In response to this Court's suggestion, the government asked for 90 days. It provided two reasons for its request.

> The first reason is this case involves a significant amount of discoverable material. It's a significant undertaking. *There's an agent from the FBI who has been essentially exclusively assigned to that task,* but the resources that that requires are significant. And so as opposed to setting a shorter deadline and rushing things for lack of a better word, I'd ask that we set 90 days and allow a thorough review and production of discovery.
>
> The other reason is as the Court indicated, it would be helpful to have a final determination regarding this death penalty

---

[5] Obviously, the government knew it was not feasible to schedule deadline for motions yet as counsel had no idea what the scope of the case was and there were still counsel issues to work out. However, nothing was preventing the government from preparing or providing discovery.

[6] A 60-day deadline would have resulted in a deadline set 109 days after the filing of the second superseding indictment.

issue before we all come back and before motion practice
begins, and I think kicking this out 90 days versus 60 days errs
on the side of caution with respect to that determination.

Feb. 23, 2024 Transcript at 6-7 (emphasis added).

As this Court knows, the Notice that the government would not pursue the death
penalty was filed later that day (Dkt. # 75) so it ended up having no bearing on the need
for 90 days as opposed to the 60 days that this Court proposed.

In regard to the volume of discovery, to the extent that there was "an agent from
the FBI who has been essentially exclusively assigned to that," 60 days should have been
more than sufficient, but nonetheless the government asked for 90. The government
referred to it as "an additional 30-day cushion." Feb. 23, 2024 Transcript at 7-9.

The defense indicated that it had no way of knowing what the volume of discovery
was, so it could not really argue in opposition to the lengthy timeframe requested by the
government.

I think we're all in a position where we somewhat have to
defer to the Government in terms of how long it will take
them to produce discovery, but I would note… I've had a
number of mega cases where discovery could be produced in
30 to 60 days… obviously almost all of the defendants are in
custody. I have concerns about the length of that type of
adjournment, but um, given the fact that the Government is
the only entity at this point that can describe the volume of
discovery and they're saying they need 90 days, um, I don't
know that there's much I can do to rebut that.

Feb. 23, 2024 Transcript at 8-9.

Despite the fact that counsel did not, at that time, question the government's representation that 90 days would be necessary, nor did counsel oppose the request based on the fact that it had no indication as to what the actual volume of discovery is, the government nonetheless felt compelled to respond.

> [I]t's perplexing to hear that counsel has concerns regarding speedy trial when we've had I think three separate status conferences where counsel hasn't wanted to set a scheduling order in place. To come today and say, hey, that's too long to ask for is contrary to the arguments that have been raised that the arraignment, the status conference after the arraignment. It's inconsistent with arguments previously raised that the Court shouldn't set a scheduling order. So I don't understand.

> Feb. 23, 2024 Transcript 9-10

Counsel replied:

> Judge, just -- I don't want to have it turned into a back and forth, but I do want to correct the record. At the arraignment, I asked for discovery. I said I think we should put a scheduling order in place. I indicated that I would be a proponent of split -- bifurcating non dispositive and dispositive motions. I specifically said to the Court if we start getting discovery, it can inform us on the size of the case. So that was an application I made.

> I believe the Government's response was they thought that would build in delay in some manner. So I just want that to be clear, and obviously, this is an investigation that took place over several months. There is a period of time that precedes the charges where the discovery could be prepared in anticipation of an indictment. Again, I'm not opposing the 90 days. The Government is in the position to say that the volume is that high. My point is merely that defendants are in

custody. That's a consideration, and it informs on other considerations the Court has.

Feb. 23, 2024 Transcript 10-11.

Counsel for Mr. Ermin also added "whatever time the Government needs to get us the complete discovery obviously would help us, but the implication that somehow we are here today as a result of delays from defendants is I think inappropriate." Feb. 23, 2024 Transcript at 11.

Ultimately, this Court agreed to grant the extensive 90-day deadline, but it specifically indicated that to the extent possible, the discovery should "be produced sooner than that date" and it should be produced "[o]n a rolling basis so that people can hit the ground running in terms of what they think they need to do." Feb. 23, 2024 Transcript at 12.

This direction by the Court followed an earlier colloquy, where the Court asked if it was possible to do "rolling production during the 90 day period" and the government responded: "I certainly think so, Judge. I think that *there's material that is probably close to ready to go out at this point* because we've obviously been working on it since the return of the indictment." Feb. 23, 2024 Transcript at 10 (emphasis added).

The deadline for discovery was set for May 23, 2024, and a status conference was set for June 3, 2024. Transcript at 12-13.

The Government moved for an exclusion of time, which recognized that the Court expected that the defendants would be able to review discovery in advance of the June status conference.

> So the Government would request that the time between today's date and June 3, 2024, be excluded from the speedy trial act pursuant to Title 18 United States Code Section 3161(h)(7)(a) and (h)(7)(b)(4) in that the interest of justice in the exclusion of such time outweigh the defendant's interest in a speedier trial specifically because with this time between today and June 3 the Government will prepare and produce an itemized list of discovery to counsels for all of the evidence. Additionally, it will provide time between May 23 and June 3 for counsel for all of the defendants to review such discovery and report back to the Court at that status conference about how much time they need to file motions.
>
> Feb. 23, 2024 Transcript at 16-17.

Based on the understanding that discovery would be provided on a rolling basis to the extent possible and completed on or before May 23, 2024, the Court issued an exclusion of time.

At no point during the conference did the government state that it intended to seek a protective order or that the defendants would need to provide hard drives at any point in order to receive discovery.

Over the 90 days following the status conference, no discovery was provided. None. Not a single byte of date or a single page of discovery was disclosed.

The government, on its own, decided that it would not engage in rolling discovery.

Then on May 20, 2024, with only three days before the deadline to complete discovery disclosure, the government advised defense counsel it would need a hard drive from each of the defendants in order to provide discovery. The government indicated the copying of discovery "upload may take 2-3 days to complete."

The government stated it needed a hard drive containing space for up to 3 terabytes of data. That is substantial enough that it would require most or all attorneys to purchase a new drive and have it delivered to the government before the copying could even start.

Over the next week and a half, most of the attorneys obtained hard drives and had the drives sent or delivered to the government. None of the defense attorneys received a hard drive back regardless of how quickly each attorney was able to purchase the drive and deliver it to the government.

Instead, on May 29, 2024, for the first time, the government sent an email stating that it would withhold discovery until a "protective order is authorized by the Court."

<u>Status Conference on June 3, 2024</u>

At the status conference on June 3, 2024, the government seemed to suggest that the delay regarding the disclosure of discovery was somehow the responsibility of the defense. The government stated that most of defense counsel had not immediately responded to the government's email requesting consent to its proposed protective order.

The government initially omitted the fact that the email had been sent only five days earlier, 145 days after the indictment was filed.[7]

After the Court established a timeline, including that the government did not request a protective order until over a week after the discovery deadline had already expired, it inquired about the reason for the delay.

The government did not offer much in terms of an explanation for the delay, but it seemingly admitted that part of the reason discovery had not been prepared was because the trial team was engaged in another trial in *US v Bongiovanni et al.*[8]

The defense indicated that by the following evening, it expected it could provide a proposed protective order with input and/or edits from most or all of the attorneys. The defense requested a deadline be set for the government to file a motion for a protective order if the parties could not reach an agreement. The defense also noted that the government had not requested any extension of the discovery deadline, and that discovery should have been disclosed over a week before the government even mentioned a protective order.

---

[7] The government also omitted any substantive acknowledgement of the court's direction to provide rolling discovery.

[8] Notably, the government had already been engaged in that trial during the February 23, 2024, status conference, so the government was fully aware of the time commitments associated with the trial when it requested 90 days, including the 30-day cushion.

The government indicated it would release the discovery if a temporary protective order was issued indicating that the discovery could be viewed by "attorney's eyes only."

The Court set a scheduling requiring any motions for a protective order be filed by June 10, 2024. That date would also serve as a deadline for defendants to file motions related to relief based on the government's failure to abide this Court's ordered discovery deadline.

The government then moved for an exclusion of time pursuant to 18 U.S.C. Sections 3161(h)(7)(A) and (h)(7)(B)(iv). Because the government failed to produce discovery as directed by this Court and because that delay had prevented the parties from reviewing discovery in advance of the court date so a scheduling order could be set, the Court denied the request for an exclusion of time in the interest of justice.

A Text Order was issued that day summarizing the appearance and confirming that time would not be excluded from the Speedy Trial Act calendar. Dkt. # 122 ("I deny the government's request to enter a further exclusion of time from the Speedy Trial Act calendar pursuant to 18 U.S.C. Sections 3161(h)(7)(A) and (h)(7)(B)(iv). As of today, time if no longer excluded from the Speedy Trial Act calendar.")

On June 5, 2024, the government antagonistically filed a motion for an exclusion of time, essentially moving to exclude almost the same period of time that it had moved to exclude at the June 3, 2024, status conference but was denied.

The mere filing of the motion was an attempt to accomplish the government's goal of having the time excluded, because the government would contend that the pendency of the motion itself stopped the Speedy Trial clock and thus, by making the motion, the government has attempted to circumvent the consequence of the Court's decision not to exclude time.

The defense filed a motion for sanctions at Docket Entry 132, and the arguments contained there are incorporated herein, with the additional discussion below.

## III. DISCUSSION

### A. THE GOVERNMENT'S DELAY IN DISCLOSURE IMPLICATED OTHER MISCONDUCT PRIOR TO THE FILING OF THE SECOND SUPERSEDING INDICTMENT

Throughout the fall 2023, the government charged the majority of defendants in this case, one by one, in separate cases. In each instance, in an effort to secure the defendants' detention, the government alluded to and, at times, directly referenced portions of the narrative that would be used to form the second superseding indictment. But the government withheld the discovery that was applicable to these allegations.

This was clearly unfair to the defendants as it prevented them from effectively rebutting the allegations or providing substantive context, which the government often omitted during the course of its proffer. The government made allegations that would permeate the media reporting in *Bongiovanni et al* and would publicly prejudice the individual defendants.

It also prevented the defendants from conclusively identifying or presenting material that established these cases to be related from the outset. While the connection between cases might not have impacted early trial preparation or litigation in the matter, it should draw some concern when considered in relation to the government's related case filings, which purportedly omitted any acknowledgement of the connections between these cases in what has an uncanny resemblance to an attempt at judge shopping.

The defendants have never received a copy of the related case filings, but at an appearance in *Bongiovanni et al*, on March 15, 2024, the District Court confronted the government on its selective case filings.

> THE COURT:
>
> I'm sorry, there were cases filed that were clearly related to this case without related case forms from your office, right? The -- the Gogolack case, and several others that are related to Gogolack. In fact, the ones that were related Gogolack were filed with related case forms after Gogolack was filed, related after it was assigned to Judge Sinatra, then related case forms were filed.
>
> Now, the fact that related case forms were not filed in Gogolack and the other cases related to the Gerace case, that can't possibly be an attempt to judge shop, can it?
>
> Case no. 19-cr-227, Dkt. # 825 at 10-11.

The government responded with the following explanation:

> When we had a -- when we had Crystal Quinn die in Wellsville, New York, that is all we knew. In fact, I think as

> this Court knows, it was her attorney that notified me that she
> was dead. The circumstances, the situation, were all
> unknowns. So we looked into it.
>
> The very first charge, though, was a drug and gun case
> charging Simon Gogolack. At that point in time, it would have
> been premature and borderline disingenuous to relate Mr.
> Gogolack's case to Mr. Gerace's case.
>
> Case no. 19-cr-227, Dkt. # 825 at 11-12.

Of course, shortly after Simon Gogolack was charged, it was obvious to everyone

in the courtroom that this was a related case. *See e.g.* Dan Herbeck, *Judge assigns new*

*attorney to man under scrutiny in Pharaoh's strip club probe*, The Buffalo News, Sept. 7, 2023,

https://tinyurl.com/BN090723.

And less than a month after Mr. Gogolack had been charged, members of this trial

team were making public comments about allegations of witness tampering. *See e.g.* Dan

Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, The Buffalo

News, Sept. 14, 2023, https://tinyurl.com/BN091423 ("'This case is as serious as it gets,'

[AUSA] Cooper told the judge. He added that the charges filed against Gogolack so far

'are only the tip of the iceberg.'")

Nonetheless, the government claimed "it would have been premature and

borderline disingenuous to relate Mr. Gogolack's case to Mr. Gerace's case" and because

on March 15, 2024, the defense had still not received discovery, it was unable to respond

to those representations.

Now, after discovery was finally disclosed, it is clear that even before Mr. Gogolack was charged by complaint on August 17, 2023, the investigation into Ms. Quinn's death had already been identified as related to the investigation of Mr. Gerace.

Indeed, buried in the discovery, at bate stamp 00010744, there is a document that identifies that a ███████ will be created for the death investigation of Ms. Quinn, and identifies the death investigation as ███████████████████████████

███████████████ is clearly a reference to the charges that were pending in Bongiovanni et al. █████ is the abbreviation for ███████████ a reference to Italian Organized Crime, which the government has repeatedly claimed, without evidence, that Mr. Gerace has a connection to.



The document is dated ███████████ almost a week before Mr. Gogolack was initially charged by complaint, and over a month before he was indicted and a District Court Judge was assigned.

Even before the report, incorporated above, was created, the government had sought a warrant from this Court on ████████████. Even with the massive disclosure, it appears the government has not yet provided warrant applications, but it provide the actual warrant which references ███████████████████████████ ███████ so even though the government initially held back charges against Mr.

Gogolack related to the Ms. Quinn's death, the discovery reveals that the government was presenting information to establish probable cause that presumably included information related to Ms. Quinn. And less than a week later, official FBI reports indicated that death investigation to be related to Bongiovanni et al.

So, when the government told the District Court, in a public proceeding, that it did not file related case filings, because it would have been "borderline disingenuous" to connect the two cases, setting aside that everyone in the public knew the cases were connected, the FBI had created official documentation making a connection between Bongiovanni et al, and the investigation into Ms. Quinn's death, well before the government declined to file a related case form in *US v. Gogolack*.

Now, months later, the document is found buried at page 10,744 of the bate stamped discovery that the government was late to disclose. The clear implication is that the government did indeed engage in judge shopping, it made misrepresentations related to those decisions, and it delayed disclosure of discovery that would ultimately speak to that issue.

This alone supports a dismissal with prejudice, or a dismissal with a hearing to determine where it should be with or without prejudice.

### B. EVEN WHEN CONSIDERED IN ISOLATION, THE DISCOVERY VIOLATION WAS EGREGIOUS

The Second Superseding Indictment was filed on January 5, 2024, the trial team was not on trial in US v. Bongiovanni. The government could have worked to produce the discovery then, but there is no evidence that the government made any substantive efforts towards disclosure.

The government opposed efforts to move the discovery process along. When counsel for Mr. Gerace first addressed the topic of discovery disclosure at his arraignment, the government opposed efforts towards disclosure, claiming without explanation, that disclosure at that stage would somehow cause delay. When counsel for Mr. Gogolack requested a deadline for discovery at a status conference in January, the government inexplicably argued that a deadline for discovery should not be set unless a motion deadline is set in conjunction with it. Meanwhile, there is no evidence that the government was doing anything to further the disclosure efforts even though the US v. Bongiovanni trial had not started.

At the status conference on February 23, 2024, forty-nine (49) days had already passed since the filing of the second superseding indictment. The Court indicated that it was going to set a deadline for the government to provide discovery.

This Court had appropriately estimated that sixty (60) days should be enough to complete the disclosure of discovery. When added to the time that had already passed

since the filing of the indictment, that would have amounted to one-hundred nine (109) days, an extraordinarily long amount of time for the government to produce discovery.

The Government insisted that it needed 90 additional days despite the fact that the defendants remained in custody and would clearly be prejudiced by any delay. The 30-day "cushion" would result in a discovery deadline of May 23, 2024.

That deadline was set one-hundred thirty-nine (139) days after the indictment was filed. That is an exceedingly lengthy amount of time for the government to produce discovery, especially when defendants are in custody.

This Court was clearly concerned about the length of delay the government was requesting, but it attempted to balance its concerns with a directive that discovery be provided on a rolling basis.

Given the length of time that was afforded to the government as a deadline to conclude discovery disclosure and given that <u>discovery was directed to be provided on a rolling basis</u> in the months that preceded the deadline, the government's willful violation of this Court's Order is egregious and, as recognized by this Court in its Decision and Order, "constitutes bad faith." Dkt. # 173 at 5.

The finding of bad faith requires a sanction more severe than that ordered in other cases, such as *US v. Morgan*, where the initial decision to dismiss without prejudice noted that the Court was not prepared to make a determination of bad faith, and notably, the

defendants were not in custody. By comparison, here, dismissal with prejudice is appropriate and necessary.

When the District Court in Morgan was presented with additional evidence of potential bad faith, the Court ordered a hearing and was prepared to reconsider its decision to dismiss without prejudice. Consistent with that intention, the Court here already has sufficient information to find bad faith, and such, the decision to dismiss with prejudice is appropriate. Anything less absolves the government of its misconduct and allows it a "redo," which will have no deterrent effect at all.

Thus, the violation, considered in isolation is sufficient to support dismissal with prejudice.

That said, knowing dismissal with prejudice is an extraordinary remedy, the Court should not make the determination in isolation, and instead, it consider the government's misconduct conjunction with the historical mishandling of discovery obligations and the specific circumstances surrounding the discovery violation in this case, including the misrepresentations made to the Court.

### C. THE VIOLATION OF THE DISCOVERY ORDER SHOULD BE CONSIDERED IN CONJUNCTION WITH OTHER GOVERNMENT MISCONDUCT

In instances of prosecutorial misconduct, each instance "must not be considered in isolation." *Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005).

One of the principles repeatedly applied in the criminal justice system is that misconduct is judged not in seclusion when prior instances of misconduct exist.

The government seeks sentencing enhancements in certain instances where an individual has committed a predicate offense. The government advocates for pretrial detention based on allegations of dangerousness for prior misdeeds. Courts consider deterrence at sentencing, a consideration that is implicated by an individual who thumbs his nose at prior corrective measures.

The Courts applies similar considerations related to law enforcement. For example, the government can rely on good faith exceptions to the exclusionary rule in "isolated" situations, but exclusionary rule applies to circumstances including those involving gross negligence or if a violations based on recurring or systemic negligence. *See Davis v. United States*, 564 U.S. 229, 236–40 (2011); *Herring v. United States*, 555 U.S. 135, 144 (2009).

Here, the government's blatant discovery violation, in a high-profile case, follows other violations in cases including *Morgan* and *Parks*, discussed above.

Specifically, the government was warned that subsequent discovery violations would be informed by the concerns raised in these cases. In *Morgan*, the Court sought assurances that steps would be taken to assure that the government appropriately comply with discovery orders in future cases. In *Parks*, the Court specifically warned that the

40

compounding concerns of the government's handling of discovery may require more aggressive sanctions in the future, including dismissal.

Thus, as egregious as the discovery violation in this case is, particularly because it involved a blatant disregard of this Court's Order, the analysis should also be informed by the recent history of mishandling of discovery in this District.

Moreover, serious concerns related to prior discovery violations include the implication that the government may be willing to make misrepresentations to minimize or distract from its mishandling of its discovery obligations. That, too, is obviously an issue here, which supports that a decision to dismiss should be issued with prejudice, barring the government from re-prosecution of this matter.

## D. THIS RECORD SUPPORTS THE CONCLUSION THAT THE GOVERNMENT HAS MADE MISREPRESENTATIONS REGARDING ITS DISCOVERY EFFORTS

When asked on February 23, 2024, whether rolling discovery would be possible, the government indicated that it believed that there was "material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment." Feb. 23, 2024 Transcript at 10.

The government's representation on February 23, 2024, is not supported by any evidence within the record. The government has been given multiple opportunities to address its efforts to prepare discovery.

The government filed a motion for an exclusion of time with an affidavit that addressed discovery disclosure. Dkt. # 123-1. The affidavit did not address any efforts related to discovery preparation prior to February 23, 2024, and only mentions that date in reference to the status conference that was held. The affidavit then, under the heading "Preparation for Discovery Production," the affidavit makes a temporal jump to May 16, 2024 without detailing anything that occurred earlier other than there had been "nearly three-months of working… to collect, organize, bates-stamp, process, and review discoverable material." Dkt. # 123-1 at 5-6.

The sworn affidavit further stated that "[u]ntil the collection, organization, processing, and review of the discoverable material had taken place, it would not have been clear what size hard drive would be required to store the discoverable material for production." Dkt. # 123-1 at 6.

In June, when discovery was finally made available, an index was provided with 15 columns of information, and 12,992 rows, for each item of discovery. One of the columns is titled "File Path." Review of the index, reveals that the file path for the vast majority discoverable items includes the file path:

*/001 May 2024 Discovery/001. FBI Discovery Recieved 2024-04-26/1st Discovery Production to USAO 04_26_24/*

This portion of the file path is contained in 12,195 items. It indicates the "1st Discovery Production" was not received by the US Attorney's Office until April 26, 2024, over two months after the February 20, 2024, conference where the government represented to this Court that in order to receive a 90-day deadline, it would provide rolling discovery, because there was "material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment."

After reviewing the index and noticing the information contained in the file path column, this issue was brought to the Court's attention for the first time at the motion arguments on July 22, 2024.

After being pressed on the implication of that file path, the government offered denied that it was indicative of any delay regarding efforts to produce discovery, stating the following:

> The date that Mr. Foti is referencing is when material that had been getting combined and put together and selected and organized for months by the FBI and HSI was dropped off in a hard drive to the U.S. Attorney's Office to begin the process of Bates numbering.
>
> 7/22/24 Transcript at 23.

The explanation presents two significant issues for this Court to consider.

First, the statement again implies that the government, on its own, had completely disregarded the Court's directive for rolling discovery, a necessary component of the decision to grant 90 days for disclosure.

Second, the statement only raises more questions regarding the government's representations related to its discovery efforts. If the US Attorney's Office received a physical hard drive on April 26, 2024, then it begs the question: why could the US Attorney's Office not identify the size of the hard drives it would need from defense counsel to produce the discovery? It obviously knew the physical storage capacity of the drive it received from the FBI and other larger digital items should have been relatively easy to calculate. There is no clear reason why defense counsel would be informed it needed to obtain and deliver a 3 terabyte hard drive only days before the deadline to conclude the rolling discovery disclosure.

Furthermore, at that appearance on July 22, 2024, the government stated that discovery production "started when we had the status conference, if not before then." 7/22/24 Transcript at 24. This statement appears to be in contrast to the representation in February that "we've obviously been working on it since the return of the indictment."

On its face, these statements present inconsistencies by officers of the Court surrounding the discovery efforts. Of course, the defendants have sought a hearing to clear up the inconsistencies and factual gaps in the record, but the government has opposed those efforts, so the Court is left with a record that supports a sanction would appropriately include dismissal *with* prejudice.

### E. THE INDICTMENT ITSELF IS LITTERED WITH FALSEHOODS

The indictment, itself, and parts of the government's submissions have proffered demonstratively false information. This includes the government's efforts to obtain a wholly inappropriate, and arguably illegal, protective order included.

In its Amended Motion for a Protective Order, the government made the following comments in regard to *Bongiovanni et al*:

> *United States v. Bongiovanni, et al.*, Case Nos. 19-CR-227, 23-CR-37, involved charges of witness tampering, public corruption, sex trafficking, drug trafficking, and obstruction of justice. A protective order was issued. See id. Doc. No. 347. Nevertheless, counsel for Peter Gerace, including one of his present attorneys in that case, Eric Soehnlein, listed government witness Crystal Quinn as a defense witness. Although the protective order prevented defense counsel from disclosing to the defendant the names of witnesses on the government's witness list until a certain number of days before trial, it did not prevent defense counsel from listing the government's witnesses on the defendant's own list and then reviewing the defense witness list with the defendant, potentially circumventing the protective order, and identifying government witnesses to the defendant in a roundabout way. Crystal Quinn was ultimately murdered, and defendants Gerace, Ermin, Hinkle, and Gogolack have been indicted by a grand jury for Witness Tampering Conspiracy surrounding her murder. *See United States v. Gogolack et. al.*, 23-cr-99, Doc. No. 25, Second Superseding Indictment, Count 2.
>
> Dkt. # 156 at 11-12.

The government's comments regarding the sealed defense witness list[9] echo the alleged overt act included in paragraph 25 in the Second Superseding Indictment:

> The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names and from providing GERACE with the government's witness list.

> Dkt. # 24 at 16.

The defense filed a response addressing the falsity of the cited overt acts in the Second Superseding Indictment, which the government proffered to procure an inappropriate protective order.

The allegation that the Mr. Gerace's defense team placed Ms. Quinn on the defense witness list to "reveal[] to [Mr. Gerace] the government's witnesses' names" calls for a total suspension of disbelief, requiring the Court to believe (1) that Mr. Gerace would have had no reason to place Ms. Quinn on the witness list himself; and (2) that Mr. Gerace did not already know that the government intended to call Mr. Quinn as a witness. To advance those conclusions, the government ignores its own public comments and submissions made prior to the filing of the defense witness list.

---

[9] Although the government's Affidavit did not mention this, it should be noted that the defense witness list, referred to in the Government's Affidavit was filed under seal and never made available to the public.

But as discussed in the Background, above, Mr. Gerace would have had reason to include Ms. Quinn on his witness list, particularly because Ms. Quinn's initial comments to the government agents contradicted the narrative that the government sought to advance.

Regardless of whether the government felt Ms. Quinn's initial comments were false, she provided statements to agents contradicting the government's narrative of what occurred on November 19, 2019, which the government included in a publicly filed complaint, unsealed four months before the defense witness list was filed.

The idea that defense counsel would include Ms. Quinn on the witness list to reveal her identity as a cooperating witness is utter nonsense. Mr. Gerace would have had a substantial interest in calling Ms. Quinn as a witness to elicit the factual information that he believed she could provide, which may have included, but would not be limited to, the statements she made to the government agents, contradicting the government's narrative.

Even if the defense, or Mr. Gerace, had learned that Ms. Quinn ultimately agreed to cooperate with the government, the defense would have had an interest in preserving its right to call her as a witness, because the fact that she voluntarily provided information to the government that contradicted its narrative, but she was then charged and compelled to cooperate, would make her a potentially valuable witness to the defense as it relates to the government's tactics and the credibility of the investigation.

Thus, the suggestion that the defense would include Ms. Quinn with the purpose of revealing her cooperation is not only illogical as a general premise, but it attempts to lodge allegations, primarily directed at defense counsel, based on conjecture that is contradicted by facts.[10]

The government proffered these false allegations as a basis for the inappropriate protective in its Amended Motion, but when confronted with the facts that demonstrate that the allegations in the government's motion, and the indictment, are false, the government had nothing to offer in reply.

> The defendant spends much of his supplemental filing (Doc. No. 164) attempting to engage in a paper trial of the merits of allegations contained in the Second Superseding Indictment in this case. See e.g. Doc. No. 164 at pgs. 10-17. The government, while it disagrees strongly with the assertions made by the defendant, does not intend to use its reply brief to address such arguments.
>
> Dkt. # 167.

Despite the fact that the government had reiterated the allegations in the second superseding indictment as a basis for the protective order, the government quickly retreated discussing the allegations, having nothing to offer to rebut the discussion that they are *clearly* false, and the government's inclusion of those allegations in both the

---

[10] The defense's Supplemental Response to the government's Amended Motion for a Protective Order also addressed "The Insinuation That the Defense Witness List Revealed Mr. Quinn's Cooperation Attempts to Ignore the Government's Public Proffer of Information Establishing Her Cooperation Months Earlier."

indictment and its subsequent submissions to this Court are extraordinarily problematic. It seeks further inquiry of this Court, and further consideration in support of a decision to dismiss this indictment, with prejudice.

The government should not be permitted to wreak havoc with the filing of an indictment containing demonstratively false information, then willfully violate an order of this court, and have the indictment dismissed with an opportunity to file a new one.

## IV. CONCLUSION

The facts surrounding the government's willful disregard of this Court's Order supports dismissal with prejudice.

While the failure to produce rolling discovery, and the complete disregard of the discovery deadline are both egregious, it is compounded by the government's historical, repetitive failure to honor its discovery allegations to the accused in other cases in this District.

Moreover, the facts surrounding the violation support the need for a more aggressive sanction here. The evidence of the government's misrepresentations related to discovery and other aspects of this case support the requested sanction.

Thus, for all of the reasons set forth above, Mr. Gerace respectfully requests that the indictment be dismissed, with prejudice, or a decision to dismiss be issued pending a hearing to determine whether dismissal should be with or without prejudice.

Dated: August 7, 2024

/s/ Mark A. Foti
Mark A. Foti, Esq.