IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.           23-CR-99-LJV-JJM

SIMON GOGOLACK, et al.,

       Defendants.

## GOVERNMENT APPEAL OF AUGUST 23, 2024 DECISION AND ORDER BY MAGISTRATE JUDGE JEREMIAH J. McCARTHY

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Tiffany H. Lee and Caitlin M. Higgins, Assistant United States Attorneys, of counsel, hereby files its appeal of Magistrate Judge Jeremiah J. McCarthy's August 23, 2024 Decision and Order. *See* Docket No. 200.


Because the Magistrate Court's finding that the government acted in bad faith in failing to provide discovery by the May 23, 2024 deadline set forth in the Magistrate Court's scheduling order was contrary to law and clearly erroneous, and because the sanctions imposed by the Magistrate Court were also contrary to law and clearly erroneous, the Magistrate Court's Decision and Order should be reversed and remanded for the imposition of a sanction commensurate with both the government's conduct and prejudice to the defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 13, 2023, the grand jury returned a five-count Indictment against defendant Gogolack. Docket No. 12.  On January 5, 2024, the grand jury returned a Second Superseding Indictment, adding all additional defendants. Docket No. 24.  This Court arraigned the defendants on January 9, 2024 (*see* Docket No. 29 [defendants Roncone, Knight, and Barber]); January 10, 2024 (*see* Docket No. 31 [defendants Gerace, Ermin, Hinkle, and Barnes]); and January 24, 2024 (*see* Docket No. 45 [defendant Gogolack]).  The case was referred to Magistrate Judge Jeremiah J. McCarthy for resolution of pretrial matters. *See* Docket No. 28.

On February 23, 2024, Magistrate Judge McCarthy set a scheduling order which directed the government to produce voluntary discovery to the defendants on or before May 23, 2024, and set a further status conference for June 3, 2024.  *See* Docket No. 73.  The Court excluded the time from February 23, 2024, until June 3, 2024, pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and (h)(7)(B)(iv).  *See* Docket No. 74.

Between February 23, 2024, and June 3, 2024, the parties engaged in litigation regarding various issues including detention (*see* Docket Nos. 81, 83, 85, 87, 92, 95, 98, 101, 103, 108, 112, 113, 114, 117, 119); appointment of counsel (*see* Docket Nos. 84, 94); and discovery for detention hearings (*see* Docket Nos. 96, 100, 102, 106, 116).

On May 20, 2024, the government advised defense counsel that a three-terabyte hard drive would be required to handle the volume of discovery it was ready to produce.  As the

government was awaiting receipt of the hard drives,[1] it also engaged defense counsel about the need for a protective order.  However, there is no dispute that the government did not email a proposed protective order to defense counsel until May 29, 2024—six days after discovery was due pursuant to the Magistrate Court's scheduling order.  *See* Docket No. 142, at 3, 19.  By the time of the June 3, 2024 status conference, the government had received responses regarding the proposed protective order from three of the nine defense attorneys. *Id.* at 19.

At the June 3, 2024 status conference, the defendants objected to the fact that they had not received the discovery by the May 23, 2024 deadline.  They also objected to certain terms of the government's proposed protective order.  *See* Docket No. 120.  The Magistrate Court directed that the discovery be produced by the government "for attorney's eyes only" pending agreement as to the protective order, and issued a briefing schedule as to the protective order. *Id*.  In response to the defendants' objections to not having received the discovery by May 23, 2023, the Magistrate Court allowed the defendants to file motions suggesting possible consequences for the government's failure.  Finally, the Magistrate Court denied the government's request to exclude the period from June 3, 2024, to June 27, 2024[2] (the date set for a scheduling conference), from the Speedy Trial Act clock "[f]or the reasons set forth by defendants' counsel on the record."  *Id.*

---

[1] As of the May 23, 2024 discovery deadline, the government had received hard drives from three attorneys.  The remaining hard drives were received after the deadline.  *See* Docket No. 123-1, ¶ 14.

[2] The June 27, 2024 date was later rescheduled to July 11, 2024, with exclusion of Speedy Trial Act time between those dates.  *See* Docket No. 152.  Thereafter, defendant Gogolack moved for an adjournment of oral argument, Docket No. 154, which was granted over the government's objection, Docket No. 157.  Oral argument was rescheduled for July 22, 2024, with a further exclusion of Speedy Trial Act time.  *See* Docket No. 159.

As of June 4, 2024, the discovery that the government agreed to voluntarily produce was either provided to counsel for the defendants, or ready for pickup.  *See* Docket No. 123-1, at ¶¶ 26-31.

On June 10, 2024, the government filed an *ex parte* motion for a protective order.  *See* Docket No. 129.  On the same day, various defendants filed motions for a hearing and sanctions.  *See* Docket Nos. 131, 132, 135, 137, 140.  On June 14, 2024, the government filed a response to the defendants' motions for a hearing and sanctions.  *See* Docket No. 142.  The government proposed that an appropriate sanction would be to count the twelve-day delay in producing discovery to the defendants against the government under the Speedy Trial Act, noting that courts should impose the "least severe sanction that will accomplish the desired result – prompt and full compliance with the court's discovery orders." *Id*. (quoting *United States v. Sarcinelli*, 667 F.2d 5, 7 (5th Cir. 1982)).  The parties continued to litigate the issue of the protective order.  *See* Docket Nos. 134, 136, 138, 146, 149, 151–53, 156, 158, 160-64, 166, and 167.

The July 22, 2024 Oral Argument:

On July 22, 2024, the Magistrate Court held oral argument on the defendants' motions for a hearing and sanctions and reserved decision.  *See* Docket No. 168.  However, the Magistrate Court stated that "based on what [it had] heard thus far, [it did not] find there [was] any indication of bad faith that would warrant a hearing…."  *Id*.; *see also* Docket No. 169 at 27-28.  Specifically, the Magistrate Court stated that in all its dealing with the prosecutors, "and continuing to today" it had "no reason to doubt [their] good faith and [it]

appreciate[d] [their] candor, both in [their] submission and in what [they] said today…." *Id.*; *see also id.* at 29 ("And, again, Mr. Tripi, you made the written submission, you've made a very candid oral presentation, as have you, Mr. Cooper, and I appreciate that."). The Magistrate Court went on to say: "I don't find anything particularly blameworthy in the three of you, what you've done and what you haven't done. I think it's understandable." Nevertheless, the Magistrate Court concluded, and the government concedes, that it was "undisputed that the failure to earlier seek a protective order was a mistake that shouldn't have happened." *Id.* at 29. The Magistrate Court stated that "for many reasons … the government's conduct ha[d] been unjustifiable" and that it warranted revisiting the Speedy Trial Act exclusion that the Court had imposed on February 23rd. *Id.* at 27-28. As to any dismissal, the Magistrate Court stated that it was leaning towards dismissal without prejudice, but noted that no such motions had yet been made. *Id.* at 29. The Magistrate Court indicated that it would follow up with a written decision. *Id.* at 29.

The July 29, 2024 Decision and Order:

The Magistrate Court filed its written decision one week later, on July 29, 2024. *See* Docket No. 173. In that Decision and Order, the Magistrate Court reversed course and found that the government's twelve-day delay in producing discovery had, in fact, constituted bad faith. *See* Docket No. 173, at 2 (although the Magistrate Court had "found 'no indication of bad faith' … upon further review of the government's submission [from June 14, 2024], [it] now realize[d] that [it] spoke too soon"). The Magistrate Court, citing to *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 345 (2d Cir. 1986), held that "[t]he government's willful violation of [its] order constitutes bad faith," *id.* at 5, and that the sanction proposed

by the government was "clearly an inadequate response to its misconduct in this case." *Id.* The Court set forth the following as its conclusions: that the government's "alleged oversight" of the need for a protective order for three months "was not merely negligent, but grossly negligent" *id.* at 4; that the government's delay in seeking a protective order was not merely an "oversight," it was a "deliberate[ ] deci[sion]not to comply with th[e] order [to produce voluntary discovery by May 23, 2024]" *id.* at 5; and that the government "made a calculated decision to disobey [the Court's] order to produce, and to defer its request for a protective order until the deadline for production had expired...." *Id.*

Recognizing that its previously described Speedy Trial Act remedy "would have little impact," since Speedy Trial Act time was also automatically excluded under 18 U.S.C. § 3161(h)(1)(D) due to the pendency of various unresolved motions, the Magistrate Court invited the defendants to submit additional briefing addressing the appropriate sanction or sanctions to be imposed. *See id.* at 2, 6.

On August 7, 2024, defendants Gerace (Docket No. 189), Ermin (Docket No. 181), Knight (Docket No. 184), Hinkle (Docket No. 186), Gogolack (Docket No. 187), Barber (Docket No. 185), and Barnes (Docket Nos. 182 and 183), filed their respective submissions on sanctions. Relying on the Magistrate Court's finding that the government's willful twelve-day delay in providing discovery constituted bad faith, each of the defendants asserted that dismissal of the Second Superseding Indictment with prejudice—the most severe possible sanction—was the appropriate sanction to address the government's conduct.

The Government's August 12, 2024 Motion for Reconsideration and Opposition to Defense Motions for Sanctions:

On August 12, 2024, the government filed a motion for reconsideration and response in opposition to defendants' submissions on sanctions, asserting that the Magistrate Court should reconsider its July 29, 2024 Decision and Order as it pertained to the bad faith finding and deny the defendants' requests for sanctions as incommensurate with the government's failure to comply with the May 23, 2024 discovery deadline.  *See* Docket No. 191.  Noting that the Second Circuit has not defined "bad faith" in the context of Federal Rule of Criminal Procedure 16, the government set forth the controlling law, under which controlling law the Court's bad faith finding could not stand.  *Id*. at 5-9.  The government also addressed the Magistrate Court's reliance on *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329 (2d Cir. 1986), a procedurally and legally distinguishable civil case that involved the award of attorneys' fees under a specific bad faith exception to the "American Rule".  *Id* at 9-10.  Finally, the government addressed the defendants' requests for sanctions in the context of the applicable case law, an analysis that revealed the inappropriateness of the sanction requested by all defendants—that is, the dismissal of the Second Superseding Indictment with prejudice.  *Id*. at 15-32.

Several of the defendants filed responses.  *See* Docket Nos. 193-95, 198.

The August 23, 2024 Oral Argument:

At the August 23, 2024 court appearance, the Magistrate Court heard argument from the government on its motion for reconsideration, and specifically, its argument that the Magistrate Court's finding of bad faith was not supported by the facts of what had occurred,

or by the caselaw, including *Dow Chemical*.  The Magistrate Court issued a decision from the bench denying the government's motion for reconsideration, reaffirming its opinion that the government's conduct exhibited a willful violation of its order and therefore bad faith, and imposing a three-part sanction as follows:  (1) disqualifying the assigned Assistant United States Attorneys ("AUSAs")[3] from further involvement in the case; (2) precluding the government from seeking a protective order; and (3) charging three months' delay against the government for purposes of the Sixth Amendment right to a speedy trial.  *See* Docket No. 199. The Court issued a written Decision and Order the same day.  *See* Docket No. 200.

The August 23, 2024 Decision and Order:

In its August 23, 2024 Decision and Order, the Magistrate Court found that the government had "simply chose[n] not to [comply with its order], absent a protective order which it had not requested and [the Court] had not ordered," and concluded that such decision by the government "[did] not furnish a colorable basis [for] violating [the Court's] order."  Docket No. 200, at 3 (internal citation omitted).  Further, the Magistrate Court found that the government failed to comply with the May 23, 2024, discovery deadline in order to obtain a tactical advantage, namely "by limiting defendants' access to and use of the information in a manner which [the Court] had not ordered."  *Id.* at 3-4.

On August 26, 2024, the government filed a motion with this Court for an extension of time to appeal the Magistrate Court's August 23, 2024 Decision and Order and to stay the Decision and Order.  *See* Docket No. 201.  This Court granted that motion, set a briefing

---

[3] AUSAs Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck.

schedule, and stayed the Magistrate Court's Decision and Order until resolution of the government's appeal. *See* Docket No. 202.

## STANDARD OF REVIEW

A District Court reviews a Magistrate Judge's Decision and Order on non-dispositive motions under the "contrary to law" or "clearly erroneous" standard. *See* 28 U.S.C. §§ 636(b)(1)(A), (C); Fed. R. Crim. P. 59(a). An order is deemed "contrary to law if it fails to apply or misapplies relevant statutes, case law or rules of procedure." *United States v. Turnquist*, No. 21-CR-15 (JLS) (JJM), 2022 WL 1913593, at *2 (W.D.N.Y. June 3, 2022) (internal quotations omitted). Moreover, "[a] finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Martinez*, 110 F.4th 160, 174 (2d Cir. 2024) (internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "The clearly erroneous standard is highly deferential, and magistrate judges are afforded broad discretion in resolving non-dispositive disputes." *United States v. Rivera-Banchs*, 516 F. Supp. 3d 316, 320 (W.D.N.Y. 2021) (quoting *S.E.C. v. Verdiramo*, 890 F. Supp.2d 257, 266 (S.D.N.Y. 2011)). Pursuant to this standard, then, a district court may reverse a decision and order "where the magistrate judge abused his discretion." *United States v. Williams*, No. 17-CR-78-FPG, 2019 WL 5260267, at *2 (W.D.N.Y. Oct. 17, 2019) (quoting *Centro De La Communidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp.2d 127, 139 (E.D.N.Y. 2013)).

.

## ARGUMENT

**I.    THE COURT SHOULD REVERSE THE MAGISTRATE COURT'S BAD FAITH FINDING AS BOTH CONTRARY TO LAW AND CLEARLY ERRONEOUS.**

### A. The Magistrate Court's Bad Faith Finding is Contrary to Law.

The Magistrate Court's July 29, 2024 Decision and Order reversed its earlier finding that the government had not acted in bad faith when it failed to turn discovery over by the May 23, 2024 discovery deadline. *See* Docket No. 173. The Court's August 23, 2024 Decision and Order denied the government's motion for reconsideration of the bad faith finding and imposed sanctions on the government. *See* Docket No. 200. The government's appeal of the Magistrate Court's August 23, 2024 Decision and Order is also an appeal of its July 29, 2024 Decision and Order.

The Magistrate Court's conclusion that the government's failure to meet a discovery deadline constitutes bad faith is contrary to law because, in reaching the finding, the Magistrate Court "fail[ed] to apply or misapplie[d] relevant statutes, case law or rules of procedure." *Collens v. City of New York*, 222 F.R.D. 249, 251 (S.D.N.Y. 2004) (internal quotations omitted). The Magistrate Court failed to apply or misapplied relevant statutes, case law, and rules of procedure in three regards: (1) it failed to consider relevant caselaw addressing discovery violations in criminal cases; (2) it improperly predicated its bad faith finding on a conclusion that the government sought a protective order to gain a tactical advantage; and (3) it improperly concluded that bad faith can be based on a finding of "faithlessness" or "treachery" without a finding of deceit.

1.  <u>The Magistrate Court Failed to Consider Relevant Caselaw Addressing Discovery Violations in Criminal Cases.</u>

The Court's finding of bad faith is contrary to law in that it failed to consider cases in this and other Circuits that involve discovery violations in criminal cases, that is, violations of Federal Rule of Criminal procedure 16. Instead, the Magistrate Court's finding of bad faith was predicated on civil cases, including *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329 (2d Cir. 1986), which are both procedurally and legally distinguishable. *See* Docket No. 173, at 5 (citing *Dow Chemical* in support of its finding that "[t]he government's willful violation of [his] order constitute[d] bad faith").

As the government argued in its motion for reconsideration, the Magistrate Court's reliance on civil cases such as *Dow Chemical* was misplaced. *Dow Chemical* involved the award of attorneys' fees under the bad faith exception of the "American Rule," not bad faith in the context of a Rule 16 discovery violation. Even so, the Second Circuit in *Dow Chemical* noted that a party asserting bad faith must show: (1) actions taken entirely without color and taken for harassment or delay or for other improper purpose, and (2) a "high degree of specificity in the factual findings of the lower courts" in order to merit the imposition of attorneys' fees. 782 F.2d at 344 (internal quotation and alteration omitted). The Second Circuit stated that courts can look to "the conduct of the party in instigating or maintaining the litigation for an assessment of whether there has been substantive bad faith" to include "procedural bad faith as exhibited by, for example, its use of oppressive tactics or its willful violations of court orders." *Id.* at 345.

As set forth in the government's motion for reconsideration, the Magistrate Court overlooked a crucial part of *Dow Chemical* in that for a party to make a claim of bad faith in the first instance, it must show meritless actions and that the conduct was taken for harassment, delay, or for other improper purpose.  *See* Docket No. 191, at 10-11.  The government also asserted that the Magistrate Court had failed to address the Second Circuit's determination in *Dow Chemical* that the district court had failed to make adequate findings to support the bad faith standard for purposes of imposing sanctions.  *Id.* at 10 (citing *Dow Chemical,* 782 F.2d at 345 (registering surprise that the district court had felt that the two incidents cited in the record were sufficient to justify an award of attorneys' fees)).  The government asserted that such an observation by the Second Circuit demonstrated that even intentional failures to comply with a court order, standing alone, would not rise to the level of bad faith required to award attorneys' fees.  *See* Docket No. 191, at 10-11 (citing *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977) (remanding "for more specific findings" as to whether attorneys' actions were "undertaken in bad faith, without justification or for an improper purpose, such as harassment or delay")).

In denying the government's motion for reconsideration, however, the Magistrate Court disagreed that it had overlooked anything in *Dow Chemical* and continued to apply *Dow Chemical*'s test in support of its finding of bad faith, even though the test is inapplicable in a criminal context.  *See* Docket No. 200, at 2.  Indeed, the August 23, 2024 Decision and Order incorporated additional language from *Dow Chemical*, now finding that the government acted in bad faith, not only because it "consciously," "deliberately," and "willfully" violated the Magistrate Court's order, (*see* Docket No. 173 at 5), but also because its violation of the

discovery deadline was "entirely without color," and "undertaken for an improper purpose." Docket No. 200, at 2-3; *see also Dow Chemical*, 782 F.2d at 344 ("To ensure, however, that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both 'clear evidence' that the challenged actions '*are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes*.'") (emphasis added).

Although the Second Circuit has yet to explicitly define "bad faith" in the context of Rule 16, it has clearly differentiated between negligence and bad faith, finding that the former does not constitute bad faith. For example, in *United States v. Pizarro*, No. 19-2391, 2023 WL 3332539 (2d Cir. May 10, 2023) (Summary Order),[4] a case where the government belatedly disclosed *Brady* material on the eve of two trial dates, "[t]he government explained that it initially withheld information while law enforcement investigated and did not have an adequate system for ensuring that the withheld material was timely disclosed when the investigation was complete." *Id.* at *1. In declining to dismiss the indictment, the Second Circuit observed that the government's explanation was consistent with the record and the defendants had not pointed to any evidence that the failure was "based on bad faith rather than negligence or was otherwise part of a larger pattern." *Id.*

Similarly, in *United States v. Wynder*, No. 20-CR-470 (PKC), 2022 WL 3572881, at *1 (S.D.N.Y. Aug. 19, 2022), the district court found that the prosecutors' conduct in failing to

---

[4] "[D]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases," *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (quoting Order dated June 26, 2007, adopting 2d Cir. Local R. 32.1); *see also United States v. Montague*, 67 F.4th 520, 535 n.4 (2d Cir. 2023).

produce highly relevant documents that were within their possession and control was not in

bad faith because "[t]he government did not gain any advantage from its errors and

omissions." The court noted that the case involved:

> [A] series of government failures that resulted in the *non-production of hundreds of thousands of highly relevant documents* that had been in the government's possession or control in some instances for more than a year. *The series of failures was compounded by untrue representations made to the Court* that induced it initially to deny a defense application for a continuance of the trial date.

*Id.* at *1 (emphasis supplied). In declining to find that the government had acted in bad faith,

the district court necessarily looked at the purpose of the government's conduct, and

concluded that while such conduct amounted to "serious and repeated neglect," it was not

taken in bad faith:

> Evidentiary preclusion, Rule 16[(d)(2)], or an adverse inference charge, as suggested by defendants, may be appropriate for actions taken in bad faith, but does not fit these circumstances that amount to serious and repeated neglect. *The Court cannot see any benefit to the government derived from this unseemly mess.* There is no claim that prosecutors were trying to hide the ball and were caught only when the defendants unexpectedly decided to proceed to trial.

*Id.* at *5 (emphasis added). Importantly, the district court in *Wynder* observed that

"[p]rosecutors, like judges and defense counsel, make mistakes. It is inherent to the human

condition." *Id.* at *1; *see also United States v. Parks*, 19-CR-87, W.D.N.Y. Docket No. 996

(declining to dismiss indictment and finding no bad faith where government failed to turn

over *Brady* material on eve of trial);[5] *United States v. Morgan*, 493 F.Supp.3d 171, 180

(W.D.N.Y. 2020) (even where government failed to meet court deadlines, "it is clear that the

---

[5] Indeed, at various times during the *Parks* litigation, this Court characterized the government's failure to disclose *Brady* material as a mistake.

government's mistakes, while negligent, do not constitute willful misconduct undertaken in bad faith");[6] *United States v. Eldridge*, No. 09–CR–329–A, 2014 W L 4829146, at *6 (W.D.N.Y. Sept. 29, 2014) (in the context of the destruction of evidence "[n]egligence is not enough to establish bad faith" pursuant to *Arizona v. Youngblood*, 488 U.S. 51 (1988)).

In contrast, a review of the government's failures in *United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020), demonstrates the types of conduct that could potentially support a finding that the government had acted in bad faith.  In *Nejad*, the government made a series of significantly belated disclosures, including a decision to "bury" exculpatory evidence by "deceptively hiding it among several other documents that had been previously disclosed." *Id.* at 222.  As a result of such conduct, the government itself moved to dismiss the indictment with prejudice.  *Id.*  Nevertheless, the court invoked its supervisory power to review the government's conduct:

> It is the fervent hope of the Court that no sanctions are necessary. But it is the firm view of the Court that if Government lawyers acted in bad faith by knowingly withholding exculpatory material from defense or intentionally made a misleading statement to the Court, then some sanction or referral to the Grievance Committee … would be appropriate.

---

[6] The defendants subsequently filed motions for reconsideration asking the court to dismiss the indictment with prejudice based on alleged misrepresentations made by the government as to discovery in the case.  *See United States v. Robert Morgan*, 18-CR-108, WDNY, Docket Nos. 505, 506, 507, 509.  Based on these allegations, the Court determined that there was a sufficient basis to justify an evidentiary hearing.  18-CR-108, Docket Nos. 548, 549. However, because the case resolved with the defendants pleading guilty and withdrawing their motions for reconsideration, and because the Court found that it had "every expectation that the [government] w[ould] take the necessary steps to investigate the allegations and ensure that any necessary remedial actions are taken to address those issues," the Court ultimately declined to hold the hearing.  18-CR-108, Docket No. 625.

*Id.* at 224.  After further fact finding, the district court in *Nejad* found that the government conduct, while "far from acceptable" did not constitute "intentional misconduct" and therefore did not warrant the imposition of sanctions:

> While the Court does not find intentional misconduct, the conduct of the prosecutors in this case was far from acceptable. Prosecutors have an obligation to ensure that their disclosures to the defense are complete and their representations to the court are correct. These obligations require affirmative diligence, not only the absence of abject bad faith. As important, public confidence in the administration of justice depends on prosecutors owning and rectifying their mistakes.

*United States v. Nejad*, 521 F. Supp. 3d 438, 450 (S.D.N.Y. 2021).  The court further held that "[a]lthough the Government's errors and ethical lapses in this case are pervasive, the Court does not find that prosecutors intentionally withheld documents from the defense or intentionally misled the Court."  *Id.* at 454.  The government's conduct in *Nejad* stands in stark contrast to the government's failure, in this case, to produce discovery by the deadline set forth in the Magistrate Court's scheduling order because it was waiting on an agreement as to a protective order.

In concluding that the government's failure to produce discovery by the May 23, 2023, discovery deadline constituted bad faith on the part of the prosecutors, the Magistrate Court failed to consider the above, factually relevant cases, which were decided in this Circuit, and which were decided in the context of criminal, not civil, discovery.  Instead, the Magistrate Court relied on standards taken from the very different world of civil discovery, including whether there was a "colorable basis" for violating its scheduling order.  In that regard, the Magistrate Court concluded that because the government had not asked for a protective order, its decision to withhold production of discovery past the deadline in order to obtain a

protective order "d[id] not furnish a colorable basis [for] violating [the Court's] order." Docket No. 200 at 3 (citing civil cases for the proposition that "litigants [may] not anoint themselves with the power to adjudge the validity of orders to which they are subject").

The Magistrate Court's Decision and Order finding bad faith does not cite to any factually similar criminal case, that is, a criminal case in which the government failed to produce Rule 16 discovery by the deadline set by the court in a scheduling order. Nor does the Magistrate Court address the Second Circuit precedent, *see infra*, that requires courts, when considering alleged violations of Rule 16, to assess the underlying intent and culpability of the party alleged to have violated the Rule.

2. The Magistrate Court's Predication of a Bad Faith Finding on its Conclusion that the Government Sought a Protective Order to Gain a Tactical Advantage is Contrary to Law.

In concluding that the government had acted in bad faith when it decided to wait for a protective order before turning over discovery, the Magistrate Court rejected the government's argument that, in pursuing a protective order, it did not act "with any motive to delay the proceedings [or] to gain tactical advantage." *See* Docket No. 200 at 3 (quoting Docket No. 191, at 8). To the contrary, the Magistrate Court held that the government consciously decided to withhold production of discovery until a protective order was in place "to obtain a tactical advantage, by limiting defendants' access to and use of the information in a manner which [the court] had not ordered." *Id.* at 3-4. The Magistrate Court did not cite to any precedent for this holding, and the government could find none.

Indeed, case law in this and other Circuits supports the government's position that a protective order confers no tactical advantage to the government.  For example, in *United States v. Arrington*, District Court Judge John L. Sinatra rejected that exact argument.  *United States v. Arrington*, No. 15-CR-33-A, 2022 WL 3229843 (W.D.N.Y. Aug. 10, 2022).  Arrington had argued that "the Government's 'interest' in enforcing the Protective Order [was] being used by the [G]overnment for tactical advantages over [him] to impair his defense before trial, and to limit his ability to have access to the evidence and materials for preparation for trial." 2022 WL 3229843, at *17 n.17.  Judge Sinatra's rejection of this argument is consistent with the case law discussing protective orders.

Federal Rule of Criminal Procedure 16(d)(1) recognizes that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  As this Court is aware, "[c]ourts often issue protective orders in criminal cases." *United States v. Dixon*, 355 F. Supp. 3d 1, 4 (D.D.C. 2019).  Courts do so because "protective orders … serve [ ] the significant interest of ensuring the safety of witnesses and confidential informants." *United States v. Powell*, No. 1:24-CR-18, 2024 WL 3344642, at *2 (S.D.OH July 9, 2024) (internal quotation omitted).  While Rule 16 grants courts "'vast' discretion to 'assure that a defendant's right to a fair trial [is] not overridden by the confidentiality and privacy interests of others,'" *id.* (quoting *United States v. O'Keefe*, 2007 WL 1239204 at *2 (D.D.C 2007)), the Supreme Court has held that "courts can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman v. United States*, 394 U.S. 165, 185 (1969).  Because protective orders are contemplated under Rule 16 as a matter of course to

ensure witness safety and prevent unwarranted disclosure of discovery materials, they are, by definition, not a weapon by which to obtain a tactical advantage. As such, the Magistrate Court's holding that the government's violation of the discovery deadline to negotiate a protective order was undertaken for an improper purpose is contrary to law.

3. <u>The Magistrate Court's Conclusion that Bad Faith does not Require a Finding of Deceit, but Rather can be based on a Finding of "Faithlessness" or "Treachery" is Contrary to Law</u>.

Finally, the Magistrate Court rejected the government's assertion that under Second Circuit precedent, there could be no finding of bad faith in the absence of evidence to show that the government's failure to meet the discovery deadline was undertaken with deceit. *See* Docket No. 200 at 4 (quoting Docket No. 191 at 8 (citing *United States v. Bove*, 888 F.3d 606, 608 (2d Cir. 2018)). Specifically, the Court held that "[w]hile *Bove* does state that "[a]n act is 'in bad faith' if it is intentionally deceptive or dishonest," it does not suggest that bad faith *requires* deceit in every case." *Id.* (emphasis in original). Indeed, the Magistrate Court relied on *Bove*'s reference to the Oxford English Dictionary definition of bad faith, which definition includes the terms "faithlessness" and "treachery," and then concluded that "the government certainly was not faithful to its promise (which [the court] then ordered) to produce voluntary discovery by May 23, 2024." *Id.*; *see also* Docket No. 207 at 16-17 ("Let's take faithlessness for a minute. The Government promised to produce discovery by May 23rd. It intentionally did not. Can that be considered faithlessness? Faithlessness to the obligation that they undertook?").

19

The government does not contest that *Bove* included "faithlessness" and "treachery" in its definition of bad faith in the context of the Hyde Amendment. Critically, however, *Bove* explicitly tied "faithlessness" and "treachery" to "intentional deceit or dishonesty (in bad faith)." *See* 888 F.3d at 608-09 (holding that "[f]or the government's position to be 'vexatious, frivolous, or in bad faith,' the prosecution must have been brought (a) to hector or intimidate the defendant on shaky factual or legal grounds (vexatious); (b) without even a reasonably arguable factual and legal basis (frivolous); or (c) with an element of intentional deceit or dishonesty (in bad faith)").

Nevertheless, the Magistrate Court concluded that "if deceit were the sole lynchpin of bad faith, then the government's conduct would be completely unrestrained, provided it was not deceptive in the process.  That obviously cannot be the law."  *See* Docket No. 200 at 4. The Magistrate Court was correct insofar as that is *not* the law.  The law, in the context of Rule 16 sanctions, is that where the government commits a discovery violation, the decision as to what "sanctions for nondisclosure should be imposed depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other." *United States v. Miranda*, 526 F.2d 1319, 1324 (2d Cir. 1975). Indeed, the Second Circuit has explicitly instructed courts to assess "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016) (quoting *United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976)).  What is more, courts in this Circuit have held that negligence—even when gross—

does not constitute bad faith, evincing a state of mind requirement for bad faith. *See, e.g.*, *Wynder*, No. 20-CR-470 (PKC), 2022 WL 3572881, at *1 (S.D.N.Y. Aug. 19, 2022) (holding that although a series of government failures resulted in the non-production of "hundreds of thousands of highly relevant documents," there was no bad faith where the government did not gain any advantage from the conduct); *Morgan*, 493 F. Supp. 3d 171, 219 (W.D.N.Y. 2020) ("None of the delay can be considered deliberate delay, as the government's missteps are attributable to its negligence—not for the purpose of gaining a tactical advantage or prejudicing Defendants."); *cf.* July 29, 2024 Decision and Order, Docket No. 173, at 4 (in concluding that the government had acted in bad faith, the Magistrate Court held that "the government's alleged oversight of [the requirement for a protective order] for almost three months was not merely negligent, but grossly negligent").

In other words, based on Second Circuit precedent, bad faith requires more than mere volition (*i.e.*, "[a]n act of making a choice or decision").[7] In addition to the intent to act, bad faith requires malintent—deceit, dishonesty, treachery, and a "state of mind affirmatively operating with furtive design or ill will." *See United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) (quoting Black's Law Dictionary 139 (6th Ed. 1990)). If negligence or even gross negligence were the sole lynchpin for bad faith (which courts have rejected), then every prosecutor, defense attorney, and judge in this country has acted in bad faith.

In sum, "not every error amounts to prosecutorial misconduct." *United States v. Montgomery*, 990 F.2d 266, 271 (7th Cir. 1993); *see also McClure v. United States*, No. 3:19-CR-

---

[7] Merriam-Webster.

106, 2021 WL 2403452, at *3 (E.D. Tenn. June 11, 2021) ("Not every prosecutorial error amounts to prosecutorial misconduct, and, to succeed on such a claim, the petitioner must show that he or she was prejudiced by the prosecutor's actions."). That is not to say that courts should ignore errors falling short of prosecutorial misconduct. The law recognizes as much when it instructs courts to fashion remedies commensurate with the error by examining the underlying intent of the actor. The requirement to impose a remedy commensurate with the error, in and of itself, demonstrates that a bad faith finding premised solely on the volitional aspect of the government's failure to meet a court-imposed deadline is contrary to law and must be vacated.

Allowing the Magistrate Court's bad faith finding to stand contravenes Second Circuit precedent as to the definition of bad faith in the context of criminal cases. It also has the practical effect of subjecting prosecutors and defense attorneys alike to the prospect of sanctions for every failure to comply with any order or deadline imposed by the court relative to discovery. This is not what Rule 16 contemplates.

**B. The Magistrate Court's Bad Faith Finding is Clearly Erroneous.**

In addition to being contrary to law, the Magistrate Court's bad faith finding is clearly erroneous. Considering the controlling law and a review of the record, this is not a case where there were "two permissible views of the evidence." *Anderson*, 470 U.S. at 574. Instead, applying the law, as set forth above, and reviewing the record, the only permissible view of the evidence is that the government did not act in bad faith in withholding discovery until a protective order was in place. This is not to say that the violation of the scheduling order did

not amount to negligence.  Rather, based on the case law, the government's conduct simply does not amount to bad faith.

With respect to discovery and compliance with the May 23, 2024 discovery deadline, the government proffered regarding its efforts to gather, organize, process, Bates number, and review multiple terabytes of discovery material, which work was completed by May 20, 2024—three days before the discovery deadline—absent receipt of hard drives from defense counsel, and later, absent agreement on a protective order.  *See* Docket No. 142, at 9-26, 22-25; Docket No. 169 at 22-25.

With respect to the protective order, the government proffered that, as it was awaiting receipt of the hard drives from defense counsel, it also engaged defense counsel about the need for a protective order.  Nevertheless, the government conceded that it did not email a proposed protective order to defense counsel until May 29, 2024—six days after discovery was due pursuant to the Magistrate Court's scheduling order.  *See* Docket No. 142 at 3, 19.  Even then, however, the government received responses regarding the protective order from only three defense attorneys prior to the June 3, 2024, status conference.  *Id.* at 19.

Two incontrovertible facts emerge from the proffer made by the government:  (1) the discovery was ready for production on May 20, 2024, when the government requested hard drives from the defense; and (2) the government realized it overlooked the need for a protective order and, while awaiting the hard drives from all defendants, engaged the defendants in good faith with respect to negotiating a protective order.  Both facts not only

underscore the government's intent to comply with the scheduling order, but undercut any inference that the government acted in bad faith. What is more, the government recognized it made a mistake and did not attempt to hide from it. *See, e.g.*, Docket No. 169 at 24 ("The 12 days here, it's not about whether people were working on the discovery production, it's about a slip up on my part about a protective order, and then not being ready to turn it over without a protective order.") and 25 ("...we made a mistake. We didn't begin the protective order process earlier.").

The mistake, however, was just that, human error. *See Wynder*, 2022 WL 3572881, at *1. The record simply does not support the inference that in seeking a protective order, the government acted in bad faith, for example, to gain a tactical advantage or to deceive the court or defense counsel.

The Magistrate Court agreed—at least at first. At the July 22, 2024 oral argument, the Magistrate Court stated that in all its dealing with the prosecutors, "and continuing to today" it had "no reason to doubt [their] good faith and [it] appreciate[d] [their] candor, both in [their] submission and in what [they] said today...." *Id.* at 27-28. The Magistrate Court went on to say: "I don't find anything particularly blameworthy in the three of you, what you've done and what you haven't done. I think it's understandable." *Id.* at 27. And finally, the Magistrate Court stated: "I don't find, based on what I've heard thus far, I don't find that there is any indication of bad faith that would warrant a hearing." *Id.* at 28. As the Magistrate Court concluded, and the government concedes—"it's undisputed that the failure to earlier seek a protective order was a mistake that shouldn't have happened." *Id.* at 29.

Seven days later, however, on July 29, 2024, the Magistrate Court issued a Decision and Order in which it reversed course and found that the government's conduct had been grossly negligent and constituted bad faith. *See* Docket No. 173. Seven days after complimenting the prosecutors for their candor and stating that it had no reason to question their good faith, the Magistrate Court stated that "upon further review of the government's submission, I now realize that I spoke too soon." *Id.* at 2 (internal quotation marks omitted). As to the sanction to be imposed, the Magistrate Court acknowledged that the sanction it had wanted to impose, namely the vacating of the February 23, 2024 to June 3, 2024 Speedy Trial exclusion, would have little impact since the time was also excluded due to the pendency of various motions, so it presented the issue to defense counsel and gave them an opportunity to suggest an appropriate sanction. *Id.* The Magistrate Court's holding that the government's conduct constituted "gross negligence" and "bad faith" is clearly erroneous because it is inconsistent with controlling law, *see supra,* and is belied by the facts.

The Magistrate Court's subsequent denial of the government's motion for reconsideration was based in part on its conclusion that the government acted in bad faith by consciously disobeying the scheduling order in order to obtain a protective order for a tactical advantage. *See* Docket No. 200, at 3-4. However, as set forth above, neither the facts nor the law support the conclusion that delaying production of discovery to obtain a protective order in a case involving the murder of a government witness constitutes bad faith or provides any tactical advantage. When one compares the government conduct at issue here with the conduct at issue in other cases in this Circuit, it is clear that the government's actions do not

rise to the level of bad faith conduct—that is, conduct deliberately undertaken to deceive the Court or defense counsel or to gain a tactical advantage.

II.     **THE COURT SHOULD REVERSE THE MAGISTRATE COURT'S DECISION AND ORDER REGARDING SANCTIONS AS CONTRARY TO LAW AND CLEARLY ERRONEOUS**.

A. **The Magistrate Court's Imposition of Sanctions was Contrary to Law and Clearly Erroneous.**

If a party fails to comply with Rule 16, the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances. *See* Fed. R. Crim. P. 16(d)(2).

"The goal of discovery in criminal trials is to ensure a fair and thorough determination of defendant's guilt or innocence." *United States v. Nwoke*, No. 18-20686, 2022 WL 3044817, at *3 (E.D. Mich. Aug. 2, 2022). "One of the objectives of Rule 16 is to eliminate the idea that a criminal trial is a sporting contest in which the game of cat and mouse is acceptable." *United States v. Howell*, 231 F.3d 615, 626 (9th Cir. 2000). Thus, Rule 16 is meant to provide adequate and timely discovery to the defense while preserving the truth-seeking function of the trial; it is not meant to be punitive in nature. *See, e.g., United States v. Camargo-Vergara*, 57 F.3d 993, 999 (11th Cir. 1995) ("Inadvertence does not render a discovery violation harmless; rather, the purpose of Rule 16 is to protect a defendant's right to a fair trial rather than to punish the government's non-compliance."); *United States v. Rodriguez*, 799 F.2d 649, 654 (11th Cir. 1986) (stating that "[t]he purpose of the rule is not to punish the Government, as to

which intentional conduct would be relevant, but to protect the defendant's right to a fair trial"); *United States v. DeLeo*, 422 F.2d 487, 499 (1st Cir. 1970) (noting that "the prosecutor's duty of disclosure is imposed to assure fairness to the accused rather than to punish the prosecutor or the public" and holding that "the absence of conceivable prejudice to the accused completely disposes of his objection").  Rule 16 stands in contrast to the civil discovery rule, Federal Rule of Civil Procedure 37, which is punitive.  *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763-64 (1980) (Sanctions for failure to comply with discovery orders must "be applied diligently both to penalize those whose conduct may be deemed to warrant such sanctions and to deter those who might be tempted to such conduct in absence of such deterrent.") (internal quotations omitted).

A district court has broad discretion in criminal cases to impose sanctions for failing to comply with a discovery order.  *See Lee*, 834 F.3d at 158.  "Whether or not sanctions for nondisclosure should be imposed depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other."  *Miranda*, 526 F.2d at 1324.

The Second Circuit uses several factors to evaluate whether a district court appropriately exercised its discretion when determining sanctions/remedial action for Rule 16 violations including "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances."  *Lee*, 834 F.3d at 159; *see also United States v. Hastings*, 126

F.3d 310, 317 (4th Cir. 1997) (also considering "whether any less severe sanction will remedy the prejudice and the wrongdoing of the government"); *United States v. Wicker*, 848 F.2d 1059, 1061-62 (10th Cir. 1988) (stressing "the feasibility of curing the prejudice with a continuance"); *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1984) (same). These factors act as a "guide" for the district court's consideration of sanctions; "they are not intended to dictate the bounds of the court's discretion." *Wicker*, 848 F.2d at 1061.

A court may also sanction the government pursuant to its supervisory powers. When considering an exercise of its supervisory powers, a district court has various options: it may limit the witnesses or testimony offered by the government; it may sanction the attorneys; it may dismiss the case without prejudice; and it may dismiss the case with prejudice, "the most drastic remedy … because this prevents the government from retrying the defendants at all."[8] *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020).

After concluding that the government had acted in bad faith when it failed to produce discovery in compliance with the Magistrate Court's scheduling order, the Magistrate Court imposed three sanctions against the government: (1) disqualification of the assigned AUSAs; (2) preclusion of the government from seeking a protective order; and (3) charging three months' delay against the government for purposes of the Sixth Amendment right to a speedy

---

[8] The dismissal of an indictment is justified "to eliminate prejudice to a defendant; or, pursuant to [a court's] supervisory power, to prevent prosecutorial impairment of the grand jury's independent role." *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983); *see also United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (holding that a district court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct" (quoting *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995)).

trial.  *See* Docket No. 200 at 5-9.  The Magistrate Court's imposition of such sanctions was contrary to governing law because, in imposing the sanctions, it failed to reference, let alone analyze, what prejudice, if any, the government's conduct caused the defendants, and because the Magistrate Court failed to apply the least severe sanction, imposing instead sanctions that were divorced from the concerns of Rule 16.

    1.   The Magistrate Court Failed to Address What Prejudice, if any, the Government's Conduct Caused the Defendants.

      This Court should reverse the Magistrate Court's holding as to sanctions because the Magistrate Court failed to conduct any analysis of the prejudice caused to the defendants by the government's conduct.  To determine what sanction, if any, is appropriate, courts consider "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances."  *Lee*, 834 F.3d at 159 (quoting *Pineros*, 532 F.2d at 871).  "A defendant is prejudiced under Rule 16 only when he [or she] is unduly surprised and lacks an adequate opportunity to prepare a defense, or when the violation substantially influences the jury."  *United States v. Stevens*, 380 F.3d 1021, 1026 (7th Cir. 2004).  "Frequently it will be found that the party who requested disclosure has not been prejudiced and that no sanction is needed."  *United States v. Charley*, 189 F.3d 1251, 1262 (10th Cir. 1999) (quoting 2 Charles Alan Wright, Federal Practice and Procedure § 260, at 121-22).  "Although the delay in disclosure clearly violates Rule 16 and the Court's scheduling orders, delay alone is seldom sufficient to create prejudice, especially when the defendant receives the information in time to prepare for effective use at trial."  *United States v. Henderson*, No. 1:03-CR-155, 2005 WL 8159585, at *4 (E.D. Tenn. Apr. 26, 2005).  Here, the only cognizable argument the defendants can and do

make is that there was a twelve-day delay in receiving discovery.  Because this delay alone, particularly at this early stage in the case, is insufficient to create prejudice, the Magistrate Court's imposition of any sanction other than a continuance is contrary to law.  There has not been, nor can there be, a demonstration of prejudice.

### 2. The Magistrate Court Failed to Impose the Least Severe Sanction.

Likewise, the Court should reverse the Magistrate Court's Decision and Order as to sanctions because the Magistrate Court failed to impose "the least severe sanction that will accomplish prompt and full compliance with the discovery order." *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002).  Although the Magistrate Court acknowledged that imposition of "the lease severe sanction" is the standard, *see* Docket No. 200 at 4, it failed to follow it.  Rather than starting with the least severe sanction and working its way up, the Magistrate Court started with the most severe sanction and worked its way down. Specifically, the Magistrate Court first considered the most severe sanction, that is, dismissal with prejudice.  Ultimately, although every defendant had argued that dismissal with prejudice was appropriate, the Court rejected such sanction because "[it] would be excessively harsh at this stage of the case."[9]

The Court next considered dismissal without prejudice and concluded that "while perhaps a closer question, [it] would likely result merely in reprosecution and further delay, which serves nobody's interest."  *Id.* at 5.

---

[9] During oral argument, the Magistrate Court also noted that it did not "believe that a dismissal of the superseding indictment would withstand Appellate review" and was "not interested in wasting [its] time, [defendants'] time, any Court's time on something that is going to be a nonstarter."  Docket No. 207 at 21-22.

The Court's next consideration was disqualification of the AUSAs assigned to the case, a sanction it ultimately adopted. *See* Docket No. 200, at 7-8. However, in doing so, the Court failed to consider whether a lesser sanction, such as a continuance, would sufficiently address the specifics of the government's failure. As discussed in more detail below, none of the three sanctions imposed by the Court—disqualification, protective order preclusion, or running of constitutional speedy trial time—are "just," considering the circumstances of the government's conduct. Nor do such sanctions underscore the concerns inherent in Rule 16— "not to punish the government … but to protect the defendant's right to a fair trial." *Rodriguez*, 799 F.2d at 654. For the reasons set forth below, each of the sanctions imposed by the Magistrate Court is contrary to law and clearly erroneous.

### 3. The Magistrate Court's Disqualification of the Assigned AUSAs is Contrary to Law and Clearly Erroneous.

The Magistrate Court's disqualification of the assigned AUSAs is contrary to law. "The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016) (quoting *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005)). The "supervisory powers doctrine is an extraordinary one which should be sparingly exercised." *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 136 (2d Cir. 2017) (citation and quotation marks omitted). In the same vein, "disqualification of government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878–79 (10th Cir. 2003) (internal quotation marks and citation omitted). "[C]ourt decisions indicate that this sanction should be reserved for especially egregious and deliberate misconduct." *United States v. Houdersheldt*,

No. CR 3:19-00239, 2020 WL 7210993, at *7 (S.D.W.Va. Dec. 3, 2020) (collecting cases).

To determine if disqualification is required, the court generally weighs "[t]he egregiousness

of the violation, the presence or absence of prejudice to the other side, and whether and to

what extent there has been a diminution of effectiveness of counsel." *United States v. Koerber*,

No. 2:17-CR-37-RJS-PMW, 2017 WL 3172809, at *4 (D. Utah July 25, 2017).


Disqualification is not proper absent evidence of prosecutorial misconduct—such as

deliberately reviewing materials that the prosecutor knows or has reason to know are

privileged—and severe prejudice to the defendant. *See United States v. Stewart*, 294 F. Supp.

2d 490, 494 (S.D.N.Y. 2003); *United States v. Chong*, 58 F. Supp. 2d 1153, 1160 (D. Haw.

1999) ("Because there has been no prejudice and no prosecutorial misconduct, the Court finds

that disqualification is not justified.") (citation omitted); *United States v. Skeddle*, 989 F. Supp.

890, 899 (N.D. Ohio 1997) (disqualification of prosecutors not appropriate "due to their

exposure to documents that I may determine to be privileged, where the privilege can be

applied to exclude those documents at trial.  This is particularly true where the government

has not gained insight via the documents into the relationship between the defendants and the

attorneys defending them in this prosecution"); *cf. Richards v. Jain*, 168 F. Supp. 2d 1195

(W.D. Wa. 2001) (law firm disqualified where law firm reviewed approximately a thousand

privileged documents, many of which were clearly marked "Attorney-Client Privilege," over

an eleven-month period, and failed to timely notify opposing counsel that it had received

privileged information).

The Constitution grants the Executive Branch the power to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.  The law requires that the United States Attorney for a given District "prosecute for all offenses against the United States" and "prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned."  28 U.S.C. § 547.  Choosing who will prosecute a given case lies within the Executive Branch's "seemingly exclusive" discretion.  *United States v. Silva-Rosa*, 275 F.3d 18, 22 (1st Cir. 2001).  A court order "dictat[ing] to the executive branch whom it can appoint as its prosecutors" therefore triggers "weighty separation of powers concerns."  *Id.*; *Matter of Grand Jury Subpoena of Rochon*, 873 F.2d 170,174 (7th Cir. 1989) (a disqualification order preventing an executive official from carrying out "an executive function within [his] exclusive prerogative" "raises sharp separation-of-powers-concerns").  "In particular, it is inappropriate for courts to attempt to use the supervisory power to justify an extreme remedy when, short of such heroic measures, the means are at hand to construct a satisfactory anodyne more narrowly tailored to the objective."  *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994) (citing *United States v. Hasting*, 461 U.S. 499, 506 (1983) (overturning use of supervisory power to deter prosecutorial misconduct through reversal of conviction)).  This separation-of-powers principle imposes "significant limits" on a district court's supervisory power to order remedies against the executive.  *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985).  Indeed, "[t]he exercise of the supervisory power must concern real prejudice to the defendant [and must] not be a naked exercise in supervision over executive branch officials."  *United States v. Miceli*, 774 F. Supp. 760, 773 (W.D.N.Y.1991); *see also United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir.1983) ("Recent cases in the Supreme Court and this Circuit have established that the federal judiciary's supervisory powers over prosecutorial

activities that take place outside the courthouse is extremely limited, *if it exists at all.*") (emphasis supplied), *cert. denied,* 464 U.S. 942 (1983)).

For a court's exercise of supervisory authority over a coequal branch to be valid, two conditions must be met. *First*, as a threshold matter, the district court must have "'a clear basis in fact and law"' for exercising its supervisory authority. *Gatto*, 763 F.2d at 1046 (quoting *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977)). Where the court seeks to disqualify even a single AUSA, its basis for doing so must not only be clear but "very strong." *United States v. Kember*, 685 F.2d 451, 459 (D.C. Cir. 1982). *Second*, the court may not sanction "executive conduct that is otherwise permitted by the Constitution, a federal statute or a rule;" "the creation of a rule by supervisory power can be justified only when a recognized right has been violated." *Gatto*, 763 F.2d at 1046. If these two factors are not satisfied, the court will most likely be "invading the executive sphere rather than protecting itself from invasion." *Id.*; *see also United States v. Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992).

Although the Magistrate Court recognized that "disqualification is rarely ordered," it nevertheless imposed this sanction. In doing so, it relied on two cases that exemplify the extreme, and serve only to underscore that such a sanction is inappropriate in *this* case. First, in *United States v. Davis,* 2019 WL 5865935, (W.D.Va. 2019), the government violated multiple discovery orders with its late disclosures during the course of a trial, despite the court granting continuances in an attempt to remedy the earlier nondisclosures. This caused the court to note, "[i]t is distressing to the court that, after all of the wailing and gnashing of teeth that accompanied the government's myriad discovery failings, no one from the government's team

had taken steps necessary to assure the defense and the court that all relevant discovery had been produced." *Id*. at *4. In *Davis*, not only did the court find that there was gross negligence on the part of the government but that, unlike the instant case, the defendant suffered "some prejudice" as a result. *Id*. at *9. Second, in *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414 (D. Md. 1986), the district court dismissed the indictment and disqualified the lead AUSA because of exceptional government misconduct. *Id*. at 1438 ("Exhaustive research reveals no case in which Government personnel committed repeated misconduct in so many forms as occurred here."). The *Omni* defendants filed a motion to dismiss the indictment based on alleged intrusions into attorney-client privilege. The court found that any intrusions did not justify dismissal but ultimately dismissed the indictment based on government misconduct committed during litigation of the motion. *Id*. at 1423, 1440. The court found that the government had altered and created documents in response to the defendants' motion that included subtle shifts in tone casting the government's conduct in a more favorable light. *Id*. at 1423-28. The court further found that the AUSA and others failed to disclose the creation and alteration of the documents, gave untrue and incorrect testimony, and made misrepresentations to the court. *Id*. at 1428-36. The court concluded that the government's "consistent course of entrenched and flagrant misconduct" shocked the conscience and warranted disqualification and dismissal. *Id*. at 1440. Certainly, the conduct in this case is a far cry from the arguable perjury and obstruction of justice at issue in *Omni*. What is more, the government could not find a single case supporting the imposition of a disqualification sanction based on conduct similar to what occurred here. As such, the Magistrate Court's disqualification of the assigned AUSAs was contrary to law.

The disqualification sanction was also clearly erroneous on these facts. Similar to the bad faith finding, upholding the disqualification requires this Court to ignore incontrovertible facts that the discovery was ready for production as of May 20, 2023; that the government intended to comply with the court's order but, whether negligently or grossly negligent, overlooked negotiation of a protective order; and that the government sought the protective order in good faith and not for some untoward tactical advantage. Further, to uphold disqualification, this Court must ignore that the Magistrate Court imposed this extreme sanction absent a finding of prejudice to the defendants. Finally, to uphold disqualification, this Court must contend with the risk that doing so creates unchartered precedent that technical violations of scheduling orders, by either party, can result in disqualification.

Accordingly, for the reasons set forth above, the Magistrate Court's disqualification of the assigned AUSAs is contrary to law and clearly erroneous.

4. <u>The Magistrate Court's Sanction as to the Sixth Amendment Speedy Trial Time is Contrary to Law and Clearly Erroneous.</u>

The Magistrate Court held that "[t]he government's misconduct in this case has led to at least three months' delay," and "[c]harging the government with [that] time seems entirely equitable." *See* Docket No. 200, at 6. However, a conclusion that such a sanction "*seems* equitable," fails to provide a legal basis for the imposition of such sanction under Rule 16(d)(2). In fact, the Magistrate Court failed to provide any legal support for imposing this sanction. *See* Docket No. 200.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial.... U.S. Const. Amend. VI. "The absence of a Speedy Trial Act violation does not *ipso facto* defeat a Sixth Amendment speedy trial claim." *See* 18 U.S.C. § 3173. Numerous courts, however, have held that it will be an "unusual case in which the [Speedy Trial] Act is followed but the Constitution violated." *United States v. Rodriguez-Mendez*, No. 22-1422, 2023 WL 3378005, at *4 (3d Cir. May 11, 2023), *cert. denied*, No. 23-5526, 2023 WL 6558697 (U.S. Oct. 10, 2023) (internal quotation omitted); *United States v. Koerber*, 10 F.4th 1083, 1109 (10th Cir. 2021); *United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir. 2014); *United States v. Bieganowski*, 313 F.3d 264, 284 (5th Cir. 2002); *United States v. Davenport*, 935 F.2d 1223, 1238-39 (11th Cir. 1991); *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982); *United States v. Feeterman*, 2023 WL 2782287, at *11 (W.D.N.Y. Apr. 5, 2023). "Even more exceptional must be the case in which the Act is followed but there is a 'clear or obvious' Sixth Amendment error." *Rice*, 746 F.3d 1081.

The speedy-trial right is "amorphous," "slippery," and "necessarily relative." *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (quoting *Beavers v. Haubert*, 198 U.S. 77, 87 (1905)). It is "consistent with delays and depend[ent] upon circumstances." *Id.* at 522 (internal quotation marks omitted). The right therefore cannot be measured in a finite number of days, months, or years, "largely because what may be considered 'speedy' is necessarily dependent on the nature of the trial and the parties' interests in the given case." *United States v. Tufino*, No. 20-CR-81S, 2021 WL 1788521, at *2 (W.D.N.Y. May 5, 2021) (citing *United States v. Ghailani*, 733 F.3d 29, 41 (2d Cir. 2013)); *Barker*, 407 U.S. at 521 ("It is ... impossible to determine with precision when the right has been denied. We cannot definitively say how long is too long in

a system where justice is supposed to be swift but deliberate."); *United States v. Ewell*, 383 U.S. 116, 120 (1966) ("A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."); *United States v. Ray*, 578 F.3d 184, 191 (2d Cir. 2009) (noting that the right "neither prohibits all delays, nor establishes a strict time limit between the announcement of a charge and the commencement of trial").

There is a fundamental "difference between the right to [a] speedy trial and the accused's other constitutional rights." *Barker*, 407 U.S. at 521. Although pretrial delays can harm the defendant, sometimes "deprivation of the right may work to the accused's advantage." *Id.* For example, "witnesses may become unavailable or their memories may fade," which may weaken the prosecution's case if it depends on witness testimony. *Id.* "Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to [a] speedy trial does not per se prejudice the accused's ability to defend himself." *Id.*

Accordingly, in *Barker*, the Supreme Court refused to "quantif[y]" the right "into a specified number of days or months" or to hinge the right on a defendant's explicit request for a speedy trial. *Id.* at 522–25. Rejecting such "inflexible approaches," *Barker* established a "balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 529-30. The Supreme Court promulgated a four-factor test to determine whether the right to speedy trial has been violated:  (1) length of delay; (2) reason for the delay; (3)

defendant's assertion of the right; and (4) prejudice.  *Id.* at 533.  Regarding the four factors, the Supreme Court held that:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Id.*

The Magistrate Court's automatic charge of three months to the government usurps the power of this Court to conduct the proper *Barker* analysis and is contrary to Second Circuit law, namely *United States v. Esquilin*, 205 F.3d 1325 (2d Cir. 2000) (Unpublished Summary Order).  First, the Magistrate Court's sanction presupposes that there will be a delay here that triggers the *Barker* analysis.  Second, the sanction automatically charges the time to the government without regard to the *Barker* assessment with respect to the factor involving the reason for delay.  Indeed, as this Court is aware, there are three types of Sixth Amendment speedy trial delay: deliberate, neutral, and valid.  *See Barker*, 407 U.S. at 531.  Deliberate delay, which is delay intended to confer an advantage over a defendant, weighs most heavily against the government.  *Id.* at 530.  Delay resulting from government negligence and overcrowded court dockets, however, is weighed less heavily against the government.  *Id.*; *see also United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir. 1990) (no Sixth Amendment violation despite apparent government negligence in failing to expedite a mental competency examination). "Delay is considered 'valid' delay if it is reasonable pretrial delay, *see e.g.*, *United States v. Vassell*, 970 F.2d 1162, 1165 (2d Cir. 1992) (seven-month delay in complex case to negotiate plea and cooperation agreement with co-defendant).

Moreover, even if the twelve-day lapse in producing discovery caused delay, that delay was automatically excluded pursuant to 18 U.S.C. § 3161(h)(1)(D) due to the pendency of various motions. The defendants made a strategic choice to file motions for sanctions based on the twelve-day delay. In making this decision, the defendants understood that this would cause further delay to the proceedings, versus simply litigating the protective order and setting a motions deadline. In essence, the defendants now seek to "use the delay caused by those motions as a basis for a speedy-trial claim" where "[h]aving sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon." *See United States v. Loud Hawk*, 474 U.S. 302, 316-17 (1986).

Third, the Magistrate Court's sanction contravenes *Esquilin*, 205 F.3d at 1325. In *Esquilin*, the Second Circuit rejected the exact argument defendants advance here. Specifically, the defendant in *Esquilin* argued that "the government's failure to produce Rule 16 discovery material until only a few weeks before the trial led to violations of the Speedy Trial Act, 18 U.S.C. § 3161, and the Sixth Amendment." *Id.* The Second Circuit summarized the defendant's argument as stating "[t]hat [the Court] should not apply the normal rule, which excludes delay due to pre-trial motions, *see* 18 U.S.C. § 3161(h)(1)(F), because the delay in this case was caused by government error." *Id.*; *see* Docket No. 881 at 26. In other words, "defendant[s] [are] requesting this court to read an exception into the provisions of the Speedy Trial Act that filing of a pretrial motion by a defendant and consideration of such motion by the court excludes time from the trial clock ... because the need for the defendant's motion arises out of government misconduct." *Id.*

The Second Circuit held that "[g]overnment failure to comply with discovery rules can prevent exclusion of time from speedy trial calculations if that failure is chronic or in bad faith." *Id.* (citing *United States v. Anderson*, 902 F.2d 1105, 1109 (2d Cir. 1990)).  In *Esquilin*, the district court found that the government's discovery failures were inadvertent as opposed to made in bad faith and, therefore, "[b]ecause the government action that caused the delay was not taken in bad faith, we find no violation of the Speedy Trial Act."  *Id.*; *see also Anderson*, 902 F.2d at 1109 (quoting *United States v. Hastings*, 847 F.2d 920 (1st Cir. 1988), to note that even a "pattern of discovery infractions should not have affected the balancing demanded by the Speedy Trial Act")).  Here, as discussed above, the Magistrate Court's finding as to bad faith is contrary to law and clearly erroneous.  As such, *Esquilin* is instructive on the question whether the sanction as to Speedy Trial time is contrary to law and clearly erroneous.

     5.  <u>The Magistrate Court's Sanction as to the Protective Order is Contrary to Law and Clearly Erroneous</u>.

Finally, the Magistrate Court's sanction precluding the government from seeking a protective order is contrary to law and clearly erroneous.  The Court failed to cite to a single legal authority to support precluding the government from seeking a protective order.  No such authority exists.  "At any time, the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  Fed. R. Crim. P. 16(d)(1).  While a court order is generally not needed for the parties to conduct discovery, the Court "has the inherent right to enter an order under this rule."  Fed. R. Crim .P. 16 Advisory Committee's Notes (1974 amendments).  "Although the rule does not attempt to indicate when a protective order should be entered, it is obvious that one would be appropriate where there is reason to believe that a witness would be subject to physical or economic harm if his [or her] identity is

revealed." *United States v. Torres*, No. 20-CR-00418, 2020 WL 4500046, at *3 (D.N.J. Aug. 5, 2020) (quoting Fed. R. Crim. P. 16 Advisory Committee's Notes (1974 Amendments)). Indeed, the Supreme Court directs court that "where appropriate, [they should] place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman*, 394 U.S. at 185.

Precluding the government from providing input as to a protective order and, instead, allowing the defendants to fashion the contours of the order is contrary to the goals to be achieved by protective orders. Defense attorneys must of course be solely focused on the rights of their clients. Government counsel, on the other hand, must also consider the rights of third parties. To constrain the government's ability to protect the rights of third parties and instead entrust that duty to defense counsel, whose interests are in direct conflict with such interests, is both contrary to law and clearly erroneous.

## CONCLUSION

For the reasons set forth above, this Court should reverse the Magistrate Court's finding, as set forth in its July 29, 2024 and August 23, 2024 Decision and Orders, that the government acted in bad faith in failing to produce discovery by the May 23, 2024 deadline imposed by the Court in order to put a protective order in place; reverse the Magistrate Court's finding that disqualification of the assigned AUSAs, the running of constitutional speed trial time, and the removal of the government from negotiating the terms of the protective order constitute appropriate sanctions to address the government's delayed production of discovery;

and remand to the Magistrate Court for the imposition of a sanction commensurate with both

the government's conduct and any prejudice to the defendants.


     DATED:     Buffalo, New York, September 20, 2024.


               TRINI E. ROSS
               United States Attorney


          BY:    s/CAITLIN M. HIGGINS
               s/TIFFANY H. LEE
               Assistant United States Attorneys
               United States Attorney's Office
               Western District of New York
               138 Delaware Avenue
               Buffalo, New York 14202
               (716) 843-5818
               Caitlin.Higgins@usdoj.gov