UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.

SIMON GOGOLACK,

             Defendant.
_____

23-CR-99-LJV-JJM

RESPONSE TO GOVERNMENT
APPEAL OF MAGISTRATE
DECISION AND ORDER

      Magistrate judges are entrusted with broad authority when ruling on non-dispositive matters. To overturn such a decision, a reviewing court must find that a magistrate judge "abused his discretion" or committed an error so egregious that it is "contrary to law." "This standard is highly deferential, [and] imposes a heavy burden on the objecting party." *United States v. Williams*, 339 F. Supp. 3d 129, 133 (W.D.N.Y. 2018) (internal citations omitted).

      The government cannot meet this heavy burden. In a continuing theme, the government attempts to find fault with Magistrate Judge McCarthy's Decision and Order by narrowing its view – and by extension this Court's view – of the relevant facts. The government puts blinders on this Court, hoping it sees only that which is placed immediately in front of it. A broader view, one that includes a full understanding of the government's misconduct in this case and the long history of discovery mis- and malfeasance by the U.S. Attorney's Office in this District, demonstrates that the government did act in bad faith, and that Judge McCarthy correctly imposed sanctions.

      The burden to overturn Judge McCarthy's decision is heavy for good reason. Judge McCarthy issued the orders that the government ignored, and he listened to the prosecution as it attempted with various rationales to justify those actions. His findings are non-dispositive, and

while significant for purposes of the personnel in the United States Attorney's Office, the sanctions have no immediate bearing on the case against Mr. Gogolack, who remains jailed and unable, more than a year after his arrest, to review the discovery regarding the most severe charges against him.

### I.   Judge McCarthy correctly found that the government acted in bad faith.

Bad faith is necessarily a context-specific and fact-dependent finding. Despite this, the government spends only about 310 words of it more than 12,500-word brief addressing what happened between the complaint and the discovery deadline. As a result, key facts are omitted.

Mr. Gogolack first demanded discovery on September 14, 2023. Mr. Gogolack had been arraigned on the first indictment, and counsel orally demanded discovery and specifically argued that it was no longer voluntary. Tr. Sept. 14, 2023, at 52. The Court issued a scheduling order that set October 16, 2023, as the discovery deadline. Dkt. 17. After the government filed a superseding indictment a week later, that discovery deadline remained the same. Dkts. 18, 21.

On January 5, 2024, the government filed the second superseding (and current) indictment. Dkt. 24. This was the first indictment that alleged the conspiracy to obstruct justice. *Id*.

The Court addressed discovery on the second superseding indictment at the February 23, 2024, status. Initially, the Court suggested a 60-day discovery deadline. Tr. Feb. 23, 2024, at 6. The government requested 90 days and said that the extra 30 days would be a cushion that ensured that they would "get this right and do discovery appropriately . . . and almost invariably will save time on the back end." *Id*. at 6-7.

In response, the Court asked about providing rolling discovery during that period. *Id*. at 10. The government said that it was open to providing rolling discovery and that it thought "there's material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment." *Id*.

The Court granted the government's request for a 90-day deadline but wanted the discovery produced sooner and on a rolling basis if possible. *Id*. at 12. The government agreed. *Id*.

The government produced no rolling discovery during the ninety-day period. Nor did it explain to the Court or defense counsel why rolling discovery was not possible.

Three days before the 90-day discovery deadline, the government asked defense counsel to provide a three-terabyte hard drive. Defense counsel provided that hard drive two days later.

The 90-day discovery deadline passed without the government providing discovery, adjourning the deadline, or reaching out to defense counsel. The deadline also passed without the government mentioning a protective order.

Six days later, the government proposed a protective order and told defense counsel that it would not produce discovery until a protective order was authorized: "I am hoping that this protective order can be instituted on consent without the need for litigation. Does everyone agree with the terms of this proposed protective order? If so, I will submit it to Judge McCarthy on consent. Once the protective order is authorized by the Court, we will release the discoverable material." Dkt. 123-1 at ¶ 15.

That proposed protective order would have, among other things, limited who defense counsel could use as an agent:

3

> **ORDERED** that no member or associate of the Outlaws Motorcycle Club, Rare Breed Motorcycle Club, Chosen Few Motorcycle Club, Kingsmen Motorcycle Club, Nomad Motorcycle Club, or any support club of the Outlaws Motorcycle Club may serve as a defendant or counsel's agent; and it is further

Dkt. 129-1 at 2.

It would have required defense counsel to affirmatively disclose to the government anyone that it shared discovery with:

> **ORDERED**, that counsel for the defendants shall ensure compliance with this Order by each member of the defense team, and provide a certification to the U.S. Attorney's Office listing the name of each person on the defense team who has been permitted to review the materials.

*Id.* at 6.

And it incorporated rules that govern almost all of defense counsel interactions with their colleagues, staff, and witnesses:

> **ORDERED**, that a defendant, counsel, and agent thereof shall neither contact nor cause the contact of a witness or suspected witness represented by counsel but, rather, shall communicate with any represented witness or suspected witness through that individual's counsel; and it is further
>
> **ORDERED**, that a defendant, counsel, and agent thereof shall neither contact nor cause the contact of a co-defendant represented by counsel but, rather, shall communicate with any represented defendant through that individual's counsel; and it is further
>
> **ORDERED**, that all counsel adequately supervise any lawyers, agents, and/or staff members consistent with Rules 5.1, 5.2, and 5.3 of the New York Rules of Professional Conduct; and it is further

*Id.* at 4.

Defendants proposed their own protective order. Dkt. 146-2. The government did not respond until the day of the deadline to move for a protective order. Then, it told defense counsel that it did not believe a negotiated protective order was possible. Dkt. 142 at 25-26. It filed a motion, asking the Court to "so order" its original proposed protective order. Dkt. 129.

At the June 3, 2024 status, defendants still had not received discovery. Defendants had little choice but to agree to a temporary attorney-eyes-only protective order so that the government would provide discovery while the permanent protective order issue was addressed. That so-called temporary order is still in place.

At the time, the government did not accept any accountability. In their initial email to defense counsel about the protective order, the government did not apologize for the late protective order request. Dkt. 123-1 at ¶ 15. Rather, it implored defense counsel to respond quickly so that the issue could be resolved quickly. Later the government suggested that defense

5

counsel bore blame for the outstanding protective order, based on our failure to promptly reply to the government's email. *Id*. at ¶¶ 19-22. Indeed, even though, in the face of these sanctions, the government has taken a more conciliatory tone, it continues to blame the defense. *See* Dkt, 230 at 23 ("Even then, however, the government received responses regarding the protective order from only three defense attorneys prior to the June 3, 2024 status conference.").

Further, the government objected to even a short, largely ceremonial, reduction from the 70-day Speedy Trial Act clock. At the June 2, 2024 status, the government moved to exclude the time between that status and the next status to allow defense counsel to review discovery. The Court denied that request. Dkt. 122. Three days later, the government filed a motion to exclude time, again arguing that the time should be excluded because defense counsel needed time to review discovery. *See* Dkt. 123.

In its appeal, the government glosses over or ignores that it had told defense counsel and the Court that it had the discovery ready, and it would not provide it until a protective order was entered. As Judge McCarthy correctly found, the government made a volitional and tactical decision to violate the Court's discovery order.

The government then tried to cover its tracks. It argued, "This is not a situation where the government made a conscious decision to ignore deadlines or order." Dkt. 142 at 19. But as Judge McCarthy found, "that is *exactly* what it did." Dkt. 173 at 5 (emphasis original).

In the motion to reconsider the Court's bad faith finding, the government tied itself in knots trying in attempt to get around this. On one page it wrote "nothing in the record supports a conclusion that the government's conduct reflected a conscious decision to ignore the Court's ordered discovery deadline." Dkt. 191 at 11. On the next page, it wrote "And while the

government did consciously decide to withhold the production of discovery it had told defense counsel was ready until a protective order was in place. . ." *Id*. at 12.

These denials contributed to the Court's bad faith finding and sanctions. Dkts. 173 at 5, 200 at 7.

Similarly, the government takes issue with Judge McCarthy's conclusion that the government sought a "tactical advantage" through the protective order. But the government does not explain in its appeal that it – not the Court or defense counsel – made the protective order a prerequisite to complying with the Court's discovery order. The government also did not detail the protective order itself: how it would limit those whom defense counsel could use as an expert, while allowing the government to gain insight into defense strategy by requiring defense counsel to disclose those with whom we shared discovery.

Omissions such as these are also found in the government's attempt to rely on caselaw. The government claims that Judge Sinatra has "rejected that exact argument" in *United States v. Arrington*. Dkt. 230 at 18 (citing *United States v Arrington*, 2022 WL 3229843, at *17 n.17 (W.D.N.Y. Aug. 10, 2022). In fact, Judge Sinatra rejected, in a footnote, an argument raised by an in-custody pro-se litigant that the government was enforcing a protective order against him to gain a tactical advantage. *Arrington*, 2022 WL 3229843, at *17 n.17. Judge Sinatra did not issue a blanket ruling that protective orders could never be used to gain a tactical advantage; nor did he address the issue here: holding discovery hostage as leverage for a restrictive protective order.

The government also takes Judge McCarthy to task for supposedly not finding that the government acted deceitfully. But when imposing sanctions, Judge McCarthy specifically found that the government had violated its disclosure obligation and "told [him] that they did not." Dkt.

7

200 at 7. He then quoted a case about the expectation of candor to the Court. *Id*. (citing *Hassoun v. Searls*, 524 F.Supp 3d 101, 110 [W.D.N.Y. 2021]).

II.   **Judge McCarthy did not overlook caselaw or commit error, let alone clear error, in imposing sanctions.**

The government dedicates a large portion of its brief to arguing that Judge McCarthy incorrectly defined and applied the law on bad faith. The government, for instance, quibbles with Judge McCarthy's reference to *Dow Chemical* because *Dow* is a civil case. But the government itself must recognize that analogy to civil cases is appropriate because the Second Circuit has not defined "bad faith" in the context of a criminal case or Rule 16. *See* Gov. Appeal at 13. It is true that some cases find that under those particular circumstances the government has not acted in bad faith, but those cases are easily distinguishable. No case exists where a court under facts identical or even similar to these was reversed for finding that the prosecution acted in bad faith. To put a finer point on it, the government's argument must fail because, even under its legal theory for sanctions, there was no controlling case for the Court to overlook or misapply.

Like "reasonable doubt," "bad faith" defies easy interpretation. It is the type of non-dispositive finding entrusted to a magistrate judge that should be left undisturbed absent some clearly defined law to the contrary. No such law – whether from statute or precedent – exists. The government's elaborate and convoluted attempt to find fault with Judge McCarthy's definition and application only drives that point home.

For example, the government argues that the Court misapplies a case it had cited in its motion for reconsideration, *United States v. Bove,* because the Court focused at one point at oral argument on one concept – faithlessness -- from that decision. Gov. Appeal. at 19-20. The Court was wrong to focus on this, according to the government, because *Bove* "explicitly ties

8

faithlessness and treachery to intentional deceit or dishonesty." The argument here appears to be that while the government may have acted faithlessly it did not act dishonestly. But this is nothing more than semantics, and hardly the type of stuff that could support a finding from a reviewing court that a lower court acted contrary to law.

As noted above, the government attempts to get around this fatal fact by claiming that the Court overlooked several distinguishable cases. *United States v. Pizarro,* No. 17-CR-151 (AJN), 2021 WL 4665044, at *1 (S.D.N.Y. Oct. 6, 2021), for example, dealt with a *Brady* violation, not Rule 16.

*United States v. Wydner* at least addressed Rule 16, but the "[d]efendants d[id] not assert that the prosecutors' conduct was in bad faith." 2022 WL 3572881, at *1 (S.D.N.Y. Aug. 19, 2022). This case is much different. The defendants have asserted just that, and the Magistrate Court has agreed.

*United States v. Nejad* addressed a Court's decision not to impose further sanctions under its supervisory power after the government agreed to dismiss the case with prejudice due to *Brady* violations. 521 F.Supp.3d 438 (S.D.N.Y. 2021). If the government agrees to dismiss this case with prejudice, defense counsel will concede that *Nejad* applies. Until then, Judge McCarthy did not err, let alone commit reversible error, by "overlooking" these cases.

If anything, it is the government that overlooked relevant caselaw. It seeks to cabin the Court's authority to impose sanctions to Rule 16, and largely glosses over other sources of the Court's sanction authority. Judge McCarthy never limited himself that way. When first requesting briefing on sanctions, he observed "[t]rial courts have broad discretion in ruling on procedural violations and fashioning appropriate sanctions." Dkt. 173. And while some defendants mentioned Rule 16, defendants also argued that the Court has supervisory power to

9

impose these sanctions. *E.g.,* Dkt. 187 at 2-3, 15. The sanction of disqualification arises from that supervisory power. Nonetheless, the government hardly addresses it in its appeal.

What is more, the government never even defines "bad faith." Cobbling together its argument, it is fair to say that it contends "bad faith" requires (1) more than negligence, (2) that the government benefited from the action, and (3) some degree of deceit.

Accepting that as accurate, the government would still not prevail, because Judge McCarthy found all three. He found that the government was grossly negligent in not requesting a protective order *and* that it consciously decided to violate his order; that the government tried to benefit from that decision through imposition and insistence on an overly restrictive protective order; and that the government was not forthright with the Court about that decision. While the government disagrees, it has not pointed to any controlling law that demonstrates such a finding was an abuse of discretion or contrary to law.

### III. The sanctions were appropriate and could have gone further.

Judge McCarthy imposed the appropriate sanctions, and, as argued in Mr. Gogolack's cross-appeal, should have imposed more severe sanctions.

The government claims that Judge McCarthy did not impose the least severe because he began his analysis with dismissal with prejudice. Dkt. 230. Judge McCarthy began there because all defendants had requested that remedy. It was a convenient analytical starting point, not a rejection of the least severe sanction.

Disqualification was an appropriate sanction. As a case cited by the government observes, "[d]isqualification . . . is reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior." *United States v.*

10

*Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003); Dkt. 230 at 32 (citing *Stewart*). Here, the government deliberately violated disclosure obligations, sought a tactical advantage in doing do, and then told the Court that they did not consciously violate the discovery deadline. *See* 200 at 7.

The sanctions imposed have no immediate impact on the merits of the case brought against Mr. Gogolack. Judge McCarthy committed no abuse of discretion. The government has not met its heavy burden, and the Decision and Order should stand.

**DATED**:   Buffalo, New York, October 4, 2024

Respectfully submitted,

**/s/ Jeffrey T. Bagley**
Jeffrey T. Bagley

**/s/ John J. Morrissey**
John J. Morrisey

Assistant Federal Public Defenders
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341, (716) 551-3346 (Fax)
jeffrey_bagley@fd.org
Counsel for Defendant

**TO:**   Caitlin Higgins *et al*.
Assistant United States Attorneys