IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-                                                         Case No.: 23-CR-99

PETER GERACE, JR.,

                              Defendant.
_____


### MEMORANDUM IN OPPOSITION TO THE GOVERNMENT'S APPEAL OF AUGUST 23, 2024 DECISION  AND ORDER BY MAGISTRATE JUDGE JEREMIAH J. McCARTHY




Dated: October 8, 2024



                                        s/ Mark A. Foti, Esq.
                                        Mark A. Foti, Esq.
                                        The Foti Law Firm, P.C.
                                        16 W Main Street, Suite 100
                                        Rochester, NY 14614
                                        (585) 461-1999

# Table of Contents

I. PRELIMINARY STATEMENT...........................................................................................................3

II. BACKGROUND REGARDING DISCOVERY ISSUES IN THE WDNY ...................................4

  A. UNITED STATES V. MORGAN, 18-CR-108-EAW .........................................................................4

  B. UNITED STATES V. PARKS, 19-CR-87 LJV ................................................................................8

III. BACKGROUND REGARDING US V. GOGOLACK...................................................................11

  A.   THE EVENTS PRECEDING THE SECOND SUPERSEDING INDICTMENT ..........................................11

    1. Crystal Quinn's Involvement in US v Bongiovanni et al ...................................................11

    2. Death of Crystal Quinn Resulted in an Investigation Targeting Peter Gerace ................18

    3. The Prosecution Commenced with Charges Against Simon Gogolack ............................21

  B.   THE SECOND SUPERSEDING INDICTMENT AND SCHEDULING OF DISCOVERY DISCLOSURE .......22

    1. The Superseding Indictment is Filed Containing Demonstratively False Allegations...................22

    2. Initial Requests for Discovery.........................................................................................24

    3. The Government Argued for an Extended Discovery Deadline at the Status Conference on February 23, 2024 .......................................................................................................................26

  C.   THE VIOLATION OF THE COURT'S ORDER .............................................................................31

    1. Discovery Disclosure between the February 23rd and June 3rd.......................................31

    2. The June 3rd Status Conference ......................................................................................37

  D.   LITIGATION FOLLOWING THE GOVERNMENT'S WILLFUL VIOLATION OF THE COURT'S ORDER.............39

    1. The Government's Motion for Reconsideration of the Magistrate Judge's Decision to Deny an Exclusion of Time in the Interest of Justice ........................................................................39

    2. The Government's Motion for a Protective Order ...........................................................40

    3. The Motion for Sanctions ...............................................................................................45

  E. THE MAGISTRATE JUDGE'S DECISION AND ORDERS .............................................................47

IV. APPLICABLE LAW ....................................................................................................................48

  A. THE COURT'S SUPERVISORY FUNCTION ...............................................................................48

    1. Discovery Violations......................................................................................................48

    2. The Court's Supervisory Role.........................................................................................50

  B. STANDARD OF REVIEW ON APPEAL ......................................................................................51

V. DISCUSSION .................................................................................................................................52

  A. THE GOVERNMENT'S APPEAL DEMONSTRATES THAT IT STILL DOES NOT ACKNOWLEDGE THE SCOPE OF ITS MISCONDUCT....................................................................................................................53

  B. THE GOVERNMENT FAILS TO RECOGNIZE THE PREJUDICE TO THE DEFENDANTS ...........................57

  C. THE GOVERNMENT'S APPEAL FAILS TO ADDRESS THE GOVERNMENT'S MISREPRESENTATIONS MADE REGARDING ITS DISCOVERY EFFORTS ..........................................................................................60

  D. THE IMPOSED SANCTIONS WERE LESS SEVERE THAN NECESSARY TO DETER FUTURE MISCONDUCT...........64

  IV. CONCLUSION ........................................................................................................................65

# I. PRELIMINARY STATEMENT

There is little doubt that Judge McCarthy spent a substantial amount of time considering an appropriate sanction, and attempted to find a sanction that was meaningful, but least necessary to accomplish the objective.

The sanctions he imposed appear to be narrowly focus on the discovery violation and not the collateral and surrounding evidence of misconduct.

Likewise, the government has remained silent as to the inconsistent representations regarding the discovery disclosure, the demonstratively false information in the indictment, the appearance of prosecutorial steering early in the case, and other misconduct. It has chosen to narrowly address the discovery violation.

It is the defense's position that the entire record, including all areas of misconduct should be considered, and it will continue to argue that position in the briefing related to its appeal of the Magistrate Judge's Order, because if the entire record is considered, more meaningful sanctions would be necessary, including dismissal.

However, in response to the government's appeal, the defense will only present arguments regarding the discovery violation narrowly discussed in the Magistrate Judge's Decision and Order.

## II. BACKGROUND REGARDING DISCOVERY ISSUES IN THE WDNY

The government's misconduct regarding disclosure is not an isolated incident. It is an example of willful misconduct that follows a series of discovery abuses in other cases.

There are an increasing number of cases there the government's failure to properly engage in discovery and disclosure as directed by the Court, relevant caselaw, and statutory authority impacts defendants' liberty interests, speedy trial, and the proper and fair administration of justice.

Two of those cases, *United States v. Morgan* and *United States v. Parks*, are discussed below. *Morgan* demonstrates the need for the Court to engage in its supervisory function to resolve issues of discovery and misrepresentation by the government made to the Court. *Parks* represents a similar point, with a specific emphasis on the pattern of discovery issues that have emerged in this District.

### A. UNITED STATES V. MORGAN, 18-CR-108-EAW

Defendants were accused by way of a 114-count Superseding Indictment, filed May 21, 2019, with a scheme spanning over a decade to defraud financial institutions and government-sponsored enterprises Freddie Mac and Fannie Mae. *United States v. Morgan*, 493 F. Supp. 3d 171, 179-80 (W.D.N.Y. 2020).

All parties to the case conceded the breadth and scope of discovery was complex and voluminous. It appears that both the size and complexity of discovery in Morgan was far greater than that presented in this case.

In *Morgan*, after the defendants sought dismissal of the indictment on statutory speedy trial grounds, the District Court granted the motion in October 2020. *United States v. Morgan*, Case No. 18-cr-108-EAW-HKS, Docket Item468.

The Court "recognize[d] at the outset that the government has mishandled discovery in this case," but the Court noted that it was "not clear whether the government's missteps are due to insufficient resources dedicated to the case, a lack of experience or expertise, an apathetic approach to the prosecution of this case, or perhaps a combination of all of the above."  *United States v. Morgan*, 493 F. Supp. 3d at 180.

At that time, the Court found that "the government's mistakes, while negligent, do not constitute willful misconduct undertaken in bad faith." *Id*.

The Court did find that "it would have been much more prudent if the government… had utilized a competent vendor to process the [electronic discovery]" *Id*. at 203.

However, the Court ultimately found, at that time, that the government's disclosure failure was not in bad faith, the Court imposed the sanction of dismissal of the case without prejudice.  *Id*. at 215. The decision to dismiss without prejudice was made

based on multiple considerations, including the fact that none of the defendants in that case had been in custody while awaiting for trial. *Id*.

As expected, the government simply responded to the dismissal by filing a new indictment, resetting the speedy trial clock, and presumably cleansing itself of any meaningful sanction for its misconduct.

However, after a new indictment was filed, the defendants moved for reconsideration of the dismissal of the prior indictment without prejudice, arguing that dismissal with prejudice was warranted based on newly-discovered evidence that the government had engaged in misconduct, including making intentionally misleading statements and omissions to the court.

The district court directed the government to respond, in affidavit form, to the allegations and, during oral argument on the motion, concluded that an evidentiary hearing was necessary to address the district court's concerns regarding the government's conduct and its prior representations to the court.

The defendants pled guilty before the hearing occurred and, under their plea agreements, withdrew their motions for reconsideration.

However, on April 22, 2022, the District Court entered an Order explaining that there remained "unresolved facts in the record" as to whether "representatives of the United States intentionally misrepresented information" during the course of this criminal action. (*United States v. Morgan*, Case No. 18-cr-108-EAW-HKS, Docket Item613

at 3). Pursuant to its inherent authority to supervise conduct of the members of its bar, the Court indicated it was considering "additional fact-finding" to determine "if government lawyers intentionally made a misleading statement to the Court." (*Id.* at 2-3)

Specifically, the District Court considered "whether the Court, on its own, should resolve those factual disputes, notwithstanding the withdrawn motions" by the defendants. *Id*. at 3. The District Court ordered that, if the government took the position that no further misconduct inquiry by the district court was necessary, it could file a submission setting forth the basis for that position, including any potential "plans the government has to pursue the issues on its own internally." *Id*.

The Government's represented that a hearing was not necessary.

> As set forth above, OPR has initiated an inquiry into this case and, consistent with its function within the Department, will review not only the matters which the Court has identified as relevant to a further hearing, but also will review the entire record for violations of rules of procedure, regulations, court orders, rules of professional responsibility, Department standards of conduct, discovery, and the Constitution. This review will proceed after proceedings in this Court are concluded. Thus, this Court need not duplicate those efforts and expend its own judicial resources in the process. In addition, the USAO/WDNY has taken important steps, including collaborating with Department discovery experts, creating uniform discovery procedures coordinated by the LSU, and increasing training for AUSAs and management, all directed toward preventing the recurrence of the problems that occurred in this case.
>
> *United States v. Morgan*, Case No. 18-cr-108-EAW-HKS, Docket Item624 at 12-13.

Various submissions in this case were initially under seal, but the local newspaper, the Democrat and Chronicle, through its parent company, Gannet Media Corporation, sought the unsealing of the records. The Second Circuit weighed in, addressing the issue of sealing, but also providing some particularly instructive language as it pertains to the obligations of the US Attorney's Office.

> There is a strong public interest in the manner in which criminal cases are conducted, including the handling of any allegations of prosecutorial misconduct during the discovery phase of the case. It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. **The court expects all attorneys who appear before it to conduct themselves with the utmost candor, but that expectation is particularly keen when it comes to attorneys representing the United States of America because they are guardians of the public interest**.
>
> *Gannett Media Corp. v. United States*, 2022 U.S. App. LEXIS 35099, *1 (emphasis added).

### B. UNITED STATES V. PARKS, 19-CR-87 LJV

After the defense in *Parks* uncovered issues related to the government violating its discovery violations, the Court precluded the government from offering certain evidence at trial.

The Court noted in its preclusion decision that there are multiple cases which raise serious concerns about the discovery practices of the US Attorney's Office in this District.

> And this is not the first case in recent memory to call into question the government's discovery practices in this District. See United States v. Morgan, 18-CR-108-EAW (indictment dismissed without prejudice due to government's violations of its discovery obligations); United States v. Padua, 20-CR191-LJV (indictment dismissed with prejudice due to prosecutorial misconduct related to sanction imposed for violations of government's discovery obligations); United States v. Tyshawn Brown, 19-CR-222-EAW (indictment dismissed on government's motion related to Brady/Giglio disclosure issues); United States v. Coleman, 19-CR-221-RJA (Brady/Giglio disclosure issues).
>
> …
>
> [T]his Court cannot look the other way and permit such discovery violations—at best serious errors in judgment by the government—to persist when liberty interests are at stake.

> US v. Parks, Case No. 19-cr-00087-LJV-JJM, Docket Item966 at 2.

The Court further noted that while the government "often repeats the mantra that it takes its discovery obligations seriously and understands its ongoing disclosure requirements," in light of "the history noted above, in some cases that mantra seems to be little more than empty words." *US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Docket Item966 at 2-3.

The Court declined to dismiss the indictment, but strongly suggested that dismissal should be expected as a possible sanction for future violations.

> Dismissal is not the appropriate sanction here. But it may be the next time. And so this Court strongly encourages the United States Attorney's Office to honor the assurances it offered in United States v. Morgan: "a focus and commitment by [the United States Attorney's Office's] leadership to take

necessary and appropriate steps, including increased
supervision and training, to ensure that such failures are
addressed and do not occur in the future." See United States
v. Morgan, 18-CR-108-EAW, Docket Item 647 at 2.

*US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Docket Item966 at
30.

The government seeking to avoid the compounding effect of multiple disclosure

violations over the course of multiple cases, filed a motion in Parks, seeking to "Correct

and Clarify the Record" *US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Docket Item968. The

Government requested "the Court remove from its Decision and Order the citations to

the Brown, Coleman, Morgan, and Padua cases as support for the Court's conclusion that

they are similar to the instant case and that they demonstrate a history by the USAO-

WDNY of failing to comply with its disclosure obligations." *US v. Parks*, Case No. 19-cr-

00087-LJV-JJM, Docket Item968 at 13.

While the Court could have likely denied the government's motion with a short

Text Order, the Court granted the government's request to clarify the Court's decision

and offered the government a further explanation, observing that the history of the cited

cases "demonstrate a fundamental misconception by prosecutors in the USAO-WDNY

about what their discovery obligations are." *United States v. Parks*, Case No. 19-cr-87,

Dkt.# 972 at 3. Ultimately, "[t]he point is that the government seems to approach its

discovery obligations by finding ways not to disclose evidence and excuses for not

disclosing it sooner or at all." *United States v. Parks*, Case No. 19-cr-87, Dkt.# 972 at 11.

Now, even with those concerns fully clarified, this District is again confronted with blatant disclosure violation, but in this instance, it is one that has been marked by bad faith. Docket Item 172 at 5. Only a meaningful sanction will address the most recent instance of misconduct.

### III. BACKGROUND REGARDING US V. GOGOLACK

A. THE EVENTS PRECEDING THE SECOND SUPERSEDING INDICTMENT

1. Crystal Quinn's Involvement in US v Bongiovanni et al

*General Background of US v Bongiovanni et al*

Case no. 19-cr-227 commenced with the indictment of Joseph Bongiovanni. Peter Gerace was charged in the Second Superseding indictment in February, 2021, over three years ago.

The case was originally scheduled for trial at a status conference on November 30, 2022.

Mr. Gerace had already been on home confinement for nearly two years at that point, Judge Sinatra indicated that he would consider a motion to downgrade Mr. Gerace's electronic monitoring to curfew. Case No. 19-cr-227, Docket Item363 at 21-22.

The defense filed a motion to modify the conditions of release. Case No. 19-cr-227, Docket Item337. The government opposed. Case No. 19-cr-227, Docket Item350 at 13. Over the government's objection, the Court issued a Modification Order on January 19,

2023, granting the portion of the defense's motion that sought a downgrade to a curfew. Case No. 19-cr-227, Docket Item361.

The government did not appeal the decision. Instead, it chose to pursue a new indictment against Mr. Gerace, which it would use as a vehicle to pursue a motion to detain Mr. Gerace.

In order to do that, the government decided to target Peter Gerace's close friend, Crystal Quinn.

*The Government Charges and "Flips" Crystal Quinn*

On January 24, 2023, only five days after the Court downgraded Mr. Gerace to curfew, the government provided Ms. Quinn with a target letter.

The subject of the target letter was an incident from November 19, 2019, over three years earlier. That incident had been the subject of multiple public proffers by the government, as far back as May 4, 2021.[1] Only after a trial date had been scheduled and Mr. Gerace had been downgraded to curfew, did the government decide to pursue Ms. Quinn.

Almost immediately following the issuance of the target letter, agents went to Ms. Quinn's home and spoke to her, without counsel present. During the course of this

---

[1] The government publicly proffered in May 2021 that they had "obtained search warrants for his Facebook account. There has been a witness that received threats through a Facebook account during a scenario where Mr. Gerace was present with the person who was -- we're still investigating it… that that occurred in or about November of 2019." Case No. 19-cr-227, Docket Item 118 at 6-7.

discussion, Ms. Quinn contradicted the government's narrative regarding what occurred in November 2019.

On February 3, 2023, the government filed a Criminal Complaint against Crystal Quinn with three counts related to allegations of threatening and tampering with a witness. Case no. 23-mj-011, Docket Item 1.[2]

The Court granted the government's request to unseal the Complaint on February 8, 2023. *See* Case no. 23-mj-011, unnumbered Minute Entry filed February 8, 2023.

Over the following few weeks, with the criminal charges as leverage, Ms. Quinn agreed to proffer. Once the charges had served their purpose to leverage Ms. Quinn into agreeing to the government's narrative, the government agreed to dismissal of charges.

*The Government Publicly Reveals that it "Got" Ms. Quinn*

In March 2023, only three months before Mr. Gerace was scheduled to go to trial, the government obtained a new indictment related to the incident in November 2019. The government used the indictment as a vehicle to move for detention despite the fact that Pretrial recommended Mr. Gerace's continued release.[3]

---

[2] A copy of the complaint, without exhibits, is available on this docket at Docket Item 164-1.

[3] On March 24, 2023, Mr. Gerace's probation officer stated: "He is on GPS. He is monitored 24/7. We've done unannounced home contacts; unannounced work contacts; unannounced drug and alcohol tests. All have been negative. We view his maps daily, weekly, monthly, in terms of his GPS mapping. He was on home detention, and then he was switched over to curfew. Since he's been on curfew and even home detention, there's been no occasion of violations, where he's stepped out of the house or had any curfew violations. All tests have been negative, and he's followed all release conditions in terms -- as they've been set forth by this Court. So there has been no non-compliance on our end in terms of his supervision and following the rules set forth by Your Honor." [Case No. 19-cr-227, 3/24/23 Transcript at 46-47].

During the detention proffer on March 24, 2023, the government spent a considerable amount of time proffering to the allegations related to the incident in November 2019. The government acknowledged that the defense would be able to argue that the government "knew about this for three years." [Case No. 19-cr-227, 3/24/23 Transcript at 31]. The government argued "truth does not equal proof." [Case No. 19-cr-227, 3/24/23 Transcript at 31]. Specifically, the Government indicated that as of 2021, it had two witnesses who described the interaction in November 2019, and although the "initial information was similar in nature," in March or early February of 2023, the Government "got a third witness." [Case No. 19-cr-227, 3/24/23 Transcript at 38].

The government's public comments abandoned any secrecy as to Ms. Quinn's expected cooperation. Setting aside Mr. Gerace's knowledge of the incident and who was present, any member of the public or the media could have easily reviewed the government's public comments in context of the Complaint filed against Ms. Quinn regarding the November incident, unsealed in early February of 2023:

> VICTIM stated that after receiving the Facebook Messenger message from the account of PERSON 1, VICTIM researched PERSON 1's account and determined, based on a picture posted in PERSON 1's Facebook account, that PERSON 1 and QUINN were together at the time that the message from PERSON 1's account arrived in VICTIM's Facebook Messenger inbox. Moreover, based on the background of the picture depicting PERSON 1 and QUINN, VICTIM knew that PERSON 1 and QUINN were at P.G's home at the time VICTIM received the threats in her Facebook Messenger inbox. As described herein, VICTIM was a close associate of P.G., has been to P.G.'s home and thus was familiar with his residence.

> Docket Item 164-1 at 12, ¶ 26.

14

Despite the fact that the government revealed that it "got" Ms. Quinn, and despite the fact that the government used Ms. Quinn to support its efforts to detain Mr. Gerace, the defense would still have had reason to believe that favorable testimony could be procured by Ms. Quinn from the witness stand.

*Gerace Had Reason to Believe that Quinn Would Have Provided Testimony Favorable to Him*

It stands to reason that Mr. Gerace, who considered Ms. Quinn a friend, and believed her capable of rebutting many of the government's evidence, including the credibility of many of the government's witnesses, would have wanted Ms. Quinn to be called as a witness if the government did not call her.

That is especially true because Ms. Quinn's initial comments to the government agents contradicted the narrative that the government sought to advance regarding November 2019. The publicly available information provided in the Complaint, drafted by a Federal agent, included the following allegations:

- I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name. (¶ 46)

- QUINN stated that she recalled this instance, which is detailed supra, and confirmed that she was with PERSON 1 and P .G. when the messages were sent to VICTIM. QUINN further stated that the messages were sent via Facebook messenger, and that QUINN stated that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account. (¶ 47)(emphasis added)

- Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM]

using [PERSON l's] Facebook Messenger account, is false, fraudulent, and fictitious. (¶ 48)

*See* Docket Item 164-1 at 17-18.

Mr. Gerace would have had a substantial interest in calling Ms. Quinn as a witness to elicit the factual information that he believed she could provide, which may have included, but would not be limited to, the statements she made to the government agents, contradicting the government's narrative.

Even if the government had Ms. Quinn as a witness, the defense believed that she could have provided helpful testimony, because she voluntarily provided information to the government that contradicted its narrative, but then after being charged, she was compelled to cooperate and agree to the government's narrative.

*The Reporting of Ms. Quinn's Death*

After Ms. Quinn died, the mother of Ms. Quinn spoke out, primarily blaming the government for her daughter's death in an interview with the Buffalo News and in affidavits provided to former counsel, Steven Cohen.

> "In my heart, I cannot believe she would commit suicide, but I know that is a possibility," said Sharon Quinn, who works as a clerk with the Depew Police. "Crystal was under tremendous pressure, extreme pressure from the FBI to testify. *They told her they would put her in prison if she didn't testify against Peter*. She was so scared that when somebody would knock on our front door, she would run out our back door and hide somewhere."

> Dan Herbeck, *Witness who died was under 'extreme pressure' to testify against strip club owner, her mom says*, Aug. 20, 2023, The

Buffalo News (available at https://tinyurl.com/BN082023) (emphasis added).

The government pursued a claim that Sharon Quinn had her affidavits altered by Mr. Cohen[4], but the government has consistently ignored that Sharon Quinn spoke to The Buffalo News about her opinions as well.

The government was clearly concerned about public perception of the witness death. Within weeks of the article featuring quotes from Ms. Quinn's mother accusing the government of "extreme pressure," and coercion with threats of prison, the government moved for unprecedented relief of intradistrict transfer. Case No 19-vr-227, Docket Item 619.

That motion was ultimately denied. Case No. 19-vr-227, Docket Item 663. But while the government's discomfort with those headlines did not result in intradistrict transfer as it had hoped, the backdrop to this entire case (*Gogolack et al*) is an investigation that was motivated to present a public rebuttal to allegations that the government was responsible for the witness's death.

The government repeatedly used the early court appearances and public filings for the defendants in this case to sway public opinion with the dissemination of limited curated information starting in September 2023. Dan Herbeck, *Prosecutors say Wellsville*

---

[4] Discussions with Mr. Cohen's counsel reveal there is strong proof establishing these allegation to be false.

*man tampered with government witnesses*, Sept. 14, 2023, The Buffalo News (available at https://tinyurl.com/BN091423); see also Patrick Lakamp, *Pharaoh's witness overdosed on enough fentanyl to kill hundreds*, Nov. 3, 2023, The Buffalo News (available at https://tinyurl.com/BN110323).

These efforts were consistent with this trial team's historical practice of making carefully selected inflammatory allegations at public appearances and in its public submissions knowing its statements will attract media attention. In an Editorial, the Buffalo News noted "defense lawyers and anonymous sources made up a smidgen of that coverage, compared to the deluge of information mined from the government's public filings." Editorial Board, Thanks for the compliment, feds – and the stories, Sept. 12, 2023, The Buffalo News (available at https://tinyurl.com/BN091223).

In some instances, the information provided to the Courts and the public was admittedly inaccurate. *See e.g.* Letter from Joesph M. Tripi, Docket Item 34. In other instances, the record has never been corrected. Many of the allegations presented in the early court appearance and submissions were clearly presented at a time when the defense had not been provided discovery and could not rebut or clarify the record.

## 2. Death of Crystal Quinn Resulted in an Investigation Targeting Peter Gerace

In *USA v Bongiovanni et al*, the FBI investigated Joseph Bongiovanni, Peter Gerace, Jr. and others alongside other Federal law enforcement agencies. Much of the FBI's

18

involvement in the investigation was documented under a specific Case ID: 58A-BF-3179872.

Almost immediately after the witness death was reported, the government decided to pursue an investigation regarding the death, and it categorically identified that investigation as being related to *USA v Bongiovanni et al* and Peter Gerace, Jr.

Buried in the delayed discovery from case no. 23-cr-99, at bate stamp 00010744, there is a FD-1057 that indicates that a "sub file" was created for the death investigation of witness. The Case ID is listed as "58A-BF-3179872-DEATH QUINN," a subset of the CASE ID used in relation to *USA v Bongiovanni et al*.

On the FD-1057, to the right of the Case ID, the investigation was clearly identified as "PUBLIC CORRUPTION AND LCN RELATED."

"Public Corruption" is clearly a reference to the charges that were pending in case no. 19-cr-227 and "LCN" is the abbreviation for "La Cosa Nostra," a reference to Italian Organized Crime, which the government has repeatedly claimed, without evidence, that Mr. Gerace has a connection to.

The document was dated August 11, 2023, almost a week before Mr. Gogolack was initially charged by complaint, and over a month before he was indicted and a District Court Judge was assigned.

The early investigation into the witness death focused on Mr. Gogolack. All FBI efforts to investigate Mr. Gogolack were tagged with the Case ID "58A-BF-3179872-

DEATH QUINN," the file number used regarding the investigation for *Bongiovanni et al* and Peter Gerace, Jr.

In August 2023, before Mr. Gogolack was even charged by complaint, the government had conducted an interview of Mr. Gogolack following a coordinated state arrest, the government had seized his cell phone and had it delivered to the Regional Computer Forensic Laboratory for extraction, and it had sought a warrant to search Mr. Gogolack's residence. These investigative efforts were documented under the same case ID: 58A-BF-3179872-DEATH QUINN.

For example, when Mr. Gogolack's cell phone was seized and collected by Federal agents for extraction, an FBI Receipt of Property form referred to "Case ID: 58A-BF-3179872-QUINN." A 302 drafted on August 11, 2023, indicates that on August 7, 2023, Mr. Gogolack's cell phone was transported to Regional Computer Forensic Laboratory in order to extract the contents of the phones.[5] That 302 was associated with "File # 58A-BF-3179872-DEATH QUINN." The Receipt of Property and the 302 were both provided in the delayed discovery in Case no. 23-cr-99.

---

[5] A 302 drafted on August 25, 2023, indicates that the phone was seized pursuant to a search warrant, but that warrant may be another item that the government has not yet disclosed as none of the defendants have been able to locate it.

3. The Prosecution Commenced with Charges Against Simon Gogolack

Defendant Simon Gogolack was charged by Complaint on August 17, 2023, and initially appeared on August 23, 2023. Magistrate Judge Case Number ("Magistrate no.") 23-mj-01115-JJM, Docket Item 1, 4. Mr. Gogolack was detained on the government's motion. Magistrate no. 23-mj-01115-JJM, Docket Item 4.

Mr. Gogolack was indicted less than one month later on September 13, 2023. Docket Item 12. An arraignment and detention hearing were held on September 14, 2023. Docket Item 15.

The Magistrate Judge issued a Scheduling Order on September 15, 2023, that ordered "All voluntary discovery shall be completed by October 16, 2023." Docket Item 17 at 1.

Five days later, on September 20, 2023, a superseding indictment was filed against Gogolack. Docket Item 18. An arraignment on the superseding indictment was held on September 25, 2023. Docket Item 20.

The Magistrate Judge issued a Scheduling Order on the Superseding Indictment. Docket Item 21. The discovery deadline remained the same. Docket Item 21 at 1 ("All voluntary discovery shall be completed by October 16, 2023.")

Other defendants were charged, individually by separate complaints, including: Howard Hinkle (Magistrate no. 23-mj-05219-MJR)[6]; Michael Roncone (Magistrate no. 23-mj-00168-HKS); Scott Barnes (Magistrate no. 23-mj-00166-HKS); and John Ermin (Magistrate no. 23-mj-00167-HKS).

On December 13, 2024, Mr. Gogolack requested an extension of time to file pretrial motions. Docket Item 22. The Court granted the request and issued an Amended Scheduling Order on the Superseding Indictment. Docket Item 23. The scheduling order did not provide a new deadline for discovery because the government never requested an extension of time to disclose discovery. *Id.*

B. THE SECOND SUPERSEDING INDICTMENT AND SCHEDULING OF DISCOVERY DISCLOSURE

1. The Superseding Indictment is Filed Containing Demonstratively False Allegations

On January 5, 2024, a Second Superseding Indictment was filed against Mr. Gogolack, which included Mr. Gerace and all of the defendants listed supra. Docket Item 24.

The indictment, itself, presents demonstratively false allegations. For example, the alleged overt act included in paragraph 25 in the Second Superseding Indictment alleges:

> The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited

---

[6] Howard Hinkle was also charged with Dillon Anderson who has since had his charges dismissed. *See* Magistrate no. 23-mj-05219-MJR, Docket Item 20

> attorneys for GERACE from revealing to GERACE the
> government's witnesses' names and from providing
> GERACE with the government's witness list.

> Docket Item 24 at 16.

The allegation that the Mr. Gerace's defense team placed Ms. Quinn on the defense witness list to "reveal[] to [Mr. Gerace] the government's witnesses' names" is blatantly false and would require (1) that Mr. Gerace would have had no reason to place Ms. Quinn on the witness list himself; and (2) that Mr. Gerace did not already know that the government intended to call Mr. Quinn as a witness.

Mr. Gerace would have had a clear reason to include Ms. Quinn on his witness list, particularly because Ms. Quinn's initial comments to the government agents contradicted the narrative that the government sought to advance. Regardless of whether the government felt Ms. Quinn's initial comments were false, she provided statements to agents contradicting the government's narrative of what occurred on November 19, 2019, which the government included in a publicly filed complaint, unsealed four months before the defense witness list was filed. Mr. Gerace would have had a substantial interest in calling Ms. Quinn as a witness to elicit the factual information that he believed she could provide, which may have included, but would not be limited to, the statements she made to the government agents, contradicting the government's narrative. The suggestion that the defense would include Ms. Quinn with the purpose of revealing her cooperation is not only illogical as a general premise, but it attempted to lodge

allegations, primarily directed at defense counsel, based on conjecture that is contradicted by facts. [7]

Furthermore, prior to the filing of the witness list, the government had revealed Ms. Quinn's cooperation during the detention hearing for Mr. Gerace, which further established the allegation in the indictment as completely false.

## 2. Initial Requests for Discovery

At the arraignment for Mr. Gerace on January 10, 2024, counsel appeared provisionally, and although not yet retained or appointed on this case, counsel made a request for initial discovery disclosure. Docket Item 46 at 13-14 ("So, I would ask that at least some preliminary disclosure be provided, beyond the indictment, to give counsel an idea of what's going to be involved here in terms of the defense of this case, in terms of motion practice, in terms of the timeframe associated with a trial.")

The government opposed any disclosure claiming that because counsel was not yet confirmed and that disclosure would somehow "build[] delay into this case." Docket Item 46 at 14.

---

[7] Later in this case the government would proffer these false allegations as a basis for the inappropriate protective order, but when confronted with the facts that demonstrate that the allegations in the government's motion, and the indictment, are false, the government had nothing to offer in reply. *See* Docket Item 167 ("The government, while it disagrees strongly with the assertions made by the defendant, does not intend to use its reply brief to address such arguments.")

The government made no comment about how long the discovery process would take, or that hard drives would have to be provided by the defendants, or that it would be seeking a protective order at some point.

A status conference was set for January 31, 2024.

At the status conference on January 31, 2024, counsel for Mr. Gogolack made a detailed request regarding the need for a discovery deadline:

> Mr. Gogolack has been on the complaint since August. We don't have basic discovery in the case.
>
> I know the Government has made several representations at various detention hearings about discovery that they have, but we're in a position where we're unable to evaluate any of that because we don't have it, Judge.
>
> So I'd ask that you set a discovery deadline before you set any other scheduling order and we can come back at a status conference at some point in the future and set motions deadlines, but I would ask for a discovery deadline first.
>
> Dkt. 66 at 30.

Even though by January 31, 2024, 26 days had already passed since the filing of the indictment, and 167 days had passed since Mr. Gogolack was initially charged, the government opposed setting a discovery deadline unless the Court was also going to set

a deadline for motions, even though there was no explanation for why those two deadlines would need to be set at the same time.[8] Docket Item 66 at 30-31.

A status conference was set for February 23, 2024.

## 3. The Government Argued for an Extended Discovery Deadline at the Status Conference on February 23, 2024

On February 23, 2024, 49 days after the filing of the second superseding indictment, The Magistrate Judge held a status conference. The government had still not provided a single page or a single byte of discovery to Mr. Gerace.

At the status conference, The Magistrate Judge proposed that a discovery deadline be set. Feb. 23, 2024 Transcript at 3. The Magistrate Judge proposed a generous 60-day deadline.[9] Feb. 23, 2024 Transcript at 6.

In response to this The Magistrate Judge's suggestion, the government asked for 90 days. It provided two reasons for its request.

> The first reason is this case involves a significant amount of discoverable material. It's a significant undertaking. *There's an agent from the FBI who has been essentially exclusively assigned to that task,* but the resources that that requires are significant. And so as opposed to setting a shorter deadline and rushing things for lack of a better word, I'd ask that we set 90 days and allow a thorough review and production of discovery.

---

[8] Obviously, it was not feasible to schedule deadline for motions yet as counsel had no idea what the scope of the case was and there were still counsel issues to work out. However, nothing was preventing the government from preparing or providing discovery.

[9] A 60-day deadline would have resulted in a deadline set 109 days after the filing of the second superseding indictment.

> The other reason is as the Court indicated, it would be helpful to have a final determination regarding this death penalty issue before we all come back and before motion practice begins, and I think kicking this out 90 days versus 60 days errs on the side of caution with respect to that determination.
>
> Feb. 23, 2024 Transcript at 6-7 (emphasis added).

The Notice that the government would not pursue the death penalty was filed later that day (Docket Item 75) so it ended up having no bearing on the need for 90 days as opposed to the 60 days that the Magistrate Judge proposed.

In regard to the volume of discovery, to the extent that there was "an agent from the FBI who has been essentially exclusively assigned to that," 60 days should have been more than sufficient, but nonetheless the government asked for 90. The government referred to it as "an additional 30-day cushion." Feb. 23, 2024 Transcript at 7-9.

The defense indicated that it had no way of knowing what the volume of discovery was, so it could not really argue in opposition to the lengthy timeframe requested by the government.

> I think we're all in a position where we somewhat have to defer to the Government in terms of how long it will take them to produce discovery, but I would note… I've had a number of mega cases where discovery could be produced in 30 to 60 days… obviously almost all of the defendants are in custody. I have concerns about the length of that type of adjournment, but um, given the fact that the Government is the only entity at this point that can describe the volume of discovery and they're saying they need 90 days, um, I don't know that there's much I can do to rebut that.

Feb. 23, 2024 Transcript at 8-9.

Despite the fact that counsel did not, at that time, question the government's representation that 90 days would be necessary, nor did counsel oppose the request based on the fact that it had no indication as to what the actual volume of discovery is, the government nonetheless felt compelled to respond.

> [I]t's perplexing to hear that counsel has concerns regarding speedy trial when we've had I think three separate status conferences where counsel hasn't wanted to set a scheduling order in place. To come today and say, hey, that's too long to ask for is contrary to the arguments that have been raised that the arraignment, the status conference after the arraignment. It's inconsistent with arguments previously raised that the Court shouldn't set a scheduling order. So I don't understand.

> Feb. 23, 2024 Transcript 9-10

Counsel replied:

> Judge, just -- I don't want to have it turned into a back and forth, but I do want to correct the record. At the arraignment, I asked for discovery. I said I think we should put a scheduling order in place. I indicated that I would be a proponent of split -- bifurcating non dispositive and dispositive motions. I specifically said to the Court if we start getting discovery, it can inform us on the size of the case. So that was an application I made.

> I believe the Government's response was they thought that would build in delay in some manner. So I just want that to be clear, and obviously, this is an investigation that took place over several months. There is a period of time that precedes the charges where the discovery could be prepared in anticipation of an indictment. Again, I'm not opposing the 90 days. The Government is in the position to say that the

> volume is that high. My point is merely that defendants are in custody. That's a consideration, and it informs on other considerations the Court has.
>
> Feb. 23, 2024 Transcript 10-11.

Counsel for Mr. Ermin also added "whatever time the Government needs to get us the complete discovery obviously would help us, but the implication that somehow we are here today as a result of delays from defendants is I think inappropriate." Feb. 23, 2024 Transcript at 11.

Ultimately, the Magistrate Judge agreed to grant the extensive 90-day deadline, but it specifically indicated that to the extent possible, the discovery should "be produced sooner than that date" and it should be produced "[o]n a rolling basis so that people can hit the ground running in terms of what they think they need to do." Feb. 23, 2024 Transcript at 12.

This direction by the Magistrate Judge followed an earlier colloquy, where the Magistrate Judge asked if it was possible to do "rolling production during the 90 day period" and the government responded: "I certainly think so, Judge. I think that *there's material that is probably close to ready to go out at this point* because we've obviously been working on it since the return of the indictment." Feb. 23, 2024 Transcript at 10 (emphasis added).

The deadline for discovery was set for May 23, 2024, and a status conference was set for June 3, 2024. Transcript at 12-13.

The Government moved for an exclusion of time, which recognized that the Court expected that the defendants would be able to review discovery in advance of the June status conference.

> So the Government would request that the time between today's date and June 3, 2024, be excluded from the speedy trial act pursuant to Title 18 United States Code Section 3161(h)(7)(a) and (h)(7)(b)(4) in that the interest of justice in the exclusion of such time outweigh the defendant's interest in a speedier trial specifically because with this time between today and June 3 the Government will prepare and produce an itemized list of discovery to counsels for all of the evidence. Additionally, it will provide time between May 23 and June 3 for counsel for all of the defendants to review such discovery and report back to the Court at that status conference about how much time they need to file motions.
>
> Feb. 23, 2024 Transcript at 16-17.

Based on the understanding that discovery would be provided on a rolling basis to the extent possible and completed on or before May 23, 2024, the Court issued an exclusion of time.

These issues were summarized on the Minute Entry entered on the public docket:

> The government requests 90 days to produce discovery. After some discussion, the court sets a 90-day deadline and sets a follow-up status conference for 6/3/2024 at 2:00 PM to discuss motion schedules. The court directs the government to provide discovery on a rolling basis, to extent possible. STA time excluded as to all defendants through the June 3rd status conference for the reasons stated by the government.
>
> Docket Item 73.

At no point during the conference did the government state that it intended to seek a protective order or that the defendants would need to provide hard drives at any point in order to receive discovery.

C.  The Violation of the Court's Order

1. Discovery Disclosure between the February 23rd and June 3rd

At the time of the February 23, 2024, status conference, 49 days had already passed following the filing of the superseding indictment. Starting February 23, 2024, the government was to provide rolling discovery over the following 90 days, with a deadline that it be completed by May 23, 2024.

Over the next 90 days, the following chart documents the government's daily compliance with that directive:

| Date | Any Rolling Discovery Produced? | Request for a hard drive? | Proposed Protective Order? |
|------|-------------------------------|---------------------------|----------------------------|
| 2/23/2024 | No | No | No |
| 2/24/2024 | No | No | No |
| 2/25/2024 | No | No | No |
| 2/26/2024 | No | No | No |
| 2/27/2024 | No | No | No |
| 2/28/2024 | No | No | No |
| 2/29/2024 | No | No | No |
| 3/1/2024 | No | No | No |
| 3/2/2024 | No | No | No |
| 3/3/2024 | No | No | No |

| | | | |
|---|---|---|---|
| 3/4/2024 | No | No | No |
| 3/5/2024 | No | No | No |
| 3/6/2024 | No | No | No |
| 3/7/2024 | No | No | No |
| 3/8/2024 | No | No | No |
| 3/9/2024 | No | No | No |
| 3/10/2024 | No | No | No |
| 3/11/2024 | No | No | No |
| 3/12/2024 | No | No | No |
| 3/13/2024 | No | No | No |
| 3/14/2024 | No | No | No |
| 3/15/2024 | No | No | No |
| 3/16/2024 | No | No | No |
| 3/17/2024 | No | No | No |
| 3/18/2024 | No | No | No |
| 3/19/2024 | No | No | No |
| 3/20/2024 | No | No | No |
| 3/21/2024 | No | No | No |
| 3/22/2024 | No | No | No |
| 3/23/2024 | No | No | No |
| 3/24/2024 | No | No | No |
| 3/25/2024 | No | No | No |
| 3/26/2024 | No | No | No |
| 3/27/2024 | No | No | No |
| 3/28/2024 | No | No | No |
| 3/29/2024 | No | No | No |
| 3/30/2024 | No | No | No |

| | | | |
|---|---|---|---|
| 3/31/2024 | No | No | No |
| 4/1/2024 | No | No | No |
| 4/2/2024 | No | No | No |
| 4/3/2024 | No | No | No |
| 4/4/2024 | No | No | No |
| 4/5/2024 | No | No | No |
| 4/6/2024 | No | No | No |
| 4/7/2024 | No | No | No |
| 4/8/2024 | No | No | No |
| 4/9/2024 | No | No | No |
| 4/10/2024 | No | No | No |
| 4/11/2024 | No | No | No |
| 4/12/2024 | No | No | No |
| 4/13/2024 | No | No | No |
| 4/14/2024 | No | No | No |
| 4/15/2024 | No | No | No |
| 4/16/2024 | No | No | No |
| 4/17/2024 | No | No | No |
| 4/18/2024 | No | No | No |
| 4/19/2024 | No | No | No |
| 4/20/2024 | No | No | No |
| 4/21/2024 | No | No | No |
| 4/22/2024 | No | No | No |
| 4/23/2024 | No | No | No |
| 4/24/2024 | No | No | No |
| 4/25/2024 | No | No | No |
| 4/26/2024 | No | No | No |

| | | | |
|---|---|---|---|
| 4/27/2024 | No | No | No |
| 4/28/2024 | No | No | No |
| 4/29/2024 | No | No | No |
| 4/30/2024 | No | No | No |
| 5/1/2024 | No | No | No |
| 5/2/2024 | No | No | No |
| 5/3/2024 | No | No | No |
| 5/4/2024 | No | No | No |
| 5/5/2024 | No | No | No |
| 5/6/2024 | No | No | No |
| 5/7/2024 | No | No | No |
| 5/8/2024 | No | No | No |
| 5/9/2024 | No | No | No |
| 5/10/2024 | No | No | No |
| 5/11/2024 | No | No | No |
| 5/12/2024 | No | No | No |
| 5/13/2024 | No | No | No |
| 5/14/2024 | No | No | No |
| 5/15/2024 | No | No | No |
| 5/16/2024 | No | No | No |
| 5/17/2024 | No | No | No |
| 5/18/2024 | No | No | No |
| 5/19/2024 | No | No | No |
| 5/20/2024 | No | Yes[10] | No |

---

[10] Although the government requested the hard drive prior to the expiration of discovery, it was requested so late that most defendants would not be able to purchase and deliver the drive prior to the expiration of the deadline, and even if they did it would not matter because (1) it would take multiple days to copy the data onto the drive; and (2) the government had no intention of disclosing the material until a protective

| 5/21/2024 | No | | No |
|---|---|---|---|
| 5/22/2024 | No | | No |
| 5/23/2024 | No | | No |

At no point did the government move for an extension of the discovery deadline.

For the first time, on May 20, 2024[11], the government advised defense counsel it would need a hard drive from each of the defendants in order to provide discovery. The government indicated the copying of discovery "upload may take 2-3 days to complete."

The government stated it needed a hard drive containing space for up to 3 terabytes of data. That is substantial enough that it would require most or all attorneys to purchase a new drive and have it delivered to the government before the copying could even start.

Over the next week and a half, most of the attorneys obtained hard drives and had the drives sent or delivered to the government. None of the defense attorneys received a hard drive back regardless of how quickly each attorney was able to purchase the drive and deliver it to the government.

---

order was in place, and it would not first broach the subject of a protective order until nearly a week after the deadline passed.

[11] May 20, 2024, was 136 days after the second superseding indictment was filed.

Instead, on May 29, 2024, for the first time, the government sent an email stating that it would withhold discovery until a "protective order is authorized by the Court."[12]

The government's email attached a 5-page proposed protective order. Even though the government tried to quickly elicit consent from defense counsel for its proposed protective order, the document included several provisions that the government could not have possibly believed all defense counsel would consent to.

Over the next two days, communication between the defense attorneys resulted in most of defense counsel deciding to meet to collectively to review the protective order. Because the government had waited until only a few business days before the June 3, 2024, status conference, the attorneys could not realistically meet before that date.

On June 3, 2024, the attorneys met before the scheduled status conference to review the proposed protective order in an effort to establish a collective position regarding whether they would consent to a protective order and if so, which provisions would be agreeable. The attorneys came to a consensus on which provisions were agreeable and which provisions were inappropriate and/or redundant.

Immediately following that meeting, the parties convened in court for the status conference.

---

[12] The government should have received an out-of-office reply from my email address on that date, because I was out of the district for argument at the Second Circuit.

2. The June 3rd Status Conference

At the status conference on June 3, 2024, the government seemed to suggest that the delay regarding the disclosure of discovery was somehow the responsibility of the defense. The government stated that most of defense counsel had not immediately responded to the government's email requesting consent to its proposed protective order. The government initially omitted the fact that the email had been sent only five days earlier, 145 days after the indictment was filed.[13]

After the Court established a timeline, including that the government did not request a protective order until over a week after the discovery deadline had already expired, it inquired about the reason for the delay.

The government did not offer much in terms of an explanation for the delay, but it seemingly admitted that part of the reason discovery had not been prepared was because the trial team was engaged in another trial in *US v Bongiovanni et al*.[14]

The defense indicated that by the following evening, it expected it could provide a proposed protective order with input and/or edits from most or all of the attorneys. The defense requested a deadline be set for the government to file a motion for a protective

---

[13] The government also omitted any substantive acknowledgement of the court's direction to provide rolling discovery.

[14] Notably, the government had already been engaged in that trial during the February 23, 2024, status conference, so the government was fully aware of the time commitments associated with the trial when it requested 90 days, including the 30-day cushion.

order if the parties could not reach an agreement. The defense also noted that the government had not requested any extension of the discovery deadline, and that discovery should have been disclosed over a week before the government even mentioned a protective order.

The government indicated it would release the discovery if a temporary protective order was issued indicating that the discovery could be viewed by "attorney's eyes only."

The Court set a scheduling requiring any motions for a protective order be filed by June 10, 2024. That date would also serve as a deadline for defendants to file motions related to relief based on the government's failure to abide the Magistrate Judge's ordered discovery deadline.

The government then moved for an exclusion of time pursuant to 18 U.S.C. Sections 3161(h)(7)(A) and (h)(7)(B)(iv). Because the government failed to produce discovery as directed by the Magistrate Judge and because that delay had prevented the parties from reviewing discovery in advance of the court date so a scheduling order could be set, the Court denied the request for an exclusion of time in the interest of justice.

A Text Order was issued that day summarizing the appearance and confirming that time would not be excluded from the Speedy Trial Act calendar.

| 06/03/2024 | 122 | TEXT ORDER as to Simon Gogolack, Peter Gerace, Jr, John Thomas Ermin, Michael Roncone, Frank Knight, Howard Hinkle, Jr., Cortnie Barber, Bernard Byrd, III, Scott Barnes: In accordance with today's conference, the government's production of discovery shall be deemed attorney's eyes only pending further order of the court and without prejudice to defendants' right to argue against that designation. The parties shall continue to confer in an |

|  |  | effort to reach agreement on a proposed protective order. By June 10, 2024, the parties shall either file a proposed stipulated protective order or motion(s) for the entry of a protective order. By that deadline defendants may also file motions directed to consequences of the government's failure to abide by my February 23, 2024 Text Order 74 requiring the government to produce discovery to them by no later than May 23, 2024. Responses to these motions (if any) shall be filed by June 14, 2024, after which time the motion(s) will be taken under advisement. A further conference is scheduled for June 27, 2024 at 2:00 p.m. For the reasons set forth by defendants' counsel on the record, I deny the government's request to enter a further exclusion of time from the Speedy Trial Act calendar pursuant to 18 U.S.C. Sections 3161(h)(7)(A) and (h)(7)(B)(iv). As of today, time if no longer excluded from the Speedy Trial Act calendar. SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 6/3/24. (MDY) (Entered: 06/03/2024) |
|---|---|---|

### D. Litigation Following the Government's Willful Violation of the Court's Order

#### 1. The Government's Motion for Reconsideration of the Magistrate Judge's Decision to Deny an Exclusion of Time in the Interest of Justice

On June 5, 2024, the day after the defense sent a proposed protective order, the government filed a motion for an exclusion of time from June 5, 2024, to June 27, 2024.

The government did not label the motion as a motion for reconsideration but given the Court had already denied an exclusion of time almost identical to the exclusion requested in the government's new motion, it is clearly a motion for reconsideration as to those dates.

This follows a trend developing within the last several months that the government will file motions seeking relief for reconsideration when it loses a motion. It did so in this case, when the Court denied the government's motion for disclosure of

Gerace and Ermin's financial affidavits. *See* Docket Item 86, 90 (government claimed it was entitled to file a Reply despite never requesting the opportunity to file one prior to the Court's Decision). It did so in *Bogiovanni et al*, when the District Court denied the government's motion to disqualify Eric Soehnlein. *See* Case no. 19-cr-00227-LJV-MJR, Docket Item 919 (after the District Court issued a detailed and lengthy Decision and Order denying the government's motion to disqualify Mr. Soehnlein, the government filed a Motion and Memorandum to Resolve Actual and Potential Conflicts of Interest arguing that the District Court should not accept any *Curcio* waiver and should disqualify Mr. Soehnlein).

In this instance though, the mere filing of the motion is an attempt to achieve the government's goal. The government will likely contend that the pendency of the motion itself stopped the Speedy Trial clock and thus, by making the motion, the government has attempted to circumvent the consequence of the Magistrate Judge's decision not to exclude time, at least temporarily, regardless of whether its motion had any merit.

## 2. The Government's Motion for a Protective Order

*The Proposed Protective Order*

Following up on the June 3, 2024, status conference, counsel for Gerace sent an email to the government with an attachment containing a proposed protective order. The proposed protective order was drafted with input and/or edits from the majority of

attorneys. Counsel for at least six of the defendants had weighed in that they would stipulate to this protective order if it was acceptable to the government.

That proposed protective order was sent to the government on the evening of June 4, 2024. The following morning, the government sent a reply email indicating that they would "take a look and get back to" the defense.

Despite the claim that the government had wanted to work towards an agreement on the protective order, the government never made any further effort to discuss a compromise.

On Juen 10, 2024, six days after the defense had provided a proposed protective order, the government followed up with an email indicating that it is going to file a motion for a protective order. The clear implication of the email was that because defense counsel had not agreed to a large enough percentage of the government's proposed protective order, it would file a motion instead of engaging in further discussion.

The Government opted to file that motion *ex parte* to avoid having its argument tested by the adversarial process. Docket Item 129.

Without first seeking permission to do so, the Government opted to file its motion *ex parte* to avoid having its argument tested by the adversarial process. Docket Item 129.

In response to the government's decision to file the motion, *ex parte*, without first seeking permission to do so, the Magistrate Judge issued a Text Order directing the government to provide authority for its attempt to file *ex parte*.

| | | |
|---|---|---|
| 06/12/2024 | 134 | TEXT ORDER as to Simon Gogolack, Peter Gerace, Jr, John Thomas Ermin, Michael Roncone, Frank Knight, Howard Hinkle, Jr., Cortnie Barber, Bernard Byrd, III, Scott Barnes: By June 13, 2024 the government shall supplement its motion for a protective order [129] with authority for its submission of an *ex parte* Affidavit in support of the motion. Defendants' deadline to respond to the motion [129], as supplemented, is extended from June 14, 2024 (see June 3, 2024 Text Order [122]) to June 19, 2024. SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 6/12/24. (MDY) |

On June 13, the defense provided a memorandum related to the *ex parte* submission issue, which "respectfully requested that this Court reject the government's attempt to file its motion *ex parte* and allow the defense to review the government's motion so that the content of a protective order can appropriately be the product of the adversarial process, ensuring that the defendants' rights to properly prepare a defense are not improperly hindered." Docket Item 136 at 8.

Later that day, the government filed its memorandum which provided no explanation for why it did not first seek permission leave to file *ex parte* other than to argue in a footnote that it is "common practice in this district that the government files applications for protective orders *ex parte* without first moving for leave under the local rules," and "this practice encourages efficiency and affords defendants more timely access to discovery, and thus is not commonly subject to the scorched earth litigation tactics that Gerace appears ready to embrace here." Docket Item 138 at 2.

On June 20, the defense sought permission to file its response *ex parte*. Docket Item 149. The government opposed. Docket Item 151.

The following week, the Court determined that the *ex parte* motion practice was not going to be permitted for either party.

| 06/24/2024 | 152 | TEXT ORDER as to Simon Gogolack, Peter Gerace, Jr, John Thomas Ermin, Michael Roncone, Frank Knight, Howard Hinkle, Jr., Cortnie Barber, Bernard Byrd, III, Scott Barnes: Before the court is defendant Gerace's motion [149] for permission to file his response to the government's motion for a protective order [129] ex parte. Having reviewed that motion [149] and the government's response [151], it is denied. Gerace's response shall be publicly filed by June 26, 2024. Also before the court is the government's Memorandum of Law regarding its authority to file an ex parte Affidavit in support of its motion for a protective order [138]. Having reviewed that submission [138] and the defendants' opposition [136,146], in fairness to defendants, they are entitled to a meaningful opportunity to respond to the government's motion. Therefore, by June 28, 2024, the government shall either publicly file a redacted version of the Affidavit, with the defendants' reserving their right to challenge the propriety of those redactions, or withdraw the ex parte Affidavit in lieu of a publicly filed submission. Defendants may file any supplemental responses to the government's motion for a protective order [129] by July 3, 2024. Oral argument of that motion [129], as well as the other pending motions [123, 131, 132], is rescheduled from June 27, 2024 [122] to July 11, 2024 at 1:00 p.m. The time from June 27, 2024 through July 11, 2024 is excluded from the Speedy Trial Act calendar pursuant to 18 U.S.C. Section 3161(h)(1)(D) due to the pendency of motions, and in the interest of justice pursuant to 18 U.S.C. Section 3161(h)(7)(A) and (h)(7)(B)(iv), insofar as this additional period will afford the parties reasonable time to brief the relevant issues in this case and the ends of justice served by granting this continuance outweigh the best interests of the public and the defendants in a speedy trial. Whether the filing of the government's motion to exclude time from the Speedy Trial Act calendar [123] automatically excluded time to June 27, 2024, when I previously declined to enter an interest of justice exclusion for that |

| | | period [122], remains an open question. SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 6/24/24. (MDY) |
|---|---|---|

The defense filed a response for Gerace, publicly, on June 26, 2024, as directed. Dkt. 153.

The government was directed to "either publicly file a redacted version of the Affidavit… or withdraw the *ex parte* Affidavit in lieu of a publicly filed submission." On June 28, 2024, the government filed what appears to be a redacted version of the original Affidavit. Docket Item 156.[15]

After having had the opportunity to review the redacted version of the affidavit in support of the government's motion, the defense submitted a supplemental response. Docket Item 164.

The defense argued (A) The Government's Comments on Bongiovanni et al Is a Restatement of False Allegations Asserted in the Second Superseding Indictment; (B) The Government Also Presents Allegations about Other Cases Without Essential Context; (C) The Government's Attacks on Defense Counsel are Baseless and Reckless; (D) The Government's Submission Actually Provides Support for the Arguments Made by the Defense in Favor of Its Proposed Protective Order; (E) The Government Provides No

---

[15] Although the government's submission appears to be a redacted version of the original Affidavit, as authorized by Text Order 152, the government signed and notarized the Affidavit on June 28, 2024.

Valid Explanation for Why Its Proposed Protective Order Is Necessary as Opposed to the

Defense Proposed Protective Order. Docket Item 164.

### 3. The Motion for Sanctions

*The Defendant's Motion for Sanctions Based on the Government's Violation of the Court's Order*

On June 10, 2024, the defense moved for a hearing and the imposition sanctions

due to the government's disregard of this court's discovery order. Docket Item 132.

The defense argued:

> The government's clearly demonstrated a complete disregard
> for the Court's Order in multiple respects: (1) the government
> did not provide rolling discovery at any point during the
> extensive 90 days afforded to the government to complete
> discovery production; (2) the government did not request an
> extension of time to provide discovery after the court-ordered
> deadline; and (3) the government continued to withhold
> discovery after the discovery deadline had expired while it
> raised the issue of a protective order for the very first time.

> The government has offered not legitimate explanation for the
> delay, other than its admission that the trial team in this case
> was focusing its attention on a trial in *Bongiovanni et al*, a jury
> trial that was held of an out-of-custody defendant that
> resulted in a hung jury on the majority of the counts.

> Setting aside that the government was already engaged in that
> trial in February when it claimed that 90 days was sufficient
> and that it had discovery that was already "close to ready to
> go out," the excuse is unavailing for multiple other reasons.

> The US Attorney's Office had multiple other AUSAs enter
> appearances on this case, presumably to assist in managing
> the case while the trial team was engaged in trial. Those
> AUSAs were not engaged in the Bongiovanni trial, and there

has been no explanation for why they could not oversee the disclosure of rolling discovery.

Furthermore, this indictment was filed over a month before the Bongiovanni trial commenced, and the discovery deadline was over a month after the trial concluded, so the trial team's decision to focus on the Bongiovanni trial does not explain the failure to address discovery in this case for any period of time that it was not engaged in trial.

The DOJ Policy Manual notes that "[p]roviding broad and early discovery often promotes the truth-seeking mission of the Department" and "provides a margin of error in case the prosecutor's good faith determination of the scope of appropriate discovery is in error." DOJ Justice Manual, 9-5.002- Criminal Discovery. Indeed the manual directs that prosecutors must comply with "local rules, applicable case law, and any final court order regarding discovery." *Id*. There is no exception for engagement in another trial.

Finally, in addition to the additional AUSAs who had appeared in this case, there were a team of other individuals involved in the discovery process apparently including a dedicated FBI agent, a Litigation Specialist, and other US Attorney staff.

This team of individuals should have been capable of ensuring that rolling discovery was provided for, and that the discovery deadline was met. The failure to do so is consistent with a lack of supervision by the US Attorney's Office and a disregard for this Court's discovery Order.

Docket Item 132-1 at 26-28.

The defense requested a hearing to address what appeared to, at best, be gross misconduct or, at worse, strategic, intentional delay by the government. Among the potential sanctions identified were vacating the exclusion of time from February 23, 2024,

which for Mr. Gerace may have resulted in dismissal, or a preclusion order of all evidence

disclosed after the deadline to conclude discovery disclosure. Docket Item 132-1 at 31-32.

*The Defendant's Response to the Government's Motion for an Exclusion of Time*

The requests for a hearing and sanctions were further addressed in the defense's

response to the government's motion to exclude time.

The defense argued:

> The motion should be denied, but not without first holding a
> hearing, to resolve issues of fact surrounding the
> government's failure to produce rolling discovery at any time
> during the 90 days following the February 23, 2024, status
> conference, the government's failure to provide discovery by
> the May 23, 2024, deadline, and the government's failure to
> propose a protective order until after expiration of the
> discovery deadline despite its intention to withhold discovery
> until one had been issued.
>
> Docket Item 148 at 22.

The defense further noted that "after the conclusion of the evidence presented at

that hearing, the Court should not only deny the government's motion, but consider

sanctions against the government for bringing this motion as a means of circumventing

this Court's decision to deny the exclusion of time." Docket Item 148 at 27-28.

### E. THE MAGISTRATE JUDGE'S DECISION AND ORDERS

After having fully considered the facts pertaining to the government's willful

violation of the Court's Order regarding discovery, the Magistrate Judge issued a

Decision and Order, dated July 29, 2024 finding the government acted in bad faith. Docket

Item 173 at 5 ("although I had unequivocally ordered production of voluntary discovery by May 23, 2024, the government deliberately decided not to comply with that order… The government's willful violation of my order constitutes bad faith.").

The government filed a motion to Reconsider which was denied in a Decision and Order, dated August 23, 2024,  in which the Magistrate Judge imposed specific sanctions, including: (1) disqualification of the trial team initially assigned to prosecute this case; (2) preclusion of the government providing further argument regarding a protective order; and (3) identifying three months of delay for purposes of constitutional speedy trial. Docket Item 200.

The government has brought an appeal of that Order, arguing for the matter to be remanded to the Magistrate Court for the imposition of a less significant sanction. Docket Item 230 at 43.

## IV. APPLICABLE LAW

### A. THE COURT'S SUPERVISORY FUNCTION

### 1. Discovery Violations

Federal Rule of Criminal Procedure 16(d)(2) gives the trial court substantial discretion to impose sanctions for failure to comply with discovery orders. See, e.g., United States v. Gee, 695 F.2d 1165, 1168 (9th Cir. 1983) (emphasizing that sanctions for failure to comply with a discovery rule are reviewed under the abuse of discretion

standard). If a party fails to comply with Rule 16, the court may: (1) order the violating party to permit the discovery or inspection; specify its time place, and manner; and prescribe other just terms and conditions; (2) grant a continuance; (3) prohibit the violating party from introducing the undisclosed evidence; or (4) enter any other order that is just under the circumstances. *See* FED. R. CRIM. P. 16(d)(2)(A)-(D).

Preclusion of evidence is an appropriate sanction for the failure to comply with discovery rules. *See e.g. United States v. Davis*, 244 F.3d 666, 672 (8th Cir. 2001) (determining exclusion proper as a sanction for prosecution's failure to comply with the court's discovery deadline for disclosure of DNA testing results).

Indeed, the Second Circuit has noted that "[a] district court has broad discretion in fashioning a remedy for the government's violation of its obligations under Rule 16(a), including ordering the exclusion of evidence." *US v. Salameh*, 152 F. 3d 88, 130 (2d Cir. 1998); *See also United States v. Thai*, 29 F.3d 785, 804 (2d Cir.1994).

Refusal to provide discovery, or even deliberate attempts to impede discovery by instructing witnesses not to reduce facts to writing, may result in a valid contempt citation. *In re Serra*, 484 F.2d 947, 948 (9th Cir. 1973) (upholding contempt citation where

defense counsel[16] told psychiatrist not to prepare report of psychiatric interview to prevent reciprocal discovery of report).

The broad authority granted to this Court under Rule 16 provides authority for this Court to fashion an appropriate sanction for the Government's disregard of this Court's Order regarding disclosure of rolling discovery to be completed by February 23, 2024. That authority is compounded by the authority provided to this Court in its Supervisory Role.

## 2. The Court's Supervisory Role

This Court maintains supervisory authority to formulate rules and impose sanctions when necessary to appropriately oversee the administration of justice, including the protection of rights afforded to the accused and the fairness of the adversarial process.

The supervisory power of the judiciary is based on the overarching principle that "judges exercise substantial discretion over what happens inside the courtroom." *United States v. Simpson*, 927 F.2d 1088, 1090-91 (9th Cir. 1991). The exercise of a court's supervisory power is intended "to prevent parties from reaping benefit or incurring harm

---

[16] Even a criminal defendant, who is afforded Sixth Amendment protections may be subject to sanctions including preclusion for discovery violations. *See United States v. Young*, 248 F.3d 260, 266-67 (4th Cir. 2001); *United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999).

from violations of substantive or procedural rules governing matters apart from the trial itself." *United States v. Williams*, 504 U.S. at 46.

Even if the government conduct had not triggered authority for a sanction under Rule 16, a federal court, in the exercise of its supervisory authority "may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." *Bank of Nova Scotia v. United States*, 487 US 250, 254 (1988)(*quoting United States v. Hasting*, 461 U. S. 499, 505 (1983); *see also United States v. Williams*, 504 U.S. 36, 45 (1992).

In its supervisory role, courts are permitted to consider relief, including dismissal of an indictment in an exercise of its supervisory powers if the misconduct is sufficiently egregious. *See e.g. Simpson*, 927 F.2d at 1090.

## B. STANDARD OF REVIEW ON APPEAL

On appeal, the District Court reviews a Magistrate Judge's decision and order on non-dispositive matters for clear error. *See* 28 U.S.C. § 636(b)(1)(A)("a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court… A judge of the court may reconsider any pretrial matter under this subparagraph [] where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."); *see also* Fed. R. Crim. P. 59(a).

 "This standard is highly deferential, [and] imposes a heavy burden on the objecting party." *United States v. Williams*, 339 F. Supp. 3d 129, 133 (W.D.N.Y. 2018) (internal citations omitted).

That is consistent with the principle that "magistrate judges are afforded broad discretion in resolving non-dispositive disputes." *United States v. Rivera-Banchs*, 516 F. Supp. 3d 316, 320 (W.D.N.Y. 2021) (*quoting S.E.C. v. Verdiramo*, 890 F. Supp.2d 257, 266 (S.D.N.Y. 2011)).

To find clear error, the District Court must be "left with the definite and firm conviction that a mistake has been committed." *United States v. Martinez*, 110 F.4th 160, 174 (2d Cir. 2024). (internal citations omitted). Thus, reversal is generally reserved for when the Magistrate Judge "abused his discretion." *United States v. Williams*, No. 17-CR-78-FPG, 2019 WL 5260267, at *2 (W.D.N.Y. Oct. 17, 2019) (citations omitted).

## V. DISCUSSION

The government's appeal fails to demonstrate clear error or abuse of discretion. Perhaps the most obvious reason the government's arguments fall short is because the blatant disregard of the Magistrate Judge's Discovery Order cannot be considered in a vacuum, isolated from the government's history of mishandling discovery in this District.

One of the principles repeatedly applied in the criminal justice system is that misconduct is judged not in seclusion when prior instances of misconduct exist. It is expected, for example, that the government will seek sentencing enhancements in certain instances where an individual has committed a predicate offense, and it some instances, it will advocate for pretrial detention based on allegations of dangerousness for prior crimes.

52

The Courts also considers repetition of behavior in regard to law enforcement. For example, the government can rely on good faith exceptions to the exclusionary rule in "isolated" situations, but exclusionary rule applies to circumstances including those involving gross negligence or violations based on recurring or systemic negligence. *See Davis v. United States*, 564 U.S. 229, 236–40 (2011); *Herring v. United States*, 555 U.S. 135, 144 (2009).

Here, the government's blatant discovery violation, in a high-profile case, follows other violations in cases including *Morgan* and *Parks*.

Specifically, the government was warned that subsequent discovery violations would be informed by the concerns raised in these cases. In *Morgan*, the District Court sought assurances that steps would be taken to assure that the government appropriately comply with discovery orders in future cases. In *Parks*, the Court specifically warned that the compounding concerns of the government's handling of discovery may require more aggressive sanctions in the future, including dismissal.

The appeal in this case demonstrates that the government continues to ignore the Court's warnings.

## A. THE GOVERNMENT'S APPEAL DEMONSTRATES THAT IT STILL DOES NOT ACKNOWLEDGE THE SCOPE OF ITS MISCONDUCT

The government continues to ignore the facts and the arguments that have been presented, instead opting to claim "the only cognizable argument the defendants can and

do make is that there was a twelve-day delay in receiving discovery." Docket Item 230 at 29-30.

Claiming there was only a "twelve-day delay" in providing discovery demonstrates the government continues to miss the point of the Court's efforts to highlight its obligations to timely produce discovery to the accused.

The Second Superseding Indictment was filed on January 5, 2024, when the trial team was not on trial in *US v. Bongiovanni*. The government could have worked to produce the discovery then, but there is no evidence that the government made any substantive efforts towards disclosure.

Instead, the record demonstrated that despite having moved for detention on almost all of the defendants, the government opposed all defense efforts to commence the discovery process.[17]

When counsel for Mr. Gerace first addressed the topic of discovery disclosure at his arraignment, the government opposed efforts towards disclosure, claiming without explanation, that disclosure at that stage would somehow cause delay.

When counsel for Mr. Gogolack requested a deadline for discovery at a status conference in January, the government inexplicably argued that a deadline for discovery should not be set unless a motion deadline is set in conjunction with it.

---

[17] In the Factual and Procedural Background section of the Government's Appeal, it again ignores that the trial team opposed efforts by defendants to start the discovery process in January.

There is no evidence that the government was doing anything to further the disclosure efforts even though the *US v. Bongiovanni* trial had not yet started.

It was not until the status conference on February 23, 2024, that the Magistrate Judge indicated that he was going to set a deadline for the government to provide discovery. At that point, forty-nine (49) days had already passed since the filing of the second superseding indictment.

The Magistrate Judge appropriately estimated that sixty (60) days should be enough to complete the disclosure of discovery. When added to the time that had already passed since the filing of the indictment, that would have amounted to one-hundred nine (109) days, an extraordinarily long amount of time for the government to produce discovery.

But the government insisted that it needed 90 additional days despite the fact that the defendants remained in custody and would clearly be prejudiced by any delay. The 30-day "cushion" would result in a discovery deadline of May 23, 2024.

That deadline was set one-hundred thirty-nine (139) days after the indictment was filed. That is an exceedingly lengthy amount of time for the government to produce discovery, especially when defendants are in custody.

The Magistrate Judge was appropriately concerned about the length of delay the government was requesting, but it attempted to balance its concerns with a directive that discovery be provided on a rolling basis.

Given the length of time that was afforded to the government as a deadline to conclude discovery disclosure and given that discovery was directed to be provided on a rolling basis in the months that preceded the deadline, the government's willful violation of the Discovery Order was egregious, as recognized by the Magistrate Judge in his Decision and Order when he identified it as bad faith. Docket Item 173 at 5.

The finding of bad faith supported a sanction more severe than that ordered in other cases, such as *US v. Morgan*, where the initial decision to dismiss without prejudice noted that the Court was not prepared to make a determination of bad faith, and notably, the defendants were not in custody.

When the District Court in *Morgan* was presented with additional evidence of potential bad faith, the Court ordered a hearing and was prepared to reconsider its decision to order the dismissal be without prejudice. Here, the Magistrate Judge, having appropriately found bad faith, could have recommended this Court dismiss with prejudice. In comparison to *Morgan*, which was heading in that direction, dismissal with prejudice would have been more appropriate here, particularly given the defendants' custody statuses.

Nonetheless, the Magistrate Judge settled on far less severe sanctions.

## B. The Government Fails to Recognize the Prejudice to the Defendants

Relying on the false premise that the government's efforts only resulted in 12 days of delayed disclosure, it argues "this delay alone, particularly at this early stage in the case, is insufficient to create prejudice." Docket Item 230 at 30.

As discussed above, the efforts to delay disclosure were far more substantial than the 12 days that passed following the deadline set for the conclusion of rolling discovery. The government successfully opposed early efforts to set a deadline, it advocated for an absurdly long, extended deadline to conclude discovery, it suggested to the Magistrate it would engage in rolling discovery but provided none, and then, it blew pass the Court-ordered deadline to conclude discovery and chose to continue to withhold discovery.

Setting aside the obvious, that the delayed disclosure has extended the pretrial detention of the majority of defendants, while they are still not permitted to review or even discuss discovery pursuant to the temporary "Attorneys' Eyes Only" restriction, the defendants have repeatedly identified other examples of prejudice from the delayed disclosure.

For example, throughout the fall 2023, the government charged the majority of defendants in this case, one by one, in separate cases. In each instance, in an effort to secure the defendants' detention, the government alluded to and, at times, directly referenced portions of the narrative that would be used to form the second superseding

indictment. But the government withheld the discovery that was applicable to these allegations.

This prevented the defendants from effectively rebutting the allegations or providing substantive context, which the government often omitted during the course of its proffer. Some of the defendants have identified specific comments made during those detention hearing that are easily rebutted by review of the discovery.

Nonetheless, when defendants move for release, the government advocates for the continuation of the detention orders issued following hearings where it maintained an unfair advantage, arguing there is no change in circumstances.

Furthermore, the government made allegations that would permeate the media during the course of the early detention hearings, and those allegations would publicly prejudice the individual defendants even before they were charged in this indictment; the delayed discovery has permitted much of those public allegations to settle in the public forum without any response or rebuttal for almost a year.

This may have a particularly negative and prejudicial impact on Mr. Gerace who faces a trial in this District in *Bongiovanni et al*, on a hope that jurors were not consciously or subconsciously impacted by the coverage of the early proceedings in the cases related to this investigation, which constantly referenced Mr. Gerace in the media reporting.

Mr. Gerace is also uniquely prejudiced, because the Government's delay in disclosure also prevented counsel for Gerace from timely flagging evidence of

prosecutorial judge shopping, that might have helped resolve the government's motion

practice attempting to disqualify counsel in *Bongiovanni et al*, much quicker.

For example, because defendants do not receive a copy of related case filings,

counsel for Mr. Gerace had no idea what was presented or omitted from the related case

filing in *Gogolack et al*, but at an appearance in *Bongiovanni et al*, on March 15, 2024, this

Court confronted the government on its selective case filings.

> THE COURT:
>
> I'm sorry, there were cases filed that were clearly related to this case without related case forms from your office, right? The -- the Gogolack case, and several others that are related to Gogolack. In fact, the ones that were related Gogolack were filed with related case forms after Gogolack was filed, related after it was assigned to Judge Sinatra, then related case forms were filed.
>
> Now, the fact that related case forms were not filed in Gogolack and the other cases related to the Gerace case, that can't possibly be an attempt to judge shop, can it?
>
> Case no. 19-cr-227, Docket Item825 at 10-11.

The government responded with the following explanation:

> When we had a -- when we had Crystal Quinn die in Wellsville, New York, that is all we knew. In fact, I think as this Court knows, it was her attorney that notified me that she was dead. The circumstances, the situation, were all unknowns. So we looked into it.
>
> The very first charge, though, was a drug and gun case charging Simon Gogolack. At that point in time, it would have been premature and borderline disingenuous to relate Mr. Gogolack's case to Mr. Gerace's case.

Case no. 19-cr-227, Docket Item825 at 11-12.

The defense had no way of responding to these comment, because discovery in *Gogolack et al* had been delayed, but months later, when counsel finally received the discovery, it learned that the investigation regarding Crystal Quinn's death was opened as an FBI subfile of the investigation underlying *Bongiovanni et al*, and it was assigned the same case file number. All investigative efforts into Mr. Gogolack, from the start, were conducted under the same FBI case number as the investigation into Mr. Gerace.

The efforts to delay discovery clearly benefited the government in multiple respects, and it prejudiced the defendants, particularly Mr. Gerace, whose counsel finally received the tens of thousands of pages of discovery in *US v. Gogolack*, as they were approaching the trial date in *Bongiovanni et al*, almost assuring that counsel would have to split its attention between motion practice in *Gogolack* and trial in *Bongiovanni*.

### C. THE GOVERNMENT'S APPEAL FAILS TO ADDRESS THE GOVERNMENT'S MISREPRESENTATIONS MADE REGARDING ITS DISCOVERY EFFORTS

When asked on February 23, 2024, whether rolling discovery would be possible, the government indicated that it believed that there was "material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment." Feb. 23, 2024 Transcript at 10.

The government's representation on February 23, 2024, is not supported by any evidence within the record. The government was given multiple opportunities to address its efforts to prepare discovery.

The government's motion for an exclusion of time was filed with an affidavit that addressed discovery disclosure. Docket Item 123-1. The affidavit did not address any efforts related to discovery preparation prior to February 23, 2024, and only mentions that date in reference to the status conference that was held. The affidavit then, under the heading "Preparation for Discovery Production," makes a temporal jump to May 16, 2024 without detailing anything that occurred earlier other than there had been "nearly three-months of working… to collect, organize, bates-stamp, process, and review discoverable material." Docket Item123-1 at 5-6.

The sworn affidavit further stated that "[u]ntil the collection, organization, processing, and review of the discoverable material had taken place, it would not have been clear what size hard drive would be required to store the discoverable material for production." Docket Item 123-1 at 6.

In June, when discovery was finally made available, an index was provided with 15 columns of information, and 12,992 rows, for each item of discovery. One of the columns is titled "File Path." Review of the index, reveals that the file path for the vast majority discoverable items includes the file path:

*/001 May 2024 Discovery/001. FBI Discovery Recieved 2024-04-26/1st Discovery Production to USAO 04_26_24/*

This portion of the file path is contained in 12,195 items. It indicates the "1st Discovery Production" was not received by the US Attorney's Office until April 26, 2024, over two months after the February 20, 2024, conference where the government represented to this Court that in order to receive a 90-day deadline, it would provide rolling discovery, because there was "material that is probably close to ready to go out at this point because we've obviously been working on it since the return of the indictment."

After reviewing the index and noticing the information contained in the file path column, this issue was brought to the Court's attention for the first time at the motion arguments on July 22, 2024.

After being pressed on the implication of that file path, the government offered denied that it was indicative of any delay regarding efforts to produce discovery, stating the following:

> The date that Mr. Foti is referencing is when material that had been getting combined and put together and selected and organized for months by the FBI and HSI was dropped off in a hard drive to the U.S. Attorney's Office to begin the process of Bates numbering.
>
> 7/22/24 Transcript at 23.

The explanation presents two significant issues for this Court to consider.

First, the statement again implies that the government, on its own, had completely disregarded the Magistrate Judge's directive for rolling discovery, a necessary component of the decision to grant 90 days for disclosure.

Second, the statement only raises more questions regarding the government's representations related to its discovery efforts. If the US Attorney's Office received a physical hard drive on April 26, 2024, then it begs the question: why could the US Attorney's Office not identify the size of the hard drives it would need from defense counsel to produce the discovery? It obviously knew the physical storage capacity of the drive it received from the FBI and other larger digital items should have been relatively easy to calculate. There is no clear reason why defense counsel would be informed it needed to obtain and deliver a 3 terabyte hard drive only days before the deadline to conclude the rolling discovery disclosure.

Furthermore, at that appearance on July 22, 2024, the government stated that discovery production "started when we had the status conference, if not before then." 7/22/24 Transcript at 24. This statement appears to be in contrast to the representation in February that "we've obviously been working on it since the return of the indictment."

These statements present inconsistencies by officers of the Court surrounding the discovery efforts. The government continues to avoid addressing them in an appeal that calls for sanctions related to the discovery violations.

The defendants had sought a hearing to clear up the inconsistencies and factual gaps in the record, but the government opposed those efforts, and even now, the government avoids asking that that the matter be remanded to the Magistrate Judge to conduct a hearing to clear up the discrepancies, and instead merely asks for a less significant sanction, which would amount to almost nothing of significance.

### D. THE IMPOSED SANCTIONS WERE LESS SEVERE THAN NECESSARY TO DETER FUTURE MISCONDUCT

The imposed sanctions only provided minimal relief to the defendants and virtually no prejudice to the government.

The disqualification of three of the AUSAs who have entered appearances in this case, leaves the US Attorney's Office for the Western District of New York in full control of the case. Any other AUSAs from the office can step in, including any of the multiple other prosecutors who previously entered appearances in this matter.

A sanction identifying the time as counting against the government for constitutional speedy trial purposes provides minimal benefit to the defendants, because the delay was clearly the responsibility of the government's regardless of whether it was articulated as a sanction or not. The government opposed early discovery deadlines, made no efforts towards disclosure, then advocated for an extraordinarily long period of time to conclude discovery, and provided no discovery during that time period at all, in violation of the Magistrate Judge's Order.

Finally, in regard to the Protective Order, the government has already filed multiple submissions stating its position why its preferred protective order should be ordered, which included multiple misstatements of fact, particularly pointed at defense attorneys in this district and bizarre allegations directed at attorneys in this case. The government already had their opportunity to be heard.

The government's proposed protective order was inappropriate in multiple respects, and the defense had proposed a protective order that removed the superfluous and inappropriate paragraphs form the government's protective order. The imposition of the defense-drafted protective order is not a sanction, because if a protective order is to be issued in this case, the defense proposed protective order was the appropriate order to issue.

The government is not truly prejudiced and will likely not be deterred in regard to future conduct. To the extent that the government's appeal argues "the Magistrate Court failed to impose the least severe sanction" (Docket Item 230 at 30), the defense agrees, but only because the sanctions impose are not severe enough to offset the prejudice sustained by the defendants, particularly Mr. Gerace. The least severe sanction is far greater than what has been imposed up to this point.

## IV. CONCLUSION

Thus, for all of the reasons set forth above, Mr. Gerace respectfully requests that this Court deny the government's appeal of the Magistrate's Decision and Order, calling

for a less severe sanction to be imposed, and consider the defendant's pending appeal, requesting a more severe sanction that that which was initially imposed by the Magistrate Judge.

Dated: October 8, 2024

/s/ Mark A. Foti_____
Mark A. Foti, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that, on October 8, 2024, this memorandum is served on all counsel of record by electronically filing the submission with the Clerk of the United States District Court for the Western District of New York using the Court's Case Management/Electronic Case Filing system.

DATED:  October 8, 2024
        Rochester, New York

                                        s/Mark A. Foti
                                        Mark A. Foti, Esq.