IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

               v.                                       **23-CR-99-LJV-JJM**

HOWARD HINKLE, JR.,

                         Defendant.

_____

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CONTINUED DETENTION

      **THE UNITED STATES OF AMERICA**, by and through its attorneys, Trini E. Ross,

United States Attorney for the Western District of New York, Joseph M. Tripi and Casey L.

Chalbeck, Assistant United States Attorney, of counsel, hereby files this supplemental

memorandum in support of continued detention as requested by the Court on October 10,

2024. *See* Docket Nos. 10, 217-2, 257[1],[2].

---

[1] Unless noted otherwise, "Docket" refers to the operative docket 23-cr-99. The government incorporates all of its arguments previously proffered in support of detention as though set forth fully herein.

[2] This memorandum will address (1) the evidence United States District Court Judge John L. Sinatra, Jr. ("Judge Sinatra") relied upon in his November 3, 2023, Order of Detention; (2) the Simon Gogolack's ("**GOGOLACK**") interview on August 2, 2023; and, (3) evidence pertaining to Hinkle's involvement in the conspiracies charged in Count 1 through 3, including Crystal Quinn's death. Based upon discussion in Court on October 10, 2024, it is the government's understanding that, because this memorandum is evidentiary in nature and refers to witnesses (although not by name), the Court will permit this filing to be made under seal.

## ARGUMENT

### I.    UNITED STATES DISTRICT COURT JUDGE JOHN L. SINATRA, JR. DID NOT RELY UPON CRYSTAL QUINN'S DEATH TO DETAIN THE DEFENDANT DUE TO HIS DANGEROUSNESS

On October 10, 2024, this Court indicated that the procedural posture of this case effectively requires it to determine whether there is presently new information new information that would have changed Judge Sinatra's detention decision. While this Court's review of the magistrate's decision is *de novo*, the Court indicated that, in sum and substance, it will not exercise its discretion to reverse Judge Sinatra's decision unless there is new information that would have caused Judge Sinatra to render a different decision. The simple answer to the Court's fundamental question is no—there is not new information warranting reversal of Judge Sinatra's detention decision. Judge Sinatra's decision to detain the defendant, which was affirmed by the Second Circuit, should remain undisturbed.

As the Court is aware, the defendant was initially charged via criminal complaint on October 24, 2023 ("predecessor criminal complaint") with firearm and narcotics-related offenses, and he was subsequently detained by Judge Sinatra. *See* Case No. 23-mj-5219. The facts underlying the defendant's predecessor criminal complaint mirror the charges pending against him in Counts 18 through 22 of the instant Second Superseding Indictment. Additionally, after the defendant was detained on drug and firearm-related charges, a Federal Grand Jury determined that probable cause exists to charge the defendant in Counts 1, 2, and 3—intertwined conspiracies charging obstruction, witness tampering, and retaliation against a federal witness, Crystal Quinn.

Notably, in rendering his decision to detain the defendant solely upon the charges set forth in the predecessor criminal complaint, Judge Sinatra relied upon the charges in the

complaint, the defendant's history and characteristics, and the strength of the evidence underlying the charges in the predecessor criminal complaint.   While Judge Sinatra characterized Crystal Quinn's death as "not irrelevant," to the government's detention proffer, his analysis was anchored in the charged firearm and narcotics offenses, the dangers inherent in those offenses, and the defendant's history.[3]   Specifically, Judge Sinatra detained the defendant based upon the following:

1. The charges in the predecessor criminal complaint.

2. The quantities of marijuana plants and firearms involved in the defendant's underlying conduct.

3. The strategic placement of weapons inside the defendant's residence.

4. The weight of the evidence—*i.e.,* government proffers pertaining to marijuana, text messages, sales , and firearms in conjunction with the defendant's marijuana sales along with the defendant's prior felony conviction [for Attempted Assault in the Second Degree].

5. The defendant's questionable employment.

6. The defendant's criminal history.

7. The defendant's mental health and substance abuse history.

8. The defendant's stated intent to do self-harm as referenced in a December 2021, incident wherein the defendant threatened to kill his wife and himself.

9. The defendant's conduct with FBI agents who were at his house [*i.e.*, a potential armed standoff appeared contemplated by an FBI agent and the defendant had a firearm practically within arm's reach at the threshold of his door].

*See* Docket No. 217-2 (Transcript of Oral Argument, Nov. 3, 2023), at 59:3-25, 60:1-19.

---

[3] And the government's proffer was limited.  The government's focus in mentioning that there was information that **HINKLE** was aware of a bounty on Ms. Quinn's life, was to demonstrate **HINKLE'S** connection to a criminal underworld.  It is axiomatic that people who are engaged in legitimate societal behaviors are not usually imparted with knowledge about the existence of a bounty on the life of a federal witnesses.  *See* Doc. No. 217-2 at 18:14-25.

To the extent Judge Sinatra referenced Crystal Quinn's then-uncharged death, his comments were measured and limited. *Id.* at 60: 5-7 ("The Crystal Quinn proffers are worth considering, even if they are not independently sufficient to detain the defendant, but they are not irrelevant, for sure."); 61:11-14 ("And I'm considering the -- **for what it is worth**, the -- what I've heard here today regarding the death of Crystal Quinn and the statement about her having a bounty on her life, which is corroborated by someone other than Mr. Gogolack.") (emphasis added).

As a result, this Court should continue to detain the defendant without delving more deeply into the facts underlying Crystal Quinn's death as set forth in the Second Superseding Indictment returned on January 5, 2024. The Second Superseding Indictment was returned 63 days after Judge Sinatra ordered the defendant detained on the firearm and narcotics-related offenses charged in the predecessor complaint. The determination of whether there is probable cause to believe that defendant **HINKLE** was involved in the obstruction/tampering/retaliation conspiracies charged in the Second Superseding Indictment, the Grand Jury's determination is final. *United States v. Contreras*, 776 F.2d 51, 54 (2d Cir. 1985). Moreover, a defendant's evaluation of the strength of the government's case against him, which is all the defendant's spin on cherry-picked portions of **GOGOLACK'S** FBI interview are, is not a changed circumstance. *See United States v. Speed*, No. 09-CR-329A, 2013 WL 1221479, at *3 (W.D.N.Y. Mar. 25, 2013) ("New and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event."); *see also United States v. Rodriguez,* No. 12-CR-

4

83-S, 2014 WL 2573327, at *2 (W.D.N.Y. June 9, 2014) (same); *United States v. Arrington*, No. 15-CR-33-A, 2022 WL 2586501, at *3 (W.D.N.Y. July 8, 2022) (same).

## II.     The Obstruction of Justice, Witness Tampering, and Retaliation Conspiracies

### A.     Legal Principles Underlying the Charged Conspiracies

On October 10, 2024, this Court requested the government to address the defendant's involvement in Crustal Quinn's death, and **GOGOALCK'S** interview with the FBI at the Depew Police Department on August 2, 2023.  Because the defendant is not substantively charged with murdering Crustal Quinn, and due to the complex and nuanced nature of the charged conspiracies—featuring a concerted effort to obstruct justice—discussion of the legal principles fundamental to the charged conspiracies is necessary to contextualize the evidence.

Count 1 alleges a detailed Conspiracy to Defraud the United States and to Obstruct Justice and Tamper with a Witness in violation of both the "defraud prong" and "any offense against the United States prong" of Title 18, United States Code, Section 371.  It is a so-called *Klein* conspiracy "If two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371.  The language of the "defraud prong" of the federal conspiracy statute that creates criminal liability for anyone who conspires "either to commit any offense against the United States, or to defraud the United States . . . ."  Pursuant to *United States v. Klein*, 247 F.2d 908, 921 (2d Cir. 1957), a "Klein Conspiracy" is an agreement to defraud the United States by interfering or obstructing lawful government functions through "deceit, craft or trickery, [and] by means that are dishonest." *United States v. Caldwell*, 989 F.2d 1056, 1058 (9th Cir. 1993).

The elements require: (1) the defendant entered into an agreement, (2) to obstruct a lawful function of the Government, (3) by deceitful or dishonest means, and (4) committed at least one overt act in furtherance of the conspiracy. *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996). A conspiracy to defraud charge is not unconstitutionally vague when the indictment alleges with particularity "the essential nature of the alleged fraud" and identifies the specific conduct which furthered the conspiracy. *United States v. Cueto*, 151 F.3d 620, 636 (7th Cir. 1998); *United States v. Helmsley*, 941 F.2d 71, 90-91 (2d Cir. 1991) ("What is required is only that an indictment charging a defraud clause conspiracy set forth with precision 'the essential nature of the alleged fraud.'"). The meaning of "conspiracy to defraud" is framed in general terms; it is impossible for Congress to anticipate, identify, and define each and every context in which an agreement to act would qualify as a conspiracy to defraud. *Cueto*, 151 F.3d at 635.

A *Klein* conspiracy can apply to any federal agency or district court. *United States v. Rankin*, 870 F.2d 109, 113-14 (3d Cir. 1989) (U.S. District Court). The Government must prove that the conspirators intended to harm the Federal Government, which can be established through circumstantial evidence. *United States v. Whiteford*, 676 F.3d 348, 359 (3d Cir. 2012). A defendant may use a third party to reach and defraud the Government. *See United States v. Tanner*, 483 U.S. 107, 132 (1987). Notably, the conspiracy does not require proof of an agreement to violate a specific federal statute or regulation, or direct evidence of an explicit agreement; a "tacit understanding" among coconspirators may be inferred from circumstantial evidence. It "is well established that the term 'defraud' as used in section 371 is 'interpreted much more broadly than when it is used in the mail and wire fraud statutes.'" *Ballistrea*, 101 F.3d at 831 (quoting *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988)).

The gist of the crime is an agreement to defraud the United States by interfering or obstructing lawful government functions through "deceit, craft or trickery, [and] by means that are dishonest." *Caldwell*, at 1058 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). Violating the defraud prong may also be accomplished by conspiring "to cheat the U.S. government of money or property, **or to interfere with its operations**." *United States v. Whiteford*, 676 F.3d 348, 356 (3d Cir. 2012) (citing *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007)) (emphasis added).  The statute places no condition on the method used to defraud the United States, and it reaches any "interference or obstruction of a lawful governmental function 'by deceit, craft or treachery or at least by means that are dishonest.'" *United States v. Collins*, 78 F. 3d 1021, 1037 (6th Cir. 1996).  The statute encompasses "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of the government," and, importantly, "neither the conspiracy's goal nor the means used to achieve it need to be independently illegal."  *Cueto*, 151 F.3d at 635 (citing *United States v. Jackson*, 33 F.3d 866,870 (7th Cir. 1994)); *United States v. Sans*, 731 F.2d 1521, 1534 (11th Cir. 1984).  If the Government's evidence demonstrates that the defendant conspired to impair the function of a federal agency, no other form of injury to the Federal Government is required to establish a conspiracy to defraud the Government. *See United States v. Dean*, 55 F.3d 640, 647 (D.C. Cir. 1995).  While conspirators must have an agreed upon objective to impede the Government, it need not be the sole or even a major objective of the conspiracy.  *United States v. Gricco*, 277 F.3d 339, 348 (3d Cir. 2002).  As in all conspiracy cases, an agreement can be inferred from a "concert of action" and "may exist by tacit agreement; an express or explicit agreement is not required." *United States v. Mann*,161 F.3d 840, 850-51 (5th Cir. 1998).

7

Here, as charged, the conspiracy was to defraud the United States District Court and Federal Grand Jury, and to otherwise to obstruct and tamper with witnesses, in several ways, including by, among other things: (1) preventing, influencing, and corruptly persuading Crystal Quinn from becoming a government witness and thereby preventing her from testifying before a federal grand jury (the March 2022 Grand Jury investigating Gerace for witness tampering); (2) influencing, obstructing, and endeavoring to influence and obstruct Crystal Quinn from testifying in United States District Court for the Western District of New York against Gerace in the case of *United States v. Gerace*, Case Nos. 19-CR-227 and 23-CR-37; and (3) obstructing, concealing, and covering up evidence related to the investigation into Crystal Quinn's death and the criminal activities engaged in by the individuals and groups that caused her death in order to prevent information from being discovered, subpoenaed, and presented to a Federal Grand Jury (the July 2023 Grand Jury) investigating the death of Crystal Quinn.   Relatedly, obstruction of justice requires the government prove that the defendant had a specific intent to obstruct or impede a pending judicial proceeding. The elements are: (1) that there was a pending judicial proceeding, (2) that the defendant knew this proceeding was pending, and (3) that the defendant then corruptly endeavored to influence, obstruct, or impede the due administration of justice.   There must be a "nexus" relationship in time, causation, or logic with the judicial proceedings so that the proscribed endeavor "must have the 'natural and probable effect' of interfering with the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995).   There is no requirement that the defendant's endeavors succeed or even that they were capable of succeeding (as long as the accused was unaware of the futility of his efforts to obstruct). *United States v. Tackett*, 113 F.3d 603, 611 (6th Cir. 1997).   As here, conspiracy to violate §1503 can

8

also be prosecuted under the general conspiracy statute, 18 U.S.C. 371. *United States v. Bruno*, 383 F.3d 65, 87-88 (2d Cir. 2004). *See* 23-CR-99, Second Superseding Indictment, Manner and Means at ¶5(a)(i)-(ix).

Notably, "[i]n this Circuit it is well established that the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." *United States v. Greenberg*, No. 21-CR-92 (AJN), 2022 WL 827304, at *10 (S.D.N.Y. Mar. 9, 2022). And it is unquestioned that this applies to *both* the offense and defraud prongs in the conspiracy statute. *United States v. Damra*, 621 F.3d 474, 506-07 (6th Cir. 2010) (declining to depart "from the general rule that the defraud and offense clauses are not mutually exclusive"); *United States v. Harmas*, 974 F.2d 1262, 1266 (11th Cir. 1992) (Section 371 "is written in the disjunctive and should be interpreted as establishing two alternative means of committing a violation."). Specifically, "given conduct may be proscribed by both the offense and defraud clauses, and the fact that a particular course of conduct is chargeable under one clause does not render it immune from prosecution under the other." *United States v. Gambone*, 125 F.Supp.2d 128, 134 (E.D. Pa. 2000) (citing *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092 (4th Cir. 1993)); *see also United States v. Haga*, 821 F.2d 1036, 1039 (5th Cir. 1987) (stating that offense and defraud clauses describe two different criminal offenses and therefore an indictment brought under § 371 may allege either or both offenses); *United States v. Stickle*, 355 F.Supp.2d 1317, 1327-28 (S.D. Fla. 2004), *aff'd*, 454 F.3d 1265 (11th Cir. 2006); *United States v. Trie*, 23 F. Supp. 2d 55, 61 n.8 (D.D.C. 1998); *United States v. Dale*, 782 F.Supp. 615, 618 (D.D.C. 1991) (holding that it is not duplicitous to charge both offense and defraud clauses).

9

Moreover, individuals remain in a criminal conspiracy until they withdraw, or the objectives of the conspiracy have been achieved. The Second Circuit has stated, that "(1) resignation from the enterprise does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law; (2) total severing of ties with the enterprise may constitute withdrawal from the conspiracy; however (3) even if the defendant completely severs his or her ties with the enterprise, the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations." *United States v. Berger*, 224 F.3d 107, 119 (2d Cir. 2000).

In that vein, statements made to individuals to induce them to take actions in furtherance of conspiracy objectives are conspirator statements even if the individuals taking such actions are not part of the conspiracy. While the declarant and a defendant must be members of the conspiracy, statements made during the course and in furtherance of a conspiracy simply "must be such as to prompt the listener ... to respond in a way that promotes or facilitates the carrying out of a criminal activity." *United States v. Maldonado–Rivera,* 922 F.2d 934, 958 (2d Cir.1990). Indeed, a statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green*, 887 F.2d 25, 27–28 (1st Cir. 1989)(coconspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance

10

requirement."). Alternatively, statements designed to recruit individuals to a conspiracy (*i.e.*, to file a frivolous civil lawsuit based upon manufactured facts), are also coconspirator statements. *United States v. Johnson*, 469 F. Supp. 3d 193, 216 (S.D.N.Y. 2019)(collecting cases). In *United States v. Graham*, statements made by coconspirators soliciting investors in a sham corporation were in furtherance of a conspiracy, 477 Fed.Appx. 818, 822 (2d Cir. 2012), and there are parallels to the making of false statements meant to induce participation in a civil lawsuit based upon a false premise.

"Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence," *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir.2007). The government need not show that the defendant knew all of the details of the conspiracy, "so long as he knew its general nature and extent." *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir.1994). Nor must the government prove that the defendant knew the identities of all of the other conspirators. *United States v. Downing*, 297 F.3d 52, 57 (2d Cir.2002). Indeed, a defendant may be a co-conspirator if he knows only one other member of the conspiracy, *see United States v. Manarite*, 448 F.2d 583, 589 (2d Cir.1971), and "a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy," *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir.1975).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



**B. Crystal Quinn's Death and The Simon Gogolack Interview[4]**

Given the nature of the charged conspiracies to defraud the United States, obstruct justice, tamper with, and retaliate against a witness, the entire **GOGOLACK** interview is a coconspirator statement that is incriminating as to **GOGOLACK** and his codefendants.

Indeed, thirty years ago, the Supreme Court recognized what ordinary human beings know to be true: "One of the most effective ways to lie is to mix falsehood with truth." *Williamson v. United States*, 512 U.S. 594, 599–600 (1994).

The Second Circuit's decision in *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006), is instructive. In *Stewart*, Martha Stewart and others were charged with conspiracy to obstruct justice [in violation of 18 U.S.C. § 371] and related offenses stemming from their efforts to cover-up insider trading related to her sale of stock. 433 F.3d at 291. As the investigation commenced, Stewart and others participated in a series of interviews with investigators that

---

[4] This section should not be construed as a bill of particulars, or as a complete statement of the evidence available to the government as against defendant Hinkle or any charged codefendant. However, a detailed review of some of the evidence is necessary to contextualize some of Hinkle's conduct and to address the questions posed by the Court during oral argument.

were designed to give "false and misleading responses to certain of the investigators' questions while shrouding those responses with an aura of accurate detail." *Stewart*, 433 F.3d at 291. On appeal, Stewart argued that the truthful portions of their statements to investigators must be excluded as "testimonial" under the Confrontation Clause. *Id.* The Second Circuit rejected Stewart's argument and observed that the crimes for which the defendants were convicted included co-conspirators' statements made in the course of and in furtherance of a conspiratorial plan to mislead investigators. 433 F.3d at 292. The Second Circuit further explained the reasoning behind its analysis, as follows:

> Here the truthful portions of the testimonial statements were made in furtherance of a conspiracy to obstruct justice. The essence of such a conspiracy necessarily contemplates that the conspirators would provide false information to government agencies during the course of their investigation and during interrogations that would produce testimonial statements of one or the other of them. It defies logic, human experience and even imagination to believe that a conspirator bent on impeding an investigation by providing false information to investigators would lace the totality of that presentation with falsehoods on every subject of inquiry. To do so would be to alert the investigators immediately that the conspirator is not to be believed, and the effort to obstruct would fail from the outset. As noted, the admissibility of such totally false statements, made in the course and in furtherance of the conspiracy, suffers no Sixth Amendment bar under *Crawford.* The truthful portions of statements in furtherance of the conspiracy, albeit spoken in a testimonial setting, are intended to make the false portions believable and the obstruction effective. Thus, the truthful portions are offered, not for the narrow purpose of proving merely the truth of those portions, but for the far more significant purpose of showing each conspirator's attempt to lend credence to the entire testimonial presentation and thereby obstruct justice. It would be unacceptably ironic to permit the truthfulness of a portion of a testimonial presentation to provide a basis for keeping from a jury a conspirator's attempt to use that truthful portion to obstruct law enforcement officers in their effort to learn the complete truth.

*Stewart*, 433 F.3d at 292–93. The Second Circuit held that "when the object of a conspiracy is to obstruct justice, mislead law enforcement officers, or commit similar offenses by making false statements to investigating officers, truthful statements made to such officers designed

to lend credence to the false statements and hence advance the conspiracy[4] are not rendered inadmissible by the Confrontation Clause." *Id.* at 293.

Here, as in *Stewart*, **GOGOLACK** and others gave a series of interviews, each one peppered with half-truths and lies, to advance the charged conspiracies, obstruct justice, and to cover-up the orchestrated death of Crystal Quinn. As a result, this Court should reject defense efforts to cherry pick a sentence of an interview, which was laden with lies and misrepresentations in furtherance of a conspiracy to obstruct justice, to rewrite history and undo Judge Sinatra and the Second Circuit's decision's concluding that the defendant should be detained because he presents a danger to the community.

**GOGOLACK'S** interview with the FBI on August 2, 2023, must be contextualized and viewed through the lens of the myriad false statements he made up to that point to Crystal Quinn's mother, to the 911 operator, to the Wellsville Police officers who responded to his house, and to the County Coroner, who showed up to remove Crystal Quinn's body from his residence. When viewed through the proper framework, consistent with the underpinnings of the Supreme Court's decision in *Williamson* and the Second Circuit's decision in *Stewart*, **GOGOLACK'S** statements are coconspirator statements in furtherance of the charged conspiracies, and his lies and half-truths far from exculpatory, but rather are part of the *res gestae* of the charged conspiracies and are admissible and incriminating against all of **GOGOLACK'S** coconspirators, including **HINKLE**.

**(i)     *Factual Overview***

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████







On February 3, 2023, Ms. Quinn was charged by criminal complaint, 23-mj-11, related
to threatening Facebook messages she sent to threaten ████████, a witness against
Gerace.  A copy of the Second Superseding Indictment in Case No. 19-CR-227 charging

**GERACE** was attached to Ms. Quinn's criminal complaint, and was readily available on Pacer. ███████████████████████████████████████████████████

███████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

On or about February 16, 2023, after the FBI visited Quinn and served her a target letter, Attorney 1 contacted Ms. Quinn at Gerace Attorney 1's direction in violation of the ethical rule against having contact with represented parties, to prevent Ms. Quinn from becoming a government witness and testifying against Gerace. *See* Count 1, Overt Act ¶17.

On March 9, 2023, Ms. Quinn testified before the March 2022 Grand Jury, and on March 23, 2023, the Grand Jury voted to indict **GERACE** with three counts of witness tampering and one count of distribution of cocaine. See Case No. 23-CR-37. In the interim, unknown individuals attempted to scare Ms. Quinn in order to influence and persuade her

against cooperating and testifying.  In particular, on March 13, 2023, unknown individuals placed dead rats on Ms. Quinn's mother's and roommate's vehicles, as follows:



The rat symbolism is a well-known threatening gesture, and Gerace and the Outlaws MC were highly motivated to silence Ms. Quinn.[6]  Indeed, by March 13, 2023, Ms. Quinn had proffered and testified against **GERACE** and had proffered about the Outlaws MC.  *See* Count 1, Overt Act ¶18. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

---

[6] ████████████████████████████████████████
████████████████████████

























---
[10] Adjusted from UTC to EST.

30.     On July 22, 2023, at approximately 5:51 p.m. EST, **GOGLACK** made an outgoing call to **HINKLE** and then called and texted Crystal Quinn.

31.     On July 22, 2023, at approximately 6:57 p.m. EST, **GOGOLACK** asked Crystal Quinn to drive him from Buffalo, New York to Wellsville, New York by texting, in part: "let's take ur whip [car] to the country [Wellsville]."

32.     On July 22, 2023, at approximately 9:31 p.m. EST, **GOGOLACK** received an incoming call from **HINKLE**, which lasted 16 minutes and 17 seconds.

33.     On the morning of July 24, 2023, **KNIGHT** and **HINKLE** exchanged a cellular telephone call, which lasted approximately 1 minute.

34.     Later that day, **KNIGHT** and **HINKLE** attempted to communicate by cellular telephone two additional times.

35.     On July 25, 2023, at approximately 11:59 p.m. EST, **GOGOLACK,** who was still in the Buffalo-area, texted IIINKLE that he "should be in town [Wellsville, New York] tomorrow give me a call then."


Source Extraction:











[16]







a.



b.





a. 

b.

c.

d.



Against the backdrop of concealment and obstruction as to the sequence and manner of Ms. Quinn's death, the entirety of **GOGOLACK'S** August 2, 2023, interview with the FBI at the Depew Police Department stationhouse contained coconspirator statements. During the interview, **GOGOLACK** made statements designed to distance both **HINKLE** and **GOGOLACK** from Ms. Quinn's death and/or its cover-up, and the bikers. Indeed, **GOGOLACK** concealed and obfuscated the true extent of his relationship with **HINKLE** and **HINKLE'S** nexus to the RBMC while mixing in some partial truths about the bounty that **GOGOLACK** and **HINKLE** each knew was on Ms. Quinn's life. *See Stewart, supra.*













---

[22] While the government believes it has set forth ample detail establishing the fact that **GOGOLACK'S** false statements were in furtherance of his conspiracy with **HINKLE** and others, as the government indicated in its Reply to **HINKLE'S** motion for release:

> To the best of the [government's] knowledge, no court has held that, in the context of a pre-indictment, detention hearing proffer in the midst of an active murder investigation, the government has to proffer defendant Gogolack's self-serving lies and attempts at misdirection, and then reveal all of its evidence disproving those lies. Indeed, *Brady* commands the government to disclose "evidence [that] is material either to guilt or to punishment" and explains that failure to do so "violates due process ... irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "*Brady* was primarily concerned with ensuring that 'criminal *trials* are fair.'" *United States v. Oseguera Gonzalez*, No. CR 20-40 (BAH), 2020 WL 1065448, at *4 (D.D.C. Mar. 5, 2020), *aff'd*, 805 F. App'x 8 (D.C. Cir. 2020) (quoting *Brady* 373 U.S. at 87). A pretrial detention hearing, however, "does not concern the defendant's guilt, innocence, or punishment." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 536–37 (1979) ("[T]he Government concededly may detain [a defendant] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment.")). As such, a detention hearing "does not implicate the due process concerns that animated *Brady*" and "[t]he law is well-settled . . . that the parties may proceed by evidentiary proffer at a pretrial detention hearing, and the government need only inform the court what it believes it can show at trial." *Id.*





## **CONCLUSION**

For all the reasons stated above, and in the government's prior proffers and submissions, the Court should revoke Judge McCarthy's Oral Release Order. The firearm and drug-related offenses were sufficient for Judge Sinatra, as affirmed by the Second Circuit, to detain **HINKLE** based upon his danger to the community. Since that time, HINKLE has been charged in complex and serious conspiracies related to the orchestrated death and cover-up of the death of a federal witness, Ms. Quinn.

---

[25] ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████

**REQUEST TO SEAL**

During oral argument, the Court indicated that it would potentially accept *ex parte* information pertaining to witnesses.  However, rather than preparing an *ex parte* submission, at this juncture the government has endeavored to anonymize witnesses to the extent practicable in order to share the entirety of the government's submission with defense counsel. Upon request, the government will make underlying information available to the Court.

**REQUEST FOR A PROTECTIVE ORDER**

Because this submission is evidentiary in nature, and it contains information about codefendants who have made statements, as well as information summarized from a victim and witnesses, the government requests that counsel for **HINKLE** retain all copies of this filing in their possession. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  ■ The government proposes to file a

---

[26] The government proposes to file a redacted version of this on the public docket available to all counsel.

redacted version of this on the public docket available to all counsel. Accordingly, the government respectfully requests:

1. That this sealed filing be maintained by counsel for **HINKLE**, and that no copies of it be provided to the defendant or any third parties;

2. That access to this unredacted sealed filing be restricted to counsel of record for **HINKLE** (at least until such time as the Court enters a Protective Order in 23-CR-99, at which time this sealed filing could be provided to counsel for all defendants under the terms of the protective order); and

3. That the government be permitted to file a redacted version on the public docket available to all defendants.[27]

## REQUEST FOR PERMISSION TO FILE AN OVERSIZED BRIEF

Because of the extent and nature of the details provided by the government, we respectfully request permission to file this oversized brief.

DATED:  Buffalo, New York, October 24, 2024

                                   TRINI E. ROSS
                                   United States Attorney

                                   BY:   s/ JOSEPH M. TRIPI
                                        s/CASEY L. CHALBECK
                                        Assistant United States Attorneys
                                        United States Attorney's Office
                                        Western District of New York
                                        138 Delaware Avenue
                                        Buffalo, New York 14202
                                        (716) 843-5839
                                        Joseph.Tripi@usdoj.gov

---

[27] ██████████████████████████████████████████

Case Number:
Recording:
Page:        1

# EXHIBIT A—TRANSCRIPT OF INTERVIEW OF
# SIMON GOGOLACK





























































































