1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK


- - - - - - - - - - - - - - X        23-CR-0099
UNITED STATES OF AMERICA,
                Plaintiff

            Vs.                      Buffalo, New York
JOHN THOMAS ERMIN,                   September 20, 2024
                Defendant
- - - - - - - - - - - - - - X


                    TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
                UNITED STATES MAGISTRATE JUDGE


                U.S. ATTORNEY'S OFFICE - BUFFALO
                BY: CAITLIN M. HIGGINS, ESQ.
                138 Delaware Avenue
                Buffalo, New York 14202
                Appearing on behalf of the Plaintiff

                MUSCATO, DIMILLO & VONA, LLP
                BY: GEORGE V. C. MUSCATO, ESQ.
                107 East Avenue
                Lockport, New York 14094
                Appearing on behalf of the Defendant


COURT REPORTER: Brandi A. Wilkins
                scalisba@gmail.com
                Kenneth B. Keating Federal Building
                100 State Street, Room 1250A
                Rochester, New York 14614

2

THE CLERK:  All rise.

THE COURT:  Good afternoon.  Please be seated.

THE CLERK:  We're on the record in criminal proceeding 23-CR-99, United States of America versus John Thomas Ermin for a hearing on detention.  Present in the courtroom are Assistant U.S. Attorney Caitlin Higgins, defendant Mr. Ermin with attorney George Muscato and United States Probation Officer Andre McCrae the honorable Jeremiah J. McCarthy presiding.

THE COURT:  Good afternoon, Mr. Ermin and counsel, Mr. McCrae.

MS. HIGGINS:  Good afternoon, Your Honor.

THE COURT:  We're here for Mr. Ermin's release which the Government opposes.  I have reviewed all the papers and I'll hear from counsel, and you can either remain at counsel table or come up.  Whatever you prefer.

MR. MUSCATO:  Thank you.  Good afternoon, Your Honor.  The release that we're asking for before, I get into the substance of it, is obviously that the Court consider releasing him from detention.  We appreciate that this is serious charges, but we're asking that he be permitted to be confined to his home on 41 Richmond Street which is owned for over 24 years

I believe.  He lives there alone with his wife. Whatever additional requirements would be acceptable to this defendant if he was released to his home which would include ankle monitoring, any kind of phone call monitoring, a surrender of his passport, and of course we would offer the house as security which we have the title to.  Additionally, there is a modest mortgage on it but there's approximately $190,000 to $200,000 in equity in that.

My client is not a man of a lot of means but we do have other vehicles that we might be able to pledge in addition to the home.  We believe that if the Court should grant this that that would certainly assure his appearance in Court.  I don't know -- I mentioned he would also surrender the passport that would effectively render it impossible for him to leave the country.

And of course, Your Honor, as you've observed, Mr. Ermin has a disability, a significant disability as a result of an automobile accident in 2000 in which he lost his leg and he also lost his wife as part of that.  So sometimes he's in the Courtroom with a wheelchair, sometimes he's able to ambulate in with his prosthetic leg.  So obviously he's a person that hasn't a great deal of opportunity

4

physically to flee, and I believe that the criteria that we've offered to the Court would assure at least the one factor that he would make himself available.

So with respect to the substance of this particular request, there is now ten months that my client has been incarcerated. The Government says, you know, that's not long enough. It doesn't comply with the cases that they cite, but the fact of the matter is, Your Honor, that they leave out one salient factor with respect to that case that's important here and that is who is responsible -- that is who is responsible for this delay. And clearly, based upon your earlier rulings, it was the Government notwithstanding the fact --

THE COURT:  Which has been stayed.

MR. MUSCATO:  Which has been what.

THE COURT:  Been stayed.

MR. MUSCATO:  It has been, and that is important too because when you initially made the ruling from the bench you had just kind of a little bit different attitude. Then after reflection and thought, you came to the conclusion that there was gross negligence involved and bad behavior quite frankly, and that's pretty significant here, and the fact that it has been a stayed not only does the three

5

months -- the constitutional three months that we talked about or that the Court imposed here apply as far as my client is concerned but they have appealed this and they have stayed this and we have yet to get an order, a protective order in place, and clearly this is going to take a number of months before we even get into the eyes only discovery, and yet my client continues to sit in jail and that's the criteria that the Arena case addresses, the change of circumstances that brings us -- gives us the opportunity to ask the Court to consider releasing him from detention.

The reason we're here today is because of the Government's actions notwithstanding its been stayed, and it would be significantly longer period of time before my client gets to even address the charges against him.  And I appreciate the presentence -- pre-trial services investigation here and the fact that they don't recommend release, but nevertheless they do acknowledge that there's a change of circumstances, and the Supreme Court has recognized that delay is a change of circumstances which gives the Court the opportunity to open this detention hearing but I didn't stop there.

I kind of was accused of being a little bit

6

of a copy cat with respect to the Hinkle matter, but there are some additional things that I also raised with respect to our prior detention hearing that was not available to us at that particular period of time. And for one, this whole thing is obstruction of justice, interference and ultimately leading to the death of a young lady.

And the theory was that she was lured into Wellsville by one of the participants in this indictment. I didn't have those emails, and it took me quite a while in light of the fact that the Court's ruling with respect to this to figure out where they were, how to get there and how to get them out, but when I did see them -- and I know they're under seal so I'm going to respect that, but when I did have a chance to review these emails, she wasn't lured there. He was being lured to her, and they were in this -- and I'm not disclosing anything that wasn't already disclosed by Mr. Tripi.

They were engaged in this romantic relationship. I don't know how long it's been going on, but for -- but for the purposes of today, if I had known that at the time that I appeared in front of Judge Wolford we could at least said well, wait a minute here, this wasn't a situation in which there

7

was some big conspiracy going on and this young lady was being lured into Wellsville for some sort of nefarious behavior.  The fact of the matter is all kinds of drugs were being discussed and she was romantically involved and asking him to come to her house for whatever they do in the relationship without me getting into the details.  That's number one.

Number two, which is an additional thing that I think is important is that following the detention hearing, so -- Mr. Tripi did what I thought was the right thing, he corrected the record with respect to the timeframe when Peter Gerace learned that this Crystal Quinn was cooperating with the Government.  Initially it was said was March and then now was pushed back to May.

There is a discrepancy as to when he made these ridiculous comments that he made, but it was clearly, clearly after my client's initial visit to him at the Niagara County Jail which was April 4 or 6, I forgot exactly the date, and then there was a subsequent visit.  But we don't know whether these events and this knowledge of him occurred after the subsequent visit or before, and I think that's an important factor which the Court, Judge Wolford could have addressed as part of that hearing.

8

Now they're going to say well, I didn't raise it in the appeal. I didn't, but that doesn't mean I waived it for a further detention hearing, and as the Court is well aware, the fact that it's clearly an error of appeal to the Second Circuit, and so I just didn't include that newly found information as part of that. And at that point in time whether that's standard I'm not quite sure it would have made any difference, but the fact of the matter is when you view that and you view the issue with respect to the activities between Mr. Gogolack and this young lady, it's clear that this was not some sort of a nefarious event.

I appreciate that what I'm doing is arguing the evidence that was presented at the time of the detention hearing, but as you were well aware, the evidence required in a detention hearing are pretty broad. Most of the time it's proffers, and if there's not an awful lot of substance other than what the attorneys have to say. Had I known what these emails now show, yes. I would have been able to respond, but I think they're important as far as any criteria to open this particular detention hearing.

They say well, my client is a bad person because he's a member of the Outlaws and he has the

9

ability, maybe he's in some sort of leadership role and he has the ability to bring allegiance of men and generate money and look at all the things he had in his house, his paraphernalia and the media coverage of some of the -- and pleadings of some of the members of his organization.

What is the relevance of that as far as him being a danger to society?  He -- most of it is first amendment protected information under any circumstances.  Mr. Ermin -- what is important, Mr. Ermin has no criminal record, no domestic violence record.  Has he ever had brush ups with the law?  Yes, but none of them ever resulted in any criminal convictions, and that's important because he's a 55-year-old man that has been a member of the Outlaws for 25 plus years, I believe, and he has no criminal record.

He is not tied to anything directly involving any bad conduct at all, and there is nothing that they can show other than the fact he's a member of the Outlaws that signals that he's some sort of a danger to society.  Nothing.  And yet that is of course one of the first criteria.  Home confinement doesn't change that at all.  It gives -- it has the same control over him as if he was incarcerated.

10

And I think lastly, and I raise this because I just wanted to see where it would go, the Court is aware of the fact that while in jail he's taken advantage of a lot of different programs and he's well respected in terms of participating in events, and I said and they want you to believe that somehow this guy is a danger to society because of the fact that he has control here, but there is not a single incident anywhere in the record that he while in prison ever encouraged them to do or whatever it might be somebody to do something derogatory as a result of this indictment.  The only conversations they have is between him and his wife, maybe a couple occasional people who call, and of course his wife visits him on a regular basis.  There is nothing here.  Jail is reflective of exactly the man that this person is.  He is an artist.  He graduated from an art school.  He ask asked in jail if he can assist people with artwork and things of that nature.  That's who this man is.  That's who's locked up, and I believe that the basis of the fact that there's significant change of circumstances the Court should consider releasing him to home confinement.  Thank you.

THE COURT:  Thank you, sir.

MS. HIGGINS:  Judge, may I?  I'm going to

attempt to use the Elmo so have some --

THE COURT:  Okay.

MS. HIGGINS:  -- patience with me.  Judge, we are here today because this defendant has been indicted by a Grand Jury on some of the most serious charges that someone can be indicted on.  He has been indicted, meaning that the Grand Jury found that there is probable cause to believe that he conspired with others to obstruct justice and to tamper with a witness, to among other things cause the death of a federal witness, Crystal Quinn, who as this Court knows was cooperating with the Government and was supposed to testify in United States versus Bongiovanni and United States versus Gerace.  That is why we are here today.

We have litigated the bad faith issue.  We have litigated those issues.  As Your Honor recognized that order is now stayed and is being litigated, but pre-trial delay as cited by the defense has been rejected by the Second Circuit as a reason for release particularly when we are dealing with the timeframe that we are dealing with here.

But I want to go back.  I want to start at the beginning and why we are here like I just said.  99% of the motorcycling public are law abiding.  There

12

are 1% who are not.  The Outlaws Motorcycle Gang has been recognized by law enforcement as a 1% club.  They are that 1% who by their own admission, by their own statements are not law abiding.  They are a club who might involve motorcycles but they are a sophisticated criminal organization, and Chief Judge Wolford recognized this extensively after having a two day detention hearing, recognized that it is a sophisticated organization.

It is an organization that is violent.  It is an organization that is engaged in drug trafficking.  And it is an organization that is espouses vitreal and hatred and these are just two of the examples, and these are exhibits, Judge.  I know that we submitted the exhibit list to Your Honor and I'm just going to show some of those right now and I'll reference some.

This is Government Exhibit 16A, and this photograph was found in the clubhouse.  At the last detention hearing, defense counsel said they're not racist.  They're not.  It doesn't have anything to do with that.  This isn't racist?  This is what this club stands for.  This isn't racist?  A swastika.  This is on a big wall in the clubhouse.  This is what this club stands for.

Judge Wolford rejected -- Chief Judge Wolford rejected the exact argument that defense counsel made today, that none of this matters, that this is irrelevant, that because as defense counsel conceded during the detention hearing that his client is the president of the Outlaws. That doesn't matter. You shouldn't consider it for detention. Chief Judge Wolford rejected that argument and the Second Circuit affirmed it and found that he is a danger to the community based on his leadership position in this dangerous organization. To the extent that defense counsel wants to relitigate those issues, this Court should reject that.

Now, this defendant, Mr. Ermin, or as he refers to himself in letters that we found Tommy O 1%er and his legions of brothers refer to him Tommy O 1%er, this exhibit which is his vest that was found at the clubhouse tells you everything you need to know. And this was all proffered, Your Honor, during the first detention hearing and I know Your Honor is aware. I submitted the transcripts to you and I know that you've reviewed them.

This patch, BBT, baseball bat team. You get that cash when you engage in an act of violence. This patch, the red lightning bolt swastika like patch

14

again signifies that this defendant got the patch for engaging in acts of violence.  He wears this vest.  He is proud of that.  This is the 1% club and this is Tommy O 1%er who above all else despises snitches and rats but wants you to believe that he should be released even though he's been indicted for obstructing justice and witness tampering for a rat.

He wants you to believe he won't do it.  He's not a danger to the community.  Judge, this was found in his house.  This is Government Exhibit 2A, and AUSA Tripi proffered that this was found during the execution of the search warrant, that this is his handwriting.  Nobody talks.  Everybody walks.  Make sure to know not to talk if arrested.  Shot, stabbed beat to cops or in Court.  If they don't understand this, we don't need them.

And some nice merchandise at the clubhouse as well.  Excuse my language, judge.  Talk shit, get hit.  Snitches get stitches.  In case anyone forgot, they had this nice demonstrative.  That's a rat with a neuse around its neck and this is Government Exhibit 17A.  Again, this was found at the clubhouse.  This is the type of defendant we're dealing with.  This is the type of organization that we're dealing with.

As I said, John Ermin is the National

President of the Outlaws motorcycle club.  His own counsel admitted it, and I can give you the transcript that's from Page 111-112 of the December 27 detention hearing, and actually, Chief Judge Wolford made afoot note about that as well in her decision, and before the Grand Jury returned an indictment that we've discussed now, before that Grand Jury returned the indictment, Chief Judge Wolford conducted like I said an extensive detention hearing for this defendant.

Even then Chief Judge Wolford held that there were no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance.  In fact, she used the words it is an inescapable conclusion.  Those are strong words.  It was a 34 page opinion, and as I said, the Second Circuit affirmed it, and regardless of all of those facts, this defendant wants you to ignore them all.  He wants to relitigate detention, and he's asking you to reopen his detention hearing based on change in circumstances.

And he says, again, the first is pre-trial delay.  The second is the evaluation of the evidence, and I'll get to that, Judge, because the text messages he's talking about were actually proffered during that detention hearing.  We'll get there.  In reality, the

16

only change in circumstance from December of 2023 is that this Court issued a release order which is now stayed for his codefendant Howard Hinkle Jr. Three days after Your Honor issued the oral release order, this defendant filed a motion for release. Plain and simple, the defendant is seizing on what he sees to be an opportunity. That's not what the Bail Reform Act is supposed to be used for. And the only other actual change in circumstance that is material is again that we now have a Federal Grand Jury indictment pending against this defendant.

I want to get to the standard for reopening a detention hearing. Before you rule on that issue and before we get to the factors relevant to detention, as Your Honor recognized in the Hinkle prior bail motion that he made that you denied, you said that the starting point in deciding to reopen a detention hearing is the original detention decision.

Beginning with that detention decision, Your Honor must then ask two questions, and the first is has this defendant presented new material information or a change in circumstances. If the answer is yes, then you have to ask if so would that information change or change in circumstances materially impact Chief Judge Wolford's detention decision. The answer

17

is no to both questions.  The inquiry should and must end there.

As I already stated, the Second Circuit has rejected pre-trial delay as a basis for release, and I just want to address some of the comments about responsibility for delay.  That is not an analysis that is appropriate for the Bail Reform Act.  That is an argument that I anticipate down the line if we get to that point where they're making speedy trial motions that defendant can raise in a speedy trial motion, but even then, the Second Circuit case of Espolin says even where the Government is accused of bad faith and the defendants have to file motions as they did here, Judge, they filed motions for sanctions, that time isn't counted against the Government.  That's Espolin, but we can get to that down the road when we're actually dealing with the speedy trial act.  Right now we're dealing with the Bail Reform Act.  And Your Honor, I cited many cases, some from this district but from the circuit talking about pre-trial delay and the Second Circuit rejecting it as a basis for release.

Now, going to the information that this defendant cites as the new material information or truly changed circumstance, the first, that Crystal

18

Quinn was in love with Simon.  I would direct Your Honor to Page 45 of the detention transcript, and I believe it was the first detention hearing.  That was proffered that Crystal Quinn seemed to have some feelings for the defendant, and I'm going to be very careful here, Judge, as Mr. Muscato was.  I don't want to go beyond our protective order that's in operation right now.  I'm not going to get into everything else, but what I found curious is that Mr. Muscato didn't address that at all even though parts of those -- that even though Mr. Tripi had proffered the fact that Crystal Quinn seemed to have feelings for Mr. Gogolack.  That's because it's not material.

Now, Mr. Muscato is making much of the fact that during some of the text messages it appeared that Ms. Quinn wanted Mr. Gogolack to come to her house. Where did they end up, Judge?  Yeah.  He went to her house, but where did they ultimately end up?  Where was Crystal Quinn killed?  Not at her house.  She was killed in Wellsville.  She was killed after Mr. Gogolack lured her to Wellsville and brought her to a poker game, and we know what happened after that. That is not a material or new circumstance that merits reopening the detention hearing.

Now, Judge, I am taking it a little bit out

of order, but with respect to the hit man quotes that Mr. Muscato raised in his motion, those quotes were actually proffered during the detention hearing. Again, December 19, Page 43 to 44 of the transcript, those quotes are proffered. That Mr. Muscato or the defendant don't like the fact that they were proffered or don't believe that that's what it meant makes no difference. That's exactly what it sounds like. The defendants estimation and characterization of the evidence that doesn't merit reopening the detention hearing.

And the correction letter, Judge, as Mr. Muscato conceded, actually two points that he conceded, one, he didn't include it in his record for appeal and he could have. The date of that letter, Judge, was January 6, 2024. It was sent to Chief Judge Wolford and it CCed defense counsel. If it was so material then I would think just as he is today Mr. Muscato would have raised that as a basis to reopen the hearing. He didn't.

He waited until September 12, 2024, and the letter doesn't change anything, Judge. It doesn't change anything because the fact of the matter is we know that this defendant met with Peter Gerace in jail only two times. Now, at the original detention

20

hearing, Judge, the defense wanted chief Judge Wolford to believe they were just talking about business at Pharaohs. That's it. They just had to meet twice to talk to business at Pharaohs. It just coincided with the dates that Mr. Gerace was furious that his motions for release had been denied. And as to the second meeting, it just so happens that three or four weeks later Crystal Quinn is dead.

The fact of the matter is, Judge, none of this is new. None of this is material. This is all a facade. They want you to reopen the detention hearing because they saw that Howard Hinkle had a release order. Pure and simple.

And I'm going to address the bond and property information. I know that was addressed in the motion as well. And as Mr. Muscato correctly stated, those may go to risk of flight, but they don't go to danger to the community. And that is not new information because he could have offered that at the first detention hearing. He didn't. Or contrary like we say in our papers, Chief Judge Wolford could have su esponte as we've seen judges do imposed those conditions if she saw them to be sufficient or asked about them. She didn't because they're not sufficient.

21

As to the letter from his peer counselor, the Government is happy that the defendant is seeking help in jail, but the fact that the letter says he wants to help other people, he wants the world to be a better place, then he should denounce the Outlaws, and if he can't do that, we know that's not true.  We know that's not true.  And it's certainly not a reason to release this defendant.

The statement that home confinement is the same and exercises the same control over the defendant is astounding.  In jail, we can log who visits the defendant.  There's a log of that.  In jail, there's a log of telephone calls.  In jail, your phone calls are recorded.  In jail, if you have email, your emails are recorded.  It's not the same.

Judge, this defendant -- just as Mr. Tripi proffered during the first detention hearing, just as Peter Gerace did when he had electronic monitoring, he had parties at his house.  This defendant is in a picture attending one of those parties while Peter Gerace is out on release.  There is nothing stopping the president of the Outlaws from having people come to him.  In fact, that was proffered during the original detention hearing.

There was surveillance of a meeting that

22

happened at the Holiday Inn near the airport where people from all across the country, Outlaws from all across the country came to Buffalo because he's the president. He sends the message, and in fact, Judge, he's still doing it in jail we reviewed his jail calls and Mr. Muscato is right. He does communicate with his wife often but he communicates with other people.

One on December 15, 2023, Judge, a Hill Billy who is also an Outlaw by the way asks the defendant if there's anything that he can do for him and what does this defendant respond? The best thing you can do is you tell every single, and I won't say the word, judge, an expletive, Outlaw in this nation that that phone, meaning his phone, is no longer mine and it is in the possession of the fucking man. Pass that along to the other clubs. Get ahold of Tim and all them guys and let them know. He's still sending messages. Don't communicate with me on that phone. The Feds have it. Sending messages to Outlaws across the country from jail. He's doing it from jail.

He also said things like on December 9, 2023, he's upset that nobody put money on his commissary and that they better look out when he gets out, and if these guys don't put money on his account, they will hate him when he gets out. He's talking to

Two Cents who seems to be sort of like the consigliere from the Mafia. He -- he's an Outlaw and he's a legal investigator who is advising the defendant in jail and this legal investigator says he's disrupted five cases and brought 13 innocent men home. He means exactly what he says. Two Cents tells him the Government is listening to us right now. The Government is listening to us and is advising him not to cooperate because that's what the Outlaws are about, no snitching.

And one thing that came up and I know that Judge Wolford addressed it as well is in terms of risk of flight, Judge Wolford was deeply troubled by the fact that the defendant omitted his travel history which -- international travel history which seemed to be pretty significant. And also omitted the fact that the defendant had a bank account.

Well, it appears as of at least December 10, 2023, that the defendant also has a bit coin account and I just asked pre-trial services if they were ever apprised of that and they weren't. Judge, this defendant has resources. He just has to snap his fingers. He's had brothers send him money when he was sick before. He's in charge. People do what they tell him to do.

24

Judge, at this point, I would ask Your Honor to rule on first whether to reopen the detention hearing, and then if you are inclined to reopen, it we can proceed to detention, but I would ask if you are inclined to reopen it that we be able to appeal that discreet decision because a detention hearing in this case, which I'm prepared to start today, will be extensive again.  It will be another, you know, two days I would say as it was in front of Chief Judge Wolford, but I appreciate the time to go through this and if you have any questions for me.

THE COURT:  Thank you.

MS. HIGGINS:  Thank you.

THE COURT:  Mr. Muscato, anything further?

MR. MUSCATO:  If I may, Your Honor.  It's --

THE COURT:  Yeah.  Get near the mic.

MR. MUSCATO:  Sorry.

THE COURT:  Thank you.

MR. MUSCATO:  So the Government says to the Court look at these photos here.  He's a racist.  He's a Nazi.  He has all these patches on here, baseball bat fight club, all these things all which are really first amendment rights, but in spite of the fact that they convey nefarious kinds of ideas and activities and things of that nature, but what they are not

25

saying to you, he hasn't done anything wrong in his life.  He has no criminal record at all, and that is what really is important here as to whether he is a menace or a danger to society.  When he's not being watched when he is out and about and he is not a convicted of any crimes.

So they can say what they want about all of these little things that are part of the insignias and things of that nature of the Outlaws, but this person does not have any criminal record.  And I know that there was this thing about the fact that when you talk to Mr. McCrae and Probation that he was asked about going out of the country, and he said he hadn't been and actually he had gone to Mexico, I believe.

The other day I was asked have you been out of the country been on any vacations and I said no, and then somebody said well, didn't you go up to the Shaw Festival last month, and I said oh, I forgot.  That's out of the country.  And that was the same thing here with respect to having gone to Mexico.  Sometimes it just doesn't always register with people, but it's not that big of a deal because we are offering to surrender his passport and we're offering to do whatever it takes to ensure his appearance in Court.  Thank you.

26

THE COURT: All right. Thank you both.

MS. HIGGINS: Thank you, Judge.

THE COURT: These are very serious charges, but he -- he is entitled to defend himself and move his case along. Right now we are at a stand still on that. As you know, I did order Mr. Hinkle's release, the codefendant. I think there's some factual differences between the two scenarios, but in any event, that release order has been stayed right now.

Judge Wolford ruled and I've reviewed her January 3, 2024, decision extensively that was before the indictment was returned, and at this point, I see no reason to revisit that but I will say this. I am concerned. I continue to be concerned about the delay in this case. Right now, my hands are tied. I -- I'll abide the event until some decision is made one way or the other, but I can't do anything right now in terms of progressing the case. I can't -- I can't adopt a protective order because part of my sanction was that the defendant -- the Government would have no role in the negotiations of that. That's been stayed.

So everybody is sitting right now and that is frustrating to me, but nonetheless, we are where we are. I don't find at this basis at this time a reason to grant him release. I do find that what has

27

occurred and what led to my detention -- excuse me -- my sanctions order would be a change of circumstances which would enable me to at least consider an application for release, but having considered what's been argue and what Judge Wolford ruled, I don't find that there's a basis at this point to order Mr. Ermin's release, and therefore, I will not do so. That's not to say that down the road I might not take a different view.  So we'll leave it at that.  Thank you.

MR. MUSCATO:  Thank you.

MS. HIGGINS:  Thank you, Judge.

(Proceeding concluded at 2:41 p.m.)

**CERTIFICATE OF COURT REPORTER**

I certify that this is a true and accurate record of proceedings in the United States District Court for the Western District of New York before the Honorable Jeremiah J. McCarthy on September 20, 2024.

S/ Brandi A. Wilkins

Brandi A. Wilkins

Official Court Reporter