IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.          23-CR-99-LJV

SIMON GOGOLACK, et al.,

     Defendants.
_____

## MOTION FOR RECONSIDERTATION OF ASSIGNMENT OF SECOND CJA COUNSEL FOR DEFENDANTS

  **THE UNITED STATES OF AMERICA**, by and through its attorneys, Joel Louis Violanti, Acting United States Attorney for the Western District of New York, Joseph M. Tripi, Assistant United States Attorney, of counsel, hereby file this motion for reconsideration regarding the appointment of second court appointed CJA counsel for defendants.

## STATEMENT OF FACTS

  On January 5, 2024, defendants Gogolack, Gerace, Ermin, and Hinkle were charged with, among other things, witness tampering conspiracy in violation of 18 U.S.C. § 1512(k) (Count 2) and witness retaliation conspiracy (Count 3) in violation of 18 U.S.C. § 1513(f). *See* Sec. Super. Indict., at 31–34, Doc. No. 24.[1] The Second Superseding Indictment does not allege any death penalty statutory aggravating factors and, therefore, the government may not seek the death penalty on the pending indictment. *See* 18 U.S.C. § 3593(d) ("[*i*]*f no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death* authorized by

---

[1] Defendants Roncone, Knight, and Barber are charged in various other counts—and each defendant is represented by one attorney.

law.").  Indeed, because the statutory aggravating factors "increase the maximum penalty for a crime" from life imprisonment to death, they "must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  *Jones v. United States*, 526 U.S. 227, 234 n.6 (1999).

On January 10, 2024, the defendants were arraigned.  *See* Doc. No. 46 (Transcript of Arraignment).  At that time, the government explained that the indictment did not allege statutory aggravating factors and therefore the maximum penalty is life imprisonment.  *Id.* at 4-5, 16.[2]

On January 19, 2024, defendant Gerace filed a motion seeking to appoint learned counsel, *see* Doc. No. 42,[3] and on January 26, 2024, the government filed a response in opposition.  *See* Doc. No. 50.

On January 31, 2024, counsel for defendants Gerace and Hinkle argued in support of their request for assignment of learned counsel.  *See* Doc. No. 66 (Transcript of Status Conference).  Counsel for Gerace and Ermin also requested to be assigned even though they were retained on other related cases.  *Id.*

On February 20, 2024, the government moved for disclosure of Gerace and Ermin's financial affidavits, *see* Doc. No. 71, the defendants opposed, *see* Doc. Nos. 76, 79, and the Court

---

[2] Page number references are the ECF assigned pages numbers, not the original transcript page numbering.

[3] Hinkle filed to appoint learned counsel on January 24, 2024.  *See* Doc. No. 47.

ultimately denied the government's motion for disclosure and granted Gerace and Ermin's motions assign their privately retained attorneys as CJA counsel, *see* Doc. Nos. 84, 94, 109, 111.

On February 23, 2024, just 49 days after charges were filed, the government filed notice that it would not seek the death penalty in this case. *See* Doc. No. 75. The government's official notice not to seek the death penalty terminated Gerace and Ermin's right to learned counsel and effectively rendered Gerace's motion for learned counsel moot. *See* Doc. No. 42, 94. Importantly, defendant Gerace's motion for assignment of second counsel **was not** predicated upon the complexity of the case, but rather *entirely* upon the premise that this could be a death-eligible case. The words "mega case" or "complex case" are absent from Gerace's motion for learned (second) counsel. *See* Doc. No. 42.

On March 8, 2024, Gerace's previously retained attorney, Mark Foti, Esq., was formally assigned as CJA counsel. As set forth above, the Court exercised its discretion to use CJA funds so that Gerace could keep his retained private attorney and maintain continuity of counsel, rather than using the CJA's system of random assignments to assign Gerace a CJA attorney. After assigning Mr. Foti, the Court stated: "Okay. As you all know, the Government, I think, a week ago today advised that the death penalty issue is now off the table. *So at this point, I think Mr. Foti is -- is adequate and we'll proceed on that basis.*" *See* Mar. 8, 2024, Tr. at 3:15-19 (emphasis added).[4] The Court denied the request to appoint second counsel at that time. *Id.* at 4-5; *see also* Doc. No. 94.

---

[4] A copy of this transcript is attached as **Exhibit A**.

On November 21, 2024, after months of litigation, the District Court vacated this Court's Decision and Order regarding sanctions and charged five months of time to the government for the purposes of a Sixth Amendment speedy trial analysis as a sanction. *See* Doc. No. 310.[5]

On November 22, 2024, the Court issued a Scheduling Order, which required all defendants to file dispositive and non-dispositive motions by January 22, 2025. The deadlines in the Scheduling Order were set after the Court received input from the defendants as to when they would be able to prepare and file motions. *See* Doc. No. 312, Minute Entry 11/22/2024. Significantly, because the government provided comprehensive discovery in early June 2024, as of January 22, 2025, the defendants would have had over seven (7) months to review discovery and file dispositive and non-dispositive motions.

On January 15, 2025, just seven days before motions were due, defendant Gogolack, joined by all defendants, filed a motion seeking a thirty day extension of the motions deadline. *See* Doc. Nos. 340, 346. In seeking the extension, *not a single defendant stated that the case was "unusually complex" or a "mega case" such that they needed additional attorneys assigned.* In fact, the extension requests made it clear that the assigned CJA attorneys for the defendants were working together. *See* Doc. No. 346-1 at ¶¶ 10-11 ("Counsel for the defendants have also discussed various non-dispositive issues, including potential discovery issues that may still need to be resolved. It appears to potentially benefit Mr. Gerace to remain on the same schedule as the other defendants, at least for purposes identifying any remaining discovery issues that may

---

[5] The Court should be wary that this sanction, which the government acknowledges was appropriate, may create incentive for the defendants to strategically delay this case. One way to do that is to on-board additional attorneys and then delay the motions schedule for those additional attorneys to get caught up to speed. If a reviewing Court determines that the time is neutral, or was caused by the Court, it may be attributable to the government in a Sixth Amendment context even if that is not this Court's intent.

exist." […] "The Amended Scheduling Order that has been issued by this Court provides for a reasonably short extension and keeping Mr. Gerace on the same schedule, for now, will potentially avoid multiple court appearances and duplication of arguments that can be addressed simultaneously by the defendants as long as they remain joined."). On January 16, 2025,[6] over the government's objection, the Court granted the defendants' joint motion for an extension of time and issued an Amended Scheduling Order that required all defendants to file dispositive and non-dispositive motions by February 21, 2025. *See* Doc. Nos. 344 (Text Order), 345 (Amended Scheduling Order).

On February 5, 2025, the newly sworn Attorney General of the United States issued an internal guidance memorandum to all Department of Justice ("DOJ") employees entitled: "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions." In the memorandum, the Attorney General made clear: "[T]his guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States […]." The memorandum further directed DOJ attorneys at the Capital Review Committee to review no seek decisions in all pending capital eligible cases between January 20, 2021, and January 19, 2025, and it provided them with 120 days to complete the internal review process. Notably, applying the 120 day time-period for internal DOJ review to the time-frames set forth in the Amended Scheduling Order—*the latest* the Court and the parties would know whether this case would be

---

[6] Between January 2024 and February 2025, the parties litigated issues related to detention, discovery, and sanctions, and the government produced searchable and organized discovery. *See generally*, Case No. 23-CR-99 (Docket).

impacted at all by DOJ's internal review would be June 5, 2025, which is before oral argument on motions is scheduled to occur.

On February 6, 2025, this Court entered a Text Order which read: "Although the government previously stated that it would not seek the death penalty against defendants Gogolack, Gerace, Ermin and Hinkle, the Department of Justice has now decided to reconsider such determinations in all death penalty eligible cases. In light of that recent development, a conference will be held on 2/10/2025 at 2:00 p.m. in the Genesee Courtroom, 6th Floor West, 2 Niagara Square, Buffalo, NY to discuss whether additional *learned counsel* should be appointed." *See* Doc. No. 350. The Court's Text Order was prompted by an *ex parte* submission by the Federal Public Defender, whose office represents defendant Simon Gogolack in this case. *See* Tr. Feb. 10, 2025 at 29. Significantly, from March 9, 2024 until February 9, 2025—a period of 11 months—not a single attorney for any defendant filed a motion or requested assignment of a second CJA attorney based upon the alleged complexity of the case, or for any other reason.

### The February 10, 2025, Status Conference

On February 10, 2025, the Court held a status conference and inquired as to whether the government had any information beyond that what was contained in the Attorney General's memorandum. The government did not have any additional information to report, and no specific information that the status of this case would change. Consistent with the Attorney General's guidance, the government argued that DOJ internal guidance did not create any rights for the defendants and urged the Court to refrain from assigning learned counsel. The government stressed that prematurely and unnecessarily assigning additional attorneys would—as it now has—create more delays in this case. In particular, the government stated, in part:

> [T]he new [defense] attorneys would want to weigh in on what motions to file and how to proceed with the case. And we're now 11 days away from motions being due. I imagine it would take a day or two for the Court to get attorneys. Even if you did it this afternoon, that's leaving ten days for the current attorneys to communicate with the new attorneys, review a very significant amount of discovery that's been provided and make determinations, which, ultimately, right now, we have a no seek. I have no reason to believe that that's going to change, other than the memo saying all decisions are going to be looked at.

*See* Feb. 10, 2025, Tr., at 10-11.[7]

In his renewed request for learned counsel, defendant Gerace regurgitated the same arguments, *see* Doc. No. 42, that this Court previously rejected after the government provided notice that it would not seek the death penalty.[8] During his initial colloquy with the Court, counsel for Gerace unequivocally stated that his request for second counsel was for learned counsel because of the potential for capital punishment, and not because the case was unusually complex,[9] as follows:

> I don't have the experience to be able to distinguish between what issues need to be preemptively raised in pretrial motion practice, **in a capital cases versus a very large mega case**. I don't know that. And I don't think the majority of the attorneys here, with exception, I think, of **Mr. Henry, was qualified as learned counsel, are in a position where they are able to identify whether we are making an enormous strategic error during the course of our motion practice that could impact a defendant who is potentially facing a capital -- a capital prosecution**.

*See* Feb. 10, 2025, Tr. at 18-19.

---

[7] A copy of the February 10, 2025, transcript is attached as **Exhibit B**.

[8] *See* Mar. 8, 2024, Tr. at 3:15-19 ("Okay. As you all know, the Government, I think, a week ago today advised that the death penalty issue is now off the table. So at this point, I think Mr. Foti is -- is adequate and we'll proceed on that basis.").

[9] As recently as December 2024, counsel for defendant Gerace skillfully and knowledgably handled a complex case. *See United States v. Peter Gerace, Jr.,* Case Nos. 19-CR-227/23-CR-37.

Counsel for Gogolack followed suit and claimed that learned counsel should be assigned because this case may later become a death penalty case. *See id.* at 22:19-25. Then, the Federal Public Defender, whose office represents defendant Gogolack and who submitted the DOJ's internal guidance to the Court to initiate the status conference, personally advocated[10] for the assignment of learned counsel, as follows:

> No, Judge. As you know, as the Federal defender, I brought to the Court's attention that the Department of Justice is going to review all of the prior no seek decisions of the last administration. It was quite literally one of the first things that the new Attorney General issued after being sworn in, so I think we should take it quite seriously. I do very much sympathize and appreciate with my colleagues across the aisle, that they don't necessarily know what the next steps are, but I don't think we should presume. We have a no seek. I think, the memo indicates everything is under review, so we do not have that now. Our plan requires assignment of counsel at the earliest possible moment, when a death eligible offense is charged.

*Id.* at 30.

***

> It is a plan that is drafted based on a model that was approved by the judicial conference of the United States. Every judge in this district has approved our plan and the Second Circuit has also adopted it. That plan requires appointment, without special findings. We've had criminal complaints where capital offenses are charged and counsel assigned. We have had cases before Federal charges are filed and counsel is assigned. The plan contemplates a case having learned counsel at the earliest possible moment. And I would say, Judge, I appreciate that there may be guidance forthcoming that will give reassurance to all that the prior no seek will be reinstated and go forward with a noncapital case, but that is not what we have today. And I would urge the Court to not put procedural form over Constitutional substance. The rights of the Sixth Amendment of these defendants in a capital prosecution is preeminent and I would respectfully urge you to assign counsel now.

---

[10] Neither the CJA Plan nor CJA Policies and Procedures for the Western District of New York (dated, Sept. 2022) provide that the Federal Public Defender will have an advocacy role in the assignment of counsel, including whether learned counsel should be assigned, but that is precisely what happened in this case. If the Federal Public Defender was going to become the advocate for Gogolack and other defendants, then the Federal Public Defender had no business initiating *ex parte* contact with the Court and discussing assignment of specific learned counsel with the Court before the government ever stepped into court or had notice of the Court's concerns.

*Id.* at 31.[11,12]

Next, after receiving input from other defense attorneys and the government, the Court indicated it would hold off on the decision to assign learned counsel and decided to hold the February 21, 2025, motions deadline in abeyance pending a status conference on March 5, 2025. *Id.* at 31-38. Promptly after the March 5, status conference date was scheduled and the February 21 motions deadline was held in abeyance, counsel for Gerace immediately pivoted and asked for assignment of second counsel on the basis that this case was a purported "mega case." In particular, counsel stated:

---

[11]    Under the District's CJA Plan, it is the Court's responsibility to ensure timely appointment of counsel. Specifically, "[t]he court, in cooperation with the Federal Public Defender **and the United States Attorney**, will make such arrangements with federal, state, and local investigative and police agencies as will ensure timely appointment of counsel." CJA Plan at 8 (available at: https://www.nywd.uscourts.gov/sites/nywd/files/CJA%20Plan%202021-10-31%20Signed%20with%20Circuit%20Approval.pdf) (emphasis added).

 The Federal Public Defender's role under the CJA Plan is to "maintain a record of panel attorney appointments and, when appropriate, data reflecting the apportionment of appointments between attorneys from the federal public defender office and panel attorneys." *Id.* at 20.  The assignments shall ordinarily be made on a rotational basis, *see id.*, except that in a complex or otherwise difficult case appointment may be made "outside the normal rotation to ensure that the defendant has sufficiently experienced counsel." *Id.* However, the CJA plan **does not** contemplate that the Federal Public Defender will personally step into an advocate role, or communicate *ex parte* with the Court pertaining to an internal DOJ guidance memorandum, or advocate for assignment of learned counsel and discuss who may be appropriate to assign as learned counsel based upon an internal DOJ guidance memorandum **before** the government is aware of the Court's concerns, and **before** the government has an opportunity to appear to address any such concerns.

[12]    The Court acknowledged on the record this issue was first raised by the Federal Public Defender, and it was clear that specific learned counsel were discussed between the Federal Public Defender and the Court before the appearance. *See* Feb. 10, 2025, Tr. at 29-30, 42:5-12 ("But on the basis that it's a mega case, I will appoint – and this -- these two attorneys -- it's been in consultation with the defender's office, which is also provided for in the CJA plan, I'll appoint -- if they will accept the appointment, Cheryl Meyers Buth for Defendant Gerace and Barry Covert for Defendant Ermin, as additional counsel right now based on the fact that it's a mega case. Not necessarily on the fact that it is death eligible."). In a follow-up email shortly after the February 10, 2025, appearance (on which the government was not copied but later observed when a prospective assigned learned counsel copied the government on email correspondence to the Court), the Court stated, in part: " I hope (expect?) that this will not come as a surprise to you, but today I appointed Cheryl as co-counsel to Mark Foti for defendant Peter Gerace, Jr., and Barry as co-counsel to George Muscato for defendant John Ermin. **[The Federal Public Defender] tells me that she previously checked with each of you as to your availability to serve as learned counsel for these defendants**. It may or may not come to that, but I think it makes sense to get you involved at this stage and to stay on even if the government reconfirms its earlier decision not to seek the death penalty." (Emphasis added).

I would ask if the Court is still weighing whether to appoint learned counsel, I would simply in conjunction with that renew my request for second counsel pursuant to the case. That this is a mega case. And given the Court has the ability to appoint -- to make a determination of who to appoint counsel, in consultation with the Federal Defenders Office, if the Court appoints second counsel on those grounds, and simply takes into consideration the posture of the case and appoints somebody who has experience to fulfill the role of learned counsel, then I think we end up being in a much better position when we come back here. Regardless of what the Government is able to report at that point, in the meantime there can be conversations about what concerns we should be expressing to the Court. If any -- beyond the type of conversation we had today, where I appreciate the Court's compliment that I'm a good attorney, but -- you know, continue to recognize -- […] That the whole point of learned counsel -- and if we can have that appointment now, we're in a better position when we come back, regardless of where the Government goes with it at this point.

*Id.* at 38-40. Then, notwithstanding that discovery had been produced seven months earlier and defense motions were due in eleven days, counsel for defendant Ermin chimed in: "Candidly, **I was in the process of preparing a motion** to ask the Court to consider appointment of second counsel." *Id.* at 40 (emphasis added)[13]. Following some additional discussion with counsel for Gerace, the Court stated:

All right. And here's what I'm going to do today. Not necessarily on the basis that it's a death penalty eligible case, because -- because I don't know that right now. Nobody knows that. But on the basis that it's a mega case, I will appoint -- and this -- these two attorneys -- **it's been in consultation with the defender's office, which is also provided for in the CJA plan, I'll appoint -- if they will accept the appointment, Cheryl Meyers Buth for Defendant Gerace and Barry Covert for Defendant Ermin**, as additional counsel right now based on the fact that it's a mega case. Not necessarily on the fact that it is death eligible. But if it turns out to be death eligible, they are both qualified to -- to fulfill that role. But, again, I'm going to hold -- as I said, I'm going to hold the [motion] deadlines in abeyance[.]

*Id.* at 42 (emphasis added).

---

[13] However, no such motion was ever filed and, at the time, dispositive and non-dispositive motions were due in eleven days.

By the conclusion of the February 25th status, the Court, in the absence of any written motion to assign second counsel and on the basis that this case is purportedly a "mega case" and with no opportunity for the government to respond in writing to the conclusory assertion, delayed motions and assigned two attorneys who are *de facto* learned counsel to defendants Gerace and Ermin. Furthermore, it is apparent attorneys assigned were pre-selected by the Federal Public Defender, who not only represents a party to this action—defendant Gogolack—but who also actively advocated for the Court to assign pre-selected counsel of choice outside of the ordinary CJA rotation.[14]

## THE GOVERNING LAW

Generally, the court may modify pre-trial rulings at any time before final judgment. *See In re United States*, 733 F.2d 10, 13 (2d Cir. 1984). "Although the Federal Rules of Criminal Procedure do not specifically recognize motions for reconsideration, such motions have traditionally been allowed within the Second Circuit." *United States v. Lucas*, 383 F. Supp. 3d 105, 110 (W.D.N.Y. 2019) (internal quotation marks omitted). District courts "have applied the applicable civil standard to such motions in criminal cases." *Id.* (internal quotation marks omitted). The government recognizes that "the standard for granting a motion for reconsideration is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words,

---

[14] It is also worth noting that counsel for Ermin and Gerace were each originally retained, and the Court has already exercised considerable discretion by allowing original counsel of choice to remain while being paid through the CJA fund.

that might reasonably be expected to alter the conclusion reached by the court." I*n re Lettieri*, No. 23-MC-32-LJV, 2024 WL 1076271, at *1 (W.D.N.Y. Mar. 12, 2024).

"The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Id.* (quoting *Kharshiladze v. Philips*, 2021 WL 1525869, at *1 (W.D.N.Y. Apr. 19, 2021)); *see also Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). "To these ends, a request for reconsideration under Local Rule 6.3 ("Rule 6.3") must point to controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." *United States v. Agostini*, No. 00-cr-237, 2015 WL 8528451 at *2 (S.D.N.Y. Dec. 9, 2015); *see also Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).[15]

## **ARGUMENT**

### I.    **The Defendants are not Entitled to Learned Counsel or Two CJA Attorneys Provided at Taxpayer Expense**

#### A.    **The Law and Policy Pertaining to the Assignment of Learned or Second CJA Counsel**

The Second Circuit's decision in *United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008) provides that where the death penalty will not be sought, a defendant's statutory right to have second court-appointed learned counsel is extinguished. Title 18, United States Code, Section

---

[15] Because the Court denied defendant Gerace's request for assignment of second counsel on March 8, 2024, without prejudice, the government submits that defendant Gerace should have had the burden to move for reconsideration, or at least be required to file a new motion on notice to the government detailing why second counsel was necessary.

3005 does not require the district court to continue the appointment of a second counsel who is learned in capital cases where, as here, the government has notified the court and the parties that the death penalty will not be sought. *See In re Sterling-Suarez*, 306 F.3d 1170, 1174-75 (1st Cir. 2002); *United States v. Shepherd*, 576 F.2d 719, 727-29 (7th Cir. 1978); *United States v. Wedell*, 567 F.2d 767, 770-71 (8th Cir. 1977).

The Criminal Justice Act ("CJA") Policies and Procedures for the United States District Court, Western District of New York instruct that, in cases such as this where the death penalty will not be sought, the court should consider making an appropriate reduction in the number of counsel as provided in CJA Guideline § 630.30.20. In determining whether circumstances justify continuation of more than one attorney, the court should consider the following: (a) the need to avoid disruption of the proceedings; (b) whether the decision not to seek the death penalty occurred late in the litigation; (c) whether the case is unusually complex; and (d) whether the defense has reasonably allocated trial duties among counsel well into the case such that it would negatively impact the representation to dismiss one attorney. *See* W.D.N.Y. CRIM. JUSTICE ACT. POLICIES & PROCEDURES, (dated Sept. 2022) (hereinafter "the District's CJA Policies and Procedures"), at 11-12. In turn, CJA Guideline § 630.30.20 provides:

**§ 630.30.20 Number of Counsel**

(a) The court should, **absent extenuating circumstances**, make an appropriate reduction in the number of counsel.

(b) In deciding whether there are extenuating circumstances, the court should consider the following factors:

(1) the need to avoid disruption of the proceedings;

(2) whether the decision not to seek the death penalty occurred late in the litigation;

(3) whether the case is unusually complex; and

(4) any other factors that would interfere with the need to ensure effective representation of the defendant.

(Emphasis added).

In recognition of the Second Circuit's decision in *Douglas*, CJA Guideline § 630.30.20, which counsels that *extenuating circumstances* should be present for a court to retain learned counsel for a defendant once the government provides notice that it will not seek the death penalty, and consistent with the District's CJA Policies and Procedures expressly directing the Court to consider reducing the number of counsel as provided in CJA Guideline § 630.30.20, courts in this District frequently deny requests to assign learned counsel to non-capital eligible defendants.[16]

For example, in *United States v. Eldridge,* No. 09-CR-329, 2014 WL 4640848 (W.D.N.Y. Sept. 16, 2014), the defendants were charged in a seventeen count indictment charging racketeering, racketeering conspiracy, murder in aid of racketeering, conspiracy to distribute controlled substances, possession of firearms in furtherance of drug trafficking crimes, violent crime in aid of racketeering-kidnaping, Hobbs Act robbery and conspiracy, and various firearm

---

[16] "The government has standing to make a motion requesting that the court review (even after appointment is made) a defendant's eligibility for court-appointed counsel." *United States v. Jenkins*, No. 5:11-CR-0602 (GTS), 2012 WL 12952829, at *3 (N.D.N.Y. Oct. 9, 2012) (citing *United States v. Harris*, 707 F.2d 653, 654-63 (2d Cir. 1983) (affirming district court decision that considered, and essentially granted, the government's post-appointment motion for a determination of that defendant was not entitled to court-appointed counsel)). The Court should further deny additional counsel because it has refused to permit the government to observe the financial affidavits that assign CJA funds to pay formerly retained attorneys for defendants Ermin and Gerace.

offenses.  The indictment alleged that defendants were members of a criminal organization that engaged in the distribution of cocaine, cocaine base, marijuana and heroin and also committed acts of violence in furtherance of their drug trafficking enterprise, including murder, robbery and extortion.  The indictment further alleged that the defendants robbed, murdered and attempted to rob and murder other individuals involved in drug distribution and allegedly carried, brandished and discharged firearms in furtherance of these activities.  *Id.* at *1.  Each defendant in the case was assigned two attorneys, including learned counsel, and the case was litigated for over four years.  *Id.*  The government moved to reduce the number of counsel before trial arguing that the case was no longer a capital case, and the defendants opposed.  Judge Arcara analyzed the issue through the appropriate lens, as follows:

> The Second Circuit has held that when the Government decides not to seek the death penalty, defendants no longer have a statutory right to court-appointed second counsel. *United States v. Douglas*, 525 F.3d 225 (2d. Cir.2008). In addition, the Criminal Justice Act Guidelines ("CJA Guidelines") provide that the court should, absent extenuating circumstances, make an appropriate reduction in the number of counsel in cases where the death penalty will not be sought. See Guidelines for the Admin. Of Criminal Justice Act, vol. VII, § A, ch. 6.02(B)(2). In determining whether extenuating circumstances exist, the Court should consider the following: (a) the need to avoid disruption in the proceedings; (b) whether the decision not to seek the death penalty occurred late in the litigation; (c) whether the case is unusually complex; and (d) any other factors that would interfere with the need to ensure adequate representation of the defendant.

*Id.* at *4.  Next, Judge Arcara analyzed whether there were extenuating circumstances that would warrant two court appointed lawyer and determined there were not.  In particular, Judge Arcara recognized that although the indictment was "lengthy and the charges were extensive" the case was "no more factually or legally complicated than other multi-defendant RICO and RICO conspiracy cases which have been tried before this Court and which have involved a single court-appointed lawyer for each defendant. Likewise, this case is no more factually or

legally complicated than other cases which included Notices of Special Findings pursuant to Sections 3591 and 3592, and which involved a reduction of counsel when it was determined that the Government would not seek the death penalty." *Id.*

Judge Arcara further observed that "[i]f this Court were to determine that the nature of the charges here required two lawyers per defendant, it would rarely if ever be permitted to reduce counsel when the Government elected not to pursue the death penalty. **This result would be in direct conflict with the instructions of the Criminal Justice Act Guidelines, as well as this Court's duty to control taxpayer expenses.**" *Id.* (Emphasis added). Turning to whether removal of counsel would disrupt proceedings, Judge Arcara determined "that removal of court-appointed second counsel will not significantly disrupt the proceedings" because trial was not set to begin for "four and a half months." *Id.* at *5. Judge Arcara continued: "it bears mentioning that while court-appointed second counsel will be removed, three defense attorneys remain [one for each defendant] who will have the opportunity to collaborate, when appropriate, over the course of the trial." *Id.* In rejecting counsel's claims of extenuating circumstances and granting the government's motion to remove second counsel, Judge Arcara concluded:

> the demands cited by counsel and the disruption in removing an attorney, while not insignificant, are present in most serious and lengthy criminal trials and are not the types of unique circumstances which would require the continuation of two court-appointed attorneys. If the Court were to accept these as extenuating circumstances, it would seldom be permitted to remove court-appointed second counsel after learning that the Government did not intend to seek the death penalty. As noted above, this notion is directly contrary to the Court's duty, pursuant to the CJA Guidelines and this District's Death Penalty Reference Guide, to reduce expenditures and remove taxpayer-funded second counsel when the death penalty will not be sought and no extenuating circumstances exist.

*Id.*

In a federal capital murder prosecution in the Rochester part of the district, former Chief Judge Geraci denied the defendant's appeal of the magistrate judge's decision to reduce the number of attorneys appointed to represent a defendant following notification that the government would not seek the death penalty. *United States v. Kendrick,* No. 10-CR-6096, 2013 WL 1896982, at \*2 (W.D.N.Y. Apr. 12, 2013), *objections overruled,* No. 10-CR-6096-FPG, 2013 WL 1896988 (W.D.N.Y. May 6, 2013). The magistrate judge's decision, which was adopted by Judge Geraci, applied the factors set forth in CJA Guidelines § 630.30.20 and determined that reducing the number of attorneys was appropriate. First, the magistrate judge determined reduction in counsel would not disrupt proceedings. *Id.* at \*2. Second, the magistrate judge observed that "[a]lthough the Court has required counsel to proceed with motion practice unrelated to the death penalty, the motions that have been filed have not been argued and additional pretrial hearings need to be scheduled. In terms of the substantive prosecution of the defendants for the crimes charged, the case is still fairly early in the pretrial litigation stage." *Id.* Third, the magistrate judge found that "while the case is complex, I do not find it so unusually complex that the interests of justice demand two lawyers for each defendant," and, as here, that "[t]his case involves other defendants who were not charged with capital offenses and these cases have proceeded with the non-capital defendants being represented by only one appointed attorney. While certainly complex, I do not find the case in its current posture to be so complex that additional counsel is required to be appointed to protect the defendants' right to a fair trial." *Id.*

Similarly, in *United States v. Jonas,* in a double-murder case where the defendants were facing potential *mandatory minimum* life sentences, this Court promptly relieved second counsel after it received notice of the government's intention not to seek the death penalty. 2013 WL 2450603, at *1 (W.D.N.Y. June 5, 2013). When counsel sought re-assignment of second counsel, this Court required detailed submissions as to why re-assignment of second counsel was necessary. *Id.* In analyzing the request, this Court acknowledged that assignment would only be appropriate if extenuating circumstances existed after considering: (1) the need to avoid disruption of the proceedings; (2) whether the decision not to seek the death penalty occurred late in the litigation; (3) whether the case is unusually complex; and (4) any other factors that would interfere with the need to ensure effective representation of the defendant." *Id.* at *2. In *Jonas*, the defense argued that the case was complex because it was a "federal double homicide" and because the defendant had developed trust in the assigned learned counsel. *Id.* Nevertheless, this Court was unpersuaded that the "federal double homicide" case was unusually complex. *Id.* ("[A]lthough I recognize that this case may be complex, I do not find it to be so unusually complex that the interests of justice demand two lawyers."). This Court in *Jonas* concluded: "Based upon the unique circumstances of this case, I conclude that counsels' proposal is acceptable, provided that they agree to *combined* compensation equal to the current rate payable to a *single* capital case counsel ($178.00/hour) under the Criminal Justice Act." *Id.* at *3 (emphasis in original).

In *United States v. Wilson,* which charged leaders of the Kingsmen Motorcycle Club in a 46 Count indictment with racketeering conspiracy, murder in aid of racketeering, and various other offenses, the magistrate judge acknowledged that extenuating circumstances were

required to continue with two assigned counsel and determined that the complexity of that case warranted keeping two assigned counsel who, by that time, had worked together on the case for over one year and had divided work between themselves. *United States v. Wilson*, No. 15-CR-00142-EAW-MJR, 2017 WL 1456984, at *11 (W.D.N.Y. Apr. 25, 2017). However, the Kingsmen RICO murder case was far more complex than this case. That case involved more than twice as many defendants; had racketeering predicate activity based upon myriad violations of Florida, New York, and federal law; had conduct that occurred in multiple states up and down the East Coast; and, each of the Kingsmen defendants, who were permitted to maintain second counsel, were charged with Murder in Aid of Racketeering and faced *mandatory minimum sentences of life imprisonment* if convicted at trial. None of these defendants are similarly situated.

The District's CJA Policies and Procedures also provide that, for non-capital prosecutions, "[I]n most circumstances, only one CJA-compensated attorney is necessary for each client representation. However, a second attorney may be appointed in any case determined by the court to be extremely difficult or when such appointment would be in the interest of justice to ensure high quality representation. See CJA Guideline § 230.53.20." *See* District's CJA Policies and Procedures at 13 ("Non-Capital Representations"). In turn, CJA Guideline § 230.53.20 provides:

> (a) In an extremely difficult case where the court finds it in the interest of justice to appoint an additional attorney, each attorney is eligible to receive the maximum compensation allowable under the CJA.

19

(b) The finding of the court that the appointment of an additional attorney in a difficult case was necessary and in the interest of justice must appear on the Order of Appointment.[17]

Thus, in order to trigger the defendant's statutory right to assigned learned counsel—the case must be punishable by death. In order for a defendant to retain "learned counsel" once the government provides notice that it will not seek the death penalty—the Court must make appropriate findings and determine that there are "extenuating circumstances." Finally, in non-capital cases, assignment of a second CJA should be rare and limited extremely difficult cases or where the court finds it in the interest of justice to appoint an additional attorney to ensure high quality representation.[18]

## B. There is no Possibility that the Defendant's will be Subjected to Capital Punishment on the Pending Indictment, and the Defendants are not Entitled to Learned Counsel

As set forth above, there is currently no possibility of capital punishment on the pending indictment. Title 18, United States Code, Section 3005 extends some defendants charged in death-eligible indictments the statutory right to counsel learned in the law of capital punishment. But this entitlement serves as a procedural affirmation of the grave finality of the *sentence* made possible by certain charges, not of the seriousness or the complexity of the charges themselves. The Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.*, obliges the government to submit certain statutory intent and aggravating factors before a defendant's crime becomes death eligible. *See id.* §§ 3591–92. More specifically, § 3591 authorizes the imposition of the death penalty only if a separate sentencing hearing is held pursuant to § 3593 in which the

---

[17] Available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-6#a230_53

[18] Interest of justice assignments are typically limited to extremely difficult cases where issues have arisen with the attentiveness or effectiveness of an attorney, or where the attorney-client relationship has become strained during the course of representation—none of these situations apply to this case.

factfinder considers proof of mitigating and aggravating factors, as listed in § 3592. If the factfinder finds that aggravating factors sufficiently outweigh all mitigating factors to justify a sentence of death or if aggravating factors, without any mitigating factors, are sufficient to justify a sentence of death, the factfinder is authorized to recommend the death penalty. *See* § 3593. If such a recommendation is made, the court must follow the recommendation and sentence the defendant to death. *See* § 3594. However, "[*i*]*f no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death* authorized by law." § 3593(d) (emphasis added). Consequently, these factors "increase the maximum penalty for a crime" from life imprisonment to death and thus "must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

Here, because the Second Superseding Indictment does not charge any of the statutory factors necessary to impose a death sentence, Counts 2 and 3 cannot statutorily entitle the defendants to learned counsel. *Jones*, 526 U.S. at 234 n.6; *see United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003) (concluding that the statutory factors "are the functional equivalent of elements of the capital offense" and "must be charged in the indictment"); *United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005) (concluding that "[t]he indictment must include at least one statutory aggravating factor to satisfy the Fifth Amendment because that is what is required to elevate the available statutory maximum sentence from life imprisonment to death"); *United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) ("Before a federal defendant is eligible for the death penalty, the government must provide notice of its intent to seek the death penalty and specify the aggravating factors upon which it intends to rely."); *cf. United States v. Fell*, 531 F.3d 197, 207 (2d Cir. 2008) (observing that, after the government initially "did not charge

statutory aggravating factors, the government obtained a superseding indictment which included the threshold culpability factors and the statutory aggravating factors."); *accord Ring v. Arizona*, 536 U.S. 584, 609 (2002) (stating that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'" (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n. 19 (2000))); *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 (2003) ("Put simply, if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact-no matter how the State labels it-constitutes an element, and must be found by a jury beyond a reasonable doubt.").

Because there is no possibility that the defendants could be punished by death on this indictment, they are not statutorily entitled to learned counsel.

## C.    The Attorney General's Memorandum did not Create any Rights for the Defendants

"[I]nternal Government policies do not create rights in private citizens." *United States v. Loften,* 518 F.Supp. 839, 856 (S.D.N.Y.1981), *aff'd,* 819 F.2d 1130 (2d Cir.1987). While this case falls into a category of cases that the Attorney General has directed to be subject to an *internal* DOJ review—simply because of the time-period in which this case was charged—the Attorney General's memorandum did not create any rights for any defendant and did not transform a relatively routine obstruction conspiracy, witness tampering, and narcotics indictment into one in which the defendants could be executed. As set forth above, the government advised the Court and the defendants on February 23, 2024, that it would not seek the death penalty. That status has not changed. Accordingly, the defendants are not entitled to learned counsel, *see Douglas*, 525 F.3d at 237, and the Court should not assign additional CJA attorneys to the case predicated upon internal DOJ guidance, which confers no rights upon any defendant.

### D.    The Court did not Make any Findings of Extenuating Circumstances

"The purpose of the two-attorney right is to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel." *Douglas,* 525 F.3d at 235 (quoting *Waggoner,* 339 F.3d at 918).  Nevertheless, although the indictment does not charge death-eligible offenses, counsel for the defendants and the Federal Public Defender used the February 10, 2025, status conference to vigorously and repeatedly advocate for specific learned counsel.  Specifically, as set forth in Section I, *supra,* counsel for Gerace acknowledged that, while he was wholly capable of handling a complex case, it was his lack of experience in capital prosecutions which motivated his request for learned counsel.  *See* Feb. 10, 2025, Tr. at 18-19 ("**I don't have the experience** to be able to distinguish between what issues need to be preemptively raised in pretrial motion practice, **in a capital cases versus a very large mega case**. I don't know that. And I don't think the majority of the attorneys here, with exception, I think, of Mr. Henry, was qualified as learned counsel, are in a position where they are able to identify whether we are making an enormous strategic error during the course of our motion practice that could impact a defendant who is potentially facing a capital – a capital prosecution." (emphases added)).  Counsel for Hinkle, Gogolack, and the Federal Public Defender also made impassioned pleas for learned counsel—suggesting that they were somehow incapable of timely filing basic Fourth Amendment, Fifth Amendment, and basic discovery motions germane to every single federal case—without the assignment of learned counsel, even after both the Court and the government acknowledged that the Court could re-open the pre-trial motion period were the Department of Justice to revoke its "no seek" decision.  *See*, Feb. 10, 2025, Tr. at 18-19, 31-42.

Only after the Court initially resisted assigning learned counsel did the attorneys for Gerace and Ermin pivot to their unsupported and conclusory claims that the case was a "mega case," an issue, it bears repeating, the government had no notice would be raised at the proceedings.[19]  The terms "mega case" do not appear in the District's CJA Plan, the CJA Guidelines, or the cases in the District—*Eldridge, Kendrick, Jonas, Wilson*—in the context of whether to permit learned counsel to remain in non-capital cases, or with respect to assignment of multiple CJA attorneys.  As described below, the fact that this is a multi-defendant case with a lot of organized and searchable discovery (that the defense has had seven months to review) does not transform a relatively routine witness tampering and drug case into an unusually complex case.  In fact, defendants in far more complex murder cases—often facing mandatory life sentences—have not been permitted to keep assigned learned counsel in non-capital cases. As Judge Arcara once aptly observed in a far more complex RICO/Murder prosecution: "[i]f this Court were to determine that the nature of the charges here required two lawyers per defendant, it would rarely if ever be permitted to reduce counsel when the Government elected not to pursue the death penalty. **This result would be in direct conflict with the instructions of the Criminal Justice Act Guidelines, as well as this Court's duty to control taxpayer expenses**."  *See Eldridge,* supra at *4  (emphasis added).

Obviously, while it may have been adroit and zealous advocacy, the defendants' claims that this is a "mega case"—after 10 months of silence on the issue and with an imminent motions deadline—was a pretext for assigning learned counsel.  On these facts, assigning a total

---

[19] The term "mega case" or "mega status" is reserved for use in case budgeting matters.  *See* District's CJA Plan & Polices (dated Sept. 2022), Sec. III(C) (Case Budgeting).

of nine attorneys, who work collaboratively, to represent six defendants[20] in a non-capital prosecution is the converse of what Judge Arcara described as the "Court's duty to control taxpayer expenses." *Id.*  Although the Court stated that it was not assigning the selected attorneys as second counsel on the basis of death-eligibility, that was the practical real-world effect of discussing the matter with the Federal Public Defender before the status conference, identifying qualified learned counsel, and then assigning learned counsel consistent with arguments proffered by defendant Gerace in writing and echoed by other defense counsel during the majority of the status conference.[21]

Because it assigned learned counsel to this non-capital case, which is evinced by the fact that it did not make the assignment on the ordinary rotational basis, *see* CJA Plan at 8, the Court was required to determine whether there extenuating circumstances after considering: (1) the need to avoid disruption of the proceedings; (2) whether the decision not to seek the death penalty occurred late in the litigation; (3) whether the case is unusually complex; and (4) any other factors that would interfere with the need to ensure effective representation of the defendant.  The Court's failure to consider these factors warrants reconsideration of its decision and, upon reconsideration, the Court should find that each factor weighs heavily against the defendants.

---

[20] Upon information and belief, Claire Montroy, Esq. is retained counsel for Frank Knight, and is not assigned.

[21] Counsel for Gerace (Mark Foti), Ermin (George Moscato), Gogolack (Jeffrey Bagley), Hinkle (Dan Henry and Frank Bogulski), and the Federal Public Defender **all** argued that the Court should assign learned counsel.

### 1. The Need to Avoid Disruption of the Proceedings

There will be no disruption of proceedings removing *de facto* learned counsel assigned on February 10, 2025, less than two weeks after the assignment.[22]  They have not meaningfully reviewed discovery, appeared in court, made arguments, developed relationships with the defendants, or otherwise done anything of substance on the case.  In fact, the only disruption in the case has been caused by learned counsel.  After having received discovery seven months ago, the defendants feigned inability timely to file motions because they purportedly needed input from learned counsel.  On the heels of these defense arguments, the Court suspended the motions schedule that it had previously extended over the government's objection.  Now, the case sits while *de facto* learned counsel are onboarded and while the Court waits for additional guidance from the government based off of an internal guidance memorandum that provided 120 days for the Capital Case Section to conduct its internal review.

Regardless of the status of the government's internal review, all defendants can and should prepare and file the motions they have had upwards of seven months, and a recent thirty day extension, to work on.  *See Kendrick, supra* at *2 (requiring defendants to file motions unrelated to the death penalty while awaiting the government's decision of whether to seek the death penalty). Certain motions pertaining to discovery, Fourth and Fifth Amendment suppression issues, dismissal of counts or the indictment, and other motions do not change regardless of whether a case is a capital or non-capital prosecution.  These motions were due on February 21, 2025, but now there is no date and newly assigned counsel will undoubtedly ask

---

[22] The Court assigned *de facto* learned counsel for Gerace on February 10, and the assignment was finalized for Ermin on February 14, 2025. *See* Doc. Nos. 352, 353, 354.

for more time to review discovery and assist in motion practice. Later, the defendants will endeavor to file motions to dismiss for Sixth Amendment Speedy Trial and, given the state of the case law, this Court's decision to delay the case may be held against the government. Simply, the Court's decision to inject two new attorneys into the case right before motions are due has disrupted the case and stalled its progress. Promptly removing the recently assigned attorneys will serve to get this case back on track expeditiously and will help ensure there is no additional delay. Accordingly, this factor weighs heavily against the defendants and against a finding of extenuating circumstances such that recently assigned learned or second counsel should be removed.

### 2. The Decision Not to Seek the Death Penalty Occurred Early

The decision not to seek the death penalty occurred approximately a year ago—on February 23, 2024. As set forth above, it took just 49 days after charges were initially filed for the government to notify the Court and the defendants that the government would not seek the death penalty in this case. *See* Doc. No. 75. As of this writing, that status has not changed and this indictment would need to be superseded to allege statutory aggravating factors in order to transform what is a non-capital eligible indictment into one with the potential for the death penalty. Pursuant to the Attorney General's internal guidance memo, the review of all cases will be completed in no greater than 120 days, or, as set forth above, before oral argument on motions was scheduled to occur in this case. Accordingly, this factor weighs heavily against the defendants and against a finding of extenuating circumstances such that recently assigned learned or second counsel should be removed.

### 3. The Case is not Unusually Complex

As a plain reding of the indictment establishes, the case is not unusually complex. The indictment lays bare an easy to read chronology of events that not complicated to understand. In discovery, and in the various detention hearings and related filings, the defense has been privy to detailed proffers about the government's evidence and the inferences that it will argue to a jury. If racketeering murder cases covering conduct over a period of many years are not too complex, *see Eldridge, supra*, or federal murder cases with defendants facing mandatory minimum terms of life imprisonment (unlike the defendants in this case who are not subject to mandatory minimum life sentences) are not too complex, *see Kendrick*, *supra*, then this case is not too complex for one attorney.

At its core, this is a straight-forward witness tampering and obstruction conspiracy with a death. Indeed, the Court's prior comments underscore that this case is not unusually complex such that it warrants assignment of additional attorneys as second or learned counsel. *See* Mar. 8, 2024, Tr. at 3:15-19 ("Okay. As you all know, the Government, I think, a week ago today advised that the death penalty issue is now off the table. *So at this point, I think Mr. Foti is -- is adequate and we'll proceed on that basis*.") (emphasis added). The fact that no defendant—from March 9, 2025, until February 10, 2025—filed a motion or otherwise complained about the unusual complexity or extreme difficulty of the case should lay bare that the defense requests for more attorneys are borne out of opportunity, not necessity, to gain a strategic advantage

based upon internal DOJ guidance that do not—and this Court should not permit to—confer any rights upon any defendant.[23]

Voluminous discovery and serious penalties do not make cases complex. If that was the standard, then virtually every fraud, narcotics, firearm, overdose death, murder case, and conspiracy prosecuted in federal court would require the Court to assign two CJA attorneys. In that vein, cases with media attention do not make them complex, and do not entitle defendants whose cases are covered in the media to two attorneys while other defendants, facing similar charges and penalties, are not afforded two attorneys.

This case involves the same type of direct and circumstantial evidence that exists in virtually every conspiracy case. What is more, no defendant has proffered an argument—aside from there is a lot of discovery—that supports the conclusion that this case is unusually complex. Moreover, this Court acknowledged that the case is not unusually complex when it denied Gerace's prior request to assign second counsel. *See* Mar. 8, 2024, Tr. at 3:15-19.

---

[23] The internal DOJ memorandum that the Federal Public Defender sent to the Court, by its express terms and by case law interpreting DOJ internal policies, establishes that DOJ internal policies may not be relied upon to create any rights enforceable at law. *See, e.g., United States v. Ash,* 464 F. Supp. 3d 621, 632 (S.D.N.Y. 2020), *aff'd,* No. 22-1048-CR, 2022 WL 16955057 (2d Cir. Nov. 16, 2022) (DOJ Manual does not create any rights). It has been found that the [DOJ] Protocol "does not create substantive or procedural rights." *United States v. Roman,* 931 F. Supp. 960, 964 (D.R.I. 1996). Rather, "[t]he [DOJ] protocol articulates internal administrative procedures to be followed by DOJ personnel...." *Id.* It "provides for 'standards for determination' to guide the death penalty decision making process." *Id.* (citing DOJ Manual, § 9–10.000G). *Accord: United States v. McVeigh,* 944 F. Supp. 1478, 1483 (D. Colo. 1996) ("the decision to seek the death penalty under the Act is a matter of prosecutorial discretion [and] [t]he [DOJ] Protocol [does] not create any individual right or entitlement...."). *Cf. United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir. 1990), *cert. denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990) ("the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party") (citations omitted); *United States v. Loften,* 518 F. Supp. 839, 856 (S.D.N.Y. 1981), *aff'd,* 819 F.2d 1130 (2d Cir. 1987) ("internal Government policies do not create rights in private citizens. The United States Attorney's Manual itself specifically states that it is not intended to, does not, and may not be relied upon, to create any rights whatever in any party").

Nothing about the facts of the case or applicable law has changed since that time. Accordingly, this factor weighs heavily against the defendants and against a finding of extenuating circumstances such that recently assigned learned or second counsel should be removed.

### 4. There are no Other Factors Warranting Assignment of Additional Counsel

During the February 10, 2025, status conference, the Court commented that defendant Gerace's attorney was a good attorney. The government agrees and submits that counsels diligence and ability are among the reasons why he has taken the leading role for the defendants at virtually every argument. Similarly, defendant Ermin's attorney is highly experienced and well-respected in the legal community. Given their reputation and ability, it is no coincidence defendants Gerace and Ermin privately retained these attorneys until the Court permitted them to be paid by CJA funds.[24] This is not a situation where the Court has expressed concerns that attorneys are not zealously advocating on behalf of defendants Gerace and Ermin, or where the attorneys routinely miss court appearances, or where the attorneys are inexperienced. Simply put, as the litigation in this case to date plainly establishes, Gerace and Ermin have zealous and highly competent counsel. Therefore this factor weighs heavily against the defendants and against a finding of extenuating circumstances such that recently assigned learned or second counsel should be removed.

---

[24] On January 26, 2024, *see* Doc. No. 50 ("Memorandum/Brief Regarding Potential Assignment of Learned Counsel), the government argued that Gerace and Ermin were not entitled to learned counsel because they retained private counsel.

**E.    The Court did not Make any Findings that the Case was Extremely Difficult**

As set forth above, in non-capital prosecutions, although the Court has discretion to assign a second attorney, the Court must find that the case is an "extremely difficult" case or that the appointment of a second attorney "would be in the interest of justice to assure high quality representation." *See* District's CJA Policies and Procedures at 13 ("Non-Capital Representations"). Indeed, in most cases "only one CJA-compensated attorney is necessary for each client representation." *Id.* Moreover, pursuant to CJA Guideline § 230.53.20(b), "[t]he finding of the court that the appointment of an additional attorney in a difficult case was necessary and in the interest of justice must appear on the Order of Appointment."

Neither the District's CJA Policies and Procedures nor CJA Guideline § 230.53.20(a) define the phrase "extremely difficult," and the government's research has not revealed a case defining it in the context of CJA Guideline § 230.53.20(a). However, the government submits that the phrase "extremely difficult" is synonymous with being "unusually complex" as the phrase is used when courts decide whether to permit learned counsel to remain on a case after the government provides notice that it will not seek the death penalty.

The Court has not made any findings on the record that this case is either "unusually complex," or that it is "extremely difficult." Moreover, to the government's knowledge the Court has not  made a finding in accordance with CJA Guideline § 230.53.20(b) that the appointment of an additional attorney in a difficult case was necessary and in the interest of justice must appear on the Order of Appointment. The Court's lack of findings that the case is "unusually complex" or "extremely difficult" is consistent with the government's position, *see*

Point I(D)(3), *supra*, that this case is neither "unusually complex" nor "extremely difficult". The government submits that many defendants facing equally or more serious charges and attendant penalties have had only one, not two, CJA attorney—and these defendants should not be afforded special treatment.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should reconsider its decision to assign *de facto* learned counsel, or second CJA counsel, to defendants Gerace and Ermin.[25]  Second CJA counsel should be removed from each defendant and the Court should require the defense to file dispositive and non-dispositive motions promptly and as close as practicable to the previous deadline of February 21, 2025.

DATED:  Buffalo, New York, February 20, 2024.

JOEL LOUIS VIOLANTI
Acting United States Attorney

BY:    s/ JOSEPH M. TRIPI
Assistant United States Attorneys
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5839
Joseph.Tripi@usdoj.gov

---

[25] The Court should also reevaluate its prior decision to permit defendant Hinkle to retain second CJA counsel. *See* Doc. No. 120 ("The court discusses continued appointment of dual counsel for defendant Hinkle in light of government's death penalty commitment. Defendant requests to maintain dual counsel. The court maintains appointment for time being and will review.").  The government was not provided Hinkle's *ex parte* motion to continue as co-counsel, *see* Doc. No. 125, but the Court's Text Order did not make findings that the case was unusually complex or extremely difficult, *see* Doc. No. 133.  As a result, the Court should reconsider its determination in light of the applicable standards and consistent with the District's CJA Plan and Procedures.

# EXHIBIT A

```
              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NEW YORK


  UNITED STATES OF AMERICA,   *        Docket No.
                                       1:23-cr-00099-LJV-JJM-1
                              *
                              *        Buffalo, New York
               v.             *        March 8, 2024
                              *        3:04 p.m.
                              *
  PETER GERACE, JR.  (2),     *        STATUS CONFERENCE
                              *
              Defendant.      *
                              *
* * * * * * * * * * * * * * * *



              FTR TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
              UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Government:        TRINI M. ROSS, ESQ.,
                           UNITED STATES ATTORNEY,
                           By NICHOLAS COOPER, ESQ.,
                             CASEY CHALBECK, ESQ.,
                           Federal Centre,
                           138 Delaware Avenue,
                           Buffalo, New York  14202
                           Assistant United States Attorney
                           Appearing for the United States



For Defendant (2):         MARK A. FOTI, ESQ.,
                           16 West Main Street,
                           Suite 100,
                           Rochester, New York  14614.



The Courtroom Deputy:      ERIC GLYNN
```

1   The Court Reporter/FTR Transcriber:

2                                   BONNIE S. WEBER, RPR,
                                    Notary Public,
3                                   Robert H. Jackson Courthouse,
                                    2 Niagara Square,
4                                   Buffalo, New York  14202,
                                    Bonnie_Weber@nywd.uscourts.gov.
5

6

7               Proceedings recorded by FTR Gold Recording,
                      transcript produced by computer.
8

9

10

11               (Proceedings commenced at 3:04 p.m.)

12

13          **THE CLERK:**  All rise.

14          The United States District Court for the Western

15   District of New York is now in session.

16          **THE COURT:**  Please be seated.

17          **THE CLERK:**  On the record in criminal proceeding

18   23-CR-99, United States of America versus Peter Gerace for a

19   status conference.

20          Present in the courtroom are Assistant U.S. Attorneys

21   Nicholas Cooper and Casey Chalbeck.

22          Defendant Mr. Gerace with attorney Mark Foti.

23          The Honorable Jeremiah J. McCarthy presiding.

24          **THE COURT:**  All right.  Good afternoon again,

25   everyone.

 1          **MR. COOPER:**  Good afternoon, Judge.

 2          **MR. FOTI:**  Good afternoon, Judge.

 3          **THE COURT:**  And today's proceeding is for the purposes

 4   of considering Mr. Gerace's motion for appointment of counsel, I

 5   have reviewed the submissions by Mr. Gerace and by Mr. Foti.

 6          I have considered the submissions by the Government

 7   and by counsel in regard to the issue of whether the Government

 8   should have access to the financial submissions.

 9          I have concluded that they should not and you are free

10   to object, but I'm not changing my mind.

11          So based on my review of those submissions, I conclude

12   that Mr. Gerace is entitled to appointment of counsel and,

13   Mr. Foti, are you willing to accept the appointment?

14          **MR. FOTI:**  I am, Judge.  Yes.

15          **THE COURT:**  Okay.  As you all know, the Government, I

16   think, a week ago today advised that the death penalty issue is

17   now off the table.

18          So at this point, I think Mr. Foti is -- is adequate

19   and we'll proceed on that basis.

20          **MR. FOTI:**  Judge, we had noted our position that it

21   appears that this is a mega case.

22          I know that there is other defendants that had a

23   second attorney appointed because it was believed at that point

24   that it was a going to be a capital offense or that it was

25   capital eligible.

1          **THE COURT:**  Yeah.

2          **MR. FOTI:**  Depending on what the Government ultimately

3     decided -- I don't know what application we made with regard to

4     those attorneys and whether they will stay on as second counsel,

5     it is my request that based on the scope of this case that a

6     second attorney be appointed.

7          And at this time, Mr. Soehnlein is second counsel on

8     the other matter that's pending.

9          There is a motion to disqualify pending that won't be

10    resolved until at least next week, at the earliest.

11         But if that resolves in our favor and Mr. Soehnlein is

12    not disqualified, I would ask that he be appointed as co-counsel

13    here.

14         And I'm mindful that a similar determination was made

15    in the other case for Joseph Bongiovanni, when it was decided

16    that he needed appointed counsel, to have two attorneys

17    appointed.

18         I don't think it necessarily has to be decided today,

19    but that is our request.

20         **THE COURT:**  Well, I'll -- I'll take that under

21    consideration.

22         I'm not granting that today nor am I denying.  I'm

23    just not deciding it.

24         And you are correct that in this case, I appointed, I

25    believe, Mr. Henry as co-counsel for Mr. Bogulski, but that was

1    at the point at which it was still potentially a death penalty

2    case.

3          So I may rescind that.  I haven't yet and I may

4    continue it.  If I do continue it, I probably would look

5    favorably on your application, but I'm just not deciding any of

6    that today.

7          And I think what we have in place is a deadline.  We

8    didn't last week.  We didn't put a scheduling order in effect,

9    other than a deadline in June, I believe, for completion of

10   voluntary discovery, right?

11         And then at that point or maybe late May --

12         **MS. CHALBECK:**  Judge --

13         **THE COURT:**  -- I think it was about three months --

14   pardon?

15         **MS. CHALBECK:**  Judge, I believe that the discovery

16   deadline is May 23rd.

17         **THE COURT:**  Okay.

18         **MS. CHALBECK:**  And my understanding is that we will

19   then have a status conference on June 3rd.

20         **THE COURT:**  Right.

21         **MS. CHALBECK:**  At 2 p.m.

22         **THE COURT:**  Right.  To -- to set either -- well, to

23   see where we're at and hopefully set a scheduling order -- order

24   at that point.

25         But so for right now, I think you have what you need,

1  Mr. Foti.

2          **MR. FOTI:**  Understood.

3          **THE COURT:**  Okay.  Is there anything else I need to

4  address today?

5          **MR. FOTI:**  No, Judge.  We're all set.

6          **MR. COOPER:**  Nothing from the Government, Judge.

7          **THE COURT:**  Okay.  Thank you all.

8          **MS. CHALBECK:**  Thank you, Judge.

9

10                  (Proceedings concluded at 3:09 p.m.)

11                          *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2      "I certify that the foregoing is a correct transcript, to the

3        best of my ability, from the record of proceedings in the

4                       above-entitled matter."

5

6

7     _s/ Bonnie S. Weber_              _February 14, 2025_
        Signature                          Date

8

9    BONNIE S. WEBER, RPR

10   Official Court Reporter
     United States District Court
11   Western District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

```
                     UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,   *        Docket Number:
                                     1:23-cr-00099-LJV-JJM
                            *
                            *        Buffalo, New York
                 v.         *        February 10, 2025
                            *        2:02 p.m.
                            *
SIMON GOGOLACK,                      STATUS CONFERENCE
also known as Greek,    (1)*
PETER GERACE, JR.,      (2)*
JOHN THOMAS ERMIN,
also known as Tommy O,  (3)*
MICHAEL RONCONE,
also known as Cone,     (4)*
FRANK KNIGHT,           (5)*
HOWARD HINKLE, JR.,
also known as Hard How, (6)*
CORTNIE BARBER,         (7)*
BERNARD BYRD, III,      (8)*
SCOTT BARNES,
Also known as Big Scott
Onepercenter,
Also known as
Scott J. Barnes,        (9)*
                            *
             Defendants.    *
                            *
 *  *  *  *  *  *  *  *  *  *  *  *  *

              FTR TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JEREMIAH J. McCARTHY
             UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:          TRINI E. ROSS,
                            UNITED STATES ATTORNEY,
                            By CASEY L. CHALBECK, ESQ.,
                               JOSEPH M. TRIPI, ESQ.,
                               NICHOLAS COOPER, ESQ.,
                            Assistant United States Attorney,
                            Federal Centre,
                            138 Delaware Avenue,
                            Buffalo, New York  14202,
                            Appearing for the United States.
```

```
 1   For Defendant 1:              FEDERAL PUBLIC DEFENDER'S OFFICE
                                   By JEFFREY T. BAGLEY, ESQ.,
 2                                    MARIANNE MARIANO, ESQ.,
                                   Assistant Federal Public Defender,
 3                                 300 Pearl Street,
                                   Suite 200,
 4                                 Buffalo, New York   14202.

 5
     For Defendant 2:              THE FOTI LAW FIRM, P.C.,
 6                                 By MARK A. FOTI, ESQ.,
                                   16 W. Main Street,
 7                                 Suite 100,
                                   Rochester, New York  14614.

 8

 9   For Defendant 3:              MUSCATO, DiMILLO & VONA, LLP,
                                   By GEORGE V.C. MUSCATO, ESQ.,
10                                 107 East Avenue,
                                   Lockport, New York  14094.

11

12   For Defendant 6:              FRANK M. BOGULSKI, ATTORNEY AT LAW,
                                   By FRANK M. BOGULSKI, ESQ.,
13                                 286 Delaware Avenue,
                                   Suite B,
14                                 Buffalo, New York  14202
                                   And
15                                 VILLARINI & HENRY, LLP,
                                   By DANIEL J. HENRY, JR., ESQ.,
16                                 16 Main Street,
                                   Hamburg, New York  14075.

17

18   For Defendant 7:              BRIAN J. HUTCHISON, ESQ.,
                                   Attorney at Law,
19                                 14 West Main Street,
                                   Lockport, New York  14094.

20

21
     The Courtroom Deputy:         JOANNA DICKINSON
22

23   The FTR/Court Reporter:       BONNIE S. WEBER, RPR,
                                   Notary Public,
24                                 Robert H. Jackson Courthouse,
                                   2 Niagara Square,
25                                 Buffalo, New York  14202,
                                   Bonnie_Weber@nywd.uscourts.gov.
```

1

2
                Proceedings recorded by FTR and mechanical stenography,
3                      transcript produced by computer.

4

5

6

7                      (Proceedings commenced at 2:02 p.m.)

8

9            **THE CLERK:**  All rise.

10           The United States District Court for the Western

11    District of New York is now in session.

12           **THE COURT:**  Good afternoon.

13           **THE CLERK:**  We are on the record in United States of

14    America versus Simon Gogolack, et al, criminal matter number

15    23-CR-99.  We're here for a status conference.

16           For the Government, we have AUSAs Nicholas Cooper,

17    Joseph Tripi and Casey Chalbeck.

18           Defendant Simon Gogolack is present with attorneys

19    Jeff Bagley and FPD Marianne Mariano.

20           Defendant Peter Gerace not present, but is represented

21    by Attorney Mark Foti.

22           Defendant John Ermin is present with George Muscato.

23           Howard Hinkle, Jr., with Dan Henry.

24           Cortnie Barber is not present, but is represented by

25    Attorney Brian Hutchison.

1       Not present are defendants Michael Roncone or his

2  attorney, Paul Dell or Frank Knight, with his attorney Clair

3  Montroy, III.

4       The Honorable Jeremiah J. McCarthy presiding.

5       **THE COURT:**  Good afternoon, again, everyone.

6       **MR. COOPER:**  Good afternoon.

7       **MR. FOTI:**  Hi, Judge.

8       **UNIDENTIFIED SPEAKER:**  Hi, Judge.

9       **THE COURT:**  Everyone was advised of this proceeding.

10  Mr. Foti, I understand Mr. Gerace is waiving his appearance,

11  correct?

12       **MR. FOTI:**  Yes, Your Honor.

13       **THE COURT:**  Okay.  And which other defendant is not --

14  a couple other defendants.

15       **MR. COOPER:**  Judge, Defendant Mike Roncone.

16       **THE COURT:**  Right.

17       **MR. COOPER:**  And his attorney, Paul Dell, are not

18  here.  And then defendant Frank Knight and his attorney Clair

19  Montroy are not here.

20       Defendant Cortnie Barber is not here, but her attorney

21  Mr. Hutchison is here.  And I think Mr. Hutchison had reached

22  out to the Court about whether or not his client needed to be

23  here.

24       **THE COURT:**  Yeah.  And I advised she could waive.

25       **MR. HUTCHISON:**  I spoke with her yesterday about the

1    proceedings and she elected to waive.

2        **THE COURT:**  Okay.  Well, in any event, the reason I

3    scheduled this proceeding was to -- it doesn't directly affect

4    all defendants, but it may affect those four defendants who were

5    previously charged, at least, potentially with a death penalty

6    eligible crime.

7        I know Mr. Cooper and counsel, about a year ago, you

8    indicated that you would not be seeking the death penalty

9    against any of the four defendants.

10       The last week, I received a copy, as did all the

11   judges, of a memo from the Department of Justice dated February

12   5, 2025, addressing several issues, but one of which is a

13   directive that all no seek decisions be reviewed.

14       And so in light of that, I'm considering appointing

15   learned counsel.  But I -- for those who don't yet have it, who

16   are charged potentially with death penalty eligible crimes,

17   but -- Mr. Cooper -- or anybody, do you have any more

18   information than I do at this point as to what -- what may

19   occur?

20       **MR. COOPER:**  So, Judge, I guess, first of all, what I

21   would like to say is that the superseding indictment or second

22   superseding indictment, as it's charged, it's the Government's

23   position that it's not a death eligible offense, as it's

24   charged, because there are no aggravating factors alleged which

25   would be required.

 1              So in order for this case to even get there, it would

 2      have to be superseded again and additional allegations would

 3      have to be alleged in the indictment.

 4              I would indicate to the Court, which I think is kind

 5      of obvious in the memo as well, that this is an internal review

 6      process.

 7              It doesn't create any external rights for any charged

 8      defendant.  There is no basis, at this time -- at least it's our

 9      position, there is no basis at this time to assign additional

10      counsel.

11              I think that would -- would be premature.  As it

12      stands right now, this case has a no seek determination.

13              And I don't think that -- I think it would create some

14      significant issues and take us off the track that we have gotten

15      on.

16              Right now, to add additional learned counsel, my

17      expectation is that there would be delay -- significant delay

18      built into this case.

19              And it seems too early to do that right now, given the

20      fact that we currently have a no seek order.

21              Other than the fact that there was a memo saying cases

22      are going to be looked at, I have no reason to believe that that

23      will change the no seek in this case.

24              **THE COURT:**  Okay.  The -- your no seek, though -- and

25      correct me if I'm wrong, because it's been a while since, you

1    know -- I know we set the scheduling order and -- but since that

2    time, I really haven't had much involvement with this case.

3            But the no seek your -- I believe it was

4    February 20th -- give me just a second.

5            Joanna, do you -- all right.  Bear with me a minute.

6    I apologize.

7            Okay.  Mr. Cooper, I believe your -- you advised the

8    Court -- or your office advised the Court last February -- I'm

9    looking at the precise date.  I think it was toward the end of

10   February.

11           Do you recall?

12           **MR. COOPER:**  It was.  It was certainly February of

13   2024, Judge.

14           **THE COURT:**  Right.

15           **MR. COOPER:**  The exact date might have been

16   February 23rd, but I'm not positive.

17           **THE COURT:**  You have a good memory.  Yeah.  I think

18   I'm looking -- it's Docket Number 75 -- yeah.

19           February 23rd of last year, you indicated that the

20   Government will not seek the death penalty.

21           Now, the indictment that was in effect at that time

22   hasn't been superseded, has it?

23           **MR. COOPER:**  No, Judge.

24           **THE COURT:**  Right.  So there would have been -- I

25   mean, when you say that as charged, there was no potential death

1  penalty, then there would have been no need to issue a no seek

2  notice, right?

3          **MR. COOPER:**  So, Judge, I think this was the position

4  that we took initially with the Court, when we -- we were here

5  about a year ago or a little bit more than that --

6          **THE COURT:**  Right.  Right.

7          **MR. COOPER:**  -- having the same discussion about

8  whether learned counsel was necessary.

9          **THE COURT:**  Right.

10         **MR. COOPER:**  I think it was the trial team's position

11 at that time, as well, that as charged, that it's not a case, as

12 it's currently charged --

13         **THE COURT:**  Yeah.

14         **MR. COOPER:**  -- that would be eligible.

15         And, now, if it was superseded and additional

16 allegations were made, it could be ultimately be pursued -- you

17 know, we pursued a decision.

18         There was a no seek and that's where we stand right

19 now.  We have a no seek.  We have a schedule.  Things are moving

20 along, with the exception of -- you know, a short delay for

21 additional time for the defendants to file motions.

22         We're moving along well right now and I think the

23 concern that the Government has is that this is going to cause

24 some significant delay on the off chance that something happens.

25         And it may be building in delay, where we can avoid

1  that by waiting a little while and see how this plays out.

2        And so I'd ask the Court that we kind of pump the

3  brakes and -- and let this play out a little bit further and get

4  some additional guidance from main justice and we can come back,

5  if necessary, and address it.

6        **THE COURT:**  Okay.  I'm not -- well, let me just ask

7  any of you.

8        Other than the memo, do you have any other information

9  as to the likelihood that this would or would not be reassessed?

10        **MR. COOPER:**  Can I have one second?

11        **THE COURT:**  Sure.

12        **MR. COOPER:**  So, Judge, the only reason that this case

13  falls within the memo is because of the date range in the memo.

14        We don't have any specific information that this case

15  was, you know, singled out in any way for a re-review or a

16  second look, but --

17        **THE COURT:**  I'm not -- I'm not suggesting that from

18  the memo.  And, in fact, the memo indicates that other types of

19  crimes would probably be given priority in -- in the

20  reassessment, but it doesn't rule out any case, so that's what

21  I'm just trying to wrestle with.

22        **MR. COOPER:**  So I would say right now, we, at this

23  table, are operating with the same information that you are

24  operating with from the memorandum.

25        We haven't gotten specific direction about this case,

1    you know, regarding that memo, so --

2          **THE COURT:**  Yeah.

3          **MR. COOPER:**  -- we're playing with the same cards

4    here, but our position is it would just be premature to kind of

5    take the case off track.

6          **THE COURT:**  Okay.  Well, under the current scheduling

7    order -- the amended scheduling order, February 21st is the

8    deadline for motions, right?

9          **MR. COOPER:**  I believe so, Judge.

10          **THE COURT:**  Yeah.  So -- I mean, why -- what -- why --

11    why do you think that addition of the death learned counsel --

12    if I were to do that, why do you think that would delay that

13    schedule?

14          **MR. COOPER:**  Well, Judge, I think that the new

15    attorneys would want to weigh in on what motions to file and how

16    to proceed with the case.

17          And we're now 11 days away from motions being due.  I

18    imagine it would take a day or two for the Court to get

19    attorneys.

20          Even if you did it this afternoon, that's leaving ten

21    days for the current attorneys to communicate with the new

22    attorneys, review a very significant amount of discovery that's

23    been provided and make determinations, which, ultimately, right

24    now, we have a no seek.

25          I have no reason to believe that that's going to

1    change, other than the memo saying all decisions are going to be

2    looked at.

3            **MR. TRIPI:**  Judge, if I may.

4            **THE COURT:**  Yeah.

5            **MR. TRIPI:**  I think the purpose of learned counsel,

6    generally, is to assign attorneys who have been qualified to

7    handle death eligible cases.

8            And so from the perspective of those attorneys, they

9    come into a case looking at it through the lens of mitigation.

10            And how to handle mitigation in the context of the

11    death penalty protocol, within the Department of Justice, that's

12    the whole reason for having this subset of attorneys that would

13    qualify as learned counsel.

14            The reason that this case shouldn't be put on that

15    track is because, one, the indictment doesn't allege death

16    eligible offenses, because there is no aggravating factors.

17            Two, we have no indication specific to this case at

18    all that anything is going to change.

19            And other than it falling within a date range, it

20    qualifies for that internal review process, but there has been

21    no indication that that -- as we sit here today, that that's

22    going to impact anything as it relates to the way this case is

23    charged.

24            Now, any learned counsel, in my experience, is going

25    to want to come into the case and learn everything about the

 1  defendant, everything about potential mitigation and that

 2  involves the discovery that's been issued in this case.

 3        But it also involves a whole subset of review and

 4  looking into the backgrounds of these -- these defendants and

 5  their history and their families and all of those kinds of

 6  things that, frankly, aren't even in the discovery yet.

 7        So it's not a matter of just assigning a second

 8  attorney, who -- who is just going to, you know, wait and let

 9  motions play out.

10        There is a whole category of work that a learned

11  counsel is supposed to be brought in to do and that's why they

12  exist.

13        And so to do all of that, to inject all of that into

14  the case, when we're three -- 11 days from motions, on the

15  if-come seems to be an inefficient use of judicial resources.

16        Now, certainly, if the Court wants, it can -- it

17  always has the right to assign two attorneys and that -- that

18  would be up to you.

19        But where we are right now, you have defendants

20  charged with obstruction of justice, witness tampering,

21  narcotics conspiracy and firearm offenses.

22        That is not unlike hundreds of defendants in this

23  district who don't get two attorneys.

24        And so in the Court's role, there is some element of

25  protecting, I think, CJA resources and waiting for an

1    appropriate triggering point to assign those types of attorneys.

2           This Court has made the decision that when this was

3    not a death eligible case that only one set of attorneys made --

4    made a pitch and qualified for two attorneys on the case.

5           Nothing's changed.  And so we would ask the Court to

6    either not pursue that assigning learned counsel or, at least,

7    give -- I mean, we just got the memo, I think, on Friday or

8    Thursday.

9           And here we are, it's Monday.  So I would ask the

10   Court to at least hold off and allow us to get more guidance, if

11   that's even going to come, related to this case.

12          I don't think holding off while motions on the current

13   schedule could be filed.  And I think they are imminent by each

14   of the counsel, because I know they are working hard on it.

15          They are calling us about certain issues and topics

16   and we're handling things informally, whether it be related to

17   search warrants or helping them navigate the discovery, that

18   they need to look at things of that nature.

19          So I want to just ask the Court to -- to hit a pause

20   on it.  That would be my pitch.  But that's the -- that's the

21   reason, as it relates to learned counsel, that I think it could

22   take it way off track.

23          **THE COURT:**  Okay.  Well, let me just say, Mr. Tripi --

24   and in regard to the fact that you have all been working well

25   together, I -- based on the fact that I haven't heard anything

1    from anybody in several months, since I set the scheduling

2    order, I'm assuming that you are all working together and that's

3    a good thing.

4          Let me -- let me just hear, does anybody on the

5    defense side wish to weigh in?

6          Obviously, only those who potentially are --

7    potentially could be death eligible are the ones that I need to

8    hear from.

9          I'm not inclined, at this point -- whether I do or do

10   not appoint additional counsel, I'm not inclined to extend the

11   deadline right now, so, go -- yeah.

12         Mr. Foti --

13   **MR. FOTI:**  Judge, I think Mr. Gerace and Mr. Ermin are

14   the two defendants who are most directly impacted by the

15   decision before the Court.

16         Because it's been a little over a year, I just want to

17   redirect the Court's attention to Docket Number 42, which was a

18   memo I filed at the time regarding the appointment of learned

19   counsel and authorization of capital resources.

20         And I, over the course of 23 pages, laid out the

21   defense arguments of why this charge, even if not charged with

22   the aggravating factors is sufficient to be considered by the

23   Court, a capital offense, it's consistent with caselaw.

24         It's consistent with the DOJ's own justice manual that

25   indicates regardless of whether the Attorney General has

1    determined appropriate to pursue a death penalty or not, even

2    the potential of a charge renders it categorically a capital

3    offense.

4          I -- I think that there is no question, it's a capital

5    offense.  And I think that's a determination that the Court

6    essentially made and agreed with back at the beginning of this

7    case.

8          But, ultimately, we received the notice that the

9    Government was not going to seek and as a result, although I

10   think Mr. Gerace -- I think we made a request for second

11   counsel, consistent with being a mega case, back then.

12         We have not renewed that request.  And we've litigated

13   other matters in the meantime, but that has been pending.

14         I think it did change the posture of that request to

15   the extent that learned counsel no longer seemed to be

16   necessary.

17         But the one thing I would observe, Judge, that I think

18   is important here, is there -- is something significant that can

19   interpreted by that memo of last week, regardless of how that's

20   going to be implemented.

21         **THE COURT:**  Yeah.  Have -- have you all seen it?

22         **MR. FOTI:**  Yes.  Yes.

23         **THE COURT:**  Okay.

24         **MR. FOTI:**  We -- I don't think it speaks significantly

25   to how the review process or re-review process is going to be

1    implemented.

2          And I think a lot of the local U.S. Attorneys Offices,

3    including here in the Western District of New York, are

4    probably -- even though they are not going to say it on the

5    record, I would imagine they are probably frustrated by the idea

6    that they have been put in a position where they can't speak to

7    how this is going to be resolved.

8          That said --

9          **THE COURT:**  I -- I won't put them on the spot in --

10         **MR. FOTI:**  And I won't either, but I think it's --

11   what matters here for the Court is the memo conveys something

12   pretty significant to the Court and all the defendants.

13         Which is, even if intention has been given -- has been

14   noticed that they are not going to seek the death penalty,

15   that's subject to review possibly at any time and, say,

16   certainly, going to be subject to re-review.

17         At this time, based on that memo, regardless of

18   whatever procedure is implemented.  The reason that's

19   significant, Judge, is because all of the authority in terms of

20   whether to appoint learned counsel, is very clear that learned

21   counsel should be appointed at the earliest opportunity

22   possible.

23         That's the exact language -- and I'm quoting from the

24   Western District of New York CJA plan.

25         **THE COURT:**  Well, okay.  I'm looking at -- and I'll --

1   I'll come to you, but while you mention it, I'm looking at

2   Section 15(b)(3) of the -- of the CJA plan that says:  Qualified

3   counsel must be appointed in capital cases at the earliest

4   possible opportunity.

5          And then Section 15(c)(1)(A) says:  Appointment of

6   qualified capital trial counsel must occur no later than when a

7   defendant is charged with a Federal criminal offense, wherein --

8   where the penalty of death is possible.

9          **MR. FOTI:**  That's exactly right, Judge.  And -- and 18

10  US Code 3005 and 3006(a) sub E, specifically, grants the

11  judicial conference the authority that is delegated to the

12  districts to come up with a plan that is to be applied within

13  the district.

14         That is the plan that's in place here in the Western

15  District.  And also, Judge, it's consistent with caselaw across

16  the country.

17         Because if you go back and look at the memo when I

18  briefed this previously -- I believe, it's page 15 of the

19  memo -- I listed cases from districts throughout the country,

20  where even before somebody was charged, just the possibility

21  that there is State charges pending or investigation pending,

22  learned counsel -- learned counsel was appointed to a defendant.

23         So in situations where there is even less of a passer

24  within the Federal Court than there is in this case, learned

25  counsel was appointed merely based on the possibility that it

1   could become a prosecution involving an intention to seek the

2   death penalty and those cases are listed.  I think there is

3   maybe a dozen to two dozen cases.

4        **THE COURT:**  Right.  But doesn't Mr. Foti --

5   Mr. Foti -- and no criticism intended here, but as you said, you

6   raised that a long time ago.

7        And then after the no seek determination, you didn't

8   re-raise it.  It wasn't on my radar, at least.

9        And -- and so I guess I'm wondering my -- I've got two

10  concerns.  First of all, in the interest of these defendants,

11  including yours, whether learned counsel should be appointed.

12       But, secondly, what that time frame should be and

13  whether it would impact the current schedule.

14       **MR. FOTI:**  So miss -- I conferred briefly with the

15  Government this morning, just to kind of discuss what might

16  happen today.

17       And I expressed a concern to them that I expressed to

18  this Court.  This is my primary concern.  I understand the

19  interest in moving forward.

20       I think the defendants, generally, have expressed the

21  same interest, but I don't -- I, myself, Mark Foti, I don't have

22  the experience to be able to distinguish between what issues

23  need to be preemptively raised in pretrial motion practice, in a

24  capital cases versus a very large mega case.

25       I don't know that.  And I don't think the majority of

1    the attorneys here, with exception, I think, of Mr. Henry, was

2    qualified as learned counsel, are in a position where they are

3    able to identify whether we are making an enormous strategic

4    error during the course of our motion practice that could impact

5    a defendant who is potentially facing a capital -- a capital

6    prosecution.

7            I appreciate that this office in the past was able to

8    provide intention not to seek.

9            And even though I don't know that they publically

10   indicated, they went through the fast track process -- the

11   timing of which, we received that notice suggests that they did.

12           I would imagine that they -- if procedurally

13   permitted, they may try to give us a quick turnaround in terms

14   of an answer.

15           But we don't know at this point anything other than

16   the administration is going to reconsider the death penalty in

17   this case and all cases from that time frame.

18           And before we're filing motions, Judge, I don't want

19   to do anything to build in delay, but I also don't want to do

20   something that is in egregious strategic error, because we

21   didn't act on this immediately, as the CJA plan directs that we

22   do for that very reason.

23           **THE COURT:**  Okay.  Mr. Muscato, where are you?

24   Anything you want to say?

25           **MR. MUSCATO:**  I don't think -- thank you, Your Honor.

1    I don't think I need to add anything additional to what Mr. Foti

2    said.  Thank you.

3         **MR. COOPER:**  Judge, can I just briefly respond --

4         **THE COURT:**  Yeah.

5         **MR. COOPER:**  -- to what Mr. Foti said?

6         **THE COURT:**  Sure.  Sure.

7         **MR. COOPER:**  So the section that the Court read from

8    about Section 15(b)(3), I would just note, again, that as this

9    case is currently charged, it's not -- the death penalty is not

10   a possible outcome on this indictment.

11        It doesn't allege aggravating factors that are

12   required in Title 18, United States Code Section 3592.

13        And so --

14        **THE COURT:**  Okay.  But -- but --

15        **MR. COOPER:**  -- and so if --

16        **THE COURT:**  What I'm trying to -- what I'm wrestling

17   with is if that's the case, that that's the same indictment that

18   was in effect at the time you issued your no seek notice -- so

19   there wouldn't have been a reason for seeking the death penalty

20   at that point -- at that point, anyway, right?

21        **MR. COOPER:**  So, Judge, the -- I guess what I'm

22   indicating is that we would have to supersede in order to

23   actually have that been an outcome that could happen for the

24   defendants.

25        When -- if and when that happens, which I have no

1  reason to think it will happen, the defendants would have an

2  opportunity, as Mr. Foti just indicated, to confer with learned

3  counsel and make these strategic decisions about what motions

4  would be filed, because a superseding indictment would give them

5  an opportunity to pursue new motions.

6          But right now, that's not the track that the case is

7  on.  We currently have a no seek.  There is no specific

8  information to this case that that's going to change.

9          And so what the Government is asking is to keep us on

10  track -- and if something changes in the future -- if this

11  happens, the defendants will have an opportunity to have learned

12  counsel weigh in on motions.

13          And the Government's position is not going to be to

14  ask you not to assign learned counsel, if this becomes a case

15  where that's being sought.

16          But there is no reason to believe right now that the

17  current status quo is going to change, other than a memo -- a

18  nationwide memo.

19          **MR. TRIPI:**  Judge, I think the only thing I would like

20  to add is that, as you indicated, from indictment, where we

21  didn't allege aggravating factors, to notifying essentially the

22  parties and the Court that the death penalty would not be

23  sought.

24          Meaning, we're not going to supersede this indictment

25  to make it a death eligible -- a death possible case.  That was

 1   a little over 30 days -- roughly, 30 days.

 2          And I'm not allowed to talk about the department's

 3   internal death penalty procedures, but I think I'm allowed to

 4   say, based on that timeline, you can infer it qualified.

 5          This case was determined appropriate for an expedited

 6   review and determination that it was a no seek case and we did

 7   that very quickly.

 8          You are aware of other cases in this district where it

 9   takes a much longer time to reach the final conclusion.

10          And so with that, I would say there has been no

11   change, since that time, that would merit action at this point.

12          That's all I have, Judge.

13          **THE COURT:**  Okay.  I guess, who --

14          **MR. BAGLEY:**  Judge -- Judge, could I weigh in just

15   briefly?

16          **THE COURT:**  Yeah.  Mr. Bagley, go ahead.

17          **MR. BAGLEY:**  Thank you.  So I think what Mr. Foti

18   represented our position quite well, Judge.

19          What I would just add is that what we're trying to

20   avoid is a situation where six months from now, this does become

21   a death penalty case.

22          And motions have been filed and things have been done

23   that can't be undone.

24          And what the Government is representing to you today

25   is that they don't know, right?

1          What they are telling you is it could be a death

2     penalty case in the future.  And they haven't represented to you

3     that it won't be.

4          And until --

5          **THE COURT:**  Because they don't know.

6          **MR. BAGLEY:**  -- and until they rep -- right.  They

7     don't know.

8          **THE COURT:**  That's not up to them or not --

9          **MR. BAGLEY:**  That's fair.  Fair.  But until they can

10    represent that it will not be a death penalty case, then we're

11    in a position, whereas Mr. Foti articularly argued to you, you

12    have to presume that it is.

13         And the resources need to be dedicated to it, such

14    that it is.

15         **THE COURT:**  Well --

16         **MR. COOPER:**  Judge --

17         **THE COURT:**  Just a second.

18         If I understand you two correctly, though, if I

19    were -- if I were to appoint -- you would want it combined with

20    an extension of the motion schedule.

21         And that's -- that's where I got a big problem,

22    because I've got -- we've got -- let's see, Defendant Barnes is

23    no longer in the case.

24         He -- his action was severed.  Defendant Byrd,

25    unfortunately, has passed away.  So we have seven -- one, two,

1    three, four, five, six -- seven defendants left.

2         Four of which are potentially -- potentially impacted

3    by -- by this memo.  Three of which are not.  And they certainly

4    have a right to a speedy trial, too.

5         And if I were to put everything on or further extend,

6    that would be detrimental to their rights, so that's what I'm

7    wrestling with right now.

8         **MR. FOTI:**  And, Judge, I -- I certainly am wrestling

9    with that as well.

10        Mr. Gerace has less issues to raise in pretrial

11   motions than some of the other defendants, I think, based on the

12   fact that we haven't been really provided any Rule 12 notice of

13   anything, I believe we can move to suppress.

14        So in terms of that portion of the dispositive

15   motions, there is less for us to litigate.

16        I -- I also -- you know, Judge, that -- I'm taking

17   speedy trial very seriously.

18        **THE COURT:**  Well, we are.  I think --

19        **MR. FOTI:**  Yes.  We are.  And I was the last attorney

20   to join in on the request to extend motions last time.

21        So in January, I was concerned about any extension.  I

22   feel differently today than I did a month ago.

23        Now, I do want a second set of eyes on this from

24   somebody who is going to tell me whether we are making a very

25   bad strategic mistake, in terms of filing motions, based on the

 1    current posture of the case, when there is still this potential

 2    of a capital prosecution out there pending now.

 3         I don't think if somebody else comes in and they

 4    advise me, with their experience -- which will clearly be more

 5    substantial than mine, that it really isn't going to impact

 6    anything if we file pretrial motions now and we can simply

 7    supplement later, then that would be the course we would pursue.

 8         But if there is a concern about filing motions now,

 9    that I am unaware of, I'm limited by my own experience and

10    that's the whole reason I think it would have been great if we

11    had went forward and appointed learned counsel at the outset,

12    because they would already be in place.

13         But we are revisiting that decision now and we should

14    make that decision to put them in place and then let us advise

15    the Court upon conferring whether there is a reason why we think

16    we need additional time on motions.

17         I -- I imagine that the new counsel, as the Government

18    pointed out, probably will say I want to review things, to be

19    able to adequately advise on that.

20         I don't really know on that, though.  All I'm asking

21    for at this time is the appointment of learned counsel and an

22    openness to having them weigh in on whether we need additional

23    time or not.

24         **MR. COOPER:**  Judge, a year ago, you exercised some

25    discretion in waiting and you waited.

 1            And I think, like Mr. Tripi said, pretty quick.  And I

 2    think, actually, the Court was pleased at how quick a decision

 3    came back and it was able to keep the case on track.

 4            And that decision ended up, I think, saving a

 5    significant amount of resources.

 6            Whereas, if you had appointed learned counsel

 7    initially, that would have been an expense for the CJA that

 8    became unnecessary pretty shortly after.

 9            So by waiting, it ended up working out.  And the

10    Government's position here is just asking you to make that same

11    decision.

12            It's only been a couple of days since the memo came

13    out.  We're going to get additional guidance from main justice

14    about how this process is going to play out.

15            So we're just asking you to wait, again, to avoid

16    adding in -- building in delay, that we may very likely be able

17    to avoid.

18            If -- if additional motions need to be filed because

19    this becomes a death penalty case, there will be an opportunity

20    to do that.

21            They are not going to lose the opportunity to do that.

22    But if we add learned counsel to the case now, the first thing

23    that's going to happen is a request for an extension.

24            And I appreciate Mr. Foti was pretty candid about

25    that, because no attorney is going to come in and know nothing

1   about the case and give Mark advice about it.

2        They can't do that.  They have to learn it first.

3   That will take time.  So motions are going to get delayed.

4        And then what's going to happen, I expect, is two

5   years from now, there is going to be a speedy trial argument and

6   the Government is going to be blamed for this delay, because

7   they are going to say the Attorney General wrote a memo.  That's

8   what caused this delay.

9        The Court had to appoint learned counsel, because of

10  the memo.  And so even though they are going to ask for more

11  time for motions, it's going to -- they are going to argue that

12  it should count against us for Constitutional speedy trial time.

13       We're trying to keep the case on schedule right now.

14  Nothing has changed.  It's a no seek case.  Let's move forward.

15       **MR. HENRY:**  Judge, Your Honor.

16       **THE COURT:**  Yeah.

17       **MR. HENRY:**  Mr. Henry or Dan Henry, I mean, on behalf

18  of Mr. Hinkle.  I want to just echo what Mr. Foti indicated and

19  the concern he has.

20       And that's --

21       **THE COURT:**  Can you get to a mic?

22       **MR. HENRY:**  That's the biggest concern in the death

23  penalty case, is the filing of the motions.

24       And to file motions too soon, sometimes the Government

25  will argue, well, why don't you have bifurcation of motions?

 1          You can file certain motions at one stage and then

 2   death penalty ones at another stage, but that causes a lot of

 3   problems.

 4          Because in filing earlier motions ahead of time

 5   creates issues that can implicate and have an impact on what you

 6   do on the death penalty side and the mitigation side.

 7          And the two phases, you got the guilty phase and

 8   you -- you've got the death penalty phase.

 9          So in this particular case, if we were to go forward

10   and file our motions January 21st or February 21st, and then

11   they do seek the death penalty and then we have to re-file new

12   motions that could have a clear impact on what has already been

13   filed to the detriment of our clients.

14          So I'm just talking in general, from handling death

15   penalty cases.  And that's -- that's a real serious concern is

16   when the motions are filed, what those motions contain and the

17   effect it has on the potential death penalty portion.

18          **THE COURT:**  Okay.

19          **MR. FOTI:**  That's exactly what I'm concerned about,

20   Judge.

21          And I -- I can say -- just as an example, I can think

22   of -- without ever having practiced in a capital prosecution is

23   I would imagine I would advise my client quite differently or at

24   least consider things quite differently on establishing standing

25   for certain issues.

1          If you are -- if you are considering anything through

2     the lens of a potential capital prosecution, there are different

3     additional considerations before your client puts into writing

4     something to establish standing, which is necessary for filing

5     of dispositive motions at this stage.

6          So I just think that -- in my opinion -- and, again,

7     it's from a point where I lack experience, but I defer to

8     Mr. Henry and he is expressing exactly what I'm concerned about.

9          There is the potential, to our client's detriment,

10    that filing motions now will hurt them in a subsequent capital

11    prosecution.

12         Then I am -- there is nothing that I can think of that

13    would make me want to file motions right now, knowing that given

14    the severity of that type of prosecution that I could make a

15    misstep.

16         And the one thing that can remedy that is the

17    appointment of learned counsel and allowing them to advise us

18    and make sure that we're not doing something that could hurt our

19    clients down the road in a case where life and death is

20    literally at stake.

21         **THE COURT:**  Okay.  Ms. Mariano, do you want to say

22    anything?

23         Because this isn't a state secret, but it was brought

24    to my attention by Marianne Mariano that this memo had been

25    issued, as well as all the other judges.

1          That's when I became aware of it.  I mean, it only

2   happened last week.

3          Is there anything that you want to say, just

4   generally?

5          **MS. MARIANO:**  No, Judge.  As you know, as the Federal

6   defender, I brought to the Court's attention that the Department

7   of Justice is going to review all of the prior no seek decisions

8   of the last administration.

9          It was quite literally one of the first things that

10  the new Attorney General issued after being sworn in, so I think

11  we should take it quite seriously.

12         I do very much sympathize and appreciate with my

13  colleagues across the aisle, that they don't necessarily know

14  what the next steps are, but I don't think we should presume.

15         We have a no seek.  I think, the memo indicates

16  everything is under review, so we do not have that now.

17         Our plan requires assignment of counsel at the

18  earliest possible moment, when a death eligible offense is

19  charged.

20         **THE COURT:**  And they are saying --

21         **MS. MARIANO:**  It is never weighted.

22         **THE COURT:**  They are saying it hasn't been -- they are

23  saying it hasn't been charged.

24         **MS. MARIANO:**  That is just not the way our plan has

25  ever been interpreted, Your Honor.

1          It is a plan that is drafted based on a model that was

2     approved by the judicial conference of the United States.

3          Every judge in this district has approved our plan and

4     the Second Circuit has also adopted it.

5          That plan requires appointment, without special

6     findings.  We've had criminal complaints where capital offenses

7     are charged and counsel assigned.

8          We have had cases before Federal charges are filed and

9     counsel is assigned.  The plan contemplates a case having

10    learned counsel at the earliest possible moment.

11         And I would say, Judge, I appreciate that there may be

12    guidance forthcoming that will give reassurance to all that the

13    prior no seek will be reinstated and go forward with a

14    noncapital case, but that is not what we have today.

15         And I would urge the Court to not put procedural form

16    over Constitutional substance.  The rights of the Sixth

17    Amendment of these defendants in a capital prosecution is

18    preeminent and I would respectfully urge you to assign counsel

19    now.

20         **THE COURT:**  Okay.  But, I mean, this is not easy on

21    anybody's part, because nobody really knows what's going on

22    right now.

23         But I -- I take it that four defendants who

24    potentially are subject to death eligible charges, those four

25    would not or would want an extension of the deadline for

1  motions, correct?

2         **MR. HENRY:**  From the death penalty, yes.  That's what

3  we would want.

4         **THE COURT:**  Mr. Foti, I take it you do?

5         **MR. FOTI:**  I -- I don't have the experience Mr. Henry

6  has, but the fact that he thinks it would be prudent then, yes.

7  Absolutely.

8         **THE COURT:**  Mr. Muscato.

9         **MR. MUSCATO:**  I have to agree with Mr. Henry.  I

10 wasn't going to ask for an extension, but I think he has raised

11 an important issue that we need to --

12        **THE COURT:**  And I'm -- I'm not saying I'm giving one.

13 I'm just trying to get your opinions down.

14        Mr. Bogulski?

15        **MR. BOGULSKI:**  Yes, Judge.  Yes.

16        **THE COURT:**  Okay.  Then -- then, but -- then I've got

17 three defendants who also have speedy trial interests, who are

18 not even potentially subject to death penalty charges.

19        And that's -- that's defendants Roncone, Knight and

20 Cortnie Barber, I take it.  And I'd like to hear from counsel

21 who is here, what -- what's their view.

22        **MR. HUTCHISON:**  Judge, Brian Hutchison, on behalf of

23 Ms. Barber, who is excused for today.

24        It's no secret, Judge, I've been talking with the

25 prosecution, that I have an intention to file the motion to

1    sever.  I think I have a good faith basis to request at this

2    point that her case be severed.

3            Even prior to this conversation, there is some

4    implications with co-defendant Gogolack, who is also charged in

5    those counts.

6            But my client's alleged criminal conduct has no

7    connection to the charge that is resulting in this death penalty

8    eligible discussion.

9            So from Ms. Barber's standpoint, we certainly don't

10   want the case to be unnecessarily delayed.

11           But to the extent that the Court would be considering

12   an extension on omnibus discovery, omnibus motions going

13   forward, it would be Ms. Barber's position and my position, on

14   her behalf, that we're -- we would be filing a severance motion

15   asking for her portion of the case, to be severed for her

16   charges.

17           And to go forward on a separate more expedited motion

18   practice than what might be a part of the death penalty eligible

19   case.

20           **THE COURT:**  Okay.  Thank you.  And let's see Attorney

21   Montroy is not here for defendant Knight, correct?

22           **MR. COOPER:**  That's right, Judge.

23           **THE COURT:**  Who else we got?

24           **MR. COOPER:**  Paul Dell for Mike Roncone.

25           **THE COURT:**  Yeah.  Paul's not here, right?

1          Okay.  How quickly do you think you could get an

2     indication or if you -- and if you don't know, I completely

3     understand that, but --

4          **MR. TRIPI:**  I can give you a suggestion.

5          **THE COURT:**  Right.

6          **MR. TRIPI:**  Maybe we can reconvene in the next two

7     weeks or so and I can try to press for more information.

8          That's about the best I can represent on that front,

9     Judge.  Again, I'm limited to what I can say about the protocol.

10    I've pointed out before that the decision was made relatively

11    quickly.

12         **THE COURT:**  Yeah.

13         **MR. TRIPI:**  In this case, I -- that might be a decent

14    interim step, when I can provide you with more insight into

15    timelines and time frames.

16         **THE COURT:**  Uh-huh.

17         **MR. TRIPI:**  I know one thing is for sure that this

18    Court is not going to prejudice any defendant in supplementing

19    motions, if -- if that ever comes to fruition.

20         But the only thing I'd like to correct from the point

21    Ms. Mariano made, is this case is different than all the ones

22    that she was just talking about, because we have a directive

23    from the Attorney General at the time, specific to this case,

24    directing us not to seek.

25         And as we sit here today, we have no indication that

 1    we are going to be directed to seek in this case.  So that's

 2    where we're at.

 3              **THE COURT:**  Yeah.  Okay.  I understand that.

 4              Back -- Mr. Hutchison, you know, if -- if it were up

 5    to me and it's not severance, that's going to be decided by

 6    Judge Vilardo.

 7              If it were up to me, I think the best way to proceed

 8    to protect the interests of the four who may be subject to death

 9    penalty eligible charges and to protect the interests of the

10    other three who are not, and presumably have, you know, speedy

11    trial interests, I would probably be inclined to grant a

12    severance.

13              Although, I -- you know, I'd have to give it a lot of

14    thought, but it's not up to me.  It's up to Judge Vilardo.

15              I suggest maybe, if you want to make a motion, you --

16    you go ahead and do that.

17              But I think for now, I'm trying to balance everybody's

18    interests, Mr. Tripi, I think I may go along with your

19    suggestion.

20              I'm going to put the February 21st deadline on hold

21    for a very short period of time.

22              I want to reconvene today is the 10th.  Maybe we

23    convene in three or even four weeks.  Hopefully, by then you

24    have an indication.

25              But if you don't, then I have to decide what I'm going

1    to do, but that at least gives us some time to explore whether

2    or not there will be a consideration in this case.

3            I hear everything you are saying about the fact that

4    there was a quick turnaround on the no seek from the last

5    Attorney General.

6            We have a different Attorney General now.  I don't --

7    nobody knows what, you know, what her attitude is going to be.

8            But I -- again, I do -- from the memo itself, it seems

9    that the primary focus of the reevaluation would be on types of

10   crimes older than this case, but it does say all -- all

11   determinations need to be reassessed, so --

12           **MR. TRIPI:**  My -- my plan, Judge, given your comments,

13   would be to order this transcript, ask for --

14           **THE COURT:**  Yeah.

15           **MR. TRIPI:**  -- ask for it to be -- ask for it to be on

16   the three week end of things and -- and --

17           **THE COURT:**  Yeah.

18           **MR. TRIPI:**  -- I'll do my best --

19           **THE COURT:**  You know --

20           **MR. TRIPI:**  -- my best to get as much information as

21   possible.

22           **THE COURT:**  Well, I appreciate that.  And, you know,

23   just point out the kind of conundrum that I find myself in -- we

24   all find ourselves in, which is what do we do to protect

25   everybody's interests in the best -- in the best manner

1    possible?

2         So I'm going to hold that February 21st deadline in

3    abeyance, for a short period of time, I'm going to.

4         So I don't want Mr. Foti -- you know, I understand

5    what you are saying about you and -- you're a great attorney, as

6    you all are, okay?

7         You can print that portion of the transcript and put

8    it on your wall, but --

9         **MR. FOTI:**  Thank you, Judge.

10        **THE COURT:**  But I -- you know, I understand what you

11   are saying, that you might, because you don't have experience in

12   this area.

13        You might make a mistake in your filings -- well,

14   I'm -- I'm sensitive to that, but we've got to move forward

15   sooner or later on everybody's behalf.

16        So I'm just going to hold that -- hold the

17   February 21st deadline in abeyance for now.

18        I want to reconvene -- maybe, Mr. Tripi, you tell me

19   what -- what would make sense in terms of when we get back

20   together.

21        **MR. TRIPI:**  You suggested three or four weeks, Judge.

22   Can we get a date in about three weeks?

23        **THE COURT:**  Sure.  Today is the 10th.  So how about

24   Monday?  Can we do Monday, March 3rd?

25        **MR. TRIPI:**  That's fine, Your Honor.

1          **MR. FOTI:**  Judge, I have multiple appearances in

2     Rochester that day.

3          **THE COURT:**  Okay.

4          **MR. FOTI:**  Could we do any other day that week?  I

5     just -- I just don't want to have to try to reschedule them all.

6          **THE COURT:**  Sure.

7          **MR. COOPER:**  Not to be difficult, could we avoid

8     Tuesday as well that week?

9          **THE COURT:**  Okay.

10         **MR. COOPER:**  If we're not doing Monday.

11         **THE COURT:**  Okay.  How about how about Wednesday, the

12    5th at 11:30?

13         **MR. COOPER:**  That works for the Government.

14         **MR. TRIPI:**  That works.  Thank you.

15         **THE COURT:**  Does that work for everybody?

16         **MR. FOTI:**  Yes, Your Honor.

17         **MR. HUTCHISON:**  Yes, Judge.

18         **MR. MUSCATO:**  Yes.

19         **THE COURT:**  Okay.  So in terms of your preparation on

20    your motions, because I assume you were all preparing for the

21    February 21st date.

22         I'm not saying to stop.  You should continue, but you

23    shouldn't feel that you've got that deadline to file, okay?

24         **MR. FOTI:**  Judge, on the second issue of appointment

25    of counsel, I don't know if the Court intends to rule on that

1  today, but, I guess, what I would ask if the Court is still

2  weighing whether to appoint learned counsel, I would simply in

3  conjunction with that renew my request for second counsel

4  pursuant to the case.

5       That this is a mega case.  And given the Court has the

6  ability to appoint -- to make a determination of who to appoint

7  counsel, in consultation with the Federal Defenders Office, if

8  the Court appoints second counsel on those grounds, and simply

9  takes into consideration the posture of the case and appoints

10  somebody who has experience to fulfill the role of learned

11  counsel, then I think we end up being in a much better position

12  when we come back here.

13       Regardless of what the Government is able to report at

14  that point, in the meantime there can be conversations about

15  what concerns we should be expressing to the Court.

16       If any -- beyond the type of conversation we had

17  today, where I appreciate the Court's compliment that I'm a good

18  attorney, but -- you know, continue to recognize --

19       **THE COURT:**  Well, well, don't overread that.

20       **MR. FOTI:**  I -- no.  I am -- I do intend to put it on

21  my wall, Judge.

22       And I plan to point it out to anybody who visits my

23  office, but I -- I continue to express that I'm not experienced

24  in this type of litigation.

25       That the whole point of learned counsel -- and if we

1    can have that appointment now, we're in a better position when

2    we come back, regardless of where the Government goes with it at

3    this point.

4            **MR. MUSCATO:**  Your Honor --

5            **THE COURT:**  Yeah.

6            **MR. MUSCATO:**  Candidly, this is George Muscato.

7    Candidly, I was in the process of preparing a motion to ask the

8    Court to consider appointment of second counsel.

9            Quite frankly, the amount of discovery in this case is

10   significant.  The issues are extremely important.

11           Whether this is a death penalty case or not, it is a

12   mega case.  And I think that Mark has quite frankly expressed my

13   feeling on this, that a second counsel would be very helpful.

14           I appreciate the fact that the Government has three

15   attorneys always involved.  From their point of view, they have

16   a much more significant burden.

17           But our response is also significant and I think that

18   a second attorney would probably be merited under any

19   circumstances, with all due respect.

20           **THE COURT:**  But if I were to appoint additional

21   counsel for you two, does everybody get one?

22           **MR. MUSCATO:**  Well, I think that the four of us and

23   Mr. Henry and Mr. Bogulski are already representing Mr. Hinkle

24   jointly.

25           The Federal Public Defenders Office, I know that

 1    Mr. Morrissey is on family leave, but he will be coming back to

 2    assist Mr. Bagley.

 3            So quite frankly, it is just Mr. Foti and I that are

 4    solo.

 5            **MR. FOTI:**  We're -- I think Mr. Muscato and I are the

 6    only ones who have made a request for second counsel, pursuant

 7    to the fact that it's a mega case.

 8            So we have that request in conjunction with the

 9    request for learned counsel.

10            If the Court were to grant that request, that

11    Mr. Muscato and -- and I have made, it will also potentially

12    resolve the issue of whether learned counsel needs to be

13    appointed, which I think it does.

14            I think the CJA plan directs it, but I think it could

15    potentially -- depending on who the second attorneys are that

16    are appointed and what their experience level is, it could

17    resolve -- it could resolve that concern.

18            And the other attorneys who are on the case, if they

19    feel they are in a position where they need to request second

20    counsel, based on the fact it's a mega case, they, I think,

21    have -- are free to do that.

22            But I don't believe any of them have at this point --

23    and given that their clients don't have the same exposure that

24    our clients have, they may not feel that it's ultimately

25    necessary.

1          **THE COURT:**  All right.  And here's what I'm going to

2     do today.  Not necessarily on the basis that it's a death

3     penalty eligible case, because -- because I don't know that

4     right now.

5          Nobody knows that.  But on the basis that it's a mega

6     case, I will appoint -- and this -- these two attorneys -- it's

7     been in consultation with the defender's office, which is also

8     provided for in the CJA plan, I'll appoint -- if they will

9     accept the appointment, Cheryl Meyers Buth for Defendant Gerace

10    and Barry Covert for Defendant Ermin, as additional counsel

11    right now based on the fact that it's a mega case.

12         Not necessarily on the fact that it is death eligible.

13    But if it turns out to be death eligible, they are both

14    qualified to -- to fulfill that role.

15         But, again, I'm going to hold -- as I said, I'm going

16    to hold the discovery deadlines in abeyance either now or --

17         **UNIDENTIFIED SPEAKER:**  The motion.

18         **THE COURT:**  -- not forever.

19         And when we reconvene, maybe we will have an

20    indication, I hope.  You can't make a promise, but all you can

21    assure me is that you will make best efforts to get an answer

22    and that's all I can ask of you.

23         And then we'll see where we go.  I'm going to advise

24    also Judge Vilardo of today's conference and the interests that

25    Mr. Hutchison, for example, advanced on -- on behalf of his

1    client.

2        And that maybe severance down the road will be

3    necessary.  Maybe it won't.  But I'll at least bring him up to

4    speed on where we're at right now, okay?

5        **MR. BOGULSKI:**  Judge --

6        **THE COURT:**  Yeah.

7        **MR. BOGULSKI:**  Frank Bogulski.

8        **THE COURT:**  Yes.

9        **MR. BOGULSKI:**  Just an idea, since we already have

10   Mr. Covert and Ms. Meyers Buth and Mr. Henry, you could just

11   appoint them as learned counsel right here, right now, as we --

12       **THE COURT:**  I don't have to do that.  I mean, because

13   I'll do that, if necessary, but I don't have to do that.

14       Right now, I'll appoint them as learned counsel when I

15   have to, but they are going to be in the -- they are going to be

16   in the case anyway, okay?

17       **MR. BOGULSKI:**  Thank you, Judge.

18       **THE COURT:**  All right.

19       **MR. COOPER:**  Judge --

20       **THE COURT:**  Yeah.

21       **MR. COOPER:**  Just two things, I want to point --

22       **THE COURT:**  Yes.

23       **MR. COOPER:**  -- say -- first of all, when you were

24   making a record a moment ago, you said you were going to hold

25   the discovery deadline in abeyance.

1            I know you --

2        **THE COURT:**  For a short period.

3        **MR. COOPER:**  -- I believe you meant to say the

4   motions.  It's the motions deadline.

5        **THE COURT:**  I'm sorry.  Yeah.  Yeah.  I misspoke.  The

6   motions deadline.

7        **MR. COOPER:**  Just wanted to make sure that the record

8   was clear there.

9        **THE COURT:**  Right.

10       **MR. COOPER:**  And the second thing is towards the end

11  there, you indicated that you were going to have a discussion

12  with Judge Vilardo about today's status conference to let him

13  know --

14       **THE COURT:**  I was just going to update him.  I don't

15  know -- by e-mail.  I don't know if I will talk to him.

16       **MR. COOPER:**  The one thing I was going to request -- I

17  understand if -- if you are going to discuss with him what's

18  going on with the adding counsel to the case.

19            With respect to the severance, Judge -- Judge, I would

20  respectfully ask that you hold off.

21            And if Mr. Hutchison wants to file a motion to Judge

22  Vilardo, he can file a motion.  And that way the Government is

23  party to what's being filed --

24       **THE COURT:**  Yeah.

25       **MR. COOPER:**  -- to Judge Vilardo.  And that way, we

1    have an opportunity to respond, as opposed to --

2         **THE COURT:**  No.  Obviously, if there is a motion for

3    severance, you will certainly have the opportunity to respond.

4         I'm just trying to alert him to all the various

5    possibilities.  That's all I'm saying, okay?

6         I'm not trying to foreclose the Government from --

7         **MR. COOPER:**  Well, I think what you said when you were

8    making a record a moment ago was that you were going to tell him

9    that you thought that severance would be necessary or would

10   likely be necessary.

11        **THE COURT:**  No.

12        **MR. COOPER:**  And I'm concerned by that --

13        **THE COURT:**  No, no.

14        **MR. COOPER:**  -- because --

15        **THE COURT:**  No.  What I --

16        **MR. COOPER:**  That's not -- that's adverse to my

17   client's --

18        **THE COURT:**  What I --

19        **MR. COOPER:**  -- position, so --

20        **THE COURT:**  Okay.  What I also said or what I meant to

21   say is that there are a lot of factors that enter into a

22   severance determination.

23        And I -- I may not be familiar with all of them, so

24   I'm not -- I'm not even suggesting -- I didn't mean to suggest

25   that that's what should happen, but that there may be a request

 1   for that.

 2          MR. COOPER:  Understood.  If it's -- just that there

 3   may be a request for it.  I'll leave it.

 4          THE COURT:  Yeah -- no.  I'll --

 5          MR. COOPER:  I have no issue with that.

 6          THE COURT:  I'll leave it at that.

 7          MR. COOPER:  Okay.

 8          THE COURT:  Okay.

 9          MR. COOPER:  Thanks, Judge.

10          THE COURT:  If somebody's going to ask for a

11   transcript, which I think would be a good idea, that that's --

12   that's what I meant to say.

13          That's what I'm saying now.  I'm not making a

14   recommendation for severance.  I'm just saying -- you know, that

15   maybe a possibility to consider.

16          MR. COOPER:  Understood.

17          THE COURT:  Okay.

18          MR. COOPER:  Yes, Judge.

19          THE COURT:  All right.  So I guess we need a short

20   additional speedy trial extension to from February 21st through

21   March 5, right?

22          MR. COOPER:  Yes, Judge.

23          THE COURT:  Because the current motion deadline was

24   the 21st and so we'll need about two weeks -- a little over two

25   week extension.

1          Anybody want to make a motion?

2          MR. COOPER:  Judge, the Government would request that

3     the time between today and March 5, 2025, be disallowed from the

4     Speedy Trial Act pursuant to Title 18, United States Code

5     Section 3161(h)(7)(A) and (h)(7)(B)(4), specifically, because it

6     was the request of the four defendants that are asking for the

7     Court to appoint learned counsel.

8          And also asking for the Court to extend the motions

9     deadline, so that they have an opportunity, if the posture of

10    this case changes to get the input from that additional counsel

11    about how motions should be filed, what motions should be filed

12    and to review discovery with those additional attorneys.

13         So it's in the interest of justice and the interest of

14    the defendant and those interests outweigh the interests of the

15    public and the defendants in a speedier trial.

16         THE COURT:  Any objection?

17         MR. BAGLEY:  Judge, we don't have an objection.  You

18    know, I think we -- we've made the record clear as to -- as to

19    why it is that we think, you know, motions can't be filed on the

20    21st.

21         THE COURT:  Cannot be filed.

22         MR. BAGLEY:  Cannot be filed.

23         THE COURT:  Right.

24         MR. BAGLEY:  On the 21st, Judge?

25         THE COURT:  Right.

1          **MR. BAGLEY:**  And so we stand by the record that --

2    that we made, but we don't have an objection to that speedy

3    trial exclusion, for the reasons that have been articulated

4    today.

5          **THE COURT:**  Okay.  Anybody else?

6          All right.  And I recognize that a couple of the

7    defendants are not here and not represented today, but that

8    that's going to be my ruling.

9          It's not a long term extension, but I think it enables

10   us to give further consideration to the interests of all the

11   defendants.

12         So for the reasons stated by counsel -- all of the

13   reasons stated by counsel, the Speedy Trial Act deadline is

14   excluded from February 21st to and including March 5th, 2025,

15   from the Speedy Trial Act calendar, okay?

16         **MR. COOPER:**  Judge, last thing before we break for

17   today.

18         **THE COURT:**  Yeah.

19         **MR. COOPER:**  You pointed out before that Mr. Knight

20   and his attorney and Mr. Montroy aren't present today.

21         If my memory serves, the last one, if not two

22   appearances, they have not been present.  And I haven't had any

23   contact from them.

24         And I've been in touch -- or one of us has been in

25   touch with most of the attorneys in this case, so, I guess, I'm

 1   just expressing some concern that Mr. Knight hasn't been present

 2   to know what's going on in this case and also his lawyer hasn't

 3   come to Court, I think, now twice in a row.

 4          So I'm not in any way trying to disparage Mr. Montroy.

 5   I've never worked with him before, but I do think it's important

 6   that he show up to Court and be present to know what's going on

 7   in the case.

 8          **THE COURT:**  Yeah.  I will -- I will issue a directive

 9   that they be present at the next conference.

10          **MR. COOPER:**  Okay.  And I hope that's not taken the

11   wrong way.

12          **THE COURT:**  No, no, no.

13          **MR. COOPER:**  I'm just trying to do the right thing.

14          **THE COURT:**  Not at all.  Not at all.

15          **MR. COOPER:**  Okay.

16          **THE COURT:**  Anything further today?

17          **MR. TRIPI:**  No, thank you, Judge.

18          **MR. FOTI:**  No, thank you.

19          **MR. MUSCATO:**  Thank you, Judge.

20          **THE COURT:**  Thank you all.

21

22              (Proceedings concluded at 2:58 p.m.)

23                      *   *   *

24

25

1

2      "I certify that the foregoing is a correct transcript, to the

3        best of my ability, from the record of proceedings in the

4                        above-entitled matter."

5

6

7      _s/ Bonnie S. Weber_          _February 12, 2025_
          Signature                      Date

8

9      BONNIE S. WEBER, RPR

10     Official Court Reporter
       United States District Court
11     Western District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25