IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.           23-CR-99-LJV

SIMON GOGOLACK, et al.,

      Defendants.
_____

### GOVERNMENT'S REPLY TO THE DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR RECONSIDERATION OF ASSIGNMENT OF SECOND CJA COUNSEL FOR DEFENDANTS

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, Joseph M. Tripi, Assistant United States Attorney, of counsel, hereby files this reply to the defendants' joint response (*see* ECF No. 360) in opposition to the government's motion for reconsideration (*see* ECF No. 355) regarding the appointment of second court appointed CJA counsel for defendants.

### INTRODUCTION

The government submits that reconsideration is appropriate here for several reasons. First, the government has standing to object to unnecessary CJA assignments because the Second Circuit and cases in this judicial district have held that CJA assignments—and disbursement of tax payer dollars inherent therein—are subject to the adversarial process. Second, the decision to appoint additional CJA counsel was not made with full consideration of the government's fully-formed position through a complete adversarial process. Third, DOJ internal guidance and the case law interpreting such guidance confers no rights upon the defendants, and the Court used DOJ internal guidance as a mechanism, in the absence of a

defense motion, to reverse its prior decision denying second CJA counsel to the defendants. Fourth, the Court neither made findings of extenuating circumstances, which is the CJA guideline standard guiding the Court's discretion as to whether to retain learned counsel in a non-capital case, nor that the case was "unusually complex." Fifth, the Court did not make any findings that the case is "extremely difficult," which is the CJA guideline standard guiding the Court's discretion as to whether to assign a second CJA attorney in a non-capital criminal case. Finally, this Court previously determined that one attorney was sufficient and, under these circumstances, assigning additional attorneys at this juncture to only defendants Gerace and Ermin risks a public perception that certain defendants will be assigned extra resources when similarly situated defendants in this case—and in other prior serious cases—are not. *Wheat v. United States*, 486 U.S. 153, 160 (1988) (observing that federal courts have "an independent  interest in ensuring […] that legal proceedings appear fair to all who observe them.").

In their joint response, the defendants argue that there is no basis for the Court to reconsider its appointment of counsel because (1) they are statutorily entitled to the appointment of counsel because of the potential for the death penalty to be sought and (2), even if they were not, "the Court . . . exercised appropriate discretion to appoint two lawyers on a mega-case". J. Resp. in Opp., at 27.

These assertions ignore a critical tenet of the government's motion for reconsideration: after an *ex parte* process initiated by the office representing one of the defendants, the defendants entered the "status conference" armed with a year's old motion to appoint counsel in a CJA "mega" case that the Court ultimately granted without providing notice to the

government that it was considering such a motion or making any of the complexity findings contemplated by the CJA Plan. Later, the government learned via an email that the Court had seemingly begun considering that counsel identified by the Federal Public Defender would be appointed, without either the Court or the Federal Public Defender consulting the conflicts list that the government previously circulated and before the government ever stepped into court. The government, meanwhile, had no notice that the "status" conference would be used by defendants to backdoor the appointment of counsel through the "mega" case nomenclature, as a status conference is not a motion's argument and a "mega" case is not a capital case implicated by DOJ's internal memoranda.

At bottom, a proceeding commenced only after an opposing party initiates contact with the Court, and after said opposing party tacitly begins the process of persuasion before the government is even aware of the issue, does not comport with the principles of fairness and transparency that are demanded of federal criminal cases. *See generally United States v. Rechnitz*, 75 F.4th 131, 146 (2d Cir. 2023). *That* is why, in combination with the foregoing, the Court should reconsider its decision and, at minimum, make the requisite findings of complexity that, under its own CJA plan, merit the appointment of additional counsel.

1. **The Government has Standing—and Law, Policy, Practice, Precedent, and Principle All Favor Hearing the Government's Perspective as to whether the Appointment of Counsel Coheres with Law and Policy.**

Defendants argue that the Court should prohibit the government from weighing in on the appointment of counsel. *See* J. Resp. in Opp., at 23–24. In their view, the government's objective in seeking a conviction "divests" it of the right to comment on the appointment of counsel. *See id.* at 23. The policy, history, practice of the Western District of New York, and

fundamental principles governing the American system of adjudication, however, recognize that the government has a meaningful voice in these proceedings, one that establishes the government's standing to participate in this litigation and counsels in favor of reconsideration.

First, though certain CJA matters, like funding and payment, are rightfully reserved for *ex parte* communications with the court, the CJA policy itself contemplates, and as the defendants concede, that the government will be consulted as to certain matters, such as conflicts of interest, prior to the appointment of counsel.

Second, the history, practice, and precedent of this district, and others within the Second Circuits, subjects, in limited fashion, CJA appointments to our adversarial system of adjudication.  For example, the government may initiate (or respond to) conflict of interest issues as they arise.  Likewise, where CJA counsel is appointed through statutory learned counsel provisions, such as in death-eligible indictments, the government *routinely* litigates the propriety of those appointments.  *See, e.g.*, *United States v. Douglas*, 525 F.3d 225, 235 (2d Cir. 2008) (noting a dispute between the government and the defendant as to whether the statutory right to second counsel is extinguished when the Department of Justice issues its no-seek decision); *United States v. Jenkins*, 279 F. Supp. 3d 455, 457 (W.D.N.Y. 2018) (recognizing both that the government sought the removal of second, court-appointed counsel after the Department of Justice issued a no-seek determination and that the Magistrate Court granted the request); *United States v. Eldridge,* 2014 WL 4640848 at *4 (W.D.N.Y. 2014) (rejecting a defendant's law of the case arguments and removing second CJA counsel in a RICO/murder case while observing: "[i]f this Court were to determine that the nature of the charges here required two lawyers per defendant, it would rarely if ever be permitted to reduce counsel

when the Government elected not to pursue the death penalty. This result would be in direct conflict with the instructions of the Criminal Justice Act Guidelines, as well as this Court's duty to control taxpayer expenses."); *United States v. Zaccaria*, 1997 WL 642985, at *4 (W.D.N.Y. Apr. 11, 1997) (noting that in addition to insuring that both rich and poor are afforded an adequate defense, the CJA imposes a duty on the court to exercise vigilance in the use of taxpayer funds).

Just as well, it is the practice of this circuit, and the districts therein, to afford the government an opportunity to litigate certain issues implicating the propriety of the appointment of CJA counsel, be it due to financial ineligibility or the appointment of second counsel. *See, e.g.*, *United States v. Harris*, 707 F.2d 653, 658 (2d Cir. 1983) (considering the government's arguments regarding an appeal concerning the appointment of CJA counsel); *United States v. Hernandez*, No. 18-CR-6126-FPG, 2022 WL 368407, at *1 (W.D.N.Y. Feb. 8, 2022) (noting that the defendant argued in a motion that the Court erroneously declined to appoint him a second attorney and that the government opposed the motion).

In fact, the legal analysis and broader principles elucidated in *Harris* squarely reject the legal argument advanced by the defendants, who invite the Court to conclude that because the CJA statute permits avenues of *ex parte* communication with the court involving the appointment of investigators or expert witnesses, the entire appointment of counsel process is exempt from the adversarial process. *See* Joint Resp. in Opp., at 16.

Not so, according to *Harris*. There, the government challenged the continuing propriety of the appointment of CJA counsel after furnishing evidence that the defendant

undervalued his income by 50%. *Harris*, 707 F.2d at 660. Based on the government-supplied financial evidence, the court found that the defendant failed to establish that he lacked the resources to afford counsel and terminated CJA counsel's appointment. *See id.* On appeal, the defendant argued that the district court erred by considering his financial affidavit in open court, as opposed through an *ex parte*, *in camera* proceeding.[1] *See id.* at 662.

The Second Circuit rejected that argument. Though the Act "specifically provides for *ex parte* applications for services other than counsel, *see* 18 U.S.C. § 3006A(e)(1), . . . there is no such requirement for proceedings involving the appointment or termination of counsel." *Id.* The fact that "Congress obviously knew how to provide for an *ex parte* proceeding when it seemed appropriate," yet failed "to do so in the context of appointment of counsel" was "significant," in the Second Circuit's view. *Id.* By distinguishing the CJA statute's explicit *ex parte* framework as to the appointment of services "other than counsel" from its silence as to the appointment of counsel, generally, *Harris*'s statutory interpretation analysis directly refutes that advanced by the defendants. *See* Joint Resp. in Opp. at 16.

More critically, the Second Circuit rejected outright the very concept urged by the defendants here—*viz.*, that the appointment of CJA counsel somehow falls outside the scope of adversarial proceedings. To the contrary, the Second Circuit embraced application of the adversarial process to CJA appointments, finding explicitly that "our legal system is rooted in the idea that facts are best determined in adversary proceedings" and warning that "secret, *ex parte* hearings 'are manifestly conceptually incompatible with our system of criminal

---

[1] Mr. Gerace has made these same arguments before this Court, seemingly without informing the Court of binding contradictory precedent.

jurisprudence.'"  *Id.* (quoting *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1141 (2d Cir. 1978)).  In other words, the mere fact that litigating issues in the light of day may present an "unappealing choice" for a defendant is no basis, in the Second Circuit's view, to abandon the principles of adversarial litigation.  *See also United States v. Avenatti*, 550 F. Supp. 3d 36, 47 (S.D.N.Y. 2021) (noting, in a case concerning the appointment of CJA counsel and the unsealing of financial affidavits, that "the court's inquiry is generally made *in* the context of the adversarial process, and the decision to deny or terminate appointed counsel can be appealed" (internal quotations omitted and emphasis added)).

Defendants may note that *Harris* and its progeny concern the tension between open access to CJA financial affidavits and the defendant's interest in concealing false statements made on such affidavits from the government, whereas this case presently does not.  But other cases, such *Douglas*, stand for the principle that the adversarial system of adjudication extends equally to matters of statutory or policy interpretation as it does to fact-finding.  *See* 525 F.3d at 235 (regarding an appellate dispute between the defendant and the government over the appointment of learned counsel).  And, were there any doubt, district courts interpreting and applying *Harris* have viewed it as generally standing for the proposition that the normal adversarial process will apply in the absence of a statutory dictate requiring otherwise.  *See United States v. Hilsen*, No. 03 CR.919(RWS), 2004 WL 2284388, at *4 (S.D.N.Y. Oct. 12, 2004) (interpreting *Harris* for the general proposition that "facts are best determined in adversary proceedings"); *United States v. Coniam*, 574 F. Supp. 615, 617 (D. Conn. 1983) ("The role of the government in relation to the utilization of the CJA appropriation for the guarantee of defendant's rights, while nowhere specified, is nonetheless *appropriately invited by the*

*approval of an adversarial process* by which to insure the propriety of defendant's receipt of services of counsel under the CJA." (emphasis added)).

Indeed, it would be peculiar and troubling to permit the defendants a say over which rights, if any, are conferred by Department of Justice memoranda, but not the Department of Justice, itself.  And it would be equally anomalous in our system of adjudication if the Court heard only the defendants' interpretation of the CJA statute, CJA policy, or caselaw involving CJA issues, especially where no statute, rule, or case dictates such exclusive consideration.  Yet, that is precisely what defendants seemingly engineered prior to the February 10th status conference and what they urge the Court to embrace now.

The consequences of that position are startling.  Were the defendants correct—that the government lacks any substantive seat at the table when it comes to defense-related appointment of counsel issues—the courts issuing these decisions would have been deprived from any legal viewpoint contrary to those advanced by the defense, thereby thrusting the courts out of their role as neutral arbitrators of facts and law and into either a rubber stamp for one viewpoint or the position of a party.

But that is precisely where the courts ought not be.  As the Supreme Court recognized in *United States v. Sineng-Smith*, "in both civil and criminal cases, *in the first instance* and on appeal" our system of adjudication "rel[ies] on the *parties* to frame the issues for decision and assign[s] to courts the role of *neutral* arbiter of matters the *parties* present."  590 U.S. 371, 375 (2020) (emphases added) (Ginsburg, J.) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).  In like manner, *Sineng-Smith* teaches that courts, as "passive instruments" of

8

government, are not to "sally forth each day looking for wrongs to right" but, rather, "wait for cases to come to them, and when cases arise . . . normally decide only questions presented by the parties." 590 U.S. at 376 (internal quotations omitted and cleaned up).

The defendants' broader arguments turn these principles on their heads. Though law and policy govern the appointment of counsel in capital and complex cases, respectively, defendants would shield this court from any viewpoint of said law and policy that is contrary to their own. True, such an echo chamber may advance defendants' own interests—but the price the system pays when courts are deprived of the "benefit of the adversarial process" is a heightened risk of "issuing an improvident or ill-advised opinion[s]." *United States v. Leffler*, 942 F.3d 1192, 1197–98 (10th Cir. 2019).

Worse, the defendants would have the judiciary play the role of advocate, looking for potential wrongs to potentially right on its own outside of the adversarial process, thereby abandoning its perch of neutral adjudication. The Second Circuit, following the Supreme Court, has recognized this feature of the defendants' litigation strategy for the bug it truly is: an abuse of discretion. *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 356 n. 24 (2d Cir. 2021) (analyzing a departure from the parties' framing of the issues under the abuse of discretion standard).

Precedent and principle make clear what defendants' opposition—with its omissions, aspersions, insinuations, and vilification[2] of the government—obfuscates: the motion for

---

[2] For example, the defendants accuse the government of trying to "pressure" and bully the Court into issuing decisions favorable for the government. Joint Resp. in Opp., at 28. These accusations hardly merit a response but, to eliminate all doubt, the government is certain that

reconsideration is rooted in principles of procedural fairness, party presentation, and the desire that law and policy be followed after healthy, robust contest. It is only through the adversarial process—which was inadequate here on the heels of the Court's *sua sponte* noticing of a status conference following an *ex parte* communication with the Federal Public Defender, who represents one of the defendants, that resulted in the granting of a year's old motion (*see* ECF No. 42) the government never knew was under consideration—that the Court can adequately determine the content and meaning of the law and policy to be followed.

Finally, because the appointment of CJA counsel is generally subject to the adversarial process, *see supra*, there can be no doubt that the government has standing participate in these discussions. Moreover, the appointment of CJA counsel as to the specific facts of this case arose from the Department of Justice's issuance of an internal memoranda concerning cases reviewed under the death eligibility framework. Defendants cite no case for the proposition that the government lacks standing to engage in litigation concerning the government's own policies, let alone the interpretation of federal law.

**2.    Reconsideration is Necessary because Adversarial Consideration Never Occurred in the First Instance.**

Defendants next maintain that the government has failed to identify a legal basis for its motion for reconsideration. *See* Joint Resp. in Opp., at 24. As defendants put it, reconsideration should "be denied unless the moving party can point to controlling decisions

---

the judges of the Western District of New York—members of an independent branch of government—feel no sense of "pressure" to issue decisions favorable to federal prosecutors. To espouse such claims not only insults the intentions and good faith of government attorneys engaging in routine pre-trial litigation, but also demeans a judiciary tasked strictly with neutrally and fairly applying the law to facts.

or data that the court overlooked." *Id.* at 25. The government wholly agrees with this standard. Start with what the Court overlooked: the notion of subjecting motion practice to an adversarial process in the first instance.

Rather than hold defendants to their burden in filing (i) a motion for reconsideration of the Court's prior denial of the request for second counsel, (ii) a second motion for the appointment of additional counsel, or (iii) a motion for a status conference to set a briefing schedule, the Court *sua sponte* scheduled a status conference to discuss an internal DOJ memorandum. *See generally* Ziv Schwartz, *Supplementing Supplemental Briefing*, 22 J. APP. PRAC. & PROCESS 339, 386 (2022) ("*Sua sponte* action is in tension with the adversarial system of appellate litigation. Instead of following the principle of party presentation, courts acting *sua sponte* take the rein in the framing and articulating the boundaries of a dispute.").

Behind the scenes and without considering (i) the conflict list previously circulated by the government, (ii) Second Circuit precedent cautioning against *ex parte* communications, generally, and (iii) Second Circuit and district precedent specifically subjecting aspects of the CJA appointment process to adversarial litigation, the Federal Public Defender, who represents Mr. Gogolack, corresponded with the Court about which attorneys to choose. *See Rechnitz*, 75 F. 4th at 146 ("*Ex parte* communications are similarly disfavored, particularly in the criminal context."); *Harris*, 707 F.2d at 662 (noting that even in the CJA context, "our legal system is rooted in the idea that facts are best determined in adversary proceedings; secret, *ex parte* hearings are manifestly conceptually incompatible with our system of criminal jurisprudence" (internal quotations omitted)). Subsequent email traffic indicates that the

discussions over who to appoint was already in the works *prior* to the government even stepping foot through the courtroom door.

During the status conference, certain defendants came armed with a previously denied motion to appoint counsel due to this being a "mega" case, resurrecting without notice to the government arguments analytically distinct from the status conference's purpose—to discuss death penalty eligibility—and not raised since their rejection a year ago.  Much to the government's surprise, and without the government receiving an opportunity to file a written response to arguments that were previously denied, the Court revived the motion and appointed counsel under the "mega" case framework—at the very end of the court appearance—without making the factual findings of unusual complexity or extreme difficulty that the CJA policy contemplates, and without soliciting the government's views about whether the case was "unusually complex" or "extremely difficult" as contemplated by the CJA Plan & Procedures and CJA Guidelines.  Now, owing in part to this series of *ex parte* communications, *sua sponte* scheduling, and the granting of an unnoticed, previously denied motion, the adversarial process that should have occurred earlier is being shoehorned into a motion for reconsideration.[3]

In the defendants' view, the granting without adversarial process of an unnoticed motion bootstrapped to a court-initiated status conference about a totally different issue

---

[3] The government submits that the defense should have been required to file a motion for reconsideration on notice to the government, enabling the government to make a fully informed written response.  Moreover, if the Court applied the law of the case doctrine as the defendants suggest it should be applied, *see* ECF No. 360 at 22, then the Court would have denied the defendants' *ad hoc* attempt to have this Court reverse its prior decision denying second CJA counsel in this non-capital prosecution.

stemming from a party's *ex parte* communications with the Court merits no reconsideration. The Supreme Court, however, has cautioned that "a federal court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system." *Wood v. Milyard*, 566 U.S. 463, 472 (2012). Yet, that is exactly what occurred here, which is why reconsideration is necessary. Or, stated more simply, reconsideration is necessary because adversarial consideration never occurred in the first instance.

Reconsideration is also appropriate "where a court overlooks . . . factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) (second omission original and internal quotations omitted), *aff'd sub nom. Tenney v. Credit Suisse First Bos. Corp.*, No. 05-3430-CV, 2006 WL 1423785 (2d Cir. May 19, 2006). Here, neither the government nor the defendants can articulate what factual matters were or were not considered because the Court failed to make the factual findings under the CJA policy that guide the appointment of additional counsel. *See* W.D.N.Y. CJA POLICES & PROC., at 12, (Sept. 2022) ("The factors to consider in determining whether circumstances justify the continuation of more than one attorney include: the need to avoid disruption of the proceedings, whether the decision not to seek the death penalty occurred late in the litigation, *whether the case is unusually complex*, and whether the defense has reasonably allocated trial duties among counsel well into the case such that it would negatively impact the representation to dismiss one attorney." (emphasis added)).

In that vein, defendants never grapple with the government's discussion of *Kendrick* and *Jonas*, two cases in which courts in this district—including this Court—expressly

acknowledged the need to make factual findings of, for example, unusual complexity to justify the appointment of second counsel. *See United States v. Kendrick,* No. 10-CR-6096, 2013 WL 1896982, at *2 (W.D.N.Y. Apr. 12, 2013) (concluding that "while the case is complex, [the court] do[es] not find it so unusually complex that the interests of justice demand two lawyers for each defendant"), *objections overruled,* No. 10-CR-6096-FPG, 2013 WL 1896988 (W.D.N.Y. May 6, 2013); *United States v. Jonas*, No. 11-CR-00366-RJA-JJM, 2013 WL 2450603, at *2 (W.D.N.Y. June 5, 2013) (McCarthy, J.) ("In exercising [the discretion to appoint two CJA attorneys], courts have looked for guidance to the policy of the Judicial Conference of the United States, which states that absent extenuating circumstances,' once the government determines that a prosecution is no longer a potential death penalty case prosecution, the court 'should . . . make an appropriate reduction in the number of counsel' and 'reduce the compensation rate.' . . . In determining the existence of 'extenuating circumstances,' the Guide suggests the court consider '(1) the need to avoid disruption of the proceedings; (2) whether the decision not to seek the death penalty occurred late in the litigation; (3) whether the case is unusually complex; and (4) any other factors that would interfere with the need to ensure effective representation of the defendant." (cleaned up)).

There is a reason why defendants never so much as mention these two cases: any discussion would require at least tacit acknowledgement that factual findings under the standard this very Court previously embraced were not made here, which squarely merits reconsideration. After all, how can it be that a court "abuses its discretion when its decision . . . rests on . . . a clearly erroneous factual finding", *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 376 (2d Cir. 2024) (cleaned up), or when no factual finding is made, *see United States v. Greenfield*, 44 F.3d 1141, 1147 (2d Cir. 1995) (vacating a district court decisions where

no factual findings were made), but reconsideration of a decision eclipsing the adversarial process in which *none* of the requisite factual findings was made is improper? That position is logically untenable, which is likely why even those courts denying motions for reconsideration have made pains to identify whether a party has, at the very least, challenged the court's factual findings. *See, e.g.*, *Petty v. City of New York*, No. 10 CIV. 8581 KPF, 2014 WL 7250945, at *3 (S.D.N.Y. Dec. 22, 2014) ("Plaintiff has not submitted any evidence *calling the Court's factual findings*—or its legal conclusions—*into question*. For this reason as well, Plaintiff's reconsideration motion fails." (emphasis added)).

Because defendants simply cannot defend what literally does not exist—that is, the Court's factual findings—they instead argue that the case *is* unusually complex and thus merits the appointment of second counsel.[4] *See* J. Resp. in Opp., at 38–46. In making this argument, defendants lodge four arguments, none of which merit the appointment of additional counsel.

First, defendants seek additional counsel because of the distance between where they are housed and their attorneys' offices. *See id.* at 38. Noting that newly appointed counsel works in closer proximity to their detention facilities, defendants suggest that closing the spatial gap is one reason to retroactively justify the Court's appointment decision. To credit this argument—which is unmoored from case complexity and does not outright trigger any effective assistance of counsel issues—would set the precedent that all defendants housed 2 ½

---

[4] Once more, the arguments between the parties are a byproduct of the short-circuited adversarial process characterizing the instant litigation: rather than having a robust back-and-forth about the case's complexity in the first instance, the parties are having it on the back end in a motion for reconsideration.

hours away from their attorneys require a second attorney.  Moreover, the defendants completely omit that, in the protective order litigation, they lobbied the Court to permit them to discuss discovery and other aspects of the case over video-conferencing technology.  *See* Protective Order, at 2 n.3, (ECF No. 254) (dated Oct. 9, 2024).  Defendants offer no rationalization for why teleconferencing technology has been suitable up to date but, now, suddenly, affords insufficient access to counsel such that the appointment of second counsel is necessary for an effective defense.

Second, defendants cite to the volume of discovery.  But defendants have had access to the discovery for approximately eight months, during which time they have not raised the need for second counsel to ensure effective assistance.  Defendants' position should trouble the Court to the extent it implies that defendants' counsel have not reviewed the discovery until just recently—conveniently, right when the Department of Justice's memoranda were released—and, upon doing so, had the revelation that second counsel was necessary.  Stated otherwise, defendants' contention implies that since receiving the discovery, defendants' counsel has not thoroughly reviewed it, because had they reviewed it, they would have made the very request they are making today to process the production.

Nor do defendants argue that the content of the discovery is of such complexity that two attorneys are necessary to comprehend it.  Indeed, this is not an overly complex computer crimes case wherein the defendants may benefit from counsel with a specialized, technical background.  To the contrary, it is an obstruction case involving, for certain defendants, guns and drugs.

Third, defendants point to indictments in other cases involving Mr. Gerace as creating some basis warranting the appointment of second counsel. *See* J. Resp. in Opp., at 38–39. Specifically, defendants claim that they have to "review evidence" stemming from those other indictments. *Id.* at 38. But what defendants omit is that not all the evidence germane to 1:19-CR-227 and 1:23-CR-37 bears on this case. Though they would have this Court believe that reviewing evidence related to those cases taxes their resources, they fail to characterize that the discovery pertinent to those indictments as voluminous or complex. In fact, most of the discovery pertinent to those cases relates to court filings that Mr. Gerace's counsel is already familiar with and that Mr. Ermin's initial counsel ought to have little difficulty comprehending.

Fourth, defendants complain that the government's "litigation strategy" has delayed their review of the discovery. *Id.* at 40. In particular, they point to litigation over detention, objections to a protective order, sanctions motions, and now an internal DOJ memorandum that confers no substantive rights on the defendants. *See id.* Not mentioned in this revisionist history are the incontrovertible facts that it was the defendants who moved to reopen their detention hearings, the defendants who promulgated a protective order that violated constitutional separation of powers, and the defendants who, in a status conference about the Department of Justice's internal review processes, orally resurrected a previously denied motion without any notice to the government or opportunity for the government to respond. *See* Mot. for Release from Custody, ECF No. 213, (dated Sept. 12, 2024) (motion to reopen Mr. Ermin's detention hearing); Mot. for Release from Custody, ECF No. 174, (dated Aug. 1, 2024) (motion to reopen Mr. Hinkle's detention hearing); Protective Order, ECF No. 256, (dated Oct. 9, 2024) (noting that the protective order implemented was identical to that

submitted by the defendants, except for "few modifications"); Status Conf. Tran., at 14, (dated Feb. 10, 2025) (Counsel for Mr. Gerace: "Because it's been a little over a year, I just want to redirect the Court's attention to Docket Number 42, which was a memo I filed at the time regarding the appointment of learned counsel and authorization of capital resources."). It follows then that, to the extent the defendants complain that briefing stemming from *their* litigation strategy has taken time away from their review of the discovery, the government is not to blame.

Moreover, the suggestion that the government's motions are to blame for the defendants' apparent failure to adequately review discovery is particularly dubious considering that on the same day defendants filed their Joint Response in Opposition, counsel for Mr. Gerace sought an extension of time to file his post-trial motions in 19-CR-227 and 23-CR-37 citing, among other reason, the fact that illness and other client obligations functioned as resource constraints that required additional time to file a Rule 29 motion. *See* Mot. for Extension of Time to File Rule 29 Mot. — Decl. Eric Soehnlein, at 2–3 ¶¶ 5–8, (dated Feb. 28, 2025) (stating that after the *Gerace* trial, "Mr. Foti and I turned our attention to other cases we are handling, both within and outside of this district, that were not the focus of our attention during the preparation and trial of this case", "throughout the month of January and February, Mr. Foti and I were both out of our respective offices for significant time due to illness", the "partial[] distract[ion]" from the "government's motion for a gag order", and "the significant and complicated nature of the evidence" from trial as reasons to provide the defense with an additional 60 days to file their motions). Though Mr. Gerace candidly acknowledged these constraints before the District Court, before this Court he blames only

the government for the unspecified "challenges" he is confronting in terms of the "dedication of resources." Joint Resp. in Opp., at 39.

Fifth, and finally, defendants claim that they need a second attorney to help "gather[] and review[] all relevant media articles or broadcasts" should they file a motion to change venue that they are considering. *Id.* at 40. The government questions whether an additional attorney is necessary to accomplish this task but, in any event, defendants' consideration of changing venues is difficult to square with their insistence that appointing a second attorney would simplify case management logistics. If the defendants do in fact seek an alternative venue, prudence—not a hasty appointment of counsel that subverts the adversarial process— favors delaying any additional appointment until the geographic future of this case is settled.

### 3.    Reconsideration is Appropriate because DOJ Internal Guidance does not Confer Substantive Rights upon Defendants.

The defendants forwarded DOJ internal guidance to the Court as a mechanism to goad this Court into reconsidering its denial of the Mr. Geraces' prior motion (*see* ECF No. 42) to assign second counsel. By doing so, the government was blind-sided and the Court was therefore deprived of government's fully formed arguments in opposition. Had the Court been provided with a defense motion for reconsideration of counsel status, the Court would have had the benefit of government argument and research, which establishes that DOJ internal guidance does not confer rights upon individual defendants. Indeed, numerous courts have held that DOJ internal guidance do not confer rights upon individual defendants. *United States v. Loften,* 518 F.Supp. 839, 856 (S.D.N.Y.1981), *aff'd,* 819 F.2d 1130 (2d Cir.1987) (internal government policies do not create rights in individual defendants); *see also United States v. Ash,* 464 F. Supp. 3d 621, 632 (S.D.N.Y. 2020), *aff'd,* No. 22-1048-CR, 2022 WL

16955057 (2d Cir. Nov. 16, 2022) (DOJ Manual does not create any rights). It has been found that the [DOJ capital case] protocol "does not create substantive or procedural rights." *United States v. Roman,* 931 F.Supp. 960, 964 (D.R.I.1996). Rather, "[t]he protocol articulates internal administrative procedures to be followed by DOJ personnel...." *Id.* It "provides for 'standards for determination' to guide the death penalty decision making process." *Id.* (citing DOJ Manual, § 9–10.000G). *Accord: United States v. McVeigh,* 944 F.Supp. 1478, 1483 (D.Colo.1996) ("the decision to seek the death penalty under the Act is a matter of prosecutorial discretion [and] [t]he Protocol [does] not create any individual right or entitlement...."). *Cf. United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.1990), *cert, denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990) ("the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party") (citations omitted). The defendants' joint response entirely ignores the manner in which the Court appearance came to fruition and fails to grapple with the fact that their entire argument for second counsel hinged on a hypothetical outcome (i.e., the possibility of the death penalty) based upon internal DOJ guidance that does not confer rights upon any defendants. This Court should not base its decisions upon speculative outcomes based upon internal DOJ guidance. The factual reality is that this is not a death penalty case as charged, and the government may not seek the death penalty on this indictment.

While the defendants argue around the point, they also do not expressly deny that the pending indictment is not capable of serving as the vehicle for a capital prosecution. Given that the defendants cannot transform a non-capital case into a capital case—and thereby take advantage of the statutory entitlement to learned counsel that is reserved for capital defendants—reconsideration is appropriate. The Court should not permit defendants to

weaponize DOJ internal guidance to reverse a decision the Court made almost one year ago. *See* Mar. 8, 2024, Tr. at 3:15-19 ("Okay. As you all know, the Government, I think, a week ago today advised that the death penalty issue is now off the table. *So at this point, I think Mr. Foti is -- is adequate and we'll proceed on that basis*."). By using internal DOJ guidance to justify reversing its previous denial of second counsel, the Court placed these non-capital defendants on par with defendants who are charged with capital offenses.

The downstream consequences of the Court's decision have already adversely impacted the case. Defense motions which were due on February 21st have yet to be filed. As a result, rather than the government reviewing, researching, and responding to defense motions and progressing the case, the case is stuck in neutral with no motions scheduled—and the defendants well-know that neutral delay is often attributed to the government by reviewing courts in Sixth Amendment speedy trial contexts. *United States v. Tigano*, 880 F.3d 602, 616 (2d Cir. 2018) ("*Barker* makes clear that 'neutral' delays must be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."). Moreover, the defendants have requested additional discovery hard drives for the newly assigned defense attorneys. In addition to the time newly assigned counsel will undoubtedly request to review discovery, the government has already been required to divert additional resources to begin the process of reproducing discovery an eighth and ninth time, which causes additional strain on government resources. Notably, the defendants have not denied—either at the February 10th court appearance or in their joint response—that they will endeavor to attribute these delays to the government when they inevitably later file motions to dismiss based upon their right to a speedy trial under the Sixth Amendment. Accordingly, the facts of the case remain unchanged and the Court should reconsider its decision to use

internal DOJ guidance as a springboard to assign additional defense attorneys, delay the case, and provide the defendants with tactical and strategic advantages, including more grist for a later motion to dismiss under the Sixth Amendment.

4. **Reconsideration is Appropriate because the Court Failed to Find Extenuating Circumstances, and the Case is not "Unusually Complex."**

While the government acknowledges that the Court has discretion to assign counsel, the Court's discretion, the Second Circuit's decision in *Douglas supra*, the CJA Guidelines and CJA Plan provide clear guideposts.  Where the government has provided notice that it will not seek the death penalty, the Court should only assign learned counsel where there are extenuating circumstances. *See* CJA Plan at 8. In its motion for reconsideration (*see* ECF No. 355), the government explained the Court was required to determine whether there extenuating circumstances after considering: (1) the need to avoid disruption of the proceedings; (2) whether the decision not to seek the death penalty occurred late in the litigation; (3) whether the case is unusually complex; and (4) any other factors that would interfere with the need to ensure effective representation of the defendant.  In their joint response, the defendants do not address any of the factors other than complexity of the case. *See* generally ECF No. 360.  That is, the defendants do not deny that adding new attorneys will—and already has—disrupt the case, or that the decision not to seek the death penalty was made early in the case.[5] Moreover, no defendant has argued that the case is too complex for them to understand, or prepare, or that they believe they will be ineffective without second

---

[5] Even though DOJ internal guidance does not confer rights upon any defendants, they also do not argue that the 120 day time period provided for the DOJ Capital Case Section to review all pending capital eligible cases between January 20, 2021, and January 19, 2025, is an unduly long time.  In fact, even if this case is the *last* case reviewed in the DOJ, the review would have been completed no later than June 5, 2025, which is before defense motions were set to be argued in this case.

counsel—and silence on those issues should speak volumes. Indeed, beyond citation to the volume of discovery, the defendants have failed to grapple with the complexity of the case in any meaningful way. The case involves public docket entries, transcripts of prior proceedings, discovery relating to a case in which Mr. Gerace has already been tried, witness testimony, search warrants for premises and cell phones, and a detailed indictment that—when combined with the discovery—provides a virtual roadmap of what the government will prove.

To the extent the defendant has attempted to attribute complexity to government statements, a more than cursory look at the context of the government's comments do not support the defendants' argument. First, when the government suggested to Judge Vilardo that additional counsel be assigned to Mr. Gerace during an oral argument in 19-CR-227 due to the pendency of the government's then-pending motion to disqualify counsel, the suggestion was in response to the District Court's observation during oral argument on March 15, 2024, that the government's then-pending motion to disqualify counsel could cause a Sixth Amendment speedy trial dismissal. *See* 19-CR-227, ECF. No. 825 at 33-39. As a result, in subsequent briefing in May of 2024 related to the disqualification issue (*see* 19-CR-227, ECF. No. 919), the government suggested to the District Court that—to protect Mr. Gerace's speedy trial rights in all cases and if the District Court had speedy trial concerns—it could consider assigning additional counsel to Mr. Gerace's pending cases. The District Court declined to do so.[6] Second, in a footnote in the defendants' joint motion (*see* ECF. 360 at n. 10), the defense attributed comments the government made about witness tampering concerns—concerns that are only exacerbated by delays in the case—and conflated them with

---

[6] Ultimately, Gerace proceeded to trial in Case No. 19-CR-227 and was convicted of 8 of 9 counts at trial.

complexity of the charges the defendants must defend.  The defendants' attempt to transform government concerns about witness tampering into a defense justification to delay the case and assign additional defense attorneys flips reality on its head and should be rejected.[7,8]

---

[7] During a status conference on July 22, 2024, the government counsel stated, in part:

> Judge, I've been a prosecutor for 20-plus years, almost 17 of it I've been appearing in front of your Honor. I've handled some very serious RICO murder cases, complex conspiracies that involved witness tampering and all types of issues like that. However, this case stems from the case that stands apart from all of the cases that I've had, either before this Court or others in this courthouse, in terms of 19CR227 and 23CR37. The issues that were inherent in those cases with efforts to tamper with witnesses, to obstruct justice or otherwise improperly influence government witnesses and potential government witnesses, and all of that culminated in this indictment charging the orchestrated death of a federal witness. Those cases included efforts to thwart witness participation even before Mr. Gerace was charged in 19CR227. They involved him suing two witnesses in state court. The government going and getting an injunction of a state lawsuit, that appeal going up to the Second Circuit, and the Second Circuit using language during oral argument that was critical of Gerace's efforts while affirming the injunction that was issued by Judge Sinatra. And then it flowed, once the case was charged, we learned about Facebook threats to witnesses, witnesses who or a witness in particular who was assaulted, and then we learned about an attorney for Mr. Gerace reaching out through an unwitting attorney trying to essentially convince a witness not to cooperate with the government. A witness who was knowingly represented by other counsel. It then led from there to threats by symbolism of placing rats on driveways and vehicles at the locations of not one but two potential witnesses or their families' houses. It continued with comments in the news denigrating potential witnesses and even government counsel. And it ended with the death of a witness. And all of this was happening as the trial prosecutors here that you see were gearing up for a trial, engaged in a trial, while we were simultaneously investigating the very serious death of a witness, something that courts -- obstruction of justice efforts, the Courts in the Second Circuit and the Second Circuit itself in *LaFontaine* have said are the biggest threat to the integrity of court proceedings.

*See* Doc. No. 169 at 10:17-12:11.  Government witness tampering concerns, and the complexities and challenges faced by *the government* resulting therefrom, do not transform this case into an "unusually complex" or "extremely difficult" case *for the defendants* sufficient to justify assignment of additional attorneys at taxpayer expense.

[8] Even a cursory review of the indictment demonstrates that Count 1, which charges a *Klein* and Obstruction conspiracy, is the most complex.  However, that charge also charges Frank Knight and Michael Roncone, who have not complained about the complexity of the case,

Finally, the defendants do not deny that the Court failed to make any findings as to extenuating circumstances, including whether the case is "unusually complex" and, therefore, reconsideration is appropriate.

**5.    Reconsideration is Appropriate because the Court Failed to Find that the Case is not "Extremely Difficult."**

The defendants do not contest that, in non-capital cases, assignment of a second CJA should be rare and limited to extremely difficult cases or where the court finds it in the interest of justice to appoint an additional attorney to ensure high quality representation.  *See* ECF No. 355 at 20, 31-32.  The defendants also do not even attempt to argue that the Court made any such findings and, as a result, reconsideration is appropriate.

<u>**CONCLUSION**</u>

For the reasons set forth above and in ECF No. 355, the Court should reconsider its decision to assign *de* facto learned counsel, or second CJA counsel, to defendants Gerace and Ermin.  Second CJA counsel should be removed from each defendant and the Court should require the defense to file dispositive and non-dispositive motions promptly and as close as practicable to the previous deadline of February 21, 2025.  Alternatively, the Court should

---

or the volume of discovery, and are each represented by one attorney.  Count 1 and the corresponding overt acts are incorporated by reference in to Counts 2 and 3, which relate to Crystal Quinn's murder.  In other words, the proof underlying Counts 1, 2, and 3, is the same, and, as evinced by their collective 11 months of silence, these counts are not unusually complex or extremely difficult for any of the skilled defense attorneys involved in this case. However, if the Court disagrees, reverses its decision from March 8, 2024, denying assigned second CJA counsel, and makes appropriate findings of extenuating circumstances or extreme difficulty, then fairness dictates that all defendants should receive additional CJA counsel, not just Gerace and Ermin. Nevertheless, the government submits that no defendants should receive additional CJA counsel and that one attorney is sufficient to provide an adequate defense.  *See Eldridge, supra.*

make appropriate findings and, consistent with its obligations under the CJA to control taxpayer expenses, *see Eldridge* and *Zaccaria*, *supra,* should issue a ruling similar to the one it issued in *Jonas* requiring counsel to agree to the CJA rate payable to a single attorney.

      DATED:  Buffalo, New York, March 4, 2024.

                                            MICHAEL DIGIACOMO
                                            United States Attorney

                      BY:   s/ JOSEPH M. TRIPI
                                Assistant United States Attorneys
                                United States Attorney's Office
                                Western District of New York
                                138 Delaware Avenue
                                Buffalo, New York 14202
                                (716) 843-5839
                                Joseph.Tripi@usdoj.gov