UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

vs.

                                                   Docket No 1:23-CR-99

JOHN THOMAS ERMIN, ET AL

                              Defendants.
_____

## DEFENDANT ERMIN REPLY TO GOVERNMENT
## RESPONSE AND MEMORANDUM OF LAW [423]
## (NON-DISPOSITIVE PRETRIAL MOTIONS)

GEORGE V.C. MUSCATO, ESQ., and DONALD M. THOMPSON, ESQ., being duly sworn, depose and say:

1.     We are attorneys licensed to practice in the State of New York and the United States District Court for the Western District of New York, and we are co-counsel representing Defendant JOHN THOMAS ERMIN.

2.     We offer specific reply to some of the issues raised by the Government.

## I – SEARCH WARRANT APPLICATION

3.     In light of the Government's response it would appear that the Government has conceded that Defendant Ermin has established standing with respect to 41 Richmond Avenue, Lancaster, New York, and is entitled to the application for the Search Warrant dated December 5, 2023.

## II – JOINDER

4.     Defendant Ermin joins in motions of his co-defendants. However, we have included in this filing is a reply specific to Defendant Ermin.

## II – CHANGE OF VICINAGE

5.       There is an old saying "guilt by association" and that is exactly what Defendant Ermin is trying to avoid by requesting a change in vicinage so as not to be lumped together with other prejudicial pretrial publicity.

6.       Mr. Ermin has an interest in change of vicinage separate and apart from (and superior to) the other codefendants and in particular, defendant Gerace, based on the prejudicial and pervasive pretrial publicity to date including, as further discussed below, the government's comments about and media coverage of the Outlaws Motorcycle Club in the course of Mr. Gerace's trial and to the media in the course of that trial, as well as the pretrial publicity during the detention hearings for Mr. Ermin and others.  The encyclopedia of media coverage filed with the defendants' joint motion for change of vicinage both supports this motion and provides additional support for Mr. Ermin's motion for severance from Mr. Gerace for trial.

7.       Previously, and well before much of the media coverage referred to in the defendants' motion for change of vicinage, the government argued that the extensive publicity warranted, and in fact compelled a change of vicinage (*see* Dkt. 243, 58-60).  Now the government contends that at minimum Mr. Gerace is making the same motion for the purpose of judge-shopping (*id.* at 68-69).

8.       The government further alleges that the change of vicinage motion is really just Mr. Gerace's motion and that the other defendants just hangers-on added in name only, but with no real interest in a change of vicinage (*id.* at 68-70). These claims are not true for two reasons.

9.       First, change of vicinage would not require transfer of the case to another judge; a change of vicinage motion is therefore a completely ineffective way to judge-shop.  Clearly, Mr. Ermin has no interest in judge-shopping even if somehow a change of vicinage motion could be

used in this way.  It was Chief Judge Wolford who reversed the magistrate judge's order releasing Mr. Ermin on conditions and ordering him detained, on the government's appeal of the magistrate's detention order.  Thus, if judges changed as the result of a change of vicinage, Mr. Ermin would have no basis to expect more favorable treatment and indeed, has some basis to fear less favorable treatment, before Judge Wolford (and there is no indication that any other of the judges who sit primarily in Rochester have any views on or contact with this case).

10.    Nonetheless, Mr. Ermin zealously moves for change of vicinage to avoid the overwhelming and prejudicial publicity that has saturated the media market in the western half of the Western District of New York (divided largely and conveniently for these purposes along media outlet coverage lines).

11.    Second, Mr. Ermin is not a hanger-on who joined Mr. Gerace's motion in name only.  He has an interest in change of vicinage separate and apart from any Mr. Gerace's interest.

12.    Defendant Ermin was employed by Pharoah's Gentlemen's Club as a manager. He was not charged, nor was he involved, in any of the ultimate convictions of Mr. Gerace or Mr. Bongiovanni.  By allowing Defendant Ermin to remain in the same Indictment, and in the Buffalo venue, would weigh heavily towards a conviction by association only.

13.    The government has also repeatedly and publicly stressed Mr. Ermin's status as a leader of the Outlaws Motorcycle Club asserting, essentially, that he is a leader of a criminal band who, through him, are available to do Mr. Gerace's bidding.  But simple membership in the Outlaws Motorcycle Club, beyond its obvious prejudicial value to the government, has no bearing on the allegations of criminal conduct in this case. Engaging in criminal conduct while an Outlaw, a member of the PTA, or in one's individual capacity (whether or not simultaneously a member of one or more organizations) is irrelevant to one's criminal liability.  Here, however, the government

has repeatedly and publicly argued that the Outlaws have a propensity to engage in criminal conduct, separate and apart from any actual evidence of criminal conduct in this case.

14.     The government has thereby attempted publicly to create a nexus where none exists between the conduct charged and actions consistent with or in furtherance of membership in the Outlaws Motorcycle Club.  It has done so by demonizing the Outlaws, and Mr. Ermin in particular, based on signage and decorations in the Outlaw clubhouse, tattoos, and other protected speech (but not any actual conduct relative to that speech).  The government's detention proffers were replete with invective and innuendo based on the interior decorating choices at the Outlaws clubhouse (Dkt. 2, 12-13).

15.     The government has also attempted to portray Mr. Ermin, as a member of the Outlaws and consistent with that membership, as physically violent by, for example, misrepresenting his involvement in prior acts of violence when attempting (ultimately successfully) to secure his pretrial detention (Dkt. 2, 29-31).

16.     Also in the course of Mr. Ermin's detention proceedings the government attempted to infer, in the absence of any evidence that, he possessed authority, as one in a leadership role in the Outlaws, to command a hoard of nefarious actors prepared to willingly carry out his criminal bidding, to curry favor with him or to gain entry into the Outlaws club. It's a great story, but so is Snow White. Neither have any basis in fact. But both are well known to the jury pool in the western half of the Western District of New York, the coverage area of the Buffalo News, the Wellsville Times, channels 2 and 4 and the other media outlets covering and largely confined to, the western half of the Western District of New York, thanks to the government's public commentary and the media's frequently daily coverage of Mr. Gerace's prior and current proceedings.  By contrast, the print and broadcast media has not covered Mr. Gerace's proceedings at all – not his multiple

indictments and court appearances, not his trial, not his personal media interviews, or the salacious details serialized in the Buffalo and surrounding area's media concerning his family relationships, business, personal contacts with local high-profile individuals, and alleged association with Italian Organized Crime members.[1]

17.    The government has also argued that change of vicinage should not be granted because Mr. Gerace does not have clean hands – he has voluntarily contributed to media coverage by giving interviews and making other statements to the media (Dkt. 423, 66-67).  This is true.  Mr. Gerace has contributed to the media storm in this, and in his prior cases – he is responsible for at least some, but by no means all of the media attention these cases have generated.  The same does not apply to Mr. Ermin.  He is responsible for none of the media attention to his case.  The media's attraction to Mr. Gerace or the details about his cases and the consequent poisoning of the jury pool is a primary reason for Mr. Ermin's motion for change of vicinage and separately, for Mr. Ermin's motion for severance for trial from Mr. Gerace.

Wherefore, the defendants' motion for change of vicinage should be granted for the reasons cited above, in the other defendants' replies, and in the defendants' joint nondispositive motions.

Dated: May 7, 2025

/s/ George V.C. Muscato
GEORGE V.C. MUSCATO, ESQ.
Attorney for Defendant JOHN ERMIN

/s/ Donald M. Thompson
DONALD M. THOMPSON, ESQ.
Attorney for Defendant JOHN ERMIN

---

[1] It is no overstatement to say that virtually no one in Rochester or even is aware of Joseph Todaro, has heard of his alleged association with Italian Organized Crime, knows he is related to Mr. Gerace, is aware that Mr. Gerace was pictured in a T-shirt bearing the name of Mr. Todaro's pizza parlor, or knows anything about the Outlaw Motorcycle Club. These facts would not mean anything to the average Rochester juror. The same cannot be said of the Buffalo jury pool.