IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     v.                                                                  23-CR-99-LJV

SIMON GOGOLACK, et al.,

            Defendants.
_____

## GOVERNMENT'S REPLY IN SUPPORT OF ITS APPEAL OF THE MAGISTRATE COURT'S ORDER DIRECTING DISCLOSURE OF GRAND JURY MINUTES

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, Nicholas T. Cooper, Casey L. Chalbeck, Joseph M. Tripi, and Caitlin M. Higgins, Assistant United States Attorneys, of counsel, hereby submits the following reply in support of its appeal of the Magistrate Court's Order directing disclosure of grand jury minutes (ECF No. 443).

### ANALYSIS

Mr. Gerace's response brief does little to rebut the core theses of the government's appeal. Instead, and tellingly, Mr. Gerace's response invites this Court to affirm the Magistrate Court's order in contravention of governing law and on a record that does not exist. He does this first by asking the Court to conclude that the particularized need standard does not apply where a court conducts an *in camera* inspection of grand jury materials—even though Second Circuit and other appellate authority confirms that it does. In the alternative, Mr. Gerace blitzes the Court with misinformation that ignores the Magistrate Court's actual statements, purports to rewrite the indictment, and assumes the Magistrate Court based its decision on a record that is undermined by the Magistrate Court's own words. Mr. Gerace

double downs on this tactic when he proposes that this Court affirm the Magistrate Court's order on a basis—Mr. Gerace's prosecutorial forum shopping allegations—that the Magistrate Court clearly did not consider as part of its disclosure order. And then, as a last-ditch effort, Mr. Gerace advances novel and spurious claims of prosecutorial dishonesty.

What this insignificant sound and fury seeks to distract from are clear, record-supported legal conclusions: that, in directing the disclosure of grand jury minutes, the Magistrate Court did not hold the defendants to their burden of demonstrating a particularized need; based its order on a rationale the defendants never argued, that has no logical nexus to whether the indictment can be dismissed, and is in derogation of the presumption of regularity; and is unmoored from any evidence in the record. Because the Magistrate Court's actual treatment of this issue reflects that it either abused its discretion or committed clear error, the Court should reverse the disclosure order.

### A. A finding of particularized need is required under Second Circuit precedent for *in camera* review of grand jury materials.

Attempting to rescue the Magistrate Court's ruling, which displayed neither an acknowledgement of the "particularized need" standard nor an effort to apply it, Mr. Gerace first declares that the standard does not apply at all. *See id.*, at 12. ("*In Camera* review does not require a finding of a particularized need."). In his view, the proposition that *in camera* inspection of grand jury minutes requires a showing of particularized need is nothing short of "an extreme view of Rule 6(e)." *Id.* at 16.

Binding Second Circuit authority says otherwise. In *United States v. Sobotka*, 623 F.2d 764 (2d Cir. 1980) the Second Circuit, in reversing a district court's order of disclosure, explained that "[t]he district court . . . had the obligation to assess the strength of the particularized showing of need made by the Government in view of the case law *and then* to

make an *in camera* examination of the pertinent portions of the grand jury transcript." *Id.* at 768 (first emphasis added). The Second Circuit did not say that the district court did not need to apply the particularized need standard prior to conducting an *in camera* inspection. To the contrary, the circuit observed that the district court's power to conduct an *in camera* examination was contingent upon the party's satisfactory demonstration of particularized need. *See id.* Consistent with this, prior to *Sobotka*, the Second Circuit had observed that "no case in this Circuit has ever held that the secrecy of the grand jury must be breached" short of "a showing of particularized need." *United States v. Moten*, 582 F.2d 654, 663 (2d Cir. 1978).

Three basic, well-established, (and non-extremist) principles confirm the wisdom of this approach. First, "no such [general] 'supervisory' judicial authority [over the grand jury] exists." *United States v. Williams*, 504 U.S. 36, 47 (1992); *see In re U.S.*, 441 F.3d 44, 57 (1st Cir. 2006) (observing that the grand jury "is not an arm of the district court"). This means that, to the text that the federal judiciary has supervisory authority over the grand jury, it is conditional authority. Here, the condition that triggers that authority is none other than the defendant's demonstration of a particularized need. Second, owing to the grand jury's status as a quasi-independent entity that works in close collaboration with a coordinate branch of government whose officers take an oath to support the Constitution and take care that the laws be faithfully executed, a "presumption of regularity" attaches to grand jury proceedings. *See United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023); *see also United States v. R. Enters., Inc.*, 498 U.S. 292, 300 (1991) (recognizing that "the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority"); *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("A review of grand jury minutes should not be

3

permitted without concrete allegations of [g]overnment misconduct."). Third, the grand jury's secrecy survives even the conclusion of an investigation. *See Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557, 566 n.11 (1983). Combined with *Sobotka* and *Moten*, these core tenets of the grand jury system establish what Mr. Gerace and the Magistrate Court would seek to ignore: that the particularized need standard applies to *all* grand-jury-disclosure requests.

Appellate courts from across the country, in addition to district court decisions in our own circuit, have reached the same conclusion. *See U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 173 F.3d 757, 760 (10th Cir. 1999) ("Once the district court is satisfied that a particularized need has been articulated by counsel, the court shall, from its *in camera* review of the relevant grand jury testimony, determine where in the testimony the particularized need is supported."); *United States v. Schneider*, No. 22-10340, 2023 WL 8714899, at *1 (9th Cir. Dec. 18, 2023) ("We agree with the district court that Schneider's *speculative allegations as to possible defects in the grand jury proceedings* did not show a "particularized need" for the materials sought. Moreover, given the nature of Schneider's assertions, the district court did not abuse its discretion in denying his motion without first reviewing the materials *in camera*." (emphasis added)); *Bast v. United States*, 542 F.2d 893, 895 (4th Cir. 1976) (affirming the district court's denial of the defendant's request that it inspect *in camera* due to the defendant's failure to show a particularized need for the materials); *see also United States v. Aronov*, No. 19-CR-408 (MKB), 2024 WL 554577, at *4 (E.D.N.Y. Feb. 12, 2024) (applying the particularized need standard to a defendant's request for the *in camera* inspection of grand jury materials); *United States v. Smith*, 105 F. Supp. 3d 255, 261 (W.D.N.Y. 2015) (holding that the particularized need standard applied to a defendant's request for the *in camera* inspection of grand jury materials).

None of the cases that Mr. Gerace cites undermine the well-supported decisions of these courts. In *Dennis v. United States*, 384 U.S. 855 (1966), the principal case Mr. Gerace relies on, the Supreme Court addressed whether a trial court erred by denying the defendants' motion for disclosure of grand jury transcripts that were "made at the conclusion of the direct examination of each of the witnesses." 384 U.S. at 869. The Court then raised *Pittsburg Plate Glass Co. v. United States*, 360 U.S. 395 (1959), where it discussed disclosure of grand jury minutes prior to cross examination, and stated that the "Court reserved decision on the question whether *in camera* inspection by the trial judge"—in the midst of trial—"is an appropriate or satisfactory measure when there is a showing of a 'particularized need' for disclosure." *Dennis*, 384 U.S. at 874. The Court then opined that "[t]his procedure," referring to *in camera* inspection of grand jury transcripts for purposes of disclosure before cross examination, "has been adopted in some of the Court of Appeals," and that "[i]n the Second Circuit it is available as a matter of right." *Id.* The Court then held that "this practice may be useful in enabling the trial court to rule on a defense motion for production [ ] of grand jury testimony." *Id.*

Decided well over a decade prior the Supreme Court's announcement of the particularized need standard in *Douglas Oil Co. v. Petrol Stops N.W.*, 441 U.S. 221 (1979), *Dennis* involved neither Rule 6(e) nor the pre-trial disclosure of grand jury materials. In a similar vein, *Dennis* did not discuss the standard a defendant seeking to ultimately dismiss his indictment must show in order to penetrate the grand jury's secrecy. Indeed, to the extent *Deniss* at all blessed the district court's *in camera* review of grand jury transcripts, it did so during the middle of trial, long after an indictment could be dismissed, to assist its evaluation of whether the government was required to disclose an already-testifying trial witness's prior

5

statements.  Unsurprisingly, *Dennis* says nothing of the standard by which a court may review grand jury transcripts in connection with a defendant's pre-trial efforts to dismiss an indictment.

The other cases Mr. Gerace cites are similarly unavailing.  The question of the district court's power to conduct an *in camera* inspection absent a finding of particularized need was not fully developed in *United States v. Eldridge*, No. 09-CR-329, 2014 WL 257224, at *4 (W.D.N.Y. Jan. 23, 2014), and thus that decision is of limited persuasive value vis-à-vis those decisions, such as *Smith*, that thoughtfully address why application of the particularized need standard is required by law.  Moreover, as *Smith* recognized, *Eldridge* and the two other cases Mr. Gerace relies upon, *United States v. Allen*, No. 09–CR–329, 2014 WL 1745933, at *2–3, (W.D.N.Y. Apr. 30, 2014); and *United States v. Twersky*, No. S2 92 Cr. 1082(SWK), 1994 WL 319367, at *5, (S.D.N.Y. June 29, 1994), each involved "some other [non-speculative] ground", such as the government's disclosure in *Eldridge* that one of its grand jury witnesses perjured himself, that merited the *in camera* inspection of grand jury material.  *Smith*, 101 F. Supp. 3d at 262 n.3.

Consistent with this, where the issue has been raised and briefed, those courts that have ordered the *in camera* inspection of grand jury minutes have done so only after concluding that "*the [party] . . . adduce[d] facts that strongly suggest misconduct at the grand jury and where no alternative means of illuminat[ing] the grand jury proceeding exist.*"  *Frederick v. New York City*, No. 11 CIV. 469 JPO, 2012 WL 4947806, at *14 (S.D.N.Y. Oct. 11, 2012) (Oetken, J.) (emphasis added).  And even in those "rare" cases where such circumstances exist, courts have viewed *in camera* inspection as a continuation of their duty to "accurately calibrate" a party's showing of particularized need—not the end of the analysis.  *Id.*

6

Applying these standards to this case, the takeaway is two-fold: (1) the particularized need standard applies to the *in camera* inspection of grand jury materials and (2) the Magistrate Court did not *apply* that standard when ordering the disclosure of grand jury instructions, a conclusion Mr. Gerace is hard-pressed to challenge.

> **B.     Mr. Gerace does not contend with the Magistrate Court's alleviation of the defendants' burden and creation of a disclosure basis bearing no articulable basis for the indictment's dismissal**.

In its appeal, the government argued that the Magistrate Court did not apply the "particularized need" standard or hold the defendants to their burden of satisfying it, as evidenced by the Magistrate Court's basing its decision "on an issue"—*viz.*, how the grand jury was instructed—"the defendants never raised." Gov. App., at 14–15. Indeed, "[b]ecause the Magistrate Court based [its] holding on an issue the defendants never raised, it is axiomatic that the defendants could not have made (and did not make), 'with particularity' a 'showing of need for the transcripts' with respect to grand jury instructions." *Id.* at 15 (quoting *Douglas Oil Co.*, 411 U.S. at 221. What is more, though the Magistrate Court's advocacy on behalf of the defendants violates the letter and the spirit of the party presentation principle, its purported basis for disclosure—determining how the grand jury was instructed—is divorced from any articulable "ground" upon which the indictment "may" be "dismiss[ed]". FED. R. CRIM. P. 6(e)(3)(E)(ii); *see* Gov. App., at 16 (arguing that *Smith* stands for the proposition that a defendant fails to demonstrate a particularized need to access the grand jury's instructions when her arguments rest on the indictment's allegations).

7

Mr. Gerace fails to contend with any of these arguments. Instead, he attacks the government's motivation for appealing the Magistrate Court's order,[1] complains of the quality of the government's briefing,[2] accuses the government's counsel of dishonesty, and alleges the government's current arguments as being made in bad faith.[3]

All of these baseless distractions serve to obfuscate that the Magistrate Court ignored the presumption of regularity and a straightforward reading of the indictment to instead anchor its rulings on a rationale never pressed in contravention of a standard it plainly never acknowledged (let alone applied), and did so in connection with a bid for dismissing the indictment—one, evidently, involving grand jury instructions—that neither it nor the defendants have ever identified. *See* FED. R. CRIM. P. 6(e)(3)(E)(ii) (providing that the court may authorized disclosure if the defendant "shows *that a ground may exist* to dismiss the indictment because of a matter that occurred before the grand jury" (emphasis added)). Because this Court's appellate review is based on the record that actually exists—as opposed

---

[1] The government's motivation is simple: courts must apply the presumption of regularity and the particularized need standard prior to reviewing grand jury transcripts, and when courts misapply those standards, the government is entitled to appeal. The government's appeal does not equate to an effort to "thwart" the court from uncovering evidence of misconduct that does not exist. Gerace Resp. Br., at 17.

[2] Mr. Gerace inaccurately states that the government had "months" to "workshop" its response to his motion for the disclosure of grand jury minutes. Gerace Resp. Br., at 5. The Magistrate Court gave the government two weeks to respond to approximately 332 pages of defense motions. Because the defendants have, at least on occasion, paid lip service to their speedy trial rights (while objecting to the court setting a trial date), the government did not ask for an extension prior to filing its 168-page response. To the extent Mr. Gerace complains that the government did not fully articulate its reading of the indictment until oral argument, he nevertheless concedes that the record contained the government's arguments prior to the Magistrate Court's disclosure order. Furthermore, the government's response in opposition to the defendant's motion for disclosure contested the defendants' reading of the "facts asserted" in the indictment. *See* Gov. Omnibus Resp. in Opp. Defs.' Non-Disp. Pre-Tr. Mots., at 50, ECF No. 423, (dated Apr. 30, 2025). This challenge, along with the government's oral argument, was sufficient to preserve the government's argument on appeal.

[3] The government is obligated to respond to Mr. Gerace's latest round of invidious allegations and does so in Sec. D.

to the one Mr. Gerace wishes were real—it should conclude that, on this record, the Magistrate Court abused its discretion.

In this vein, the Court should reject Mr. Gerace's efforts to retcon the record and rewrite the Magistrate Court's order. The Magistrate Court did not find that Overt Act ¶ 25 is "clearly false" because it "falsely alleged that defense counsel 'revealed' [Ms.] Quinn's cooperation by placing her on a witness list—when in fact her cooperation had already been made public through both public court proceedings and unsealed records." Gerace Resp. Br., at 19. Instead, the Magistrate Court explicitly stated it was "***not addressing***" Mr. Gerace's disclosure motion "in terms of whether there[] [was] evidence to support" Overt Act ¶ 25. Non-Disp. Mots. Oral Arg. Tran., at 102–03, (dated May 21, 2025) (emphasis added). Instead, the Magistrate Court advised that it was granting disclosure "in terms of how was the jury instructed so that they could make this finding," a ground, once more, the defendants never argued. *Id.*

Mr. Gerace declines to defend the Magistrate Court's actual analysis of his motion. At no point in his response brief does he even attempt to reconcile the Magistrate Court's "ruling" under Rule 6(e)(3)(E)(ii), which contemplates the disclosure of materials insofar as they bear some nexus to a ground that "may exist to dismiss the indictment." FED. R. CRIM. P. 6(e)(3)(E)(ii); *Williams*, 504 U.S. at 46 (explaining that the court's supervisory power can only be "used to dismiss an indictment . . . where [grand jury] misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions'"); *United States v. Puglia*, 8 F.3d 478, 481–82 (7th Cir. 1993) (concluding that the defendant did not make a sufficient showing meriting the disclosure of grand jury materials where his theory of

9

misconduct could not, under the law, result in the dismissal of the indictment).  Though in rare circumstances inapplicable here courts may dismiss an indictment for prejudicially incorrect instructions, Mr. Gerace has never articulated a connection between his misreading of Overt Act ¶ 25 and a theory premised upon any such incorrect instructions.  Neither, for that matter, did the Magistrate Court, even though that this precisely what the particularized need standard demands.  *See generally* United States v. Phillips, No. 22-CR-138 (LJL), 2023 WL 6812286, at *1 (S.D.N.Y. Oct. 16, 2023) ("[T]he government is under no obligation to provide the grand jury with legal instructions.").

       Nor does Mr. Gerace endeavor to defend the Magistrate Court's abandonment of the party presentation principle.  Though a substantial part of the government's appeal, *see* Gov. App., at 11–12, 17, 19–22, that doctrine is entirely omitted in Mr. Gerace's response brief, *see generally* Gerace Resp. Br.  Mr. Gerace's decision to ignore the Magistrate Court's unnecessary broadening of the defendants' arguments for their own benefit comes as no surprise: under the doctrine, the Magistrate Court's creation of the basis for disclosure where the defendants bore the burden of production and persuasion is indefensible.  *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation," which assigns to courts "the role of neutral arbiter of matters the parties present."); *See Moten*, 582 F.2d at 662 (noting that it the party seeking disclosure that carries the burden of demonstrating a particularized need).  Once again, the Magistrate Court's transformative departure from the party presentation principle is, by itself, a sufficient basis to conclude that it abused its discretion in ordering the disclosure of grand jury materials.  *See Sineneng-Smith*, 590 U.S. at 374–75, 380 (concluding that the Ninth Circuit abused its discretion when it radically departed from the party-presentation principle).

Moreover, though the Magistrate Court explicitly rejected Mr. Gerace's invitation to conclude that there was no "evidence" to support the Indictment's allegation in Overt Act ¶ 24, *see* Oral Arg. Tran., at 103, had the Magistrate Court done so—and made the findings Mr. Gerace wishes it made—its finding would have been clearly erroneous.  First, the Indictment made pains to allege that Ms. Quinn was charged by Criminal Complaint—an "unsealed record," one might say—for witness tampering on February 3, 2023; that Mr. Gerace was indicted on witness tampering charges on March 23, 2023; that detention hearings were held on March 24th and March 27th related to that indictment; and that on April 6th, Ms. Quinn's Criminal Complaint was dismissed. *See id.*, at 4 ¶¶ 10, 15 – 5 ¶¶ 16, 19.

Mr. Gerace and anyone familiar with the criminal justice system's dynamics could have easily inferred that Ms. Quinn began cooperating prior to Mr. Gerace's indictment for witness tampering on March 23rd.  Consistent with this, the very first Overt Act alleged in Count alleges that Gerace Attorney 1, just days after Ms. Quinn was charged by Criminal Complaint, caused an unwitting attorney, Attorney 2, to reach out to Ms. Quinn.  *See id.* at 14 ¶ 17.  Then on March 13th, less than a week after Ms. Quinn testified in the grand jury, *see id.* at 4 ¶ 14, unknown individuals placed dead rats on Ms. Quinn's mother's vehicle and in the vicinity of Ms. Quinn's residence, *see id.* at 15 ¶ 18.

Though the individuals who placed the rats near Ms. Quinn's home were unknown to the grand jury when they returned the indictment, the grand jury nevertheless found that the defendants, including Mr. Gerace, caused the rats to be

> placed at [Ms.] Quinn's residence to corruptly and by threat and communication, influence, obstruct, and impede, and endeavor to corruptly influence, obstruct, and impede [Ms.] Quinn from cooperating with members, and to prevent [Ms.] Quinn from testifying against [Mr.] Gerace in . . . Case Nos. 19-CR-227 and 23-CR-37 . . . .

11

Plainly, the Indictment's own allegations establish that Mr. Gerace and other co-conspirators believed Ms. Quinn was cooperating prior to her placement on the defense's witness list. To put a finer point on it, it is facially illogical that the grand jury could have concluded that Mr. Gerace conspired with others to engage in witness tampering against Ms. Quinn—namely, by causing the placement of rats at Ms. Quinn's residence in March 2023—while simultaneously concluding that Mr. Gerace did not learn of Ms. Quinn's status as a witness until months later through the filing of the defense witness list in June 2023. *See id.* at 16 ¶ 24 (alleging that "[o]n or about June 20, 2023, Gerace Attorney 1 filed and caused the filing of" the defendant's witness list). Overt Act ¶ 25 does not contradict this reading of the Indictment, as it says nothing of how Mr. Gerace initially learned of Ms. Quinn's cooperation with the government.[4]

Furthermore, contrary to Mr. Gerace's efforts to literally rewrite the Indictment, Overt Act ¶ 25 does not allege that Gerace Attorney 1 "revealed" that Ms. Quinn was a government witness through the filing of his witness list. Rather, Overt Act ¶ 25 alleges that the Protective Order prohibited Mr. Gerace's attorneys "from *revealing*" to Mr. Gerace the government's witness list. Sec. Super. Indict., at 16 ¶ 25, ECF No. 24, (dated Jan. 5, 2024).

---

[4] Contrary to another misreading of the Indictment's plain text that Mr. Gerace is keen to adopt, Overt Act ¶ 25 does not even allege that Gerace Attorney 1 *violated* the Protective Order. As the Court knows, protective orders, like other sources of law, can be "circumvented", without such circumvention rising to the level of a violation. *See id.* at ¶ 25 ("The listing of [Ms.] Quinn has a witness for [Mr.] Gerace circumvented the provisions of a Protective Order which prohibited attorneys . . . from revealing to [Mr.] Gerace the government's witnesses' names and from providing [Mr.] Gerace with the government's witness list."). Indeed, a defendant, or opposing party in any litigation, may capitalized on perceived loopholes in a statute, a regulation, or an order. For example, a court may instruct the parties not to communicate with former jurors about a case. But this order may not reach one of the party's family members, who decides to talk with the juror and report back to the party what she said. In that hypothetical scenario, a reasonable person might say that the court's order has been circumvented even if not directly violated. The government is perplexed as to why this basic observation—that not all circumventions amount to violations—is the source of such consternation for Mr. Gerace, especially since overt acts need not be inherently criminal. *See United States v. Montour*, 944 F.2d 1019, 1026 (2d Cir. 1991) ("[A]n overt act need not be inherently criminal to support a conspiracy conviction."). Regardless, these facts were within the purview of the grand jury and will be for the petite jury to determine at trial.

By now, this much should be clear: a plain and straightforward reading of the indictment, combined with the presumption of regularity, supports the notion that the grand jury was provided evidence from which it could determine that Mr. Gerace learned of Ms. Quinn's cooperation with the government long before the June 2023 filing of the defense witness list. Because this reading necessarily refutes Mr. Gerace's motion, the Magistrate Court could not have concluded that Mr. Gerace carried his burden of demonstrating a particularized need. *See Moten*, 582 F.2d at 662 (noting that it the party seeking disclosure that carries the burden of demonstrating a particularized need).

And, indeed, the Magistrate Court made no such findings. Instead, the Magistrate Court articulated a basis for disclosure—a curiosity about, or a lack of understanding as to how, the government instructed the grand jury—that no defendant raised, about which no record evidence exists, and that the government lacked the ability to respond to. There is no case that the government has been able to find establishing that a judge's curiosity as to how the grand jury was instructed is sufficient to merit the *in camera* inspection of grand jury materials. Were there, the particularized need standard would hardly be the heavy burden that the law acknowledges it to be. Worse still, there is no basis in the record to believe that the issue of grand jury instructions bears any nexus to Mr. Gerace's ability to dismiss the indictment, as required by Rule 6(e). *See Smith*, 105 F. Supp. 3d at 262 (recognizing that no logical nexus exists where a defendant premises her showing of particularized need as to the acquisition of jury instructions on the purported insufficiency of an indictment's allegations). Viewed individually or in their totality, these errors should leave this Court with the firm impression that the Magistrate Court's actual order is premised upon a clearly erroneous determination of the facts and/or was arrived at through an abuse of its discretion.

## C. Mr. Gerace's prosecutorial steering allegations are beyond the scope of this appeal.

Hoping to rescue the Magistrate Court's conclusion, Mr. Gerace pivots to more prosecutorial misconduct motions, this time arguing that his claim of prosecutorial steering serves as an alternative basis for affirming the Magistrate Court's disclosure order. *See* Gerace Resp. Br., at 3–4, 23–24, 27–29. Mr. Gerace appears to think these arguments are relevant for two reasons. First, though he concedes that "Magistrate Judge McCarthy did not appear to address prosecutorial steering when deciding to order disclosure for *in camera* inspection," he insists that "Magistrate Judge McCarthy did not deny the motion on those grounds either." *Id.* at 24. Second, he claims that, in the event the particularized need standard applies, his claims of prosecutorial steering satisfy that standard. *See id.* at 27–28. These arguments are unavailing.

Though the Magistrate Court's order is vague and ambiguous as to what it *was* based on, it very clearly was *not* based on Mr. Gerace's prosecutorial steering arguments. Specifically, the Magistrate Court stated:

> Criminal Rule 6(e)(3)(E) states that the Court *may* authorize disclosure at a time and a manner and subject to any other conditions that it directs of a Grand Jury matter, sub (2), at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the Grand Jury. *I emphasize the word* "may" *here*. I'm not drawing any conclusions as to whether there was any impropriety. I don't know. But focusing again only on -- and I've read the other allegations, the factual allegations but I still have trouble with how the Grand Jury was able to – I'm not addressing this in terms of whether there's evidence to support it, *I'm addressing it in terms of how was the jury instructed so that they could make this finding*. So I am going to direct that the Grand Jury minutes be given to me for my *in-camera* review.
>
> Mr. Foti, I know you've asked that you have access to it, too. Not at this point because I think I have enough to make my own determination as to whether or not further disclosure is appropriate. I may conclude

14

>that I don't think there was any impropriety. I would indicate that to Judge Vilardo, if I conclude that there may have been. We'll see where we go from there. But for now that's my ruling.

Oral Arg. Tran., at 102–03 (emphasis added).

As the transcript establishes, the Magistrate Court did not focus on, or make passing reference to, Mr. Gerace's allegations related to prosecutorial forum shopping when articulating the basis of its disclosure order. *See generally id.* Instead, as the Magistrate Court stated quite clearly, the disclosure order was focused on "how was the jury instructed so that they could make this finding," presumably alluding to Overt Act ¶ 25. *Id.* For that reason, Mr. Gerace's claim that the Magistrate Court's decision was "shaped by" the government's "silence" as to his prosecutorial forum shopping claims is invented from whole cloth and untethered to the record. Gerace Resp. Br., at 24.

Likewise, because the Magistrate Court did not base its disclosure order on Mr. Gerace's forum shopping allegations, those claims are irrelevant to deciding whether the Magistrate Court abused its discretion for why it *did* order disclosure: its lack of understanding as to how the grand jury was "instructed" so that it "could make" an unspecified factual "finding." Oral Arg. Tran., at 103. Finally, even if the Magistrate Court did credit Mr. Gerace's argument, doing so would have been contrary to law—and thus an abuse of discretion—because such a claim is not an actionable basis for disclosure under Rule 6(e). Specifically, Mr. Gerace's argument focuses not on whether prosecutorial misconduct occurred "before the grand jury," but rather whether the government engaged in "judge shopping," when it filed a case-related form outside of the grand jury's presence.[5] FED. R.

---

[5] Resisting this conclusion, Mr. Gerace claims that the government's purported judge shopping—which the government has repeatedly and emphatically denied—amounted to misconduct before the grand jury because it reflected a "curated, misleading narrative to the grand jury to justify its strategy" of "provok[ing] detention, obscur[ing] judicial oversight, and shap[ing] public perception." Gerace Resp. Br. at

CRIM. P. 6(e) (3)(E)(ii). Mr. Gerace cites no law—and the government can find none—in which a court has expanded the plain meaning of Rule 6(e)'s limitations to green light the kind of argument Mr. Gerace urges here.[6] Accordingly, in addition to there being no basis to consider them on appeal, Mr. Gerace's arguments fail on the merits.

> **D. Mr. Gerace's most recent spate of government misconduct allegations are belied by the record and at odds with common sense.**

Justice Oliver Wendell Holmes famously directed lawyers to "Strike for the jugular, and let the rest go." Oliver Wendell Holmes, *Speeches* 77 (1934). But far from encouraging *ad hominem* attacks, the Justice hoped attorneys would channel their power of adversarial advocacy toward their opponent's legal ideas. In the spirit of that ideal, the government declines to respond to most of Mr. Gerace's invective. However, to the extent Mr. Gerace seeks to double-down on his misreading of the Indictment by misreading an affidavit previously filed by government counsel, and the insinuating that the government's counsel was dishonest with the Court, the government would be remiss not to clarify the record.

Specifically, Mr. Gerace claims to have unearthed a contradiction—and, he insinuates, more—in the government's characterization of Overt Act ¶ 25. In particular, he points to an affidavit filed by government counsel in support of a prior motion for a protective

---

27. This argument is as illogical as it is factually baseless. Matters that occurred outside the grand jury (i.e., matters related to the Clerk's office and the case-related form) are unrelated to the matters occurring before the grand jury—and Rule 6(e) affords defendants no avenue to sift through grand jury material as a means to substantiate prosecutorial misconduct claims premised upon actions taken outside of the grand jury. As such, the government's presentation of evidence before the grand jury is not impacted by matters that occur outside of the grand jury's presence.

[6]   As proof of his latest prosecutorial misconduct conspiracy theory, Mr. Gerace cites (1) a FBI file that labeled the investigation of Ms. Quinn's death as a subfile of the "Bongiovanni/Gerace" investigation; (2) "the government's denial of any such relationship" between the Gerace investigation and Ms. Quinn's death during an oral argument held March 15, 2024, in Case Nos. 19-CR-227 and 23-CR-37; and (3) "Related-case forms were selectively filed after a new judge had been assigned." Gerace Resp. Br., at 28. Though these allegations are beyond the scope of the government's appeal, the government has and continues to contest each of Mr. Gerace's assertions and mischaracterizations.

order. *See* Rev'd & Super. Mot. Protective Order, ECF No. 156, (dated June 28, 2024). To demonstrate the "good cause" necessary for a protective order, the government pointed to examples of actual and potential issues involving protective orders that have occurred in this district. As one example, counsel pointed to case numbers 19-CR-227 and 23-CR-37, where Mr. Gerace's attorneys "listed government witness Crystal Quinn as a defense witness." *Id.* at 11 ¶ 16(a) (Aff. Nicholas Cooper). Thereafter, counsel accurately summarized the protective order, noting that it "prevented defense counsel from disclosing to the defendant the names of witnesses on the government's witness list until a certain number of days before trial, [but] [ ] did not prevent defense counsel from listing the government's witnesses the defendant's own list and then reviewing the defense witness list with the defendant." *Id.* at 11–12. Though counsel recognized that the Protective Order in Case Nos. 19-CR-227 and 23-CR-37 did not "prevent" this conduct, he nonetheless thought this reflected a "potential[] circumvent[ion] [of] the protective order," as it could have been used to "*identify*[] witnesses to the defendant in a roundabout way."[7] *Id.* at 12 (emphasis added). Mr. Gerace contends that these "earlier sworn submissions . . . to Magistrate Judge McCarthy" "are inconsistent with" the "factual arguments presented to this Court on appeal," namely the government's position that it was not through the filing of the defense witness list that Mr. Gerace learned of Ms. Quinn's cooperation. Gerace Resp. Br., at 22.

---

[7] Mr. Gerace's own briefing makes this point. As he acknowledges, the protective order did not prevent defense counsel from "having discussions" with Mr. Gerace "about facts relevant to a potential defense," including "that [Ms.] Quinn was publicly charged by the government earlier that year, and then the charges were dropped once the government had utilized her to obtain a new indictment and detention of [Mr.] Gerace." Gerace Resp. Br., at 7 n. 10. In other words, Mr. Gerace agrees with the government's counsel that the protective order did not directly prohibit him from indirectly identifying the government's witnesses, such as in the manner Mr. Gerace outlined above, and especially was limited in its ability to prevent such roundabout identification if those conversations were held in connection with purported defense witnesses.

17

Mr. Gerace's analysis, and conclusion, is erroneous. Whether the listing of Ms. Quinn on the defense's witness list identified her as a government witness does not mean that it was *through that identification* that Mr. Gerace *learned* that Ms. Quinn was a government witness. It is the latter proposition that Mr. Gerace premises his motion for disclosure, even though it is at war with a common sense reading of the indictment and, now, government counsel's affidavit. *See* Gerace Resp. Br., at 19.

Consider the following hypothetical, which will be familiar to all those who have worked on criminal cases: law enforcement has been investigating a series of robberies. As part of the investigation, law enforcement has obtained (1) video footage of the robbers, (2) their fingerprints, resulting in positive matches, (3) the license plate numbers of the vehicles they used to get away, which reveals the vehicles are registered to the individuals depicted in the video, and (4) a cell phone belonging to one of the robbers containing text messages between him and his co-conspirator discussing the robberies they've committed. Through all this information, law enforcement knows the identities of the robbers. However, for good measure, they show a six pack of photographs to a store clerk who witnessed one of the robberies. The store clerk positively identifies the robbers.

In this hypothetical, no one could fairly say that law enforcement learned of the robbers' identities *through* the store clerk's positive identification. That is because, as the hypothetical demonstrates, law enforcement learned of the robbers' identities through myriad other sources of evidence. Likewise, government counsel's reference to the defense witness's list "roundabout" identification of government witnesses does not mean that it was *through* that witness list that Mr. Gerace's *learned of* Ms. Quinn's cooperation with the government. This is especially so considering, as the indictment reflects, that it has long been the

18

government's theory that Mr. Gerace *learned of* Ms. Quinn's cooperation long before the filing of the defense witness list (likely no later than the March 2023 detention hearings), in the same way that the hypothetical's intrepid investigators learned of the robbers' identities long before store clerk's positive identification of the robbers.

Accordingly, to the extent Mr. Gerace attempts to portray government counsel as dishonest, and the government's current position as inconsistent with its prior representation, his characterizations should be rejected.[8]  In sum, (1) the government's counsel was not dishonest with the Court and (2) there is no contradiction between counsel's prior representations and the government's current arguments.  In fact, a careful, nuanced reading of Overt Act ¶ 25 is entirely consistent with the government's prior representations to the court regarding the protective order.  Accordingly, Mr. Gerace's newest slate of prosecutorial misconduct arguments should be rejected by this Court and play no role in its assessment of whether the Magistrate Court abused its discretion.

On that score, the Magistrate Court's error is manifest: it based its disclosure order on a rationale not argued by the defendants, for which no record evidence supports, in purported furtherance of a theory of dismissal that no one has yet to articulate.  And though the Magistrate Court explicitly did not adopt Mr. Gerace's theory that the evidence was insufficient to support the grand jury's finding, it bears repeating that Mr. Gerace's warped construction of the indictment is at odds with the indictment's plain terms, the presumption

---

[8]  Alternatively, Mr. Gerace argues that on May 21, 2025, the Magistrate Court "was certainly familiar" with government counsel's affidavit from June 28, 2024.  Gerace Resp. Br., at 23.  There is no basis in the record to support Mr. Gerace's speculation that the Magistrate Court had in mind an affidavit in support of a protective order filed eleven months prior to oral argument.  To the contrary, the Magistrate Court made it clear that it was struggling to organize the "huge volume of issues" presented by the defendants' non-dispositive motions.  Oral Arg. Tran., at 3.

of regularity, and a fair, holistic reading of the document. Accordingly, the Court should reverse the Magistrate Court's disclosure order.

## CONCLUSION

For the reasons stated herein, the government respectfully requests that the Court grant the government's appeal by reversing the Magistrate Court's disclosure order.

DATED: Buffalo, New York, July 16, 2025.

                      MICHAEL DIGIACOMO
                      United States Attorney


BY:   s/ CASEY L. CHALBECK
       s/NICHOLAS T. COOPER
       s/JOSEPH M. TRIPI
       s/CAITLIN M. HIGGINS
       Assistant United States Attorney
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       (716) 843-5881
       Casey.Chalbeck@usdoj.gov