IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v. 23-CR-99-LJV

SIMON GOGOLACK, et al.,

Defendants.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT JOHN ERMIN'S MOTION TO COMPEL THE PRODUCTION OF AN UNREDACTED SEARCH WARRANT AFFIDAVIT**

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Nicholas T. Cooper, Casey L. Chalbeck, Joseph M. Tripi, and Caitlin M. Higgins, Assistant United States Attorneys, of counsel, hereby files its response to defendant John T. Ermin's motion to compel the production of an unredacted search warrant affidavit (ECF No. 529).

## I. FACTUAL BACKGROUND

On December 5, 2023, United States Magistrate Judge H. Kenneth Schroeder, Jr., issued a search warrant authorizing federal law enforcement to search the residence of defendant John T. Ermin. Including exhibits, the entire application package totals 346 pages. On May 22, 2024, counsel for the government e-mailed a minimally redacted search warrant application to counsel for Mr. Ermin. As the Court's *in camera* inspection of the unredacted search warrant will confirm, the redactions conceal source identifiers or details that could be used to identify sources.

The government has grave and specific concerns that disclosing an unredacted search warrant affidavit will endanger witnesses and sources referenced in the affidavit. In particular, on August 13, 2025, the FBI interviewed one of Crystal Quinn's surviving family members who reported that a private investigator working for Mr. Ermin's defense team had recently contacted her, attempted to interview her, and told her, in sum and substance, that if Mr. Ermin and the Outlaws Motorcycle Club "were going to do anything [i.e., murder Ms. Quinn] you would never have found her body." *See* Exhibit A (Redacted FBI 302 dated August 13, 2025). Understandably, the witness found this statement disturbing because the private investigator essentially disclosed that Mr. Ermin and the Outlaw Motorcycle Club were capable of murder but would not have been so "sloppy" as to get caught. *See id.* at 2.

## II. LEGAL FRAMEWORK

Even assuming *arguendo* that defense counsel has a Fourth Amendment right to inspect search warrant affidavits, the government can overcome that right—in whole or in part—by showing a compelling governmental interest. *See In re Ares Armor , 206/208 N. Freeman St., Oceanside*, 687 F. App'x 622, 624 (9th Cir. 2017) (unpublished) (noting that even if a Fourth Amendment right to inspection exists, the government can show a "compelling . . . interest" to keep certain information in a search warrant affidavit "under seal"). Maintaining the government's so-called "informant's privilege" can satisfy this "compelling interest" standard. *See United States v. Russotti*, 746 F.2d 945, 980 (2d Cir. 1984) ("It has consistently been held that an informant's identity need not be disclosed unless 'essential to the defense.'" (quoting *Scher v. United States*, 305 U.S. 251, 254 (1938))).

For example, in *United States v. Napier*, 436 F.2d 1133 (9th Cir. 2006), the Ninth Circuit affirmed the district court's denial of a defendant's motion to unseal, in its entirety, a redacted

search warrant application that he had sought to use in furtherance of a *Franks* hearing. *Id.* at 1136. Though the Ninth Circuit agreed that *Franks* created *some* right of access to a search warrant affidavit, it disagreed that it "created an unlimited right to access all information possibly needed to meet [*Franks*'] preliminary showing requirement." *Id.* Instead, a countervailing privilege belonging to the government to "maintain[] [the] integrity of ongoing criminal investigations and ensur[e] the safety of [any] informant" cabined the defendant's Fourth Amendment right of access. *Id.*

Indeed, the informer's privilege recognizes the government's power "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 60–64 (1957). And though *Roviaro* speaks of the informant's identity, courts interpreting that precedent have broadly extended the privilege "to information that would tend to reveal the identity of the informant." *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, No. 11 CIV. 3543 WHP, 2014 WL 2116147, at *3 (S.D.N.Y. May 14, 2014) (quoting *Napier*, 436 F.3d at 1136); *see United States v. Cartagena*, 593 F.3d 104, 113 (1st Cir. 2010) ("[I]f disclosure of a communication's contents will also tend to reveal an informant's identity, the contents are also privileged.").

## III. APPLICATION

The Court should deny Mr. Ermin's motion because, as the Court's *in camera* inspection of the warrant application will confirm, the search warrant provided to defense counsel redacts information that could be used to identify witnesses and sources. Source identity falls within the heartland of the government's informer privilege. *Rovario*, 353 U.S. at 60. And exposing those identities may imperil the safety of those individuals who provided

information resulting in the arrest of Mr. Ermin, the (now former) International President of the Outlaws Motorcycle Club.

Disclosing the unredacted affidavit pursuant to an attorney's eyes only protective order does not allay the government's investigative and witness-safety concerns for three reasons. First, informants share valuable information to law enforcement with the expectation that law enforcement will treat their identities with the secrecy commensurate with the great personal risk they are subjecting themselves to by promoting the public good. A court order prohibiting defense attorneys from exposing identifying information to their clients does little to assuage the fear of the informant whose safety now resides in the hands of the defendants' agents. The result is that, even if an attorneys' eyes only designation is never violated, the disclosure itself may chill the sharing of information. Second, the safe handling of documents reflecting source information bearing on the leadership of an international criminal enterprise is critical. The more widely available the unredacted search warrant application becomes, the more likely that information will either be inadvertently disclosed or nefariously obtained. And, third, the FBI is aware that a non-attorney member of Mr. Ermin's defense team recently told a witness in this case that, in sum and substance, if Mr. Ermin and the Outlaws Motorcycle Club were behind Ms. Quinn's murder, her body never would have been found. These kinds of intimidating comments indicate that not all members of the Mr. Ermin's defense team share his attorneys' professionalism and circumspection when it comes to handling sensitive information.

Assuming these risks is especially unnecessary where, as here, the defense has failed to specify why, precisely, the identities of the government's sources are necessary to challenge the validity of the search warrant. Rather than offer specifics, Mr. Ermin seeks the disclosure

so that he may "thoroughly review any and all issues that may be subject" to a dispositive motion. Mot. Disclosure, at 3 ¶ 3. Such generalities do not even amount to a demonstration of theoretical relevance in the face of the government's informer privilege. For these reasons, Mr. Ermin's disclosure motion should be denied.

## IV. CONCLUSION

For the reasons stated herein, the United States respectfully asks that the Court deny Mr. Ermin's disclosure motion (ECF No. 529).

DATED: Buffalo, New York, August 15, 2025.

MICHAEL DIGIACOMO
United States Attorney

BY: s/ CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov

# Exhibit A

FD-302 (Rev. 5-8-10)






**FEDERAL BUREAU OF INVESTIGATION**

Date of entry 08/14/2025

On August 13th 2025, Special Agent (SA) Brian A. Burns and SA Adam Penna telephonically contacted [REDACTED]. After being advised of the identities of the interviewing Agents [REDACTED] provided the following information:

[Agent Note: The previous week SA Burns had spoken briefly to [REDACTED] concerning the upcoming sentencing of Courtnie Barber. During the course of that conversation [REDACTED] indicated she had spoken with a private investigator for John Ermin. At the time SA Burns was not in a position to fully follow up on this information and this August 13th interview was the follow up.]

[REDACTED] advised that two private investigators had come to her residence to discuss the pending case involving [REDACTED] Crystal Quinn's death. [REDACTED] further advised that her roommate [REDACTED] was present during the conversation with the private investigators.

[REDACTED] stated the lead private investigator was an individual named Tony Olivo. [REDACTED] stated the private investigator left a business card, and his name on the card was J.A. Tony Olivo. [REDACTED] did not recall the name of the other private investigator with Olivo. [REDACTED] indicated that she had written on the card "attorney George Moscato".

[REDACTED] stated that Olivo had said something to her which she found very disturbing, and which was why she wanted to mention it to SA Burns when they had spoken last week.

[REDACTED] advised that Olivo was not at her residence for long and she basically let him talk. [REDACTED] stated that Olivo was telling her that Ermin was innocent. [REDACTED]

Investigation on 08/13/2025 at Buffalo, New York, United States (Phone)

File # [REDACTED] Date drafted 08/14/2025

by PENNA ADAM

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

[redacted]

During the course of the conversation with the private investigators, Olivo told [redacted] words to the effect of "if they were going to do anything you would never have found her body." [redacted] stated this was "more or less" what Olivo expressed to her. [redacted] understood the "they" Olivo was talking about was the Outlaw Motorcycle Gang. [redacted] further stated that Olivo's statement was disturbing because Olivo was essentially saying his client and the Outlaw Motorcycle Gang were capable of murder but would not have been so "sloppy" as to get caught.