IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

SIMON GOGOLACK, et al.

Defendants.
_____

**MEMORANDUM IN SUPPORT OF**
**DISPOSITIVE PRETRIAL MOTIONS**

**ON BEHALF OF PETER GERACE, JR.**

Case No.: 23-CR-99

Dated: August 8, 2025

**I. BACKGROUND** ------------------------------------------------------------------------------------------------3

  A. Events Preceding the Death of Crystal Quinn------------------------------------------------------------3

     1. The Events Leading to the Government Targeting Crystal Quinn -------------------------------3

     2. The Government Charges and "Flips" Crystal Quinn------------------------------------------------4

     3. The Government Publicly Reveals that it "Got" Ms. Quinn ---------------------------------------5

     4. Gerace Believed Quinn Would Provide Testimony Favorable to Him------------------------7

     5. The Public Reporting of Ms. Quinn's Death --------------------------------------------------------9

  B. The Investigation Following the Death of Quinn --------------------------------------------------11

     1. The Investigation Immediately Targeted Gerace, Even Before Charging Gogolack----------------11

     2. The Government Subpoenaed a Defense Investigator Without a Crime Fraud Order --------------14

  C. Procedural History of This Case-----------------------------------------------------------------------20

     1. The Filing of Charges Against Gogolack, Hinkle, Ermin and Others ----------------------20

     2. The Second Superseding Indictment Consolidates the Pending Cases ------------------21

     3. The Discovery Scheduling Order------------------------------------------------------------------22

     4. Requests for Second Counsel -----------------------------------------------------------------------26

     5. The Violation of the Court's Discovery Order --------------------------------------------------27

     6. The Government's Motion for Reconsideration of the Court's Decision to Deny an Exclusion of Time in the Interest of Justice ---------------------------------------------------------------------------------------29

     7. Sanctions Litigation --------------------------------------------------------------------------------30

       a. Defendants Move for Sanctions Based on the Government's Violation of the Court's Order----------------30

       b. Defense for Gerace Responds to the Government's Motion for an Exclusion of Time ------------------------31

       c. The Imposition of Sanctions -----------------------------------------------------------------------------32

     8. The February 5, 2025, DOJ Memorandum-------------------------------------------------------34

     9. Pretrial Motions ------------------------------------------------------------------------------------36

**II. MOTIONS** -----------------------------------------------------------------------------------------------**36**

  A.   Motion to Dismiss Counts 1-3 Pursuant To Fed.R.Crim.P.12(B)(3)(B)----------------------------36

     1. Introduction ----------------------------------------------------------------------------------------36

     2. Summary of Counts 1-3----------------------------------------------------------------------------38

     3. Counts 1-3 Are Duplicitous -----------------------------------------------------------------------40

     4. Klein conspiracy and Lack of Specificity re: Gerace Attorney 1 -----------------------------49

  B.   Motion to Dismiss Based on Defective Grand Jury Proceedings-------------------------------------54

     1. Initial Grounds to Dismiss, Prior to Grand Jury Review -----------------------------------56

  C.   Motion to Dismiss Based on Prosecutorial Steering-----------------------------------------------61

     1. The Government Was Confronted in March 2024 on its Selective Related Case Filings ------------------62

     2. Despite the Government's Comments in March 2024, the Government Had Immediately Connected the Witness Death Investigation to the Prosecution of Mr. Gerace ----------------------------------------------65

     3. Motion to Dismiss and Grand Jury Review ----------------------------------------------------68

  D.   Motion to Dismiss or Suppress Due to the Subpoena Compelling Production From Gerace's Investigator----------------------------------------------------------------------------------------------------------69

  E.   Motion for Leave to Join in Co-Defendant's Motions----------------------------------------------76

  F.   Motion for Leave to Make Other Pretrial Motions -----------------------------------------------76

**IV. CONCLUSION**----------------------------------------------------------------------------------------------**78**

# I. BACKGROUND[1]

## A. EVENTS PRECEDING THE DEATH OF CRYSTAL QUINN

### 1. The Events Leading to the Government Targeting Crystal Quinn

The Second Superseding Indictment in this case establishes that Counts 1-3 are related to the prosecution in US v. Bongiovanni et al, case no. 19-cr-227.[2]

Case no. 19-cr-227 commenced with the indictment of former DEA Special Agent Joseph Bongiovanni on October 31, 2019. (Case no. 19-cr-227, Dkt. 1). Peter Gerace was charged in the Second Superseding Indictment in that case on February 25, 2021, nearly four-and-a-half years ago. (Case no. 19-cr-227, Dkt. 89).

The case was initially scheduled for trial at a status conference on November 30, 2022. At that time, Mr. Gerace had already been on home confinement for nearly two years, so District Court Judge Sinatra indicated that he would consider a motion to downgrade Mr. Gerace's electronic monitoring to curfew. (Case No. 19-cr-227, Dkt. 363 at 21-22).

The defense filed a motion to modify the conditions of release. (Case No. 19-cr-227, Dkt. 337). The government opposed. (Case No. 19-cr-227, Dkt. 350 at 13). Over the government's objection, Judge Sinatra issued a Modification Order on January 19, 2023,

---

[1] Portions of this Background section were contained in prior submissions. Mindful of the administrative change to Judge Wolford. The background relevant to this case is included here and supplemented with additional information relevant to dispositive motions, including specifically the information related to subpoenaing of a defense investigator during the grand jury proceedings.

[2] The indictment refers to case no. 19-cr-227 at least 26 times.

granting the portion of the defense's motion that sought a downgrade to a curfew. (Case No. 19-cr-227, Dkt. 361).

Within days of Judge Sinatra granting the defense motion, the government targeted Peter Gerace's close friend, Crystal Quinn.[3]

## 2. The Government Charges and "Flips" Crystal Quinn

On January 24, 2023, only five days after the Court downgraded Mr. Gerace to curfew, the government served Ms. Quinn with a target letter. The subject of the target letter was an incident from November 19, 2019, over three years earlier.[4]

Agents served Ms. Quinn with the target letter at her home and proceeded to question her without counsel present. During questioning, Ms. Quinn provided information that contradicted the government's narrative regarding what occurred in November 2019. (Case no. 23-mj-011, Dkt. 1).

On February 3, 2023, the government filed a Criminal Complaint against Crystal Quinn with three counts related to allegations from November 2019 of threatening and tampering with a witness. (Case no. 23-mj-011, Dkt. 1[5]). Attorney Michael D'Amico was

---

[3] As discussed below, the targeting of Ms. Quinn, over two years after Mr. Gerace had been charged, was used to return a new indictment and bring a motion to detain Mr. Gerace just months before his trial date.

[4] The November 2019 incident had already been the subject of multiple public proffers going as far back as May 4, 2021, when the government publicly proffered that it had "obtained search warrants for [Gerace's] Facebook account. There has been a witness that received threats through a Facebook account during a scenario where Mr. Gerace was present with the person who was -- we're still investigating it… that that occurred in or about November of 2019." (Case No. 19-cr-227, Dkt. 118 at 6-7).

[5] A copy of the complaint, without exhibits, is available on this docket at Dkt. 164-1 and it is respectfully requested that it be considered incorporated into the record for purposes of dispositive motions.

retained to represent Ms. Quinn and appeared with her at the initial appearance on February 8, 2023. (*See* Case no. 23-mj-011, unnumbered Minute Entry filed February 8, 2023).

At the initial appearance, the Court granted the government's request to unseal the complaint. (*Id*.).

Now facing criminal prosecution, Ms. Quinn began to cooperate. The charges had served as sufficient leverage to get Ms. Quinn to change her original story and agree to the government's narrative. Shortly thereafter, the government agreed to dismissal of charges.

### 3. The Government Publicly Reveals that it "Got" Ms. Quinn

In March 2023, only three months before Mr. Gerace and Mr. Bongiovanni were scheduled to go to trial on case no. 19-cr-227, the government obtained a new indictment against Mr. Gerace related to the November 2019 incident involving Ms. Quinn. *See* case no. 23-cr-37.[6]

The government used the indictment as a vehicle to move for detention on March 24, 2023, despite United States Pretrial Services recommending Mr. Gerace's continued release.

Mr. Gerace's probation officer stated pretrial's position:

---

[6] Even though the government had access to the Facebook messages from the November 2019 incident for approximately three years, it did not target Ms. Quinn and charge Mr. Gerace regarding the incident until after Judge Sinatra relaxed Mr. Gerace's conditions of release.

> [Gerace] is on GPS. He is monitored 24/7. We've done unannounced home contacts; unannounced work contacts; unannounced drug and alcohol tests. All have been negative. We view his maps daily, weekly, monthly, in terms of his GPS mapping. He was on home detention, and then he was switched over to curfew. Since he's been on curfew and even home detention, there's been no occasion of violations, where he's stepped out of the house or had any curfew violations. All tests have been negative, and he's followed all release conditions in terms -- as they've been set forth by this Court. So there has been no non-compliance on our end in terms of his supervision and following the rules set forth by Your Honor.

(Case No. 19-cr-227, 3/24/23 Transcript at 46-47).

During the detention hearing, the government spent a considerable amount of time proffering to allegations related to the November 2019 incident. The government proffered that as of 2021, it had two witnesses who described the interaction in November 2019, and although the "initial information was similar in nature," in February or early March of 2023, the Government "got a third witness."[7] (Case No. 19-cr-227, 3/24/23 Transcript at 38).

It was clear that Ms. Quinn was the third witness. Any member of the public or media could easily review the government's public comments that it got its third witness in February or March of 2023 in the context of the complaint filed against Ms. Quinn which had been unsealed in early February 2023.

---

[7] The government did not tell Judge Sinatra that the third witness (Crystal Quinn) initially contradicted the information it obtained from one of the other witnesses but changed her story after being charged and would soon have her charges dismissed for changing her story to agree with the government's narrative.

The complaint against Ms. Quinn described the incident on November 19, 2019, involving Mr. Gerace and only three other people: (1)"VICTIM"; (2) "PERSON 1"; and (3) "QUINN." For example, Mr. Gerace and all three individuals were referenced in paragraph 26 of the complaint:

> VICTIM stated that after receiving the Facebook Messenger message from the account of PERSON 1, VICTIM researched PERSON 1's account and determined, based on a picture posted in PERSON 1's Facebook account, that PERSON 1 and QUINN were together at the time that the message from PERSON 1's account arrived in VICTIM's Facebook Messenger inbox. Moreover, based on the background of the picture depicting PERSON 1 and QUINN, VICTIM knew that PERSON 1 and QUINN were at P.G's home at the time VICTIM received the threats in her Facebook Messenger inbox. As described herein, VICTIM was a close associate of P.G., has been to P.G.'s home and thus was familiar with his residence.

> (Case no. 23-mj-00011-HKS, Dkt. 1 at 12).

Thus, when the government proffered at the detention hearing in March 24, 2023, that it "got a third witness" related to the November incident, it was clear that Ms. Quinn was cooperating along with the other two individuals referenced in the complaint.

## 4. Gerace Believed Quinn Would Provide Testimony Favorable to Him

Mr. Gerace considered Ms. Quinn a friend and believed she would be helpful to his defense because she could impeach the credibility of many government witnesses and she could shed light on tactics the government used to secure her cooperation and pressure witnesses to cooperate with the government's narratives.

Ms. Quinn's initial statement to government agents contradicted the theory that the government sought to advance regarding what occurred in November 2019. The publicly available information provided in the complaint, drafted by a Federal agent, included the following allegations:

- I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name. (¶ 46)

- QUINN stated that she recalled this instance, which is detailed supra, and confirmed that she was with PERSON 1 and P.G. when the messages were sent to VICTIM. QUINN further stated that the messages were sent via Facebook messenger, and that *QUINN stated that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account*. (¶ 47)(emphasis added)

- Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account, is false, fraudulent, and fictitious. (¶ 48)

(*See* Case no. 23-mj-00011-HKS, Dkt. # 1 at 17-18).

Mr. Gerace's attorneys would have an interest in calling Ms. Quinn as a witness, regardless of whether she cooperated with the government, because she made statements to the government agents that contradicted the government's narrative.

If her story changed after the government charged her, it would demonstrate the amount of pressure the government can put on individuals to testify the way government wanted them to.

Tragically, Ms. Quinn died from a drug overdose on or about July 31, 2023. The government subsequently attempted to tie her death to Mr. Gerace.

5. The Public Reporting of Ms. Quinn's Death

After Ms. Quinn died, the mother of Ms. Quinn spoke out, primarily blaming the government for her daughter's death in an interview with the Buffalo News and in affidavits provided to former counsel, Steven Cohen.

> "In my heart, I cannot believe she would commit suicide, but I know that is a possibility," said Sharon Quinn, who works as a clerk with the Depew Police. "Crystal was under *tremendous pressure, extreme pressure* from the FBI to testify. *They told her they would put her in prison if she didn't testify against Peter*. She was so scared that when somebody would knock on our front door, she would run out our back door and hide somewhere."
>
> Dan Herbeck, *Witness who died was under 'extreme pressure' to testify against strip club owner, her mom says*, Aug. 20, 2023, The Buffalo News (available at https://tinyurl.com/BN082023) (emphasis added).

The government has claimed that the mother of Ms. Quinn had her affidavits altered by Mr. Cohen.[8] (*See* Dkt. # 24 at 26 ("On or about August 14, 2023, Gerace Attorney 1 made changes or caused changes to be made to the draft affidavits provided by Investigator 1. The changes made or caused to be made by Gerace Attorney 1 supported the narrative that Crystal Quinn had been suicidal prior to her death.")).

---

[8] Discussions with Mr. Cohen's counsel reveal there is strong proof establishing these allegations to be false.

The government has consistently ignored the mother of Ms. Quinn's comments to a reporter at The Buffalo News.

On September 6, 2023, just weeks after the Buffalo News article which featured comments from Ms. Quinn's mother accusing the government of using "extreme pressure," and coercion with threats of prison, the government moved for intradistrict transfer from Buffalo to Rochester. (Case No 19-cr-227, Dkt. 619). The motion was ultimately denied. (Case No. 19-cr-227, Dkt. 663).

Following the public reporting of the pressure the government was putting on Ms. Quinn, the government started using detention hearings and other early court appearances and public filings to push selective information into the public sphere. *See e.g.*, Dan Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, Sept. 14, 2023, The Buffalo News (available at https://tinyurl.com/BN091423); *see also* Patrick Lakamp, *Pharaoh's witness overdosed on enough fentanyl to kill hundreds*, Nov. 3, 2023, The Buffalo News (available at https://tinyurl.com/BN110323).

In some instances, the information provided was inaccurate. (*See e.g.* Dkt. 34 (government letter acknowledging inaccurate information during government detention proffer)). Many of the public allegations presented in the early court appearances and submissions were presented at a time when the government had not provided discovery

leaving the defendants without any way to publicly rebut the allegations, leaving the public information plainly one-sided.[9]

### B. THE INVESTIGATION FOLLOWING THE DEATH OF QUINN

#### 1. The Investigation Immediately Targeted Gerace, Even Before Charging Gogolack

In *USA v Bongiovanni et al*, the FBI investigated Joseph Bongiovanni, Peter Gerace, Jr. and others alongside other Federal law enforcement agencies. Much of the FBI's involvement in the investigation was documented under a specific Case ID: 58A-BF-3179872.

Almost immediately after Quinn's death was reported, the government decided to pursue an investigation regarding the death, and it categorically identified that investigation as being related to *USA v Bongiovanni et al* and Peter Gerace, Jr.

It was not until discovery was finally received in case no. 23-cr-99, that the defense learned information about the ongoing FBI investigation. At bate stamp 00010744, there is a FD-1057 that indicates that a "sub file" was created for the death investigation of witness. The Case ID is listed as "58A-BF-3179872-DEATH QUINN," a subset of the CASE ID used in relation to *USA v Bongiovanni et al*.

---

[9] When the government moved for intradistrict transfer in Case No. 19-cr-227, the Editorial Board for the Buffalo News noted in regard to the coverage of USA v Bongiovani et al, "defense lawyers and anonymous sources made up a smidgen of that coverage, compared to the deluge of information mined from the government's public filings." Editorial Board, *Thanks for the compliment, feds – and the stories*, Sept. 12, 2023, The Buffalo News (available at https://tinyurl.com/BN091223).

On the FD-1057, to the right of the Case ID, the investigation was clearly identified as "PUBLIC CORRUPTION AND LCN RELATED." "Public Corruption" refers to charges that were pending against Mr. Bongiovanni and Mr. Gerace in case no. 19-cr-227 and "LCN" is the abbreviation for "La Cosa Nostra," a reference to Italian Organized Crime, to which the government has repeatedly claimed, without evidence, that Mr. Gerace is connected.



The document was dated August 11, 2023, a week and a half after Ms. Quinn's death and almost a week before Mr. Gogolack was charged by criminal complaint. It was over a month before he was indicted and a District Court Judge was assigned.

The early investigation into Ms. Quinn's death focused on Mr. Gogolack. All FBI efforts to investigate Mr. Gogolack were tagged with the Case ID "58A-BF-3179872-DEATH QUINN," the file number used regarding the investigation for *Bongiovanni et al* and Peter Gerace, Jr.

In August 2023, before Mr. Gogolack was even charged by complaint, the government had conducted an interview of Mr. Gogolack following a coordinated state arrest, the government had seized his cell phone and had it delivered to the Regional Computer Forensic Laboratory for extraction, and it had sought a warrant to search Mr. Gogolack's residence. These investigative efforts were documented under the same case ID: 58A-BF-3179872-DEATH QUINN.[10]

The discovery showed that in August 2023, even before Mr. Gogolack was first charged, the government knew the FBI was pursuing the investigation against Mr.

---

[10] For example, when Mr. Gogolack's cell phone was seized and collected by Federal agents for extraction, an FBI Receipt of Property form referred to "Case ID: 58A-BF-3179872-QUINN." A 302 drafted on August 11, 2023, indicates that on August 7, 2023, Mr. Gogolack's cell phone was transported to Regional Computer Forensic Laboratory in order to extract the contents of the phones. That 302 was associated with "File # 58A-BF-3179872-DEATH QUINN." The Receipt of Property and the 302 were both provided in the delayed discovery in Case no. 23-cr-99.



**FEDERAL BUREAU OF INVESTIGATION**
**Receipt for Property**

Case ID: 58A-BF-3179872 - Quinn
On (date): 8-2-2023
Approx 10:30p

item (s) listed below were:
☒ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

Gogolack as part of the investigation and under the same case ID associated with Mr. Gerace and *Bongiovanni et al*.

## 2. The Government Subpoenaed a Defense Investigator Without a Crime Fraud Order

On October 31, 2023, the United States Attorney's Office for the Western District of New York issued a grand jury subpoena seeking documents and testimony from Paul Lawrence, Mr. Gerace's prior private investigator in three criminal cases in this federal district court: 19-cr-227; 23-cr-37; and 23-cr-60.[11] (Exhibit A at 20-21).

On November 1, 2023, Mr. Lawrence was served with the grand jury subpoena dated October 31, 2023. The subpoena sought Mr. Lawrence's testimony before the grand jury one week later on November 8, 2023. (*Id*.).

The subpoena also sought the following materials: "any notes, written statements, or recordings that Mr. Lawrence created or obtained from interactions with or interview of John Grieco or Sharon Quinn." (*Id*.).

After, current counsel for Mr. Gerace learned of the subpoena, Mr. Lawrence was advised to retain counsel. Mr. Lawrence retained Mr. Eoannou.

Mr. Gerace confirmed to his counsel (1) that Mr. Gerace understood Mr. Lawrence to be part of the defense team; (2) that Mr. Gerace understood his communication with

---

[11] In preparing his defense, upon information and belief, Mr. Cohen and Mr. Gerace engaged the services of Paul Lawrence in early 2023. Mr. Lawrence worked at the direction of Mr. Cohen for several months during 2023. After Mr. Cohen was relieved of representing Mr. Gerace, Mr. Lawrence continued to work with Mr. Gerace's current counsel in investigating issues in this case and preparing Mr. Gerace's defense.

Mr. Lawrence to be privileged; (3) that Mr. Gerace understood any material produced by Mr. Lawrence, while acting at the direction of his counsel, was privileged; and (4) Mr. Gerace was not willing to waive any privilege related to Mr. Lawrence.

In conjunction with Mr. Eoannou, the defense drafted a Motion to Quash the Subpoena based on Mr. Gerace's standing to assert privilege regarding his defense investigator.

On November 6, 2023, the defense contacted chambers for Judge Vilardo's chambers via email to advise the Court that the defense investigator had been subpoenaed and that Mr. Gerace did not waive his privilege. The defense inquired regarding the procedural steps to address the subpoena. The US Attorney's Office was copied on the email. (Exhibit A at 002-003.)

The government responded indicating that the motion would have to go to Judge Arcara because it was related to a grand jury matter. It added that "in a prior Court filing, counsel for Gerace stated in an affidavit that ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

See Cohen Affidavit, August 14, 2023 (under seal), ECF No. 604-1. Thus, to the extent there is now a representation that this is the Gerace 'defense investigator,' such claim seems contradictory to prior sworn Gerace defense team representations." (Exhibit A at 002.)

Upon receipt of the government's email, the defense located the filing by prior counsel and reviewed its contents for context. Mr. Cohen did not explicitly state that Mr. Lawrence was not a defense investigator, but the content of the affidavit does appear to make that implication.

However, Mr. Cohen, Mr. Lawrence, and Mr. Gerace had all clearly advised the current defense team upon substitution of counsel that Mr. Lawrence was part of the defense team.

The defense contacted the government via email. (Exhibit A at 004.) Initially believing that the government had relied on that affidavit in good faith and was not merely using it as a pretext to elicit testimony from the defense investigator, the defense acknowledged the content of Mr. Cohen's affidavit, but advised the government that the implication drawn from that affidavit is not consistent with what the defense understood Mr. Lawrence's role to be.

Believing at that time that the government was acting in good faith, the defense asked for time to look into the disparity between the inference that is drawn from reviewing Mr. Cohen's affidavit and what the defense knew to be factually accurate - that Mr. Lawrence was a member of the defense team and that he received direction by Mr. Cohen. The defense did not request that the subpoena be withdrawn or delayed indefinitely at that time. It was only requested that compliance be delayed from Wednesday, November 8, 2023, to Monday, November 13, 2023.

The Government refused to delay the return date of the subpoena and did not seek to discuss the issue further.

Defense counsel made an expedited effort to secure evidence that corroborated and confirmed that Mr. Lawrence was indeed part of the defense team for the duration of his involvement in this case and was consistently treated as such by prior counsel.

This evidence included an email sent in June 2023 from Mr. Cohen to Mr. Lawrence specifically indicating that Mr. Lawrence is part of the defense team.

Counsel for Mr. Gerace filed a Motion to Quash on the morning of November 7, 2024, requesting ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

The Government responded that evening, but filed its response entirely *ex parte* and did not provide the defense with a redacted version of the response or a summary of any arguments contained therein.

The following morning, ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

- 17 -



Presumably based on the government's representations and arguments, the Court denied the motion to quash, and Mr. Lawrence was ordered to comply with the subpoena.

As a result, in order to comply with the subpoena, Counsel for Mr. Lawrence provided an audio recording of Mr. Lawrence conducting two witness interviews and Mr. Lawrence testified before the grand jury moments later.

Although the government has not provided grand jury testimony for Mr. Lawrence, it appears that at least part of his testimony may be encapsulated in the Second Superseding Indictment for Case no. 23-cr-00099.

> On or about August 11, 2023, *an investigator working with Gerace Attorney 1*, a person known to the Grand Jury and referred to herein as "Investigator 1," *was instructed by Gerace Attorney 1 to interview Crystal Quinn's mother and a friend of Crystal Quinn's mother* in order to generate and obtain statements which would advance a narrative that Crystal Quinn had been suicidal prior to her death.

Case no. 23-cr-00099, Dkt. # 24 at 25-26 (emphasis added).

If, during Mr. Lawrence's testimony, he confirmed that he was acting at the direction of Mr. Cohen, the Government had elicited sworn testimony to support that Mr. Lawrence was part of the defense team.

Even if the government intentionally avoided asking Mr. Lawrence what his role was during the course of the grand jury testimony , it would seem that the testimony establishing that the interviews were conducted on behalf of Mr. Cohen would confirm that material associated with those interviews, including notes and/or tangible evidence, such as the recording, would be attorney work-product.

The government did not possess a crime fraud order when it secured Mr. Lawrence's compliance with its subpoena on November 8, 2023.

Even though it appears that the US Attorney's Office elicited testimony from Mr. Lawrence confirming his status as a member of the defense team, acting at direction of Mr. Cohen, the government did not return the recording or delay its review until authorized to do so by a crime fraud order.

Instead, it appears that the US Attorney's Office immediately reviewed the recording and drew certain conclusions regarding the content of the recording.[12] It now appears that the government may seek to utilize this evidence in this case.

---

[12] Based on the government's interpretation of Mr. Lawrence's comments, without seeking to interview him again for clarification, the government used the recording as the basis to seek disqualification of Mr. Soehnlein in case no. 19-cr-227.

<u>C. PROCEDURAL HISTORY OF THIS CASE</u>

<u>1. The Filing of Charges Against Gogolack, Hinkle, Ermin and Others</u>

Mr. Gogolack was charged by complaint on August 17, 2023, and initially appeared on August 23, 2023. (Magistrate Judge Case Number ("Magistrate no.") 23-mj-01115-JJM, Dkt. 1, 4). Mr. Gogolack was detained on the government's motion. (Magistrate no. 23-mj-01115-JJM, Dkt. 4).

Mr. Gogolack was indicted less than one month later on September 13, 2023. (Dkt. 12). An arraignment and detention hearing were held on September 14, 2023. (Dkt. 15).

The Magistrate Judge issued a Scheduling Order on September 15, 2023, that ordered "All voluntary discovery shall be completed by October 16, 2023." (Dkt. 17 at 1).

Five days later, on September 20, 2023, a superseding indictment was filed against Mr. Gogolack. (Dkt. 18). An arraignment on the superseding indictment was held on September 25, 2023. (Dkt. 20).

Following the indictment of Mr. Gogolack, other individuals tied to the ongoing death investigation were charged by separate complaints, including: Howard Hinkle (Magistrate no. 23-mj-05219-MJR)[13]; Michael Roncone (Magistrate no. 23-mj-00168-HKS); Scott Barnes (Magistrate no. 23-mj-00166-HKS); and John Ermin (Magistrate no. 23-mj-00167-HKS).

---

[13] Howard Hinkle was also charged with Dillon Anderson who has since had his charges dismissed. (*See* Magistrate no. 23-mj-05219-MJR, Dkt. 20.)

## 2. The Second Superseding Indictment Consolidates the Pending Cases

On January 5, 2024, a Second Superseding Indictment was filed against Mr. Gogolack, which, for the first time, included Mr. Gerace along with all of the defendants listed above. (Dkt. 24).

At the arraignment for Mr. Gerace on January 10, 2024, counsel appeared provisionally, and although not yet retained or appointed on this case, counsel made a request for initial discovery disclosure. (Dkt. 46 at 13-14).

The government opposed any disclosure until the issue of whether Mr. Gerace would retain counsel or counsel would be assigned was resolved, claiming that providing immediate discovery would somehow "build[] delay into this case." (Dkt. 46 at 14).

The government made no comment about how long the discovery process would take, or that hard drives would have to be provided by the defendants, or that it would be seeking a protective order at some point.

A status conference was set for January 31, 2024.

At that status conference, counsel for Mr. Gogolack, who was charged five months earlier, made a detailed request regarding the need for a discovery deadline:

> Mr. Gogolack has been on the complaint since August. We don't have basic discovery in the case.
>
> I know the Government has made several representations at various detention hearings about discovery that they have, but we're in a position where we're unable to evaluate any of that because we don't have it, Judge.

So I'd ask that you set a discovery deadline before you set any other scheduling order and we can come back at a status conference at some point in the future and set motions deadlines, but I would ask for a discovery deadline first.

(Dkt. 66 at 30).

Even though by January 31, 2024, 26 days had already passed since the filing of the indictment, and 167 days had passed since Mr. Gogolack was initially charged, the government opposed setting a discovery deadline unless the Court was also going to set a deadline for motions, even though there was no explanation for why those two deadlines would need to be set at the same time. (Dkt. 66 at 30-31).

A further status conference was set for February 23, 2024.

3. The Discovery Scheduling Order

On February 23, 2024, 49 days after the filing of the second superseding indictment, the Court held a status conference. The government had still not provided a single page or a single byte of discovery other than the minimal material provided to some defendants in conjunction with detention hearings.

At the status conference, the Court proposed that a discovery deadline be set. (Feb. 23, 2024 Transcript at 3). The Court proposed a generous 60-day deadline.[14] (Feb. 23, 2024 Transcript at 6).

---

[14] A 60-day deadline would have resulted in a deadline set 109 days after the filing of the second superseding indictment.

In response to this Court's suggestion, the government asked for 90 days. It provided two reasons for its request.

> The first reason is this case involves a significant amount of discoverable material. It's a significant undertaking. *There's an agent from the FBI who has been essentially exclusively assigned to that task*, but the resources that that requires are significant. And so as opposed to setting a shorter deadline and rushing things for lack of a better word, I'd ask that we set 90 days and allow a thorough review and production of discovery.
>
> The other reason is as the Court indicated, it would be helpful to have a final determination regarding this death penalty issue before we all come back and before motion practice begins, and I think kicking this out 90 days versus 60 days errs on the side of caution with respect to that determination.
>
> (Feb. 23, 2024 Transcript at 6-7 (emphasis added)).

In regard to the volume of discovery, to the extent that there was "an agent from the FBI who has been essentially exclusively assigned to that," presumably since charges were first filed in August 2023, 60 days should have been more than sufficient, but nonetheless the government asked for 90. The government referred to it as "an additional 30-day cushion." (Feb. 23, 2024 Transcript at 7-9).

Counsel for Mr. Gerace acknowledged that he had no way of knowing what the volume of discovery was, so he could not really argue in opposition to the lengthy timeframe requested by the government.

> I think we're all in a position where we somewhat have to defer to the Government in terms of how long it will take them to produce discovery, but I would note… I've had a

- 23 -

> number of mega cases where discovery could be produced in
> 30 to 60 days… obviously almost all of the defendants are in
> custody. I have concerns about the length of that type of
> adjournment, but um, given the fact that the Government is
> the only entity at this point that can describe the volume of
> discovery and they're saying they need 90 days, um, I don't
> know that there's much I can do to rebut that.

(Feb. 23, 2024 Transcript at 8-9).

Despite the fact that counsel did not, at that time, question the government's representation that 90 days would be necessary, nor did counsel oppose the request based on the fact that it had no indication as to what the actual volume of discovery is, the government nonetheless felt compelled to respond.

> [I]t's perplexing to hear that counsel has concerns regarding
> speedy trial when we've had I think three separate status
> conferences where counsel hasn't wanted to set a scheduling
> order in place. To come today and say, hey, that's too long to
> ask for is contrary to the arguments that have been raised that
> the arraignment, the status conference after the arraignment.
> It's inconsistent with arguments previously raised that the
> Court shouldn't set a scheduling order. So I don't understand.

(Feb. 23, 2024 Transcript 9-10).

Counsel replied:

> Judge, just -- I don't want to have it turned into a back and
> forth, but I do want to correct the record. At the arraignment,
> I asked for discovery. I said I think we should put a
> scheduling order in place. I indicated that I would be a
> proponent of split -- bifurcating non dispositive and
> dispositive motions. I specifically said to the Court if we start
> getting discovery, it can inform us on the size of the case. So
> that was an application I made.

> I believe the Government's response was they thought that would build in delay in some manner. So I just want that to be clear, and obviously, this is an investigation that took place over several months. There is a period of time that precedes the charges where the discovery could be prepared in anticipation of an indictment. Again, I'm not opposing the 90 days. The Government is in the position to say that the volume is that high. My point is merely that defendants are in custody. That's a consideration, and it informs on other considerations the Court has.

> (Feb. 23, 2024 Transcript 10-11).

Counsel for Mr. Ermin also added "whatever time the Government needs to get us the complete discovery obviously would help us, but the implication that somehow we are here today as a result of delays from defendants is I think inappropriate." (Feb. 23, 2024 Transcript at 11).

Ultimately, the Court agreed to grant the extensive 90-day deadline, but it specifically indicated that to the extent possible, the discovery should "be produced sooner than that date" and it should be produced "[o]n a rolling basis so that people can hit the ground running in terms of what they think they need to do." (Feb. 23, 2024 Transcript at 12).

This direction by the Court followed an earlier colloquy, where the Court asked if it was possible to do "rolling production during the 90 day period" and the government responded: "I certainly think so, Judge. I think that *there's material that is probably close to*

*ready to go out at this point* because we've obviously been working on it since the return of the indictment." (Feb. 23, 2024 Transcript at 10 (emphasis added)).

The deadline for discovery was set for May 23, 2024, and a status conference was set for June 3, 2024. (Transcript at 12-13).

The Government moved for an exclusion of time. (Feb. 23, 2024 Transcript at 16-17). Based on the understanding the government would provide rolling discovery and complete disclosure by May 23, 2024, the Court issued an exclusion of time. (*See* Dkt. 73 ("After some discussion, the court sets a 90-day deadline and sets a follow-up status conference for 6/3/2024 at 2:00 PM to discuss motion schedules. The court directs the government to provide discovery on a rolling basis, to extent possible.")).

At no point during the conference did the government state that it intended to seek a protective order or that the defendants would need to provide hard drives at any point in order to receive discovery.

## 4. Requests for Second Counsel

At a status conference on March 8, 2024, Mr. Foti made the request for a second attorney to be appointed to Mr. Gerace. (Dkt. 355 at 36-37). Mr. Foti noted that the request was complicated by the fact that the government had moved to disqualify Mr. Gerace's other attorney, Eric Soehnlein, in case no. 19-cr-227.

The Court did not rule on the request for second CJA counsel to be appointed. The Court indicated that it was not going to decide that issue at that time: "I'm not granting that today nor am I denying. I'm just not deciding it." (Dkt. 355 at 37).

Since that time, this case has been categorically identified as a mega case by the Circuit and the District. Mr. Hinkle, for example, was appointed a second attorney, Daniel Henry, to represent him. Regardless of whether Mr. Henry's initial appointment was made to serve as learned counsel, his representation was continued pursuant to a non-capital (mega case) budget approved by the Second Circuit's case budgeting attorney and the District Court.

The request for second counsel remained pending while the parties litigated sanctions against the government for violating the Court's Discovery Order, set at the February 23, 2024, status conference.

5. The Violation of the Court's Discovery Order

At no point during the 90 days that followed the February 23, 2024, status conference, did the government provide discovery. Nor did the government move for an extension of the discovery deadline.

For the first time, on May 20, 2024, the government advised defense counsel it would need a hard drive from each of the defendants in order to provide discovery. The government indicated the copying of discovery "upload may take 2-3 days to complete."

The government stated it needed a hard drive containing space for up to 3 terabytes of data. Over the next week and a half, most of the attorneys obtained hard drives and had the drives sent or delivered to the government. None of the defense attorneys received a hard drive back regardless of how quickly each attorney was able to purchase the drive and deliver it to the government.

Instead, on May 29, 2024, for the first time, the government sent an email stating that it would withhold discovery until a "protective order is authorized by the Court." The government's email attached a 5-page proposed protective order.

Days later, at the status conference on June 3, 2024, the government seemed to suggest that the delay regarding the disclosure of discovery was somehow the responsibility of the defense. After the Court established a timeline, including that the government did not request a protective order until over a week after the discovery deadline had already expired, it inquired about the reason for the delay.

The government did not offer much in terms of an explanation for the delay, but it seemingly admitted that part of the reason discovery had not been prepared was because the trial team was engaged in the first trial of Mr. Bongiovanni in *US v Bongiovanni et al*. The government indicated it would release the discovery if a temporary protective order was issued indicating that the discovery could be viewed by "attorney's eyes only," which the defendants reluctantly agreed to.

The government then moved for an exclusion of Speedy Trial time. Because the government failed to produce discovery as directed by the Court and because that delay had prevented the parties from reviewing discovery in advance of the court date, the Court denied the request for an exclusion of time in the interest of justice. See Text Order at Dkt. 122 ("For the reasons set forth by defendants' counsel on the record, I deny the government's request to enter a further exclusion of time from the Speedy Trial Act calendar pursuant to 18 U.S.C. Sections 3161(h)(7)(A) and (h)(7)(B)(iv). As of today, time if no longer excluded from the Speedy Trial Act calendar.")

## 6. The Government's Motion for Reconsideration of the Court's Decision to Deny an Exclusion of Time in the Interest of Justice

On June 5, 2024, just two days after the status conference in which the Court denied the Speedy Trial exclusion, the government filed another motion for an exclusion of time from June 5, 2024, to June 27, 2024.

The motion was for an exclusion of time almost identical to the exclusion requested at the June 3, 2024, status conference which had been denied by the Court. The mere filing of the motion was clearly an attempt to circumvent the Court's ruling by stopping the Speedy Trial clock while the motion was pending.

7. Sanctions Litigation

*a. Defendants Move for Sanctions Based on the Government's Violation of the Court's Order*

On June 10, 2024, the defense for Mr. Gogolack and Mr. Gerace moved for a hearing and the imposition of sanctions due to the government's disregard of this court's discovery order. (Dkt. 131, 132). Other defendants joined. (*See e.g.* Dkt. 135, 137, 140).

The defense for Mr. Gerace argued:

> The government's clearly demonstrated a complete disregard for the Court's Order in multiple respects: (1) the government did not provide rolling discovery at any point during the extensive 90 days afforded to the government to complete discovery production; (2) the government did not request an extension of time to provide discovery after the court-ordered deadline; and (3) the government continued to withhold discovery after the discovery deadline had expired while it raised the issue of a protective order for the very first time.
>
> …
>
> The US Attorney's Office had multiple other AUSAs enter appearances on this case, presumably to assist in managing the case while the trial team was engaged in trial. Those AUSAs were not engaged in the Bongiovanni trial, and there has been no explanation for why they could not oversee the disclosure of rolling discovery.
>
> …
>
> Finally, in addition to the additional AUSAs who had appeared in this case, there were a team of other individuals involved in the discovery process apparently including a dedicated FBI agent, a Litigation Specialist, and other US Attorney staff.
>
> This team of individuals should have been capable of ensuring that rolling discovery was provided for, and that the

discovery deadline was met. The failure to do so is consistent with a lack of supervision by the US Attorney's Office and a disregard for this Court's discovery Order.

(Dkt. 132-1 at 26-28).

The defendants requested a hearing to address what appeared to, at best, be gross misconduct or, at worse, strategic delay by the government. [15]

b. *Defense for Gerace Responds to the Government's Motion for an Exclusion of Time*

The requests for a hearing and sanctions were further addressed in the Mr. Gerace's response to the government's motion to exclude time:

The motion should be denied, but not without first holding a hearing, to resolve issues of fact surrounding the government's failure to produce rolling discovery at any time during the 90 days following the February 23, 2024, status conference, the government's failure to provide discovery by the May 23, 2024, deadline, and the government's failure to propose a protective order until after expiration of the discovery deadline despite its intention to withhold discovery until one had been issued.

(Dkt. 148 at 22).

The defense further noted that "after the conclusion of the evidence presented at that hearing, the Court should not only deny the government's motion, but consider

---

[15] Notably, the government's trial team was clearly stretched thin with the Bongiovanni trials. The delay would give the trial team additional time before the filing of defense motions in this case. Moreover, most defendants were detained after the government aggressively pursued motions for detention. Longer periods of incarceration strategically benefit the government's efforts to pressure defendants into plea agreements including cooperation provisions.

sanctions against the government for bringing this motion as a means of circumventing this Court's decision to deny the exclusion of time." (Dkt. 148 at 27-28).

*c. The Imposition of Sanctions*

After having fully considered the facts pertaining to the government's willful violation of the Court's Order regarding discovery, the Court issued a Decision and Order, dated July 29, 2024, finding the government acted in bad faith. Dkt. 173 at 5 ("although I had unequivocally ordered production of voluntary discovery by May 23, 2024, the government deliberately decided not to comply with that order… The government's willful violation of my order constitutes bad faith.").

The government filed a Motion to Reconsider which was denied in a Decision and Order, dated August 23, 2024, in which the Court imposed specific sanctions, including: (1) disqualification of the trial team initially assigned to prosecute this case; (2) preclusion of the government providing further argument regarding a protective order; and (3) identifying three months of delay for purposes of constitutional speedy trial. (Dkt. 200).

The government brought an appeal of that Order, arguing for the imposition of a less significant sanction. (Dkt. 230 at 43).

The District Court did ultimately vacate the imposed sanctions in favor of what might be considered less impactful sanctions, but "it can see why Judge McCarthy did what he did. And the consequence of that—which was a direct result of the government's actions— was a five-month period of delay." (Dkt. 310 at 16).

The District Court noted its sanction "may not be perfect, but in light of all the circumstances, this Court finds it is the best solution available at this time." (*Id*. at 17). In a footnote immediately following that comment, the Court specified that "[t]his decision and order is without prejudice to the defendants' arguing that the government should be precluded from using certain evidence as a sanction." (*Id*. at fn 10).

Notably, the District Court did not make any findings regarding other issues raised by the defense, including: the government's effort to circumvent the Court's denial of a statutory exclusion of speedy trial time; prosecutorial steering (judge shopping); false information in the indictment; or any other issue warranting sanctions.

> The defendants urge this Court to go beyond reviewing the findings that Judge McCarthy made in his two decisions on sanctions and to review the entire history of this case. This Court thinks that is beyond the scope of this appeal and confines its review to Judge McCarthy's findings on bad faith and sanctions.
>
> (Dkt. 310 at 10, fn 6).

Not long after the District Court rendered its Decision and Order regarding sanctions, a scheduling order was set for pretrial motions. (Dkt. 313).

8. The February 5, 2025, DOJ Memorandum

Before motions were due under the Amended Scheduling Order[16], on February 5, 2025, the Attorney General (AG) issued a memorandum to all DOJ employees implementing Executive Order 14164 entitled "Restoring the Death Penalty and Protecting Public Safety." The memorandum directs that all prior no-seek decisions are to be reevaluated by the AG's Capital Review Committee, which will make a fresh determination concerning whether to pursue capital prosecution, including a determination of whether additional, not-currently-charged capital offenses should be added. This review is to be completed within 4 months, or in other words, by June 5, 2025.

This case was the subject of an earlier "No Seek" decision during the Biden Administration, and thus, the case would be subject to "a fresh determination concerning whether to pursue capital prosecution, including a determination of whether additional, not-currently-charged capital offenses should be added."

A status conference was held on February 10, 2025, where the appointment of learned counsel and capital resources was discussed. (Dkt. 355 at 48). The government opposed the appointment of capital resources, but acknowledged that "if the Court

---

[16] The defendants had requested one adjournment of the motion scheduling order for approximately 30 days. (Dkt. 340, 346). The Court granted the request and issued the Amended Scheduling Order. (Dkt. 345).

wants, it can—it always has the right to assign two attorneys and that—that would be up to you." (Dkt. 355 at 53).

As the discussion continued, the defense for Mr. Gerace and Mr. Ermin revisited the earlier motions to have second counsel appointed based on the size and complexity of the case, and requested that the Court appoint second counsel based on mega case status, but select counsel who would qualify as Learned Counsel to assist in navigating the review process for the prior No Seek decision.

In other words, it was requested that Mr. Gerace and Mr. Ermin receive the same benefit of two attorneys that Mr. Gogolack was receiving through his representation by the Federal Defender's office or that Mr. Hinkle was receiving based on a non-capital (mega case) budget approved by the Circuit's case budgeting attorney and the District Court in this case.

The Court determined that it was appropriate to appoint second counsel to Mr. Gerace and Mr. Ermin.

The government moved for reconsideration (Dkt. 355) even though it has had *nine* different government attorneys enter appearances on the docket in a 13-month span, and at least six have actively made arguments in court or filed submissions during that timeframe. The government's motion for reconsideration was ultimately denied.

9. Pretrial Motions

After counsel was resolved, Mr. Gerace's appointed attorneys have worked together to file non-dispositive motions which demonstrated the complexity of this case, argue the government's appeal of Magistrate Judge McCarthy's decision to review grand jury minutes *in camera,* and filed other motions, currently scheduled for argument. At this time, Mr. Gerace seeks further relief in the dispositive motions, contained below.

## II. MOTIONS

### A. MOTION TO DISMISS COUNTS 1-3 PURSUANT TO FED.R.CRIM.P.12(B)(3)(B)

1. Introduction

Defendant moves the Court to dismiss counts of the second superseding indictment which are duplicitous or lack specificity pursuant to Fed. R. Crim. P. 12(b)(3)(B)(i,iii) or for other relief to prevent undue prejudice to defendant at trial.

With regard to the dismissal of duplicitous counts, Count 1 charges a so-called Klein conspiracy alleging the defendant conspired to defraud the United States by means of obstructing justice.  Counts 2 and 3 allege conspiracies in violation of 18 U.S.C. §1512 and 18 U.S.C. §1513 respectively. The latter counts incorporate the allegations in Count 1 by reference and, thereby, allege two distinct conspiracies within a single count. The allegations in Count 1 include a narrative recitation of the elements of the "defraud" prong of 18 U.S.C. §371. *See* summary of counts, *supra.*

As to dismissal for lack of specificity, the overt acts in furtherance of the conspiracy reference conduct by "Gerace Attorney 1" without indicating whether he is an alleged co-conspirator; nor is there an allegation that the defendant was aware of or instructed Attorney 1 to engage in those overt acts in furtherance of the conspiracy (Second Superseding Indictment, Dkt. 24, Count 1, "Overt Acts", pp. 14 ¶17- p.31, ¶107).

In its non-dispositive motions, the defense requested information, either through a bill of particulars or discovery, to clarify which of the listed overt acts apply to which Count in anticipation of moving to dismiss based on multiplicity/duplicity grounds and also whether the government claimed Gerace Attorney 1 was a co-conspirator.   The government opposed giving a bill of particulars and the Magistrate Judge ruled:

> The government has said you are not entitled to a bill of particulars on that [the second superseding indictment]. I agree with the government but what that means as far as I'm concerned is – and not prejudging anything about the validity of the superseding indictment –but you can, I think, with a clear conscience argue that the indictment on its face doesn't – is insufficient in terms of notice, duplicity, multiplicity or whatever. You can remind me that you asked for a bill of particulars and that I denied that request. So we're going to leave it at that."

(Transcript of oral argument May 21, 2025 at 60).

Defendant Gerace now moves to dismiss the duplicitous counts pursuant to Fed. R. Crim. P. 12(b)(3)(B)(ii)[17] and to dismiss the indictment for impermissible lack of specificity with regard to the overt acts pursuant to Fed. R. Crim. P. 12(b)(3)(B)(iii)[18].

2. Summary of Counts 1-3

Count 1 charges a conspiracy to defraud the United States under 18 U.S.C. §371 ("*Klein* conspiracy").

Within the body of Count 1, the indictment alleges the so-called "manner and means" by which the defendants defrauded the government, i.e. by committing specified acts constituting obstruction of justice pursuant to 18 U.S.C. §1503[19].

---

[17] By incorporating the allegations under 18 U.S.C. §371 in Counts 2 and 3, the indictment can also be viewed as multiplicitous. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). A multiplicitous indictment violates the Double Jeopardy Clause of the Fifth Amendment because it "subjects a person to punishment for the same crime more than once."*United States v. Leon-Becerril*, No. 15-CR-88-A, 2017 U.S. Dist. LEXIS 217283, at *4 (W.D.N.Y. Jan. 12, 2017) (quoting *Chacko*, 169 F.3d at 145).

[18] 12(b)(B) a defect in the indictment or information, including:

      (i) joining two or more offenses in the same count (duplicity);

      (ii) charging the same offense in more than one count (multiplicity);

      (iii) lack of specificity;

      (iv) improper joinder; and

      (v) failure to state an offense

Defendant previously filed a motion for severance under subdivision B(iv) "improper joinder" that is scheduled for argument on August 20, 2025.

[19] Paragraph 2 of Count 1:
"From in or about February 2023, and continuing thereafter until the return date of this Second Superseding Indictment, the defendants…knowingly and intentionally conspire and agree together and with others, known and unknown to the Grand Jury:

      a.  To defraud the United States of and concerning its government al functions and rights, that is of and concerning its right to have its business and its affairs, and particularly the transaction of the

Count 2 charges a conspiracy to violate 18 U.S.C. §1512(k): "Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy".

Count 3 charges a conspiracy to violate 18 U.S.C. §1513(f): "Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

Counts 2 and 3 are captioned "Witness Tampering Conspiracy" and "Witness Retaliation Conspiracy", respectively. Within the text of both counts 2 and 3 the indictment alleges "From in or about March 2023, through on or about August 1, 2023, in the Western District of New York, and elsewhere, the defendants…did knowingly and willfully combine, conspire and agree together and with others, known and unknown to the Grand Jury, to commit the following offenses…". Each count then alleges that defendants violated various subdivisions of the cited statutes, §1512 and §1513 respectively[20]. Counts 2 and 3 charge specific conspiracy statutes which are different than

---

official business of the United States District Court of the Western District of New York, and the Grand Jury of the United States District Court for the Western District of New York conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment, and obstruction; and

b.  To violate Title 18, United States Code, Section 1503 (Obstruction of Justice) by corruptly endeavoring to influence, obstruct, and impede the due administration of justice, that is, the proceedings of the federal grand jury and the trials of the United States District Court for the Western District of New York.

[20] Paragraph 2 of Count 2:

the general conspiracy statute in Count 1. However, they also purport to incorporate the conspiracy alleged in Count 1 which specifically references 18 U.S.C. §371.

Pursuant to Fed.R.Crim.P.7(c)(1) the statutory citation to the offense alleged to have been committed appears at the end of each of Counts 1, 2 and 3 of the second superseding indictment. (Dkt. 24). Count 1 cites 18 U.S.C. §371; Count 2 cites 18 U.S.C. §1512(k); Count 3 cites 18 U.S.C. §1513(f). Neither Count 2 or Count 3 contains a citation to the federal conspiracy statute, 18 U.S.C. § 371. The purpose of this requirement is to give a defendant adequate notice of the charges to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense. *United States v. Carrier*, 672 F.2d 300, 303 (2d Cir.), *cert. denied*, 457 U.S. 1139, 73 L. Ed. 2d 1359, 102 S. Ct. 2972 (1982). *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

### 3. Counts 1-3 Are Duplicitous

At bottom, this case alleges defendants conspired to interfere with the government's plans to use Quinn as a witness against Peter Gerace. The government has

---

"From in or about March 2023, through on or about August 1, 2023, in the Western District of New York, and elsewhere, the defendants… did knowingly and willfully combine, conspire, and agree together and with others, known and unknown to the Grand Jury, to commit the following offenses: [1512(a), 1512(j), 1512(a)(2), 1512(b)(1), 1512(b)(2)(A), 1512(b)(3), all in violation of 1512(k)]"

Paragraph 2 of Count 3:

"From in or about March 2023, through on or about August 1, 2023, in the Western District of New York, and elsewhere, the defendants… did knowingly and willfully combine, conspire, and agree together and with others, known and unknown to the Grand Jury, to commit the following offenses: [1513(a)(1)(A), 1513(a)(1)(B), all in violation of 1513(f).]"

already conceded at oral argument of the non-dispositive motions that it has no direct

proof that Gerace solicited another person to threaten or harm Quinn while he was locked

up in jail; rather the government will rely on "inferences" or as Ermin's lawyer put it,

"speculation" (transcript of oral argument May 21, 2025 at 28). Forty thousand pages of

discovery contain no proof whatsoever of Gerace's involvement in Quinn's death. Rather,

Quinn's cell phone records[21] as summarized in the joint non-dispositive motions, reveal

a quite different narrative from that provided by the government in pleadings and

detention hearings.

The first three Counts of the indictment all contain lengthy sub-parts alleging

violations of sections of the charged statutes. Obviously, the government's strategy in

framing the indictment in this way was to stretch what is essentially a single conspiracy

into multiple counts to maximize the impact upon the jury despite the absence of

evidence. No doubt the government will argue that rather than dismissing what the

defense believes are duplicitous counts, the Court should rely on jury instructions to cure

any prejudice. Jury instructions are prophylactic. In this case, after hearing the

government repeatedly discuss the same conspiracy in different ways, the harm to

---

[21] The defense has asked the government to produce Facebook and Facebook messenger records from Quinn's phone which were not part of the disclosures to date. While Gerace has been detained since 2023, the only jail calls the government has turned over are from March 2023-April 2023. While those include calls with co-defendant Ermin, none of the content remotely pertains to Quinn.

defendant will be done before the jury gets the case. This is exactly what the government had in mind by indicting the case this way.

Count 1 charges that defendants violated 18 U.S.C. §371 by conspiring to defraud the United States; it specifies the "Means and Manner" of committing the offense as obstructing justice under 18 U.S.C.§1503.

Counts 2 and 3 each alleged that defendants "conspired…to commit the following offenses…" citing 18 U.S.C. 1512 and §1513, respectively.

Additionally, both Counts 2 and 3 incorporate the allegations of Count 1 which contains different conspiracy language.

Had Counts 2 and 3 each charged an offense against the United States under 18 U.S.C. §371 by means of §1512 or §1513, they would not be duplicitous even after incorporating the offense charged under the "defraud" prong of Count 1. That is because 18 U.S.C. §371 has been held to define one crime (conspiracy) committed by different means.

As the government pointed out in its response to dispositive motions, the Second Circuit has held that charging an offense under the defraud prong and under the offense prong of §371 in a single count is proper. *United States v. Bilzerian*, 926 F2d. 1285 (2d Cir. 1991); s*ee also United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939)* (Sutherland, J.) (holding that indictment was not "bad for duplicity because it alleges that the conspiracy contemplated the violation of a criminal statute and also the defrauding of the

United States"); *United States v. Williams*, 705 F.2d 603, 623-24 (2d Cir. 1983) (indictment alleging offense and defraud conspiracy in same count not duplicitous).

In earlier opposing the defense request for a bill of particulars to clarify aspects of the indictment, the government responded that Count 2 and Count 3 only incorporate "factual" allegations from Count 1. That is not what the indictment says.

Counts 2 and 3 state: "The allegations of the Introduction and Count 1 are repeated and re-alleged and incorporated herein by reference as though set forth fully herein" (Ct.2, p.31, ¶1 and Ct. 3, p.33, ¶1).

In *United States v. Rittweger*, 259 F. Supp. 2d 275, 289 (S.D.N.Y. 2003) the court dealt with defendant's argument that Count 9 alleged both the conspiracy charged in Count 1 in addition to the conspiracy charged in Count 9. The court found the defendant was wrong in alleging the same conspiracy from Count 1 was simply realleged through incorporation in Count 9. "Count Nine does reallege many of the allegations contained in the First Count. However, the paragraphs realleged, paragraphs 1-42 and 46-47, contain factual allegations that are relevant to Count Nine. The specific charging language of the conspiracy charged in Count One are contained in paragraphs 43-45 of the Indictment and those paragraphs are not realleged in Count Nine". *Rittweger*, 259 F.Supp. 2d at 279. Critically "the specific charging language in paragraphs 43-45 of Count One were not incorporated into Count Nine and that the conspiracies alleged in both counts while related were unique" *Id*.

In this case there was no effort to identify and incorporate only the factual allegations from Count 1 which are relevant to Count 2 or Count 3. Rather, the government simply incorporates the "allegations of the Introduction and Count 1" *in toto*.

Another example is *United States v. Gosy*, No. 16-CR-46, 2019 U.S. Dist. LEXIS 31389 (W.D.N.Y. Feb. 27, 2019) where the indictment was much less of a "speaking indictment" than what we have in this case. The defendant in *Gosy*, a medical doctor specializing in pain management, was charged in a 166-count superseding indictment with health care fraud (counts 149-166) and illegally distributing controlled substances (counts 1-148). There, the defense alleged that the incorporation of Count 1 into the health care fraud counts made those counts duplicitous. The government argued that those counts were not duplicitous because their incorporation of Count 1 was done for the purpose of describing the means by which Dr. Gosy committed fraud and the proof of the allegations in Count 1 were relevant to the health care fraud counts (citing *United States v. Vilar*, No. 05 CR. 621 (RJS), 2008 U.S. Dist. LEXIS 69160, 2008 WL 4298545, at *2 (S.D.N.Y. Sept. 5, 2008).

In *Gosy*, Judge Geraci noted that the healthcare fraud counts incorporated all the paragraphs of Count 1. He found that the factual allegations were relevant to those counts but the conspiracies were distinct. To avoid a duplicity problem, Judge Geraci adopted the recommendation of Magistrate Judge Schroeder and ordered that the paragraphs containing charging language be struck as surplusage.

In the civil context, courts have criticized the type of aggregating of allegations without specifying what acts correspond to which claims. Sometimes called "shotgun" complaints, that incorporate a preceding count wholesale make it overly burdensome to identify which facts support each claim since not every fact related to every cause of action. *See e.g., Mikov v. Vill. of Palm Springs*, No. 23-13311, 2024 U.S. App. LEXIS 15526 (11th Cir. June 26, 2024) (shotgun complaints fail to give defendants adequate notice of the claims against them and requires courts to "sift out the irrelevancies, a task that can be quite onerous").

In the instant case, the wholesale incorporation of language from "Count 1," including the statutory elements of the offenses charged (defrauding the government and obstruction of justice) into each of Counts 2 & 3, result in the latter counts each charging multiple crimes and the same offense (conspiracy to obstruct justice) being charged multiple times.

The defendant is prejudiced by the structure of the indictment in myriad ways. Conviction on Count 1 may result in automatic conviction under Counts 2 and 3 since the allegations of Count 1 are repeated in those Counts. Even though Count 1 carries a much less severe sentence, a jury may use the same conduct alleged in Count 1 to convict under Counts 2 and 3, exposing him to much harsher penalties. This would also violate his due process rights and the Double Jeopardy Clause of the Fifth Amendment.

Count 1 of the indictment charges a general conspiracy under 18 U.S.C. § 371 and a specific conspiracy to obstruct justice under 18 U.S.C. § 1503; see Count 1, ¶2(a), (b). The penalty for a violation of § 371 is a maximum of 5 years in prison. The penalty for violating the witness tampering statute, 18 U.S.C. § 1512 in Count 2 in the manner alleged is up to 20 years for threatening the use of physical force, up to 30 years if physical force is used against any person or life in the case of an intentional death. The penalty for violating the witness retaliation statute in 18 U.S.C. § 1513 in the manner alleged is up to 20 years if bodily harm is caused, up to 30 years for an attempt to kill and life in the case of intentional death.

If a jury found the defendant guilty of the conduct in Count 1, it may use that as a basis to convict under Counts 2 and 3, subjecting defendant to a much high sentence and to multiple sentences for the same conduct.

Defendant is also prejudiced by the ambiguity of which overt acts pertain to which counts in the indictment. He is entitled to notice of the charges he has to defend against. Here the government might try in any one of three ways to prove the same conspiracy. The structure of the indictment takes what is essentially one conspiracy and charges it as three different offenses giving the jury a false and exaggerated sense of the extent of the defendant's criminal conduct. The use of an identical set of overt acts and similar elements in Counts 1-3 poses a serious risk of juror confusion and also carry a substantial risk that a jury will return a general verdict.

Some courts have held that a single count alleging a general conspiracy under the offense clause of 18 U.S.C. § 371 and a separate, specific conspiracy are not duplicitous. See *United States v. Amato*, 367 F. Supp. 547 (S.D.N.Y. 1973) (count is not duplicitous when, as here, it charges a conspiracy under the offense prong of the general conspiracy statute (§371) as well as a conspiracy under a specific conspiracy statute (§1962). This is different than here where Counts 2 and 3 incorporate the defraud prong of §371 and §1503 (obstruction of justice). The defense believes the indictment here is more problematic than in *Amato* and related cases but finds their approach instructive.

In the Second Circuit case of *United States v. Orozco-Prada*, 732 F.2d 1076, 1083 (2d Cir. 1984) the court looked to a Fourth Circuit case, *United States v. Quicksey*, 525 F.2d 337 (4th Cir. 1975), cert. denied, 423 U.S. 1087, 47 L. Ed. 2d 97, 96 S. Ct. 878 (1976), where the defendants were charged in a single count with a general conspiracy under 18 U.S.C.§371 and a specific drug conspiracy under 21 U.S.C. §846. The jury found the defendants guilty under that count without specifying whether they were guilty of a general conspiracy or the particular drug conspiracy. The court stated that if the government agreed to resentencing under the general conspiracy statute, it would affirm the convictions and remand for resentencing. If the government did not consent, it would vacate the convictions and remand for a new trial. Id. The Orozco-Prada Court pointed out that at least one district court in our circuit has held that a defendant convicted on a count

alleging two statutory violations was entitled to be sentenced under the statute providing

the least severe punishment:

> The D.C. Circuit reached the same result in *Brown v. United States*, 112 U.S. App. D.C. 57, 299 F.2d 438 (D.C. Cir.), *cert. denied*, 370 U.S. 946, 82 S. Ct. 1593, 8 L. Ed. 2d 812 (1962), in an opinion written by then Circuit Judge Burger. In that case, as in *Quicksey*, the court found that the record contained evidence from which a jury could have concluded that the statutes with the higher penalty had been violated but nonetheless refused to affirm the district court. *See also United States v. Noah*, 475 F.2d 688, 693 & n.7 (9th Cir.), *cert. denied*, 414 U.S. 821, 1095, 94 S. Ct. 119, 38 L. Ed. 2d 54 (1973). And, a district court in our circuit has read *Brown* as requiring a sentencing judge faced with a conviction on a count that charged the violation of more than one statute to impose a sentence under the statute providing the least severe punishment. *United States v. Amato*, 367 F. Supp. 547, 549 (S.D.N.Y. 1973).
>
> We realize, of course, that the cases we have just discussed all involved counts charging the violation of more than one statute. We have a case, instead, in which the count charges the violation of a single conspiracy statute, but where the conspiracy has two objects. We believe that this case raises the same problem of ascertaining juror intent that is at issue in counts charging the violation of multiple statutes. 8 Moore's Federal Practice para. 8.03[2], at 9-10 (2d ed. 1983). Thus, we cannot uphold Eduardo Orozco's sentence on Count One".

*United States v. Orozco-Prada*, 732 F.2d 1076, 1083-84 (2d Cir. 1984).

Here, the incorporation of Count 1 into Counts 2 and 3 charge distinct conspiracies

within a single count. Under the circumstances of this case, doing so imperils defendant's

constitutional rights. The defense, therefore, moves to dismiss Counts 2 and 3.

4. *Klein* conspiracy and Lack of Specificity re: Gerace Attorney 1

In dicta in *Hammerschmidt v. United States*, 265 U.S. 182 (1924) the Supreme Court referred to conspiring to defraud the United States means cheating the government out of property or money "but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery or at least by means that are dishonest." This dicta expanded the meaning of "defraud" under Sec. 371 because *Hammerschmidt* stripped the word "defraud" of its common law roots…" (*Haas v. Henkel*, 216 U.S. 462 (1910) (not essential that a conspiracy include a financial loss).

In recent Supreme Court cases, see e.g. *McNally v. United States*, 483 U.. 350 (1987), the Supreme Court has cautioned that criminal fraud statutes should not be construed "in a manner that leaves its outer boundaries ambiguous" and warned against "loose interpretations of criminal fraud statutes which allow the fact situation to define the crime" (*McNally* also prevents the government from basing federal fraud convictions on harms to intangible interest unconnected to property. See *United States v. Wallach*, 935 F2d 445, 461-464) (2d Cir. 1991))

While the Second Circuit has questioned the viability of a *Klein* conspiracy in cases where the government has not been defrauded of money or property, like here, it has recognized the continued binding precedent for allowing other non-economic acts of "deceit, craft or trickery". *United States v. Ballistrea*, 101 F3d 827 (2d Cir. 1996)(term "defraud" as used in §371 is 'interpreted much more broadly than when it is used in the

mail and wire fraud statutes'); *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012, cert. denied, 571 U.S. 819 (2013) ("[T]o prove a *Klein* conspiracy, the Government must show (1) that the defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy.")[22].

Defendant nevertheless moves to dismiss Count 1 in order to preserve his objection to being charged with a non-economic *Klein* conspiracy which it believes is far afield from the original intent of Congress.

Further, the indictment charges, as part of the defraud prong of the Klein conspiracy, that defendants conspired and engaged in acts of deceit. However, it is unclear whether the government is alleging acts undertaken by Attorney 1 were acts of deceit or dishonesty for purposes of establishing the fraud element. The overt acts naming defendant Gerace himself are not acts of deceit and dishonesty.

This lack of specificity as to what crime Gerace committed is prejudicial and he therefore moves to dismiss Count 1 on that basis as well. In the alternative, a bill of particulars is necessary to identify what, if any, acts alleged in the indictment are contended to be acts of deceit or dishonesty. Without a bill of particulars, the defense

---

[22] The Second Circuit has scheduled oral argument next month in a case in which the defense has urged the Court to pull back on the common law expansion of the Klein doctrine and questioned its application where the charged conspiracy does not involve a loss of money or property. *United States v. Lingat*, 2024 U.S. Dist. LEXIS 134574 (S.D.N.Y. 7/30/24).

cannot effectively challenge the legal sufficiency of the indictment; for example by raising a challenge to whether an affidavit submitted in open court and subject to the litigation process is an act of deceit or dishonesty under *Klein* or whether it constitutes the separate offense of obstruction of justice[23].

The indictment itself is ambiguous in omitting any allegation that Gerace was aware of or instructed Attorney 1 to attempt to communicate with Crystal Quinn while she was represented, or to include certain witness names on the pretrial defense witness list, or to pursue a "false narrative" during court proceedings that Quinn had killed herself [second superseding indictment, dkt #24, Count 1, "Overt Acts", ¶68, p.24]. The "Overt Acts" section of Count 1 contains references to conduct of lawyers which were not illegal, and did not further any conspiracy to obstruct justice (*see* second superseding indictment, Dkt. 24, Count 1, "Overt Acts", ¶¶17, 24-26, p.16; ¶68). This should be

---

[23] See defense argument 5/21/25 at 58-59: "I understand the same conduct can be charged for both prongs (defraud and obstruction) under Count 1. What I'm asking in a bill of particulars is what conduct are we talking about? What I'm asking in a Bill of Particulars is what conduct are we talking about? What overt acts pertain strictly to Count 1? ...What I was saying was witness tampering and obstruction sound to me, when you read the overt acts, like there's no distinguishing factor between them. So the argument was give us a bill of particulars to help us distinguish what do you mean by obstruction versus what do you mean by witness tampering. Both obstruction and witness tampering have different ways that they can be pleaded. So under obstruction, you can have obstruction by force or you can have what the case law refers to as non-coercive obstruction. Under witness tampering, there's two subdivisions, one involves force, the other one involves corruptly persuading somebody. So they're very, very similar. And when you just have one menu of overt acts, I can't tell are you saying that count 1 and count 2 are the same, in essence, or are there acts that apply to Count 1's obstruction that don't apply to Count 2? I can't tell – and that's a notice issue and that's a Bill of Particulars."

particularized to provide Mr. Gerace notice of the acts he allegedly undertook which constitute obstruction of justice or defrauding the government.

Right now, there is no way for the defense to tell if Attorney 1 is alleged to be a co-conspirator, or whether his conduct in defense of Gerace is protected under the safe harbor provision of 18 U.S.C. §1515(c). There is no allegation that Attorney 1 had any criminal intent or that Gerace directed him to take the specified overt acts. Therefore, it is unclear whether the overt acts by Attorney 1 are attributable to Gerace and the other co-conspirators. If not, they are surplusage that should be stricken from the indictment. (*See* transcript of oral argument, May 21, 2025 at 59).

The government has refused to clarify whether it alleges Attorney 1 is a co-conspirator. It cites cases where co-conspirator statements are admissible without directly saying it will seek to have the trial court find that Attorney 1 is a co-conspirator.

The government has, to this point, maintained that statements (presumably made by Attorney 1) may be admissible at trial under Fed. R. Evid. 801(d)(2)(D) as a statement made by the party's agent and, therefore, not hearsay (*see also* govt resp to non-dispositive motions at 116-117). Further, it continues to imply that, although not charged, Gerace was directing Attorney 1's acts to accomplish the objectives of the conspiracy or that he "weaponize[d] his attorney to obstruct justice by causing the attorney to inject falsehoods into a system designed to ascertain the truth" (*see* govt resp at 44-45)(citing former Senator Robert Menendez case; however, Sen. Menendez was not charged with

obstruction under §1503). There is no proof of this and as far as the defendant knows the government has not taken a statement from Gerace Attorney 1. The government specifically alleges that Gerace does not have a constitutionally protected interest (i.e. in communications with his lawyer) when he is "using his attorney to fraudulently induce a federal judge to release him from detention" Id. The government further points out that Attorney 1 could also be prosecuted for obstruction "depending on the circumstances". Id.

The defense is seeking a bill of particulars regarding what specific acts (of the "Overt Acts") in the indictment, the government claims constitutes obstruction of justice. The government indicated it does not have any recordings, witness statements, admissions or other evidence that Gerace instructed Attorney 1 to take the actions cited in the indictment. For example, Gerace did not submit any affidavits which were signed by him attesting to specific facts. Not every deceitful act by a person or their agent, including an attorney, amounts to obstruction of justice.

Rather, the defense believes the government will seek to argue that the trial jury should infer Gerace's knowledge by virtue of the acts of Attorney 1. This is problematical for two reasons: First, inferring Gerace's knowledge arising from his relationship with Attorney 1 may still intrude on the confidential attorney-client relationship. There is nothing criminal about what Attorney 1 did. Concededly, in a properly pleaded *Klein* conspiracy even innocent acts may be used to prove the conspiracy. However, absent

some facts from which to infer Gerace was using Attorney 1 to obstruct justice, it invites a jury to engage in pure speculation. Second, there are potential hearsay issues at trial.

Lastly, the defense has made a request for reports of interviews with the defense investigator who was working for Gerace Attorney 1. The government provided the audio recording of the investigator's interview of S.Q. and J.G. as well as affidavits created by the investigator after listening to the recording (see govt resp at 153)[24]. However, the government has still not provided the investigator's grand jury testimony.

Based on the lack of specificity regarding which overt acts support the *Klein* conspiracy, as well as the allegations in Counts 2 and 3 of the indictment, the defendant moves to dismiss those counts; in the alternative, it respectfully requests that the Court order the government to provide a bill of particulars or whatever other relief the Court deems appropriate.

B. Motion to Dismiss Based on Defective Grand Jury Proceedings

In the non-dispositive motions, Mr. Gerace, in conjunction with other defendants moved for disclosure of grand jury recordings pursuant to Federal Rules of Criminal Procedure, Rule 6(e)(3)(E)(ii). (Dkt. 410 at 67).

---

[24] Gerace counsel Mark Foti has access to the recording and other material through his previous of Mr. Gerace at trial before Judge Vilardo (19-cr-227 and 23-cr-37). Gerace co-counsel and counsel for the co-defendants here do not have access to it because of a protective order still in place in that case.

Rule 6(e)(3)(E)(ii) permits disclosure of the recorded grand jury minutes and transcriptions at the request of a defendant who shows that a ground may exist for a motion to dismiss an Indictment.

It was noted that one potential motion to dismiss would be based on "false overt acts in the indictment support the conclusion that the grand jury was knowingly presented with false information." (Dkt. 410 at 67-68).

Based on false information in the indictment, it was noted that "[t]he intentional inclusion of false allegations in the indictment implies the grand jury presentation was also engineered to present an obviously false narrative, which certainly supports disclosure of grand jury minutes in support of a potential motion to dismiss." (Dkt. 410 at 73).

After hearing oral argument on the motions, Magistrate Judge McCarthy reserved on disclosure of grand jury minutes to defense counsel but found a particularized need for *in camera* review. Earlier today, he confirmed that "a sufficient showing has been made to justify further inquiry" (Dkt. 544 at 3) and directed disclosure of "the entire grand jury proceedings."

The defense hereby moves to dismiss preliminarily on the grounds below, but the defense seeks to be heard further after *in camera* review of the grand jury minutes has been completed.

1. Initial Grounds to Dismiss, Prior to Grand Jury Review

This case is founded on the fictional narrative comprised of multiple connected false theories: (1) Mr. Gerace learned though inappropriate means that Ms. Quinn was a witness; (2) he communicated that information to Mr. Ermin and directed Ms. Quinn be killed; (3) Mr. Ermin accepted that direction and enlisted the assistance of members of the Rare Breed Motorcycle Club to carry out a plan to kill Ms. Quinn; (4) the Rare Breed Motorcycle Club then enlisted the assistance of Mr. Gogolack in the plan to kill Ms. Quinn; and (5) Mr. Gogolack gave drugs to Ms. Quinn with the purpose of killing her.

The above-listed theories are dependent on each other. Collectively, they present a story starting with Mr. Gerace, moving through local motorcycle clubs, and ending with an allegation that Mr. Gogolack intentionally killed Ms. Quinn.

The theory that Mr. Gerace inappropriately learned that Ms. Quinn was a government witness is documented in the indictment's overt acts:

> The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names and from providing GERACE with the government's witness list.

> Docket Item 24 at 16 (emphasis added).

The allegation that the Mr. Gerace's defense team listed Ms. Quinn as a witness for the defense to "circumvent the Protective order" and "reveal" Ms. Quinn as a government witness is clearly false and utterly absurd.

Even knowing this overt act is based on an illogical premise, it is obvious why the government included it. The government wanted to advance a theory that Mr. Gerace became aware that Ms. Quinn was a potential government witness by inappropriate and secretive means, so the government can argue Mr. Gerace was the gatekeeper of this information and would be responsible for sharing it with other individuals such as Mr. Ermin.

In reality, as discussed in the Background (*supra*) the government had publicly revealed Ms. Quinn to be a cooperating witness during a detention hearing in March 2023 before witness lists were filed in case no. 19-cr-227.

Not only was that information conspicuously absent from the indictment, the indictment advances the false narrative that Mr. Gerace's attorneys circumvented the protective order by revealing Ms. Quinn as a government witness by including her on the defense witness list, which is blatantly false.

Throughout these proceedings, the defense had repeatedly pointed out the obvious falsity of the overt act and the government had no substantive response. (*See e.g.*, Dkt. 164, 167).

When the defendants moved for disclosure of grand jury minutes, the defendants were clear that they interpreted the overt act as the plain language suggested – accusing Attorney 1 of violating provisions of the protective order which were identified as "revealing to Gerace the government's witnesses' names" and "providing Gerace with the government's witness list." mindful of the defendants' interpretation, the government characterized the defendants' arguments as a "general disagreement with findings." Docket Item 423 at 55 (emphasis added).

The government filed a response which offered no argue or comment to suggest that the defendants misinterpreted ¶25. Instead, the government characterized the defendants' arguments as a "general disagreement *with findings*." (Dkt. 423 at 55 (emphasis added)). Thus, in its initial response, the government recognized that the defendants' interpretation of ¶25, was consistent with the grand jury's "findings." Moreover, the government argued that "the defendants are not entitled to challenge a grand jury proceeding—or the contents of an indictment—because they disagree *with the facts asserted*." (Dkt. 423 at 54-55).

The defense replied:

> The government seeks to obfuscate the issue before the Court with an oversimplification of the defense's point. The issue is not whether the defense disagrees with the grand jury's findings. It is true, general disagreement may exist in most criminal cases. The issue here is far more concerning. There are overt acts among the grand jury's findings, that are demonstratively false, so much so that it is clear the

government knew they were false but nonetheless allowed for an indictment to be returned on this false information.

The government has an inherent responsibility for candor, and yet, if this Court were to accept the government's position in its response, the Court would endorse the position that the government can knowingly act on and present evidence, without judicial oversight, so long as the defendant gets a trial. That is a frightening concept – one that should be rejected by this Court. Consequently, the Court should grant the requested relief: disclosure of grand jury minutes and leave to file motions to dismiss.

(Dkt. 431 at 22).

At oral argument, the government arrived with the new strategy of stringing together other tenuous allegations in the indictment to suggest that possible inferences can be drawn closer to the truth in contrast to the blatantly false allegation in ¶25.

Even though the government had previously referred to the defendants' review of ¶25 as disagreement with "the facts asserted," at oral argument, the government claimed for the first time that the defendants misinterpreted the paragraph.

MR. CHALBECK: So I want to, I just one premise that I think is foundational to Mr. Foti's argument which is that in his view what paragraph 25 is alleging is that it is through the listing of Crystal Quinn as a defense witness that Mr. Gerace is able to learn of her status as a government witness. And that is not what paragraph 25 alleges. It alleges that the listing circumvented the protective order. But that does not equate to this is how Gerace learns that she's a witness.

Docket Item 438 at 89.

The timeliness of this argument, first being presented at oral argument was dubious on its face. But more concerning than the delay of arriving at this argument is the fact that the government advanced this argument after having previously proffered the following in a sworn affidavit:

> United States v. Bongiovanni, et al., Case Nos. 19-CR-227, 23-CR-37, involved charges of witness tampering, public corruption, sex trafficking, drug trafficking, and obstruction of justice. A protective order was issued. See id. Doc. No. 347. Nevertheless, *counsel for Peter Gerace, including one of his present attorneys in that case, Eric Soehnlein, listed government witness Crystal Quinn as a defense witness.* Although the protective order prevented defense counsel from disclosing to the defendant the names of witnesses on the government's witness list until a certain number of days before trial, it did not prevent defense counsel from listing the government's witnesses on the defendant's own list and then reviewing the defense witness list with the defendant, *potentially circumventing the protective order, and identifying government witnesses to the defendant in a roundabout way.* Crystal Quinn was ultimately murdered, and defendants Gerace, Ermin, Hinkle, and Gogolack have been indicted by a grand jury for Witness Tampering Conspiracy surrounding her murder. See United States v. Gogolack et. al., 23-cr-99, Doc. No. 25, Second Superseding Indictment, Count 2.

> (Dkt. 156 at 11-12 (emphasis added)).

Thus, the factual arguments the government ultimately chose to pursue, i.e. that the language of the paragraph 25 was misinterpreted, were blatantly inconsistent with the earlier sworn submission in this case, cited above. Specifically, the government stated that "counsel for Peter Gerace, including one of his present attorneys in that case, Eric

Soehnlein, listed government witness Crystal Quinn as a defense witness" and then goes on to say it "potentially circumvent[ed] the protective order" by "identifying government witnesses to the defendant."

At this point, there is enough evidence in the record that to support that the indictment includes information supporting a narrative the government knows to be false, and that should provide a sufficient basis to dismiss the indictment.

## C. MOTION TO DISMISS BASED ON PROSECUTORIAL STEERING

"The selection of a judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant… he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings." *Cruz v. Abbate*, 812 F.2d 571, 573-74 (9th Cir. 1987)(remanded to "determine whether an abuse of discretion or constitutional violation has occurred" and authorizing the use of "supervisory powers to correct the matter"). "The suggestion that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow, touching the entire criminal justice system" *Id.* at 574.

It naturally follows that "a system that allows prosecutorial judge-shopping arguably lacks 'the appearance of impartiality that is required to obtain the confidence of the public and the accused in the system.'" *United States v. Pearson*, 203 F.3d 1243, 1264 (10th Cir. 2000)(quoting *Tyson v. State*, 619 N.E.2d 276, 300 (Ind. Ct. App. 1993). The practice of "prosecutorial steering" is a threat to the "independence of the judiciary." *Id.*

Thus, "[t]he importance of impartiality carries over to the criminal justice system as a whole, including the process of the selection of the judge. Leaving aside the question of the prosecutor's motives, *the mere appearance of partiality, even if unfounded*, greatly undermines the credibility of the criminal justice system." *Francolino v. Kuhlman*, 224 F. Supp. 2d 615, 630 (S.D.N.Y. 2002)(emphasis added).

In the Western District of New York, the government is provided enormous power to influence the assignment of cases through the filing of related case forms. Our district previously did not have a rule that requires related case forms be automatically disclosed to defense counsel.[25]

Thus, in our District, the system was premised on the belief that the government could be trusted to demonstrate the utmost candor associated with these filings and that the government would never selectively submit or withhold the forms for strategic purposes.

1. The Government Was Confronted in March 2024 on its Selective Related Case Filings

In paragraph 24 of this indictment, the government alleges it was an overt act in furtherance of the conspiracy in Count One that Mr. Gerace's defense counsel filed a

---

[25] Compare to the local rules for the District Court for the District of Columbia (cited as "D.C.D. LCvR"), which contains a rule for submission of a related case form, which must also be "mailed to all defense counsel along with the notification of the arraignment" so the defendant is provided an opportunity to object. D.C.D. LCvR 40.5 (b)(1). (available at https://tinyurl.com/DCLocalRules).

witness list that included two individuals who were relatives of the assigned District

Judge:

> On or about June 20, 2023, Gerace Attorney 1 filed and caused the filing of a trial witness list that named two relatives of the assigned District Judge as GERACE'S defense witnesses. The listing of the District Judge's relatives as GERACE trial witnesses resulted in the District Judge recusing himself pursuant to 28 U.S.C. 455(b)(5)(iv), and the trial of Case Nos. 19-CR-227 and 23-CR-37, which was then scheduled for August 14, 2023, being adjourned.

> Dkt. # 24 at 16.

Based on the substance of that allegation, in Case no. 19-cr-227, the government

moved to disqualify Eric Soehnlein, one of Mr. Gerace's lead attorneys, because he was

representing Mr. Gerace in June 2023, and among other things, the government alleged

the above-listed overt act was an attempt to judge-shop.[26]

On March 15, 2024, during oral argument for the motion to disqualify in Case no.

19-cr-227, the District Court questioned the government about the government's own

conduct in this case that suggested possible judge-shopping. Specifically, the Court asked

the government about its selective submission of related case filings.

The government responded, claiming it would have been "inappropriate" and

"borderline disingenuous" to identify a connection between Mr. Gogolack and the

---

[26] Essentially, the government alleged that Mr. Soehnlein was a witness to the events that transpired in Case No. 19-cr-227. Indeed, the government indicated that Mr. Soehnlein may be called to testify. In that vein, there is also a reasonable likelihood that the government's trial team would be witnesses in this case, but the government has insisted on having the same trial team prosecute both cases.

charges pending against Mr. Gerace. (Case no. 19-cr-227, Dkt. 825 at 11-12).[27] The government pointed out that the "very first charge… was a drug and gun case." (Case no. 19-cr-227, Dkt. 825 at 11-12).

Yet, less than a month later, when Mr. Gogolack was indicted and a District Court Judge needed to be assigned, the government was appearing at the arraignment making public comments about witness tampering. *See e.g.* Dan Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, The Buffalo News, Sept. 14, 2023, https://tinyurl.com/BN091423 ("'This case is as serious as it gets,' [AUSA] Cooper told the judge. He added that the charges filed against Gogolack so far 'are only the tip of the iceberg.'")

Although it appeared that the government's comments in March 2024 were not entirely candid about the connection between the initial charges against Mr. Gogolack and the prosecution of Mr. Gerace, the defense did not have any further information at that time.

After disclosure of the much-delayed discovery in case no. 23-cr-227, the defense received information that established that even before Mr. Gogolack was charged by

---

[27] That assertion was troubling on its face, because when Mr. Gogolack was charged, it was obvious to everyone in the courtroom that this was a related case. *See e.g.* Dan Herbeck, *Judge assigns new attorney to man under scrutiny in Pharaoh's strip club probe*, The Buffalo News, Sept. 7, 2023, https://tinyurl.com/BN090723.

complaint on August 17, 2023, the government had already connected both Mr. Gogolack and Mr. Gerace, and presumably others, to the investigation into the witness's death.

## 2. Despite the Government's Comments in March 2024, the Government Had Immediately Connected the Witness Death Investigation to the Prosecution of Mr. Gerace

As discussed in the Background, the FBI's involvement in the investigation underlying *US v Bongiovanni et al* was documented under a specific Case ID: 58A-BF-3179872.

When Ms. Quinn's death was reported, the government immediately identified that investigation as being related to *USA v Bongiovanni et al* and Peter Gerace, Jr. The FBI created a "sub file" for the death investigation of witness using the Case ID "58A-BF-3179872-DEATH QUINN," a subset of the CASE ID used in relation to *USA v Bongiovanni et al*.

That information was not known to the defense in May 2024. Because the government had not provided rolling discovery as directed by this Court, the defense had no discovery from case no 23-cr-99 at that time. When the government made discovery available the following month, buried at bate stamp 00010744, there is the FD-1057, dated August 11, 2023, that shows the investigation into Ms. Quinn's death was identified as a related to case no 19-cr-227 even before Mr. Gogolack was charged by complaint, and over a month before he was indicted and a District Court Judge was assigned.

While the government claimed that the initial charge against Mr. Gogolack was a "drug and gun case," the early investigation into Mr. Gogolack was clearly focused on the witness death, and all FBI efforts to investigate Mr. Gogolack were tagged with the Case ID "58A-BF-3179872-DEATH QUINN," the file number used regarding the investigation for *Bongiovanni et al* and Peter Gerace, Jr. (*see supra* at p. 14, n. 8)

Also provided in the delayed discovery was the video of a custodial interview of Mr. Gogolack on August 2, 2023. Mr. Gogolack was arrested by a local police agency in apparent coordination with Federal agents. He was taken into custody and questioned by the agents. The interview almost exclusively focused on the investigation regarding the witness death.

Moreover, in the discovery was the warrant for Mr. Gogolack's residence, issued on August 5, 2023. It referenced multiple violations, including "Title 21, United States Code, Sections 841(a)(l)(resulting in death)" and indicates all of the violations "are more particularly described in the application and affidavit for this warrant which is incorporated herein by reference."

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

**See Attachment B , Particular Items to be Seized, attached hereto and incorporated herein by reference as through set forth fully herein.**

All of which are evidence, fruits, and instrumentalities of a violations of Title 18, United States Code, Sections 4, 1001, 922(g)(1); 922(g)(3); 924(c)(1)(A); 1513(a)(1); and Title 21, United States Code, Sections 841(a)(1)(resulting in death) and 846, and all of which are more particularly described in the application and affidavit for this warrant which is incorporated herein by reference.

The government has not disclosed search warrant applications in the discovery, but even without the ability to review the application, the face of the warrant indicates that the government was proffering information alleging probable cause that Mr. Gogolack was involved in criminal conduct associated with the witness death as early as August 5, 2023.

Thus, even if the government chose to initially hold back charges against Mr. Gogolack related to the witness death, the discovery reveals that the government was investigating Mr. Gogolack almost exclusively with the purpose of advancing the investigation into the witness death, and indeed, the efforts to advance that investigation were being documented by the government under Case # 58A-BF-3179872-DEATH QUINN.

When the government told the District Court, in a public proceeding on March 15, 2024, that it did not submit related case filings for Mr. Gogolack to inform the Court of a connection to Mr. Gerace, it argued that it would have been "borderline disingenuous" to connect the two cases. However, the government knew that in August 2023, even before Mr. Gogolack was first charged, the FBI was pursuing the investigation against Mr. Gogolack under the same case ID associated with Mr. Gerace and *Bongiovanni et al*. The government was in possession of official documentation detailing the investigative efforts into Mr. Gogolack were officially labeled as being related to case no. 19-cr-227 from the beginning. Yet, the government declined to submit a related case form in *USA v. Gogolack*

when the complaint was filed in August 2023, and it again declined to submit a related case form when the indictment was filed in September 2023.

That discovery reveals the clear implication that the government did indeed engage in prosecutorial steering, or judge-shopping, by declining to file a case-related form when Mr. Gogolack was first charged even though it later denied it.

### 3. Motion to Dismiss and Grand Jury Review

The appearance that the government attempted to influence judge selection in this case greatly undermines the credibility of the criminal justice system if not addressed.

There is already evidence which supports the conclusion that there was deliberate prosecutorial steering in this case, and thus dismissal is appropriate on this record.

However, it would also be appropriate to determine what information the government had elicited at the grand jury prior to the indictment of Mr. Gogolack, when it declined to file a related case form.

Thus, the defense seeks permission to supplement this motion further either after grand jury minutes have been reviewed *in camera* by Magistrate Judge McCarthy or at any other time that the defense obtains information establishing that evidence had been elicited at the grand jury, prior to Mr. Gogolack's initial indictment, which established his case was related to the charges against Mr. Gerace.

### D. Motion to Dismiss or Suppress Due to the Subpoena Compelling Production From Gerace's Investigator

It is well settled that "[t]he Sixth Amendment's assistance of counsel guarantee can be meaningfully implemented only if a criminal defendant knows his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceedings." *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1997).

The attorney-client privilege is "one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998). The purpose of the privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Id.* (internal citation and quotation marks omitted).

A separate, but related privilege is the attorney work product privilege.[28] Federal Rules of Criminal Procedure (Fed. R. Crim. P.) 16 codifies work-product protection for documents and materials prepared in connection with the investigation or defense of the case in criminal proceedings.

---

[28] The work product doctrine is suffused with policy considerations relating to the appropriate role of the attorney and the relationship between client and attorney. *United States v. Nobles*, 422 U.S. 225, 236-40, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975); *Upjohn Co. v. United States*, 449 U.S. 383, 398, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). *Doe v. United States (In re Grand Jury Subpoena Dated October 22, 2001)*, 282 F.3d 156, 160 (2d Cir. 2002).

Although Rule 16 refers to proceedings in which there is a named defendant, the work-product protection rule has also been applied to grand jury proceedings. *See, e.g.,* *In re Grand Jury Subpoena*, 482 F.2d 72 (2d Cir. 1973).

Work-product protection applies to materials obtained or prepared with an eye toward litigation. The work-product doctrine protects work product of the lawyer or an agent of the lawyer by prohibiting 'unwarranted inquiries into the files and the mental impressions of an attorney in criminal litigation.' *In re Grand Jury Proceedings*, 2001 U.S. Dist. LEXIS 15646 (N.D.N.Y. October 3, 2001). It can encompass facts as well as opinion. The work product privilege applies to preparation not only by lawyers but also by other types of party representatives including, for example, investigators like Mr. Lawrence, seeking factual information. *Doe v. United States (In re Grand Jury Subpoena Dated October 22, 2001)*, 282 F.3d 156, 157 (2d Cir. 2002).

Here, Mr. Gerace had a protected privilege both in his communications with attorney and his attorney's agents, and in his attorney's work-product, which would include those hired to work as part of the defense team, as an agent of his attorney.

Throughout Mr. Gerace's criminal proceedings, his attorneys had employed professional services as part of the defense against these charges, including, obviously, the utilization of private investigators.[29]

---

[29] Along with changes in counsel, there have been other changes to the composition of the defense team, including investigators and paralegals.

During the course of Mr. Cohen's representation and continuing for a couple of months after he was relieved, Mr. Lawrence acted as an investigator for the defense team, including taking direction from Mr. Cohen to complete tasks related to the defense of this case.

Mr. Gerace communicated with Mr. Lawrence with the appropriate understanding that his communication would be privileged, and Mr. Lawrence created material during the course of the investigative steps he took at Mr. Cohen's direction.

With that in mind, the fact that Mr. Lawrence would be subpoenaed to the grand jury, particularly with less than two months before trial was scheduling in case no. 19-cr-227, was unforeseeable. It immediately invoked enormous concerns for Mr. Gerace's Sixth Amendment Right to Counsel, based on a clear effort to pierce the veil of privileged communication and material.

The concerns that any attorney would have regarding the issuance of a subpoena for a defense investigator are reflected in the Department of Justice Manual.

> Authorization of the Criminal Division. Because of the potential effects upon an attorney-client relationship that may result from the issuance of a subpoena to an attorney for information relating to the attorney's representation of a client, the Department exercises close control over such subpoenas. Such subpoenas (for both criminal and civil matters) must first be authorized by the Assistant Attorney General or a Deputy Assistant Attorney General for the Criminal Division before they may issue, unless the circumstances warrant application of [a specific exemption].

…

This policy extends to proposed subpoenas to paralegals, investigators, or other employees or agents of attorneys, if the information sought relates to the attorney's representation of a client, including information that the employee or the agent of the attorney, rather than the attorney personally, acquired.

Justice Manual (JM) § 9-13.410 (Revised in 2018) available at https://tinyurl.com/913410 (emphasis added)

When defense counsel contacted chambers for this Court on November 6, 2023, to address the subpoenaing of Mr. Lawrence, the defense stated:

Last week the defense investigator in US v Gerace was served with a subpoena to appear before a Federal grand jury this Wednesday (11/8) at 1:00 p.m. to testify and produce materials. *There was no attempt to contact Eric or me prior to the service.*

The investigator engaged legal counsel, Thomas J. Eoannou, who I have cc'd on this email. I understand that Tom has communicated with the Government. He asked for an adjournment, which the Government has refused.

Eric and I have also communicated with Tom, and we have advised him that *there is no waiver of privilege by Mr. Gerace or defense counsel that would permit the investigator to testify regarding his involvement in this matter. That is just one of the concerns that immediately comes to mind in response to the Government's attempt to pull a defense investigator into the grand jury.*

Exhibit B-2 (emphasis added).

When the government claimed it had not contacted defense counsel, because it had relied on an affidavit from Mr. Cohen, which appeared to imply that Mr. Lawrence

was hired by a third party and worked independently of the defense team, the defense initially accepted the government's representation.

However, even if that explained why the US Attorney's Office had initially failed to contact the defense or followed proper DOJ protocols before issuing the subpoena to a defense investigator, the government was now being provided an affirmative clarification that Mr. Lawrence was indeed part of the defense team. That assertion should have triggered appropriate measures by the US Attorney's Office, in line with DOJ protocol, to treat Mr. Lawrence as a member of the defense team.

The government sought to claim that it generally believed, at that point in its investigation, that the implication by Mr. Cohen in his affidavit that Mr. Lawrence acted independently was more credible than the direct confirmation by the current defense team that Mr. Lawrence was a member of the defense team.

The US Attorney's Office could have made efforts to request evidence confirming Mr. Lawrence's status one way or another, but it did not attempt to do so.

Not only did the US Attorney's Office avoid making those efforts, it attempted to prevent the defense from having time to furnish proof to confirm its assertion that Mr. Lawrence was a defense investigator. The defense only requested that the US Attorney's Office delay enforcement for a few days in order to provide proof. The US Attorney's Office refused. The US Attorney's Office provided no reason as to why it could not

accommodate a few days. As we now know, the return of an indictment was not imminent.

When the defense filed the motion to quash, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

The US Attorney's Office presented all of its arguments to Judge Arcara, *ex parte*, but it appears that at least part of the arguments presented to the Court were based on the false representation that Mr. Lawrence was not part of the defense team and was not acting at the direction of Mr. Cohen. The prosecutors knew otherwise or, at a minimum, had reason to know otherwise and willfully refused to confirm the veracity of its arguments.

When the US Attorney's Office convinced Judge Arcara to order compliance with the subpoena, it came into possession of the recording from Mr. Lawrence and secured his testimony.

Prior to his testimony, the US Attorney's Office could have asked Mr. Lawrence whether he acted at the direction of Mr. Cohen in defense of this matter, but instead, upon information and belief, it had Mr. Lawrence immediately enter the grand jury to testify.

The US Attorney's Office could have led its questioning with an attempt to confirm whether Mr. Lawrence was part of the defense team and then ceased questioning, but it does not appear the government did that.

However, even though it the US Attorney's Office likely did not lead with investigation of Mr. Lawrence's status, it does appear that the answers ultimately establish he acted as an agent of Mr. Cohen, based on allegations that were included in the indictment (Dkt. 24). Nonetheless, upon information and belief, the government made no attempt to correct the false information it had previously proffered to Judge Arcara, nor did it take any other corrective measure.

The US Attorney's Office did not return the recording that it had obtained, nor did it secure the recording and await a decision by the court regarding whether a crime-fraud order would be issued before reviewing its contents.

Instead, it appears to the defense, based on the available record, that the US Attorney's Office reviewed the recording while knowing that it was obtained by false arguments.

Now, it appears the government intends to use the recording that were obtained based on false arguments to a District Court Judge in order to compel testimony and disclosure from a member of Mr. Gerace's defense team.

This supports an additional ground in support of dismissal, as the circumstances demonstrate further abuse of subpoena power and the grand jury process. However,

short of such relief, the government should not be permitted to utilize the evidence wrongfully obtained form the defense investigator and at a minimum suppression should be ordered in conjunction with any other relief that this Court finds just and appropriate.

### E. MOTION FOR LEAVE TO JOIN IN CO-DEFENDANT'S MOTIONS

Other defendants have filed dispositive pretrial motions.

To the extent that Mr. Gerace has standing to do so, he moves to adopt any motions or arguments filed by any of his co-defendants to the extent that the relief requested is not adverse to his individual interests and will not cause unreasonable delay of Mr. Gerace's ability to proceed to trial.

This motion is made in the interest of judicial efficiency. Permitting Mr. Gerace to join in their co-defendants' motions will avoid duplicative filings by defense counsel. Therefore, Mr. Gerace request that he be deemed to join in any motion filed by a co-defendant to the extent that it seeks relief favorable to Mr. Gerace.

### F. MOTION FOR LEAVE TO MAKE OTHER PRETRIAL MOTIONS

Mr. Gerace is in a different position from many of his co-defendants. The government has not provided notice pursuant to Rule 12 of any evidence seized from Mr. Gerace pursuant to a search warrant.

Although Mr. Gerace presents multiple legal issues herein, he recognizes his case may be able to advance to trial much sooner than other defendants, particularly Mr.

Gogolack who just received new counsel after the government made a disclosure revealing a conflict for the first time.

Mr. Gerace seeks to resolve these motions and move towards trial as expeditiously as possible.

Nonetheless, as Mr. Gerace awaits trial, he requests this Court permit him to make further and additional motions which may be necessitated by due process of law, by the Court's ruling on the relief sought herein, by additional discovery provided by the Government or investigation made by the defense, and/or by any information provided by the government in response to the defendant's demands.

Specifically, Mr. Gerace seeks to reserve his right to make the further pretrial motions including: (1) motions *in limine* related to evidence the government or defnedants intend to introduce at trial; (2) motions pursuant to Federal Rule of Criminal Procedure 17(b)/(c) for orders allowing the pretrial production of documents; (3) motions pursuant to Federal Rule of Criminal Procedure 15(a) for pre-trial deposition of a witness; (4) motions for pre-trial production of Government summaries pursuant to Federal Rule of Evidence 1006; (5) motions for a supplemental jury questionnaire or for counsel participation in voir dire; (6) motions for additional peremptory challenges; (7) motion for various non-pattern jury instructions; and (8) *ex parte* motions for authorization of funds for experts and other resources to defend these matters.

Finally, Mr. Gerace may seek to supplement these motions or advance further motions depending on the outcome of the *in camera* review of grand jury minutes by Magistrate Judge McCarthy.

For the foregoing reasons, the Court should issue an Order permitting Mr. Gerace to make other motions as requested above.

## IV. CONCLUSION

For all of the reasons set forth above, Mr. Gerace respectfully request this Court order the relief requested in the Notice of Motion and such other relief that this Court deems appropriate.

DATED:    Orchard Park, New York
          August 8, 2025

                                    s/ Cheryl Meyers Buth
                                    Cheryl Meyers Buth, Esq.
                                    MEYERS BUTH LAW GROUP, PLLC
                                    *Attorneys for Defendant Peter Gerace, Jr.*
                                    21 Princeton Place, Suite 105
                                    Orchard Park, New York 14127
                                    (716) 508-8598
                                    cmbuth@mblg.us

DATED:    Rochester, New York
          August 8, 2025

                                    s/ Mark A. Foti
                                    Mark A. Foti, Esq.
                                    THE FOTI LAW FIRM, P.C.
                                    *Attorneys for Defendant Peter Gerace, Jr.*
                                    16 W. Main Street – Suite 100
                                    Rochester, New York 14614
                                    (585) 461-1999
                                    mark@fotilaw.com