**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

                        Case No. 1:23-cr-99

          Plaintiff,               (EAW)

vs.                        August 20, 2025

**SIMON GOGOLACK,** a/k/a Greek,
**PETER GERACE, JR.,**
**JOHN THOMAS ERMIN,** a/k/a Tommy O,
**MICHAEL RONCONE,** a/k/a Cone,
**FRANK KNIGHT,**
**HOWARD HINKLE, JR.,** a/k/a Hard How,

            Defendants.
_____

**TRANSCRIPT OF STATUS CONFERENCE**
BEFORE THE HONORABLE ELIZABETH A. WOLFORD
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**         **MICHAEL DiGIACOMO, UNITED STATES ATTORNEY**
                   **BY: JOSEPH M. TRIPI, ESQ.**
                      **NICHOLAS T. COOPER, ESQ.**
                      **CASEY M. CHALBECK, ESQ.**
                 Assistant United States Attorneys
                 Federal Centre, 138 Delaware Avenue
                 Buffalo, New York 14202
                 For the Plaintiff

                 **ROSENTHAL KOOSHOIAN & LENNON, LLP**
                 **BY: PETER MATTHEW KOOSHOIAN, ESQ.**
                 80 West Huron Street
                 Buffalo, New York 14202
                   And
                 **TEXIDO LAW**
                 **BY: NICHOLAS TIMOTHY TEXIDO, ESQ.**
                 69 Delaware Avenue, Suite 1100
                 Buffalo, New York 14202
                 For Defendant Gogolack -refused transport

                 **THE FOTI LAW FIRM, P.C.**
                 **BY: MARK A. FOTI, ESQ.**
                 The Powers Building
                 16 West Main Street, Suite 100
                 Rochester, New York 14614
                   And

**MEYERS BUTH LAW GROUP**
**BY: CHERYL MEYERS-BUTH, ESQ.**
21 Princeton Place, Suite 105
Orchard Park, New York 14127
For Defendant Gerace


**MUSCATO DiMILLO & VONA, LLP**
**BY: GEORGE V.C. MUSCATO, ESQ.**
107 East Avenue
Lockport, New York 14094
  And
**EASTON THOMPSON KASPEREK SHIFFRIN LLP**
**BY: DONALD M. THOMPSON, ESQ.**
16 West Main Street, Suite 243
Rochester, New York 14614
For Defendant Ermin


**DELL LEGAL**
**BY: PAUL GORDON DELL, ESQ.**
70 Niagara Street, Suite #108
Buffalo, New York 14202
For Defendant Roncone


**DONOHUE LAW**
**BY: BARRY J. DONOHUE,ESQ.**
77 Broad Street
Tonawanda, New York 14150
  And
**CERULLI, MASSARE & LEMBKE**
**BY: MATTHEW LEMBKE, ESQ.**
Times Square Building
45 Exchange Boulevard, Suite 925
Rochester, New York 14614
For Defendant Knight - waive appearance


**VILLARINI & HENRY, LLP**
**BY: DANIEL J. HENRY, JR., ESQ.**
16 Main Street
Hamburg, New York 14075
For Defendant Hinkle


LAW CLERK:          **CAITLIN A. LOUGHRAN, ESQ.**

COURT DEPUTY CLERK:  **SANDRA D. WILSON**

COURT REPORTER:     **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                    Robert H. Jackson Courthouse
                    2 Niagara Square
                    Buffalo, New York 14202
                    Ann_Sawyer@nywd.uscourts.gov

(Proceeding commended at 1:30 p.m.)

**THE CLERK:** All rise, United States district court for the Western District of New York is now in session. The Honorable Elizabeth Wolford presiding.

**THE COURT:** You can have a seat, everybody.

**THE CLERK:** On the record. United States versus Gogolack. 23-CR-99. We're here for a status conference.

Counsel, please state your name and who you represent.

**THE COURT:** Why don't we do this, actually. Why don't we go through each party separately.

So on behalf of the government?

**MR. COOPER:** For the United States, Nicholas Cooper, Casey Chalbeck, and Joseph Tripi. Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

And on behalf of Mr. Gerace?

**MR. FOTI:** Good afternoon, Your Honor. Mark Foti and Cheryl Meyers-Buth on behalf of Mr. Gerace, who is present in the courtroom.

**THE COURT:** All right. Good afternoon, Mr. Gerace.

**DEFENDANT GERACE:** Good afternoon, Your Honor.

**THE COURT:** On behalf of Mr. Ermin.

**MR. MUSCATO:** Your Honor, Don Thompson and George Muscato. Good afternoon.

**THE COURT:** And Mr. Ermin is present in the

courtroom?

MR. MUSCATO:  He is, Your Honor.

THE COURT:  And on behalf of Mr. Roncone?

MR. DELL:  Good afternoon, Your Honor.  Paul Dell for Mr. Roncone, who is sitting next to me.

THE COURT:  Good afternoon.

On behalf of Frank Knight?

MR. DONOHUE:  Good afternoon, Your Honor.  Barry Donohue and Matthew Lembke are present.  Mr. Knight is also in the courtroom.

Where is Mr. Knight?  There you are.

Do you want him seated at counsel table?

THE COURT:  No, he's --

MR. DONOHUE:  He's fine there, Your Honor?

THE COURT:  That was going to be my first order of business after we go through the roll call is to appoint Mr. Lembke formally.

On behalf of Mr. Hinkle?

MR. HENRY:  Daniel Henry, and Frank Bogulski has an excused absence.  And my client is present with me.

THE COURT:  All right.  And on behalf of Mr. Gogolack?

MR. KOOSHOIAN:  Good afternoon, Judge.  Peter Kooshoian and Mr. Texido.  Mr. Gogolack's not present.

THE COURT:  And I received a communication from my

courtroom deputy that the marshals indicated that Mr. Gogolack refused transport?

**MR. KOOSHOIAN:**  I was told the same thing, Your Honor.

**THE COURT:**  Are you asking to waive his appearance?

**MR. KOOSHOIAN:**  Yes, Your Honor.

**THE COURT:**  Okay.  His appearance will be waived.

Mr. Lembke, confirming on the record what was discussed after our last court appearance was that you're willing and able to become involved in this case and represent Mr. Knight with Mr. Donohue?

**MR. LEMBKE:**  I am, Your Honor, yes.

**THE COURT:**  Thank you.  The Court appreciates your service.  And I will appoint you nunc pro tunc to July 31, 2025, which is the date of our last appearance, and it's the date I called you to see if you were willing to get involved.

**MR. LEMBKE:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

The dispositive motions that have been filed by Mr. Gerace, Mr. Ermin, Mr. Roncone, and Mr. Hinkle, they were filed at docket 545.

On behalf of Mr. Gerace, it was filed at docket 545.

Docket 548 is Mr. Hinkle's motion.

Docket 540 is Mr. Ermin's motion.

And docket 536 is Mr. Roncone's.

My plan is to handle all those motions and all of the issues that were raised in those motions. I've communicated that and discussed with Judge McCarthy. Judge McCarthy will continue to handle Mr. Knight's non-dispositive motions, as well as his review of the grand jury material.

But otherwise, I guess it would be fair to state all pending issues right now, I think the default would be that I will handle those unless I let you know otherwise.

The question I have about the dispositive motions, or one of them, is for the government, are there any issues right now that the government would concede would warrant a hearing? For instance, just to give you a hint as to what I think would warrant a hearing, Mr. Roncone's motion to suppress statements.

I don't know if the government's in a position right now to agree that a hearing at least tentatively should be scheduled on that. And if so, I was thinking of scheduling it today, along with oral argument on the motions. But --

**MR. COOPER:** Can we just ask you for a moment to confer, Judge, before we answer your question?

**THE COURT:** Sure. And so we're clear, there were two motions to suppress statements that were filed, Mr. Hinkle's and Mr. Roncone's.

I'm not indicating this with respect to Mr. Hinkle's, we're going to have to have litigation over whether or not

what he has filed is sufficient to warrant a hearing.  But it did strike me as pretty apparent that we need to have a hearing on Mr. Roncone's motion.

**MR. COOPER:**  Sure.  If we can just have one second, please?

**THE COURT:**  Sure.

As the government's doing that, Mr. Foti, I need your redacted memo of law.

**MR. FOTI:**  I literally, as we were sitting here, Judge, I realized that I hadn't sent that in yet, I apologize.

**THE COURT:**  That's okay.  Make sure you get it to us.

**MR. FOTI:**  I will.

**MR. TRIPI:**  Judge, may I ask a question?  We've conferred.

**THE COURT:**  Sure.

**MR. TRIPI:**  I apologize for not having it at my fingertips or knowing the answer to this.  But did Mr. Roncone file a factual affidavit that --

**THE COURT:**  He did.

**MR. TRIPI:**  I couldn't remember if he did.

**THE COURT:**  Right, Mr. Dell?

**MR. DELL:**  That's correct.  I filed a factual affidavit with a non dispositive motion.  And after seeing your response to that, we did a second one that's --

**THE COURT:**  And, Caitlin, do you want to grab that?

Because that's in that binder there.

MR. DELL:  That was flushed out.

MR. TRIPI:  Pertaining to the statements, Paul?

MR. DELL:  Correct.

THE COURT:  Hold on one second because, I --

MR. TRIPI:  This has now refreshed our recollection as to that affidavit, Your Honor, and if you've reviewed it and you think it's sufficient, we'll consent to the hearing.

THE COURT:  Okay.  All right.  So we will schedule that today.

I also want to schedule oral argument on all the dispositive motions.  We've got the government's deadline to respond as September 5th, and then the reply is due September 19.

So there were two dates that I was going to propose: September 25th in Buffalo, or October 1st in Buffalo.

My preference probably is October 1st.  It will just give me a bit more time to review everything after the reply papers, but I can do either date.  So why don't we check first with the government.

MR. COOPER:  Judge, we prefer the October date --

THE COURT:  Okay.

MR. COOPER:  -- but we're available, you know, whatever the Court decides.

THE COURT:  All right.  What about Mr. Gerace's

attorneys?

MR. FOTI:  Judge, we have a little bit of a split here.  Ms. Meyers-Buth, who is the heart and brains of this team, is not available on October 1st.

But on September 25th, I have the Defender Services Advisory Group meeting with other --

THE COURT:  Is your microphone on?

MR. FOTI:  It's -- the lights's on.  I guess if I keep it a couple inches from my mouth.

I have a meeting on the 25th with the Defense Advisory Group which is all day.

THE COURT:  What -- okay.  Look it, I can propose other dates, too.

What -- Ms. Meyers-Buth, are you out that whole week? Or just the 1st is not good?

MS. MEYERS-BUTH:  I'm out from September 30th for the next six days.  I'm taking a family member to an out-of-state medical appointment.  But other than that, I am generally available.

THE COURT:  You can do the 29th?

MS. MEYERS-BUTH:  I could, sure.

THE COURT:  How's the 29th work for the government?

MR. COOPER:  That's fine for the government.  Thank you, Judge.

MR. FOTI:  That works.

THE COURT:   That works for the Gerace team?

MR. FOTI:   Yeah.

MS. MEYERS-BUTH:   Thank you, Your Honor.

THE COURT:   What about Mr. Ermin's counsel.

MR. MUSCATO:   What are we looking at, Judge?  The 29th?

THE COURT:   We're now looking at September 29th in Buffalo.

MR. MUSCATO:   We're all set for the 29th.

THE COURT:   Okay.  Mr. Roncone?

MR. DELL:   Yes, that's fine.

THE COURT:   And Mr. Hinkle.

MR. HENRY:   That will work.

THE COURT:   Okay.  Why don't we say 11 a.m. on September 29 in Buffalo for oral arguments on the pending dispositive motions filed by Mr. Gerace, Mr. Ermin, Mr. Roncone, Mr. Hinkle, at dockets 545, 548, 540, and 536.

And then in terms of a date for a hearing on Mr. Roncone's motion to suppress statements, can we do October 1st?

MR. COOPER:   That works for the government, Judge.

MR. DELL:   Yes, that works.

THE COURT:   Okay.  Why don't we say 1.  Well, I have a sentencing at 11 that day, so -- it will be here in Buffalo.  Why don't we say 12:30?

**MR. DELL:**  Okay.

**THE COURT:**  And I'll issue a text order just confirming not only these dates, but also the deadline for any witness list or exhibit list for the hearing.  Okay?

**MR. COOPER:**  Understood.  Thank you, Judge.

**THE COURT:**  Thank you.

The next issue I wanted to deal with was the deadlines for Mr. Knight and Mr. Gogolack to file dispositive motions.

So let me first ask Mr. Texido and Mr. Kooshoian, have you obtained the file from the Federal Public Defender's Office?

**MR. KOOSHOIAN:**  Yes, I obtained it August 7th, Judge.

**THE COURT:**  And would you characterize the FPD's office as facilitating the transfer of this case in a cooperative manner?

**MR. KOOSHOIAN:**  Oh, yeah, that's not been a problem.

**THE COURT:**  Okay.  Good.  It seems as though Mr. Knight has proposed October 24.

Where is Mr. Knight's team?

**MR. DONOHUE:**  Yes.  Yes, ma'am.

**THE COURT:**  Okay.  And the government, you're not necessarily objecting to that; is that correct?

**MR. COOPER:**  So, Judge, we had initially suggested a -- I think a mid or late September date.  And Mr. Donohue

came back and indicated he would prefer late October.

I think ultimately where we left it was that we didn't feel like late October was egregious, and we're not trying to have fights we don't need to have.  So if the Court agrees with the late October date, we're not gonna object.

**THE COURT:**  Okay.  So let's say October 24 for -- is the deadline for Mr. Knight to file dispositive motions.

And then November 21 for the government to file a response.

December 5 for any reply papers.

And could we schedule oral argument on December 10th here in Buffalo?

**MR. COOPER:**  Works for the government, Your Honor.

**THE COURT:**  Mr. Donohue?  Mr. Lembke?

**MR. DONOHUE:**  Yes, Your Honor.

**THE COURT:**  Okay.  2 p.m. on December 10th in Buffalo for oral argument on Mr. Knight's dispositive motions.

So, it doesn't seem as though we're going to have as easy a resolution of the deadline for Mr. Gogolack's dispositive motions.  So, Mr. Kooshoian and Mr. Texido, you're proposing late January?

**MR. KOOSHOIAN:**  Yes, Your Honor.

**THE COURT:**  That's -- that strikes me as too long. In other words, I mean, you were appointed.  I -- I appreciate it's a significant case, and I know you've got a lot of other

things going on.

But you also were appointed in July.  We've got the FPD's office that's been working up this case for years, I think.  I -- I don't think it's reasonable to put off the motions for what essentially would be, what, six months?

MR. KOOSHOIAN:  It would be five months, Judge.

THE COURT:  Well, six months from when you were appointed, I think.

MR. KOOSHOIAN:  Well, I was appointed with Mr. Ange, who then got off the case right before I was -- I told the Court -- when the Court asked me to take the case, I'm going out of town for ten days, and I got back.  And I got -- when I got appointed, I didn't have the file, and I certainly wasn't going to take it on my family vacation.

And then when I got back and I got the file and trying to work through it.  And what I can see so far is not only is it voluminous, but much of the information we need to file dispositive motions we don't have right now, none of it.

THE COURT:  Like -- like discovery, you mean?

MR. KOOSHOIAN:  Correct.  And I thought the Court might address that today.  There's an issue with all of the applications for the eight or nine search warrants that relate to Mr. Gogolack, none of which were provided to the previous defense counsel.

THE COURT:  Well, then that -- there was litigation

in front of Judge McCarthy I think on that.  He denied the motion for disclosure of the search warrant applications.  The deadline to file reply papers was put on hold when new counsel -- it was ascertained new counsel would need to get involved.  And so we need to complete the briefing on that and have oral argument on that.

But separate and apart from that issue, I think you have -- you have discovery, right, that was transferred to you by the FPD's office?

**MR. KOOSHOIAN:**  I -- I have 30- to 50,000 pages.

**THE COURT:**  Okay.  And I just appointed a discovery attorney, yes.

**MR. KOOSHOIAN:**  I'd like to thank you for that.  I'd like to thank Mr. Thompson for making that application. Hopefully it will assist us, and will be in a searchable format, which currently it's not.

**THE COURT:**  But the suggestion that you need to have six months to -- because you say Mr. Ange was originally appointed.  Mr. Texido was appointed in -- before the end of July, as well.

I mean, I'm not suggesting you don't need sufficient time, but that just strikes me as too much time.

**MR. KOOSHOIAN:**  Honestly, Your Honor I was trying to be realistic.

**THE COURT:**  Mr. Thompson, maybe you'll jump in to --

**MR. THOMPSON:**  I have a suggestion.  Maybe --

**THE COURT:**  Of course you do.

**MR. THOMPSON:**  I always have a suggestion, Judge. Some are good, some are not good.

**THE COURT:**  That won't prevent you from --

**MR. THOMPSON:**  It doesn't stop me.

**THE COURT:**  No, I know it doesn't.

**MR. THOMPSON:**  But since we did get a discovery management attorney, they will put together a database in short order, and I think we'll have a pretty good idea at that point of how accessible this information is going to be.  You know, maybe if we have a status in 30 days or --

**THE COURT:**  We're going to do that anyway, trust me.

**MR. THOMPSON:**  Okay.

**THE COURT:**  We're gonna set a deadline today for Mr. Gogolack to file motions.

This is a deadline that I'll expect dispositive motions to be filed by.  It doesn't mean that if that deadline comes and you can't submit a motion to me saying, look it, I can file a motion on this -- there's some issue that you must know right now you're going to be able to file a dispositive motion on.  There's other issues that you may not be able to know right now that you're going to file dispositive motions on.  And I'll hear you out on that.

But I just think, let's face it folks, we all work on

deadlines, including me.  That's -- that's the way our profession works.

And so I just think pushing this out to the end of January is, at this point, an unreasonably long deadline.  Now I'm not suggesting that what the government suggested of September or even the October deadline that we just put in place for Mr. Knight works for new counsel.  I'm not saying that I'm not willing to push it out further than that.  But that just seems too far in my estimation at this point.

**MR. KOOSHOIAN:**  May I make a suggestion?

**THE COURT:**  Sure.

**MR. KOOSHOIAN:**  Can we shoot for we'll get this discovery attorney going, and hopefully we'll -- I'd like to -- well, first, the date which from the standpoint of there's a lot of information I haven't seen in this case, or Mr. Texido.  Like, a lot.

And a lot of it has to do with what I said before, is the information that's underlying these warrants that will be necessary to review for dispositive motions if they're to be made.

The other thing is there's going to be a need to hire experts.  Probably at least, that I can see right out of the gate, four or five.

I know there's a budget issue right now with doing that.  That's at least until October 1st.

THE COURT:  Well, there's no -- there's payment issue, there's no budget issue.  I mean --

MR. KOOSHOIAN:  I'm sorry.

THE COURT:  I mean, in other words, there's nothing -- you should definitely be working with Allen Nelson to put a budget in place to -- to afford the hiring of any experts that you need.

MR. KOOSHOIAN:  That's one of the things we have to do, and we're going to do that.  But I just -- when I'm looking at these deadlines right now, partially blind, I'm trying to set something up that I think, you know, taking into consideration everything that could go wrong, we'll probably be able to make this deadline without having to ask the Court for more time.  That's -- and my own caseload.

THE COURT:  Okay.  No, I understand that.

Mr. Cooper, you look like you want to say something?

MR. COOPER:  Yes, Judge, thank you.

The one thing I would say is that with respect to the volume of discovery -- and I understand counsel has to get up to speed, and they came into the case later than some of the other attorneys -- but with respect to dispositive motions, Fourth and Fifth amendment issues, the universe of search warrants is limited.  There's an even more limited universe of search warrants that relate to Mr. Gogolack, his house, his cell phone, a Google account, it's a fairly limited universe.

I had a phone call with Mr. Kooshoian yesterday discussing this. To the extent that there's information that he wants to be able to file dispositive motions, his client is the impediment to that because they haven't filed an affidavit of standing. And as Your Honor pointed out, that was litigated in front of Judge McCarthy. But it's not the government withholding information that he's established that he is entitled to.

So I don't think that six months is necessary to file a fairly standard motion to suppress a search warrant for a Franks issue or, you know, those are not overly complex and they don't require the review of 50,000 pages of discoverable material.

With respect to the hiring of five experts, that sounded to me more like something that needs to be done in anticipation of trial, not in anticipation of the suppression hearing for a statement that Mr. Gogolack made that's been in the file for years.

The third thing that I would point out is that the government has remained accessible to all the defense attorneys in this case, so if there's issues locating something in discovery Mr. Kooshoian and Mr. Texido both have my phone number, and I would be happy to point them to search warrants that relate to Mr. Gogolack, statements, Bates numbered identification. Where are the statements from Simon?

I can point them to that if that will help meet a faster timeframe, I will make myself available to do that.  But I do think that late January is too much time for that.

**THE COURT:**  All right.  Here's what we're gonna do. We're gonna work backwards.

The appeal from Judge McCarthy's decision -- or, recommendation, I guess it was a decision, I think, to not release the search warrants.  Does Mr. Gogolack want to file a response or a reply?

**MR. KOOSHOIAN:**  I don't know.  I haven't spoken with him about it because he's in Northeast Ohio.

**THE COURT:**  Well, I'll ask Mr. Texido, because I asked you to be prepared to discuss this when we were together in July -- I think it was July.  Yeah.

**MR. TEXIDO:**  Yes, Judge.  Reading through the papers, I believe that argument is before Your Honor.  And we don't need to submit anything further on the issue unless the Court would like further briefing, then we would, of course, do so.

**THE COURT:**  Are you asking for oral argument on the issue?

**MR. TEXIDO:**  Yes, oral argument on the issue.

**THE COURT:**  Okay.  So let's set an oral argument date on a motion that's already been litigated in front of Judge McCarthy, and has been briefed by prior counsel with an appeal to me.

What about September 8th?  No.  That's not good.

What about September 10th in Rochester?

**MR. KOOSHOIAN:**  I can't do September 10, Judge.

**THE COURT:**  What about September 11th?

**MR. KOOSHOIAN:**  I can't do those last three days of that week.

**THE COURT:**  Okay.  What about the 9th?

**MR. KOOSHOIAN:**  He 9th?  Yeah, I can do the 9th any time except 9:30.

**THE COURT:**  This will be in Rochester.

**MR. KOOSHOIAN:**  Okay, would it ben in the afternoon?

**THE COURT:**  I can do it in the afternoon.

**MR. KOOSHOIAN:**  Yeah, that can work.

**THE COURT:**  Does that work for the government?

**MR. COOPER:**  I'll make it work.

**THE COURT:**  3 p.m. on the 9th in Rochester for oral argument on Mr. Gogolack's appeal on Judge McCarthy's determination with respect to the search warrants.

And then right now, I'm going to set a December 1 deadline for Mr. Gogolack to file dispositive motions.  We'll have a status conference before then, and we'll discuss the status of everything.  But I think December 1 is a reasonable date based on everything I've heard at this point for Mr. Gogolack to be able to file dispositive motions, or at least most of his dispositive motions.

I'm not going to set a deadline for the government to respond to oral argument at this point, we can address that at -- once we have a status conference on the date as it's approaching.

All right.  We were going to have oral argument today on the severance motions that are pending at dockets 405, 408, 410, 514, and 493.

I -- I guess I've read everything.  I anticipate I'm going to make a decision from the bench, but I'm open to hearing any further argument that anybody wants to make.  So I guess I'll start with Mr. Gerace's attorneys.

**MR. FOTI:**  Judge, I think the issue has been briefed extensively.  I think we raised a number of different considerations for severance, both in regards to severance of the counts and severance of the defendants.

**THE COURT:**  And just -- and just to, I think any Rule 14 determination at this point is premature.  So I am not -- and look, I expect to deny the motion without prejudice as premature at this point, and I don't see how we really resolve those issues right now.  So I think really Rule 8 is the issue.

**MR. FOTI:**  So, Judge, I guess just at a high level, the points that we keep coming back to and -- is on the face of the indictment, you can see a fundamental problem here, which is there's essentially -- as the government has pointed

out in the past, six different cases that were kind of rolled into one.

But there's one case in particular that stands out from the rest, which is the charges against Mr. Gogolack starting at Count 6 through 18.  There's 12 counts, all that pertain to Mr. Gogolack that are separate from the other defendants.

**THE COURT:**  But you say they're separate.  I mean, they're all related to the alleged drug trafficking that is related to the alleged method by which the alleged conspiracy to obstruct justice was accomplished.

**MR. FOTI:**  Judge, I agree that there's an allegation against Mr. Gogolack that he conspired with two other individuals that were not charged in Counts 1 through 3 to engage in a narcotics conspiracy, and that narcotics are part of the conspiracy that is alleged in Counts 1 through 3.  But short of that one piece of overlap, I don't see them as connected at all.  I think --

**THE COURT:**  Well, I mean, the method by which it's claimed that Ms. Quinn was murdered was through the administration of fentanyl.  And then you look at the other counts, I mean, they're all related to either maintaining a drug trafficking premises, or engaging in a narcotics conspiracy.  I mean, I don't -- I don't see how that's improper joinder under Rule 8.

**MR. FOTI:** Judge, I think obviously an individually can be part of different conspiracies with different objectives, different means, and those two conspiracies simply having an overlapping defendant isn't necessarily a basis to -- to have them joined and not to avoid the prejudice that flows from that.

And I obviously, I'm referencing issues that pertain to both Rule 14 and 8, but nonetheless, we -- we have an allegation against Mr. Gogolack that he was involved with two codefendants in a narcotics conspiracy and kidnapping and other allegations that are extraordinarily prejudicial pertaining to that conspiracy.

The two other defendants that are involved until that set of charges are no longer part of this case.  One of them has taken a plea, the case is resolved.  The other's passed away.

And now you have Mr. Gogolack involved in a number of charges with very little evidentiary overlap.

The government doesn't need to prove a narcotics conspiracy or provide the same extent of evidence relating to a narcotics conspiracy between Mr. Gogolack and others to prove Counts 1 through 3, or even Count 4, Judge.  Because Count 4, Mr. Gogolack is only charged in, but I recognize that Count 4 pertains to the conspiracy of Counts 1 through 3.

And that's fundamentally different than what your

dealing with, with the block of 12 counts in 6 through 18.

They -- they -- they -- the narcotics conspiracy does not need to be proven to establish the government's allegation that Mr. Gogolack gave drugs to an individual causing an overdose consistent with Counts 1 through 3.  It just doesn't.

It's -- it's additional evidence that's designed to prejudice the jury against the remaining defendants.

You could separate the two cases with very little impact to either case other than procedural challenges of having to do two separate trials.  But to that point, Judge, and again, some of this may be premature, but Mr. Gogolack's also in a totally different posture now than everybody else.  I mean, he --

**THE COURT:**  Well, and if that ultimately ends up serving as a basis for motion for severance, so be it.  But right now, it -- I don't have a motion for severance based on that, and it's premature to be arguing that at this point.

**MR. FOTI:**  We did -- I believe, Judge, that we provided a supplement that spoke to that, but it wasn't part of the underlying motion or memorandum in support.  I think we referenced that it just provides one more additional consideration in totality of what's before the Court for purposes of severance.

You know, and there's other things obviously collateral to the decision such as vicinage that may apply

differently to Mr. Gogolack than some of the other defendants. But at the center of the issue, Judge, I understand the Court's point 100 percent.  Mr. Gogolack is charged in Count 6 with a narcotics conspiracy, and then there's a number of extremely prejudicial allegations, kidnapping being at the forefront of them, that pertains to the narcotics conspiracy.

THE COURT:  But I think it also pertains -- I mean, my understanding of the kidnapping allegation is that the allegations are that Mr. Gogolack kidnapped drug customers to cover up his involvement in the drug trafficking which was related to ultimately the -- allegedly related to the means and method by which Ms. Quinn was purportedly murdered.

And I think that in part is the government's theory of the case.  Am I stating that correctly?  Or --

MR. FOTI:  Judge, can I just on that point?

THE COURT:  Yeah.

MR. FOTI:  If the point that the Court -- and maybe I'm misunderstanding, but the point is Mr. Gogolack engaged in violent acts as part of covering up certain actions that pertain to this case, or to Counts 1 through 3, the kidnapping counts pertain from -- are dated March 2023, several months before any of the events that are put into motion that pertain to this indictment, pertaining to Ms. Quinn's death.

So I understand the Court's point, I would agree with it if there were allegations of kidnapping and coverup and

obstruction that relate to post-August or September of 2023.

But you're talking about totally separate allegations pertaining to a narcotics conspiracy that take place even before the alleged motive could potentially exist in this case involving Ms. Quinn.

It's a separate case.  There's separate allegations. They're extraordinarily prejudicial, I'll give you that.  But that's -- that's not in any way speaking to what's going on in Counts 1 through 3 based on the government's allegations.

**THE COURT:**  Let me ask a clarification from the government as to what your theory is as to how the kidnapping counts are related to Counts 1 through 3.

**MR. COOPER:**  Judge, to address the timeline first, the -- the timeline that Mr. Foti laid out with respect to when the kidnapping occurred is accurate, that that predates the murder of Crystal Quinn.

The witness tampering allegations that occur, the victims of the witness tampering are the same victims of the kidnapping occurs after the murder of Crystal Quinn.

The government's theory with respect to that specific issue and how they're linked is that when the FBI and law enforcement are in Wellsville beginning to investigate the death of Crystal Quinn, Simon Gogolack, recognizing that he's kind of the focus of that investigation because she's found dead in his house, is essentially attempting to limit his

exposure to law enforcement because he knows these two people he kidnapped are walking around town in Wellsville, and he sends threatening communications to them essentially attempting to stifle them from cooperating with or talking to law enforcement as law enforcement has drawn their focus on him as a result of Crystal Quinn being found dead in his house.

And I'm going to turn it over to Ms. Chalbeck to put a finer point on this.

**MS. CHALBECK:**  There's another point to that, Your Honor.  So during the kidnappings, Mr. Gogolack threatens -- or, I should say at least part and parcel with the kidnappings, Mr. Gogolack threatens his kidnapping victims.  And as I understand the evidence, he specifically says that he'll kill them and make them look like it's an overdose.

And it's the government's theory that that's exactly what he did with respect to Miss Quinn.

And so one of the reasons the government thinks that Mr. Gogolack intimidates these two particular witnesses is because they're walking around Wellsville while the FBI is investigating Ms. Quinn's death with knowledge in their minds that Simon Gogolack has threatened to do something eerily similar to them that he did to Ms. Quinn.

My colleague says it might have just been one of the

kidnapping victims.  So I was using the word "them," plural, it should be singular.

THE COURT:  But the government's theory is that both of the kidnapping victims were also victims of witness tampering to prevent an investigation into the death of Ms. Quinn.

MS. CHALBECK:  Absolutely.

THE COURT:  Did I get that correctly?

MS. CHALBECK:  Absolutely, Judge.  And I would just add two other factual details that I think merit consideration here.

The first, going back to the kidnapping, is that there are communications between Mr. Gogolack and Mr. Knight that are contemporaneous with the period in which the kidnapping occurs, in which Mr. Gogolack alludes to having kidnapped the two victims.

So, the government can -- can then argue Mr. Knight had notice that Mr. Gogolack was capable of these kinds of activities because he communicated as much via a text message. So that's one point.

And then the second point is that there -- at least one kidnapping victim was communicating with Mr. Gogolack the weekend of Ms. Quinn's death.  And there is evidence of narcotics activity between those two individuals -- Mr. Gogolack and the kidnapping victim -- we anticipate that

that is going to be brought up in trial.  So it's difficult, though, to understand that relationship if you divorce the kidnappings and the narcotics conspiracy from this case.

THE COURT:  Okay.  Go ahead, Mr. Foti.  You were in the middle of your argument.

MR. FOTI:  Judge, I just think that's such a minor piece of evidence that can come in under a trial for Counts 1 through 4 without going into events earlier.

THE COURT:  I don't think that's the standard, though, whether or not defense counsel considers it a minor piece of evidence.  I mean, under Rule 8, we all know what the standard is.  And I'm just not seeing that there's improper joinder of defendants or counts in this case.

MR. FOTI:  Judge, I guess so much of this --

THE COURT:  The Rule 14 issues are different, and I'm not suggesting I'm going to resolve them today.

MR. FOTI:  I just think so much of this case, Judge, and this will come up at every time that we have argument, it really comes down to the fact that this is a circumstantial case, and there's constant disagreement over what is a reasonable inference to draw, and what isn't, and what's pure speculation.

Well, what I would say about the government's --

THE COURT:  That's up to the jury to decide.

MR. FOTI:  I recognize that.  But there's also --

there's also still a threshold to get past before something qualifies as a reasonable inference for a jury to hear the evidence on.

And I think in terms of what we didn't hear on the arguments, the government is indicating, well, there's a reasonable inference that because Mr. Gogolack is tampering with witnesses after law enforcement are in Wellsville in August, that somehow it pertains to Ms. Quinn.  Except there's been no proffer of any attempt by Mr. Gogolack to tamper with witnesses, and as part of that tampering indicate to those witnesses that he specifically did not want them to speak to law enforcement because of Ms. Quinn, or about Ms. Quinn, or anything that relates to the Counts 1 through 3, other than the government indicating that one of the witnesses claims he made a comment that sounds similar to -- to their theory of what happened to Ms. Quinn in Counts 1 through 3.

Other than that one comment, the allegations of tampering with witness -- pertaining to tampering with witnesses that were allegedly kidnapped early in the year completely unrelated to Counts 1 through 3.  And simply saying, well, because law enforcement was in Wellsville, that somehow that now connects Counts 6 through 18 to Counts 1 through 3, is an extremely tenuous connection in my view.

And the -- the impact of the prejudice, the administrative challenges of having this many counts where so

many of them are completely unrelated involving one defendant, that those are all part of the Court's consideration here, and I think they warrant severance.

**THE COURT:** Okay. Any other defense counsel have any other argument you want to make on this?

**MR. MUSCATO:** Yes.

**THE COURT:** Go ahead.

**MR. MUSCATO:** May I please?

**THE COURT:** And you're welcome to argue from counsel table, you can come to the podium, whatever you want to do.

**MR. MUSCATO:** Am I okay right here?

**THE COURT:** Yes.

**MR. MUSCATO:** Your Honor, with respect to Mr. Ermin, we have raised the severance of Count 24, which is the 922(g)(3), which would appear to be clearly within the prohibition of Rule 8.

In that particular account, they allege that our client, Mr. Ermin, possessed really what amounts to hunting rifles with a recreational amount of marijuana, however you look at it.

And it really clearly has nothing to do with any of the allegations contained in 1 through 3 for sure, and certainly he was legally entitled to possess these firearms. Whereas, some of these other counts perhaps deal with prior convicted felons who possessed firearms. That's not the case

here.

And I see that the government responds by saying, well, we found knives, we found patches, we found bullets, ammunition, all of which was legal.  But that may still come in depending on how the Court rules later on down the road here.  But it has nothing to do with this 922(g)(3) and the allegations that they have laid out in that particular charge.

So, quite frankly, Your Honor, under Rule 8, it clearly would fall within the prohibition of joining with 1 through 3.

**THE COURT:**  It doesn't in the sense that you've got the same alleged participants, Mr. Ermin, with Counts 1 through 3 and Count 24.

And then you have the factual overlap, because the search warrant executed at Mr. Ermin's home that purportedly resulted in the discovery of the evidence that supports Count 24 was executed because of his alleged involvement in the conduct alleged in Counts 1 through 3.

**MR. MUSCATO:**  Well, well, that is -- that is correct. I mean, he is -- he is an overlapped defendant.  But clearly, Count 24 is totally unrelated to the theory of the -- this conspiracy to begin with.

Second of all, the only reason that this 922(g)(3) --

**THE COURT:**  And I guess, though, I mean you're not suggesting that the evidence related to Count 24 is unrelated

to the alleged conspiracy?

MR. MUSCATO:  Yes, I am.  Certainly.

What we have is we have firearms, but they were all legally possessed.  There's no --

THE COURT:  They're not legally possessed if he's an unlawful user of narcotics.

MR. MUSCATO:  He is -- that -- that -- that -- no, they're still legally possessed, but it becomes a violation of this particular statute if he's an unlawful user of narcotics.

THE COURT:  Because it's illegal to possess a firearm if you're an unlawful user of narcotics.

MR. MUSCATO:  Yes.  But we're talking here marijuana, and we're talking a small quantity.  Whereas everything else in this entire indictment has to deal with fentanyl or other very seriously hard drugs.

And -- and in this particular case, they're trying to tie a gummies and a recreational amount of marijuana, which as the Court is well aware, is legal to possess outside of the federal government.  And so with that caveat, they tie that charge into this much more serious conspiracy.

And so, quite frankly, there's no similar character, there's no similar transition, there's nothing that would satisfy the criteria of Rule 8.

THE COURT:  Okay.  Any other defense counsel?  Yeah, Mr. Henry?

**MR. HENRY:** Judge, just to make clear, Rule 14, you're not addressing?

**THE COURT:** I'm not addressing -- yeah, I'm not -- well, I'm going to deny without prejudice Rule 14. I think it's premature to address that.

**MR. HENRY:** Okay. Because I asked Mr. Foti about the prejudice, and there's a lot to talk about on that. But I'll reserve on that based on your ruling.

**THE COURT:** Okay. Is your microphone on?

**MR. HENRY:** Can you hear it now? Okay.

In regards to Counts 19 through 22, which are the marijuana and the firearms charges concerning Mr. Hinkle, they have absolutely nothing to do with Counts 1 through 3.

The government tries to raise the claim that, well, Mr. Hinkle allegedly sold some marijuana to members of the Rare Breed, and therefore the Rare Breed and other motorcycle clubs are involved in or alleged to be involved in the death of Ms. Quinn. And, therefore, that -- that's the nexus that draws it in.

But in relationship to that, Judge, there's no connection regarding the drugs, the firearms, to Counts 1 through 3.

If it's alleged that Mr. Hinkle -- and I'm not admitting that, but for the argument sake here that he did provide drugs to members of the Rare Breed -- it's simply a

buyer-seller relationship.  It's not a conspiratorial liability, it's a mere association if that.  It would be equivalent to an individual selling drugs to a teacher on the school grounds.  It doesn't make him a member of the faculty or the administration.

**THE COURT:**  But aren't those arguments for the jury?

**MR. HENRY:**  Well, what they're trying to argue here is that these charges should be linked to Counts 1 through 3, and the government -- that's how they're trying to bring it in because, he's selling it to a member of the motorcycle club. But that has nothing to do with her death.

And an interesting point here, Judge, and --

**THE COURT:**  But it doesn't -- I mean, I don't think it necessarily has to do with Ms. Quinn's death, if it is related to the conspiracy, or how the conspiracy relationship purportedly developed.

**MR. HENRY:**  It's not though.

**THE COURT:**  That's the government's argument.

**MR. HENRY:**  Under Rule 8, it's the same or similar character, or based on the same act, transaction, connected to the same common scheme or plan.

And this has nothing to do with it.  You have marijuana, you have firearms.  Alleged in her death is by fentanyl.

**THE COURT:**  You don't think separate drugs counts --

you don't think you can have a conspiracy count involving six defendants, and then you've got different counts involving maybe just one defendant's name, but different drugs?  You don't that would be proper joinder?  The law doesn't require all the drugs to be the same.

MR. HENRY:  No, but they have to be connected somehow to that, and it's not.  And that's what the government's argument is.  That's how they're trying to bring this in, Counts 19 to 22 in their reply papers, that it's connected because they're claiming that he's involved with the motorcycle gang, and the motorcycle gang is tied into the death of Ms. Quinn.  And there's nothing.  There's no nexus between the two.

When they issued a search warrant, they found these drugs and the firearms on his house.  When they charged him back in October of 2023, the only charge they charged him with was Counts 19 through 22.  And they even mentioned in their reply papers that these are just simple ordinary charges.

THE COURT:  Do you mean in the complaint?

MR. HENRY:  In the complaint, yeah, in the criminal complaint.

They don't charge him with sections -- Counts 1 through 3 and the marijuana and drugs charges.  The only charge they charge him with is Counts 19 through 22 involving marijuana and the firearms, which if they were connected, why

not charge him altogether.  It's showing --

THE COURT:  But they are now.

MR. HENRY:  No, they're not.  That's the fact.  They never charged him in the criminal complaint --

THE COURT:  Yeah, but they indicted him for that.

MR. HENRY:  Subsequent to that, later, back in -- I think it was back in November.

THE COURT:  I mean, there's a lot of charges that are not in the criminal complaint that end up in an indictment.

MR. HENRY:  Right.  But my point is, Judge, is that the drugs and the marijuana have absolutely no connection to Counts 1, 2 and 3.  There's none.

They also try to argue that he's -- his relationship that he was present at Gogolack's residence when Crystal Quinn, under her drunk -- under her drug-induced state, claims that she sees people with firearms pointing at her and bikers.

There's no evidence he's there.  There's zero, Judge.

They have geofence data that shows his phone is not active anywhere near that location.  They have his cell phone extraction that shows they cannot say that he's at that location.  The evidence is clear that there's no evidence that he's at the location where they're claiming Crystal Quinn is viewing these or seeing these people pointing guns at her. There's none.  There's no witnesses, there's no physical evidence that establishes that.

So you have all that.  And that's what they're trying to link these three charges to the conspiracy, and they don't exist.  There's no connection between him and that.

THE COURT:  I think you mean the four charges, 19 through 22.

MR. HENRY:  Yeah, I'm sorry, there's four.  There's 19, 20, 21, and 22.

THE COURT:  All right.

MR. FOTI:  Judge, I don't mean to interrupt, but can I just be excused for a moment?  I just need to run -- I have a 2:30, and I want to let Judge Arcara know that we're still in the middle of argument.

THE COURT:  You want to be excused for a moment?

MR. FOTI:  Just, I didn't want the Court -- obviously I made a distraction by interrupting, but I didn't want to just step out.

THE COURT:  I think maybe it's with Mr. Glaberson?

MR. GLABERSON:  I'll go tell him.

THE COURT:  Thank you, Mr. Glaberson.  There you go.

MR. FOTI:  Thank you.

THE COURT:  All right.  Who else wants to make an argument from the defense side on this?  Nobody?  Okay.

The government, do you want to respond?

MS. CHALBECK:  Sure, Judge.

So I'll address Mr. Hinkle's comments first.

THE COURT:  Move your microphone forward.  There's something wrong with the audio in this room.

MS. CHALBECK:  Can you hear me?

THE COURT:  Yes.

MS. CHALBECK:  I'll address Mr. Hinkle's arguments first.  So Rule 8(b) says that joinder is proper where the defendants are alleged to have participated in the same act or transaction, or in the same series of acts or transactions constituting an offense or offenses.

And so the indictment on page 7 in paragraph 30 reads that Mr. Hinkle is a Wellsville resident and is an associate of Roncone, the RBMC, Knight, and Gogolack.

There are other allegations in the indictment, I think both in the introduction and in Count 1 and elsewhere, that speak to Mr. Hinkle's association.  So I'm starting there.

As the government laid out in its papers, it explained that part of the association between Mr. Hinkle, Mr. Roncone, and the RBMC, which is related to the allegation I just read, involves the distribution of marijuana.  And so it is plain that Mr. Hinkle's possession of marijuana, his distribution of it, is part of the same act or series of acts or transactions that constitutes an offense, the offense in which he's charged with the possession of marijuana, and the offense in which he's alleged to have an association the RBMC

and Mr. Roncone.

So, I think that that clears that misunderstanding up.  If Your Honor has additional questions about that, I'm happy to answer them.  If not, I'll move on to Mr. Ermin's arguments, which I'll do.

THE COURT:  Go ahead.

MS. CHALBECK:  So, one of the things that I heard was a similar argument, it mirrors Mr. Hinkle's argument that this count, this 922(g)(3) count, looks really different than the witness tampering, the witness retaliation, the obstruction of justice counts charged in Counts 1 through 3, but that's not the standard.  Again, the standard, without getting into the nuances that the 2nd Circuit is still developing between 8(a) and 8(b), when you have --

THE COURT:  Which is you have a single defendant, but if you have a defendant in a multi-defendant case who's charged alone in a single count, there's a question as to whether or not 8(a) also has to be --

MS. CHALBECK:  Right.

THE COURT:  -- analyzed.

MS. CHALBECK:  So without getting into that, and just looking at this through the more restrictive lens of 8(b), again, is this part of the same act or transaction or series of acts and transactions that are alleged elsewhere.  And so Your Honor can read the introduction of the indictment in

Count 1.

Count 1 alleges that Mr. Ermin is the president or was the president of the Outlaws Motorcycle Club, and that that is a criminal organization. That he had an interest in this case, there are allegations to that effect.

And then we searched Mr. Ermin's residence. And what do we find? We find, I think as Your Honor noted in the detention order, we find firearms, brass knuckles, a crossbow, cutting weapons, dozens of blunt instruments.

And then on top of that, this marijuana.

And so all of the weapons, all of the brass knuckles, all of the papers related to Mr. Ermin's following of the Gerace case in 19-cr-227, all of that comes in as evidence pertinent to his -- the allegations in Count 1 in his associations.

And the only other thing is marijuana, which arguably relates to, like, criminal activity that he's alleged, or criminal, you know, organizational criminal activity that's alleged in Count 1, too. But I think the main thrust of our argument there is that all of this other evidence from the search comes in to prove some of the allegations contained in Count 1, and the only ancillary thing is this marijuana. I don't think that that makes Count 24 divorceable from Counts 1 through 3. It's still part of the same act or transaction or series of acts or transactions as the allegations contained in

Count 1 that are then reincorporated in Counts 2 and 3.

So if Your Honor has questions about my argument there, I'm happy to take them.

**THE COURT:** By not asking any questions, that means I don't have any.

**MS. CHALBECK:** Great. And then I'll just move to Mr. Gerace's arguments then.

So one of the things that I heard Mr. Foti say is that the government has not proffered, you know, a basis to -- to really factually substantiate this theory that we have. Well, I'll proffer that right now.

So after Mr. Gogolack is arrested, he exchanges text messages, they're through Cash App.

**THE COURT:** Through what?

**MS. CHALBECK:** Cash App. If you -- if you --

**THE COURT:** I can figure it out.

**MS. CHALBECK:** Okay.

**THE COURT:** I get the gist.

**MS. CHALBECK:** So you can -- you can communicate through Cash App, and you just exchange, like, a dollar or 50 cents back and forth. And one of the things in sum and substance, that they're talking about is Mr. Gogolack's recent arrest.

Mr. Gogolack, in the government's view, is reassuring Mr. Knight --

THE COURT:  Who's he communicating with?

MS. CHALBECK:  Frank Knight.

THE COURT:  Okay.

MS. CHALBECK:  -- through Cash App.

And Mr. Gogolack reassures Frank Knight that they're looking at him into this other business involving the kidnapping victims, as opposed to Crystal Quinn's death.

That's something that Mr. Gogolack is saying to Mr. Knight about the kidnapping victims to reassure his coconspirator that, hey, they're not looking at me as to Crystal Quinn, they're looking at these other things, too.

And then around the same time period, Mr. Gogolack is making efforts to intimidate those witnesses and silence them. He does that also through Cash App in part, sending them messages.

And so it's plainly part of the same series of transactions.

In addition to that, Your Honor, the kidnapping evidence is pretty part and parcel of the narcotics conspiracy evidence which is fundamental to Counts 1 through 3.  I address the narcotics conspiracy evidence and why that is so critical to the case in our papers.  But just to recap, Mr. Gogolack says to one of his coconspirators, who's now deceased, that he's trying to start a business that they talked about, where they put on makeup on people, clean up

houses, detail cars.  And unless you have the evidence of the narcotics conspiracy in there, the defense is going to be able to argue, well, you don't know, Jury, if Bernard Byrd III was a -- who's the decedent, the deceased defendant -- if he was working at some auto detailing place.  He -- this could be a legitimate conversation.

If you know that Simon Gogolack and Mr. Byrd are in a narcotics conspiracy, then -- and you hear that that kind of language is often used as slang to talk about killing people or cleaning up hits, then that conversation becomes much more illuminating and relevant to this case, specifically because Mr. Gogolack is making those statements around the same time that he's reentering Crystal Quinn's life and communicating with her.

**THE COURT:**  Okay.  Thank you.  Thank you for everybody's arguments.

I am going to deny the Rule 8 severance motions.  I'm going issue a decision explaining in further detail my reasoning.

I am denying without prejudice the Rule 14 severance motion.  And I will, I'm sure, hear more about that later on.

Now, and just so the record's clear, Mr. Gogolack had filed severance motions, his prior counsel filed them.  Yeah, they did.

**MR. KOOSHOIAN:**  I thought -- I thought my review

looked like they filed a request for extension of time to file a severance motion.

THE COURT: No.

MR. KOOSHOIAN: I didn't see severance motion.

THE COURT: Yeah, he filed the motion, and then he also argued that the Rule 14 issues, I believe, should be decided later on --

MR. KOOSHOIAN: Oh, okay.

THE COURT: -- but he hadn't filed that.

I'm not preventing, though, Mr. Gogolack from, as part of your dispositive motions, filing a severance motion. I'm not preventing, as well, any of the defendants from refiling for Rule 14 motion as we get closer in time to the date of trial.

But the Rule 8 arguments that the defendants have made are being resolved to deny those motions. I do not believe there's improper joinder of defendants or counts in this case. And, as I said, I'll issue a written decision addressing my reasoning in further detail.

So let's talk about a trial date. I know that's something that is still pending, as well as the trial location.

The two defendants that we have not heard from on their position with respect to the trial location are Mr. Knight and Mr. Gogolack. Are either of you in a position

to opine on your position at this point?

**MR. DONOHUE:**  We do not have a position, Your Honor. We have no objection to Rochester, I think that was the thought.

**THE COURT:**  Okay.  Mr. Kooshoian and Mr. Texido, are you in a position to address that at all now?  Or no?

**MR. KOOSHOIAN:**  I'm not in a position to address that, no.

**THE COURT:**  I want to set a deadline for you to address that issue.

**MR. KOOSHOIAN:**  Yes.

**THE COURT:**  So can we say by the date of our oral argument on the appeal from Judge McCarthy you'll let me know what your position is?

**MR. KOOSHOIAN:**  Yes.

**THE COURT:**  Okay.

**MR. COOPER:**  September 9.

**THE COURT:**  September 9.  Okay.

Separate and apart from trial location, let's talk about a trial date.

I know there's a lot we still need to accomplish before we go forward with a trial, but I'm going to throw a date out there and see what everybody's response is.

June 8th, 2026.

**MR. COOPER:**  The government's available, Judge.

**MR. FOTI:** Judge, I believe Mr. Gerace will be ready well in advance of that date. Based on our dispositive motions, we don't anticipate any evidentiary hearings. Probably a date by February or March we would anticipate be ready to proceed.

**THE COURT:** Well, he's joined with other defendants, and I just denied the motion to sever those other defendants. So you can certainly make a statutory speedy trial argument if you want at some point if you believe that the time is unreasonable. But February or March to June, I don't think you're probably going to find any caselaw supporting an unreasonably -- time during that time period.

So what's your avail -- I mean, you can certainly make the argument and I'll take a look at it.

**MR. FOTI:** Well, I also note it, because we will revisit Rule 14 issues at some point, and I wanted the Court to be aware that we've discussed amongst ourselves and that's when we determined we would be ready to go.

**THE COURT:** Okay. But you've got dispositive motions pending at this point.

**MR. FOTI:** Yes.

**THE COURT:** So you're not ready right now.

**MR. FOTI:** I don't have any conflict with June, if that's the date that's set.

**THE COURT:** Yeah, we're talking about three months,

so you're talking about your summer basically.

MR. FOTI:  Understood.

THE COURT:  And, Ms. Meyers-Buth, you're both available?

MS. MEYERS-BUTH:  Yeah, I'm available.

THE COURT:  All right.  What about Mr. Ermin's team?

MR. THOMPSON:  Judge, I just had a trial that was going to cover both the February and March and the June dates. It settled this morning, so I'm available as early as February or March, but I'm also available in June.

And I'll let Mr. Muscato speak to his schedule.

MR. MUSCATO:  I'm fine with June 8th or any time before that.

THE COURT:  Okay.  What about Mr. Roncone?

MR. DELL:  I'm available, Your Honor.

THE COURT:  Mr. Knight?

MR. DONOHUE:  We're available, Your Honor.

THE COURT:  Mr. Hinkle?

MR. HENRY:  We're available.

THE COURT:  Mr. Bogulski is, too?

MR. HENRY:  He will be, yes.

THE COURT:  Okay.  Mr. Gogolack's team?

MR. KOOSHOIAN:  I'm available, Judge.

MR. TEXIDO:  I'm available as well, Your Honor.

THE COURT:  Okay.  So what I -- I'm going issue an

order that's -- if we're ready toe do this sooner than June 8th, we'll do it sooner than June 8th. But I'm going to issue an order setting a trial date of June 8th, location still to be determined. And I'm expecting counsel to block off three months after the start of that trial date for this trial.

And you're going to have to advise any judges who want to schedule you for a trial during that time period that you're otherwise occupied. Any questions about that?

**MR. FOTI:** No.

**THE COURT:** Okay. The probation files for Crystal Quinn the two other individuals.

So Mr. Knight's filed a motion at 517.

Mr. Gerace has filed a motion at docket 507.

And the government filed a response at docket 560.

So I have addressed this issue, and let's set aside the issue of Crystal Quinn's probation files for the moment. With respect to these two other individuals, I have a decision -- couple decisions I issued in the Pirk case, one of which is at 2018 Westlaw 3118279, which addressed the review of PSRs in connection with witnesses who are on the government's witness list. And it just captures what the 2nd Circuit caselaw is on the issue.

But among other things, to release the PSR, the Court has to determine that there's a compelling need for disclosure

to meet the ends of justice.  And under that standard, you have to assess or the Court has to assess whether or not the defendant already possesses the information or should have the information.

And then in connection with that case, as well, I don't think this was reported anywhere, but it's docket -- the case number is 15-CR-142, and the docket is 1093, where the defense had also sought files from the probation office separate and apart from the PSRs related to impeachment information, like Chron files and so forth, and I denied that request.

I don't see how at this point I could possibly make a determination that for two individuals who may or may not be witnesses at trial, that there's a compelling need to review the PSRs for impeachment information or that the defense cannot obtain the information that could be contained in there elsewhere.  I mean, I'm not suggesting that there will -- may be a point in time where I have to do that, but I just don't understand the, I guess, defense position that I should be doing that now.  And I don't see how you think I could reasonably conclude that you've met the burden, your burden, to require me to look through that information right now.

**MS. MEYERS-BUTH:**  So, Judge, if I could address that on behalf of Mr. Gerace?

**THE COURT:**  Sure.

**MS. MEYERS-BUTH:**  The reason that we asked for it now is because, as Mr. Foti alluded to, we've made it through all 40-some thousand pages of discovery.  Almost nothing applies to Mr. Gerace.  So that's not been helpful.

We are relying on the government's disclosure of Brady material, that's why we came up with the names of those two individuals.  And we are looking at it from an investigative point of view of.

Certainly, we can go on their dockets and find some materials.  But in terms of investigating what the government's case is against Mr. Gerace, we're at a standstill, I'll be honest with you.  We've done everything we can up until now.

And unless we're getting early Jencks or something else to work on, we just don't see anything else that pertains to Mr. Gerace in this entire discovery.

**THE COURT:**  But if we're talking -- I mean, think about it.  We're talking about a potentially three-month trial.  I imagine the government's going to have a lot of witnesses on their witness list.  So, I mean, why these two folks?

**MS. MEYERS-BUTH:**  Because they're the only ones we know about right now.  We have asked for early Jencks and Brady disclosures as part of our non dispositive.

We got maybe, you know, an inch worth of paper on the

early Brady.  The only people that were listed that pertain to Mr. Gerace were the two individuals that we cite in our papers.  That's it.

So we have nothing -- literally, nothing else to do.  That's why I think Mr. Foti was saying, after our dispositive motions are decided we're ready for trial.

Absent some early Jencks disclosure or something else, we were up to speed.  And so we asked for that now thinking we could potentially use it in an investigative avenue, in the event that -- especially the one that the last name begins with an R, especially if -- since he testified in the grand jury, especially if the government anticipates calling him, we'd like to investigate --

THE COURT:  But don't you have to do the investigation first, and then tell me why I have to nonetheless review in camera PSR information and find there's a compelling need for it, and that you can't find the information elsewhere?

MS. MEYERS-BUTH:  Yeah.  And we've done as much as we can on that, given just the name of the person and the little --

THE COURT:  But you've got the docket.  Go look at the docket.  There's information on the docket.  I looked at it last night.  There's information on both.  One less, because it was just a violation of supervised release, but

that's all public.

MS. MEYERS-BUTH: Right. And we have that. But we don't know what we don't know. So that was --

THE COURT: I don't think that meets the standard under the 2nd Circuit caselaw.

MS. MEYERS-BUTH: So, Judge, if that's going to be your ruling, I would ask that it be without prejudice so we can renew it at an appropriate time then.

THE COURT: Okay.

MR. TRIPI: Judge, can I just add something to that?

THE COURT: Sure.

MR. TRIPI: As to the individual that they're really interested in that they mentioned a moment appearing, that individual testified at Mr. Gerace's last trial, and Mr. Foti, I believe, cross-examined the individual. If it wasn't him, it was Mr. Soehnlein. But to say that they have no idea what he might say --

THE COURT: There must have been a PSR review --

MR. TRIPI: I don't know if they requested that in that case --

THE COURT: Oh.

MR. TRIPI: -- but they're requesting it in this case. In any event, there was a full robust cross-examination. So to say they don't have any clue as to what this person might say, if he testifies in this case the

testimony will be similar.

There's a public transcript available that uses only the person's initials, and Ms. Sawyer was the one who prepared it.  It's available.  And there was a robust cross-examination.

So I think those arguments, in addition to not meeting the standard that you've articulated, fall a little flat.

**MS. MEYERS-BUTH:**  Well, I still don't have any idea about him, because I don't have access to any of the protected --

**MR. TRIPI:**  Go on PACER, Cheryl.

**MS. MEYERS-BUTH:**  -- the protected material.  To some extent, it's still subject to a protective order.

**THE COURT:**  So, explain that to me.

**MR. FOTI:**  Judge, in case 19-cr-227, there's a protective order that pertains to all 3500 material including witness names.

And it's been something that Ms. Meyers-Buth has brought -- has -- has asked me to file a motion in that case asking for a modification of the protective order in that case to allow the sharing of information with Ms. Meyers-Buth in this case.  It's something we've talked to the government about previously.  I don't think -- I think they indicated they would discuss what their position --

THE COURT:  Is the government opposed to that?

MS. CHALBECK:  The government, months ago, I think advised Mr. Foti to file his motion in 19-cr-227 before Judge Vilardo.  Months ago.

THE COURT:  What's the government's position on that though?

MR. TRIPI:  Judge, there's a lot of witnesses from that case, so --

THE COURT:  Yeah, but you're not seriously suggesting that Mr. Foti can't share information with his cocounsel in this case about the same defendant?

MR. TRIPI:  Our -- our main issue is if there are -- let me step back just for a moment.

That conspiracy went up until 2019.  There are a lot of people who Ms. Meyers-Buth doesn't need, whose information doesn't need to be further disseminated --

THE COURT:  To Ms. Meyers-Buth?  Seriously?

MR. TRIPI:  Judge --

THE COURT:  She's cocounsel with Mr. Foti representing the same defendant.

MR. TRIPI:  Judge, if there's overlap --

THE COURT:  Come on.

MR. TRIPI:  -- if there's overlap of witnesses --

THE COURT:  That seems unreasonable.

MR. TRIPI:  -- if there's overlap of witnesses

between the cases, I'm not arguing at some point those people --

THE COURT: Yeah, but they're cocounsel in this case, representing the same person, it was --

MR. TRIPI: But there are people that have nothing to do with this case whose information doesn't need to be further disseminated.

THE COURT: In all likelihood, Mr. Foti is not going to share it with her. But why can't he be freely able to discuss it with her as cocounsel for Mr. Gerace?

MR. TRIPI: Well, that's not what they asked. They didn't ask to be able to discuss this person who testified publicly, they asked for a blanket, you know, we're not subject to the protective order in this case. We're dealing in this case with a death of a witness, and I have a number of witnesses who want to move on with their life and not have things further disseminated. And I think that's a legitimate government interest.

THE COURT: I disagree with you. It strikes me as unreasonable for you to be taking -- or, the government to be taking the position that Mr. Foti, who is representing Mr. Gerace, with cocounsel this case that just because she wasn't involved in that case with Mr. Foti, I mean, she could have been counsel of record but she wasn't, that he can't decide -- to put those types of restraints on somebody just

strikes me as unreasonable.  Impractical.

MR. TRIPI:  For people who have nothing to do with this case?  We're not talking about this particular --

File your motion as to this individual.  I'm sure we'll take a position that this Court can find reasonable.

THE COURT:  I think you should file a motion in front of Judge Vilardo on this, because ultimately if it's his protective order, he's going have to resolve it.

MR. TRIPI:  That's the same thing we've asked them to do months ago, Judge.

MR. FOTI:  I intend to do that, Judge.  Obviously, we'd hoped it would be without opposition.

THE COURT:  I think the government's position's unreasonable.  I'm on record.  Get a copy of the transcript and share it with Judge Vilardo for what it's worth.

MR. FOTI:  Understood.

THE COURT:  I think that position is unreasonable. The suggestion that cocounsel in a case -- he has a wealth of information that he's learned in representing Mr. Gerace in connection with another matter, and the suggestion that Mr. Foti is hamstrung and can't have discussions with his council about this just is unworkable to me.

MR. TRIPI:  Judge, I feel like we're talking past each other, because if they file a motion regarding this individual, we're likely --

THE COURT:  It shouldn't be just with respect to this individual.

MR. TRIPI:  But they're -- Judge, you don't understand the volume of information that --

THE COURT:  No, I definitely don't understand the volume.

MR. TRIPI:  There are people from 2009 that have nothing to do with this.

THE COURT:  So what?  Why can't Mr. Foti discuss it with Ms. Meyers-Buth?

Mr. Gerace knows about it.  Mr. Foti knows about it. But Ms. Meyers-Buth can't know about it?  That's unreasonable.

MR. TRIPI:  But they're not relevant to this case.

THE COURT:  According to you.  But guess what? Relevancy is not within the ambit of what the government thinks or what Mr. Tripi thinks.  It's -- the defense has the right to investigate this and share information and discuss it.

MR. TRIPI:  I just don't understand how people who interacted with Mr. Gerace in 2009, who have nothing to do with a witness death in 2023 --

THE COURT:  I don't know either, Mr. Tripi, and maybe they won't.  But to put the handcuffs on Mr. Foti, he can't even discuss with Ms. Meyers-Buth?  That's unreasonable to me.

MR. FOTI:  I also can give one answer to that, Judge.

One point is this case, 23-CR-99, is premised on the idea that there was an effort to eliminate a witness in 19-cr-227.

And it has been a point in litigation throughout that we have no reason to believe that Ms. Quinn ever would have had any significance to 19-cr-227.  That is comparable to the vast majority of witnesses in that case.  And it's something I can't talk to Ms. Meyers-Buth about right now is the significance of what the other witnesses were testifying to comparable to Ms. Quinn.

THE COURT:  Then you really need to file a motion in front of Judge Vilardo.

MR. FOTI:  I agree.  I just -- because the arguments are being made that all those other witnesses are irrelevant when 19-cr --

THE COURT:  I don't see how --

MR. FOTI:  Right.

THE COURT:  -- you can reasonably argue that witnesses in the case that led to this case are irrelevant.  I just don't see how you can make that argument.

MR. TRIPI:  We're not arguing Ms. Quinn is irrelevant.  We're not arguing that this --

THE COURT:  Yeah, but you can't pick and choose, Mr. Tripi, I mean, you've got to look at the totality of the picture here.

MR. TRIPI:  Judge, there are a lot of people, for

example, who came and went from Pharaoh's and were done with this by 2016 that under -- if you had it in front of you, you would be saying -- I believe you'd be saying how in the world is disclosure necessary?

It's really no different than the probation files.

**THE COURT:** But Mr. Foti shouldn't have to go through each witness separately and file a separate motion in front of Judge Vilardo.

**MR. TRIPI:** He can certainly list the dozen or half dozen or five that he thinks are reasonable.

**THE COURT:** Come on.  That's -- I just think that's so unreasonable.  I really do.

**MR. TRIPI:** Well, I apologize, Judge.  We just have a difference of opinion an that.

**THE COURT:** We do.  We do.  And I, again, I think you need to file a motion in front of Judge Vilardo.  I mean you're talking about a public trial.  A public trial.

**MR. TRIPI:** Right.

**THE COURT:** Where there's presumably an appeal.  The transcripts are presumably going to be public.

**MR. TRIPI:** I just argued that when they said we have no idea what the person said, exactly.  But they -- they -- they seem to want more witnesses than just the ones relevant to this case.  That's my issue.

**THE COURT:** Yeah.  But, again, the government

shouldn't be the one that decides relevance.

**MR. TRIPI:** They have to determine -- they have to make a showing of materiality. That's their obligation under Rule 16.

**THE COURT:** Well, you and I aren't going to see eye to eye on this. I just think that's extremely unreasonable. It's one of the more unreasonable positions that I have heard the government take with respect to a case that you have cocounsel in this case, same defendant, case stems from that case, and Mr. Foti can't share this information with Ms. Meyers-Buth which, again, Mr. Gerace knows because he was sitting there at the trial.

**MR. TRIPI:** Well, Judge, I apologize. I've also never had a case where I was dealing with a correlated witness death case off of a case I prosecuted, so maybe I'm a little hesitant, that's all.

**THE COURT:** But you're talking about disclosing it to another attorney. You're not talking about publicly disseminating the information. All you're talking about at this point is allowing Mr. Foti to discuss it with Ms. Meyers-Buth, right? I mean --

**MR. TRIPI:** I --

**THE COURT:** -- that's all I'm suggesting is it is just wholly unreasonable to suggest he can't have a free flowing of ideas with his cocounsel on this.

MR. TRIPI:  I don't necessarily think that's where our rub would be, having a conversation.

THE COURT:  That's all I'm suggesting.

MR. TRIPI:  Any concern?

THE COURT:  That's all I'm suggesting.  Is that Mr. Foti should be allowed to, should be permitted, and I wouldn't think the government would object, I just can't believe you would object, to him discussing this with Ms. Meyers-Buth.  And sharing -- that Ms. Meyers-Buth would be governed by the protective order in that case.  But it at least allows two cocounsel for Mr. Gerace to be able to discuss this.

Just think about this.  Because this just doesn't make sense to me.

And I agree with you, I don't know -- I don't know anything -- well, I don't want to say that.  But I don't know the extent of the information.  But all we're talking about is sharing it with Ms. Meyers-Buth.

MR. TRIPI:  I understand, Judge.

THE COURT:  All right.  So, I forget how we got here.

Oh, the probation files.  I'm going to deny the request to review the probation files for these two other witnesses.  I guess Ms. Quinn, and Mr. Knight you had a motion directed, I don't know if you specifically --

MR. DONOHUE:  Your Honor, I just joined their motion

because, although we're going to move for severance, that hasn't happened yet.  And so to the extent we stay in this case, I would want, if the Court did review those files, I would want the Court to review them for Mr. Knight as well.

**THE COURT:**  And that will happen for everybody.  You can renew the request for any witnesses, and I would expect you to review these requests, this is to defense counsel, for any witnesses who are gonna be testifying at trial.  And you review the PSRs for impeachment information, and I'll do that.  But at this point, I think it's premature with respect to those two other individuals.

I think Crystal Quinn is a different issue for a number of reasons.  So what I'm going to do is I'm going to review the material I've received from the probation office, and then I think we'll discuss the next steps.  I don't have a good sense at this point any more than I did the last time as to what the information is that's in there.

And I think that was everything.  No, it wasn't everything.

The motion for the disclosure of the redacted search warrant application by Mr. Ermin, that was filed at docket 529.

The government filed a response at docket 557.

I'm going to review the -- I now have, I believe, the redacted and unredacted search warrant.  And I'll review it to

see what the government has redacted, and then we can have further argument on it.  But I just think it would be a little premature at this point because I haven't reviewed that.

That was everything I had on my list.

I do want to set another status conference date in addition to the dates that we've set, but I want to turn to all the parties to see what else you may have.

So anything from the government?

MR. COOPER:  Your Honor, the only thing on the issue that you just touched on a moment ago with respect to the probation files, in the last filing from Defendant Gerace there was, I think it was the reply to the government's letter, just continuing to refer to the information over and over again with Brady.

THE COURT:  What are you talking about?

MR. COOPER:  The letter that Ms. Meyers-Buth filed last night, or two nights ago, I think it was last night.

THE COURT:  She filed a letter last night?

MR. COOPER:  She emailed it.  I imagine it wasn't just to the government, but I believe it went to the Court as well.

THE COURT:  Last night?

MR. COOPER:  Yes, Judge.  I mean, she can speak to it better than I.  I received an email from Ms. Meyers-Buth last night.

**MS. MEYERS-BUTH:**  It was by email because the --

**THE COURT:**  Who did you send it to in my chambers?

**MS. MEYERS-BUTH:**  Caitlin.

**THE COURT:**  Caitlin?

**MS. MEYERS-BUTH:**  Yeah, my paralegal sent it.  Let me make sure.

**THE COURT:**  As Ms. Meyers-Buth is looking that up, make sure when you're sending anything, you send it to Ms. Loughran as well.  She's the law clerk who will be working with me on this case, and I wanted to make sure she sees everything.

**MS. LOUGHRAN:**  The last email that I got from Cheryl is a -- a different case.

**THE COURT:**  What is your paralegal's name?

**MS. MEYERS-BUTH:**  Jennifer Ciccarella, C-I-C-C-A-R-E-L-L-A.  She sent it at 3:15 yesterday.

**MS. LOUGHRAN:**  I forwarded it to you.

**THE COURT:**  You forwarded it to me?

**MS. LOUGHRAN:**  To Dawn, maybe.

**THE COURT:**  Did you send it to me?

**MS. LOUGHRAN:**  Let me look, Judge.  Yeah, I sent it to Dawn.  I thought she was putting it in your binder.  I'll send it to you now, Judge.

**THE COURT:**  Yeah, I haven't seen it.

**MS. MEYERS-BUTH:**  It was just a reply on the same

issues on Ms. Quinn's probation file and those two witnesses.

THE COURT:  Was there anything in there about the two witnesses that, I guess, altered my decision that I just made?  I don't --

MS. MEYERS-BUTH:  I don't think so, Judge.  I trust the Court will read it.  And if you have any -- if you need any follow-up, I certainly am happy to --

THE COURT:  Okay.  I have not read the letter.  So if it causes me to revisit how I resolved the issue with respect to those two witnesses, I will do so.

MS. MEYERS-BUTH:  Thank you, Your Honor.

THE COURT:  But I haven't seen it, but you have an issue with something that's in there.

MR. COOPER:  Judge, the only thing I wanted to do because the government didn't have an opportunity to respond to it in writing is bring up again on the record is the constant claim that this material that we've been discussing, the probation files, is Brady material, is -- is improper classification.  And I think it's intentionally used because it's a word that essentially carries a negative implication for the government.

Ms. Meyers-Buth is well aware that the government is not in possession of that material, that United States Probation has the material.  And continuing to call it in public filings and in arguments before the Court Brady

material is an improper use of the term.  It's not in our possession.

And so I just take issue with the constantly calling it that material.  And I think it's done on purpose to make it look like we're doing something wrong.  It's not material that we had.

That's all I've got, Judge.

THE COURT:  All right.  Anything else from the government?

MR. COOPER:  No, thank you.

THE COURT:  All right.  Anything else, Mr. Foti or Ms. Meyers-Buth?

MR. FOTI:  No, Judge, thank you.

THE COURT:  Mr. Henry?

MR. HENRY:  No, Your Honor, thank you.

THE COURT:  Mr. Lembke or Mr. Donohue?

MR. DONOHUE:  No, Your Honor.

THE COURT:  Mr. Dell?  Oh, we haven't picked another date for a status conference.  We need to do that.

MR. DELL:  I would like to enter something in writing with the trial.  I believe that trying the case in Rochester would be a hardship for me and my client.  I'm retained.  My office a three-minute walk from here.  We would be talking about round-trip, five days a week, 15 hours.

THE COURT:  Yeah.  Trust me, I've done it a number of

times.

**MR. DELL:** And my client is even further, he's in Lancaster. I'm talking about attorney time, too. I'll put something in writing, I don't have a deadline.

**THE COURT:** Okay. Do that before September 9 if you would.

**MR. DELL:** Okay.

**THE COURT:** Okay? All right. Mr. Kooshoian and Mr. Texido?

**MR. KOOSHOIAN:** Yes, Your Honor.

**THE COURT:** Anything else?

**MR. KOOSHOIAN:** No, Your Honor.

**MR. TEXIDO:** No, Your Honor.

**THE COURT:** And Mr. Thompson or Mr. Muscato?

**MR. MUSCATO:** No, thank you, Your Honor.

**MR. THOMPSON:** No, thank you, Judge.

**THE COURT:** We do need to pick another date, though, for another status conference.

What about September 25th for a status conference? I know we had floated that idea I think for -- and you're not available, but I'm just talking about a status conference, I mean, as long as at least one person from the trial team is available, we can have a status conference.

**MR. FOTI:** For a status, that's fine, Judge. I won't appear that date, but Ms. Meyers-Buth obviously --

THE COURT:  And if you want to appear remotely or if you're available, I'm open to that.

MR. FOTI:  Thank you, Judge.

THE COURT:  It would be in Buffalo.  Is that okay with the government?

MS. CHALBECK:  That works for the government, Judge.

THE COURT:  What about Mr. Knight's team?

MR. DONOHUE:  That works, Your Honor.

THE COURT:  Mr. Henry?

MR. HENRY:  That works.

THE COURT:  Mr. Ermin's team.

MR. MUSCATO:  You're asking about the 25th. Your Honor?

THE COURT:  Yeah.  I haven't set a time, but I'm just throwing that date out.

MR. MUSCATO:  It works for us, thank you.

THE COURT:  Mr. Dell?

MR. DELL:  That's fine.

THE COURT:  Mr. Kooshoian, you said that's okay.

MR. KOOSHOIAN:  Yeah, that's okay.  I didn't know what time.

THE COURT:  What time do you prefer?

MR. KOOSHOIAN:  Morning.  Sometime in the morning.

THE COURT:  Why don't we say 11 a.m.

MR. KOOSHOIAN:  Great.

THE COURT:  We will have a further status conference at 11 a.m. on September 25th.  Thank you very much everybody.

ALL PARTIES:  Thank you, Your Honor.

(Proceedings concluded at 3:04 p.m.)

                *        *        *        *        *.

**CERTIFICATE OF REPORTER**

        In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on August 20, 2025.


                        s/ Ann M. Sawyer
                        Ann M. Sawyer, FCRR, RPR, CRR
                        Official Court Reporter
                        U.S.D.C., W.D.N.Y.