IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

SIMON GOGOLACK, et al.

Defendants.

_____

**<u>DEFENDANT'S REPLY TO THE GOVERNMENT RESPONSE IN OPPOSITION TO
THE DEFENDANT'S DISPOSITIVE PRETRIAL MOTIONS</u>**

**ON BEHALF OF PETER GERACE, JR.**

Case No.: 23-CR-99

Dated: September 19, 2025

INTRODUCTION ................................................................................................................2

THE MOTION TO DISMISS TO DISMISS COUNTS 1-3 PURSUANT TO FED.R.CRIM.P.12(B)(3)(B) 3

    A. THE GOVERNMENT'S ARGUMENT THAT ONLY FACTUAL ALLEGATIONS IN COUNT 1 WERE INCORPORATED INTO COUNTS 2 AND 3 IS BELIED BY THE LANGUAGE OF THE INDICTMENT ............................................................3

    B. THE GOVERNMENT'S CONTINUED RELUCTANCE TO STATE WHETHER GERACE ATTORNEY 1 IS AN UNINDICTED CO-CONSPIRATOR IMPACTS THE SUFFICIENCY ANALYSIS ...............................................6

    COUNTS 2 AND 3 ARE DUPLICITOUS AND SHOULD BE DISMISSED ..............................................10

THE MOTION TO DISMISS THE INDICTMENT BASED ON DEFECTIVE GRAND JURY PROCEEDINGS ......................................................................................................12

    A. THE GOVERNMENT'S ATTEMPTS TO MODIFY THE PLAIN MEANING OF THE OVERT ACTS IN THE INDICTMENT ............................................................................................................13

        1. Overt acts preceding the defense witness list .................................................................14

        2. Government attempts to import new meaning to ¶25 .......................................................17

        3. The government's argument regarding circumvention of the defense witness list ................19

    B. THE GOVERNMENT ARGUES THIS COURT IS POWERLESS TO ADDRESS GOVERNMENT MISCONDUCT ..........23

THE MOTION TO DISMISS DUE TO PROSECUTORIAL STEERING ..........................26

    A. THE RECORD REVEALS PROSECUTORIAL STEERING ............................................................27

    B. THE NEED TO ADDRESS THE PROSECUTORIAL STEERING IN THIS CASE .....................................31

THE MOTION TO DISMISS OR SUPPRESS DUE TO THE SUBPOENA COMPELLING PRODUCTION FROM GERACE'S INVESTIGATOR .....................................................33

    A. IT WAS PROPER FOR THE DEFENSE TO RAISE THIS ISSUE BEFORE THIS COURT ............................34

        1. Appeal of the Motion to Quash to the Second Circuit .....................................................34

        2. Sanction Motion in Case No. 19-cr-227 ......................................................................35

        3. Sanction motion before Judge Arcara...........................................................................37

    B. FACTS GLOSSED OVER BY THE GOVERNMENT'S RESPONSE ....................................................38

CONCLUSION................................................................................................................38

# <u>INTRODUCTION</u>

The defendant, Peter Gerace, Jr., through counsel (hereafter referred to as "the defense"), brought dispositive motions seeking: (1) dismissal of Counts 1-3 pursuant to Fed. R. Crim. P. 12(B)(3)(B); (2) dismissal based on defective grand jury proceedings; (3)

dismissal based on prosecutorial steering; (4) dismissal or suppression due to the subpoena compelling production from the defendant's investigator; (5) leave to join in co-defendant's motions; (6) leave to make other pretrial motions; and (7) such other relief that this Court deems appropriate. (Dkt. 545).

The defendant filed a memorandum in support of the dispositive motions, under seal. (Dkt. 582). A redacted version of the memorandum is publicly filed. (Dkt. 581)[1].

The government filed a response memorandum in opposition to Mr. Gerace's dispositive Motions (hereafter cited to as "Govt Resp").

The defense hereby submits the following reply to the government's memorandum in opposition.[2]

## THE MOTION TO DISMISS TO DISMISS COUNTS 1-3 PURSUANT TO FED.R.CRIM.P.12(B)(3)(B)

### A. THE GOVERNMENT'S ARGUMENT THAT ONLY FACTUAL ALLEGATIONS IN COUNT 1 WERE INCORPORATED INTO COUNTS 2 AND 3 IS BELIED BY THE LANGUAGE OF THE INDICTMENT

The government opposes the defense argument that Counts 2 and 3 are duplicitous with an unsupported syntactic argument.

The first paragraph of Counts 2 and 3 states:

---

[1] This Reply will cite to the public version of the memorandum whenever possible.

[2] The defense also seeks to be heard further at the motion hearing scheduled for September 29, 2025, or as soon as counsel can be heard regarding the requested relief.

> The allegations of the Introduction and Count 1 are repeated and re-alleged and incorporated herein by reference as though set forth fully herein.

First, the government argues Counts 2 and 3 are not duplicitous because the indictment did not specifically incorporate the "charge" in Count 1 into Counts 2 and 3; only the "allegations." While there is no clarifying language in this respect contained in the indictment itself, the government denies that Count 1 in its entirety, including the statutory charging language, is incorporated into Counts 2 and 3. It reads the word "allegations" which immediately precedes "Introduction" as if it also appeared before the words "Count 1." Next, the government argues that the word "allegations" refers to "facts" and not to "charges." The government's own interpretation aside, it does not state that the grand jurors were so instructed on the definition of "allegations". Generally speaking, "allegations" can refer to facts, charges, claims or legal conclusions.[3]

The "Manner and Means" section in Count 1 incorporated into Counts 2 & 3 contains paragraphs which are a mix of facts and statutory language. Even if Counts 1, 2 & 3 are titled differently (conspiracy to defraud the government, witness tampering and retaliation) once the allegations of Count 1 are incorporated into Counts 2 & 3, Counts 2 & 3 hinge on the government proving that the defendants conspired to obstruct justice under 18 U.S.C. §1503 as the means to commit those conspiracies. Whereas the

---

[3] For a discussion in the civil context of analyzing the sufficiency of a complaint, see *"What is the Difference Between a Conclusion and a Fact?"*, Howard M. Erichson, Cardozo Law Review, Vol. 41, Issue 3 (available at https://cardozolawreview.com)

government could convict under Count 1 if it proved only the "defraud" prong even if it did not prove the obstruction of justice conspiracy, it would need to prove both conspiracies to convict under Counts 2 and 3. Counts 2 and 3, in effect, each charge two separate conspiracies.

The language of the obstruction statute (§1503) is very similar to the language of the other conspiracies charged in Counts 2 & 3. For example, both Count 1, ¶5(a)[4] and Count 2, ¶ (2)(c)[5] use the same or similar verbs: ¶5(a) uses "influence, obstruct, and impede" versus ¶(2)(c)'s "influence, delay, and prevent". This lends itself to the likelihood of juror confusion and also fails to apprise the defendant of the exact nature of the conspiracy charge against him.

Both Fed.R.Crim.P.7 and case law recognize that it is possible to incorporate by reference background, means and methods and overt act allegations into another count. This could have been accomplished in a simpler, more straightforward indictment by clearly incorporating all factual allegations of one count into another. Likewise, here there may not have been a duplicity problem if the indictment specifically identified the

---

[4] Count 1, ¶5(a) "Corruptly and by threat, force and communication, influence, obstruct and impede [the trial in United States District Court 19-cr-227 and 23-cr-37 and the March 2022 and July 2023 Federal Grand Jury]

[5] Count 2, ¶(2)(c). "to use intimidation, threats, and corruptly persuade, Crystal Quinn, a witness, and to attempt to do so, with intent to influence, delay, and prevent the testimony of Crystal Quinn in Case Nos. 19-CR-227 and 23-CR-37, Federal proceedings held in the United States District Court for the Western District of New York, in violation of Title 18, United States Code, Section 1512(b)(1) and 1512(j)"

numbered paragraphs of Count 1 which were being incorporated by reference. In this regard, the government fails to address *United States v. Rittweger*, 259 F.Supp.2d 275 (S.D.N.Y. 2003) cited by the defense which incorporated only specified paragraphs from another count (see Def. Reply dkt 431 at p.19). Had the government incorporated purely factual contentions from Count 1 into Count 2 & 3, there would be no issue.

B. THE GOVERNMENT'S CONTINUED RELUCTANCE TO STATE WHETHER GERACE ATTORNEY 1 IS AN UNINDICTED CO-CONSPIRATOR IMPACTS THE SUFFICIENCY ANALYSIS

Under "Manner and Means", paragraph 5(a)(i) states that it was part of the conspiracy (to defraud the United States by committing a violation of the obstruction of justice statute) that the defendants:

> (i)    caus[ed] an individual, Attorney 2, to text message Crystal Quinn, who was already represented by another attorney, to corruptly influence, obstruct, and imped, and endeavor to corruptly influence, obstruct, and impede Crystal Quinn from cooperating with members of federal law enforcement, and to prevent Crystal Quinn from testifying against GERACE in United States District Court…

In other words, the intent of the defendants was to obstruct justice by causing Attorney 2 to text message Quinn. This is a legal conclusion couched as a factual allegation. It does not provide facts supporting what the defendants did; it merely states what they intended.

At the end of paragraph 5 the indictment states in all-encompassing language, "In violation of Title 18, United States Code, Section 1503". A fair reading of that paragraph

is that it is alleging the defendants conspired to commit the offense of obstruction of justice. That interpretation comports with paragraph 2 of Count 1 which claims the defendants knowingly conspired "together and with others" "a. to defraud the United States…and b. to violate Title 18 United States Code, Section 1503 (conspiracy to obstruct justice)".

Aside from that, there is an overt act which alleges it was Attorney 1 who "caused an unwitting attorney, Attorney 2" to communicate with Quinn, not the defendants themselves as alleged in ¶5(a)(i). See "Overt Acts", ¶17. While Attorney 1 is not identified in the indictment, his/her identity can be gleaned from pleadings in two related cases and more directly from the indictment's references to those criminal case docket numbers[6]. The defense requested a bill of particulars not as to Attorney 1's identity, but rather to clarify whether the government was alleging he/she was a co-conspirator. Tr. oral argument 5/21/25 p.59; see also USAM at 9-11.130 (identity of unindicted co-conspirators may be supplied, upon request, in a bill of particulars).

There is no overt act in which the defendants are claimed to have caused Attorney 2 to contact Quinn. There also is not a claim that Mr. Gerace exercised control over

---

[6] See "Introduction" ¶24 "Gerace Attorney 1, who is known to the Grand Jury, was one of Gerace's attorneys of record in Case Nos. 19-cr-227 and 23-cr-37 from June 15, 2021, until September 6, 2023. Attorney 2, who is known to the Grand Jury, was an unwitting attorney that Gerace Attorney 1 used to send messages to government witness Crystal Quinn in or about February 2023"

Attorney 1 or knew of Attorney 1's actions. Further, Attorney 1 is not identified as an unindicted co-conspirator so that his acts could be imputed to the defendants.

To actually indict Attorney 1, the government would have had to seek permission from Main Justice. The United States Justice Manual §9-2.032 - Notification to the Criminal Division of Certain Prosecutions of Attorneys provides:

> 1. In either of the following two circumstances, the United States Attorney or Departmental Component Head shall notify the Director of the Office of Enforcement Operations, Criminal Division, whenever his/her office intends to file a complaint, information, or indictment against an attorney:
>
>> A. When the charges are based, in whole or in part, on evidence that the attorney served as counsel for an ongoing criminal enterprise or organization; or
>>
>> B. When—
>>
>>> (a) the charges are based, in whole or in part, on actions or omissions by the attorney during the representation of a current or former client; and
>>>
>>> (b) the attorney's current or former client is, or is likely to be, a witness against the attorney; *and*
>>>
>>> (c) the client will, or is likely to, testify against the attorney pursuant to a non-prosecution, cooperation, or similar agreement with the government.

If Attorney 1 is an "unindicted co-conspirator" he/she is impliedly complicit in the defendants' wrongdoing although not charged by a grand jury and, as he/she is uncharged, without a forum to defend his/her reputation. The Department of Justice's

policy manual specifically warns U.S. Attorneys, that "there is ordinarily 'no legitimate governmental interest served' by the government's public allegation of wrongdoing by an uncharged party." On the other hand, if Attorney 1 is not an unindicted co-conspirator, and without a factual allegation that his/her acts were performed at the direction of or with the tacit approval of the defendants, then those acts are prejudicial, inflammatory surplusage which should be stricken. Fed.R.Crim.P.7(d)

The government claims that without appealing the magistrate's ruling and waiting for him to hear the issue as part and parcel of dispositive motions (before the government moved to rescind the referral order) and then appealing, that the defense somehow waived the issue.

> The government has said you are not entitled to a Bill of Particulars on that. I agree with the government but what that means as far as I'm concerned is -- and not prejudging anything about the validity of the superseding indictment -- but you can, I think, with a clear conscience argue that the indictment on its face doesn't -- is insufficient in terms of notice, duplicity, multiplicity, or whatever. You can remind me that you asked for a Bill of Particulars and that I denied that request. So we're going to leave it at that.
>
> Tr. oral argument 5/21/25, p.60

The Magistrate Judge anticipated that the issue would come up again in his handling of dispositive motions and advised the defense "to remind" him when considering the sufficiency of the indictment that the government refused the request for

a bill of particulars. This Court nevertheless has the discretion to order a bill of particulars on this issue.[7]

Whether Attorney 1 is an unindicted co-conspirator is also problematical because the time periods of the counts overlap. Count 1 alleges the conspiracies to defraud and obstruct took place from February 2023 through the return date of the second superseding indictment (January 5, 2024). Counts 2 & 3 allege the witness tampering and retaliation conspiracies occurred from March 2023 through Ms. Quinn's death on August 1, 2023. The significance is that the conspiracy to defraud allegedly began prior to any contact between Mr. Gerace and Mr. Ermin who is the only defendant with whom Mr. Gerace is alleged to have communicated. Mr. Ermin visited Mr. Gerace at the Niagara County Jail on April 4, 2023. Attorney 1, however, was representing Gerace since June 15, 2021. He was alleged to have engaged in "overt acts" beginning in February 2023 (*see* "overt acts" ¶17).

## COUNTS 2 AND 3 ARE DUPLICITOUS AND SHOULD BE DISMISSED

Counts 2 and 3 of the indictment are duplicitous since they appear to charge separate offenses in a single count.

---

[7] The issue will come up again at trial in the context of Rule 801(d)(2)(E) inquiries when the Court determines whether a potential witness is or is not a co-conspirator when considering the admissibility of the witness's statements. Because the witness is an attorney, it also raises issues of privilege and implicates the defendants' right to present a defense if forced to waive attorney-client privilege to obtain his testimony.

> The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both. Adverse effects on a defendant may include improper notice of the charges against him, prejudice in the shaping of evidentiary rulings, in sentencing, in limiting review on appeal, in exposure to double jeopardy, and of course the danger that a conviction will result from a less than unanimous verdict as to each separate offense.

*United States v. Duncan*, 850 F.2d 1104,1108 n.4 (6th Cir. 1988).

The government obviously wanted a speaking indictment to give it the advantage of getting information about its case out in the public. The result now is an indictment which is overly repetitive, convoluted and difficult to understand. While the government suggests that jury instructions at the end of the trial would be adequate to alleviate any prejudice accruing to the defendant it does not cite an example or discuss what such an instruction might look like. Jury instructions are prophylactic. They would not prevent prosecutors in their opening statement or the Court in its preliminary instructions from referencing that the conspiracy to obstruct justice in Count 1 is incorporated into Counts 2 and 3.

Additionally, the Court cannot strike the incorporated language without risking running afoul of Supreme Court decisions that hold the guaranty of indictment by a grand jury implies that an indictment may not be amended. *Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781 (1887) (When an indictment is filed with the court no change can be made in the

body of the instrument by order of the court, or by the prosecuting attorney, without a resubmission of the case to the grand jury).

It is respectfully submitted that this Court should dismiss Counts 2 and 3 as duplicitous.

## THE MOTION TO DISMISS THE INDICTMENT BASED ON DEFECTIVE GRAND JURY PROCEEDINGS

The defense moved to dismiss the indictment based on defective grand jury proceedings, arguing "the indictment includes information supporting a narrative the government knows to be false, and that should provide a sufficient basis to dismiss the indictment." (Dkt. 581 at 61).[8]

In its Response, the government argues the motion to dismiss "is premised upon a misreading of the indictment and is unsupported by the law." (Govt Resp. at 14).

Neither of the government's arguments holds up under scrutiny, and the defendant's motion to dismiss should be granted.

---

[8] Similar arguments were the basis of a motion for disclosure of Grand Jury Minutes, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(ii). The Magistrate found sufficient basis to review the grand jury minutes in camera. That review is pending. The defense has requested the opportunity "to be heard further after in camera review of the grand jury minutes has been completed." (Dkt. 581 at 55).

## A. THE GOVERNMENT'S ATTEMPTS TO MODIFY THE PLAIN MEANING OF THE OVERT ACTS IN THE INDICTMENT

As pointed out in the defendant's motion to dismiss, much of the government's argument that ¶25 is misread is relatively new. The defense first pointed out the blatant falsity of ¶25 in a submission filed on July 12, 2024. (Dkt. 164 at 10-12). The government did not come up with new ways to interpret ¶25 until oral argument for non-dispositive motions on May 21, 2025.[9]

In any event, the timing of the government's arguments regarding ¶25 is not as problematic as the content. The arguments appear to generally fall into two main categories: (1) there are overt acts that pre-date the defense witness list that could be read to insinuate that Mr. Gerace already knew of Quinn's cooperation before the defense witness list; and (2) ¶25 should be interpreted in a nuanced manner other than what the plain meaning provides.

---

[9] The government's response brief to the non-dispositive motions never even alluded to this argument. Instead, the government simply argued "the defendants may challenge the government's evidence at trial and, if they choose, present competent evidence and appropriate argument to contest the government's case. But the defendants are not entitled to challenge a grand jury proceeding—or the contents of an indictment—because they disagree *with the facts asserted*. To hold otherwise would invite every defendant in every case to access grand jury materials on the basis that the defendant disagreed with *the Grand Jury's findings*." (Dkt. 423 at 54)(emphasis added). Thus, at that time, the government characterized the defense's arguments as disagreement with "facts asserted," and did not suggest the defense misinterpreted the indictment.

1. Overt acts preceding the defense witness list

In terms of the timeline presented in the indictment, there are three points in which the government references overt act(s) that the government argues could imply that Mr. Gerace knew that Ms. Quinn was a government witness prior to having it "revealed" through the defense witness list.[10] Those overt acts are discussed below:

*Overt Act ¶ 17*

¶ 17 states "[o]n or about February 16, 2023, knowing and having reason to know that Crystal Quinn was represented in the matter by another attorney[11], Gerace Attorney 1 caused[12] an unwitting attorney, Attorney 2, to: (i) communicate with Crystal Quinn without the consent of Crystal Quinn's attorney; (ii) offer to represent Crystal Quinn in the matter in which Crystal Quinn already had an attorney; and (iii) offer to represent Crystal Quinn because Gerace Attorney 1, was "concerned that the feds might be trying to intimidate [Crystal Quinn] or even just bring [Crystal Quinn] in for questioning."

---

[10] Of course, this exercise ignores the plain meaning of "reveal" which is "to make known." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/reveal. Accessed 19 Sep. 2025. If the indictment had alleged that Mr. Gerace knew of Ms. Quinn's cooperation as a government witness prior to the defense witness list, the defense witness list could not have "revealed" that she was a government witness.

[11] There is no apparent reason to believe that Attorney 1 would automatically know about Quinn complaint. In fact, if Attorney 1 had read the complaint, he would have known the government already attempted to question Ms. Quinn in contravention of the other language in the paragraph.

[12] ¶17 is one of the paragraphs that demonstrate the fact that Attorney 1 is clearly accused of being a co-conspirator, even though the government refuses to acknowledge this to be the case indictment (discussed supra).

Gerace Attorney 1 caused Attorney 2 to make a communication to Crystal Quinn…" (Dkt. 24 at 14).

If "Gerace Attorney 1" was concerned about the possibility that Federal law enforcement trying to communicate or intimidate Ms. Quinn, that does not amount to knowledge that Ms. Quinn had already sat for a proffer or agreed to cooperate as a government witness.

*Overt Act ¶ 18*

¶ 18 states "[o]n or about March 13, 2023, individuals unknown to the Grand Jury placed dead rats on Crystal Quinn's mother's vehicle and in the vicinity of Crystal Quinn's residence in Depew, New York." (Dkt. 24 at 15).

This allegation does not identify any actual evidence connecting the dead rats to Mr. Gerace. Indeed, the fact that it was "unknown" who allegedly placed the dead rats points to an allegation based on pure conjecture, instead of evidence.

Even if dead rats had been placed by "individuals unknown," as alleged, and Mr. Gerace was somehow indirectly involved (which he was not), that would not mean Mr. Gerace knew Ms. Quinn was a government witness and the indictment certainly does not allege that he knew that Ms. Quinn was a government witness at that time.

*Overt Acts ¶¶ 16, 20, 23*

The government refers to multiple overt acts that address the detention hearing in which the government moved to detain Mr. Gerace a few months before the scheduled trial date. Those overt acts include *¶¶ 16, 20,* and *23.*

If the indictment was alleging actual facts, the indictment would have indicated that Ms. Quinn was the subject of the government's' proffer at the detention hearing, and this is where it was revealed that Ms. Quinn was a government witness.[13]

Instead, the indictment is entirely silent as to the government's proffer, leading to one of two possibilities: (1) the substance of the government's proffer identifying Ms. Quinn's status as a witness was withheld from the grand jury; or (2) the grand jury learned that Ms. Quinn was identified as a witness, but the indictment was still crafted in a manner which omitted this fact to avoid public reporting on this point.

*Overt Act ¶ 25*

It is primarily the overt paragraphs discussed above that the government points to in order to argue ¶25 should be interpreted differently than that suggested by the plain meaning of the words contained therein.

> The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the

---

[13] The fact that Ms. Quinn was a government witness could only be *revealed* once. After that point, at most, the fact that she was a government witness could merely be *confirmed*.

> government's witnesses' names and from providing
> GERACE with the government's witness list.

(Dkt. 24 at 16).

Overt Acts ¶¶ 16-23 do not change the plain and obvious meaning of ¶25. None of

the earlier paragraphs indicate that Mr. Gerace learned Ms. Quinn was a government

witness, not even the paragraphs regarding the detention hearing.

Instead, ¶25 clearly and unambiguously alleges the provisions of the protective

order were circumvented and the only provision referenced is that attorneys for Gerace

were prohibited "from revealing to GERACE the government's witnesses' names and

from providing GERACE with the government's witness list."[14]

2. Government attempts to import new meaning to ¶25

The government reimagines ¶25 as containing "three parts": (1) "The trial witness

list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense

_____

[14] The plain meaning of the paragraph is also reflected clearly in the government's sworn motion
for a protective order, when it stated: "Although the protective order prevented defense counsel
from disclosing to the defendant the names of witnesses on the government's witness list… it did
not prevent defense counsel from listing the government's witnesses on the defendant's own list
and then reviewing the defense witness list with the defendant, potentially circumventing the
protective order, and *identifying* government witnesses to the defendant in a roundabout way."
(Dkt. 156 at 11-12 (emphasis added)). In the government's response, it also tried to suggest new
meaning to this allegation beyond what the words actually state. The government argues that
"Government counsel neither alleged that counsel for Mr. Gerace *identified* Crystal Quinn as a
government witness to Mr. Gerace nor that Mr. Gerace learned of Ms. Quinn's cooperation with
the government through his counsel… government counsel opined that the defense's decision to
list government witnesses as defense witnesses could have "potentially" circumvented the
protective order by *identifying* "witnesses." (Govt Resp. at 22 (emphasis added)).

witness."; (2) "The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of the Protective Order . . ."; and (3) "The Protective Order 'prohibited attorneys for Gerace from revealing to Gerace the government witnesses' names and from providing Gerace with the government's witness list.'" (Govt Resp. at 19-20).

That is an misleading way to read ¶25. It changes the second sentence of the paragraph ("The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names and from providing GERACE with the government's witness list.") by removing the word "which" and treating the relative clause in the sentence as if it was an independent sentence, even though the relative clause establishes the provision of the protective order that was circumvented.[15]

Reviewing the remainder of the government's arguments, it appears the government attempted to bifurcate the second sentence into two parts, so that it could attempt to more broadly argue that there could be an issue of fact as to whether the protective order was violated. The attempt to modify the clear meaning of that sentence is evidence that the government knows the ¶25 is blatantly false as written.

---

[15] One can apply an analogous sentence structure to any allegation, and it would be read the same way (e.g. "the defendant violated the law which prohibited the defendant from committing theft." The statement would obviously be interpreted as that the defendant committed theft.

3. The government's argument regarding circumvention of the defense witness list

Having bifurcated the allegation that the "listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names…" into two parts, the government argues that "[o]nly the second part of Overt Act ¶ 25—that is, whether the listing of Crystal Quinn circumvented the provisions of the Protective Order—is contested." (Govt Resp. at 20).

The government has repeatedly failed to provide any plausible explanation as to how the defense witness list violated the protective order. It failed to do so at the oral argument for non-dispositive motions, and it fails to do so now.

Despite the government's arguments, at some point it does acknowledge admit the truth of the defendant's position: "Overt Act ¶ 25 states that (1) the Protective Order prohibited Mr. Gerace's attorneys 'from revealing' to their client the government's witness list and the names listed therein, and (2) that the listing of Ms. Quinn circumvented this restriction." (Govt Resp. at 21).

Setting aside the plain definition of the word "reveal,"[16] and merely reviewing the broad allegation that listing a government witness on the defense witness would violate the protective order, the allegation is still demonstratively false and the government knows it.

The government presents no real argument for how placing an individual on the defense witness list would reveal them as a government cooperator/witness. The closest it comes to supporting that claim is its point that "Mr. Gerace's witness list already reserved the right to '[c]all each and every witness identified by the Government in its witness list, as either a direct witness for [his] case in chief, or in rebuttal to the Government's case.'" (Govt Resp at 20).

The purpose of that language has the opposite effect that the government seems to argue it does. It should be obvious that language actually conceals to the defendant whether defense witnesses may also be listed on the government witness list.

There are many witnesses that Mr. Gerace's counsel may have had an interest in reserving the ability to call in a defense case, even if the witness might be hostile to the

---

[16] The government sets forth an argument that "Overt Act ¶ 25 does not allege that the defense witness list is what 'reveal[ed]' to Mr. Gerace that Ms. Quinn was a cooperating witness… Overt Act ¶ 25 reflects that the listing of Ms. Quinn on the defense witness list effectively exploited a loophole in the Protective Order, not that it was through her listing that Mr. Gerace learned of Ms. Quinn's cooperation with the government." (Govt Resp. at 21 (emphasis in original)). As discussed above, the plain definition of "reveal" is "to make known." If Mr. Gerace already knew Ms. Quinn was a government witness, it could not be revealed to him through the protective order as the paragraph clearly alleges.

defense. This would potentially include every witness on the government witness list, particularly in case a witness is later dropped from the government witness list for suspicious reasons or if the defense learns of additional information following the conclusion of witness's testimony that gives reason to recall the witness.

If the defense had not reserved the right to call government witnesses, counsel would need to list every government witness on its own defense witness list in order to reserve the right to call them. If Mr. Gerace saw names that he thought would be irrelevant to his case, he would likely ask his counsel why the name was included, and if counsel could not answer the question, then the individual's inclusion on the government witness list could be surmised.

Alternatively, if the defense team reserved the right to call government witnesses and then chose to omit all government witnesses from the defense witness list, it would be equally problematic. For example, if Mr. Gerace expected the inclusion of a witness on the defense witness list, but counsel omitted the individual because he or she was already on the government witness list, it would be impossible for counsel to explain to Mr. Gerace the reason why the witness was left off of the defense witness list without revealing that the provision regarding government witnesses preserved the right to call the individual.

Indeed, that was the case with Ms. Quinn, who Mr. Gerace had a substantial interest in calling as a witness. Mr. Gerace believed that ultimately Ms. Quinn would be

helpful to the defense case. Whether she ultimately testified for the government or defense at trial, she could reveal coercive tactics that the government used against her to attempt to secure her cooperation.

There is absolutely no logical way that the decision to include certain government witnesses on the defense witness list would identify those individuals as government witnesses, particularly *because of* the provision on the defense witness list that it has separately reserved the right to call anyone from the government witness list. If Mr. Gerace knew anyone on the defense witness list was a government witness, it is because it was revealed at some other earlier point in time, and it was certainly not revealed by the defense witness list.

The government set forth a particular narrative in ¶ 25 that is both illogical and false. The government either presented false information to the grand jury, or the evidence to the grand jury accurately identified that the government's detention proffer revealed Ms. Quinn as a witness, but the indictment nonetheless leaves that fact out.

In the event of the latter, an acknowledgement of the omission would have demonstrated a good faith effort to resolve the inaccuracy. Instead, the government has jumped through hoops to rework the plain meaning of ¶ 25, imagining the paragraph written differently, and importing new meaning to the word "reveal."

This is an attempt by the government to marshal false allegations, and the government must be held accountable. The appropriate relief is dismissal.

## B. THE GOVERNMENT ARGUES THIS COURT IS POWERLESS TO ADDRESS GOVERNMENT MISCONDUCT

The government argues "[c]ourts may not dismiss indictments in response to challenges to their evidentiary sufficiency, because '[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits.'" (Govt Resp. at 19 (citations omitted)).

Even if that is correct, this is not an issue of legal sufficiency. This is an attempt by the government to knowingly marshal false allegations.

A prosecutor always has an obligation to correct false or misleading testimony. *See Alcorta v. Texas*, 355 U.S. 28 (1957) (Court recognized that the prosecution's failure to correct misleading testimony at trial violated the defendant's right to due process). That obligation should have even greater importance at grand jury where the government is given unbridled control over the presentation of evidence.

Other jurisdictions have addressed this concern directly. *See e.g., People v. Pelchat*, 62 N.Y.2d 97 (1984):

> The Grand Jury was created as an investigative and accusatory body made up of laymen from the general population and given the function of assessing the sufficiency of the prosecutor's case, thus insulating the innocent from governmental excesses. Unhampered by technical legal rules of procedure and evidence and divorced from the control of the 105*105 government, the grand jurors were free to make their presentments and indictments as they deemed satisfactory, "pledged to indict no one because of prejudice and to free no one because of special favor" (*Costello v United*

*States*, 350 US 359, 362; and *see People v Glen*, 173 N.Y. 395, 401; *United States v Umans*, 368 F.2d 725, 730).

…

It is familiar doctrine that a prosecutor serves a dual role as advocate and public officer. He is charged with the duty not only to seek convictions but also to see that justice is done. In his position as a public officer he owes a duty of fair dealing to the accused and candor to the courts, a duty which he violates when he obtains a conviction based upon evidence he knows to be false.

…

[C]ourts have exercised their inherent powers to dismiss an indictment … when the quality of the evidence is challenged because the witness's testimony was perjured (*United States v Basurto*, 497 F.2d 781; *cf. United States v Flaherty*, 668 F.2d 566; *United States v Kennedy*, 564 F.2d 1329, *cert den sub nom. Myers v United States*, 435 US 944), or when the indictment is founded on hearsay testimony which the Grand Jury may not have understood as such (*United States v Estepa*, 471 F.2d 1132). Courts have dismissed in these circumstances even though there was sufficient other reliable evidence presented, or the prosecutor acquired the knowledge of the false evidence after the indictment was handed up, or the prosecutor made a full disclosure of the falsity after discovering it (*United States v Basurto, supra; cf. People v Leary*, 305 N.Y. 793). Indeed, courts have stated that indictments may be dismissed solely because they were obtained by the prosecutor for improper motives (*see, e.g., United States v DeMarco*, 401 F Supp 505, affd 550 F.2d 1224; *People v Tyler*, 46 N.Y.2d 251; *Matter of Cunningham v Nadjari*, 39 N.Y.2d 314, 318).

*Id*. at 104-107.

Federal defendants are not immune to the protections afforded by Due Process, and the Federal judiciary is explicitly empowered with a supervisory function in order to to appropriately oversee the administration of justice, including the protection of rights afforded to the accused and the fairness of the adversarial process.

The supervisory power of the judiciary is based on the overarching principle that "judges exercise substantial discretion over what happens inside the courtroom." *United States v. Simpson*, 927 F.2d 1088, 1090-91 (9th Cir. 1991). The exercise of a court's supervisory power is intended "to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules governing matters apart from the trial itself." *United States v. Williams*, 504 U.S. 36, 46 (1992).

Indeed, importance of the supervisory function was demonstrated by this Court in *United States v Morgan*, Case no. 18-CR-108-EAW. The efforts made by this Court to address potential government misconduct, particularly related to false representations has been recognized as a vehicle for positive change in this District.

The Second Circuit referred to these efforts in *Gannett Media Corp. v. United States*. While the decision may have addressed the issue of sealing, the Circuit also clearly indicated that this Court was properly conducting an important and necessary function when it sought to review potential misrepresentation by the government:

> It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. **The court expects all attorneys who appear before it to conduct themselves with**

> **the utmost candor, but that expectation is particularly keen when it comes to attorneys representing the United States of America because they are guardians of the public interest**.

Gannett Media Corp. v. United States, 2022 U.S. App. LEXIS 35099, *1 (emphasis added).

Now, presented with evidence that the government has advanced a false narrative at the grand jury, or at least within the four corners of the indictment, the government's argument that the Court is powerless to impose meaningful relief should ring hallow. This Court is empowered to address the issue as necessary to ensure that grand jury is not used as a vehicle to produce an indictment with demonstratively false allegations.

## THE MOTION TO DISMISS DUE TO PROSECUTORIAL STEERING

The defense moved to dismiss the indictment based on prosecutorial steering. The government makes a big to-do over the defense referring to the "appearance" of prosecutorial steering, but as noted in the defendant's motion, "[t]he importance of impartiality carries over to the criminal justice system as a whole, including the process of the selection of the judge. Leaving aside the question of the prosecutor's motives, *the mere appearance of partiality, even if unfounded*, greatly undermines the credibility of the criminal justice system." (Dkt. 581 at 62; quoting *Francolino v. Kuhlman*, 224 F. Supp. 2d 615, 630 (S.D.N.Y. 2002)).

The defense went on to argue "[t]here is already evidence which supports the conclusion that there was deliberate prosecutorial steering in this case[17], and thus dismissal is appropriate on this record." (Dkt. 581 at 68).

In its Response, the government argued the motion to dismiss "misstates the record, misconstrues the discovery, and is legally meritless." (Govt Res. at 25).

The government's position is not supported by the facts or the history of this case. The defendant's motion to dismiss should be granted.

### A. THE RECORD REVEALS PROSECUTORIAL STEERING

No matter how the government tries to selectively curate the facts related to this issue, they do not align with the government's lead argument: i.e. the denial that the government "engaged in any kind of judge shopping," because "Simon Gogolack's initial narcotics and firearms charges bore no connection to Mr. Gerace's indictments in 19-CR-227 or 23-CR-37." (Govt Resp. at 37).

In its "relevant background" section, the government addresses the investigation into Mr. Gogolack that preceded the charges being filed against him in three relatively short paragraphs. The entirety of that background information is below:

> On August 2, 2023, the United States Attorney's Office learned that Ms. Quinn died in Wellsville, New York. Mr. Gogolack

---

[17] Mindful that grand jury minutes are being reviewed *in camera*, the defense noted that it sought "permission to supplement this motion further… [if] the defense obtains information establishing that evidence had been elicited at the grand jury, prior to Mr. Gogolack's initial indictment, which established his case was related to the charges against Mr. Gerace." (Dkt. 581 at 68).

had reported Ms. Quinn's death to 911 the day before–August l, 2023. The circumstances of Ms. Quinn's death, including the location, cause, and manner, were not immediately apparent. The government immediately commenced an investigation into Mr. Gogolack, and the circumstances of Ms. Quinn's death.

On August 2, 2023, when Mr. Gogolack drove from Wellsville to Depew, New York to return Ms. Quinn's mother's car, the Depew Police Department detained him for driving with a suspended license. At that time, the FBI interviewed Mr. Gogolack and seized his phone pursuant to a federal search warrant.

On August 5, 2023, Magistrate Judge McCarthy signed a search warrant for Mr. Gogolack's Wellsville residence. During the execution of the warrant on August 8, 2023, the FBI found drugs and firearms, including several marijuana plants.

(Govt Resp. at 26-27).

The government did not address any relevant details of how the investigation was commenced. It did not detail who was involved in commencing the investigation. It did not detail why the Federal government took jurisdiction over the investigation or what was involved in that decision.

Although the government avoided substantively addressing those details, the answer to those questions can be partially surmised by another detail that the government avoided addressing in its background section: the investigation into Mr. Gogolack was immediately categorized as a subset of the FBI's investigation into Mr. Gerace, so much so the government utilized the same FBI file number.

The government only addresses this later, leading with the obvious but irrelevant point that "the U.S. Attorney's Office does not control how the FBI manages its computer files." What the FBI's case file reveals is not some insight into a digital case filing system, it is direct insight into why the investigation in Mr. Gogolack was opened and pursued by the Federal government. It reveals that within Federal law enforcement, it was deemed appropriate to relate all investigation into Mr. Gogolack with the investigation and pending prosecution of Mr. Gerace.

Thus, while the government's submission attempts to minimize the connection that is revealed by utilizing the same FBI Case number, the reality is that all investigative material related to Mr. Gogolack was branded with the same number used to relate investigative material to the pending case against Mr. Gerace.

To the extent that the government's response insinuates that the FBI is a separate entity making investigative decisions regarding how to pursue Mr. Gogolack without consulting the US Attorney's Office, that defies experience and common sense. It is not surprising that the government offers no evidence to support the insinuation that the FBI acted on its own when it related the Gogolack investigation to Mr. Gerace.

What the history of the case actually shows is that the US Attorney's Office was involved in the investigation into Mr. Gogolack from the beginning, and just as the FBI had internally related the Gogolack case to Mr. Gerace, so too did the US Attorney's Office.

The AUSAs handling the investigation into Mr. Gogolack were, not surprisingly, the same AUSAs who were prosecuting Mr. Gerace. The AUSAs who were prosecuting Mr. Gerace in case no. 19-cr-227 were consulting with the FBI about the investigation of Mr. Gogolack. The AUSAs prosecuting case no. 19-cr-227 were presenting evidence to the grand jury against Mr. Gogolack. And those AUSAs were making decisions about which charges to file against Mr. Gogolack and when, and whether to avoid filing a case-related form that would result in the assignment of the same District Court Judge that was currently assigned to case no. 19-cr-277.

When the government made a motion to detain Mr. Gogolack, the government proffered information about Mr. Quinn in the public courthouse. The government's response admits that it had to discuss Ms. Quinn "to provide *necessary context* to the evidence of Mr. Gogolack's guns and drug charges." (Govt Resp. at 32 (emphasis added)). The government cites five different points in the detention hearing transcript that involved discussion or reference to Ms. Quinn. (*Id*. at 32-33).

However, the government argues that reference to witness tampering at the detention hearing was only in reference to other witnesses, and the government argues close attention to the exact language of the proffer would make that clear. *Id*. The government further states the Buffalo News made "clear from the surrounding context that" the witnesses referred to were not Ms. Quinn. (*Id*. at 40).

Of course, the government omits reference to the quote attributed to the government's detention proffer that the allegations were "the tip of the iceberg," and the government ignored that the news coverage was clearly focused on the investigation into Ms. Quinn's death. Everyone in the courtroom appeared to recognize the initial charges against Mr. Gogolack were related to the investigation of the death of Ms. Quinn and the prosecution of Mr. Gerace.[18]

The defense noted in its motion that the initial Gogolack search warrant application(s) to Judge McCarthy likely drew that connection, though the defense has been unable to review the application at this time. The defense also noted that even in the early stages of the grand jury presentation against Mr. Gogolack, there was likely testimony and evidence presented that related to Mr. Gerace. At this time, the defense has been unable to review grand jury minutes to determine the extent to which that may have happened, but it has asked for disclosure of the minutes so it can advance those arguments further if appropriate.

## B. The Need to Address the Prosecutorial Steering in this Case

It is possible that many instances of prosecutorial steering go undiscovered.

---

[18] The Buffalo News has created a "Complete Coverage" series regarding the "The death of federal witness Crystal Quinn" and each article involving Mr. Gogolack was categorized accordingly.

In its Response, the government repeatedly cites the Tenth Circuit decision in *United States v. Pearson* for the position that even if prosecutorial steering is a violation of the defendant's Fifth Amendment right to due process, it is generally harmless.[19]

The Tenth Circuit did conclude that the prosecutorial steering in *Pearson* would be harmless error. However, such a determination would not be controlling in this Circuit, or any other Circuit for that matter.

For example, in the dispositive motions, the defense cited *Cruz v. Abbate*, 812 F.2d 571, 573-74 (9th Cir. 1987), where the Ninth Circuit remanded to "determine whether an abuse of discretion or constitutional violation has occurred" and authorized the use of "supervisory powers to correct the matter." The Circuit noted: "The selection of a judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant… he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings." *Id*. The government did not address Cruz in its response.

It is no surprise that the issue of prosecutorial steering has little or no prior litigation in this District. Until relatively recently, the defense was not privy to any part of the procedures for case-related forms. This enormous responsibility was entrusted

---

[19] The defense also cited *Pearson* in the dispositive motions, particularly because the Tenth Circuit highlighted four substantial problems with the practice of prosecutorial steering, including that "a system that allows prosecutorial judge-shopping arguably lacks 'the appearance of impartiality that is required to obtain the confidence of the public and the accused in the system.'" *United States v. Pearson*, 203 F.3d 1243, 1263-1266 (10th Cir. 2000).

exclusively to the US Attorney's Office with the clear expectation that it would handle it with the utmost candor.

And yet, the prosecutorial steering was so obvious and brazen in this case, that it clearly raised red flags for the judiciary, prompting a letter from this Court in its capacity as Chief Judge of the District and further leading to direct questions posed by Judge Vilardo at an appearance in Case no. 19-cr-227.

The government responded to this Court's inquiry and Judge Vilardo's questions, essentially claiming no connection between the initial charges of Mr. Gogolack and the pending charges of Mr. Gerace. But at no time, even in the private letter to this Court, did the government acknowledge the reality of the early investigation involving Mr. Gogolack, which had been tagged as part of the prosecution of Mr. Gerace before he was even charged.

At this time, now being made aware of the connections that existed between the cases when the government elected not to file a case-related form, this Court should act in its supervisory role to dismiss the indictment that was the subject of prosecutorial steering and subsequent representation by the government minimizing its conduct.

## THE MOTION TO DISMISS OR SUPPRESS DUE TO THE SUBPOENA COMPELLING PRODUCTION FROM GERACE'S INVESTIGATOR

A. It Was Proper for the Defense to Raise This Issue Before This Court

In regard to the motions to dismiss or suppress related to the government's tactics utilized to compel testimony from a defense investigator and obtain privileged material, the government repeatedly suggests that instead of raising this issue in this case, Mr. Gerace should have litigated the issue further elsewhere.

The government suggests that when Mr. Gerace's motion to quash was denied, he could have appealed to the Second Circuit Court of Appeals. The government suggests that the defense could bring motion to render a decision on the issue (which is still pending) with Judge Vilardo. The government even suggested Mr. Gerace could have filed a sanctions motion before Judge Arcara.

The government's attempts to point this Court away from the issue by suggesting that counsel should have raised it (or continued to raise it) elsewhere are discussed below.

1. Appeal of the Motion to Quash to the Second Circuit

The government highlighted that the defense could have appealed the sealed motion to quash proceeding, much of which was handled *ex parte*, to the Second Circuit. That might have been possible, theoretically, but the practical reality is the government ensured that the timing of the investigator's testimony would make that a practical impossibility.

The oral argument on the motion to quash occurred the same day as testimony had been scheduled.

The government acknowledges that multiple attempts were made to ask the government to delay the testimony (which would have provided more time to make a more substantive motion before Judge Arcara or appeal to the Circuit), but the government deliberately denied each request to delay the testimony.

## 2. Sanction Motion in Case No. 19-cr-227

The government argued that because Mr. Gerace brought a motion for sanctions in Case no 19-cr-227, that raising the issue here is an attempt to get "a second bite of the same apple in front of a different audience." (Govt Resp. at 56).

The use of that expression here is misplaced. In case no. 19-cr-227, Mr. Gerace sought sanctions based on repeated acts by the US Attorney's Office that violated Mr. Gerace's Sixth Amendment rights to counsel, including multiple attempts to disqualify his attorney of choice. The defense asked Judge Vilardo to consider the violations collectively and individually.

The sanctions were sought to offset the impact of the government's conduct in case no. 19-cr-227. For example, the loss of the private investigator who had been working on the case for multiple months preceding the substitution of counsel came with a significant loss to the defense team.[20] Thus, in case no. 19-cr-227, the defense requested sanctions and the defense suggested dismissal as one potential type of relief.

---

[20] After he was compelled to testify at the grand jury, the investigator continued to be represented by counsel, and communication with the Gerace defense team ceased.

Judge Vilardo reviewed the defense's list of Sixth Amendment violations, and for the most part he denied them. But this issue involving the private investigator survived. In the context of case no 19-cr-227, Judge Vilardo indicated that at some point he would render a decision on whether to impose sanctions and what those sanctions would be. That has not happened at this point.

In this case (case no. 23-cr-99), the defense has raised arguments based on much of the same government misconduct, but in no way can it be characterized as a second bite of the apple.

First of all, there is still no decision from Judge Vilardo on this issue, so this does not amount to re-litigating an issue that was resolved. It amounts to collateral litigation rising from the same facts, something that can be expected based on the circumstances of this case.

More importantly, it is in this case that the government intends to use the illegally obtained evidence. The motion is not brought in context of repeated Sixth Amendment violations in case no. 19-cr-227. Instead, it is brought in context of the fact that the government looks to benefit from its conduct, including the subpoenaing of a defense investigator and the review of work-product, even after the investigator had testified that he was acting as an agent for Gerace Attorney 1.

This cannot be permitted. Whether the relief is dismissal because of the abuse of grand jury or exclusion of evidence, the relief would be appropriately tailored to this case, and the government should be prevented from advancing this evidence to a jury.

As a final note, the specific suggestion that the motion is an attempt to put this issue before "a different audience" is nonsensical. If Judge Vilardo had continued to preside over this case, the motion would still have been brought[21]. It only arrives at a different audience, because the decision was made to administratively transfer this case.

## 3. Sanction motion before Judge Arcara

Even though the government complains that brining the motion in this case is an attempt to get "a second bite of the same apple in front of a different audience," it simultaneously suggests that Mr. Gerace should have brought a sanction motion before Judge Arcara. (Govt Resp. at 56).

It is not clear what that would accomplish. Judge Arcara does not preside over this case. But perhaps that is exactly why the government would have preferred the issue be decided elsewhere. This case is where the government intends to use the illegally obtained evidence, and thus the government is motivated to steer the issue elsewhere, where the options for relief are limited, and exclusion of improperly obtained evidence is not an option for the Court.

---

[21] Given the fact that it is this case that the government seeks to use the unlawfully obtained evidence, failing to bring the motion here would be careless, perhaps even ineffective.

### B. Facts Glossed Over by the Government's Response

In regard to this motion, the government raised multiple arguments but generally ignored certain central facts, including: (1) that the investigator's attorney presented communication demonstrating Gerace Attorney 1 had communicated with the investigator to identify him as part of the defense team; (2) the defense could not respond to any argument that the government presented to Judge Arcara before he made his decision because they were all ex parte; and (3) most importantly, after the investigator gave sworn testimony, it was conclusively established that he was acting as an agent of Gerace Attorney 1. But the government never corrected its earlier arguments to Judge Arcara or sought guidance on whether it could maintain the recording it obtained by subpoena. Instead, it reviewed the material and now attempts to use it as evidence at this trial.

If there are any issues of fact that are unresolved by the motion practice, the defense respectfully requests a hearing to resolve the dispute.

## CONCLUSION

For all of the reasons set forth above, Mr. Gerace respectfully request this Court order the relief requested in his Dispositive motions and such other relief that this Court deems appropriate.

DATED:    Orchard Park, New York
            September 19, 2025

<u>s/ Cheryl Meyers Buth</u>
Cheryl Meyers Buth, Esq.
MEYERS BUTH LAW GROUP, PLLC
*Attorneys for Defendant Peter Gerace, Jr.*
21 Princeton Place, Suite 105
Orchard Park, New York 14127
 (716) 508-8598
<u>cmbuth@mblg.us</u>

DATED:    Rochester, New York
            September 19, 2025

<u>s/ Mark A. Foti</u>
Mark A. Foti, Esq.
THE FOTI LAW FIRM, P.C.
*Attorneys for Defendant Peter Gerace, Jr.*
16 W. Main Street – Suite 100
Rochester, New York 14614
(585) 461-1999
<u>mark@fotilaw.com</u>