UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     )      23CR99
                             )
vs.
                                 Buffalo, New York
MICHAEL RONCONE,
                             )   October 1, 2025
                Defendant.        12:30 p.m.
- - - - - - - - - - - - - - - X
**SUPPRESSION HEARING**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ELIZABETH A. WOLFORD
UNITED STATES DISTRICT JUDGE

**FOR PLAINTIFF:   NICHOLAS COOPER, ESQ.**
**CASEY L. CHALBECK, ESQ.**
Assistant United States Attorneys
138 Delaware Avenue
Buffalo, New York 14202


**FOR DEFENDANT:   PAUL G. DELL, ESQ.**
Law Office of Paul G. Dell
70 Niagara Street
Buffalo, New York 14202

**COURT REPORTER: Karen J. Clark, Official Court Reporter**
**Karenclark1013@AOL.com**

USA V. MICHAEL RONCONE

I N D E X

| WITNESS NAME | DX | CX | RDX | RCX |
|---|---|---|---|---|
| S.A.  B. Burns | 9 | 98 | 113 | |
| M. Roncone | 120 | 124 | 166 | |
| G. Rondon | 171 | 188 | 189 | |

| EXHIBIT NO. | PAGE REC'D |
|---|---|
| 1 A | 50 |
| 2 B | 85 |
| 3 A | 21 |
| 3 B | 21 |
| 3500 D | 50 |
| A | 123 |
| 10 | 170 |

P R O C E E D I N G

*            *            *

THE CLERK:  On the record, United States versus Michael Roncone, 23CR99.  We're here for oral argument.  Counsel, please state your name and who you represent.

MR. COOPER:  Good afternoon, your Honor.

USA V. MICHAEL RONCONE

For the United States, Nicholas Cooper, Casey Chalbeck and paralegal Karen Chapoux.

THE COURT:  You look quizzical when you're saying it.

MR. COOPER:  I'm trying to remember that.

THE COURT:  Good afternoon.

MR. DELL:  Paul Dell for Michael Roncone. Good afternoon.

THE COURT:  And Mr. Roncone is in the courtroom and apologize for running late.  Are we ready to proceed from the government's perspective?

MR. COOPER:  We are, Judge.  I would just ask to make a record about some housekeeping matters and we're ready to call our first witness.

THE COURT:  Go ahead.

MR. COOPER:  Judge, this morning when we were preparing to come over for the hearing, Special Agent Burns showed me had some notes he had handwritten on a 302 as he wrote and prepared to testify.  I turned that over within a couple of minutes of learning of it and we produced it as 3500 E to the Court and you should have a hard copy of it.  And I apologize to Mr. Dell for it coming over at the last minute and it was generated the last minute.

USA V. MICHAEL RONCONE

THE COURT:  Okay.  And you received a copy of it?

MR. DELL:  I did.

THE COURT:  Okay.

MR. COOPER:  And the other thing, Judge, government marked all of the body camera videos.  It's my intention to offer one of the recordings, which is 414, that is exhibit 6 C as in Charlie.  This morning Mr. Dell was kind enough to call me and tell me that he also intended to introduce one recording.  Thankfully for all of us, it's the same exact same one.  And I'll let him speak for himself and I think we'll do that on consent or by stipulation.

THE COURT:  You agree with that?

MR. DELL:  Yes, I do.

THE COURT:  So it's 6 C?

MR. COOPER:  Yes, your Honor.

THE COURT:  Six C will come into evidence based on the stipulation.

(**WHEREUPON, EXHIBIT 6C WAS RECEIVED INTO EVIDENCE.**)

MR. COOPER:  And I would indicate that the government plans to call two witnesses today, Special Agent Brian Burns and New York State Police Investigator

USA V. MICHAEL RONCONE

Geraldo Rondon and I will proceed in that order.

THE COURT:  Okay.  And just to clarify, because when the motion was filed, the government had not submitted its response papers, obviously.  The government is only seeking to introduce -- why don't you clarify on the record.

MR. COOPER:  Absolutely, Judge.  Thank you for reminding me.  I broke this down into two buckets of statements.  The dividing line is the point which Mr. Roncone indicates he wishes to cease answering questions and requests his attorney, Mr. Tadaro.  Everything with him leading up to end the questioning and for his attorney, the government seeks to introduce in its case in chief at trial.  Anything after that point, I would only seek to introduce should the defendant testify to something that is inconsistent.  And the purpose of pointing that out is I think that that second bucket of statements after he is invoked, would only be analyzed for voluntariness as opposed to for purposes of Miranda. It would have to be voluntary in order for the government to use it even on cross examination.  So I intend to elicit testimony about that second bucket of statements, but I am going to argue to the Court that they should be permitted to cross examine should he

USA V. MICHAEL RONCONE

testify.

THE COURT:  It strikes me that because of that, the issues at this hearing are Fifth Amendment related as opposed to Sixth Amendment related.  Is that a fair statement?

MR. COOPER:  That is my position, certainly.

THE COURT:  Do you agree with that, Mr. Dell?

MR. DELL:  As far as the earlier statements, yes.

THE COURT:  Well, but if the later statements would only be used if, in fact, Mr. Roncone testifies and to cross examine him if there is any inconsistencies for impeachment purposes, then I don't know that the fact that they were elicited after he invoked his right to counsel would prohibit the government from using them on cross examination.

MR. DELL:  I agree with that.

THE COURT:  Okay.  All right.  And my plan would be, we'll have the testimony, we'll have the hearing, hopefully get through it today and then parties would order a transcript and we'll have post-hearing briefing and we can have further oral argument if I think it's necessary or if either of you think it's

USA V. MICHAEL RONCONE

necessary.  Does that work for everybody?

MR. COOPER:  Absolutely, Judge.  What is your common practice with respect to the schedule for briefing?  How much time do you ordinarily grant?

THE COURT:  Usually I would say 30 days after the transcript is produced and then two weeks after that for any response papers.  And, I mean, usually I would say simultaneous briefing, in other words 30 days, but I'm open to suggestions if you want to do it otherwise.

MR. COOPER:  That works perfect for the government.  I have a trip planned for -- I have a trip planned out of town for about a week and I want to make sure; it's not going to be a problem.

MR. DELL:  That should be a fine.  I do have a state trial beginning October 16th and then I have a trial in front of Judge Sinatra in November, but I'm going to try and get it done anyway.  I mean, I've already done a lot of preparation.  If I have a problem, I'll let the Court know.

THE COURT:  The first step is going to be to get the transcript.  So if you want to order it expedited, you're not CJA so -- would the government be ordering?  Nobody has any money now.

USA V. MICHAEL RONCONE

MR. COOPER:  I would be cutting off my nose to spite my face if I asked to expedite it, because then it would interfere with my trip.

MR. DELL:  Mr. Roncone asked if he had to come today because the government is shut down.

MR. COOPER:  We have to come, we just don't get paid.

THE COURT:  Well, it's going to probably take at least a few weeks, probably 30 days, to get the transcript, so that is kind of the time frame we're looking at.  Okay.

MR. COOPER:  That works for the government.

THE COURT:  And if once it's produced there is an issue with the schedule, you can --

MR. DELL:  I am standby for the Judge Sinatra trial, so I might be able to write it at the same time for pro se.

THE COURT:  That will be interesting.

Okay.  With that, is the government ready to proceed.

MR. COOPER:  Yes, your Honor.  Are you -- are you okay if I bring my water up to the podium?

THE COURT:  Yes.

MR. COOPER:  We're ready to go and the

B. BURNS - DX BY MR. COOPER

government would call Special Agent Brian Burns.

THE COURT:  Agent Burns, why don't you go over to -- she will tell you where to go.

(**S.A. B. BURNS WAS CALLED TO THE WITNESS STAND AND SWORN.**)

THE COURT:  Agent Burns, I'm going to give you some instructions before you get started.  Why don't you state your first and last name and spell your last name.

THE WITNESS:  Brian, B-r-i-a-n, Burns, B-u-r-n-s.

THE COURT:  So Agent Burns, I am Judge Wolford.  I would ask that you please only answer the questions that you're asked.  Don't volunteer information.  Wait a second after the question is asked so that if there is an objection, I can rule on it before you answer.  And speak slowly, clearly, make sure you speak into the microphone so everybody can hear you and so that my court reporter is able to take down your testimony.  Do you understand?

THE WITNESS:  Yes, I do.

THE COURT:  Thank you.

You may proceed whenever you're ready, Mr. Cooper.

B. BURNS - DX BY MR. COOPER

MR. COOPER:  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. COOPER:**

Q.  Good afternoon, Special Agent Burns.

A.  Good afternoon, Mr. Cooper.

Q.  Can you describe for the Court a little bit about your educational background?

A.  Yes.  I went to the University of Buffalo, received a Bachelor's of Science in pharmacy.  I was a licensed pharmacist in New York State and I also received a Master's in Business Administration from the University of Buffalo, and I graduated with a Master's in '97.

Q.  Okay.  After you obtained those degrees, did you begin working as a pharmacist?

A.  Yeah.  In '94, I got my pharmacy degree and started as a licensed pharmacist in New York State.

Q.  And about how long did you work as a licensed pharmacist?

A.  Three, four years.

Q.  What caused you to stop working as a licensed pharmacist?

A.  I had applied to the FBI and was accepted and entered on duty in Quantico, Virginia in October of 1998.

B. BURNS - DX BY MR. COOPER

Q.   Now, I'd like for you to summarize, key word "summarize," the training that you received at Quantico for Chief Judge Wolford.

A.   It's pretty extensive.  It was approximately four months you live there.  They taught you constitutional law, federal criminal law, they taught you firearms, they taught you tactics, effectuate an arrest, they taught you search and seizure procedures, they taught you how to drive high rates of speed and pursuits, things like that, interview techniques.  They talked about the different responsibilities of the FBI.  It was pretty expansive.

Q.   You mentioned that that lasted approximately four months, so I want to move now to early 1999.  Did you get assigned to a specific field office?

A.   Yes, I entered on duty in the Memphis FBI office, Memphis, Tennessee.

Q.   And just the time frame for right now, how long were you assigned to the Memphis, Tennessee FBI field office?

A.   From 1999 to approximately January 2008, although I was, for the next couple of years, I was going back and forth, I was finishing up a rather large case and had a number of trials being completed.

B. BURNS - DX BY MR. COOPER

Q.   Was that Operation Tennessee Waltz that you're referring to?

A.   It was Operation Tennessee Waltz.

Q.   Was that a jeopardy question one time?

A.   It was a jeopardy question one time.  It is an old case from a long time ago.

Q.   We talked about the period from 1999 to 2008. When you were in Tennessee during that time period, did you work on narcotics cases?

A.   Yes, pretty extensively at the beginning of my career.

Q.   Did there come a time when you transitioned from working on those narcotics investigations to working on cases involving law enforcement corruption?

A.   Yes.  In Memphis Tennessee at that time there was a number of officers that were involved in the narcotics distribution assisting different criminal organizations, drug traffickers, and it was kind of a natural progression that myself and some other members of the Memphis police narcotics unit started targeting those officers.  That was my first foyer into corruption, not really law enforcement corruption, but I did segue into public officials, elected officials.

Q.   Is it fair to say that your career transferred

B. BURNS - DX BY MR. COOPER

from primarily narcotics work to primarily corruption work?

A.   Yes, fair characterization.

Q.   You mentioned in 2008 you left the Memphis Tennessee field office.  Where did you go?

A.   I was assigned to Buffalo and the Niagara Falls resident agency, at that time FBI Buffalo had a small office in Niagara Falls.

Q.   Why did you transition from Memphis to Buffalo?

A.   I had an opportunity to come back to Buffalo and that was -- I was born and raised here, so I wanted to get back home for because it's my community as well as by then I had a family and wanted my kids to know their relatives.

Q.   Were you assigned to a specific group or team when you came to the Buffalo field office?

A.   Yes.  Initially it was Niagara Falls RA, but working white collar crime.  And then when that closed, the Niagara Falls RA, they rolled me into Buffalo again on the white collars crime squad.

Q.   When you say "RA"?

A.   I'm sorry, resident agency, it's a satellite of a main office.

Q.   After the satellite office in Niagara Falls

B. BURNS - DX BY MR. COOPER

closed, you transitioned to Buffalo?

A.   That's correct.

Q.   And during your time from 2008 to the present, predominantly what types of cases have you worked on?

A.   The public corruption for the vast majority. I've done a couple of frauds and then, well, the Tops is a hates crime, civil rights case, so those, yeah, that kind of encompasses the vast majority or the work I've done while in Buffalo.

Q.   And for the record, when you say "Tops," you're talking, referring to *United States v. Gendron*?

A.   Yes.

Q.   During your time, your whole career as a FBI Special Agent, have you participated before in the execution of search warrants?

A.   Hundreds.

Q.   Now, are you personally a member of the FBI SWAT team?

A.   I am not.

Q.   Is SWAT team the right phrase for me to use?

A.   Yeah, that is the term that they use around our office.

Q.   So you'll know what I'm talking about if I say SWAT team?

B. BURNS - DX BY MR. COOPER

A.   I will.

Q.   Have you ever been a member of the FBI SWAT team?

A.   No, I have not.

Q.   When SWAT is being used to execute a search warrant, generally, are there different roles for the SWAT officers and the officers who are members of the search team?

A.   Yes.

Q.   Can you just give kind of a 30,000 foot overview, what is the difference between somebody in a search warrant who is a member of the SWAT team and somebody who is a member of the search team?

A.   So the SWAT team, their sole responsibility is to effect the arrest or execute the search warrant.  By that I mean, execute in the sense of making entry and making sure the scene is safe, you know, detaining anyone present, if there is an arrest warrant, taking that individual safely into custody, so they are really for entry and for effecting the search, not the search portion of it.

Q.   Generally, as an FBI Special Agent, are you the person who is responsible for deciding whether the SWAT team is used or not at a particular search warrant?

A.   No.  If I have an arrest, upcoming arrest, I can

B. BURNS - DX BY MR. COOPER

talk that through with my supervisor and then to the --

mostly looking at whether somebody is propensity for

violence or firearms, whether a dangerous situation, but

ultimately, the ultimate decision my supervisor then

would brief up our executive management, the SAC and

SWAT team leader and they make a final call on whether

it's an or arrest or search warrant execution that would

need SWAT's involvement.

Q.   So you don't personally make that decision, is
that right?

A.   No, I may have a suggestion, but they make the
call.

Q.   During your time as an FBI Special Agent, have
you conducted interviews of subjects of investigation?

A.   Hundreds, maybe thousand.

Q.   During your time as a FBI Special Agent, have you
interviewed subjects of investigation during the
execution of a search warrant?

A.   Yes, hundreds of times.

Q.   Is that something that occurs frequently?

A.   Yes.  We always want to attempt to interview
anyone that was present.  The search warrants would be
standard practice and good practice.

Q.   I want to direct your attention now to a specific

B. BURNS - DX BY MR. COOPER

day, okay?

A.   Certainly.

Q.   I want to discuss December 7th of 2023, were you working that day?

A.   Yes, I was.

Q.   Did you participate in the execution of the search warrant at 4998 Williams Street in Lancaster, New York?

A.   Not the execution, no.

Q.   And so this kind of comes back to the different roles between the SWAT team and the search team.  Let me see if I can ask the question in a better way.

Were you present at the scene or in the vicinity of the scene of a search warrant execution at 4998 Williams Street?

A.   Yes, I was.

Q.   That day, December 7th, was your role to be a member of the team initially entering the premises?

A.   It was not.

Q.   What was your role on December 7th, 2023?

A.   My role was to attempt an interview of Michael Roncone.

MR. COOPER:  Your Honor, is it okay with you if I ask Ms. Chapoux to pull an exhibit up on the

B. BURNS - DX BY MR. COOPER

screen?

THE COURT:  Yes, that is fine.

MR. COOPER:  Ms. Chapoux, can you pull up exhibit 3 A to start with?

Q.  Can you see that on your screen, Special Agent Burns?

THE WITNESS:  I cannot.

MR. COOPER:  Okay.

THE COURT:  Paul, is your screen working?

MR. DELL:  Yes, it is.

MR. COOPER:  It's up to you, if not, I can hand it to you.

The only thing I would say we may need it for the video.

THE COURT:  And the --

MR. COOPER:  We have it, a couple of minutes.

THE COURT:  I have this.

MR. COOPER:  We'll be flexible and we'll make it work.

THE COURT:  Why don't you call IT?

THE CLERK:  Yes, Judge.

MR. COOPER:  May I continue, Judge?

THE COURT:  Yes, you may.

                    B. BURNS - DX BY MR. COOPER

MR. COOPER:  Do you mind if I approach the witness?

THE COURT:  I do not mind and you don't have to ask me that.

MR. COOPER:  Understood.

THE COURT:  Okay.  For anything that I do, trial, whatever, you never have to ask to approach the witness.  If you get out of line, I'll let you know.

MR. COOPER:  I know that, and appreciate you telling me.

Paul, do you need to see this or are you good, 3A?  I'm going to hand the exhibit.

MR. DELL:  I don't need to see it.

Q.  Brian, I just handed you what's marked for identification as Government's Exhibit 3 A.  I would like you to take a moment and look through those pages and look back up at me when you're finished.

A.  I'm familiar with this.

Q.  What is that?

A.  It's a search warrant for the subject Michael Roncone, the person of him.

Q.  Okay.  And is that a fair and accurate depiction of the search warrant for the person of Michael Roncone that was executed on December 7th, 2023?

B. BURNS - DX BY MR. COOPER

A.   Yes, it is.

Q.   Okay.

MR. COOPER:  Sorry.  Thank you.

Q.   I'm handing you now what's marked for identification as Government's Exhibit 3 B.  Take a moment take a look at that and look back up at me when you're finished.

A.   I'm familiar with this.

Q.   What is that?

A.   That is a search warrant for the residence of Michael Roncone, 4998 Williams Street in Lancaster, New York.

Q.   4998 Williams Street, is that what you said?

A.   That's correct.

Q.   Is that a fair and accurate depiction of the search warrant for Mr. Roncone's residence that was executed on December 7th, 2023?

A.   Yes, it is.

Q.   Thank you.

MR. COOPER:  Your Honor, with that foundation, the government would offer Government's Exhibit exhibits 3 A and 3 B into evidence.

THE COURT:  Any objection?

MR. DELL:  No objection, your Honor.

B. BURNS - DX BY MR. COOPER

THE COURT:  All right.  3 A and 3 B will come into evidence.

MR. COOPER:  Thank you.

(**WHEREUPON, EXHIBITS 3A and 3B WERE RECEIVED INTO EVIDENCE.**)

Q.  Were you the affiant for those search warrants?

A.  I was not.

MR. COOPER:  You can pull that down, Ms. Champoux.  Thank you very much.

Q.  Ultimately with respect to the search warrant that was executed or search warrants that were executed on December 7th, 2023, was there a determination made by the FBI that the SWAT team would be used to make entry into the premises and clear it?

A.  Yes, it was decided it would be a SWAT operation.

Q.  Okay.  When SWAT is initially executing the search warrant, are you on scene so to speak?

A.  Yeah, in the vicinity would be a fair characterization.  They don't want you in their area that they are, so usually it's kind of just down the street.

Q.  So when you use the words "in the vicinity," would it be fair to say you're close but you're not standing in the front yard with the SWAT team?

B. BURNS - DX BY MR. COOPER

A.    That's correct.

Q.    Okay.  Is the reason that they have members of the search team and other agents that are not part of SWAT separate and kind of in the vicinity but not on the front yard with them for officer safety?

A.    Yeah.  The team, they train together and they have specific roles and responsibilities, so they wouldn't want non-team members being a part of that. They have their routine and their practice.

Q.    Now, because you weren't physically present with the SWAT team on the front yard at the time they first arrived, you didn't see and hear the things that they saw and heard at that time, right?

A.    Did not.

Q.    Are you aware that they are wearing body worn camera during that time?

A.    Yes, they are required to.

Q.    In anticipation of testifying at this hearing today, did you review substantial portions of that body worn camera from different members of the SWAT team?

A.    Yes, I did.

Q.    Based on your review of that body worn camera, the audio, the video, from different perspectives, are you familiar with what occurred when SWAT arrived?

B. BURNS - DX BY MR. COOPER

A.   Yes, I am.

Q.   I'm going to ask you some general questions. Were there steps taken to alert Mr. Roncone that there was a search warrant being executed at 4998 Williams Street?

A.   Yes, there were.

Q.   And if you can give me an approximate time when SWAT arrives at 4998 Williams Street, what time is that?

A.   Approximately 6 a.m.

Q.   So 0600, approximately?

A.   That's correct.

Q.   When SWAT arrived at 4998 Williams Street at approximately 0600 or 6 a.m. on the dot, was there a police siren being utilized?

A.   Yes, there was.

Q.   And was there flashing colored lights?

A.   Yeah, there was a marked unit in the street.

Q.   Was there an audible siren that was quite loud, quite blaring?

A.   Yes, there was.

Q.   Was there an announcement made over a megaphone or speaker?

A.   Bull horn.

Q.   A bull horn?

B. BURNS - DX BY MR. COOPER

A.   I envision it sounded like something, something along those lines.

Q.   A very loud announcement was made, is that fair?

A.   Yes.

Q.   Did that announce the presence of federal agents at the location?

A.   It did.

Q.   Did it announce there was a search warrant for the residence?

A.   It did.

Q.   In addition to the siren, the light, and the bull horn, was there also a phone call made to Mr. Roncone's cell phone?

A.   Yes.

Q.   Who made that phone call?

A.   I believe it was a hostage negotiator, it's their responsibility on these operations.

Q.   Are you familiar generally with why that is a tactic used by the SWAT team?

A.   They prefer to what they call call out instead of having to kind of make entry through the door or hit it with a ram or something along the lines, the preferred method is to try and call the individual or individuals in the residence out for safety reasons.

B. BURNS - DX BY MR. COOPER

Q.   So based on your review of body camera video, are you aware that the FBI SWAT team offered Mr. Roncone the opportunity to come out of the house on his own?

A.   They did.

Q.   Okay.  And that, as you mentioned a moment ago, as opposed to forcing entry into the home on their own, right?

A.   That's correct.

Q.   Have you heard some of the audio from body camera videos of the phone call between the hostage negotiator and Mr. Roncone?

A.   Yes, I have.

Q.   Can you hear some of the things that that person is saying to Mr. Roncone?

A.   Yes.  They are explaining the situation and telling him he needs to come out.

Q.   At any point from what you've reviewed in the body camera, did that person who called Mr. Roncone threaten him?

A.   No.

Q.   At any point did they shout at him or scream at him?

A.   Not that I heard.

Q.   Did Mr. Roncone ultimately come outside?

B. BURNS - DX BY MR. COOPER

A.   He did.

Q.   Is his coming outside of the house and being approached by agents, is that captured on one of the body camera videos or maybe more than one?

A.   Yes, I think more than one, I know more than one.

Q.   Was Mr. Roncone dragged out of the house by agents?

A.   He was not.

Q.   When Mr. Roncone initially came out of 4998 Williams Street, is he handcuffed?

A.   He is.

Q.   And is that by members of the SWAT team?

A.   It is.

Q.   At the time that that occurred, based on your review of the video and your experience as an FBI Special Agent, was that house or scene at 4998 Williams secured yet?

A.   Not yet.

Q.   From reviewing the body worn camera video, did you observe and hear Mr. Roncone speak to the SWAT agent or agents that initially interacted with him?

A.   Yes, I did.

Q.   Was Mr. Roncone respectful to the agents?

A.   Very.

B. BURNS - DX BY MR. COOPER

Q.   Were the agents polite and respectful with Mr. Roncone?

A.   Very.

Q.   Was there any physical altercation between Mr. Roncone and the SWAT agents that you observed?

A.   None at all.

Q.   From the body worn camera that you observed, did anyone threaten or intimidate Mr. Roncone when he was placed in handcuffs?

A.   No.

Q.   All right.  You testified a moment ago that SWAT arrived at about 6 a.m.  Was it a number -- was it a number of minutes before Mr. Roncone actually came outside of the house?

A.   A number of minutes, yes.

Q.   Does the video give a more exact time frame from when they arrived to when he comes outside?

A.   Maybe seven minutes.  The video would have the exact time.

Q.   Your approximation is seven minutes?

A.   Approximate.

Q.   So let's say give or take it's about 6:07 in the morning when Mr. Roncone comes outside, was it still dark out at that time?

B. BURNS - DX BY MR. COOPER

A.   Yes.

Q.   Can you describe for the Court what the weather was like that morning?

A.   It was an ugly day, snowy, rainy, cold, precipitation, kind of slushy, changed to a freezing rain as it got warmer throughout the morning.

Q.   You said it got warmer throughout the morning. At 6:07 was it really cold outside?

A.   Yes.

Q.   Wind blowing pretty hard?

A.   Yes, it was cold the whole day and it got warm enough to turn into sleet instead of snow.

MR. COOPER:  Ms. Champoux has pulled up exhibit 6 C.

THE COURT:  I've got IT here and let's take a break for a minute.

(Whereupon, there was a break in the proceeding.)

THE COURT:  All right.  Back on the record, the screen at the witness box has been fixed.  You can continue whenever you're ready.

Q.   Do you recognize what is on the screen, Agent Burns?

A.   Yes.

B. BURNS - DX BY MR. COOPER

Q.   And this is what has been received into evidence as Government's Exhibit 6 C?

A.   6 C.1, maybe.

Q.   6C as in Charlie?

A.   Yes.

Q.   And this is body worn camera video from one of the members of the SWAT team, right?

A.   Yes.

THE COURT:   Agent Burns said 6C.1.  Is there some significance?

MS. CHAMPOUX:   At the top of the screen it says point one.

THE COURT:   But the exhibit is 6C.

MS. CHALBECK:   Yes.

Q.   Special Agent Burns, is it your understanding this is body worn camera footage from one of the SWAT team from December 7th, 2023?

A.   Yes.

Q.   And does the body worn camera -- it is in UTC time, but does it have timestamps indicating when it starts and when it ends?

A.   It does.

Q.   Have you reviewed those timestamps for the body worn camera specific to Government's Exhibit 6C?

B. BURNS - DX BY MR. COOPER

A.   Yes, I have.

Q.   Does the body worn camera for body worn camera 6C start at approximately 5:52 a.m. in Eastern time?

A.   Correct.

Q.   And this 30-minute clip would end then 5:52 plus thirty at 6:22 a.m., correct?

A.   That's correct.

Q.   We're going to try and move this along as quickly as we can.  The first about nine minutes of this video from 5:52 a.m. to about 6 or 6:01 a.m. shows the SWAT team driving to 4998 Williams Street, is that correct?

A.   From their staging location to the front of the evidence.

Q.   So, if we ask Ms. Champoux in a second to skip to nine minutes into the video, is it your understanding that is when it's going to show the SWAT team arriving at 4998 Williams Street?

A.   Yes.

          MR. COOPER:  Ms. Champoux, are you able to move to nine minutes.  And just a touch before.  Go ahead and play it.

          (**Video played.**)

          THE COURT:  Can you pause it there and tell me what time we're at for the record, approximately?

B. BURNS - DX BY MR. COOPER

THE WITNESS:  You want me to answer that?

MR. COOPER:  No.  Ms. Champoux.

MS. CHAMPOUX:  Approximately 10 minutes.

MR. COOPER:  We paused it approximately 10 minutes now into the file.  In that one-minute period, did you hear a female voice begin speaking?

A.  Yes.

Q.  Did you recognize, not who the person is, but who the person is in the context of the SWAT team?

A.  Yes, that would be the -- hostage negotiators are responsible for that.  I don't know the agent responsible for that, but that was the agent responsible for telephonically contacting, in this case, Mr. Roncone.

Q.  And when you hear that female individual's voice speaking on the audio recording, who you believe is a hostage negotiator, is it your understanding that is her having a phone conversation with Mr. Roncone?

A.  Yes.

MR. COOPER:  Go ahead and play it, Ms. Champoux.

(**Video continued.**)

MR. COOPER:  Ms. Champoux, would you pause it and call out the time we're at for me?

B. BURNS - DX BY MR. COOPER

MR. COOPER:  So we're just before the 14 minutes.

I asked Ms. Champoux to pause it.

Q.   Special Agent Burns, would it be fair to say it's been about five minutes since the initial call out on the siren at the 9-minute mark from now 14 minutes into the video file?

A.   That is accurate.

Q.   And has Mr. Roncone come outside yet?

A.   Not yet.

Q.   You've reviewed this before, right?

A.   Yes, a number of times.

Q.   Is it fair to say it is about the 15-minute timestamp when Mr. Roncone comes outside?

A.   Yes, now that I'm looking at it.

MR. COOPER:  Ms. Champoux, can we skip ahead to 15 there.  You can play it right there.

(**Video continued**.)

MR. COOPER:  Ms. Champoux, will you pause it?

Q.   Special Agent Burns, did you hear a member of the SWAT team having a discussion with Mr. Roncone at that point?

A.   Yes, I did.

B. BURNS - DX BY MR. COOPER

Q.   Did you hear the SWAT officer ask him if it's just him and his dad inside the house?

A.   Yes, I did.

Q.   And did Mr. Roncone answer in the affirmative on that?

A.   He did.

Q.   Did you ask hear the SWAT officer ask if there were any pets in the house?

A.   Yes, I did.

Q.   And did you hear Mr. Roncone indicate in sum and substance just a fish tank?

A.   Yes.

Q.   And are those common questions asked by law enforcement at the time they are executing a search warrant?

A.   Yes, want to know who else is in there, especially animals, maybe a dangerous dog.

Q.   What is the purpose of law enforcement asking those questions?

A.   Obviously for everybody's safety.  You want to know who else is in the residence.  You don't take it as a certainty, but it gives you a starting point. Sometimes there are children, sometimes there is maybe somebody has a cognitive disability or something like

B. BURNS - DX BY MR. COOPER

that.  Any of that information is helpful, that is obviously standard.

Q.  Generally are those questions asked for officer safety and safety of people inside the premises?

A.  Absolutely.

Q.  That conversation between the SWAT agent and Mr. Roncone, was the SWAT agent raising his voice or shouting at him?

A.  He was not.

Q.  Did he threaten or intimidate him in any way?

A.  He did not.

MR. COOPER:  Okay.  You can play it, Ms. Champoux.

(**Video continued.**)

MR. COOPER:  Can you pause it?

Ms. Champoux, can you pause it?

Q.  Did you hear Mr. Roncone make a request of the SWAT officer?

A.  Yes.

Q.  What did he say?

A.  Asked if they would get his father a jacket.

Q.  And did the SWAT officer respond that the case team will take care of that?

A.  Yes, they would get them buckled up in a car.

B. BURNS - DX BY MR. COOPER

Q.   He indicated that they would take them out of the weather?

A.   Yes.

Q.   And can you see the weather was kind of bad out?

A.   The weather was horrible that day.

MR COOPER:   Go ahead and play it, Ms. Champoux.

(Video continued.)

MR. COOPER:   Can you pause it, Ms. Champoux.

Q.   Did the SWAT agent ask Mr. Roncone if there were any weapons in the house?

A.   Yes, he did.

Q.   And did Mr. Roncone answer and tell him about some firearms in the house?

A.   Yes.   Mr. Roncone discussed there being long guns as well as a couple of handguns and he had a pistol permit.

Q.   And what is the tone of that conversation?

A.   Very cordial, not heightened at all.

Q.   Not heightened at all?

A.   No.

THE COURT:   Can you play it, Ms. Champoux?

(Video continued.)

Can you pause it, Ms. Champoux?

B. BURNS - DX BY MR. COOPER

Q.   Did you hear Mr. Roncone say something?

A.   Yes.

Q.   Did you hear anyone ask him a question before he said that?

A.   I did not.

Q.   What did Mr. Roncone offer up there?

A.   I believe he said the handgun was at the side of his bed; I'll have to hear it again.

MR. COOPER:  Ms. Champoux, can you go a couple seconds back to play that for Special Agent Burns again?  That is perfect.

(**Video continued.**)

Q.   Will you pause it.  Did you hear what he said that time?

A.   Yes.

Q.   What did he say?

A.   "The handgun next to my bed is loaded."  He previously indicated there was a handgun by his bed.

Q.   In the time that he said that, in the recording, can you hear anyone ask him a question?

A.   No, not just before that statement.

Q.   Okay.  Go ahead.  Play it Ms. Champoux, thank you.

(Video Continued.)

B. BURNS - DX BY MR. COOPER

MR. COOPER:  Can you pause it?

Q.   Did you hear Mr. Roncone ask another question of the SWAT agents at that point?

A.   Yes.

Q.   What did he say?

A.   I believe he said he wanted to text his boss and obviously this is the time work would be later in the day.

Q.   And so we'll cover this later, but did Mr. Roncone eventually make a similar request of you?

A.   Yes, he did.

Q.   And did you allow or call his boss for him and allow him to talk to his boss?

A.   Yes, I did.

MR. COOPER:  Go ahead and play it, Ms. Champoux.

(Video continued.)

MR. COOPER:  Can you pause it, Ms. Champoux?

Q.   Special Agent Burns, we're just past the 20-minute mark, maybe at about the 21-minute mark.

Did you hear Mr. Roncone make another statement to law enforcement?

A.   Yes.

Q.   Did you hear him ask the SWAT Officer if you can

B. BURNS - DX BY MR. COOPER

please get his dad a blanket?

A.   Yes.

Q.   Did you hear him say, "I've been pretty fucking cool with you," something along with those lines?

A.   Yes.

Q.   And to be fair, he has been polite and respectful with the agents up until this point?

A.   Yes, he has been.

Q.   And did you hear the SWAT Officer say the case team is literally on their way?

A.   He is coming, they are almost here is what I think he said.

Q.   And we're 21-minute into the mark 2120.

Ms. Champoux, go ahead and play it.

Thank you.

(**Video continued.**)

MR. COOPER:   Can you pause it, Ms. Champoux?

Q.   Special Agent Burns, did you hear one of the SWAT officers come over and provide Mr. Roncone with an update with what they were going to do to keep his father warm?

A.   Yes.

Q.   Did they tell him they were going to get him seated in a car?

B. BURNS - DX BY MR. COOPER

A.   Yes.

Q.   And did you hear him respond to that?

A.   An affirmative thank you, something along those lines.

Q.   Did he say "I appreciate you"?

A.   Appreciate it.

Q.   Would you consider that interaction between the SWAT Officer and Mr. Roncone to be contentious in any way?

A.   Not at all.

Q.   Polite and respectful?

A.   Yes.

            MR. COOPER:  Go ahead and play it Ms. Champoux.

            (Video continued.)

            MR. COOPER:  Will you pause it one more time?

Q.   Did you see a vehicle just pull up into the parking lot of the fire department across the street?

A.   Yes, I did.

Q.   And you're familiar with the vicinity of 4998 Williams Street, right?

A.   Yes, I am.

Q.   When the case team was arriving, including

B. BURNS - DX BY MR. COOPER

yourself, were you going to pull up your car right in the front yard of 4998?

A.    No, they would have still been clearing the house.

Q.    Where did the case team park their vehicles when they arrived?

A.    Across the street in the volunteer fire department lot.

Q.    Is that maybe 100 feet from the house or approximately 100 feet from the property?

A.    Yes, almost directly across, but a little bit over.

Q.    So slightly diagonal across the street from the house, is that fair to say?

A.    That's accurate.

Q.    Is it in the immediate vicinity of 4998 Williams Street?

A.    Yes.

Q.    And where we see headlights, what I just circled poorly, is that one of the case team vehicles arriving?

A.    Yeah.  I believe that was -- yeah, had the headlights, it was better earlier in the video.

Q.    Okay.  Let's clear.

MR. COOPER:  Ms. Champoux, would you be able

B. BURNS - DX BY MR. COOPER

to play it again.  Thank you.

(Video continued.)

Q.  Can you see that vehicle pulling into the fire department?

A.  Yes, I can.

MR. COOPER:  Ms. Champoux, can you pause it and tell me what time we're at.  We're at about the 26-minute mark, Special Agent Burns.

Q.  Do you see a member of the SWAT team walk Mr. Roncone across the street and have him sit down in the back of a sedan or vehicle?

A.  Yes, I do.

Q.  If we're at 26 minutes into the file now, and he came out of the house approximately 15 minutes into the file, is it about eleven minutes since he came outside when he sits in the back of this car?

A.  That is correct.

Q.  Okay.  At this point, he is in handcuffs, correct?

A.  That's correct.

Q.  And the SWAT team is still kind of with him right now, is that correct?

A.  Yeah, they -- the one SWAT team member walked him over.

B. BURNS - DX BY MR. COOPER

MR. COOPER:  Go ahead and play it, Ms. Champoux.  Thank you.

(Video continued.)

MR. COOPER:  Will you pause it again?

Q.  Do you recognize the woman depicted on the screen?

A.  Yes, I do.

Q.  And who is that?

A.  Special Agent Tina Taylor.

Q.  Is she somebody you work with?

A.  She is on my squad and she is now my supervisor.

Q.  Did you hear her mention you?

A.  Yes.  She said I would be coming or something along those lines.

Q.  Did you hear her say, "Brian is on his way there"?

A.  Yes.

Q.  And were you, in fact, on your way at this time?

A.  Yes, I was.

MR. COOPER:  And go ahead and play the recording, Ms. Champoux.

(Video continued.)

Will you pause it there?

Q.  Did you hear Special Agent Taylor ask Mr. Roncone

B. BURNS - DX BY MR. COOPER

a question?

A.   Yes.

Q.   What did she ask him?

A.   Is it easier for you to stand outside.

Q.   Did she say, Mike, is it easier for you to stand outside?

A.   Yes.

Q.   Did she yell at him or shout at him?

A.   No, not at all.

Q.   Was she being respectful?

A.   Yes.

Q.   And did you hear the SWAT agent respond to Agent Taylor?

A.   Yes.

Q.   What did he say?

A.   It's kind of chilly.

Q.   Referencing the weather?

A.   It was cold that day.

MR. COOPER:  Go ahead, Ms. Champoux.

(Video continued.)

MR. COOPER:  Will you pause it right there?

Q.   Did you hear Mr. Roncone make another statement to law enforcement there?

A.   Yes, I did.

B. BURNS - DX BY MR. COOPER

Q. And can you tell the Court what it was?

A. Concerning his mother.

Q. After the mom.

A. Can you cuff in front, I believe, words to that effect.

MR. COOPER: Can you go back a few seconds, Ms. Champoux?

We're almost finished with the recording, Judge.

Will you pause it, Ms. Champoux?

Q. Did you hear him that time?

A. Yes.

Q. What did he say?

A. "There is nothing in the house."

Q. Did you hear him say, "there is nothing in the house you have to worry about"?

A. That's correct.

MR COOPER: Go ahead and play it, Ms. Champoux. Thank you.

(Video continued.)

MR. COOPER: Will you pause it? Did you hear the SWAT Officer ask Special Agent Taylor if she was okay with him being front cuffed?

A. Yes.

B. BURNS - DX BY MR. COOPER

Q.  How did she respond?

A.  She said, "yes."

Q.  And then did Mr. Roncone make a comment?

A.  Yes.

Q.  And what did he say?

A.  Asked if they have any man cuffs.

Q.  Man cuffs?

A.  Yes, like large.

Q.  Like larger?

A.  Yes.

        MR. COOPER:  Go ahead and play it.

            (Video continued.)

            Will you pause it again?

Q.  Did you just hear Mr. Roncone laughing?

A.  Yes, I did.

Q.  Go ahead and play it.

            (Video continued.)

        MR. COOPER:  Ms. Champoux, will you pause it for the final time?  Can you give me a read out on the time at the end here?

Q.  Just under 30 minutes, is that correct?

A.  That's correct.

Q.  And so from the time the recording starts at 0552 to the time the recording ends at 0622, does anybody

                    B. BURNS - DX BY MR. COOPER

threaten Mr. Roncone?

A.   They do not.

Q.   Did anybody get into a verbal altercation with him?

A.   Not at all.

Q.   Did you observe anybody try to intimidate him?

A.   No.

Q.   Did Mr. Roncone get nasty with the agents at any point during that recording?

A.   Not at all.

Q.   Was he polite and respectful to them?

A.   Yes.

Q.   Did you hear times he chuckled or laughed?

A.   Yes.

Q.   And did you hear times when he made jokes about man-size handcuffs?

A.   Yes, I did.

          MR. COOPER:  Can you leave that up for a second, Ms. Champoux?  And then, Paul, I'm going to hand him the 302.

          MR. DELL:  Sure, that's fine.

Q.   Special Agent Burns, I'm handing you what's marked for identification as Government's Exhibit 15 as in apple.  Do you recognize that document?

B. BURNS - DX BY MR. COOPER

A.   Yes, I do.

Q.   What do you recognize that to be?

A.   An FD 302 report of the events on December 7th, 2023 that I drafted along with co-author investigator, Geraldo Rondon.

Q.   Is that a report concerning your interactions and investigator Rondon's investigations with Mr. Roncone on December 7th, 2023?

A.   Yes, it is.

Q.   Did you draft it?

A.   Yes.

Q.   Is that a fair and accurate depiction of the report that you drafted?

A.   Yes, it is.

Q.   I'm going to hand you exhibit 3500 D now for identification.

A.   Yes.

Q.   Do you recognize that?

A.   Yes, I do.

Q.   Is that the same 302 report?

A.   It is with some markings on it.

Q.   Some handwritten scribbles?

A.   That's right.

Q.   Who put those there?

B. BURNS - DX BY MR. COOPER

A.   Yesterday there was a status conference on this case.  When I sat back there, I was reviewing it while I was listening to the proceeding.

Q.   You said a status conference on this case. You're not referring to 23CR99, you're saying a status conference on a different case?

A.   No, it was the Gogolack, et al on the 9th floor.

Q.   Or on Monday?

A.   On Monday.  Was that -- what's today?

THE COURT:  On Monday.

A.   Yes.

THE WITNESS:  I'm sorry, your Honor, on Monday.  It's been a long week.

Q.   So Monday?

A.   Monday.

Q.   During the status conference, you were reviewing your 302.  Is that right?

A.   While I was listening to the status, yes.

Q.   And you made some handwritten notes on it?

A.   Yes, I apologize on the dates.

Q.   In the handwritten notes, did you correct a typographical error that you had in your 302?

A.   Yes.

Q.   Was that regarding the numerical address of Mr.

B. BURNS - DX BY MR. COOPER

Roncone's residence?

A. Yes.

Q. You wrote "4995" in the report and you corrected it to be 4998, correct?

A. Yes.

Q. Fair to say when you were reviewing it, you were getting yourself ready for your testimony for today?

A. Yes. I hadn't looked at it in a while and I was refreshing my recollection.

Q. And there were other small notes that you made on the 302, correct?

A. That's correct.

Q. And are those depicted the in 3500D?

A. They are.

MR. COOPER: At this time, the government would offer into evidence Government's Exhibit 1 A and Government's Exhibit 3500 D.

THE COURT: Any objection?

MR. DELL: Your Honor, on the condition that we can also admit Mr. Roncone's two affidavits, otherwise it's bolstering hearsay.

MR. COOPER: Well, hearsay --

THE COURT: When we get to any evidence that you want to introduce, if you want to move in the

B. BURNS - DX BY MR. COOPER

affidavits, are you intending to object to that?

MR. COOPER:  No, Judge.

THE COURT:  So no objection to these with that understanding -- you can object if you want.

MR. DELL:  I still object.

THE COURT:  Overruled.  I'm going to allow in 1 A and 3500 D.

(**WHEREUPON, EXHIBITS 1A AND 3500 D WERE RECEIVED INTO EVIDENCE.**)

MR. COOPER:  Thank you, your Honor.

Q.  Special Agent Burns, the interactions that you had with Mr. Roncone that we're talking about here today, those occurred just under two years ago.  Is that right?

A.  That's right.

Q.  Does having Government's Exhibit 1 A and Government's Exhibit 3500 D in front of you, is that going to help you to provide accurate testimony today?

A.  Yes, it will.

Q.  Does the report and your notes help refresh your memory about things that occurred?

A.  Yes, it does.

Q.  Okay.  Why do you write a report after something like interviewing a subject?

B. BURNS - DX BY MR. COOPER

A. Because you want to have an accurate timely reflection of the events and conversation or statements made contemporaneous to that day or that event, so we always do 302s to memorialize that.

Q. Is your brain a tape recorder?

A. It is not.

Q. And during an interview of a subject, is it common practice for someone to take notes?

A. Yes, it is.

Q. Did that happen when you spoke to Mr. Roncone?

A. Yes, it did.

Q. And were those notes used to create an official report?

A. Yes.

Q. Is that the report you're holding?

A. Yes, it is.

Q. What time did you arrive in the immediate vicinity, immediate vicinity of 4998 Williams Street on December 7th?

A. It was, best as I can recollect, it was approximate to the time that we spoke with Mr. Roncone after he been placed in Special Agent Taylor's vehicle, shortly thereafter.

Q. Does the report indicate what time you arrived

B. BURNS - DX BY MR. COOPER

and began interacting with Mr. Roncone?

A.   Yes, it does.

Q.   What time does it say that happened?

A.   Approximately 6:22 a.m.

Q.   And if you look up on the screen for a second, we still have Government's Exhibit 6 C as in Charlie up. At the very end of that file, it's 6:22 a.m. and the SWAT officer is facing towards the Roncone residence. Is that correct?

A.   Yes, he is on the way back.

Q.   So, essentially, as his body worn camera video ends, this file that we're watching, very close in time to that, you're arriving and interacting with Mr. Roncone.  Is that accurate?

A.   That's correct.

Q.   Okay.  At that time, give or take a minute, 6:22 a.m., would it be fair to say that Mr. Roncone had been in handcuffs for about seven minutes, from 6:15 a.m. to 6:22 a.m.  I'm sorry, 6:15, call out is, let me work through this, the call out occurs nine minutes into the recording at about 6 a.m., correct?

A.   That's correct.

Q.   Mr. Roncone comes out about seven minutes after that?

B. BURNS - DX BY MR. COOPER

A.   Yes.

Q.   So from 6:07 to 6:22, that is about 15 minutes, is that right?

A.   That's correct.

Q.   So the time that he is in handcuffs, would you agree with me is about 6:07 a.m. to 6:22 a.m. give or take?

A.   Give or take, yes.

Q.   Once you arrive and interact with Mr. Roncone, can you describe for the Court to the best of your recollection, the very first few things that you said to him and anything he may have said to you?

A.   Yes.

THE COURT:  Can I clarify, the handcuffs were not taken off the a 6:22 a.m. or were they?

THE WITNESS:  They were not.

Q.   And we're going there right now.  I'm sorry for that.

Go ahead Special Agent Burns.

A.   So initially myself and Investigator Rondon, both identified ourselves and who we were with, displayed our credentials, and he displayed his identification and he was removed from Special Agent Taylor's vehicle and we headed over to Investigator Rondon's vehicle.

B. BURNS - DX BY MR. COOPER

Q.   And was Investigator Rondon's vehicle generally in the same parking lot that Special Agent Taylor's vehicle?

A.   Yes, Ford Explorer, it was about 20 feet away.

Q.   So you walked over yourself, Investigator Rondon and Mr. Roncone walked from Special Agent Taylor's vehicle about 20 feet or so to Investigator Rondon's vehicle.  Is that correct?

A.   That is what I recall.

Q.   When you got to Investigator Rondon's vehicle, describe for the Court what happened at that point?

A.   At that point, we wanted to begin our attempted interview and question Mr. Roncone, so as it states, first thing I did was explain he was not under arrest and he had been detained for everyone's safety and I explained the SWAT team does what they do and their goal is to execute, basically make the scene safe, and that is for everyone's safety.  So he had been detained, handcuffed for that reason.

So I explained to him he is not under arrest, that he had been detained pursuant to the search warrant being executed at the residence.  And I then confirmed again with him that he was not under arrest.  I wanted to make sure that was really clear, and did not need to

B. BURNS - DX BY MR. COOPER

speak with the investigators.  And at that point, we took the handcuffs off of him for the -- at least until he invoked.

Q.   So I want to walk through that right now.  When you walk with Mr. Roncone -- or you walk with Mr. Roncone and Investigator Rondon over to Investigator Rondon's vehicle, correct?

A.   That is as I recall or we pulled up next to him or drove over there.  I can't recall with specificity. I do specifically recall introducing ourselves and him being in Investigator Rondon's car and explain to him why he had been handcuffed and why he was detained and then telling him he didn't have to talk to us and then the cuffs being removed.

Q.   So at the time that you're either in or near Investigator Rondon's vehicle, did you personally yourself advise Mr. Roncone that he was not under arrest?

A.   Absolutely.

Q.   Did you advise Mr. Roncone the reason that he had been handcuffed?

A.   Yes, I explained there was a federal search warrant being executed that had been signed by a federal judge and that there had been probable cause so that we

B. BURNS - DX BY MR. COOPER

had a warrant for his residence.

Q.    When you're explaining that he is not under arrest and the reason why he had been detained and handcuffed, did you remove his handcuffs?

A.    After that, yes.  And we had Investigator Rondon and myself had spoke about we were going to unhandcuff him and spoke to him and attempted to interview him.

Q.    So you planned in advance that you wanted to make sure he was not in handcuffs?

A.    I wanted to make sure Investigator Rondon was comfortable and that I was comfortable and he was comfortable that we would be speaking with him uncuffed during the interview.

Q.    And during the same time frame, let's say within a minute, is the same conversation you are not under arrest, you were detained because of a search warrant and the handcuffs being removed.  Is that all happening within a minute?

A.    Yes, that is all in a row and I did it twice.  I said he wasn't under arrest and I did include he didn't need to speak with us.  I said, "You don't need to speak with us, but I do want do have some things I want to tell you about related to search warrant."

Q.    Okay.  When you say those things to Mr. Roncone,

B. BURNS - DX BY MR. COOPER

is that give or take within a couple of minutes of your first walking up and introducing yourself to him?

A. Yes, definitely.

Q. So within a minute or a couple of minutes of you introducing yourself to Mr. Roncone are the handcuffs removed?

A. Yes.

Q. Did you explain that he wasn't under arrest twice?

A. Yes.

Q. And when you explained you are not under arrest, you don't have to talk with us, did Mr. Roncone demand he wanted to leave?

A. He did not.

Q. Did you hope he would stay and talk to you?

A. Yes, I certainly wanted to at least get some statement from him.

Q. You wanted to talk to him, right?

A. Absolutely.

Q. Did he tell you he wanted to leave?

A. He did not.

Q. Did he tell you he wanted an attorney?

A. He did not.

Q. Did he tell you he did not want to answer any

B. BURNS - DX BY MR. COOPER

questions?

A.   He did not.

Q.   Once you've explained all of those things that I've now asked you about three times, did you begin to conduct an interview of Mr. Roncone?

A.   It was an interview, it was also kind of a conversation back and forth.

Q.   Is your strategy -- you told the Court when you first started testifying that you've conducted hundreds, maybe thousands of interviews.  Is that correct?

A.   That's fair.

Q.   Would you say over that time?

MR. DELL:  Your Honor, I'm going to object over the leading.  There has been a lot of leading and I try to back off and it gets to point that Mr. Cooper is testifying.

THE COURT:  I'm going to sustain the leading objection.

Q.   Okay.  I'll start that question over.  Do you have a standard practice in terms of your demeanor for how you conduct an interview?

A.   Yes, I've been doing interviews for a very long time and I've always evolved, but I've always tried to build rapport and always polite, independent, active,

B. BURNS - DX BY MR. COOPER

not threatening.  I find those techniques don't work, I build a rapport and then have a conversation.

Q.   Do you try to be friendly and respectful?

A.   Absolutely.

Q.   When you interacted with Mr. Roncone on December 7th, 2023, what was your demeanor like then?

A.   Same.  It was cordial, it was calm and not threatening and basically building rapport and explaining to him why we were there and what was going on.

Q.   During your entire law enforcement career, have you interacted with people, anyone, who you've observed and based on your physical observations you thought yourself this person is terrified?

A.   Absolutely.

Q.   Are those physical observations that you're able to make?

A.   Oh, yeah.

Q.   Have you seen that before in your career?

A.   Yes; tears, heavy breathing, sweating.

Q.   Did you observe any of those things with Mr. Roncone when you were interacting with him?

A.   No, not at all.

Q.   Did he appear to be afraid?

B. BURNS - DX BY MR. COOPER

A. No.

Q. Did he exhibit any physical behaviors that made you think he was intimidated?

A. No.

Q. Was he crying?

A. No.

Q. Whimpering?

A. No.

Q. Was the tone of his voice normal?

A. Yes.

Q. Was the tone of your voice normal?

A. Yes, a very cordial conversation.

Q. Would you describe for the Court -- I guess pick up from where we've left off in your interaction with Mr. Roncone.

A. Yes. So, again, I was explaining the search warrant, the circumstances, and it's kind of my common practice to explain there was a search warrant, and then I said, as I stated in the 302, related to the events in Wellsville involving Howie Hinkle and Frank Knight, and they were individuals that I knew had been down in Wellsville at the time of the death of Ms. Quinn.

Q. Okay. You explained that to Mr. Roncone. Did you explain that to Mr. Roncone that this had to do with

B. BURNS - DX BY MR. COOPER

Crystal and Howie and Frank?

A.   That's correct.

Q.   And did he respond to that?

A.   Yes.

Q.   What did he say?

A.   He said quote, "they all play cards together."

Q.   You just used the word "quote" in a 302, does that have significance?

A.   Yes, it does.

Q.   What is the significance based on your training and experience putting quotation marks in a 302?

A.   I put quotation in a statement in a 302 when that is something an individual said.  I have a clear recollection of it and I will put a quote with the concurrence of the other agent.

THE COURT:  Do you have an independent recollection of this as you're sitting here, because I see you're looking at 302?

THE WITNESS:  No, not independent recollection.  I wrote it at the time.  This is two years from now.  I remember, you know, him saying that he didn't, that he wasn't involved in it, basically the quotes from the 302, but I don't independently, at this time, remember the quotes, per se.

B. BURNS - DX BY MR. COOPER

THE COURT:  So you're not able to testify as to what he said without reading from the 302, is that a fair statement?

THE WITNESS:  I probably have some of the quotes memorized from the 302, I mean.

THE COURT:  But you've memorized them from the 302?

THE WITNESS:  From refreshing my recollection, yes.

THE COURT:  Have you memorized them from the 302 or is looking at the 302 refreshing your recollection as to what he said?

THE WITNESS:  No, it's refreshing my recollection.

THE COURT:  Okay.  Go ahead, Mr. Cooper.

MR. COOPER:  Thank you, Judge.

**CONTINUING DIRECT EXAMINATION BY MR. COOPER:**

Q.  So, Special Agent Burns, I asked you before if your brain worked like a tape recorder.  And I know it's kind of a silly question, but it's been about two years since you spoke with Mr. Roncone on December 7th, 2023, right?

A.  That's correct.

Q.  And so if you didn't have a 302 and you had to

B. BURNS - DX BY MR. COOPER

come in and testify, would it have been difficult for you to remember the exact quotes and the words he used specifically?

A.   The exact quotes, yes.

Q.   Even if you didn't have a 302, would you be able to testify, just based on your memory, about the topics that you discussed and the gist of the statements --

A.   Absolutely yes.

Q.   You have to let me finish my question.  The gist of the statements made to you?

A.   Yes.

THE COURT:  Let me ask one more question. Do you take notes contemporaneously -- let me rephrase it.

Did you take notes contemporaneously when you were talking to Mr. Roncone or did you memorialize the notes afterwards?

THE WITNESS:  Investigator Rondon was next to me taking the notes.  So I was -- the way I was positioned, I was in the front side passenger and then Investigator Rondon was in the driver's seat and then Mr. Roncone is behind Investigator Rondon, so I'm talking and I'm not taking notes and Investigator Rondon is taking notes, as best as he can, kind of crumbled up

B. BURNS - DX BY MR. COOPER

there, so it was his notes and then I relied on those and also my memory when I memorialized that 302 that day.

THE COURT:  Okay.  Thank you.

Q.  And Special Agent Burns, that is a good point you brought up in response to the Court's question.  What is the date that you wrote that 302?

A.  12/7/2023.  I went back to the office because it was an important one and I knew some of the statements and I wanted to make sure I had it contemporaneously.

Q.  So would it be fair to stay that you drafted that report within hours of your interaction with Mr. Roncone?

A.  Yes, that afternoon.

Q.  When Frank Knight and Howie Hinkle and Crystal Quinn came up during your discussion with Mr. Roncone, what did he say to you about that topic?

A.  He said they all play cards together.  He also said that he learned of her death after it occurred.  And then he learned that he didn't know or that he heard it from -- let's see, yeah.  He learned about it after she died and basically implying he had no involvement in that.

Q.  Okay.  The quotes that exist in Government's

B. BURNS - DX BY MR. COOPER

Exhibit 1 A, are those direct quotes that Mr. Roncone said to you that you then memorialized in an official FBI report?

A. Yes.

Q. And at the time you drafted that report, it had been a number of hours since the conversation and it was fresh in your mind, correct?

A. That is correct.

Q. So after the topic of, initially, the topic of Wellsville and Frank Knight and Hinkle come up, does the conversation switch to a different topic?

A. Yes, it does.

Q. What topic is that?

A. He discussed traveling or why he relocated back to his father's residence.

Q. What did he say to you about why he relocated to his father's residence?

A. That his mother had left his father and he expressed his -- he was upset with his sister because he felt that she had encouraged his mother to leave his father and that was the reason he was up here. Additionally, he discussed there had been a fire, which I was aware of, so I was interested in that, there was a fire, he said his residence, which I also understood to

B. BURNS - DX BY MR. COOPER

be the Rare Breed motorcycle club in Wellsville.  I understood there was an arson and it had burned down. He was upset that Wellsville police had not arrested somebody.  He implied he thought it was not a thorough investigation and he found some evidence afterwards that he thought the police should have found.  We talked about that, that kind of bucket.

Q.   That's okay.  Let's stay on that topic.  The topic of the Rare Breed clubhouse came up during your conversation at that time?

A.   That's right.

Q.   Were you aware at that point in the investigation that previously there had been a physical Rare Breed clubhouse in the vicinity of Scott Avenue in Wellsville?

A.   Yes.  I was familiar with that from my involvement in the investigation and speaking with the police officers from Wellsville.

Q.   And were you aware at the time you were interviewing Mr. Roncone that that Wellsville Rare Breed motorcycle clubhouse had previously burned down?

A.   Yes, there had been an arson or suspected arson.

Q.   And when Mr. Roncone was speaking about that, was that kind of consistent with things you already knew in the investigation?

B. BURNS - DX BY MR. COOPER

A.   Yes, confirmed his involvement in the prison down there and the clubhouse and it was corroborating what we knew to be accurate.

Q.   And you mentioned a moment ago that Mr. Roncone indicated to you that it was his residence that burned down.  You knew it to be the clubhouse, is that correct?

A.   Yes, that is what I understood it to be.

Q.   And Mr. Roncone -- let me rephrase.

Did Mr. Roncone say anything to you about his views on the local police investigation into that arson?

A.   Yes.

Q.   Did he express displeasure about that?

A.   He thought it wasn't being properly investigated and he was further upset in that they had indicated they were going to arrest someone and they had not.

Q.   Okay.  Did Mr. Roncone make statements to you about what would be inside of his residence?

A.   Yes.

Q.   Okay.  Is that a topic that you brought up?

A.   I brought that up.  That is standard, whenever I -- we are executing a search warrant at someone's residence, I always, whoever has been in there, I ask them what is in there, are there things that will hurt people, explosives, evidence of crime, drugs, guns,

B. BURNS - DX BY MR. COOPER

things along those lines.  That was my -- I always ask that and I asked that in this case.

Q.  And when you asked Mr. Roncone if there was anything inside the house like drugs, explosives or guns, did you tell him "you have to answer this question"?

A.  No.

Q.  Was it a question you ask?

A.  It was another part of the interview.

Q.  And at the beginning of the interview, you already advised him he didn't have to talk to you?

A.  That's right.

Q.  And when you asked him if there was anything like drugs, explosives or firearms in the residence?

A.  Yes.

Q.  What did he say?

A.  He said there were no drugs, no explosives, and then he indicated there seemed to be a descent amount of firearms, long guns and handguns and that he had a permit and all of the handguns were on the permit.

Q.  Did you discuss with Mr. Roncone what, if any, electronic devices were in the house?

A.  Yes.  And just to clarify, too, on the firearms, I do recall him mentioning, in order to ascertain which

B. BURNS - DX BY MR. COOPER

ones were his or which ones were his fathers, he would have to specifically identify those.  That was another part of the gun conversation, firearm.

Q.   Was he being cooperative with you?

A.   Yes, a back and forth, it was cordial.

Q.   Did the topic of electronic devices come up?

A.   Yes, another standard, whenever a search warrant is being executed or in the process of being executed, and I'm speaking to someone that was in the residence or part of the investigation, I always ask them what sort of electronics we'll find, where their phone is, just to get a sense of -- there are so many electronics in some places now, it's especially helpful if you can ascertain what certain members of in the household are using.

Q.   We moved 3 A and 3 B into evidence.  Do you recall looking at those earlier?

A.   Yes, I do.

Q.   And the search warrant -- did the search warrants for Mr. Roncone's person and premises authorize agents to seize electronic devices?

A.   Yes, it did.

Q.   When you asked Mr. Roncone if there were electronic devices in the house, did he answer you?

A.   Yes.

B. BURNS - DX BY MR. COOPER

Q.   And what did he tell you?

A.   His cell phone was -- there is a quote, like, the guys in the military gear have it.  I knew by his representation of that that the SWAT team had his phone, that they had taken, likely, off of his person.  I didn't know that at the time.  But then he mentioned he had a computer that he barely used, and his father had a cell phone, and his father also had a tablet.  That was the extent of the electronics that he represented were in the residence to me.

Q.   After the conversation about the electronic devices, did the conversation move onto another topic?

A.   Yes.

Q.   Can you describe that to the Court?

A.   It kind of segued back to Quinn, the conversation bounced, but we went back to the death of Crystal Quinn.

Q.   What, if anything, came up during that part of the conversation?

A.   It was his representations of his conversations with Frank Knight.  And, again, there are quotes related to that, that I wouldn't know the exact quote, but generally he talked about his conversations with Frank Knight.  And referring to the girl, he talked about Simon Gogolack who he described as being a narcotics

B. BURNS - DX BY MR. COOPER

user and crazy, so that was that part of the conversation.

Q.   And so with, obviously, the caveat that you just testified that you need to look at the report to get the exact quotes, the report is in evidence.  Can you read into the record the exact quotes that Mr. Roncone said at that point in the interview?

A.   Sure.  So Roncone stated, "Frank called me about the girl," that is a quote, and I put "referring to Crystal Quinn," and then another quote, "me and Frank messaged each other about her, I did not know her at all."  And then Roncone heard about, and this is a quote, "the girl, after she died," end quote.  Roncone said words to the effect, and that was the part that I just testified to, and it was not a quote, was that he was crazy and a big drug user.

Q.   When you say "he," who are you referring to?

A.   Simon Gogolack.

Q.   And then the final quote, I quote from Mr. Roncone, "I don't know anything about the girl's death."  Is that -- are those quotes consistent with what you remember about your conversation with Mr. Roncone?

A.   Yes, generally those statements, but the exact quotes I would need to refresh my recollection.

B. BURNS - DX BY MR. COOPER

Q.   Okay.   After you discussed the Crystal Quinn, Wellsville topic a second time, does the conversation switch to the location of the new Rare Breed clubhouse also known as kind of the trailer park?

A.   Yes.   So then the conversation kind of, I started describing more or sharing more with Mr. Roncone about the events of that day.  I think I was explaining that there are other clubhouses, the Buffalo clubhouse, the Outlaw motorcycle clubhouse, Mr. Ermin's residence, explaining the scope of the amount of search warrants that day.  And in those, I also mentioned the new, what we were calling the new Rare Breed clubhouse, which is a series of what we understood to be RVs or trailers on the hill in Wellsville, which he confirmed was kind of their new clubhouse, quote, unquote.

Q.   So just to summarize that.  Did you provide to Mr. Roncone information about the scope of law enforcement's activities that day?

A.   Yes, I did.

Q.   And when you were doing that, did the topic of Alma Hill outdoor Rare Breed clubhouse come up in conversation?

A.   Yes.   Mr. Roncone was very concerned specifically that he had described to us how he had spent a lot of

B. BURNS - DX BY MR. COOPER

time and energy, you know, winterizing them, and I knew to be involved with draining the water lines and filling them with antifreeze and talked about how all of them had kind of been sealed up, tarped up, something, ti the effect it was clear it was post-hunting season and they had all been kind of buttoned up for the winter and he was concerned about the execution of the search warrant and how that would affect the fact that it was all winterized.

Q.   After Mr. Roncone expressed concern to you about the state that the RVs would be left in after they were searched, did he make statements to you that he terminated your interview with him?

A.   Yes, he did.

Q.   What did he say to you?

A.   Essentially he said he invoked and didn't want to answer any questions and he wanted to have a lawyer.

Q.   Okay.   Up until that point, all of the whole conversation you've described for the Court, up until that point had Mr. Roncone ever asked for an attorney?

A.   He had not.

Q.   Up until that point, had Mr. Roncone ever declined to answer any of your questions?

A.   He had not.

B. BURNS - DX BY MR. COOPER

Q.  Up until that point, had Mr. Roncone told you he just didn't want to talk anymore?

A.  He did not.

Q.  Once Mr. Roncone said that to you, that he didn't want to answer any more questions and that he invoked, did you ask him about who his attorney was?

A.  Yes, I did.

Q.  And why did you do that?

A.  It's my standard practice.  I always ask them who their attorney is, especially having been around as long as I have, I know virtually all of the defense attorneys that practice in federal court.  And oftentimes I'll have their telephone, I'll have their cellular numbers. It's been my practice if somebody says, "I have Herb Greenman," then I would call up Mr. Greenman and say, "Mr. Greenman, this is Brian Burns, we have a search warrant on your client," and it's my practice to provide the phone to the client and then say, "I'm walking away."

Q.  Okay.  Is that kind of a just a courtesy that you extend?

A.  Two reasons.  One, the defense attorneys will often tell their clients, hey, basically it calms the situation.  They explain to them, you know, you don't,

B. BURNS - DX BY MR. COOPER

Mr. Greenman, for example, he says, I tell my clients, that's the FBI's place until they get done and you shouldn't be there, you can't intervene, you can't intercede. It's useful in the sense that it saves us some of the -- if someone tries to interact or it calms the situation so.

Q. So is it a part of your common practice to ask a person who their attorney is?

A. Yes.

Q. Did Mr. Roncone answer that question?

A. Yes.

Q. What did he say?

A. David Tadaro.

Q. Is that a person that you're familiar with?

A. No.

Q. Is that a person whose phone number you had?

A. I did not have Mr. Tadaro's phone number.

Q. Were you able to make the call that you just described and kind of put them on the phone?

A. No, not in this situation.

Q. After Mr. Roncone told you he was done answering questions and wanted his attorney, was he handcuffed at that point?

A. Yes, he was.

B. BURNS - DX BY MR. COOPER

Q.   Front cuffed or rear cuffed?

A.   Front cuffed.

Q.   What did you do after Mr. Roncone was front cuffed and the interview had terminated at that point?

A.   Probably a little bit of small talk.  I recall I explained to him kind of what the search warrant would go on and these things take a while.  And I recall explaining his truck or his vehicle was also part of the warrant, so that that way we would have to search that before he could get that.  And I believe we talked maybe a little bit about his father.  He was always concerned about his father, but there was no more questioning about the case.  And there was -- we're talking a brief period of time before he wanted to talk to his employer.

Q.   Let's pause there and set a time frame. According to the 302 and your testimony, if you began interacting with Mr. Roncone around 6:22 in the morning, approximately how many minutes did that last before he told you "I don't want to answer any more questions"?

A.   Approximately maybe 20 minutes.

Q.   Okay.  That would put us around 6:42, is that fair?

A.   I would say that may be 15, it wasn't a long interview.

B. BURNS - DX BY MR. COOPER

Q.   After Mr. Roncone told you he didn't want to answer any more questions and invoked his right to an attorney, did he make statements about wanting to call his employer?

A.   Yes.

Q.   Now, did you help facilitate that?

A.   Yes.  He indicated that he was supposed to be supervising a tile job.  My understanding is he had a ceramic floor and he was concerned that, one, he wouldn't be able to get to work in time, and I think that is where the comments about the discussion about the truck came in, and then he wanted to call his boss to say that he was going to be late for work.  And then also he was concerned because I guess the individual that he was working with, he was to supervise the individual, and he didn't know if that individual could do it without his oversight, I guess would be a way to describe it.

Q.   Did you put him on the phone with his boss?

A.   Yes, I did.

Q.   Did you hold the phone so he could talk to his boss?

A.   Yes, we did.

Q.   At any point during that interaction about the

B. BURNS - DX BY MR. COOPER

boss or the work, did you ask him questions about the case or investigation?

A.   No.   There was no more questioning about the case.   It was more about what was going to happen concerning the search and getting it turned back over to him at the end, things like that.

Q.   At some point, did you enter 4998 Williams Street?

A.   Yes.

Q.   So in order to do that, you would have had to walk away from Investigator Rondon's vehicle, is that right?

A.   That's correct.

Q.   When you walked away from Investigator Rondon's vehicle, did another member of law enforcement, essentially, take your place as Geraldo's partner?

A.   Yes, there were two other troopers.  Investigator Ginnane and Supervisor Senior New York State Police investigator.  They were in the vehicle kind of next to us.  They weren't participating in the interview but in close proximity, one or both of them, I don't recall, kind of came in to assist Investigator Rondon because, obviously, it wouldn't be appropriate for him to be alone.  So I went to the residence.

B. BURNS - DX BY MR. COOPER

Q. And then you mentioned a second senior investigator, as you sit here, you having trouble remembering that person's name?

A. Yes, that was the first time and I think the last time I ever met him.

Q. If I said his name, would you recognize it?

A. Definitely.

Q. Was it Senior Investigator Schreiber?

MR. COOPER: S-c-h-r-e-i-b-e-r.

A. Yes.

Q. Special Agent Burns, do you remember, as you sit here today, the exact time that you first walked into 4998 Williams Street?

A. Not the exact time.

Q. Okay. Are you familiar with FBI report that documented the exact time that you went in with SWAT?

A. Yes. It was -- well, I didn't go in with them. I went and met with them. I know it's approximately 7:06, 7:07, but I would have to see the report for the exact time.

Q. Okay.

MR. COOPER: I'll show him 7.

Q. I'll show you what's been marked Government's Exhibit 7 and take a look at the second page of that and

B. BURNS - DX BY MR. COOPER

read through it and look up at me when you're finished.

   A.  I see it.

   Q.  Okay.  Did looking at that refresh your memory?

   A.  To the exact time, yes.

   Q.  Did there come a time when SWAT brought you and one other agent for a walk through of 4998 Williams Street?

   A.  Yes, it's kind of common practice that once the SWAT team feels the site is secure, they call like a turn over, so myself and Special Agent Andrea Salino, she was leading the search team and we met with the Special Agent, the SWAT team leader, and he had been from Buffalo, and so I knew him and we met with them and he essentially turned over the scene.  He said it was all clear and he provided me Mr. Roncone's cell phone and that was, based on the report, 7:06.

   Q.  Was that initial walk through with SWAT a little earlier than 7:06?

   A.  Possibly, a little bit shorter.  It was kind of a walk over and a turn over.

   Q.  May I have that back?

   A.  Yeah.

   Q.  You mentioned that this SWAT team leader handed you something.  What was that?

B. BURNS - DX BY MR. COOPER

A.   That was Mr. Roncone's cellular telephone.

Q.   We discussed this earlier, the search warrants that you had, exhibits 3 A and 3 B, did those authorize law enforcement to seize Mr. Roncone's cell phone?

A.   They did.

Q.   If you need to look at the warrant to refresh your memory, tell me, but did those warrants authorize law enforcement to use biometric features of Mr. Roncone to unlock the cell phone?

A.   I recall that paragraph.

Q.   Was it in there?

A.   It was in there.

Q.   Did you take the cell phone and walk back over to Investigator Rondon's vehicle?

A.   Yes.

Q.   And why did you do that?

A.   Because I believed when I opened it, I would need to get the biometrics - fingerprints, facial.

Q.   In order to unlock it?

A.   Yes.

Q.   When you got over the vehicle, did you like touch or engage with the phone to get the screen activated?

A.   Yes, something to bring it back to life.

Q.   And did it, in fact, need to be locked or not?

B. BURNS - DX BY MR. COOPER

A.   It was unlocked.

Q.   And did you comment, were you surprised by that?

A.   I was surprised by that.

Q.   Did you make a comment when the phone didn't have a lock?

A.   Yes, no pass code, something like along those lines.

Q.   And when you said that, were you in the presence of Mr. Roncone?

A.   Yes, I was.

Q.   Did you say that because you wanted him to talk or comment on it?

A.   No.  I was surprised.  It's rare that you find a phone and doesn't have some sort of protection.

Q.   And when you made the comment about the phone not having a screen lock, did Mr. Roncone respond?

A.   Yes.

Q.   What did he say?

A.   Words to the effect, "I have nothing to hide."  I don't know the exact quote, but nothing to hide.

Q.   Was it your intention when you made the comment to have him respond to you?

A.   No, I was mentioning, I stated, oh, there is no pass code, no protection, whatever I said.

B. BURNS - DX BY MR. COOPER

Q.   Got it.  And then at some point did you go inside the house and engage with members of the search team?

A.   A couple different times throughout that morning.

Q.   Okay.  Was your attention brought to some items that were recovered or observed inside the house?

A.   After a few hours as the search progressed.

Q.   So a few hours go by, the search progresses, what is your attention directed to?

A.   A number of things; a lot of firearms.  But the ones that were of importance at that moment were some narcotics that were up in, what I believed to be Mr. Roncone's bedroom, in the drawer there was a plastic baggie with white powder.  And also in the safe there was a tray, appeared to be some cocaine, cocaine residue, narcotics, essentially.

Q.   Now, I want to pause there for a moment.  You described for the Court earlier that when you first started speaking with Mr. Roncone, you told him he was not under arrest and you told him that twice.  Is that correct?

A.   That's correct.

Q.   At the time that you were telling him that, did you believe that to be true?

A.   No, it was absolutely true.  I had no information

B. BURNS - DX BY MR. COOPER

-- I had nothing I could have at that point or had the authority to effect an arrest on.

Q. Okay. When your attention was brought to narcotics and narcotics paraphernalia inside the house, in your mind, as a 25-plus year special agent, is that situation kind of changing now?

A. Yes, especially with the firearms being present.

Q. Okay. What, if anything, did you do with the drug evidence that you observed inside the house?

A. Well, I had been in communication with like what, we call the command post or people back at the office, so I was keeping them apprised and the case agent, Tommy Weis, what was going on. And I also took some photographs on my phone of that evidence because I knew that the search team would be taking their own photos, but those are on a card and I needed something tangible that I had on my phone right then and there.

Q. You mentioned that you took some pictures of the things -- you took some photos yourself of things that were observed inside the residence. Is that correct?

A. That's correct.

Q. I'm going to hand you what's marked for identification as Government's Exhibit 2 B as in boy. Just look through all of the pages of 2 B and look back

B. BURNS - DX BY MR. COOPER

up at me when you're finished.

A.   Yes.   Those are the photographs that I took on my phone.

Q.   Does Government's Exhibit 2 B fairly and accurately depict the photographs that you took on your cell phone of items inside Mr. Roncone's residence?

A.   Yes, it does.

MR. COOPER:  Judge, with that foundation, I offer Government's Exhibit 2 B into evidence.

MR. DELL:  No objection.

THE COURT:  Okay.  Two B will come into evidence.

(**WHEREUPON, EXHIBIT 2B WAS RECEIVED INTO EVIDENCE.**)

MR. COOPER:  May I have that back, Brian?

THE WITNESS:  Certainly.

MR. COOPER:  Thank you.

Your Honor, do you have a hard copy of it in front of you?

THE COURT:  I do, I think so.

Q.   Special Agent Burns, I'm showing you the first page of Government's Exhibit 2 B.  This very first picture.  Can you see that?  Karen has it up on the screen.  Thank you, Karen.

B. BURNS - DX BY MR. COOPER

Can you describe, why did you take this picture?

A.   Because it had what appeared to be some kind of maybe cocaine or meth in a little baggie in this drawer along with the casing of a firearm and some currency.

MR. COOPER:  Ms. Champoux, can you zoom in on this portion?  That is perfect.

Q.   Does that appear to be a live round of ammunition?

A.   That's it.  My eyes are not as good.  They are attached to the 302, but I don't have them.  This is a full unused bullet.

Q.   Okay.  So then you mentioned something that looked like cocaine to you can you point out to the court where that is?

A.   Yes, based on that.  The white baggie next to the cartridge, the firearm.

Q.   And you mentioned earlier that you've worked on narcotics cases before.  Are you familiar with a corner or baggie corner?

A.   Yes, that is essentially what it looked like to me.  We didn't field test it at that time.

Q.   Got it.

MR. COOPER:  And you can pull that one down Ms. Champoux.  And if you can go to the very next page.

B. BURNS - DX BY MR. COOPER

Q.  Was this another photograph that you took?

A.  Yes, it is.

Q.  Where was this inside the residence?

A.  It was inside the safe.

Q.  And we'll help you out.

MR. COOPER:  Ms. Champoux, can you zoom in on what you were doing.  Perfect.

Q.  Can you see that?

A.  Yes, I can.

Q.  What does this appear to be based on your training and experience?

A.  Like a tray and kind of doing lines of coke or meth.

Q.  Can you see powder residue?

A.  Yes.

Q.  Can you see a plastic bag corner?

A.  Yes.

Q.  And what is in the bottom right?  What is the item in the bottom right?

A.  Mortar and pestle, maybe somebody crushing tablets and snorting them.

Q.  And a mortar and pestle, does there appear to be residue in there?

A.  Yes.

B. BURNS - DX BY MR. COOPER

Q. And do you see a straw on the tray?

A. Yes.

Q. Is that drug paraphernalia?

A. In my experience, yes.

Q. And is there some sort of card or credit card on that tray?

A. Yes, there is.

Q. And I know your eyes are bad, can you read the name?

A. James Roncone.

Q. And James Roncone is not who is sitting here?

A. That is Michael.

Q. And who is James Roncone?

A. That is his father.

MR. COOPER: And can you zoom out and you can take this exhibit down, Ms. Champoux. Thank you.

Q. At some point after taking the pictures, let me rewind for one second. Do you know approximately when you took the pictures?

A. They were like 10:36, 10:37, one might be a little later, but those two are approximately 10:36 or 10:37 a.m.

Q. So give or take, is that approximately four hours after you initially interacted with Mr. Roncone?

B. BURNS - DX BY MR. COOPER

A.    Yes, it is.

Q.    And when you took those pictures, did you ultimately go back over to the vehicle where Investigator Rondon was sitting with Mr. Roncone?

A.    Yes, I did.

Q.    Why did you go back to the vehicle after taking the pictures?

A.    I believed we were heading towards the arrest.  I don't think I had the authority yet, but I suspected that we would be charging Mr. Roncone, so it would change the calculus and change the situation.  He wouldn't be able to leave, and, obviously, we would have to inform him he was under arrest, so my purpose was to basically show him this in order for him to start realizing there are some things are going to change.

Q.    When you first spoke with him, you told him he was not under arrest.  Is that correct?

A.    That's correct.

Q.    And you describe to the Court that you took these photos of what appeared to be drug evidence?

A.    That's correct.

Q.    And in your mind at the time you were taking pictures, did you think you were likely going to be arresting Mr. Roncone that day?

B. BURNS - DX BY MR. COOPER

A.  Yes.

Q.  Did you go back to the vehicle with the intention of advising him of that?

A.  I went back notifying him that we found narcotics and I didn't know if I had the authority yet, but I knew it was likely forthcoming, so I don't think -- I didn't want to say, oh, you're going to be arrested, because I didn't know if I had it at that time, but I knew it was going to be imminent, so I wanted to show him we found drugs.

Q.  Were you providing an update of what happened in the house?

A.  Yes.

Q.  And describe, when you walked back to Investigator Rondon's vehicle, describe what happens?

A.  He opened the window and I displayed to him the telephone and we recovered these items, something along those lines, that these were drugs in the house.

Q.  And did you show him -- the two pictures that we just showed the Court, did you show him those two pictures on your cell phone?

A.  Yes, I did.

Q.  Did you ask him any questions or did you tell him, hey, mike, we found these in the house?  How did

B. BURNS - DX BY MR. COOPER

that play out?

A.  I knew he invoked, so I wasn't going to ask any further questions, but I wanted him to be aware, hey, we found these -- there were drugs in your house.

Q.  So in terms, for a moment, and in terms of what your intention was at the time you showed him that, was your intention to try and get him to make incriminating statements about the picture?

A.  No, I knew he already invoked.

Q.  But you did show him pictures of drugs that were found inside the house?

A.  Yes, we did.

Q.  Did Mr. Roncone respond when you advised him and showed him the pictures of the drugs?

A.  He either pointed to the card or said something about the card and I knew the card was not in his name, and I knew -- I got the impression he was implying that that this wasn't his drugs.

Q.  Did he say something along the lines of that is not my name on the card?

A.  Something along those lines.  It was about the card and the fact that his name wasn't on it.

Q.  And did you know that, at the time he said that, did you know whose name was on the card?

B. BURNS - DX BY MR. COOPER

A.    I knew it wasn't his name at that time.  I'm not sure if it was his brother or father, I thought it was his father or outside chance it was his brother, but I knew it wasn't his name.

Q.    When Mr. Roncone indicated to you, "it's not my name on the card," what did you say in response?

A.    Because I believed it was his father, I believed he was kind of putting it on his father.  I said something, "are you trying to put this on your father?" He was very protective of his father in our initial conversation and concerned about his father, so he kind of bothered me and I said that.

Q.    He says something like, "it's not my name on the card," is that right?

A.    Correct.

Q.    Did that bother you?

A.    Yes, it did.

Q.    And you were describing it bothered you because earlier he seemed to be concerned about his dad?

A.    I did.  And I thought he was basically trying to put the drugs on his father who was older.

Q.    And when he said, hey, it's not my name on the card, you followed up with a statement, right?

A.    Yes, I did.

B. BURNS - DX BY MR. COOPER

Q.   And what was that statement, tell the Court.

A.   I don't know.

Q.   In sum and substance.

A.   In sum and substance, it was like are you trying to put this on your father, trying to say this was your dad's, something like that.  It was kind of like, I was a little frustrated that he said that about his dad.

Q.   And did he respond to that statement?

A.   Yeah, don't bring my dad, words to the effect, don't bring my dad into this.  It was just a card that was around, something like that.

Q.   Okay.  Did you yell at Mr. Roncone at any point?

A.   No.

Q.   Now we're at the 10 a.m. or 10:30 a.m. conversation.  At any point did you yell at him?

A.   No, I did not.

Q.   Did you threaten him?

A.   No.  I had annoyance, but didn't raise or elevate it.

Q.   Did he appear, based on your observations with him, did he appear frightened?

A.   No.

Q.   Was he crying?

A.   No.

B. BURNS - DX BY MR. COOPER

Q.   Was he whimpering?

A.   Not at all.

Q.   Did he appear confused at all?

A.   No.

Q.   Based on your interactions with him the entire day, did he appear to speak and understand English?

A.   Yes, definitely.

Q.   When he did engage with you, the whole day, were his comments to you responsive to things you were saying or things that were going on around you?

A.   Yes, it was a back and forth conversation.

Q.   Did he appear to be intoxicated on alcohol?

A.   No.

Q.   Did he appear to be intoxicated on drugs?

A.   Not at all.

Q.   Did he ever make statements to you that he was having like a medical condition or medical emergency, anything like that?

A.   No.

Q.   Okay.  May I have the documents back?

     At some point shortly after that 10:45 or 10:30 conversation about the pictures on your phone, was Mr. Roncone arrested?

A.   Yes.

B. BURNS - DX BY MR. COOPER

Q.   And were you present when Mr. Roncone was placed under arrest?

A.   Yes, I was.

Q.   Was Investigator Rondon present when Mr. Roncone was placed under arrest?

A.   Yes.

Q.   Was he, he being Mr. Roncone, was he verbally advised he was under arrest?

A.   Yes, he was told definitively.

Q.   Who said that?

A.   I believe it was Investigator Rondon or myself, but I believe it was Investigator Rondon.

Q.   And when Mr. Roncone was verbally advised that he was under arrest, was he advised of his Miranda warnings?

A.   Yes.

Q.   Who did that?

A.   Investigator Rondon.

Q.   And do you recall whether Investigator Rondon did that from memory or read off something?

A.   I believe he had his card out.

Q.   When you say his card, can you make a record?

A.   I have it, too.  You have a little Miranda card in your wallet and you pull that out so you hit

B. BURNS - DX BY MR. COOPER

everything.

Q.   And is it your recollection that Investigator Rondon read off a Miranda card?

A.   Yes, I recall that.

Q.   Okay.  Shortly after Mr. Roncone was verbally advised he was under arrest, was he transported away from the scene of 4998 Williams Street?

A.   Yes, he was.

Q.   And did you personally do that?

A.   No, it was Investigator Rondon, he handled that as we discussed he would with his team.

MR. COOPER:  Your Honor, may I have one second to confer with Ms. Chalbeck?

THE COURT:  I was going to take a break before any cross examination.

MR. COOPER:  That would be great.

THE COURT:  We'll take a 10 minute break and see everybody back here shortly.

(Whereupon, there was a break in the proceeding. )

THE CLERK:  Back on the record with United States versus Michael Roncone.

THE COURT:  All right.  Note the presence of all counsel as well Mr. Roncone.  Agent Burns is on the

B. BURNS - CX BY MR. DELL

witness stand.

Mr. Cooper, anything else?

MR. COOPER:  I have no further questions for this witness.

THE COURT:  Okay.  Mr. Dell, cross examination.

MR. DELL:  Right over here?

THE COURT:  Yes, the one right there.

**CROSS EXAMINATION BY MR. DELL:**

Q.  Good afternoon.

A.  Good afternoon, Mr. Dell.

Q.  So on the morning in question, a search warrant was being executed?

A.  That's correct.

Q.  All right.  It was a big deal, right?

A.  Yeah, it was a pretty significant operation between all of the locations.

Q.  And a SWAT team was involved?

A.  For this location, yes.

Q.  And did they -- we saw the video, the military-style gear on and big guns?

A.  Yes.

Q.  And you were part of a team who was building a case regarding the death of a possible murder of a

B. BURNS - CX BY MR. DELL

federal witness in a possible cover up?

A.   Right, that's correct.

Q.   And Mr. Roncone was a target of the investigation?

A.   Yes, he was.

Q.   And as a possible witness, right?

A.   As a witness to the -- to the events, yes, I agree.

Q.   Or, as you know, the way you looked at it, you were hoping that he would be a witness, right?

A.   I always hope somebody becomes a witness, either as a government witness or cooperator.

Q.   And that day specifically, you were looking for evidence connected to that investigation?

A.   Yes, that's correct.

Q.   And you knew that Mr. Roncone had legal guns in the house?

A.   Yeah, we were aware that he was a gun owner.

Q.   And you were hoping to find drugs also so that you could charge him with a crime that day, right?

MR. COOPER:   Objection as to what Special Agent Burns was hoping.

THE COURT:   Overruled.

A.   I mean, if we execute a search warrant, I would

B. BURNS - CX BY MR. DELL

hope that items that we were looking to seize are found at that location.

Q.   Right.  And so some of those items on the search warrant, they included drugs, right?

A.   That's correct.

Q.   And that would allow you to definitely have authority to arrest him that day, right?

A.   Correct.

Q.   Now, the SWAT team, they had explosive devices and drones with them?

A.   Yes, and drones and flash bangs.

Q.   Yes.  And to your knowledge, everybody is specifically trained for these executions or raids as they call them?

A.   Yes.

Q.   And that is to keep everyone safe?

A.   Correct.

Q.   And not to allow the occupants of the house, especially not the target, to leave, correct?

A.   Make sure that everyone is safe, yeah, and, I mean, flee, things like that.

Q.   And your job that day was going to be to try and talk to Mr. Roncone, right?

A.   That's correct.

B. BURNS - CX BY MR. DELL

Q.   So you wanted him out of the house and safe and detained so you could talk to him?

A.   I wanted him -- I knew he would be detained. Standard procedure for SWAT that they detain someone and that they are detained until it's rendered safe, it's the area.

Q.   And you wanted Mr. Roncone's person in close proximity to you so you can talk to him?

A.   I did want to attempt to interview him, yes.

Q.   And you told Mr. Cooper, you suggested to Mr. Cooper that Mr. Roncone was put into a vehicle because it was cold out, right?

A.   That's right.

Q.   And it was cold out, right?

A.   Yes, it was very cold.

Q.   But it's also true that for convenience purposes, you wanted him in a nice private place with you where you could talk to him?

A.   I did want to make it just me and Investigator Rondon and Mr. Roncone.

Q.   And, okay.  And this search warrant execution took place in a suburban neighborhood and it was dark out, right?

A.   Yes.

B. BURNS - CX BY MR. DELL

Q.   And there were flashing lights from law enforcement vehicles?

A.   Yes.

Q.   And there was a bull horn and you said like a glaring kind of alarm at the beginning?

A.   Yes.  I think the patrolman probably tripped his siren.

Q.   Okay.  So is it fair to say that Mr. Roncone was not going to be permitted to get into his truck and drive to work while the search warrant was being executed?

A.   No.  We had the -- I remember the search warrant included the truck, so clearly he would not.

Q.   He was not going to be permitted to get an Uber and go to work while the search warrant is being executed?

A.   I would not have had a problem if he said, I wanted to get an Uber, as long as it was done safely away from the location after, you know, after initially he is removed from the direct out of the driveway and all that, I would not have had a problem with him getting an Uber.

Q.   You told him he wasn't under arrest, correct?

A.   That's correct.

B. BURNS - CX BY MR. DELL

Q.   You never told him he could leave?

A.   I did not.

Q.   He was in the back seat of a law enforcement vehicle when you first had contact with him?

A.   That's correct.

Q.   And how many other officers or law enforcement personnel were in the car with him?

A.   In the first car, when he was is in Special Agent Taylor's vehicle?

Q.   When you first contacted him or had contact with him.

A.   I think it's sort of like it was on the video, I think he was in the vehicle and there might have been Special Agent Taylor and another agent kind of either -- I don't think they were in the vehicle with him, I think they were next to the vehicle.

Q.   And then you got in and sat next to him?

A.   No.  I think we walked in.  As a result, we walked him over or walked over to the Investigator Rondon's vehicle.  It's either that or we pulled up and he got in the car and I feel like we walked over to him like 20 feet to where we were parked.

Q.   And was there ever less than two officers or agents with him?

B. BURNS - CX BY MR. DELL

A.   No.

Q.   Okay.  And at one point, I think you said it was about 7:30, he was telling you that he was supposed to go to work at 9 o'clock?

A.   I think it was 6:45.

Q.   6:45?

A.   Mm-hmm.

Q.   And that is when you let him talk to his boss?

A.   Yes.  He asked if he could make contact and he knew the number and I dialed it and put it on speaker.

Q.   And this is kind of when you're having kind of a casual friendly conversation with Mr. Roncone?

A.   After he has invoked, so kind of we're done with the conversation part of it.

Q.   Okay.  All right.  But that was after it was invoked.  But at that time, you told him that there was a chance that he might be able to go to work?

A.   Absolutely at that time.

Q.   At 9, right?

A.   Absolutely.  I did tell him that -- a couple things I told him.  I did tell him he could go to work because at that point I didn't realize what was in the house and he indicated to me there was no drugs and the guns were lawful.  And the one caveat I told him that

B. BURNS - CX BY MR. DELL

the search warrants take a while and the truck was part of it and he wasn't able to use the truck and I think that is what prompted the call.

Q.   Okay.   But your understanding is that he had to go to work at 9?

A.   I don't remember 9, but I believe it was morning, early.

Q.   And this conversation was about 6:54?

A.   Yes.

Q.   And at the time, you were telling him maybe you can get to work on time?

A.   Absolutely.

Q.   Would it have been reasonable for him to believe that, at the time of the conversation, he could not go to work?

A.   Well, probably because he wouldn't have access to his vehicle.   The vehicle was the one, I do remember that, recall that conversation.

Q.   Okay.   And you never read him his Miranda warnings, right?

A.   Did not.

Q.   Even though you're asking him questions reasonably likely to elicit incriminating responses?

                MR. COOPER:   Judge, objection to that

B. BURNS - CX BY MR. DELL

question.  That is an ultimate issue question.

THE COURT:  Read it back, please, Karen.

(Whereupon, the Court Reporter read back the pending question.)

Sustained.

Q.  Well, you asked him what he knew about the death of Crystal Quinn, right?

A.  About the events surrounding that.

Q.  Okay.  And you asked him about conversations he had with Frank Knight?

A.  That's correct and Howie Hinkle.

Q.  And Howie Hinkle and Tommy O?

A.  I don't remember a lot of - the conversation kind of flowed from the arrest.  I don't know if we ever got to Tommy O stuff.  It's possible that I mentioned it.

Q.  And you were asking whether he had illegal drugs in the house?

A.  Correct.

Q.  Now, all of these questions could elicit a response which would be an admission to a crime, right?

A.  That's correct.

Q.  And you didn't have any body cam on you?

A.  I did not.

Q.  You had no recording device at all?

B. BURNS - CX BY MR. DELL

A.   I did not.

Q.   You had your smart phone on you?

A.   I had my phone on me.

Q.   You easily could have recorded the conversation with your phone?

A.   Well, I could have easily recorded it, but I would have needed authorization.

Q.   Okay.  And if you had, it would be a lot easier to confirm what was said and under what circumstances?

MR. COOPER:  I object to that question.

THE COURT:  Sustained.

Q.   All right.  Now, you prepared -- you drafted a 302 you said several hours later that same day, December 7th?

A.   Correct.

Q.   But the 302 itself, it does say drafted 12/7, but was it entered into 12/13/23?

A.   So what happens is you draft it, and then you have to get your coauthor, in this case, Geraldo Rondon, so he reviewed it and then we both have to sign off on it.  And then your supervisor eventually signs off on it.  So that date is when the final supervisor approves it and it gets serialized to the case file.

Q.   And do you know whether changes were made to it

B. BURNS - CX BY MR. DELL

or not?

A.   I know Geraldo reviewed it.  I don't know if there were any, what I can recall, changes, if any.

Q.   Now, you chose not to read him his Miranda warnings, correct?

A.   That's correct.

Q.   But, obviously, with all your training, you're familiar with Miranda warnings?

A.   Very familiar.

Q.   You probably carry a card with you?

A.   I do.

Q.   And the Miranda warnings, you have a right to remain silent, right?

A.   Correct.

Q.   You never told Mr. Roncone that?

A.   I did not.

Q.   And anything you say can be used against you in court, correct?

A.   Correct, I did not say that.

Q.   You did not say that to him.  You never told him he has the right to an attorney?

A.   I did not.

Q.   You never told him that that if he cannot afford an attorney, one will be afforded free of cost, right?

B. BURNS - CX BY MR. DELL

A.   I did not.

Q.   And Mr. Cooper asked you whether Mr. Roncone affirmatively stated any of that, correct?

A.   I'm sorry.

Q.   Mr. Cooper asked you if Mr. Roncone ever asked for an attorney, right?

A.   He did at one point.

Q.   No, but Mr. Cooper -- he did later on, right?

A.   Correct.

Q.   But earlier on, you recall Mr. Cooper asking you on direct asking you whether Mr. Roncone ever asked if he could have an attorney or whether he ever asked --

A.   I do recall that question, prior to the invocation?

Q.   Right.

A.   Yes.

THE COURT:   I want to make sure the transcript is clear.  Whether he ever asked for an attorney or whether he ever asked -- you were saying something else.

MR. DELL:   Whether he could remain silent.

THE COURT:   Okay.  Did you answer that?  In other words, the question is, do you recall Mr. Cooper asking you on direct whether Mr. Roncone ever asked to

B. BURNS - CX BY MR. DELL

have an attorney or whether he ever asked to remain silent.

MR. DELL:  Whether he can remain silent.

THE COURT:  Whether Mr. Roncone asked.

MR. DELL:  Right.

THE COURT:  If he can remain silent.

A.  I don't remember.  I recall Mr. Cooper asking if he ever invoked prior to the invocation.  I remember that question.  I don't remember --

Q.  That is a better way to put it.

A.  I don't remember Mr. Cooper asking whether the remain silent part, I'm lost on.

Q.  We can move on.  But you understand that to waive Miranda rights, it's law enforcement that has to ask these questions.  Correct?

A.  Correct.

MR. COOPER:  I object to that question, a day late.

THE COURT:  What?

MR. COOPER:  I said I was late on the objection.

THE COURT:  You were and I'll overrule it.

Q.  Okay.  And you answered "yes"?

A.  Yes, correct.

B. BURNS - CX BY MR. DELL

Q.   And why didn't you give him a formal reading of the Miranda rights?

A.   At that point, it's a voluntary interview.  I have not any indication that he is going to be arrested. I explained to him that he was not under arrest two times and he had been unhandcuffed.  So it was in my -- it was a voluntary interview.

Q.   Would have been very easy to just give him his rights, correct?

A.   I could have read them.

Q.   And a number of those questions, you asked him if he had given you, in your mind, the correct answer, you would have arrested him, right?

A.   I'm sorry, if you could clarify that.

Q.   Well, earlier, just a few minutes ago, I asked you about certain he questions you asked him, correct?

A.   Correct.

Q.   And you stated that a number of those questions could have led to an incriminating response, correct?

A.   Correct.

Q.   So that being the case, you still didn't read him his Miranda rights?

A.   An incriminating response wouldn't necessarily cause me to effectuate an arrest, if that is what you're

B. BURNS - CX BY MR. DELL

--

Q.   Let me ask you this.  Mr. Roncone was more -- on that day, he was more than a possible witness, right?

A.   Correct.

Q.   He was the target of that warrant execution, right?

A.   That warrant, yes.

Q.   Now, later on, you confronted him with pictures of what was found in the house, correct?

A.   That's correct.

Q.   And you testified that you didn't mean to ask him any questions because he had invoked his right to counsel, right?

A.   I wasn't trying to elicit a response.  I wasn't questioning him.  I knew he invoked and that was over.

Q.   Why didn't you just tell him that the stuff was found?  Why did you have to actually exhibit a photo of it?

A.   I guess I could have just told him.  I think I was showing it to -- I knew that it would likely an arrest authorization was forthcoming, so I wanted to show what we found.

Q.   Isn't it fair to say, at least a part of you, if not a big part of you, was hoping that he would start

B. BURNS - RDX BY MR. COOPER

talking to you again?

A.   No.   I knew once he invoked, it would take a lot for him to uninvoke because that is equivocating.

MR. DELL:   I have nothing further.

THE COURT:   Thank you, Mr. Dell.

Any redirect, Mr. Cooper?

MR. COOPER:   May I have a very brief moment to read Ms. Chalbeck's notes?

THE COURT:   Sure.

MR. COOPER:   May I have a very brief redirect?

THE COURT:   Sure.

MR. COOPER:   Thank you.

**REDIRECT EXAMINATION BY MR. COOPER:**

Q.   Special Agent Burns, you were asked some questions on cross examination about the type of outfits that the SWAT team was wearing.   Do you recall those questions?

A.   Yes, I do.

Q.   Were you wearing a military gear outfit when you interacted with Mr. Roncone?

A.   I was not.

Q.   I should have hit that on direct.   Today you're wearing a suit and tie.   Were you dressed that way on

B. BURNS - RDX BY MR. COOPER

December 7th?

A.   I don't know if I was wearing a suit, but I didn't have gear on or a bulletproof vest on.

Q.   Special Agent Burns, were you wearing civilian clothing?

A.   Yes, I was.

Q.   You were also asked some questions on cross examination about the type of firearms that the SWAT team had.  Do you recall those questions?

A.   Yes, I do.

Q.   They had, for lack of a better term, "long guns," right?

A.   Assault rifles, yes.

Q.   And were you in possession of one of those types of weapons?

A.   I was not.

Q.   Do you even carry a gun, Special Agent Burns?

A.   Yes, I do.  I did have my handgun concealed that day on my side.

Q.   When you say concealed, was it covered by your clothing?

A.   Yes.

Q.   At any point while you interacted with Mr. Roncone, did you display your firearm to him?

B. BURNS - RDX BY MR. COOPER

A.   Did not.

Q.   At any point while you had that conversation pre-invocation with Mr. Roncone, did you see Investigator Rondon display his firearm to him?

A.   I did not.

Q.   Based on your physical presence for that conversation that day, was Investigator Rondon's firearm visible?

A.   It was not.

Q.   Was your firearm visible?

A.   It was not.

Q.   At any point after the invocation, did you display your firearm at Mr. Roncone?

A.   Did not.

Q.   Did Investigator Roncone?

A.   He did not.

Q.   Other than what you observed in exhibit 6 C when Mr. Roncone is being -- walking back towards the SWAT team and coming out of the house, other than that portion, did you see anybody with your eyes or in body camera video point a weapon at Mr. Roncone?

A.   Did not.

Q.   Okay.  Ultimately you became familiar with what was recovered inside the house, right?

B. BURNS - RDX BY MR. COOPER

A.  Yes, I did.

Q.  Based on what was recovered inside the house, did you develop an opinion about whether Mr. Roncone was a stranger to firearms?

A.  It was pretty clear he was intimately familiar with firearms.

Q.  In fact, during your conversation, he told you, "I've got long guns and pistols," right?

A.  That's correct.

Q.  He told you there are so many guns in the house he would have to specify for you which one are his and which ones are dad's, is that fair?

A.  That's fair.

Q.  Okay.  You were asked some questions on cross examination about the number of law enforcement personnel that were around Mr. Roncone when you interacted with him.  Do you recall those questions?

A.  I do.

Q.  During the, let's start with the pre-invocation conversation, how many law enforcement officers were in the vehicle?

A.  Just myself and Investigator Rondon.

Q.  And as you've already testified -- withdrawn.

Were either of you looming, physically looming,

B. BURNS - RDX BY MR. COOPER

over Mr. Roncone?

A.   No.   As I testified previously, I'm in the seat and facing him and Investigator Rondon is over here so we weren't over the seat, we were just having a conversation.

Q.   Okay.   You were asked some questions on cross examination about the conversation you had with Mr. Roncone about whether he would be able to get to work on time.   Do you remember that?

A.   Yes.

Q.   And I want to focus in on that fro a second.   And Mr. Dell asked you a question on cross, and he said you told him maybe you would be able to get to work on time. Is that right?

A.   That's correct.

Q.   I want to put a time on that statement.   At the point you're saying that to Mr. Roncone, the entire pre-invocation conversation has occurred.   Is that right?

A.   That is fair.

Q.   So if we're analyzing what happened in Mr. Roncone's brain, you hadn't said those words out loud until after he has invoked?

A.   That is when he turned over to what the rest of

B. BURNS - RDX BY MR. COOPER

the day was going to look like.

Q.   To answer my question:  You hadn't said that until after Mr. Roncone invoked, right?

A.   Right.

Q.   At the beginning of your interaction with Mr. Roncone, did you say things to him about his custodial status?

A.   At the beginning?

Q.   At the beginning.

A.   I said he was not under arrest.

Q.   How many times did you say that to him?

A.   Twice.

Q.   Mr. Dell asked you a question on cross examination about whether you affirmatively told Mr. Roncone that he had a right to remain silent and you said, "no, I didn't tell him that."  Do you recall that?

A.   I do.

Q.   And did you discuss with him whether he had to speak with you?

A.   I did.

Q.   What did you say to him?

A.   I said that he did not have to speak with me.

Q.   Okay.  When you said those words to Mr. Roncone, did he appear confused by that?

B. BURNS - RDX BY MR. COOPER

A.   No, we just moved on and talking.

Q.   And based on your common sense life experience, did Mr. Roncone appear to understand what you were saying when you said "you don't have to speak to me"?

A.   Yes.

MR. COOPER:  I have nothing further.

Thank you, Judge.

THE COURT:  Thank you, Mr. Cooper.

Do you have anything else, Mr. Dell?

MR. DELL:  I don't.

THE COURT:  Okay.  Agent Burns, you can step down.

Is the government ready to call its next witness?

MR. COOPER:  May I have one second?

Your Honor, what I have as moved into evidence, can I check that with what the Court has?

THE COURT:  Sure.

MR. COOPER:  I have exhibit 1 A, 2 B, Exhibit 3 A, exhibit 3 B, exhibit 6 C, and that's it, and 3500 D.

THE COURT:  Correct.  That is correct.  And, Sandra, you may have been out when 3 A and 3 B came in, I think.

USA V. MICHAEL RONCONE

THE CLERK:  No, I got them.  I have three of the ones that were admitted.  And all of the other ones he just spoke about.  So, but I have the ones that he has that you recited, yes.  I have all of those.

THE COURT:  And I agree with Mr. Cooper, Sandra agrees with Mr. Cooper.  And, Mr. Dell, do you disagree?

MR. DELL:  No disagreement, it's my job.

MR. COOPER:  With that, the government will rest and I respectfully request that we reserve to call Mr. Rondon if there is a defense witness on rebuttal.

THE COURT:  Are you ready to identify whether you will have any witness?

MR. DELL:  Yes.  Mr. Roncone will take the stand.

THE COURT:  Come on up, Mr. Roncone.

MR. COOPER:  Judge, can Special Agent Burns stay.

THE COURT:  Yes, he is fine.  He is finished testifying.

(**M. RONCONE WAS CALLED TO THE WITNESS STAND AND SWORN.**)

THE COURT:  All right.  Mr. Roncone, I know you were here for the instructions I gave Agent Burns.  I'm going to first ask you to state your first and last

M. RONCONE - DX BY MR. DELL

name and spell your last name for the record.

THE WITNESS:  Michael Roncone, R-o-n-c-o-n-e.

THE COURT:  And, Mr. Roncone, only answer the question that you're asked.  Don't volunteer information.  If there is an objection to a question, you need to wait until I rule on it and I'll let you know whether or not you can answer it.

And make sure you speak slowly, carefully, make sure you keep your voice up and speak into the microphone.  I want to make sure that everyone hears you, but also my court reporter is taking down a transcript.  Do you understand?

THE WITNESS:  Yes, your Honor.

THE COURT:  Okay.  You may proceed whenever you're ready, Mr. Dell.

MR. DELL:  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. DELL:**

Q.   Mr. Roncone, do you recall coming to my office specifically on July 2nd, 2025 and talking about motions that we had to file?

A.   Yes.

Q.   And do you remember talking to me about what a standing affidavit is?

M. RONCONE - DX BY MR. DELL

A.  I know we discussed it, but my knowledge of legal stuff is a little lacks.

Q.  Do you remember talking that I needed you to sign something so we would get a hearing such as this?

A.  Yes.

THE COURT:  Mr. Roncone, the base of the microphone moves closer, move that closer to you.

THE WITNESS:  Is that better?

THE COURT:  Yes.

Q.  And do you remember us talking about everything you remembered about the morning of your arrest?

A.  Correct.

Q.  And you ultimately, you ultimately --

MR. DELL:  Should I have this marked before I bring it up?

THE COURT:  The attorneys mark in federal court.

MR. DELL:  I apologize.

THE COURT:  You don't have any stickers.  Do we have any stickers?

MR. COOPER:  I don't have any.

THE COURT:  And why don't we use letters for the defense exhibits?

THE CLERK:  You only have one and you want

M. RONCONE - DX BY MR. DELL

to do A.

MR. DELL:  Yes, we'll mark it Defendant's Exhibit A for identification.

Q.  So, Mr. Roncone, do you recall that at some point in my office, I just started to create by typing an affidavit?

A.  Yes.

Q.  And then we reviewed it together?

A.  Yes.

Q.  Okay.  And I'm showing you what's been marked Defendant's Exhibit A for identification.  Do you recognize that document?

A.  Yes.

Q.  Okay.  And is that the document that you ultimately signed that day?

A.  Yes.

Q.  Okay.  And you read it before you signed it?

A.  Yes.

Q.  And to the best of your recollection, is that your memory of the events of the morning of your arrest?

A.  That's correct.

Q.  Okay.  Thank you.

MR. DELL:  At this time, the defense moves Defendant's Exhibit A into evidence.

M. RONCONE - DX BY MR. DELL

THE COURT:  Any objection?

MR. COOPER:  No.  Thank you, Judge.

THE COURT:  All right.  Defendant's Exhibit A will come into evidence.

(**WHEREUPON, EXHIBIT A WAS RECEIVED INTO EVIDENCE.**)

Karen refuses to touch exhibits.  She gets hostile.

Q.  So, Mr. Roncone, you said this afternoon and listened to the lengthy testimony of Special Agent Burns?

A.  Yes, I did.

Q.  Okay.  Why -- did you -- did you believe that you were free to leave when he was speaking to you in the car?

A.  No, I did not.

Q.  And why not?

A.  There was always someone next to me.  There was obviously military guys that were around me when I first left the house.  There was never a moment I was by myself or unsupervised and our conversation about work made me seem like I was pretty much stuck there until 9 o'clock.

Q.  Okay.  All right.

M. RONCONE - DX BY MR. DELL

MR. DELL:  I've got nothing further.

THE COURT:  Thank you, Mr. Dell.

Cross examination?

MR. COOPER:  Yes, please.  May I have that? Thank you so much.

THE COURT:  Do we have a docket reference for the affidavit so I can get a copy?

MR. DELL:  The affidavit was attached to the dispositive motion that I filed.

THE COURT:  You know, it doesn't matter, we can get -- I can have Sandra make copies afterwards.  I just want to make sure I have a copy of it.

MR. DELL:  Docket 536 and it was attached.

THE COURT:  Attached to docket 536?

MR. DELL:  Yes.

THE COURT:  Okay, thank you.

MR. COOPER:  May I inquire?

THE COURT:  Yes.  Whenever you're ready, Mr. Cooper.

**CROSS EXAMINATION BY MR. COOPER:**

Q.  Good afternoon, Mr. Roncone.  How are you?

A.  Good.

Q.  I'm sorry?

A.  Good.

M. RONCONE - CX BY MR. COOPER

Q.   You heard Special Agent Burns testify and Mr. Dell asked you that a second ago.  Were you paying attention when he was testifying?

A.   Yes.

THE COURT:  Just make sure you wait until he finished the question before you answer?

Q.   First time testifying?

A.   First time for all of this.

Q.   Understood.  When you were listening to Special Agent Burns testify, did you hear Special Agent Burns testify that your handcuffs were removed before he had any interview conversations with you?

A.   Yes, I heard him say that.

Q.   Okay.  When you sat with Mr. Dell, as you testified on direct examination, and discussed generating an affidavit so you could get a hearing, did Mr. Dell you the important things you had to put in the affidavit?

A.   No, he had me explain what happened during that day.

Q.   During that conversation did Mr. Dell ask you if your handcuffs were ever removed?

A.   Yes, he did.

Q.   What did you tell him?

M. RONCONE - CX BY MR. COOPER

A.   I never had my handcuffs removed.

Q.   So in your affidavit, this is Defense Exhibit A on paragraph 6, it says, "My handcuffs were switched to the front when I was placed in the back of the vehicle." I want to pause there.  Is that what we saw in Government's Exhibit 6 C where we see the SWAT team move your handcuffs around to the front?

A.   Correct.

Q.   That is what you're referring to there?

A.   Yes.

Q.   And then you wrote, "I remained handcuffed the entire time except when they allowed me to pee behind the vehicle," right?

A.   Yes.

Q.   When did you pee behind the vehicle, like in the timeline that we've all heard about today, when did that happen?

A.   That was after our conversation.

Q.   With Special Agent Burns?

A.   Yes.

Q.   Okay.  And when you say "after our conversation," I know it kind of occurred in fits and spurts, can you be a little bit more specific about which conversation you're referring to?

M. RONCONE - CX BY MR. COOPER

A.   That was our first conversation that we had in the car with me initially meeting him.

Q.   And what you wrote in this affidavit is that you needed to pee and you said, "allowed me to pee behind the vehicle," do you recall that?

A.   Yes, they were also worried about me running away.

Q.   There is not a question in front of your right now.  I'm not trying to be a jerk, just wait for me to ask the question.

A.   My apologies.

Q.   That's okay.  When you got out of the vehicle to urinate, is it your testimony that you did not have handcuffs on at that time?

A.   They were removed so I could do that, yes.

Q.   Okay.  But earlier in the affidavit, you've indicated that your handcuffs had been switched to the front, right?

A.   Correct.

Q.   And I'm not trying to embarrass you or anything like that, but if your handcuffs are cuffed in front of you, you can urinate with the handcuffs still on, right?

A.   I never did that before.

Q.   You've been handcuffed in front of your body

M. RONCONE - CX BY MR. COOPER

before, right?

A.   Yes.

Q.   That happened on December 7th, right?

A.   Yes.

Q.   And, again, I'm not trying to be crass here, but the area that you would need to reach is within arm's reach of where your handcuffs would be, right?

A.   It is within arm's reach.

Q.   Did you say is or is not?

A.   It is within arm's reach.

Q.   You could have done that, right?  Physically possible?

A.   It's possible, but...

Q.   Your testimony is that that is the only time the handcuffs came off, right?

A.   Correct.

Q.   So you're testifying, just to be clear, you're testifying when Special Agent Burns sat in that same chair this afternoon and testified that they removed your handcuffs for that whole conversation, you're testifying that he is lying, right?

A.   I'm saying I remember my handcuffs being on.

Q.   Well, I want to be really clear because this is important, are you saying, I'm not sure or are you

M. RONCONE - CX BY MR. COOPER

saying I have a definitive memory, Judge, I remember the handcuffs were on the whole time and that guy is a liar? Which one was it?

MR. DELL: Objection, your Honor. That is an improper question, that is not an either or.

THE COURT: Overruled. It's cross examination, go ahead, you can answer.

A. I remember my handcuffs being on the entire time.

Q. You're sure about that?

A. I am sure about that.

Q. So when Special Agent Burns testified to Chief Judge Wolford that they removed your handcuffs, your testimony to the Chief Judge is that he is a liar, right?

A. I'm saying they were on the whole time. I don't want to call the guy a liar, that is rude, but they were on the whole time.

Q. You're worried about being rude?

A. Yes, sorry.

Q. But your testimony is that this federal agent got on the witness stand and lied about taking your handcuffs off and now you're saying I don't want to be rude and call him a liar?

MR. DELL: Objection, argumentative.

M. RONCONE - CX BY MR. COOPER

THE COURT:  Sustained.

MR. COOPER:  I'll move on.

Q.   When you sat and discussed on direct examination Mr. Dell asked you questions about a meeting that he had with you discussing this suppression hearing, do you remember that?

A.   Yes.

Q.   Did you understand all on your own how a suppression hearing could be important?

A.   Not completely.

Q.   Okay.  Did Mr. Dell explain to you how a suppression hearing could be important?

A.   Yes.

Q.   And so I'm not trying to dig into the contents of that conversation, but just generally for what's going on in your head, you understood that this is a big moment in your case, right?

A.   I understand that.

Q.   Okay.  Did you understand it during that conversation with Mr. Dell?

A.   Yes.

Q.   Before you drafted this affidavit?

A.   Yes.

Q.   You understood that this was important, right?

M. RONCONE - CX BY MR. COOPER

A.   Yes.

Q.   Okay.  And there is kind of specific topics, it's only three pages, it's really two pages and one tiny paragraph at the top, it's pretty focused on specific material, right?

A.   Correct.

Q.   Before you were asked questions by Mr. Dell about what happened that day, did Mr. Dell discuss with you that it was important that certain things be included in the affidavit?

A.   No.

Q.   It wasn't the -- this exhibit, Defense Exhibit A wasn't the first affidavit that you wrote and signed -- let me withdraw that.

Defense Exhibit A was not the first affidavit that you signed with respect to the events of December 7, 2023, was it?

A.   No.

Q.   You had previously signed an affidavit, presumably one drafted by Mr. Dell, correct?

A.   Yes.

MR. COOPER:  Your Honor, I'm holding, this is from docket No. 421, it's Mr. Roncone's affidavit that is two pages in length from document 421.  It's

M. RONCONE - CX BY MR. COOPER

different than exhibit A.  I'll ask that it be marked as Government's Exhibit 10.

And Ms. Champoux went to get me a sticker but for the meantime can it be constructively marked as Government 10?

THE COURT:  Sure, that's fine.  Go ahead.

MR. COOPER:  Thank you.

Q.  Mr. Roncone, do you mind if I walk up to you to hand this to you?

THE COURT:  Hopefully you all learned that you need to bring your stickers into federal court.

MR. COOPER:  Yes, Judge.

A.  Sure.

Q.  Can you take a look at that and look back up to me when you're finished?

Did you have a chance to look at Government's 10 for identification?

A.  Ten?

Q.  That is not written on the page.

A.  That is this?

Q.  That is what we're naming that document.  Did you have a chance to look at the two pieces of paper?

A.  Yeah, I looked at it.

Q.  Do you recognize that?

M. RONCONE - CX BY MR. COOPER

A.   Yes.

Q.   What is that?

A.   That was my statements from when I talked to my attorney about what happened on December 7th and the response to the properties and where, the Alma Hill, the trailers, and, yeah, it just goes to everything that we discussed about the search warrants and that, correct, yeah.

THE COURT:   What is the date on it?  Why don't you give us the date on the second page?

THE WITNESS:   April 25th.

THE COURT:   Of what year?

THE WITNESS:   2025.

Q.   Do you mind if I come up and grab it?

A.   Yeah, here you go.

Q.   Thanks.  The second page of Government Exhibit 10 for identification, what you were just holding, it has a signature line with your name underneath it.  Is that your signature on the signature line?

A.   Yes.

Q.   Did you read it before you signed it?

A.   Yeah, I read it.

Q.   And you understood at the time that you were signing it that it was important that the information in

M. RONCONE - CX BY MR. COOPER

here be true, right?

A.   Yes.

Q.   And it was important that the information in here be accurate, right?

A.   Yes.

Q.   I'm going to hand it back to you.  It is six paragraphs.  You take as much time as you need.

Can you tell the Court which paragraph in that document did you write "I was handcuffed the whole time"?

A.   In this one?  It's not stated there, correct.

Q.   You have it in front of you?

A.   I don't say that in here.

Q.   You didn't say that in that affidavit, right?

A.   No.

Q.   May I have it back?  Thank you.

You did talk about your interview with Special Agent Burns in that affidavit, though, right?

A.   Yes.

Q.   You said you were asked and answered a number of questions, right?

A.   Yes.

Q.   You talked about never being told that anything you said could be used against you.  Do you remember

M. RONCONE - CX BY MR. COOPER

right writing that in here?

A.   Repeat that.

Q.   Sure.   In paragraph six, your affidavit says, "I was never told that anything I said could be used against me, nor was I advised that I had the right to an attorney, and that if I could not afford an attorney, one could be appointed to me"?

A.   That is correct.

Q.   You wrote that in your first affidavit, right?

A.   Yes.

Q.   You wrote in your first affidavit, "At one point, I stated that I did not want to answer any more questions."   Do you remember that?

A.   Correct.

Q.   You wrote, "The agents continued to ask me questions."   Do you remember that?

Do you want me to hand that to you?

A.   I recall about the drugs after the house, I don't know.

Q.   My question is, did you write that sentence in your first affidavit?

A.   If it's on there, then yes.

Q.   Here I'll show it to you again.

A.   I understand what you're asking, but it was two

M. RONCONE - CX BY MR. COOPER

years ago, it's hard to recall.

Q.   Okay.

A.   Yeah.

Q.   I appreciate --

A.   After I gave my statement that I wanted a lawyer, I believe that was the end of most of the questions.

Q.   What I'm asking you, just simple, the sentence, "The agents continued to ask me questions," you wrote that in your first affidavit, right?

A.   Yes.

Q.   And then you wrote, "I was not read Miranda rights until much later in the morning."  That is the very last sentence, right?

A.   Yes, correct.

Q.   So in the same paragraph, and I'll hand it to you if you want to look at it, in the same paragraph, you say, "I was never told anything I said could be used against me," and then you say, "I was read my Miranda rights that morning," see what I'm getting at here?

A.   That was later after.

Q.   So the first sentence when you say, "I was never told that anything I said could be used against me," are you referring to the pre-arrest discussion that you had?

A.   The original meeting of the agent, there was

M. RONCONE - CX BY MR. COOPER

never that conversation.

Q.   Okay.  Special Agent Burns did tell you that you did not have to speak with him, right?

A.   Yes.

Q.   Okay.  When he said those words to you, hey, Mike you don't have to talk with us, did you understand what those words meant?

A.   Yeah.

Q.   Okay.  He never threatened you, right?

A.   No.

Q.   He never raised his voice at you, right?

A.   No.

Q.   He never said you better talk to me or else?

A.   No.

Q.   So when I asked him all those questions on direct examination earlier today and he said, "no, I never threatened him, never yelled at him," all of his answers were true?

A.   Yes.

Q.   And you were sitting in the car with him?

A.   Yes.

Q.   He was polite towards you?

A.   Yes.

Q.   And he was respectful towards you, right?

M. RONCONE - CX BY MR. COOPER

A.   Yes.

Q.   And in fact, every law enforcement officer that you interacted with that day was polite and respectful?

A.   Yes.

Q.   And when you expressed discomfort about your dad in a t-shirt in the front yard, they said, we'll put him in a front seat of a car, right?

A.   Yes.

Q.   And when they made good on that representation to you, a SWAT Officer came over and said, "Hey, Mike, we got your dad in the front seat of a car."

A.   Yes.

Q.   And what did you say in response?

A.   I thanked him.

Q.   Because no one was being nasty or intimidating in any way towards you, right?

A.   No.

Q.   Okay.  Do you agree -- well let met withdraw that.

     At some time on December 7th hours after your conversation with Agent Burns, you were advised, "Hey Mike, you are under arrest"?

A.   It was right before I came downtown.

Q.   And you correct me if I'm wrong, sometime after

M. RONCONE - CX BY MR. COOPER

11 a.m., they transport you away from your house.  Does that sound right?

A.   Yes.

Q.   Shortly before that, maybe 10:58, you're formally advised, "Hey, Mike, you're under arrest"?

A.   Yes.

Q.   You remember that?

A.   Yes.

Q.   And at that point, you were formally advised of your rights?

A.   At the moment I was told I was being arrested, right.

Q.   Exactly at the moment you were told you were being arrested, you were told of your Miranda Warnings, correct?

A.   Yes.

Q.   And you were handcuffed, right?

A.   Yes.

Q.   Who placed you in those handcuffs when you were under arrest?

A.   I want to say the handcuffs were still on then.

Q.   Are you sure or are you guessing?

A.   I'm pretty sure they were still on the whole time.

M. RONCONE - CX BY MR. COOPER

Q.   You sounded uncertain because you said "I want to say."  So just not trying to be difficult, but the words you just used when I asked you that question, the words were, "I want to say the handcuffs were already on or still on."  Is that what you just said?

A.   Through that whole day, I want to say I was. Through that whole day, I do not recall ever having the handcuffs off.

Q.   We covered this, but it's important that we clarify.  When you say, "I don't recall," are you saying that I don't remember or are you saying definitively I remember, I'm sure?

A.   My memory that day were the handcuffs were on me for the whole time.

Q.   So when Investigator Rondon placed you in handcuffs at the time you were being arrested, are you saying that it was a second pair of handcuffs?

A.   No, I was already handcuffed.

Q.   Oh, so he didn't handcuff you at the time you were arrested?

A.   You said handcuffed, I was agreeing because I was already handcuffed.

Q.   My question:  Do you remember Geraldo Rondon?

A.   Yes.

M. RONCONE - CX BY MR. COOPER

Q.   Two guys in the car when Special Agent Burns is interviewing, right?

A.   Yes.

Q.   One of them is Brian Burns, right?

A.   Yes.

Q.   And the other was Geraldo Rondon?

A.   Yes, and another gentleman that sat right next to me.

Q.   And that was when Brian left, correct?

A.   He was right up there until we drove away.

Q.   Let's cover this.  When Special Agent Burns and Investigator Rondon first bring you in Geraldo's vehicle do, you remember going into a second vehicle?

A.   No, I was in that vehicle.

Q.   Okay.  So Government Exhibit 6 C, the video we all watched earlier, shows you in Tina Taylor's vehicle, the first car you are in when they come to you, do you remember that?

A.   Yes.

Q.   And at some point, Brian move you to Geraldo's vehicle?

A.   That is what I meant.  Geraldo's vehicle was the vehicle I stayed in.

Q.   So in total, there were two vehicles you were in?

M. RONCONE - CX BY MR. COOPER

A.   I was only in the other one a little while.

Q.   I get that.  I'm just trying to specify what time you are talking about.

A.   Yes.

Q.   When Geraldo and Brian bring you to Geraldo's vehicle, where did you sit in the vehicle?

A.   In the back seat behind the driver.

Q.   So Special Agent Burns testified about that earlier, right?

A.   Yes.

Q.   And that is where he said you sat?

A.   Yes.

Q.   And who was in the driver's seat?

A.   Geraldo.

Q.   Yep.  And if you don't remember, you can say the other guy and we'll know who you're talking about.  And who was in the front passenger seat?

A.   The agent.

Q.   The one who testified today?

A.   Yes.

Q.   Okay.  At the time that Special Agent Burns was interviewing you in Geraldo's vehicle, were there any other human beings in the car other than you, Geraldo and Special Agent Burns?

M. RONCONE - CX BY MR. COOPER

A.   No.

Q.   Okay.  So when Special Agent Burns said it was just the three of us in the vehicle, that was true, also, right?

A.   Yes.

Q.   You were there, right?

A.   Yes.

Q.   Okay.  When another agent came, doesn't matter what the person's name is, would you agree with me that person was replacing Special Agent Burns when he walked away?

A.   Yes.

Q.   Okay.

A.   And he sat in the back next to me.

Q.   And he sat in the back next to you, right?

A.   Yes.

Q.   He didn't point his gun at you, right?

A.   No.

Q.   And he didn't threaten or intimidate you in any way, right?

A.   They were all armed.

Q.   Did you hear my question?

A.   Sorry, nobody threatened me.

Q.   He did not threaten you?

M. RONCONE - CX BY MR. COOPER

A.   No.

Q.   And he didn't intimidate you?

A.   No.

Q.   In fact, that guy, the guy that sat in the back next to you, pretty quite guy, right?

A.   Yes.

Q.   So when Special Agent Burns left and that other person came and sat in the back next to you, interview was over at this point, correct, right?

A.   Correct.

Q.   The topics that Special Agent Burns said that you said that you discussed, you heard him testify about that?

A.   Yes.

Q.   Did you discuss with him Frank and Howie?

        MR. DELL:  Your Honor, I'm going to object. The content of the conversation is not at issue in this trial.

        MR. COOPER:  His credibility is at issue.

        THE COURT:  Yeah, his credibility is at issue, so overruled.  Go ahead.

A.   Yeah, I talked to him about Frank and Howie.

        THE COURT:  Just so it's clear, I didn't say "his credibility," I said "credibility is at issue."  I

M. RONCONE - CX BY MR. COOPER

am just correcting the court reporter.

Q. So when Special Agent Burns sat in the chair and said you spoke to him about Frank and Howie, he was telling the truth about that, right?

A. Correct.

Q. It is another instance of what he said and what you said of being the same, correct?

A. I understand.

Q. And when Special Agent Burns said you talked to him about the electronic devices in the house, that the military gear guys took your phone, was that accurate?

A. Yes.

Q. That happened, you said that?

A. Yes.

Q. When Special Agent Burns testified in that same chair that you're sitting in that you told him about numerous firearms in the house that were on your permit, legally owned, was he telling the truth about that?

A. Yes.

Q. That happened as well?

A. Yes.

Q. Those words came out of your mouth?

A. Yes.

Q. When Special Agent Burns testified that he asked

M. RONCONE - CX BY MR. COOPER

you a question about whether there were any drugs or explosives or firearms in the house, do you remember him asking you that?

A.    Yes.

Q.    So he told the truth about that question as well?

A.    Yes.

Q.    And you answered that question, right?

A.    Yes.

Q.    You told him no drugs in the house, right?

A.    Yes.

Q.    You told him there are firearms and they are on my permit, right?

A.    Yes.

Q.    And you told him no explosives, right?

A.    Yes.

Q.    And you would agree with me, we watched the video 6 C earlier, you had been volunteering that morning to other law enforcement officers, hey, guys nothing in the house you need to worry about, right?

A.    Yes.

Q.    Do you remember saying that in the video?

A.    I was being safe.

Q.    Okay.  I get it.  I'm just asking if you said it in the video?

M. RONCONE - CX BY MR. COOPER

A.   Yes.

Q.   When you told Special Agent Burns that there were no drugs in the house, you were actually lying, though, right?

A.   No.

Q.   No, you weren't?

A.   No.

Q.   Did you see the picture that we pulled up earlier, the one with the tray and the mortar and pestle and the white powder?

A.   Yes.

Q.   What was that?

A.   That was in the gun safe.

Q.   I didn't say where was that, I'm sorry, I said what was that?

A.   That was drugs.

Q.   Okay.  So you know what drugs are, right?

A.   Yeah.

Q.   The white powdery substance and the mortar and pestle on the tray with the credit card and the straw and plastic baggie corner, that was drugs, right?

A.   Yes.

Q.   Was it cocaine?

A.   I don't know.

M. RONCONE - CX BY MR. COOPER

Q.  You don't know?  You are having difficulty answering that question?

MR. DELL:  Asked and answered, he said "no."

MR. COOPER:  He said, "I don't know."

THE COURT:  No, he said "I don't know."

A.  I don't.

MR. COOPER:  Can we pull up the picture, Ms. Champoux?

Q.  What color is cocaine, Mike?

A.  White.

Q.  So you know that, right?

A.  Yes.

Q.  Is it a liquid or powder?

A.  It's a powder.

Q.  Are you familiar with how cocaine is packaged commonly?

A.  Yes.

Q.  Look at the picture on the right side of your screen, 1 C in evidence.

MR. COOPER:  Ms. Champoux, can you zoom in? Let's start with this.

Q.  What is this item that is gold in color that I just circled?

A.  It's a 9 mm bullet.

M. RONCONE - CX BY MR. COOPER

Q.   It's a round of ammunition, right?

A.   Yes.

Q.   And what are we looking at here, this white colored object that is twisted up?

A.   It's probably drugs.

Q.   Okay.  Where is that in your house?

A.   That was in a dresser drawer of mine.

Q.   In your dresser drawer?

A.   In my room.

Q.   Okay.  You said it was "probably drugs."  I mean, we could be sure about that, right, Mike?  Was it probably drugs or was it drugs?

A.   Yes, it was drugs.

Q.   So when you said "probably drugs," a second ago, why did you say that?

A.   Because it was given to me.

Q.   I didn't ask you who gave it to you.  I asked if it was drugs or not drugs.  You said "probably drugs," but, in fact, in reality, you know, Mike, it was drugs, right?

A.   Yes.

Q.   So when you said "probably drugs," you were lying to the Court, right?

A.   Okay.  I'm sorry, I made a mistake with that.

M. RONCONE - CX BY MR. COOPER

Q.   Were you confused or did you intentionally, because it's a bad answer for you to give, say "probably drugs"?  Which one was it?  It's okay.

A.   I know it's drugs.  I just -- it wasn't -- someone gave it to me, I threw it in the dresser drawer.

Q.   Do you understand when you got up in that chair, the courtroom deputy walked over and asked you to raise your right hand.  Do you remember that?

A.   Yes.

Q.   What did the courtroom deputy tell you before you sat in that chair, Mike?

A.   To tell the truth.  And I'm doing this.  I am.  I'm sorry.  I'm really nervous.  I never did this before.

Q.   Nerves don't cause you to be uncertain of whether that in your dresser drawer is drugs or maybe drugs or probably drugs, that is not nerves, right, Mike?  Is that your testimony?  Oh, I was nervous and I forgot whether it was drugs or not?

A.   No.

Q.   Okay.  That's not good.  Let's move on.

MR. COOPER:  Can we move onto the tray, Ms. Champoux?  Let's see how we do this time.

Q.   What is that in the white pestle, white powdery

M. RONCONE - CX BY MR. COOPER

substance in there?

A. Drugs.

Q. Definitely drugs that time?

A. Yes.

Q. Whose drugs?

A. My father.

Q. Your father's drugs?

A. Yes.

Q. Could we zoom out of that?

These drugs on the right in exhibit 1 C and in your dresser drawer in your bedroom, those are your drugs, right?

A. Yes, they were given to me.

Q. I didn't ask you who gave them to you for the third time, I'm asking if they were your drugs. They were your drugs?

A. Yes.

Q. They weren't dad's drugs, right?

A. Yes.

Q. And the tray on the left, those are dad's drugs, right?

A. Yes.

Q. And you heard Special Agent Burns testify before when he confronted you about this tray, you said, "not

M. RONCONE - CX BY MR. COOPER

my name on the credit card."  Did you say that?

A.   Yes.

Q.   That happened?

A.   Yes.

Q.   So he told the truth about that, too?

A.   Yes.

Q.   And Special Agent Burns got kind of miffed, for lack of a better word, that you were pawning it off on the your dad, right?

A.   Yes.

Q.   And he said to you something along the lines of, Mike, you're going to put that on your dad?

A.   Yes.

Q.   How old are you?

A.   I'm 44 now.

Q.   So you were 42 when this was going on?

A.   Yes.

Q.   So how old was your -- how old is your dad?

A.   Sixty-nine.

Q.   So 67 at the time, give or take?

A.   Yes.

Q.   And Special Agent Burns said to you, Mike, are you going to put this on your dad.  Do you remember that?

M. RONCONE - CX BY MR. COOPER

A.   Yes.

Q.   And you answered that question, right?

A.   Yes, I did.

Q.   And, in fact, what you said to Special Agent was, no, that's mine, I just used a card that was laying around?

A.   That's incorrect.

Q.   I'm not asking if it's correct or incorrect, I'm asking if you said to an FBI agent, those are my drugs in Government's Exhibit 1 D, those are my drugs and I used a card that was laying around, did those words come out of your mouth?

A.   No.

Q.   And what words came out of your mouth?

A.   He said, "should I go arrest your father?"  And I said, "No, leave him alone.  Let's go."  And at that point, I knew everybody was there for me and there was no reason to bring my father into it.

Q.   I'm looking at Government's Exhibit 1 A and I'm on the third page of the document, this is the 302 report that I know you're familiar with because you said in your affidavit you reviewed it.  Do you know what I am talking about, the FBI report about your statement?

A.   Yeah.

M. RONCONE - CX BY MR. COOPER

Q.   On page 3, the top paragraph, Special Agent Burns wrote, "Roncone then stated "or keep" my father out of it."  Did you say that?

A.   Yes, I did said that.

Q.   That is accurate, right?

A.   That is accurate.

Q.   He didn't make that up?

A.   No.

Q.   And then he writes in the same sentence, "And then stated he, Roncone, used the card that was just laying around."  Did you use those words?

A.   No, I did not.

Q.   So he made up half the sentence?

A.   That is correct.

Q.   Okay.  You did not tell Special Agent Burns, "those drugs belong to my father," right?

A.   I never said that.

Q.   You didn't tell him that, correct?

A.   All I said is, "that is not my name on the card."

Q.   And the reason you suggested that is not my name on the card because you didn't want to get in trouble for those drugs, right?

A.   It was just an observation I made at the time and to make a statement.

M. RONCONE - CX BY MR. COOPER

Q.   I mean, you didn't say to him that card is light blue and blue, did you?

A.   No.

Q.   So you picked something to point out that would direct attention towards another person, right, Mike?

A.   At the moment, yes.

Q.   And the reason you did that is because you, Mike, didn't want to get in trouble for it, right?

A.   Negative.

Q.   Explain why you pointed out that someone else's name was on the card if not to not get in trouble?

A.   At the moment, I was pissed that was in the house.

Q.   You were pissed it was in the house?

A.   Yes.

Q.   Let's look at Government's Exhibit 1 C, your own drugs are in the house?

A.   I forgot that was in that drawer.  It's been in there for who knows how long.

Q.   The drugs that someone else gave you you now forgot it was there?

A.   It was in a sock drawer, it got thrown in there.

Q.   You use drugs, right?

A.   Not all of the time.

M. RONCONE - CX BY MR. COOPER

Q.   I didn't ask if you use drugs all of the time.

MR. DELL:  Your Honor, I'm going to renew my objection.

THE COURT:  I'm going to sustain the objection to whether or not he uses drugs.

MR. COOPER:  May I rephrase the question?

THE COURT:  Sure, we'll see.

Q.   The search warrant occurred on December 7th, 2023, right?

A.   Yes.

Q.   December is the last month of the year, right?

A.   Yes.

Q.   In the year 2023, you used drugs, correct?

MR. DELL:  Renew my objection, your Honor. That is a specific element that they have to prove at trial.

MR. COOPER:  It's not trial, it's not his testimony, I'm assessing credibility.

THE COURT:  I know.  And I think you have an argument that you can ask it, but I'm going to sustain the objection.

MR. COOPER:  Judge, respectfully, may we have a sidebar outside of the presence of the witness so I can make a further argument?

M. RONCONE - CX BY MR. COOPER

THE COURT:  Sure.

(Sidebar discussion on the record.)

THE COURT:  Look it, I agree that credibility is absolutely an issue, but Mr. Dell did not ask him any questions about the substance of the 302 or the substance of the charges.  But I agree, it's perfectly appropriate for you to be asking these questions as to the accuracy of what Agent Burns testified to because there are two different versions of events here, probably most significantly the handcuffs.  But when you're starting to get into the elements of the offense and he is on the witness stand, I've given him no warnings about the fact, as I would to a criminal defendant in a trial, that you can testify, you don't have to testify, it's ultimately your determination as to whether or not you want to testify.  I'm just very uncomfortable with this.  So I just think asking him a question about whether or not he used drugs during 2023 is just going a step too far and that is why I'm sustaining the objection.

MR. COOPER:  May I make a record, and I understand the Court's ruling.  I think Mr. Dell has been doing this much longer than I have, and I know that Mr. Dell had discussions with his client.  He has

M. RONCONE - CX BY MR. COOPER

literally testified about it, about, you know, today, the affidavit, I'm sure Mr. Dell prepared his client, the benefits of testifying and the risks of testifying. They put in an affidavit where the defendant swore that he reviewed the contents of an affidavit and he disagrees with many of the statements, he reviewed the contents of the 302 and he disagrees with many of the statements in there.  So I've tried to go through systematically, as we do that, I got kind of a surprising answer from him about drugs, whether they are his or whether they are not his, I think that significantly impacted his credibility, and I would like to further probe on that kind of unexpected area.  One of the ways to probe on that is, you know, you've said the drugs were handed to them by some random person and you put them in a drawer.  Following up, you do, in fact, use drugs, right?  I'm not trying to sandbag trial, I'm trying to, within the suppression hearing, by questioning him on his credibility, I think it's fair game.

To the extent the Court didn't give him warnings, he has a very competent attorney.  He is not pro se.  I don't think that should weigh on what is and what is not an appropriate question.  I think it is

M. RONCONE - CX BY MR. COOPER

important to the credibility, but if the Court is sticking to the ruling, I understand.

THE COURT:  Anything you want to put on the record?

MR. DELL:  Of course I agree with your Honor.  But, you know, Mr. Cooper has cross examined him, cross examined him extensively comparing the two versions, and he has already done this.  And this is just cumulative.  Plus, it's possibly prejudicial to the bigger picture and it's an element that has to be proven at trial.

MR. COOPER:  This is not testimony that is usable against the defendant at trial.  The purpose today is not trying to trap him in testimony for trial. The purpose is about assessing his credibility and I think it's fair play when he gets up there and chooses to testify.

MR. DELL:  I think we're getting more into discovery for him than we are -- how much further?

THE COURT:  So I'll go back to my original comment.  I'm not suggesting that I had to go through with him the fact that he had a right to remain silent. I think there is an argument that would have been inappropriately interfering with him and his attorney's

M. RONCONE - CX BY MR. COOPER

strategy about how to handle this suppression hearing. And so that is why I didn't do it. And I agree that there is an argument that the government has that it's a perfectly reasonable question. I'm sustaining the objection, though, because I think it's gone a step too far. You can go and ask any questions you want that draw a distinction between what Agent Burns has testified to and what he has testified to. I'm allowing that.

MR. COOPER: Appreciate that.

THE COURT: But this is just beyond that.

MR. COOPER: I understand the Court's ruling and I'll move on.

THE COURT: All right. Thank you.

(Proceeding continued.)

THE COURT: All right. We are back, no longer at sidebar. I think the microphone is not working, though, Sandra. There it goes.

All right. I sustained the objection based on the discussions at sidebar. Why don't you move on, Mr. Cooper?

MR. COOPER: Yes, your Honor.

**CONTINUING CROSS EXAMINATION BY MR. COOPER:**

Q.   Mr. Roncone, I'm just going to kind of jump to a

M. RONCONE - CX BY MR. COOPER

new topic here.

You can leave that up for now, Karen.

We were talking before about Defendant's Exhibit A, which is your nine paragraph affidavit from July of 2025, and we were comparing it with Government's Exhibit 10 for identification which is your April affidavit.  Do you remember when we talked about that?

A.   Yes.

Q.   You'd agree with me that there are pretty significant details that you didn't -- did not include in your first affidavit that you then put in your second affidavit, right?

A.   That is correct.

Q.   Juiced it up a little bit, right?

A.   I was asked different questions by my lawyer.

Q.   Okay.  So let's talk about that.  Is it your testimony that in advance of filing the first affidavit, the topic of whether or not you are handcuffed during your questioning by law enforcement never came up?

A.   I believe there was something else that came out that I read that gave statements to certain things and that I corrected with him that were not accurate from now how I remember.

Q.   So my question, again, just to bring it back

M. RONCONE - CX BY MR. COOPER

there, is it your testimony to the Court that during the conversation before the first affidavit gets filed, Mr. Dell never had a discussion with you about whether law enforcement handcuffed you while you were being questioned.  Is that your testimony?

A.   I don't believe that came up in our conversation when I was explaining to him what happened that evening or that morning.

Q.   So at no point during the first conversation before the April affidavit with your lawyer about your interview with law enforcement, at no point did you tell Paul, "I was handcuffed the whole time," that never happened?

A.   I would imagine no because it would have been in there.

Q.   It did make it's way to the second affidavit, right?

A.   Yes, that time we talked more details.

Q.   Second affidavit you signed in July of 2025, correct?

A.   Yes.

Q.   Special Agent Burns authored his report, Government's Exhibit 1 A, hours after this happened, right?

M. RONCONE - CX BY MR. COOPER

A.   According to what he said earlier, yes.

Q.   You want to look at it?

A.   I've read it.

Q.   Okay.  You're familiar with the date drafted line, it says 12/7/2023, right?

A.   Yes.

Q.   You think that is made up?

A.   No.

Q.   You think that is probably accurate, right?

A.   Of course it's accurate.

Q.   So December 7th, the same day of the conversation, Brian Burns of the FBI wrote this report, right?

A.   Yes.

Q.   That was way closer in time to the conversation than your July 2025 affidavit, right?

A.   Yes.

Q.   So December '23 to December '24 would be 12 months.  December '24 to July '25 is eight months.  So 20 months went by between the time you had a conversation with Special Agent Burns and the time you signed this affidavit, right?

A.   Yes.

Q.   And I can't help but notice during multiple times

M. RONCONE - CX BY MR. COOPER

during this testimony today, you seemed to waiver on whether you were handcuffed during the whole time?  Is that fair?

A.  Correct.

Q.  A couple times you were a little unsure, then you doubled down on it?

A.  My recollection, my memory of that day, was I was in handcuffs the entire time.

Q.  But my question that I just asked you, if during your testimony today, just now, you wavered several times, right, because I pointed it out to you, you've wavered several times on whether you're certain about that, right?

A.  Yes.

MR. DELL:  Your Honor, speculation, your Honor.

THE COURT:  Wait, wait, speculation is your objection?

MR. DELL:  He is asking him to speculate on an opinion of his own testimony.

THE COURT:  Overruled.  Go ahead, Mr. Roncone.  You're uncertain, is that a fair statement?

THE WITNESS:  When I play that day back in my head and I look at that video, and, yeah, there were

M. RONCONE - CX BY MR. COOPER

some things, some conversations with the guys in the military gear, that I, you know, I had forgotten, but I never forgot sitting in that car talking with him and, I just, I remember my hands being like this through the whole, the whole day.  It's how I remember.

THE COURT:  And you're putting your hands together in a -- clasping them.

THE WITNESS:  Like I couldn't, it's how I just, the day has haunted me since the beginning of this whole, for two, and, hey, however long it's been.  This just turned my world upside down.  I mean, that is just how I remember that day.

Q.   I'm not trying to be insensitive on how the case has impacted your life.  But my question is really only limited to whether or not you, as you sit here, can testify with certainty, with certainty, that your hands were handcuffed the entire time or it was a traumatic thing you're saying that you're nervous and you just don't remember, which one is it, sir?

A.   Certainty, I guess I'm not certain.  All right?

Q.   Okay.  That's okay.

A.   But like I said, my memory of that day, my hands were together, they were cuffed, questions, and just, you know.

M. RONCONE - RDX BY MR. DELL

Q.   But you're not certain, yes or no?

A.   No.

Q.   Okay.

MR. COOPER:  May I just have one moment, Judge?

(Whereupon, there was a pause in the proceeding.)

Judge, I have no further cross examination. Thank you.

THE COURT:  All right.  Thank you, Mr. Cooper.

Mr. Dell, any redirect?

MR. DELL:  Very briefly.

**REDIRECT EXAMINATION BY MR. DELL:**

Q.   Mike, you and I have had conversations about that morning throughout my representation of you, right?

A.   Yes.

THE COURT:  Why don't you stand by the microphone?

Q.   And throughout my representation of you, right?

A.   Correct.

Q.   And on the days that we sat down and I typed out those affidavits, who decided what was in the affidavit, me or you?

M. RONCONE - RDX BY MR. DELL

A.   I did.

Q.   Well, it was your statements, right?

A.   Yes.

Q.   But as far as what statements made their way into the affidavit, who actually wrote it?

A.   You did.

Q.   I wrote it.  Okay.  And that was after talking about what happened, right?

A.   Yes.

Q.   And those weren't the only days that we talked about it, right?

A.   No.

Q.   And do you remember we filed the first set of motions, non-dispositive, right?

A.   Yes.

Q.   And do you remember hearing that the government agreed that you had standing as the two other places that were searched?

A.   Yes.

Q.   Search warrants.  And do you remember me telling you that they were not agreeing to standing with regard to your statements?

A.   Yes.

Q.   And we would have to do another affidavit?

M. RONCONE - RDX BY MR. DELL

A.   Correct.

Q.   And that we would have to add details to it?

A.   Yes.

Q.   Did you make up those details?

A.   No.

Q.   An, in fact, you had given those details in the past, right?

A.   Yes.

Q.   And it was me who was actually writing the affidavit?

A.   Correct.

          MR. DELL:   I have nothing further.

          THE COURT:   Any further cross?

          MR. COOPER:   I don't think so, Judge.

          THE COURT:   Okay.   You can step down, Mr. Roncone.

          THE WITNESS:   Thank you, your Honor.

          THE COURT:   Any other part on the part of the defense?

          MR. DELL:   No, your Honor.

          THE COURT:   Any rebuttal?

          MR. COOPER:   Judge, a much shorter direct examination than Special Agent Burns, but I would request the Court permit me to call Investigator Rondon

USA V. MICHAEL RONCONE

on whether the defendant was handcuffed.

THE COURT:  He is outside?

MR. COOPER:  He better be.  I'll check.  Can we get him?

THE COURT:  Can we get the two affidavits, and, Sandra, maybe we can make some copies.

MR. COOPER:  I didn't move Government's 10 in.

MR. DELL:  This is the file, my file copy of my dispositive motions.  They are both attached to this.

THE COURT:  But do you have the one we put the sticker on?

MR. DELL:  I think Mr. Cooper does.

MR. COOPER:  I think I do as well.

THE COURT:  Hang on one second.

And are you moving in?

You can come up, sir.

Are you moving in 10?

MR. COOPER:  I'm going to ask to move it in.

THE COURT:  Any objection, Mr. Dell?

MR. DELL:  I have no objection.

MR. COOPER:  You're going to go into that witness stand and stay standing up until the courtroom deputy speaks to you.

USA V. MICHAEL RONCONE

Mr. Dell, do you have any objection to exhibit 10 coming into evidence?

MR. DELL:  No, I do not.

(**Whereupon, Exhibit 10 was received into evidence.**)

THE COURT:  Ten will come into evidence and Defense Exhibit A.  Hand them to Sandra and she can make copies.

My court reporter is going to swear you in. So you can step up into the chair.

(**G. Rondon was called to the witness stand and sworn**)

THE COURT:  Thank you.  When seated, if you could state your first and last name and spell them both.

THE WITNESS:  My first name is Geraldo, G-e-r-a-l-d-o, my last name is Rondon, R-o-n-d-o-n.

THE COURT:  All right.  Is it officer, agent?

THE WITNESS:  I'm an investigator with the New York State Police.

THE COURT:  So Investigator Rondon, my name is Judge Wolford and I have some instructions for you before you get started.  First of all, only answer the question that you're asked.  Don't volunteer

G. RONDON - DX BY MR. COOPER

information.  If there is an objection to a question, you need to wait until I rule on it and I'll let you know whether or not you can answer it.  And speak slowly and clearly, and make sure you keep your voice up and speak into the microphone so everyone can hear you and so that my court reporter is able to take down your testimony.  Do you understand?

THE WITNESS:  I understand, your Honor.

THE COURT:  Okay.  You can proceed whenever you're ready, Mr. Cooper.

MR. COOPER:  Thank you, your Honor.

**DIRECT EXAMINATION BY MR. COOPER:**

Q.   Good afternoon, Investigator Rondon?

A.   Good afternoon.

Q.   You've been sitting around a long time waiting to get up there.

A.   Yes, I have.

Q.   Thank you for being patient.  We prepared before you came here and I told you some of the questions I might ask you, right?

A.   Yes.

Q.   I'm going to ask you much more limited set of questions.  I really only want to focus on one topic. Okay?

G. RONDON - DX BY MR. COOPER

A.   Okay.

Q.   Before we get there, can you explain to the Court what your background is, education and work experience?

A.   Well, my education is, I went to high school, Bishop Timon High School and graduated, went to ECC and got an associate's degree from there.  I went to the Coast Guard, served my time in the Coast Guard, and got a job in the New York State Police.

Q.   What year did you get a job with the New York State Police?

A.   October 30th, 2000.

Q.   You got the whole date down.  October 30th, 2000, so almost 25 years ago.  Is that correct?

A.   Correct.

Q.   It's a big anniversary coming up there?

A.   Yes.

Q.   In the 25 years that you have worked for the New York State Police, have you ever been a member of any task forces?

A.   Yes.

Q.   Have you been a member of any task forces with the FBI?

A.   Yes.

Q.   More than one?

G. RONDON - DX BY MR. COOPER

A.   Yes.

Q.   Which task forces?

A.   Safe Streets Gang task force and Organized Crime task force.

Q.   So I'll clarify, two different ones, correct?

A.   Yes.

Q.   The first one is the Safe Streets Task Force, right?

A.   That's correct.

Q.   And that investigates gang activity, right?

A.   Yes.

Q.   The second task force is called Organized Crime Task Force?

A.   That is correct.

Q.   When did you become a member of the Organized Crime Task Force?

A.   Approximately the beginning of 2021.

Q.   So, in December of 2023, were you a member of the FBI's Organized Crime Task Force?

A.   Yes.

Q.   Are you familiar with an FBI agent named Brian Burns?

A.   Yes.

Q.   When did you meet Brian Burns?

G. RONDON - DX BY MR. COOPER

A.   Over 10 years ago.

Q.   So we're in 2025 now, would it be fair to say sometime around 2015?

A.   No, I would say 2009.

Q.   Okay.  So that is 16 years ago?

A.   Yeah, 16 years ago.

Q.   Math is not my strong suit, but that one I got. Investigator Rondon, have you worked on cases with Special Agent Burns before?

A.   Yes.

Q.   And have you conducted interviews with him, before December of 2023, had you conducted interviews with him?

A.   Yes, I have.

Q.   Okay.  Have you come to be aware of Special Agent Burns' demeanor and disposition when he conducts an interview?

A.   Yes.

Q.   Is he like an angry fire and brim stone kind of guy?

A.   No, not at all.

Q.   I want to ask you specifically now about December 7th, 2023.  Okay?

A.   Okay.

G. RONDON - DX BY MR. COOPER

Q.   Were you working that day?

A.   Yes.

Q.   What was your responsibility on December 7th, 2023?

A.   To assist to attempt to conduct an interview.

Q.   And who were you supposed to be assisting?

A.   Special Agent Brian Burns.

Q.   I'm going to ask just some limited questions and I'm going to be fairly specific about what you observed that day.  Okay?

A.   Okay.

Q.   Around 6:22 in the morning, did you and Special Agent Burns arrive at a fire hall just across the street from 4998 Williams Street?

A.   Yes.

Q.   Did you interact with a civilian at that time?

A.   Yes.

Q.   Who is the person that you interacted with?

A.   Michael Roncone, that gentleman right there.

Q.   You just gestured at the gentleman sitting at the defense table, correct?

            THE COURT:  Any objection?

            MR. DELL:  There are two gentlemen here.

            MR. COOPER:  Point taken.  The one on the

G. RONDON - DX BY MR. COOPER

right from your perspective.

THE WITNESS:  I know who Paul is, but Michael is right there.

Q.  So you interacted with the defendant?

A.  Yes.

Q.  And did Special Agent Burns interact with him?

A.  Yes.

Q.  At any point that whole day, did you threaten or intimidate Mr. Roncone?

A.  No.

Q.  At any point that day, did Special Agent Burns threaten or intimidate Mr. Roncone?

A.  No.

Q.  What word or words would you use to describe the demeanor of your interactions with Mr. Roncone?

A.  Respectful.

Q.  Was he respectful to you?

A.  He was.

Q.  Was he respectful to Special Agent Burns?

A.  He was.

Q.  And were you both respectful to him in return?

A.  Yes, we were.

Q.  When you first laid eyes on Mr. Roncone on December 7th, 2023, where was he?

G. RONDON - DX BY MR. COOPER

A.   He was in Special Agent Tina -- I forget her last name, but she is an agent with the FBI and her vehicle, coming out of her vehicle.

Q.   If I said her last name, would you remember it?

A.   I believe so.

Q.   Is it Tina Taylor?

A.   Yes, Tina Taylor.

Q.   So when you first saw the defendant, he was seated in Special Agent Taylor's vehicle?

A.   That's correct.

Q.   When you first saw him that day, was he handcuffed?

A.   He was.

Q.   Where was he handcuffed?

A.   In the front.

Q.   When you interacted with the defendant, did he move from being in Special Agent Tina Taylor's vehicle to somewhere else?

A.   Yes, to my vehicle.

Q.   Were you present with him at your vehicle?

A.   Yes.

Q.   Was Special Agent Brian Burns present with him at your vehicle?

A.   Yes.

G. RONDON - DX BY MR. COOPER

Q.   Did you hear Special Agent Burns introduce himself to Mr. Roncone?

A.   Yes.

Q.   Did he show him his FBI I.D. or whatever?

A.   Yes.

Q.   Did you have an opportunity to introduce yourself to Mr. Roncone?

A.   I did.

Q.   And did you show him your New York State Police credentials?

A.   I did.

Q.   After introducing yourselves to Mr. Roncone, did Special Agent Burns talk to Mr. Roncone?

A.   Yes, he did.

Q.   Okay.  Did you see anything happen to the handcuffs that were on Mr. Roncone's hands at that point of the day?

A.   Yes, we took them off.

Q.   Are you sure about that?

A.   Yes.

Q.   Okay.  No doubt in your mind?

A.   Yes.

Q.   His handcuffs came off when you and Brian met with him by your vehicle, is that correct?

G. RONDON - DX BY MR. COOPER

A.   That is correct.

Q.   At some point later, did handcuffs go back on Mr. Roncone?

A.   Yes, they did.

Q.   Several hours later, is that fair to say?

A.   Yes.

Q.   Okay.  Who put handcuffs back on Mr. Roncone?

A.   I believe I did.

Q.   Do you have a clear memory of that?

A.   Pretty good memory because I remember my handcuffs were bigger.

Q.   And what about the fact that your handcuffs are bigger sticks out in your mind?

A.   Because he said I had big hands, I recall now looking at him, do you have bigger handcuffs?

Q.   You're testifying that you remember the defendant saying to you, hey, do you have bigger handcuffs because I'm a big guy, something like that?

A.   Something like that because his hands are big.

Q.   And did you put your handcuffs on him?

A.   Yes.

Q.   At the time you put your handcuffs on him was that the same time he was being told you're under arrest?  Let me withdraw that question.

G. RONDON - DX BY MR. COOPER

When the handcuffs come off, that is when you're first getting to your vehicle, right?

A.   Yes.

Q.   And then you interview him with Special Agent Burns, right?

A.   That's correct.

Q.   When the interview sends Mr. Roncone terminates the interview do you remember that?

A.   He did terminate the interview.

Q.   Do you remember what he said at that time?

A.   He would like to talk to a lawyer and he named the lawyer.

Q.   When the interview was terminated, was he placed in handcuffs at that point?

A.   Yes he was.

Q.   And whose handcuffs was he placed in at that point?

A.   My handcuffs.

Q.   So I jumped a head so the interview occurs while the interview is happening and Brian is talking to him, what were you dog while the interview is happening?

A.   Trying to take notes.

Q.   And when the interview ends because Mr. Roncone says hey I want to talk to a lawyer was he then placed

G. RONDON - DX BY MR. COOPER

in handcuffs?

A.   Yes.

Q.   You have an independent memory of that happening?

A.   Yes.

THE COURT:   That was before he was arrested, correct?

THE WITNESS:   Yes.

THE COURT:   Okay.

Q.   It's after all of the statements, was that after all of the statements that he made prior to invoking?

A.   Can you ask that again?  Ask that again.

Q.   I can try and ask that better.  I'm sorry.

The defendant's handcuffs are removed at the time the interview begins, right?

A.   Right.

Q.   Brian asks him questions and you take notes, right?

A.   Yes.

Q.   The whole time that is happening, Brian is asking him questions, you're taking notes, they are having a conversation, is he uncuffed that whole time?

A.   Yes, he is.

Q.   When the interview terminates, at that time is he re-handcuffed?

G. RONDON - DX BY MR. COOPER

A.   Yes, he is re-handcuffed.

Q.   Where is he seated when the interview is terminated?

A.   He is directly behind me.  I'm in my assigned vehicle he is directly behind me.

Q.   Is your assigned vehicle like a standard New York State Police cruiser?

A.   No, it's not.

Q.   Is a Ford Explorer?

A.   It's a Ford Explorer.

Q.   Does it have a cage between the back and front?

A.   It does not.

Q.   So is there is an access between the back and front, is that fair?

A.   Yes.

Q.   You mentioned that Mr. Roncone, the defendant, was seated right behind you during the interview.  Is that correct?

A.   That's correct.

Q.   When the interview ended, he was placed back in handcuffs, is that correct?

A.   Yes.

Q.   Was he still seated directly behind you?

A.   Yes, he was still seated directly behind me.

G. RONDON - DX BY MR. COOPER

THE COURT:  But at that point, they are different handcuffs, they are your handcuffs?

THE WITNESS:  Yes, they are.

THE COURT:  He wasn't cuffed with the same cuffs?

THE WITNESS:  No, because those cuffs were given to whoever claimed them or owned them, and I don't know who owned those.

THE COURT:  In other words, when were they given back to whoever owned those?

THE WITNESS:  When we were at the vehicles, at my vehicle and Tina's vehicle.

THE COURT:  And you --

THE WITNESS:  And they were exchanged.

THE COURT:  And was Tina's vehicle near your vehicle?

THE WITNESS:  Close proximity, yes.

CONTINUING DIRECT EXAMINATION BY MR. COOPER:

Q.  So he is initially seated in Special Agent Taylor's vehicle, right?

A.  Yes.

Q.  At some point, he is brought into your vehicle to sit and have a conversation with you and Brian, correct?

A.  Yes.

G. RONDON - DX BY MR. COOPER

Q.   Was the distance between Tina's vehicle and your vehicle far?

A.   No.

Q.   Do you recall if you guys walked over to your vehicle or if you pulled up next to Tina's vehicle, do you recall how that happened?

A.   I pulled my vehicle, I pulled in close proximity to Tina's vehicle.

Q.   And when you pull over close to Tina's vehicle, is that when you get out and introduce yourself to Mr. Roncone?

A.   Yes.

Q.   And is that when Special Agent Burns talks to Mr. Roncone and shows him his credentials?

A.   Yes.

Q.   At some point, Mr. Roncone gets in your vehicle, right?

A.   Yes.

Q.   And at the time he gets into your vehicle and has that conversation, was he cuffed or not handcuffed?

A.   He was not handcuffed.

Q.   And when the interview ends, was he placed in handcuffs?

A.   Yes, he is.

G. RONDON - DX BY MR. COOPER

Q.   May I have 1 A?

I'm going to hand you what's in evidence as Government's Exhibit 1 A.  Do you recognize that?

A.   Yes, I do.

Q.   Is that a 302 that is drafted by Brian Burns and yourself about the interactions with Mike Roncone on December 7th?

A.   Yes.

Q.   Okay.  You were the person would took notes, right?

A.   I did.

Q.   And Brian Burns is the person who drafted this report, right?

A.   Yes.

Q.   Did you meet and discuss with Brian what was contained in this 302 before it was sent up?

A.   Yes.

Q.   Okay.  Is that standard practice?

A.   Yes.

Q.   And you're listed at the bottom as, essentially, a coauthor of this report, is that correct?

A.   That is correct, yes.

Q.   May I have that back for one second?

A.   Yes.

G. RONDON - DX BY MR. COOPER

Q.   If you look at the second paragraph on the first page of that document, does that memorialize the timing of Mr. Roncone's handcuffs being removed?

A.   Second paragraph, right here?

Q.   Yes, if you read that paragraph yourself and then I'll ask you a question.

A.   Yes.

Q.   Did you read that second paragraph?

A.   I did.

Q.   The first sentence, it says, "It was explained to Roncone that he was not under arrest and had been detained for everyone's safety pursuant to the federal search warrant being executed at his residence."  Do you see that sentence?

A.   Yes.

Q.   Who explained that to him?

A.   Brian Burns.

Q.   Next sentence, "It was further reconfirmed to Roncone that he was not under arrest and did not need to speak with the investigators."  Do you see that sentence?

A.   Yes, I do.

Q.   Did that happen?

A.   Yes.

G. RONDON - DX BY MR. COOPER

Q.   And who said that to Mr. Roncone?

A.   Special Agent Burns.

Q.   And then the next sentence says, "Roncone's handcuffs were subsequently removed and he was sitting in Investigator Rondon's vehicle as it was cold and rainy out."  Do you see that?

A.   Yes.

Q.   Did that happen?

A.   Yes.

Q.   Okay.  At the time this 302 was being drafted, if any of those hadn't happened and you saw them in the 302, would you have said, hey, Brian, I don't remember it playing out this way?

A.   Absolutely I would have told him, yeah.

Q.   That is one of the reasons you review it, right?

A.   Yes.

Q.   And the information that is contained in this affidavit is consistent with what you recall.  Is that fair to say?

A.   Yes.

Q.   And at the time this was drafted and reviewed by you, that was much more close in time to this interview than today, right?

A.   Yes.

G. RONDON - CX BY MR. DELL

Q.   Okay.

MR. COOPER:   I have no further questions, Judge.

THE COURT:   Okay.   Thank you, Mr. Cooper.

Cross examination.

**CROSS EXAMINATION BY MR. DELL:**

Q.   Investigator, do you recall Mr. Roncone asking if he could go to the bathroom at some point?

A.   I do recall that, yes.

Q.   Okay.   And the two of you allowed him to go to the bathroom near the vehicle or behind it?

A.   I believe so.

Q.   Okay.   And do you remember where in this timeline that occurred?

A.   I do not recall.   I know it's during the time that he is with me under my supervision in my car.

Q.   Okay.   All right.   And if he had walked out and then just kept walking, you would not -- you and your partner would not have allowed him to just leave, would you?

A.   No, he would have had handcuffs and he would still have had his handcuffs on.   At that time you're thinking?

Q.   That was my question.   Would you have allowed him

G. RONDON - RDX BY MR. COOPER

to leave, just walk down the street and not come back?

A.   No, I would have told him he has to stay until the search is completed.

MR. DELL:  Okay.  I have nothing further.

THE COURT:  Thank you, Mr. Dell.

Any redirect?

**REDIRECT EXAMINATION BY MR. COOPER:**

Q.   Before Special Agent Burns asked him any questions, Special Agent Burns told the defendant that he was not under arrest, right?

A.   That's correct.

Q.   Do you remember that?

A.   Yes.

Q.   Okay.  Did the defendant say, hey, Brian, am I allowed to leave?

A.   He never said that, no.

MR. COOPER:  I have no further questions.

THE COURT:  Anything else, Mr. Dell?

MR. DELL:  No, your Honor.

THE COURT:  Okay.  You can step down, sir. Thank you.

THE WITNESS:  Thank you, your Honor.

MR. COOPER:  I'll take that back.

THE COURT:  You can return it to Mr. Cooper.

USA V. MICHAEL RONCONE

Any other proof from the government?

MR. COOPER:  No.  Thank you, your Honor.

THE COURT:  Any other proof from the defense?

MR. DELL:  No, your Honor.

THE COURT:  Let's confirm what exhibits are in evidence.  I've got 1 A, 2 B, 3 A, 3 B, 6 C, 3500 D, A, and 10 A being the Defense Exhibit, is that correct.

MS. CHAMPOUX?  Yes.

THE COURT:  Is that correct, Ms. Champoux?

MS. CHAMPOUX:  Yes.

THE COURT:  Mr. Dell?

MR. DELL:  Yes.

THE COURT:  Sandra?

MR. DELL:  What about 7, was it just spoken?

MR. COOPER:  You're correct that 7 was brought up, I handed it to a witness, but I didn't offer that in.

THE COURT:  All right.  So the proof is closed.  As we discussed at the beginning of this, you're going to -- who is going to order the transcript?  The government?  Well, as I said, nobody has any money.  Usually I'd have government do it.

MR. COOPER:  I'm confident that the

USA V. MICHAEL RONCONE

government can offer we're ordering it no matter what.

MR. COOPER:  I'm going to tell them that the Judge ordered.

THE COURT:  I'm ordering the government to order the transcript.

MR. COOPER:  Thank you, your Honor.

THE COURT:  And once the transcript is produced, within 30 days there will be simultaneous submissions two weeks after that.  Any response to those submissions and then I will decide whether or not we have oral argument.

MR. COOPER:  Understood.

MR. DELL:  Okay.

THE COURT:  And if you need any alterations to those deadlines once the transcript is produced, you let me know.

MR. COOPER:  Thank you, your Honor.

MR. DELL:  That's fine.

THE COURT:  Anything else from the government?

MR. COOPER:  No, thank you.

THE COURT:  Mr. Dell.

MR. DELL:  No.

THE COURT:  Have a good day, everybody.

USA V. MICHAEL RONCONE

Thank you.


                    *      *      *

              CERTIFICATE OF REPORTER


   I certify that the foregoing is a correct transcript
of the record of proceedings in the above-entitled
matter.


S/ Karen J. Clark,  RPR

Official Court Reporter