IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

SIMON GOGOLACK, et al.

Defendants.

_____

## MEMORANDUM IN SUPPORT OF THE DEFENDANT'S MOTION TO MODIFY THE QUINN PROBATION FILE PROTECTIVE ORDER FILED AT DOCKET ENTRY 658

**ON BEHALF OF PETER GERACE, JR.**

Case No.: 23-CR-99

Dated: November 12, 2025

[REDACTED VERSION]

I. INTRODUCTION --------------------------------------------------------------------------- 2

II. BACKGROUND --------------------------------------------------------------------------- 3

    A. THE CRIMINAL PROSECUTION OF QUINN AND HER SUBSEQUENT DEATH ------------------- 4

    B. THE EARLY PROCEEDINGS IN UNITED STATES V GOGOLACK ------------------------------- 6

    C. LITIGATION REGARDING THE QUINN PROBATION FILE ----------------------------------10

III. RELEVANT LEGAL CONSIDERATIONS----------------------------------------------------11

IV. DISCUSSION -------------------------------------------------------------------------------13

    A.  THE INDICTMENT COMPARED TO THE PROBATION FILE --------------------------------13

    B.  THE DISCOVERY COMPARED TO THE PROBATION FILE --------------------------------15

        *Summary Chart*-----------------------------------------------------------------------21

    C.  REQUESTED MODIFICATION OF THE PROTECTIVE ORDER----------------------------------22

V. CONCLUSION ----------------------------------------------------------------------------24

# I. INTRODUCTION

After reviewing the United States Probation Office file pertaining to Crystal Quinn at the request of defense counsel, on October 20, 2025, this Court advised that it would permit the production of information and material from the file, subject to a protective order. The protective order was entered on October 31, 2025. (Dkt. 658).

The initial order contains very tight restrictions limiting review to "attorney's eyes only." However, the Court indicated that it anticipated liberalizing access to the file contents after the attorneys had an opportunity to review the material and make further requests.

[REDACTED VERSION]

Having now reviewed the material, it is the defense's position that the protective order impedes further investigation of the facts of the case and the preparation of a trial defense.

The restrictions limit the defense's ability to interview witnesses about certain significant and relevant materials and conceal important information from the public.

This motion is now brought for relief from the protective order so that counsel can share the file materials with our client, our investigator, and discuss the contents with potential witnesses, including experts or fact witnesses who could opine about Quinn's mental health/substance abuse history and treatment.

## II. BACKGROUND

Almost immediately after Crystal Quinn died in August 2023, the government started to pursue an investigation premised on the theory that Ms. Quinn was murdered. It made multiple public statements speaking to these allegations.

When the government charged Mr. Gerace and others in the Second Superseding Indictment on January 5, 2024, it filed a public "speaking" indictment that alleged Mr. Gerace, through his attorney, obstructed justice by setting up a false account of Ms. Quinn's death as a suicide or accidental overdose.

The government has sought protective orders that focus on limiting disclosure of information, from the defense and the public. Information that contradicts the

[REDACTED VERSION]

government's theory of the case has been suppressed and it has repeatedly proffered a selective narrative in public court proceedings.

### A. THE CRIMINAL PROSECUTION OF QUINN AND HER SUBSEQUENT DEATH

Nearly five years ago, Peter Gerace was charged in *US v Bongiovanni et al* (case no. 19-cr-227). The case was originally scheduled for trial at a status conference on November 30, 2022. The trial was scheduled for June 2024. On January 19, 2023, over the government's objection, the District Court granted a defense motion to downgrade Mr. Gerace's home confinement to a curfew[1]. (Case No. 19-cr-227, Dkt. 361).

On January 24, 2023, only five days after the government objected to the Court's decision to relax the terms of Mr. Gerace's release, federal agents went to Ms. Quinn's home to serve her with a target letter. The letter informed her that she was the target of an investigation into alleged witness intimidation based on text messages she sent to a former Pharoah's dancer on November 19, 2019, over three years earlier (she was one of several former dancers expected to testify against Mr. Gerace). That incident had been the subject of multiple public proffers by the government in Mr. Gerace's case, as far back as May 4, 2021. (Case No. 19-cr-227, Dkt. 118 at 6-7). Only after a trial date had been scheduled and Mr. Gerace had been downgraded to curfew, did the government take any steps to charge Ms. Quinn.

---

[1] Mr. Gerace had already been on home confinement for nearly two years at that point without violation.

[REDACTED VERSION]

Upon issuance of the target letter, agents showed up at Ms. Quinn's home and spoke to her, without counsel present. During the course of this discussion, Ms. Quinn



.

On February 3, 2023, the government filed a Criminal Complaint against Crystal Quinn with three counts related to allegations of threatening and tampering with a witness. (Case no. 23-mj-011, Dkt. 1).[2]

With the criminal charges as leverage, the government wanted Ms. Quinn to cooperate. Once the charges had served their purpose to leverage Ms. Quinn into engaging in a proffer and agreeing to the government's narrative, the government quickly prepared a pretrial diversion agreement resulting in dismissal of the charges. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

In March 2023, only three months before Mr. Gerace was scheduled to go to trial, the government superseded the indictment to include the incident involving Ms. Quinn in November 2019. The government then used the indictment as a vehicle to move for

---

[2] A copy of the complaint, without exhibits, is also available on this docket at Docket Entry 164-1.

detention even though the Pretrial services report recommended Mr. Gerace's continued release. Mr. Gerace was detained.

Ms. Quinn remained under the supervision of the probation office in anticipation she would be called as a witness at Mr. Gerace's trial, which was adjourned from early summer to the Fall. On or about August 1, 2023, Ms. Quinn died of an apparent drug overdose, which would ultimately lead to the current indictment alleging she was murdered to prevent her from testifying against Mr. Gerace.

### B. The Early Proceedings in United States v Gogolack

Defendant Simon Gogolack was charged by Complaint on August 17, 2023, and indicted less than one month later, on September 13, 2023. (Dkt. 12). A superseding indictment was filed against him on September 20, 2023. (Dkt. 18).

Other defendants were charged individually by separate complaints, including: Howard Hinkle (case no. 23-mj-05219-MJR)[3]; Michael Roncone (case no. 23-mj-00168-HKS); Scott Barnes (case no. 23-mj-00166-HKS); and John Ermin (case no. 23-mj-00167-HKS).

Starting in September 2023, the government used early court appearances and public filings for the defendants in this case to disseminate selective information which would sway public opinion. Dan Herbeck, *Prosecutors say Wellsville man tampered with*

---

[3] Howard Hinkle was also charged with Dillon Anderson who has since had his charges dismissed. *(Case no. 23-mj-05219-MJR, Dkt. 20).*

[REDACTED VERSION]

*government witnesses*, Sept. 14, 2023, The Buffalo News (available at https://tinyurl.com/BN091423); see also Patrick Lakamp, *Pharaoh's witness overdosed on enough fentanyl to kill hundreds*, Nov. 3, 2023, The Buffalo News (available at https://tinyurl.com/BN110323).

When the government charged Mr. Gerace and the other defendants in the Second Superseding Indictment, it filed a "speaking" indictment compiling and expanding the allegations related to the government's narrative that Mr. Gerace and others conspired to kill Ms. Quinn.

Following the filing of the second superseding indictment, the government opposed the defendants' early attempts to obtain discovery,[4] and when the Magistrate ultimately insisted on setting a scheduling order, the government requested 90 additional days, to provide discovery. The Magistrate Judge agreed to the 90-day deadline, but he specifically indicated that to the extent possible, the discovery should "be produced sooner than that date" and it should be produced "[o]n a rolling basis so that people can hit the ground running in terms of what they think they need to do." (Feb. 23, 2024 Transcript at 12). Based on the understanding that discovery would be provided on a rolling basis, the Magistate Judge set a deadline of May 23, 2024, to complete discovery.

---

[4] For example, at Mr. Gerace's arraignment on January 20, 2024, counsel made an initial request: "I would ask that at least some preliminary disclosure be provided, beyond the indictment, to give counsel an idea of what's going to be involved here in terms of the defense of this case, in terms of motion practice, in terms of the timeframe associated with a trial." (Dkt. 46 at 13-14). It was opposed by the government.

[REDACTED VERSION]

No rolling discovery was provided. On May 20, 2024 (136 days after the second superseding indictment was filed), the government advised the defense it would need 3-terabyte hard drives from each defendant. Over the next week and a half, most of the attorneys obtained hard drives and had them delivered to the government. Then, on May 29, 2024, after the discovery deadline had already passed, the government sent an email stating that it would withhold discovery until a "protective order is authorized by the Court." At a status conference on June 3, 2024, the government indicated it would release the discovery if a temporary protective order was issued indicating that all discovery could be viewed by "attorney's eyes only" while the parties litigate the terms of a long-term protective order. The defendants reluctantly agreed.

The government moved for a protective order that would permit counsel from sharing discovery with the defendants, but prohibited the disclosure of any information to third parties or the public. (Dkt. 129-1). As the defense noted at the time, the government's proposed protective order essentially amounted to a gag order:

> Now the government presents claims that a protective order should be issued preventing the dissemination of any and all discovery to the public or any third party.
>
> This concern seems problematic given that the government has a history of pushing allegations into the media, and then attempts to cast blame on the defense for public coverage of this case. It is also concerning that the government has made comments about the purported evidence in this case and wants a protective order to prevent any context given to those allegations the government has advanced in the public forum.

> In many respects, the government is seeking what is
> tantamount to a gag order, a motion that the government
> already made in another prosecution of Mr. Gerace. Case No.
> 19-cr-227, Dkt. # 543. That motion was denied. Case No. 19-cr-
> 227, Dkt. # 652.

(Dkt. 153 at 9-10).

The litigation regarding the protective order was resolved several months later.

Discovery remained under the "attorneys' eyes only" restriction for the duration of that

litigation.

The government's failure to comply with the discovery schedule ultimately

resulted in sanctions related to constitutional speedy trial delay. (Decision and Order,

Dkt. 173) However, delay was not the sole impact of the delayed disclosure. The

government had been proffering allegations at public appearances and detention

hearings starting in September 2023. When Mr. Gerace's former attorney in 19-cr-227

made comments to the press that Ms. Quinn's death was more likely a suicide or

accidental overdose than a murder, the government presented evidence to the grand jury

about him[5]. Then, the government filed a speaking indictment in January 2024. The

defense did not receive discovery until June 2024, and even then, it was limited to

"attorneys' eyes only" while the protective order was litigated. As a result, the defendants

---

[5] Referred to as "Attorney 1" in the second superseding indictment, there are multiple overt acts naming him and describing various acts he took which the government it impliedly viewed as advancing the conspiracy. The government has, to date, refused to state its position whether "Attorney 1" is an unindicted co-conspirator which creates various issues as discussed in footnote 6, below.

could not respond to the government's narrative which by that time had been cemented in the public sphere unchallenged for nearly a year.

### C. LITIGATION REGARDING THE QUINN PROBATION FILE

After the parties appeared to argue defendants' non-dispositive motions, on May 21, 2025, the government acceded to the defense *Brady* request for copies of emails between prosecutors, Quinn's lawyer and the federal probation officer who was supervising her. The defense had argued that since the medical examiner did not conclude her death was a homicide, other alternative explanations should have been considered before jumping to the conclusion she was murdered. This is especially true since the government is on record indicating there is no direct evidence against Mr. Gerace and it intends to rely on circumstantial "inferences" at trial.

On July 24, 2025, based on the content of the communications between the prosecutor, probation officer and Quinn's lawyer immediately before her death, the defense for Mr. Gerace moved for access to the probation officer's file. (Dkt. 538 [sealed]; 507 [redacted]). Counsel for Mr. Knight joined. (Dkt. 517). The government filed a response on August 18, 2025. (Dkt. 560). The defense for Mr. Gerace replied on August 21. (Dkt. 570).

By August 22, 2025, this Court had completed *in camera* review of Ms. Quinn's probation file, but had identified a number of issues that it sought to resolve prior to

rendering a decision whether to disclose the records to the parties. In a Text Order on August 25, 2025, this Court directed further submissions. (Dkt. 580).

The defense filed a memorandum/brief on September 15, 2025. (Dkt. 607). The government filed a supplemental letter brief. (Dkt. 622 [sealed]). The potential disclosure was discussed further at an appearance on September 29, 2025. (Dkt. 636).

On October 20, 2025, this Court advised the parties that it intended to permit the production of certain portions of Ms. Quinn's probation file subject, at least initially, to an "Attorney Eyes Only" protective order. The protective order was issued on October 31, 2025 (Dkt. 658), and the materials have since been produced to the parties.

## III. RELEVANT LEGAL CONSIDERATIONS

Federal Rule of Criminal Procedure 16(d)(1) provides that a court may issue a protective order over materials produced during discovery if "good cause" exists and there is a showing that "disclosure will result in a clearly defined, specific and serious injury." *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y 2006) (citing *Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *United States v. Smith*, 985 F.Supp. 2d 506, 523 (S.D.N.Y. 2013) (party seeking order must show the potential for harm through particular facts, not just conclusory statements). The protective order must be "no broader than is necessary"

[REDACTED VERSION]

*Id.* at 524; *United States v. White*, No. 24-CR-300 (DEH), 2024 U.S. Dist. LEXIS 97207, at \*2-3 (S.D.N.Y. May 31, 2024); See also *United States v. Smith,* 985 F.Supp.2d 506 (SDNY 2013) ("Thus, courts should take care to ensure that the protection afforded to discovery information is no broader than is necessary to accomplish the proffered goals of the protective order").

"[W]hether to modify a protective order is entrusted to the discretion of the District Court." *Scanlan v. Town of Greenwich*, Civ. No. 3:18CV01322, 2021 U.S. Dist. LEXIS 70126, 2021 WL 1352994, at \*2-3 (D. Conn. Apr. 12, 2021); *United States v. Ngono*, 2021 U.S. Dist. LEXIS 127499, at \*3-7 (S.D.N.Y. July 8, 2021); US v. Gendron;  *United States v. Calderon*, No. 3:15-CR-25 (JCH), 2017 LX 69861, at \*9 (D. Conn. Dec. 1, 2017). Criminal courts within this Circuit "have generally applied the same standard that exists in civil cases." *United States v. Maxwell*, No, 20 Cr. 330, 2020 U.S. Dist. LEXIS 160267, 2020 WL 5237334, at \*1 n.2 (S.D.N.Y. Sept. 2, 2020) (collecting cases)). Courts have held that modification may be appropriate "if there is a showing of "some extraordinary circumstance or compelling need.'" *United States v. Kerik*, No. 07 CR 1027, 2014 U.S. Dist. LEXIS 199025, 2014 WL 12710346, at \*1 (S.D.N.Y. July 23, 2014) (quoting *TheStreet.com*, 273 F.3d at 230, 231) (alteration in original).

Here, defense counsel moved for access to Crystal Quinn's probation file. The Court granted limited access to the file and initially ordered that the materials would be provided for "Attorney's Eyes Only." However, the Court specifically contemplated on

the record that it anticipated entertaining a motion to relax those restrictions once defense

counsel had an opportunity to review the contents of the file.

# IV. DISCUSSION

## A. THE INDICTMENT COMPARED TO THE PROBATION FILE

The Second Superseding Indictment charges Mr. Gerace with conspiracy to

obstruct justice, tamper with and intimidate Ms. Quinn with the goal of preventing her

from testifying at Gerace's trial or retaliating for her cooperation with law enforcement.

(Dkt. 24). For example, the Second Superseding Indictment alleges the following:

- ¶6. "It was part of the conspiracy that Gerace Attorney 1[6], would make efforts to prevent Crystal Quinn from becoming a government witness";

- "Overt Acts":

  - ¶¶17-26, 74

  - ¶76 "On or about August 11, 2023, an investigator working with Gerace Attorney 1, a person known to the Grand Jury and referred to herein as "Investigator 1," was instructed by Gerace Attorney 1 to interview Crystal Quinn's mother and a friend of Crystal Quinn's mother in order to generate and obtain statements **which would advance a narrative that Crystal Quinn had been suicidal prior to her death**".

---

[6] Until the government clarifies its position regarding the status of "Attorney 1," the defense is unable to file additional motions related to that issue. For example, if "Attorney 1" is not a co-conspirator, then the defense may file a motion to strike certain language from the indictment and/or for jury instructions aimed at clarifying that Attorney 1's actions should not be imputed to Mr. Gerace. On the other hand, if "Attorney 1" is a co-conspirator, that would mean Mr. Gerace was represented by a co-conspirator during the 19-cr-227 case.

The government has alleged that advancing what it has called a "false narrative" that Ms. Quinn's death was not a murder was part of the criminal scheme in this case. The probation file, however, makes clear that

- Ms. Quinn ███████████████████████████████ ;

- At least one of those occasions involved ███████████████████████ ███████████████ ;

- She had ███████████████████████████████████ ███████████ ;

- The probation officer ███████████████████████████ ███████████████████████ ;

- She continued to ███████████████████████████████ ███████████ ;

- She repeatedly discussed ██████████████████████████ ███████████████████████████████████████ ███████████ ;

"Attorney 1" did not have the benefit of discovery in this case when he pursued an explanation for Ms. Quinn's death contrary to the government's theory. In hindsight, it is now apparent, based on a review of Quinn's cell phone records in combination with the contents of the probation file, that the defense has at least a reasonable basis to investigate whether her death could have resulted from suicide[7] or an accidental

---

[7] Prior to Quinn's death, another individual related to this case died by suicide after two attempts. The individual was pressured by the government to provide information against Mr. Gerace. The individual attempted suicide on one occasion in February 2021, and after the government persisted in its investigation, he made the second attempt in April 2022.

overdose. This is especially true since Ms. Quinn had ███████████████████

███████████████████████████████ .

- ¶77 "On or about August 11, 2023, Investigator 1 simultaneously interviewed Crystal Quinn's mother and her mother's friend. During the interview, **Crystal Quinn's mother and her mother's friend both specifically denied that Crystal Quinn was suicidal** prior to her death" (see also ¶¶78-81).

In fact, the investigator recorded his meeting with Sharon Quinn and her friend during which they made the following statements, in sum and substance, among others:



B. THE DISCOVERY COMPARED TO THE PROBATION FILE

Despite the allegations pertaining to Gerace Attorney 1 and case no. 19-cr-227, the discovery that connects Crystal Quinn to Peter Gerace is minimal. Of the 40,000-plus

documents disclosed by the government, it appears that less than 200 pages even remotely pertain to Quinn's relationship with Gerace (that is less than .5% of the documentary discovery). The disclosure includes:



Quinn overdosed sometime after 11:00 p.m. on July 31st or early on August 1st. However, it was only after reviewing the probation file that the circumstances under which Quinn was leveraged into cooperating with the government became clear.

When FBI agents delivered a target letter to Ms. Quinn at her residence in January 2023, they questioned Ms. Quinn without counsel and ██████████████████████

[REDACTED VERSION]

███████████[8]. She provided information that contradicted the narrative that the government sought to advance regarding November 2019. The publicly available information provided in the Complaint, drafted by a Federal agent, included the following allegations:

- I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name. (¶ 46)

- QUINN stated that she recalled this instance, which is detailed supra, and confirmed that she was with PERSON 1 and P .G. when the messages were sent to VICTIM. QUINN further stated that the messages were sent via Facebook messenger, and that QUINN stated that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account. (¶ 47)(emphasis added)

- Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account, is false, fraudulent, and fictitious. (¶ 48)

(Dkt. 164-1 at 17-18).

Prior to Ms. Quinn's arrest on the criminal complaint in February 2023, she had been ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████. She had been ███████████████████████████

---

[8] In the recording of the meeting with Attorney 1's investigator, Sharon Quinn represented that ███████ ███████████████████████████████. The defense requested a copy of any FBI 302 documenting the fact Sharon Quinn conveyed this information. To date, no report has been provided.

███████████████████████████████████████████████████. On top of all

this, she was █████████████████████████████████████████████████

███████████████████████████████.

      After her release from custody on February 8, ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

According to notes and a report, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████.

      ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.

[REDACTED VERSION]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ .

When the government moved to detain Mr. Gerace in March 2023 based on Quinn's cooperation, it failed to disclose to the Court or the defense ██████████████████ ████████████████████████████ .

After Quinn's death, Gerace's then-attorney obtained affidavits from her mother and family friend in which they stated that ████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ .

While the government has attacked various aspects of those affidavits, ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ .

It is reasonable to conclude from the timing of these events that the government used Ms. Quinn's alleged involvement in texting a witness three years prior as a ruse to compel her to talk with prosecutors; and used pretrial diversion as a means to exercise control over her to ensure she was available to testify at Mr. Gerace's trial.

It was only after the government charged Ms. Quinn in a felony criminal complaint, that she and her attorney[9] agreed to meet with the government to try to minimize her exposure to prison. When the government ~~has~~ referred to these circumstances or provided documentation regarding these events, there was no mention of her surgery or her physical or mental condition. █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████. Furthermore, Ms. Quinn

████████████████████████████████████████████.

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████. In the government's rush to seek a new indictment and motion to detain Mr. Gerace, it sought ████████████

---

[9] Based on discussions with the government, the defense believes the government may have met with Quinn's attorney after her death. Counsel is unaware whether he testified in the grand jury. It should be pointed out that the protections of Quinn's privileged communications with her attorney should survive her death. However, if Ms. Quinn's attorney prepared any notes during his attendance at the proffers, they would not be protected from discovery since no privilege applied under those circumstances.

[10] ████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

<u>Summary Chart</u>

      The defense has previously provided this Court with a chart showing a sample of

Crystal Quinn's text messages as well as the emails exchanged between the prosecutor,

Quinn's lawyer and her probation officer. (*Memorandum in Support of Motion for Production*

*& Review of Probation Files*, Dkt. 507-1 at 2-6 [redacted]). Attached is an appendix

containing an updated chart containing a chronology ~~including~~ which incorporates both

Quinn's text messages and relevant dates and information from the Probation file.

      In sum, ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

■ ██████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████
■ ██████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████

[REDACTED VERSION]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

## C. Requested Modification of the Protective Order

At this point, the defense is impaired by virtue of not being able to discuss all

relevant information with Mr. Gerace. The defense wants to discuss the probation records

with Mr. Gerace to determine what, if anything, he knew about Ms. Quinn's ███████. ████████████████████. Mr. Gerace has been detained and is currently housed in Cattaraugus County Jail. Because of the protective orders, counsel cannot even mail him unredacted copies of the motions, including this one.

Further, the government has admitted it did not interview the probation officer after Ms. Quinn's death despite its knowledge about ███████████████ ██████████████ and moved directly to indict this case as a murder despite ████████████████████. The defense would like to be able to interview both fact and expert witnesses and, in doing so, reference the specific entries in the probation file.

There are no █████████████████████ in the file. However, it is apparent that the probation officer ██████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ██████████████████. The individuals Ms. Quinn had contact with during this period are likely to have information about ███████████ ██████████████████████

The defense would want to discuss information from the probation file with potential witnesses to first verify the claims or contest Ms. Quinn's credibility/character for truthfulness; second to gather information about ███████████ (as borne out by the probation file); and third, to try to obtain other relevant records or identify other witnesses for trial.

## V. CONCLUSION

The defense is already hampered by having one of Mr. Gerace's lawyers being denied access to discovery and trial materials from his related case (19-cr-223). The government has also refused the defense requests for meaningful early Jencks disclosure; opposed Mr. Gerace's motion for severance; and insisted on protective orders to control what and how much information is able to be publicly filed in this case

The nature of the materials in Quinn's probation file are directly relevant to the defense that she was not killed as a result of a conspiracy by the defendants. While the file contains personal identifying and confidential information for decedent Quinn, the defense is not asking for revocation of the order *in toto*. Rather, we are asking to be able to make investigative use of it by being free to discuss and, where appropriate, refer to documentation from the file. We are not seeking to otherwise disseminate physical copies of the information.

Additionally, the defense would specifically request that we be allowed to discuss the file contents with our client. On this key issue, counsel are prevented from discussing the contents of Quinn's probation file with Mr. Gerace and effectively evaluating the viability of a potential defense with their client.

For all of the above reasons, the defense moves this Court for an order modifying the protective order.

DATED:    Orchard Park, New York
             November 12, 2025

                                /s/ Cheryl Meyers Buth
                                Cheryl Meyers Buth, Esq.
                                MEYERS BUTH LAW GROUP, PLLC
                                *Attorneys for Defendant Peter Gerace, Jr.*
                                21 Princeton Place, Suite 105
                                Orchard Park, New York 14127
                                 (716) 508-8598
                                cmbuth@mblg.us

DATED:    Rochester, New York
             November 12, 2025

                                /s/ Mark A. Foti
                                Mark A. Foti, Esq.
                                THE FOTI LAW FIRM, P.C.
                                *Attorneys for Defendant Peter Gerace, Jr.*
                                16 W. Main Street – Suite 100
                                Rochester, New York 14614
                                (585) 461-1999
                                mark@fotilaw.com

[REDACTED VERSION]