IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

          v.                              23-CR-99-EAW

MICHAEL RONCONE,

                    Defendant.
_____

### GOVERNMENT'S POST-HEARING MEMORANDUM
### IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS

**THE UNITED STATES OF AMERICA**, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorneys, respectfully files this post-hearing memorandum in opposition to the defendant's pretrial motion (Doc. No. 536 at ¶¶ 28–31) seeking suppression of statements made by the defendant. Because the defendant was not in custody at the time of the statements[1] and all his statements were voluntary, the defendant's motion to suppress should be denied.

## I. FACTUAL BACKGROUND

On August 8, 2025, defendant Roncone filed an omnibus pretrial motion which in part sought suppression of statements made by the defendant to law enforcement on December 7, 2023. *See* Doc. No. 536 at ¶¶ 28–31. On September 16, 2025, the government filed a response to the defendant's pretrial motions (*see* Doc. No. 611) and at oral argument the Court

---

[1] The government specified which statements it intends to use on its case-in-chief in its response to Mr. Roncone's Motion to Suppress, on the record at the outset of the suppression hearing, and again *infra*.

scheduled an evidentiary hearing for October 1, 2025. *See* Doc. No. 567. On October 1, 2025, at the outset of the hearing, the parties and the Court established the contours of the pertinent issues.[2] The government called Federal Bureau of Investigation (FBI) Special Agent Brian Burns to provide testimony, entered six (6) exhibits into evidence,[3] and then rested. The defendant testified in support of his motion to suppress and entered one (1) exhibit into evidence.[4] During the cross examination of the defendant, the government introduced a seventh exhibit into evidence.[5] *Id.* The government called New York State Police Investigator Geraldo Rondon in rebuttal of the defendant's testimony. *Id. See, generally,* Tr1.[6] The facts relevant to the instant suppression motion can be summarized through the testimony of the three witnesses as follows.

<u>*Testimony of Special Agent Brian Burns, Tr1 at 10 – 118*</u>

On December 7, 2023, a search warrant was executed at the defendant's residence located at 4998 William Street, Lancaster New York, by the FBI with the assistance of other

---

[2] The Government suggested that the analysis be conducted by distinguishing statements by the defendant into two buckets – (1) statements made before defendant invokes his right to remain silent and to counsel and (2) statements made after that invocation. Herein, the government defines those two categories of statements as "pre-invocation statements" and "post-invocation statements". The Government seeks to introduce pre-invocation statements on its case-in-chief, requiring that they be analyzed under a *Miranda* framework as well as a voluntariness framework. The government does not seek to introduce post-invocation statements on its case-in-chief, and only seeks to use those statements on cross-examination of the defendant for impeachment purposes, requiring only that those post-invocation statements be analyzed for voluntariness. The Court posited that the issues at the hearing were Fifth Amendment related, as opposed to Sixth Amendment related, and both parties ultimately agreed.

[3] Government Exhibits in evidence include: 1A (SA Burns 302 Report), 2B (SA Burns Photos), 3A (Roncone Person Search Warrant), 3B (Roncone Premises Search Warrant), 6C (SWAT Body Camera Recording), and 3500D (SA Burns Hearing Prep Handwritten Notes).

[4] Defense Exhibit A (Roncone Affidavit July 2025).

[5] Government Exhibit 10 (Roncone Affidavit April 2025).

[6] References herein to "Tr1." are to the transcript of the evidentiary hearing held on October 1, 2025, which appears at Doc. No. 653. References to "Ex." are to government and defense exhibits introduced during the hearing. The exhibits have already been provided to the Court and can be provided again if necessary.

law enforcement agencies. Tr1 at 20. The search warrant was initially executed by the FBI SWAT team, who was responsible for making entry into the premises and clearing it. Tr1 at 20, 97. FBI SWAT wore "military-style gear" and carried "big guns". Tr1 at 97. FBI SWAT also wore body cameras during the execution of the search warrant. Tr1 at 22. The FBI SWAT team arrived at the premises at about 6:00 a.m., and used a loud police siren, flashing lights, and a bullhorn to announce the presence of federal agents at the location and to announce that they had a search warrant for the premises. Tr1 at 23–24, 101. The weather during the early morning hours of December 7, 2023, was snowy, rainy, windy, and very cold. Tr1 at 28, 100.

An FBI hostage negotiator also made a phone call to defendant Roncone's cell phone to advise him of what was going on. Tr1 at 24. This "call out" process allowed for defendant Roncone to exit the house on his own as opposed to using a ram to make forced entry into the home. Tr1 at 24. The hostage negotiator who called defendant Roncone on his cell phone (to advise him of what was going on and instruct him to come out of the home) did not threaten, shout at, or scream at Mr. Roncone. Tr1 at 25. At about 6:07 a.m., defendant Roncone exited his residence. Tr1 at 27. He was met by FBI SWAT who initially placed him into handcuffs. Tr1 at 26. SA Burns testified that it is standard procedure for SWAT to detain someone until the scene is rendered safe. Tr1 at 100.

Defendant Roncone's interaction with the FBI SWAT was captured on the body-worn camera and that footage reflects that the interaction was mutually polite and respectful. Tr1 at 26–27. FBI SWAT did not threaten or intimidate defendant Roncone. Tr1 at 27. An FBI SWAT officer asked defendant Roncone if it was just him and his dad inside of the home, and defendant Roncone answered in the affirmative. Tr1 at 33. An FBI SWAT officer asked defendant Roncone if there were any pets in the house, and defendant Roncone told them

about his fish tank.  Tr1 at 33.  Those questions, about the existence of other people or pets inside of the residence, are standard questions asked to improve the safety of civilians and law enforcement during the execution of the search warrant.  Tr1 at 33–34.

During that interaction with FBI SWAT, defendant Roncone requested that the officers get his father a jacket, and the officer responded, in sum and substance, that they would take Roncone and his father out of the weather and get them into vehicles.  Tr1 at 34–35.  The SWAT officer then asked defendant Roncone if there were any weapons in the house, and defendant Roncone answered and advised law enforcement that there were long guns and handguns inside of the residence.  Tr1 at 35.  The tone of that conversation was "very cordial" and "not heightened at all".  Tr1 at 35.  Moments later, defendant Roncone volunteered the statement that "the handgun next to my bed is loaded."  Tr1 at 36.  That statement was not in direct response to a question by law enforcement.  Tr1 at 36.  At around 6:13 a.m., [21 minutes into Ex. 6c], defendant Roncone asked the SWAT officers to get his dad a blanket and stated, "I've been pretty fucking cool with you."  The SWAT officer informed defendant Roncone that the case team was "almost here."  Tr1 at 37–38.  Shortly thereafter, the SWAT officers informed defendant Roncone that they were getting his father seated in a car, and defendant Roncone responded appreciatively.  Tr1 at 38–39.  At about 6:18 a.m. [26 minutes into Ex. 6c], which was approximately 11 minutes after defendant Roncone first came outside, defendant Roncone was seated in the back of a vehicle parked across the street from his house.  Tr1 at 40–42.  Defendant Roncone interacted with FBI SA Tina Taylor, who arranged for his handcuffs to be moved to the front of his body at his request; during that period, defendant Roncone joked with the agents about whether they had any "man-cuffs" and laughed.  Tr1 at 44–45.  At about 6:22 a.m., the SWAT officer's body

4

camera video file ended as he walked away from defendant Roncone and back towards the target premises. Tr1 at 45–46.

FBI SA Burns arrived on scene and first interacted with defendant Roncone at about 6:22 a.m. Tr1 at 51–52, *see also* Ex. 1A.[7] SA Burns' role on December 7, 2023, was "to attempt an interview of Michael Roncone." Tr1 at 17. SA Burns and his partner, Investigator Rondon, introduced themselves to defendant Roncone, told him who they worked for, and showed him their credentials. Tr1 at 53. SA Burns wore civilian clothing and his sidearm, a handgun, was concealed under his clothing. Tr1 at 113. Neither SA Burns nor Investigator Rondon ever displayed their firearms to defendant Roncone. Tr1 at 113. SA Burns and Investigator Rondon transferred defendant Roncone from SA Taylor's vehicle into Investigator Rondon's vehicle, which was about 20 feet away. Tr1 at 53–54. The case team's vehicles were parked approximately 100 feet away from defendant Roncone's house, in the parking lot of a volunteer fire department. Tr1 at 40. The vehicles were in the immediate vicinity of defendant Roncone's house. Tr1 at 40.

Upon arriving at Investigator Rondon's vehicle, SA Burns explained to defendant Roncone that he was not under arrest and that he had been detained and handcuffed for everyone's safety while the SWAT team cleared the house. Tr1 at 54. SA Burns, because he "wanted to make sure it was really clear" explained to defendant Roncone twice that he was "not under arrest".[8] Tr1 at 54, 56, 57, 117. SA Burns and Inv. Rondon then removed the handcuffs from defendant Roncone. In addition to telling defendant Roncone, twice, that he

---

[7] At that time, defendant Roncone had been in handcuffs for about 15 minutes, from about 6:07 a.m.,when he exits his residence and is encountered by FBI SWAT, until about 6:22 a.m., when SA Burns and Investigator Rondon remove the handcuffs.

[8] SA Burns later testified that, at the time he told defendant Roncone that he was not under arrest, his statement was "absolutely true" and that at that time he did not have information sufficient to effect an arrest. Tr1 at 83–84.

was not under arrest, SA Burns also told defendant Roncone that "he didn't have to talk to us." Tr1 at 55, 56, 57, 117. Defendant Roncone appeared to understand what SA Burns was saying. Tr1 at 117. Despite this, defendant Roncone did not demand to leave or refuse to answer any questions. Tr1 at 57–57. SA Burns did not read defendant Roncone his Miranda warnings at that time because it was a voluntary interview; at that time, it had been explained twice to Roncone that he was not under arrest and he had been unhandcuffed. Tr1 at 107, 110. SA Burns had previously had a discussion with Investigator Rondon about the fact that they would uncuff defendant Roncone for their attempted interview. Tr1 at 56. SA Burns and Investigator Rondon removed defendant Roncone's handcuffs within a minute or a couple of minutes of the time that they first introduced themselves to him, at about 6:22 a.m. Tr1 at 57. Defendant Roncone would not have been permitted to get into his truck and drive to work because the search warrant "included the truck". Tr1 at 101. SA Burns "would not have had a problem" with defendant Roncone "getting an Uber" to take him away from the location of the search. Tr1 at 101. SA Burns never expressly told defendant Roncone that he could leave. Tr1 at 102. After defendant Roncone's handcuffs were removed, the interview began. Tr1 at 58.

SA Burns has conducted hundreds, if not thousands, of interviews in his career as an FBI Special Agent, and has developed a standard practice of being polite, friendly, and respectful, and working to build rapport. Tr1 at 58–59. SA Burns described his demeanor in his interaction with defendant Roncone as "cordial and calm, not threatening". Tr1 at 59. SA Burns is aware of physical behaviors that can be observed that may indicate that a person is afraid, terrified, or intimidated. Tr1 at 59. SA Burns did not observe any of those physical behaviors from defendant Roncone. Tr1 at 59–60. During the conversation between SA Burns and defendant Roncone, defendant Roncone did not cry or whimper, and the tone of

his voice was normal. Tr1 at 60. SA Burns and Investigator Rondon were the only people in the vehicle with defendant Roncone during the interview, and neither of them were physically looming over him. Tr1 at 115–16.

SA Burns informed defendant Roncone that the search warrant at his house was "related to the events in Wellsville involving Howie Hinkle and Frank Knight" and "the death of Ms. Quinn." Tr1 at 60, 105. Defendant Roncone responded, stating "they all play cards together". Tr1 at 61. Defendant Roncone also stated that he had learned of Crystal Quinn's death after it had occurred. Tr1 at 64. The exact quotes that defendant Roncone uttered are reflected in quotation marks in Ex. 1A. Tr1 at 61–65. Investigator Rondon took notes contemporaneously as SA Burns was conducting the interview, and Investigator Rondon's notes were used several hours later to generate the official 302 report documenting the conversation. Tr1 at 63–64, 106. Defendant Roncone made additional statements to SA Burns about his living situation, about an arson at his prior home in Wellsville, and the subsequent police investigation. Tr1 at 65–67.

SA Burns also asked defendant Roncone about what was inside of his house, if there was anything that would hurt people, explosives, drugs, or guns. Tr1 at 67–68. Defendant Roncone told SA Burns that there were no drugs and no explosives in the home, but that there were a number of firearms, including long guns and handguns, for which he had a permit. Tr1 at 68–69. On the topic of the firearms, defendant Roncone told SA Burns that he could specifically identify for agents which belonged to him and which belonged to his father. Tr1 at 68–69. SA Burns described this part of the conversation as being "back and forth" and "cordial". Tr1 at 69.

SA Burns further asked defendant Roncone about what sort of electronic devices are inside of the house, and where defendant Roncone's phone was. Tr1 at 69. Defendant

Roncone answered SA Burns' question about where his cell phone was, stating "the guys in the military gear have it." Tr1 at 70. Defendant Roncone also told SA Burns that, inside the house, they would find a computer that he barely used, as well as his father's cellphone and his father's tablet. Tr1 at 70. After discussing the electronic devices, the conversation transitioned back to the topic of Crystal Quinn's death. Tr1 at 70.

Defendant Roncone told SA Burns about his conversations with Frank Knight in the context of Crystal Quinn's death, and told SA Burns that Simon Gogolack was crazy and a drug user. Tr1 at 70–71. The exact words that defendant Roncone stated to SA Burns are reflected in Ex. 1A and include "Frank called me about the girl", "me and Frank messaged about her, I did not know her at all", and that Roncone heard about "the girl, after she died". Tr1 at 71, *see also* Ex. 1A. SA Burns then advised defendant Roncone about other locations being searched that morning, including the Outlaws clubhouse, Ermin's residence, the Buffalo Rare Breed clubhouse, and the new Wellsville Rare Breed Clubhouse. Tr1 at 72. Defendant Roncone expressed concern to SA Burns about the RBMC clubhouse on Alma Hill being searched because the trailers had all been winterized already. Tr1 at 72–73. At that point, for the first time, defendant Roncone told SA Burns that he didn't want to answer any questions and that he wanted an attorney. Tr1 at 73–74. SA Burns asked defendant Roncone who his attorney was, intending to call that person and give defendant Roncone an opportunity to speak with them. Tr1 at 74. Defendant Roncone indicated that his attorney was an individual named David Todaro, a person SA Burns was not familiar with, so SA Burns was unable to facilitate the phone call. Tr1 at 74–75. When defendant Roncone chose to terminate the interview, he was once again placed in handcuffs in front of his body. Tr1 at

75–76.[9] SA Burns estimated that this portion of the interview with defendant Roncone (from the beginning of their interactions until he requested an attorney) lasted between 15 and 20 minutes.  Tr1 at 76.

After ending the interview and asking for his attorney, defendant Roncone asked SA Burns if he could call his employer to tell him that he was going to be late for work.  Tr1 at 77.  SA Burns facilitated that phone call.  Tr1 at 77.  SA Burns told defendant Roncone that Roncone might be able to get to work by 9 a.m, but that the search warrant included his truck, which is what prompted the call to defendant Roncone's boss.  Tr1 at 103–104.  SA Burns then left the vehicle to check on the search of defendant Roncone's residence, and he was replaced in the vehicle by one or two New York State Troopers so that Investigator Rondon would not be alone in his vehicle with defendant Roncone.  Tr1 at 78–79.  SA Burns was provided with defendant Roncone's cellphone by the SWAT team leader.  Tr1 at 80–81.  SA Burns brought the cellphone back to Investigator Rondon's vehicle because he believed he would need to use biometric features of defendant Roncone in order to unlock it.  Tr1 at 81.  When he got back to the vehicle, SA Burns interacted with the cellphone and was surprised to find that it was unlocked, causing him to comment out loud, in the presence of defendant Roncone, that the phone had no passcode.  Tr1 at 81–82.  Defendant Roncone responded by stating, in sum and substance, that he had nothing to hide.  Tr1 at 82.

A few hours later, as the search progressed, SA Burns was notified about a number of items discovered in the residence, including numerous firearms and suspected narcotics in a drawer in defendant Roncone's bedroom as well as on a tray in the safe.  Tr1 at 83.  SA Burns

---

[9] This concludes the portion of defendant Roncone's pre-invocation statements to law enforcement that the government intends to offer on its case-in-chief against defendant Roncone at trial.  The government has reserved the right to use the remainder of the post-invocation statements addressed in this section to cross-examine defendant Roncone should he testify at trial inconsistently with said statements.

took photographs of the drug evidence using his cellphone at about 10:36 a.m.  Tr1 at 84, 88.

After taking the photographs, SA Burns went back to the vehicle where defendant Roncone

was seated to show him the photographs, provide him an update on what was found in the

house, and advise him that he wouldn't be able to leave and that he was likely going to be

under arrest.  Tr1 at 89–90.  SA Burns advised defendant Roncone of what had been found,

and showed defendant Roncone the photographs of the suspected drugs in the dresser drawer

and in the safe.  Tr1 at 90–91.  Defendant Roncone made a comment about the credit card

on the tray in the safe, drawing attention to the fact that his name was not on the card.  Tr1

at 91.  SA Burns interpreted this as defendant Roncone implying that the drugs were not his.

Tr1 at 91.  SA Burns responded by stating words to the effect of "are you trying to put this on

your father?"  Tr1 at 92, 93.  Defendant Roncone responded to that by stating words to the

effect of "don't bring my dad into this.  It was just a card that was around."  Tr1 at 93.  At no

point during this interaction did SA Burns raise his voice, yell at defendant Roncone, or

threaten defendant Roncone.  Tr1 at 93.  SA Burns testified that his tone "had annoyance".

Tr1 at 93.  During this interaction, defendant Roncone did not appear frightened, did not cry,

did not whimper, and did not appear confused.  Tr1 at 93–94.  At no point during SA Burns'

interactions with defendant Roncone on December 7, 2023, did defendant Roncone appear

to be intoxicated on alcohol or drugs.  Tr1 at 94.  At all times that SA Burns observed

defendant Roncone on December 7, 2023, there were never less than two officers or agents

with him.  Tr1 at 102.  At no point did SA Burns ever observe anyone point a weapon at

defendant Roncone other than when he was initially coming out of his house towards the

SWAT team.  Tr1 at 114.

      At some point shortly after that conversation about the photographs on SA Burns'

phone, defendant Roncone was formally arrested.  Tr1 at 94.  SA Burns was present with

Investigator Rondon when defendant Roncone was formally advised that he was under arrest, at which point Investigator Rondon advised defendant Roncone of his Miranda warnings. Tr1 at 95. Shortly after defendant Roncone was advised that he was under arrest, he was transported away from the scene of 4998 William Street by Investigator Rondon. Tr1 at 96.

<u>*Testimony of defendant Michael Roncone, Tr1 at 120 – 168*</u>

Defendant Roncone testified in support of his own suppression motion. Tr1 at 120–168. Defendant Roncone reviewed and signed a standing affidavit related to the events of December 7, 2023. Tr1 at 120, *see also* Ex. A. Defendant Roncone testified that he did not believe that he was free to leave when SA Burns was speaking to him in the vehicle. Tr1 at 123. Defendant Roncone testified that he felt like he was "pretty much stuck there until 9 o'clock". Tr1 at 123. Defendant Roncone testified that he remembered his handcuffs being on during the entire interview/conversation with SA Burns. Tr1 at 128, 129. Defendant Roncone testified that in his previous affidavit, he did not allege that he was handcuffed the entire time. Tr1 at 133–134, *see also* Ex. 10. When asked questions about the details of his first affidavit regarding the events of December 7, 2023, defendant Roncone testified "it was two years ago, it's hard to recall." Tr1 at 135–136. Defendant Roncone then conceded that "after I gave my statement that I wanted a lawyer, I believe that was the end of most of the questions." Tr 1 at 136. Defendant Roncone agreed that SA Burns told Roncone that Roncone did not have to speak with him and admitted that he understood what those words meant. Tr1 at 137. Defendant Roncone acknowledged that SA Burns never threatened him or raised his voice at him, and that SA Burns was telling the truth when he testified to that. Tr1 at 137. Defendant Roncone testified that SA Burns was polite and respectful towards him, as was every other law enforcement officer that he interacted with that day. Tr1 at 137–

138.  When being asked about his interactions with the SWAT team, defendant Roncone testified that no one was being nasty or intimidating towards him in any way.  Tr1 at 138.

Defendant Roncone testified that sometime just before 11:00 a.m. he was formally advised that he was under arrest and advised of his Miranda warnings.  Tr1 at 139.  When asked if he was handcuffed at the time he was formally advised of his arrest, defendant Roncone testified "I want to say the handcuffs were still on then" and "I'm pretty sure they were still on the whole time."  Tr1 at 139.  Defendant Roncone went on to testify "Through that whole day, I want to say I was.  Through that whole day, I do not recall ever having the handcuffs off."[10]  Tr1 at 140.  Defendant Roncone testified that the agent who replaced SA Burns in the vehicle after the interview was over never threatened or intimidated him in any way.  Tr1 at 143 – 144.

Defendant Roncone corroborated the testimony of SA Burns, agreeing that their interview included the topic of "Frank and Howie".  Tr1 at 144.  Defendant Roncone admitted to discussing electronic devices with SA Burns and acknowledged that SA Burns was telling the truth when he testified about that.  Tr1 at 145.  Defendant Roncone admitted to discussing the firearms in his house with SA Burns and acknowledged that SA Burns was telling the truth when he testified about that.  Tr1 at 145.  Defendant Roncone agreed that SA Burns asked him about the presence of drugs in the house and acknowledged that SA Burns was telling the truth when he testified about that.  Tr1 at 145–146.  Defendant Roncone also admitted that he told SA Burns that there were no drugs in the house.  Tr1 at 146.  Defendant Roncone denied that he was lying to SA Burns when he denied the presence of drugs in the house.  Tr1 at 147.  When asked what was depicted in the photograph of the white powder

---

[10] This is inconsistent with defendant Roncone's own testimony just 13 minutes earlier (Tr1 at 128), when he testified that his handcuffs were removed for him to urinate behind a vehicle.

12

on the tray in the safe, defendant Roncone testified "that was drugs" and acknowledged that he knows what drugs are. Tr1 at 147. Defendant Roncone testified that he knows that cocaine is white, and that it is a powder, and that he is familiar with how cocaine is commonly packaged. Tr1 at 148.

When questioned about the "white colored object that is twisted up" in his dresser drawer (Ex. 2B, pg.1), defendant Roncone testified "it's probably drugs." Tr1 at 149. Defendant Roncone testified "that was in a dresser drawer of mine. In my room." Tr1 at 149. When pressed on whether it was "probably drugs" or "drugs", defendant Roncone conceded "Yes, it was drugs". Tr1 at 149. When asked why he first testified it was "probably drugs" defendant Roncone responded, "because it was given to me." Tr1 at 149. When asked if he in fact knew, in reality, that it was drugs, defendant Roncone admitted "Yes." Tr1 at 149. When asked if he had been caught lying to the Court, defendant Roncone conceded "Okay. I'm sorry, I made a mistake with that." When asked if he was confused or if he intentionally said, "probably drugs" because he perceived it as a bad answer for him to give, defendant Roncone confirmed "I know it's drugs." Tr1 at 150. Defendant Roncone confirmed that he was not so nervous during his testimony that he just forgot the substance was drugs. Tr1 at 150.

Defendant Roncone went on to testify that the white powdery substance in the safe was drugs which belonged to his father. Tr1 at 151. Defendant Roncone acknowledged that, when SA Burns confronted him with the photo of the drugs on the tray, defendant Roncone said that it was not his name on the credit card. Tr1 at 151. Defendant Roncone testified that SA Burns asked him "Mike, are you going to put this on your dad?" Tr1 at 152–153. Defendant Roncone denied telling SA Burns that he just used a card that was laying around. Tr1 at 153. When shown the 302 report, defendant Roncone testified that SA Burns made up

half of the sentence.  Tr1 at 154.  When asked if he used drugs, defendant Roncone responded, "Not all of the time."  Tr1 at 155.

Defendant Roncone acknowledged that SA Burns' report, drafted on December 7, 2023, was written much closer in time to their actual interaction than defendant Roncone's July 2025 affidavit.  Tr1 at 163.  When asked if it was fair to say that Roncone had "waivered" multiple times during his testimony on the topic of whether he was handcuffed the entire time, defendant Roncone responded "Correct."  Tr1 at 164.  When pressed on this topic, defendant Roncone ultimately admitted "Certainty, I guess I'm not certain.  All right?".  Tr1 at 165. When asked directly "[b]ut you're not certain, yes or no?" defendant Roncone responded "No."

### _Testimony of Investigator Rondon, Tr1 at 171 – 189_

Investigator Rondon was called to testify in rebuttal to the defendant's testimony.  Tr1 at 171–189.  Investigator Rondon's responsibility on December 7, 2023, was to assist SA Brian Burns in conducting an interview of defendant Roncone.  Tr1 at 175.  Investigator Rondon described his interactions with defendant Roncone as mutually "respectful" and testified that neither he nor SA Burns ever threatened or intimidated the defendant.  Tr1 at 176.  When Investigator Rondon first observed defendant Roncone on December 7, 2023, he was coming out of SA Tina Taylor's vehicle, and he was handcuffed in the front.  Tr1 at 177.  Investigator Rondon, SA Burns, and defendant Roncone relocated to Investigator Rondon's vehicle.  Tr1 at 177.  Both SA Burns and Investigator Rondon introduced themselves to the defendant and showed him their law enforcement identification.  Tr1 at 178.  Investigator Rondon testified that SA Burns explained to defendant Roncone that he was not under arrest and that he had been detained for everyone's safety pursuant to the federal search warrant being executed at his residence.  Tr1 at 186.  Investigator Rondon testified that SA Burns reiterated to defendant

Roncone that he was not under arrest and that he did not need to speak with investigators. Tr1 at 186–187. When asked what happened to defendant Roncone's handcuffs after the agents had introduced themselves, Investigator Rondon testified "we took them off." Tr1 at 178. When asked if he was sure about that, Investigator Rondon testified "Yes." Tr1 at 178. At the time that defendant Roncone got into Investigator Rondon's vehicle, he was not handcuffed. Tr1 at 184. The whole time that SA Burns was asking defendant Roncone questions and Investigator Rondon was taking notes, the defendant was uncuffed. Tr1 at 181.

The interview with defendant Roncone ended when defendant Roncone indicated that he wanted a lawyer and provided the name of his lawyer. Tr1 at 180. Defendant Roncone was placed in handcuffs at that point, before he was formally arrested. Tr1 at 180, 181. Investigator Rondon testified that he eventually put handcuffs back on defendant Roncone, and that he used his own handcuffs, which he remembered clearly because "my handcuffs were bigger." Tr1 at 179. Investigator Rondon recalled that the defendant made a specific request for larger handcuffs. Tr1 at 179. Investigator Rondon confirmed that when the defendant was placed back in handcuffs, at the conclusion of the interview, they were different handcuffs from the ones he had initially been placed in. Tr1 at 183. The original set of handcuffs were returned to whoever owned them at around the time the defendant was moved from SA Taylor's vehicle to Investigator Rondon's vehicle. Tr1 at 183.

Investigator Rondon could not recall exactly what time in the morning the defendant asked to go to the bathroom, but did recall that it occurred, and testified that it would have been while defendant Roncone was under his supervision. Tr1 at 188. When asked whether he would have allowed defendant Roncone to "just [keep] walking" and "just leave" at that time, Investigator Rondon answered "[n]o, I would have told him he has to stay until the search is completed." Tr1 at 188–189. Investigator Rondon confirmed that defendant

15

Roncone had been advised by SA Burns at the outset that he was not under arrest, and that

defendant Roncone never asked if he was allowed to leave.  Tr1 at 189.

## II. <u>ARGUMENT</u>

**A.    THE DEFENDANT'S PRE-INVOCATION STATEMENTS TO SPECIAL AGENT BURNS AND INVESTIGATOR RONDON SHOULD NOT BE SUPPRESSED AS THE DEFENDANT WAS NOT IN CUSTODY FOR THE PURPOSES OF MIRANDA WHEN HE MADE THE STATEMENTS**

In the defendant's pretrial motion, he argues that any statements he made to law

enforcement officers on December 7, 2023, should be suppressed because he was in custody

and not provided with any *Miranda* warnings.  This argument should be rejected because,

based on the facts presented at the evidentiary hearing, the defendant was not in custody when

he spoke with SA Burns and Investigator Rondon inside of a vehicle parked approximately

100 feet from defendant's house.

With respect to *Miranda*, it is well established that *Miranda* warnings are only necessary

when a person is subject to custodial interrogation.  *See Miranda v. Arizona*, 384 U.S. 436, 444

(1966); *Oregon v. Mathiason*, 429 U.S. 492 (1977); *California v. Beheler*, 463 U.S. 1121 (1983).

The Supreme Court has defined custodial interrogation as "questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise deprived of his

freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  The test used to

determine if a defendant is considered "in custody" is an objective one.  *Yarborough v.

Alvarado*, 541 U.S. 652, 667 (2004).  However, "'custody' for *Miranda* purposes is not

coterminous with, though it is often informed by, the colloquial understanding of custody."

*United States v. FNU LNU*, 653 F.3d 144, 152-53 (2d Cir. 2011).  A reviewing court must first

"determine the circumstances surrounding the interrogation" and second, given such

circumstances, assess if a reasonable person would have felt free to end the interrogation and leave. *Thomas v. Keohane*, 516 U.S. 99, 112 (1995); *see also Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998).

To determine whether an individual is in "custody" for *Miranda* purposes, the Second Circuit uses "a two-step, objective test, that asks whether: (1) a reasonable person in the defendant's position would have understood that he or she was free to leave; and (2) there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018) (*citing United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016)). "Although both elements are required, the second is the 'ultimate inquiry' because a 'free–to–leave inquiry reveals only whether the person questioned was seized.'" *Faux*, 828 F.3d at 135 (*quoting United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). To determine if there was a restraint of freedom of movement akin to a formal arrest, courts are to employ an objective inquiry of a variety of factors, including:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*United States v. Schaffer*, 851 F.3d 166, 174 (2d Cir. 2017) (*quoting Faux*, 828 F.3d at 135).

The Second Circuit has noted that "courts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *Faux*, 828 F.3d at 135-36 (suspect was not in custody when questioned at home for two hours while agents executed search warrant where she was told she was not under arrest, questioning was "largely conversational," and agents did not show firearms or make threats). When questioning an individual in his own home, the individual is not placed in custody by simply being forbidden to enter a specific location or being shadowed around the home by law enforcement. *See United States v. Kirsch*,

54 F.3d 1062, 1068 (2d Cir. 1995) (suspect was not in custody when the only restraint was that she was not permitted to enter her apartment while a search warrant was being executed); *see also Faux*, 828 F.3d at 137 ("A reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution and that (absent other hallmarks of custody) freedom of action is not being curtailed to a degree associated with formal arrest."). Also, particularly relevant, is the use of restraints such as handcuffs, which "are generally recognized as a hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004). When an individual has been advised that he is not under arrest and is free to leave, "while not dispositive, is probative in 'assessing the extent to which a reasonable person would understand any restraints on his freedom.'" *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (*quoting Newton*, 369 F.3d at 676). The fact that law enforcement restricts a person from entering a specific location during a search does not, by itself, constitute custody. *United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995) (suspect was not in custody where only restraint imposed on her was that she was not permitted to enter her apartment while search was conducted.)

The meaning of custody under *Miranda* is narrower than the meaning of a "seizure" under the Fourth Amendment. *See United States v. Schaffer*, 851 F.3d 166, 175–76 (2d Cir. 2017) (defendant was not in custody even though he was denied permission to leave; "not every seizure constitutes custody for purposes of *Miranda*"); *see also United States v. Santillan*, 902 F.3d 49, 61-62 (2d Cir. 2018) (even though stop was "prolonged" and defendant was directed to wait in the back of police car , "[o]n the balance, this stop bore a much greater similarity to a traffic stop or *Terry* stop than to the type of custodial interaction that would trigger the requirement of *Miranda* warnings."). Here, defendant was temporarily detained when he exited his home during the execution of a search warrant. Defendant was in

handcuffs for about 15 minutes (from 6:07 a.m. until about 6:22 a.m.) before the handcuffs were removed and he was told that he was not under arrest.

In *Michigan v. Summers*, the Supreme Court held that a valid search warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981). A detention of this sort is permitted because (1) it creates conditions for an orderly search; (2) it protects the police; and (3) it makes flight more difficult if incriminating evidence is discovered. *Id.* at 702-03; *see also L.A. County v. Rettele*, 550 U.S. 609 (2007) (naked couple roused from bed and forced to stand motionless for one to two minutes during the execution of a search for four suspects, because it protected the deputies executing the warrant from potential weapons concealed in the bed). The authority to detain established by *Summers* "must be limited to the immediate vicinity of the premises to be searched." *Bailey v. United States*, 568 U.S. 186, 199 (2013). The Second Circuit has noted that use of handcuffs at one point during an encounter is not dispositive on the question of custody for *Miranda* purposes. *See United States v. Cota*, 953 F.2d 753, 758–59 (2d Cir. 1992) (concluding that the defendant was not in custody where the "initial use of guns and handcuffs [were] necessitated by the officer's safety, but the handcuffs were removed as soon as ... the perceived safety threat abated"); *see also Familetti*, 878 F.3d at 61 (the defendant's "initial restraints cannot establish a state of custody for the duration of his interactions with the police.").

A law enforcement official's "unarticulated plan has no bearing on the question of whether a suspect was in custody at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Therefore, the fact that a person is considered a suspect, or that an investigation has focused on a particular individual is immaterial. *See Stansbury v.*

19

*California*, 511 U.S. 318, 324 (1994); *Beckwith v. United States*, 425 U.S. 341, 347 (1976). The law enforcement official's knowledge or beliefs only come into play if they are conveyed to the defendant and that such a conveyance would lead a reasonable person in the defendant's position to feel that his freedom was restricted. *See Stansbury*, 511 U.S. at 325. Thus, the fact that handcuffs were reapplied to defendant after the pre-invocation interview ended, or that Investigator Rondon testified that he would have required defendant to remain on scene until the search concluded, are irrelevant to this determination.

Based on the facts set forth during the evidentiary hearing, it is clear that a reasonable person under the circumstances presented to the defendant, while unhandcuffed and in a vehicle across the street from his front yard, would not have believed that his freedom of movement was curtailed to a degree associated with a formal arrest, especially after being told twice that he was not under arrest and after law enforcement explained the reason for the initial temporary detention. Although the defendant was brought out of his residence and handcuffed following loud law enforcement commands, the handcuffs were removed once the "case team" arrived and were not used again until after the pre-invocation interview with SA Burns and Investigator Rondon had concluded. The Second Circuit has noted that use of handcuffs at one point during an encounter is not dispositive on the question of custody for *Miranda* purposes. *See Cota*, 953 F.2d at 758– (concluding that the defendant was not in custody where the "initial use of guns and handcuffs [were] necessitated by the officer's safety, but the handcuffs were removed as soon as ... the perceived safety threat abated"); *Familetti*, 878 F.3d at 61 (the defendant's "initial restraints cannot establish a state of custody for the duration of his interactions with the police."). At no time was the defendant's freedom of movement physically restrained while he was speaking with SA Burns during the pre-invocation interview. Although SA Burns and Investigator Rondon had weapons on them

while they were speaking with the defendant, the record indicates that the weapons were never brandished and were likely not even visible to defendant. The conversation between the defendant and SA Burns was calm and polite and did not involve any type of loud police commands. SA Burns described his interaction with the defendant during the pre-invocation interview as cordial and calm. The defendant himself testified that SA Burns was polite and respectful during their interaction. SA Burns explicitly informed the defendant—twice— that he was not under arrest, explained to the defendant why he had been temporarily detained during the execution of the search warrant, and advised the defendant that he did not need to speak with investigators. The pre-invocation interview lasted between 15 and 20 minutes. These circumstances all warrant a conclusion that the defendant's freedom of movement was not restrained to a degree equivalent with that of a formal arrest.

To accept the defendant's argument that *Miranda* warnings were required here, this Court would have to "ignore completely that Miranda was grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of ... in-custody interrogation.'" *Beckwith*, 425 U.S. at 346 (*quoting Miranda*, 384 U.S. at 445). The record is uncontroverted that defendant Roncone was never advised he could not leave, that he never asked to leave, and that he was twice advised that he was not under arrest but that he had been temporarily detained for the safe execution of the search warrant.

In *Schaffer*, 851 F.3d at 174, the Second Circuit held that a defendant who twice asked to leave his office where law enforcement was conducting a search, was not in "custody" for *Miranda* purposes. In reaching this conclusion, the Court in *Schaffer* also found persuasive several factors also present here, namely: the defendant "was not handcuffed or otherwise physically restrained during his interview;" "at no point did any of the agents have their weapons drawn;" the defendant was interviewed in "familiar surroundings;" the defendant

"voluntarily agreed to speak with the agents;" and "there was no evidence that [the defendant] asked for an attorney or that the agents denied a request for an attorney."[11]  *Id.*

Therefore, under the circumstances established during the evidentiary hearing, the defendant was not in custody at the time he spoke with SA Burns and Investigator Rondon. As a result, *Miranda* warnings were not required to be provided to the defendant during that pre-invocation interview, and this Court should deny the defendant's motion on the ground he was not in custody.

**B.    THE DEFENDANT'S STATEMENTS TO SPECIAL AGENT BURNS AND INVESTIGATOR RONDON WERE VOLUNTARY AND NOT THE PRODUCT OF COERCION**

Separate and apart from an analysis of a defendant's statements under *Miranda*, the Supreme Court has held that due process forbids the use at trial of a statement that has been obtained from a defendant by coercion.  *See Brown v. Mississippi*, 297 U.S. 278, 286 (1936), and *Miller v. Fenton*, 474 U.S. 104, 109 (1985) (holding that by virtue of the Due Process Clause "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.").  In his motion to suppress, the defendant summarily claims (in one sentence, without factual support, explanation, or analysis) that his statements to SA Burns were involuntary.  *See* Doc. No. 536 at ¶ 31.  However, with the benefit of the facts set forth in the evidentiary hearing, this Court should easily conclude that the defendant's statements to SA Burns and Investigator Rondon were voluntary, and not the product of coercion.

---

[11] Here, the government is analyzing the pre-invocation portion of the interview, which is the only portion of the interview which must be analyzed for Miranda purposes.  The government agrees that it is uncontested that the defendant eventually requested an attorney, which concluded the "pre-invocation" portion of his interactions with law enforcement on December 7, 2023.

Generally, claims of involuntary confessions involve a defendant who is suffering from a physical ailment at the time of the confession. *See United States v. Taylor*, 745 F.3d 15, 25 (2d Cir. 2014) (confession involuntary where suspect had overdosed and was intermittently conscious). The issue is whether the conduct of law enforcement officials "was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *see also Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988) ("Is the confession the product of an essentially free and unconstrained choice by its maker?"). The voluntariness of a statement made by a defendant must be assessed based upon the totality of the circumstances. *See United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990). The prosecution bears the burden of showing voluntariness. *See Colorado v. Connelly*, 479 U.S. 157, 168–69. The inquiry centers around "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green* 850 F.2d at 900. Historically, the principal cases in which coercion has been found have involved truly outrageous conduct by the police, such as beating the defendant, *see Brown v. Mississippi*, 297 U.S. 278 (1936); administration of a "truth serum," *see Townsend v. Sain*, 372 U.S. 293 (1963); depriving the defendant of food and holding him in a "sweat box," *see Brooks v. Florida*, 389 U.S. 413 (1967); threatening to take the defendant's ailing wife into custody, *see Rogers*, 365 U.S. at 534; or to deprive the defendant of her welfare benefits and custody of her children, *see Lynumn v. Illinois,* 372 U.S. 528 (1963). More recently, unlike the facts of this case, the Second Circuit found government conduct sufficiently coercive to render a confession involuntary in situations such as continuing to question a suspect who was actively overdosing on drugs, *see United States v. Taylor*, 745 F.3d 15, 25 (2d Cir. 2014); where a suspect was told that if he asked for a lawyer he would be prohibited from cooperating with the government, *see United States v. Anderson*, 929 F.2d 96, 100–02 (2d. Cir. 1991); or where a

prosecutor told a suspect, accurately though unrealistically, that he faced "a possible sentence of a hundred years.", *see United States v. Duvall*, 537 F.2d 15, 25 (2d Cir. 1976).

No outrageous government conduct occurred here. The defendant has not set forth any facts to establish that he was in a weakened physical condition at the time of his statements to the agents. Rather, the testimony has established that upon exiting his residence, the defendant was treated with decency and respect and brought to a vehicle to be kept warm and out of the cold temperatures and falling snow. Upon meeting with the defendant, SA Burns had his handcuffs removed, sat with him in a vehicle to keep warm, spoke with him cordially and politely. Moreover, SA Burns testified that the defendant was not laboring under any type of disability, nor was under the influence of any drugs or alcohol during the execution of the search warrant or the interview. Under these circumstances, there is no question that the defendant's statements were voluntary. *See United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012) (defendant's statements voluntary even though he was hospitalized, restrained, and in pain); and *United States v. Dzionara-Norsen*, No. 19-CR-6131-FPG, 2020 WL 3401267, at *6 (W.D.N.Y. June 18, 2020) (despite having autism and on medication, the defendant's statement was voluntary).

In the instant case, SA Burns continued to interact with defendant Roncone after defendant Roncone invoked his right to counsel. At defendant's request, SA Burns used his own phone to call Roncone's employer and put them on the phone with one another. When incriminating evidence was found in defendant's home, SA Burns showed pictures of that evidence to defendant Roncone, which elicited responses. The government does not intend to use those post-invocation statements on its case-in-chief. However, because those statements were not the product of coercion which overbore defendant Roncone's will, they remained voluntary. As such, the government has requested that the Court permit it to use

24

those statements to cross-examine the defendant, should he testify at trial inconsistently with those prior statements to law enforcement.

### III.  CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendant's motion to suppress statements be denied.


DATED:       Buffalo, New York, November 26, 2025.

Respectfully submitted,

MICHAEL DIGIACOMO
United States Attorney


BY:       *S/ NICHOLAS T. COOPER*
          _____
          NICHOLAS T. COOPER
          Assistant United States Attorney
          United States Attorney's Office
          Western District of New York
          100 State Street
          Rochester, New York 14614
          585-935-7512
          Nicholas.Cooper@usdoj.gov