UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

UNITED STATES OF AMERICA,

          v.

SIMON GOGOLACK, a/k/a Greek,
PETER GERACE, JR.,
JOHN THOMAS ERMIN, a/k/a Tommy O,
MICHAEL RONCONE, a/k/a Cone,
FRANK KNIGHT, and
HOWARD HINKLE, JR., a/k/a Hard How,

          Defendants.

———————————————————

**DECISION AND ORDER**

1:23-CR-00099 EAW

Defendants John Thomas Ermin a/k/a Tommy O ("Ermin"), Michael Roncone a/k/a Cone ("Roncone"), and Howard Hinkle, Jr., a/k/a Hard How ("Hinkle"), are charged by way of a Second Superseding Indictment ("SSI"), along with three remaining defendants, with certain crimes, including a conspiracy to obstruct justice involving the death of Crystal Quinn ("Quinn"), a witness cooperating with another federal prosecution against defendant Peter Gerace, Jr. ("Gerace"). (Dkt. 24). Pending before the undersigned are motions to suppress and/or for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (Dkt. 536 (Roncone motion); Dkt. 540 (Ermin motion); Dkt. 548 (Hinkle motion); Dkt. 550 (sealed Hinkle motion)).

Roncone's motion relates to searches on December 7, 2023, of his residence, his trailer, and the Rare Breed Motorcycle Club ("RBMC") Buffalo clubhouse ("Buffalo-RBMC clubhouse"), pursuant to a warrant signed by United States Magistrate Judge H. Kenneth Schroeder, Jr., on December 5, 2023, which was supported by a 69-page affidavit

sworn to by FBI Special Agent Thomas V. Weis ("Agent Weis"), with various attachments, including a 141-page exhibit signed by Agent Weis describing the investigation to date. Ermin's motion relates to a search of his residence on the same date and pursuant to the same warrant.  Hinkle's motion relates to searches on October 24, 2023, of his residence and his cabin, pursuant to a warrant signed by United States Magistrate Judge Michael J. Roemer on October 22, 2023, which was supported by a 70-page affidavit sworn to by FBI Special Agent Adam Penna ("Agent Penna"), with exhibits.

The government filed its response in opposition to Defendants' motions in a redacted format on September 16, 2025 (Dkt. 611), and under seal in an unredacted format (Dkt. 612).  On September 22, 2025, Ermin filed a reply (Dkt. 625; Dkt. 627 (sealed filing)) and Hinkle filed a reply (Dkt. 626; Dkt. 628 (sealed filing)).  Oral argument was held on September 29, 2025, at which time the Court reserved decision.  (Dkt. 636).

Because the searches of the above-mentioned properties were supported by probable cause, and because Ermin and Hinkle have failed to articulate a valid basis for a *Franks* hearing, the motions are denied.

I.    SUMMARY OF DEFENDANTS' MOTIONS

    A.    Roncone Motion to Suppress[1]

        1.    Roncone's Arguments

Roncone seeks to suppress evidence seized pursuant to a search warrant executed on December 7, 2023, at 4998 Williams Street, Lancaster, New York (Roncone's residence), a location at Alma Hill Road, Wellsville, New York (Roncone's trailer), and the Buffalo-RBMC clubhouse located at 934 East Delavan Avenue, Buffalo, New York. (Dkt. 536 at 7-9). Roncone argues that the warrant lacked probable cause because it was based on speculation. (*Id*. at 8). Roncone's counsel argues—without specification—that his investigation has revealed "many" of the facts set forth in the warrant application to be untrue, and there is an insufficient showing in the application as to the reliability of witnesses or informants "or that the alleged facts were not stale and therefore not a proper basis for probable cause." (*Id*.).

Roncone argues that he has standing to contest the searches in all three locations. (*Id*.). In support of the motion, Roncone has submitted an affirmation dated April 25, 2025, wherein he states that he has resided at 4998 William Street, Lancaster, New York for several years, he resided there in December 2023, and he continues to reside there to the present day. (Dkt. 536-1 at ¶ 1). Roncone's affirmation also states that he is "the owner of a trailer located behind (north of), and in between 801 and 882 Alma Hill Road,

---

[1]    Roncone has also filed a motion to suppress statements. (Dkt. 536 at 9-10). An evidentiary hearing was held on October 1, 2025, with oral argument occurring on December 22, 2025, after post-hearing briefing. The Court will address Roncone's motion to suppress statements in a separate decision.

- 3 -

Wellsville, New York," and that prior to his arrest on December 7, 2023, he often slept in the trailer on the weekends, especially during hunting season. (*Id.* at ¶ 2). Roncone's affirmation also states that at the time of his arrest, he was a member of the RBMC, and that he had keys to the Buffalo-RBMC clubhouse allowing him to "come and go as I pleased for approximately 14 years." (*Id.* at ¶ 3). Roncone also alleges that he "occasionally slept there." (*Id.*).

### 2.    Government's Opposition

The government disputes that Roncone has established an objectively reasonable expectation of privacy of the Buffalo-RBMC clubhouse. (Dkt. 611 at 83 n.24). The government also argues that Roncone's "blanket, conclusory assertion that the affidavit 'did not provide probable cause to search the locations', . . . without any citation to the factual record or legal analysis, is insufficient to overcome [the] search warrant's presumptive validity." (*Id.* at 88). The government further argues that the warrant was supported by probable cause for all three premises, and even if not, the good faith exception would necessitate denial of Roncone's motion. (*Id.* at 88-89).

### B.    Ermin's Motion to Suppress

### 1.    Ermin's Arguments

Ermin seeks to suppress the fruits of the search warrant executed at his residence on December 7, 2023, or alternatively for a *Franks* hearing. (Dkt. 540 at 8-12). Ermin has submitted an affidavit establishing that he resided at the residence on the date in question. (Dkt. 405-2). Ermin contends that the affidavit of Agent Weis supporting the warrant contains deliberate inaccurate statements. (Dkt. 540 at ¶ 32). Specifically, Ermin argues:

(1) Agent Weis was not qualified to opine as to the Outlaw Motorcycle Club ("OMC") and his statements about the OMC were not accurate or based on his personal knowledge (*id.* at ¶¶ 34-38); (2) Agent Weis inaccurately references certain threatening remarks that Gerace made following a March 27, 2023 appearance in federal court, after which Ermin visited him in the Niagara County Jail on April 4, 2023 (*id.* at ¶¶ 39-42); and (3) Agent Weis inaccurately references members of the OMC as unindicted co-conspirators with activities at Pharoah's Gentlemen's Club (*id.* at ¶ 43).

2.    Government's Opposition

The government responds that to the extent Ermin is challenging the opinions offered by Agent Weis concerning the OMC, he expressly informed the issuing magistrate judge as to the basis for that information and there was nothing improper about offering this information. (Dkt. 611 at 105-06). With respect to the incorrect date as to when Gerace allegedly made threats following his detention, the government acknowledges that it initially incorrectly stated in several different contexts that Gerace made the threats on March 27, 2023, after a new indictment was returned in case number 23-CR-37 and Gerace was detained by United States District Judge John L. Sinatra, Jr., when in fact the threats were made on May 31, 2023, after Judge Sinatra denied Gerace's motion to reopen the detention hearing. (Dkt. 611 at 106-107; *see* Dkt. 612, Ex. C). But notwithstanding this error, the government contends that the high burden for a *Franks* hearing has not been satisfied.

Finally, the government responds that there was nothing inaccurate about Agent Weis stating that several members of the OMC were considered to be unindicted co-

conspirators in the illegal activity at Pharaoh's Gentlemen's Club.  (Dkt. 611 at 107).  The government continues that Agent Weis was not referring to the allegations in the indictment against Gerace in case number 19-CR-227, but rather law enforcement's beliefs as to the OMC members' role.

### 3.    Ermin's Reply

Ermin filed a reply in further support of his motion for a *Franks* hearing and to suppress, focusing on the inaccurate statement by Agent Weis as to the timing of the alleged threats made by Gerace.  (Dkt. 625; Dkt. 627 (sealed unredacted reply)).

## C.    Hinkle's Motion to Suppress

### 1.    Hinkle's Arguments

Hinkle argues that evidence seized pursuant to a search warrant executed on October 24, 2023, at his residence (4290 Donovan Road, Alma, New York) and his cabin (1614 Fanton Road, Willing, New York), should be suppressed.  He argues that he is entitled to a *Franks* hearing "because of what appears to be the misrepresentation of facts and reckless use of false statements in the [search warrant] applications."  (Dkt. 548 at ¶ 10; *see also* ¶ 14 (Hinkle contending that "there is a reckless misrepresentation of facts and/or false statements in the applications" submitted by Agent Penna.)).  Hinkle provides what can only be characterized as a laundry list of alleged misrepresentations, including: Agent Penna's qualifications did not "allow him to opine of factors surrounding the overdose drug death of Crystal Quinn or the nature of this specific case" (*id*. at ¶ 16); Agent Penna misrepresented that Hinkle was a "member or associate" of the RBMC, even though he had evidence that was not disclosed in the search warrant application indicating otherwise

(*id*. at ¶¶ 17-21); Agent Penna misrepresented that he had evidence that Hinkle told Quinn that there was "money on her head" (*id*. at ¶¶ 22-28); Agent Penna misrepresented that defendant Frank Knight ("Knight") did not "readily offer up . . . information" that Knight possessed a detailed history of attendees at the weekly poker games, including those attending the July 27, 2023 game, and that he had no foundation for making the statement that Gogolack had no need to text Hinkle about attending the poker game, no foundation to discredit exculpatory information as to Hinkle's membership in the RBMC and his involvement in Quinn's death, and he misrepresented that Hinkle was present at Gogolack's residence on the morning of July 28, 2023, when information from the FBI Cellular Analysis Survey Team ("CAST") revealed that his phone was not active that morning (*id*. at ¶¶ 29-38); regarding Quinn's death, that Agent Penna misrepresented that Gogolack received a threatening text message from Quinn's mother about Quinn when the text message was actually about Quinn's mother's car, Agent Penna's statement about the amount of fentanyl in Quinn's blood—specifically, that it was consistent with an intentional killing—was conclusory, and Agent Penna was not qualified to opine on such a matter, and the United States Attorney's Office for the Western District of New York has only prosecuted accidental overdoses (*id*. at ¶¶ 39-41); Agent Penna misrepresented and provided no evidence that Gogolack and Hinkle had a "close relationship," consistent with a conspiracy (*id*. at ¶ 42); and Agent Penna misrepresented geofence data, making the unsupported statement that Hinkle's cellphone was at Gogolack's residence the morning of July 28, 2023 (*id*. at ¶¶ 43-44).  Hinkle further argues that the search warrant should be suppressed because it lacks particularity, there is no identification of the specific offenses

of drug trafficking and/or illegal firearms possession, and law enforcement unlawfully entered into a trailer/camper that was on the premises at his residence at 4290 Donovan Road, but not named in the warrant.  (*Id*. at ¶¶ 45-52).

      2.    <u>Government's Opposition</u>

The government responds that the search warrant was supported by substantial and detailed information regarding the killing of Quinn, and that Hinkle knew and had information about her death.  (Dkt. 611 at 108-14).  The government argues that the warrant is sufficiently particularized, including because Attachment B to the search warrant lists the items to be searched for and seized, and law enforcement was permitted to seize firearms and marijuana in plain view in Hinkle's residence and cabin while lawfully searching for small items included in the warrant application.  (*Id*. at 114-20).  The government also argues that as to Hinkle's residence, law enforcement took the prophylactic step of applying for a follow-up warrant authorizing them to search for and seize items based on their plain-view observations, including firearms, ammunition, and controlled substances.  (*Id*.).  The government also argues that the search of the "Jay Feather RV" trailer/camper parked on the curtilage of Hinkle's residence at 4290 Donovan Road, from which law enforcement seized evidence, including marijuana plants, was proper, both because the warrant expressly authorized the search of the curtilage, and also because the government applied for a follow-up warrant to search the trailer/camper.  (*Id*. at 120-21).  Finally, the government argues that even if the search warrant was not supported by probable cause, the good faith exception would apply and the warrants should not be suppressed, since the officers relied in good faith upon a search warrant issued by a

neutral and detached magistrate judge.  (*Id*. at 125).  As to Hinkle's request for a *Franks* hearing, the government argues that Hinkle has failed to sustain his burden of showing that Agent Penna's affidavit was knowingly false or deliberately misleading.  (*Id*. at 126-34).

   3. <u>Hinkle's Reply</u>

  Hinkle argues in his reply that although the warrant described certain items to be searched, it did not specify drugs and firearms, and the plain view doctrine does not apply because the agents were not lawfully present, due to the taint from misrepresentations in the search warrant, and obtaining a follow-up warrant did not cure this defect.  (Dkt. 628 at 6-7).  Hinkle further argues that the trailer/camper was not on the curtilage of his property, since it was not intimately tied to the house, and the agents should have secured the trailer/camper and applied for a separate search warrant.  (*Id*. at 7-8).  Finally, Hinkle reiterates his arguments that Agent Penna's statements were misleading and/or that he is not qualified to make them.  (*Id*. at 8-14).

## II. <u>SUMMARY OF APPLICABLE LEGAL STANDARDS</u>

### A. <u>Probable Cause</u>

  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence."  *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).

"[P]robable cause to search a place exists if the issuing judge finds a 'fair probability that contraband or evidence of a crime will be found in a particular place' and a federal court must apply a 'totality-of-the-circumstances analysis' in pursuing this inquiry." *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  When reviewing the validity of a search warrant:

> the duty of [the] court . . . is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed. A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant.

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (citation modified); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate. . . ."). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of *de novo* review." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 236) (alteration in original). "[R]esolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)); *see United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) ("Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant, and its related concern that '[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." (alteration in original) (citation modified)).

B.    Standard for *Franks* Hearing

The standard for entitlement to a *Franks* hearing is high.  *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).  Pursuant to *Franks*, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  438 U.S. at 155-56.  To be entitled to a *Franks* hearing, a defendant's attack on material contained in the search warrant:

> must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.

*Id*. at 171.  Therefore, "[t]o invoke the *Franks* rule, a defendant is required to show: (1) 'that there were intentional and material misrepresentations or omissions' in the warrant affidavit, and (2) that the 'alleged falsehoods or omissions were necessary to the . . . probable cause finding.'"  *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (quoting *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003)).  Notably, "there is . . . a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171.

C.    Standing

Fourth Amendment rights attach only to places and things in which the individual challenging the search has "an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega,* 480 U.S. 709, 715 (1987) (citation modified); *see*, *e.g.*, *Rakas v. Illinois,* 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.").  "It has been clear for a generation that 'Fourth Amendment rights are personal rights that may not be vicariously asserted.'" *United States v. Haqq,* 278 F.3d 44, 47 (2d Cir. 2002) (alterations omitted) (quoting *Rakas,* 439 U.S. at 133-34); *see*, *e.g.*, *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir. 1991) ("The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.").  "In evaluating [standing] claims, the court generally considers whether the defendant had any property or possessory interest in the place searched or the items seized." *Id*.  The burden is on the defendant to show that he has a reasonable expectation of privacy. *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980); *see also United States v. Cruz,* 475 F. Supp. 2d 250, 253 (W.D.N.Y. 2007) ("The burden of establishing the existence of a reasonable expectation of privacy rests on the defendant.").

D.    Good Faith Exception

"A violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule[.]" *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010).  "Indeed,

exclusion 'has always been our last resort, not our first impulse.'" *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Instead, whether the exclusionary rule applies "depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 141). The "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)). "The good-faith exception . . . holds that when the agents executing a search warrant act with an objectively reasonable good-faith belief that their conduct is lawful, improperly obtained evidence remains admissible because in such circumstances, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *United States v. Eldred*, 933 F.3d 110, 118 (2d Cir. 2019) (citation modified).

In *United States v. Leon*, the Supreme Court identified four circumstances in which the good faith exception does not apply and the officer's reliance on the warrant will not be considered to have been in good faith:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923). "These exceptions reflect the general rule that, '[t]o trigger the exclusionary rule, police

conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *United States v. Romain*, 678 F. App'x 23, 25 (2d Cir. 2017) (alteration in original) (quoting *Herring*, 555 U.S. at 144).  "'The pertinent analysis of deterrence and culpability is objective,' and "'our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances."'"  *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 145).

"'The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant."  *Clark*, 638 F.3d at 100 (citation modified).  Moreover, as counseled by the Second Circuit, in assessing whether the government has met its burden, a court must consider that "in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection."  *Id.*

III.   ANALYSIS

A.   Roncone's Motion to Suppress

The Court concludes that the search warrants for all three premises from which Roncone seeks to suppress evidence (4998 Williams Street, Lancaster, New York (Roncone's residence), a location at Alma Hill Road, Wellsville, New York (Roncone's trailer), and the Buffalo-RBMC clubhouse located at 934 East Delavan Avenue, Buffalo, New York) were supported by probable cause.[2]

The search of the clubhouse was supported by specific allegations of historical and contemporary narcotics use, distribution, and manufacturing, as well as firearms possession. Moreover, the affidavit established probable cause to believe that a criminal conspiracy involving the OMC, the RBMC, Hinkle, and Gogolack operated to target and silence Quinn. As such, based on historical knowledge about the operation of similarly situated motorcycle clubs, as well as specific allegations pertaining to the OMC and RBMC's relationship, there was probable cause to support the search of the Buffalo-RBMC clubhouse for association and other enterprise evidence.[3]

---

[2]   The search warrant application for the three premises from which Roncone seeks to suppress evidence was produced to him under seal. The Court has reviewed the entirety of the search warrant application, but given that it remains under seal, the Court's references to the content included in the warrant application are minimal. The Court has taken a similar approach with respect to its discussion of the search warrant applications at issue with the Hinkle and Ermin motions.

[3]   The government argues that Roncone lacks standing to challenge the search of the Buffalo-RBMC clubhouse. Roncone submits in his affidavit that at time of his arrest for this case, he was a member of the RBMC, that he had keys to the Buffalo-RBMC clubhouse, and he occasionally slept there. (Dkt. 536-1 at ¶ 3). The government offers no facts undercutting Roncone's assertions, and its argument that Roncone is akin to an

Those same allegations, along with specific allegations that Roncone was a leader of both the Wellsville and Buffalo RBMC chapters, created probable cause to search his personal residence and trailer, as did allegations of his involvement in narcotics use and distribution and his unlawful possession of firearms. Roncone argues in conclusory fashion that the search warrant applications are based on "sheer speculation" and that informants and witnesses relied upon in the search warrant application were not reliable (*see* Dkt. 536 at 8)—but he notably fails to identify any of the specific facts he finds objectionable. *See, e.g., United States v. Nejad*, 436 F. Supp. 3d 707, 721 (S.D.N.Y. 2020) (noting that "conjecture," supported by nothing more, does not support that alleged misstatements in warrant were designed to mislead).

Finally, even if the search warrants are not supported by probable cause, the government correctly argues that Roncone "does not—and cannot—claim that the government did not rely in good faith on the Magistrate Court's issuance of the warrant, which was supported by a detailed 69-page affidavit and even more detailed 141-page signed exhibit." (Dkt. 611 at 89). There is no indication from the record that any of the exceptions to the exclusionary rule would apply, such as that the magistrate judge was

---

"overnight guest" is not persuasive, where Roncone asserts that he had keys to the Buffalo-RBMC clubhouse—in other words, he was able to come and go from the clubhouse as he pleased and therefore exercised at least some form of control over the premises. That said, the Court is not convinced that Roncone's allegations are sufficient to confer standing. *Cf. United States v. Pirk*, 282 F. Supp. 3d 585 (W.D.N.Y. 2017) (affirming magistrate judge's determinations that members of motorcycle club lacked standing to challenge searches of clubhouses). Nonetheless, because the Court can easily determine that the search warrant is supported by probable cause, it will assume for purposes of the motion that Roncone had standing to challenge the search warrant for the Buffalo-RBMC clubhouse.

knowingly misled, that the magistrate judge wholly abandoned his judicial role, that the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable, or that the warrant was so facially deficient that reliance upon it was unreasonable. *Moore*, 968 F.2d at 222 (citing *Leon*, 468 U.S. at 923). Roncone does not appear to dispute that the government relied in good faith on the search warrant, and he does not argue in his motion papers that the good faith exception would not apply. Based on its review of the record—including the search warrant application—the Court concludes that even if the search warrant was not supported by probable cause, the good faith exception would apply. For those reasons, Roncone's motion to suppress is denied.

B. <u>Ermin's Motion to Suppress/for a *Franks* Hearing</u>

The Court turns next to the motion to suppress and for a *Franks* hearing filed by Ermin, and finds that the search warrant for Ermin's house was supported by probable cause. For those same reasons, Ermin has failed to demonstrate his entitlement to a *Franks* hearing.

As noted above, Ermin contends that Agent Weis was not qualified to give information on the OMC in connection with the search warrant. The Court disagrees. Given his training, experience, and involvement in the investigation, Agent Weis was qualified to opine as to outlaw motorcycle gangs and the OMC. Contrary to Ermin's implication, Agent Weis did not state in his affidavit that he was an "expert" on the OMC. As outlined in the search warrant affidavit, Agent Weis began working as a special agent with the FBI in 2017, and participated in several investigations involving witness tampering and retaliation, organized crime, firearms offenses, and drug trafficking, which

are many of the same crimes identified in the search warrant.  Further, Agent Weis stated that he personally participated in the investigation of Ermin and his alleged co-conspirators, and gave a detailed recitation of the facts regarding the OMC, their clubhouse, organizational structure, and alleged illegal activities, and he adequately explained how he came to learn this information.  (*See generally*, 23-MJ-158).  The fact that Agent Weis is not an "expert" in the OMC specifically, and particularly given the 69-page affidavit and 141-page attachment which lays out in detail the investigation of the alleged conspiracy to murder Quinn, does not undercut his ability to opine as to whether there is probable cause to believe that evidence of a crime would be found at Ermin's residence.

With respect to Ermin's argument that the search warrant affidavit included incorrect information—specifically, that Agent Weis's affidavit states that Gerace stated "fuck the rats" and "all snitches die" on March 27, 2023, following Judge Sinatra's decision to detain him and prior to an April 4, 2023 jail visit by Ermin, when Gerace actually made the statements on May 31, 2023, after Judge Sinatra denied Gerace's motion to reopen his detention hearing—the Court finds that this does not meet the standard for a *Franks* hearing.  As noted in its response papers, when the government learned that the cooperating witness who overheard Gerace's comments did so on May 31, 2023, which was different than what had been represented during the detention hearing before the undersigned concerning Ermin, it immediately notified the Court.  Ermin offers no evidence that this inaccurate statement was made intentionally or recklessly—which, as explained above, is required to establish entitlement to a *Franks* hearing.  *See, e.g., United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023) ("Allegations of negligence or innocent mistake are

insufficient" to satisfy *Franks* standard (citation modified)); *see also Nejad*, 436 F. Supp. 3d at 719 (explaining that, to warrant a *Franks* hearing, a reviewing court must be presented with evidence that a misstatement in a warrant application was "designed to mislead").

Further, the Court does not believe that Agent Weis's inaccurate statement is necessary to the finding of probable cause—including because Ermin does not appear to dispute that Gerace made the statement about "rats" and "snitches" following Judge Sinatra's decision regarding Gerace's custody status, nor does Ermin dispute that Gerace learned Quinn was a cooperating witness on March 27, 2023, or that Gerace met with Ermin on April 4, 2023—all prior to Quinn's death in August 2023. Moreover, after Gerace allegedly made these statements on May 31, 2023, Ermin again met with Gerace on July 6, 2023—and less than 30 days later Quinn was dead. Thus, the chain of events culminating in Quinn's death is not materially altered by the fact that Gerace made the statement about "rats" and "snitches" in May 2023, as opposed to in March 2023. If anything, the accurate date of the statements (May 31, 2023) and Ermin's second visit with Gerace (July 6, 2023), is more closely linked temporally to Quinn's death. And even setting aside this inaccuracy, the affidavit more than adequately establishes probable cause. *See Sandalo*, 70 F.4th at 85 ("As for materiality, the alleged falsehood or omission should be set aside and the remaining portions of the affidavit should be reviewed to determine if probable cause still exists." (citation modified)).

Finally, the Court does not find that Ermin's argument that Agent Weis inaccurately referenced members of the OMC as unindicted co-conspirators in the criminal activity of Pharoh's Gentlemen's Club requires a *Franks* hearing. The second superseding indictment

in 19-CR-227 states that several of Gerace's male employees at Pharoah's were members of the OMC. (*See United States v. Gerace*, 19-CR-227, Dkt. 89 at ¶ 4 ("Several of **GERACE**'s male employees at Pharoah's are members of a motorcycle club called the Outlaws Motorcycle Club ("Outlaws MC") (W.D.N.Y. Feb. 25, 2021)). Agent Weis's statement in the search warrant application—which was that certain OMC members were "considered unindicted coconspirators" in the illegal activity at Pharoah's—is not inconsistent with the allegations in the second superseding indictment in case 19-CR-227. Specifically, Agent Weis's statement reflects law enforcement's evaluation of OMC members referred to in the affidavit as unindicted coconspirators, and not the second superseding indictment's actual treatment of those individuals. In his reply, Ermin does not dispute this argument. Even if he did, the Court would be hard-pressed to find that this alleged inconsistency was designed to mislead, or material to the probable cause determination. Accordingly, the Court finds that this alleged discrepancy is not enough to support the request for a *Franks* hearing.

C.    Hinkle's Motion to Suppress/for a *Franks* Hearing

The Court finds that the search warrants for Hinkle's house (4290 Donovan Road, Alma, New York) and his cabin (1614 Fanton Road, Willing, New York) were supported by probable cause. For those same reasons, Hinkle has failed to demonstrate his entitlement to a *Franks* hearing.

The search warrant for Hinkle's house and cabin do not lack particularity. "The purpose of the particularity requirement . . . 'is that those searches deemed necessary should be as limited as possible,'" including the "specific evil" that is "the 'general warrant'

abhorred by the colonists, and the problem is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings." *United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987) (citation modified). "The particularity requirement has three components. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the 'items to be seized by their relation to designated crimes.'" *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (citation modified).

The search warrants for Hinkle's properties are supported by a lengthy affidavit by Agent Penna, which details Quinn's alleged killing. Agent Penna's affidavit provides detailed information about Hinkle's background, discusses specific information supporting how and why Hinkle had knowledge of Quinn's death, and why the seizure of certain property, including electronic devices such as his cell phones, would lead to the discovery of evidence. (*See* Dkt. 612, Ex. D). Attachment A to the search warrant application identifies the specific places to be searched. Attachment B to the search warrant application, which is incorporated into Agent Penna's affidavit, lists 26 categories of items to be searched for and seized. Finally, the search warrant application, Agent Penna's affidavit, and Attachment B list the various target offenses for which evidence may be seized, including violations of 18 U.S.C. §1513(a)(1) and (f) (retaliation against a witness, victim, or informant and conspiracy to do the same), 18 U.S.C. § 1512(b) and 1512(k) (witness tampering and conspiracy to do the same), 18 U.S.C. § 1001(a) (false statements), 18 U.S.C. § 2 (aiding and abetting), and 18 U.S.C. § 4 (misprision of a felony). Accordingly, the warrant application sufficiently identifies the specific offenses for which

law enforcement established probable cause, describes the specific places to be searched, and specifies the items to be seized by their relation to designated crimes.

Hinkle argues that the search warrants did not permit law enforcement to seize firearms and drugs from his property. Because the Court finds that any firearms and drugs were in plain view during the search and, considering the other information contained in the warrant affidavit—such as that Quinn was killed by a lethal dose of fentanyl, and the use of firearms by other members of the conspiracy—the seizure of firearms and drugs from the property was appropriate and supported by probable cause. *See, e.g., United States v. Gotti*, 42 F. Supp. 2d 252, 275-76 (S.D.N.Y. 1999) (where search warrant expressly authorized the search of the basement, including any containers that could hold cash and other items listed, concluding that seizure of firearms was appropriate, since "it was immediately apparent that these items constituted evidence of criminal offenses," and "their seizure under the plain view doctrine was . . . permissible"); *United States v. Salaman*, 742 F. Supp. 3d 221, 239-40 (D. Conn. 2024) (where search warrant did not authorize seizure of narcotics paraphernalia, holding that seizure of the same was proper under plain view doctrine, because law enforcement was present at apartment with the authority of a search warrant to search through the contents of the apartment to locate any items that were within the scope of the search warrant, including the defendant's cellphone).

The government states that while searching Hinkle's properties, law enforcement observed contraband, including drugs and firearms, in plain view, and that law enforcement knew at the time of the search that Hinkle was a felon. (*See* Dkt. 612 at 116-19 (list of

evidence seized from 4290 Donovan Road, and location from which it was seized); *id.* at 124 (list of evidence seized from 1614 Fanton Road, and location from which it was seized)). Hinkle does not dispute that these items were in plain view. Rather, he argues that because the warrant affidavit includes falsities and misrepresentations, law enforcement were not lawfully searching his properties in the first instance. However, for the reasons articulated further below, the Court does not find that argument to be persuasive.

Hinkle also argues that law enforcement illegally searched his trailer/camper because it was not listed as a place to be searched on the search warrant application, nor was it on the curtilage of the Donovan Road property. Here, the warrant permitted law enforcement to search "4290 Donovan Road, Alma, NY 14895 ***and curtilage***" (Dkt. 612, Ex. D (emphasis added)), and photographs of the residence submitted in connection with the search warrant application depict the trailer/camper parked in the driveway (*id.*). Law enforcement seized marijuana in plain view from the trailer/camper.

Courts have concluded that if an outbuilding is included within a home's curtilage, a search warrant authorizing a search of a defendant's residence permits the search of items and buildings within the curtilage as well, but these cases have not addressed the specific circumstances of a camper. *See, e.g., United States v. Barsalou*, No. 2:24-cr-00135, 2026 WL 83893, at *6-9 (D. Vt. Jan. 12, 2026) (discussing distinctions between a "shed, outbuilding or other type of storage area," and a "camper, whose primary purpose is to be a place to stay or living space," and considering whether search of a trailer on the curtilage of property was authorized by the warrant application). However, the Court need not

- 23 -

resolve this issue, because even if the trailer/camper was not authorized to be searched pursuant to the search warrant, the officers acted reasonably—including because the photographs submitted in support of the search warrant included depictions of the trailer/camper, and also because law enforcement secured a separate, follow-up warrant to search the trailer/camper, and therefore the good faith exception would apply.  (*See* Dkt. 612, Ex. E (search warrant for "Jay Feather" trailer)); *cf. Barsalou*, 2026 WL 83893, at *8-9 (concluding that the good faith exception did not apply, where the information provided to the magistrate judge did not sufficiently describe the possibility of a separate residence on the property, and also noting that "no evidence presented to the court suggests the officers made any effort to get a second warrant").

As to Hinkle's request for a *Franks* hearing, as further explained above, he has identified numerous statements in Agent Penna's affidavit with which he takes issue.  (*See* Section (I)(C)(1), *supra*).  The Court has carefully reviewed the entirety of the search warrant affidavit and concludes that none of the alleged misstatements or omissions, standing alone or collectively, meet the *Franks* standard.  Hinkle's laundry list of alleged "misstatements" fails to demonstrate that the warrant affidavit contained intentional and material misrepresentations or omissions, or that the alleged falsehoods or omissions were necessary to the probable cause finding.

As to the first prong of the *Franks* analysis, Hinkle has failed to demonstrate that alleged misstatements or omissions were intentionally false or misleading.  He has not offered any credible and probative evidence supporting that Agent Penna's statements in the search warrant affidavit were untrue—rather, as outlined in further detail in the

government's opposition which takes on Hinkle's arguments point-by-point (*see* Dkt. 611 at 126-137), Hinkle repeatedly misconstrues Agent Penna's statements and then offers his own interpretation of other evidence in the case which he believes undercuts the misconstrued statements in the search warrant application. This does not satisfy *Franks*.

For example, Hinkle does not offer any support for his assertions that Agent Penna was not qualified to opine on the amount of fentanyl in Quinn's blood, or that she was intentionally killed. Likewise, while Hinkle takes great issue with the suggestion by Agent Penna that Hinkle was "a member or associate" of the RBMC when others purportedly confirmed that he was not a RBMC member (Dkt. 548 at ¶¶ 17-21), even Hinkle's own statements support a conclusion that he was at the very least associated with the RBMC (*see* Dkt. 612 (sealed exhibits J and K)). Hinkle's attempts to quarrel with the meaning of "associate" do not come close to establishing an intentionally false or misleading statement. Similarly, Hinkle complains that the search warrant application makes reference to his alleged statement to Quinn that there was money on her head when Gogolack did not convey that information with as much certainty. (Dkt. 548 at ¶¶ 22-28). But again, Hinkle misconstrues the statements in the search warrant application concerning Hinkle's alleged statement to Quinn, and in any event, even under his construction of the statement he fails to meet the *Franks* standard. Likewise, while Hinkle takes issue with the search warrant application's statements about geofence data (*id.* at ¶¶ 43-44), he cites no misrepresentation concerning the geofence data outlined in the application. In the end, even considered as a whole, Hinkle's arguments fail to satisfy the *Franks* standard and evince only Hinkle's desire to cross-examine. *See, e.g., United States v. Taylor*, 672 F. Supp. 2d 539, 540-41

(S.D.N.Y. 2009) (denying the defendant's request for a *Franks* hearing where his initial *Franks* showing consisted of a "sparse, half-page affidavit and [an] . . . assertion in a memorandum of law" to demonstrate recklessness by the FBI agent issuing the search warrant for the defendant's apartment); *see also Nejad*, 436 F. Supp. 3d at 720-21 (rejecting the defendant's argument that warrant application included "misstatements, omissions, and . . . misleading claims," which were derived from "stringing together unrelated facts to create false implications," because the defendant "offered little evidence that these statements are in fact misstatements," and that he offered "even less credible and probative evidence that these alleged misstatements were deliberately false or made with reckless disregard for the truth," and explaining that an "alleged lack of further support or evidence for an allegation does not constitute an *obvious* reason to doubt the veracity of that allegation"). In sum, Hinkle offers no evidence supporting that Agent Penna's statements in the search warrant application were not true, or that they were made knowingly or intentionally, and none of the statements identified by Hinkle undercut the "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171.

Nor has Hinkle demonstrated that the alleged misstatements were necessary to the probable cause finding. For example, Hinkle's contention that he was not a "member" of the RBMC has no impact on whether law enforcement had probable cause to search his house and cabin, particularly in light of other information in the search warrant application, which support the conclusion that Hinkle had information relating to Quinn's death, including: (1) Hinkle associated with and knew members of the RBMC; (2) Gogolack held

himself out as a hitman; (3) Hinkle had telephone communications with Gogolack, including when Gogolack was communicating with Quinn, and before and after Quinn's death; (4) Hinkle, Gogolack, and Quinn attended a poker game together not long before Quinn's death; (5) one of the last places Quinn was known to be alive was at Hinkle's cabin; and (6) Quinn texted a friend that she believed Gogolack and "the bikers" were setting her up.  (*See* Dkt. 612, Ex. D).  For those reasons, Hinkle's motion for a *Franks* hearing is denied.

## IV.    CONCLUSION

For the foregoing reasons, Ermin's and Hinkle's motions to suppress search warrants and/or for a *Franks* hearing (Dkt. 540; Dkt. 548) and Roncone's motion to suppress (Dkt. 536), are denied.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        February 9, 2026
              Rochester, New York

- 27 -