UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

MICHAEL RONCONE, a/k/a Cone,

Defendant.

**DECISION AND ORDER**

1:23-CR-00099 EAW

Defendant Michael Roncone a/k/a Cone ("Roncone") is charged by way of a Second Superseding Indictment ("SSI") with the following crimes: (1) conspiracy to obstruct justice in violation of 18 U.S.C. § 371 (count 1); (2) unlawful user of controlled substances in possession of firearms in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(8) (count 25); and (3) making false statements in violation of 18 U.S.C. § 1001(a)(2) (count 26). (Dkt. 24). Pending before the undersigned is Roncone's motion to suppress statements allegedly made to law enforcement on December 7, 2023. (Dkt. 536).[1] For the reasons set forth below, the motion is denied.

---

[1]     Roncone also sought dismissal of count 25, which was denied without prejudice by Decision and Order entered November 3, 2025 (Dkt. 660), and suppression of evidence seized on or about December 7, 2023, pursuant to a search warrant, which was denied by Decision and Order entered February 9, 2026 (Dkt. 756). In addition, Roncone filed boilerplate requests for leave to join in his co-defendants' motions (Dkt. 536 at ¶¶ 32-33) and to make other motions (*id*. at ¶ 34). Those requests are denied without prejudice. *See United States v. Cobb*, 544 F. Supp. 3d 310, 344-45 (W.D.N.Y. 2021) ("[I]t is prudent to adopt a policy requiring each defense counsel to independently file motions on behalf of their clients and not simply file boilerplate motions seeking to join in relevant motions of co-counsel. One of the reasons for this policy is that co-defendants may not pursue their motions for a variety of reasons, including entering a plea of guilty." (citations omitted)). If Roncone seeks to file a subsequent pretrial motion that is untimely or join in relief sought by his co-defendants, he needs to file a particularized motion identifying the basis for the

## BACKGROUND

A grand jury returned the SSI against Roncone and others on January 5, 2024. (Dkt. 24). Roncone filed the pending motion on August 8, 2025. (Dkt. 536). The government filed opposition papers (Dkt. 611 (redacted opposition); Dkt. 612 (sealed opposition)), but consented to an evidentiary hearing concerning the motion to suppress statements, which was conducted on October 1, 2025 (Dkt. 640). The government called FBI Special Agent Brian Burns ("SA Burns") and FBI Task Force Officer Geraldo Rondon ("TFO Rondon") to testify at the hearing, and Roncone testified on his own behalf. (*Id.*; *see* Dkt. 653). The following exhibits were admitted into evidence at the hearing:

- Exhibit 1A (FBI 302 marked with GOV-00011411 through GOV-00011413);

- Exhibit 2B (Photos attached to FBI 302 marked with GOV-00011421 through GOV-00011422, GOV-00011499 through GOV-00011511);

- Exhibit 3A (Search Warrant for Roncone's person: GOV-00011430 through GOV-00011437);

- Exhibit 3B (Search Warrant for Roncone's residence at 4998 Williams Street in Lancaster, New York: GOV-00011489 through GOV-00011497);

- Exhibit 6C (Body Worn Camera Video);

- Exhibit 3500D (FBI 302 marked as Exhibit 1A with SA Burns' handwritten notes);

- Exhibit A (Roncone's affidavit signed July 2, 2025); and,

- Exhibit 10 (Roncone's affidavit signed April 25, 2025).

---

request and, if applicable, the reason that the motion was not filed in a timely fashion. The Court will not entertain boilerplate and unspecified requests for relief.

Both parties filed post-hearing submissions (Dkt. 680 (government's post-hearing submission); Dkt. 681 (Roncone's post-hearing submission); Dkt. 706 (Roncone's reply); Dkt. 709 (government's reply)), and oral argument was held before the undersigned on December 22, 2025, at which time the Court reserved decision (Dkt. 720). Then, by Text Order entered February 17, 2026, the Court sought clarification as to whether the government was seeking to admit as part of its case-in-chief statements that Roncone allegedly made as reflected on Exhibit 6C and prior to being interviewed by SA Burns and TFO Rondon. (Dkt. 759). The government filed a letter on February 18, 2026, clarifying that it was not seeking to use those statements as part of its case-in-chief. (Dkt. 766).

## SUMMARY OF TESTIMONY AT EVIDENTIARY HEARING

### A.    SA Burns

After testifying about background information (Dkt. 653 at 10-16), SA Burns described execution of a search warrant at Roncone's residence at 4998 Williams Street in Lancaster, New York, on December 7, 2023. SA Burns' role was to attempt to conduct an interview of Roncone. (*Id.* at 17). SA Burns testified that the FBI SWAT team was used to make entry into the residence and clear it, commencing at about 6:00 a.m. that morning. (*Id.* at 21-23). A bull horn was used to announce the presence of federal agents (*id.* at 23-24), and that there was a search warrant for the residence (*id.* at 24). Additionally, a member of the team telephoned Roncone. (*Id.*). Roncone was offered the opportunity to voluntarily leave the premises, rather than the SWAT team making a forced entry, and he opted to do so. (*Id.* at 24-25). It took Roncone about 15 minutes to exit the residence. (*Id.* at 32). Roncone was handcuffed by the FBI SWAT team after exiting the residence, but

he was not threatened or physically forced outside. (*Id.* at 25-26). SA Burns described the interactions between Roncone and the FBI SWAT agents as polite and respectful. (*Id.* at 26-27, 38-39).

These interactions are reflected by the body worn camera video admitted into evidence as Exhibit 6C. Roncone confirmed to the agents that it was just him and his father in the house, with no pets other than fish in a tank. (*Id.* at 33). Law enforcement did not raise their voices or threaten Roncone. (*Id.* at 34). And in response to Roncone's request, the agents agreed to secure his father in a car to shield him from the lousy weather that morning. (*Id.* at 34-35; 37-38). Roncone told the SWAT team about weapons in the house, including a loaded handgun next to his bed. (*Id.* at 35-36).

About 11 minutes after Roncone exited his residence, a SWAT team member walked him across the street to the volunteer fire department parking lot located about 100 feet from Roncone's property, and seated him in the back of the vehicle used by FBI Special Agent Tina Taylor ("SA Taylor"). (*Id.* at 40-41, 51). Roncone was still in handcuffs at this point. (*Id.* at 41). He made a joke with the agents about needing man-size handcuffs. (*Id.* at 45-46).

SA Burns arrived at the scene at about 6:22 a.m. (*Id.* at 52). Before SA Burns' arrival, Roncone was in handcuffs for about 15 minutes. (*Id.* at 53). SA Burns along with TFO Rondon identified themselves to Roncone, removed him from SA Taylor's vehicle, and entered TFO Rondon's vehicle, which was in the same fire department parking lot as SA Taylor's vehicle, about 20 feet away. (*Id.* at 54).

SA Burns explained to Roncone that he was not under arrest, that he had been handcuffed for safety reasons related to execution of the search warrant, and that he did not need to speak to the agents. (*Id.* at 54-55). SA Burns repeated to Roncone that he was not under arrest. (*Id.* at 54, 117). The handcuffs were removed. (*Id.* at 56). This all occurred within a matter of minutes of SA Burns introducing himself to Roncone. (*Id.* at 57). SA Burns testified that Roncone did not appear frightened or intimidated, and the tone of the conversation was cordial. (*Id.* at 59-60). Roncone did not tell SA Burns that he wanted to leave or not answer any questions. (*Id.* at 57-58).

SA Burns explained to Roncone that the investigation related to Crystal Quinn, Frank Knight, and Howard Hinkle, and Roncone responded that "they all play cards together." (*Id.* at 60-61). SA Burns was seated in the front passenger seat, TFO Rondon was seated in the driver's seat, and Roncone was seated behind the driver's seat. (*Id.* at 63). SA Burns drafted the FBI 302 (Exhibit 1A) within hours of his interaction with Roncone. (*Id.* at 64). Roncone told SA Burns in response to SA Burns' questions that there were no drugs in the residence, but a number of firearms. (*Id.* at 68). Roncone referred to Simon Gogolack as a narcotics user and crazy (*id.* at 70-71), and stated that he learned of Crystal Quinn's death from Frank Knight (*id.* at 71). Roncone denied any knowledge about Crystal Quinn's death. (*Id.* at 71). Roncone explained how the former RBMC clubhouse (also his residence) near Scott Avenue in Wellsville had burned down and that the new clubhouse was a series of trailers and RVs at Alma Hill in Wellsville. (*Id.* at 65-67, 72).

About 20 minutes into the conversation, Roncone stated he wanted a lawyer. (*Id.* at 73, 76). Roncone was then re-handcuffed (in the front). (*Id.* at 75-76). SA Burns did not ask him any other questions about the case. (*Id.* at 78).

Roncone then said he wanted to call his employer to advise he may be late for work, and SA Burns facilitated that communication. (*Id.* at 77). SA Burns was then provided Roncone's cell phone by the SWAT team leader, and he walked it over to Roncone believing he would need to use Roncone's biometrics to unlock it (as permitted by the search warrant). (*Id.* at 81). But it was not password protected, to which SA Burns expressed surprise and Roncone stated that he had nothing to hide. (*Id.* at 82). As the search progressed, a plastic baggie with white powder was found in a drawer in what was believed to be Roncone's bedroom, and a tray with what appeared to be cocaine with Roncone's father's credit card was found in a safe. (*Id.* at 83). SA Burns took photographs of these items on his phone (Exhibit 2B). (*Id.* at 84-85). SA Burns returned to the vehicle where Roncone was seated and informed him that drugs were found in the residence. (*Id.* at 90-91). Roncone responded by pointing to the card as not being his, to which SA Burns responded by asking if he was trying to put this on his father, and Roncone responded "don't bring my dad into this." (*Id.* at 93). At around 10:30 a.m. or 10:45 a.m. that morning, Roncone was arrested, provided warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966), and transported away from the scene. (*Id.* at 94-96).

At no point during his interactions with Roncone did SA Burns yell or threaten him, and Roncone never appeared frightened or confused. (*Id.* at 93-94). That morning, there were never fewer than two officers or agents with Roncone. (*Id.* at 102-03). SA Burns

testified that Roncone was not provided *Miranda* warnings prior to his arrest because it was a voluntary interview and SA Burns had no indication that Roncone would be arrested (until the suspected drugs were found). (*Id.* at 110). SA Burns was wearing civilian clothing. (*Id.* at 113). SA Burns had a handgun concealed by his clothing. (*Id.* at 113). He did not display his firearm when interacting with Roncone. (*Id.* at 113-14). Similarly, TFO Rondon did not display his firearm to Roncone during the interview, and his firearm was not visible. (*Id.* at 114).

### B.    Roncone

Roncone testified on his own behalf at the suppression hearing. (*Id.* at 119). He testified that the affidavit he signed on July 2, 2025 (Exhibit A) reflected his memory of the events on December 7, 2023. (*Id.* at 122). Roncone testified that he did not believe he was free to leave when SA Burns was interviewing him in TFO Rondon's vehicle. (*Id.* at 123). Roncone explained:

> There was always someone next to me. There was obviously military guys that were around me when I first left the house. There was never a moment I was by myself or unsupervised and our conversation about work made me seem like I was pretty much stuck there until 9 o'clock.

(*Id.*). Roncone acknowledged that his handcuffs were switched to the front when he was originally placed in a vehicle, but he claims he remained handcuffed the entire time, even during SA Burns' pre-invocation interview. (*Id.* at 126-29, 139-40; *see* Ex. A at ¶ 6). Roncone testified that the only time the handcuffs were removed was when he was allowed to urinate at some point after the interview. (Dkt. 653 at 126-27). Roncone signed an

earlier affidavit on April 25, 2025, that does not address his handcuffing on December 7, 2023. (*Id.* at 134; *see* Ex. 10).

Roncone acknowledged that SA Burns told him that he did not have to speak with him. (Dkt. 653 at 137). He also acknowledged that SA Burns never threatened him, never raised his voice, and was polite and respectful. (*Id.* at 137-38). In fact, all the law enforcement officers were polite and respectful to him that morning. (*Id.* at 138). Roncone acknowledged that only SA Burns, TFO Rondon, and Roncone were in the vehicle during the pre-invocation interview. (*Id.* at 143). And Roncone largely conceded the accuracy of the interview discussion as testified by SA Burns. (*Id.* at 144-46).

Roncone conceded on cross-examination that he had wavered on whether he was handcuffed the entire time during his testimony. (*Id.* at 163-65; *see, e.g., id.* at 139 ("I'm pretty sure they [the handcuffs] were still on the whole time.")). And he conceded that he was uncertain. (*Id.* at 165).

### C.     TFO Rondon

TFO Rondon testified as a rebuttal witness for the government. (*Id.* at 168-69). He is an investigator with the New York State Police who was part of the FBI Organized Crime Task Force in December 2023. (*Id.* at 170, 173). His role on December 7, 2023, was to assist SA Burns to try to interview Roncone. (*Id.* at 175).

TFO Rondon first encountered Roncone that morning when Roncone was seated with handcuffs attached in the front in SA Taylor's vehicle in the fire department parking lot. (*Id.* at 175, 177). SA Burns and TFO Rondon introduced themselves to Roncone and moved him to TFO Rondon's vehicle (a Ford Explorer). (*Id.* at 178, 184). Roncone's

handcuffs were removed at this point and remained off during the interview. (*Id.* at 178, 180-81, 184, 187).

TFO Rondon was responsible for taking notes during the interview. (*Id.* at 180). No threats or intimidation tactics were used by TFO Rondon or SA Burns during the interview, and the demeanor of the interview was respectful. (*Id.* at 176). Roncone was told that he was not under arrest, he had been detained for safety purposes during the search warrant execution, and he did not need to speak to SA Burns and TFO Rondon. (*Id.* at 186).

But after Roncone stated he wanted an attorney and the interview terminated, TFO Rondon handcuffed Roncone. (*Id.* at 179, 181-82, 184). TFO Rondon testified on cross-examination that he would not have let Roncone walk off, and if Roncone had tried to do so he would have told him he needed to stay until the search was completed. (*Id.* at 189). This was different than SA Burns' testimony on the subject. (*Id.* at 101). In any event, Roncone never asked to leave. (*Id.* at 189).

## ARGUMENTS OF THE PARTIES

In his non-dispositive motions filed on April 16, 2025, Roncone sought suppression of the statements made on December 7, 2023 (Dkt. 403 at 15; Dkt. 421), and then on August 8, 2025, Roncone filed a dispositive motion also seeking suppression of the statements (Dkt. 536 at 9-10). Roncone argued for suppression based on the theory that he was in custody during the interview without being administered *Miranda* warnings. (*Id.*). In support of the later motion, Roncone attached both his initial affidavit and a new affidavit. (Dkt. 536-1; Dkt. 536-2). The government, while consenting to an evidentiary hearing,

argued that Roncone was not in custody during the pre-invocation interview for *Miranda* purposes, and that any statements made were voluntary.  (Dkt. 611 at 89-95).

At the start of the evidentiary hearing, the parties agreed that the issues to be resolved by the Court were Fifth Amendment-related, not Sixth Amendment.  (Dkt. 653 at 6).  After the hearing, the parties submitted post-hearing briefing on the issues.  (Dkt. 680 (government's post-hearing memorandum); Dkt. 681 (Roncone's post-hearing memorandum); Dkt. 706 (Roncone's reply letter); Dkt. 709 (government's reply letter)).  Oral argument was held before the undersigned on December 22, 2025, at which time the Court reserved decision.  (Dkt. 720).

The government seeks to utilize only the pre-invocation statements as part of its case-in-chief—in other words, any statements attributable to Roncone before he stated he wanted to speak to his lawyer.  As framed by the government, those statements must be analyzed under both a *Miranda* and voluntariness framework.  (Dkt. 680 at 2 n.2).  The post-invocation statements would be used by the government only for impeachment purposes, and thus they must be analyzed for voluntariness.  (*Id.*).  Roncone argues that the statements during the interview by SA Burns were obtained while he was in custody, and further that all statements were obtained involuntarily.  (Dkt. 681; Dkt. 706).

### FINDINGS OF FACT AND LEGAL CONCLUSIONS

The statements attributable to Roncone on December 7, 2023, can be broken down into three segments: (1) statements made upon his emergence from his residence when confronted by the SWAT team members and before he was placed in TFO Rondon's vehicle and interviewed by SA Burns; (2) statements made during the interview in TFO

Rondon's vehicle during the interview by SA Burns prior to invoking his right to counsel; and (3) statements made after Roncone invoked his right to counsel.  The government has represented that it is seeking to use only the second category of statements as part of its case-in-chief.  Therefore, whether Roncone was in custody during the pre-invocation interview is a threshold inquiry on the motion to suppress.  And with respect to all the statements, including categories one and three that the government may seek to use for impeachment purposes only, the inquiry is whether the statements were voluntary.

A.    **Summary of Credible Evidence**

The events of December 7, 2023, are largely undisputed, except for whether Roncone was handcuffed during the interview by SA Burns.  Based on its assessment of the witness testimony, including the substance of the answers and the witnesses' demeanor while testifying, the Court concludes that Roncone was *not handcuffed* during the interview.  The Court bases this conclusion on its assessment of the credible evidence admitted at the hearing—finding that SA Burns and TFO Rondon credibly testified that Roncone was uncuffed during the interview in TFO Rondon's vehicle, and that Roncone's equivocal statements about the continued presence of handcuffs were not credible.  Thus, the Court's summary of its factual findings based on the credible evidence is as set forth below.

On December 7, 2023, Roncone was awakened by the FBI SWAT Team announcing that they were executing a search warrant at his residence on 4998 Williams Street in Lancaster, New York.  Roncone and his father were given time to voluntarily exit the premises which took about 15 minutes.  Roncone was handcuffed upon exiting the

premises for safety purposes and then placed in SA Taylor's vehicle located across the street in the volunteer fire department parking lot about 100 feet away. Roncone's father was secured safely in another vehicle and the law enforcement representatives were polite and respectful at all times. At one point Roncone even joked with the agents about needing man-size handcuffs and at no point during the morning was he threatened, intimidated, or yelled at. Roncone did not appear frightened, upset, or confused.

About 15 minutes after Roncone exited the residence, SA Burns and TFO Rondon moved him into the back seat of TFO Rondon's Ford Explorer and removed the handcuffs. SA Burns explained to Roncone that he was not under arrest (and repeated this statement), that he had been handcuffed for safety reasons related to execution of the search warrant, and that he did not need to speak with them. Neither SA Burns nor TFO Rondon revealed their weapons to Roncone. Roncone was not provided with *Miranda* warnings before the interview. No threats or use of force were used by either SA Burns or TFO Rondon, the conversation was polite and calm, and Roncone did not appear frightened, intimidated or confused.

The interview by SA Burns lasted about 20 minutes, at which point Roncone stated he wanted a lawyer. Roncone was then re-cuffed with his hands in the front and the interview ended. Roncone was never told that he was free to leave, but he also never asked to leave. Instead, SA Burns facilitated communication with his employer about being late for work.

It was not until drugs were located in the residence that probable cause arose to arrest Roncone.   At that point, after the exchange between SA Burns and Roncone concerning the drugs, Roncone was arrested and provided *Miranda* warnings.

### B.    Roncone Was Not "In Custody"[2]

"*Miranda*'s warning requirements apply only to 'custodial interrogation.'"  *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004).  The Supreme Court has explained:

> "Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

*J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (citation omitted).  "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' herself to be "'subjected to restraints comparable to those associated with a formal arrest.'"  *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (second alteration in original) (citations omitted).  The Second Circuit has described the test for determining custody status as asking "(1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue,' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated

---

2    The Second Circuit has not definitively resolved which party bears the burden to establish that a defendant is (or is not) in custody for *Miranda* purposes.  *See United States v. Beal*, 730 F. App'x 30, 33 n.2 (2d Cir. 2018); *United States v. Simmonds*, 641 F. App'x 99, 102 (2d Cir. 2016).  In this case, no matter which party bears the burden of proof, the Court concludes that Roncone was not in custody.

with formal arrest.'"  *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (citation omitted).  While both parts of the test must be satisfied to conclude that an individual is in custody, the second question is the "ultimate inquiry" because the first question only reveals whether the individual was seized and "[n]ot all seizures amount to 'custody'; a seizure is a necessary, but not sufficient, condition."  *Id.*

To answer that second and ultimate question—whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest—courts must "conduct an objective examination of 'all the surrounding circumstances.'"  *United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017) (quoting *Faux*, 828 F.3d at 135)).  To conduct this objective inquiry, the Second Circuit has advised courts to consider various factors including:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*Id.* at 174 (quoting *Faux*, 828 F.3d at 135)).

"[T]he 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant."  *J.D.B.*, 564 U.S. at 271 (citation omitted).  That said, "an officer's knowledge or beliefs 'may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned,' but 'only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'"  *Faux*, 828 F.3d at 135 (citation omitted).

- 14 -

"[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Newton*, 369 F.3d at 675. "Only in extreme or unusual circumstances have courts held that suspects interrogated in their homes were restricted to a degree comparable to that of an individual placed under formal arrest." *United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (collecting cases, ranging from suspect being told he was under arrest and not free to leave to suspect being handcuffed). *Cf. Faux*, 828 F.3d at 135-36 ("The home is 'the most constitutionally protected place on earth'; thus, the right to terminate the interrogation and be 'free to leave' is 'hollow' if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home. At the same time, courts rarely conclude, absent a formal arrest, that a suspect questioned in her home is 'in custody.'" (internal citation omitted)); *United States v. Valerio*, 765 F. App'x 562, 565-66 (2d Cir. 2019) (defendant not in custody when questioned while a dozen officers were executing search warrant in his home because defendant was asked, not directed, to sit for interview in dining room; he was not threatened or told he was not free to leave; he was not handcuffed and remained calm throughout the interview).

On the other hand, that an interview takes place at a police station does not, standing alone, demonstrate that an individual is "in custody." "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody,'" and "police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *See*

*also United States v. Wallace*, 178 F. App'x 76, 79-80 (2d Cir. 2006) (explaining that "there is no requirement that the Miranda warning be given merely because the interview takes place at the police station," and finding that the defendant, who had not been arrested or searched, and was questioned in a room with an open door and told he was free to leave at any time, was not in custody); *United States v. Rogers*, No. 99 Cr. 710(CM), 2000 WL 101235, at *12 (S.D.N.Y. Jan. 27, 2000) ("In the context of determining whether an individual is in custody under the Fifth Amendment, the courts have long recognized that the setting of a police station or a police interrogation room, without more, is not so coercive as to preclude a reasonable person from feeling free to leave."), *aff'd*, 225 F.3d 647 (2d Cir. 2000).

The fact that handcuffs were initially used for officer safety purposes upon execution of the search warrant, does not determine custody status at the time of a later interview if the handcuffs have been removed. *United States v. Familetti*, 878 F.3d 53, 61 (2d Cir. 2017) ("[The defendant's] initial restraints cannot establish a state of custody for the duration of his interactions with the police."); *see Simmonds*, 641 F. App'x at 102 ("Although the use of firearms is generally an important factor in our analysis of the totality of the circumstances, the fact that the officers initially used firearms and briefly searched [defendant] does not compel a conclusion that the ensuing interrogation was custodial, especially where the use of firearms was 'necessitated by the officers' safety concerns' and ended 'as soon as . . . the perceived security threat abated.'" (citation omitted)); *United States v. Cota*, 953 F.2d 753, 758-59 (2d Cir. 1992) (concluding that defendant was not in custody where "the initial use of guns and handcuffs [was] necessitated by the officers'

safety concerns, but the handcuffs were removed as soon as the car was examined and the perceived security threat abated"); *United States v. Bershchansky*, 958 F. Supp. 2d 354, 383 (E.D.N.Y. 2013) ("Even the use of handcuffs prior to an interrogation, however, does not automatically render the interrogation custodial."), *aff'd*, 788 F.3d 102 (2d Cir. 2015).

In this case, based on the evidence discussed above, the Court concludes that while a reasonable person in Roncone's position may not have understood he was free to leave the scene on December 7, 2023 (indeed, SA Burns and TFO Rondon gave conflicting information on whether Roncone was free to leave), the ultimate inquiry—whether a reasonable person in Roncone's position would have understood himself to be subjected to restraints comparable to those associated with a formal arrest—must be answered in the negative. The Court bases that conclusion on several key facts.

First, the interview by SA Burns was short—a total of around 20 minutes. Second, the credible evidence supports a finding that restraints were not used during the interview; similarly, no threats or use of force were used by either SA Burns or TFO Rondon. Third, while Roncone was never told he was free to leave, he was repeatedly told he was not under arrest, he was told he did not have to answer the questions posed by SA Burns, and Roncone never asked to leave. Indeed, the fact that there was discussion about Roncone contacting his employer supports a finding that while it was objectively reasonable to believe he may be late for work, it was not reasonable to believe he was arrested so as to prevent his attendance at work altogether. Even Roncone's testimony supports that conclusion. (*See* Dkt. 653 at 123 (Roncone testifying that he believed he was "stuck there until 9 o'clock")).

Fourth, while both SA Burns and TFO Rondon were armed, neither showed their weapons, and they were dressed in civilian clothing.

The Court acknowledges that Roncone did not volunteer for the interview, but again, he was told he did not have to answer the questions being asked. And in terms of the location, while the interview did not take place inside Roncone's residence, it took place in an unmarked vehicle (TFO Rondon's Ford Explorer) parked in the parking lot across the street from Roncone's residence. Given that even interviews taking place at a police station can be non-custodial, as discussed by the caselaw cited above, the location of the interview supports the Court's conclusion that it was non-custodial. *See United States v. Nahkai*, 139 F.4th 859, 869-70 (10th Cir. 2025) (reversing district court's suppression order and finding that questioning in unmarked police vehicle outside home with no physical restraints not custodial interrogation); *United States v. Hoeffener*, 950 F.3d 1037, 1046 (8th Cir. 2020) (finding defendant not in custody during in-vehicle questioning for purposes of *Miranda*, while search warrant was being executed at defendant's home, citing to fact that defendant was not handcuffed, did not ask to leave vehicle at any point, and conversation was polite). This conclusion of non-custodial status while interviewed in TFO Rondon's Ford Explorer is further supported by the fact that the evidence supports a conclusion that Roncone, like his father, was placed in a vehicle for protection against the lousy weather that morning (rather than some attempt to confine him throughout the interview).

Accordingly, based on the Court's consideration of all the circumstances surrounding the interview of Roncone by SA Burns, it concludes that objectively a person

in Roncone's position would not have understood his freedom of action to have been curtailed to a degree associated with formal arrest. As a result, *Miranda* warnings were not required before Roncone was interviewed by SA Burns.

### C.    Roncone's Statements Were Voluntary

Having determined that Roncone's pre-invocation statements were non-custodial, the Court next assesses whether his statements on December 7, 2023, during all three phases of the exchanges with law enforcement, were voluntary.[3]

"When . . . a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue before the court is whether the statements were voluntary, *i.e.*, the 'product of an essentially free and unconstrained choice by [their] maker,' or coerced by police activity in violation of constitutional rights not to incriminate oneself and due process. . . ." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (alteration in original) (citations omitted). "'[C]oercive police activity' is a 'necessary predicate' to holding a confession constitutionally involuntary," and a court is required to "make 'specific findings . . . that under the totality of the circumstances . . . the defendant's will was overborne by the [police] conduct.'" *Id.* (second alteration in original) (citations

---

[3]    As the government has acknowledged, it only would seek to use Roncone's statements during the first and third segments of the interactions with law enforcement for impeachment purposes if Roncone testifies at trial. *See Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."). Thus, the Court assesses all statements made by Roncone on December 7, 2023, for voluntariness.

omitted); *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) ("Incriminating statements made in non-custodial settings are inadmissible if the statements were not made voluntarily—that is, if the defendant's 'will was overborne.'").  In determining whether a confession is voluntary, "[t]here is only one guide—the totality of the circumstances rule." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).  "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 901-02.  The government bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004).

The Court easily concludes that Roncone's statements on December 7, 2023, were voluntary.  The interactions during the first phase of the encounter on December 7, 2023, are captured on the body worn camera video admitted into evidence as Exhibit 6C.  Despite the presence of armed agents in tactical gear with weapons, the interactions involving Roncone were calm, respectful, and cordial.  Roncone, who plainly had a great deal of familiarity with firearms, did not appear intimidated or threatened in any way by the situation, and in fact at one point is observed joking with the agents.

During the pre-invocation interview by SA Burns, Roncone similarly was not coerced into providing the statements.  Rather, they were made voluntarily.  Roncone was advised by SA Burns that he did not need to answer the questions; the conversation was polite, calm, and non-threatening; Roncone did not appear frightened or intimidated and at

no point was he threatened by SA Burns or TFO Rondon; Roncone did not appear confused nor did he reveal a lack of understanding of the situation; the conversation took place in a non-custodial setting in TFO Rondon's unmarked Ford Explorer, across the street from Roncone's residence; SA Burns and TFO Rondon were dressed in civilian clothing and did not display their weapons; and about 20 minutes into the conversation, Roncone brought it to a halt when he asked for his attorney.  Under the circumstances, Roncone's will was not overborne and he made the statements voluntarily.

Finally, the statements made by Roncone after he asked for his attorney were similarly not coerced in a way that would make them involuntary.  The setting was the same as the pre-invocation statements, except that Roncone was in handcuffs.  But there was no coercive conduct by law enforcement rendering Roncone's statements non-voluntary.  Although SA Burns confronted Roncone at one point with the drugs found in the residence and expressed disappointment that Roncone could be attempting to blame his father for the drugs, that conduct does not come anywhere close to coercive police conduct that would render the statements involuntary.  In other words, SA Burns' expression of disappointment or even disdain that Roncone was attempting to blame his father for the drugs does not change the conclusion that Roncone's statements were "the product of a free and deliberate choice rather than intimidation, coercion, or deception. . . ." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023).  In fact, even if SA Burns had threatened to arrest Roncone's father (he did not), that likely would not have amounted to coercion given the probable cause that arose for an arrest upon discovery of the drugs. *See United States v. Zimmerman*, 480 F. Supp. 3d 446, 455-56 (E.D.N.Y. 2020) ("While 'no

federal court has yet held that a confession or consent is involuntary solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible confinement,' neither the Second Circuit nor the Supreme Court has 'squarely addressed whether threats to charge third-parties amount to coercion.' However, 'several . . . district courts within this circuit have held that 'such a threat does not render a confession involuntary if the police have probable cause to arrest the family member and thus could lawfully carry out the threat.'" (citations omitted)); *United States v. Fable*, No. 3:18-CR-00003 (JCH), 2018 WL 3727346, at \*10 (D. Conn. July 24, 2018) ("While the Second Circuit has never squarely addressed whether a threat to a third party renders a suspect's confession involuntary, other district courts in this Circuit have concluded that it is not coercive to threaten to arrest a suspect's family members if the police have probable cause to carry out the arrest.").

Accordingly, under the totality of the circumstances, Roncone's statements on December 7, 2023, were voluntary.

## CONCLUSION

For the foregoing reasons, Roncone's motion to suppress the statements made on December 7, 2023 (Dkt. 536), is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:     March 20, 2026
           Rochester, New York

- 22 -