IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SIMON GOGOLACK, et al.,

Defendants.

23-CR-99-EAW
**(filed under seal)**

---

## GOVERNMENT'S SEALED PRE-TRIAL MEMORANDUM OF LAW REGARDING GERACE ATTORNEY-CLIENT PRIVILEGE ISSUES AND FORFEITURE BY WRONGDOING

MICHAEL DiGiacomo
United States Attorney

BY:   s/ CASEY L. CHALBECK
s/ NICHOLAS T. COOPER
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov

**Table of Contents**

I. ████████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████ ............... 1

    A.    Factual Background ................................................................. 1

    B.    Legal Framework ................................................. 36

    C.    Application ...................................................... 48

II.    Crystal Quinn's Testimonial Statements are Admissible Under Forfeiture by Wrongdoing .......................................................................... 92

    A.    Factual Background ........................................................ 92

        1.    Testimonial Statement: January 24, 2023 – Interview of Crystal Quinn .............. 92

        2.    Testimonial Statement: February 7, 2023 – Arrest of Crystal Quinn ................... 93

        3.    Testimonial Statement February 16, 2023 – Proffer Interview of Crystal Quinn .. 94

        4.    Non-Testimonial Statements: February 16, 2023 – Attorney Cohen Instructs Attorney Michael Bly to Contact Crystal Quinn ....................................... 95

        5.    Testimonial Statement: February 23, 2023 – Proffer Interview of Crystal Quinn. 97

        6.    Testimonial Statement: February 27, 2023 – Proffer Interview of Crystal Quinn. 98

        7.    Testimonial Statement: March 7, 2023 – Proffer Interview of Crystal Quinn ...... 99

        8.    Testimonial Statement: March 9, 2023 – Crystal Quinn Grand Jury Testimony . 99

        9.    Testimonial Statement: March 14, 2023 – Crystal Quinn Alerts FBI about Dead Rats 102

        10.    Testimonial Statement: Follow-Up Interview ............................................... 102

        11.    Non-Testimonial Statement: March 22, 2023 – Crystal Quinn Alerts FBI about Injured Dog ........................................................................... 103

        12.    Testimonial Statement: March 22, 2023 – Follow-Up Interview with Crystal Quinn about Injured Dog ............................................................... 103

        13.    Testimonial Statement: April 6, 2023 – Crystal Quinn provides Router Information to FBI ..................................................................... 104

        14.    Testimonial Statement: June 9, 2023 – Security Camera Installed at Crystal Quinn Residence ................................................................ 104

██     ████████████████████████████████

████████

16. Non-testimonial statement: July 2023 – Crystal Quinn Statements about Price on her Head ...................................................................................................105

17. Non-testimonial statement: July 2023 – Crystal Quinn Statements regarding Trip to Wellsville with Simon Gogolack ...............................................................106

18. Non-testimonial statement: July 27, 2023 – July 30, 2023 – Crystal Quinn Statements During Time in Wellsville with Simon Gogolack...................................107

19. Non-testimonial statements: July 20, 2023 – July 30, 2023 – Crystal Quinn Statements to Simon Gogolack via Text Message...................................................109

B. Legal Frameworks .................................................................................109

 1. Forfeiture by Wrongdoing................................................................109

 2. Other Hearsay Exceptions and Non-Hearsay ..................................................111

C. Application...................................................................................112

 1. The Government's Abbreviated Offer of Anticipated Proof Shows that Messrs. Gerace, Ermin, Roncone, Hinkle, and Gogolack Caused Ms. Quinn's Unavailability with the Intent of Preventing Her From Testifying at Trial and Cooperating with Federal Law Enforcement. ...................................................................................112

III. CONCLUSION .................................................................................129



1







5



7





























15.

20







24







18.













































Here,









”).



















































## II.    Crystal Quinn's Testimonial Statements are Admissible Under Forfeiture by Wrongdoing

This brief proceeds in three parts. First, it sets forth the relevant testimonial and non-testimonial statements Crystal Quinn made to law enforcement and others. Second, it outlines the governing legal framework, including the doctrine of forfeiture by wrongdoing as well as the applicable hearsay and non-hearsay bases for admission.[22] Lastly, it applies forfeiture by wrongdoing principles to the record here and explains why Ms. Quinn's statements are admissible pursuant to Rule 804(b)(6). [23]

### A.    Factual Background

### 1.    Testimonial Statement: January 24, 2023 – Interview of Crystal Quinn

On January 24, 2023, FBI Special Agents Jason Kammeraad and Anthony Butera served Ms. Quinn with a "Target Letter" related to a witness tampering incident in which a witness against Mr. Gerace in a sex trafficking investigation, P.H., received a threatening, hostile message from Ms. Quinn through a third party's Facebook account. *See* EXHIBIT 27 (FBI 302 "Interview of Crystal Quinn – 1/24/2023" (GOV-00037009)).  The contents of the Facebook message identified Ms. Quinn as the author.

---

[22]    For the purposes of conducting a forfeiture by wrongdoing analysis, it is unnecessary to resolve to what extent, if any, Ms. Quinn's non-testimonial statements are admissible pursuant to a hearsay exception.  The government anticipates that many of the hearsay determinations will need to be made during trial, at which time witnesses will testify to Ms. Quinn's state of excitement while making the statements.  Accordingly, this brief does not fully address the admissibility—pursuant to various hearsay exceptions—of Ms. Quinn's non-testimonial statements.

[23]    The following discussion of Ms. Quinn's statement is not intended to be exhaustive and the government reserves it right to seek to introduce all of Ms. Quinn's statements documented in the attached and referenced in this brief.  In other words, the government should not be limited to seeking in only the specific quotations referenced in this brief.

Upon receipt of the letter, Ms. Quinn told the agents that at the time the Facebook messages were sent, she was with Mr. Gerace and another individual, C.C.  Ms. Quinn informed the agents that it was actually C.C. who authored those messages.  *Id.*  Ms. Quinn went on to briefly describe her relationship with Mr. Gerace before explaining  she was "in fear of cooperating with law enforcement" because she believed "the Outlaws will kill her, her dogs, and her mother."  *Id.*  Ms. Quinn further stated that "the Outlaws have a rule of conduct that she is aware of and that she knows what happens to those that cooperate with law enforcement."  *Id.*  Ms. Quinn advised that she "turned a blind eye" when it came to the Outlaws activities and Mr. Gerace's activities at Pharoah's Gentleman's Club.  *Id.*  Ms. Quinn indicated that she knew Mr. Ermin, whom she identified as "Tommy O," to be the president of the Outlaws and Pharoah's manager.  *Id.*  Ms. Quinn reiterated that her "main concern is the Outlaws."  *Id.*  Ms. Quinn also  stated that she did not believe she had otherwise communicated with any of Mr. Gerace's lawyers.  *Id.*  Ms. Quinn noted that she was represented by Michael D'Amico, Esq., at which point the agents spoke with Mr. D'Amico and informed him of the nature of their interaction with Ms. Quinn.  *Id.*

### 2.    Testimonial Statement: February 7, 2023 – Arrest of Crystal Quinn

On February 7, 2023, FBI Special Agents arrested Ms. Quinn at her home in relation to a Criminal Complaint (Case No. 23-MJ-11) charging her with three counts of witness tampering related to the Facebook message she sent to P.H. while she was with Mr. Gerace on November 19, 2019. [24]  During her arrest, Ms. Quinn made statements about: (i) bringing her prescription medication to the jail (*see* EXHIBIT 28, FBI 302 "Arrest of Crystal

---

[24]    The Criminal Complaint was produced as Rule 16 discovery (GOV-00030650) in the instant matter, Case No. 23-CR-99.  A copy of the Second Superseding Indictment in Case No. 19-CR-227 was attached as an Exhibit in support of the Criminal Complaint charging Ms. Quinn.

Quinn"(GOV-00037178)); (ii) blaming her attorney for her arrest (*see* EXHIBIT 29, FBI 302 "Events of 2_7_23 at residence of Crystal Quinn" (GOV-00037182)); (iii) her mental state at the time (*see* EXHIBIT 30, FBI 302 "Spontaneous Utterance by Crystal Quinn" (GOV-00000092)); and, (iv) that Mr. Gerace contacted her shortly after the last time that she spoke with her attorney, Mr. D'Amico, which she found weird. *Id.*

### 3.    Testimonial Statement February 16, 2023 – Proffer Interview of Crystal Quinn

On February 16, 2023, FBI Special Agents and Assistant United States Attorneys met with Ms. Quinn and Mr. D'Amico and executed a proffer agreement. *See* EXHIBIT 31 (FBI 302 "Proffer Interview of Crystal Quinn on 2/16/23" (GOV-00037327)). At the outset of the interview, Ms. Quinn expressed concerns for her safety in relation to being a witness/cooperator in the investigation into Mr. Gerace and Pharoah's because (i) she was followed while leaving her attorney's office before her arrest; (ii) Mr. Gerace texted her about the investigation; and, (iii) attorney ▮▮▮▮▮▮▮ texted her regarding the case. *Id.* During the proffer interview, Ms. Quinn ultimately admitted to sending the threatening messages to P.H. on November 19, 2019. *Id* at 3. Ms. Quinn stated she was with Mr. Gerace on November 19, 2019, and that Mr. Gerace said P.H. was a "piece of shit" and a "snitch bitch." *Id.* Ms. Quinn explained that Mr. Gerace told her P.H. "snitched" after "being in a cell for 3 days" and "broke" before giving information to the "Feds" regarding Mr. Gerace and Pharoah's. *Id.* at 3, 4. Ms. Quinn clarified that the term "narc" meant the same thing as a "snitch" and that "bad things happen to snitches." *Id.* Ms. Quinn told investigators Mr. Gerace said "K.L., P.H., and K.N. were all snitches." *Id.* at 4.

Ms. Quinn also told investigators about highly incriminating admissions that Mr. Gerace made to her regarding his relationship with his then-co-defendant, former DEA agent

Joseph Bongiovanni.  Specifically, Mr. Gerace told Ms. Quinn that  Mr. Bongiovanni was "protecting" Mr. Gerace and Pharoah's by "feeding the DEA false info so that the DEA would not look into Gerace or PGC." *Id.* at 5–6.  Ms. Quinn also described how Mr. Gerace directed the Pharoh's manager to "get her out of the club" after a dancer overdosed. *Id.* at 7.

**4.    Non-Testimonial Statements: February 16, 2023 – Attorney Cohen Instructs Attorney ▮▮▮▮▮▮ to Contact Crystal Quinn**

On February 16, 2023, ▮▮▮▮▮▮, Esq., sent the below-depicted text messages (GOV-00037006–008) to Crystal Quinn:





95



On March 29, 2023, Mr. D'Amico advised FBI Special Agents that he had been in contact with Mr. Cohen between April and May **2022** regarding his [D'Amico's] representation of Ms. Quinn. Mr. D'Amico further explained that he initially scheduled but later canceled, a meeting between Ms. Quinn and Mr. Cohen. Mr. D'Amico confirmed to

agents that the meeting was never rescheduled.  *See* EXHIBIT 32 (FBI 302 "Interview of Michael D'Amico 3-29-23").

Also on March 29, 2023, FBI Special Agents interviewed ███████████████████ ███████.  ███████ advised the FBI that his February 16, 2023, text messages to Ms. Quinn were prompted by a phone call he received from Mr. Cohen.  ███████ stated that Mr. Cohen called him and asked if he ███ was representing Ms. Quinn, to which ███████ replied that he did not represent Quinn at this time.  ███████ stated that Mr. Cohen asked him to "reach out to Quinn" because Mr. Cohen was "concerned that the feds might be trying to intimidate Quinn or bring Quinn in for questioning."  ███████ stated that he did not know Mr. Cohen prior to receiving that phone call from him.  *See* EXHIBIT 33 (FBI 302 "Interview of ███████ ███████ 3-29-23").

### 5.    Testimonial Statement: February 23, 2023 – Proffer Interview of Crystal Quinn

On February 23, 2023, FBI Special Agents and Assistant United States Attorneys met with Ms. Quinn and Mr. D'Amico pursuant to a previously executed proffer agreement.  *See* EXHIBIT 34 (FBI 302 "Proffer Session Two – Crystal Quinn – 02/23/2023" (GOV-00037038)).  During that meeting, Ms. Quinn described Mr. Gerace instructing her to provide free drinks to Mr. Bongiovanni at Pharoah's.  *Id*. at 1.  Ms. Quinn advised that when she saw a news report referencing Mr. Bongiovanni's arrest, she called Mr. Gerace and asked him "What is going on with the news" and that Mr. Gerace responded by stating that he did not want to talk on the phone and that they could talk at his place.  *Id*.  Ms. Quinn went on to describe that when she next saw Mr. Gerace in person, Mr. Gerace confided in her that Mr. Bongiovanni was protecting him by "lying to the feds and giving them false information to steer them away from me and my bar."  *Id*.  Mr. Gerace went on to state that "[Bongiovanni]

97

got sloppy." *Id*. Ms. Quinn also went on to describe details of an overdose that she observed at Pharoah's, *id.* at 3–4, and meetings she observed Mr. Gerace have at his house which she described as "mob meetings" where Mr. Gerace would tell her "[y]ou can't be at the house when they arrive and if they see you here there's going to be a problem," *id.* at 8.

### 6.    Testimonial Statement: February 27, 2023 – Proffer Interview of Crystal Quinn

On February 27, 2023, FBI Special Agents and Assistant United States Attorneys met with Ms. Quinn and Mr. D'Amico pursuant to a previously executed proffer agreement. *See* EXHIBIT 35 (FBI 302 "Proffer Session Three – Crystal Quinn – 02/27/2023" (GOV-00037060)). At the outset of the interview, Ms. Quinn advised that one of her dogs recently found a rat in her yard and brought it inside of her house. *Id*. at 1. Ms. Quinn also described an instance where she observed a "doped out white girl" upstairs with Gerace and other men. *Id*. at 2–3. Ms. Quinn described that the "white girl was on someone's lap with a guy smacking her ass" and that this made Ms. Quinn upset because of "how out of it [the white girl] was". *Id*. Ms. Quinn described telling Mr. Gerace that she was going to go downstairs with the white girl, to which Mr. Gerace responded, "fuck you" and told her that she "better bring someone else back up." *Id*.

Ms. Quinn described that she had previously been to the Outlaws MC Clubhouse with P.R. and C.B.,[25] and that everyone who entered the clubhouse had to turn in their cellphone at the door. *Id*. at 5. Ms. Quinn described that when she was at the Outlaws Clubhouse, she would consume cocaine, and, on one occasion, had a seizure there from consuming cocaine. *Id*. Ms. Quinn stated that she had previously dated both P.R. and C.B. *Id*.

___

[25]    P.R. and C.B. are both known to law enforcement to be members of the Outlaws Motorcycle Club.

7.      **Testimonial Statement: March 7, 2023 – Proffer Interview of Crystal Quinn**

On March 7, 2023, FBI Special Agents and Assistant United States Attorneys met with Ms. Quinn and Mr. D'Amico pursuant to a previously executed proffer agreement. *See* EXHIBIT 36 (FBI 302 "Proffer Interview of Crystal Quinn" (GOV-00037077)). In addition to previously discussed topics, Ms. Quinn stated that C.B., whom she dated for a short time, is a member of the Outlaws that works in construction, and that his "Outlaws number" is "21." *Id.* at 4. Ms. Quinn also stated that she did not believe that Mr. Gerace is a member of the Outlaws, nor does she believe that he has an Outlaws tattoo. *Id.* at 4. Ms. Quinn stated that she knew Mr. Gerace rode his motorcycle with the Outlaws MC "during their yearly pig roast." *Id.* Ms. Quinn also stated that her father was friends with John Ermin a/k/a "Tommy O". *Id.* Ms. Quinn also described how Mr. Gerace would retaliate against dancers at Pharoah's who "turned him down" by causing managers at the club to "bother the girls about every little thing" and "put [the dancer] on the dayshift" which would "cause them to earn less money, and they would either quit or sleep with him." *Id.* at 5.

8.      **Testimonial Statement: March 9, 2023 – Crystal Quinn Grand Jury Testimony**

On March 9, 2023, Ms. Quinn appeared before a federal Grand Jury in the Western District of New York and offered sworn testimony. *See* EXHIBIT 37 (Crystal Quinn Grand Jury Trans., March 9, 2023 (GOV-00037352)). Ms. Quinn testified about her pending case, her agreement to cooperate with the government, and her hope that cooperating would result in a benefit for her in her pending case. *Id.* at 2–5. Ms. Quinn discussed the medications that she was taking at the time. *Id*. at 7–9.

Ms. Quinn also testified about her history of working at Pharoah's when she was 19 to 21 years old, and the history of her relationship and affiliation with Mr. Gerace. *Id*. at 9–

12.    Ms. Quinn described her substance abuse diagnosis, and her history of drug use, to include drug use at Pharoah's and her drug use with Mr. Gerace. *Id.* at 14–20. Ms. Quinn testified about Mr. Gerace's operational control over Pharoah's, and about some of the employees, including Mr. Ermin and other members of the Outlaws Motorcycle Club. *Id*. at 21–22. Ms. Quinn described her observations of drug use at Pharoah's, including at least one overdose, and about Mr. Gerace's unofficial policy for employees not to call the police. *Id.* at 22–26. Ms. Quinn described Mr. Gerace's response to an overdosing dancer at the club, telling the manager to "Get her out of my club", which she overheard while Mr. Gerace was on speakerphone. *Id*. at 26–28. Ms. Quinn also described an occurrence of a dancer she knew to be high on heroin being in the private upstairs area at Pharoah's with Mr. Gerace and others. *Id.* at 29–30.

Ms. Quinn testified about Mr. Gerace's relationship with Mr. Bongiovanni, including that he was to be given free drinks and free dances, and that employees were instructed to "take care of him when he comes there." *Id*. at 39–40. Ms. Quinn testified about discussing Mr. Bongiovanni's arrest with Mr. Gerace, and Mr. Gerace's admission that Mr. Bongiovanni was "giving the FBI false statements to keep them from coming to the club as long as he [Mr. Gerace] took care of him [Bongiovanni]." *Id*. at 41–42. Ms. Quinn testified that once Mr. Bongiovanni was arrested, she believed that Mr. Gerace thought that he, too, was under investigation. *Id*. at 43. Ms. Quinn described how Mr. Gerace would make comments to her about people that he thought were "snitching" on him, including P.H. and Mr. Bongiovanni. *Id*. Ms. Quinn testified that "snitching" refers to someone who is "speaking with the police" or telling on other people. *Id*. at 44.

Ms. Quinn described Mr. Gerace's comments about P.H. providing law enforcement with information about him, and that Mr. Gerace stated words to the effect of "she snitched to the FBI". *Id.* at 45–46. Ms. Quinn testified about P.H.'s history with Mr. Gerace, and the likelihood that she had observed Mr. Gerace involved in illegal activity including cocaine distribution. *Id.* at 47. Ms. Quinn testified that if P.H. provided that information about Mr. Gerace to the government, that would be snitching, and that snitching could get someone in trouble, "not with the government, with that person." *Id.* at 48. Ms. Quinn testified that Mr. Gerace had discussed P.H. being a snitch prior to the events of November 19, 2019. *Id.* at 48–49. Ms. Quinn described how, on November 19, 2019, Mr. Gerace distributed cocaine to her and talked to her about how P.H. was "a snitch bitch", causing Ms. Quinn to get angry and send threatening messages to P.H. including, *inter alia*, calling her a "snitch junkie cunt." *Id.* at 49–56. Ms. Quinn testified that she would not have sent the messages to P.H. that night if Mr. Gerace had not fueled her with cocaine and alcohol and "pumped her up" by referring to P.H. as a "snitch bitch". *Id.* at 56–57.

Ms. Quinn also testified about concerning text messages that she received after her arrest but before her first meeting with the government on February 16, 2023. *Id.* at 59. Ms. Quinn described how, shortly after she left her attorney's office, she received text messages from ███████ telling her that Mr. Cohen was "interested in [her] wellbeing." *Id.* Ms. Quinn described that she knew ██████ from "just him being in Buffalo" and from socializing at bars, but that she never used him on a case. *Id.* at 60. Ms. Quinn knew ██████ to be an attorney who also had a band that played at local bars. *Id.* Ms. Quinn identified the text messages that ██████ sent to her, which she ultimately forwarded to her attorney. *Id.* at 60–61. Ms. Quinn testified about receiving the message from ██████ indicating that Mr. Cohen

101

had asked for ████ to reach out to her out of concern that the "feds might be trying to intimidate you or even just bring you in for questioning." *Id.* at 62. Ms. Quinn described how one of her responses to ████ where she stated "by the way, never used him for an attorney. That's bullshit." was actually intended for her attorney, Mr. D'Amico, but was accidentally sent to ████. *Id.* at 63–64. Ms. Quinn testified that she found it odd that this attorney reached out to her out of the blue, and that it concerned her and scared her and caused her to be afraid to even go to her attorney's office. *Id*. at 64–65.

**9.    Testimonial Statement: March 14, 2023 – Crystal Quinn Alerts FBI about Dead Rats**

On March 14, 2023, FBI Special Agent Brian Burns received a text message from Ms. Quinn stating:

> Hi Brian Crystal Quinn here Mike D'Amicko [sic] my attorney told me to call u to let u know 2 different rats where [sic] thrown on my car and my roomates truck so if u can get back to me all I know is I'm trusting my attorney and he told me to call the nice guy I'm not terrified of and that would be you so if u can get back to me please thank u.

*See* EXHIBIT 38 (FBI 302 "Events of 3/14 to 3/15 re Crystal Quinn residence and dead rat threat" (GOV-00037190)).

**10.    Testimonial Statement: Follow-Up Interview**

During a follow-up phone conversation with SA Burns and SA Kammeraad, Ms. Quinn advised the agents that, on March 13, 2023, her brother's friend Kenny advised her that there was a dead rat on her mother's vehicle in the driveway. *Id*. Ms. Quinn advised the FBI agents that she was scared. *Id*. Ms. Quinn also advised that the next day, March 14, 2023, Ms. Quinn and her friend noticed another dead rat on the vehicle of her roommate, ████ ████ *Id.* Ms. Quinn advised the agents that she was "very scared" after the discovery of

the second rat and was worried about who is coming after her. *Id.* Ms. Quinn provided the FBI with details about the timing surrounding the dead rats and indicated that an individual named " ███ " may be responsible due to his close involvement with Mr. Gerace. *Id.* Ms. Quinn also mentioned a woman named " ███ " who may have been involved because " ███ " used to hang out with Mr. Gerace and P.H.

### 11. Non-Testimonial Statement: March 22, 2023 – Crystal Quinn Alerts FBI about Injured Dog

On March 21, 2023, FBI Special Agent Brian Burns received an unsolicited text message from Ms. Quinn stating:

> So Brian my worse fear has now come true my dogs eye well right beside eye was punctured we just seen it!! I knew this was going to happen!!! I need to move now I'm going to be checking out my windows not letting dogs outside alone I should have got the the idea when I seen the rats!! I'm taking him to vet tomorrow but Brian I am scared scared for my life and the life of my family and dogs this is just crazy

*See* EXHIBIT 39 (FBI 302 "Events of 3-21-22-23 Involving Crystal Quinn's dog" (GOV-00037184)).

### 12. Testimonial Statement: March 22, 2023 – Follow-Up Interview with Crystal Quinn about Injured Dog

During a subsequent phone call, Ms. Quinn described to the FBI how she and her mom noticed a wound near her dog's eye, and how she believed the dog was assaulted because of her cooperation with the Federal government. *Id.* Ms. Quinn told the FBI that she was "very scared for herself, her family, and her five dogs." *Id.* Ms. Quinn acknowledged that the injury could have been accidental, but later advised the FBI " . . . my life has turned into a nightmare and I just want to move. My animals are my life, my family they don't deserve this." *Id.*

13. **Testimonial Statement: April 6, 2023 – Crystal Quinn provides Router Information to FBI**

On April 6, 2023, FBI Special Agent Jason Kammeraad went to Ms. Quinn's residence where Ms. Quinn provided him with information related to her wireless internet router. *See* EXHIBIT 40 (FBI 302 "Interview of Crystal Quinn – 4-6-2023" (GOV-00037175)).[26]

14. **Testimonial Statement: June 9, 2023 – Security Camera Installed at Crystal Quinn Residence**

On June 9, 2023, FBI Special Agents Jason Kammeraad, Brian Burns, and Anthony Butera went to Ms. Quinn's residence to install an authorized security camera on the exterior of her residence for her protection as a cooperating witness. *See* EXHIBIT 41 (FBI 302 "Interview of Crystal Quinn – 06/09/2023" (GOV-00037204)). While the FBI was present at her home, Ms. Quinn reported a recent occurrence where she was at the home of a man, R.F., who sent text messages to her that she believed were intended for others, causing her to believe that R.F. was involved in a plan to arrange for her to get "jumped." *Id.*



---

[26]    This interview was provided in relation to the FBI's investigation into the dead rats at Ms. Quinn's residence.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ ██

        ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

### 16. Non-testimonial statement: July 2023 – Crystal Quinn Statements about Price on her Head

Some weeks before her death, Ms. Quinn told her uncle, ████████████, that she was afraid that she might not be here much longer because she heard that there was a price on her head. *See* EXHIBIT 45 (████████ Grand Jury Trans., Nov. 29, 2023) at 12–13. Ms. Quinn made Mr. Schultz promise not to tell anyone about that. *Id.* at 17. Ms. Quinn told

---

[27] During his interview with the FBI, ████████ characterized these letters as "suicide letters" but he did not attribute that characterization to a statement made by Ms. Quinn. ████████ followed up by stating that he had been in contact with Ms. Quinn in the days prior to her death and that she was not suicidal.

Mr. Schultz that she had been to the biker clubhouse and had information about them. *Id*. at 13.

17.     **Non-testimonial statement: July 2023 – Crystal Quinn Statements regarding Trip to Wellsville with Simon Gogolack**

In July 2023, Crystal Quinn advised ▮▮▮▮▮ that she was scared, that people left rats at her house and that they were out to get her. *See* EXHIBIT 43 at 12. Ms. Quinn advised ▮▮▮▮▮ that she had to testify in a case that was coming up, and that she was nervous about it. *Id*. at 12–13. Ms. Quinn told ▮▮▮▮▮ "they're going to get me." *Id.* at 13.

On July 27, 2023, Crystal Quinn asked ▮▮▮▮▮ "Ma, can I go with [Simon] to Wellsville? He's got a house out there. We're going to go in the trails." *See* EXHIBIT 46 (▮▮▮▮▮ Grand Jury Trans., Oct. 18, 2023) at 16–17. Crystal stated to ▮▮▮▮▮ "I got to get away, I need time to breathe." *Id*. at 17. Crystal asked ▮▮▮▮▮ "Can Simon drive the car?" *Id*. Crystal described the trip to ▮▮▮▮▮ as a "weekend trip". *Id*. The last thing that Crystal said to ▮▮▮▮▮ before she left for Wellsville was "I'll be back Monday, I love you." *Id.* at 22.

On July 27, 2023, Crystal Quinn told ▮▮▮▮▮ that Simon Gogolack had invited her to his house and she would "like to go for a couple days just to get a rest." *See* EXHIBIT 44 at 19.

On July 27, 2023, Ms. Quinn told ▮▮▮▮▮ that she was stressed out and needed to "get away for a few days." *See* EXHIBIT 45 at 18. The last thing that Ms. Quinn ever said to ▮▮▮▮▮ was, "Uncle ▮▮▮▮▮ he's a nobody" when describing Simon Gogolack, before leaving to go to Wellsville with him. *Id*. at 19.

106

18.     **Non-testimonial statement: July 27, 2023 – July 30, 2023 – Crystal Quinn Statements During Time in Wellsville with Simon Gogolack**

███████████ spoke with Ms. Quinn about Ms. Quinn's intention to travel to Wellsville with Mr. Gogolack, and that based on that conversation, ███████████ understood Ms. Quinn was planning a weekend trip to Wellsville, and that she intended to come back to Depew afterward. EXHIBIT 43 at 16.

In the early morning hours of July 28, 2023, Ms. Quinn sent a number of text messages to a contact stored in her phone as "███████████", which was an old contact for ███████████. *See* EXHIBIT 47 (███ Text Timeline,GOV-00039270). In those messages, Ms. Quinn stated the following:

1. "Yo I feel set up"
2. "There is a room behind me and they are going to rape me I think"
3. "And Simon gave me up no idea why"
4. "I got 10 red beams looking at me"
5. "Call me"
6. "Yea I just heard Simon speaking to one of the bikers"
7. "I think he is getting me set up right now"
8. "I hear him outside"
9. "And all these red lights started flashing on me like really"
10. "Call me none"
11. "Now"
12. "9-11"
13. "There like trying to make sounds to think I'm stuck"
14. No man's"
15. "Yeah, call me change the time salmon and they wanted us"
16. "Pick up"
17. "Deb me and Simon are in danger call me"
18. "I think they allow 5 girls to come in and whip my ass I can here then"

    "Jumping me now"

███████████ had multiple phone conversations with Ms. Quinn while Ms. Quinn was in Wellsville, and remembers Ms. Quinn telling her that she was upset because Simon kept

snorting heroin, and that Ms. Quinn got "real pissed" about it and indicated that she "just wanted to come back home." EXHIBOT 43 at 17. Ms. Quinn told ██████████ that she intended to come back home and visit ██████████ and her husband. *Id*. at 17–18. Ms. Quinn called ██████████ several times during the early-morning hours one day and whispered, but ██████████ could not hear what she was saying. *Id*. at 19–21. The last time that Ms. Quinn spoke to ██████████, Ms. Quinn stated that she was planning to come home and that she was going to spend time with ██████████ and her husband. *Id*. at 21–22. While Ms. Quinn was in Wellsville, she told ██████████ that she was afraid because "they were out to get her". *Id*. at 23.

While in Wellsville, Crystal Quinn spoke over the phone with ██████████ On the first afternoon that Crystal was in Wellsville, she told █████ "I'm here with some of Simon's friends and I will be home Monday." *See* EXHIBIT 46 at 22. Crystal also told █████ "Ma, I'm having a good time." *Id*. at 25.

While in Wellsville, Crystal Quinn spoke over the phone with ██████████ several times. While she was in Wellsville, Ms. Quinn provided ██████████ with Simon Gogolack's phone number. *See* EXHIBIT 44 at 21–22. In the early morning hours of July 30, 2023, Ms. Quinn told ██████████ that she "was going to be coming home soon" and that she "missed ██████████ missed the dogs" and that she "couldn't wait to get home." *Id*. at 24. Later that night, Ms. Quinn told ██████████ that she was enjoying herself and resting. *Id*. On Monday, July 31, 2023, Ms. Quinn told ██████████ that "she wanted to come home" and that she missed ██████████ and the dogs, and that she was "coming home tomorrow morning." *Id*. at 26.

108

19.    **Non-testimonial statements: July 20, 2023 – July 30, 2023 – Crystal Quinn Statements to Simon Gogolack via Text Message**

Between July 20, 2023 and July 30, 2023, Crystal Quinn exchanges dozens of text messages with Simon Gogolack. *See* EXHIBIT 48 (Crystal Quinn's Text Messages with Simon Gogolack).[28]    In general, the messages provide information about Ms. Quinn reconnecting with Mr. Gogolack, Ms. Quinn traveling to Wellsville with Mr. Gogolack, and the events that occurred while Ms. Quinn was present in Wellsville with Mr. Gogolack. *Id.*

B.    **Legal Frameworks**

1.    **Forfeiture by Wrongdoing**

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.    Nonetheless, "'the law [will not] allow a person to take advantage of his own wrong,'" *United States v. Mastrangelo*, 693 F.2d 269, 272 (2d Cir. 1982) (quoting *Diaz v. United States*, 223 U.S. 442, 458 (1912) (other internal quotation marks omitted)), and it is thus well established, as a matter of "[s]imple equity" and "common sense," that the right to confrontation is forfeited if the defendant has "wrongfully procured the witnesses' silence through threats, actual violence or murder," *United States v. Dhinsa*, 243 F.3d 635, 651 (2d Cir. 2001); *see also Crawford v. Washington*, 541 U.S. 36, 62 (2004) ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds").

In 1997, the Federal Rules of Evidence were amended to "recognize[ ] the need for a prophylactic rule to deal with [this type of] abhorrent behavior 'which strikes at the heart of

---

[28]    In this report, Ms. Quinn's text messages are on the left (in blue) and Mr. Gogolack's text messages are on the right (in green). The text messages are in "UTC" time, and therefore four hours must be subtracted to obtain Eastern Daylight Time.

the system of justice itself.'" FED. R. EVID. 804 Advisory Committee Note (1997) (quoting *Mastrangelo*, 693 F.2d at 273). Under the heading "Forfeiture by wrongdoing," Rule 804(b)(6) provides that the hearsay rule does not require the exclusion of "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." FED. R. EVID. 804(b)(6) (emphasis added). Accordingly, the district court may admit hearsay evidence as to statements by an unavailable declarant if it finds by a preponderance of the evidence, that (a) the "party against whom the out-of-court statement is offered[ ] was involved in, or responsible for, procuring the unavailability of the declarant through knowledge, complicity, planning or in any other way," and (b) that party "acted with the intent of procuring the declarant's unavailability as an actual or potential witness," *Dhinsa*, 243 F.3d at 653–54 (internal quotation marks omitted).

The doctrine only applies, however, to the declarant's testimonial statements. *See Giles v. California*, 554 U.S. 353, 376 (2008) ("[O]nly testimonial statements are excluded by the Confrontation Clause."). A statement is testimonial when it is made in response to a law enforcement interrogation, the "primary purpose" of which is "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. "Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules . . . ." *Giles*, 554 U.S. at 376.

Courts considering Rule 804(b)(6) applications are required to hold an evidentiary hearing outside the presence of the jury to determine whether the government has satisfied the two-part *Dhinsa* test. Where "[t]he court must decide any preliminary question about whether . . . evidence is admissible[,] [it] is not bound by evidence rules, except those on

110

privilege." FED. R. EVID. 104(a); *accord Bourjaily v. United States*, 483 U.S. 171, 177–78 (1987); *see United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002) ("[T]o affirm the district court's ruling, we may decide to consider all the evidence at trial, including evidence not presented at the hearing on the motion in limine.").

### 2. Other Hearsay Exceptions and Non-Hearsay

Several other hearsay exceptions and principles are relevant here. First, under Rule 803(1), "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is exempted from the bar against hearsay. FED. R. EVID. 803(1). Second, under Rule 803(2), "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," also known as the excited utterance exception, is exempted from the bar against hearsay. FED. R. EVID. 803(2). Third, under Rule 803(3), "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is exempted from the bar against hearsay. FED. R. EVID. 803(3).

Questions are not hearsay. *See United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (holding that "questions posed by the IRS agent were not hearsay, because[,] as a matter of law, questions are not 'assertions' within the meaning of Rule 801"). By that same token, directives or commands are not hearsay. *See United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). Finally, statements not offered to prove the truth of the matter asserted are also not hearsay.

111

### C.     Application

Ms. Quinn's testimonial statements, *see supra*, are admissible under Rule 804(b)(6) under a theory of forfeiture by wrongdoing.  As set forth in the below abbreviated offer of proof, the government will show by a preponderance of the evidence that Messrs. Gerace, Ermin, Gogolack, Hinkle, and Roncone participated in a conspiracy designed to procure Ms. Quinn's unavailability, and that Ms. Quinn's statements are admissible to those defendants.

**1.     The Government's Abbreviated Offer of Anticipated Proof Shows that Messrs. Gerace, Ermin, Roncone, Hinkle, and Gogolack Caused Ms. Quinn's Unavailability with the Intent of Preventing Her From Testifying at Trial and Cooperating with Federal Law Enforcement.**

Hoping to weaken the government's proof at trial and, ultimately, abscond from the United States entirely, Mr. Gerace, with the help of others, initiated a course of conduct designed to prevent Ms. Quinn from cooperating with federal law enforcement and, when that failed, to silence Ms. Quinn permanently.  First, on February 16, 2023, Mr. Gerace, through Mr. Cohen, caused another attorney, ███████, to contact Ms. Quinn about matters pertaining to her representation.  *See* Dkt. 24 at 14 ¶16; EXHIBIT 49 (███████ Grand Jury Trans., Jan. 3, 2024).  Mr. Cohen knew that a different attorney, Mr. D'Amico, actually represented Ms. Quinn, having previously attempted (and failed) to secure meetings with Ms. Quinn through Mr. D'Amico in 2022.  EXHIBIT 32.  ███████ will testify that Mr. Cohen never informed him that Ms. Quinn was already represented when Mr. Cohen indicated that he wanted ███████ to reach out to her regarding the possibility of representing her in federal court.  EXHIBIT 49 at 24.  ███████ sent Ms. Quinn text messages to that effect.  *Id.* at 14–21.  When Ms. Quinn rejected ███████ professional advances, the effort to prevent Ms. Quinn from testifying escalated.

On February 27, 2023, Ms. Quinn disclosed that one of her dogs recently found a rat in her yard. *See* EXHIBIT 35. Next, on March 14, 2023, after Ms. Quinn became a cooperating witness and five days after Ms. Quinn testified in the Grand Jury, rats were placed on or near vehicles belonging to ▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓ One week later, Ms. Quinn found her dog injured, having suffered a puncture wound on his eye. *See* EXHIBIT 39.

Soon thereafter, Mr. Gerace was indicted in Case No. 1:23-CR-37 for witness tampering against P.H. *See* Case No. 23-CR-37, Doc. No. 1. During his arraignment, the government moved for Mr. Gerace's detention. *See* Case No. 23-CR-37, Doc. No. 4. The government's subsequent detention proffer, which took place on March 27, 2023, and March 28, 2023, would have made clear to Mr. Gerace that Ms. Quinn was a cooperating government witness, as only four people could serve as potential witnesses to the tampering of P.H.—P.H., C.C., Ms. Quinn, and Mr. Gerace—and the government alluded to having acquired a third witness. EXHIBIT 2 at 16. Judge Sinatra granted the government's motion. *See* Case No. 23-CR-37, Doc. No. 8. In explaining why he was ordering Mr. Gerace detained pending trial, Judge Sinatra rightfully focused on Mr. Gerace's witness tampering of P.H. and the strength of the government's evidence of Mr. Gerace's witness tampering.

Judge Sinatra's decision to detain Mr. Gerace proved consequential, as it crystalized Mr. Gerace's focus on exacting retribution against Ms. Quinn, whom he blamed for his second indictment and incarceration, and magnified his desire to avoid trial. The same day that Judge Sinatra ordered Mr. Gerace detained, Mr. Ermin, then the International President of the Outlaws Motorcycle Club and a manager of Pharoah's Gentlemen's Club, visited Mr. Gerace at the Niagara County jail on March 27, 2023. *See* Dkt. 24 at 15 ¶ 19; EXHIBIT 50 (Gerace, Peter Niagara Co Jail Visitor List (GOV-00036985)).

At first, Mr. Gerace attempted to get out of jail through legitimate, legal means, as evidenced by Mr. Cohen's motion to Judge Sinatra asking him to reconsider Mr. Gerace's detention order. *See* Dkt. 24 at 15 ¶ 20; EXHIBIT 3. But, during the May 31, 2023, oral argument, the government proffered about Ms. Quinn's recent discovery of dead rats on vehicles belonging to her mother and ▮▮▮▮▮ And when Judge Sinatra indicated at oral argument that he was going to deny Mr. Gerace's motion for reconsideration, Mr. Gerace grew irate. Though Mr. Gerace told his attorney he knew nothing about the rats placed at Ms. Quinn's residence, *see* EXHIBIT 4 at 21, in the van ride back to his pre-trial detention facility, Mr. Gerace told witness ▮▮▮▮▮, in sum and substance, (1) fuck the rats; (2) all rats should die; and (3) no matter what, anybody can get touched because when all this is over, I have very serious people to tie up my loose ends, *see* Dkt. 24 at 15 ¶ 21; EXHIBIT 6 at 21–22.

On June 5, 2023, Judge Sinatra formally denied Mr. Gerace's motion for reconsideration. *See* Case No. 19-CR-227 Minute Entry, Dkt.499, (dated June 5, 2023). Eleven days later, and in furtherance of his efforts to secure his release, delay his trial, and/or engender reversible appellate error, Mr. Gerace caused his attorneys to transmit to Judge Sinatra's chambers his defense witness list containing two of Judge Sinatra's close relatives: ▮▮▮▮▮▮▮▮▮▮ EXHIBIT 9 at ¶¶ 171, 240. Mr. Gerace caused his attorneys, including Mr. Cohen, to proffer false information regarding his relationship with both ▮▮ ▮▮ and ▮▮▮ to induce Judge Sinatra into recusing from the case pursuant to 28 U.S.C. § 455(b)(5)(iv). EXHIBIT 9 at ¶¶ 171, 240 ; EXHIBIT 10 at 5:3–17, 7:4–10 ; EXHIBIT 20 at 55–58; EXHIBIT 25 at 1–2.

Mr. Gerace knew that if Judge Sinatra recused, the case was likely to be transferred to the only other active judge in Buffalo, Judge Vilardo, whom he deemed a more favorable audience for his forthcoming motions to adjourn the trial and for pretrial release. Relying on the false proffers, Judge Sinatra recused.  Shortly after Judge Sinatra's recusal, Mr. Gerace successfully adjourned his trial scheduled for August 14, 2023, and not long after advanced his motion for pre-trial release.  *See* EXHIBIT 12.   Buying time was critical for Mr. Gerace's project in two respects.  First, adjourning the trial enlarged the window that Mr. Gerace's co-conspirators had to weaken the government's trial proof by tampering with and retaliating against witnesses like Ms. Quinn.  Second, and relatedly, it provided Mr. Gerace more time to "change the circumstances" bearing on his detention, the standard Mr. Gerace would need to meet to secure pre-trial release.  Those interests converged in one human being: Ms. Quinn.

The end of June and the month of July 2023 saw several developments in the conspiracy to silence Ms. Quinn.  First, on June 30, 2023, Mr. Roncone, a leader of the Rare Breed Motorcycle Club, and Mr. Knight had an in-person meeting.  The Rare Breed Motorcycle Club is an Outlaws support club and has it's own relationship with Pharoah's.  Mr. Knight is a close friend of Mr. Roncone's, and an associate of the Rare Breed Motorcycle Club.  Then, on July 4, 2023, Mr. Hinkle attended a bike gathering in Wellsville, New York, taking photographs of members of the Rare Breed Motorcycle Club.  *See* Dkt. 24 at 17 ¶ 28. Two days after that, Mr. Ermin—whose interests against Ms. Quinn aligned with Mr. Gerace's, as Ms. Quinn had overdosed on cocaine at an Outlaws clubhouse—again held an in-person meeting with Mr. Gerace in the Niagara County jail.  The government anticipates that its case-in-chief might contain evidence that establishes Mr. Ermin's consciousness of guilt regarding what was discussed during Mr. Gerace and Mr. Ermin's July 6th meeting.

115

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████    *See* EXHIBIT 42.

Then Mr. Gogolack re-entered Ms. Quinn's life. Around roughly the same time period, Ms. Quinn, in a state of fear, told her uncle, ████████, that Pharoah's (which was then managed by Mr. Ermin, a powerful person who could tie up Mr. Gerace's loose ends) had put a price on her head. EXHIBIT 45 at 12–13. Mr. Gogolack echoed those statements to ████████, noting that he was taking Ms. Quinn to his place because she "was afraid because she had a price on her head." *Id.* at 16.

Yet, As Mr. Gogolack and Ms. Quinn reacquainted themselves, Mr. Gogolack was offering hitman services to a drug supplier, Bernard Byrd III, over text message:





On July 26, 2023, Mr. Gogolack texted Ms. Quinn that he was "gonna shoot" himself if he did not "get outta the city," as pictured below:



Mr. Gogolack's threat to commit suicide prompted a strong reaction from Ms. Quinn, who offered to bring Mr. Gogolack to her home to keep him "safe":



Though Mr. Gogolack initially told Ms. Quinn that he needed to return to Wellsville so that he could "get [his] mail n replacement id credit cards and taxes," on July 27, 2023, Mr. Gogolack took Ms. Quinn to a poker game run by Mr. Knight that historically had been held at the Rare Breed Motorcycle Club clubhouse and managed by members of the Rare Breed Motorcycle Club. While en route, Mr. Gogolack texted Mr. Hinkle, "How I'm in town n *have that*. Lmk if ur in cuz I don't have cash on mE [sic] . N I wanna gamble". Dkt. 24 at 18 ¶ 38 (emphasis added).

While at the poker game, Mr. Gogolack and Mr. Hinkle left Ms. Quinn and walked off, separately for what appears on the video evidence to be a private conversation. Months later, on December 3, 2023, (before Mr. Gogolack was formally charged with offenses related to Ms. Quinn's death) when Mr. Gogolack was on a recorded jail phone call discussing that private conversation in the field near the fire hall, he stated "Oh listen to this, they said in the newspaper I'm on recording somewhere in front of a field talking about killing somebody. Did you hear what I said?" The other participant in the call states "Yeah, but they aren't going to pursue that." Mr. Gogolack responds, incredulously, "they aren't going to pursue that? I'm glad you think so. *I hope they don't*. But its all a lie anyway." (emphasis added).

After the poker game concluded, Mr. Hinkle and Mr. Knight can be seen talking in the parking lot. Later that evening, Mr. Hinkle hosted Ms. Quinn and Mr. Gogolack at his hunting cabin. ███████████████████████████████████ , ███████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████



In the early morning hours of July 28, 2023, Ms. Quinn and Mr. Gogolack were confronted by armed bikers while at Gogolack's residence. Ms. Quinn sent several text messages to Mr. Gogolack and another individual that provide a real-time window into the unfolding confrontation and the fear it placed Ms. Quinn in. *See* EXHIBIT 48 at 37–47; EXHIBIT 47. In particular, Ms. Quinn disclosed to Mr. Gogolack her suspicions that Mr. Hinkle set them up and disclosed to another individual her impression that Mr. Gogolack was setting her up to be killed by the bikers.[29] During the confrontation, Mr. Gogolack's location data places him in Mr. Knight's residence, directly across from Mr. Gogolack's residence.

Some hours later, after the confrontation ended, Ms. Quinn spoke on the phone with ███████, who overheard Mr. Gogolack mention that "an old friend" of Ms. Quinn's had paid Ms. Quinn and Mr. Gogolack a visit the night before. EXHIBIT 43 at 21. Mr. Gogolack also made admissions about the armed confrontation to another witness in this case.

---

[29]    Mr. Gogolack, for his part, eventually let slip in his recorded interview with the FBI at Depew PD that Ms. Quinn told him that she "thinks that possibly that, uhm, that they spoke with some other leader that they know they're there."

By August 1, 2023, Ms. Quinn was dead of an apparent fentanyl overdose.[30]  Mr. Gogolack likely waited hours after learning that Ms. Quinn died to report her death, and only did so after ██████████ threatened to call the police on him.  Mr. Gogolack immediately attributed Ms. Quinn's death to suicide.  However, multiple witnesses who spoke to Ms. Quinn during her final days report the same observations: Ms. Quinn expressed an intent to return home.

Following Ms. Quinn's death, Mr. Gogolack texted Mr. Knight that he believed the "mafia" provided Ms. Quinn a hotshot—i.e., an intentionally lethal dose of narcotics.  Mr. Gogolack's description of a hotshot—along with his efforts to obstruct the crime scene after Ms. Quinn's death—mirrored threats he previously made to another witness against him in which he claimed he would kill the witness, make his death look like an overdose, and then burn his body in a car.  In fact, Mr. Gogolack admitted to ██████████ that he distributed drugs to Ms. Quinn during a phone call shortly after Ms. Quinn's death, commenting, "I gave her a Xanax."  *See* EXHIBIT 44 at 30..

On August 3, 2023, Mr. Knight was interviewed by the FBI and attempted to conceal from the FBI information about Mr. Hinkle's presence at the July 27, 2023, poker game.  After

---

[30]     The government has previously represented that Ms. Quinn had 400 times a potentially lethal limit of fentanyl in her blood as evidence of her intentional killing.  That representation was based on the evidence available to the government at the time, which included toxicology report, autopsy report, and testimony of Dr. Richard Scott.  Recently, in preparation for trial, the government has consulted with an expert witness in the field of toxicology.  The government anticipates that expert will testify that the amount of fentanyl contained in a post-mortem blood draw is not necessarily representative of the amount of fentanyl present in the body pre-mortem.  Although the government anticipates that witness will testify that Ms. Quinn died of a drug-overdose, the government does not anticipate that witness will attribute significance to the quantitative levels reflected in the post-mortem blood draw.  That expert witness has not yet provided the government with a written report regarding her findings; however such report will be produced upon receipt.

that interview, during which Mr. Knight necessarily would have learned that the FBI was interested in Mr. Hinkle and in the Rare Breed Motorcycle club, Mr. Knight exchanged text messages and phone calls with Mr. Roncone.



123



That same day,

in addition to trading a flurry of calls with Mr. Knight, Mr. Roncone called his contact for "tommy O":

| To:<br>7169016822<br>tommy O<br><br>Direction:<br>Outgoing | 10/24/2023<br>8:40:15<br>PM(UTC+0) | 00:00:00 | Not<br>answered |
|---|---|---|---|

He then called a second number he had for Mr. Ermin, a call that lasted 44 seconds:

| To:<br>17169496335<br><br>Direction:<br>Outgoing | 10/24/2023<br>8:44:19<br>PM(UTC+0) | 00:00:44 | Answered |
|---|---|---|---|

Further, with respect to Mr. Ermin, the proof at trial will establish that Mr. Ermin was the leader of the Outlaws Motorcycle Club, an international motorcycle gang in the Buffalo-area. The evidence at trial will establish that the Rare Breed Motorcycle Club was subservient to the Outlaws Motorcycle Club. The evidence at trial will establish that Mr. Ermin closely monitored developments in Case No. 19-CR-227.[32] The evidence at trial will establish that the Outlaws Motorcycle Club is institutionally committed to intimidating, tampering, and retaliating against witnesses and informants. Witness testimony at trial will likely establish Mr. Ermin's consciousness of guilt surrounding the conversations he had with Mr. Gerace while visiting him in jail as related to the charges in this very case.

---

[32]    When Ermin's residence was searched, law enforcement recovered (i) the indictment related to Case No. 19-CR-227, including the sealed cover sheet, and a variety of federal search warrants. Law enforcement also recovered law enforcement documents discussing the activities of confidential informants, which included handwritten notations on the documents. The material seized from his house also included filings from Case No. 19-CR-227, with highlights referencing Mr. Ermin or the Outlaws Motorcycle club.

Altogether, this offer of proof, if replicated at trial, satisfies by the preponderance of the evidence that Messrs. Gogolack, Gerace, Ermin, Hinkle, and Roncone caused Ms. Quinn's unavailability. It also shows that they did so with the intention of making her unavailable to testify about the contents covered in the testimonial statements identified in Sec. II(A)(1)–(3), (5)–(10), and (12)–(14), *supra*.

A recent Tenth Circuit decision illustrates how the government has satisfied the second component of this standard. *See United States v. Rudolph*, 152 F.4th 1197 (10th Cir. 2025) (Holmes, C.J.). In that case, defendant-appellant Rudolph argued that the district court erred in admitting statements that his deceased wife intended to offer at future divorce proceedings. *See id.* at 1231–33. The government argued—and the district court agreed—that Rudolph killed his wife to prevent her from testifying in future divorce proceedings, and that her anticipated testimony should be admitted under Rule 804(b)(6). *See id.* at 1231–32. The Tenth Circuit affirmed, concluding that "[t]hree pieces of evidence from trial" supported the district court's determination. *Id.* at 1232.

First, a witness testified that Rudolph's mistress told her that Rudolph could not get divorced because his wife "would take everything he had." *Id.* Rudolph would have had this concern, the Tenth Circuit reasoned, because the postnuptial Rudolph and his wife purportedly entered into was fraudulent, Rudolph having forged her signature. *See id.* As such, "[k]illing [the wife] would have been a way for Mr. Rudolph to ensure that she was not available to raise these doubts about the 2000 postnuptial agreement in a divorce proceeding." *Id.* Second, Rudolph's friend testified that Rudolph asked him about signing a postnuptial agreement with his wife *after* he had purportedly executed the fraudulently signed agreement. *See id.* That testimony, too, "suggest[ed] that [ ] Rudolph was uncomfortable with the validity

126

of the purported . . . postnuptial agreement." *Id.* Lastly, a family law expert testified that the postnuptial agreement was very likely unenforceable. *See id.* The wife's "testimony would have underscored this fact of invalidity and, consequently, [ ] Rudolph decided to kill her—at least in part—so that she would not be available." *Id.*

Here there are, broadly speaking, eight categories of testimonial statements that the conspirators wanted to prevent Ms. Quinn from disclosing: statements regarding (1) acts of witness tampering against P.H.; (2) drug use, sex acts, and sexual exploitation at Pharoah's; (3) Mr. Gerace's corrupt relationship with Mr. Bongiovanni; (4) the identities of members of the Outlaws; (5) drug use at the Outlaws' clubhouse; (6) the Outlaws' institutional commitment to retaliating against witnesses; (7) Mr. Gerace's meetings with members of organized crime; (8) Mr. Gerace's close relationship with the Outlaws; and (8) the dead rats found at Ms. Quinn's residence. The entire purpose of killing Ms. Quinn was to prevent her from testifying about all of them. Ms. Quinn was the third and final witness against Mr. Gerace regarding the witness tampering charged in Case No. 1:23-CR-37. She also offered valuable corroboration of Mr. Bongiovanni's corrupt, bribery-driven protection of Mr. Gerace and the narcotics use and sex trafficking at Pharoah's that were at issue in Case No. 1:19-CR-227, giving both Mr. Gerace and Mr. Ermin—the manager of Pharoah's and the International President of the Outlaws who closely followed the prosecution in 1:19-CR-227—a strong motivation to silence Ms. Quinn. This was especially true after the May 31, 2023, oral argument on Mr. Gerace's motion for reconsideration, in which it became clear that Ms. Quinn was cooperating with law enforcement regarding the dead rats discovered at her home. In that respect, Ms. Quinn's continued, undeterred cooperation with federal law enforcement jeopardized Mr. Gerace's quest to secure his pre-trial release and make off for Costa Rica.

127

Moreover, Mr. Ermin was also motivated to silence Ms. Quinn because she overdosed on cocaine at one of the clubhouses belonging to the criminal organization he headed. Ms. Quinn also knew the identities of two Outlaws members, P.R. and C.B., having previously dated them. As the Outlaws' organizational head, and someone's who future could very well be tied to Mr. Gerace's, Mr. Ermin had a strong institutional and personal motive for silencing Ms. Quinn.

Finally, that Messrs. Gerace, Ermin, Hinkle, and Roncone did not personally distribute the fentanyl that killed Ms. Quinn does not insulate them from liability when their co-conspirator, Mr. Gogolack, did. *See United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007) (concluding that a defendant could not evade forfeiture by wrongdoing because he was imprisoned—and thus did not murder the victim directly—at the time of the witness's death where the government showed that the defendant was part of a conspiracy); *United States v. Hankton*, 51 F. 4th 578, 600 (5th Cir. 2022) (affirming the district court's conclusion that the defendant's "imprisonment at the time [the witness] was murdered did not preclude a finding that [the defendant] caused or acquiesced in [the witness's] murder"); *United States v. Dinkins*, 691 F.3d 358, 38 (4th Cir. 2012) (holding that a defendant in a conspiracy waives his "Confrontation Clause rights when (1) the defendant participated directly in planning or procuring the declarant's unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy"); *id.* at 384 ("The language of Rule 804(b)(6) supports the application of *Pinkerton* principles of conspiratorial liability in the forfeiture-by-wrongdoing context, by requiring that the defendant either have "wrongfully caused—*or acquiesced in* wrongfully causing—the declarant's unavailability." (emphasis added)); United

128

States v. Carson, 455 F.3d 336, 363–64 (D.C. Cir. 2006) (explaining that the forfeiture rule applies "with equal force" to a defendant whose co-conspirators rendered the witness unavailable). In other words, sufficient proof of a conspiracy in which a witness's murder is reasonably foreseeable is enough to extend the application of forfeiture-by-wrongdoing principles to all of the co-conspirators who participated in, or acquiesced to, the effort to tamper with and retaliate against Ms. Quinn.

Should the government's proof at trial mirror that discussed in this memorandum, the government respectfully requests that the Court admit Ms. Quinn's testimonial statements.

### III.   CONCLUSION

For the reasons stated above, the government respectfully requests that the Court grant the relief requested herein.

DATED:  Buffalo, New York, March 11, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:   s/NICHOLAS T. COOPER
s/CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202