IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      v.                                       23-CR-99-EAW

SIMON GOGOLACK, et al.,

      Defendants.

_____

### RESPONSE IN OPPOSITION TO THE DEFENDANTS' RULE 14 SEVERANCE MOTIONS

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Casey L. Chalbeck, Assistant United States Attorney, of counsel, hereby offers the following response in opposition to Defendants Gerace, Hinkle, Ermin, Knight, and Roncone's motions for severance. *See* Dkts. 833, 837, 832, 828, and 831.

### I.      Mr. Gerace's Severance Motion Should Be Denied.

Mr. Gerace raises two arguments in favor of his Rule 14 motion for severance. First, Mr. Gerace claims that severance is necessary due to prejudicial pre-trial publicity. Specifically, Mr. Gerace claims that pre-trial publicity surrounding his upcoming sentencing in 1:19-CR-227, will unfairly prejudice him in this matter's trial scheduled to begin June 8, 2026. Second, Mr. Gerace urges severance because a joint trial will include evidence about the Outlaws' internal operations, which he claims is irrelevant to any case in which he would be the sole defendant.

The Court should reject these arguments. Mr. Gerace is not entitled to *any* equitable relief premised upon the flames of pre-trial publicity he repeatedly and enthusiastically fanned throughout the 1:19-CR-227 litigation. Moreover, insofar as Mr. Gerace complains about the

timing of any pre-trial publicity resulting from his upcoming sentencing, he has only himself to blame: Mr. Gerace has repeatedly delayed his sentencing in 1:19-CR-227, all but guaranteeing that press coverage of that proceeding will coincide with the leadup to this trial. Even then, pre-trial publicity does not merit severance, especially where other mechanisms, like *voir dire*, can ensure the impanelment of a fair and impartial jury. Finally, Mr. Gerace's evidentiary arguments overlook that even in a severed trial, Outlaws-specific evidence would be admissible to prove the conspiracies charged in Counts 1 through 3. Accordingly, the Court should deny Mr. Gerace's motion for severance.

### A. Severance is not merited where Mr. Gerace's own conduct has engendered the pre-trial publicity he claims requires severance.

Severance under Rule 14 is a form of equitable relief. *Cf. United States v. Contreras*, 21 F. Supp. 3d 299, 303 (W.D.N.Y. 2016) ("A number of equitable and practical considerations support th[e] preference" for joint trials.); *see generally Zafiro v. United States*, 506 U.S. 534, 538–39 (1993) (explaining why joint trials are preferable and identifying the prejudicial circumstances in which severance under Rule 14 would be appropriate). But equitable relief is unavailable to defendants who, like Mr. Gerace, have dirtied their hands by encouraging the very prejudice they claim entitles them to judicial intervention. *Holm v. First Unum Life Ins. Co.*, 7 F. App'x 40, 41 (2d Cir. 2001) (unpublished) ("The 'unclean hands' doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.'" (quoting *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 814 (1945))).

The Court should deny severance because the prejudice Mr. Gerace claims is self-created. First, after years of speaking publicly and helping generate the publicity he now cites, he cannot invoke that same coverage as a basis for separate trials. Second, Mr. Gerace having

2

sought and obtained the delays that brought this trial within weeks of his sentencing, cannot now rely on the foreseeable consequence of those extensions as grounds for severance.

**1. Self-created media publicity**.

From the outset of his prosecutions, Mr. Gerace, through counsel and personally, has fed the media's interest in his cases. With respect to Mr. Gerace's former counsel, examples of comments made to the press include:

1.    "Cohen lambasted Gerace's ex-wife, Katrina Nigro, and Assistant U.S. Attorney Joseph Tripi, the lead prosecutor in the ongoing federal investigation into organized crime. 'A disgruntled and disturbed ex-wife has been casting aspersions against some very fine people, and Judge Michalski is one in a long list who have been victimized by her,' Cohen said." Michel, Lou & Herbeck, Dan, The Buffalo News, Mar. 24, 2022, <https://buffalonews.com/news/local/crime-and-courts/feds-search-home-of-state-supreme-court-justice-john-michalski-who-was-hit-by-train/article_566a67f2-ab82-11ec-8254-ab64dd8b3b22.html>

2.    "It's unfortunate that anyone would believe a word Ms. Nigro says. We know her history. Telling tales is nothing new to her." Brown, Steve & O'Rourke, Joseph, 2WGRZ News Publication, May 4, 2021, <https://www.wgrz.com/article/news/investigations/the-judge-the-strip-club-owner-and-the-ex-wife/71-c5c6b9d3-87ba-43ee-9adf-d3c23d176e75>

3.    "Steven M. Cohen, an attorney for Peter Gerace, has raised questions about her credibility in a lawsuit accusing her of libeling and slandering Peter Gerace." Herbeck, Dan, The Buffalo News, Aug. 29, 2021, <https://buffalonews.com/news/local/crime-and-courts/witness-in-organized-crime-probe-sent-to-jail-for-six-months-for-vehicular-assault/article_5d54c7b8-0116-11ec-9278-1b9ba7fdc3c1.html>

4.    "A disgruntled and disturbed ex-wife has been casting aspersions against some very fine people, and Judge Michalski is one in a long list who have been victimized by her," Cohen said. … "Regrettably, a naive assistant U.S. attorney has swallowed everything this woman says hook, line and sinker." Herbeck, Dan, The Buffalo News, Mar. 22, 2022, https://buffalonews.com/news/local/crime-and-courts/feds-search-home-of-state-supreme-court-justice-john-michalski-who-was-hit-by-train/article_566a67f2-ab82-11ec-8254-ab64dd8b3b22.html>

5.    "I have no evidence of a crime committed by Mr. Gerace. I don't have the names of a single witness. I am befuddled," Cohen said.  Michel, Lou, The Buffalo News, Nov. 22, 2022, <https://buffalonews.com/news/local/trial-date-set-for-strip-club-owner-ex-dea-agent-in-organized-crime-case/article_430b4fe8-70ec-11ed-b0d4-bb0f6d5eb35b.html>

6.    "My client still is terribly disadvantaged. I don't know the name of a single witness, a single victim, a single transaction for which my client has been indicted. That is ludicrous," he said. "Mr. Tripi continues to say my client is a danger. He hasn't been able to point to a single instance where my client has threatened anyone directly or indirectly," Cohen said.  McAndrew, Mike, The Buffalo News, Jan. 11, 2023, <https://buffalonews.com/news/local/crime-and-courts/prosecutors-can-keep-witnesses-secret-for-now-in-bribery-case-tied-to-organized-crime/article_54189566-90f9-11ed-9fa9-5f078216dfae.html>

7.    Steven M. Cohen, said it is his understanding that all four of the charges involved one witness "who I am very much looking forward to cross-examining under oath." "We are not at all surprised that the U.S. Attorney is attempting to bring additional charges now. It has become apparent that there's no direct evidence against Peter", Cohen said Saturday." *See*, Becker, Maki, The Buffalo News, Mar. 25, 2023, <https://buffalonews.com/news/local/crime-and-courts/peter-gerace-jr-witness-tampering-human-trafficking-organized-crime/article_5ff462e6-cb43-11ed-a878-63084e90f921.html>

8.    "There is no way this jury is going to be able to unhear the term Italian organized crime," Cohen said. "They're not going to unhear the term mafia. And they're also not going to be able to unhear the fact that Peter does have relatives who were involved in that. Peter himself was never involved in Italian organized crime. But he has relatives who likely were." […] When the judge tells jurors to disregard something that they have heard or seen in court, it rarely affects the jurors like it is intended, Cohen said."  Lakamp, Patrick, The Buffalo News, May 5, 2023, <https://buffalonews.com/news/local/crime-and-courts/ex-dea-agent-strip-club-owner-should-be-tried-together-judge-says/article_d2592222-e9ed-11ed-aec6-e7ad940a8f3e.html>

9.    "The government is doing everything in its power to prevent Gerace's defense from preparing our client for trial," he said. **"**Regrettably, they have found a sympathetic judge who has ordered all these restrictions." Lakamp, Patrick and Michel, Lou, The Buffalo News, May 31, 2023, < https://buffalonews.com/news/local/judge-refuses-to-suppress-evidence-from-searches-of-geraces-home-and-strip-club/article_eeee9966-ff1a-11ed-8610-6fccddc702b4.html>

10. "This judge continues to be particularly harsh to Mr. Gerace, and we see no legitimate basis for that," said Steven M. Cohen, who with attorneys Eric M. Soehnlein and Joseph M. LaTona, represents Gerace. "He appears to accept whatever the prosecution says at face value, even though they are bare allegations not supported by evidence." Lakamp, Patrick, The Buffalo News, June 6, 2023, <https://buffalonews.com/news/local/judge-refuses-to-release-strip-club-owner-ahead-of-bribery-sex--and-drug-trafficking/article_3fd18366-0475-11ee-a8d3-5fb60c07e3c4.html>

11. "The assistant United States attorney continues to make allegations and propound innuendo, no evidence," Cohen said. "We look forward to a trial before impartial jurors so that our client can be acquitted and finally move beyond these baseless allegations." "There seems to be no depths to which he will not plunge to attack Mr. Gerace," Cohen said." Lakamp, Patrick and Michel, Lou, The Buffalo News, June 11, 2023, <https://buffalonews.com/news/local/crime-and-courts/prosecutor-calls-late-judge-michalski-unindicted-co-conspirator-in-gerace-sex-trafficking-case/article_732e1112-0573-11ee-bf9d-ebe59a91d8da.html>

12. "This is not a case where they have any evidence," Cohen said of the government, even after all of the executed search warrants. "There's nothing going to be on the table. You know, here are the handcuffs that were used to chain the girls to the wall. Doesn't exist. Here's a picture of the container that the girls were shipped off to Shanghai. Doesn't exist. Here are the drugs that were caught or bought on premises. Doesn't exist. So this is all about character." Lakamp, Patrick, The Buffalo News, June 21, 2023, <https://buffalonews.com/news/local/crime-and-courts/judge-recuses-himself-from-strip-club-owner-case-after-voicing-suspicion-of-legal-gamesmanship/article_b3bd89ee-103e-11ee-82da-53ded94b7e1b.html>.[1]

In addition to blitzing the press through counsel, Mr. Gerace has personally run media routes, generating the very press coverage he now contends requires severance. For example, in the run up to his trial in 1:19-CR-227, Mr. Gerace wrote letters to the news media complaining about the government's counsel and U.S. District Court Judge John L. Sinatra.

---

[1] Additionally, with respect to the media coverage in 119-CR-227, the government received information from a witness that Mr. Gerace was attempting to weaponize press coverage to poison the jury venire against the government.

Those complaints resulted in at least one evening news broadcast.  More recently, Mr. Gerace has sought to re-litigate his convictions in 1:19-CR-227 by giving multiple interviews with televised and print media.  And just last month, Mr. Gerace provided an interview with The Buffalo News in which he stated, "Somebody's got to open their eyes as to what the prosecutors are doing."  Patrick LaKamp, THE BUFFALO NEWS, Apr. 19, 2026, https://buffalonews.com/news/local/crime-courts/article_6417626d-65be-4e4f-86af-bcbbbfd79b66.html.

Mr. Gerace cannot wield media coverage as both a shield and a sword.  He cannot spend years cultivating publicity, speaking to the press, and shaping the public narrative, only to then invoke that same publicity as grounds for severance when trial approaches.  The prejudice he now claims is the foreseeable product of his own conduct.  Having sharpened the sword himself, he cannot now ask this Court to blunt it.

### 2.  Self-created delays.

Nor can Mr. Gerace use time as both a shield and a sword. He sought repeated extensions to pursue motion practice and now uses that time to claim the intersection of the sentencing and new trial prejudices him.  The very circumstance he invokes only exists at his request.  Having wielded delay to his advantage he cannot now hide behind its predictable consequence.

Mr. Gerace's attention-seeking behavior before the media is rivaled only by his sustained, repeated efforts to delay his sentencing, the timing of which he also claims requires severance.  The jury convicted Mr. Gerace of conspiracy to defraud the United States, bribery of a public official, sex trafficking conspiracy, narcotics conspiracy, witness tampering, and distribution of cocaine on December 27, 2024.  *See* Dkts. 1425, 1426, 1:19-CR-227.  First, on

February 28, 2025, Mr. Gerace moved for a sixty-day extension of time to file his post-verdict Rule 29 and Rule 33 motions, which the district court granted. Dkts. 1448, 1449, at *id.* Next, on April 29, 2025, Mr. Gerace requested another thirty-day extension of time to file his post-verdict Rule 29 and Rule 33 motions, which the district court granted and made the defendant's post-verdict motions due on May 29, 2025. Dkts. 1521, 1526, at *id.* Then, on May 29, 2025, Mr. Gerace requested a twelve-day extension of time to file his post-verdict Rule 29 and Rule 33 motions, which the district court granted and made the defendant's post-verdict motions due on June 10, 2025. Dkts. 1553, 1554, at *id.*

On June 10, 2025, Mr. Gerace filed a sixty-five-page Rule 29 and Rule 33 motion. Dkt. 1559, at *id.* The government responded on August 4, 2025, after receiving one four-day extension. *See* Dkt. 1606, at *id.* On August 11, 2025, the Court rescheduled Mr. Gerace's sentencing for October 31, 2025. Dkt. 1609, at *id.* After that sentencing date was set, Mr. Gerace requested and received several extensions of time to file his reply to the government's response brief. *See* Dkts. 1610–16, at *id.* Mr. Gerace ultimately replied on August 29, 2025. Dkt. 1618, at *id.*

On October 21, 2025, the Court rescheduled Mr. Gerace's sentencing for February 12, 2026, and set deadlines for filing of the PSR, sentencing motions and statements, responses to sentencing motions and statements, and for character letters to be sent to the district court. Dkt. 1638, at *id.* On January 8, 2026, the government informally advised the district court that the PSR, which was due to be filed on December 29, 2025, had not yet been prepared and filed. On January 14, 2026, U.S. Probation informally advised the district court that Mr. Gerace's refusal to participate in the Probation interview process resulted in a delay in completing the PSR.

After this, the district court issued a new sentencing order.  *See* Dkt. 1663, at *id.*  On February 23, 2026, U.S. Probation timely filed the PSR and provided it to the parties.  Dkt. 1677, at *id.*  On March 5, 2026, the government timely filed its Statement with Respect to Sentencing Factors.  Dkt. 1680, at *id*.  Mr. Gerace, however, disregarded the district court's scheduling order and neither timely filed any sentencing factor or motions nor sought an extension of time to do so.  On March 17, 2026, twelve days after his submissions were due, Mr. Gerace filed a motion seeking fourteen days "to file objections to the presentence investigation report and other sentencing advocacy."  Dkt. 1687, at *id.* And on April 20, 2026, the District Court adjourned Mr. Gerace's sentencing once again in light of a government request to hold oral argument on a forfeiture issue and Mr. Gerace's "extensive objections and other pending motions."  Text Order, Dkt. 1733, 1:19-CR-227, (dated Apr. 20, 2026).

Four extensions.  Two episodes of inexplicable, unsanctioned delay.  And an (as yet) unscheduled sentencing date at least 483 days after a jury of his peers convicted him of sex trafficking conspiracy, bribery of a public official, narcotics conspiracy, and witness tampering.  If Mr. Gerace wanted the passing of time to quell the media coverage he has not hesitated to churn up the government, he could have—and should have—made different choices.  Because of the choices Mr. Gerace did make, this Court should "close[] the door[]" on severance.  *Precision Instrument Mfg. Co.*, 324 U.S. at 814.  Accordingly, Mr. Gerace's severance motion should be denied.

**B.    Severance is not merited where evidence about the Outlaws would be admissible against Mr. Gerace in a standalone trial.**

Mr. Gerace also claims that severance is appropriate because "the government intends to present evidence in a joint trial which would be inadmissible in a trial against Mr. Gerace,

including evidence associated with the innerworkings of the Outlaws [ ], an organization in which Mr. Gerace did not have any form of membership." Dkt. 833 at 3.

But evidence of the Outlaws' innerworkings, including co-defendant John Ermin's close monitoring of Mr. Gerace's prosecution in 1:19-CR-227, would be admissible in any trial featuring Mr. Gerace, joint or otherwise, as it is necessary to prove specific allegations in the Indictment and the government's theory of the obstruction conspiracies charged in Counts 1 through 3.[2] Specifically, such evidence is probative of the Indictment's allegation that Mr. Ermin was the international or national president of the Outlaws, makes legible the significance of Mr. Gerace's two in-person meetings with Mr. Ermin following his detention hearings, and contextualizes the Rare Breed's involvement in the conspiracy to retaliate against Ms. Quinn. "[W]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *United States v. Al Fawwaz*, 67 F. Supp. 3d 581, 585 (S.D.N.Y. 2014) (quoting *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998)). Notwithstanding this elementary principle of law, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *United States v. Brown*, 627 F. Supp. 3d 206, 235 (E.D.N.Y. 2022) (quoting *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008)).

Severing the trials would only serve to "impair both the efficiency and the fairness of the criminal justice system" by requiring the government to "present[] the same evidence again and again" and the "victims and witnesses to repeat the inconvenience (and sometimes

---

[2]     While Mr. Gerace may not have been a member of the Outlaws, he was a close associate of the gang, having employed several members at his club and as security, and using them to commit his criminal misdeeds.

trauma) of testifying." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).   This fragmented process results in the "random[] favoring [of] the last-tried defendants who have the advantage of knowing the prosecution's case beforehand" and increases the likelihood that witnesses in one case will be unavailable for another.   *Id.*   Because Mr. Gerace's unfounded evidentiary objections, and attendant concerns about prejudicial spillover, do not support his bid for severance, his motion should be denied.

## II.     Mr. Hinkle's Severance Motion Should be Denied.

Mr. Hinkle also moves for severance under Rule 14(a).   *See* Dkt. 837 at 1.   Mr. Hinkle argues that severance is necessary for three reasons.   First, Mr. Hinkle contends that severance is appropriate because the government's presentation of evidence concerning the prosecution of Mr. Gerace in 1:19-CR-227 "does [not] [ ] involve" Mr. Hinkle and will "create[] a direct 'spillover effect' that will direct impact Mr. Hinkle's ability to receive a fair trial."   *Id.* at 4.   In support of this claim, Mr. Hinkle urges that the jury will find Mr. Hinkle guilty by association because Mr. Gerace "is a convicted felon in the eyes of the jury."   *Id.* at 5.   Mr. Hinkle further argues that the "marked different degrees in culpability among the defendants," including differences in culpability between Mr. Hinkle and Mr. Gogolack, and Mr. Hinkle and Mr. Gerace, warrant severance.   *Id.*   Second, Mr. Hinkle insists that "the media coverage" associated with Mr. Gerace's "sentencing will occur within the same timeframe as the distribution of Supplemental Juror Questionnaires and less than 6-8 weeks prior to the commencement of trial."   *Id.*   And, third, Mr. Hinkle claims that "[t]he complexity of the case will prevent [the] jury [from] compartmentalizing" the evidence.   *Id.* at 7 (bold and all caps omitted).   As set forth below, each of Mr. Hinkle's arguments is unavailing, and his motion should be denied.

10

### A.    Mr. Hinkle cannot carry his extremely heavy burden of identifying a risk of prejudicial spillover.

Mr. Hinkle cannot carry his "extremely heavy burden" of demonstrating a "risk of prejudicial spillover from a joint trial." *United States v. Shkreli*, 260 F. Supp. 3d 247, 253 (E.D.N.Y. 2017) (first quoting *United States v. Nerlinger*, 862 F. 2d 967, 974 (2d Cir. 1988)). For starters, Mr. Hinkle's argument launches from a fatally flawed premise—that much of the evidence would not be admissible against him in a severed trial due to his "minimal and peripheral role," and his lack of membership in, or association with, "any motorcycle club."[3] Dkt. 837 at 6.    This is incorrect.    The Indictment alleges multi-layered, far-reaching conspiracies to obstruct justice through fraud, tampering, and retaliation. *See* Dkt. 24 at 1–34. Mr. Hinkle is alleged to have been involved in each conspiracy. *See id.* As before, "where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Al Fawwaz*, 67 F. Supp. 3d at 585 (quoting *Salameh*, 152 F.3d at 111). Consequently, evidence concerning the reach and layers of the conspiracy would be admissible against Mr. Hinkle irrespective of whether the trials were severed or joint. *See Salameh*, 152 F.3d at 115 (noting that prejudicial spillover warranting severance is generally "an unlikely occurrence when all the defendants are charged under the same conspiracy count" (citing *United States v. DiNome*, 954 F.2d 839, 843–44 (2d Cir. 1992)).

Nor does Mr. Hinkle's "minimal" or "peripheral role"—characterizations the government disputes—favor severance.    "[D]iffering levels of culpability and proof are

---

[3]    Once again, Mr. Hinkle is making representations to this Court that are flatly contradicted by admissions he made to the government over the course of two proffers. As the government argues in its motions in *limine*, Mr. Hinkle's repeated assertions that he "is not a member nor an associate of any motorcycle club" waives the proffer-protection otherwise accorded to his contrary statements and entitles the government to use them at trial.

inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Delgado*, 972 F.3d 63, 81 (2d Cir. 2020) (quoting *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983)).    "Indeed, not only are joint trials 'constitutionally permissible' when they place 'defendants who are . . .  marginally involved alongside those heavily involved'; they are 'often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy.'" *Delgado*, 972 F.3d at 81 (quoting *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003)); *see also United States v. Brown*, 627 F. Supp. 3d 206, 235–36 (E.D.N.Y. 2022) (holding that defendants had not sufficiently alleged spillover prejudice when their motions were based on their non-membership in the gang); *United States v. Brown*, No. 3:12-CR-74 WWE, 2012 WL 6681690 at *1-2 (D. Conn. Dec. 21, 2012) (non-gang-affiliated defendant denied severance from gang-involved codefendants because the court found that much of the same evidence would be admissible in a separate trial, and jury instructions sufficiently would separate the evidence).    And though Mr. Hinkle notes that markedly "different degrees of culpability" can increase the risk of prejudice, Dkt. 837 at 5 (citing *Zafiro*, 506 U.S. at 539), it is also true that "joint trials" can "enabl[e] more accurate assessment[s] of relative culpability—advantages which sometimes operate to the defendant's benefit." *Richardson*, 481 U.S. at 210.    In any event, any heightened risk of prejudice can be managed by clear, careful instructions.

Mr. Hinkle's reliance on *United States v. Branker*, 395 F.2d 881 (2d Cir. 1968) does nothing to undermine these conclusions.    The severance issues in *Branker* stemmed from the district court's dismissal, at the conclusion of trial, of a conspiracy count linking all or most of the defendants charged in the eighty-four-count indictment. *See id.* at 887–89.    At that point, the Second Circuit explained, severance was necessary because a significant portion of

12

the evidence against certain defendants—specifically, those charged in fewer than ten counts—was admissible only through the since-dismissed conspiracy count. *Id.* at 888. By contrast, Mr. Hinkle's motion for severance arrives pre-trial, in a case involving seven counts linked together by three overlapping obstruction conspiracies. Because *Branker* is inapposite to this case, Mr. Hinkle's motion should be denied.

### B. Pre-trial publicity associated with Mr. Gerace's case and upcoming sentencing does not justify severance.

Mr. Hinkle next argues that severance is necessary due to pre-trial publicity surrounding Mr. Gerace's prosecution and upcoming sentencing in 1:19-CR-227. *See* Dkt. 837 at 1–2. Pre-trial publicity is not a permissible basis to grant severance, especially where the pre-trial publicity concerning Mr. Gerace's prosecution in 1:19-CR-227 is not directed toward Mr. Hinkle and where a severed trial would still likely garner local press attention. *See United States v. Biaggi*, 672 F. Supp. 112, 123 (S.D.N.Y. 1987) (holding that severance was unwarranted where there was no allegation that pre-trial publicity was "unfavorable" to a co-defendant and where a solo trial would likely garner publicity because the co-defendant alleged committed crimes while serving in public office); *United States v. Washington*, 819 F. Supp. 358, 363 (D. Vt. 1993) (holding that "appropriate cautionary jury instructions can obviate the need for severance where violent crime or publicity is an issue"). Furthermore, *voir dire* can effectively ensure that the defendants receive a fair and impartial jury. *See Martoma*, 2014 WL 164181, at *7. Accordingly, Mr. Hinkle's motion should be denied.

### C. The Length and Complexity of the Trial Do Not Favor Severance.

Lastly, Mr. Hinkle contends that the complexity of the case heightens the risk that prejudicial spillover will deprive him of his right to a fair trial. *See* Dkt. 837 at 7–10. Mr. Hinkle claims that the "moderately complex evidence . . . will require close evaluation by the

jury," a task complicated "by multiple timelines of alleged crimes committed, different alleged conspiracies, different types of crimes, and an array of false statements by co-defendants." *Id.* at 7. If history is any indication, juries are intelligent and focused enough to follow even "moderately complex" trials. Consider, for instance, *United States v. Casamento*, 887 F.2d 1141 (2d Cir.1989), an appeal of a seventeen-month-long trial involving twenty-one defendants, over 275 witnesses, thousands of exhibits, and 40,000 pages of trial transcripts. *Id.* at 1149–50. The defendant-appellants argued that the district court abused its discretion in denying their motions for severance due to the length and complexity of the trial. *See id.* Though the Second Circuit agreed that "the magnitude of th[e] trial was extraordinary," it "ha[d] no reason to believe that the jury lacked the intellectual capacity to meet the task before it." *Id.* Moreover, "the nature of the evidence and the legal concepts involved in the case were not extraordinarily difficult to comprehend, as they might be, for example, in a complex anti-trust case involving abstruse economic theories . . . ." *Id.* at 1150. Mr. Hinkle suggests that understanding the "medical records[,] toxicology results . . . , FBI geofence/cell phone surveillance, and overlapping conspiracies" will be too complicated for the jury to comprehend. But, as *Casamento* demonstrates, juries can follow lengthy conspiracies, and there is no reason to believe that medical records, toxicology results, or cell phone data— routine categories of evidence in criminal cases—would inhibit the jury's ability to carefully and fairly evaluate the evidence. Accordingly, Mr. Hinkle's motion for severance should be denied.

### III.     Mr. Ermin's Motion for Severance Should Be Denied.

Mr. Ermin asks "that Counts 1–3 be severed and that he be tried individually with respect to the" Indictment. Dkt. 832 at 1. The Court has already determined that Counts 1

through 5, 23, and 26 are to be grouped together, and the remaining counts severed. Mr. Ermin offers no new argument as to why the Court should revisit its earlier determination. Mr. Ermin next argues that pre-trial publicity centered on Mr. Gerace "is extremely prejudicial to [Mr.] Ermin when assessing the import of their meeting at the jail," in 2023 after Mr. Gerace was detained. *Id.* at 2. As before, pre-trial publicity is an insufficient basis to sever the defendants. Moreover, irrespective of any pre-trial publicity, the jury will learn of Mr. Gerace's "legal problems"—such as the fact he had been indicted in 1:19-CR-227— through the government's presentation of the evidence. Evidence of Mr. Gerace's legal liabilities is an inextricable component of the prosecution of this case, which concerns the obstruction of 1:19-CR-227. *See generally* Dkt. 24 at 1–35, 45, and 47.

Additionally, Mr. Ermin posits that evidence of Mr. Gerace's motive "to silence Crystal Quinn . . . . would not normally be admissible against" Mr. Ermin. Dkt. 832 at 2. But, as with his co-defendants, this argument overlooks that "[w]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Al Fawwaz*, 67 F. Supp. 3d at 585 (quoting *Salameh*, 152 F.3d at 111). Thus, evidence of Mr. Gerace's motive to tamper with and retaliate against Ms. Quinn—the very impulse that set into motion the conspiracies charged in Counts 1 through 3—is undeniably admissible against Mr. Ermin irrespective of whether he is tried jointly with his co-defendants or is severed. Finally, though Mr. Ermin claims that "no jury charge or instruction would insulate [him] from [ ] unfair prejudice," Dkt. 832 at 3, the "prejudice" Mr. Ermin alludes to is, far from being unfair, in accordance with the rules of evidence and conspiracy law. *See Al Fawwaz*, 67 F. Supp. 3d at 585. Accordingly, Mr. Ermin's motion for severance should be denied.

### IV.    Mr. Knight's Motion for Severance Should Be Denied.

Mr. Knight moves for severance on three grounds.  First, he claims that pre-trial publicity related to Mr. Gerace's upcoming sentencing will irreparably prejudice his ability to have a fair trial.  Dkt. 828-1 at 3.  In Mr. Knight's view, the media coverage of Mr. Gerace's sentencing "will make Gerace a toxic co-defendant."  *Id.*  Second, Mr. Knight argues that "[i]t will be impossible for the jury to separate the conduct alleged in [Ms.] Quinn's testimonial statements and follow the Court's instructions not to consider them against Knight, especially because he was acquainted (if not friends) with three of the five defendants against whom the government seeks to admit her statements on a forfeiture by wrongdoing theory."  *Id.* at 4–5.  Mr. Knight also argues severance is necessary because, in his view, the government's proposed motorcycle gang expert, ATF Intelligence Operation Specialist ("IOS") Jeremy Scheetz, will provide testimony irrelevant to Mr. Knight.  *Id.* at 6.  Third, and similarly, Mr. Knight states that potential privilege and crime-fraud issues involving Mr. Gerace, attorney Steve Cohen, and private investigator Paul Lawrence are inflammatory and prejudicial to Mr. Knight, and therefore require Mr. Knight's severance.  *Id.* at 6–7.  Fourth, Mr. Knight believes severance is necessary because of "*Bruton*" issues that he concededly has yet to identify.

None of these claims are persuasive.  For starters, Mr. Knight fails to identify any case supporting his theory that Mr. Gerace's pre-trial publicity requires severance.  Nor does he substantiate his assumption that local media coverage of Mr. Gerace's prosecution in 1:19-CR-227 will prejudice a jury venire that, if experience is any indicator, is unlikely to read the news or get it from legacy outlets.  And, as with his co-defendants, Mr. Knight fails to explain why *voir dire* is an inadequate mechanism "to address concerns about the effect of pre-trial publicity on a defendant's right to a fair trial."  *Martoma*, 2014 WL 164181, at *7.

16

Mr. Knight's concern that the jury will impermissibly find him guilty based on statements involving the Outlaws and Mr. Gerace's sex trafficking operation, corruption, narcotics, and witness tampering crimes is equally unfounded.  In multi-defendant cases, it is not unusual for evidence to be admitted to one defendant but not another.  Guided by the Court's instructions, juries are nevertheless able to differentiate between defendants and the evidence during their deliberations, even in cases implicating the forfeiture by wrongdoing doctrine.  *See United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991) (noting that the "disparit[ies] in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance"); *United States v. Harris*, No. CR 24-105, 2025 WL 2104274, at *19 (E.D. La. July 25, 2025) ("While the Government does seek to introduce statements under the forfeiture by wrongdoing exception against Alfortish, Parker, and Motta, admission of evidence or statements against one defendant that may not apply to another defendant, on its own, does not warrant severance."). It would be odd, however, if the jury held Ms. Quinn's statements against Mr. Knight when (1) the government will not argue that the statements should be held against Mr. Knight, (2) the statements bear no facial connection to Mr. Knight or a motorcycle club (i.e., the Rare Breed) with which he is closely associated, and (3) the Court will instruct the jury not to consider the statements when assessing Mr. Knight's guilt as to Counts 1, 5, and 23.

Mr. Knight's remaining objections to the joint trial can be resolved in short order.  Mr. Knight claims that IOS Scheetz's anticipated testimony is irrelevant to Mr. Knight because the government does not "dispute" that Mr. Knight was ever "a member, prospect, or **hang-around** of, or otherwise associated with or affiliated with, the Outlaws M.C. or the **Rare Breed M.C.**"  Dkt. 828-1 at 5 (emphases added).  He is wrong.  Because Mr. Knight

characterized himself as a Rare Breed "hang-around" in his interview with the FBI and is "otherwise" closely "associated with . . . the Rare Breed," the government very much disputes Mr. Knight's representations to this Court. Moreover, irrespective of his association with the Rare Breed, Mr. Knight is charged in a conspiracy involving the motorcycle gangs. Therefore, even if Mr. Knight were severed from his co-defendants, most of the evidence would be admissible against him in a stand-alone trial. *See Al Fawwaz*, 67 F. Supp. 3d at 585 (noting that "[w]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant" (quoting *Salameh*, 152 F.3d at 111)). By that same token, evidence of Mr. Gerace's obstruction of 1:19-CR-227 through Mr. Cohen would still be admissible against Mr. Knight, as that conduct is alleged in Count 1 as part of a larger effort to defraud the United States District Court and its Grand Jury and obstruct the Grand Jury's work. That Mr. Gerace's work unfolded on the front-end of that conspiracy and Mr. Knight's the backend does not preclude the government from proving the entire conspiracy, as charged, even in a severed trial. *See Al Fawwaz*, 67 F. Supp. 3d at 585. Finally, insofar as Mr. Knight raises the specter of *Bruton* issues without actually identifying any *Bruton* issues for the Court, his motion should be denied as premature. Accordingly, Mr. Knight's motion for severance should be denied.

## V.    Mr. Roncone's Motion for Severance Should be Denied.

Lastly, Mr. Roncone moves for severance, citing the pre-trial publicity surrounding Mr. Gerace, ATF IOS Scheetz's anticipated testimony concerning the Outlaws and its support and affiliate clubs, and undefined "undecided evidentiary issues." Dkt. 831 at 1–5. None of these issues merit severance. First, as previously noted, pre-trial publicity does not warrant severance

because *voir dire* can effectively ensure that Mr. Roncone receives a fair and impartial jury. *See Martoma*, 2014 WL 164181, at *7. Second, insofar as Mr. Roncone argues that IOS Scheetz's testimony concerning "the Outlaw Motorcycle Club" would prejudice him because he "is not a member of the Outlaw Motorcycle Club," Dkt. 831 at 4, he fails to note that IOS Scheetz's anticipated testimony will also help the jury understand the Outlaws' relationship with their affiliate and support clubs. Mr. Roncone is a leader of the Rare Breed Motorcycle Club, which is an Outlaws support club. Accordingly, IOS Scheetz's anticipated testimony is directly relevant to Mr. Roncone's commitments to the Rare Breed and the Outlaws, and would be admissible against Mr. Roncone even if he were severed. *See Al Fawwaz*, 67 F. Supp. 3d at 585. Lastly, insofar as Mr. Roncone seeks severance due to undefined evidentiary issues, his motion is premature. Accordingly, the Court should deny Mr. Roncone's motion for severance.

## CONCLUSION

In conclusion, the Court should deny the defendants' motions for severance.

DATED: Buffalo, New York, April 22, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:    s/ CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov

19