IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

        v.                                              23-CR-99-EAW

SIMON GOGOLACK,

                Defendant.

_____

### GOVERNMENT'S POST-HEARING MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS

**THE UNITED STATES OF AMERICA**, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorneys, respectfully files this post-hearing memorandum in opposition to the defendant's pretrial motion (Doc. No. 690 at ¶¶ 79–84) seeking suppression of statements made by the defendant. Because the defendant's statements[1] were either (1) not the product of custodial interrogation, or (2) were made after a knowing, intelligent, and voluntary waiver of *Miranda,* and (3) because all his statements were voluntary, the defendant's motion to suppress should be denied.

### I. FACTUAL BACKGROUND

On December 2, 2025, defendant Gogolack filed an omnibus pretrial motion which, in part, sought to suppress statements the defendant made to law enforcement on August 2, 2023. *See* Doc. No. 690 at ¶¶ 79–84. On December 23, 2025, the government filed a response

---

[1] The government specified which statements it intends to use on its case-in-chief in its response to Mr. Gogolack's Motion to Suppress, on the record at the outset of the suppression hearing, and again *infra.*

to the defendant's pretrial motion (*see* Doc. No. 723).  On January 2, 2026, Mr. Gogolack filed his reply (*see* Doc. No. 727).  At oral argument on January 7, 2026, the Court ordered Mr. Gogolack to produce any affidavit in support of his motion to suppress by January 16, 2026.  *See* Doc. No. 730.  On January 16, 2026, Mr. Gogolack filed his affidavit.  *See* Doc. No. 736.  At oral argument on January 21, 2026, the Court ordered Mr. Gogolack to supplement his suppression briefing by February 4, 2026 (which he did, *see* Doc. No. 751) and ordered the government to respond to the supplemental brief by February 18, 2026 (which it did, *see* Doc. No. 767).

At oral argument on February 24, 2026, the Court scheduled an evidentiary hearing for March 27 and March 30, 2026.  *See* Doc. No. 773.  At the outset of the hearing, the parties and the Court agreed that the issue to be resolved was a narrow one. The only question before the court was whether the defendant was subjected to a two-step interrogation.[2]   The government called Lieutenant Aleksander Wojciechowicz of the Depew Police Department ("DPD"), and Special Agents Adam Penna and Jason Kammeraad of the Federal Bureau of Investigation ("FBI"), entered exhibits into evidence,[3] and then rested.  *See*, *generally*, Tr1.[4]

---

[2] The Court and that parties agreed that the purpose of the hearing was to find facts related to whether law enforcement engaged in a deliberate, two-step interrogation process – and that the purpose was not to address other issues, such as whether Mr. Gogolack invoked his right to counsel, which did not require additional fact-finding beyond the exhibits already before the Court.

[3] Exhibits in evidence include: 1 (Depew Body Camera Video), 1A (Pre-Arrest Body Camera), 1B (Post-Arrest Body Camera), 2 (Depew Full Station Video), 2A (Screenshot of Video), 2B (Screenshot of Video), 3 (Depew PD Arrest Report), 4 (Interview of Gogolack Transcript), 5 (Updated Transcript of Gogolack Interview), 6 (Penna/Woj Text Messages), 3500A (Cell Phone SW Packet), 3501B (Interview of SQ 302), 3501B-1 (Notes from SQ Interview), 3501B-2 (SQ FD-597), 3501C (Penna Affidavit), 3501D (Email Thread), 3501E (Interview of PG 302).

[4] "Tr1." refers to the combined March 27, 2026, and March 30, 2026, transcripts.  "Ex." refers to government and defense exhibits introduced during the hearing.  The government already provided exhibits to the Court and can provide them again if necessary.

The facts relevant to the instant suppression motion can be summarized through the testimony of the three witnesses as follows.

*Testimony of Lieutenant Wojciechowicz, Tr1 at 14 – 80*

On August 2, 2023, then-Police Officer ("PO") Wojciechowicz was instructed by his shift supervisor to "meet with two FBI agents and essentially conduct a traffic stop on a vehicle that they were going to be investigating." Tr1 at 21. PO Wojciechowicz was advised of the name Simon Gogolack, and informed that Gogolack would likely be operating a 2008 Honda Accord. Tr1 at 22, 23. PO Wojciechowicz checked Mr. Gogolack's information in a law enforcement database containing information related to his driving record, which revealed not only Mr. Gogolack's photograph, but that his license was both suspended and revoked. Tr1 at 23–25. PO Wojciechowicz did not recall learning any specific details about why the FBI wanted to interact with Mr. Gogolack from his conversation with his supervisor. Tr1 at 25. Ultimately, PO Wojciechowicz got in contact with the FBI agents. Tr1 at 25–26. At some point on August 2, 2023, PO Wojciechowicz waited in the vicinity of Donna Court, Depew, New York, to see whether Mr. Gogolack would be driving the Honda Accord in the area. Tr1 at 26. While waiting, PO Wojciechowicz met with FBI agents there at approximately 4:08 p.m. Tr1 at 54. PO Wojciechowicz recalled the FBI agents requesting assistance with a traffic stop but did not recall receiving any other information about their investigation. Tr1 at 55.

Eventually, PO Wojciechowicz observed Mr. Gogolack, driving a 2008 black Honda Accord. Tr1 at 26–27. PO Wojciechowicz also noticed that Mr. Gogolack failed to properly signal his turn in violation of New York State ("NYS") Vehicle and Traffic Law ("VTL"). Tr1 at 27–28. PO Wojciechowicz then initiated a traffic stop by activating his emergency lights, which in turn, automatically activated his body-worn camera video. Tr1 at 28.

3

PO Wojciechowicz recorded two videos. The first body-worn camera video recorded the traffic stop, beginning at about 7:05 p.m. Tr1 at 30. PO Wojciechowicz approached Mr. Gogolack's vehicle and eventually arrested him for the aforementioned VTL violations. Tr1 at 30. PO Wojciechowicz spoke with FBI agents twice over the phone: once just before arriving in the vicinity of Donna Court, and a second immediately after stopping Mr. Gogolack. Tr1 at 35–37. PO Wojciechowicz recalled that in the second call, the FBI agents alerted him to the follow-car behind Mr. Gogolack. Tr1 at 37.

PO Wojciechowicz had no intention of interviewing Mr. Gogolack on August 2, 2023. Tr1 at 30–31. Neither the FBI agents, nor anyone else, asked PO Wojciechowicz to interview Mr. Gogolack. Tr1 at 31. PO Wojciechowicz did not provide Mr. Gogolack with *Miranda* warnings at the time of his arrest. *Id.*

After placing Mr. Gogolack under arrest, PO Wojciechowicz placed Mr. Gogolack in the back of his patrol vehicle, walked away, and deactivated his body-worn camera at about 7:12 p.m. Tr1 at 32. PO Wojciechowicz deactivated his body-worn camera because Mr. Gogolack was in custody and, to him, the incident was over. Tr1 at 59. PO Wojciechowicz did not recall having any conversation with Mr. Gogolack in between the conclusion of the first body-worn camera video and the start of the second—and he is confident he did not interview Mr. Gogolack during such time. Tr1 at 33–34. PO Wojciechowicz did not recall the FBI disclosing to him why Mr. Gogolack was a person of interest in their investigation— and he is confident that the FBI did not ask him to question Mr. Gogolack on their behalf. Tr1 at 34–35. PO Wojciechowicz did not have any recollection of FBI agents interacting with, or speaking to, Mr. Gogolack while at Donna Court. Tr1 at 37–38.

The second body-worn camera video starts approximately 65 minutes after the first video ends. Tr1 at 38. During that 65-minute period, PO Wojciechowicz recalls conducting

a vehicle inventory on the 2008 Honda Accord. Tr1 at 38–39. PO Wojciechowicz did not end up impounding the vehicle. Tr1 at 60. Since he did not ultimately impound the vehicle, PO Wojciechowicz did not create an inventory form related to the vehicle. Tr1 at 78. During this time, PO Wojciechowicz recalled that his supervisor responded and that the FBI agents talked with the Honda Accord's registered owner. Tr1 at 38–39. PO Wojciechowicz recalled the supervisor on scene being Lieutenant Menard, who arrived on scene "to see what was going on since we were working with the FBI" which was not an everyday occurrence for their local police department. Tr1 at 42. The supervisor arrived with a trainee; PO Wojciechowicz did not observe either interact with Mr. Gogolack. Tr1 at 42–43.

PO Wojciechowicz testified that before he got in his vehicle to transport Mr. Gogolack to DPD, he had no plan in his head to interview Mr. Gogolack. Tr1 at 43. PO Wojciechowicz turned on his body-worn camera while transporting Mr. Gogolack "for officer safety and just to prevent any accusations of anything happening, I turned it on." Tr1 at 68. PO Wojciechowicz testified that, as he sat before the Court on March 27, 2026, he did not believe that he ever "interviewed" Mr. Gogolack. Tr 1 at 44. PO Wojciechowicz explained that as a police officer, he is motivated to keep the mood light during an arrest and to avoid escalating or creating a hostile environment—because that facilitates an all-around better experience for both the officer and arrestee. Tr1 at 44. For those reasons, PO Wojciechowicz explained that if an arrestee addresses PO Wojciechowicz, he does not ignore them—he responds.

While transporting Mt. Gogolack from Donna Court to DPD, Mr. Gogolack spoke a lot. Tr1 at 45. And PO Wojciechowicz responded to some of the things that Mr. Gogolack said. Tr1 at 45. When Mr. Gogolack positioned himself directly behind PO Wojciechowicz, he asked Mr. Gogolack to move over to the passenger side of the vehicle. Tr1 at 64. In the moment, PO Wojciechowicz explained to Mr. Gogolack that his request was that he could

"hear you better." PO Wojciechowicz explained to the Court that this request was primarily out of concern for his own safety. Tr1 at 64. PO Wojciechowicz further explained that asking Mr. Gogolack to move so he could hear is a "nicer way of saying it to the individual" to achieve that end. Tr1 at 64. PO Wojciechowicz never threatened or made any promises to Mr. Gogolack and described their interaction as mutually respectful. Tr1 at 46.

When they arrived at the DPD, PO Wojciechowicz asked Mr. Gogolack questions regarding routine booking information, but did not otherwise question him about any criminal activity. Tr1 at 48. The FBI agents arrived while PO Wojciechowicz was still completing the process of booking. Tr1 at 48–49. PO Wojciechowicz did not have any recollection of the FBI agents interviewing Mr. Gogolack in his presence in the booking area. Tr1 at 49. PO Wojciechowicz did not document any of the statements Mr. Gogolack made in a "710.30 form." Tr1 at 50. PO Wojciechowicz never observed the FBI agents threaten Mr. Gogolack or act violently towards him, and nothing about their interaction with Mr. Gogolack stood out in his memory at all. Tr1 at 51.

*Testimony of Special Agent Adam Penna, Tr1 at 84–166*

Special Agent ("SA") Adam Penna testified about his training and experience, including his training about interviews and how to follow constitutional requirements like Miranda warnings. Tr1 at 84–87. SA Penna testified that new agents are trained at Quantico to avoid doing anything to upset or circumvent Miranda warnings, and that concept is "drilled into every new agent pretty hard at Quantico." Tr1 at 122. SA Penna testified that he was taught that Miranda warnings should be read when "two factors are in play: when there is custody, and there is interrogation . . . ." Tr1 at 87. SA Penna was never taught to deliberately delay Miranda warnings in order to obtain statements first. Tr1 at 88. SA Penna has conducted over 1,000 interviews in his career. Tr1 at 88. SA Penna testified that Miranda

warnings are not always required in those interviews, unless custody and interrogation are present. Tr1 at 89. When planning to conduct a formal custodial interview, SA Penna generally seeks an interview room that can be recorded "for documentation purposes" and advising the person of their Miranda rights. Tr1 at 89.

SA Penna was aware that Crystal Quinn was slated to be witness for the government in a federal trial against Peter Gerace and Joseph Bongiovanni. Tr1 at 91–92. On August 2, 2023, SA Penna became involved in the investigation into Crystal Quinn's death, along with SA Brian Burns and SA Jason Kammeraad. Tr1 at 89–90. That day, FBI analysts and support staff were also working on the death investigation. Tr1 at 90. SA Brian Burns provided SA Penna with preliminary information about Crystal's death. Tr1 at 90. Among the information SA Penna gleaned was that an individual who was with Crystal before she died would be returning her mother's car that day (August 2). Tr1 at 91.

SA Penna described how the FBI was learning information from Sharon Quinn, Ms. Quinn's mother, as well as from the local police department in the town where Ms. Quinn's death was reported. Tr1 at 92–93. The FBI learned from Sharon Quinn that Crystal and "Simon" had taken Sharon's car down to "somewhere in the Southern Tier" and that "Simon" indicated he was going to return the car to Depew, New York on August 2, 2023. Tr1 at 93. SA Penna was receiving information about "Simon's progress, his travel from the Southern Tier back to Buffalo" from SA Brian Burns, and he believed SA Burns was receiving the information from Sharon Quinn. Tr1 at 140–142. The first time that SA Penna recalls having direct contact with Sharon Quinn was "after the traffic stop and arrest of Simon Gogolack by the Depew Police Department outside of Sharon Quinn's house." Tr1 at 94. SA Penna learned from FBI analysts that "Simon" was "Simon Gogolack" and that his license was "invalid" or "suspended"—meaning that if he was driving a vehicle "he would be

breaking the law". Tr1 at 94–95. The FBI contacted DPD to request assistance initiating a traffic stop of Mr. Gogolack. Tr1 at 95. DPD advised the FBI that, if Mr. Gogolack was in fact driving with a suspended license, they would be able to arrest him and bring him back to the police station. Tr1 at 95–96. SA Penna recognized that "perhaps during [the booking process] we would have an opportunity to speak with him." Tr1 at 96.

SA Penna and SA Kammeraad eventually went to the vicinity of Donna Court when— based on information the FBI was receiving from Sharon Quinn—they believed Mr. Gogolack was on his way. Tr1 at 97. Once the FBI had learned from DPD that they would arrest Mr. Gogolack if they observed him driving with a suspended license, SA Penna began to formulate a plan to conduct a custodial interview of Mr. Gogolack. Tr1 at 99. This involved coordination with DPD, including finding out whether they had a recorded interview room. Tr1 at 99. SA Penna testified that "we weren't going to be taking custody, but because he was going to be in someone else's custody, it was important we do it formally and Mirandize him and get it on video if we can." Tr1 at 99. SA Penna worked with SA Kammeraad to formulate a plan regarding a custodial interview of Simon Gogolack. Tr1 at 99. The plan was to conduct a "fact-finding interview" and to "try to get him to talk and see what he'll say." Tr1 at 99–100.

SA Penna testified that there was <u>not</u> a plan to question Mr. Gogolack without Miranda and then to later repeat that line of questioning after advising him of his Miranda warnings. Tr1 at 100.

SA Penna testified that on August 2, 2023, at about 7:00 p.m., he was with SA Kammeraad in the vicinity of Donna Court, Depew, New York, waiting for DPD to conduct a traffic stop of Mr. Gogolack's vehicle. Tr1 at 100. By the time the traffic stop occurred, SA Penna had been investigating Crystal Quinn's death for "at least a few hours". Tr1 at 101.

At that time, the agents had not received an autopsy report or a toxicology report. Tr1 at 101. SA Penna did not recall having reviewed local police reports related to Ms. Quinn's death by the time of Mr. Gogolack's traffic stop. Tr1 at 101. By that time, SA Penna had not formed an opinion as to the manner of Ms. Quinn's death. Tr1 at 102, 164.

SA Penna recalled arriving at the scene of the traffic stop of Mr. Gogolack, and checking with the DPD officer to "mak[e] sure he had everything he needed and [the scene] was secure." Tr1 at 102. SA Penna observed Simon Gogolack in the custody of the Depew police officer. Tr1 at 102–103. SA Penna first recalled seeing Mr. Gogolack in the back of the DPD vehicle. Tr1 at 103. SA Penna testified that he did not recall talking to Mr. Gogolack when SA Penna arrived at the scene of the traffic stop. Tr1 at 103–104. SA Penna did not learn that SA Kammeraad had spoken with Mr. Gogolack at the scene of the traffic stop until "sometime later". Tr1 at 104.

One of the first things that SA Penna did while at Donna Court was identify a "trail car" that had been following behind Mr. Gogolack before the traffic stop, approach that vehicle, and find out who was inside and what they were doing there. Tr1 at 104–105. SA Penna identified the driver of that vehicle as "Paul Gogolack, [ ] Simon's father". Tr1 at 105. SA Penna spoke to Paul Gogolack, advised him that Simon was going to be taken to DPD, but that he likely would not be detained overnight, and offered to call Paul Gogolack to facilitate picking Simon up from the stationhouse. Tr1 at 105. SA Penna also observed a female in that vehicle, who he later identified as Cortnie Barber. Tr1 at 105–106. While at the scene, SA Penna also approached Sharon Quinn (and possibly John Grieco) to "make sure they didn't come out in the street and do anything." Tr1 at 106. SA Penna ultimately conducted a "long interview" of Sharon Quinn to attempt to gather information about Crystal's death and notated what he learned in handwritten notes on his notepad. Tr1 at 107.

9

While at the scene, SA Penna also reviewed the contents of the Honda Accord that Mr. Gogolack was driving. Tr1 at 107. Inside the trunk, SA Penna observed Crystal's belongings and some loose pills. Tr1 at 108. SA Penna compared the loose pills in the trunk to Crystal's prescription medication that Sharon Quinn produced. Tr1 at 108. After reviewing his report to refresh his memory, SA Penna testified that there had been one loose Xanax pill in the trunk, at that Ms. Quinn had a nearly-full prescription bottle left at home. Tr1 at 109. SA Penna testified that he did not have any idea why Mr. Gogolack was at Donna Court in the back of a police car for an hour before being brought to the DPD. Tr1 at 152.

Upon leaving 51 Donna Court, SA Penna and SA Kammeraad went to DPD and stopped at Burger King along the way because "it was getting late and we figured Simon might be hungry." Tr1 at 112. SA Penna recalled arriving at DPD "shortly after 9 p.m." where he saw Mr. Gogolack in the booking area sitting across from the arresting officer. Tr1 at 112. SA Penna did not speak with PO Wojciechowicz about any conversations he (Wojciechowicz) may have had with Mr. Gogolack. Tr1 at 114. SA Penna spent "less than 10 minutes" in the booking area with Mr. Gogolack while SA Kammeraad met with PO Wojciechowicz for a "mini tour of the Depew PD" to get acquainted with the interview room and the set-up. Tr1 at 114–15. During the timeframe SA Penna was alone with Mr. Gogolack, he did not ask Mr. Gogolack anything about his investigation—and did not recall asking Mr. Gogolack anything at all. Tr1 at 115. SA Penna testified that "I was trying not to make conversation with him because I knew we were literally about to have a recorded interview, and I didn't want to begin that process prematurely." Tr1 at 116.

SA Penna testified that once he was notified that the Depew police officer had reached a point where he no longer needed to ask Mr. Gogolack questions to complete the booking process, "we explained to Simon we [ ] were FBI agents, and wanted to ask him some

questions." Tr1 at 116. SA Penna testified that "it was pretty clear that he knew what we were there for and what we wanted to talk to him about" and "we told him there was an interview room down the hall and he agreed to come with us and have a conversation with us." Tr1 at 116. SA Penna did not want to have a substantive conversation with Mr. Gogolack in front of the Depew officer because the Depew police officer "wasn't involved" in their investigation and because "we didn't know where it was going to go, so it made sense to do it separately." Tr1 at 116. SA Penna also testified that he felt Mr. Gogolack might be "more free and open" if the interview occurred outside of the presence of the Depew officer to make it clear that it was "unrelated to the reason he was in custody with Depew." Tr1 at 116–17.

SA Penna testified that once inside the interview room, he and SA Kammeraad advised Mr. Gogolack of his Miranda warnings. Tr1 at 118. SA Penna testified that neither he, nor his partner, ever threatened Mr. Gogolack, promised anything to Mr. Gogolack, or displayed their weapons at Mr. Gogolack. Tr1 at 118. SA Penna identified the paper in front of SA Kammeraad in a screenshot from the video recording of the interview (Ex. 2B) as his notes from his interview of Sharon Quinn. Tr1 at 119–120. SA Penna testified that he does not believe that, at the time of the video-recorded interview of Mr. Gogolack, he was aware that SA Kammeraad had spoken with Mr. Gogolack earlier while at Donna Court. Tr1 at 121.

During a break in the interview of Mr. Gogolack, where the agents left the room, SA Penna remembered SA Kammeraad "preparing a search warrant" but did not recall if he (SA Penna) assisted in that process. Tr1 at 127–128.

SA Penna testified that he did not, at any point, devise a plan with SA Kammeraad to circumvent Miranda and effectuate a two-step interrogation. Tr1 at 122.

11

*Testimony of Special Agent Jason Kammeraad, Tr1 at 172 – 245*

SA Kammeraad testified about his education, training, and professional experience. Tr1 at 172 – 75.  That included training at Quantico, Virginia regarding interview techniques and legal training.  Tr1 at 175.  SA Kammeraad testified about his work assisting in trial preparation in the case of *United States v. Bongiovanni and Gerace*, including attending proffer meetings with Crystal Quinn.  Tr1 at 176.  On the morning of August 2, 2023, SA Kammeraad learned of Crystal Quinn's death from SA Brian Burns.  Tr1 at 177.  SA Kammeraad began working immediately, and in conjunction with other agents, to learn more about Crystal Quinn's death.  Tr1 at 177–78.

SA Kammeraad learned that Simon Gogolack would be returning Sharon Quinn's car to Depew, New York.  Tr1 at 178, 228.  He believed the source of that information was John Grieco, Sharon Quinn's roommate.  Tr1 at 178.  Prior to August 2, 2023, SA Kammeraad had never heard the name Simon Gogolack at all.  Tr1 at 178–79.  SA Kammeraad obtained a "workup" on Mr. Gogolack, which informed him that Mr. Gogolack's driver's license "was either suspended or revoked."  Tr1 at 179.  SA Kammeraad and other members of the investigative team came up with a plan to attempt to make contact with Simon Gogolack in Depew, New York by having a Depew police officer conduct a traffic stop.  Tr1 at 180.  SA Kammeraad testified that somebody from his team reached out to Depew PD to attempt to gain their assistance, and he learned that the Depew PD had agreed to provide their assistance.  Tr1 at 180.

SA Kammeraad testified that he remembers meeting with a Depew police officer in the vicinity of Donna Court around 4 p.m. on August 2, 2023.  SA Kammeraad did not have a distinct memory of that interaction but testified that he did not tell the Depew officer details

12

about what he was investigating. Tr1 at 181. That interaction lasted less than 15 minutes. Tr1 at 229–30.

At some point on August 2, SA Burns forwarded an email to SA Kammeraad containing Wellsville police reports and scene photographs related to Ms. Quinn's death. Tr1 at 181–82. SA Kammeraad testified that he recalled reviewing that material, but that he was not sure exactly when he reviewed that material. Tr1 at 182. SA Kammeraad had not yet received an autopsy report or toxicology report related to Ms. Quinn's death. Tr1 at 182. On August 2, 2023, SA Kammeraad did not know whether Ms. Quinn's death was an accident, or whether foul play was involved. Tr1 at 182–83. After meeting the Depew officer around 4 p.m., SA Kammeraad remained on scene in the vicinity of Donna Court with his partner SA Penna. Tr1 at 183. During that time, SA Kammeraad and SA Penna discussed their plan for conducting a custodial interview of Simon Gogolack if he was arrested by the Depew Police Department. Tr1 at 185. SA Kammeraad explained "If there was indeed an arrest of Simon, then we planned to conduct [the interview] at the Depew Police Department." Tr1 at 185. SA Kammeraad testified that he did <u>not</u> have a plan in his mind to conduct a substantive interview of Mr. Gogolack while he sat in the back of a police vehicle. Tr1 at 185.

SA Kammeraad recalled SA Penna being in telephonic contact with the Depew officer regarding coordination of the traffic stop. Tr1 at 184. Once the traffic stop occurred, SA Kammeraad drove to the traffic stop, which took him less than one minute. Tr1 at 185. SA Kammeraad recalls Simon Gogolack being handcuffed and placed under arrest by the Depew officer. Tr1 at 186, 231–33. SA Kammeraad testified that he spoke with the Depew police officer, but that he did not ask the Depew police officer to ask Mr. Gogolack any questions. Tr1 at 188.

13

At some point after the conversation with the Depew officer, SA Kammeraad approached Simon Gogolack where he was located in the back of the Depew police vehicle. Tr1 at 188. SA Kammeraad's intention was "to introduce myself to Simon." Tr1 at 188. SA Kammeraad explained the reason that he wanted to introduce himself, stating "I was there on scene, I wasn't a uniformed officer, and my intent was to interview Simon at a later [time]. I didn't want the first time that he saw me or knew who I was to be at an interview." Tr1 at 189. SA Kammeraad did <u>not</u> intend on asking Mr. Gogolack substantive questions or any questions at all. Tr1 at 189. SA Kammeraad intended only to "tell Simon who I was and to let him know that after Depew Police Department was done with whatever they are doing here, that I would like to sit down and have a conversation with him." Tr1 at 189. SA Kammeraad recalls introducing himself to Mr. Gogolack and recalls Mr. Gogolack responding by stating words to the effect of "Yeah, I know who you guys are, I know Crystal was talking with you or working with you". Tr1 at 190. SA Kammeraad does not recall the conversation verbatim. Tr1 at 190. SA Kammeraad testified that the only topics he recalls coming up during the conversation were that "Simon knew who we were, that Crystal had told him [Simon] that she was working with the FBI, and in general that Crystal was in Wellsville with him [Simon]." Tr1 at 190. SA Kammeraad did not take notes of his conversation with Mr. Gogolack by the side of the vehicle, nor did he even bring a notepad with him, because it was not his intent to ask Mr. Gogolack any questions, or to solicit any answers that he would need to document in a 302. Tr1 at 244.

During the conversation by the car, SA Kammeraad did not go through a detailed timeline with Mr. Gogolack about everything that occurred from the moment he met up with Crystal until the moment he reported her death. Tr1 at 190–91. During that conversation by the car, SA Kammeraad did not ask Mr. Gogolack if he had provided Ms. Quinn with drugs

14

that weekend.  Tr1 at 191.  During that conversation by the car, SA Kammeraad did not ask Mr. Gogolack details about who Mr. Gogolack what individuals Mr. Gogolack interacted with during the time that he was with Crystal.  Tr1 at 191.  SA Kammeraad testified that those were topics that he would ultimately want to ask Mr. Gogolack during an interview. Tr1 at 191.

SA Kammeraad described Mr. Gogolack's demeanor as calm during their interaction by the Depew police vehicle, that neither of them were yelling, and that the conversation was not argumentative.  Tr1 at 191–92.  SA Kammeraad testified that, although he had not planned on asking Mr. Gogolack any questions before approaching him, at some point during their interaction SA Kammeraad did in fact ask Mr. Gogolack questions.  Tr1 at 192.  SA Kammeraad testified that happened organically during the conversation.  Tr1 at 192.  SA Kammeraad did not take notes of that conversation with Mr. Gogolack and cannot remember exactly how long the conversation lasted.  Tr1 at 193.  SA Kammeraad testified that "it could not have been longer than 15 minutes, if that" and that it could have been shorter than 15 minutes.  Tr1 at 193.  SA Kammeraad never threatened or intimidated Mr. Gogolack, and at no point during that interaction did Mr. Gogolack indicate that he wanted to stop speaking with SA Kammeraad or that he wanted to speak with a lawyer.  Tr1 at 193.  SA Kammeraad testified that the conversation never got contentious.  Tr1 at 193.  SA Kammeraad testified that Mr. Gogolack's responses to his questions during that interaction were more "rambling answers" than "direct, responsive answers".  Tr1 at 194.

SA Kammeraad testified that he did not Mirandize Mr. Gogolack before that conversation by the side of the police vehicle took place "because it wasn't my intent (nor did I try to) ask him any questions that would elicit an incriminating response or a confession." Tr1 at 194–95.  SA Kammeraad testified that, before this litigation ensured, he had never

15

heard the term "two-step interrogation process" and that he had never been trained to engage in a two-step interrogation process at any point during his career. Similarly, SA Kammeraad testified that he had never even heard of a "question-first strategy" with regard to interviews. Tr1 at 195. SA Kammeraad testified that he never received training that it was permissible to try to get someone to confess, then Mirandize them, then try to elicit the same confession. Tr1 at 196. SA Kammeraad testified that the thought of that never even crossed his mind, and that is not what he did here. Tr1 at 196.

In addition to speaking with Mr. Gogolack by the side of the vehicle, SA Kammeraad participated in other activities while he was at the scene at Donna Court. Tr1 at 196–97. Those other activities included speaking with SA Penna and Sharon Quinn, completing paperwork and "going through Crystal's belongings that were in Sharon's car." Tr1 at 197. SA Kammeraad did not take notes of the conversation with Sharon Quinn, but he believes that SA Penna did take notes. Tr1 at 197. SA Kammeraad testified that Sharon Quinn was "fairly upset" during their interview and that an interview like that isn't something he would rush through. Tr1 at 197–198. SA Kammeraad testified about SA Penna completing a FD 597 form, a receipt for property, with Sharon Quinn. Tr1 at 198. SA Kammeraad testified that, while interviewing Sharon Quinn, he and SA Penna attempted to develop a timeline surrounding Crystal's death. Tr1 at 198–99. SA Kammeraad testified that the interview with Sharon Quinn "continued throughout the time that we were there with her." Tr1 at 238. SA Kammeraad did not return to speak to Mr. Gogolack by the vehicle after SA Kammeraad interviewed Sharon Quinn. Tr1 at 239. SA Kammeraad was unaware of whether SA Burns had previously interviewed Sharon Quinn about the timeline surrounding Crystal's death. Tr1 at 199. SA Kammeraad had participated in a 3-way phone call with SA Burns and John Grieco earlier that afternoon, where Mr. Grieco was providing information to the FBI about

16

Simon Gogolack returning Sharon's vehicle to Depew. Tr1 at 200–01. SA Kammeraad testified that, in addition to working with numerous FBI personnel on August 2, 2023, he believes that he was also working with members of the United States Attorney's Office, and that he had communication with the United States Attorney's Office that day. Tr1 at 201–202.

SA Kammeraad testified that he did not tell the Depew Police Officer whether or when to take Simon Gogolack to the Depew Police Department, and that he was not aware of anybody at the FBI wanting to keep Mr. Gogolack on scene. Tr1 at 235–36. SA Kammeraad testified that when he and SA Penna left the vicinity of Donna Court, they stopped at Burger King to pick up food for Mr. Gogolack before eventually arriving at the Depew Police Department. Tr1 at 202. The parties stipulated that SA Kammeraad and SA Penna arrived at the Depew Police Department at about 9:23 p.m. Tr1 at 203. SA Kammeraad has reviewed the video from the booking area of the Depew Police Department and observed himself coming and going from the booking area during an 8-minute period. Tr1 at 203, 240. SA Kammeraad also observed, on the video, times where it appears that he is talking with Mr. Gogolack. Tr1 at 204, 241. SA Kammeraad did not remember verbatim what he said to Mr. Gogolack but testified that he generally recalls reiterating that he wanted to sit down with Mr. Gogolack and speak to him and discussing logistically how that would occur. Tr1 at 204–05, 241. During that interaction in the booking area, SA Kammeraad did not threaten Mr. Gogolack or make any promises to Mr. Gogolack, and SA Kammeraad did not recall that interaction being contentious or heated. Tr1 at 205. SA Kammeraad testified that he was not conducting a substantive interview of Mr. Gogolack in the booking area, and that he did not want to do that in the booking area. Tr1 at 205.

SA Kammeraad testified that, while all of that was going on, members of the US Attorney's Office were working on a draft affidavit for a warrant to search Mr. Gogolack's cell phone. Tr1 at 205. SA Kammeraad testified that he was not the person physically typing that affidavit into Microsoft Word. Tr1 at 205. SA Kammeraad testified that he ultimately received a draft affidavit for his review from AUSA Nick Cooper at about 8:36 p.m. Tr1 at 206–208. SA Kammeraad recalls having phone contact with the US Attorney's Office while he reviewed the draft affidavit, which he received about 50 minutes before arriving at the Depew Police Department. Tr1 at 208.

SA Kammeraad testified that at around 9:30 p.m., Mr. Gogolack entered an interview room and was advised of his Miranda warnings. Tr1 at 208–209. At some point towards the beginning of their interview, SA Kammeraad told Mr. Gogolack, in sum and substance "I'm just going to go off of what you've already told me." Tr1 at 209. SA Kammeraad explained that "The basis of stating that was going back to the [police] vehicle, when I first introduced myself to Simon, I explained I'm an agent with the FBI, I would like to talk to you about Crystal. In sum and substance, Simon told me that he knew Crystal, who we were and that Crystal was talking with us. I wanted basically picking up right from there when I said that to Simon." Tr1 at 209. SA Kammeraad also testified that at one point during the interview he stated to the effect of "from what I remember you saying, what I've got jotted down is . . . . " Tr1 at 209. SA Kammeraad explained that he had not, in fact, written anything down, and that the notes in front of him during the interview were SA Penna's notes from his interview of Sharon Quinn. Tr1 at 209–11.

SA Kammeraad testified that during the recorded interview of Simon Gogolack, he and SA Penna asked a number of questions attempting to obtain a timeline from Simon Gogolack about his time with Crystal Quinn leading up to her death. Tr1 at 212. SA

18

Kammeraad testified that is not something that he did during his conversation with Mr. Gogolack by the side of the vehicle. Tr1 at 212. SA Kammeraad testified that during the recorded interview with Simon Gogolack, he and SA Penna endeavored to learn who Mr. Gogolack interacted with while he was with Ms. Quinn in Wellsville. Tr1 at 212. SA Kammeraad testified that is not something he did during his conversation with Mr. Gogolack by the side of the vehicle. Tr1 at 212. SA Kammeraad testified that during the recorded interview with Simon Gogolack, he and SA Penna asked Mr. Gogolack questions about what substances Ms. Quinn had access to or ingested leading up to her death. Tr1 at 212–13. SA Kammeraad testified that is not something he discussed with Mr. Gogolack by the side of the vehicle. Tr1 at 213. SA Kammeraad testified that during the recorded interview of Mr. Gogolack, he learned that there had been green Xanax bars involved in Gogolack's weekend with Ms. Quinn. Tr1 at 213. SA Kammeraad testified that green Xanax bars did not come up during the discussion by the side of the vehicle. Tr1 at 213.

At some point during the recorded interview of Mr. Gogolack, SA Kammeraad and SA Penna left the room for about 30 minutes. Tr1 at 214. During that timeframe, SA Kammeraad recalls swearing out the affidavit for a search warrant to search Mr. Gogolack's cell phone. Tr1 at 214. SA Kammeraad testified about the contents of the probable cause section of that affidavit. Tr1 at 220–25. SA Kammeraad testified that he included information about Ms. Quinn having been threatened in the past because "the information could be relevant." Tr1 at 225.

## II.  LEGAL FRAMEWORK

In the defendant's pretrial motions, he argues that any statements he made to law enforcement officers on August 2, 2023, should be suppressed for a variety of reasons including that he was subjected to a deliberate two-step interrogation process.[5]  This argument should be rejected because it is clear based on the facts presented at the evidentiary hearing that SA Kammeraad did not have any plan to question Mr. Gogolack by the side of vehicle and did not intend to engage in a two-step interrogation process.

**Miranda warnings, generally**

For the Miranda advice-of-rights requirements to be triggered, the defendant must be subjected to "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  The term "interrogation" includes express questioning of the suspect and its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Whether interrogation has occurred does not turn on the subjective intent of the police; the relevant test looks at "the perspective of the suspect." *Perkins*, 496 U.S. at 296.

Volunteered statements that are made by a suspect not in response to questions or actions by law enforcement are not the result of interrogation and do not require Miranda warnings.  *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966), *see also United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017).

**Officer responses that do not rise to the level of an interrogation**

---

[5] Since the evidentiary hearing was limited in scope to the deliberate two-step interrogation argument, the government will only brief and respond to that argument in this filing.  Other bases for suppression have already been briefed separately.

Likewise, interrogation does not occur where a question was asked out of "curiosity" rather than for an investigatory purpose, *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987), or when a defendant and a police officer are engaging in casual conversation. *See United States v. McConer*, 530 F.3d 484, 497 (6th Cir. 2008) (noting that a "casual background question" did not rise to the level of interrogation); *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."); *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response."); *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) ("Incriminating statements made in the course of casual conversation are not products of a custodial interrogation."); *United States v. Hackley*, 636 F.2d 493, 498 (D.C. Cir. 1980) ("[B]ut Fontanna's inquiry followed the casual conversation about [the defendant's] cousin Sharon and their attempt to reach her on the telephone, and, fairly construed, it was not directed at obtaining a confession."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 533 (E.D.N.Y. 2014) ("SA Ricciardi's small talk about the weather and his family, for instance, were not reasonably likely to elicit an incriminating response.").

Similarly, an officer's inquiry, in response to a suspect's "muttering" can be viewed more as "the product of curiosity" than the result of purposeful interrogation. *See United States v. Thomas*, 961 F.Supp. 43, 45 (W.D.N.Y., Apr. 7, 1997). In that same vein, an officer's limited clarifying questions made in response to a defendant's unsolicited utterance do not transform an otherwise casual communication between defendant and officer into an interrogation. *See United States v. Rommy*, 506 F.3d 108, 132–34 (2d. Cir. 2007) (limited clarifying follow-up questions to otherwise volunteered information does not constitute

21

interrogation).  In short, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 301.

**Two-step interrogations**

Even if an initial confession is improperly obtained without the required Miranda warnings, the government is not precluded from introducing a subsequent confession obtained after the warnings have been properly administered.  *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *Tankleff v. Senkowski*, 135 F.3d 235, 244–45 (2d Cir. 1998).  This principle does not, however, permit officers to employ a "question first" strategy, in which they deliberately withhold Miranda warnings until a suspect has confessed and then give the warnings in the midst of a coordinated and continuing interrogation.  *See Missouri v. Seibert*, 542 U.S. 600 (2004); *see also United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (noting that *Seibert* creates an exception to *Elstad* rule but does not otherwise overrule it).

1. **Suppression is limited to deliberate two-step interrogations designed to undermine Miranda**.

Under *Missouri v. Seibert*, as interpreted by the Second Circuit, suppression of a subsequently Mirandized statement is warranted only in the narrow circumstance where law enforcement *deliberately* employed two-step interrogation technique to undermine the effectiveness of the later warnings. *United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012) (recognizing Justice Kennedy's concurrence in *Seibert* as controlling); *see also Missouri v. Seibert*, 542 U.S. 600, 621-22 (2004) (Kennedy, J., concurring) (explaining that deliberateness is the decisive factor in determining whether two-step interrogation strategy was employed).

2. **Courts assess deliberateness under the totality of the circumstances**.

In determining deliberateness, courts consider "the totality of the objective and subjective evidence surrounding the interrogations[.]" *United States v. Williams*, 681 F.3d 35,

22

41 (2d Cir. 2012) (quoting *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010)). This determination is "guided by—but not limited to—the factors identified by the plurality in *Seibert*." *United States v. Moore*, 670 F.3d 222, 230 (2d Cir. 2012) (citations omitted).

Although the five factors the *Seibert* plurality identified were originally framed to assess whether later warnings could nevertheless still be effective, the Second Circuit uses these factors as "helpful indicia for whether an alleged two-step interrogation was intended to circumvent Miranda." *Id.* (internal quotations and citations omitted). The five *Siebert* factors are therefore used "not to weigh the effectiveness of the later Miranda warnings, but to shed light on the detectives' intent." *Id.*

The Seibert factors guide the deliberateness inquiry. Those five factors include:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012) (quoting *Missouri v. Seibert*, 542 U.S. 600, 615 (2004)).

### 3.    Recognized factors that weigh against finding a deliberate two-step interrogation.

The Second Circuit in *Williams* identified several circumstances weighing against a finding of deliberateness: [1] where the "first round of interrogation was neither complete nor detailed"; [2] where any overlap between the two statements was limited; [3] where despite some continuity of personnel, "the timing and setting" of the two statements were materially different; and [4] where nothing suggested that officers "treated the second round as

continuous with the first" or used the later session as a "cross-examination using information gained during the first round of interrogation." *Williams*, 681 F.3d at 44-45.

Justice Kennedy further identified circumstances in which it would be "extravagant" to infer a deliberate two-step strategy, including where: an "*officer may not plan to question the suspect*" or "referr[ed] to prior statements to test their veracity or to refresh recollection" since "[s]killed investigators often interview suspects multiple times, and good police work may" require as much. *Missouri v. Seibert*, 542 U.S. 600, 620 (2004) (Kennedy, J., concurring) (emphasis added); *Williams*, 681 F.3d at 41 (emphasis in original).

4.    **Absent deliberateness, the relevant question is whether the warned statement was knowing and voluntary.**

Absent proof of such deliberateness, admissibility of a subsequent warned statement is governed by *Oregon v. Elstad*, which asks whether the warned statement was knowingly and voluntarily made. *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012); *see also Oregon v. Elstad,* 470 U.S. 298, 309 (1985)). "[T]he Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy." *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012).

## III.  <u>APPLICATION</u>

Based on the facts set forth during the evidentiary hearing, this Court should find that SA Kammeraad, SA Penna, and PO Wojciechowicz did not—collectively or independently—engage in a deliberate two-step interrogation process designed to undermine the subsequent provision of Miranda warnings to Mr. Gogolack.

As a threshold issue, the Court should credit the testimony of the government's witnesses. Their testimony was candid, measured, and internally consistent. They answered questions directly, acknowledged what they did not remember, and admitted what they did

24

not know. Where their recollections were limited, they said as much plainly. Their demeanor reflected a sincere effort to answer truthfully, and their testimony was consistent with the surrounding evidence and the chronology of events. Those hallmarks of candor and restraint strong support a finding that their testimony was credible and reliable.

Specifically, SA Kammeraad testified consistently, logically, and credibly, that he had no intention of asking any questions of Mr. Gogolack as he sat in the back of the DPD vehicle. Only that SA Kammeraad planned to introducing himself. SA Kammeraad explained how this introduction morphed unexpectedly into an unwieldly, back-and-forth conversation. Both agents unequivocally stated that there was no plan to question Mr. Gogolack there at all.

But beyond the agents' testimony that they had no plan to question first and administer Miranda warnings later, the objective circumstances independently confirm that no deliberate two-step strategy occurred here. First, under the totality of circumstances, the initial encounter was not a calculated ploy designed to circumvent or undermine Miranda. Second, the facts of this case are readily distinguishable from the purposeful circumstances that warranted suppression in *Capers*. And third, this matter more closely resembles *Williams*, where the Second Circuit found no deliberateness and upheld admission of the later-warned statement.

### A.     Totality of the circumstances

### 1.     Completeness and detail of the questions and answers in the first interrogation.

SA Kammeraad testified that the only topics he recalls coming up during the conversation were that "Simon knew who we were, that Crystal had told him [Simon] that she was working with the FBI, and in general that Crystal was in Wellsville with him

[Simon]." SA Kammeraad testified that, in the first conversation, he did not ask Mr. Gogolack for details about the timeline of his days with Ms. Quinn. SA Kammeraad testified that, in the first conversation, he did not ask Mr. Gogolack for details regarding who he and Ms. Quinn interacted with in the days leading up to her death. SA Kammeraad testified that, in the first conversation, he did not ask Mr. Gogolack for details about what if any substances Ms. Quinn had access to or ingested in the days leading up to her death. Considering that the SA Kammeraad was at the very beginning stages of an investigation into the death of a federal witness, his brief conversation with Simon Gogolack by the side of the Depew police vehicle can not be credibly described as a complete and/or detailed session of questions and answers. Based on the credible testimony of SA Kammeraad, it was just the opposite. No evidence before the Court indicates otherwise.

       2.     **Overlapping content**

The second factor that courts consider is the *overlapping content of the two statements*. Here, SA Kammeraad testified that during the second, much-longer, interview of Mr. Gogolack, they covered in detail the content of Mr. Gogolack's time with Ms. Quinn, the different people that Mr. Gogolack and Ms. Quinn interacted with down in Wellsville, and the substances that Ms. Quinn may have ingested during her time in Wellsville. SA Kammeraad testified that none of that content was addressed during his brief initial discussion with Mr. Gogolack. SA Kammeraad explained that the first discussion lasted no more than fifteen minutes. SA Kammeraad agreed on cross-examination that the second interview likely lasted about 1 hour (excluding the 30 minutes where the agents leave the room). Therefore, even the length of the respective discussions establish that the second interview included substantially more content than the first – because it would be seemingly impossible to cover one hour's worth of content in fifteen minutes. The testimony and evidence establish that the

26

first conversation between SA Kammeraad and Mr. Gogolack was so short that neither PO Wojciechowicz nor SA Penna even noticed that it had occurred.

### 3.    Timing of the interrogations

The third factor that courts consider is *the timing and setting of the interrogations.*  Here, the first discussion and the second, substantive interview were separated by both time and space.  As to time, SA Kammeraad testified that his conversation with Mr. Gogolack by the side of the vehicle occurred shortly after Mr. Gogolack was placed in the back of the Depew police vehicle, and before the FBI's thorough interview of Sharon Quinn.  Based upon the timestamp from the first Depew body-worn camera video, the Court can infer that the first discussion between SA Kammeraad and Mr. Gogolack began sometime shortly after 7:12 p.m. and lasted no more than 15 minutes.  The government submits that, based upon the evidence in the record, it would be safe and reasonable for the Court to determine that the first discussion concluded sometime around 7:30 p.m.  The uncontroverted evidence of the Depew Police Department video establishes that the second interview of Mr. Gogolack did not begin until just after 9:30 p.m.  Therefore, the two instances were temporally separate by approximately 2 hours.  The *timing* is distinct, as one discussion occurred immediately following Mr. Gogolack's arrest, and the second discussion occurred hours later, in a police interview room, after Mr. Gogolack had been transported from the scene and booked.  As to space, it appears uncontroverted that the two interviews took place miles apart—a distance that required a drive of 8 minutes as reflected in the second body-worn camera recording of PO Wojciechowicz.

### 4.    Degree of continuity in police personnel

The fourth factor that courts consider is *the degree of continuity in police personnel in the two interviews*.  Here, the evidence establishes that SA Kammeraad was present for both

interview/interactions with Mr. Gogolack and that SA Penna was present only for the second. Additionally, there is an intervening period (both in the patrol car and the booking area) where Mr. Gogolack is only in the presence of PO Wojciechowicz, who was present for neither the first interview nor the second interview.

### 5.     Time lapse in between statements

The fifth factor that courts consider is *the time lapse between the two interviews*. As discussed above in greater detail, the totality of the evidence establishes that there was likely at least 2 hours between the conclusion of the first interview and the inception of the second.

### B.     The case at bar is distinguishable from *Capers*.

In *Capers*, the Second Circuit notes that the district court had found it clear from officer testimony that the failure to provide Miranda warnings was not an accident, or due to a lack of experience. 627 F.3d at 481. By contrast, SA Kammeraad (while clearly an experienced law enforcement officer) offered a credible and common-sense explanation for why he did not read Mr. Gogolack his Miranda warnings before initially speaking with him—because he had no intention of asking him any questions.

Also in *Capers*, the Second Circuit found that the first interrogation resulted in a confession and there remained little, if anything, of incriminating potential left unsaid. *Id.* at 483. By contrast, Mr. Gogolack made no confession during the interaction by the side of the vehicle with SA Kammeraad, and there remained a full universe of incriminating statements left unsaid—to include details of Mr. Gogolack's interactions with Mr. Hinkle and Mr. Knight while he was with Ms. Quinn, Mr. Gogolack's admission regarding green Xanax bars, and Mr. Gogolack's admission that Ms. Quinn told him that Mr. Hinkle had advised her that there was a price on her head, all statements that only occurred in the second, thorough interview of Mr. Gogolack.

28

The Second Circuit in *Capers* also examined the setting and context of the two interviews, determining that the first interaction was "in no way casual" and was a formal interrogation. That is also distinct from the facts here, where SA Kammeraad intended only to introduce himself and, when Mr. Gogolack began making rambling statements about his time with Ms. Quinn, asked some follow-up questions. It is clear from the testimony of SA Kammeraad that the first interaction by the car was nothing like the subsequent, mirandized interview at the Depew Police Department.

Finally, the *Capers* Court found that the latter interview was essentially a cross-examination using information gained during the first round of interrogation. Again, that is not the case here. SA Kammeraad explained how much of the incriminating information discovered during the second interview of Mr. Gogolack had never come up at all during their first discussion.

### C.    This case is aligned with *Williams*.

Viewed through the framework set forth in *United States v. Williams*, this case does not present the rare and "infrequent" circumstance in which agents deliberately employed a two-step interrogation technique to undermine Miranda. *See United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012) (citing *Missouri v. Seibert*, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring)). In considering the totality of the objective and subjective evidence, this Court should find that the agents did not employ a deliberate two-step interrogation. *See id.* at 41.

First, there is no evidence of a deliberate plan to circumvent Miranda. Both agents testified unequivocally that they were trained to comply with Miranda, not evade it, and there was no coordinated strategy to secure an unwarned admission and later repeat them after warnings. That conclusion aligns with *Williams*, which focused on whether officers acted in a calculated manner to undermine later warnings. It further aligns with Justice Kennedy's

observation, relied upon in *Williams*, that it would be "extravagant" to infer deliberateness where an officer "may not plan to question the suspect" or may instead be waiting for a more appropriate time to conduct a formal interview. *See Williams* at 40. That is precisely what occurred here: SA Kammeraad testified that he did not Mirandize Mr. Gogolack as he sat in the police vehicle "because it wasn't my intent (nor did I try to) ask him any questions that would elicit an incriminating response or a confession." Tr1 at 194–95. The best evidence of SA Kammeraad's subjective intent is that he did not so much as even bring a notepad with him—because it was not his intent to ask Mr. Gogolack any questions, or to solicit any answers that he would need to document in a 302. *See* Tr1 at 244.

Second, the initial encounter bore none of the hallmarks of a covert first-stage interrogation. Although the Mr. Gogolack was in custody, custody alone is not dispositive. The first exchange was introductory, general, and limited. Not confession-seeking or comprehensive. SA Kammeraad testified that the only topics he recalled coming up during the conversation were that "Simon knew who we were, that Crystal had told him that she was working with the FBI, and in general that Crystal was in Wellsville with him." Tr1 at 190. But SA Kammeraad already knew that Ms. Quinn was in Wellsville with him from an independent source. The only new information he learned was that Ms. Quinn told Mr. Gogolack she was a cooperator. Even so, he did not ask about the "who, what, when, where, why" of Ms. Quinn's death. There were no questions about how Mr. Gogolack knew Ms. Quinn was a cooperator, the timeline of events, about what if any drugs were provided to Ms. Quinn, or who she may have interacted with in Wellsville leading up to her death. *See* Tr1 190-91.

Indeed, the initial questioning here was even less pointed than in *Williams*, where the officers during the execution of a search warrant in a firearms trafficking investigation asked

about missing firearms and a missing suspected trafficker before warnings were administered. If the more direct questioning in *Williams* did not amount to a deliberate two-step strategy, then the less probing interaction here does not either. Nor does the approximately fifteen-minute duration alter that conclusion; substance, not the clock, controls and the conversation never developed into a full custodial interrogation.

Third, Mr. Gogolack did not give a complete inculpatory statement during the first encounter, eliminating the core concern underlying *Seibert*—that the "cat was out of the bag" before warnings were given.  Mr. Gogolack plainly had substantially more to say and only provided a fuller account after receiving Miranda warnings. As in *Williams*, Mr. Gogolack's warned statement here was not a rote repetition of an earlier unwarned statement. Instead, the second interview materially expanded beyond anything said during the preliminary exchange, confirming that the first encounter had not progressed far and had not rendered the later warnings meaningless.

Fourth, Agent Kammeraad's limited reference during the second interview to what Mr. Gogolack had said earlier was not an exploitation of the unwarned statement. *Williams*, quoting Justice Kennedy's concurrence in *Seibert*, recognized that skilled investigators often interview suspects multiple times and that "good police work may involve referring to prior statements to test their veracity or to refresh recollection." *Williams* at 40–41. That is what happened here. The prior exchange was mentioned only as a starting point to orient chronology and refresh recollection at the beginning of the narrative—not to confront Mr. Gogolack, expose inconsistencies, or pressure him into continuing. Far from demonstrating exploitation, that limited reference underscores how little was covered during the first encounter.

31

Finally, Mr. Gogolack's statements were provided voluntarily and free of coercion. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985). "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991). The general nature of the initial questioning and the near two-hour passage of time between the interviews, and the contrast in setting between the police vehicle and station house contradict any notion of coercion. *See United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (finding second set of statements were provided "voluntarily" because the brevity and focused of initial questioning coupled with the near two-hour passage of time between interviews and contrast in interview settings "belie coercion"). And the best evidence of the voluntariness of Mr. Gogolack's statement is that he exercised control over the interview by choosing to stop the questioning. That conduct in and of itself demonstrates Mr. Gogolack's understood his rights and that the Miranda warnings functioned exactly as intended.

In sum, this case fits comfortably within *Williams*, not *Seibert*. If the circumstances in *Williams*—which involved more pointed pre-warning questioning and some overlap in later topics—did not warrant suppression, then the facts here do not either. Because the record here is devoid of any deliberate question-first strategy, suppression should be denied.

## IV.  <u>CONCLUSION</u>

There is no evidence in the record that law enforcement engaged in a deliberate two-step interrogation process with regards to their interactions with Mr. Gogolack on August 2, 2023. The credible testimony and the evidence should lead this Court to the conclusion that no such deliberate, two-step interrogation process occurred. The defendant's motion to suppress his post-Mirandized statements should be denied.

DATED:     Buffalo, New York, April 24, 2026.

Respectfully submitted,

MICHAEL DIGIACOMO
United States Attorney


*S/ NICHOLAS T. COOPER*

BY:     _____

NICHOLAS T. COOPER
Assistant United States Attorney
United States Attorney's Office
Western District of New York
100 State Street
Rochester, New York 14614
585-935-7512
Nicholas.Cooper@usdoj.gov