IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SIMON GOGOLACK, et al.,

Defendants.

23-CR-99-EAW
**(filed under seal)**

---

## GOVERNMENT'S PRE-TRIAL STATEMENT OF THE FACTS AND MOTIONS IN LIMINE

MICHAEL DIGIACOMO
United States Attorney

BY:    s/ CASEY L. CHALBECK
s/ KATERINA POWERS
s/ NICHOLAS T. COOPER
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.    SUMMARY OF CHARGES ........................................................................... 1

III.    STATEMENT OF FACTS REGARDING COUNTS 4, 5, 23, AND 26 .................................. 3

    A.    Count 4: Distribution of Fentanyl Resulting in Death................................ 3

    B.    Count 5: Mr. Knight's False Statement Regarding Howard Hinkle Attending the
July 27, 2023 Poker Game.................................................................... 5

    C.    Count 23: Mr. Knight's False Statement Regarding Mr. Gogolack's Visit to Mr.
Knight's Residence on July 28, 2023. ...................................................... 7

    D.    Count 26: Mr. Roncone's False Statement Regarding His Knowledge of Ms.
Quinn's Death and Whether there were Narcotics in his Residence............................... 7

IV.    MOTIONS IN LIMINE............................................................................... 11

MOTIONS TO ADMIT INTRINSIC OR, ALTERNATIVELY, RULE 404(B) EVIDENCE.................... 11

    A.    Legal Frameworks.............................................................................. 11

    B.    Motion to Admit Evidence Showing the Defendants' Affiliation with the Outlaws
and Rare Breed, and the Outlaws' Association with the Rare Breed. ............................... 14

        1.    Factual Background ...................................................................... 14

        B.    Application................................................................................. 16

    C.    Motion to Admit Evidence Showing the Outlaws' Prior Acts with Mr. Gerace... 19

        1.    Factual Background ...................................................................... 20

        2.    Application................................................................................. 21

    D.    Motion to Admit Evidence Showing the Outlaws' Institutional Commitment to
Harming Witnesses and Monitoring Law Enforcement Investigations into the Club. ...... 23

        1.    Factual Background ...................................................................... 23

        2.    Application................................................................................. 26

E.    Motion to Admit Evidence Showing the Rare Breed's Efforts to Monitor Law Enforcement Investigations and its Institutional Commitment to Harming Witnesses.... 30

    1.    Factual Background ........................................................................ 31

    2.    Application.................................................................................... 32

F.    Motion to Admit Evidence of Prior Acts Committed by the Rare Breed at the Behest of the Outlaws............................................................................................ 34

    1.    Factual Background ........................................................................ 35

    2.    Application.................................................................................... 36

G.    Motion to Admit Evidence of Simon Gogolack's Participation in a Conspiracy to Distribute Fentanyl and Xanax.................................................................... 37

    1.    Factual Background ........................................................................ 38

    2.    Application.................................................................................... 39

H.    Motion to Admit Evidence of Mr. Gogolack's Prior Bad Acts ██████████ ██████████████████ ........................................................................ 40

    1.    Factual Background ........................................................................ 41

    2.    Application.................................................................................... 46

I.    Motion to Admit Evidence of Mr. Gogolack's False Impersonation of ███ ████████ ........................................................................ 52

J.    Motion to Admit Evidence of Howard Hinkle's Marijuana and Firearm Possession 53

MOTIONS TO ADMIT OUT-OF-COURT STATEMENTS ........................................ 55

A.    Legal Frameworks........................................................................... 56

    1.    Rule 801(d)(2) and Other Forms of Non-Hearsay........................... 56

    2.    Rule 803(1).................................................................................. 57

    3.    Rule 803(2).................................................................................. 57

    4.    Rule 803(3).................................................................................. 58

5. Rule 803(6)..................................................................................... 58

6. Rule 804(b)(3) ............................................................................... 60

7. Rule 804(b)(6) ............................................................................... 61

8. Rule 807 ......................................................................................... 62

9. The Rule of Completeness............................................................. 62

10. ██████████████████████████████████ ....................... 62

B. Motion to Admit Evidence of Mr. Gerace's Admission by Silence....................... 64

C. Motion to Admit Text Message Evidence ███████████████████████
████████████████████. ........................................................................... 65

1. Factual Background ........................................................................ 65

2. Application...................................................................................... 66

D. Motion to Admit Evidence of Crystal Quinn's Fear of the Outlaws and Mr.
Gerace ......................................................................................................... 67

1. Factual Background ........................................................................ 67

2. Application...................................................................................... 67

E. Motion to Admit Text Message Evidence of the July 28, 2023 Biker
Confrontation. ............................................................................................. 69

1. Relevant Facts and Application ...................................................... 69

F. The Court Should Admit RBMC and Outlaws Phone Lists, Meeting Minutes, and
Ledgers. ....................................................................................................... 90

1. Factual Background ........................................................................ 90

2. Application...................................................................................... 90

G. ████████████████████████████████████████████████
██████ ........................................................................................................ 92

1. Factual Background ........................................................................ 92

2. Application...................................................................................... 93

**MOTIONS TO PRECLUDE AND LIMIT CERTAIN EVIDENCE AND ARGUMENTS** ...................... 95

    A.    Motion to Limit Evidence and Argument Concerning Crystal Quinn's History of Mental Illness and Suicidal Ideation .................................................................... 95

    B.    Motion to Preclude Comment, Argument, and Evidence Regarding Prosecutorial Charging Decisions ...................................................................................... 98

    C.    Motion to Prohibit Unfounded Allegations of Government Misconduct or Irrelevant Challenges to the Quality of the Government's Work. ...................................... 99

        1.    Background ...................................................................................... 100

        2.    Legal Framework and Application ........................................................ 100

    D.    Motion to Preclude Speculative or Hearsay Evidence of an Alternate Perpetrator 101

    E.    Motion to Restrict Use of Third-Party's Statements to Impeach .......................... 104

    F.    Motion to Preclude The Defense from Eliciting Self-Serving Hearsay ................... 105

**MISCELLANEOUS MOTIONS IN *LIMINE*** ................................................................... 106

    A.    Motion to Admit Evidence Regarding Penalties Associated with the Offenses Charged Against Mr. Gerace in 1:19-CR-227. .................................................... 106

    B.    Motion to Compel Disclosure of an Advice-of-Counsel Defense ........................ 106

**V.**    **ADDITIONAL ISSUES** ................................................................................ 109

    A.    The Court Should Admit Co-Conspirator Statements .......................................... 109

    B.    *Bruton* Issues .................................................................................................. 111

    C.    The Admissibility of Certain Redacted Court Documents ................................... 113

    D.    Rule 608 Notices .............................................................................................. 116

    E.    Rule 609 Notices .............................................................................................. 120

**V. CONCLUSION** ................................................................................................... 121

# I. INTRODUCTION

This memorandum is provided in compliance with the Court's Pretrial Order. It summarizes the government's proof as to Counts 4, 5, 23, and 26 of the Second Superseding Indictment (the "Indictment"). This memorandum also contains specific motions in limine concerning evidentiary issues that may require pretrial rulings. The government reserves its right to supplement this memorandum, to raise any additional motions in limine, and/or to respond to any evidentiary issues raised by the defendants.

## II. SUMMARY OF CHARGES

| Name of Defendant | Counts | Violations |
|---|---|---|
| SIMON GOGOLACK | 1 | 18 U.S.C. § 371, 1503 |
| | 2 | 18 U.S.C. § 1512 |
| | 3 | 18 U.S.C. § 1513 |
| | 4 | 21 U.S.C. § 841(b)(1)(C) |
| PETER GERACE, JR. | 1 | 18 U.S.C. § 371, 1503 |
| | 2 | 18 U.S.C. § 1512 |
| | 3 | 18 U.S.C. § 1513 |
| JOHN T. ERMIN | 1 | 18 U.S.C. § 371, 1503 |
| | 2 | 18 U.S.C. § 1512 |
| | 3 | 18 U.S.C. § 1513 |
| MICHAEL RONCONE | 1 | 18 U.S.C. § 371, 1503 |
| | 26 | 18 U.S.C. § 1001 |
| HOWARD HINKLE, JR. | 1 | 18 U.S.C. § 371, 1503 |
| | 2 | 18 U.S.C. § 1512 |
| | 3 | 18 U.S.C. § 1513 |
| FRANK KNIGHT | 1 | 18 U.S.C. § 371, 1503 |
| | 5 | 18 U.S.C. § 1001 |
| | 23 | 18 U.S.C. § 1001 |

The Indictment charges each of the defendants in Count 1 (Obstruction of Justice/*Klein* Conspiracy). Dkt. 24 at 2–31. The Indictment also charges Messrs. Gogolack, Gerace, Ermin, and Hinkle in Count 2 (Witness Tampering Conspiracy) and Count 3 (Witness Retaliation Conspiracy). *Id.* at 31–34.

1

Mr. Gogolack is further charged in Count 4, which alleges that he knowingly and intentionally distributed fentanyl to Crystal Quinn, causing her death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). *Id*. 24 at 34.

Mr. Knight is charged with making two false statements in connection with the obstruction/*Klein* conspiracy charged in Count 1. Specifically, Count 5 charges Mr. Knight with falsely stating to the FBI on August 3, 2023, that Mr. Hinkle "was not at a poker game in Wellsville attended by Crystal Quinn on July 27, 2023, and that he did not think [Mr.] Hinkle was at the poker game[.]" *Id*. 24 at 35. Overt Act ¶ 60, likewise, alleges that on August 3, 2023, Mr. Knight "made false and misleading statements to the FBI, including that [Mr.] Hinkle had not been present at the July 27, 2023 poker game." *Id.* at 23 ¶ 60. Similarly, Count 23 charges Mr. Knight with making a false statement when he represented to the FBI that Mr. Gogolack did not visit his residence during the early morning hours of July 28, 2023. *Id.* at 45. That allegation is also alleged as an Overt Act in Count 1. *See id.* at 29 ¶ 95 ("On October 24, 2023, the FBI interviewed KNIGHT. During the interview, KNIGHT made false and misleading statements to the FBI, including denying that GOGOLACK had visited KNIGHT'S residence during the early morning hours on July 28, 2023 . . . .").

Mr. Roncone is also charged with making a false statement. *See id*. at 47. Specifically, Count 26 alleges that Mr. Roncone falsely represented to the FBI that "(i) that he did not know anything about Crystal Quinn's death; and (ii) that there were no drugs in his residence, when in truth and in fact, and as defendant MICHAEL RONCONE a/k/a Cone then and there well knew, (i) he did know something about Crystal Quinn's death; and (ii) there were drugs inside his residence." *Id.* That false statement is also alleged as an Overt Act in Count 1. *Id.* at 30–31 ¶ 106.

### III.    STATEMENT OF FACTS REGARDING COUNTS 4, 5, 23, AND 26

The Indictment is pleaded in detail, and the government respectfully refers the Court to the allegations contained in the Indictment, as well as the government's Pre-Trial Memorandum of Law Regarding Gerace Attorney-Client Privilege Issues and Forfeiture by Wrongdoing (dated March 11, 2026). However, the following offers a brief overview of the facts bearing on Mr. Gogolack's distribution of fentanyl (Count 4), Mr. Knight's false statements (Counts 5 and 23), and Mr. Roncone's false statement (Count 26).

#### A.    Count 4: Distribution of Fentanyl Resulting in Death

Count 4 charges Mr. Gogolack with distribution of fentanyl resulting in death. Dkt. 24 at 34. The evidence establishing this charge unfolded as follows.

On August 1, 2023, Crystal Quinn failed to respond to repeated calls and text messages from her mother, Sharon Quinn. Alarmed, Sharon Quinn contacted Mr. Gogolack and threatened to call the police if no one responded. Only then did Mr. Gogolack call 911 and report Ms. Quinn's death.

Responding officers found Ms. Quinn face down, hunched over on her knees and forearms, with blood pooling in her stomach and extremities. Full rigor mortis had already set in, indicating her death occurred between 12 and 24 hours earlier. Ms. Quinn's mouth and the white bedsheets beneath her were stained red with blood. Shotgun shells littered the surrounding floor.

Expert testimony will establish that Ms. Quinn died from an opioid overdose. But those close to Ms. Quinn will testify that Ms. Quinn was vehemently opposed to opioid use—so much so that, during one of the last times she was seen alive, she complained to others about Mr. Gogolack's opioid use. There is no evidence Ms. Quinn ever intentionally acquired

3

opioids, including fentanyl, in 2023. There are, however, text messages showing that Mr. Gogolack did.

After calling 911, Mr. Gogolack admitted to John Grieco, Ms. Quinn's friend, that he gave Ms. Quinn a Xanax before she died. Yet, his story repeatedly—and suspiciously—changed. For example, Mr. Gogolack also claimed that Ms. Quinn was suicidal, and intimated that she killed herself. But those close to Ms. Quinn will testify to the opposite: Ms. Quinn was looking forward to coming home. Likewise, when law enforcement arrived on the scene at 296 Scott Avenue, Mr. Gogolack made false, misleading, and contradictory statements evincing his consciousness of guilt, including that:

1. Mr. Gogolack last saw Ms. Quinn laying in the same spot she was found dead, and thought she was sleeping;[1]

2. Mr. Gogolack last saw Ms. Quinn when she gave him a ride home;

3. Mr. Gogolack lived in the left side of the duplex at 296 Scott Avenue, Wellsville, New York;

4. ████████████ lived in the downstairs—or right side—of the duplex, where Ms. Quinn was found dead;

5. Law enforcement could make him a "suspect if that's what's needed to find out what happened to" Ms. Quinn; and

6. Ms. Quinn discussed killing herself.

Mr. Gogolack's story to the FBI was markedly different. Mr. Gogolack told the FBI that he had seen Ms. Quinn "take a bunch of Xanax," which he described as green bars labeled "S-90-something-3," the night before she was found dead. According to Mr. Gogolack, Ms. Quinn told him that the pills were "not working" and that she was "gonna

---

[1] Photos of Ms. Quinn's body flatly undermine Mr. Gogolack's assertion that he thought Ms. Quinn was sleeping.

take some more." Mr. Gogolack disclosed that he passed out on his lawn after consuming a piece of the same pills Ms. Quinn consumed.

Witness testimony will establish that Mr. Gogolack previously middled a sale of purported Xanax—known as a "green hulk"—containing suspected opioids that nearly resulted in another overdose. That witness will further testify, and text messages will show, that he told Mr. Gogolack of his near-overdose from the "green hulks." Other witnesses will testify that Mr. Gogolack was a fentanyl dealer. An August 8, 2023 search of Mr. Gogolack's residence revealed trace amounts of what appeared to be fentanyl on a scale. Laboratory analysis confirmed that the substance contained fentanyl.

Lastly, witness testimony will further establish that Mr. Gogolack once threatened to hotshot someone and make it look like an accidental overdose.[2] In that same vein, Mr. Gogolack texted Mr. Knight that the "mafia" provided Ms. Quinn with laced pills to kill her. The government intends to show that this statement was almost true—and intentionally misdirected. Mr. Gogolack—on behalf motorcycle gang members and associates—provided Ms. Quinn with fentanyl to kill her.

### B. Count 5: Mr. Knight's False Statement Regarding Howard Hinkle Attending the July 27, 2023 Poker Game.

Count 5 charges Mr. Knight with making a false statement to FBI special agents when he represented that his friend and co-defendant, Mr. Hinkle, "was not at a poker game in Wellsville attended by Crystal Quinn on July 27, 2023, and that he did not think [Mr.] Hinkle was at the poker game[.]" Dkt. 24 at 35.

---

[2] A hotshot is a cocktail or large dose of drugs designed to induce an overdose.

In a video-recorded interview from August 3, 2023, Mr. Knight told Special Agent Adam Penna that Mr. Hinkle was not present for the poker game. Mr. Knight then went as far telling Special Agent Penna that he attempted to call Mr. Hinkle several times regarding the poker game, with no success. Mr. Knight also claimed that he could not give a roster of attendees because he deleted his list. But these statements are belied by the evidence.

Mr. Knight's statement that he did not think Mr. Hinkle was at the game was false. Mr. Knight's phone records prove as much. Mr. Knight's text messages show he texted Mr. Hinkle to park next to him before the poker game. Mr. Knight's statement is only further contradicted by his account of events. To Special Agent Penna, Mr. Knight specifically recounted calling Mr. Hinkle to no avail. His texts show the opposite. They were in communication by text that same day. This evidence underscores his consciousness of guilt and intent to provide false statements.

Mr. Knight's statement that Mr. Hinkle was not at the poker game was also false. Video footage from outside the poker game shows Mr. Knight and Mr. Hinkle interacting at length before and after the poker game. Importantly, Mr. Knight's lies occurred only six days after the July 27th poker game

After his interview with Special Agent Penna, Mr. Knight drove to Mr. Hinkle's house. Mr. Knight recounted the interview to Mr. Hinkle, saying he did not want to speak over the phone because he feared it was tapped. He then discussed Mr. Quinn's death and intimated that Mr. Hinkle should peddle a narrative distancing the Rare Breed from the events that unfolded across the street at Mr. Gogolack's house.

6

**C.      Count 23: Mr. Knight's False Statement Regarding Mr. Gogolack's Visit to Mr. Knight's Residence on July 28, 2023.**

Count 23 charges Mr. Knight with making a false statement to FBI special agents on October 24, 2023, when he represented that Mr. Gogolack did not visit his residence during the early morning hours on July 28, 2023, when in fact, Mr. Gogolack visited his residence during that time.  Dkt. 24 at 45.

Mr. Knight claimed, in a recorded interview, that Mr. Gogolack did not visit his home in the early morning hours of July 28, 2023, protesting how his dog would have woken him up if anyone had entered the home—offering that account as proof that no one was there.

But Mr. Gogolack's geolocation data contradicts him.  Mr. Gogolack's Google geolocation records place Mr. Gogolack's phone inside Mr. Knight's residence at the very time Mr. Knight insists Mr. Gogolack was absent and Mr. Knight was asleep.  And the timing matters.  Around the same time Mr. Gogolack's phone was inside Mr. Knight's home, Ms. Quinn sent text messages describing a confrontation with armed bikers belonging to the "wannabe crue", which the government will argue is a reference to the Rare Breed, an Outlaws support club.  Mr. Knight was a self-described Rare Breed "hang-around."  Mr. Knight's statement was not just inaccurate—it is refuted by contemporaneous digital evidence.

**D.      Count 26: Mr. Roncone's False Statement Regarding His Knowledge of Ms. Quinn's Death and Whether there were Narcotics in his Residence.**

Count 26 charges Mr. Roncone with making a false statement to FBI special agents on December 7, 2023, when he represented (1) that he did not know anything about Ms. Quinn's death and (2) that there were no drugs in his residence when, in fact, Mr. Roncone knew something about Ms. Quinn's death and knew there were drugs in his residence.  Dkt. 24 at 47.

7

### Mr. Roncone's Statements Regarding Ms. Quinn's Death

Both direct and circumstantial evidence prove that Mr. Roncone knew something of Ms. Quinn's death. First and foremost, Mr. Roncone's own statements show he knew Ms. Quinn died when he spoke with the FBI. Shortly before Ms. Quinn's death, Rare Breed members met in person with Outlaws members. Then, shortly after Ms. Quinn's death, Mr. Roncone—the president of the Rare Breed's Wellsville Chapter—and Mr. Knight—a self-proclaimed Rare Breed "hang-around", close friend of Mr. Roncone's, and neighbor to Mr. Gogolack—exchanged text messages discussing the recent events in Wellsville. In their texts, Mr. Roncone sent a screenshot of Ms. Quinn's Facebook account to Mr. Knight, asking "is this the girl", as pictured below. This was before Mr. Knight ever identified Ms. Quinn by name.



Mr. Roncone's knowledge of Ms. Quinn's identity before Mr. Knight confirmed that she was dead, is strong circumstantial evidence that Mr. Roncone knew of Ms. Quinn.

8

Second, Ms. Quinn's text messages to Mr. Gogolack during the early morning hours of July 28, 2023, support the inference that Rare Breed members, whom Ms. Quinn identified as the "wannabe crue," confronted Ms. Quinn at gunpoint. As the then-president of the Rare Breed's Wellsville chapter, a jury could fairly infer that Mr. Roncone had knowledge of the confrontation, as discussed *infra*.

Third, phone records place Mr. Roncone in immediate contact with Mr. Knight and Mr. Ermin at critical junctures in the investigation. On August 3, 2023, Mr. Knight called Mr. Roncone almost immediately after special agents interviewed him about Ms. Quinn's death. Mr. Knight made this call just before meeting with Mr. Hinkle, where he laid out the narrative distancing the Rare Breed from Ms. Quinn's death.

Next, on October 24, 2023, Mr. Knight immediately contacted Mr. Roncone after the FBI executed a search warrant on his home. Mr. Roncone then contacted his father—a senior leader of the RMBC. Later that same day, after being interviewed for a second time by special agents about Ms. Quinn's death, Mr. Knight communicated with Mr. Roncone again. Mr. Roncone then spoke with Mr. Ermin—the most powerful member of the Outlaws in the world—who shared defendant Peter Gerace, Jr.'s motive to silence Ms. Quinn. Then, on October 26, 2023, two days after the FBI searched Mr. Knight's home, Mr. Knight and Mr. Roncone communicated via telephone approximately 12 times.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████    e.    Coupled with Ms. Quinn's excited utterances during the early morning hours of July 28th when bikers in Wellsville belonging to the "wannabe crue" confronted Ms. Quinn at gun point, Mr. Roncone's status as the then-president of the Rare Breed's Wellsville chapter, and the Rare Breed's institutional mandate to support the Outlaws, as discussed *infra*, a jury could reasonably conclude that Mr. Roncone lied to the FBI when he said he knew nothing of Ms. Quinn's death.

**Mr. Roncone's Statements Regarding the Presence of Narcotics in his Residence**

Count 26 also charges Mr. Roncone with falsely denying the presence of narcotics in his residence.  The evidence at trial will show that narcotics were found in Mr. Roncone's bedroom, in a gun safe containing his firearms, and elsewhere in his residence.

## IV.    MOTIONS IN LIMINE

### MOTIONS TO ADMIT INTRINSIC OR, ALTERNATIVELY, RULE 404(B) EVIDENCE

The government moves to admit several categories of evidence that are generally intrinsic to the conspiracies charged in Counts 1 through 3 and the distribution of fentanyl charged in Count 4.  Alternatively, the evidence is admissible pursuant to Rule 404(b).  This section first proceeds with the relevant legal frameworks, including the frameworks for relevance, Rule 404(b), and Rule 403.  The government then applies those frameworks to each of its specific motions.

### A.    Legal Frameworks

#### 1.    Relevance

The defendants' gang affiliations and their relationships with one another are relevant because they provide necessary context and complete the narrative of the charged offenses. To be admissible at trial, evidence must be relevant.  The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) (quotations omitted).  Relevant evidence "need only tend to prove the government's case," and that includes evidence that provides context and dimension to the charged conduct, even where it does not directly establish an element of the offense. *United States v. Gonzalez*, 110 F.3d 936, 941–42 (2d Cir. 1997).

"[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).  Background evidence is admissible under Rule 403 to explain the circumstances surrounding the charged events and to furnish the jury with an understanding of the intent and meaning of a defendant's actions.  *United States v. Daly,* 842 F.2d 1380, 1388 (2d Cir.1988); *see also Gonzalez*, 110 F.3d at 941–42 (upholding admissibility of burglary evidence from earlier that night as relevant to motive and for context for the charged firearm offense under Rules 401 and 403).  When "a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (quotations omitted).

### 2.     Rule 404(b)

Federal Rule of Evidence 404(b) provides that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . . .

Fed. R. Evid. 404(b).

The Second Circuit "follow[s] an inclusionary rule, allowing the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir.1994).

There are three requirements in order for evidence of "[c]rimes, wrongs or other acts" to be admitted under Rule 404(b).  First, the evidence must be offered for a purpose other than to prove the defendant's bad character or criminal propensity.  *See United States v. Mickens*, 926 F.2d 1323, 1328 (2d Cir. 1991) (quotation omitted).  Second, the evidence must be relevant

12

under Federal Rules of Evidence 401 and 402 and satisfy the balancing test under Rule 403. *Id.* at 1328.  Third, the court must instruct the jury about the limited purpose for which the government's evidence is being admitted if the defendant so requests. *Id.* at 1328–29.

Rule 404(b) does not govern evidence intrinsic to the charged conduct. *See United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994).  Because such evidence is part of the same narrative as the charged conduct, it is not "other acts" evidence at all.  "Evidence of uncharged criminal activity is not considered 'other crimes' evidence under [Rule] 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'" *United States v. Towne,* 870 F.2d 880, 886 (2d Cir. 1989) (cleaned up).

### 3.    Prejudice

Although intrinsic evidence is admissible, it remains subject to Rule 403.  Under Rule 403, relevant evidence may be excluded only where its probative value is substantially outweighed by a danger of unfair prejudice. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  Unfair prejudice namely means "an undue tendency to suggest decision on an improper basis" rather than on proof specific to the charged conduct. *Id*.  To determine whether evidence is unfairly prejudicial, courts evaluate the evidence in the context of the charged crimes. *United States v. Smothers*, 652 F. Supp. 3d 271, 285 (E.D.N.Y. 2023).

Evidence is not unfairly prejudicial simply because it is damaging. *See, e.g.*, *Gonzalez*, 110 F.3d at 942; *Thai*, 29 F.3d at 813 (finding no abuse of discretion under Rule 403 in admitting graphic testimony concerning murder, robbery, and related crimes where the evidence was tied to participation in gang-related conduct); *United States v. Fortenberry,* 971 F.2d 717, 721 (11th Cir. 1992) (finding evidence that defendant committed double murder

13

did not violate Rule 403 when admitted to establish possession of a firearm). Rather, exclusion is warranted where the evidence is "more inflammatory than the charged crime." *United States v. Livoti,* 196 F.3d 322, 326 (2d Cir. 1999); *cf. United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'"); *United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir. 1991) (upholding admission under Rule 403 of testimony related to murders and dismemberments by gang members as probative of the existence of the charged enterprise).

**B.    Motion to Admit Evidence Showing the Defendants' Affiliation with the Outlaws and Rare Breed, and the Outlaws' Association with the Rare Breed.**

The government moves to admit evidence showing: (1) the defendants' association with the Outlaws and the Rare Breed motorcycle clubs; (2) the defendant's association with one another; and (3) the Outlaws, Rare Breed, and Pharoah's association with one another. Evidence of the defendants' association with the Outlaws and Rare Breed motorcycle gangs— and their interrelationship with each other and with Pharoah's—is necessary to understand how the defendants executed the conduct charged in Counts 1 through 3.

As set forth below, such evidence is admissible because: (a) it provides critical background and context for the crimes charges; (b) it is intrinsic to the charged offenses and therefore not governed by Rule 404(b); and (c) its substantial probative value is not outweighed by the risk of unfair prejudice under Rule 403.

**1.    Factual Background**

Mr. Gerace was the owner and operator of Pharoah's. Dkt. 24 at 2 ¶ 1. Mr. Ermin was the manager of Pharoah's and the International or "National President of the Outlaws," a biker gang with international reach whose members were also employed at Pharoah's. *Id.*

14

at ¶ 2. Mr. Roncone, meanwhile, was the President of Rare Breed's Wellsville chapter. The Rare Breed is a biker gang "aligned with" and supportive of the Outlaws. *Id.* at 7 ¶ 27, 6–7 ¶ 25. Like the Outlaws, the Rare Breed had a relationship with Mr. Gerace and Pharoah's. *Id.* at 6–7 ¶ 25. Mr. Roncone was also personally associated with Mr. Ermin, Mr. Knight, and Mr. Gogolack. *See id.* at 7 ¶¶ 27, 28, 30, 8 ¶ 31.

To prove these association allegations, the government anticipates moving to admit the following categories of evidence:

1.   As to Mr. Gerace: affidavits in which Mr. Gerace claims to be the owner of Pharoah's; and witness testimony.

2.   As to Mr. Ermin's status as the manager of Pharoah's: an affidavit in which Mr. Ermin purports to manage Pharoah's; pay stubs from Pharoah's seized from Mr. Ermin's residence; and witness testimony.

3.   As to Mr. Ermin's membership in the Outlaws and his leadership status: photographs; jewelry; vests; apparel; writings; documents; and expert testimony tending to show that Mr. Ermin was the International or National President of the Outlaws.

4.   As to the employment of other Outlaws members at Pharoah's: witness testimony.

5.   As to Mr. Roncone's membership in the Rare Breed: photographs; vests; apparel; meeting minutes; club records; and witness testimony showing that Mr. Roncone was a member and leader of the Rare Breed.

6.   As to Mr. Hinkle's association with Mr. Roncone and the Rare Breed: photographs; cell phone evidence; an obituary concerning Howard Hinkle, Sr.; witness testimony; Rare Breed meeting minutes; ████████████ ████████████████ .

7.   As to Mr. Knight's association with Mr. Roncone and the Rare Breed: statements made by Mr. Knight; cell phone evidence; call detail records; video footage of Mr. Knight and members of the Rare Breed; and witness testimony.

8.   As to Mr. Gogolack's association with Mr. Roncone and the Rare Breed: cell phone evidence; jail calls; and witness testimony.

15

9.    As to the Rare Breed's association and alignment with the Outlaws: photographs; cards; Rare Breed meeting minutes; and witness testimony.

10.   As to the Rare Breed's relationship with Pharoah's and Mr. Gerace: fliers that identify Pharoah's as a sponsor of Rare Breed events; meeting minutes in which Pharoah's is referenced; and witness testimony.

**B.    Application**

**a.    Relevance**

The defendants' gang affiliation is directly relevant because it provides essential context without which the charged conduct does not make sense. The defendants' affiliation with motorcycle gangs is not peripheral background. Nor is the connection between the motorcycle gangs and Pharoah's. It is the framework that makes the charged conduct intelligible. Without that context, the evidence would present an incoherent narrative in which multiple defendants coordinated to target the Ms. Quinn even though, on its face, her death appears to benefit only one of them—Mr. Gerace. Evidence of the defendants' gang affiliations supplies that missing explanation.

Specifically, the defendants shared membership in, or association with, motorcycle gangs and Pharoah's explain why they acted in concert. It establishes that their conduct was not the product of disconnected decision-making but rather flowed from a common affiliation governed by shared expectations and objectives. In that context, far from being anomalous, the defendants' coordinated actions were the predictable product of that association.

The gang evidence also provides critical context for motive. The government's proof will show that hostility and violence toward "snitches" is one of the Outlaws' and the Rare Breed's core organizational tenets. And Ms. Quinn—a government witness slated to identify Pharoah's and the Outlaws Buffalo Clubhouse as hotbeds of criminal activity—fit that profile.

16

This evidence further explains why the defendants collectively targeted Ms. Quinn. It explains why individuals who otherwise lacked personal stakes in the outcome of Mr. Gerace's case nevertheless participated in the charged conduct. Without that backdrop, the jury would be left with a fragmented and misleading narrative—one stripped of motive, divorced from coordination, and marked by critical gaps.

Finally, the gangs' internal structure and hierarchy are essential to understanding the roles each defendant played. The evidence will show that certain defendants occupied positions of authority, while others were subordinate, and that the Rare Breed, as a whole, was subordinate to the Outlaws. That hierarchy explains why lower-ranking members or associates acted at the direction of others and participated in the offense despite lacking an independent motive. Absent that context, the actions of those defendants would appear disconnected and inexplicable. In short, the defendants' gang affiliation is necessary to provide the jury with a coherent account of the charged offenses. It explains why the defendants acted together, why they targeted Ms. Quinn, and why each participant behaved as they did.

The necessity of this context is not abstract—it is borne out of the evidence itself. Only through the lens of the gang's hierarchy does Mr. Ermin's motivation to participate in the conspiracy come into focus. Only through that same lens—and Mr. Ermin's position at the top of that hierarchy—do Mr. Gerace's references to having "powerful people" to "tie up [his] loose ends," take on their full meaning. And while Ms. Quinn's anticipated testimony, on its face, did not identify any of the defendants, other than Mr. Gerace, those statements carry broadened significance when viewed in connection with the gangs' activities at Pharoah's. This in turn explains why multiple motorcycle gang members would react collectively to the

17

prospect that Ms. Quinn would testify against Mr. Gerace. Without that context, these critical pieces of evidence appear isolated and ambiguous; with it, they form a coherent and compelling account of the defendants' coordinated conduct.

### b.    Rule 404(b) analysis

Alternatively, the evidence is admissible under Rule 404(b) because it bears on the Outlaws' and Rare Breed's motive for tampering with and retaliating against Ms. Quinn. Without evidence of each group's association with one another, the motive collapses. The jury will not understand why the Outlaws cared about Mr. Gerace's criminal liability. Nor will the jury appreciate the Rare Breed's motive to assist the Outlaws and Mr. Gerace, or understand how a coordinated, multi-tiered obstruction scheme emerged across six defendants, two motorcycle gangs, and a strip club owner.

The government does not seek to introduce gang affiliation to argue that the defendants are bad people or acted in conformity with a criminal character. Instead, the evidence is offered to explain the relationships among the defendants, the coordinated nature of their actions, the motive for targeting Ms. Quinn, and the decision-making structure that governed their conduct. These are core aspects of the charged offenses themselves. Because the gang-affiliation evidence is intrinsic to the charged conduct and necessary to render that conduct digestible to the jury, it is admissible under Rule 401 and is not subject to Rule 404(b). But even if it is subject to Rule 404(b), it is admissible to explain the defendants' motive and plan.

### c.    Probative value substantially outweighs risk of unfair prejudice

The defendants may argue that evidence of gang affiliation is prejudicial. But Rule 403 excludes only unfair prejudice—an undue tendency to invite a decision on improper basis— and not simply evidence that is damaging to the defense. Here, the probative value of the

18

gang evidence is substantial.  As discussed, it explains why the defendants acted in concert, why the victim was targeted, and how the hierarchy of the gang informed each defendant's conduct.  Without this evidence, the jury would be left with a fragmented and confusing account of the charged offenses.

Nor is the risk of unfair prejudice sufficient to warrant exclusion.  The challenged evidence is not more inflammatory than the charged conduct itself, which involves the obstruction of justice by way of killing a federal witness.  This directly illuminates motive, the relationships among participants, and the nature of the criminal activity.  Against that backdrop, the introduction of gang affiliation evidence—offered for the limited purpose of explaining context and motive—does not create a risk of unfair prejudice that substantially outweighs its probative value.  Any residual risk can be addressed through a limiting instruction directing the jury to consider the evidence only for its proper purposes.

Accordingly, the Court should permit the government to introduce evidence showing (1) the defendants' association with the Outlaws and the Rare Breed motorcycle clubs, (2) the defendant's association with one another, and (3) the association between the Outlaws, the Rare Breed, and Pharoah's.

### C.    Motion to Admit Evidence Showing the Outlaws' Prior Acts with Mr. Gerace

The government further moves to admit evidence showing that the Outlaws had a pre-existing criminal relationship with Mr. Gerace.  Specifically, the government anticipates that a witness will testify that Mr. Gerace admitted to her that the Outlaws "got rid of the body" of a Pharoah's dancer who had overdosed on drugs.  This evidence is admissible under Rule 404(b) to show the trust between Mr. Gerace and Mr. Ermin, and their shared intent,

19

knowledge, and plan, and its probative value is not substantially outweighed by any danger of unfair prejudice.

### 1.    Factual Background

A witness is expected to describe an occasion wherein Mr. Gerace, while stressed about the federal investigation and under the influence, admitted that the "bikers" "got rid of" the body of a Pharoah's dancer:

Q.    And did he start to make statements to you regarding -- withdrawn.  Did he start to make statements and acting in a way that you thought he was stressed about something?

A.    Yes.

Q.    What did he say?

A.    That he was stressed about the fact that the whole place got raided and that they were looking for papers and trying to accuse him of something he never did and brought up the girl that overdosed and he got rid of her body.

Q.    Okay.  As close as you can to what Peter said about that, what did he say about a girl that overdosed, describe that conversation.

A.    I was sitting there and he was like, so the whole entire raid and everything happened today.  I was like yeah, I'm aware.  He goes they were looking for stuff, that I'm being completely accused of getting rid of a girl's body and I was like wait, what.  Like I've heard about it, other people have told me about it but I didn't think it was actually true and he goes yeah, a girl overdosed and I had to fucking get rid of her body and I was like okay, well, what happened.

Q.    What did he say?

20

***

```
Q.    Did you ask or did he say who got rid of the body?

A.    Bikers.

Q.    Did he say that out loud?

A.    Yes.  I don't know what bikers.  I'm going to assume
the ones that are still working there, but I don't know.
```

The evidence at trial will show that the "bikers" with whom Mr. Gerace had a close, trusting, and agency relationship were the Outlaws, thereby enabling the jury to infer that Mr. Gerace was referring to the Outlaws.

### 2.      Application

Evidence of Mr. Gerace's existing criminal relationship with the Outlaws, an organization then headed by Mr. Ermin, is essential to understanding why Mr. Gerace trusted the Outlaws to "tie up his loose ends." *See Pitre*, 960 F.2d at 1118 (affirming the district court's admission of evidence of prior drug transactions involving the same parties to show "a relationship of trust between the parties and that 'they knew about transactions of this type'"); *United States v. Blanco*, 811 F. App'x 696, 705 (2d Cir. 2020) (unpublished) (affirming the district court's admission of narcotics evidence in a bank robbery case to explain why a robbery co-conspirator "trusted" the defendant "to play a key role in planning a risky and dangerous bank robbery"); *United States v. Serrano*, 640 F. App'x 94, 97–98 (2d Cir. 2016) (unpublished) (affirming the district court's admission of narcotics evidence in a narcotics and robbery case because "[t]he challenged evidence permitted the jury to understand why . . . [the defendant] sufficiently trusted [his co-conspirator] to say that he 'wanted it' and, therefore, quickly entered into the charged robbery conspiracy"); *United States v. Lopez*, 112 F. App'x 774, 777 (2d Cir. 2004) (unpublished) (affirming the district court's admission of

21

"evidence that [the defendant] had committed unspecified uncharged crimes in the past with" his co-conspirator because it "established the defendants' past relationship of trust in connection with criminal activities").

The evidence is also sufficiently similar to the charges at issue here to be probative of Mr. Gerace's intent, knowledge, and plan. Like the deceased dancer, Ms. Quinn was a former Pharoah's employee who posed a risk to Mr. Gerace's criminal operation. And, as with his prior use of the Outlaws to dispose of the dead body to insulate himself from criminal liability, a jury could reasonably infer that Mr. Gerace intended to stymie the prosecution in 1:19-CR-227, by once more outsourcing his dirty work to the Outlaws to eliminate the problem posed by Ms. Quinn's cooperation. Indeed, without the context of Mr. Gerace's admission, the jury could be left wondering who Mr. Gerace was referring to when he bragged to ▮ about knowing "powerful" people who could "tie up his loose ends," and might further question why Mr. Gerace would include Mr. Ermin as one of those people. The answer to those questions is based on, among other facts, Mr. Gerace's pre-existing criminal relationship with the Outlaws to dispose of those who posed a risk to Mr. Gerace.

Finally, the evidence is more probative than it is unfairly prejudicial. In fact, it is not unfairly prejudicial at all. Mr. Gerace's admissions are being offered to show why Mr. Gerace and Mr. Ermin trusted one another to dispose of their other mutual problem—Ms. Quinn— and the meaning of Mr. Gerace's statements to ▮. Moreover, the evidence is no more inflammatory than the murder conspiracy allegations in this case. The Court can also limit the possibility of unfair prejudice infecting the trial by providing a limiting instruction to the jury.

22

**D.    Motion to Admit Evidence Showing the Outlaws' Institutional Commitment to Harming Witnesses and Monitoring Law Enforcement Investigations into the Club.**

The government moves to admit evidence showing the Outlaws's institutional commitment to harming witnesses and monitoring law enforcement investigations into the club.  Specifically, the government seeks to introduce two categories of evidence: (1) the Outlaws hostility toward perceived cooperators; and (2) documents recovered from Mr. Ermin and the Outlaws Clubhouse demonstrating efforts to track law enforcement activity and identify cooperating witnesses.

This evidence is admissible as background necessary to understand the charged conduct.  Understanding the Outlaws' organizational norms and commitments is critical to understanding both the "how" and "why" the obstruction, tampering, and retaliation conspiracies against Ms. Quinn unfolded.  Accordingly, this evidence is intrinsic to the criminal conduct at issue in Counts 1 through 3.  Alternatively, this evidence is admissible pursuant to Rule 404(b).  Under either theory of admissibility, it is not unduly prejudicial under Rule 403.

**1.    Factual Background**

For the Outlaws, preserving group cohesion and internal discipline is paramount—and publicly enforced. Their organizational records—directing members to heed the norms and mores elevating group cohesion above what is "right" or comfortable and requiring members to financially support their incarcerated peers—prove as much.  *See* GOV-00004929 (National Constitution Outlaws Motorcycle Club of North America) ("A probate will not be told to do something that a member himself would not do."); GOV-00004037–38 ("My thoughts" note seized from 41 Richmond).

23

Witnesses, like Ms. Quinn, who cooperate with law enforcement against the Outlaws threaten this cohesion and, by extension, the integrity of the organization. For that reason, as the indictment alleges, the Outlaws have an "organizational commitment to intimidating, harming, or potentially killing individuals who pose a threat to their organization." Dkt. 24 at 2 ¶ 3. By way of example, the Outlaws' Brazilian chapter formalized the consequences of violating this canon in its bylaws, which state that "[t]reason, secret treason, . . . unapproved cooperation with authorities, . . . [and] omission of notifying chapter of contact with police," are each grounds for a "[d]ishonorable discharge" from the club.

The Outlaws broadcast their norms and commitments through branded apparel—including patches, shirts, hats, signs, and/or other items—bearing the acronym "G.F.O.D" (God Forgives, Outlaws Don't); slogans such as "Snitches are a Dying Breed", "Nobody Talks, Everybody Walks," and "Omerta"; and imagery of a gun pointed at the observer with the phrase "Support Your Local Outlaws" ("SYLO"), among other items.[3] The Outlaws underscore this message in their Buffalo clubhouse, prominently displaying a rat's skeleton hanging by a noose.

These attitudes were not the stuff of mere rhetoric, but a reflection of deeply embedded norms and institutional commitments underpinning the Outlaws' operations. To effectively identify witnesses and cooperators, the Outlaws, including its International or National president, Mr. Ermin, monitored ongoing prosecutions and law enforcement investigations spanning decades. The files seized from the Outlaws Buffalo Clubhouse and Mr. Ermin's residence included highlighted and annotated federal court documents, the government's witness list in a previous federal prosecution into Outlaws' leadership; FBI 302s containing

---

[3]       "Omertà" is an Italian word referring to a strict code of silence.

confidential source reporting; state law enforcement reports; law-enforcement-sensitive FBI reports; and search warrant documents relating to a 2021 search of Outlaws member, P.R.

Separately, agents recovered three filings from Case No. 1:19-CR-227: the sealed Second Superseding Indictment; the Third Amended Protective Order; and, notably, a detention brief.  The Second Superseding Indictment related to a sex trafficking conspiracy centered at Pharoah's—Mr. Gerace's strip club—and alleged that "[s]everal of GERACE'S male employees at Pharoah's are members of a motorcycle club called the Outlaws Motorcycle Club ("Outlaws MC")."

Documents seized from Mr. Ermin's home show his commitment to the Outlaws internal enforcement efforts—particularly its mandate to identify "snitches" or people that otherwise provide information to law enforcement.  Those materials include efforts to decode the identities of suspected witnesses and cooperators.  Mr. Ermin also maintained notes outlining how overly informational social medial posts and conversations with "cunts"—or female romantic partners—constitute "dry snitching."[4]   In addition, agents recovered a photograph of South American motorcycle club members with blue arrows annotated in what appears to be Mr. Ermin's handwriting, indicating which club members were actually members of law enforcement.  The materials recovered from Mr. Ermin's home reflect the Outlaw's institutional commitment to witness tampering, *see* Dkt. 24 at 2 ¶ 3, and their proactive—and reactive—efforts to obstructing law enforcement investigations.  *See id.* at 12 ¶ 8.

---

[4]     The government will argue that "[d]ry snitching" is the act of indirectly informing or disclosing secret information.

### 2.   Application

The government seeks to introduce two categories of evidence: (1) the Outlaws mandate to harm witnesses including the group's apparel and messaging reflecting its hostility toward perceived threats; and (2) documents recovered from Mr. Ermin's residence and the Outlaws' Clubhouse demonstrating efforts to track law enforcement activity.  This evidence is admissible as background necessary to understand the charged conduct.  In the alternative it is admissible under Rule 404(b).  Under either theory, it is not unduly prejudicial under Rule 403.

#### a.   The evidence is admissible as background.

This evidence is intrinsic to the charged offenses because it explains the relationships, motives, and coordinated conduct at the heart of the case. The proof will show that the Outlaws were focused on identifying and responding to perceived threats—both within and outside the group—and that this focus drove the defendants' conduct.

#### i.   Harming witnesses

Evidence of the Outlaws' branded apparel and the prominently displayed rat skeleton in the Clubhouse are intrinsic to the charged offenses because it reflects their institutional commitment to obstructing justice (through witness tampering) and the defendants' conduct within it. Theses slogans and imagery communicate the group's mandate to identify and act against perceived "snitches" and reinforce internal discipline.

The evidence of a rat skeleton hanging by a noose is admissible as background because it explains the Outlaws internal code, how members viewed perceived threats, and how the defendants understood and acted in conformity with that code. This display was more than just décor; it declares that the Outlaws, organizationally, believed that "rats" should be

26

executed.[5]   Its prominent display in the main space the Outlaws congregate reflects the group's attitude toward such individuals and the fate they deserve: execution. That context is critical here. Ms. Quinn was perceived as a law enforcement cooperator. And the hanging rat skeleton provides the lens through which Mr. Ermin, and the legions of Outlaws and support club members he controlled, viewed her.

Without this evidence, the jury would be left with an incomplete and potentially misleading picture of the relationships, motive, and coordinated conduct at issue in this conspiracy.  The apparel and rat skeleton evidence contextualizes the charged conduct.

This same evidence explains why Mr. Ermin and Mr. Gerace conspired to commit Counts 1 through 3, in the first place.  Far from being coincidental, this coordination stemmed from Mr. Gerace's awareness that Mr. Ermin's organization was institutionally committed to responding to perceived threats.  Because this evidence explains the defendants' conduct, their coordination, and their response to investigative pressure, it completes the story of the charged offenses and is admissible as direct background.  *See United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000) (background evidence admissible to "complete the story" of the charged conspiracy and "explain to the jury how the illegal relationship between the participants in the crime developed") (internal quotations omitted) (quoting *Pitre*, 960 F.2d at 1119)).

### ii.　　Monitoring law enforcement activity

Mr. Ermin's monitoring of law enforcement activity is similarly central to this case. The documents recovered from Mr. Ermin's home—including sealed court records— represent a sustained effort to track investigative developments into the Outlaws.  The scale and scope of that monitoring demonstrate the defendants' investment in the organization and

---

[5]　　A "rat" is widely utilized as a term for a witness cooperating with law enforcement.

their commitment to advancing its objectives. *See United States v. Savage*, 85 F. 4th 102, 129 (3d Cir. 2023) (concluding that evidence of the appellant's endeavor to firebomb a home would be "highly probative of his participation in the charged RICO conspiracy, as it would show unity of purpose and his commitment" to a violent drug trafficking gang's objectives).

Without this evidence, the jury would be left with a distorted and incomplete account, and might view Mr. Ermin's possession of court records as benign or incidental, rather than what the evidence shows: part of a concerted and directed effort to advance the Outlaws' objective of identifying perceived threats and silencing witnesses. *See United States v. Age*, 136 F. 4th 193, 221 (5th Cir. 2025) (holding that evidence of a gang's "general acts of gang violence explained why Age III and Wilson first approached the [gang] for help with Womack's murder" because such evidence "served to 'complete the story of the crime of the trial,'" and thus was "properly admitted as intrinsic evidence") (quoting *United States v. Gurrola*, 898 F.3d 524, 536 (5th Cir. 2018)).   This is intrinsic evidence, as it is critical background to the charged conduct itself.

### b.     Alternatively, the evidence is admissible under Rule 404(b).

Even if the Court were to view this evidence as extrinsic, it is admissible under Rule 404(b) because it is probative of motive, intent, knowledge, and consciousness of guilt.  Taken together, this evidence does not invite propensity reasoning.  It instead explains why the defendants acted, how they coordinated, and what they knew.  That is precisely the use Rule 404(b) permits.

### i.     Harming witnesses

The Outlaws messaging establishes a shared mandate to identify and act against perceived threats, including "snitches."  The possession of the branded apparel is admissible under Rule 404(b) because it is probative of motive, intent, knowledge, and identity

28

(affiliation).   The slogans reflect a shared directive to act against perceived threats and witnesses, providing a concrete motive and framework for the defendants' conduct, and rebutting any claim of accident or innocent association.   The possession of such branded apparel further demonstrates the defendants' knowledge of—and alignment with—the group's objectives, supporting the inference that they knowingly participated in the charged offenses. This is a proper non-propensity use of such evidence.

Moreover, evidence of the rat skeleton hanging by a noose is admissible under Rule 404(b) because it is probative of motive and intent. That symbolism is directly relevant here, where Ms. Quinn was perceived as a law enforcement cooperator.  The prominent display of this symbol demonstrates the Outlaws' adherence to the group's code and their motive to target individuals who fit that designation—like Ms. Quinn.

### ii.        Monitoring law enforcement activity

Relatedly, Mr. Ermin's monitoring of law enforcement activity is independently admissible under Rule 404(b) for the same reasons.  It reflects his adherence to the Outlaws' directive to identify and act against perceived threats.  Tracking court filings—in the same case Ms. Quinn was slated to testify in—is not neutral conduct.  The documents in his home demonstrate not just an awareness of the investigation, but familiarity with its contours, the individuals involved, and the potential proof.  And as the government will argue, Mr. Ermin's possession of the documents is indicative of his deliberate effort to anticipate and respond to an investigation that identified the Outlaws in a federal indictment.    That knowledge is probative of motive: Ms. Quinn was connected to the very case Mr. Ermin was monitoring from his home.

The same evidence is also probative of preparation and identity.  By studying the investigative materials and tracking law enforcement activity, Mr. Ermin took concrete steps

to understand the case and positioned himself to act, reflecting advanced planning rather than coincidence. And because those materials link Ms. Quinn to Mr. Gerace by way of Pharoah's—an Outlaw-affiliated establishment—they help establish that Ms. Quinn was targeted for her participation in the case involving Pharoah's.

That conduct demonstrates Mr. Ermin's awareness of the criminal nature of the underlying conduct. It rebuts any claim that Mr. Ermin's actions were innocent, unknowing, or uncoordinated. The government offers this evidence not to show propensity but to establish Mr. Ermin's knowledge, motive, preparation, and plan to stymie the investigations into Pharoah's and the Outlaws.

### c.    The evidence is not unduly prejudicial under Rule 403.

The probative value of this evidence is substantial. It supplies motive, explains coordination, and directly illuminates the defendants' state of mind—issues that are central to the government's case. Any risk of prejudice does not stem from an improper emotional appeal, but from the evidence's legitimate force. The evidence is also not more inflammatory than the charged conduct itself. Indeed, much of it is documentary in nature, which further reduces any risk of unfair prejudice. To the extent any residual concern exists, a limiting instruction will adequately safeguard against misuse.

### E.    Motion to Admit Evidence Showing the Rare Breed's Efforts to Monitor Law Enforcement Investigations and its Institutional Commitment to Harming Witnesses.

The government also moves to admit evidence showing the Rare Breed's shared institutional commitment to harming witnesses and monitoring law enforcement investigations into the club. Specifically, the government will move to admit federal court records seized from the Rare Breed's Buffalo Clubhouse, meeting minutes, photographs from

30

inside the club, and witness testimony evincing the Rare Breed's shared institutional commitment to silencing witnesses and monitoring law enforcement investigations.

### 1.    Factual Background

Like the Outlaws, the Rare Breed discourages cooperation with law enforcement, guards against law enforcement infiltration, and is committed to silencing witnesses. During the search of the Rare Breed's Buffalo Clubhouse, law enforcement photographed two posters of note. The first poster admonished that no cell phones were allowed in the club—evidence undeniably probative of their awareness of potential law enforcement investigations and tactics used by cooperators. A second a poster depicted a man drowning in water with the words "Someone Talked!".

As with the Outlaws, this imagery is more than "tough-guy" posturing. It expresses the same commitment to obstructing law enforcement investigations promoted by the Outlaws—the club that the Rare Breed is duty-bound to support. This commitment is corroborated by Mr. Knight's own statements—that the Rare Breed previously hot-shotted someone and would not have exposed Ms. Quinn to such a large quantity of fentanyl if they were the ones who administered the dose.

Like the Outlaws, the Rare Breed monitored federal prosecutions of motorcycle clubs, as evidence by the Second Superseding Indictment and corresponding press release in Case No. 1:09-CR-96-S seized from their Buffalo clubhouse. Witness testimony, discussed in greater detail *infra*, will also establish that the Rare Breed embraces the Outlaws' anti-snitching ethos.

31

2.    **Application**

a.    **Materials and relationships are intrinsic evidence or otherwise admissible as background or, alternatively, admissible under Rule 404(b)**

At trial, the government will show that the Rare Breed serves as the Outlaws' agents and as an instrumentality of the Outlaws' will. As part of that proof, the trial evidence will demonstrate that the Rare Breed was subordinate to the Outlaws, would obey their commands without question, and would retaliate against witnesses if directed. In addition to being structurally subordinate to the Outlaws, the Rare Breed was operationally aligned with their enterprise. That operational alignment is reflected in their organizations' shared efforts to discourage cooperation with law enforcement, their common strategy of collecting federal court records to monitor prosecutions, and their mutual commitment to tampering with witnesses. The probative value of showing this institutional alignment is substantial, as it shows why the Outlaws would trust the Rare Breed, and corroborates witness testimony to the same effect. Because evidence of a trust makes it more likely that Rare Breed served as an agent or instrumentality of the Outlaws in obstructing justice as it relates to Ms. Quinn, as charged in Counts 1 through 3, the evidence should be admitted as intrinsically relevant to the charges.

Consider, first, the poster warning of the perils of talking with law enforcement found in the Rare Breed's Buffalo Clubhouse. Like its corollary from the Outlaws Clubhouse—"Nobody Talks, Everybody Walks"—this poster speaks to the Rare Breed's organizational effort to discourage talking with law enforcement. So, too, does the Rare Breed's poster admonishing guests not to possess cell phones inside the Clubhouse. That norm, in turn, is directly relevant to proving why the Outlaws would "trust" the Rare Breed to tamper with, and retaliate against, Ms. Quinn. The Rare Breed's compliance with these norms offers the Outlaws assurance that Rare Breed members will actively hinder—not help—any

forthcoming law enforcement investigation. *See United States v. Diaz*, 176 F.3d 52, 79–80 (2d Cir. 1999) (finding no abuse of discretion in admitting testimony related to drug dealing between the co-conspirators because it informed the jury on how the gang's "racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators").

The Rare Breed's tactic of obtaining and reviewing federal judicial records relating to the prosecution of *other* motorcycle gangs and their awareness of pending federal investigations further evinces why the Outlaws would outsource witness obstruction, tampering, and retaliation to the Rare Breed. Just as a certain amount of background information is relevant to showing "how the illegal relationship between the participants in the crime developed," so too is alignment evidence necessary to showing *why* certain illegal relationships formed between members of the Outlaws and Rare Breed, like Mr. Ermin and Mr. Roncone, respectively. *See Diaz*, 176 F.3d at 79. In that vein, a shared sensitivity to federal law enforcement activity and set of tactics to monitor the same explains why the Rare Breed would be entrusted with carrying out the Outlaws' dirty work.

Alternatively, for these same reasons, the evidence is admissible under Rule 404(b) as evidence of the Rare Breed's motive, intent, and preparation to tamper with Ms. Quinn.

> **b.      Mr. Knight's statement is admissible as a statement of party opponent without any *Bruton* implications, and is admissible as intrinsic evidence or through Rule 404(b).**

Mr. Knight's comments about the Rare Breed's past success in hot-shotting people is plainly relevant to the conspiracy to tamper with and retaliate against Ms. Quinn—who the government alleges died from of a hot-shot distributed by Mr. Gogolack. While this statement does reference a group Mr. Knight's co-defendants are affiliated with, the statement does not implicate *Bruton* because it was not testimonial.

Mr. Knight's statement was not testimonial because it was made to a civilian witness who was not involved in the investigation into Ms. Quinn's death at the time. *See United States v. Powell*, No. 21-CR-572 (EK), 2026 WL 161297, at *6 (E.D.N.Y. Jan. 21, 2026) ("*Bruton* applies only to testimonial statements."); *United States v. Williams*, 506 F.3d 151, 155–57 (2d Cir. 2007) (affirming the admission of a co-defendant's non-testimonial statement against penal interest); 2 Wharton's Crim. Evid. § 8:19 n.15 (15th ed. 2025) ("[E]very federal circuit to consider the issue has concluded that . . . [a] co-defendant's statement would have to be found to be testimonial before *Bruton* would be implicated.").

Moreover, though Mr. Knight's statement is intrinsically relevant to the charges, because it again evinces why the Outlaws would trust the Rare Breed to tamper with Ms. Quinn, it is alternatively admissible pursuant to Rule 404(b) because it shows modus operandi and/or plan. Specifically, the hotshot provided to Ms. Quinn bears the same signature as the prior conduct Mr. Knight described to the witness. *See United States v. Sliker*, 751 F.2d 477, 487 (2d Cir.1984) ("The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence.").

### F.     Motion to Admit Evidence of Prior Acts Committed by the Rare Breed at the Behest of the Outlaws

The government further moves to admit evidence of prior actions taken by the Rare Breed in support of the Outlaws. This evidence is intrinsic to the conspiracy, as it explains why the Outlaws would trust the Rare Breed to carry out a witness tampering and retaliation scheme. Accordingly, it is admissible independent of Rule 404(b). Alternatively, the evidence is admissible under Rule 404(b) because it is probative of the Rare Breed's motivation to

tamper with, or retaliate against, Ms. Quinn, and the plan by which such obstruction could be accomplished.

### 1.    Factual Background

The evidence at trial, including through witness testimony, will show that the Rare Breed is an Outlaws support club. As a support club, the Rare Breed is duty-bound to follow the Outlaws' orders because the Outlaws give the Rare Breed permission to exist. Failure to follow an Outlaw's commands could result in retaliation against Rare Breed members.

The Outlaws expected the Rare Breed to commit acts of violence their behalf—an expectation the Rare Breed has historically met. For example, after the Comancheros, another one-percenter club, attempted to establish a presence in the Wellsville area, the Outlaws tasked the Rare Breed with being on the "lookout" for Comancheros members. The Outlaws further directed the Rare Breed to strip any Comancheros members of their patches—using force if necessary—and turn the patches over to an Outlaw. To convey this message, the president of the Outlaws Southern Tier chapter spoke directly with the Rare Breed's president in a face-to-face meeting, which was standard operating procedure when the Outlaws expected the Rare Breed to fulfill their directives using force or violence. On yet another occasion, the Outlaws Southern Tier chapter president spoke directly with Mr. Roncone to enlist his help on checking on a location in Hinsdale where he thought the Pagans, a rival one-percenter club, were trying to open a clubhouse. Mr. Roncone and another Rare Breed member, Les Jackson, followed up as directed.

Obedience to the Outlaws' command was existentially necessary—and the consequences for resistance were dire. For example, on one occasion, several Outlaws walked into a bar patronized by Rare Breed members they did not recognize. The Outlaws stripped the Rare Breed members of their patches and beat one of them after he hesitated to give the

35

patch up.  The Outlaws also have the power to revoke the Rare Breed's status as a club and, therefore, effectively have the power to terminate the Rare Breed's existence.

### 2.    Application

Evidence of the Rare Breed's historic compliance with Outlaws directives, as well as their use of in-person meetings amongst club leadership, is inextricably intertwined with the conspiracies charged in Counts 1 through 3, as it "explain[s] the development of the illegal relationship between the defendants and their co-conspirators and explain[s] the mutual trust that existed between the co-conspirators."  *United States v. Guerrero*, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011); *see United States v. Smothers*, 652 F. Supp. 3d 271, 286–87 (E.D.N.Y. 2023) (concluding that evidence of the defendant's narcotics trafficking and engagement in violent acts with a criminal enterprise "explain[ed] [the defendant's] relationship with members and associates of [the criminal enterprise]").  Without this evidence, the jury would be left with the misimpression that the Rare Breed is independent from the Outlaws and lacks an established procedure designed to obfuscate criminal activity through which it receives Outlaws-issued directives.  Likewise, without evidence of the Rare Breed's historic success in executing the Outlaws' demands, the jury would be left wondering why the Outlaws would trust the Rare Breed to tamper with, and retaliate against, Ms. Quinn.  Historical evidence of the Rare Breed's subordination to the Outlaws goes to the heart of why the Outlaws would outsource obstructive conduct to the Rare Breed, and thus falls squarely within the ambit of the conspiracies charged in Counts 1 through 3.

Alternatively, this same evidence is admissible under Rule 404(b) as evidence of motive and plan.  Regarding motive, witness testimony will establish that the Rare Breed's compliance with the Outlaws' directives is essential to the Rare Breed's continued existence; if its members refuse, they face physical retaliation or the forced shutdown of their

organization.  There is no better way to illustrate this motivation than to discuss the Rare Breed's history of compliance with the Outlaws' directives.

Similarly, the evidence shows a common "plan" or scheme in assigning criminal dictates.  Specifically, evidence of the prior acts illustrates that it is the organizational norm between the Outlaws and the Rare Breed to discuss such dictates through in-person meetings amongst club leadership so as to frustrate law enforcement's ability to investigate and trace criminal activity.   By highlighting the organizations' use of in-person meetings to communicate criminal commands, this evidence contextualizes the import of Mr. Gerace's in-person meetings with Mr. Ermin in the months and weeks prior to Ms. Quinn's death.  Moreover, it helps the jury understand why, in investigations involving sophisticated criminal organizations like the Outlaws, law enforcement is unlikely to find an electronic or paper record greenlighting criminal acts.   And, finally, is underscores the significance of Mr. Roncone's breach of protocol when, in a moment of panic on October 24, 2023, after speaking with Mr. Knight, he called Mr. Ermin.  Accordingly, the government respectfully asks that the Court admit evidence of prior acts that the Rare Breed committed at the Outlaws' behest.

### G.   Motion to Admit Evidence of Simon Gogolack's Participation in a Conspiracy to Distribute Fentanyl and Xanax.

The government hereby moves to admit evidence of Mr. Gogolack's participation in a narcotics conspiracy to distribute fentanyl and Xanax.  Count 1 alleges that Mr. Gogolack "intentionally provided [Ms.] Quinn with a lethal dose of fentanyl," as part of his involvement in the obstruction conspiracy.  Dkt. 24 at 20 ¶ 47.  That allegation is incorporated by reference into Counts 2 and 3, which respectively charged Mr. Gogolack and others with conspiring to tamper with, and retaliate against, Ms. Quinn owing to her status as a federal witness.  And, as noted *supra* at Sec. III(A), Count 4 charges Mr. Gogolack with distributing the fentanyl

37

that killed Ms. Quinn.  Evidence of Mr. Gogolack's access to, and distribution of, fentanyl and Xanax is admissible as intrinsic evidence in this case or, alternatively, as evidence pursuant to Rule 404(b).

### 1.    Factual Background

In the days and weeks before Ms. Quinn's overdose, Mr. Gogolack was actively engaged in the distribution of fentanyl, heroin, and other narcotics with others.  At the same time Mr. Gogolack was strategically resurfacing in Ms. Quinn's life, he was offering hitman services to "Deal," in furtherance of a separate narcotics conspiracy, as pictured below:



Mr. Gogolack also had a history of possessing Xanax and fentanyl together, and middling deals of Xanax likely laced with fentanyl or other opioids. The government's witnesses will testify to as much. First, ███████████ who purchased and used narcotics with Mr. Gogolack, will testify that knew Mr. Gogolack to mix fentanyl and "benzos"[6] together. Second, ███████████ will testify that Mr. Gogolack connected him with a drug dealer who sold him a green "hulk," a type of counterfeit Xanax bar laced with opioids. After ███████████ consumed two-thirds of the "hulk," he nearly overdosed, and thereby concluded that the pills contained a mixture of Xanax and opioids. ███████████ reported his bad reaction to Mr. Gogolack and indicated he thought the pills were laced with another substance.

### 2. Application

Mr. Gogolack's access to and distribution of narcotics, including fentanyl and Xanax, is "inextricably intertwined" with his distribution of fentanyl to Ms. Quinn, as charged in Count 4, and his participation in the conspiracies charged in Counts 1 through 3. *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). This evidence shows Mr. Gogolack's access to potent and lethal drugs like fentanyl, and thereby "provide[s] the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to" Counts 1 through 4. *Inserra*, 34 F.3d at 89. Likewise, Counts 1 through 3 place Mr. Gogolack's state of mind and intent in his interactions with Ms. Quinn at issue. On that score, the temporal overlap between Mr. Gogolack's re-acquaintance with Ms. Quinn and his contemporaneous efforts to start a hitman business is powerful proof of his intent to kill Ms. Quinn.[7] But without

---

[6] "Benzos" is a colloquial term for benzodiazepines, a class of medications that includes Xanax, the brand name for alprazolam. *See* Alprazolam, MedlinePlus, Nat'l Libr. of Med., https://medlineplus.gov/druginfo/meds/a684001.html (last visited April 7, 2026).

[7] A jury could reasonably infer that Mr. Gogolack's efforts to start a hitman business were contemporaneous with his interactions with Ms. Quinn due to his use of the word "trying," the present participle

the evidence of the larger narcotics conspiracy that Mr. Gogolack had formed with "Deal," that evidence is all but divorced of its meaning.

Mr. Gogolack's prior middling of the "green hulks" to ██████████—pills that resemble Mr. Gogolack's own description of the Xanax that he saw Ms. Quinn consume—is similarly the very kind of evidence that helps the jury understand Mr. Gogolack's "understanding or intent" in distributing the drugs to her. *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Specifically, because Mr. Gogolack was on notice from ██ ████████ that the "green hulks" were dangerously potent and very likely cut with an opioid, a jury could reasonably infer that he intentionally distributed fentanyl-laced Xanax to Ms. Quinn.

Similarly, evidence of Mr. Gogolack's participation in the narcotics trade is admissible pursuant to Rule 404(b), as it tends to prove Mr. Gogolack's "opportunity" to distribute fentanyl and Xanax to Ms. Quinn, his "knowledge" that the green Xanax pills he described Ms. Quinn had consumed were laced with powerful narcotics, and that his distribution of the pills was "intent[ional]" rather than the product of a "mistake" or an "accident." Fed. R. Evid. 404(b)(2).

### H. Motion to Admit Evidence of Mr. Gogolack's Prior Bad Acts Regarding ██████████ and ████████████

Pursuant to Rule 404(b), the government further moves to admit Mr. Gogolack's prior threats to, and kidnappings of ██████████ and ████████████ for the permissible purposes of establishing identity though a distinctive modus operandi, a common plan and preparation, and Mr. Gogolack's intent, knowledge, and absence of mistake. The same

---

of "try," which connotes that the sentence's subject (Mr. Gogolack) was engaged in an ongoing, continuous effort.

evidence also demonstrates Mr. Gogolack's deliberate strategy of fabricating evidence and constructing false narratives to evade detection, further corroborating identity and common plan. Each category of evidence bears directly on disputed issues in this case and is therefore admissible.

### 1.    Factual Background

Mr. Gogolack had a problem: his residence at 296 Scott Avenue had skunks. So, ███████████ introduced Mr. Gogolack to ████████ a local wildlife trapper. All three were known to use drugs.

At their first meeting, Mr. Gogolack immediately asserted control. With a pistol in his waistband, he warned ████████ not to cross him "because then you're going to regret it." GX-3536S at 13. Mr. Gogolack then pressed the gun to ████████ head. *Id.* at 14. ████████ attempted to de-escalate, assuring Mr. Gogolack he had nothing to worry about. *Id.* at 14-15. As quickly as the threat appeared, Mr. Gogolack dismissed it—acting as though nothing happened and that he and ████████ "were good friends." *Id.*

But this was not the last time Mr. Gogolack would express a negative sentiment with respect to those causing him problems. Mr. Gogolack told to his father, ████████, that he was "F-ing pissed" when he purportedly learned that Ms. Quinn was cooperating with law enforcement "halfway to Wellsville," where he was taking her to a poker game attended by Rare Breed associates. *See* GX-3566K. Being around a cooperator put Mr. Gogolack in "an F-ing shit storm" that would get him into "trouble." *Id.* at 9.

Returning to ████████ he began the trapping work the same day that Mr. Gogolack threatened him, but was only able to address part of the infestation. He returned on subsequent occasions to continue the job. Over time, the relationship shifted: Mr.

Gogolack began compensating ████████ in fentanyl, which he continued to distribute to ████████ after his skunk problem had resolved.

On March 14, 2023, Mr. Gogolack texted his neighbor, Mr. Knight, asking whether anyone had stolen a package from his porch. Mr. Knight had no information to that effect. Nevertheless, Mr. Gogolack devised his own way to get answers. He contacted ████████ and invited him over, ostensibly to give him drugs to try.



GX-3536J.

████████ arrived a few hours later. Mr. Gogolack's girlfriend, Cortnie Barber, let him inside and directed him to the basement. GX-3536S at 26. As ████████ entered, Mr. Gogolack suddenly emerged—covered in plastic and armed with a shotgun. *Id.* Mr. Gogolack ordered ████████ into a chair positioned in the center of the basement. Plastic was placed around the room—on the floor and along the three surrounding walls—effectively enclosing him.

Mr. Gogolack then held the shotgun to ████████ head and began interrogating him about the missing package, striking him repeatedly in the head with the gun in between questions. ████████ conduct quickly escalated from intimidation to overt threats. Mr. Gogolack told ████████ that he intended to kill him by way of administering a lethal overdose and burning his body in a vehicle to make his death look like an accident. *Id.* at 55–

42

56. ▮▮▮▮▮▮ pleaded for his life, assuring Mr. Gogolack that he would not cross him. Mr. Gogolack responded by racking the shotgun.

Mr. Gogolack then expanded the encounter. He lured ▮▮▮▮▮▮ to his home under the same false pretenses—that he had drugs ▮▮▮▮▮▮ could sample. As before, Cortnie Barber answered the door and directed him to the basement. Upon entering, Mr. Gogolack approached ▮▮▮▮▮▮ at gunpoint. Mr. Gogolack interrogated ▮▮▮▮▮▮ in the same manner, demanding information about the allegedly stolen package.

As the interrogation intensified, Mr. Gogolack forced ▮▮▮▮▮▮ to go through ▮▮ ▮▮▮▮▮▮ phone in search of evidence that ▮▮▮▮▮▮ had stolen the package. Mr. Gogolack then moved ▮▮▮▮▮▮ and ▮▮▮▮▮▮ upstairs where he compelled them to handle multiple firearms and spit into cloths. Mr. Gogolack explained that this would ensure their fingerprints and DNA were on these weapons—an apparent insurance policy to fabricate or manipulate forensic evidence.

▮▮▮▮▮▮ eventually managed to escape, running barefoot approximately one mile until he reached a hospital. Mr. Gogolack then forced ▮▮▮▮▮▮ at gunpoint, to pursue ▮▮▮▮▮▮ by car.

43

In the aftermath, on March 15, 12:56 a.m., Mr. Gogolack attempted to control the narrative. At this time, he sent ████████████ a series of text messages that were inconsistent with events that had just occurred just hours before, appearing calculated to create a false, contemporaneous account in anticipation of further scrutiny.



By contrast, Mr. Gogolack's near-contemporaneous communication with his neighbor, Mr. Knight, reflected a markedly different tone and content, as shown below.



44





On August 14, 2023, after Mr. Gogolack was arrested in the instant case, he messaged "6ᵗʰ Amendment" to both ████████ and ████████ via CashApp. The Sixth Amendment provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. Am. VI.

When ████████ and ████████ received these messages, they did not know what the Sixth Amendment was. Upon researching the Sixth Amendment, both men interpreted this as a warning not to snitch on Mr. Gogolack. Notably, Mr. Gogolack sent these threats *after* soliciting Mr. Knight, on August 11, 2023, for "donations," ostensibly for a

legal defense.  Mr. Knight responded, "it's all good. they gonna hang you?"  Mr. Gogolack, attempting to assure Mr. Knight that his legal issues were not *that* serious, replied, "no fby tryn2makguys tht robed me ni coughtnmyhouse [ . . . .] sayin I held them. I caught them. N let em go..fuc".

### 2.    Application

The government is not offering evidence of Mr. Gogolack's prior bad acts to prove his character or to show his propensity for engaging in criminal activity.  Rather, Mr. Gogolack's threats to, kidnapping of, and subsequent tampering with ███████ and ███████ are admissible under Rule 404(b) as relevant to proving Mr. Gogolack's intent and plan to kill Ms. Quinn, as well as lack of mistake.

The government anticipates that Mr. Gogolack will argue either that Ms. Quinn killed herself or, alternatively, that he did not knowingly and intentionally kill her when he distributed the laced Xanax that he admitted to giving her.  Either defense places Mr. Gogolack's intent at issue—and it is well settled that evidence of prior acts may be admitted to show a defendant's knowledge or intent.  *See United States v. Bok*, 156 F.3d 157, 165-66 (2d Cir. 1998) (finding trial court acted within its discretion in allowing admission of similar act evidence by way of the defendant's tax-paying record to prove his intent to commit tax evasion where defense place intent at issue); *United States v. Clemente*, 22 F.3d 477, 482-83 (2d Cir. 1994) (finding district court's admission of similar act evidence on issues of knowledge and intent proper); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that defendant acted with the state of mind necessary to commit the offense charged.").

Here, Mr. Gogolack's prior acts toward ███████ and ███████ sufficiently parallel the circumstances of Ms. Quinn's death such that a jury could reasonably infer that Mr. Gogolack intentionally killed Ms. Quinn and *attempted* to do so according to the overdose-and-arson scheme he threatened to employ against ███████ The array of live shotgun ammunition alongside the bed on which Ms. Crystal crouching corpse rested is circumstantial evidence that Mr. Gogolack racked a shotgun in Ms. Quinn's presence, just as he did with ███████ [8] Additionally, having successfully hot-shotted Ms. Quinn, Mr. Gogolack was halfway to completing the murder plan he threatened against ███████ that is until Sharon Quinn's threat to call the state police required him to change course. Indeed, when the FBI subsequently searched Mr. Gogolack's home on August 8, 2023, they found clothing and other items in a fire pit adjacent to Mr. Gogolack's house. And, in changing course, Mr. Gogolack quickly gave voice to the false, self-serving suicide narrative that echoed the fabricated robbery narrative that Mr. Gogolack texted to ███████ after he kidnapped and threatened to kill him, and repeated to Mr. Knight following his arrest in this case.[9] Finally, Mr. Gogolack's subsequent tampering of ███████ and ███████ speaks directly to his state of mind that witnesses should be targeted for confrontation—a view aligned with the Outlaws and the Rare Breed's institutional mandates.

---

[8]    Racking a shotgun ejects the live round from the chamber.

[9]    Mr. Gogolack's violent conduct toward ███████ and ███████ which Mr. Knight witnessed at least in part, is relevant to helping "the jury understand the basis for the coconspirators' relationship of mutual trust." *United States v. McParland*, 81 F. 4th 101, 115 (2d Cir. 2023) (quoting *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996)).

47

**a.    The prior acts establish identity through a distinctive modus operandi.**

Mr. Gogolack's prior conduct reflects a highly specific and repeated method of operation that identifies him as the perpetrator of the offense charged.  This is not generic violent conduct; it is a particularized way of luring, confining, and controlling victims.

Mr. Gogolack gets them to his house the same way—under false pretenses designed to disarm suspicion.  ██████████ drove to Mr. Gogolack's home believing he was there to sample drugs.  Ms. Quinn did the same, drawn in under the guise of a budding romance and safe friendship—notwithstanding that Cortnie Barber, Mr. Gogolack's actual girlfriend, would later help with his return trip to Wellsville in the wake of Ms. Quinn's death.

Once inside, Mr. Gogolack imposes control in the same unmistakable way—through submission at shot-gun point.  ██████████ submitted to the authority of that shotgun, sitting otherwise unrestrained in a plastic chair in the basement, while Mr. Gogolack racked the shotgun.  Ms. Quinn was found dead, kneeling face down in a submissive position, surrounded by shotgun shell casings.

Mr. Gogolack's threats similarly follow the same script: overdose and coverup. Mr. Gogolack threatened to make ██████████ death look like an accidental overdose and burn his body in a car. Ms. Quinn's death was ruled an overdose, and bed sheets were recovered in a burn pit outside, evidence consistent with that same threat and Mr. Gogolack's plan to effectuate it.

And when the encounter ends, Mr. Gogolack rewrites the story:  after ██████████ escaped, Mr. Gogolack wrote messages suggesting ██████████ tried to rob him.  After Ms. Quinn died, Mr. Gogolack claimed that she committed suicide—even though she told multiple people she was looking forward to going home.  In both instances, Mr. Gogolack moved immediately to concoct a false narrative and deflect blame.

48

Even Mr. Gogolack's concerns are the same.  As he held a gun to ▓▓▓▓▓▓▓▓ head during their first meeting, he warned ▓▓▓▓▓▓▓▓ not to "cross" him.  In the same vein, Mr. Gogolack told his father that Ms. Quinn being a cooperator put him in "an F-ing shit storm" that would get him into "trouble."  And Ms. Quinn was a cooperator.  That is, until she was found dead in Mr. Gogolack's home.

Different victims.  Same method.  Same threats.  Same cover story.  Viewed together, these events establish a distinctive pattern: Mr. Gogolack lures victims to his home under false pretenses, imposes control through weapons, threatens a staged killing designed to obfuscate what actually occurred, and then constructs a false narrative to deflect blame.  Any one of these facts alone might not establish a modus operandi; but together they form a coherent, repeatable, and highly idiosyncratic method of operation that identifies Mr. Gogolack as the perpetrator and demonstrates the charged conduct was carried out pursuant to a specific pattern.

That is exactly the type of recurring pattern the Second Circuit has held admissible to prove identity through modus operandi. *See United States v. Carlton*, 534 F.3d 97, 101–02 (2d Cir. 2008) (evidence of defendant's three prior convictions for bank robbery was properly admitted to show identity through a common *modus operandi); United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984) ("The similarity sufficient to admit evidence of past acts to establish a recurring modus operandi need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence."); *United States v. Danzey*, 594 F.2d 905, 911 (2d Cir. 1979) (considering the admission of evidence of prior bank robberies to establish identity).  Accordingly, the Court should admit evidence of Mr. Gogolack's prior acts toward ▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓ pursuant to Rule 404(b).

49

**b.     The prior acts demonstrate a common plan and preparation.**

Mr. Gogolack's prior conduct shows that the charged offense was carried out pursuant to a preexisting and repeatable plan. In both the prior incident and the charged conduct, Mr. Gogolack caused individuals to travel to his home, used that location as a controlled environment to isolate them, and asserted dominance using a shotgun to coerce them into staying at the location.

The evidence further demonstrates that Mr. Gogolack began to execute the same plan he previously articulated. In the prior incident, he described a two-part course of conduct: overdose and coverup. Here, law enforcement recovered fabric and other materials in a burn pit (and Ms. Quinn's belonging hidden in Mr. Gogolack's Malibu), indicating that Mr. Gogolack had progressed beyond the initial stage and was partway through carrying out that previously threatened plan.

This is not a case of similar bad acts in the abstract. It is the same structured sequence of conduct—bring the target to the house, confine and control the target, and complete a planned course of harm and concealment. The recurrence of that sequence demonstrates that the charged conduct was executed in accordance with a plan Mr. Gogolack had previously employed and threatened.

**c.     The prior acts establish intent, knowledge, and absence of mistake**

Mr. Gogolack's prior statements that he would kill ███████ by administering drugs and making his death appear accidental are directly probative of Mr. Gogolack's intent and knowledge, and diminish any claim that Ms. Quinn's death here was accidental.

In the prior incident, Mr. Gogolack explicitly articulated a two-step plan: to administer an overdose and then conceal it by staging it as an accident. The charged conduct aligns with that plan. Ms. Quinn died from a lethal amount of fentanyl, and Mr. Gogolack characterized

50

it as either an accident or a suicide.  Mr. Gogolack's prior statements to ▇▇▇▇▇▇▇ therefore demonstrate that Mr. Gogolack knew how to cause such a death, intended to do so, and understood how to disguise it, negating any suggestion of mistake.

### d. The prior acts demonstrate a deliberate strategy to fabricate evidence and construct false narratives, further establishing identity and common plan.

Mr. Gogolack's prior conduct further reveals a calculated and repeatable strategy of manipulating evidence and creating false, contemporaneous narratives to misdirect investigators—a strategy that he employed again here.

In the earlier incident, Mr. Gogolack forced others to handle weapons and provide DNA so that their fingerprints and biological material would appear on evidence. Mr. Gogolack also sent messages designed to create a version of events that conformed with the fabricated evidence but were inconsistent with reality.  That same pattern appears in this case. After Ms. Quinn's death, Mr. Gogolack asserted that she was suicidal, despite evidence that she was looking forward to going home in the coming days, and then intimated it was an accident.  As in the prior incident, Mr. Gogolack sought to plant an alternative explanation in real time, anticipating scrutiny and attempting to shape the narrative before investigators could undercover the truth.  This conduct is admissible not only as evidence of intent and consciousness of guilt, but also because it reinforces Mr. Gogolack's distinctive method of operation and common plan: commit the act, then immediately manufacture a misleading account to conceal it.

Finally, the government does not offer this evidence to show that Mr. Gogolack has a propensity for violence.  It is offered to establish identity, common plan, and his intent and knowledge—issues squarely in dispute.  Given the close and specific parallels between the prior acts and the charged conduct, any prejudice resulting from the evidence is substantially

51

outweighed by its probative value. The Court can limit the potential for any *unfair* prejudice to reach the trial through a curative instruction. *See United States v. Carlton*, 534 F.3d 97, 102 (2d Cir. 2008). Moreover, the government notes that it would not seek to introduce the entire universe of evidence relevant to proving the kidnapping, including non-firearm physical evidence or DNA evidence. Accordingly, the government respectfully asks that the Court admit evidence of Mr. Gogolack's prior acts as to ████████ and ████████ to show identity though a distinctive modus operandi, a common plan and preparation, and Mr. Gogolack's intent, knowledge, and absence of mistake under Rule 404(b).

### I.    Motion to Admit Evidence of Mr. Gogolack's False Impersonation of ████████

Additionally, the government is moving to admit evidence of Mr. Gogolack's false impersonation of ████████ Though such evidence is intrinsic to the case, the government is further noticing it under Rule 404(b) to prove identity and Mr. Gogolack's consciousness of guilt.

On August 1, 2023, Mr. Gogolack told responding officers that he found Ms. Quinn in ████████ half of the duplex he owned by Mr. Gogolack. That was a lie: ████ ████████ had not ever lived with Mr. Gogolack. Seven days later, when the FBI searched Mr. Gogolack's residence, they discovered a cache of personal identification material belonging not only to ████████ but other individuals, too. Witness testimony will establish that Mr. Gogolack had been stealing ████████ identity for some time.

Mr. Gogolack's false representations to responding police officers make his prior theft of ████████ identity intrinsic to this case, as the government is entitled to disprove Mr. Gogolack's false and self-serving efforts to distance himself from Ms. Quinn's death. Alternatively, the evidence is admissible pursuant to Rule 404(b), as it tends to prove that Mr.

Gogolack—not ▮▮▮▮▮▮▮—distributed the fatal dose of fentanyl that killed Ms. Quinn. Whereas Mr. Gogolack initially pointed the finger at ▮▮▮▮▮▮▮, evidence that Mr. Gogolack falsely impersonated ▮▮▮▮▮▮ and stole his identity flatly refutes any suggestion that ▮▮▮▮▮▮ was involved in Ms. Quinn's death. In that way, Mr. Gogolack's invocation of ▮▮▮▮▮▮ is strong evidence of his consciousness of guilt. *See United States v. Stewart*, 112 F.3d 507, *2 (2d Cir. 1996) (unpublished table decision) ("Evidence of consciousness of guilt is admissible under Fed. R. Evid. 404(b)."). Accordingly, the government asks that the Court permit the introduction of such evidence at trial.

### J.     Motion to Admit Evidence of Howard Hinkle's Marijuana and Firearm Possession

The government also seeks to admit evidence of Mr. Hinkle's marijuana and firearm possession as evidence intrinsic to the case or, alternatively, pursuant to Rule 404(b). The evidence that Mr. Hinkle possessed and distributed marijuana to members of the Rare Breed is inextricably intertwined with the charged conduct. The government's theory is that Mr. Hinkle did not stumble into this conspiracy; he forged his own path in it. That path began with Mr. Hinkle's years' long attendance at the Rare Breed poker games in Wellsville, where he became known as a "hang-around." It turned in a criminal direction, however, when Mr. Hinkle began supplying the Rare Breed with marijuana. As such, evidence of Mr. Hinkle's marijuana distribution provides relevant background to the jury, enabling them "to understand the complete story of the crimes charged, [and] how the illegal relationship between co[-]conspirators developed." *United States v. Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006). Such evidence "is especially" important "in a case, such as the one [here] . . . , where

the prior dealings between two conspirators show 'the basis for the trust between' the co-conspirators." *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009).

Stripped of this context, the narrative falters. Without the evidence of Mr. Hinkle's marijuana distribution, the jury would be left to guess why members of a motorcycle gang trusted him, coordinated with him, acted in concert with him, and wanted him in their gang. The law does not require the government to present a fragmented story. To the contrary, where, as here, prior dealings between conspirators explain the development of trust and cooperation, that evidence is properly admitted as intrinsic to the conspiracy itself. *See id.* (evidence of prior interactions admissible to show the basis of trust between co-conspirators).

The same is true of Mr. Hinkle's possession of a firearm with a red flashlight. That evidence directly links Mr. Hinkle to the charged conduct—most notably, the July 28 biker confrontation in which Ms. Quinn contemporaneously observed that "red beams" were pointed at her and that "Howie" had set her and Mr. Gogolack up. Evidence that Mr. Hinkle possessed such a firearm is not background—it is circumstantial proof from which a reasonable jury could infer that Mr. Hinkle participated in the July 28th biker confrontation. *See United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (affirming admission of evidence that defendant possessed a pistol on days other than the date charged, holding such proof was not "other crimes" evidence because continuous possession constitutes a single offense, arose out of the same transaction, and was inextricably intertwined with the charged conduct; no limiting instruction required).

Even if the Court were to analyze this evidence under Rule 404(b), it is admissible to show Mr. Hinkle's motive. First, the evidence that Mr. Hinkle distributed marijuana to the Rare Breed is not offered to show propensity, but to establish his relationship with his co-

conspirators, his knowledge of the enterprise, and his intent to affirm his association with the Rare Breed.  By supplying marijuana, Mr. Hinkle's relationship with the Rare Breed evolved from a social association to a criminal one.  The government anticipates that the evidence will show that after supplying marijuana to the Rare Breed, the Rare Breed invited Mr. Hinkle to join the club, shortly before Ms. Quinn died. Once presented with all the evidence related to the Rare Breed's initiation process, a reasonable jury could conclude that Mr. Hinkle participated in the charged conspiracies to secure membership in the club.

Second, the evidence that Mr. Hinkle possessed a firearm with a red flashlight is independently admissible to establish identity and participation in the July 28 biker confrontation that Ms. Quinn described with "red beams."  Mr. Hinkle's possession of such a firearm with a red light links him to the event.

For both categories of evidence, the probative value is substantial. Together, they explain why Mr. Hinkle was involved in the conspiracy, and his connection to it. Any risk of unfair prejudice does not substantially outweigh that value, particularly where the conduct at issue—marijuana distribution and firearm possession—is far less inflammatory than the charged offenses themselves.  Mr. Hinkle's firearm possession—especially his possession of a firearm with a red flashlight—is directly relevant to the government's theory that he participated in the July 28 biker confrontation at Mr. Gogolack's residence.  This evidence, therefore, is directly relevant to proving the tampering and retaliation conspiracies charged in Counts 2 and 3, and thus is intrinsic to the case.

### MOTIONS TO ADMIT OUT-OF-COURT STATEMENTS

The government is also moving to admit several out-of-court statements offered by Ms. Quinn pursuant to established hearsay exceptions, as non-hearsay, or in keeping with the rule

of completeness. As before, this section begins with the governing legal framework and then applies that framework to each motion.

### A.    Legal Frameworks

### 1.    Rule 801(d)(2) and Other Forms of Non-Hearsay

Statements made by, and offered against, a party-opponent are not hearsay. Fed. R. Evid. 801(d)(2). Moreover, a party-opponent's silence in response to a question can constitute an admission if the surrounding circumstances "render it more reasonably probable that a man would answer the charge made against him than that he would not." *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976) (quoting *Wiedemann v. Walpole*, 2 Q.B. 534, 539 (1891)); *see also United States v. Tocco*, 135 F.3d 116, 128–29 (2d Cir. 1998) ("An innocent person accused of being involved in a crime will ordinarily deny such involvement or, at least, assert that the incriminatory statement is untrue. Absent circumstances that render it more probable that a person would not respond to an accusation against him than that he would, such person's silence or other ambiguous conduct is admissible as an adoptive admission under Fed. R. Evid. 801(d)(2)(B)." (citing *United States v. Shulman,* 624 F.2d 384, 390 (2d Cir. 1980) and *Flecha,* 539 F.2d at 877)); *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 259 (S.D.N.Y. 2003) ("[M]anifestation of belief in the truth of a statement may occur by silence, that is a failure to respond when natural to do so.").

Likewise, statements introduced to show the effect on the listener are not hearsay. *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013). Nor are orders, commands, threats, and questions. *See United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) (noting that orders are not hearsay); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for

56

the truth of the matter asserted therein, are not hearsay."); *United States v. Moyhernandez*, 17 F. App'x 62, 71 (2d Cir. 2001) (unpublished) ("Questions or inquiries do not constitute hearsay statements because they 'are not assertions offered for their truth.") (citing *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990)).

### 2.    Rule 803(1)

Rule 803(1) exempts from the bar against statements those statements "describing or explaining an event or condition made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).   "Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory."  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (citing *United States v. Brewer*, 36 F.3d 266, 272 (2d Cir. 1994)).

### 3.    Rule 803(2)

Rule 803(2) exempts from the bar against hearsay those statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).

"The hearsay exception for excited utterances is premised on a[n] . . . assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases."  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002); *see United States v. Bowen*, 511 F. Supp. 3d 441, 447 (S.D.N.Y. 2021) ("The reliability of excited utterances, and therefore the reason for their admissibility, is premised upon the notion that 'the declarant, in a state of excitement, is unlikely to muster the reflection necessary for fabrication.'" (quoting *Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004))).

"For a statement to qualify as an excited utterance, the proponent of the exception must establish: '(1) the occurrence of a startling event; (2) that the declarant made the

57

statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event.'"  *United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (citation omitted).  "Courts consider these elements on 'a case-by-case basis,'" and "[a]ll three inquiries bear on 'the ultimate question': 'Whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event.'"  *Maggard v. Ford Motor Co.*, 320 F. App'x 367, 372 (6th Cir. 2009) (unpublished) (citations omitted).

### 4.    Rule 803(3)

Rule 803(3) of the Federal Rules of Evidence states that

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3).

What this means is that "a witness may testify that someone expressed to them fear of someone or something, but . . . may not testify as to that person's explanations of why they were afraid."  *Apanovitch v. Houk*, 466 F.3d 460, 487 (6th Cir. 2006); *United States v. Williams*, No. 22-CR-600 (LAP), 2026 WL 203141, at *10 (S.D.N.Y. Jan. 27, 2026) ("But the Court agrees with Defendant that Rule 803(3) does not permit the introduction of backward-looking statements that reference the *basis* for Barton's fear." (emphasis added)).

### 5.    Rule 803(6)

Rule 803(6) provides:

> A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;

58

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

"Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (internal quotation marks omitted). Business records can be authenticated by a witness who lacks personal knowledge of the record's creation. *See United States v. Pirk*, No. 1:15-CR-00142 EAW, 2018 WL 1521781, at *2 (W.D.N.Y. Mar. 28, 2018) (noting that though the government's witness did "not have personal knowledge of the actual meeting minutes set forth in Government Exhibit 68.1-3 . . . . Rule 803(6) does not require such knowledge" (citing *United States v. Lieberman*, 637 F.2d 95, 100 (2d Cir. 1980)); *Lieberman*, 637 F.2d at 100 (stating that personal knowledge may be inferred from an employee's business duty to obtain and report information, and need not be based on firsthand observation); *Saks Int'l Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987) (explaining that Rule 803(6) does not require that the foundation be laid by a witness who is employed by the entity that owned or prepared the document, and there is "no requirement that the person whose first-hand knowledge was the basis of the entry identified, so long as it was the business entity's regular practice to get information from such a person").

59

### 6.      Rule 804(b)(3)

Under Rule 804(b)(3), "the hearsay rule does not exclude evidence of a statement against an unavailable declarant's penal interest" if (1) "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it had so great a tendency to expose the declarant to criminal liability" and (2) the statement "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case." *United States v. Ojudun*, 915 F.3d 875, 885 (2d Cir. 2019) (cleaned up) (quoting Fed. R. Evid. 804(b)(3)).

"[T]he inference of trustworthiness from the proffered corroborating circumstances must be strong, not merely allowable." *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987) (quotation marks omitted). "This exception rests on the notion that 'reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'" *United States v. Miller*, 954 F.3d 551, 563 (2d Cir. 2020) (quoting *United States v. Jackson*, 335 F.3d 170, 178 (2d Cir. 2003)).

A Rule 804(b)(3) analysis is done on a statement-by-statement basis. *Ojudun*, 915 F.3d at 886; *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995) (fact that a particular hearsay statement may be against penal interest does not render entire narrative admissible). "'[O]nly those declarations . . . that are individually self-inculpatory' are admissible under Rule 804(b)(3).'" *United States v. Ferguson*, 676 F.3d 260, 287 n.30 (2d Cir. 2011) (quoting *Williamson v. United States*, 512 U.S. 594, 599 (1994)). Moreover, a declarant's statements against penal interest are admissible against non-declarant defendants. *See United States v. Miller*, 954 F.3d 551, 563-64 (2d Cir. 2020) (holding the district court did not abuse its discretion in admitting, under Rule 804(b)(3), self-inculpatory statements describing acts the declarant and defendant "committed jointly" where those statements were corroborated by

60

other testimony and the declarant's plea allocution); *see also United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Hamilton*, 19 F.3d 350, 354–57 (7th Cir.1994) (rejecting an argument that admitting a co-defendant's hearsay statement against a non-declarant defendant under Rule 804(b)(3) constitutes a *Bruton* violation).

### 7.    Rule 804(b)(6)

Under Rule 804(b)(6), a statement is excluded from the hearsay rule where a declarant is unavailable as a witness and it is "[a] statement offered against a party that wrongfully caused— or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6).  Under this rule, "a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness."  Fed. R. Evid. 804(b)(6) advisory committee's note to subdivision (b)(6).

Rule 804(b)(6) is not limited to testimonial statements. The rule codifies the doctrine of forfeiture by wrongdoing, which "extinguishes confrontation claims on essentially equitable grounds." *Crawford v. Washington*, 541 U.S. 36, 62 (2004) (citing *Reynolds v. United States*, 98 U.S. 145, 158-59 (1879)). By its terms, Rule 804(b)(6) applies to any "statement offered against a party that wrongfully causes the declarant's unavailability." Fed. R. Evid. 804(b)(6).  It does not distinguish between testimonial and non-testimonial statements.  That breadth is deliberate: because forfeiture operates as a waiver of confrontation rights altogether, it removes any constitutional barrier to admissibility, leaving only the ordinary rules of evidence to govern.

61

8.    **Rule 807**

Rule 807 provides that "a hearsay statement is not excluded by the rule against

hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or

804" if:

> **(1)** the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> **(2)** it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Moreover:

> [t]he statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name— so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing—or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

Fed. R. Evid. 807.

9.    **The Rule of Completeness**

Courts are "required to place otherwise inadmissible hearsay statements into evidence,

however, if their exclusion would violate the rule of completeness." *United States v. Ramsey*,

No. 23-7211-CR, 2024 WL 5199288, at *2 (2d Cir. Dec. 23, 2024). That rule provides that

"an 'omitted portion of a statement must be placed in evidence if necessary to explain the

admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to

ensure fair and impartial understanding of the admitted portion.'" *United States v. Thiam*, 934

F.3d 89, 96 (2d Cir. 2019) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)).

10.    ███████████████████████████████

███████████████████████████████████████████ . █

████████████████████████████████████████████

63



"███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

### B.    Motion to Admit Evidence of Mr. Gerace's Admission by Silence

Witness ████████████████ testimony will implicate the Second Circuit's admission-by-silence doctrine. Specifically, ██████████████████████— will testify that he saw Mr. Gerace videochatting with a woman feeding frozen rats to a snake. ██████████ asked Mr. Gerace if the rats on the screen were the same rats "found outside the witnesses houses." Mr. Gerace did not answer that question. Similarly, ██████████ asked

Mr. Gerace if he arranged for a hotshot to be given to Ms. Quinn.  Once more, Mr. Gerace stayed silent.

Mr. Gerace's silence to ███████ questions is admissible under Rule 801(d)(2). As the Second Circuit has observed, "[a]n innocent person accused of being involved in a crime will ordinarily deny such involvement." *Tocco*, 135 F.3d at 128.  The same is true when an innocent person is directly asked if he arranged for rats to be placed at a witness's home or a hotshot be given to her. *See United States v. Vitagliano*, 86 F. App'x 470, 473 (2d Cir. 2004) (unpublished) (commenting that the "proper factual predicate supported [a] silence instruction" where a witness testified that the defendant was silent in response to a robbery accusation).  An innocent person would answer, "no, I didn't have anything to do with the rats or Ms. Quinn's death." "Since this natural reply was not forthcoming," *United States v. Williams*, 577 F.2d 188, 194 (2d Cir. 1979), the court should hold that Mr. Gerace's silence is admissible under Rule 801(d)(2), and permit the jury to resolve  whether it constitutes a true admission. *See Penguin Books*, 262 F. Supp. 2d at 259 ("Ultimately any ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess . . . (citing *Tocco*, 135 F.3d at 129)).

C. ███████████████████████████████
███ █████████████████.
███████████████████████████████
███████████████████████████████
███████



1.    **Factual Background**

███████████████████████████████

███████████████████████████████

1. ██████████████████████████████████████████
██████████

2. ████████████████████████████████
██████████

3. ████████████████████████████
██████████████

4. ██████████████████████████████████████████ ”
██████████

████████████████████████████████████████████

████████████████████████████████████

## 2.     Application

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ████████████████████

████████████████████████████████████████████

---

10 ████████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████████    ███████████

███████

**D.    Motion to Admit Evidence of Crystal Quinn's Fear of the Outlaws and Mr. Gerace**

The government further moves to admit Ms. Quinn's expressions of fear of the Outlaws and Mr. Gerace. This evidence is admissible pursuant to Rule 804(b)(6) or, alternatively, Rule 803(3). Moreover, the evidence is relevant under Rule 401, as it explains why Ms. Quinn was susceptible to being lured to Wellsville by Mr. Gogolack.

**1.    Factual Background**

Ms. Quinn made several statements to law enforcement personnel and others expressing her fear of the Outlaws. Specifically, during a January 24, 2023, interview, Ms. Quinn told law enforcement that her "main concern is the Outlaws." In July 2023, after being anally raped, Ms. Quinn told ███████ that she was afraid of Mr. Gerace and the Outlaws.

**2.    Application**

**a.    Rule 804(b)(6)**

Ms. Quinn's January 24, 2023, statement to law enforcement is admissible pursuant to Rule 804(b)(6) as to Messrs. Gerace, Ermin, Roncone, Hinkle, and Gogolack. *See* Fed. R. Evid. 804(b)(6) (regarding statements offered against a party that wrongfully caused the declarant's unavailability).

**b.    Rule 803(3)**

Ms. Quinn's statement to ███████ is a then-existing-state-of-mind statement admissible pursuant to Rule 803(3). Here, Ms. Quinn's statement to ███████ that she feared Mr. Gerace and the Outlaws clearly referred to her then current thoughts and mental conditions. That is, Ms. Quinn was not referring to a past mental thought or condition. Accordingly, the statements are admissible under Rule 803(3). *See United States v. Brown*, 122

67

F. 4th 290, 295–96 (8th Cir. 2024) (concluding that the victim's statement that he feared "people [were] trying to kill him" was admissible under Rule 803(3) because the victim's "statements refer[red] to then present events"). Accordingly, the statements are admissible pursuant to Rule 803(3).

### c.    Rule 401

Evidence of Ms. Quinn's fear of the Outlaws and Mr. Gerace is relevant for two reasons. First, Ms. Quinn's fear of the Outlaws and additional witness retaliation motivated Ms. Quinn to travel to Wellsville, New York, with Mr. Gogolack. In that way, the statements are relevant to show why Ms. Quinn was susceptible to Mr. Gogolack's machinations to lure her Wellsville—because she was afraid of being the subject of ongoing retaliation in the Buffalo area. The evidence also helps explain why associates of the Rare Breed, such as Mr. Hinkle and Mr. Gogolack, were necessary additions to the plot to tamper with, and retaliate against, Ms. Quinn, as they had sufficient distance from the Outlaws to gain Ms. Quinn's trust. *See United States v. Norman*, 107 F.4th 805, 811 (8th Cir. 2024) (affirming the admission of the decedent-victim's expressions of fear of the defendant where the statements "helped explain why [the defendant] could not act sooner and had to enlist others in his plot").

Second, some or all the defendants will argue that Ms. Quinn killed herself, thereby placing her state of mind in issue. Ms. Quinn's fear of the Outlaws and Mr. Gerace will assist the jury in finding the facts surrounding her death in two critical respects. On the one hand, the jury should be permitted to infer that Ms. Quinn's fear that other people, like the Outlaws and Mr. Gerace, could harm her is indicative of her attachment to life, and thus that she did not kill herself. After all, it is common sense that people scared of dying do not, ordinarily, welcome death. On the other hand, should the jury accept the defendants' argument that Ms. Quinn killed herself, it should nonetheless be permitted to conclude that she did so due to her

68

fear that the Outlaws or their agents would have killed her first due to other acts of witness tampering and retaliation encompassed within the conspiracies charged in Counts 2 and 3.

Accordingly, the Court should permit the admission of Ms. Quinn's statements regarding her fear of Mr. Gerace and the Outlaws.

### E. Motion to Admit Text Message Evidence of the July 28, 2023 Biker Confrontation.

The Court should also admit two sets of text message evidence relating to the July 28, 2023 biker confrontation outside of Mr. Gogolack's residence. The first set contains messages between Mr. Gogolack and Ms. Quinn. *See* GX-423-H. The second set are between Ms. Quinn and another number previously assigned to Ms. Quinn's close friend, ███████ ██████ (hereinafter referenced as "██████████'s expired contact"). *See* GX-437-D. These statements are admissible as to Messrs. Gerace, Ermin, Roncone, Hinkle, and Gogolack under Rule 804(b)(6), or, alternatively admissible pursuant to Rule 801(d)(2) and Rule 106, Rules 803(1) through (3), and on non-hearsay grounds.

### 1. Relevant Facts and Application

All of Ms. Quinn's text messages with Mr. Gogolack and ██████████ expired contact are admissible under Rule 804(b)(6) as to Messrs. Gerace, Ermin, Roncone, Hinkle, and Gogolack because they wrongfully caused or acquiesced to her unavailability. The government does not anticipate that the Court will be able to make this determination until after the text messages and other evidence are introduced. To streamline the anticipated litigation surrounding these text messages, the government is also moving to admit Mr. Gogolack's text messages with Ms. Quinn as to all of the defendants pursuant to Rule 801(d)(2) and the rule of completeness; Rules 803(1) through (3); or as non-hearsay.

Similarly, the government is moving to admit Ms. Quinn's text messages with ▮▮▮▮▮▮▮ expired contact pursuant to Rules 803(1) through (3).

### a. Text Messages between Ms. Quinn and Mr. Gogolack Regarding the July 28 Biker Confrontation

### i. Ms. Quinn's messages to Mr. Gogolack are excited utterances.

On July 28, 2023, at approximately 5:32 a.m., Ms. Quinn texted Mr. Gogolack, "Where are u." Mr. Gogolack responded, "Top of rood." The ensuing text messages establish that multiple people confronted Mr. Gogolack and Ms. Quinn. In those messages, Ms. Quinn describes being approached by multiple individuals and communicates in real time about the unfolding situation. Although the messages do not always use explicit language of fear, the content, timing, and sequence of the communication reflect that Ms. Quinn was reacting to, and under the stress of, a startling event as it occurred. *See* Fed. R. Evid. 803(2).

The surrounding circumstances—drawn from the messages themselves and Ms. Quinn's contemporaneous communications—confirm that she remained under the stress of this confrontation. During this same time period, Ms. Quinn communicated with Ms. Wilczak's expired contact and took protective steps, including sending her location data to her mother's Wellsville Police Department work email. Sending location data to an email associated with a police department further demonstrates that Ms. Quinn was responding to a perceived emergency, not engaging in reflecting thought—conduct consistent with being under the stress of a startling event. These actions taken contemporaneously with the confrontation described in the text messages demonstrate that Ms. Quinn was not engaging in reflective narration, but responding to an ongoing, stressful occurrence.

The messages here supply both the occurrence of the startling event and Ms. Quinn's reaction to them. For that reason, Ms. Quinn's messages with Mr. Gogolack are admissible as excited utterances. *See United States v. Hadden*, No. 23-6822-CR, 2024 WL 4456203, at *3

(2d Cir. Oct. 10, 2024) (affirming the district court's admissions of the victim's "text messages to a friend from a hospital bathroom, reporting [the defendant's] abuse moments earlier").

ii.     **Messages between Ms. Quinn and  Mr. Gogolack are admissible on other independent bases.**

Ms. Quinn's text messages are also largely admissible as present-sense impressions, as statements of then-existing mental or physical states, or under one of many non-hearsay bases.

Starting at the beginning of the exchange, in response to Mr. Gogolack's representation that he was on the "[t]op of rood," Ms. Quinn made the following statements:

From: +17169072928
We are fine there not hurting me
Status: Read
7/28/2023 9:32:52 AM(UTC+0)
Source Extraction: Advanced Logical

From: +17169072928
And if they do just let it happen don't get your ass killer
Status: Read
7/28/2023 9:33:12 AM(UTC+0)
Source Extraction: Advanced Logical

From: +17169072928
Killed
Status: Read
7/28/2023 9:33:15 AM(UTC+0)
Source Extraction: Advanced Logical

From: +17169072928
Simon  please
Status: Read
7/28/2023 9:33:28 AM(UTC+0)
Source Extraction: Advanced Logical

71

Ms. Quinn's statement, "we are fine there not hurting me" is admissible under Rule 803(3) as an expression of her then existing state of mental, emotional, or physical condition. *See* Fed. R. Evid. 803(3). It reflects Ms. Quinn's then-existing physical condition and sense of safety. It is not offered to prove the objective truth of whether harm was occurring, but to show the Ms. Quinn's contemporaneous state of mind—namely, that she perceived herself as safe and not under threat.

The next statements—(1) "And if they do just let it happen don't get your ass killer"; (2) "killed"; and (3) "Simon please"—are not hearsay because they are commands, not assertions. *See United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) (finding "[t]he statement '[d]o not accept money from these people' was an order" and "was therefore not hearsay"). They do not purport to describe past or present facts capable of being true or false; instead, they direct the listener's conduct. As such, they fall outside the definition of hearsay. *See id.; Bellomo*, 176 F.3d at 586 ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay.").

72

Mr. Gogolack and Ms. Quinn continued:



Mr. Gogolack's statements (in green) are admissible pursuant to Rule 801(d)(2), as party-opponent statements. Ms. Quinn's statement "I'm love u I didn't do anything wrong" is admissible under Rule 803(3) because it describes her then-existing emotional condition—namely, that she loved Mr. Gogolack—at the time it was made. The other half of the statement "I didn't do anything wrong," is not offered for its truth, but to show Ms. Quinn's state of mind—specifically, that the confrontation prompted Ms. Quinn to defend her choices.

73

*See* Fed. R. Evid. 803(3).  And the government's evidence will show that one of Ms. Quinn's

choices was to cooperate against Mr. Gerace.

Ms. Quinn and Mr. Gogolack then exchanged the following messages:



Ms. Quinn's statement, "I'm so sorry I just felt safe all I want is u in my arms," is also admissible under Rule 803(3) because it describes Ms. Quinn's then-existing mental state. The phrases "I just felt safe" and "all I want is u in my arms" express her contemporaneous feelings of security and longing for their relationship, rather than recounting past events for their truth. As such the statement is offered to show Ms. Quinn's state of mind at the time it was made, bringing it squarely within Rule 803(3), and explains to the jury why she stayed at Mr. Gogolack's house for days after. It is otherwise admissible to show the effect on the listener, Mr. Gogolack—specifically to explain his understanding of the situation—not for the truth of the matter asserted in the statement.

Ms. Quinn's two messages—"Should I lock door I'm not" and "Should I lock door"— are admissible as non-hearsay because they are questions, not assertions. Questions do not assert facts capable of being true or false and therefore fall outside the definition of hearsay; they are admissible for the fact they were asked. *See Moyhernandez*, 17 F. App'x at 71 (questions cannot be hearsay).

75

Ms. Quinn's next set of statements are also admissible as non-hearsay or under recognized exceptions:



As before, Ms. Quinn's first statement, "Let them kill me," is a command and is thus not hearsay. *See Bellomo*, 176 F.3d at 586. Ms. Quinn's second statement, "Stop I care about u so much," is also a command and an expression of her then-existing emotional state. *See id.*; Fed. R. Evid. 803(3). Ms. Quinn's third statement, "I'm so fucking sorry I really wanted to see u so bad I care about u like I have nobody," is also an expression of her then-existing emotional state and is also being offered to show the effect on the listener. Fed. R. Evid. 803(3). Lastly, Ms. Quinn's question, "There coming in aren't they," is non-hearsay. *See Moyhernandez*, 17 F. App'x at 71 (questions cannot be hearsay).

The next set of statements is similarly admissible.  In it, Mr. Gogolack states, "Ur trippin n we'll go out to get her then." Ms. Quinn responds, "I'm so sorry" and "I wanted to see u," as pictured below:



Ms. Quinn's statement, "I'm so sorry" is admissible under Rule 803(3) because it reflects her then-existing emotional state—an expression of remorse—at the time it was made, rather than a backward-looking narrative offered for its truth.  *See* Fed. R. Evid. 803(3).

Ms. Quinn's statement, "I wanted to see u," is not offered for its truth, but to show its effect on the listener. Its relevance lies in the fact that it was said and how it shaped the conversation, not in whether Ms. Quinn actually wanted to see him. It explains why Mr.

Gogolack responded "Stop … well talk later hold on," and how that prompted the subsequent series of messages.



Ms. Quinn's statements, "If you touch him your done" and "2 steps shards of u" are not hearsay because they are a threat, not an assertion of fact. The statements do not convey a proposition capable of being truth or false. *See Bellomo*, 176 F.3d at 586 (noting that "threats" are not hearsay).

The follow-up clarification—"Not u these wanna be crue"—is likewise admissible as non-hearsay as it does not contain an assertion of fact and to show its effect on the listener. It explains that Ms. Quinn was directing the threat elsewhere and was attempting to reassure the listener, Mr. Gogolack, that he was not the target, thereby reconstructing his understanding of the previous message.

The subsequent string of incoherent words—"So mint Ernst all dbstrf"—is not hearsay because it contains no assertion at all. It is relevant, however, to demonstrate the declarant's state of panic and lack of reflective thought at the time. Because it is relevant, the Court should find it is admissible.

Finally, the statement that Ms. Quinn "should call Mike" is admissible under Rule 8033) because it reflects her then-existing state of mind, including her contemporaneous intent or plan regarding future conduct.

Ms. Quinn's subsequent statements, pictured below, are, in addition to being admissible under Rule 804(b)(6), are admissible to show her fearful response to the confrontation, evidence squarely relevant to the witness tampering conspiracy charged in Count 2. *See* Dkt. 24 at 32–33 (c)–(e).



The statement "I'm going to get so fucked yo I'm done in so sorry" is admissible because it reflects Ms. Quinn's then-existing emotional state—fear, distress, and a sense of impending harm—at the time of the confrontation. It is not offered for its truth, but to show her contemporaneous reaction to the event, which is directly relevant to her fearful response.

The statement "Deserve do anything wrong" is not hearsay because it contains no coherent assertion at all. It is relevant, however, to demonstrate the declarant's state of excitement and lack of reflective thought at the time. Because it is relevant, the Court should find it is admissible.

80

As the confrontation continued, so too did Ms. Quinn's fear, as captured in her next statements:



Ms. Quinn's statements, "I'm so cold" and "I'm afraid Simon" are both admissible under Rule 803(3) because they reflect her then-existing physical and emotional state.  Fed. R. Evid. 803(3).  Each statement describes how Ms. Quinn was feeling at the time—cold and fearful—rather than recounting past events.

Ms. Quinn's statement, "I've been through this before," is admissible for the truth under Rule 804(b)(6).  In the alternative, it is admissible as non-hearsay to show the effect the message had on the listener—namely, to explain how Mr. Gogolack understood the situation and why he responded as he did. That effect is evident from Mr. Gogolack's response, in

which he reassured Ms. Quinn, "I have , 1and I'll get u through the best I can.  Ur not alone.n

scared is what will keep u on ur toes."



The message "You" is not hearsay because it does not convey any proposition capable

of being true or false.  It is admissible simply as part of the exchange including to show Ms.

Quinn's focus on the listener, Mr. Gogolack.

82

Ms. Quinn's message "I don't want no drama more u" is admissible under Rule 803(3) because it reflects Ms. Quinn's then-existing mental state—specifically, a desire to avoid conflict—at the time it was made.

The message "Do t believe them Simon" is not hearsay because it is a directive, not an assertion. It does not convey a fact capable of being true or false but instead instructs the listener, Mr. Gogolack, how to act. *See Dawkins*, 999 F.3d at 789.

Finally, Ms. Quinn's message "I swear over Dave's life" is not hearsay because it is not an assertion of fact. It does not make a proposition capable of being true or false; rather it is an expression of emphasis or sincerity. As such, it is admissible not for its truth, but as evidence of Ms. Quinn's state of desperation and for the effect on the listener.

### iii.    Rule of completeness

All Mr. Gogolack's messages are admissible as opposing party statements under Rule 801(d)(2). But those statements do not exist in a vacuum—they are part of a back-and-forth exchange. Admitting only Mr. Gogolack's messages would present a distorted and misleading account of the conversation.

To place Mr. Gogolack's statements in their proper context, the government must be permitted to introduce Ms. Quinn's corresponding messages. Those messages are necessary to make Mr. Gogolack's statements intelligible, to clarify their meaning, and to prevent the jury from drawing inaccurate or incomplete inference about what was said and why.

The text messages largely show Mr. Gogolack's attempts to calm and manage Ms. Quinn, all of which are admissible under Rule 801(d)(2). So to "place the admitted portion [of Mr. Gogolack's statements] in context," the government needs to be able to show Ms. Quinn's statements. *Thiam*, 934 F.3d at 96.    Accordingly, irrespective of whether any

83

individual statement by Ms. Quinn independently satisfies a hearsay exception, the rule of completeness requires their admission. *See* Fed. R. Evid. 106.

     **b.**    **Ms. Quinn's Text Messages to** █████████████

At 5:31 a.m., one minute before she initially texted Mr. Gogolack, Ms. Quinn sent ████████ expired contact (listed as ██████████ in the excerpted messages below) the following text messages:



| | | |
|---|---|---|
| 7/28/2023 5:31:15 AM(UTC-4) | From: ██████████ | Yo I feel set up |
| 7/28/2023 5:31:34 AM(UTC-4) | | There is a room behind me and they are going to rape me I think |
| 7/28/2023 5:31:46 AM(UTC-4) | | And Simon gave me up no idea why |
| 7/28/2023 5:31:57 AM(UTC-4) | | I got 10 red beams looking at me |

As before, each of these non-testimonial text messages is admissible pursuant to Rule 804(b)(6) as to Messrs. Gerace, Ermin, Roncone, Hinkle, and Gogolack because the evidence shows that they caused, or acquiesced in causing, Ms. Quinn's unavailability.

These messages are admissible under other hearsay exceptions, too. Each message is admissible as an excited utterance under Rule 803(2) as there is sufficient evidence to conclude that Ms. Quinn was speaking under the stress of a startling event as the event was unfolding. *See Hadden*, 2024 WL 4456203, at *3 (affirming admission of text messages sent by a victim "to a friend from a hospital bathroom, reporting [the defendant's] abuse moments earlier; and . . . then in rapid succession reported the abuse to her boyfriend—all while she was still in a state of shock from [the defendant's] conduct"). The timing of the messages further confirms that these statements qualify as excited utterances. Each message was sent within approximately 45 seconds of the last, reflecting a continuous, real-time stream of communication. That rapid cadence is consistent with someone reacting to an unfolding

84

event—not fabricating or reflecting. *See United States v. Stackhouse*, No. 22-30177, 2024 WL 3201934, at *1 (9th Cir. June 27, 2024) (affirming admission of text messages "sent by the victim to her cousin minutes after [the defendant] assaulted her" as excited utterances). Simply put, Ms. Quinn did not have the time to pause, deliberate, or contrive a narrative. The near-immediate succession of messaging underscores that they were made under the stress of excitement caused by the event. *See id.*

Moreover, Ms. Quinn's statement "Yo I feel set up" is admissible under Rule 803(3) because it reflects Ms. Quinn's then-existing mental and emotional condition—specifically, her perception that she was being targeted.  Ms. Quinn's perception that she was being set up in response to the biker confrontation, regardless of whether Mr. Gogolack and others *were*, in fact, setting her up to be physically injured or murdered, is relevant because placing Ms. Quinn in fear through a variety of intimidation tactics was an object of the tampering and retaliation conspiracies.  *See, e.g.*, Dkt. 24 at 32 ¶¶ 2(c)-2(e) (alleging that it was an object of the tampering conspiracy "to use *intimidation*, threats, and corruptly persuade, Crystal Quinn," to prevent her testimony, cause her to withhold testimony, and prevent her from communicating with law enforcement) (emphasis added).  In other words, Ms. Quinn's belief that she was being set up is relevant to proving that the July 28 biker confrontation placed her in fear.

Furthermore, Ms. Quinn's statement, "I got 10 red beams looking at me" is admissible as a present-sense impression under Rule 803(1). It describes an event as it was occurring—namely, that Ms. Quinn was being confronted by lasers—and was made contemporaneously with that event. The immediacy of the statement with its real-time nature provides the requisite reliability for admission under that rule.

85

The next set of statements Ms. Quinn made to ████████ expired contact, pictured below, is also admissible under Rule 804(b)(6) and other hearsay exceptions.



| | | |
|---|---|---|
| 7/28/2023 5:36:57 AM(UTC-4) | | 00:00:03 |
| 7/28/2023 5:39:28 AM(UTC-4) | | 00:00:05 |
| 7/28/2023 5:39:43 AM(UTC-4) | | Call me |
| 7/28/2023 5:39:43 AM(UTC-4) | | Call me |
| 7/28/2023 5:41:32 AM(UTC-4) | | Yea I just heard Simon speaking to one of the bikers |
| 7/28/2023 5:41:32 AM(UTC-4) | | Yea I just heard Simon speaking to one of the bikers |
| 7/28/2023 5:42:25 AM(UTC-4) | | I think he is getting me set up right now |
| 7/28/2023 5:42:25 AM(UTC-4) | | I think he is getting me set up right now |
| 7/28/2023 5:42:30 AM(UTC-4) | | I hear him outside |
| 7/28/2023 5:42:30 AM(UTC-4) | | I hear him outside |
| 7/28/2023 5:42:53 AM(UTC-4) | | And all these red lights started flashing on me like really |
| 7/28/2023 5:42:53 AM(UTC-4) | | And all these red lights started flashing on me like really |

Regarding the other exceptions, Ms. Quinn's directive that "████████ call her is non-hearsay. *See United States v. Dawkins*, 999 F.3d at 789; *Bellomo*, 176 F.3d at 586.

Likewise, Ms. Quinn's statements, "Yea I just heard Simon speaking to one of the bikers," "I hear him outside," and "And all these red lights started flashing on me like really," are present-sense impressions under Rule 803(1). Each statement describes an event or condition as Ms. Quinn was perceiving it—hearing individuals nearby and observing flashing lights—and was made contemporaneously with those perceptions. Ms. Quinn's use of

86

present-tense and immediate past phrasing ("just heard," "speaking," "started flashing")
reflects that she was reporting the events as they unfolded. The immediacy of the statements,
coupled with their real-time description, provides the reliability required for admissible under
the rule.

Similarly, Ms. Quinn's messages instructing ▮▮▮▮▮▮ to call her, followed by the
demand "now" are admissible as non-hearsay. *See Dawkins*, 999 F.3d at 789; *Bellomo*, 176
F.3d at 586. They do not convey facts capable of being true or false; instead they instruct the
listener to act immediately and are admissible for the fact they were said, including to show
urgency and Ms. Quinn's state of mind.



| 7/28/2023 5:43:39 AM(UTC-4) | | Call me none |
| 7/28/2023 5:43:39 AM(UTC-4) | | Call me none |
| 7/28/2023 5:43:43 AM(UTC-4) | | Now |
| 7/28/2023 5:43:43 AM(UTC-4) | | Now |

The statement "9-11" is not hearsay because it does not assert a fact capable of being
true or false. Rather it is a call for emergency assistance. It is admissible to show Ms. Quinn's
state of mind—specifically, a perceived need for urgent help—and the seriousness of the
situation as she understood it at the time.



| 7/28/2023 5:43:48 AM(UTC-4) | | 9-11 |

Ms. Quinn's next set of statements, are also admissible under various hearsay
exceptions and as non-hearsay.



| | | |
|---|---|---|
| 7/28/2023 5:44:59 AM(UTC-4) | | There like trying to make sounds to think I'm stuck |
| 7/28/2023 5:45:20 AM(UTC-4) | | No man's |
| 7/28/2023 5:45:38 AM(UTC-4) | | Emphasized "I think he is getting me set up right now " |
| 7/28/2023 5:46:18 AM(UTC-4) | | Yeah, call me change the time salmon and they wanted us |
| 7/28/2023 5:52:07 AM(UTC-4) | | 00:00:03 |
| 7/28/2023 5:52:15 AM(UTC-4) | | Pick up |
| 7/28/2023 5:54:18 AM(UTC-4) | | 00:00:03 |
| 7/28/2023 5:54:39 AM(UTC-4) | | me and Simon are in danger call me |
| 7/28/2023 5:56:23 AM(UTC-4) | | I think they allow 5 girls to come in and whip my ass I can here then |
| 7/28/2023 5:57:57 AM(UTC-4) | | Jumping me now |

The statement, "There like trying to make sounds to think I'm stuck" is admissible as a present sense impression under Rule 803(1) because it describes conduct as Ms. Quinn was perceiving it in real time. The use of present-tense phrasing reflects an ongoing effort that Ms. Quinn was observing, rather than a retrospective account. That immediacy leaves little room for reflection or fabrication and supplies the reliability that undergirds Rule 803(1).

The statement "No man's" is not hearsay because it does not assert a fact capable of being true or false. It is therefore admissible.

Ms. Quinn's emphasis on her prior text message "I think he is getting me set up right now" is admissible as an excited utterance under Rule 803(2). The statement was made during an ongoing, stressful event and reflects a spontaneous reaction to that perceived threat. Its content—asserting that she is being targeted—demonstrates fear and distress, and the

88

surrounding circumstances indicate that she lacked the opportunity for reflective thought, satisfying the requirements for Rule 803(2).

"Yeah, call me change the time salmon and they wanted us" and "Pick up" are not hearsay because they are directives, not assertions.  They do not convey propositions capable of being true or false but instead instruct the lister to act. Their urgency and repeated use further demonstrate Ms. Quinn's state of mind and the unfolding nature of the situation, making them admissible for the fact they were said.

The statement "███ me and Simon are in danger call me" is admissible on multiple grounds. It qualifies as a present sense impression under Rule 803(1) because it describes the Ms. Quinn's immediate condition—her ongoing perception to a perceived threat of harm—while it is occurring.  It is also admissible under Rule 803(3) as evidence of Ms. Quinn's then-existing state of mind—specifically, her fear and perceived threat. To the extent it is construed as a plea for help, it is additionally not hearsay because it functions as a directive rather than an assertion offered for its truth.

The statement "I think they allow 5 girls to come in and whip my ass I can here then" is admissible as a present sense impression under Rule 803(1). It combines an immediate perception ("I can here [sic] then [sic]") with a contemporaneous inference about what is about to occur, both made in real time as Ms. Quinn perceived the events unfolding. Those close temporal connections between perception and statement prove the requisite reliability.

The statement "Jumping me now" is a paradigmatic present sense impression. It describes an ongoing event using present-tense language, leaving no gap for reflection or fabrication.

89

F.      **The Court Should Admit RBMC and Outlaws Phone Lists, Meeting Minutes, and Ledgers.**

1.      **Factual Background**

Searches of locations including the Rare Breed's clubhouses, the Outlaws' Buffalo clubhouse, and Mr. Ermin's residence, led to the recovery of various club-related by-laws, phone lists, meeting minutes, sign-in sheets, and other ledgers.

These items constitute conspiracy and enterprise evidence and, in many cases, consist of rules, directives, and commands of the organizations. For instance, the by-laws constitute the written operating rules for the organization. The meeting minutes reflect the organizational structure and chain of command, the regular control of information and directives. These minutes further identify important associations between members of the conspiracies charged in Counts 1 through 3, including Mr. Hinkle and the Rare Breed, the Rare Breed and Pharoah's, and the Rare Breed and the Outlaws. These records are admissible under a plethora of hearsay exceptions, some of which are outlined below.

2.      **Application**

For starters, insofar as bylaws, minutes, and notes contain directives and rules, they are not hearsay. *See Bellomo*, 176 F.3d at 586 ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). Likewise, insofar as the records are being offered to prove association, as opposed for the truth of any given assertion of fact, they are not hearsay. *See United States v. Thornton*, 197 F.3d 241, 251 (7th Cir. 1999) (documents seized from co-conspirator during and in furtherance of conspiracy were not hearsay, and other documents were not offered for their truth but to show relationships among members and/ or organizational operations, structure and chain of command).

90

By-laws, meeting minutes, phone lists and ledgers are also business records. *See* Fed. R. Evid. 101(b)(4); *United States v. Conde*, 134 F.4th 82, 89 (2d Cir. 2025) ("The Evidence Rules define 'record' " as "includ[ing] a memorandum, report, or data compilation."). Motorcycle clubs are "organizations," such that the records are admissible as an exception to hearsay pursuant to Federal Rule of Evidence 803(6). *See* Fed. R. Evid. 803(6)(B).

While these records were seized by law enforcement, there is no requirement that the records be authenticated by a member of the organization. To the contrary, "[t]he foundation for admitting evidence under Rule 803(6) 'may be laid, in whole or in part, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted.'" *United States v. Collins*, 799 F.3d 554, 584 (6th Cir. 2015) (quoting *United States v. Laster*, 258 F.3d 525, 529 (6th Cir. 2001)).

"The only requirement is that the witness be familiar with the record keeping system." *Laster*, 258 F.3d at 529. Even then, "[t]he qualifying witness does not need to have any personal knowledge of the records' preparation." *Collins*, 799 F.3d at 584; *see also United States v. Komasa,* 767 F.3d 151, 156 (2d Cir. 2014); *Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*, 621 F. Supp. 198, 217-18 (S.D.N.Y 1985) (noting that the phrase "other qualified witness" should be given the "broadest interpretation" in authenticating business records and finding that board meeting minutes admissible as business records through former board member).

These records, maintained securely inside the clubhouse and homes, also constitute admissions and adoptive admissions of the club members, such as Mr. Roncone and Mr. Ermin, pursuant to Rules 80l(d)(2)(A), 80l(d)(2)(B), and 801(d)(2)(C), and are authorized admissions pursuant to Rule 801(d)(2)(D).

91

**G.**

**1.**     **Factual Background**



2)

**2.    Application**

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

## MOTIONS TO PRECLUDE AND LIMIT CERTAIN EVIDENCE AND ARGUMENTS

### A.      Motion to Limit Evidence and Argument Concerning Crystal Quinn's History of Mental Illness and Suicidal Ideation

The government further moves this Court to limit the defendants' presentation of evidence and scope of argument before the jury about Crystal Quinn's history of (1) mental illness and/or (2) suicidal ideation.

For starters, Ms. Quinn's history of mental illness diagnoses, including but not limited to her history of ███████████████████████, are completely irrelevant to this case.[11]  The only purpose of introducing this evidence is to suggest that Ms. Quinn possessed a character trait and acted in accordance with that trait.   Such character evidence is inadmissible under Rule 404(a)(1), which prohibits the introduction "of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait."  Fed. R. Evid. 404(a)(1).

Incontrovertible facts and leading science squarely undermine the proposition that struggling with mental illness leads to suicide.  Indeed, there are approximately 60 million Americans—more than 20 percent of the population—who suffer from mental illness annually.  *See*   Mental   Illness,   Nat'l   Inst.   Mental   Health, https://www.nimh.nih.gov/health/statistics/mental-illness, (last visited Apr. 8, 2026).  The

---

[11]      These diagnoses are detailed in the U.S. Probation Office documents previously disclosed by the Court.

95

number of people who die by suicide, by contrast, is orders of magnitude lower, averaging between 49,000 and 50,000 people as of 2023.  *Suicide Data and Statistics*, Center for Disease Control, https://www.cdc.gov/suicide/facts/data.html, (last visited Apr. 8, 2026).  And of those who kill themselves, approximately one in five have *no* history of psychiatric conditions associated with suicide risk.  *See Many Who Die By Suicide Aren't Depressed, Genetic Research Suggests*, University of Utah Health, https://healthcare.utah.edu/newsroom/news/2025/11/many-who-die-suicide-arent-depressed-genetic-research-suggests, (last visited Apr. 8, 2026).  Consequently, to admit evidence of Ms. Quinn's mental health history would confuse the jury based on a propensity theory lacking scientific or statistical support.

These facts expose the flaws in the defense's position.  Mental illness does not reliably predict suicide, and the mere existence of a mental health history says nothing about whether Ms. Quinn took her own life.  Admitting such evidence would therefore do little to assist the jury and instead invite confusion, encouraging jurors to draw an unsupported propensity inference—that because the victim struggled with mental health issues, she was more likely to have died by suicide.  But Rule 404(a)(1) does not permit that inference. The Court should preclude the defense from introducing Ms. Quinn's mental health history accordingly.

The same analysis applies to Ms. Quinn's prior ███████████ and ███████████: only evidence proximate in time to the charged events may have any relevance; remote history does not.  *See United States v. Veltmann*, 6 F.3d 1483, 1494 (11th Cir. 1993) ("A homicide victim's state of mind is unquestionably relevant to the defense theory that she committed suicide.").

While evidence of suicidal ideation and ▮▮▮▮▮▮▮ in the months immediately preceding Ms. Quinn's death may bear on her then-existing state of mind, evidence of the same occurring years earlier does not. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Any argument to the contrary necessarily rests on the impermissible inference that because Ms. Quinn had a history of suicidality, she was more likely to have acted in conformity with that history here. That is precisely the kind of character or propensity reasoning that Rule 404(a)(1) prohibits.

The Eleventh Circuit's decision in *Veltmann* underscores this distinction and confirms the appropriate temporal limits of a decedent's prior expressions of suicidality. There, the court considered whether evidence of a decedent's prior suicidal statements was admissible in a circumstantial murder case. The defendant-appellants argued that the district court erred in precluding a videotaped deposition of the decedent's former paramour, from whom she had been financially blackmailing over the course of several decades. *Id.* at 1488-89, 1494-95. During the deposition, the witness testified that the decedent had discussed killing herself at some point during the months before her death and that, in the hours before her death, the witness told her he would no longer give her any money. *Id.* at 1488–89. The government argued before the district court that the decedent's "threats of suicide in months preceding her

97

death were inadmissible hearsay and irrelevant." *Id.* at 1493.  In relevant part, the district court agreed and excluded the testimony.  *Id.*

But the Eleventh Circuit concluded otherwise.  Though the decedent's suicide threats predated her death by potentially several months, the court held them admissible only when viewed in "[t]he totality of the circumstances."  In doing so, the court agreed that the witness's "testimony was relevant" and constituted "admissible hearsay under the state of mind exception." *Id.* at 1494.  Specifically, the Eleventh Circuit concluded that

> Where one threatens suicide, talks about what should be done in event of her death, and dies within months under suspicious circumstances including the presence of a suicide note and other witnesses corroborating her depression and suicidal ideation, we do not believe uncertainty over the exact date of the suicide threats should preclude admission of those statements to show state of mind.

*Id.*

To be clear, however, the government would not object—on relevancy grounds—to evidence that Ms. Quinn expressed suicidal ideation in 2023.[12]  But the expressions of suicidality predating 2023 impermissibly invites the jury to conclude a forbidden inference— that Ms. Quinn had a general character trait toward suicidality and acted in conformity with it. *See* Fed. R. Evid. 404(a)(1).  So with the "totality of the circumstances" standard in mind, the Court should find Ms. Quinn's expressions of suicidality predating 2023 irrelevant.

**B.      Motion to Preclude Comment, Argument, and Evidence Regarding Prosecutorial Charging Decisions**

The government moves to preclude any evidence, comment, or argument suggesting that this prosecution was instituted for selective or vindictive purposes.

---

[12]      The government reserves its right to object to the admission of such evidence on other bases, including but not limited to hearsay.

A "defect in the institution of the prosecution," including claims of selective prosecution or vindictive prosecution, "is an issue for the court rather than the jury." *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (internal quotation marks omitted). Because such claims are properly raised before the court, not the jury, courts regularly preclude defendants from asserting or discussing claims about improper prosecutorial motives in front of the jury during summation and cross-examination. *See, e.g.*, *United States v. Farhane*, 634 F.3d 127, 166-67 (2d Cir. 2011) (finding no error in district court precluding defendant from alleging in summation that the government was targeting Muslims); *United States v. Malka*, 602 F. Supp. 3d 510, 543-44 (S.D.N.Y. 2022) (precluding defendant from alleging before the jury that the prosecution was motivated by the defendant's religion); *United States v. Stewart*, No. 03 Cr. 717(MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (precluding cross-examination designed to elicit evidence of prosecutorial motivations).

Several defendants, including but not limited to Mr. Gerace, have accused the government of various forms of prosecutorial misconduct, throughout this litigation and in Case No. 1:19-CR-227.

To the extent the defendants intend to raise issues concerning the prosecution or charging decisions, the government requests that the Court expressly admonish them that they may not comment—directly or indirectly—before the jury on the government's motives in bringing this prosecution.

### C.    Motion to Prohibit Unfounded Allegations of Government Misconduct or Irrelevant Challenges to the Quality of the Government's Work.

The government further moves this Court for an order prohibiting the defendants, their counsel, and/or any defense witness from asking any question, introducing any evidence, or making any statement or argument, directly or indirectly, regarding any unfounded

allegations of government misconduct or immaterial claims about the quality of the government's pre-trial investigation while the jury is present. Such evidence is irrelevant under Rule 401 and highly confusing under Rule 403.

### 1.    Background

On August 4, 2023, Mr. Gerace's then-attorney, Mr. Cohen, made a startling declaration: Crystal Quinn's death was intentional—and brought by her own hand after the government relentlessly tried to pressure her into lying about Mr. Gerace. Though that assertion remains as false today as it was then, Mr. Gerace has repeated it, along with a litany of other prosecutorial misconduct complaints, throughout the litigation in 1:19-CR-227 and this case. So, while the government cannot predict with certainty Mr. Gerace's anticipated trial strategy, it anticipates that Mr. Gerace will try to blame law enforcement by making unfounded and irrelevant claims of misconduct. Absent a demonstrable good faith basis to raise such claims, a foundation establishing their relevance, and a legally supported argument as to why such arguments are grounded in admissible evidence, the Court should prohibit such a trial strategy.

### 2.    Legal Framework and Application

The defendants are on trial—not the government. Thus, generally, a trial court should not allow a defendant to offer evidence about the quality of the government's pretrial investigation. *See United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998). "Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation." *Id.* To that end, a defendant is not allowed to engage in unfounded speculation that the government's investigation was

100

"shoddy" or "slanted." *Id.* Such evidence is irrelevant. *See* Fed. R. Evid. 401. The quality of the government's pretrial investigation does not make any fact of consequence in a case "more probable or less probable that it would be without the evidence." Fed. R. Evid. 401. Such evidence would also confuse the issues and mislead the jury. *See* Fed. R. Evid. 403; *McVeigh*, 153 F.3d at 1192 (noting such evidence "would inevitably divert the jury's attention from the issues of the trial."); *United States v. Smith*, 811 F. Supp. 3d 523, 547 (S.D.N.Y. 2025) (precluding the defendant from offering expert opinion testimony that attacked law enforcement's discovery production on Rule 401 and 403 grounds).

Moreover, to the extent the defendants will be permitted to echo Mr. Cohen's proclamation in their own arguments to the jury, such permission should be contingent upon their written demonstration that such arguments are supported by admissible evidence. That is, if the Court is inclined to permit the defendants to argue that Ms. Quinn killed herself as a result of government pressure to commit perjury, it should first require them to identify, in writing, the admissible evidence that substantiates that claim.

### D.     Motion to Preclude Speculative or Hearsay Evidence of an Alternate Perpetrator

It is reasonably anticipated that Mr. Gogolack may attempt to contest his guilt by arguing to the jury that another person is responsible for the crime, i.e., another individual may have distributed fentanyl to Ms. Quinn. The government recognizes that the right of an accused to present a defense is "a fundamental element of due process." *Washington v. State*, 388 U.S. 14, 19 (1967); *see also Holmes v. South Carolina*, 547 U.S. 319, 329–31 (2006). However, "[a] defendant's right to present evidence is not unlimited, but rather it is subject to reasonable restrictions." *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see, e.g.*, Fed. R. Evid. 403. The "accused does not have an unfettered right to offer testimony that is

101

incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). One such "reasonable restriction" is embodied in Federal Rule of Evidence 403. *See* Fed. R. Evid. 403 (allowing courts to exclude relevant evidence if the probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence").

Evidence that another person committed the crime at issue may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial. *Scheffer,* 523 U.S. at 327; *United States v. Hendricks*, 921 F.3d 320, 331 (2d Cir. 2019) ("But [t]he potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns. A court must be sensitive to the special problems presented by 'alternative perpetrator' evidence and must ensure that the defendant shows a sufficient . . . nexus between the crime charged and the asserted 'alternative perpetrator.'" (internal quotations and citations omitted)); *see also United States v. Kornhauser*, 519 F. App'x 41, 43 (2d Cir. 2013) (unpublished).

In that vein, while a defendant has a right to attempt to establish his innocence by showing that someone else did the crime, he can only do so if his proffered evidence on the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to "show a nexus between the crime charged and the asserted alternative perpetrator." *Wade v. Mantello*, 333 F.3d 51, 62 (2d Cir. 2003). Evidence of third-party culpability must be factually, temporally, and/or physically linked to the defendant's charge to be admissible. *United States v. Wade*, 512 F. App'x 11, 13–14 (2d Cir. 2013) (unpublished);

102

*see also DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001) ("Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant."). Simply invoking the names, or displaying photographs, of unrelated individuals—without independently linking those individuals to the charged offense, the victim, or the crime scene—invites speculation and risks unfair prejudice. *See id*. And the Court should preclude any such evidence. *Kornhauser*, 519 F. App'x at 43 ("Evidence of another party's guilt 'may be excluded where it . . . is speculative or remote' relative to the crime with which defendant is charged." (quoting *Holmes*, 547 U.S. at 327)).

Likewise, where a defendant attempts to advance an "alternate perpetrator" defense, he cannot do so through hearsay. *See United States v. Londonio*, No. 20-2479-CR, 2024 WL 3770712, at *5 (2d Cir. Aug. 13, 2024) ("The district court did not abuse its discretion in concluding that the proffered evidence regarding other alleged suspects was not sufficiently connected to the Meldish murder and was inadmissible hearsay."); *United States v. Choudhry*, 330 F. Supp. 3d 815, 842 (E.D.N.Y. 2018) (commenting that hearsay testimony that may have established the possibility of an alternative perpetrator was properly excluded at trial).

Accordingly, to avoid surprise and delay during trial, this Court should require the defense, if it intends to offer any evidence of third-party culpability, to advise the Court and the government of the way it proposes to do so. This allows the Court to make a timely determination as to whether the proffered evidence bears the requisite connection to the crime, or if it is mere speculation. It also will enable the Court to determine whether the evidence is subject to the bar against hearsay or falls under an established exception. Further,

103

it enables the Court to conduct the required balancing under Rule 403 of the Federal Rules of Evidence.

### E.        Motion to Restrict Use of Third-Party's Statements to Impeach

The government anticipates that, at trial, the defense will attempt to impeach cooperating witnesses with the use of statements contained in the investigative report(s) of law enforcement agents.    The government will object to this procedure unless proper foundation is established and requests a pretrial ruling precluding defendants from attempting to employ such improper impeachment techniques before the jury.

The Federal Rules of Evidence allow the introduction of a prior inconsistent statement to impeach a witness's testimony.    Fed. R. Evid. 613.  However, a third-party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization.  *See United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980).  Thus, in the absence of the witness's endorsement, a third-party's notes or report (such as an FBI 302 or similar law enforcement report) of a witness's statement may not be admitted as a prior inconsistent statement unless it is a verbatim transcript of the witness's own words.  If the third-party's notes only reflect the *note-taker's* summary characterization of a witness's prior statement, then the notes are irrelevant to impeaching the prior inconsistent statement, and thus inadmissible.  *See United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992).  The party seeking to introduce the notes bears the burden of proving that the notes reflect the witness's own words rather than the note-taker's characterization.  *Id.*

Applying the rules of evidence will not preclude the defense from otherwise attempting to impeach the witness.  Instead, the rules assure fair process to both sides.  Accordingly, the

104

Court should instruct the defendants that they are not to attempt to use a third-party's statement to impeach a witness without laying the proper foundation.

### F.    Motion to Preclude The Defense from Eliciting Self-Serving Hearsay

The Court should preclude the defense from eliciting self-serving hearsay, on cross-examination or otherwise. A defendant's out-of-court statement is not hearsay when offered by the government. Fed. R. Evid. 801(d)(2)(A). ("A statement is not hearsay if . . . [it] is offered against a party and is [] the party's own statement."). A defendant, however, does not have the same ability to offer his own statements. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

Experience dictates that defense counsel will sometimes attempt to smuggle their client's self-serving statements into cross-examination. However savvy, this tactic has the effect of permitting the defendant—the attorney's client—to testify without having to take the stand. *See McDaniel*, 398 F.3d at 545; *United States v. Green*, No. 12CR83S1235, 2017 WL 4803957, at *2 (W.D.N.Y. Oct. 25, 2017) (agreeing with the principle that defendants should not be permitted to introduce self-serving hearsay through cross-examination). The government appreciates that this Court cannot issue a ruling on this issue absent specific attempts and objections. Nevertheless, the government respectfully asks that it admonish the defense that they will not be permitted to introduce self-serving hearsay, on cross-examination or otherwise.

**MISCELLANEOUS MOTIONS IN *LIMINE***

**A.    Motion to Admit Evidence Regarding Penalties Associated with the Offenses Charged Against Mr. Gerace in 1:19-CR-227.**

The government also moves to admit evidence regarding the penalties associated with the offenses charged against Mr. Gerace in Case No. 1:19-CR-227.  The potential penalties Mr. Gerace faced in that case bear directly on his motive to silence Ms. Quinn and thus are admissible pursuant to Rule 404(b).  Mr. Gerace was almost 56 years old when the government's March 27, 2023 detention proffer all but confirmed that Ms. Quinn was cooperating against him.  At that time, "he was facing a potential sentence that would have likely resulted in him spending the rest of his life in prison," meaning that the potential penalties at stake in 1:19-CR-227 "were highly probative as to his motive" to dispose of Ms. Quinn and, ultimately, "to flee."  *See United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012).

To ensure that Mr. Gerace is not unfairly prejudiced by the introduction of such evidence, the government proposes that the jury be permitted to know that Mr. Gerace could have received a sentence ranging from 0 years to life, as none of the charges in 1:19-CR-227 carried mandatory minimum terms of imprisonment.  The government further proposes that the Court instruct the jury to consider such evidence only as to Mr. Gerace's motive.  *See Earls*, 704 F.3d at 470–71 (remarking that the district court carefully conducted a Rule 403 balancing test where it permitted the jury to learn that the defendant "did not face a mandatory minimum penalty" and instructed the jury "to consider the evidence only as it pertained to motive").

**B.    Motion to Compel Disclosure of an Advice-of-Counsel Defense**

The government respectfully moves for an order compelling Mr. Gerace to disclose whether he intends to rely upon a good faith/advice of counsel defense at trial.  Mr. Gerace's

106

intention to rely upon such a defense and the basis therefor should be disclosed in advance of trial because legal advice given to a defendant who raises a good faith defense is discoverable.

The Second Circuit has held that if a defendant raises good faith as a defense at trial or claims that he did not have knowledge that his conduct was illegal, the government is entitled to access to advice the defendant received from his attorneys. *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991). The rationale for this principle is that "it would be unfair for a party asserting contentions to an adjudicating authority to then rely on its privileges to deprive its adversary to access to material that might disprove or undermine the party's contentions." *In re Grand Jury Proceedings John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003). In *Bilzerian*, the defendant in a criminal securities fraud case moved for a pretrial ruling that advice he received from his attorneys was privileged, notwithstanding his expected testimony that he did not willfully violate the securities laws because he believed that his actions were lawful.

The Second Circuit held that the advice was discoverable:

> This waiver principle is applicable here for Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required at issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

*Id.* at 1292.

This principle applies whether the defendant testifies or not. "[A]dvancing a claim to a court or jury," regardless of the form in which it is advanced, triggers the forfeiture. *See In re Grand Jury Proceedings*, 350 F.3d at 303 ("The unfairness courts have found which justified imposing involuntary forfeiture generally resulted from a party's advancing a claim to a court or jury (or perhaps another type of decision maker) while relying on its privilege to withhold

107

from a litigation adversary materials that the adversary might need to effectively contest or impeach the claim."); *see also Liberty Environmental Systems Inc. v. County of Westchester*, No. 94-CIV-7431 (WK) (MHD), 1997 WL 471053, at *3 (S.D.N.Y. 1997) (waiver occurs "when the privilege holder makes assertions in a litigation context that put its otherwise privileged communications in issue").  As these cases establish, "unfairness" would result regardless of whether a claim concerning the defendants' good faith or lack of knowledge of the securities law is advanced through the defendants themselves, through another witness, or through defense counsel's arguments to the jury.  In all cases, the jury is left with an impression about the defendants' state of mind, and it would be unfair for the defendants to be able to create that impression while withholding evidence that may refute it.

If Mr. Gerace intends to assert an advice of counsel defense, either as part of a defense case **or** through argument to the jury, then he must, under Rule 16, produce to the government any and all communications with counsel and counsel's agents that bear on the same subject matter.  *See In re Grand Jury Proceedings*, 219 F.3d 175, 182–83 (2d. Cir. 2000) ("[T]he defendant who asserts an advice-of-counsel defense . . . is thereby deemed to have waived his privilege with respect to the advice he received" (citation omitted)); *Bilzerian*, 926 F.2d at 1292 ("The attorney-client privilege cannot at once be used as a shield and a sword."); *United States v. Locascio*, 357 F.Supp.2d 536, 553 (E.D.N.Y. 2004) (Amon, J.) (commenting that selective disclosure is not permitted; defendant would waive his attorney client privilege as to both attorneys from whom he sought advice on FTC disclosure standards).  The government thus requests, pursuant to Federal Rule of Criminal Procedure 16(b)(1)(A), that the Court compel Mr. Gerace to advise the government forthwith if he intends to raise a good faith/advice of counsel defense and turn over any materials in support of such a defense so that the

108

government may review the materials and avoid any unnecessary adjournment of the trial or prejudice to the government.

Accordingly, the government respectfully requests that the Court issue an order directing Mr. Gerace to disclose forthwith whether he will be asserting a good faith/advice of counsel defense at trial and provide all communications supporting such a defense so that the government can conduct an adequate pre-trial investigation.

## V.    ADDITIONAL ISSUES

### A.    The Court Should Admit Co-Conspirator Statements

The government anticipates that questions regarding the admissibility of co-conspirator statements may come up at trial. Pursuant to Federal Rule of Evidence 801(d)(2)(E), a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy is not hearsay and, therefore, is properly admitted against a co-conspirator of the person who made the statement.

> A co-conspirator's statement will be admitted against the accused if the government can show by a preponderance of the evidence that a conspiracy existed, that both the defendant and the declarant participated in it, that it was in existence at the time the statement was made, and that the statement was made in furtherance of the conspiracy.

*United States v. Katsougrakis*, 715 F.2d 769, 778 (2d Cir. 1983) (internal citations omitted).

The Supreme Court has indicated that statements in furtherance of a conspiracy are nontestimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections. *Crawford v. Washington*, 541 U.S. 36, 56 (2004) (noting that most "hearsay exceptions covered statements that by their nature were not testimonial-for example, business records or statements in furtherance of a conspiracy"); *Id.* at 68, (concluding that, unlike testimonial evidence, "nontestimonial hearsay . . . [may be] exempted . . . from Confrontation Clause scrutiny altogether"); *accord United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2005)

("In general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial.").

This is true even if the statements at issue were made to law enforcement officers. *See United States v. Stewart*, 433 F.3d 273, 291–92 (2d Cir. 2006) (holding that statements made to law enforcement agents, though having the "aura of testimony," were co-conspirator statements not subject to the Confrontation Clause "where the object of the conspiracy [was] to obstruct an investigation . . . engaged in obtaining those testimonial statements of the conspirators").

"The standard for independent proof of participation [in the conspiracy] is lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury . . . and the proof may be totally circumstantial." *United States v. Cicale*, 691 F.2d 95, 103 (2d Cir. 1982) (internal citation and quotations omitted). "[A]ll that is required . . . is a showing of a likelihood of an illicit association between the declarant and the defendant." *Id.* (internal citation and quotations omitted). In determining whether the government established—by a preponderance of the evidence—that a conspiracy existed and that the defendant participated in it, the Court may consider the proffered co-conspirator's statements themselves, together with all other evidence. *See Bourjaily v. United States*, 483 U.S. 171, 178-81 (1987).

The statements of a co-conspirator must have also been made "in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements regarding the "current status of the conspiracy" and "the identity and activities of coconspirators" are also made in furtherance of the conspiracy. *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (noting that in furtherance of the conspiracy implies that "the statements must in some way have been designed to promote or facilitate

110

achievement of the goals of the ongoing conspiracy, as by, for example . . . seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy").

Finally, although a co-conspirator's statement must also have been made during the course of the conspiracy, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the Indictment." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). And "[s]o long as the declarant and the party against whom the statement is offered in court were members of a conspiracy at the time the statement was made, any witness who heard the statement may recount it at trial, whether the statement was made to a conspiracy member or not[.]" *United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir. 1992) (internal quotations omitted) (quoting 4 Weinstein & Berger, *Weinstein's Evidence,* ¶ 801(d)(2)(E)[01], pp. 801–305 (1991)).

During the course of the trial, the government intends to introduce co-conspirator statements in accordance with the authority set forth above.

### B.     *Bruton* Issues

*United States v. Bruton*, 391 U.S. 123 (1968) and its progeny control the admissibility of incriminating statements to law enforcement by a defendant who implicates a codefendant. In a joint trial, these statements are admissible and do not violate the Sixth Amendment's Confrontation Clause as long as they are redacted such that the declarant's statements, when viewed in isolation, do not implicate his co-defendant. *See United States v. Williams*, 936 F.2d 698, 699 (2d Cir. 1991).

The Second Circuit has established a framework for the appropriate redactions to a defendant's statements or sanitization of a witness's testimony. Specifically,

111

a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a codefendant's *Bruton* rights.

*United States v. Jass*, 569 F.3d 47, 56 (2d Cir. 2009) (quoting *United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989) (internal quotation marks omitted) (approving substitution of neutral words "others," "other people," and "another person" for names of codefendants)); *see also United States v. Benitez*, 920 F.2d 1080, 1087 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend").

The Second Circuit has further held that there is no *Bruton* violation even if other evidence introduced at trial sheds light on the identity of that "other person" in the sanitized statement. *United States v. Lung Fong Chen*, 393 F.3d 139, 150 (2d Cir. 2004) (no *Bruton* violation even where substantial other evidence "link[ed]" the complaining defendant to the incriminating statement); *accord In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh*, 552 F.3d 93, 133-34 (2d Cir. 2008) (same, where moving defendant complained that the combination of grand jury testimony and the incriminating statement violated *Bruton*; reaffirming that incriminating inference must be compelled by the statement alone).

The Supreme Court recently reaffirmed this framework in *Samia v. United States*, 143 S. Ct. 2004 (2023). In *Samia*, Samia's co-defendant's confession, which implicated Samia by name in its original form, was admitted at trial through a testifying agent "in a way that eliminated Samia's name while avoiding any obvious indications of redaction." *Id*. at 2006. The Court held that the introduction of the altered confession, coupled with a limiting instruction, did not violate the Confrontation Clause. *Id*.

112

### C.    The Admissibility of Certain Redacted Court Documents

The government is proposing that the parties stipulate to the authenticity of the following twenty-two court documents:

1. **Case 1:20-CV-00665-LJV, Doc. No. 3-3, Affidavit of Peter Gerace, filed June 2, 2020** (GOV-00039110)– *see* Govt. Ex. 1.

2. **Case 1:20-CV-00665-LJV, Doc. No. 16-2, Reply Affidavit of Peter Gerace, filed June 22, 2020** (GOV-00039108)– *see* Govt. Ex. 2.

3. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 108-2, Declaration of John Ermin, filed March 25, 2021** (GOV-00039113) – *see* Govt. Ex. 3.

4. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 89, Second Superseding Indictment, filed February 25, 2021** (GOV-00031156) – *see* Govt. Ex. 4.

5. **Case 1:19-CR-00227-JLS-MJR, Report Listing Docket Entries 1 (October 31, 2019) through 704 (December 27, 2023)** (GOV-00031204) – *see* Govt. Ex. 5.

6. **Case 1:23-CR-00037-JLS-MJR, Doc. No. 1, Indictment, filed March 23, 2023** (GOV-00030716) – *see* Govt. Ex. 6.

7. **Case 1:23-CR-00037-JLS-MJR, Report Listing Docket Entries 1 (March 23, 2023) through 36 (October 10, 2023)** (GOV-00031290) – *see* Govt. Ex. 7.

8. **Case 1:23-MJ-11-HKS, Doc. No. 1, Criminal Complaint (Crystal Quinn), signed February 3, 2023** (GOV-00030650) – *see* Govt. Ex. 8.

9. **Transcript of Proceedings before a Grand Jury of the Western District of New York on March 9, 2023, Crystal Quinn Testimony** (GOV-00037352) – *see* Govt. Ex. 9.

10. **Pretrial Diversion Agreement and Cooperation Agreement between the United States and Crystal Quinn, signed April 3, 2023** (GOV-00037210) – *see* Govt. Ex. 10.

113

11. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 462, SEALED Government's List of Potential Witnesses, filed May 10, 2023** (GOV-00032945) – *see* Govt. Ex. 11.

12. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 347, Protective Order, filed January 9, 2023** (GOV-00030719) – *see* Govt. Ex. 12.

13. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 493, SEALED Gerace Motion to Reopen Detention Hearing and for Pretrial Release, filed May 24, 2023** (GOV-00030834) – *see* Govt. Ex. 13.

14. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 529, SEALED Defendant's Potential Witness List, filed June 20, 2023** (GOV-00033070) – *see* Govt. Ex. 14.

15. **Case 1:19-CR-00227-JLS-MJR, Status Conference on June 21, 2023 – Transcript of Proceedings** (GOV-00031398) – *see* Govt. Ex. 15.

16. **Case 1:19-CR-00227-JLS-MJR, Status Conference on June 30, 2023 – Transcript of Proceedings** (Not Bates-Numbered, produced on April 3, 2026, in VOL 015 of Discovery) – *see* Govt. Ex. 16.

17. **Case 1:19-CR-00227-LJV, Status Conference on August 4, 2023 – Transcript of Proceedings** (GOV-00031340) – *see* Govt. Ex. 17.

18. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 585, SEALED Gerace Motion for Release, filed August 9, 2023** (GOV-00030901) – *see* Govt. Ex. 18.

19. **Case 1:19-CR-00227-JLS-MJR, Doc. No. 604, SEALED Gerace Reply in Support of Motion for Release, filed August 15, 2023** (GOV-00033349) – *see* Govt. Ex. 19.

20. **Case 1:15-CR-00033-EAW-HKS-3, Status Conference on October 24, 2022, - Transcript of Proceedings** – *see* Govt. Ex. 20.

21. **Case 1:23-CR-00037-JLS-MJR, Arraignment on March 24, 2023 – Transcript of Proceedings** – *see* Govt. Ex. 22.

22. **Case 1:23-CR-00037-JLS-MJR, Detention Hearing on March 27, 2023 – Transcript of Proceedings** – *see* Govt. Ex. 23.

114

23. **Case 1:19-CR-00227-JLS-MJR, Oral Argument on May 31, 2023 –** **Transcript of Proceedings** – *see* Govt. Ex. 24.

As part of its proposed stipulations, the government is, at this time, proposing redactions to four of its exhibits:

a) Exhibit 11 (Sealed Government's List of Potential Witnesses in Case 1:19-CR-227);

b) Exhibit 13 (Sealed Gerace Motion to Reopen the Detention Hearing and for Pretrial Release in Case 1:19-CR-227);

c) Exhibit 14 (Sealed Defendant's Potential Witness List in Case 1:19-CR-227); and

d) Exhibit 18 (Sealed Gerace Motion for Release in Case 1:19-CR-227).

Though the government is optimistic that the parties will be able to agree as to both the authenticity of the documents and the scope of the redactions, it previews the nature of the redactions in the event any dispute becomes the subject of future litigation. First, regarding Exhibit 11 (Sealed Government's List of Potential Witnesses in Case 1:19-CR-227), the government has proposed redacting every witness but Crystal Quinn and Phylcia Hunt pursuant to Rules 401 and 403. *See* GX-11 at 85–86.

Second, regarding Exhibit 13 (Sealed Gerace Motion to Reopen the Detention Hearing and for Pretrial Release in Case 1:19-CR-227), the government has proposed redacting (i) various factual and legal arguments raised in favor for and against Mr. Gerace's motion for release and (ii) references to other witnesses in 1:19-CR-227.

Third, turning to Exhibit 14 (Sealed Defendant's Potential Witness List in Case 1:19-CR-227), the government has proposed redacting all but four witnesses: Ms. Quinn, Michael Sinatra, Michael Mordino, and Nick Sinatra. *See* GX-14 at 31, 36, 43.

115

Lastly, as to Exhibit 18 (Sealed Gerace Motion for Release in Case 1:19-CR-227), the government has proposed redacting (i) pages 19 through 224, which consists of defense exhibits; (ii) references to an irrelevant case; (iii) references to, and argument about, the government's representations during various pre-trial proceedings; (iv) a table of contents and list of authorities; and (v) various legal arguments.

### D.    Rule 608 Notices

Rule 608(b)(1) allows for the use of specific instances of a witness's conduct on cross-examination "if they are probative of the [witness's] character for truthfulness or untruthfulness." Here, if Mr. Gerace testifies at trial, the government moves to cross-examine him about several prior instances of his committing fraud, lying in official government proceedings, and/or defrauding the government.

First, the government moves to cross-examine Mr. Gerace about his 2005 conviction for wire fraud. In December 1992, Mr. Gerace and his co-defendant, Michael Geiger, incorporated Advanced Distributing, Inc. *See* Plea Agreement, Dkt. 165 at 3, 1:00-CR-09, (Nov. 23, 2005). In 1993 and 1994, they hired salespeople to sell marked up products, including vitamins, water filters, cleaning products, and beauty products. The salespeople made interstate phone calls to sell these products to potential customers. As part of the sales pitch, the salespeople advised potential customers that they had been selected for a "promotion" and would receive one of four premiums, such as a new Cadillac, a $5,000 cashier's check, a big-screen television, or a vacation package. *Id.* at 4. In making these pitches, the salespeople would represent to the customer that they were "absolutely guaranteed" one of the biggest and best "premiums" the company had to offer. *Id.* These guarantees, however, were false—and were designed to fraudulently induce customers to purchase the company's products. That type of conduct lies at the core of what Rule 608(b)(1)

116

contemplates: deliberate dishonestly reflecting a willingness to lie when it is advantageous. Because Mr. Gerace's testimony will turn in part on his credibility, the probative value of this line of cross-examination is substantial and will assist the jury in assessing whether to credit his testimony.

Second, the government moves to cross-examine Mr. Gerace about his prior term of supervised release. While on supervised release, Mr. Gerace was prohibited from using illicit drugs. In October 2007, Mr. Gerace nevertheless tested positive for cocaine. According to his probation officer, Mr. Gerace "vehemently denied any drug use." He was administered a sweat patch to test for the presence of narcotics, and it was later found to be tampered with although Mr. Gerace denied tampering with it. After he was told that his drug test was positive, Mr. Gerace again denied using drugs to his probation officer. According to the probation officer, Mr. Gerace eventually admitted to using cocaine twelve times and admitted that he lied to his probation officer when he denied drug use. This conduct is directly probative of Mr. Gerace's character for untruthfulness. Here, Mr. Gerace did not merely violate institutional rules—he affirmatively and repeatedly denied using cocaine despite testing positive, denied tampering with monitoring tool when confronted with evidence, and maintained those falsehoods until further confronted, at which point he admitted both the use (on multiple occasions) and that his prior denials were lies. This sequence reflects deliberate deception in the face of known contrary evidence, demonstrating a willingness to lie to avoid consequences

Third, the government moves to cross-examine Mr. Gerace about his effort with former co-defendant Joseph Bongiovanni to mislead FBI Special Agent Tom Herbst in 2009. Specifically, Mr. Gerace and Mr. Bongiovanni conspired to mislead Special Agent Herbst

117

into believing that Mr. Gerace was Mr. Bongiovanni's confidential source.  Fourth, the government moves to cross-examine Mr. Gerace about his effort with Mr. Bongiovanni to mislead the DEA into believing that he and Mr. Bongiovanni did not have a close personal friendship.  Lying to investigators and defrauding law enforcement agencies reflects a willingness to place self-interest above truthfulness, which is precisely the concern that Rule 608(b)(1) addresses.

Fifth, the government intends to cross-examine Mr. Gerace regarding an application for an Economic Injury Disaster Loan that he applied for and received through the Small Business Administration in response to the COVID-19 pandemic.  Specifically, in April 2020, Mr. Gerace applied for a loan in the name of Pharoah's and certified that "[a]pplicant does not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of nay depictions or displays, of a prurient sexual nature."  When in fact, Pharoah's was a strip club and did "present live performances of a prurient sexual nature."  Despite his knowledge that this statement on his application was incorrect, Mr. Gerace contacted the SBA in June 2020 to inquire about his application status and was granted a $150,000 loan.

Mr. Gerace then applied for two loan modifications—to increase his loan principal to $500,000 and then to $2,000,000—in August and then December of 2021.  Each time, he signed a Loan Authorization and Agreement in which he certified under penalty of perjury that: (1) "[a]ll representations in the Borrower's Loan Application (including all supplementary submissions) are true, correct, and complete and are offered to induce SBA to make this loan"; and (2) "[t]here has been no substantial adverse change in Borrower's financial condition (and organization, in case of a business borrower) since the date of the

118

application for this Loan. (Adverse changes include, but are not limited to: judgment liens, tax liens, mechanic's liens, bankruptcy, financial reverses, *arrest or conviction of felony*, etc.)." (emphasis added).   When in fact, Mr. Gerace knew that the representations in his Loan Application were false, as described above.   Moreover, Mr. Gerace had been indicted in Case No. 1:19-CR-227 and charged with numerous felonies on February 25, 2021—making his "no adverse change" certification false.   After making these false representations, Mr. Gerace was approved for and received $2,000,000 in government money that had been earmarked for small businesses struggling with the effects of a national disaster.   Collectively, Mr. Gerace's conduct reflects a willingness to make sworn false statements when it is advantageous. Given the importance of credibility, this line of cross-examination is highly probative and will assist the jury in assessing whether to credit his testimony.

Sixth, the government moves to cross-examine Mr. Gerace about his representations related to Judge Sinatra's relatives, whom he caused to be placed on his witness list to fraudulently induce Judge Sinatra into recusing from the case.   That was not a misunderstanding, it was a deliberate misrepresentation designed to create a false narrative and mislead others about the existence of supporting evidence and to steer the trajectory of the case. Fabricating or exaggerating the knowledge of a supposed witness reflects a willingness to deceive for strategic advantage, which goes to the heart of credibility.

The Court should allow cross-examination into these instances of prior deception. Courts have found that prior instances of deceit in official proceedings or matter are highly probative of a witness's character for untruthfulness. *See, e.g.*, *United States v. Whitmore*, 359 F.3d 609, 619 (D.C. Cir. 2004) ("Nothing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath."); *United*

119

*States v. Schatzle*, 901 F.2d 252, 255 (2d Cir. 1990) (finding witness's omission of prior arrest from bar application "relevant to [the witness's] capacity for truthfulness"); *United States v. Bagaric*, 706 F.2d 42, 65 (2d Cir.1983) (upholding ruling permitting cross-examination of defendant at trial based upon finding by immigration judge that defendant's testimony in prior deportation proceeding was "not credible"), *overruled on other grounds by NOW, Inc. v. Scheidler*, 510 U.S. 249 (1994). Here, too, Mr. Gerace's prior instances of deceit in official government matters—especially where he stands to benefit from the fraud—are highly probative to his credibility at trial.

### E.    Rule 609 Notices

The government hereby notices its intent to impeach the following defendants pursuant to Rule 609, should they testify:

1.    Mr. Gerace: with the evidence of his conviction for conspiracy to commit wire fraud in Case No. 1:1-CR-09 pursuant to Rule 609(b)(2); and convictions for (i) conspiring to defraud the United States and to commit bribery, (ii) bribery of a public official, (iii) sex trafficking conspiracy, (iv) narcotics conspiracy, (v) distribution of cocaine, and (v) witness tampering. *See* Fed. R. Evid. 609(a)(1).

2.    Mr. Hinkle: with the evidence of his July 2, 2009, conviction for welfare fraud (5th Degree—Class A Misdemeanor) in violation of N.Y. Penal Law 158.05. *See* Fed. R. Evid. 609(b).

Regarding the government's intent to impeach Mr. Hinkle with his welfare fraud conviction, though the conviction is more than ten years old, its probative value substantially exceeds any unfair prejudice. *See* Fed. R. Evid. 609(b). Mr. Hinkle's welfare fraud conviction is a crime of dishonesty that is probative of his truthfulness. Should Mr. Hinkle testify, he will be putting his credibility directly at issue in a self-serving manner. The jury, therefore, should know that Mr. Hinkle has previously been found guilty for fraudulently obtaining

120

benefits from the government.  *See United States v. Payton*, 159 F.3d 49, 57–58 (2d Cir. 1998) (affirming district court's admission of thirteen-year-old impeachment evidence where the defendant was impeached with the fact of his conviction for a crime involving dishonesty).

## V. CONCLUSION

For the reasons stated above, the government respectfully requests that the Court grant the relief requested herein.

DATED:  Buffalo, New York, April 17, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:    s/NICHOLAS T. COOPER
s/CASEY L. CHALBECK
s/KATERINA POWERS
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202