IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      v.                                                    23-CR-99-EAW

███████████

SIMON GOGOLACK, et al.,

      Defendants.

_____

**REPLY IN SUPPORT OF THE GOVERNMENT'S PRE-TRIAL MEMORANDUM
OF LAW REGARDING GERACE ATTORNEY-CLIENT PRIVILEGE ISSUES AND
FORFEITURE BY WRONGDOING**

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael
DiGiacomo, United States Attorney for the Western District of New York, and Casey L.
Chalbeck, Assistant United States Attorney, of counsel, hereby offers the following reply in
support of the government's Pre-Trial Memorandum of Law Regarding Gerace Attorney-
Client Privilege Issues and Forfeiture by Wrongdoing.  *See* Dkt. 848.

     **I.**    ████████████████████████████████████
████████████████████████████████ .

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████





███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

██      ████████████████████████████████████████

██████████████    ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

--------

[1]























Case 1:23-cr-00099-EAW    Document 926    Filed 05/04/26    Page 17 of 51



























ii.













## II. GOVERNMENT'S REPLY IN SUPPORT OF ITS FORFEITURE-BY-WRONGDOING MOTION.

### 1. Government's Reply to Mr. Gerace's Arguments

Mr. Gerace levies several arguments against the government's forfeiture-by-wrongdoing motion. *See* Gerace Resp. Gov. Pre-Tr. Mem. at 48–53. First, Mr. Gerace contends that statements Ms. Quinn made to law enforcement during proffers are not testimonial statements subject to the forfeiture-by-wrongdoing rule. *Id.* at 48. Second, he argues that there might be insufficient evidence to establish that Ms. Quinn's death was intentional, as opposed to accidental. *Id.* at 50–53. Third, he asks the Court to conduct a pre-trial evidentiary hearing prior to determining the admissibility of Ms. Quinn's statements.

Mr. Gerace's contention that Ms. Quinn's proffer statements are not testimonial statements is incorrect, as every appellate court considering the issue has determined. *See, e.g.*, *United States v. Henderson*, 626 F.3d 326, 334 (6th Cir. 2010) ("The government acknowledges that, to the extent Washington's proffer included her account of what

---

at 46–47 n. 12 (arguing that the government hopes to prejudice the jury "against Foti due to his legal association with Arrington"). The government does not want the jury to be prejudiced against Mr. Foti. To guard against the risk of any prejudice, the government proposes that the parties stipulate to a redacted transcript so that the exhibit never reveals Mr. Foti's name.

Henderson said to her, it should not have been admitted because it included testimonial hearsay offered to show Henderson's retaliatory animus."); *United States v. Hardwick*, 544 F.3d 565, 573 (3d Cir. 2008) ("[T]he admission of Murray's proffer statements violated the Confrontation Clause rights of Murray's co-defendants."); *cf. United States v. Banks*, 464 F.3d 184, 189 (2d Cir. 2006) ("The Government does not dispute that the pleas, allocutions, and post-arrest statement made at a proffer session constitute 'testimonial statements' of the sort barred by *Crawford*. We assume without deciding that this characterization is correct.").[14] Consistent with this, the Supreme Court has identified "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, *or similar pretrial statements that declarants would reasonably expect to be used prosecutorially*" as belonging to the "core class of 'testimonial' statements." *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (emphasis added). Indeed, the "primary purpose" of proffers is "to establish or prove past events potentially relevant to later criminal prosecution," which makes them testimonial. *Davis v. Washington*, 547 U.S. 813, 822 (2006).[15]

Insofar as Mr. Gerace suggests that Ms. Quinn's proffer statements are inadmissible because they were not contemporaneously transcribed or recorded, he cites no caselaw to support his claim. The government would venture that most of the testimonial statements in the district and others reported by law enforcement are not contemporaneously transcribed. Conditioning the admissibility of such proffer-statements on whether they were

---

[14]    In discussing *Banks*, Mr. Gerace incorrectly states that the government "conceded [that] proffers were **not** 'testimonial statements.'"    *See* Gerace Resp. Gov. Pre-Tr. Mem. at 48 (emphasis added). To the contrary, the government conceded that proffer statements *are* testimonial. *Banks*, 464 F.3d at 189.

[15]    In addition to being right under the law, recognizing that Ms. Quinn's proffer statements are testimonial generally inures to Mr. Gerace's benefit. Without such designation, Ms. Quinn's testimonial statements could be introduced through other hearsay exceptions.

contemporaneously transcribed would not only incentivize murders against proffering individuals, but significantly disrupt law enforcement methods. Accordingly, to the extent Mr. Gerace seeks to limit the scope of Ms. Quinn's testimonial statements to her grand jury testimony, his argument should be rejected.

Mr. Gerace's next claim—that there is insufficient evidence to conclude that Ms. Quinn died intentionally—is premised upon an erroneous view of the evidence. *See* Gerace Resp. Gov. Pre-Tr. Mem. at 51–53. In particular, Mr. Gerace claims that "[m]uch of the government's arguments categorizing [Ms.] Quinn's death as anything other than accidental were entirely premised on the amount of fentanyl that was drawn from her body, post-mortem," a hypothesis he claims "had no true foundation" in light of expert analysis. *Id.* at 53. The analysis he cites to, however, is not Dr. Hail's expert report, but the government's non-expert disclosure—made in an abundance of caution—that it did not anticipate its expert to testify that post-mortem fentanyl levels contained in blood was "representative of the amount of fentanyl present in the body pre-mortem." Dkt. 848 at 122 n. 30.

Consistent with this, Dr. Hail noted in her report that post-mortem blood draws are inadequate proxies on their own to gauge pre-mortem fentanyl levels with precision. *See* Hail Report at 4. Nevertheless, Dr. Hail noted that Ms. Quinn's post-mortem fentanyl concentration of 1,200 ng/ML was higher than all but one sample reported in the medical and forensic literature she reviewed, and was "significantly higher than typical concentrations reported in the medical literature." *Id.* at 5; *id.* at 17 (noting that Ms. Quinn's post-mortem fentanyl levels were "orders of magnitude higher than . . . is typically seen in deaths from illicit fentanyl" use).

Rather than contend with the evidence, Mr. Gerace intimates that government counsel must be involved in some sort of prosecutorial misconduct because they "did not say why they failed to correct [ ] misstatements" regarding the significance of Ms. Quinn's post-mortem fentanyl levels, "what the impetus was to seek" Dr. Hail's "opinion," or "when it learned its prior statements were false." Gerace Resp. Gov. Pre-Tr. Mem. at 52. Let us resolve Mr. Gerace's doubts: the government disclosed Dr. Hail's general position that post-mortem fentanyl concentrations could not be correlated with precise perimortem fentanyl levels approximately three weeks after learning it. Prior to learning of Dr. Hail's methodology, the government only reported the factual evidence it had at its disposal—*viz.*, Ms. Quinn's toxicology report which specifically notes that "postmortem blood fentanyl concentrations ranged from 0.30–110 ng/mL (median 11 ng/ML) in 301 femoral blood specimens obtained from *accidental* drug overdose death investigations," GX-3599A at 4 (emphasis added), and the medical examiner's testimony that the highest post-mortem fentanyl concentration he had seen was "80 nanograms per mililiter," GX-3651F at 19. The government's representation that Ms. Quinn's post-mortem fentanyl levels were 400 times higher than the low-end concentrations reported in the literature remains correct.

Separate and apart from the Ms. Quinn's significantly high post-mortem fentanyl concentrations, other evidence supports the government's theory that Ms. Quinn was murdered, including but not limited to:

1. Mr. Gogolack's admission that he gave Ms. Quinn "Xanax";

2. Mr. Gogolack's admission that he saw Ms. Quinn "take a bunch of Xanax" the night before her death;

3. Mr. Gogolack's admission that the Xanax Ms. Quinn consumed consisted of green bars;

4.  Mr. Gogolack's prior middling of a drug deal for "green hulks," a kind of opioid-laced, counterfeit Xanax bar, that nearly resulted in an overdose of another witness;

5.  Mr. Gogolack's prior threats to hot shot a drug user and make his death look like an accidental overdose;

6.  The July 28, 2023 armed biker confrontation in which Ms. Quinn believed that Mr. Gogolack was setting her up just days before her death;

7.  Mr. Gogolack's jail call in which he states, in sum and substance, that the government possessed video of him discussing a murder, undoubtedly referring to the video the government obtained of the July 27, 2023 poker game Mr. Gogolack attended with Ms. Quinn;

8.  The fact that the poker game was attended by multiple Rare Breed associates;

9.  The fact that the Rare Breed is a support club of the Outlaws and independently has a relationship with Pharoah's, Mr. Gerace's strip club;

10. Mr. Gerace's in-person meeting with Mr. Ermin in April and July 2023;

11. Mr. Ermin's post-indictment admission to a witness that if his in-person meetings with Mr. Gerace were not recorded, the government "didn't have nothing" on him;

12. Mr. Ermin's post-indictment statement that Mr. Gogolack should have just reported Ms. Quinn's death as an accidental overdose;

13. Mr. Gerace's admission by silence when asked if he had Ms. Quinn hot-shotted; and

14. Mr. Gerace's statements that "all rats should die" and that he had "powerful people" to tie up his "loose ends".

All these facts support the inference that Ms. Quinn was murdered irrespective of the amount of fentanyl in her blood.

Lastly, Mr. Gerace asks the Court to conduct "an evidentiary hearing" prior to trial "consistent with *United States v. Mastrangelo*, 693 F.2d 269 (2d Cir. 1982)." Gerace Resp. Gov. Pre-Tr. Mem. at 53. Conducting an evidentiary hearing prior to trial is impracticable. The trial can double as an evidentiary hearing. If and when the Court has heard a sufficient

43

quantum of evidence, or when the government wants to move in Ms. Quinn's statements, whichever is sooner, the parties can argue the issue outside the presence of the jury.

To be sure, this process would not permit either party to open on Ms. Quinn's testimonial statements. But the Constitution "does not guarantee a criminal defendant the right to an opening statement, and therefore 'the making and timing of opening statements' is left to the discretion of the trial judge." *United States v. Oztemel*, No. 3:23-CR-00026 (KAD), 2025 WL 2305886, at *12 (D. Conn. Aug. 11, 2025) (*United States v. Salovitz*, 701 F.2d 17, 21 (2d Cir. 1983)). Thus, this Court can exercise its considerable discretion to limit the parties from referencing Ms. Quinn's testimonial statements in their openings. Because the government's proposal is legal, fair, and efficient, the Court should decline Mr. Gerace's request to hold a pre-trial evidentiary hearing on the admissibility of Ms. Quinn's testimonial statements.

### 2.    Government's Reply to Mr. Roncone's Arguments

Mr. Roncone makes two principal arguments in his response brief. *See* Roncone Resp. Gov. Sealed Pre-Tr. Mem. (dated Apr. 10, 2026). ███████████████████

███████████████████████████████

███████████████████████████████

*Id.* at 6. Second, Mr. Roncone argues that the government cannot meet its burden that Mr. Roncone (i) caused or acquiesced to Ms. Quinn's death and (ii) did so to prevent Ms. Quinn from testifying.

Mr. Roncone's first argument is easily resolved by reference to basic principles governing the law of conspiracy. "[W]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *United States v. Al Fawwaz*, 67 F. Supp. 3d

581, 585 (S.D.N.Y. 2014) (quoting *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998)).

In a conspiracy, it ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ because a defendant "need not know . . . all of the details of the conspiracy" in order

to join it, *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990).  *See also United States v. Rahman*,

189 F.3d 88, 128 (2d Cir. 1999) (same).  Stated otherwise, what matters is that Mr. Roncone

and Mr. Gerace both took steps—however different—in furtherance of a larger goal to

obstruct Mr. Gerace's prosecution in 1:19-CR-227 and defraud the United States.  Thus,

insofar as Mr. Roncone seeks to limit the admissibility of evidence falling within charged

conspiracies to only Mr. Gerace, his request should be denied.

As to Mr. Roncone's second argument, ████████████████████████████

███████████████████████████████████████████.  In the absence of

that statement, the government does not believe that it possesses sufficient evidence at this

time to showing by the preponderance that Mr. Roncone participated in a conspiracy to cause

Ms. Quinn's unavailability.[16]  Accordingly, it will not move to admit Ms. Quinn's testimonial

statements against Mr. Roncone.

### 3.     Government's Reply to Mr. Gogolack's Arguments

Regarding questions of Mr. Gerace's privileged relationship with Mr. Lawrence, Mr.

Gogolack argues first that "the law of the case doctrine should not be applied against" him

because Mr. Gogolack "had no involvement in the case at the time of the prior ruling."

Gogolack Resp. Br. at 2.  Because Mr. Gogolack does not have standing to assert Mr.

---

[16]     To be clear, Mr. Roncone was never charged in Counts 2 or 3, which, as to certain conspiratorial objects, would require the government to prove that Mr. Roncone conspired to kill Ms. Quinn.

45

Gerace's privilege, it follows that the law of the case doctrine, as it relates to questions of Mr. Gerace's privilege, has no bearing on Mr. Gogolack.

Next, Mr. Gogolack claims that Mr. Gerace's obstructive conduct ███████████ ████████████████████████████████████ ████████████████████████" *Id.* at 2. Nevertheless, the evidence is relevant to establishing the conspiracies with which Mr. Gogolack is also charged. *See Al Fawwaz*, 67 F. Supp. 3d at 585.

Third, Mr. Gogolack posits that "[t]he appropriate time to make" a forfeiture-by-wrongdoing ruling "would be after the Court hears and sees sufficient evidence, which the [g]overnment indicates will not be until the near end of the trial." Gogolack Resp. Br. at 3. In this vein, Mr. Gogolack contends that the government's submission "alone cannot suffice to show this Court by a preponderance of the evidence that [Mr.] Gogolack intentionally murdered Crystal Quinn for the purpose of silencing her as a witness." *Id.* The government generally agrees with both points, and further notes that its pre-trial memorandum was not intended to supplant the Court's fact-finding.

Fourth, Mr. Gogolack argues that "much of what is being proffered as testimonial statements is not relevant." *Id.* at 4. Not so. Ms. Quinn's testimonial statements bear directly on Mr. Gerace and Mr. Ermin's motivation to have her murdered and thus are plainly relevant.

Fifth, Mr. Gogolack argues that Ms. Quinn's statements to Mr. Schultz consist of inadmissible double hearsay. Mr. Schultz recently passed away, so the government will not seek to admit his statements.

46

Sixth, Mr. Gogolack argues that Ms. Quinn's text messages to ██████████ expired contact "are unreliable" for purely speculative reasons. *Id.* To the contrary, the statements largely consist of excited utterances, present-sense impressions, and statements of then existing mental states, as the government details in its pre-trial motions in *limine*. The government does not object to the admission of Ms. Quinn's statement, "██ me and Simon are in danger call me."

Seventh, and lastly, Mr. Gogolack asks the defense to admit Ms. Quinn's other hearsay statements "to correct a misimpression." *Id.* at 4–5. Mr. Gogolack does not identify which statements he intends to admit. Accordingly, the government cannot meaningfully respond to this argument.

### 4.    Government's reply to Mr. Hinkle's arguments

Mr. Hinkle first argues that because no medical expert can determine that Ms. Quinn's "manner of death" was a homicide, there is no murder case and "FRE 804(b)(6) falls." Hinkle Resp. Br. at 4. Putting aside that it is not the job of experts to make conclusions regarding the ultimate issues at trial, a jury confronted with all the evidence in this case could determine that Ms. Quinn's death was a homicide.

Mr. Hinkle next argues that various items of evidence the government thinks are probative of his guilt can be explained as innocent conduct. *See id.* at 5–13. The government reserves its right to respond to these arguments after the actual proof has come in at trial.

Mr. Hinkle proceeds to argue that various unspecified statements from Ms. Quinn are inadmissible under any hearsay exception. *See id.* at 14 (arguing that "[w]here Ms. Quinn's statements were made in a context that allowed for deliberation, including in response to law enforcement queries, the excited utterance exception cannot rescue them, and they therefore must not be excepted from exclusion upon Rule 803(2)" without identifying to which

statements he is referring); *id.* at 15 (arguing that "[e]ven if the Court were to find a technically applicable hearsay exception, the statements should nonetheless be excluded because Ms. Quinn was manifestly unreliable at the time she made them," without identifying to which statements he is referring).  The government cannot meaningfully respond to Mr. Hinkle's hearsay objections without knowing which specific statements he believes are inadmissible and why.

In the same vein, Mr. Hinkle argues that admission of Ms. Quinn's non-testimonial statements would violate the Confrontation Clause.  *Id.* at 15–17.  But he forgets that only testimonial hearsay implicates the Confrontation Clause.  *See generally Crawford v. Washington*, 541 U.S. 36 (2004).  The admissibility of Ms. Quinn's non-testimonial statements does not trigger Mr. Hinkle's constitutional right to confront his witnesses.

### 5.    Government's reply to Mr. Ermin's arguments.

Mr. Ermin argues that the evidence against him is insufficient to establish by the preponderance that he caused or acquiesced to Ms. Quinn's murder with the intent of silencing her.[17]  Ermin Resp. Br. at 2–4.  As before, the government does not believe that the Court will be able to make this determination until near the end of trial.

Mr. Ermin also argues that Ms. Quinn's testimonial statements are unreliable.  For example, Mr. Ermin argues that "[t]he government does not have evidence supporting" Ms. Quinn's testimonial statement that she believed the Outlaws would kill her, her dog, and her mother, and that the Outlaws have a rule of conduct concerning how they deal with law enforcement cooperators.  *Id.* at 4.  Ms. Quinn's statements indicating her awareness that the Outlaws kill cooperators is relevant to showing Mr. Ermin's motivation in silencing her.  Mr.

---

[17]    *See supra* at 38 n. 12.

Ermin's commentary on the government's lack of "evidence supporting" Ms. Quinn's statements is irrelevant but, in any case, the government does have evidence of how the Outlaws "deal" with law enforcement cooperations—and Mr. Ermin is seeking to preclude it. Mr. Ermin cannot have his cake and eat it, too, by seeking to limit the government's evidence and then claim the absence of evidence supports the preclusion of Ms. Quinn's statements.

Mr. Ermin also implies that Statements 2, 3, and 4 are irrelevant as to Mr. Ermin because they relate to Mr. Cohen and Mr. Gerace. However, under *Pinkerton* principles, Ms. Quinn's statements are admissible to everyone who participated in, or acquiesced to, the effort to murder her into silence. Regarding Ms. Quinn's statements about former DEA Special Agent Joseph Bongiovanni (Statements 5 and 8), Mr. Ermin contends their admission "would cloud this indictment with allegations from the Bongiovanni case" and prejudice him. *Id.* at 4, 5. By showing Mr. Gerace's motive to silence Ms. Quinn, the statements' probative value vastly outstrips any prejudicial impact—and none of the prejudice is unfair. Similarly, Mr. Ermin argues that Ms. Quinn's statements regarding her consumption of drugs at the Outlaws Buffalo Clubhouse (Statement 6) and her association with the Outlaws (Statement 7) are irrelevant. To the contrary, they speak to Mr. Ermin's motive to have her silenced.

Mr. Ermin further claims that Ms. Quinn's statements regarding the rats found in her home (Statements 9 and 10) are irrelevant as to Mr. Ermin. On this score, the Court will only be in a position to determine their admissibility as to Mr. Ermin once the proof connecting Mr. Ermin to the tampering and retaliation conspiracies is admitted. Turning to Ms. Quinn's statements regarding injuries to her dogs (Statements 11 and 12), Mr. Ermin claims these statements are unrelated to this case. However, they are admissible to show Ms. Quinn's

49

attachment to her dogs and thus make it less probable that she killed herself. █████████

████████████████████████████████████████████████████████

████████████. Because the statement is non-testimonial, it does not impact the forfeiture-by-wrongdoing analysis and, in any event, as discussed *supra*, the government no longer intends to introduce the statement.

Mr. Ermin further notes that Mr. Schultz's anticipated testimony concerning Ms. Quinn's statements about "a price [put] on her head" (Statement 16) is irrelevant to Mr. Ermin. *Id.* at 6. Though the statement was highly relevant, the government is not seeking to admit the statement in light of Mr. Schultz's passing. Lastly, Mr. Ermin argues that none of the text messages between Ms. Quinn and Mr. Gogolack or █████████ expired contact are relevant to Mr. Ermin. Again, because these text messages are non-testimonial, they do not implicate the forfeiture-by-wrongdoing analysis.

Lastly, Mr. Ermin seeks a pre-trial evidentiary hearing to determine the admissibility of Ms. Quinn's testimonial statements, citing his inability to address the statements in his opening. This argument should be rejected for the same reasons stated *supra*.

## CONCLUSION

In conclusion, the Court should grant relief consistent with the government's Pre-Trial Memorandum.

DATED: Buffalo, New York, April 24, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:   s/ CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue

50

Buffalo, New York 14202
(716) 843-5881
Casey.Chalbeck@usdoj.gov