IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                    23-CR-99-EAW
                                                      **(filed under seal)**

SIMON GOGOLACK, a/k/a Greek,
PETER GERACE, JR.,
JOHN THOMAS ERMIN, a/k/a Tommy O,
MICHAEL RONCONE, a/k/a Cone,
FRANK KNIGHT, and
HOWARD HINKLE, JR., a/k/a Hard How

                    Defendants.

---

### GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' TRIAL BRIEFS AND MOTIONS IN LIMINE[1]

MICHAEL DIGIACOMO
United States Attorney

BY:    s/ NICHOLAS T. COOPER
       s/ CASEY L. CHALBECK
       s/ KATERINA F. POWERS
       Assistant United States Attorneys
       United States Attorney's Office
       Western District of New York
       Nicholas.Cooper@usdoj.gov

---

[1]   The government incorporates the arguments set forth in its Post-Hearing Memorandum in Opposition to Mr. Gogolack's Motion to Suppress Statements (Dkt. 885); Omnibus Response in Opposition to the Defendants' Motions to Sever (Dkt. 875); Combined Pre-Trial Memorandum and Motions in Limine (filed under seal and dated April 17, 2026); Pre-Trial Memorandum of Law regarding Privilege and Forfeiture by Wrongdoing (Dkt. 848), as set forth fully herein. Those filings are fundamental to understanding the crimes and evidence underlying them, and because the filings consist of over 250 pages (excluding exhibits), it is impractical to include all the applicable facts and legal authority in the instant response in opposition.

**Table of Contents**

I.    RESPONSE TO MR. GERACE'S MOTIONS IN LIMINE ............................ 1

   A.    The Court should deny Mr. Gerace's Motion for the Disclosure of Rule 404(b) Evidence.................................................................................................... 1

   B.    The Court should deny Mr. Gerace's renewed motion for the production of grand jury transcripts. ........................................................................................ 1

   C.    The Court should deny Mr. Gerace's motion to sever. ............................ 2

   D.    The Court should deny in part Mr. Gerace's motion to preclude evidence. ............. 2

   E.    The Court should deny Mr. Gerace's motion to preclude ATF IOS Scheetz's testimony..................................................................................................... 3

   F.    The Court should deny Mr. Gerace's motion to preclude a transcript of Roderick Arrington's appearance before Judge Sinatra. ............................................... 4

   G.    The Court should preclude evidence of Judge John Michalski's suicide. ................. 5

   H.    The government does not oppose Mr. Gerace's motion to preclude reference to his convictions in 1:19-CR-227. .......................................................................... 7

   I.    The Court should deny Mr. Gerace's motion to limit the number of autopsy and crime-scene photos....................................................................................... 7

   J.    The Court should deny Mr. Gerace's motion to preclude photos of Ms. Quinn from when she was alive.................................................................................... 8

   K.    The Court should deny in part Mr. Gerace's motion to preclude reference to his association with organized crime................................................................... 9

   L.    The Court should deny Mr. Gerace's motion for the appointment of counsel for unrepresented unindicted co-conspirators. ................................................... 10

   M.    The Court should deny Mr. Gerace's Brady motion............................... 11

II.    RESPONSE TO MR. GOGOLACK'S MOTIONS IN LIMINE ..................... 17

   A.    The Court should deny Mr. Gogolack's motion to preclude statements he made to responding Wellsville Police Department Officer Lewis Pettit. ..................................... 17

   B.    The Court should deny Mr. Gogolack's motion to preclude evidence pertaining to severed counts. ........................................................................................ 19

III.    RESPONSE TO MR. ERMIN'S MOTIONS IN LIMINE ............................ 21

   A.    The Court should deny Mr. Ermin's motion to preclude expert testimony from ATF IOS Scheetz................................................................................................ 21

     1.    Legal Framework.................................................................................. 21

2.   IOS Scheetz is a Recognized Expert on Outlaw Motorcycle Gangs who Should be Permitted to Testify. ................................................................................... 23

B.   The Court should deny in part Mr. Ermin's motion to preclude certain testimony.  28

IV.  RESPONSE TO MR. RONCONE'S MOTIONS IN LIMINE ..........................29

A.   The Court should deny Mr. Roncone's motion to preclude the admission of evidence concerning ███████ as to him. ............................................................... 29

B.   The government does not object, in part, to Mr. Roncone's motion to preclude the admission of Ms. Quinn's statements regarding Mr. Roncone. ..................................... 30

C.   The Court should deny in part Mr. Roncone's motion to preclude admission of evidence establishing his firearm and drug possession. ................................................. 31

D.   The Court should deny Mr. Roncone's motion to preclude reference to the Outlaws and the Rare Breed as "gangs." ................................................................................. 33

V.   RESPONSE TO MR. HOWARD HINKLE'S MOTIONS IN LIMINE ..............34

A.   The Court should deny Mr. Hinkle's motion to preclude references to Mr. Hinkle's membership/association with the Rare Breed Motorcycle Club or any other motorcycle club. ......................................................................................................................... 34

B.   The government does not object to Mr. Hinkle's motion to admit Mr. Gogolack's statements concerning Mr. Hinkle. ............................................................................. 34

C.   The Court should deny Mr. Hinkle's motion to preclude evidence related to the severed counts. .......................................................................................................... 35

VI.  RESPONSE TO MR. KNIGHT'S MOTIONS IN LIMINE ............................36

A.   The Court should grant in part and deny in part Mr. Knight's motion to sequester witnesses. ................................................................................................................... 36

B.   The Court should deny Mr. Knight's motion to preclude "any testimony of criminal activity that does not involve Frank Knight." .............................................................. 38

1.   Legal Framework ................................................................................... 38

2.   Analysis ................................................................................................. 40

C.   The Court should overrule Mr. Knight's hearsay objections ................................. 40

D.   The Court should deny Mr. Knight's motion to preclude Rule 404(b) evidence ...... 41

E.   The Court should deny Mr. Knight's motion to reveal the identities of non-testifying informants ................................................................................................................ 43

F.   The Court should deny Mr. Knight's motion to preclude expert testimony and text message evidence. ...................................................................................................... 43

1.   Legal framework for the admissibility of expert testimony: .............................. 44

2.    Inapplicability of Cases Cited by the Defendant ................................................. 45

G.    The Court should deny Mr. Knight's motion to strike surplusage. ......................... 46

H.    The Court should deny Mr. Knight's motion for Jencks/Brady/Giglio material .... 47

I.    The government's demands and responses to Mr. Knight's demands..................... 48

J.    The Court should deny Mr. Knight's motion for the appointment of counsel for witnesses ..................................................................................................................... 49

K.    Early Disclosure of Jury Venire ............................................................................. 49

**VII. Response to Defendants' Supplemental Brady Motions.................................49**

A.    Factual Background ................................................................................................ 50

1.    The Dr. Hail Disclosure ...................................................................................... 50

2.    The ▮▮▮▮▮▮▮ Disclosure ................................................................... 56

3.    The ▮▮▮▮▮▮▮ Disclosure ................................................................. 58

4.    The Sharon Quinn Disclosure .......................................................................... 60

5.    The Bernard Byrd Interview .............................................................................. 61

B.    Legal Framework .................................................................................................... 64

C.    Analysis ................................................................................................................... 67

**VIII.    CONCLUSION ...............................................................................74**

## I.    RESPONSE TO MR. GERACE'S MOTIONS IN LIMINE

### A. The Court should deny Mr. Gerace's Motion for the Disclosure of Rule 404(b) Evidence.

Mr. Gerace moved for the disclosure "of evidence" it intends to offer pursuant to Rule 404(b). Gerace Pre-Tr. Mots., at 9–10. The government's April 17, 2026, Pre-Trial Memorandum provides Rule 404(b) notices and the government is unaware of any claim that it has not provided Rule 404(b) "evidence." Accordingly, this motion should be denied as moot.

### B. The Court should deny Mr. Gerace's renewed motion for the production of grand jury transcripts.

Mr. Gerace moves for the production of grand jury transcripts related to (1) government toxicology reports and (2) attorney Steve Cohen's status as an unindicted co-conspirator. Gerace Pre-Tr. Mots., at 14–16. The Court should deny this motion.

Regarding the toxicology reports, Mr. Gerace already has in his possession all the grand jury testimony concerning Ms. Quinn's toxicology report. Accordingly, as to that request, the motion should be denied as moot.

Turning to Mr. Cohen, Mr. Gerace seeks grand jury material, including transcripts of the government's instructions, bearing on several irrelevant questions geared to put the grand jury evidence on trial. *See id.* at 14 ("Was it more likely that the grand jury would indict Mr. Gerace based on allegations that a lawyer was also said to be acting with the requisite intent to commit the crimes in Counts 1, 2 & 3?").

Mr. Gerace does not state why these questions are relevant to this case. Presumably, Mr. Gerace believes that the answers to those questions could influence a potential motion to dismiss he intends to file. Any such motion is bound to fail because the Indictment, on its

own, "is enough to call for trial of the charge[s] on the merits." *United States v. Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 123662, at \*1 (W.D.N.Y. Jan. 16, 2026) (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956)). Thus, notwithstanding Mr. Gerace's desire to put the grand jury's investigation on trial, "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Gogolack*, 2026 WL 123662, at \*1 (quoting *Kaley v. United States*, 571 U.S. 320, 328 (2014)). Accordingly, to the extent Mr. Gerace lacks grand jury minutes regarding the government's instructions, his motion should be denied.

### C. The Court should deny Mr. Gerace's motion to sever.

Mr. Gerace also moves for severance pursuant to Rule 14. *See* Gerace Pre-Tr. Mots., at 16–17. In that motion, Mr. Gerace briefly regurgitates some of the arguments he raised in his pending Rule 14 motion for severance. *See* Dkt. 833. The government filed its response in opposition to Mr. Gerace's motion for severance on April 22, 2026. Dkt. 875. Because Mr. Gerace does not press any new argument, the government relies on the arguments it raised in its response brief. *See id.*

### D. The Court should deny in part Mr. Gerace's motion to preclude evidence.

In a one sentence motion, Mr. Gerace moves to preclude certain evidence seized from the Outlaws clubhouse, including evidence "depicting swastikas, signs or references to 'snitches,' general characterizations of the Outlaws as a 'one percent' or otherwise violent motorcycle gang." Gerace Pre-Tr. Mots., at 19. The government does not intend to introduce evidence showcasing the Outlaws or the Rare Breed's Neo-Nazi ideology unless one of the defendants opens the door to such evidence.

Regarding evidence depicting the Outlaws and the Rare Breed's institutional commitment to witness tampering and gang affiliation, the government briefed these issues

at length in its own Motions in Limine.  *See* Gov. Pre-Tr. Statement of Facts & Mots. *Lim.*, at 23–34, (dated Apr. 17, 2026).  Owing to Mr. Gerace's failure to cite any case law or otherwise develop an argument as to why these items are inadmissible, the government opposes Mr. Gerace's motion for the reasons stated in its Pre-Tial. Statement of Facts & Motions in *Limine*.

### E. The Court should deny Mr. Gerace's motion to preclude ATF IOS Scheetz's testimony.

Mr. Gerace further moves to "join any *Daubert* motion filed which may be filed by [Mr.] Ermin to preclude the government's expert witness (Scheetz)."  Gerace Pre-Tr. Mots., at 19.  Mr. Gerace contends that IOS Scheetz's testimony "will have little relevance to Mr. Gerace, but . . . will certainly cause spillover prejudice, magnified by the government's attempts to implicate an association with that group."  *Id.*  This motion should also be denied because IOS Scheetz's testimony is relevant and probative to helping the jury understand why Mr. Gerace would trust Mr. Ermin to help tamper with and retaliate against Ms. Quinn, and is admissible to all of the co-conspirators in the conspiracy.

"Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."  *United States v. Al Fawwaz*, 67 F. Supp. 3d 581, 585 (S.D.N.Y. 2014) (quoting *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998)).  With that standard in mind, Mr. Gerace's motion proceeds from a faulty premise.  Specifically, Mr. Gerace seems to concede that IOS Scheetz's testimony would be relevant to Mr. Ermin, his co-conspirator.  Because Mr. Gerace and Mr. Ermin were part of the same conspiracy, evidence relevant to Mr. Ermin is also admissible against Mr. Gerace, thereby negating any prejudicial spillover concern.  It was Mr. Gerace who chose to enlist the help of the International or National

3

President of the Outlaws to tamper with and retaliate against Ms. Quinn, knowing full well that Mr. Ermin had the power to command legions of Outlaws and support club members to accomplish his bidding. And it was Mr. Ermin's prominence within the Outlaws organization and their myriad affiliate and support clubs is what made Mr. Ermin a "powerful person" who could "tie up" Mr. Gerace's "loose ends." Understanding Mr. Ermin's organizational ties to the Outlaws, and the norms and mores that govern the Outlaws' conduct, is essentially to explaining how the conspiracy to obstruct justice as to Ms. Quinn formed. Accordingly, the evidence is more probative than unfairly prejudicial, and Mr. Gerace's motion should be denied.

**F. The Court should deny Mr. Gerace's motion to preclude a transcript of Roderick Arrington's appearance before Judge Sinatra.**

Mr. Gerace next moves to preclude a transcript of the proceeding in which Judge Sinatra recused from Roderick Arrington's case. Gerace Pre-Tr. Mots., at 20–21. Mr. Gerace asks the Court to preclude the transcript because Mr. Foti, who served as Mr. Arrington's stand-by counsel, was present during the proceeding. *Id.* at 20. According to Mr. Gerace, introducing the transcript will "cast suspicion on Mr. Foti," as the "jury will be aware [that] he . . . appeared as standby counsel for Mr. Arrington." *Id.* However, one way to ensure that the jury remains unaware of Mr. Foti's service to Mr. Arrington is to redact his name from the transcript. Because a simple redaction will cure the issue, Mr. Gerace's motion to preclude should be denied insofar as it is based on Rule 403.

Mr. Gerace also objects to the admission of the transcript on Rule 401 grounds, and claims that it is "irrelevant to the issues in this case." *Id.* at 21. This argument is unpersuasive. The transcript shows that Mr. Arrington, Mr. Gerace's former pod mate, knew that ███████

███████████████████████████████████████████████



In these ways, admission of the transcript has the "tendency to make the existence of" the obstruction and *Klein* conspiracy charged in Count 1 "more probable . . . than it would be without the evidence." Fed. R. Evid. 401. As such, Mr. Gerace's motion should be denied.

### G. The Court should preclude evidence of Judge John Michalski's suicide.

Mr. Gerace seeks to admit evidence of "[t]he government's pressure tactics in relation to Judge Michalski," arguing that they "mirror those . . . used with Crystal Quinn." Gerace Pre-Tr. Mots., at 24. Mr. Gerace hopes to put the government on trial based on speculation that unspecified investigative tactics drove Judge Michalski to suicide. *See id.* at 22–23. Mr. Gerace further asks the Court to preclude transcripts of the government's detention proffers in 1:19-CR-227 because "they contain statements by the defendant in response to court questions regarding 'psychiatric' treatment; and by the government about its theory of prosecution that are, among other things, irrelevant, unproven, inflammatory, and unfairly prejudicial to Mr. Gerace."[2] *Id.* at 25. This motion should generally be denied in its entirety.

Regarding Mr. Gerace's motion to admit evidence concerning Judge Michalski's suicide, "the government is not on trial." *United States v. Smith*, 811 F. Supp. 3d 523, 547 (S.D.N.Y. 2025). This trial is about the defendants' conspiracies to obstruct justice and tamper with, and retaliate against, Ms. Quinn. *See* Dkt. 24. The fact that Judge Michalski

---

[2] In fact, the government's allegations were proven. *See* Jury Verdict at 2–8, 10, Dkt. 1426, 1:19-CR-227, (dated Dec. 27, 2024).

committed suicide does not make it any more probable, or less probable, that Ms. Quinn committed suicide.  It is completely irrelevant.  Moreover, were this trial to devolve into an exploration of Judge Michalski's suicide, principles of fairness would entitle the government to offer evidence of Judge Michalski's unlawful activities at Pharoah's and with Mr. Gerace, thereby prolonging this already lengthy trial and confusing the jury.  *See, e.g.*, Tr. Tran., at 17–18, (dated Dec. 6, 2024) (witness testifying about how Judge Michalski presided over a criminal case involving Mr. Gerace's ex-wife despite being close friends with Mr. Gerace); *id.* at 30–31 (witness testifying about how Judge Michalski received an envelop from Mr. Gerace containing several thousand dollars in cash); *id.* at 41 (witness testifying about how Judge Michalski engaged in sex acts in Pharoah's upstairs unit); GX-310AE (1:19-CR-227 Trial Exhibit of Mr. Gerace's Text Messages with Judge Michalski) at 1 ("John M: You're funny. Let's get some pussy there.").[3]  Accordingly, this evidence should be precluded on Rule 401 and Rule 403 grounds.

Insofar as Mr. Gerace requests preclusion of the court transcripts, his motion should be denied as premature.  The government is amenable to working with Mr. Gerace to redact irrelevant and unfairly prejudicial content contained within the transcripts.  The government cannot do so, however, based on Mr. Gerace's overly broad, vague complaints.  Because the transcripts are plainly relevant to prove Mr. Gerace's knowledge of Ms. Quinn's cooperation, the government proposes that the Court preliminarily find them relevant under Rule 401 and instruct the parties to meet and confer over the scope of any redactions.

---

[3]     Mr. Gerace suggests that Judge Michalski's suicide was prompted by the government's aggressive tactics against him.  In fact, Judge Michalski's first suicide attempt coincided with the publication of a news interview provided by a witness who testified against Mr. Gerace.  That witness identified Judge Michalski in the interview.

**H. The government does not oppose Mr. Gerace's motion to preclude reference to his convictions in 1:19-CR-227.**

Mr. Gerace next moves to preclude reference to his convictions in 1:19-CR-227. Gerace Pre-Tr. Mots., at 24.  As a general matter, the government does not oppose Mr. Gerace's request.  However, should Mr. Gerace testify, the government would move to impeach him with the fact of his convictions pursuant to Rule 609.  *See* Gov. Pre-Tr. Statement of Facts & Mots. *Lim.*, at 120–21.  Furthermore, the government reserves its right to introduce the conviction should Mr. Gerace open the door.  *Cf. United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) ("Under the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal.").

**I. The Court should deny Mr. Gerace's motion to limit the number of autopsy and crime-scene photos.**

Mr. Gerace also moves to limit the number of "autopsy and crime scene photos."[4] Gerace Pre-Tr. Mots., at 26.[5]  Specifically, Mr. Gerace asks the Court to limit some of the seventeen crime scene photos that officers responding to Ms. Quinn's death took.  *Id.*  Some of these photos depict Ms. Quinn's body.  In his view, "[t]he [g]overnment is expected to introduce these photos to inflame or unfairly prejudice the jury."  *Id.* (citing *United States v. Fell*, No. 5:01-CR-12-01, 2018 WL 7247414, at *1 (D. Vt. Apr. 4, 2018)).  Mr. Gerace's motion should be denied.

As *Fell* recognizes, crime-scene photos may be admissible to show how a crime was committed, link a defendant to the crime, or show the defendant's state of mind.  2018 WL 7247414, at *1 (citing *United States v. Standish*, 3 F.3d 1207, 1209 (8th Cir. 1993) and *United*

---

[4]    The government is not in possession of any autopsy photos and does not know if any photos exist.

[5]    Mr. Roncone also moves for the preclusion of photos of Ms. Quinn.  *See* Roncone Pre-Tr. Mots. Lim., at 16.  That motion should be denied for the reasons set forth in this response.

*States v. Treas-Wilson*, 3 F.3d 1406, 1410 (10th Cir. 1993)). The photographs depicting Ms. Quinn are relevant to show the position in which she died (crouching on her knees and forearms), which is inconsistent with Mr. Gogolack's initial statements to law enforcement that he saw her sleeping. Furthermore, some photos depict shotgun ammunition around Ms. Quinn's body, which is circumstantial evidence that Mr. Gogolack confronted Ms. Quinn in a similar manner to his kidnapping of ███████████ and ███████████ months earlier. The photos are also relevant for what they do *not* show: no suicide note, no empty pill bottle in her hand, and no tissues near her body indicating she experienced a depressive episode prior to dying.

"Probative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact." *United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998). Here, because the photos are relevant to showing the manner in which Ms. Quinn died and connect Mr. Gogolack to the crime scene, they are more probative than prejudicial. And to the extent the government's use of the photos becomes cumulative, the Court can limit their introduction at trial. *See United States v. Stanley*, No. 3:23-CR-0027-2 (VAB), 2025 WL 2165001, at *7 (D. Conn. July 30, 2025) ("[T]he Court cautions the Government that the Court may sustain objections from defense counsel to the introduction of photos, if the photographs become cumulative or their probative value is substantially outweighed by their risk of undue prejudice"). Accordingly, Mr. Gerace's motion should be denied, at least for now.

**J. The Court should deny Mr. Gerace's motion to preclude photos of Ms. Quinn from when she was alive.**

Mr. Gerace further moves to preclude the admission of photographs of Ms. Quinn from when she was alive. Gerace Pre-Tr. Mots., at 28. Mr. Gerace argues that because "Ms. Quinn's identity is not at issue . . . . [t]he only reason to offer photos of Ms. Quinn while she

was alive would be to gain sympathy for her." *Id.* This motion should also be denied. As Judge Weinstein held in *United States v. Taveras*, a defendant's stipulation to identity "do[es] not necessarily control admissibility." No. 04-CR-156(JBW), 2006 WL 473773, at *11 (E.D.N.Y. Feb. 28, 2006). In that case, as here, the government needed to prove that a defendant killed the victim. *See id.* One permissible way to prove the victim's identity is "to have witnesses view pictures [of the victim], while [she] was alive . . ." *Id.* Moreover, photos of Ms. Quinn from when she was alive will be helpful in assisting the jurors watch Ms. Quinn's movements on the Wellsville Firehall video compilation depicting her, Mr. Gogolack, Mr. Hinkle, and Mr. Knight's attendance at the July 27, 2023, poker game. Accordingly, this motion should be denied.

### K. The Court should deny in part Mr. Gerace's motion to preclude reference to his association with organized crime.

Mr. Gerace also moves to preclude the government from referencing Mr. Gerace's association with Italian organized crime. Gerace Pre-Tr. Mots., at 28. Specifically, Mr. Gerace notes that various FBI files contain the following label: "Crystal Quinn; Death Investigation Public Corruption and LCN related." *Id.* Mr. Gerace asks that this label be redacted from any reports the government moves to introduce into evidence. The government does not oppose this request. Additionally, however, Mr. Gerace "moves to preclude the government from eliciting testimony or introducing exhibits that refer to his alleged connection to organized crime." *Id.* The government opposes this request—to an extent.

As noted in its March 11th Pre-Trial Memorandum, the government anticipates moving into evidence Ms. Quinn's testimonial statement that she observed Mr. Gerace hosting "mob meetings" at his house, at which time Mr. Gerace told her, "[y]ou can't be at the house when they arrive and if they see you here there's going to be a problem." Dkt. 848

9

at 98. This evidence is highly relevant to Mr. Gerace's motive for conspiring to kill Ms. Quinn. It is not unfairly prejudicial because it is no more inflammatory than the obstruction conspiracies with which Mr. Gerace is charged. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence shall be excluded as unfairly prejudicial when it is "more inflammatory than the charged crime"); *cf. United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'" (quoting *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990))). Accordingly, this motion should be denied.

## L. The Court should deny Mr. Gerace's motion for the appointment of counsel for unrepresented unindicted co-conspirators.

Mr. Gerace next moves "for an order compelling the government to disclose the names of all unindicted co-conspirators. Additionally, the defense moves for the appointment of counsel for witnesses who can fairly be considered unindicted co-conspirators and who may be unrepresented by counsel." Gerace Pre-Tr. Mots., at 29. Mr. Gerace offers two reasons in support of this request. First, he observes that unindicted co-conspirators "have a Fifth Amendment right against self-incrimination . . . ." *Id.* Second, he maintains that he "cannot call a witness who [he] knows will simply invoke his/her Fifth Amendment privilege once on the stand before the jury." *Id.* This motion should be denied.

Mr. Gerace's motion is a thinly veiled attempt to relitigate his motion for a bill of particulars, in which Mr. Gerace sought the identities of unindicted co-conspirators. *See generally* Dkt. 410. The Magistrate Court denied that motion, and Mr. Gerace declined to appeal the denied. In his new motion, Mr. Gerace fails to cite any caselaw supporting his request that the Court compel the government to disclose unindicted co-conspirators. Such

10

an order would offend separation of powers principles, which assign the prosecutorial function to the Executive Branch. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) (noting that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion"). Requiring the Executive Branch to disclose potential uncharged subjects or targets in any investigation or prosecution would significantly interfere with its own constitutional prerogatives.

Mr. Gerace's unfounded fear that a witness will invoke his or her Fifth Amendment privilege "before the jury" does not warrant a departure from these age-old constitutional tenets. In government counsel's experience, ascertaining whether a witness intends to invoke his or her Fifth Amendment privilege can be accomplished by subpoenaing the witness to court and having an on-the-record conversation. Accordingly, this motion should be denied.

**M. The Court should deny Mr. Gerace's Brady motion.**

Mr. Gerace moves to dismiss the Second Superseding Indictment based upon figments of his imagination which might, according to him, and if they existed, amount to violations of the Due Process Protections Act. Gerace Pre-Tr. Mots. at § 12. As described below, Mr. Gerace's claims are belied by the facts and unsupported by the law, and as such his motion to dismiss should be denied.

As described in great detail in the government's Pretrial Motions in Limine at pages 40 through 52, on the evening of March 14, 2023, Simon Gogolack lured ████████ and ████████ to his home under the guise of offering them a sample of drugs. Gogolack held them each, against their will and at shotgun-point, in a homemade plastic-tarp-chamber in his basement. The facts surrounding this incident have been made a part of the record in this case as early as September 2023, when the government made detention proffers related to the incident. Physical evidence corroborating the kidnapping was

photographed, documented, and seized from Gogolack's house during the execution of search warrants on both August 8, 2023 and September 15, 2023. That material has been produced in discovery since the May 2024 VOL 001 production (*see e.g.*, GOV-00011975– GOV-00012806).

Mr. Gerace's first complaint is that "indications in the Discovery materials and defense investigation revealed that ██████████ and/or ██████████ were involved in supplying Mr. Gogolack with drugs, including cocaine and/or fentanyl in the days leading up to Ms. Quinn's death." Gerace Pre-Tr. Mots. at 29. The fact that this information was garnered from discovery material that was produced by the government undermines Mr. Gerace's claim that it somehow supports dismissal of the indictment due to suppression of *Brady* information.

Mr. Gerace next complains that the drug-user-victims of Mr. Gogolack's kidnapping continued to remain in telephonic contact with Mr. Gogolack (a drug dealer) after the kidnapping occurred. Gerace Pre-Tr. Mots. at 29–30. Once again, this is information that Mr. Gerace has gleaned from discovery material and 3500 material that was produced by the government, and therefore can in no way be the basis for a dismissal of the indictment due to suppression of *Brady* information. To the contrary, Mr. Gerace is, and has been for some time, armed with information to use to cross-examine the victims of the kidnapping just as the Constitution envisions.

Next, Mr. Gerace makes the claim that "the defense has not been provided in discovery with any physical evidence supporting a kidnapping." Gerace Pre-Tr. Mots. at 30. Once again, Mr. Gerace's claim fails to stand up to even the most minimal scrutiny. The victims described a shotgun with pointed tips used during the commission of the kidnapping.

That shotgun was seized from Mr. Gogolack's residence on August 8, 2023, and is physical evidence of the kidnapping. Documents, photographs, and lab reports related to that shotgun have been produced since the May 2024 VOL 001 of discovery.[6] Additionally, the FBI went back to the basement of Mr. Gogolack's residence on September 15, 2023 to execute a second search warrant, where they recovered ███ ███████ wallet and sheets of plastic that the victims had described hung from floor to ceiling to create a chamber. Documents, photographs, and lab reports related to those items have been produced since the May 2024 VOL 001 of discovery.[7]

Next, Mr. Gerace complains that Ms. Barber (who was present during the kidnapping) pled guilty—but her plea agreement did not reference the kidnapping. Gerace Pre-Tr. Mots. at 30. Mr. Gerace makes no logical or legal explanation regarding what this could possibly have to do with his motion to dismiss the indictment for violations of the Due Process Protections Act. It appears to be included as nothing more than a musing.

Next, Mr. Gerace speculates as to why ████████ and ████████ decided to "cooperate with the government" but provides no evidence for such a claim.[8] Gerace Pre-Tr. Mots. at 30. Mr. Gerace notes that ████████ and ████████ both (as far as the

---

[6] See, e.g., Evidence Collected Item Log from 296 Scott Avenue Search Warrant on August 8, 2023 (GOV-00011984) which lists the recovery of "Item 30: Keltec Shotgun s/n XXFD48 Model: KSG, Gauge: 12". See also, photographs of the shotgun seized from 296 Scott Avenue Search Warrant on August 8, 2023 (GOV-00012284–90).

[7] See, e.g., Evidence Collected Item Log from 296 Scott Avenue Search Warrant on September 15, 2023 (GOV-00012529) which lists the recovery of "Item 16: Black Wallet" and "Items 1, 3, 4, 5; Plastic Sheeting & White Plastic Chair" from the basement. See also, photographs of the black wallet seized from 296 Scott Avenue Search Warrant on September 15, 2023 (GOV-00012764–767) and photographs of the plastic sheeting and white plastic chair (GOV-00012709–736).

[8] ██████████████████████████████████████████████████████████

government is aware) active drug-users, have been arrested for drug-related offenses. *Id.* Mr. Gerace notes that he became aware that ▓▓▓▓▓▓ was arrested on or about October 23, 2025 and "requested Brady/Giglio information from the government". *Id.* Once again, Mr. Gerace already had the information that he is claiming the government suppressed, this time (apparently) through his own investigation. Mr. Gerace notes that "in an effort to avoid having to subpoena court records" he asked the government to "provide us with a rap sheet or any documentation in their possession." *Id.* As Mr. Gerace notes, the government advised him that we had not obtained an updated "rap sheet or any paperwork related to his state case." *Id.* at 30–31. Once again, the government cannot turn over that which it does not have. Mr. Gerace is fully capable, through his defense team, of investigating the arrest of a government witness. The government is responsible for turning over material, exculpatory information that is in its possession, but the government is not responsible for acting—at Mr. Gerace's direction—as his own personal private investigators so that he can avoid the tiresome work of "having to subpoena court records." In advance of trial, the government runs updated criminal history checks on its witnesses, and those have been and/or will be provided as part of the Jencks/3500 production in this case. The government is under no obligation to do that earlier, at Mr. Gerace's beck-and-call. *See Morgan v. Salamack*, 735 F.2d 354, 358 (2d Cir. 1984) (prosecutor not constitutionally obligated to obtain information *dehors* his files for the purpose of discovering information which defense counsel can use in impeaching the credibility of a prosecution witness).

Next, Mr. Gerace points out that, in jail calls he received as <u>discovery material that was produced by the government,</u> he has heard Mr. Gogolack claiming that someone else dropped off drugs "the day before." Gerace Pre-Tr. Mots. at 31. Mr. Gerace next refers to a

14

text message conversation—once again, <u>discovery material that was produced by the</u> <u>government</u>—attempting to twist the messages to allege that Mr. Gogolack was sending Ms. Quinn out to receive drugs on July 30, 2023.[9] *Id.*  In reality, Mr. Gogolack was referencing his girlfriend, Cortnie Barber, who was residing at her parents' address of ██████████ ████████—the address referenced in the text messages.  Other contemporaneous text messages, between Mr. Gogolack and Ms. Barber's sister's phone confirm as much.  Either way, Mr. Gerace will be free to make those arguments to the jury, should he choose, based on <u>discovery material that was produced by the government</u>.  Mr. Gerace cannot, and does not, claim that information was suppressed.

Mr. Gerace next muses about text messages (<u>discovery material that was produced by</u> <u>the government</u>) between ████████ and Mr. Gogolack in July 2023, wherein Mr. Gogolack offers to sell drugs to ████████ both "work" [crack] and "food" [opioids] as late as July 28, 2023. *Id.* at 32.  Mr. Gerace offers no explanation as to how this is in any way exculpatory (it isn't) or otherwise pertinent to his motion to dismiss the Second Superseding Indictment for violations of the Due Process Protections Act (because it isn't).

Mr. Gerace mentions next that he has obtained, using a defense investigator, information about ████████ prior criminal history, including drug-related arrests and convictions. *Id.* at 32–33.  Mr. Gerace points out that, during the FBI's first interview of ██ ████████ he was under arrest on unrelated state charges. *Id.* at 33.  Mr. Gerace also notes that ████████ did not mention the kidnapping incident during his first testimony before the Grand Jury (<u>3500 material that was produced by the government</u>). *Id.* at 33.  The

---

[9]  The scoped version of Mr. Gogolack's cellphone was produced in the May 2024 VOL 001 of discovery in this case.

government expects that this will constitute fertile ground for cross-examination of ███.

███████ if he is called to testify as a witness.

Mr. Gerace, intent on finding something to blame the government for, next states that "because the government indicted Gogolack for kidnapping, ████████ and ████████ are 'victims' which is an obstacle to obtaining information about them or seeking to interview them." *Id.* at 34. After all of that, Mr. Gerace proclaims that "IF this was done to give the government a strategic advantage, to shield their involvement in supplying drugs to Gogolack and/or to assure their testimony at trial, the defense reserves the right to file additional motions at the time of trial." *Id.* (emphasis added).

As a preliminary matter the government will state unequivocally: **that did not happen**. The government, doing its job, pursued information that Mr. Gogolack had held two people in his basement, at shotgun-point, against their will. The government investigated that conduct and, ultimately, a Grand Jury returned a valid indictment charging Mr. Gogolack with kidnapping. In the end, this motion captioned in capital letters as "MOTION TO DISMISS FOR VIOLATIONS OF THE DUE PROCESS PROTECTIONS ACT" ended as nothing more than musings, speculation, and conspiratorial accusations against the government so bereft of proof that Mr. Gerace could not muster the energy to conclude the motion by alleging any actual misconduct or requesting any actual relief.

16

## II.    RESPONSE TO MR. GOGOLACK'S MOTIONS IN LIMINE

### A. The Court should deny Mr. Gogolack's motion to preclude statements he made to responding Wellsville Police Department Officer Lewis Pettit.

Mr. Gogolack moved to preclude the following statement he made on August 1, 2023, to Wellsville Police Officer Lewis Pettit:

> Patrol attempted to have Simon complete a deposition but he stated that he should speak to an attorney and did not want the police to "twist his words."

*See* Gogolack Mot. Lim. ¶1, Exhibit A.

Defense previously raised this suppression argument in Mr. Gogolack's omnibus dispositive motion. The government relies on its prior response dated December 23, 2025. *See* Gov't Resp. in Opp'n to Def. Gogolack's Omnibus Dispositive Mot. § VII, 30–51, Dkt. 72, (unredacted version, filed Dec. 30, 2025). To the extent Mr. Gogolack now cities *United States v. Okatan*, 728 F.3d 11 (2d Cir. 2013), in further support of that request, such reliance is equal parts forfeited and misplaced.

Mr. Gogolack had an opportunity to raise *Okatan* in his dispositive motions. He failed to do so and thus has forfeited the argument. Moreover, *Okatan* does not require blanket preclusion because it is readily distinguishable. Specifically, *Okatan* found that the defendant's asserted his right to counsel and to stay silent when he unequivocally stated "I want a lawyer." *See id.* at 118. Under those circumstances, the Second Circuit held that the government cannot use the defendant's pre-arrest request for counsel and refusal to answer questions as substantive evidence of guilt. *See id.* at 120. There, the defendant's statement was treated as a direct and proper invocation of constitutional protections during accusatory questioning, and the prosecutor affirmatively urged the jury in summation to infer guilt from the exercise of those rights. *See id.* at 118-19.

17

That is not this case. Here, Mr. Gogolack did not clearly invoke any constitutional privilege. Instead, when presented with an opportunity to give a voluntary statement, he declined to participate and remarked only that he "should" speak to a lawyer. That statement is materially different from an unambiguous request of counsel or an express assertion of the privilege against self-incrimination. It conveyed uncertainty and contemplation—not a definitive invocation. Clear assertions of rights are distinguishable from equivocal references to counsel. *See Davis v. United States*, 512 U.S. 452 (1994) (holding that statements such as "Maybe I should talk to a lawyer" do not constitute a clear invocation requiring questioning to cease). It is at most an equivocal comment expressing hesitation.

The government recognizes that courts must guard against inviting the jury to equate silence with guilt. Accordingly, if the Court permits use of the statement, the proper course would be a narrow one. The government should be permitted to elicit that Mr. Gogolack declined a voluntary deposition, if relevant, to explain the court of the investigation, the sequence of events, or why the officer pursues other investigative steps. But the government will not argue that Mr. Gogolack's declination itself proves guilt and will not characterize the statement as an invocation of rights demonstrating consciousness of guilt.

Likewise, the phrase that Mr. Gogolack "should speak to a lawyer" should not be sanitized into a stronger assertion than what was said. If admitted at all, it should be presented in its precise and limited form—as an equivocal remark accompanying a refusal to participate in a voluntary deposition, not as a formal claim of privilege.

Because *United States v. Okatan* involved a clearer invocation of rights and prosecutorial use of that assertion as substantive evidence of guilt, it does not mandate preclusion here. Mr. Gogolack's statement that he declined to participate in a deposition and "should speak to a

lawyer" was not an unambiguous invocation of privilege. The motion should therefore be denied, subject to an appropriate limitation that the government not argue guilt from the declination itself.

### B. The Court should deny Mr. Gogolack's motion to preclude evidence pertaining to severed counts.

Defense moved to preclude evidence relating to the severed counts. That motion should likewise be denied for the reasons set forth in the government's Pre-Trial Motions in Limine. *See* Pre-Trial Mot. in Limine §§ IV.G, 37-40, IV.H, 40–52.

Severance of certain counts does not create a blanket rule of inadmissibility. Evidence underlying severed counts remains admissible if independently relevant under the Federal Rules of Evidence. Mr. Gogolack argues that because certain counts were severed, any evidence pertaining to those counts must automatically be precluded as irrelevant. That is not the law. Severance under Rule 14 addresses trial management and potential prejudice from joinder; it does not erase otherwise admissible evidence or immunize relevant conduct from presentation at trial. *See* Fed. Crim. Proc. R. 14(a). "Rules 401 and 402 establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules provide otherwise." *Huddleston v. United States*, 485 U.S. 681, 687 (1988).

The proper question is not whether the conduct once appeared in severed counts, but whether the evidence is admissible to a legitimate evidentiary purpose under the Federal Rules of Evidence. And there is a legitimate evidentiary purpose here. As set forth in the government's Pre-Trial Motions in Limine, this evidence relating to the severed counts is independently admissible under Rule 404(b). *See* Pre-Trial Mot. in Limine §§ IV.G, 37-40

(addressing admissibility of fentanyl and Xanax distribution conspiracy evidence), IV.H, 40-52 (addressing admissibility of kidnapping and witness tampering evidence).

Severance changes the structure of the trial; it does not transform relevant evidence to inadmissible evidence. Conduct charged in severed counts may be admitted as Rule 404(b) evidence when offered for a non-propensity purpose. *See* Fed. R. Evid. 404(b). Rule 404(b) expressly permits evidence of other acts when offered for purposes such "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The governing safeguard is Rule 403—not automatic preclusion. Any prejudice can be addressed through Rule 403 balancing and limiting instructions rather than wholesale exclusion. *See* Fed. R. Evid. 403. Relevant evidence may be excluded when the danger of unfair prejudice substantially outweighs its probative value. *See Old Chief v. United States*, 519 U.S. 172, 180. That standard is especially important here because the defense seeks a sweeping remedy untethered to any particular exhibit or testimony.

If the Court has concerns as to any specific evidence, the appropriate course is to require an offer of proof, and if admitted, instruct the jury that the evidence may be considered only for the limited purpose for which it is received—not as proof of criminal propensity.

## III.    RESPONSE TO MR. ERMIN'S MOTIONS IN LIMINE

### A. The Court should deny Mr. Ermin's motion to preclude expert testimony from ATF IOS Scheetz.

Mr. Ermin moves to exclude ATF IOS Scheetz's testimony and requests a hearing pursuant to Federal Rule of Evidence 702.  Ermin Pre-Tr. Mem., at 1.  Mr. Ermin argues that IOS Scheetz's anticipated testimony "does not meet the criteria for reliability and relevancy." *Id.* at 2.  Because IOS Scheetz is a competent expert whose expertise will assist the jury in understanding this case, Mr. Ermin's motion should be denied.

### 1.    Legal Framework

Pursuant to Rule 702, expert testimony is admissible if it relates to a specialized area of expertise and will assist the trier of fact to understand the evidence or to determine a fact in issue.  *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  The decision to admit expert testimony rests with the discretion of the trial court.  *See United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991).  The Second Circuit has repeatedly approved of the admission of expert testimony regarding the terminology, composition, structure, and practices of gangs and organized crime families even after the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).  *See United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (approving admission of expert testimony regarding "the composition and structure of organized crime families generally" and noting that "this Circuit has approved the admission of expert testimony in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families" (collecting cases)); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (affirming admission of expert testimony by FBI agent "on the nature and function of organized crime families," the "structure of such families," and "the 'rules' of La Cosa Nostra," as well as the meaning of jargon used in recorded

conversations); *United States v. Castro*, 411 F. App'x. 415 (2d Cir. 2011) (unpublished) (affirming admission of special agent's testimony about the structure of MS-13); *Matera*, 489 F.3d at 121 (affirming admission of expert testimony on "matters of organized crime families generally, not on facts specific to this case . . . [such as] the membership or rank of the defendants").

The Second Circuit has explained why such matters are an appropriate subject for expert law enforcement testimony:

> [J]ust as an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group, law enforcement officers may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations. Officers interact with members of the organization, study its operations, and exchange information with other officers. As a result, they are able to break through the group's antipathy towards outsiders and gain valuable knowledge about its parochial practices and insular lexicon. Allowing law enforcement officers to act as experts in cases involving these oft-impenetrable criminal organizations thus responds to the same concerns that animated the enactment of the criminal laws that such organizations (and their members) are typically charged with violating, such as [the racketeering statutes].

*United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008).

The Circuit also outlined the limits of such testimony imposed by Rule 703 and the Confrontation Clause. "[E]xperts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions. . . . The expert may not, however, simply transmit that hearsay to the jury. Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." *Id.* at 197. *Mejia* approved cases in which law enforcement agents testified based on their expertise in organized crime, as developed during

their careers. *See, e.g.*, id. at 190 (this Court has "repeatedly upheld the admission" of such testimony (collecting cases)); *id.* at 195 (testimony of law enforcement expert about "membership rules" and "organizational hierarchy" admissible).

Nothing requires a district court to hold a formal Daubert hearing in advance of qualifying an expert witness. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir.2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so."); *id.* at 162 ("Because the district court's inquiry here did not stop when the separate hearing was denied, but went on with an extensive consideration of the expert's credentials and methods, the jury could, if it chose to do so, rely on her testimony which was relevant to the issues in the case."); *In re Elec. Books Antitrust Litig.*, No. 11–MD–2293 (DLC), 2014 WL 1282293, at *32 (S.D.N.Y. Mar. 28, 2014) ("[N]othing in Daubert, or any other Supreme Court or Second Circuit case, mandates that the district court hold a Daubert hearing before ruling on the admissibility of expert testimony . . . ."); *cf. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[A trial court has] discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

## 2. IOS Scheetz is a Recognized Expert on Outlaw Motorcycle Gangs who Should be Permitted to Testify.

IOS Scheetz's expected testimony will be well within the bounds of admissible gang expert testimony. First, IOS Scheetz is extensively qualified. *See* Notice Expert Discl. & Ex. A, at 6, Dkt. 846, (dated Apr. 15, 2026). Mr. Ermin attempts to cast doubt on IOS Scheetz's qualification, intimating that he is not an expert based on IOS Scheetz's description of his

23

work while he served as an ATF Intelligence Research Specialist.  *See* Ermin Pre-Tr. Mem., at 5 (citing Ermin Exhibit A at 4:21 (Grand Jury Test. Dated Jan. 3, 2024)).  Mr. Ermin omits the IOS Scheetz is no longer an Intelligence Research Specialist, and began specializing in investigations targeting Outlaw Motorcycle Gangs as an Intelligence Operation Specialist in 2014.  Ermin Ex. A at 4:11, 5:11–24.

In that capacity, IOS Scheetz's regularly participates in "interviews as the sole entity representing ATF." *Id.* at 5:16–17.  And though IOS Scheetz is not responsible for conducting investigations, he regularly conducts interviews, briefings, and proffers with OMG members, prospects, hang-arounds, and other OMG associates.  *Id.* at 6:7–11.  IOS Scheetz provides substantial assistance to investigations in other ways by working with sources of information and ATF operatives at OMG events, and participating in search warrants on residences, clubhouses, and other areas used by OMGs and their members.  *See id.* at 6:13–7:3.  Since 2006, IOS Scheetz has participated in over 1200 investigations.  *Id.* at 7:4–8.

Based on his expertise, IOS Scheetz teaches approximately 15 to 20 times a year at gang conferences and symposiums.  *Id.* at 7:11–20.  IOS Scheetz also conducts briefings for foreign dignitaries and teaches internationally about OMGs, *see id.*, including high-level and elected officials from the United States, England, Denmark, Norway, Netherlands, Germany, Thailand, Vietnam, Japan, Canada, Australia, Bulgaria, Portugal, Spain, Peru, El Salvador, Delegation of the European Nation and EUROPOL, *see* Notice Expert Discl. – Ex. A, at 6, Dkt. 846, (dated Apr. 15, 2026).  IOS Scheetz also teaches and trains members of federal, state, and local law enforcement on OMGs.

IOS Scheetz's experience thus compares favorably to other law enforcement experts qualified in this Circuit.  *See, e.g.*, *Locascio*, 6 F.3d at 937 (holding that an officer who "had

been an FBI agent for seventeen years, and for five years had been on the FBI's Organized Crime Program" qualified as having the "specialized knowledge" that permitted his designation as an expert); *Mejia*, 545 F.3d at 193–94 (affirming an officer's qualification as an expert on a particular gang where the officer had considerable experience investigating that gang, namely performing surveillance, executing search warrants, debriefing over one hundred gang members, and training other law enforcement personnel); *United States v. Feliciano*, 223 F.3d 102, 109 (2d Cir. 2000) (describing an officer as having "extensive experience" with a particular gang based on the officer's execution of search warrants at gang locations, authorization and review of electronic surveillance, and participation in a joint task force for five years).

Moreover, IOS Scheetz's has testified as an expert witness in numerous state and federal trials. *See id.* at 9–16. In particular, IOS Scheetz has been deemed an expert in the following federal cases:

1.  *United States v. Nelson, et al.*, 3:17-CR-533 (N.D. Cal.);
2.  *United States v. Baker, et al.*, 5:21-CR-434 (E.D.N.C.);
3.  *United States v. Lazar*, 1:20-CR-78 (E.D. Tex.)

*See id.*

Multiple federal district court and magistrate court judges have authored opinions recognizing that IOS Scheetz is qualified to testify as an expert on OMGs.[10] *See United States*

---

[10] Mr. Ermin argues that IOS Scheetz should not be permitted to use the phrase "outlaw motorcycle gang" because such term was deemed "unconstitutionally vague" when used to articulate the conditions of a defendant's supervised release. Ermin Pre-Tr. Mem., at 6 (citing *United States v. Green*, 618 F.3d 120 (2d Cir. 2010). *Green* involved supervised release conditions that prohibited the defendant from association with members "of the Bloods street gang or any other criminal street gang." *Id.* at 122. In *discussing* that issue and a similar one raised in a district court cases, the Second Circuit compared the phrase "criminal street gang," which had a clear statutory definition, to the phrase "outlaw motorcycle gang," which did not. *See id.* at 123 (discussing *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796 (S.D.N.Y. 1997). Those decisions, however, each concerned whether the prohibited association was sufficiently defined so as to not abridge a defendant's due process rights, which entitle him to "a reasonable opportunity to know what [conduct] is prohibited, so that he may act accordingly." *Id.* at 122 (internal quotations omitted). Here, IOS Scheetz will provide a definition for OMGs. Thus, *Green* is inapposite.

*v. Nelson*, No. 17-CR-00533-EMC-1, 2021 WL 75757, at *10 (N.D. Cal. Jan. 8, 2021) (Chen, J.) ("In sum, the Court is satisfied that 'the information upon which [Mr. Scheetz] relie[s] is of the type normally obtained in [an agent's] day-to-day police activity,' and that it therefore constitutes a reliable methodology for *Daubert* purposes.  The Government plausibly argues 'that other professionals develop their knowledge about the Hells Angels the same way that [Mr. Scheetz] does: they review evidence, read documents, speak with other law enforcement officers, and draw inferences based on personal observations.'  This showing is sufficient to clear the low bar that *Daubert* sets for admitting expert testimony." (internal citations omitted)); Order, Dkt. 94, *United States v. Lazar*, 1:20-CR-78, (E.D. Tex. Oct. 25, 2023).[11]

As these courts have recognized, IOS Scheetz's expected testimony is specialized information related to his expertise that will assist the trier of fact in understanding the evidence, as information concerning such "operational methods" is "beyond the knowledge of the average citizen."  *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994).  Nor will this testimony not run afoul of either Rule 703 or the Confrontation Clause of the Sixth Amendment. *Cf. United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (expert agent's statements deviating from his expertise on drug jargon, which "he conceded to have been at least partially the product of his out-of-court interviews with coconspirators[,] were neither within the permissible bounds of expertise authorized by Locascio nor within recognized exceptions to the hearsay rule").  IOS Scheetz will not convey "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion."  *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007).

---

[11]    In an oral order, the District Court for the Eastern District of North Carolina denied the defendant's motion to exclude IOS Scheetz's expert testimony. *See* Minute Entry, Dkt. 446, *United States v. Baker et al.*, 5:21-CR-434, (dated Sept. 7, 2022) ("Court orally . . . denies the motion to exclude testimony of experts.").

Rather, he will "provide jurors with the kind of general background information that [the Second Circuit has] permitted in the past." *United States v. Castelle*, 836 F. App'x 43, 46 (2d Cir. 2020) (unpublished).

Moreover, IOS Scheetz did not participate in the investigation leading to the federal charges alleged in the Indictment, obviating the application of *Mejia*'s principal warning that qualifying a case agent as an expect imbues them with "unmerited credibility when testifying about factual matters from first-hand knowledge." 545 F.3d at 196 (quoting *Dukagjini*, 326 F.3d at 53). In short, there will be no reasonable argument that IOS Scheetz's testimony suggests that he is "an 'expert' whose expertise happens to be the [specific] defendant[s]" charged in this case. *Id.* at 191. Accordingly, there is no basis to exclude IOS Scheetz's testimony.

Furthermore, there is no need to duplicate the work of other courts by holding a formal *Daubert* to qualify IOS Scheetz as a witness. *See United States v. Nieves*, No. 19-CR-354 (JSR), 2021 WL 1535338, at *1 (S.D.N.Y. Apr. 19, 2021) (seemingly admitting gang expert testimony without requiring a *Daubert* hearing); *United States v. Ashburn*, 88 F. Supp. 3d 239, 245 (E.D.N.Y. 2015) (declining to hold a separate *Daubert* hearing concerning the reliability of expert ballistics testimony where other courts had previously admitted such testimony). To facilitate the Court's consideration of this issue, the government is enclosing as exhibits the *Nelson* and *Lazar* courts' decisions qualifying IOS Scheetz as an expert following lengthy *Daubert* hearings. *See* GX-A (*Nelson* decision); GX-B (*Lazar* decision).

Lastly, IOS Scheetz's anticipated testimony is highly relevant to the case for many of the same reasons outlined in the government's April 17th Pre-Trial Memorandum at pages 23 through 37. As a brief summary, IOS Scheetz's testimony will assist the jury in understanding

27

the scope of the power Mr. Ermin wielded as the International or National President of the Outlaws; how Outlaws use support and affiliate clubs; how the Outlaws communicate sensitive information; and who is subject to Outlaws' "no snitching" rules. In so doing, IOS Scheetz's testimony will help the jury understand the significance of Mr. Gerace and Mr. Ermin's in-person meeting, Mr. Ermin's close monitoring of Mr. Gerace's prosecution in 1:19-CR-227 and other cases, the Rare Breed's involvement in the conspiracy, and Mr. Roncone's phone calls to Mr. Ermin, among other evidence in this case. For all of these reasons, Mr. Ermin's motion should be denied.

**B. The Court should deny in part Mr. Ermin's motion to preclude certain testimony.**

Mr. Ermin next moves to preclude evidence regarding the "rat hanging from the noose" and the giant Nazi flag in the Outlaws Buffalo Clubhouse. Ermin Pre-Tr. Mem., at 7–8. Unless Mr. Ermin opens the door, the government does not intend to introduce evidence of Mr. Ermin's Neo-Nazism, racism, and antisemitism, even though he appears to have signed the Nazi flag hanging in the Outlaws Buffalo Clubhouse. However, the "rat hanging from the noose" displays the Outlaws' institutional commitment to retaliating against witnesses, and thus is probative of why Mr. Gerace trusted Mr. Ermin to participate in the conspiracies charged in Counts 1 through 3. The government discusses this evidence at length in its April 17th Motions in Limine and incorporates its arguments there by reference. *See* Gov. Mots. Lim., at 23–30.

28

## IV.    RESPONSE TO MR. RONCONE'S MOTIONS IN LIMINE

### A. The Court should deny Mr. Roncone's motion to preclude the admission of evidence concerning ████████████ as to him.

Mr. Roncone first moves to "preclude the statements advanced in the Government's Pre-Trial Memorandum as to Mr. Roncone." Roncone Pre-Tr. Mots. Lim., at 11.  Section I of the government's March 11th Pre-Trial Memorandum argued that Mr. Gerace did not have a privileged relationship with his private investigator, ████████████, for myriad reasons. *See generally* Dkt. 848 at 1–92.  For that reason, the government argued that evidence relating to ████████████ is admissible at trial. *See id.*  Insofar as Mr. Roncone seeks to limit the reach of this evidence only to Mr. Gerace, his motion should be denied.

Count 1 charges Mr. Roncone, Mr. Gerace, and others with a multi-object conspiracy to defraud the United States and obstruct justice.  "[W]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *United States v. Al Fawwaz*, 67 F. Supp. 3d 581, 585 (S.D.N.Y. 2014) (quoting *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998)).  In a conspiracy, it is of no moment that Mr. Roncone did not conspire with Mr. Gerace "████████████████████████████████████████" or "████████████████████████████," Roncone Pre-Tr. Mots. Lim., at 11, because a defendant "need not know . . . all of the details of the conspiracy" to join it, *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990). *See also United States v. Rahman*, 189 F.3d 88, 128 (2d Cir. 1999) (same).  Stated otherwise, what matters is that Mr. Roncone and Mr. Gerace both took steps—however different—in furtherance of a larger goal to obstruct Mr. Gerace's prosecution in 1:19-CR-227 and defraud the United States.  For that reason, Mr. Roncone's Rule 401 and Rule 403 objections are misplaced, and his motion should be denied.

**B.** ████████████████████████████████████████████████████
████████████████████████████████████████████████.
████████████████████████████████████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ ██ ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ .[12]

## C. The Court should deny in part Mr. Roncone's motion to preclude admission of evidence establishing his firearm and drug possession.

Mr. Roncone next moves to preclude "all statements, photographs, testimony, and other evidence related to count 25." Roncone Pre-Tr. Mots. Lim., at 15. Count 25 charged Mr. Roncone with being an unlawful user of a controlled substantive in possession of firearms. Dkt. 24 at 46–47. Evidence of Count 25 consists of firearms, photographs of firearms, and narcotics evidence. Mr. Roncone claims that this evidence is "irrelevant and would serve only to confuse the jury and subject Mr. Roncone to undue prejudice." Roncone Pre-Tr. Mots. Lim., at 15. This motion should be denied in part.

Mr. Roncone's possession of narcotics is relevant to proving Count 26, which charges as follows:

### COUNT 26

#### (False Statements)

#### The Grand Jury Further Charges That:

On or about December 7, 2023, in the Western District of New York, the defendant, **MICHAEL RONCONE a/k/a Cone**, in a matter within the jurisdiction of the executive branch of the United States, did willfully, and knowingly make materially false, fictitious, and fraudulent statements and representations to special agents of the Federal Bureau of Investigation, in that the defendant stated (i) that he did not know anything about Crystal Quinn's death; and (ii) that there were no drugs in his residence, when in truth and in fact, and as defendant **MICHAEL RONCONE a/k/a Cone** then and there well knew, (i) he did know something about Crystal Quinn's death; and (ii) there were drugs inside his residence.

**All in violation of Title 18, United States Code, Section 1001(a)(2).**

---

[12] ████████████████████████████████████████

Dkt. 24 at 47 (emphases added). To prove Count 26, the government must show that there were narcotics inside Mr. Roncone's house, such as the narcotics found in his bedroom. Narcotics evidence, therefore, should not be excluded.

Regarding the firearm evidence, the government does not intend to present the actual firearms seized from Mr. Roncone's residence or the Rare Breed's Alma Hill Clubhouse to the jury, and would not object to Mr. Roncone's motion being granted in that respect. However, photographs of the firearms seized from the Rare Breed's Alma Hill Clubhouse is relevant to show that the members of the Rare Breed participated in the armed confrontation against Ms. Quinn during the early morning hours of July 28, 2023. That conduct is encompassed within Count 1, with which Mr. Roncone is charged. *See* Dkt. 24 at 10 ¶ 5(a)(iii) (alleging that the defendants conspired to cause "members and associates of motorcycle clubs to corruptly and by threat and communication, influence, obstruct, and impede, and endeavor to corruptly influence, obstruct, and impede Crystal Quinn from cooperating with members of federal law enforcement, and to prevent Crystal Quinn from testifying against GERACE in United States District Court for the Western District of New York in Case Nos. 19-CR-227 and 23-CR-37"); *id.* at 20 ¶ 45 (alleging, as an overt act in the conspiracy, that "On July 28, 2023, during the early morning hours, GOGOLACK and Crystal Quinn returned to GOGOLACK'S residence, located at 296 Scott Avenue in Wellsville. GOGOLACK then left Crystal Quinn in the residence while he walked over to KNIGHT'S residence, which was nearby. While GOGOLACK was out of the residence, Crystal Quinn was confronted by "bikers", whose actions placed Crystal Quinn in fear for her life."). Mr. Roncone's possession of the firearms seized from the Alma Hill Clubhouse is highly probative evidence.

32

Finally, the evidence is not unfairly prejudicial because it is no more inflammatory than Count 1's other allegations against Mr. Roncone. *See United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence shall be excluded as unfairly prejudicial when it is "more inflammatory than the charged crime"); *cf. United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'" (quoting *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir. 1990))). Accordingly, Mr. Roncone's motion should be denied in part.

### D. The Court should deny Mr. Roncone's motion to preclude reference to the Outlaws and the Rare Breed as "gangs."

Mr. Roncone next moves to preclude the government from referring to the Outlaws and the Rare Breed as "gangs." Roncone Pre-Tr. Mots. Lim., at 16. In his view, referring to these gangs as gangs "would serve no purpose, and would serve only to unduly prejudice Mr. Roncone." *Id.* This motion should be denied.

The Outlaws and the Rare Breed are gangs—a fact that Mr. Roncone does not deny. Mr. Roncone chose to be a member and leader of one of the gangs. And it was through his leadership in the gang that he committed crimes. The nature and existence of these gangs is a central issue in this case, where the government theorizes that the conspiracy to retaliate against Ms. Quinn developed through the gangs and in accordance with gang norms. *Cf. United States v. Dencklau*, 160 F. 4th 1046, 1058 & n.3 (9th Cir. 2025) (holding that the district court did not abuse its discretion in permitting the use of the word "gang" to describe a motorcycle club where the word was relevant "to describing the nature of the GJMC enterprise"). This probative value vastly outweighs "any 'marginal or unfair prejudice' arising

33

from the use of the word 'gang' . . . ." *Id.* Accordingly, Mr. Roncone's motion should be denied.

## V.      RESPONSE TO MR. HOWARD HINKLE'S MOTIONS IN LIMINE

### A. The Court should deny Mr. Hinkle's motion to preclude references to Mr. Hinkle's membership/association with the Rare Breed Motorcycle Club or any other motorcycle club.

Mr. Hinkle moved to preclude references to Mr. Hinkle's membership/association with the Rare Breed or any other motorcycle club on the basis that there is no evidence to that effect. *See* Def. Aff. at 5.   The government made an offer of proof as to Mr. Hinkle's association with the Rare Breed in the government's previously filed Pre-Trial Statement of the Facts and Motions in Limine (dated April 17, 2026).  *See* Pre-Trial Mot. in Limine § IV.B, at 15.

The government respectfully submits that Mr. Hinkle's motion should be denied for the reasons set forth in the government's Pre-Trial Motions in Limine, which explains that such evidence is admissible because it: (a) it provides critical background and context for the crimes charges; (b) it is intrinsic to the charged offenses and therefore not governed by Rule 404(b); and (c) its substantial probative value is not outweighed by the risk of unfair prejudice under Rule 403.  *See id*. at 14–19.

### B. The government does not object to Mr. Hinkle's motion to admit Mr. Gogolack's statements concerning Mr. Hinkle.

Defense moved to admit statements Mr. Gogolack made to FBI Special Agents Adam Penna and Jason Kammeraad at the Depew Police Department on August 2, 2023, concerning Mr. Hinkle.  The government does not oppose this motion.

**C. The Court should deny Mr. Hinkle's motion to preclude evidence related to the severed counts.**

Mr. Hinkle further moves to preclude evidence relating to the severed counts. That motion should likewise be denied for the reasons set forth in the government's Pre-Trial Motions in Limine. *See id*. § IV.J, 53–55.

Severance of certain counts does not create a blanket rule of inadmissibility. Evidence underlying severed counts remains admissible if independently relevant under the Federal Rules of Evidence. Defense argues that because certain counts were severed, any evidence pertaining to those counts must automatically be precluded as irrelevant. That is not the law. Severance under Rule 14 addresses trial management and potential prejudice from joinder; it does not erase otherwise admissible evidence or immunize relevant conduct from presentation at trial. *See* Fed. Crim. Proc. R. 14(a). "Rules 401 and 402 establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules provide otherwise." *Huddleston v. United States*, 485 U.S. 681, 687 (1988).

The proper question is not whether the conduct once appeared in severed counts, but whether the evidence is admissible to a legitimate evidentiary purpose under the Federal Rules of Evidence. And there is a legitimate evidentiary purpose here, as set forth in the government's Pre-Trial Motions in Limine, which explains that evidence relating to severed counts 19, 20, and 21 remain independently admissible under Rule 404(b). *See id*.

Severance changes the structure of the trial; it does not transform relevant evidence to inadmissible evidence. Conduct charged in severed counts may be admitted as Rule 404(b) evidence when offered for a non-propensity purpose. *See* Fed. R. Evid. 404(b). Rule 404(b) expressly permits evidence of other acts when offered for purposes such "proving motive,

35

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The governing safeguard is Rule 403—not automatic preclusion. Any prejudice can be addressed through Rule 403 balancing and limiting instructions rather than wholesale exclusion. *See* Fed. R. Evid. 403. Relevant evidence may be excluded when the danger of unfair prejudice substantially outweighs its probative value. *See Old Chief v. United States*, 519 U.S. 172, 180. That standard is especially important here because the defense seeks a sweeping remedy untethered to any particular exhibit or testimony.

If the Court has concerns as to any specific evidence, the appropriate course is to require an offer of proof, and if admitted, instruct the jury that the evidence may be considered only for the limited purpose for which it is received—not as proof of criminal propensity.

## VI.    RESPONSE TO MR. KNIGHT'S MOTIONS IN LIMINE

### A. The Court should grant in part and deny in part Mr. Knight's motion to sequester witnesses.

Mr. Knight moves for the exclusion of witnesses from the Courtroom so that they cannot hear other witness testimony but concedes that this rule does not require the exclusion of the case agent. *See* Dkt. 859 at 6. Consistent with the authority set forth below, the government respectfully requests that the Court permit Sharon Quinn, the mother of the victim, to be present during all stages of the trial despite her status as a witness. Additionally, the government asks that the Court permit the case agent to be present during all stages of the trial despite his status as a witness. Otherwise, the government does not oppose this request.

The Crime Victims' Rights Act (CVRA) establishes, inter alia, a victim's right "not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if

36

the victim heard other testimony at that proceeding." *See* 18 U.S.C. § 3771(a)(3). The statute further establishes that "before making a determination described in subsection (a)(3), the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from the criminal proceeding." *See id.* § 3771(b)(1). Sharon Quinn, as the surviving mother of Crystal Quinn, meets the definition of the term "crime victim" as used in the statute because she is the family member of the person against whom the offense was committed, and that person [Crystal Quinn] is deceased. *See id.* § 3771(e)(2).

Although Fed. R. Evid. 615 allows the Court to exclude non-party witnesses so that they cannot hear other witnesses' testimony, four categories of persons are excepted from Rule 615, including "a person authorized by statute to be present." Fed. R. Evid. 615(d). Congress has created just such an exception for crime victims—the CVRA—which gives crime victims the right not to be excluded from any public court proceeding. *See* 18 U.S.C. § 3771(a)(3); *see also In re Mikhel,* 453 F.3d 1137, 1139 (9th Cir. 2006). The right of crime victims not to be excluded "effectively trumps Federal Rule of Evidence 615." *United States v. Turner*, 367 F.Supp.2d 319, 332 (E.D.N.Y. 2005).

The standard for exclusion requires the district court to "find by clear and convincing evidence that it is highly likely, not merely possible, that the victim-witness will alter his or her testimony." *United States v. Pirk*, 284 F.Supp.3d 445, 449 (W.D.N.Y., 2018) (quoting *Mikhel*, 453 F.3d at 1139). "A mere possibility that a victim-witness may alter his or her testimony as a result of hearing others testify is therefore insufficient to justify excluding him or her from trial." *Id.* Here, as in *Pirk*, Mr. Knight has produced no evidence—let alone clear

37

and convincing evidence—that Sharon Quinn will alter her testimony as a result of being present in the courtroom during trial.[13]

Accordingly, for the reasons set forth above, the government joins in the defendant's motion to exclude witnesses from being present for the testimony of other witnesses, except as to the government's Case Agent and the family-member of the victim, Sharon Quinn.

**B. The Court should deny Mr. Knight's motion to preclude "any testimony of criminal activity that does not involve Frank Knight."**

The Court should deny Mr. Knight's motion to exclude "any testimony of criminal activity that does not involve Frank Knight." Dkt. 859 at 6–7. Mr. Knight has failed to identify any specific evidence or testimony that he believes to be inadmissible. *Id.* Effectively, the defendant is asking this Court (in a four-sentence motion) to grant him severance from his co-defendants and also dismiss Count 1 (charging him with Obstruction of Justice/Klein Conspiracy). Since the government, in a trial charging conspiracy, must be permitted to introduce evidence proving the existence of the conspiracy and evidence proving the commission of conspiratorial acts, Mr. Knight's motion should be denied.

1. **Legal Framework**

The proof at trial will clearly show that conspiracies existed. A criminal conspiracy is established when an agreement is formed between two or more persons to undertake illegal activity. *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). The conspiracy continues until the conspiracy fails or achieves its objective, or until all members of the conspiracy have withdrawn. *See Krulewitch v. United States*, 336 U.S. 440, 442 (1949); *see also United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003).

---

[13]     Although the controlling law is the same, *Pirk* analyzed whether a victim-witness could be present for individual *voir dire* and not the entire trial.

At trial, the government intends to introduce evidence of criminal acts committed by the charged and uncharged members of the charged conspiracies. This evidence will be used against the defendants to show the existence of the conspiracy, the associations within the conspiracy, and the conspirators' involvement in the conspiracy. It is well-settled that circumstantial evidence of association among alleged co-conspirators is relevant and admissible in a conspiracy prosecution. "Since agreement is an element of conspiracy, evidence of association is relevant." *United States v. Armone*, 363 F.2d 385, 403-04 (2d Cir. 1966). The law is clear that the acts of a conspirator are admissible against a co-conspirator as long as sufficient evidence of the existence of the conspiracy has been presented. *See, e.g., United States v. Ortiz-Rengifo*, 832 F.2d 722, 725 (2d Cir. 1987); *United States v. Henderson*, 446 F.2d 9960, 965 (8th Cir. 1971); *United States v. Sepulveda*, 710 F.2d 188, 189 (5th Cir. 1983).

To be admissible against a conspirator, the acts of a co-conspirator do not have to meet the standards for the admission of co-conspirator declarations. *See United States v. Geany*, 417 F.2d 1116, 1120 n.3 (2d Cir. 1969). In other words, to be admissible against a conspirator, the acts of a co-conspirator must simply be shown to be relevant within the meaning of Federal Rule of Evidence 401, i.e., the acts "ha[ve] a tendency to make the existence of a material fact more probable." *United States v. Ortiz-Rengifo*, 832 F.2d 722, 725 (2d Cir. 1987).

When a conspiracy has been established, the criminal liability of its members "extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." *United States v. Bryser*, 954 F.2d 79, 88 (2d Cir. 1992), (*citing Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946)). As such, it is permissible to argue, and for the jury to be charged, that they may "find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been

39

committed in the furtherance of an unlawful conspiracy, and that the defendant was member of the conspiracy." *United States v. Miley*, 513 F.2d 1191, 1208 (2d Cir. 1975).

## 2. Analysis

Mr. Knight cites to *United States v. Bertolotti*, 529 F.2d 149, 157 (2d Cir. 1975), for the proposition that the government cannot, under the guise of a single conspiracy theory subject a defendant to voluminous testimony relating to unconnected crimes in which he took no part. Dkt. 859 at 6. Mr. Knight then attempts to strain that nuanced holding to support his general motion to "object to any testimony of criminal activity that does not involve Frank Knight."

As described in multiple prior filings, the conspiracy charged in Count 1 is a single conspiracy with multiple objects and charging multiple participants. *See, e.g.*, Dkt. 611 at 5–7. Mr. Knight's desire to limit his trial, in a conspiracy case, to proof of only the criminal activity that he engaged in flies in the face of the controlling law of this Circuit. *See Ortiz-Rengifo*, 832 F.2d at 725 (to be admissible against a conspirator, the acts of a co-conspirator must simply be shown to be relevant within the meaning of Federal Rule of Evidence 401). Accordingly, his motion should be denied.

## C. The Court should overrule Mr. Knight's hearsay objections

Mr. Knight raises objections, generally, to the admission of hearsay evidence but fails to identify–with any particularity, specific testimony that he believes is inadmissible hearsay. Dkt. 859 at 7. The government has provided detailed briefing on its intention to introduce a variety of particularized statements as they are either (1) non-hearsay or (2) hearsay which falls within a recognized exception. *See* Dkt. 848 at 92–132; Pre-Trial Mot. in Limine § IV at 55–95. The government will not re-iterate those arguments here. As Mr. Knight fails to

specify any particular statement to which he objects, the government is unable to respond with particularity.

### D. The Court should deny Mr. Knight's motion to preclude Rule 404(b) evidence.

Defendant Knight makes objection to specific, identified types of proof and testimony being admitted at trial on the grounds that it would violate Fed. R. Evid. 404(b). *See* Dkt. 859 at 8–10. The government has generally outlined the controlling law regarding Rule 404(b) evidence in its Pre-Trial Motions in Limine at 11–14. The government relies on the law and analysis set forth therein. However, for ease of reference, the government responds to the individual categories set forth in Mr. Knight's motion below:

Mr. Knight objects to "any testimony that Knight is a member of any motorcycle club unless that witness testifies to being a member of that motorcycle club or gang or otherwise has direct, non hearsay, knowledge of Knight's membership." *See* Dkt. 859 at 8–9. Mr. Knight cites no caselaw for the proposition that a witness must be a member of a specific motorcycle club in order to offer testimony that someone else is a member of such club. The government anticipates offering evidence in various forms, to include witness testimony, recorded interviews of Mr. Knight, and documentary evidence, establishing Knight's association with the Rare Breed and its members. In fact, Mr. Knight is a self-proclaimed Rare Breed "Hang-Around." For the reasons set forth in the government's Pre-Trial Motions in Limine at 11 through 19, such evidence should be admitted at trial.

Mr. Knight objects to evidence that a bag of THC products were found by law enforcement during a search of his home. The government does not intend to introduce evidence that a bag of THC products were found by law enforcement during a search of his home.

41

Mr. Knight objects to evidence regarding Mr. Gogolack's drug-trafficking, drug use, and kidnapping because it "has nothing to do with FRANK KNIGHT". Dkt. 859 at 9. The government has addressed, in detail, why such proof should be admissible at this trial in its Pre-Trial Motions in Limine at 37 through 55, and will not reiterate those explanations here.

Mr. Knight objects to evidence that Mr. Gerace "attempted to remove Judge Sinatra from a prior case" and that Mr. Gerace engaged in bribery, sex trafficking, drug distribution [and] witness tampering, because it "has nothing to do with FRANK KNIGHT". Dkt. 859 at 9. The government has addressed, in detail, why such proof should be admissible at this trial in this filing, its Pre-Trial Memorandum of Law Regarding Gerace Attorney-Client Privilege Issues and Forfeiture by Wrongdoing (Dkt. 848), and, more generally, its reply in support of its Pre-Trial Memorandum of Law Regarding Gerace Attorney-Client Privilege Issues and Forfeiture by Wrongdoing, which will be filed contemporaneously with this filing. The government will not reiterate those explanations here.

Mr. Knight objects to evidence that Mr. Ermin "is the international president of the Outlaws Motorcycle Club, that the OMC is a 1% club, or what the government claims it means to be a 1% club", because it "has nothing to do with FRANK KNIGHT". Dkt. 859 at 9. The government has addressed, in detail, why such proof should be admissible at this trial in its Pre-Trial Motions in Limine at 14 through 36, as well as in this filing, and will not reiterate those explanations here.

Finally, Mr. Knight objects to evidence that Mr. Roncone or Mr. Hinkle have prior criminal histories, possessed or distributed drugs, or are members of the Rare Breed Motorcycle Club, because it "has nothing to do with FRANK KNIGHT". Dkt. 859 at 9. The government has addressed, in detail, why such proof should be admissible at this trial in

this filing and in its Pre-Trial Motions in Limine at 14 through 36, and 52 through 55, and will not reiterate those explanations here.

**E. The Court should deny Mr. Knight's motion to reveal the identities of non-testifying informants**

The government does not anticipate that there will be any non-testifying informants related to the charged conduct in the Second Superseding Indictment.  Accordingly, the Court should deny this motion as moot.

**F. The Court should deny Mr. Knight's motion to preclude expert testimony and text message evidence.**

Mr. Knight moves to preclude text messages from being introduced into evidence "unless one party to the conversation testifies."  Dkt. 859 at 10.  Defendant cites no caselaw supporting this portion of the motion.  *Id.*  Where text message evidence is relevant (pursuant to FRE 401) and is either non-hearsay or falls under an exclusion to the rule against hearsay (pursuant to Rule 804), it is admissible regardless of whether a party to the conversation testifies.

Mr. Knight also moves to preclude law enforcement witnesses from offering expert/opinion testimony to interpret the content of text messages.  Dkt. 859 at 10.  The government does not intend to offer such proof at trial.

Next, Defendant Knight moves to preclude the testimony of FBI Special Agent John Orland, Cellular Analysis Survey Team (CAST) in its entirety or, in the alternative, for a *Daubert* hearing.  At least one Court in this District has previously held that the plotting of Google geolocation data on a map is not expert testimony subject to Rule 702, but is lay testimony.  *See United States v. Crawford*, 2021 WL 1730875 (W.D.N.Y. May 3, 2021) (holding that a Special Agent's testimony about Google location data was not expert testimony subject to Fed. R. Evid. 702 and *Daubert*).  As described in SA Orlando's Grand Jury testimony, his

utilization of the location data provided by Google amounted to the plotting of the information on a map, which does not involve "scientific, technical, or other specialized knowledge." *See* GX-3687A at 8. The location data itself, supplied by Google, is accompanied by a Rule 902(1) Certificate of Authenticity signed by a records custodian from Google.

1. **Legal framework for the admissibility of expert testimony:**

Under Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

In this regard, the court functions as a "gatekeeper," and must make "a preliminary assessment of whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592–93 (1993). However, despite acting as a gatekeeper, a court must be careful not to intrude too far into the fact-finding role of the jury. Instead, the court's role when presented with disputed expert testimony is merely to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert*, 509 U.S. at 597—in the words of the Second Circuit: to ensure "that the courtroom door remains closed to junk science." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

44

Thus, challenges to an expert's conclusions, or allegations that an expert has incorrectly or unreliably applied otherwise accepted and reliable scientific methods, go to the weight of the expert's testimony, not its admissibility. Such disputes are properly addressed via cross-examination or offering competing expert testimony at trial, but not outright suppression of the expert testimony. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995) (disputes regarding methodology go to the weight, not the admissibility, of expert testimony); *United States v. Rounds*, No. 10-CR-239S, 2015 WL 6643986, *2 (W.D.N.Y. Oct. 17, 2015) ("challenges to reliability and assertions of factual error in the application of a given methodology go to the weight of the evidence, not to admissibility"); *Joseph S. v. Hogan*, No. 06 Civ. 1042(BMC)(SMG), 2011 WL 2848330, at *2-3 (E.D.N.Y. July 15, 2011) (denying a *Daubert* hearing where the defendants contended that the plaintiff's expert "cherry-picked" data upon which his opinion was based).

### 2. Inapplicability of Cases Cited by the Defendant

Defendant cites to *United States v. Smith*, 110 F.4th 817, 823–24 (5th Cir. 2024), claiming that it supports his motion to preclude geolocation evidence and the testimony of SA Orlando. It does not. *Smith* is a 5th Circuit case which dealt with the constitutionality of so-called "geofence" warrants, not the admissibility of the fruit of those warrants at trial, or the admissibility of testimony surrounding such evidence. Mr. Knight never moved to suppress the data provided by Google pursuant to a search warrant, and now tries to achieve that remedy through a back door. Mr. Knight's remaining arguments, about how the other evidence relates to the Google location data (e.g., Gogolack's text messages to Crystal Quinn that he is at the "top of rood") are arguments that Mr. Knight should be free to make to the jury.

45

### G. The Court should deny Mr. Knight's motion to strike surplusage.

Mr. Knight moves to strike about twenty-one (21) overt acts from the Second Superseding Indictment, claiming that they constitute surplusage. Dkt. 859 at 13–17. Mr. Knight argues that the list of overt acts are "irrelevant and inflammatory." *Id.* at 13–14. He is wrong on both counts. The list of overt acts to which he objects include specific references to instances where defendant Knight contacted or attempted to contact, either in person or over the phone, his co-conspirators during the timeframe surrounding Ms. Quinn's murder. As to relevance, each communication between co-conspirators tends to make a material fact at issue (whether Mr. Knight engaged in an agreement with others to obstruct justice) more likely to have occurred (evidencing Mr. Knight's frequent and continuing communication with those others). As to inflammation, it is hard to imagine overt acts more benign than the listing of dates and times of phone calls and in-person meetings of co-conspirators. Mr. Knight simultaneously alleges that "the fact of these communications is relevant to no disputed fact in the case" while simultaneously alleging that the inclusion of these overt acts "invites the jury to speculate that something nefarious is occurring during these conversations without any proof." Mr. Knight is, once again, wrong. The trial is, in part, *about* whether something nefarious occurred during those communications, and proving that the communications existed and occurred is a necessary pre-condition to proving that they were about a conspiracy to obstruct justice. A jury can choose to accept or reject that based on the proof presented at trial, but Mr. Knight instead asks this Court to prevent the government from putting forth proof of a conspiracy at all.

Even overt acts appearing "legitimate" "in isolation" may be properly included in an indictment. *United States v. Montour*, 944 F.2d 1019 (2d Cir. 1991). Motions to strike surplusage from the indictment will be granted only where the challenged allegations are not

46

relevant to the crime charged *and* are inflammatory *and* prejudicial.  *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001).  Indeed, while Mr. Knight complains that overt acts alleging phone calls meet this high standard, the Second Circuit has refused to strike overt acts of cocaine distribution in a count charging a heroin trafficking conspiracy because the cocaine distribution was relevant to the structure of the organization and the relationship of the participants.  *See United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996).  Here, evidence that Mr. Knight communicated with his co-conspirators should not be stricken.  It should be for a jury to decide whether those communications reflect conspiratorial acts, and Mr. Knight will be free to argue that the communications are a result of nothing more than his friendship with those individuals.  The government intends to argue that all of the proof at trial, taken as a whole, establishes their nefarious purpose.

**H.  The Court should deny Mr. Knight's motion for Jencks/Brady/Giglio material**

Mr. Knight requests that the Court order the government to "immediately disclose all Jencks material" and "material favorable to the defense pursuant to *Brady*."  As the Court has repeatedly referenced throughout this case, the government is not obligated to produce Jencks Act material until the time set forth in the statute (which is after the witness has testified).  18 U.S.C. § 3500.  Nevertheless, the government agreed to the early production of Jencks Act material in this case, producing a voluminous batch on March 16, 2026, with the expectation that a second batch will be produced on April 27, 2026.   Mr. Knight's demand for a court order that all Jencks Act material be produced "immediately" is without foundation in law.

With respect to his motion for "material favorable to the defense" Mr. Knight asserts "that there is likely jail surveillance of some or all of the individuals in the claimed conspiracy that fail to include FRANK KNIGHT as a party or fail to otherwise implicate FRANK KNIGHT in the charged conspiracy."  Candidly, the government does not fully understand

47

what Mr. Knight is talking about, but the government does not have whatever it is that Mr. Knight is requesting and therefore cannot turn it over.

Similarly, Mr. Knight avers that he believes that "agents were preparing search warrant affidavits as soon as the day after CQ's death wherein they intimated that she was killed because she was a witness" which he suggests evinces a "rush to judgment" constituting *Giglio* material and demands that it be produced, whether he has standing or not. Dkt. 859 at 18. Mr. Knight's defense team, and all other defense teams, were provided with GX-3591AB (Gogolack Cellphone SW Packet [dated Aug 2., 2023]) on March 16, 2026. Over a month after it was provided, Mr. Knight is demanding that which he already has. The government disagrees with Knight's characterizations of a "rush to judgment" and his claims that the search warrant affidavit constitutes *Giglio* material, but in any event, he already has it. To the extent that Mr. Knight makes a general demand for *Brady* information, the government continues to comply with its *Brady* obligations.

## I. The government's demands and responses to Mr. Knight's demands.

Mr. Knight moves to permit him to use "similar acts evidence" of government cooperators. Mr. Knight does not identify any specific witnesses or acts to which he refers, negating the government's ability to meaningfully respond to his motion. The government therefore demands notice from Mr. Knight of what specific witnesses and acts he intends to introduce proof of pursuant to Rule 404(b) so that the government can offer the Court a meaningful response. Similarly, Mr. Knight makes general reference to cross-examining witnesses about prior convictions without referring to any specific witness or any specific conviction. The government demands that Mr. Knight provide notice of what prior convictions he intends to cross-examine government witnesses about, so that the government can meaningfully respond. Mr. Knight also requests that the government provide notice of

48

the 404(b) evidence it intends to rely on at trial, which the government has already done in its Pre-Trial Motions in Limine at 11 through 55. The government has addressed the law surrounding Fed. R. Evid. 404, 608, and 609 in that same filing.

### J. The Court should deny Mr. Knight's motion for the appointment of counsel for witnesses

Mr. Knight next seeks to request attorneys for unspecified unindicted co-conspirators. While several prospective civilian witnesses at this trial are represented by counsel, others are not. The government respectfully submits to the Court that it is not for Mr. Knight to demand, or decide, whether other individuals are represented by counsel.

### K. Early Disclosure of Jury Venire

Mr. Knight also requests the "name and personal information" of prospective jurors be provided as early as possible. Doc. No. 859 at 21–23. The government generally does not oppose the Court and the Clerk complying with its standard practice to provide some information regarding the jury venire. To the extent that the defendant is requesting information beyond that which is ordinarily provided, such as personal identification information, such a request should be denied.

### VII. Response to Defendants' Supplemental Brady Motions

On Monday, April 20, 2026, Mr. Gerace filed a supplemental *Brady* motion, referencing multiple recent *Brady* disclosures. *See* Dkt. 868. As described below, the premise of the motion—that multiple disclosures have been delayed or information suppressed—is flawed and inaccurate, and relates to material turned over in time for Mr. Gerace to make effective use of it at trial. Mr. Hinkle joined the motion but raised no additional arguments. *See* Dkt. 870. Mr. Knight joined the motion and filed a four-page affirmation laying out facts (from the Discovery provided by the government) that he thinks cut against the government's

49

theory, but which have nothing to do with alleged delayed *Brady* disclosures. *See* Dkt. 872. Mr. Roncone joined the motion and filed a five-page declaration raising additional arguments about the government's disclosure, including an argument about one additional document disclosed by the government on March 16, 2026. *See* Dkt. 877. Mr. Gogolack joined the motion, raising additional claims about material, which he calls Brady material, that was produced in discovery VOL 001 in May 2024. *See* Gogolack Mot. To Join (April 24, 2026, No Doc. No. Assigned yet).

### A. Factual Background

### 1. The Dr. Hail Disclosure

On February 17, 2026, the trial attorneys for the government for this matter had a Microsoft Teams meeting with Dr. Stacey Hail, who had conducted a preliminary review of materials related to this case and whom the government was considering calling as an Expert Witness at trial. During the Teams meeting, Dr. Hail explained to the government attorneys, in sum and substance, that quantitative drug-levels from a post-mortem blood draw are not necessarily representative of the amount of fentanyl present in the body pre-mortem. Based on the conversation, the government did not anticipate Dr. Hail to attribute significance to the quantitative levels of fentanyl reflected in a post-mortem blood draw.

During the meeting, the government asked Dr. Hail to be sure to include her findings/opinions on that topic in her written report for this case. As the Court can no doubt imagine, Dr. Hail speaks at a very precise, nuanced, and high level on her topics of expertise —and has an understanding of the subject matter far exceeding that of the government attorneys. The government asked Dr. Hail to explain her position regarding the significance of post-mortem blood levels in her written report with the expectation that by providing Dr.

Hail's report to defense counsel, the government would accurately and completely discharge any *Brady* obligations it had with respect to Dr. Hail's opinions. The call concluded with Dr. Hail requesting additional information and material from the government in order to generate her final report. Ultimately, Dr. Hail provided her report on April 7, 2026.

Separately, in early March 2026, the government was working towards generating a thorough and detailed pretrial memorandum of law regarding two topics that this Court had requested advanced briefing on. While generating that brief, the government realized that, although it hadn't yet received a report from Dr. Hail, it had to notify the Court and defense counsel about the information learned during the Microsoft Teams call in order to fairly, honestly, and accurately litigate the issues. The government decided to disclose, the information in a detailed footnote in what it believed was the relevant and appropriate portion of the brief. The footnote, generated by AUSAs with a far less nuanced understanding of the topic than Dr. Hail, was designed to put both the Court and defense counsel on notice of information the government had learned three weeks earlier but which was not yet part of a formal report (which would have been the government's preferred, more precise and accurate, method of disclosure). The footnote, in its entirety, is depicted below:

---

[30] The government has previously represented that Ms. Quinn had 400 times a potentially lethal limit of fentanyl in her blood as evidence of her intentional killing. That representation was based on the evidence available to the government at the time, which included toxicology report, autopsy report, and testimony of Dr. Richard Scott. Recently, in preparation for trial, the government has consulted with an expert witness in the field of toxicology. The government anticipates that expert will testify that the amount of fentanyl contained in a post-mortem blood draw is not necessarily representative of the amount of fentanyl present in the body pre-mortem. Although the government anticipates that witness will testify that Ms. Quinn died of a drug-overdose, the government does not anticipate that witness will attribute significance to the quantitative levels reflected in the post-mortem blood draw. That expert witness has not yet provided the government with a written report regarding her findings; however such report will be produced upon receipt.

122

51

At oral argument, on April 6, 2026, this Court questioned the government about this new information and advised the government, in sum and substance, that a disclosure of such significance would have been better-disclosed in a letter to the Court and defense counsel as opposed to being contained within a footnote. The government accepted the critique and noted for the Court (by way of explanation) that it had been intending on disclosing the information in the expert's formal report, to ensure that the disclosure was precise and accurate. The government indicated that, since it had not received a report by the time that the March 11-filing was due, and felt that disclosure was necessary in the March 11 filing, it chose to make the disclosure in a footnote. At that appearance, the Court ordered that Dr. Hail's report be produced no later than April 10, 2026, and that the Court and defense counsel be provided a copy as soon as it was received.

On April 7, 2026, at about 4:21 p.m., Dr. Hail produced her report to the government. At 4:48 p.m., less than 30 minutes later, the government provided Dr. Hail's report to the Court and defense counsel via USAfx. The government had wanted to hold off on providing a "sum and substance" disclosure of Dr. Hails statements during the Microsoft Teams call, instead waiting for a formal report, because the government wanted to be precise and accurate about complex and nuanced subject matter. Ultimately, those concerns were well-founded. Dr. Hail's nuanced, detailed, precise and accurate report included the following statements:

52

> when determining cause of death.  Postmortem concentrations must be considered within the context of the totality of the evidence.  In this case, the postmortem fentanyl concentration was 1,200 ng/mL in cardiac blood.  This concentration is orders of magnitude higher than what is typically seen in deaths during the illicit fentanyl crisis.  This high concentration may in be part due to the long postmortem interval and the degree of decomposition but may also reflect an extremely high dose of fentanyl administered.  If fentanyl was administered orally, more likely than CQ was administered a large dose.
> Unlike other routes of exposure such as intranasal or injection where respiratory

Dr. Hail Report, pg. 17.

## TOXICOLOGICAL CAUSE OF DEATH

> When determining a potential toxicological cause of death, the substances found in the blood or the vitreous humor are most likely to have exerted effects at or around the time of death. **Impairment, intoxication, and cause of death are not determined by drug concentrations alone**. A drug concentration, however, confirms the presence of that substance with no chance of a false positive result. Behavioral observations and/or perimortem circumstances **must** be correlated with drug concentrations to determine impairment, intoxication or cause of death.  In other words, the postmortem drug concentration must be interpreted in the context of the totality of the evidence.

Dr. Hail Report, pg. 3.

Dr. Hail's report provided detailed, specific references about the limitations of post-mortem quantitative drug levels, as depicted in part below:

53

**Interpretation of Postmortem Drug Levels**

It is well known in the toxicology community that there are no defined "lethal" levels for drugs. Ferner published an article in the British Journal of Clinical

3

Pharmacology in 2008. The article is entitled "Post-mortem clinical pharmacology." The abstract states:

*Clinical pharmacology assumes that deductions can be made about the concentrations of drugs from knowledge of the pharmacokinetic parameters in an individual; and that the effects are related to the measured concentration. Post-mortem changes render the assumptions of clinical pharmacology **largely invalid** and **make the interpretation of concentrations measured in post-mortem samples difficult or impossible**. Qualitative tests can show the presence of substances that were not present in life and can fail to detect substances that led to death. Quantitative analysis is subject to error, and because post-mortem concentrations vary in largely unpredictable ways with the site and time of sampling, because of the phenomenon of post-mortem redistribution. Consequently, compilations of 'lethal concentrations' are misleading. There is a lack of adequate studies of the true relationship between fatal events and the concentrations that can be measured subsequently, but without such studies, clinical pharmacologists and others should be **wary of interpreting post-mortem measurements**.[1] (bold emphasis added)*

This article also states, "Pharmacological assumptions of what can be deduced about the concentrations of drugs from knowledge of the pharmacokinetic parameters in an individual, and how the effects are related to the measured concentration that may be valid during life are often invalid after death. The mere presence of a drug, or its metabolites, in post-mortem tissue can be sufficient to reinforce suspicions of the link between the drug and the death.[1] Since 'lethal' drug testing has not been performed on human subjects, $LD_{50}$ (or the lethal dose that is lethal to 50% of a cohort) results are not known. In other words, no such data exists for human subjects and so lethal doses or lethal concentrations are NOT KNOWN."[1]

Dr. Hail Report, pgs. 3–4.

54

Dr. Hail contextualized this information in her report, including the following statements:

*Therefore, postmortem drug concentrations must not be interpreted "in a vacuum" and must be correlated with perimortem circumstances and the totality of the evidence.*

Notwithstanding, however, CQ's postmortem fentanyl concentration is 1,200 ng/mL. This postmortem fentanyl concentration is an outlier compared to reports in the medical and

4

forensic literature. Since the beginnings of the fentanyl crisis, I have stayed abreast of the literature and collected articles pertaining to postmortem fentanyl concentrations.[3,4,5,6] [*I generated this summary table using 4 well-known publications using artificial intelligence (ChatGPT) merely as a demonstrative*]:

## Summary of Postmortem Fentanyl Concentrations

| Study | Population / Context | Specimen | Low (ng/mL) | High (ng/mL) | Range (ng/mL) | Notes |
|---|---|---|---|---|---|---|
| Thompson et al., 2007 | 23 cases (overdose + incidental) | Blood | 5 | 152 | 5–152 | Overlap between fatal and incidental |
| Olson et al., 2010 (early) | PMR study | Femoral blood | <LOD | 14.6 | <LOD–14.6 | Early postmortem sample |
| Olson et al., 2010 (late) | PMR study | Femoral blood | 2.0 | 52.5 | 2.0–52.5 | Postmortem redistribution |
| Gill et al., 2012 | 92 patch-associated deaths | Blood | — | — | Mean ~11.8–26.4 | Wide overlap limits interpretation |
| Martinez et al., 2024 | 1,707 fentanyl-positive cases | Peripheral blood | 1.0 | 1,646 | 1.0–1,646 | Modern illicit fentanyl era |

Aside from the one extreme outlier in the Miami Dade Medical Examiner's report, CQ's postmortem fentanyl concentration is significantly higher than typical concentrations reported in the medical literature.

Dr. Hail Report, pgs. 4–5.

Ultimately, based on her actual written report, the government anticipates that Dr. Hail will testify that "**CQ's postmortem fentanyl concentration is significantly higher than typical concentrations reported in the medical literature**", that "**CQ would not have died but for opioid intoxication due to heroin, fentanyl, and acetylfentanyl**" and that "**Fentanyl is [ ] most likely the largest contributor to the but for opioid cause of death given its potency and <u>massive postmortem concentration</u>.**"

2. **The** ▮▮▮▮▮ **Disclosure**

▮▮▮▮▮ is a potential witness in this matter, as listed on the government's recently-filed witness list. On April 10, 2026, at 11:01 a.m., AUSA Cooper received a text message from attorney Jamie Auricchio indicating "*Nick, I've been retained by* ▮▮▮ *Give me a call at your convenience? – Jamie Auricchio*". On April 10, 2026, at 11:09 a.m., AUSA Cooper called attorney Jamie Auricchio. The phone call lasted about 14 minutes, ending at about 11:23 a.m. Four minutes after hanging up the phone with attorney Auricchio, at 11:27 a.m., AUSA Cooper sent the following email to all defense attorneys (including Mr. Foti and Ms. Meyers-Buth):



On April 10, 2026, at 12:36 p.m., AUSA Cooper called attorney Jamie Auricchio. That phone call lasted about 1 minute, ending at about 12:37 p.m. Seven minutes after hanging up

the phone with attorney Auricchio, at 12:44 p.m., AUSA Cooper sent the following email to all defense attorneys (including Mr. Foti and Ms. Meyers-Buth):



On April 10, 2026, at 1:14 p.m., attorney Cheryl Meyers-Buth responded to the government's email as follows:



In sum, the government disclosed the *Brady* information within two hours of receiving it, and received an email from Mr. Gerace's attorney expressing her appreciation that the government was "being up front and letting us know right away." Mr. Gerace's attorneys would ultimately take a tone of (manufactured) aggrievement, not appreciation, ten days later, when they removed the timeframe from the government's email and attempted to use it

as evidence of a pattern of delayed *Brady* disclosures.  That is why a thorough facts section is so necessary here.

### 3.  The ▮▮▮▮▮▮▮ Disclosure

Beginning on or about December 5, 2025, the FBI began the process of pulling, organizing, reviewing and ultimately producing to the USAO the serials in the file up through that date for a 3500/Jencks production.  On February 18, 2026, the FBI brought the government a drive containing potential Jencks/3500 material from that first "pull."  The material contained on that drive, after it was processed by the USAO, would ultimately constitute the majority of the material in the first batch of Jencks/3500 material produced on March 16, 2026.  That drive contained FBI serials from the origination of the case up through FBI serials that were finalized on or before December 5, 2025, with the plan to produce another drive containing more recent Serials shortly thereafter.

On December 10, 2025, the FBI conducted an interview of ▮▮▮▮▮▮▮  During the interview, ▮▮▮▮▮▮▮ made statements about his interactions with Crystal Quinn in July 2023 which constitute *Brady* material.  The FBI 302 report documenting the interview was drafted on December 10, 2025, and was finalized and entered into the FBI case file on December 30, 2025.

The first batch of 3500/Jencks Material went out on March 16, 2026, and included eleven (11) exhibits related to criminal history and social media research conducted on ▮▮ ▮▮▮▮▮ investigative work that occurred in or about November 12, 2025 (before the December 5, 2025 cutoff date when the FBI conducted its first "pull") but not the FBI 302 of his interview (which occurred after the December 5, 2025 "pull" had already occurred).

On or about March 6, 2026, the FBI produced a second drive containing potential Jencks/3500 material, including FBI Serials generated after the December 5, 2025 "pull". That batch was slated to be reviewed and produced as a part of the government's second Jencks/3500 production. Due to other pressing obligations in this case in March and early-April 2026, the government planned to review that second batch after it filed pretrial submissions on April 17, 2026.

On Saturday, April 18, 2026, the government turned back to the review and processing of Jencks/3500 material. During that review, the government read the details of the interview of ███████████ and noted that it was information that should be disclosed to the defense attorneys promptly. On Saturday, April 18, 2026, at 4:38 p.m., AUSA Cooper sent the following email to all defense attorneys (including Mr. Foti and Ms. Meyers-Buth):



Disclosure of ███████ 302

Cooper, Nicholas (USANYW)
To: mark_fotilaw.com; Cheryl Meyers Buth; dhenry_villoriniandhenry.com; fbogulski_yahoo.com; George V Muscato; dmthompson_etksdefense.com; Barry Donohue; Matthew Lembke; jenna@wojdanpricelaw.com; Paul Dell; +2 others
Cc: Chalbeck, Casey (USANYW); Violanti, Joshua (USANYW); Powers, Katerina (USANYW); Champoux, Karen (USANYW)

This is the most recent version, but you made changes to another copy. Click here to see the other versions.

Interview_of_███████.pdf
393 KB

Dear Counselors,

This afternoon, I am working through reviewing the next batch of 3500 material to produce to you all, and during that review I reviewed the attached 302. I am sending this 302 to you now, as opposed to waiting until the next batch of 3500 is ready to be produced.

I received this 302 in a production from the FBI on or about March 6, 2026, which was providing me with new 302s that had been generated in the case. I began reviewing the production this afternoon, to produce the next round of 3500 material.

Sincerely,

Nick

Less than an hour later, Ms. Meyers-Buth responded with the following email:

59



The second batch of Jencks/3500 is expected to be produced on or about April 27, 2026, but the ▊▊▊▊ 302 was sent to the defense teams about 10 days earlier than that, once it came onto the radar of the government attorneys. The ▊▊▊▊ 302 was disclosed about 51 days before trial is expected to commence.

### 4. The Sharon Quinn Disclosure

On November 10, 2025, Sharon Quinn was interviewed by the FBI and provided information regarding what Crystal had told her about being raped, including where it had occurred. In the interview, Sharon Quinn advised the FBI that ▊▊▊▊ would likely know more about it because he was dating her at the time. The 302 of the interview was drafted on November 12, 2025, and was finalized and entered into the FBI case file on November 17, 2025. Since that 302 was entered into the file before the December 5, 2025 "pull", it was provided by the FBI to the USAO on February 18, 2026. The 302 was disclosed on March 16, 2026, as Gov. Ex. 3634G, a full 84 days before the trial.

███████████████████████████████████████████████████████

████████████████████████████.

### 5. The Bernard Byrd Interview

On January 9, 2024, FBI agents interviewed Bernard Byrd III at a local hospital, where he had been placed under arrest pursuant to the Second Superseding Indictment. The interview was audio recorded. During the interview, Mr. Byrd indicates that he is not familiar with some of the slang referenced in his text communications with Gogolack. Also during the interview, the following exchange between the agent and Mr. Byrd took place (approx. 33:55 to 35:00 into the second recording)[14]:

> SA Bender: Didn't he offer you some services…and I'm not saying you accepted them…but wasn't he always trying to get you to let him do stuff for you?
>
> Byrd: Say that again.
>
> SA Bender: Wasn't he always trying to let you…to get you to let him do stuff for you?
>
> Byrd: Yah.
>
> SA Bender: Like what?
>
> Byrd: Let him work for me. Let him work for me. And all that type a shit.
>
> SA Bender: Okay, and what type of work did he offer to do?
>
> Byrd: Anything, [unintelligible], anything, anything, rob, steal, fucking kill, rape, any fucking thing.

Mr. Byrd goes on in the interview to indicate that he doesn't remember a specific conversation where Mr. Gogolack offered to kill anyone specifically. When asked a few minutes later (approx. 40:45) if Mr. Gogolack ever talked about beating anyone up or killing

---

[14] To avoid any confusion, this is not from a transcript, but from the AUSA listening to the recording and typing out what he heard into this brief.

them for him (Mr. Byrd), Mr. Byrd responded "We've talked about it, have we done it? No."
When Mr. Byrd mentions "Pro-Clean" later on in the interview (about 55:00), it appears the discussion is in reference to a contact stored in his phone, and it was a company that he (Mr. Byrd) indicated that he had worked for in the past.

The audio recording was produced in VOL 001 of discovery in this case, in or about June 4, 2024. The recordings are not bates-numbered because they were natively produced, and they appear in the VOL 001 index as follows:

| 002. DIGITAL EVIDENCE ITEMS PROVIDED NATIVELY |
| --- |
| **001. AUDIO/VIDEO** |
| 1D3_281P_Aerial Surveillance_Wellsville_2023-11-06 |
| 1D4_58A_Aerial Surveillance_2023-10-19 |
| 1D4_281P_Aerial Surveillance_Buffalo&Wellsville_2023-11-30 |
| 1D5_58A Aerial Surverillance_2023-10-23 |
| 1D5_281P_Aerial Surveillance_Buffalo_2023-12-05 |
| 1D6_58A_Aerial Surveillance_2023-10-24 |
| 1D6_281P_2023-11-30 to 2023-12-15_41 Richmond & 19 Gratton Intercept |
| 1D7_58A_2023-11-3 to 2023-11-6_80 Stevens, Wellsville_Intercept |
| 1D7_281P_2023-11-30 to 2023-12-15_417 Northumberland |
| 1D8_281P_Custodial Interview_▓▓▓▓▓▓▓2024-01-2024 |
| Jail Calls |
| Jail Calls\Barber |
| Jail Calls\Barnes |
| Jail Calls\Ermin |
| Jail Calls\Gerace |
| Jail Calls\Gogolack |
| Jail Calls\Hinkle |
| Jail Calls\Roncone |
| UID 1065 1A27 DPD_Arrests_Quinn UID 1065 1A27 DPD |
| UID_12_Interview footage DPD_Gogolack |
| UID_160_Recorded Interview of Frank Knight 8_3_23 |
| UID_292 DPD body cam_Gogolack |
| UID_357_Knight Interview 10_24_23 |
| UID_365 Hinkle\Interview23-mj-5213\UID_365 Hinkle Recording from interview Room on 10-24-23 |
| UID_757 Barber Video |
| UIDs_160_357_Knight\Interview\UID_160_Recorded Interview of Frank Knight 8_3_23 |
| UIDs_160_357_Knight\Interview\UID_357_Knight Interview 10_24_23 |
| UIDs_344_346_774_WellesvilleVPD\Poker Games\UID_344_Wellsville Fire Hall Security Camera Footage from 7-27-23 |
| UIDs_344_346_774_WellesvilleVPD\Poker Games\UID_346_Wellsville Fire Hall Security Camera Footage from 8-3-23 |
| UIDs_344_346_774_WellesvilleVPD\Poker Games\UID_774 7_27_23 compilation |

On April 22, 2026, counsel for Mr. Gogolack asked the government via email for the "302 and any notes or transcripts of Bernard Byrd's interview". The government, trying to be helpful, responded seven minutes later and advised Mr. Kooshoian that the interview was recorded, that there was no transcript of the recording, that the FBI "FD-1087" report

documenting the CD containing the recorded interview can be found at GOV-00000276 in VOL 001 of the discovery.  The government also provided a highlighted screenshot of the VOL 001 discovery index flagging for Mr. Kooshoian where he could find the recording.  Mr. Kooshoian responded again, attaching a 302 documenting Mr. Byrd's arrest, which references that a future 302 will be generated documenting the interview and attaching that Advice-of-Rights form.  Based on the new request from Mr. Kooshoian, the government confirmed with multiple people at the FBI, including SA Bender who conducted the interview of Mr. Byrd that no such 302 documenting the interview was ever generated.  The government responded to Mr. Kooshoian on April 22, 2026 at 3:13 p.m., advising him that "I have confirmed with the FBI that no such 302 exists."  The government explained that it did not believe any notes of the interview existed either, since the interview was audio recorded, and agreed to check and confirm that.  The government has checked and can confirm that there were no notes of the interview generated.

Mr. Gogolack's defense team has had the audio recording of Mr. Byrd's interview for nearly 2 years.  Nothing was suppressed—the literal recording of the interview was produced in June 2024, over two years before the trial date.  Mr. Byrd died from cancer on November 2, 2024, approximately 5 months after his recorded interview had been produced in discovery. It was a part of the record in this case that Mr. Byrd was very sick at the time he was arrested (*see* Dkt. 36, Minute Entry, January 10, 2024), and he appeared at numerous court appearances and the status of his health was apparent.  The government in no way suppressed the information contained in Mr. Byrd's interview, it was produced in the first volume of discovery in this Second Superseding Indictment, and was possessed by Mr. Gogolack's first attorney for five months before Mr. Byrd died.

B. **Legal Framework**

The government must disclose evidence favorable to the accused when it is material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194 (1963). Indeed, *Brady* and its progeny require the Government to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *United States v. Rodriguez*, 496 F.3d 221 at 226 (2d Cir. 2007). To demonstrate a *Brady* violation, a defendant must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice. *See United States v. Coppa*, 267 F.3d 132, 140 (2d Cir.2001). First, information is "suppressed" when a prosecutor, whether in good or bad faith, fails to disclose "known, favorable evidence rising to a material level." *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (emphasis added); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) (holding the government must disclose only "information which had been known to the prosecution but unknown to the defense"); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (*Brady* extends only to evidence "that is known to the prosecutor"). Furthermore, the Second Circuit has repeatedly held that "[e]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Ramsey*, No. 20-860, 2021 WL 5022640, at *2 (2d Cir. Oct. 29, 2021).

Second, pursuant to *Brady*, favorable material encompasses impeachment evidence, which is "evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Avellino*, 136 F.3d at 255. Impeachment evidence, however, is not material "when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be

64

questionable." *United States v. Hunter*, 32 F.4th 22 at 34 (2d Cir. 2022).  That is, impeachment evidence is not material when it is cumulative.  *See id.* ("[I]mpeachment based on withheld information would have been cumulative.") (citing *Avellino*, 136 F.3d at 257 ("[U]ndisclosed evidence may be cumulative, and hence not material.")).  "Undisclosed impeachment evidence may be material where the witness in question supplied the only evidence linking the defendant to the crime," but "where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." *United States v. Murphy*, No. 23-6470, 2024 WL 3264127 (2d Cir. July 2, 2024).

Third, "a defendant must show that he was prejudiced by the prosecution's failure to disclose." *Hunter*, 32 F.4th at 31.  "With respect to when the prosecution must make a disclosure required by *Brady*, the law . . . appears to be settled. *Brady* material must be disclosed in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 1992).  Indeed, the *Coppa* court held that:

> **[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.**  There is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial.

*Id.* at 144 (emphasis added).

The Second Circuit has indicated that there is no general duty on the government to disclose *Brady* material before trial. *See United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n.1 (2d Cir. 1974); *see also United States v. Persico*, 645 F.3d 85, 111–12 (2d Cir. 2011) (disclosure on the fourth day of trial that continued for six weeks was sufficient); *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988) (no *Brady* violation in failure to make pretrial disclosure where defendant failed to show prejudice); *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)

65

(government had no obligation to disclose cooperating witness's vacillation before trial). Nor is the government obligated to make disclosure of *Brady* information immediately upon request of the defense. *See Coppa (In re United States)*, 267 F.3d at 144.  Instead, the touchstone for determining the proper timing for the disclosure of *Brady* material is whether the defense has an opportunity to make effective use of the information at trial. *See Coppa (In re United States)*, 267 F.3d at 135; Leka, 257 F.3d at 100.  However, the Second Circuit has found that the failure to make pretrial disclosure of exculpatory information violates the *Brady* doctrine when it deprives the defense of a reasonable opportunity to investigate the information or otherwise use it effectively. *See Grant v. Alldredge*, 498 F.2d 376, 382 & n.7 (2d Cir. 1974) (pretrial failure to disclose that witness had identified man other than defendant as robber deprived defense of opportunity to investigate other suspect).

"[A] disclosure made on the eve of trial (or after trial has begun) may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage." *Leka*, 257 F.3d at 101 (disclosure of identity of exculpatory witness three business days before trial was insufficient where defense did not have adequate opportunity to investigate witness's potential testimony); *see also DiSimone*, 461 F.3d at 196–97 (exculpatory information not disclosed until near the end of the prosecution's case was "suppressed" for Brady purposes where earlier disclosure could have altered defense strategy); Gil, 297 F.3d at 106–07 (document was "suppressed" even though it was turned over to defense three days before trial, where it was part of 3,000-page production of "3500 material" and defense "was not in a position to read it, identify its usefulness, and use it"). *But see Douglas*, 525 F.3d at 245–46 (no suppression where documents were turned over one business day before trial as part of 290 pages of "3500 material" and documents were "easily found

and fathomed"); *Rittweger*, 524 F.3d at 182 (although government's disclosure of exculpatory information the week of trial was "troublesome," no *Brady* violation occurred where defense made effective use of information at trial).

### C. Analysis

Mr. Gerace cannot credibly claim that he is unable to effectively make use of the information contained in the ███████ 302. The trial has not happened yet. The jury has not been selected yet. Not a single witness has testified yet. The nature of the information contained in the 302—claims by ███████████ that Ms. Quinn made statements contemplating suicide—is information that the defense has had generally (though not specifically from ███████████ for years in this case. The defense is free to put ███████████ on their witness list, subpoena him, and attempt to elicit the statements that are documented in the 302. Should they so choose, the defense can send investigators to meet with ███ ███████ and ask him follow-up questions. The 302 was produced with plenty of time for Mr. Gerace, or any other defendant in this case, to make effective use of it. Therefore, the government did not deprive the defendants of due process of law simply because it did not produce the evidence sooner. <u>To be clear, the government would have preferred to do so sooner.</u> As discussed *infra*, the ███████ disclosure was produced nearly immediately, and therefore no person could sincerely or credibly argue that it was anything other than the government doing exactly what it was supposed to do.

In his Supplemental Motion, in the section entitled "Legal Standard", Mr. Gerace addresses his view of the legal standard for *Brady* disclosures which are not "prompt" or "timely" *Brady* disclosures. Dkt. 868 at 3–5. Mr. Gerace opens his "Argument" section with

the following sentence, designed to grab the Court's attention and attempt to establish a

pattern of delayed *Brady* disclosures:

"In just over a week, the government has made two *Brady* disclosures." *Id.* at 5.

Mr. Gerace then proceeds to reference the ▆▆▆ ▆ disclosure, as depicted below:



**ARGUMENT**

In just over a week, the government has made two *Brady* disclosures.

The first was a telephone call between an AUSA and the James Auricchio, the

lawyer for ▆▆▆▆▆ was a close friend of Quinn who she texted in the days

before her death. The government disclosed the following:

> During the phone call with Mr. Auricchio, Mr. Auricchio advised us that, in sum and substance, ▆▆ opined to him that Crystal Quinn committed suicide. Mr. Auricchio further advised us that while he continued to discuss that topic with ▆▆▆▆ "walked that back" and indicated that he was not sure one way or the other."

[See email dated April 10, 2026, attached as Exhibit A.]

Frustratingly, Mr. Gerace removed one crucial sentence from that paragraph when he

re-typed it into his motion as depicted above. The sentence that Mr. Gerace removed[15] is the

sentence that would establish conclusively that the ▆▆ ▆ Disclosure occurred the very

same day that the government became aware of the information. Although Mr. Gerace

indicated (as depicted above) that he would provide the actual email to the Court as Exhibit

A, he failed to do so. When the government flagged this for Mr. Gerace's attorneys in an

email—expressing frustration with the sentence cropped out of the email and asking why the

---

[15] The sentence that was removed (with some emphasis added) read "**This morning,** Ms. Chalbeck and I had a phone call with attorney Jamie Auricchio regarding his recent retention by potential witness ▆▆▆▆

entire email was not produced to the Court—the attorneys indicated that they thought it was supposed to be included in their filing and would "circle back."

Had Mr. Gerace left the disclosure in its proper context (by choosing not to remove a crucial sentence), the ▮▮▮▮▮▮ Disclosure would clearly do nothing to advance his inference/argument that **delayed** *Brady* disclosures have happened twice in one week. The actual facts regarding the ▮▮▮▮▮ Disclosure, including the fact that it was made less than 2 hours after the information became available to the government, cuts *against* the defendant's argument that the government has done something wrong here. In reality, there is nothing wrong with the fact that "in just over a week, the government has made two *Brady* disclosures." That is what the government is supposed to do when it comes into possession of *Brady* material. But the defendant needs a narrative of government misconduct to support his argument for dismissal, and so he creates one. Had Mr. Gerace chosen to be candid regarding the timing of the ▮▮▮▮▮▮ Disclosure, there would have been no reason to include it in his motion at all. When left unedited, and presented to the Court transparently, it is an example of the government doing exactly what it is supposed to do. But apparently that did not fit the narrative.

The Court may think, "*maybe Mr. Gerace or his attorneys didn't realize that the ▮▮▮▮▮▮ Disclosure was made so promptly, and they just so happened to delete that sentence from the government's email.*" Not so. As depicted in the government's factual section *supra*, Mr. Gerace's attorneys actually emailed the government within 30 minutes of the disclosure **thanking the government for "being upfront and letting us know right away**." Just ten short days later, Mr. Gerace re-wrote history and turned the prompt *Brady* disclosure into a tool to achieve their desired ends. There was no other reason to include it.

With regard to the disclosure of the ███████ 302, Mr. Gerace claims that "the timing of the disclosure begs the question why the FBI case agent who interviewed the witness did not provide it to [AUSA Cooper] for 3 months, why nobody flagged it as Brady material, and why the defense is seeing it for the first time four months after the interview occurred."[16] The government answered most of those questions in its facts section *supra*. The FBI case agent provided it to AUSA Cooper on or about March 6, 2026, in accordance with their schedule and process for intaking (relatively) recent FBI 302s for Jencks/3500 review, which generally included material from after the December 5, 2025, "pull" of material that had been included in the first batch. The report *was* flagged as *Brady* material, when AUSA Cooper read it on April 18, 2026, which explains why it was sent out, separately and immediately, before the second batch of 3500 material.

While Mr. Gerace acknowledges that "this information was provided six weeks before trial"[17] he complains that it was disclosed "2-1/2 years into the prosecution" but that, too, is misleading. The interview of ███████ occurred on December 10, 2025, and therefore could not have been disclosed (because it had not happened yet and did not exist) for the first 23 months out of the 27 months since the return of the Second Superseding Indictment. Said another way the information was disclosed four months after it was obtained—not 2 ½ years after.

In a perfect world, the interview would have been flagged earlier, which would have caused it to be disclosed earlier. However, the law does not expect that we live in a perfect world, and the law does not require that *Brady* material be turned over immediately. Rather,

---

[16]     The government notes that Mr. Gerace's attorneys noted in their filing that they did not doubt AUSA Cooper "turned it over as soon as he read it." The government appreciates that.

[17]     It was actually over seven weeks, or to be more precise, 51 days before trial.

the standard is that *Brady* material be turned over in time for a defendant to make effective use of it.  That is what happened here.

Next, Mr. Gerace raises his arguments regarding the disclosure of the Dr. Hail information gleaned from the Microsoft Teams call.  Unable to argue that the information was suppressed (it wasn't) or that it wasn't timely disclosed (it was disclosed within about 3 weeks of learning of it, and nearly 3 months before the trial), Mr. Gerace echoes the Court's concerns with the manner in which it was disclosed: in a footnote of a filing.  The government explained *supra* in its facts section (and on the record in Court at the April 6 status conference) why it had been hoping to be able to make the disclosure as part of a formal report.  When the government believed it needed to alert the Court and the parties to the information (as best it could) for the purposes of the March 11 filing, the government disclosed the information.  The government listened to, understood, and respectfully accepted the Court's criticism regarding its decision to make the disclosure in a footnote, as opposed to a separate letter.  However, best practices aside, the fact remains that the government did in fact make the disclosure.

And as it turns out, the government's footnote-disclosure made the information seem worse for the government than it actually was.  As noted in the facts section *supra*, Dr. Hail's actual report, documenting her actual opinions and findings, largely supports the government's contention since the beginning of this case that Ms. Quinn was found dead with a *massive* dose of fentanyl in her blood.  In fact, to quote Dr. Hail "CQ's postmortem fentanyl concentration is 1,200 ng/mL" which is "an outlier compared to reports in the medical and forensic literature, and "aside from [ ] one extreme outlier . . . CQ's postmortem fentanyl concentration is significantly higher than typical concentrations reported in the medical

71

literature" and was "orders of magnitude higher than what is typically seen in deaths during the illicit fentanyl crisis."

To be sure, Dr. Hail cites to medical literature in her report which indicates that "since lethal drug testing has not been performed on human subjects" "lethal doses or lethal concentrations are not known" and also cites to literature that "post-mortem changes make the interpretation of concentrations…difficult or impossible." This information, to the extent it contradicts representations made by the government (based upon the toxicology report, autopsy report, and information it had available to it at the time), was disclosed on March 11, 2026 (in the footnote in the government's filing) and was disclosed much more precisely in Dr. Hail's formal written report. Once again, no prejudice has occurred here. Mr. Gerace criticizes the timing of when the government chose to retain an expert witness for trial, but that has nothing to do with alleged *Brady* violations. While they have no burden of proof, the defendants have always been free to retain their own experts or present their own proof to the Court. When the government became aware of potential *Brady/Giglio* material related to the medical evidence, it disclosed it—just as it is supposed to.

Finally, Mr. Gerace ices the cake with mention of things that have nothing to do with the facts or law regarding his instant motion. He brings up a since-vacated bad faith finding related to discovery production in this case in May 2024 in a thinly veiled attempt to use a vacated decision by the Magistrate Court to explain why his instant motion should somehow be taken more seriously. He brings up a decision from the *United States v. Parks* to bootstrap what happened in other cases onto his own insufficient arguments. Mr. Gerace then cites to a defense sentencing memorandum from *United States v. Trotter* to express their general displeasure with the government and its charging decisions. This seemingly has nothing to

72

do with the defendant's Supplemental Brady motion at all. All this on the heels of Mr. Gerace's decision in his own brief to remove an important contextual sentence when quoting from an email to infer (without stating directly) that it represented an untimely or delayed *Brady* disclosure when that couldn't be further from the truth.

Mr. Gerace concludes with arguments that he is too busy reviewing Jencks/3500 material to make effective use of a two-page 302 report disclosed 51 days before trial. This ignores the reality that he could make effective use of the document by calling the person as a witness to testify at the trial. Mr. Gerace has two experienced attorneys and an unknown number of other staff working on his defense, and by the time the trial begins they will have had 51 days to fully investigate the two-page 302 report and make effective use of it. To the extent that the defendant claims in this motion, and his subsequent motion to adjourn the trial, that he does not have enough time to review the 3500 material, the government has one final fact for the Court. The first batch of 3500 material was made available on March 16, 2026. And while one of Mr. Gerace's attorneys came to pick up their copy the very next day, the other attorney did not come to retrieve their copy until April 10, 2026, nearly a month later. That is not the fault of the government.

Mr. Gogolack's claimed *Brady* violation fails with even minimal scrutiny. The recording of the FBI's interview with Mr. Byrd was timely disclosed nearly two years in advance of trial and five months before Mr. Byrd died. Mr. Gogolack complains that a 302 documenting or transcribing the interview—a 302 which he has been told was never generated and does not exist—has not been turned over to him. But the government cannot produce that which does not exist. The best evidence of what Mr. Byrd said—the audio recording of his statements—has been produced since the first production of discovery.

Mr. Roncone's motion about the timing of disclosures regarding ███████ statements and Sharon Quinn's statements is likely mooted by the government's revised position with respect to that area of proof. However, regardless of that, the government has explained the timing of its disclosures and the material was provided to the defendant nearly 3 months before the inception of the trial on June 8, 2026, enough time for him to have made effective use of it at trial.

Mr. Knight's motion, which lays out a timeline of purportedly exculpatory information, does not provide evidence of any exculpatory information being suppressed. On the contrary, Mr. Knight references a list of items—produced to him in Rule 16 discovery—which he thinks are exculpatory. The mere existence of exculpatory information does not equate to a *Brady* violation, where as here, the information was produced, as Mr. Knight himself seems to acknowledge because he cites to bates-numbered citations. Mr. Knight makes no effort to explain what material he is claiming was withheld, provides the Court with no timeline explaining when it was produced, and utterly fails to establish that any *Brady* violation occurred.

## VIII.  CONCLUSION

For the reasons stated above, the government respectfully requests that the Court grant the relief requested herein.

DATED:  Buffalo, New York, April 24, 2026.

MICHAEL DIGIACOMO
United States Attorney

74

BY:   s/ NICHOLAS T. COOPER
        s/ CASEY L. CHALBECK
        s/KATERINA F. POWERS
        Assistant United States Attorneys
        United States Attorney's Office
        Western District of New York
        100 State Street
        Rochester, New York 14614
        585-935-7512
        Nicholas.Cooper@usdoj.gov

75