

**U.S. Department of Justice**

*United States Attorney*
*Western District of New York*

| | |
|---|---|
| *Federal Center* | *716.843.5700* |
| *138 Delaware Avenue* | *Fax:   716.551.3052* |
| *Buffalo, New York   14202* | *Writer's Telephone:   716.843.5881* |
| | *Writer's fax:   716.551.3052* |
| | *Casey.Chalbeck@usdoj.gov* |

May 8, 2026

**VIA PACER**
Hon. Elizabeth A. Wolford
Chief United States District Judge
Kenneth B. Keating Federal Building
100 State Street
Rochester, New York 14614

Re:   ***United States of America v. Gogolack*, et al.,**
          **Case Number: 23-CR-99-EAW**

Dear Chief Judge Wolford:

Enclosed please find a revised table of Crystal Quinn's testimonial and non-testimonial statements that the government seeks to introduce pursuant to Federal Rule of Evidence 804(b)(6), other hearsay exceptions, and as non-hearsay.   The table of statements identifies the 3500 or trial exhibit number containing Ms. Quinn's statements.   Those exhibits are also enclosed, with the relevant statements highlighted for the Court and the parties' convenience.[1]

The Court should admit thirty-three sets of Ms. Quinn's statements, including all but approximately seven pages of her grand jury testimony (*see* Table at No. 15).   Statements 1 through 16 are testimonial and only admissible pursuant to Rule 804(b)(6).   Regarding these statements, this letter focuses on their admissibility under Rule 403.   The statements are plainly relevant to establishing Mr. Gerace and Mr. Ermin's motive to tamper with and retaliate against Ms. Quinn, and are reliable—and, therefore, not unfairly prejudicial— because they are corroborated by other evidence in the investigation and in the 1:19-CR-227 trial.[2]

Statements 17 through 33 are non-testimonial and are admissible pursuant to Rule 804(b)(6), other hearsay exceptions or, where indicated, as non-hearsay.   Because the Court will not be positioned to decide the government's forfeiture-by-wrongdoing application until

---

[1]      The government is docketing this letter on PACER and will transmit unredacted versions of the enclosed table of statements and exhibits, which consist of protected 3500 material and discovery, under seal via USAFx.

[2]      Specific references to corroborating evidence can be found in Column E ("Corroborating Information") of the enclosed table of statements.

near the end of the trial, this letter focuses on the admissibility of Ms. Quinn's non-testimonial hearsay statements pursuant to rules other than Rule 804(b)(6).

> **1. Statements 1 through 16 are corroborated by other evidence in the investigation and in Case No. 1:19-CR-227, and thus are more probative than unfairly prejudicial under Rule 403.**

To admit these statements, the government must first prove "by a preponderance of the evidence that (1) the defendant[s] . . . w[ere] involved in, or responsible for, procuring" Ms. Quinn's "unavailability . . . through knowledge, complicity, planning or in any other way, and (2) the defendant[s] . . . acted with the intent of procuring" Ms. Quinn's "unavailability as an actual or potential witness." *United States v. Dhinsa*, 243 F.3d 635, 653–54 (2d Cir. 2001). If the government satisfies this two-part test, the Court must assess the statements against Rule 403 "to avoid the admission of facially unreliable hearsay." *Id.* at 654.

*Dhinsa*'s "facial unreliability" standard can be traced to *United States v. Aguiar*, 975 F.2d 25 (2d Cir. 1992), where the Second Circuit assumed without deciding that admitting "facially unreliable hearsay" under a forfeiture-by-wrongdoing theory, "would raise a due process issue." *Id.* at 47. In *Aguiar*, however, the Second Circuit concluded that the Rule 804(b)(6) hearsay was not unreliable because it was "corroborated" by other evidence. *See id.* Thus, though *Aguiar* does not speak to whether such corroboration is *necessary* to establish the hearsay's reliability, its reasoning compels the conclusion that such corroboration is *sufficient* to dispel any unreliability concerns. *See also United States v. Houlihan*, 92 F.3d 1271, 1282 (1st Cir. 1996) (rejecting the appellants' contention that the admission of a decedent's "out-of-court statements violated their rights to due process because the admissions allowed them to be convicted on the basis of unreliable evidence" where "[o]ther evidence abundantly corroborate[d] (and in many instances replicate[d]) [the decedent's] account").

That said, none of the Second Circuit's precedents condition the admissibility of otherwise forfeited hearsay upon the existence of corroborating evidence. As other courts have recognized, such a rule leaves the government in a "worse" position "than if the defendants had not murdered" the declarant and would incentivize the very wrongdoing that Rule 804(b)(6) aims to discourage. *United States v. White*, 116 F.3d 903, 913 (D.C. Cir. 1997). Nor do the standard's words suggest a heightened burden. The word "facially" means "concerned with or used in improving the appearance of the face." *Facially*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/facially, (last visited May 5, 2026). At most, "facially unreliable" hearsay refers to out-of-court statements that are, on their own terms, "untrustworthy." *Unreliable*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/unreliable, (last visited May 5, 2026). So, if an out-of-court declarant said, "the stoplight is red, no actually, maybe, it was yellow" such hearsay would be facially unreliable because the words, themselves, do not reliably communicate a factual assertion. None of Statements 1 through 16 are subject to such criticism. And to the extent that there are "factors which supposedly undermined" Ms. Quinn's reliability—impure motives and drug use, for example—they are "standard

2

imperfections for a witness of h[er] sort" that a "jury" should be permitted "to consider in deciding what weight (if any) to give [her] statements." *White*, 116 F.3d at 913.

In any event, this Court need not decide what quantum of reliability necessarily clears the "facial unreliability" hurdle, because, as in *Aguilar*, Ms. Quinn's testimonial statements are corroborated by other evidence from this investigation and the 1:19-CR-227 trial. *See Aguilar*, 975 F.2d at 47; *Houlihan*, 92 F.3d at 1282.   On this point, the government has further enclosed the following materials corroborating Ms. Quinn's statements:

1. GX-43A–C (text messages between Ms. Quinn and Michael Bly);

2. GX-3685A (G.J. Test of Michael Bly);

3. GX-21 (Facebook messages between Ms. Quinn and P.H.);

4. Government Response in Opposition to Mr. Gerace's Rule 29 and Rule 33 Motions, Dkt. 1608, *United States v. Gerace*, 1:19-CR-227, (dated Aug. 4, 2025);

5. The District Court's Decision and Order denying Mr. Gerace's Rule 29 and Rule 33 Motions, Dkt. 1683, *United States v. Gerace*, 1:19-CR-227, (dated Mar. 6, 2025);

6. Trial Transcript of Katrina Nigro's Testimony, *United States v. Gerace*, 1:19-CR-227, (dated Nov. 27, 2024);

7. Trial Transcript of former DEA Special Agent Anthony Casullo, *United States v. Gerace*, 1:19-CR-227, (dated Nov. 20, 2024);

8. Trial Transcript of former DEA Special Agent Anthony Casullo, Dkt. 1506, *United States v. Gerace*, 1:19-CR-227, (dated Nov. 21, 2024);

9. Trial Transcript of Doug Augustyniak, *United States v. Gerace*, 1:19-CR-227, (dated Dec. 10, 2024);

10. GOV-00029338 (photo of a sign prohibiting the possession of cell phones from inside the Outlaws Clubhouse); and

11. GOV-00029347 (photo of a sign prohibiting the possession of cell phones from inside the Outlaws Clubhouse).

Because Ms. Quinn's corroborated statements are more probative than they are unfairly prejudicial, they are admissible.

**2.  Statements 17 through 32 are admissible pursuant to other hearsay exceptions.**

In addition, the Court should admit Ms. Quinn's non-testimonial statements—Statements 17 through 32—pursuant to other hearsay exceptions or as non-hearsay.

First, the Court should admit Ms. Quinn's statement to J.R. that "Gerace had Quinn sleeping with police detectives and recorded videos to use as leverage/blackmail," as well as Ms. Quinn's assertion that she would have engaged in such activity independent of Mr. Gerace.  *See* Table at No. 17 (citing GX-3637A at 2 (Int. J.R. dated 11/7/2025)).  Ms. Quinn's statement is admissible pursuant to Rule 804(b)(3), as a statement against penal interest.  *See* Fed. R. Evid. 804(b)(3).  "A statement is against penal interest if 'a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest.'"  *United States v. Miller*, 954 F.3d 551, 563 (2d Cir. 2020) (quoting *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004), *supplemented*, 108 F. App'x 667 (2d Cir. 2004)).  Ms. Quinn's statement that she worked with Mr. Gerace to develop blackmail on police officers is plainly against her penal interest, as extortion by way of "expos[ing] a secret . . . whether true or false, tending to subject some person to hatred, contempt, or ridicule" is a crime under New York law.  N.Y. Pen. Law 155.05(e).

Though Ms. Quinn's statement is facially trustworthy because "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true," trial testimony from 1:19-CR-227 further supports its reliability.  *Miller*, 954 F.3d at 563 (internal quotations omitted).  For starters, evidence from the 1:19-CR-227 trial confirmed beyond a reasonable doubt that Mr. Gerace corruptly leveraged his relationship with former DEA Special Agent Joseph Bongiovanni.  *See* Dec. & Order, at 7, Dkt. 1683, *United States v. Gerace*, 1:19-CR-227, (dated Mar. 6, 2026) ("[T]here was more than enough evidence to support the jury's verdict that Gerace conspired with Bongiovanni to defraud the United States.").  That trial also contained evidence that Mr. Gerace corruptly leveraged his relationship with former State Supreme Court Justice John Michalski, from whom he received "favors" and to whom he "gave . . . thousands of dollars." *Id.* at 10.  This evidence shows that Mr. Gerace repeatedly cultivated relationships with some of our society's most powerful members—including members of law enforcement and the judiciary—to wield to his own advantage.  Though Ms. Quinn's candid disclosure to J.R. describes a different means Mr. Gerace employed to leverage those relationships, it describes the same genre of corruption that the 1:19-CR-227 trial firmly established.

Second, the Court should permit J.R. to testify that Ms. Quinn told him that she was cooperating with the FBI.  *See* Table at No. 18 (citing GX-3637A at 3 (Int. J. R. dated 11/7/2025)).  This statement is important to show the effect on the listener—J.R.—who responded by telling Ms. Quinn, in sum and substance, that she needed witness protection and was a "rat."  GX-3637A at 3.  That exchange is valuable to show Ms. Quinn's state of mind shortly before she departed for Wellsville, New York with Mr. Gogolack.

Third, the Court should admit Ms. Quinn's statements concerning her fear of Mr. Gerace and the "bikers" under Rule 803(3).  *See* Table at No. 19 (citing GX-3637A at 3 (Int. J.R. dated Nov. 7, 2025)); *id.* at No. 20 (citing GX-3634AA at 8:21-25 (G.J. Test. Sharon

4

Quinn)); *id.* at No. 21 (citing GX-3634AA at 9:07-16); *id.* at No. 26 (citing GX-3574V at 9:19-10:17 (G.J. Test. John Grieco)).   Rule 803(3) exempts statements "of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" from the bar against hearsay.   FED. R. EVID. 803(3).   Ms. Quinn's expressions of fear of Mr. Gerace and unspecified motorcycle clubs are statements of her "emotional . . . condition."   *Id.*   These statements are relevant to show why Ms. Quinn left the Buffalo, New York area to travel south to Wellsville, New York with Mr. Gogolack.   Moreover, in showing that Ms. Quinn feared for her safety—and took steps to protect herself by leaving for Wellsville—the statements directly rebut the suicide narrative that the defendants seek to advance at trial for the common-sense reason that self-preservationist efforts are inconsistent with suicidality.

Fourth, the Court should admit Ms. Quinn's directives to Sharon Quinn and John Grieco that they should "blame the FBI" if anything "happened" to her.   Table at No. 22 (citing GX-3634AA at 13:06-13 (G.J. Test. Sharon Quinn)); *id.* at 6 No. 21 (citing GX-3574V at 15:06-07 (G.J. Test. John Grieco)).   Ms. Quinn's command is not hearsay.   *See United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) (noting that orders are not hearsay).   The statements are relevant for two reasons.   First, they support the inference that Ms. Quinn was not planning on killing herself.   Suicide does not "happen" to someone: it is the self-annihilatory consequence of a set of decisions within the person's control.   Ms. Quinn's statement, by contrast, assumes that an external phenomenon may harm her—an event that she believed the FBI was ultimately responsible for setting into motion.   Second, the statements show that Ms. Quinn anticipated the likelihood of harm or death—an important insight into her state of mind that further explains her decision to travel to Wellsville with Mr. Gogolack.

Fifth, the Court should admit Ms. Quinn's statements to Sharon Quinn and John Grieco that Mr. Gogolack invited her to Wellsville, and that she planned to go there to rest and relax over the weekend.   *See* Table No. 23 (citing GX-3634AA at 17:02-10 (G.J. Test Sharon Quinn)); *id.* at No. 28 (citing GX-3574V at 19:17-20 (G.J. Test. John Grieco)).   Ms. Quinn's statements regarding her then-existing plans are admissible under Rule 803(3).   Insofar as Ms. Quinn also asserted that Mr. Gogolack invited her to Wellsville, her hearsay statement contains a statement from a party-opponent admissible pursuant to Rule 801(d)(2)(A).   Alternatively, Mr. Gogolack's invitation to Ms. Quinn is non-hearsay because an invitation by its very nature is more consistent with a question (i.e., "Would you like to come to Wellsville with me?" as opposed to a declaration.

Sixth, the Court should admit Ms. Quinn's statements to Sharon Quinn and John Grieco that she intended to come home from Wellsville.   *See* Table at No. 24 (GX-3634AA at 22:05-07 (G.J. Test Sharon Quinn)); *id.* at No. 25 (GX-3634AA at 22:22-25 (G.J. Test Sharon Quinn)); *id.* at No. 29 (GX-3574V at 24:06-10 (G.J. Test. John Grieco)); *id.* at No. 30 (GX-3574V at 26:03-05 (G.J. Test. John Grieco)).   As before, Ms. Quinn's expressions of her future intent and then-existing plans are classic Rule 803(3) statements.   That Ms. Quinn repeated the same intention to return home to multiple people underscores that these statements reliably reflected Ms. Quinn's state of mind.

Seventh, the Court should admit Ms. Quinn's statements to L.D. that "Simon was gone, and [that] she was making eggs" pursuant to Rule 803(1) and as non-hearsay.   Table at No. 31 (citing GX-3539A at 2).   Rule 803(1) exempts from the bar against hearsay "statement[s] describing or explaining an event or condition, made while or immediately after the declarant perceived it."   Fed. R. Evid. 803(1).   Ms. Quinn's statement to L.D. that she was actively cooking eggs in Simon's absence is a quintessential presence-sense impression. The statement is relevant because it shows that Ms. Quinn engaged in normal, every-day activities shortly before her death, and did not indicate that she felt suicidal or psychologically tormented.

Eighth, consistent with the government's Motions in Limine, the Court should admit Ms. Quinn's text messages with Mr. Gogolack and D.W.'s expired contact from the early morning hours of July 28, 2023, as excited utterances under Rule 803(2).   "For a statement to qualify as an excited utterance, the proponent of the exception must establish: '(1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event.'"   *United States v. Wilson*, 642 F. Supp. 3d 380, 389 (W.D.N.Y. 2022) (Wolford, C.J.) (quoting *United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003)).   The evidence satisfies this three-part test.

According to Paul Gogolack, Mr. Gogolack's father, Mr. Gogolack described Ms. Quinn as "terrified" when red lasers affixed to firearms beamed through a window in Mr. Gogolack's home.   GX-3566K at 15:13–16:05.   Later in the day of July 28, 2023, another witness, D.W., overheard Mr. Gogolack say that "an old friend" of Ms. Quinn's had recently visited Ms. Quinn. [3]   GX-3679D at 20:07–21:16.   In addition to the two sets of text messages—which corroborate one another by showing Ms. Quinn's frightened, real-time accounting of the armed confrontation as it unfolded—Ms. Quinn sent a "pin" of her location to her mother's email address at 5:28 a.m.   *See* GX-437M-Report and Attachment.   Ms. Quinn's actions show both that she responded to an event that made her believe her location was relevant, and that she was clear-headed enough to intentionally leave a digital footprint. Mr. Gogolack also left a digital footprint of his location when, around the same time, he used a police scanning application that would have alerted him to any incoming law enforcement response.   *See* GX-423AN.   When viewed in connection with the other evidence, Mr. Gogolack's use of the police scanner application supports the inference that Mr. Gogolack believed there to be an emergency event unfolding that could result in a 911 call.

In sum, Mr. Gogolack's statements to his father and D.W.; the text messages themselves, which show Ms. Quinn's panicked—but consistent—response to the unfolding events to two different people; Ms. Quinn's sharing of her location to her mother's email address; and Mr. Gogolack's download of the police scanner application all point to the existence of a "startling occurrence" that unfolded simultaneous to Ms. Quinn's text messages with Mr. Gogolack and D.W.'s expired contact.   *Wilson*, 642 F. Supp. 3d at 389.   Lastly, in recounting to the event as it unfolded, Ms. Quinn's text messages plainly "relate[] to the startling event."   *Id.*   Accordingly, the Court should permit the introduction of all of Ms.

---

[3]    On Tuesday, May 5, 2026, the government learned that D.W. had passed away.   Though D.W. will be unable to testify at trial, this Court "is not bound by evidence rules" when considering "any preliminary question about whether . . . evidence is admissible."   FED. R. EVID. 104(a).

Quinn's during the early morning hours of July 28, 2023, as excited utterances under Rule 803(2).

Please do not hesitate to contact me with any questions, comments, or concerns.


Respectfully,


Casey L. Chalbeck
Assistant United States Attorney


Encl. Table of Statements (via USAFx)
Encl. Crystal Quinn Statements (via USAFx)
Encl. Corroborating Evidence (via USAFx)

CC (via PACER):
Counsel of record.