UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                        23-CR-99-EAW

—vs—

FRANK KNIGHT,

                    *Defendant.*

FRANK KNIGHT'S MEMORANDUM IN OPPOSITION TO THE
GOVERNMENT'S MOTIONS IN LIMINE

The defendants have communicated with each other, and have essentially divided up the work in preparing responses in opposition to the government's pre-trial statement of facts and motions *in limine.*  The division of labor is based, in part, on the extent to which certain portions of the government's submission relate to a particular defendant's interest.

For our part, Mr. Knight submits this response in opposition on the issue of the government's request to introduce other act evidence against the defendants.

We expect other defendants may address this issue as well, but we have tried to be as comprehensive as possible in this response while paying particular attention to Mr. Knight's interest.

At the end of this submission, we have requested leave to join in arguments and objections of other defendants on other issues after we have had a chance to review them.

OBJECTION ADMISSION OF
EVIDENCE OF "OTHER CRIMES, WRONGS, OR ACTS"

The government seeks to introduce evidence of so-called other act or bad act evidence in its case in chief (ECF Doc. No. 925, pp. 11-52) (generally referred to herein as "other act evidence" or "other acts").

During our court proceeding on May 1, 2026, there was discussion on the record, raised by me, about whether other act evidence – and in particular, other act evidence admitted under Rule 404 (b) was admissible against only the defendant who is alleged to have committed the other act or acts, or whether this other act evidence is admissible against all the defendants.

The Court and the government seemed to imply that other act evidence is admissible against all defendants because there is a conspiracy charge in which all defendants are named. I inferred from the Court's comments that the presence of a conspiracy charge against all the defendants makes other act evidence admissible against all the defendants. I argued otherwise, and I continue to argue otherwise.

We do not dispute that there are, in the main, two evidentiary principles that determine the manner in which the admissibility of other act evidence should be determined by the Court. This depends on whether or not the other act evidence is "intrinsic" to the charged conspiracy. If it is, the exclusion of such evidence depends on the Court's analysis of whether, under Rule 403, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence.

"Intrinsic evidence" is evidence of uncharged acts that "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v Ilori*, 2022 US Dist. LEXIS 118185, at *10 [SDNY July 5, 2022, No. 21-cr-00746 (MKV)]; quoting *United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010), in turn quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

Other act evidence that is not "intrinsic" to the case is analyzed for admissibility under Rule 404 (b), with which the Court is familiar.  If other act evidence is <u>not</u> intrinsic to the charged crimes, then under Rule 404 (b) the evidence must be offered for a proper purpose, relevant, and substantially more probative than prejudicial. *United States v. Dowling*, 297 F. 3d 52, 58 (2nd Cir. 2002) (citations omitted). Even under the Second Circuit's inclusionary approach, however, "district courts should not presume that [other act] evidence is relevant or admissible." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  On the contrary, this other act evidence "is relevant only if the jury can reasonably conclude that the act occurred <u>and that the defendant was the actor</u>." *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (underlining added for emphasis). The Second Circuit has held it is plain error to introduce 404 (b) evidence where there exists no credible the evidence that the act was committed by the defendant. *United States v. Jean Baptiste*, 166 F.3d 102 (2d Cir. 1999).

As we stated in a previous submission, the Second Circuit has clearly cautioned the trial courts that '[t]here are few areas in which it is as important for

this court to keep a watchful eye as on the admissibility of similar offenses in a case involving more than a single defendant.'" *United States v. Figueroa*, 618 F.2d 934, 945 [2d Cir. 1980], quoting, *United States v. Rosenwasser*, 550 F.2d 806, 814 [2d Cir.] [dissenting opinion], *cert. denied,* 434 U.S. 825, 98 S. Ct. 73, 54 L. Ed. 2d 83 [1977]

The Second Circuit also said that

> [w]hen evidence is offered against one defendant in a joint trial, determination of admissibility against that defendant resolves only the Rule 403 balancing as to him, *i.e.*, that the probative value of the evidence in his "case" is not substantially outweighed by unfair prejudice to him. But if the evidence creates a significant risk of prejudice to the co-defendants, a further issue arises as to whether the evidence is admissible in a joint trial, even though limited by cautionary instructions to the "case" of a single defendant. That issue can be considered either as a question of admissibility of evidence or severance. If the justification for a joint trial is outweighed by the prejudice to the co-defendants, the trial court can confront the prosecutor with the choice of forgoing either the evidence or the joint trial.

*United States v. Figueroa*, 618 F.2d at 944 [citations omitted].

In the government's motion *in limine*, it requests that the Court permit it to introduce the following other act evidence:

1. The defendants' "affiliation" with the Rare Breed and Outlaws;

2. The Outlaws' "association" with the Rare Breed;

3. The Outlaws' "prior acts with Mr. Gerace";

4. The Outlaws' "institutional" commitment to harming witnesses;

5.  The Outlaws' "institutional" commitment to monitoring law enforcement investigations into the club;

6.  The Rare Breed's "efforts" to monitor law enforcement investigations;

7.  The Rare Breed's "institutional" commitment to harming witnesses;

8.  The Rare Breed's "prior acts" done at the request of the Outlaws;

9.  Simon Gogolack's alleged drug trafficking activities distributing Fentanyl and Xanax;

10.  Gogolack's prior "bad acts" of alleged kidnapping;

11.  Gogolack's alleged "prior acts" of false impersonation;

12.  Howard Hinkle's marijuana possession; and

13. Hinkle's firearm's possession.

We will discuss each of these below.  Based on our conversations with counsel for other defendants, we understand that some defendants will also address some of the government's proposed other act evidence as it pertains to them.

### *The Rare Breed, the Outlaws, the Defendants' "Affiliation" with the Rare Breed and Outlaws and the Outlaws "Association" with the Rare Breed (Nos. 1-8 Above)*

We are not entirely certain any defendant's "affiliation" or lack of "affiliation" with the Outlaws or the Rare Breed (or any other organization for that matter) is an "other act", such that it is subject to an analysis under Rule 404 (b) or Rule 403, or both.

The government's attempt to offer evidence of a defendant's affiliation with a motorcycle club is burdened by a different problem.  This problem is that it is irrelevant under Rule 401.

In this case, six men, in various combinations, are on trial <u>as individuals</u> for conspiracy to obstruct justice, conspiracy to tamper with a witness, conspiracy to retaliate against a witness, and substantive counts of drug distribution and lying to the government.

As we understand it, the government's theory of the case is, as follows:  Peter Gerace talked to John Ermin at the Niagara County jail.  There is no evidence of the content of this conversation.  Then Ermin talked to Mike Roncone. There is no evidence that any conversations were had between these two men between the time of the Gerace/Ermin meetings at the jail and July 31, 2023, the date when Crystal Quinn appears to have died (and there is certainly no evidence that they discussed killing anyone, let alone Crystal Quinn, who was, at best, an insignificant witness in 19-cr-227, and objectively, among the least of Peter Gerace's problems).

Regardless, and even if they did speak to one another, it is two individuals speaking with each other.  There is no evidence, of which we are aware, that—if Roncone and Ermin discussed Crystal Quinn's status as a witness—they were acting in their respective capacities as members of motorcycle clubs.  There is no evidence that they discussed their conversations with other members of motorcycle clubs.

If they did talk, and if they did formulate a plan to kill Crystal Quinn, then apparently the plan they formulated was to enlist the services of a drug-addled, erratic, mercurial, unpredictable ne'er-do-well, vagabond, and drug dealer in Wellsville (who hadn't been in touch with Crystal Quinn in years) to do the job.

Not a particularly solid plan so far.

And apparently, the manner in which this plan was to be carried out was for the assassin to connect up with Crystal, go to her house, meet her mother and her friend, bring her back to Wellsville in her own mother's car, accompany her around Wellsville so that people in that town were sure to know that the soon-to-be-murdered woman was with him before she was killed, including taking her to a card game attended by about a dozen people, spending time with her at his home in Wellsville, inviting his ex-girlfriend's then-thirteen year old son over to spend time with him and Crystal, allow Crystal to sit in the sun on his front porch to sun herself, permit her ex-girlfriend's new husband to come to the house to pick up the thirteen-year-old boy while Crystal was sitting on the porch, then later force Crystal—apparently at gun point—to ingest a lethal dose of Fentanyl, leave her dead body uncovered and in the open in his house for a day, then call 9-1-1 to report her death, and drive her mother's car back to Depew to deliver Crystal's personal property to her mother.

This is, indeed, a plan that could be described as questionable, at best. Flawed as it may seem, this is what we understand to be the way the government

claims this murder went down. But what it has to do with any defendant's "affiliation" or "association" with a motorcycle club is unclear, to say the least.

Now, perhaps John Ermin is a member of the Outlaws, M.C. And perhaps Mike Roncone is a member of the Rare Breed M.C. For all we know, they are also members of the Knights of Columbus, the ASPCA, the Buffalo Philharmonic Orchestra Board of Trustees, and volunteers at the Red Cross. It is reasonable to assume that, if this were the case, the government would not be trying to prove the various defendants' associations with these organizations. In fact, if they were members of these organizations and the defense attempted to prove their membership in them, undoubtedly the government would object on the grounds that the defendants' associations with these conventionally accepted wholesome organizations are irrelevant to whether they committed the crimes charged in this indictment.

The truth is that the only reason the government wants to admit evidence of motorcycle clubs, including all the pictures of the inside of club houses, the weapons, drugs, strippers, misogyny, slogans, rules, patches, "cuts", "colors", flags, rules, regulations, secrecy obligations, Nazi symbolism, and all the other things the government considers nefarious, is to silently (if not actually) attempt to persuade the jury that these must be bad men because they are members of motorcycle clubs, or they are friends with bad men who are members of motorcycle clubs. And from there, by speculation and innuendo, the government will permit the jurors to think that the defendants are "bad guys". And, of course, "bad guys" do bad things, including murdering government witnesses. This is propensity evidence, once (or

twice) removed.  It is propensity by association.  And it is irrelevant and must be precluded.

From Frank Knight's perspective, the evidence of his connection with the Rare Breed is based principally on the fact that, when pressed, he described himself as a "hang around" of that club.  Frank's label aside, the facts are that he knows members of the Rare Breed. They are his contemporaries, they live in Wellsville (as does he), they like to play cards (as does he), the like to ride motorcycles (as does he), they like to have cookouts and drink beer in the summer (as does he), and perhaps they have other interests in common (like hunting and cars, for example).

There is not a single shred of evidence in this case that Frank engaged in any illegal activities with or on behalf of the Rare Breed, and more specifically, that he engaged in any conduct for the Rare Breed "at the behest of" the Outlaws M.C.

In point of fact, based upon our review of the discovery (including the *Jencks* material), there is no evidence that Frank Knight had any association, relationship, or other connection to the Outlaws at all.  He doesn't know John Ermin.  He never met him in his life. Nor does he know Peter Gerace.

This being the case, even if the Court does allow evidence concerning conduct in which Rare Breed members or Outlaws M.C. members are alleged to have engaged (like removing a women from Pharaoh's after she overdosed, or monitoring legal cases, or threatening or harming witnesses, or any of the other allegations described by the government in its pre-trial submissions), this evidence should not

be admissible against Frank Knight because there will be no proof that he engaged in any such conduct.

We have made it abundantly clear that the only adequate remedy here is severance under Rule 14.

Failing that, we are objecting now, and will continue to object at trial, and we are requesting now, and will continue to request at trial that the Court provide the jury with an unequivocal and direct limiting instruction to the jurors that they are not to consider this "other act" evidence against Frank Knight.

### Simon Gogolack's Alleged Drug Dealing, Kidnapping, and False Impersonation (Nos. 9-11 Above)

The government wants to admit three other acts allegedly committed by solely by Simon Gogolack.

The first is Gogolack's alleged drug dealing activities. As it does with nearly every item of other act evidence described in its pre-trial motions and memorandum, the government claims that the evidence that Simon sold drugs is "intrinsic" to its case. It is easy to see why the government wants to do this. It is because by labeling it as such, and if the Court were to agree, it relieves the government from having to prove that this evidence is not propensity evidence that is prohibited under Rule 404 (b). The government's characterization notwithstanding, the fact that Simon Gogolack may have sold drugs to other people on other occasions is irrelevant to this case. It does not appear that there will be any dispute that both Simon and Crystal had access to drugs and were using

multifarious forms of drugs (combined with copious amounts of alcohol) from about July 24, 2023 until August 1, 2023. Simon's status as a "drug dealer" does not tend to prove that he murdered Crystal Quinn, as opposed to Crystal dying from an accidental overdose. It would only tend to prove that Simon is a man of poor character and a criminal because he is a drug dealer. And people of bad character and who are criminals are more likely to do other bad things like commit murder. This is the definition of propensity evidence; it is evidence of Simon's character as a bad guy that the government wants to establish so they can prove that he acted in conformity with his character trait as a bad guy and killed Crystal Quinn because they don't have any direct evidence that he killed her.

Of course, Frank Knight had nothing to do with the allegations that Simon Gogolack was involved in separate drug trafficking conspiracy.

The same is true of the government's attempt to prove that Simon kidnapped two people and held them in his basement sometime in around March 2023.

This happens to be one of the two items of proof the government concedes is being offered as straight Rule 404 (b) evidence, as opposed to "intrinsic" evidence tied to the charges in this case. Instead, the government wants to offer the inflammatory description of Mr. Gogolack's alleged conduct toward the victims of this alleged kidnapping on the issue of Gogolack's "intent and plan to kill Ms. Quinn, as well as lack of mistake."

We are having trouble understanding how Mr. Gogolack's alleged conduct in relation to this incident in March 2023 tends to prove his intent to kill Crystal or that Crystal's death was not a "mistake" (*i.e.,* an accidental overdose).

Plainly the impact of this evidence is, again, to prove that Gogolack is a criminal or a bad guy because of the things he allegedly did during this purported kidnapping, and that he acted in conformity with this character trait on July 30-31, 2023 by killing Crystal Quinn. The Court should preclude the government from offering this evidence under Rule 404 (b).

Even if the Court were to conclude that the evidence is legitimately offered for a purpose other than to show that Simon is a bad guy, the Court should preclude the evidence under Rule 403 because the inflammatory nature of the proof combined with the lack of temporal other connection to the crimes charged are such that the probative value of the evidence is substantially outweighed by the unfair prejudice to all the defendants (and particularly Knight) and the colossal waste of time that would be spent proving conduct for which no defendant is on trial.

In addition, Gogolack's use of another person's identity in the past should likewise be precluded. In this regard, the government intends to prove at trial that when questioned by police, Gogolack allegedly told them that a third person lived in the half of his house where Crystal was found dead. This is arguably relevant and admissible evidence. But the fact that Gogolack may have used this same person's name or identity in the past and held himself out as this person in the past is irrelevant to any material issue in the case. Again, this type of evidence proves only

that Gogolack did bad things, is a bad guy, and therefore killed Crystal Quinn. This evidence must be precluded under Rule 404 (b) because it is propensity evidence. And even if it is admissible for some other purpose, the probative value of the evidence is substantially outweighed by the unfair prejudice that admission of such evidence would have on all the defendants (including Knight) and the waste of time that would be spent proving conduct for which no defendant is on trial in this case.

*Hinkle's Possession of Firearms and Marijuana*

The government's attempt to prove other act evidence relating to Mr. Hinkle's possession of firearms and marijuana is also irrelevant to the case of Crystal Quinn's death. As with all of the other items of other act evidence offered by the government—and the government's arguments to the contrary notwithstanding—this evidence is irrelevant to the crimes charged in this case.

The government claims that this evidence of marijuana possession and distribution is relevant because he distributed it to "members of the Rare Breed". This goes back to the very first part of this response in opposition to government's motion *in limine* in which we set forth that any defendant's connection to a motorcycle club, legal, illegal, or otherwise, is irrelevant to this case because there is no proof that any motorcycle club—as an entity—was involved in the crimes for which the defendants are on trial. The defendants are on trial for their conduct in which they allegedly engaged as individuals, not as part of any organization.

Given that it is irrelevant to the crimes charged, the only reason it would be offered is to show that Hinkle was engaged in criminal conduct and that he is,

therefore, a bad guy and more likely to have committed the crimes alleged in this case. The government admitted as much in its brief when it stated that "[b]y supplying marijuana, Mr. Hinkle's relationship with the Rare Breed evolved from a social one to a criminal one." (ECF Doc. No. 925, p. 55). This is a direct statement by the government that the evidence of Hinkle's drug distribution to members of the Rare Breed made him partners-in-crime, if you will, with the Rare Breed (who his not on trial). The only logical extension of this argument is that Hinkle was committing crimes with the Rare Breed members by selling them marijuana, and therefore, he was partners-in-crime with them in relation to the death of Crystal Quinn. This is an impermissible basis to permit such evidence and this evidence should be precluded under Rule 404 (b), or Rule 403, or both.

Finally, Mr. Hinkle's possession of a firearm with a "red beam" is also irrelevant. The government's argument here is based on the questionable and perhaps inadmissible statements of Crystal Quinn and Gogolack that they had "red beams" pointing at them. First, the Court needs to determine whether Quinn's statements are facially reliable and should be admitted in the first instance. In this regard, there is simply no competent evidence to establish that this event ever happened and that it was not the hallucination of someone suffering from drug induced psychosis.

But even if that evidence is allowed, permitting the government to admit evidence that one of Howard Hinkle's long guns had a red beam on it would invite the jury to speculate that he was part of a group of people pointing weapons at

- 14 -

Gogolack's home, which is a conclusion for which there is zero evidence (mostly because this is fiction—it didn't happen).

Given the speculative nature of this evidence, the lack of any corroborating evidence to support the inference that Hinkle was part of a group of people that allegedly pointed weapons at Gogolack's house, the only impact this evidence will have is to portray Hinkle as a gun-toting and violent person, and is therefore, more likely to have committed the crimes with which he is charged. This evidence must be precluded because it is irrelevant under Rule 401, it is impermissible propensity evidence under Rule 404 (b), and its probative value is substantially outweighed by the danger of unfair prejudice to all the defendants (including Knight), under Rule 403.

REQUEST FOR PRECLUSION UNDER RULE 403 AND<br>REQUEST FOR LIMITING INSTRUCTIONS

To the extent we have not made it clear above, to the extent the Court determines that any of the other act evidence the government seeks to introduce is admissible under Rule 404 (b) or because it is "intrinsic" to the case, we request that the Court carefully examine and analyze each item of evidence under Rule 403, and after such analysis, preclude the evidence on the grounds that its probative value is substantially outweighed by the unfair prejudice to the defendants, and in particular, to our client, Frank Knight, and will be a waste of time.

Furthermore, as set forth above, as to each of these items of other act evidence, there is no proof that Frank Knight engaged in, knew of, or was otherwise connected to the conduct alleged.

Based on this, if the Court allows such other act evidence, regardless of the grounds under which is it allowed, we believe the only appropriate remedy is severance of Frank Knight's case from the cases against his co-defendants. Without waiving this objection and request, if the Court refuses to grant Knight severance under Rule 14, we request that the Court issue a limiting instruction to the jury stating the limited purposes for which the evidence is being admitted, the purposes for which is not being admitted, and that the evidence must not be considered against Frank Knight or against any other defendant who is not alleged to committed the "other crimes, wrongs or acts."

### PERMISSION FOR LEAVE TO JOIN IN CO-DEFENDANTS' RESPONSES IN OPPOSITION TO THE GOVERNMENT'S PRE-TRIAL STATEMENT OF FACTS AND MOTIONS IN LIMINE

We have been in communication with counsel for Knight's co-defendants and counsel has, to a large extent, divided the work in responding to the government's pre-trial memorandum (mostly in relation to the defendant to whom the issues pertain most directly).

It is my intention to read Knight's co-defendants' submissions and would like to file a pleading joining in certain specific requests or arguments of his co-defendants that pertain to him. We request that the Court grant us leave to file such a request for joinder by May 19, 2026.

### CONCLUSION

WHEREFORE, Knight respectfully requests that the Court issue an order denying the government's requests for the admission of "other act" evidence as requested in its motion *in limine* (ECF Doc. No. 925); (2) permitting Knight to file a

supplemental pleading, if necessary, joining in relief requested and arguments of his co-defendants in response to the government pr-trial memorandum and motion *in limine*; and (3) granting such other relief as to the Court may seem just and proper.

DATED: May 15, 2026

s/Matthew R. Lembke

_____

Matthew R. Lembke
CERULLI, MASSARE & LEMBKE
*Attorney for Defendant*
45 Exchange Blvd., Suite 925
Rochester, NY 14614
Telephone: [585] 454-3323
matt.lembke@cmllawfirm.com