UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                        Plaintiff,

            vs.                                        Docket No 1:23-CR-99-LJV-JJM

JOHN THOMAS ERMIN, et al.

                                        Defendant.

_____

### DEFENDANT JOHN ERMIN'S RESPONSE TO THE GOVERNMENT'S PRETRIAL STATEMENT OF FACTS AND MOTIONS IN LIMINE

GEORGE V.C. MUSCATO, ESQ., and DONALD M. THOMPSON, ESQ., on behalf of JOHN THOMAS ERMIN, respond as follows to the Government's Statement of Facts and Motions in Limine, specifically motions in limine IV(B), (C), and (D):

**"Our law punishes people for what they do, not who they are."**
**<u>Buck v. Davis</u>, 137 580 U.S. 100 (2017)**

Unfortunately, that is exactly what the Government is attempting to do by claiming that they wish to admit several categories of evidence pursuant to Fed. R. Evid. 404(b) that the Government contends are intrinsic to Counts 1 through 3 of the Indictment.

The Government acknowledges in its own motion that it lacks a factual basis against Defendant Ermin. At Dkt. 925, 16, ¶ B (a), the Government states:

> "The defendants' gang affiliation is directly relevant because it provides essential context without which the charged conduct does not make sense. The defendants' affiliation with motorcycle gangs is not peripheral background. Nor is the connection between the motorcycle gangs and Pharaoh's. It is the framework that makes the charged conduct intelligible. Without that context, the evidence would present an incoherent narrative in which multiple defendants coordinated to target Ms. Quinn even though, on

1

its face, her death appears to benefit only one of them – Mr. Gerace. Evidence of the defendants' gang affiliation supplies that missing explanation."

The Government wishes to offer gang affiliation, gang hierarchy, and gang slogans, to supply facts that they cannot prove and that do not exist, given the absence of any Outlaw Motorcycle Club (OMC) initiated or OMC directed action.  The Government goes on to acknowledge that without the aforementioned prejudicial testimony, it does not have any explanation for why Defendant Ermin would be involved in the acts alleged.

The Government follows that with ". . . far from being anomalous, the defendants' coordinated actions were the predictable product of that association.  Evidence of the defendants' gang affiliation supplies that missing explanation" (*id.* at 16).  In other words, that affiliation <u>is all</u> it has to suggest Defendant Ermin's involvement.  Put another way, Defendant Ermin must be guilty – look who he is and who he is associated with.

The Government's statement of facts offers no proof of coordinated actions. The Government starts by acknowledging that the defendant, following the incarceration of Mr. Gerace, met with him on two occasions at the Niagara County Jail, both meetings at least as consistent with Defendant Ermin, as manager of Pharaoh's Gentleman's Club (PGC) being left to run the club after Mr. Gerace was incarcerated. The Government attempts to infer, without any evidence, that there was something more sinister in those conversations.  As noted above, the Government has no evidence to show that Defendant Ermin received a command to harm Crystal Quinn or conveyed such a command to anyone else.

The Government argues that such a directive – of which there is no evidence – was transmitted to the Wellsville area via communications between  members of the Outlaws and their supposed "support club" the Rare Breed MC to others who were not club members, all orchestrated by the Outlaws for some undisclosed benefit or remuneration, presumably from Defendant Gerace, the only defendant who stood to benefit by avoiding conviction under indictment 19-cr-227.  However, the Government offers no proof of any such communication.

The Government further contends that the internal structure of the OMC and/or the Rare Breed MC (Dkt. 925, p 17) ". . . explains why individuals who otherwise lacked personal stakes in the outcome of Mr. Gerace's case nevertheless participated in the charge conduct," in support of its argument that the gang affiliation and relationship to this case is relevant under Fed. R. Evid. 404(b), absent any facts supporting this claim.

Pursuant to Fed. R. Evid. 404(b)(1) "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Here, the Indictment alleges criminal conduct by a single member of the OMC (Ermin) and alleges that in furtherance of that conduct, he participated in a conspiracy with others who were not members of the OMC, or any motorcycle club, to silence a witness against Defendant Gerace.

The Government has no direct proof that Defendant Ermin committed any act in furtherance of the conspiracy; nor does the Government have any circumstantial proof

other than its inferences drawn from two meetings between Defendant Ermin, the manager of PGC and Defendant Gerace, the incarcerated owner of PGC.

In the discovery provided to date, the government points to no evidence of any command by Ermin (as the president of the OMC, or in his personal capacity, or at all) to anyone else, whether a member of a motorcycle club or otherwise, to intimidate or retaliate against Crystal Quinn for cooperating with the government.  Likewise there is no evidence of any direction or command that initiated with Defendant Ermin (or Defendant Gerace) being received or acted upon by any member of any motorcycle club, much less by any individuals who are not club members.

Thus, the government relies on a theory of institutional propensity in an attempt to fill the gaping hole in its evidence – there is no evidence, either direct or circumstantial, in any of the discovery providing support for the government's central premise that retaliation against Crystal Quinn was requested, directed, or engineered by the OMC or by Ermin, either in his individual capacity or in his capacity as president of the OMC.

The Government argues, and would like to offer expert testimony, that the OMC is institutionally committed to retaliating against cooperating witnesses (does this commitment extend to any cooperating witnesses at all? witnesses cooperating against the OMC or its members? OMC members who choose to cooperate? is this retaliation available for hire or something OMC pursues voluntarily and if so, against whom? The Government suggests no limitations on this supposed institutional commitment).  The Government further alleges that the offenses in counts 1-3 of the Indictment were committed in furtherance of that institutional commitment. At the pretrial conference on

4

May 1, 2026, the Government indicated that it would like to introduce expert gang evidence testimony early in trial (although the Government doesn't say this, likely subject to connection, to build bridges between later-introduced pieces of evidence that would otherwise apparently not be related).

Case law permits such expert testimony, including, for example, "the nature and structure of organized crime families" United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988) largely to allow juries to understand recorded conversations between defendants or messages in code United States v. Levassuer, 816 F.2d 37, 45 (2d Cir. 1987) and to understand, where relevant, organizational operation, symbols, jargon, and culture.

But the factual predicate for such evidence is the involvement of the organization to be understood in the crimes charged.  That factual predicate is absent here.  This is not a RICO prosecution.  John Ermin is charged.  The OMC is not charged, nor is the Rare Breed MC.  The Government has disclosed no evidence indicating or suggesting that Defendant Ermin used a position of authority in the OMC to further or bring about the goals of the charged conspiracies. Likewise, the Government has provided no evidence that the organization, command structure, institutional commitment or any of the other features of the OMC or Rare Breed MC were utilized, played any role in, or are in any way relevant to the commission of the crimes charged by individuals who happen to belong to those organizations (and by some who do not).

The use of such gang expert evidence is different in this case where the Government seeks to use the expert testimony to weave a web of cooperation between

coconspirators based on the supposed characteristics of the organizations to which they belong and in the absence of *any* other evidence establishing such cooperation.  Here, unlike the cases cited above, there is no coded conversation, secret handshake, or other institutional feature that needs to be interpreted to allow the jury to understand the communications or coordinated actions of coconspirators, because based on the discovery provided, they do not exist.

It goes without saying how unfairly prejudicial such testimony would be.  In United States v. Roark, 924 F.2d 1426, 1434 (8th Cir. 1991), the Court ordered a new trial where "Government use of prejudicial gang evidence was so pervasive" that the entire theme of the trial became guilt by association.

In United States v. Street, 548 F.3d 618 (8th Cir. 2008) involved an offer of proof concerning gang evidence very similar to the proposed offer in this case.  The problem in the Street case as in this case "In the present case most of the gang reputation evidence had no discernible connection to the (murder) charge (the defendant faced)  . . ." Defendant Ermin is faced with a similar scenario; his connection to the OMC has no "discernible connection" to the counts alleged in the indictment.  This is further complicated by the fact that Defendant Ermin is a member of the Outlaw Motorcycle Club – with a capital "O" – while the Government seeks to introduce a witness to testify about "outlaw motorcycle clubs" (which includes the Hell's Angles, Pagans, Bandidos, Outlaws, and others) without apparently distinguishing between the Outlaws Motorcycle Club and outlaw motorcycle clubs. This prejudice is further heightened for the defendants

who are not members of any alleged gang or motorcycle club and therefore to whom the alleged propensities or proclivities of any such organization are wholly irrelevant.

In United States v. Nelson, 103 F.Supp.2d 512 (N.D.N.Y. 1999), "evidence of a gang can be highly prejudicial and courts recognize that it may be appropriate to suppress that identification at trial.  Citing Fed. R. Evid. 403 "evidence of gang membership when its probative value was minimal . . . served as a substitute for . . . direct evidence increasing the chance of guilt purely on association."

The admission of gang expert evidence (including even the use of the word "gang") should be excluded under 404(b) and 403 as unduly and prejudicial.  Along these lines, in Defendant Ermin's prior motion it was noted that unlike "street gang" there is no statutory definition for "outlaw motorcycle gang."

### EVIDENCE OF A SUPPOSEDLY FATAL OVERDOSE AT PGC

The Government seeks to admit evidence showing that the Outlaws engaged in prior bad acts with Mr. Gerace to demonstrate that Gerace had earned the trust of the bikers, alleging as an example an incident on an unspecified date that there was a "dancer who overdosed [at PGC] and that bikers got rid of her body" (Dkt. 925, p 20-21).

In support of this claim, in its motion the Government dated April 17, 2026 (Dkt. 925) includes a screen shot of two transcript pages of the testimony of a witness not identified in the transcript or otherwise identified by the Government. Which proceeding the transcript emanates from is also not identified by the Government or identifiable by transcript excerpt included in the motion.  In the transcript excerpt, the witness alleges

that Defendant Gerace admitted to having "the bikers" dispose of the body of a woman that overdosed at PGC.

The Government has not given Defendant Ermin the transcript copied in its motion.

In its text order at Dkt. 937, the Court scheduled a hearing for May 29, 2026 to address the admissibility of this and other evidence in the Government's motion in limine.

Defendant Ermin is unable to effectively address the above allegation at the May 29th hearing without access to the information that the Government is relying on.

Based on counsel's independent investigation and upon information and belief, the testimony cited by the Government is from the grand jury testimony of witness K.M. in support of Defendant Gerace's indictment number 19-cr-227.

We have been provided with just two items of 3500 material relating to witness K.M.: a text message from her to one of the agents in the case (not relating to the above testimony), and her criminal history.

On May 14, 2026, in order file our response to the Government's motion and prepare for the hearing on May 29th, defense counsel Muscato contacted AUSA Cooper and requested a copy of the transcript cited in the Government's motion. AUSA Cooper indicated that he would provide the same.

On May 15, 2026, AUSA Cooper emailed defense counsel Muscato stating that "I am hoping to wrap up the review today and send to you. If not, I will finish it over the weekend and get it to you." Of course, defendants' motion responses are due today.

Just after noon today, the Government forwarded an additional 3500 disclosure relating to a different witness.  At 2:00 p.m. today the Government forwarded addition jail telephone calls of Defendant Gogolack.

Upon determining the probable identity of witness K.M., defense counsel Thompson contacted defense counsel Foti, who represented defendant Gerace in the prosecution of 19-cr-227.  A protective order issued by the Court in 19-cr-227 on January 9, 2023 (19-cr-227, Dkt. 347) bars defense counsel in that case from sharing the 3500 material disclosed in that case with defense counsel in this case.  When defense counsel in this case moved for access to the protected materials in 19-cr-227, the Court denied the motion because the "disclosure of the information in 23-cr-99 is governed by the disclosure obligations, including its obligations under Rule 16, Brady, and the Jencks Act. To the extent that the defendants have a basis to think that the government is violating its disclosure obligations, that challenge can be raised in 23-cr-99" (19-cr-227, Dkt. 1676). It will be, in a motion to follow.

Pursuant to the above protective order, defense counsel Foti cannot share the content of any of the 3500 materials provided to him in 19-cr-227.  He was able, however, to advise that fourteen 3500 exhibits were provided for K.M. in that case (compared with the two provided in this case).  Presumably those materials include a full copy of the transcript excerpted in the Government's motion, any 302 reports of interviews in preparation for that testimony and who knows what else, none of which has been provided to the defense in this case.

9

It should be noted that the Government organized and produced all of K.M.'s 3500 exhibits in 19-cr-227 before defendant Gerace's trial in that case, held a year and five months before the Government filed its motion in this case relying on K.M.'s testimony. This Court's text order of May 5, 2026 (Dkt. 937) further emphasized that these allegations in the Government's motion would be a part of the focus of the hearing on May 29, 2026. That text order did not prompt any further disclosures by the Government. As a consequence, Defendant Ermin is presently unable to prepare to effectively address the Government's claims at the May 29, 2026 hearing.

Upon review of the portion of the transcript inserted in the Government's motion, it appears that the witness related statements by Defendant Gerace complaining that he was being accused of the conduct in question, not that he committed it.

Upon information and belief, given its investigation and prosecution of Defendant Gerace in 19-cr-227, the Government is actually aware that this allegation is false.

The Government has produced – in either this case or in 19-cr-227 – any missing persons report, 911 call, law enforcement investigation, criminal complaint, autopsy report, death certificate, or any other identifying information whatsoever corroborating its claim that a woman died of an overdose at PGC and her body was disposed of by anyone, much less "bikers." Upon information and belief, in its investigation of 19-cr-227, the Government searched a field, a nearby body of water, and other areas adjoining PGC for the body of the woman who allegedly overdosed, but found no evidence to support that any body had been disposed of.

In addition, in the trial of 19-cr-227, the Government called Douglas Augustyniak, a former manager and bouncer at PGC who testified that a woman overdosed at PGC and that he called 911 and had her sent to an emergency room.  He was not asked by AUSA Cooper, who examined him in that case, about a woman who supposed died and whose body "bikers" supposedly disposed of.  Upon information and belief, the Government questioned Mr. Augustyniak prior to trial about a rumor that the body of the overdose victim was disposed of at the OMC clubhouse, which he specifically denied.

The Government is also actually aware, from its investigation and prosecution of 19-cr-227 that Crystal Quinn told agents that an ambulance was called for an overdose victim that she was aware of, who did not die at PGC.

In United States v. Garcia, 291 F.3d 127 (2d Cir. 2002), the court indicated that the Government must establish the relevance of the evidence to the issue in dispute. The Government may not invoke Rule 404(b) and proceed to offer carte blanche any prior act of the Defendant as in the same category of a crime. The Government must identify a similarity or connection between the two acts that make the prior act relevant to establish knowledge of the current act.  Here, the Government is attempting to connect the Outlaw Motorcycle Club to the term "bikers" and is unable to show whether the event alleged even occurred and if it did, whether Defendant John Ermin was involved in any way. If the Government cannot identify a similarity or some connection between the prior and the current acts, then the evidence of prior act is not relevant to show knowledge and intent.

The Government argues in the alternative that the proof of the missing dancer is "inextricably interviewed" with the evidence of Counts 1-3 and therefore, does not

11

constitute 404(b) evidence, but is admissible nevertheless. But it's nothing more than rumors with no police reports, missing person report, dancers inquiring as to where she might be, or follow up police investigation.

As noted above, this is not a RICO case, wherein the acts of others may be relevant to conduct charged under RICO enterprise and uncharged acts may be admissible as evidence that is inextricably intertwined with proof of an enterprise. United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).

We could find no cases that allow the Government to offer proof of a rumor. The only purpose for this proof is to prejudice the jury.

## ADMISSIBILITY OF HEARSAY STATEMENTS UNDER FED. R. OF EVID. 804(b)(6)

We previously addressed our response to this issue in our Response to the Government's desire to admit these hearsay statements under the theory of "forfeiture by wrongdoing."

We incorporate by reference that Response in this pleading.

## THE GOVERNMENT SHOULD NOT BE PERMITTED TO ADMIT OUTLAW PHONE LISTS, MEETING MINUTES AND LEDGERS

This offer is the Government's attempt to prove a case against the Defendants by focusing the Court and jury on a claim that the Outlaws have an "institutional commitment to retaliating against witnesses" as addressed above.

As previously stated, this is not a RICO prosecution or, in other words, an agreement to participate in a charged criminal enterprise through a pattern of conduct.

12

While we acknowledge other evidence may be admissible of other crimes or conduct of the RICO enterprise, the Government's pursuit of an "institutional commitment" in this particular matter is nonetheless inadmissible pursuant to Fed. R. Evid. 403 if its probative value is substantially outweighed by the danger of . . . unfair prejudice.  United States v. Smothers, 652 F.Supp.3d 271 (E.D.N.Y. 2023).

"The term unfair prejudice as to a criminal defendant speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on the ground different from proof to the specific charge." United States v. Gordon, 987 F.2d 902, 908 (2d Cir. 1993), holds that the court must assess the potential that the evidence offered has to create unfair prejudice. The probative value of the evidence depends largely on whether there is a close parallel between the crime charged and acts shown (in this case, the organizational structure of the Outlaws and their by-laws, minutes, etc.). But this indictment alleges a conspiracy between individuals.  There is no showing that the members of the Outlaw Motorcycle Club were involved in any way to commit or facilitate the crimes charged in this indictment.

The Government, by offering these exhibits, is doing nothing more than seeking to deflect the jury's attention away from the lack of facts establishing the underlying criminal charges, to an alleged organizational commitment to violence – i.e., the OMC is institutionally committed to employing violence, so it is more likely to have done so in this case (despite the absence of any allegations or evidence of OMC institutional participation in any of the crimes charged).

## CONCLUSION

The Government should be precluded from offering the proffered evidence addressed above. Defendant Ermin requests permission to join in the codefendants' motions, insofar as they are applicable to him.

Dated: May 15, 2026

/s/ George V.C. Muscato
GEORGE V.C. MUSCATO, ESQ.
Attorney for Defendant JOHN ERMIN

/s/ Donald M. Thompson
DONALD M. THOMPSON, ESQ.
Attorney for Defendant JOHN ERMIN