IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

-vs-

PETER GERACE, JR.,

Defendant.

_____

## DEFENDANT GERACE'S MEMORANDUM IN OPPOSITION TO GOVERNMENT MOTIONS IN LIMINE AND SUPPLEMENTAL MEMORANDUM

Docket No. 23-CR-99

Respectfully submitted on May 15, 2026, by:

Cheryl Meyers Buth, Esq.              Mark A. Foti, Esq.
Meyers Buth Law Group, PLLC           The Foti Law Firm, P.C.
21 Princeton Place, Suite 105         16 West Main Street, Suite 100
Orchard Park, New York 14127          Rochester, New York 14614
(716) 508-8598                        (585) 461-1999
cmbuth@mblg.us                        mark@fotilaw.com

Defendant Peter Gerace, Jr., by and through counsel, Cheryl Meyers Buth, Esq. and Mark A. Foti, Esq., provides the following memorandum in opposition to the government's motions *in limine* and supplemental pretrial memorandum.

The Table of Contents is as follows:

**THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE REGARDING OUTLAW'S INSTITUTIONAL NORMS AND COMMITMENTS** .................................. 3

**THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE SHOWING "THE OUTLAWS' PRIOR ACTS WITH MR. GERACE"** ............................................. 10

**THE GOVERNMENT'S MOTION TO ADMIT ADMISSION BY SILENCE** .............. 13

STATEMENT OF FACTS.......................................................................................... 13

APPLICABLE LAW ................................................................................................ 15

DISCUSSION ........................................................................................................ 17

*The government has not laid the required foundation that Gerace heard, attended to, understood, and adopted a specific proposition* .................................................. 17

*The alleged questions are not clean assertions, rendering responsive silence especially ambiguous*.................................................................................................................. 18

*The jailhouse context presents facts most analogous to Flecha in which admission by silence was impermissible* .................................................................................................... 19

*Rule 403 strongly favors exclusion because the accusations are extraordinarily inflammatory and only weakly probative*............................................................................. 20

*Conclusion* ............................................................................................................ 21

## <u>THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE REGARDING OUTLAW'S INSTITUTIONAL NORMS AND COMMITMENTS</u>

Mr. Gerace moved to preclude evidence seized from the Outlaws or RBMC clubhouses, including evidence "depicting swastikas, signs or references to 'snitches,' general characterizations of the Outlaws as a 'one percent' or otherwise violent motorcycle gang." Gerace Pre-Trial Motions at 19.[1]

In response, the government represented that it does not intend to introduce evidence "showcasing the Outlaws' or the Rare Breed's Neo-Nazi ideology" unless a defendant opens the door to such evidence. (Dkt. 931 at 7).

However, with respect to other evidence concerning the Outlaws and Rare Breed, the government relies attempts to admit evidence showing the outlaws' institutional commitment to harming witnesses and monitoring law enforcement investigations into the club and other evidence regarding the motorcycle clubs. *See* Gov't Motions in Limine at 28–42.

The government contends that "[u]nderstanding the Outlaws' organizational norms and commitments is critical to understanding both the "how" and "why" the obstruction, tampering, and retaliation conspiracies against Ms. Quinn unfolded." *Id*. at 28.

---

[1] The government has marked exhibits consisting of items seized from Mr. Ermin's residence. It has also marked exhibits consisting of items seized from the motorcycle clubhouse. Mr. Gerace continues his opposition to the evidence that will be depicted in these exhibits.

This is not a RICO case, a VICAR case, or a prosecution in which either the Outlaws or Rare Breed is charged as a criminal enterprise. Nor is Mr. Gerace alleged to be a member of either organization. The government's theory is therefore attenuated: it seeks to introduce a large volume of inflammatory organizational evidence to prove that other individuals belonged to groups with alleged "norms and mores" favoring witness intimidation, and then to ask the jury to infer that Mr. Gerace knowingly joined a conspiracy because he associated with those individuals.

That is precisely the kind of guilt-by-association reasoning Rules 403 and 404(b) are designed to prevent. Even where evidence has some marginal relevance, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Elfgeeh*, 515 F.3d 100, 128 (2d Cir. 2008) *quoting Old Chief v. United States*, 519 U.S. 172, 180 (1997). Evidence of gang affiliation must therefore be handled with particular care. *See United States v. Nelson*, 103 F. Supp. 2d 512, 513–14 (N.D.N.Y. 1999) (recognizing that gang-membership evidence can be highly prejudicial); *citing United States v. Butler*, 71 F.3d 243, 251 (7th Cir. 1995); *United States v. Taveras*, 585 F. Supp. 2d 327, 336 (E.D.N.Y. 2008)(noting the "substantial risk of unfair prejudice attached to gang affiliation evidence" because it is likely to be damaging in the eyes of the jury); *see also United States v. Irvin*, 87 F.3d 860, 864 (7th Cir.

1996)("evidence of gang affiliation should tend to prove an element of the charged offense, in addition to having general probative value that outweighs its prejudice").

The prejudice is obvious. Jurors naturally associate gangs—particularly motorcycle gangs described as "one percent" organizations—with violence, intimidation, and criminality. The risk is that the jury will use that evidence not to decide whether the government has proved the charged obstruction conspiracy, but to conclude that Mr. Gerace is the kind of person who would commit crimes because he associated with people connected to a motorcycle club. That danger is magnified here because the government also seeks to tell the jury that Mr. Gerace was under federal indictment when the alleged conspiracy began. Layering gang evidence on top of that existing prejudice invites the jury to decide the case based on association and propensity rather than proof specific to the charged conduct.

The government is essentially seeking to admit improper character evidence. Essentially, the government is insinuating, if not outright arguing, that members of a group allegedly engage in witness intimidation and violence; Mr. Gerace associated with some members of that group; therefore Mr. Gerace must have knowingly conspired with them to obstruct justice. But Rule 404(b)(1) prohibits evidence of other acts when offered to prove a person's character and action in conformity with that character. Fed. R. Evid. 404(b)(1). And the government has not identified a legitimate Rule 404(b)(2) purpose that

justifies the admission of dozens of inflammatory exhibits concerning organizational identity, ideology, symbols, or alleged institutional norms.

The attenuation is especially severe as to Mr. Gerace. He is not alleged to be a member of the Outlaws or Rare Breed. The government's argument is that Mr. Gerace somehow knew of these organizations' alleged "institutional commitment" to witness intimidation and then conspired with certain defendants because of that supposed organizational culture. But the government has not proffered evidence that Mr. Gerace knew of any such organizational "norms and mores." Nor has it identified any instance during Mr. Ermin's more than ten years working for Mr. Gerace in which Mr. Ermin engaged in violence at Pharaoh's, or elsewhere, on behalf of the Outlaws, Rare Breed, Mr. Gerace, or anyone else.

Membership evidence alone is not enough. In *United States v. Desena*, the Second Circuit reversed a conspiracy conviction arising from the activities of the Pagans Outlaw Motorcycle Club, explaining that the government had relied chiefly on membership to infer participation in a conspiracy, and that "membership alone would be insufficient." 260 F.3d 150, 158–59 (2d Cir. 2001). The same principle applies here with greater force: Mr. Gerace is not even alleged to be a member of the groups whose alleged culture the government seeks to put before the jury.

Courts routinely recognize the danger of admitting gang-affiliation evidence where the connection to the charged offense is weak. In *United States v. Pappas*, for

6

example, the government sought to introduce evidence that the defendant was affiliated with the Latin Kings and an associated motorcycle club to show motive and provide context for alleged drug-distribution conduct. No. 3:23-cr-62-12 (OAW), 2024 WL 4986172, at *3 (D. Conn. Dec. 5, 2024). The court precluded the evidence under Rule 403, concluding that any probative value was limited and that the danger of unfair prejudice was high. *Id*. The court emphasized that gang affiliation was not necessary to demonstrate the criminal relationship and that the remaining defendants were not charged with physical violence. Id.

The government may seek to rely on cases such as *United States v. Diaz*, 176 F.3d 52, 79–80 (2d Cir. 1999), but *Diaz* is materially different. *Diaz* involved a prosecution centered on the Latin Kings as a racketeering enterprise, where gang membership and organizational structure were directly tied to the charged RICO conspiracy. *Id*. at 79. This case is not Diaz. The Outlaws and Rare Breed are not defendants, are not charged enterprises, and their alleged institutional culture is not an element of any offense Mr. Gerace must defend against.

Likewise, cases allowing gang evidence where membership is direct proof of a charged enterprise only underscore the problem here. *See, e.g., United States v. Jones*, No. 19-cr-54 (NGG), 2024 WL 2722307, at *10–11 (E.D.N.Y. May 28, 2024) allowing evidence of gang membership where the government was required to prove the defendant's participation in the charged narcotics conspiracy and related violent conduct. Here, by

contrast, the government seeks to use organizational evidence about third-party groups as background, context, or motive. That is precisely where Rule 403 scrutiny must be most exacting.

The Eighth Circuit's decision in *United States v. Roark* is instructive. There, the government introduced extensive evidence concerning the Hells Angels Motorcycle Club in a drug-conspiracy prosecution. 924 F.2d 1426, 1432–34 (8th Cir. 1991). The court reversed, explaining that the government had effectively placed the Hells Angels on trial and attempted to convict the defendant through association with the motorcycle club. Id. at 1433–34. The trial court itself recognized the problem, observing that the government had "opened up a Pandora's box," that the evidence was "very damaging," and that it went not to the defendant's guilt or innocence but to the general reputation of the Hells Angels. *Id*. at 1432–33. The Eighth Circuit concluded that the government's effort to tie the defendant's guilt to the alleged criminality of the motorcycle club was reversible error. *Id*. at 1434.

The same concern is present here. The government should not be permitted to try the Outlaws or Rare Breed as uncharged criminal organizations in order to persuade the jury that Mr. Gerace must have joined an obstruction conspiracy. The admission of more than [50] exhibits depicting organizational symbols, clubhouse items, signs, slogans, or alleged gang culture would create precisely the kind of spillover prejudice Rule 403 forbids. The danger is not merely that the jury will hear unpleasant background evidence.

The danger is that the jury will be invited to convict based on the perceived criminality, ideology, or reputation of groups that are not on trial.

Accordingly, the Court should evidence related to the Outlaws and RBMC under Rules 401, 403, and 404(b).

In the alternative, if the Court is inclined to admit any such evidence, Mr. Gerace requests that the Court require the government to make an exhibit-by-exhibit proffer outside the presence of the jury and admit only those exhibits that are directly tied to a disputed issue in the charged offenses. Mr. Gerace further requests a limiting instruction advising the jury that evidence concerning the Outlaws, Rare Breed, or any alleged gang affiliation may not be considered as proof that Mr. Gerace has a bad character, has a propensity to commit crimes, or is guilty by association.

A limiting instruction, however, is not an adequate substitute for exclusion where the government seeks to introduce extensive organizational evidence that would make guilt by association a theme of the trial. As the Supreme Court recognized in *Bruton*, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968). *Roark* applied that principle in this precise setting, recognizing that once a jury hears extensive evidence about a motorcycle club's alleged

9

criminality, "the bell has been rung" and cannot meaningfully be unrung. *Roark*, 924 F.2d at 1433. The better course is exclusion.

## THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE SHOWING "THE OUTLAWS' PRIOR ACTS WITH MR. GERACE"

The government has moved to admit "evidence showing that the Outlaws had a pre-existing criminal relationship with Mr. Gerace. Specifically, the government anticipates that a witness will testify that Mr. Gerace admitted to her that the Outlaws 'got rid of the body' of a Pharoah's dancer who had overdosed on drugs." *See* Gov't Motions in Limine at 24.

In a response filed by Mr. Ermin, it was noted that the co-defendants have not yet been provided with 3500 material relating to the witness in question. (Dkt. 957 at 7). Although Mr. Gerace possesses at least fourteen 3500 exhibits for the witness, obtained from case no. 19-cr-227, he would seek to address this issue when the other defendants are in a position to do so as well.

However, as a preliminary matter, this issue should be framed for what it is: the government seeks to have a witness allege a conversation with Mr. Gerace to advance a completely illogical and false assertion of fact to the jury, and then utilize that falsity as propensity evidence.

The government's intentions are made clear in its motions in limine:

> The evidence is also sufficiently similar to the charges at issue
> here to be probative of Mr. Gerace's intent, knowledge, and

10

plan. *Like the deceased dancer*, Ms. Quinn was a former Pharoah's employee who posed a risk to Mr. Gerace's criminal operation. And, as with his prior use of the Outlaws to dispose of the dead body to insulate himself from criminal liability, a jury could reasonably infer that Mr. Gerace intended to stymie the prosecution in 1:19-CR-227, by once more outsourcing his dirty work to the Outlaws to eliminate the problem posed by Ms. Quinn's cooperation.

Gov't Motions in Limine at 27 (emphasis added).

The government's assertion to this Court that there was, in fact, a deceased dancer, and that this Court should consider propensity arguments based on that fact is bewildering.

As far as the defense knows, there is no real evidence that a dancer ever died from a drug overdose in Pharoah's. There is evidence that the government has spent a considerable amount of resources to investigate the possibility, and it has never obtained any actual evidence to corroborate that it happened.

At this point, if the government intends to assert that a dancer died from an overdose, and the Outlaws disposed of the body, then the government should be required to disclose the efforts it took to investigate that claim, and the result of those investigative efforts, which as far the defense knows always led to the same conclusion: nobody died from an overdose in Pharoah's.

Whether the witness is lying about her conversation with Mr. Gerace[2], or whether the conversation actually occurred, but the witness misremembers or misunderstood what was said or Mr. Gerace was lying[3], the government wants to offer the conversation to prove up that a death occurred in Pharaoh's despite no evidence to support that ever happened.

This is not an issue of whether a drug was ever used in Pharoah's or whether an overdose ever occurred. The government is alleging that a death occurred, and as far as the defense knows, there has never been a dancer reported to have died or gone missing from Pharaoh's during her shift. Despite all of the many dancers, employees, and customers of Pharaoh's that were interviewed by the government, a real person was never been identified as having died at Pharaoh's.

This issue should be fully addressed in advance of trial, after the co-defendants receive the benefit of reviewing the witness's 3500 material and relevant *Brady* information, but on the government's pretrial submission alone, this Court has reason to question the admissibility of the propensity arguments the government seeks to make.

---

[2] The witness was recruited to the investigation by Mr. Gerace's ex-wife, an individual who had incredible animus against Mr. Gerace, with the promise that the witness could be part of "a lawsuit." As far as the defense knows, this detail has not yet been detailed in a disclosed to the co-defendants.

[3] In her trial testimony, the witness claimed that this conversation occurred while Mr. Gerace was drunk and high.

## THE GOVERNMENT'S MOTION TO ADMIT ADMISSION BY SILENCE

The government has moved to admit evidence of a purported "admission by silence" under Federal Rule of Evidence 801(d)(2)(B) relating to the alleged silence of Mr. Gerace in response to questions posed to him by a cooperating government jailhouse informant.

For reasons discussed below, the government's motion should be denied. The proffered evidence falls on the wrong side of controlling Second Circuit law: silence is admissible only when the surrounding circumstances naturally called for a denial, and the circumstances here, even as alleged by the jailhouse information, makes silence a probable and appropriate response to the alleged questions.

### STATEMENT OF FACTS

In support of its motion to admit Mr. Gerace's silence as an admission, the government proffers that K.H., a former cellmate, will testify that he saw Mr. Gerace "videochatting with a woman feeding frozen rats to a snake." K.H. then allegedly asked whether the rats on the screen were the same rats "found outside the witnesses['] houses," and whether Mr. Gerace arranged for a "hotshot" to be given to Ms. Quinn. The government says Mr. Gerace did not answer either question and contends the silence is admissible as an adoptive admission under Rule 801(d)(2)(B).

13

Those are the only proffered facts concerning the alleged exchange. No additional foundation—such as hearing, attention, exact wording, repetition, timing, or surrounding circumstances—has been specified in the government's motion.

At a prior trial, K.H. testified to additional contextual facts, but not the alleged exchange itself. K.H. had entered a cooperation agreement in his own drug case, and Mr. Gerace was transferred to the jail housing K.H. and placed as his cellmate. K.H. Transcript at 2, 5[4].

K.H. acknowledged in his prior testimony that the purpose of his cooperation was to help himself and that he hoped for sentencing credit from testifying. When he met Mr. Gerace in September 2023, he was already cooperating with the Government. K.H. Transcript at 20, 29. Moreover, K.H. had access to news accounts regarding Mr. Gerace and "read a lot of letters that [Gerace] wrote, too." K.H. Transcript at 28.[5]

K.H.'s testimony did not include the allegations that the government seeks to admit here as an admission by silence.

However, the testimony does provide a specific reason why Mr. Gerace would not speak freely to this witness in jail: K.H. testified that Gerace believed there was a

---

[4] All citations to the transcript are found at case no. 19-cr-227, Dkt. 1513.

[5] Both the purported rats and the death of Ms. Quinn were widely reported in the local news.

"jailhouse snitch" in his case. K.H. Transcript at 12. On this record, if the alleged exchange occurred at all, silence toward K.H. would be expected.

### APPLICABLE LAW

The Federal Rules of Evidence (Fed. R. Evid.) define a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion. Fed. R. Evid. 801(a). A statement is not hearsay it is offered against an opposing party and "is one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B).

The Advisory Committee's note to Rule 801(d)(2)(B) explains that adoption or acquiescence may be manifested in an appropriate manner, but "when silence is relied upon, the theory is that the person would, under the circumstances, protest if the statement were untrue." The note indicates that "decision in each case calls for an evaluation in terms of probable human behavior."[6]

While the note recognizes that "[i]n civil cases, the results have generally been satisfactory," it warns that, in criminal cases, "the inference is a fairly weak one." And although the note indicates "the rule contains no special provisions concerning failure to deny in criminal cases," it also recognizes "troublesome questions have been raised by

---

[6] As a threshold issue, a trial judge should not permit an alleged admission by silence to the jury unless there are sufficient foundational facts for a reasonable inference that the defendant heard, understood, and acceded to the statement. *United States v. Moore*, 522 F.2d 1068, 1076 (9th Cir. 1975).

decisions holding that failure to deny is an admission" including that silence may: (1) reflect advice of counsel; (2) realization that "anything you say may be used against you"; (3) an "unusual opportunity" to manufacture evidence; and (4) concerns about self-incrimination.

The government cites *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976) for the proposition that "a party-opponent's silence in response to a question can constitute an admission if the surrounding circumstances 'render it more reasonably probable that a man would answer the charge made against him than that he would not.'" (Pretrial Memo at 56). However, in *Flecha*, the court reversed the admission of a supposed adoptive admission where a codefendant, while under arrest and in the defendant's presence, said, "Why so much excitement? If we are caught, we are caught." *Flecha* recognized that "Advisory Committee's Note to Rule 801(d)(2)(B) … noted that difficulties had been raised in criminal cases and that 'the inference is a fairly weak one, to begin with.'" 539 F. 2d at 877.

Furthermore, in *Flecha*, the Circuit noted that the defendant had been charged and "although the Government emphasizes that he was not being questioned by the agents, and had not been given Miranda warnings, it is clear that many arrested persons know, without benefit of warnings, that silence is usually golden." *Id*.

Indeed, ambiguity regarding a charged defendant's silence has also been reviewed by courts in context of Fifth Amendment protections, as silence is an available and

16

appropriate response to any question of misconduct. *See. e.g. Doyle v. Ohio*, 426 US 610, 618 ("it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial").

Additionally, the admission of any evidence is also subject to the Rule 403 balancing test which independently requires exclusion when probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury.

## DISCUSSION

*The government has not laid the required foundation that Gerace heard, attended to, understood, and adopted a specific proposition*

Rule 104 makes admissibility a judicial threshold question, and *Bourjaily v. United States*, 483 U.S. 171 (1987) requires the Court to resolve the necessary foundational facts by a preponderance. This Court should follow the logic of the 9th Circuit in *Moore* (*supra* at 5, n. 3): do not let the jury hear the accusation if the government cannot provide sufficient foundational facts for a reasonable inference that the defendant did hear, understand, and accede. Otherwise, the jury is exposed to precisely the sort of "extremely prejudicial" accusation that may seem powerful but is not legally usable.

The present proffer does not satisfy the burden for admission of evidence. There is no identified proof that Mr. Gerace actually heard either question, was paying attention

17

to K.H. (rather than, for example, the alleged videochat), or understood what K.H. was asking, particularly given the manner in which K.H. purportedly posed the questions.

*The alleged questions are not clean assertions, rendering responsive silence especially ambiguous*

Even if K.H.'s testimony were accepted as true, the alleged prompts posed by K.H. were ambiguous questions rather than direct declarative accusations.

"Were those the same rats found outside the witnesses' houses?" merely references that the government had alleged rats had been found outside witnesses' houses, and asks, in what clearly would be a joke, whether these rats could be the same. It is unclear what admission the government speculates that Mr. Gerace could be adopting. Clearly, the video would not show rats that were recovered from Ms. Quinn's home, so how then can the government assert that silence in response to such an ambiguous question is an admission of anything? The question is clearly interpretable as a joke, and the question does not even accuse Mr. Gerace of having done anything, as it does not allege he is responsible for rats that were found at witnesses' homes.

A similar concern comes from the purported question "[d]id you arrange for a hotshot to be given to Ms. Quinn?" which assumes that Mr. Gerace would understand K.H.'s intended meaning of "hotshot" and accept the premise that a "hotshot" was given to Ms. Quinn. A listener's refusal to respond to an ambiguous question, even if they heard it, is not indicative of anything. It is not clear that Mr. Gerace would have understood the purported premise of such a question, as "hotshot" has multiple commonly understood

18

definitions and none of them include the meaning that it appears K.H. was assigning to it. [7]

At minimum, the circumstances here are ambiguous at best, and the evidence does not weigh in favor of the position that Mr. Gerace would have responded in any particular manner. As such, the purported admission by silence should be precluded.

*The jailhouse context presents facts most analogous to Flecha in which admission by silence was impermissible*

The government's should be precluded from offering the silence as an admission because the alleged exchange occurred in jail, after Mr. Gerace was criminally charged, with a former cellmate who was facing his own criminal charges and would use any admission made by Mr. Gerace against him.

That is clearly distinguishable from other caselaw cited by the government. For example, the government cites *United States v. Williams*, 577 F. 2d 188 (2nd Cir 1978) as authority for the position that Mr. Gerace would have been compelled to reply to K.H. and assert his innocence. But within the text of the *Williams* decision, it notes "that in light of the custodial circumstances [in *Flecha*] it was not likely that the appellant would have responded to such a vaguely phrased comment and that, therefore, Rule 801(d)(2)(B) was inapplicable. Here, however, Williams and Simmons met in the street." *Id*. at 194.

---

[7] https://www.merriam-webster.com/dictionary/hotshot

This case is clearly much closer to *Flecha*, which held that the custodial setting itself makes silence unsurprising because an accused may rationally prefer to say nothing rather than engage. In fact, the jailhouse context in this case is even more problematic than in *Flecha*. K.H. was already cooperating with the Government when he met Mr. Gerace, wanted to help himself, hoped for sentencing benefit, and was perceived as a possible "jailhouse rat or snitch." A reasonable inmate would have obvious reasons not to discuss accusations of witness intimidation or homicide with such a person.

Indeed, *any* other inmate is potentially acting as an agent for the government or seeking to elicit information to benefit themselves as K.H. was doing here. There is ample reason to avoid communication, particularly if another inmate is asking direct questions regarding alleged criminal conduct.

In that regard, the Advisory Committee's note is directly on point. In criminal cases, it warns, the inference from silence is "fairly weak" because silence may be motivated by counsel, self-protection, or the knowledge that speaking is dangerous. That warning applies with special force in jail, where talking to a cellmate—especially one who could be cooperating or seeking to cooperate—is inherently and obviously perilous.

*Rule 403 strongly favors exclusion because the accusations are extraordinarily inflammatory and only weakly probative*

The ambiguity of the alleged questions and the custodial nature of the interaction both limit the potential probative value of any admission by silence. As such, any limited marginal relevance would be substantially outweighed by the danger of unfair prejudice.

A jury will struggle not to treat the questions themselves as evidence that those underlying acts occurred. That is exactly the sort of emotional and improper inference Rule 403 is designed to prevent.

Given that Mr. Gerace was in custody, aware that any statements made to others could be used against him, no matter the content, silence in response to a question regarding criminal conduct would be appropriate, and if the government is permitted to present this evidence, it would create an unfair negative inference. *See generally United States v. Hale*, 422 US 171 (1975)("the respondent's silence during police interrogation lacked significant probative value and that any reference to his silence under such circumstances carried with it an intolerably prejudicial impact").

Accordingly, the Rule 403 balancing test weighs against admission.

*Conclusion*

For all the reasons discussed above, the Court should exclude the proposed testimony that Mr. Gerace's silence in response to K.H.'s questions constituted an adoptive admission under Rule 801(d)(2)(B). The Government has not shown, by a proper Rule 104 foundation, that the circumstances naturally called for a denial, that Mr. Gerace heard and understood the exact questions, or that his silence manifested adoption rather than caution, distrust, or distraction. And even if there were some marginal relevance, Rule 403 requires exclusion because the accusations are exceptionally inflammatory and the danger of misuse is overwhelming.

DATED:      Rochester, New York
               May 15, 2026

                                             s/ Mark A. Foti_____
                                           Mark A. Foti, Esq.
                                           THE FOTI LAW FIRM, P.C.
                                           *Attorneys for Defendant Peter Gerace, Jr.*
                                           16 W. Main Street – Suite 100
                                           Rochester, New York 14614
                                           (585) 461-1999
                                           mark@fotilaw.com

DATED:      Orchard Park, New York
               May 15, 2026

                                             s/ Cheryl Meyers Buth___
                                           Cheryl Meyers Buth, Esq.
                                           MEYERS BUTH LAW GROUP, PLLC
                                           *Attorneys for Defendant Peter Gerace, Jr.*
                                           21 Princeton Place, Suite 105
                                           Orchard Park, New York 14127
                                            (716) 508-8598
                                           cmbuth@mblg.us

22