IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      v.                                                                23-CR-99-EAW

SIMON GOGOLACK, et al.,

      Defendants.

_____

**RESPONSE IN OPPOSITION TO DEFENDANT GERACE'S MOTION FOR
COURT-ORDERED IMMUNITY**

      Mr. Gerace asks this Court to order the government to confer use-immunity on Steven M. Cohen, Esq., his former attorney and co-conspirator who sought to install an attorney on Gerace's behalf to represent Crystal Quinn, a witness cooperating against Gerace; fraudulently secured Judge Sinatra's recusal from the prosecution of Gerace in 1:19-CR-227; swore to patently inaccurate and misleading statements in an affidavit he filed to secure Gerace's release before a new judge; and altered the affidavits of two witnesses in an effort to fraudulently induce a second federal judge into releasing Gerace.  Gerace Mot. to Strike Surplusage & for Court-Ordered Immunity, Dkt. 960, (dated May 15, 2026).

      Only under "extraordinary" circumstances may a Court order the government to confer use-immunity on a defense witness. *United States v. Stewart*, 907 F.3d 677, 685 (2d Cir. 2018) (quoting *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir. 1979)).  In nearly fifty years, no court in this circuit has ordered such immunity and survived appellate review.  *See* FEDERAL CRIMINAL PRACTICE: A SECOND CIRCUIT HANDBOOK 24-4 at 593–94 (Lexis 2025) (noting that "not a single" request for immunity has ever been granted under the Second Circuit's framework); *cf. United States v. Todaro*, 744 F.2d 5, 6 (2d Cir. 1984) (reversing Judge

Elfvin's order "precluding the introduction of certain evidence at trial unless the Government confer[red] use[-]immunity on two potential defense witnesses" in the prosecution of Joseph Todaro, Sr.).

This case presents no exception. The government has neither "used immunity in a discriminatory way" divorced from "legitimate law enforcement" objectives, "forced a witness to invoke the Fifth Amendment through overreaching, [n]or . . . deliberately denied immunity for the purpose of withholding exculpatory evidence." *Stewart*, 907 F.3d at 685 (quoting *United States v. Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006)). Instead, this case involves the familiar scenario of a defendant seeking to immunize "an actual or potential target for prosecution," a request that this Court should "summarily reject." *Todaro*, 744 F.2d at 9 (quoting *United States v. Turkish*, 623 F.3d 769, 778 (2d Cir. 1980)). Accordingly, Mr. Gerace's motion should be denied.

### I.      Factual Background

Mr. Gerace was charged in 1:19-CR-227 with conspiring with former DEA Special Agent Joseph Bongiovanni to defraud the United States; paying a bribe to a public official; maintaining Pharoah's Gentlemen's Club as a drug-involved premises; conspiring to distribute controlled substances; and conspiring to commit sex trafficking. *See* Dkt. 24 at 3 ¶ 5. Notwithstanding the indictment, federal law enforcement continued to investigate Mr. Gerace for witness tampering after Crystal Quinn, a close confidante of his, sent a threatening Facebook message to P.H.—one of his sex trafficking victims and a cooperating witness against him.

In April 2022, Mr. Cohen attempted to arrange a meeting with Ms. Quinn through her attorney, Mike D'Amico, as pictured below.

 

However, Ms. Quinn cancelled the meeting, citing a possible Covid-19 infection:



The meeting was never rescheduled.  On February 3, 2023, law enforcement charged Ms. Quinn via Criminal Complaint in connection with the threatening Facebook message. Dkt. 24 at 4 ¶ 10.  On or about February 16, 2023, Mr. Cohen caused another attorney, M.B., to offer to represent Ms. Quinn because Mr. Cohen was "concerned that the feds might be trying to intimidate" her and "bring [her] in for questioning." *Id.* at 14 ¶ 17.

On August 14, 2023, following Ms. Quinn's death, Mr. Cohen met with her mother, Sharon Quinn, and a close family friend, John Grieco, to review draft affidavits supposedly prepared from statements they made to Mr. Gerace's private investigator, Paul Lawrence, as

discussed in greater detail *infra*.  Mr. Cohen recorded the meeting.  On the recording, Mr. Cohen admitted to reaching out to M.B. on Mr. Gerace's behalf:

> Cohen:    Did you ever come to learn that I had reached out on Peter's behalf —Peter reached out through me to—what was that guy's name—[M.B.] who represented her in a DWI case a couple years ago. Did you ever learn that I tried reaching out to her?
>
> . . . .
>
> Cohen:    Was she aware that Peter was trying to help her retain counsel?

Cohen Audio Recording at 20:14–40, 22:00–20 (dated Aug. 14, 2023).[1]

Text messages show that Ms. Quinn rejected M.B.'s offer to assist her and told him that Mr. D'Amico was her attorney, a fact Mr. Cohen knew but never disclosed to M.B.  With Mr. D'Amico's guidance, Ms. Quinn quickly began cooperating against Mr. Gerace.  *See* Dkt. 24 at 4 ¶¶ 11–14.  After Ms. Quinn began cooperating, the Grand Jury returned an indictment charging Mr. Gerace with three counts of witness tampering in connection with the threatening message sent to P.H.  *See id.* at ¶ 15.

Based on the new indictment, the government moved to detain Mr. Gerace.  Judge Sinatra ordered Mr. Gerace's detention on March 27, 2023.  *Id.* at 15 ¶ 19.  Mr. Gerace subsequently moved to reopen his detention hearing, a request Judge Sinatra denied in a written decision on June 6, 2023.  *Id.* ¶¶ 21, 23.  On or about June 20, 2023, Mr. Cohen filed Gerace's defense witness list, which named two of Judge Sinatra's close relatives.  *Id.* at 16 ¶ 24.  When Judge Sinatra asked how those witnesses were "material" to Mr. Gerace's defense, Mr. Cohen and another attorney, Eric Soehnlein, claimed they were character witnesses.[2]  *See*

---

[1]    M.B. is identified as "Attorney 2" in the Indictment.  *See* Dkt. 24 at 14 ¶ 17.

[2]    As relevant here, Mr. Soehnlein represented Mr. Gerace alongside Mr. Cohen from February 24, 2023, until July 12, 2023.  Notice Atty. Appearance, Dkt. 377, 1:19-CR-227, (dated Feb. 24, 2023); Text Order, Dkt. 559, 1:19-CR-227, (dated July 12, 2023) (granting Mr. Soehnlein's motion to withdraw as counsel).

Tran. Status Conf., at 4:21–25, 5:3–17, 7:4–10, 12:1–18 (dated June 21, 2023).  In fact, neither relative meaningfully knew Mr. Gerace and could not testify as a character witness.[3]

In an audio recording he made of his interview with Sharon Quinn and Mr. Grieco, Mr. Lawrence admitted that Roderick Arrington, a defendant in another case, advised Mr. Gerace that "if you want to get Sinatra to have to recuse himself without asking to recuse himself . . . you just need to add witnesses to your . . . defense witness list that would be conflicted with Sinatra."  As Mr. Lawrence put it, Mr. Arrington advised, "you don't have to give them a reason why you put them on the list, you say it's a part of our defense strategy."  According to Mr. Lawrence, Mr. Arrington told Mr. Gerace that this ploy would force Judge Sinatra to choose between recusing or risking dismissal of the case.

To execute the plan, "they asked [Mr. Lawrence] to start looking up Sinatra's family tree" to identify individuals "they" could include on Mr. Gerace's defense witness list.  Ultimately, after researching Judge Sinatra's family "through Ancestry.com" "they ended up going" with two of Judge Sinatra's close relatives.  Mr. Lawrence explained that Judge Sinatra's recusal was "good because Sinatra was just penalizing Peter all over the place."  Mr. Lawrence also made offensive and disparaging comments about Judge Vilardo, the district court judge who presided over 1:19-CR-227 and 1:23-CR-37 following Judge Sinatra's recusal, that reflected the Gerace defense team's belief that Judge Vilardo would be a more favorable audience for them.

---

The government immunized Mr. Soehnlein from prosecution in 2024 in connection with the orchestrated recusal of Judge Sinatra and the falsified affidavits submitted by Mr. Cohen.

[3]    The government assumes the Court and the parties' familiarity with the facts surrounding Mr. Gerace and Mr. Cohen's to fraudulently induce Judge Sinatra into recusing from the 1:19-CR-227 and thus only briefly summarizes the pertinent facts.  For the purposes of a complete record, however, the government incorporates by reference the factual representations made in its Unredacted Pre-Trial Memorandum of Law Regarding Gerace Attorney-Client Privilege Issues and Forfeiture by Wrongdoing, at 1–36, Dkt. 848, (docketed Apr. 15, 2026).  Page number references refer to the page numbers identified in the Memorandum, not any CM/ECF pagination.

After helping orchestrate Judge Sinatra's recusal, Mr. Cohen sought to adjourn the trial scheduled in 1:19-CR-227 based on travel that he previously indicated to Judge Sinatra would not require an adjournment. *Compare* Tran. Status Conf. at 56, (dated May 17, 2023) (Cohen representing to Judge Sinatra, "Judge, there are going to be a few days in October that I am supposed to be out of the country, so I may have substitute counsel from my office appear between now and then. And a few of the trial days, have somebody else from my office here"), *with* Tran. Status Conf. at 11, (dated June 30, 2023) (Cohen representing to Judge Vilardo, "Your Honor, when Judge Sinatra gave us the August 14th [trial date], His Honor gave us an opportunity to submit letters to the Court if we were to have any conflicts. I didn't file it in light of His Honor's recusal, but I have my first vacation in three years scheduled from October 11th through October 17th to Israel, and we've had those tickets for quite a while, and we're taking the whole family").

On or about August 1, 2023, Ms. Quinn died of an apparent drug overdose. On August 4, 2023, Mr. Cohen declared that Ms. Quinn had killed herself as a result of government pressure, and announced that he was going to move for Mr. Gerace's release from custody. Status Conf. Tran., at 8, (dated Aug. 4, 2023). At that time, Mr. Cohen represented Mr. Gerace alongside attorney Tyler Eckert, then an associate at Mr. Cohen's firm. *See* Not. Atty. Appearance, Dkt. 530, 1:19-CR-227, (dated June 20, 2023) (notifying Mr. Eckert's appearance); Minute Entry, Dkt. 622, 1:19-CR-227, (dated Sept. 6, 2023) ("Attorney Cohen moved orally for his firm and himself to be relieved as counsel for defendant Gerace. Defendant Gerace joined in motion. Court granted motion . . ."). Mr. Eckert is neither a subject nor a target of any investigation.

Mr. Cohen then sent Mr. Lawrence to interview Sharon Quinn and Mr. Grieco to backfill the suicide narrative he advanced in court.  During that interview, Sharon Quinn and Mr. Grieco rejected the notion that Ms. Quinn killed herself.  At Mr. Cohen's request, Mr. Lawrence sent him Microsoft Word documents containing a compilation of Sharon Quinn and Mr. Grieco's statements—but omitting their express rejection of the suicide theory.  Mr. Cohen then inserted, or caused the insertion of, several statements supporting the suicide narrative into the draft affidavits.  Neither Sharon Quinn nor Mr. Grieco made those statements during their interviews with Mr. Lawrence.  Alongside his legal assistant, "Marissa," Mr. Cohen presented Sharon Quinn and Mr. Grieco with the draft affidavits, explicitly framing them as drafts "that supposedly [were] [their] words," despite knowing that the drafts, in fact, contained words never uttered by Sharon Quinn or Mr. Grieco.  Cohen Audio Recording at 4:53.  Though Mr. Cohen afforded Sharon Quinn and Mr. Grieco time to review the drafts, he never informed them that he inserted, or caused the insertion of, statements into the drafts.

Mr. Cohen filed Sharon Quinn and Mr. Grieco's affidavits as part of a reply brief in support of Mr. Gerace's motion for pre-trial release.  In addition, Mr. Cohen filed his own affidavit which stated:

> The sworn statements of Sharon Quinn and John Grieco were not prepared by me, or any associate or paralegal employed by this office. Ms. Quinn and Mr. Grieco got my cell phone number from a private investigator who has been investigating the death of Hon. John Michalski and is now looking into the death of Crystal Quinn. I have been interacting with that private investigator during the course of my defense of Peter Gerace.

Reply Support Mot. Pre-Tr. Release, at 15 ¶ 8 (Cohen Affidavit), Dkt. 604, *United States v. Gerace*, 1:19-CR-227, (dated Aug. 15, 2023).

The private investigator to whom Mr. Cohen referred was none other than Mr. Lawrence—who interviewed Sharon Quinn and Mr. Grieco at Mr. Cohen's behest.

## II.    Legal Framework

"The government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized." *Stewart*, 907 F.3d at 685 (quoting *Ebbers*, 458 F.3d at 118). Indeed, grants of use immunity "may well hamper the government in a future prosecution of a witness" because the "government would have to show that the immunized testimony was not the source of any evidence it presents" at trial, "and that the testimony of government witnesses was not tainted by their knowledge of the immunized testimony." *Ebbers*, 458 F.3d at 118 (citing *Kastigar v. United States*, 406 U.S. 441, 460 (1972) and *United States v. North*, 920 F.2d 940 (D.C. Cir. 1990)). And "[w]hile this burden can be met by cataloguing or 'freezing' the evidence known to the [g]overnment prior to the immunized testimony, that technique is not available when continuing investigations disclose vital evidence after, though not resulting from, the immunized testimony." *Turkish*, 623 F.2d at 774. Moreover, "the prosecutors most knowledgeable about an investigation may in some circumstances be obliged to . . . arrange for a new team of investigators and prosecutors to pursue the case against" the immunized witness, a consequence that functionally transforms the conferral of use immunity into a potent tool of prosecutorial disqualification. *Id.* Worse, "defense witness immunity could create opportunities for undermining the administration of justice by inviting cooperative perjury among law violators," as co-defendants or co-conspirators "could secure use immunity for each other, and each immunized witness could exonerate his co-defendant . . . by falsely accepting sole responsibility for the crime . . ." *Id.* at 775.

9

In part due to these dire repercussions, only "under 'extraordinary circumstances'" might the Fifth Amendment's Due Process Clause "require the government [to] confer use immunity on a witness for the defendant."[4] *Praetorius*, 622 F.2d at 1064. A defendant requesting such relief must make a two-pronged showing:

> First, the defendant must show that the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation. . . . Second, the defendant must show that the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source.

*Ebbers*, 458 F.3d at 119 (internal quotation marks and citations omitted).

However, where the "witness for whom immunity is sought is an actual or potential target of prosecution," courts should "summarily reject" the immunity request provided the prosecutor present to the Court "the circumstances that support the prosecutor's suspicion of the witness's criminal activity." *Turkish*, 623 F.2d at 778. This, alone, is sufficient "to foreclose any inquiry concerning immunity for that witness." *Id.* Claims for immunity should also be "summarily rejected" where the defendant has failed to "sufficient[ly] show[] that the witness's testimony is *clearly* exculpatory, material, *and unobtainable from other sources*." *Todaro*, 744 F.2d at 9 (emphases added).

---

[4]    Mr. Gerace assumes that the right to compel defense witness immunity is a feature of his Sixth Amendment "right to present a defense." Dkt. 960 at 19. The Second Circuit has rejected that argument, concluding that "it is difficult to see how the Sixth Amendment on its own force places upon either the prosecutor or the court any affirmative obligation to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity." *Turkish*, 623 F.2d at 774. To the extent that any right to defense-witness use-immunity exists, it emerges from modern interpretations of the Fifth Amendment's Due Process Clause. *Id.* at 777.

### III.    Application

Mr. Gerace's motion should be denied for four independent reasons.  First, the government has not "used immunity in a discriminatory manner, [ ] forced a potential witness to invoke the Fifth Amendment through overreaching, or deliberately denied immunity for the purpose of withholding exculpatory evidence." *Ebbers*, 458 F.3d at 119.  Thus far, the government has immunized one individual related to Mr. Gerace—Mr. Soehnlein—and that immunity was conferred *to benefit Mr. Gerace*, ensuring his counsel could continue representing him without engendering a *per se* conflict of interest.  Likewise, no "overreaching" is required for the government to harbor significant concerns that Mr. Cohen's conduct justifies his status as a target or potential target.  *Id.*  And there is zero evidence that the government has "deliberately denied immunity for the purpose of withholding exculpatory evidence."  *Id.* Indeed, the government is unaware of *any* exculpatory information Mr. Cohen possesses, and even Mr. Gerace cannot articulate what exculpatory testimony Mr. Cohen would actually give.

Second, Mr. Cohen's status as an "actual or potential target" for prosecution requires this Court to "summarily reject" Mr. Gerace's request that he be immunized.  *Turkish*, 623 F.2d at 778; *Todaro*, 744 F.2d at 9 ("We reiterate our view that a witness' status as an actual or potential target of prosecution *always* warrants summary rejection of a claim for defense witness immunity." (emphasis added)).  Nevertheless, Mr. Gerace invites this Court to probe the government's investigative steps to determine whether Mr. Cohen is *really* a target or potential target. Dkt. 960 at 18.  Putting aside that the government *has* taken investigative steps after identifying Mr. Cohen as an unindicted co-conspirator, including submitting two

crime-fraud applications, *Turkish* makes clear that a "prosecutor need only . . . set[] forth the circumstances that support the prosecutor's suspicion of the witness's criminal activity." 623 F.2d at 778. The government has repeatedly made that showing in court filings accessible to Mr. Gerace and does so again today. Nothing more is required "to foreclose any inquiry concerning immunity for" Mr. Cohen. *Id.*

Third, Mr. Gerace has failed to sufficiently show that Mr. Cohen's "testimony is *clearly* exculpatory, material, *and unobtainable from other sources.*" *Todaro*, 744 F.2d at 9 (emphases added). Mr. Gerace offers only the conclusory claim that Mr. Cohen's testimony "would be material and exculpatory." Dkt. 960 at 16. But this representation is bereft of any substantive details, and, as in *Todaro*, contains no meaningful "indication of what the witness[] could be expected to testify about at trial" or *why* his testimony would exculpate Mr. Gerace. 744 F.2d at 9.[5] At best, Mr. Gerace contends that Mr. Cohen "can testify about the purpose of those litigation steps, the circumstances under which affidavits were obtained and submitted, the factual basis for the defense position concerning Crystal Quinn's death, and whether any 'false suicide' narrative was knowingly advanced." Dkt. 960 at 16.

But the fact that Mr. Cohen *could* testify to these topics says nothing about whether his testimony will be exculpatory. For example, if the "purpose" of the "litigation steps" was to engineer judicial rulings through fraud, Mr. Cohen's testimony would be inculpatory, not exculpatory. And if Mr. Cohen acknowledges that, for Mr. Gerace's benefit, he caused the insertion of statements that Sharon Quinn and Mr. Grieco never made to Mr. Lawrence, his testimony would hardly be exculpatory.

---

[5]    By contrast, the defendant in *Ebbers* extensively detailed the testimony that, if immunized, three defense witnesses would provide. *See Ebbers*, 458 F.3d at 120–22. Even then, the Second Circuit concluded that the witnesses' absence did not "affect[] the total mix of evidence before the jury." *Id.* at 120.

Fourth, Mr. Gerace has not shown that he cannot solicit evidence concerning the "purpose" and circumstances surrounding certain "litigation steps" through other sources. The indictment reflects three categories of conduct implicating Mr. Gerace and Mr. Cohen in an obstruction conspiracy: (1) the effort to "retain" a new attorney for Ms. Quinn; (2) the scheme to fraudulently induce Judge Sinatra into recusing from 1:19-CR-227; and (3) the submission of falsified affidavits before Judge Vilardo to obtain Mr. Gerace's release.  Mr. Gerace could avail himself of evidence independent of Mr. Cohen as to each category.

For starters, Mr. Gerace could interview M.B., Mr. D'Amico, other individuals at Mr. Cohen's firm who may have worked with him on the Gerace matter in February 2023, or move to admit relevant electronic evidence concerning Mr. Cohen's efforts to sideline Mr. D'Amico and install M.B. as Ms. Quinn's attorney.  There is no indication that Mr. Gerace has taken any such steps.

Regarding the second category, Mr. Gerace could call Mr. Soehnlein, who is immunized and served as Mr. Cohen's co-counsel during the relevant period.  For this reason, Mr. Soehnlein is well-positioned to testify to the "purpose" behind the "litigation steps" that resulted in Judge Sinatra's recusal.  Dkt. 960 at 16.  As Mr. Cohen's former co-counsel, Mr. Soehnlein can also share the "mental impressions" Mr. Cohen and/or Mr. Gerace shared with him, as well as "communications, investigative steps, or reasoning for pursuing a particular litigation strategy"—topics Mr. Gerace insists only Mr. Cohen can address.  *Id.* Mr. Gerace looks past Mr. Soehnlein almost entirely, and his prior assertion that Mr. Soehnlein might be unwilling to testify for Mr. Gerace only underscores the problem posed by Mr. Gerace's motion: if Mr. Cohen's testimony is truly exculpatory, Mr. Soehnlein would logically be willing to corroborate it.  Gerace Mem. Opp. Gov. Mem. Privilege & Forfeiture

by Wrongdoing at 43, Dkt. 853, (docketed Apr. 16, 2026) (noting that "there are issues" regarding Mr. Soehnlein's "willingness and ability to testify for the defense"). His reluctance suggests that Mr. Cohen's testimony may be geared toward protecting Mr. Gerace, not telling the truth—exactly the cooperative-perjury concern *Turkish* warns against. *See Turkish*, 623 F.2d at 775 (warning that use immunity for defense witnesses can be manipulated to "invit[e] cooperative perjury among law violators").

Less compelling than his suggestion that Mr. Cohen would exculpate him as to the orchestrated recusal is Mr. Gerace's contention that the government immunized Mr. Soehnlein to secure a "tactical advantage." Dkt. 960 at 16. The government does not intend to call Mr. Soehnlein; the only party who stands to benefit from his immunity is Mr. Gerace— who has not subpoenaed him.

Turning to the third category, Mr. Gerace could call Mr. Eckert, who represented Mr. Gerace alongside Mr. Cohen during the period the affidavits were prepared. *See* Not. Atty. Appearance, Dkt. 530, 1:19-CR-227, (dated June 20, 2023) (notifying Mr. Eckert's appearance); Minute Entry, Dkt. 622, 1:19-CR-227, (dated Sept. 6, 2023) ("Attorney Cohen moved orally for his firm and himself to be relieved as counsel for defendant Gerace. Defendant Gerace joined in motion. Court granted motion . . ."). Mr. Eckert could testify about "communications, investigative steps, or reasons for pursuing a particular litigation strategy" in connection with the falsified affidavits because, unlike Mr. Soehnlein, Mr. Eckert "was . . . representing Mr. Gerace at that time." Dkt. 960 at 16–17. Additionally, Mr. Gerace could call Mr. Lawrence, his private investigator, who was intimately involved in the creation of the affidavits; the notary, who notarized the affidavits; and/or Mr. Cohen's legal assistant, "Marissa," who can be heard assisting Mr. Cohen in his meeting with Sharon Quinn and Mr.

Grieco.  Mr. Gerace has not explained why any of these witnesses are insufficient, or what specific exculpatory testimony Mr. Cohen could offer that they cannot.

In sum, Mr. Gerace's right to a fair trial under the Fifth Amendment does not entitle his co-conspirators to use immunity.  The government is not withholding use immunity for a discriminatory reason, and its concern as to Mr. Cohen's conduct are not premised on a strained theory of criminal wrongdoing.  *See Ebbers*, 458 F.3d at 119.  To the contrary, the government has a legitimate, well-documented basis to believe that Mr. Cohen earned his status as an actual or potential target for prosecution.  This, alone, is sufficient "to foreclose any inquiry concerning immunity" for him.  *Turkish*, 623 F.2d at 778.  Moreover, Mr. Gerace has fallen far short of carrying his burden establishing that Mr. Cohen's testimony would "clearly" and materially exculpate Mr. Gerace, and is "unobtainable from other sources." *Todaro*, 744 F.2d at 9.  And because Mr. Gerace cannot even articulate what exculpatory evidence Mr. Cohen would offer, any accusation that the government's refusal to immunize Mr. Cohen is motivated by a desire to withhold exculpatory evidence from Mr. Gerace falls flat.  Accordingly, the motion should be denied.

DATED:  Buffalo, New York, May 26, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:    s/CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716.843.5881
Casey.Chalbeck@usdoj.gov