IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                  23-CR-99-EAW

SIMON GOGOLACK, et al.,

Defendants

---

## GOVERNMENT'S FIRST AMENDED OMNIBUS REPLY IN SUPPORT OF ITS MOTIONS IN LIMINE

**THE UNITED STATES OF AMERICA**, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, Casey L. Chalbeck and Katerina F. Powers, Assistant United States Attorneys, hereby provides the following reply in support of its Pre-Trial Statement of the Facts and Motions in Limine (Dkt. 925).

> **I.    The Court Should Admit Ms. Quinn's Non-Testimonial Hearsay Statements.**
>
> **1.    Ms. Quinn's Statements about Blackmailing Police Officers on Mr. Gerace's Behalf are Statements Against Her Penal Interest.**

Mr. Gogolack argues that Ms. Quinn's admission to J.R. that "Gerace had [her] sleeping with police detectives and recorded videos to use as leverage/blackmail" is not a statement against her penal interest pursuant to Rule 804(b)(3). Gogolack Resp. Opp. Gov. Mots. Lim., at 4, Dkt. 966, (dated May 15, 2026). In particular, Mr. Gogolack suggests that Ms. Quinn simultaneously "sle[pt] with police detectives" of her own accord and was "a victim of Gerace's sex trafficking," such that the statements were not against her penal interest. *Id.*

This argument fails for three reasons.  First, it rests on an incomplete and inaccurate articulation of the government's theory of admissibility.  Ms. Quinn did not disclose to J.R. that she was *merely* having intercourse with police detectives, as Mr. Gogolack suggests.  Rather, Ms. Quinn reported that she was having sexual relations with law enforcement—at Mr. Gerace's behest—to develop "blackmail/leverage" for Mr. Gerace's benefit.  GX-3637A at 2.  As Mr. Gogolack does not contest, it is a crime under New York law to "expose a secret . . . whether true or false, tending to subject some person to hatred, contempt or ridicule"— that is, it is a crime to "blackmail" others.  N.Y. Pen. Law 155.05(e).  Ms. Quinn's statements directly implicate herself in an extortion conspiracy.

Second, there is no evidence that Mr. Gerace forced, threatened, defrauded, or coerced Ms. Quinn into participating in the extortion conspiracy, such that she could be called a "sex trafficking" victim.  Dkt. 966 at 4; *see* 18 U.S.C. § 1591(b)(1) (requiring the government to prove that commercial sex acts were "effected by means of force, threats of force, fraud, or coercion" for adult victims).  To the contrary, Ms. Quinn told J.R. that she would have engaged in the blackmail independent of Mr. Gerace.  GX-3637A at 2.

Third, even if Ms. Quinn was a victim of Mr. Gerace's wrongdoing, it is of no consequence to the Rule 804(b)(3) analysis.  Rule 804(b)(3) asks only whether "a reasonable person in the declarant's shoes would perceive the statement as detrimental to . . . her own penal interest."  *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004), *supplemented*, 108 F. App'x 667 (2d Cir. 2004).  Ms. Quinn's statements plainly meet that standard, even if, in some hypothetical prosecution, Ms. Quinn relied on an affirmative defense of duress that diminished her legal culpability.

In sum, Ms. Quinn's statements about blackmailing police detectives at Mr. Gerace's behest are admissible under Rule 804(b)(3) because Ms. Quinn is unavailable, the statements are against her penal interest, and, for the reasons detailed in the government's Supplemental Letter, they are supported by corroborating circumstances that indicate their trustworthiness. *See* Supp. Ltr., at 4–5, Dkt. 947, (dated May 8, 2026).

### 2. Ms. Quinn's statements concerning her fear of the bikers are relevant to show why she traveled to Wellsville, New York with Mr. Gogolack.

Mr. Gogolack next claims—incorrectly—that the government seeks to admit Ms. Quinn's statements indicating her fear of the bikers to show "that it was the bikers who killed her." Dkt. 966 at 5. As Mr. Gogolack correctly notes, Ms. Quinn's statements of fear are admissible to prove her then-existing emotional or mental state, but not the truth of any belief conveyed, or fact remembered. *See id.* at 5; Fed. R. Evid. 803(3) (providing that "statement[s] of memory or belief" are not admissible "to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will"). That is why—far from offering the statements to prove the facts Ms. Quinn believed—the government argued that the statements

> are relevant to show why Ms. Quinn left the Buffalo, New York area to travel south to Wellsville, New York with Mr. Gogolack. Moreover, in showing that Ms. Quinn feared for her safety—and took steps to protect herself by leaving for Wellsville—the statements directly rebut the suicide narrative that the defendants seek to advance at trial for the common-sense reason that self-preservationist efforts are inconsistent with suicidality.

Dkt. 947 at 5.

Content with his straw man, Mr. Gogolack never meaningfully responds to the government's arguments. The Court should not permit the defendants to introduce a glut of mental health records and evidence significantly pre-dating Ms. Quinn's death in service of the suicide narrative while simultaneously limiting the government's ability to rebut that

story.  Ms. Quinn's expressed fear explains why she left Buffalo for Wellsville with Mr. Gogolack; her efforts to protect herself—rather than harm herself—directly undermine the defendants' suicide narrative.  Absent this evidence, the jury will be left with the wrong impression that Ms. Quinn left for Wellsville to kill herself—a conclusion the evidence simply does not support.  Accordingly, the Court should permit the government to introduce evidence of Ms. Quinn's fear of the bikers.

   **3.     Ms. Quinn's text messages with Mr. Gogolack and Deb Wilczak's Expired Contact during the July 28, 2023, biker confrontation are admissible as excited utterances.**

Mr. Gogolack, Mr. Hinkle, and Mr. Knight each argue that Ms. Quinn's text messages with Mr. Gogolack and Deb Wilczak's expired contact are not admissible as excited utterances because "the [g]overnment cannot show that any startling event actually occurred."  Dkt. 966 at 8; *see* Hinkle Resp. Opp., at 4, Dkt. 953 (dated May 15, 2026) (arguing that "[t]he evidence is *clear* that on July 27 and into July 28, 2023" Ms. Quinn was hallucinating due to drug consumption); Knight Sec. Resp. Opp. Gov. Mots. Lim., at 1, Dkt. 962, (dated May 18, 2026) ("There is no independent evidence of a confrontation or bikers.").  To make sense of the text messages, the defendants assert that Ms. Quinn was hallucinating due to drug consumption.  Dkt. 953 at 4 (arguing that "[t]he fact that Ms. Quinn was in such a drug-induced hallucinating state of mind" makes "it impossible to distinguish between her 'then-existing' feelings and her drug-induced hallucination or memory"); Dkt. 962 at 1 ("We know that the night before this incident [Ms. Quinn] showed up to a card game 'fucked up', 'stoned', or 'high'.  It also appears they were up all night and Crystal Quinn was eating a bunch of Xanax.").  Relatedly, Mr. Knight urges that Ms. Quinn's statements are so unreliable that their admission violates his Confrontation Clause rights under the Sixth Amendment.  Dkt. 962 at 4.

4

These arguments are well suited before a jury—but they are unavailing for the purpose of determining the admissibility of Ms. Quinn's excited utterances.  Mr. Hinkle does not cite *any* evidence that Ms. Quinn was under the influence of drugs on either July 27th or July 28th, beyond one statement made by Mr. Gogolack during the confrontation: "Ur trippin n we'll go out to get her then".  GX-423H at 40.  For Mr. Hinkle, reading this single statement through the looking-glass and divorced from all other evidence "confirms Ms. Quinn's hallucinating state of mind."  Dkt. 953 at 4.  But, read in context, Mr. Gogolack's use of the word 'trippin' was intended to calm Ms. Quinn, not evidence of hallucination.  *See Trippin*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=trippin, (last visited May 21, 2026) (noting that 'Trippin' is a standard slang term used describe someone who "is overreacting or getting all bent out of shape over something small"). Nothing in the record suggests Ms. Quinn had ingested hallucinogens before or during the confrontation.

Next, Mr. Knight—again, without citation—represents that Ms. Quinn was "fucked up" at the poker game, but his own statements to the FBI contradict that claim:

| FK: | So you know, again I-I-I mean, I-I've seen Simon way more, you know, an-and I don't, honestly I don't even think he was that fucked up that night. |
|---|---|
| AP: | Okay. |
| FK: | And she didn't seem to be either. |

GX-508TX at 14 (Tran. Knight Int., dated Aug. 3, 2023).

Moreover, Mr. Knight's claim that Ms. Quinn was "eating a bunch of Xanax" appears to come from Mr. Gogolack's August 2, 2023, interview with the FBI.  However, as that transcript makes clear, Mr. Gogolack claimed that Ms. Quinn was "eating a bunch of Xanax" the night *before* she died, or July 31st—not the night of July 27th or the early morning hours of July 28th.  GX-502 at 41 (Tran. Gogolack Int., dated Aug. 2, 2023).

5

The defendants adopt strained interpretations because the evidence, viewed collectively, demonstrates that the biker confrontation occurred.  Mr. Gogolack confided in his father that he was "really scared" after "red dots" from "lasers" affixed to firearms beamed through his window at 296 Scott Avenue during the early morning hours of July 28, 2023. GX-3566K at 15.  Though Mr. Knight—again without citation—asserts that Mr. Gogolack "did not see" any lasers, Dkt. 962 at 2, his argument is belied by Mr. Gogolack's representations to his father and Mr. Gogolack's own text messages, in which he indicated he was at the "top" of the "rood" in his bulletproof "vest."  Mr. Gogolack further recounted that Ms. Quinn was "so terrified that she literally went outside and started screaming 'if you're going to shoot me, get it over with.'"  GX-3566K at 15–16. Later on July 28th, Mr. Gogolack told Deb Wilczak that "an old friend" of Ms. Quinn's paid them a visit the night prior.  GX-3679D at 20–21.

Electronic evidence also supports a finding that a startling event occurred.  At approximately 5:28 a.m., right around the time that the text messages indicate that the confrontation began, Ms. Quinn sent a "pin" of her location to her mother's email address. Consistent with Mr. Gogolack's statements to his father, Ms. Quinn sent a second "pin" of her location to Wilczak placing her outside of Mr. Gogolack's residence.  Mr. Gogolack's text messages with Ms. Quinn also support the inference that a startling event was occurring: in his own words, Mr. Gogolack advised to Ms. Quinn that he was at the top of the "rood" in his "vest."  Furthermore, at the beginning of the confrontation, Mr. Gogolack began using a police scanning application that could alert him if law enforcement was responding to the scene.  *See* GX-423AN.

Owing to Mr. Gogolack's use of the police scanner application, Google location data indicates that Mr. Gogolack traveled from his residence at 296 Scott Avenue to the interior of Mr. Knight's home. Mr. Knight is a close associate of the Rare Breed Motorcycle Club, a support club of the Outlaws, the motorcycle gang about whom Ms. Quinn made inculpatory statements to law enforcement. Mr. Gogolack and Mr. Knight both make much ado about the fact that the geofence data failed to identify other individuals within its perimeter and argue that this absence of evidence is affirmative proof that no such confrontation occurred. Dkt. 966 at 9; Dkt. 962 at 2. But the location data is plainly underinclusive: it only captured Mr. Gogolack's device even though at least two others were indisputably present.

Taken altogether, there is sufficient evidence to show that a startling event occurred and that Ms. Quinn was under a state of excitement when she sent a series of frantic text messages to Mr. Gogolack and Deb Wilczak's expired contact. That evidence is all that is necessary to defeat the defendants' Sixth Amendment argument. *See Idaho v. Wright*, 497 U.S. 805, 815 (1990) (concluding that, for the purposes of the Sixth Amendment, the reliability of hearsay "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception").

Accordingly, this Court should determine that there is sufficient evidence of an actual startling event occurring, that Ms. Quinn sent the text messages "while under the stress of excitement caused by the event," and that her statements "relate[] to the startling event." *United States v. Wilson*, 642 F. Supp. 3d 380, 389 (W.D.N.Y. 2022) (Wolford, C.J.).

### 4. Ms. Quinn's directives to Mr. Gogolack are admissible as non-hearsay.

Mr. Hinkle next argues that certain of Ms. Quinn's statements to Mr. Gogolack "are not commands" and thus are inadmissible. Dkt. 953 at 5. Specifically, Mr. Hinkle argues that "[t]he statements 'Killed' and 'Simon Please' are not commands as the government

alleges. 'Killed' is an end-result statement and 'Simon Please' is a simple statement. Neither fall[s] into any hearsay exception or admission as a non-hearsay statement." *Id.* This argument should be rejected.

Mr. Hinkle's argument concerns the following text messages sent by Ms. Quinn to Mr. Gogolack:



GX-423H at 37–40.

A jury may reasonably infer that "Killed" simply corrects the prior typo "killer." Accordingly, it appears that Ms. Quinn is correcting her use of the word "killer," such that she may be read as directing Mr. Gogolack, "And if they do just let it happen don't get your ass . . . killed". That is a command, and thus is not hearsay. *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021). Likewise, "Simon please" is not an assertion, but a plea to Mr. Gogolack to heed her commands. *Cf. United States v. Gordon*, 936 F.2d 573, *3 (6th Cir. 1991)

(Table Dec.) ("Tyrone Walker's testimony that he told Marcus Whittiker to 'be truthful' is not hearsay because the out-of-court declaration—'be truthful'—is no more an 'assertion' than 'please join my drug ring' would be.").

Mr. Hinkle next argues that Ms. Quinn's statements, "Should I lock door I'm not", "Should I lock door", and "Let them kill me" are inadmissible as statements of her then-existing mental or emotional state. Dkt. 953 at 6. But the government never argued that these statements were admissible pursuant to Rule 803(3). Rather, the government offered these statements as non-hearsay because they are questions or commands. *See* Gov. Mots. Lim., at 80–81. Accordingly, Mr. Hinkle's objections should be overruled and Ms. Quinn's statements admitted.

### 5.    Mr. Gogolack's text messages are relevant.

Mr. Hinkle also claims that some of Mr. Gogolack's text messages are irrelevant under Rule 401 and "confusing" under Rule 403. Dkt. 953 at 5. In particular, Mr. Hinkle argues that Mr. Gogolack's text message, "Told U I'm Heard to kill" should be excluded. *Id.* (citing GX-423H at 38). To the contrary, the message is both relevant and easy to understand. Mr. Gogolack's text messages are relevant to show both that a confrontation occurred and that Mr. Gogolack was attempting to lull Ms. Quinn into a false sense of security—a reality reflected in the dichotomy between Mr. Gogolack's efforts to assuage Ms. Quinn while monitoring a police scanning application for any 911 calls she might place. Moreover, Mr. Gogolack's text messages are not so confusing that they demand exclusion. Common sense dictates that Mr. Gogolack made a minor typographical error when trying to convey that he is "[h]ard to kill." At the very least, the jury should be permitted to draw that inference. Accordingly, the Court should overrule this objection and admit Mr. Gogolack's text messages.

9

6.    **Several of Ms. Quinn's statements are admissible as evidence of her then-existing mental and emotional state or to show the effect on the listener.**

Mr. Hinkle further argues that certain of Ms. Quinn's statements do not qualify as reflections of her then-existing mental or emotional condition pursuant to Rule 803(3). *See* Dkt. 953 at 5–8. Specifically, Mr. Hinkle argues that Ms. Quinn's statement, "I'm love u I didn't do anything wrong", GX-423H at 38, references "past behavior" and thus is inadmissible under Rule 803(3). As the government argued in its initial brief, Ms. Quinn's statement "I'm love u"—likely a typographical error for "I love u"—describes her contemporaneous love for Mr. Gogolack. The remainder of the statement—"I didn't do anything wrong"—is offered "to show Ms. Quinn's state of mind—specifically, that the confrontation prompted Ms. Quinn to defend her choices." Gov. Mots. Lim., at 73. Mr. Hinkle offers no response to this argument.

He also argues that Ms. Quinn's statement, "I'm so sorry I just felt safe all I want is U in my arms" is inadmissible because "[i]t references a past condition of how she had once previously felt and *wanted* 'U' in her arms." Dkt. 953 at 5 (emphasis added). But there is no textual evidence to suggest that Ms. Quinn's statement, "I'm so sorry," refers to a past event. To the contrary, the text plainly refers to her then-existing emotional state. Likewise, Ms. Quinn's statement "all I want"—not "wanted"—"is U in my arms" describes Ms. Quinn's contemporaneous desire for Mr. Gogolack. Only Ms. Quinn's statement, "I just felt safe", describes a past emotional state, and it is admissible to show the effect on the listener—Mr. Gogolack.

A similar conclusion applies to the next set of statements Mr. Hinkle seeks to preclude: "I'm so fucking sorry I really wanted to see U so bad I care about U like I have nobody". Mr. Hinkle argues that "[t]his text pertains to a backwards past event" and does "not go to Ms.

10

Quinn's forward[] and 'then-existing' state of mind." Dkt. 953 at 6. Though it is true that Ms. Quinn's statement, "I really wanted to see U so bad" refers to a past desire, her statements, "I'm so fucking sorry" and "like I have nobody" refer to contemporaneous mental and emotional states, and thus are admissible under Rule 803(3). And, as before, Ms. Quinn's backward-looking statement that she "wanted to see [Mr. Gogolack] so bad" is admissible to show the effect on the listener.

Mr. Hinkle also claims that Ms. Quinn's statement, "I've been through this before," is not admissible pursuant to Rule 803(3). Dkt. 953 at 8. The government agrees—which is why it argued that the statement was admissible pursuant to Rule 804(b)(6) or, alternatively, to show the effect on the listener. Gov. Mots. Lim., at 86. As the government previously argued, "[t]hat effect is evident from Mr. Gogolack's response, in which he reassured Ms. Quinn, "I have, 1 and I'll get u through the best I can. Ur not alone.n scared is what will keep u on ur toes." GX-423H at 43. Mr. Hinkle does not respond to this argument.

Regarding Ms. Quinn's statement, "I don't want any more drama," Mr. Hinkle urges that this, too, refers to "a past event that she would prefer not to be continued," and thus is inadmissible under Rule 803(3). Dkt. 953. Not so. That a statement bears some logical nexus to the past does not transform it into a "backward" looking statement. What matters for the purposes of a Rule 803(3) analysis is that Ms. Quinn communicated about an emotion (or mental state) in the present tense and thereby signaled that she felt the emotion at the time she sent the text message. Here, that emotion was a desire to avoid drama. Accordingly, Mr. Hinkle's objections should be overruled.

11

## II.    The Court should Admit Evidence of Mr. Gerace's Admissions by Silence.

### 1.    The government has established a sufficient foundation under Rule 801(d)(2)(B).

Federal Rule of Evidence 801(d)(2)(B) provides that a statement is not hearsay where it "is one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B).  The Rule expressly recognizes that, under appropriate circumstances, silence in response to an accusation may constitute an adoptive admission.  As the Advisory Committee explained, "[w]hen silence is relied upon, the theory is that the person would, under the circumstances, protest if the statement were untrue." Fed. R. Evid. 801 advisory committee's note to subdivision (d); *see also United States v. Hoosier*, 542 F.2d 687, 688 (6th Cir. 1976).  Whether such an inference is appropriate depends upon "probable human behavior." Fed. R. Evid. 801 advisory committee's note to subdivision (d).  Consistent with that principle, evidence that a defendant remained silent in response to incriminating accusations where the surrounding circumstances support an inference that an innocent person would ordinarily deny the allegations is admissible under the rule.

Importantly, the government is not required to conclusively prove adoption before the evidence may be admitted.  The Court need only determine whether "sufficient foundational facts have been introduced for the jury reasonably to conclude that the defendant did actually hear, understand and accede to the statement." *United States v. Sears*, 663 F.2d 896, 904 (9th Cir. 1981).  Once that threshold is met, competing interpretations of the defendant's silence are matters for the jury.

That standard is satisfied here.  According to the government's proffer, K.H.—the defendant's former cellmate—observed the defendant participating in a videochat during which a woman appeared to be feeding frozen rats to a snake.  K.H. then directly asked the

12

defendant in sum and substance, whether those were the same rats placed at Crystal Quinn's house and whether the defendant "hot shotted" Crystal Quinn. The defendant did not deny either accusation.

Those were not vague or abstract remarks. They were direct accusations tied to specific facts alleged in the charged offenses. A reasonable jury could conclude that an innocent person confronted with accusations that he orchestrated witness intimidation and murder would ordinarily deny them. The defendant argues that the government has not definitively established that the defendant heard, understood, or was paying attention to K.H. But foundational facts supporting an adoptive admission may be established circumstantially.

Here, the alleged exchange occurred between cellmates—in the same cell. Despite being in jail, despite knowing the seriousness of the accusations, Mr. Gerace still did not deny them. Under those circumstances, a jury may reasonably infer that Mr. Gerace heard and understood the accusations directed at him.

Mr. Gerace's suggestion that the government failed to establish that he heard or understood the statements mischaracterizes the governing standard and the case law applying it. In *United States v. Sears*, the Ninth Circuit found the foundational requirements for an adoptive admission lacking because the record reflected an extraordinary and obvious impediment to comprehension: one defendant suffered from a hearing problem that cast doubt on whether she could hear or understand the statements at issue. *United States v. Sears*, 663 F.2d 896, 904 (9th Cir. 1981). *Sears* therefore illustrates the type of concrete evidentiary deficiency that may preclude admission. No comparable circumstances exist here. To the contrary, the surrounding facts strongly support the inference that the defendant both heard and understood the questions directed to him.

13

Likewise, although distinguishable on its facts, *United States v. Jinadu* reinforces that the government has satisfied the foundational requirements here. There, the court found sufficient indicia of adoption where the statement was made in the defendant's presence, the defendant demonstrated he spoke English, and the surrounding circumstances showed he understood the substance of the conversation. *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996).[1]    The court considered the broader contextual indicators demonstrating the defendant heard and understood the statements. *See id*.  Those same indicators are present here: the statements were made in Mr. Gerace's presence, in the same room and in Mr. Gerace's native tongue (English).  To the extent Mr. Gerace claims that he—a prolific consumer of illegal narcotics—may not have understood the phrase "hot shot," he presents little more than a factual issue for the jury's consideration on cross-examination.

Mr. Gerace's proposed alternative interpretation—that "hot shot" could refer to the Merriam-Webster's definition of "a talented or successful person who often has a showy or flashy manner"[2]—actually underscores why the evidence is admissible.  If Mr. Gerace genuinely believed the witness was referring to innocuous conduct, one would naturally expect confusion, clarification, or a denial in response.  But Mr. Gerace offered none.  The absence of any corrective response supports the inference that Mr. Gerace understood the statement's incriminating meaning and chose not to deny it.  The existence of alternative explanations for Mr. Gerace's silence does not render the evidence inadmissible. Nevertheless, those competing inferences go to the weight of the evidence, not admissibility.

---

[1]    Although the defendant in *Jinadu* verbally responded "yes," the court's analysis did not treat that fact as the sole basis for admissibility.

[2]    "Hotshot," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/hotshot (last visited May 25, 2026) (defining "hotshot").

14

Mr. Gerace further attempts to characterize K.H.'s statements as "ambiguous questions rather than direct declarative accusations." But Rule 801(d)(2)(B) does not require a formally declarative accusation for silence to be probative. The relevant inquiry is whether, under the circumstances, the statement conveyed an incriminating meaning that would naturally call for a denial if untrue.

Here, the questions were plainly accusatory in substance. Asking Mr. Gerace whether the frozen rats in the videochat were the same ones placed at Crystal Quinn's house unmistakably implied Mr. Gerace's connection to witness intimidation. Likewise, asking whether Mr. Gerace arranged for a "hot shot" directly accused him of involvement in a homicide. Although phrased as questions, those statements communicated clear allegations of criminal conduct that naturally call for a denial if untrue.

### 2. *United States v. Flecha* does not bar admission here.

In *Flecha*, the Second Circuit held that the defendant's silence in the face of a third person's post-arrest statement "Why so much excitement? If we are caught we are caught," did not render the statement admissible against the defendant given that the defendant was in custody. *United States v. Flecha*, 539 F.2d 874, 876-77 (2d Cir. 1976). The court emphasized the uniquely custodial circumstances of the exchange, observing that an arrested person may naturally remain silent because "silence is usually golden." *Id*. at 877. The statement itself was also vague and indirect. *See id*.

Critically, however, *Flecha* did not announce a categorical rule prohibiting adoptive admission in jailhouse settings. The Second Circuit in fact later clarified that *Flecha* turned on its particular facts. *See United States v. Williams*, 577 F.2d 188, 194 (2d Cir. 1978). In *United States v. Williams*, the court distinguished *Flecha* and explained that "in light of the custodial circumstances [in *Flecha*] it was not likely that the appellant would have responded to such a

vaguely phrased comment[.]" *Id*.  *Williams* thus reaffirmed that Rule 801(d)(2)(B) remains applicable where the surrounding circumstances support the inference that an innocent person would ordinarily deny the accusation.

The circumstances here are materially different from *Flecha*.  The alleged exchange did not occur during police interrogation, immediately after arrest, or in the presence of law enforcement officers.  Rather, it occurred during a videochat that the defendant took in his shared cell with K.H.  Moreover, unlike the vague statement in *Flecha*, the accusations here were direct and unmistakable: whether the frozen rats in the videochat were the same ones placed in Crystal Quinn's house and whether Mr. Gerace arranged for her to be "hot shotted." A reasonable juror could conclude that those accusations naturally called for denial if untrue.

**3.      The jailhouse context does not render the defendant's silence inadmissible.**

Mr. Gerace further argues that silence cannot reasonably be interpreted as acquiescence because inmates may avoid discussing criminal conduct with others, particularly individuals suspected of cooperating with the government.  But that argument, at most, identifies an alternative interpretation of Mr. Gerace's silence—not a basis for exclusion.

Rule 801(d)(2)(B) does not require the government to eliminate every possible innocent explanation for silence before the evidence may be admitted.  Nor does the jailhouse context eliminate the probative value of Mr. Gerace's silence here. According to Mr. Gerace's own account, he allegedly believed there may have been a jailhouse snitch involved in his case.  Yet despite that awareness, Mr. Gerace did not deny accusations. A jury may reasonably consider whether such silence reflected an admission.  Mr. Gerace's proposed alternative explanations for silence are subjects for cross-examination and argument to the jury, not grounds for wholesale exclusion of the testimony.

16

### 4.    The cited Fifth Amendment concerns are inapplicable.

Mr. Gerace's reliance on Fifth Amendment concerns is likewise misplaced.  Cases such as *Doyle v. Ohio* concern the impeachment use of a defendant's post-Miranda silence during a custodial interrogation. *See Doyle v. Ohio*, 426 U.S. 610, 618 (1976) ("[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warning."). In *Doyle*, the question was "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings." *Id*. at 611.

No such circumstances exist here. The alleged statements here arose during a private conversation with a fellow inmate, not a custodial interrogation by law enforcement.  Nor is the statement being offered in the impeachment context. Accordingly, the constitutional concerns animating *Doyle* are absent.

### 5.    Rule 403 does not warrant exclusion.

Finally, exclusion under Rule 403 is unwarranted. The evidence is highly probative because it concerns the defendant's reaction to direct accusations central to the conduct charged.  To the extent that the evidence is damaging, that is because it is probative—not because it is unfairly prejudicial. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997).  The defendant's asserted concerns—ambiguity, jailhouse culture, and K.H.'s credibility and motive to cooperate—are all matters appropriately addressed through cross-examination. These concerns go to the weight of the evidence—not its admissibility.  Accordingly, Mr. Gerace's objections should be overruled, and his admissions by silence admitted.

### III. The Court should Admit Evidence of Mr. Gogolack's Kidnapping of J.C. and C.B.

Mr. Gogolack and Mr. Knight both object to the admission of Rule 404(b) evidence concerning Mr. Gogolack's kidnapping of J.C. and C.B. in or about March 2023. Dkt. 966 at 10–14; Knight Resp. Opp. Gov. Mots. Lim., at 1–3, 11–13, Dkt. 955, (dated May 15, 2026). Mr. Gogolack urges that such evidence should be excluded because "[t]here is no similarity between the prior incident [i.e., the kidnapping], in which Gogolack allegedly held an individual at gunpoint over a stolen package, and the current incident in which" Gogolack allegedly "purposely gave Quinn fentanyl-laced drugs with the intent to silence her as a witness." Dkt. 966 at 10. Mr. Knight, meanwhile, contends that he is "having trouble understanding how Mr. Gogolack's" kidnapping of J.C. and C.B. "tends to prove" that Ms. Quinn's death "was not a 'mistake,'" as the government believes the evidence shows. Dkt. 955 at 12.

As to Mr. Gogolack's argument, his conduct during the kidnapping mirrors the government's theory here: threats of a staged overdose, use of a shotgun, disposal of evidence, and immediate fabrication of a cover story. As to Mr. Knight's purported confusion, those parallels make the charged conduct more intelligible to the jury—and bear directly on whether Mr. Gogolack intentionally killed Ms. Quinn.

Mr. Gogolack responds with a slew of inaccurate and misleading statements and suggestions. First, he claims that "[a]n examination of the various ammunition scattered throughout the house indicates that none of it was racked through weapons." Dkt. 966 at 12. But ammunition ejected—but not fired—from a shotgun would not bear any physical markings "indicat[ing] that . . . it was racked through" the weapon. *Id.* In other words, the rounds would only bear markings if they were fired, not simply racked and ejected. Second,

there was one shotgun recovered from Mr. Gogolack's residence—and it was not found "under a bed in another room," as Mr. Gogolack states. *Id.* Rather, law enforcement recovered it hidden in Mr. Gogolack's loft/attic—a fact probative of Mr. Gogolack's consciousness of guilt. While that, alone, refutes Mr. Gogolack's assertion that "[t]here is no evidence whatsoever that the shotgun was anywhere but under that bed when Quinn took a fatal dose of fentanyl," Ms. Quinn photographed Mr. Gogolack with the shotgun in the room in which she died between two-to-three days before her death. Notably, no shotgun shells appear visible on the floor.

Because Mr. Gogolack's conduct toward J.C. and C.B. closely parallels the evidence here, and are offered to prove intent, modus operandi, and the absence of a mistake or accident, the Court should admit a limited quantum of evidence regarding the kidnapping, threats, cover-up, and tampering in this case.

## IV. The Court should Admit Evidence of Mr. Gogolack's Participation in a Narcotics Conspiracy.

Mr. Knight seeks to exclude evidence of Mr. Gogolack's narcotics trafficking, arguing that it is "irrelevant to this case." Dkt. 955 at 10. This objection should be overruled. Mr. Gogolack is charged in Count 4 with distribution of fentanyl resulting in death. Dkt. 24 at 34. The government expects that Mr. Gogolack will contest his access to fentanyl at trial and argue that C.B. distributed fentanyl to both him and Ms. Quinn. Showing that Mr. Gogolack was a fentanyl dealer is necessary to prove Mr. Gogolack's "opportunity" to possess fentanyl and an absence of mistake when distributing it to Ms. Quinn. Fed. R. Evid. 404(b). Plainly, such evidence is relevant to the government's ability to prove Count 4, as well as Counts 1 through 3, which each incorporate Mr. Gogolack's intentional distribution of fentanyl to Ms. Quinn in their factual allegations. Dkt. 24 at 20 ¶ 47, 31 ¶ 1, 33 ¶ 1.

Furthermore, evidence of Mr. Gogolack's participation in a narcotics conspiracy is intrinsic to Counts 1 through 3, which allege that Mr. Gogolack intentionally distributed fentanyl to Ms. Quinn as part of his participation in various obstruction conspiracies. *See generally* Dkt. 24 at 1–34. To prove this allegation, the government will rely, in part, on Mr. Gogolack's advertisement of hitman services to his former co-defendant and drug dealer, Bernard Byrd, III. During the same time that he was expressing a desire to commit murder-for-hire with Byrd, Mr. Gogolack was re-inserting himself into Ms. Quinn's life. This evidence is directly probative of Mr. Gogolack's intent to join a conspiracy to murder Ms. Quinn and is inextricable with Mr. Gogolack's participation in a narcotics conspiracy. Accordingly, the Court should overrule Mr. Knight's objections and permit the government to introduce evidence of Mr. Gogolack's participation in a narcotics conspiracy.

## V.       The Court Should Admit Evidence of Mr. Gogolack's Use of S.D.'s Identity.

Mr. Knight also seeks to exclude evidence of Mr. Gogolack's prior impersonation of S.D. Dkt. 955 at 12–13. Though conceding that Mr. Gogolack's false statements to police responding to Ms. Quinn's death that Ms. Quinn was found in S.D.'s apartment is "arguably relevant and admissible," Mr. Knight presses that "the fact that Gogolack may have used this same person's name or identity in the past . . . is irrelevant to any material issue in the case." *Id.* at 12. This argument is unavailing for two reasons.

First, Mr. Gogolack's false impersonation of S.D. is intrinsic to this case because it "complete[s] the story of the crime on trial." *Id.* at 3 (quoting, ultimately, *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). Without this evidence, the jury could be left under the misimpression that Mr. Gogolack's false statement about the occupants of his residence was the consequence of his panic and intoxication, as opposed to a bald-faced lie designed to

20

distance himself from Ms. Quinn's death.  Second, the evidence is admissible to show that Mr. Gogolack's lie to law enforcement about S.D. was part of his "intent[ional]" "plan" to create a false narrative to cover up Ms. Quinn's death, and thus falls within the heartland of Rule 404(b).  Accordingly, the Court should overrule Mr. Knight's objection and admit evidence of Mr. Gogolack's false impersonation of S.D.

### V. The Court should admit association evidence relevant to the defendants' participation in the charged conspiracies.

Mr. Knight, Mr. Gerace, and Mr. Roncone object to the admission of evidence establishing the defendants' association with the Outlaws, Rare Breed, and Pharoah's.  Dkt. 955 at 5–10; Dkt. 971; Dkt. 959 at 5–9.  The Court should overrule these objections.  The government does not seek to admit gang-affiliation evidence to prove propensity or criminal disposition.  Rather, the evidence is offered to explain the relationships among the conspirators, the structure and operation of the charged conspiracy, the defendants' access to individuals capable of carrying out intimidation and violence, the motive for silencing Crystal Quinn, and the context in which the charged obstruction conspiracy arose. Such evidence is admissible where, as here, it is inextricably intertwined with the charged conduct and necessary to present a coherent narrative of the conspiracy. Because association evidence is plainly relevant to explaining how the conspiracy formed, the Court should overrule this objection.

### 1. The challenged evidence is admissible as background evidence of the charged conspiracy.

As set forth in the government's motion in limine, *see* Dkt. 862 at 11–19, such evidence is admissible because: (a) it provides critical background and context for the crimes charged; (b) it is intrinsic to the charged offenses and therefore not governed by Rule 404(b); and (c) its substantial probative value is not outweighed by the risk of unfair prejudice under Rule 403.

21

"[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).  Background evidence is admissible under Rule 403 to explain the circumstances surrounding the charged events and to furnish the jury with an understanding of the intent and meaning of a defendant's actions.  *Daly*, 842 F.2d at 1388; *see also United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997) (upholding admissibility of burglary evidence from earlier that night as relevant to motive and for context for the charged firearm offense under Rules 401 and 403).

Mr. Roncone argues that his "affiliation with the Rare Breed is irrelevant to the case at hand," as is any affiliation the Rare Breed "has with the Outlaws."  Dkt. 959 at 6.  This argument overlooks a constellation of evidence showing that the Rare Breed's relationship with a criminal organization motivated to kill Ms. Quinn is fundamental to understanding how the charged conspiracies operated.  First, Ms. Quinn directly identified the "wannabe crue"—which the jury may reasonably infer is a reference to the Rare Breed—during the July 28th biker confrontation.  Second, following Ms. Quinn's death, Mr. Roncone entered the Outlaws clubhouse where, according to witness P.C., he appeared nervous and sought to communicate with Mr. Ermin.  *See* GX-3525A at 1–2.  In an interview with the FBI, P.C., who the government believes is or was the president of the Outlaws Southern Tier Chapter, stated that Mr. Roncone knew Ms. Quinn and expressed his belief that Mr. Roncone had an "adult" relationship with Ms. Quinn.[3]  *Id.* at 1.  Third, Mr. Roncone communicated with Mr. Knight and Mr. Ermin during key junctures in the conspiracy, including on October 24, 2023, after the FBI executed search warrants at Mr. Hinkle's and Mr. Knight's residences.  Fourth,

---

[3]    At trial, the government intends to ask P.C. if his belief that Mr. Roncone had an "adult" relationship with Ms. Quinn was based on Mr. Roncone's statements and/or gestures.

Mr. Roncone's text messages show that he was stressed and nervous about law enforcement's scrutiny of him, itself evidence of his consciousness of guilt. Far from being irrelevant, Mr. Roncone's own conduct in the conspiracy is impossible to understand *without* the context of his association with the Rare Breed and the Rare Breed's association with the Outlaws.

After arguing that the evidence of his association with the Rare Breed is irrelevant, Mr. Roncone counters that he would stipulate to the fact that he is associated with the Rare Breed and was the Wellsville Chapter's president. Dkt. 959 at 7–8. Citing *Old Chief v. United States*, 519 U.S. 172 (1997), Mr. Roncone argues that "where a defendant stipulates to a fact, evidence that serves only to prove that fact is cumulative, a waste of time, unduly prejudicial . . . and thus inadmissible." *Id.* *Old Chief* does not stand for the blanket rule Mr. Roncone advances. Though *Old Chief* recognized that the "the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away" might sometimes yield to a case's unique Rule 403 concerns—there, a defendant's status as a felon—it affirmed the government's general ability to offer evidence notwithstanding a defendant's willingness to stipulate, because "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." 519 U.S. at 189.[4]

For these reasons, the defendants' objections to the government's association evidence should be overruled.

---

[4] Moreover, though Mr. Roncone lambasts the government for seeking to prove facts he is willing to stipulate to in his brief before the Court, Mr. Roncone has never offered the government a proposed stipulation to consider.

### 2.    The challenged evidence is admissible notwithstanding that it is not a RICO or VICAR case.

Mr. Gerace incorrectly suggests that gang-affiliation evidence is admissible only in RICO or VICAR prosecutions. That is not the case. The relevant question is whether the evidence is probative of a disputed issue. Such evidence is in fact admissible in non-enterprise cases where it is relevant to motive, relationships among participants, opportunity, or the background and context of the charged conduct. The Sixth Circuit's decision in *United States v. Peete*, 781 F. App'x 427 (6th Cir. 2019) (unpublished) is instructive.

In *Peete*, the defendant—who was not charged in a RICO or VICAR prosecution, but with being a felon in possession of a firearm and possession of a firearm with an obliterated serial number—moved to exclude evidence of his gang affiliation. *Id.* at 438–39. There, the government sought to introduce evidence the defendant was affiliated with the Disciples street gang and, specifically, served on the gang's "security team" which the government argued explained his motive and opportunity to possess the firearm at issue. *Id.* at 439. The Sixth Circuit reversed the district court's exclusion of the evidence, holding that the defendant's gang affiliation was intrinsic to the charged conduct and independently admissible under Rule 404(b). *Id.* at 438–40. The court explained that the evidence was "directly probative" of the defendant's motive and opportunity to possess the firearm and provided critical context for the charged conduct. *Id.* at 438. Specifically, the court noted that the defendant's gang affiliation was "not a separate, or tangential, aspect of the government's case; rather, it is the catalyst for all of the events underlying the charged crime." *Id.* at 438–39.

The same reasoning applies here. Mr. Ermin's connection to the Outlaws is the "catalyst for all of the events underlying the charged crime," *id.*, and his access to individuals institutionally committed to tampering with cooperators is the mechanism through which the

24

conspiracy operated. This is "not a separate, or tangential, aspect of the government's case." *Id.* The evidence provides the necessary context for the conduct charged and is highly probative of motive, opportunity, and the conspirators' relationships. S*ee also United States v. Payne-Owens*, 845 F.3d 868, 874 (8th Cir. 2017) (concluding that evidence of the defendant's gang affiliation was relevant to show the defendant's motive for possessing a weapon and to provide context for the defendant's own statements about his gun possession in prosecution of defendant for being felon in possession of firearm).

Against that backdrop, the defendant's arguments fail. The fact that the indictment does not charge the gang itself as an enterprise does not render evidence concerning the conspirators' associations irrelevant or impermissible evidence.

Moreover, evidence concerning gang affiliation is admissible where it is relevant to explaining the relationships among conspirators and the operation of the charged conspiracy—even outside the RICO or VICAR context. *See United States v. Felder*, 993 F.3d 57, 78 (2d Cir. 2021).  In *Felder*—which involved a Hobbs Act robbery conspiracy—not a RICO or VICAR prosecution—the Second Circuit upheld the admission of photographs linking the defendant to co-defendants because the photos were relevant to showing the defendants' relationships and were therefore probative of the charged conspiracy. *Id.* at 79–80.  And even "assuming any of the challenged photographs qualify as bad acts evidence, such evidence may be admitted under this court's inclusionary approach to explain or demonstrate a criminal relationship and to help the jury understand the basis for conspirators' mutual trust." *Id* at 78.  The court accordingly rejected the argument that the evidence constituted improper character evidence under Rule 404(b). *See id.* The same reasoning

25

applies here. The challenged evidence is probative of the relationships among the conspirators, the defendant's connection to them, and the way the conspiracy operated.

### 3. The defendant incorrectly characterizes the evidence as impermissible "guilt by association" evidence.

Evidence that "completes the story" of the charged conspiracy or explains the relationships among participants is routinely admitted as direct evidence of the conspiracy itself—not propensity evidence. The Second Circuit "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Graham*, 51 F.4th 67, 81–82 (2d Cir. 2022) (quoting *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011)). Rule 404(b) excludes from its scope "evidence of uncharged criminal activity . . . if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).

These principles apply here. The government is not offering this evidence for the purpose of inferring guilt merely because the defendant associated with the Outlaws. Rather, the evidence explains why the conspirators had the ability, motive, and means to carry out the charged obstruction scheme and why Crystal Quinn posed a particular threat to the Outlaws' operating out of Pharoah's.

Any prejudice does not substantially outweigh the evidence's considerable probative value. The challenged evidence directly bears on motive, relationships among coconspirators, and the existence of a means through which the conspiracy could accomplish witness

26

intimidation and violence. Moreover, the government does not intend to introduce gang evidence in a sensationalized manner,[5] but only insofar as necessary to explain the charged conspiracy and the defendants' conduct.

The evidence is not offered to prove the defendant's bad character or propensity for violence. Rather, it is offered for permissible non-propensity purposes including motive, opportunity, relationships among the conspirators, intent, and background of the charged conspiracy. *See* Fed. R. Evid. 404(b)(2).

Evidence explaining how the conspirators knew one another, why they trusted one another, and how they had access to individuals capable and interested in witness intimidation is independently relevant apart from any propensity inference. *See United States v. Felder,* 993 F.3d 57, 78 (2d Cir. 2021) ("[A]ssuming any of the challenged photographs qualify as bad acts evidence, such evidence may be admitted under this court's inclusionary approach to explain or demonstrate a criminal relationship and to help the jury understand the basis for conspirators' mutual trust."); *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996).

### 4.    Proof Mr. Gerace was aware of the Outlaws' institutional norms.

Mr. Gerace's argument ignores the circumstantial evidence demonstrating his awareness of the Outlaws' methods and capabilities. The government's evidence will show, among other things, that Mr. Gerace, through his club, Pharoah's, was closely aligned with the Outlaws. For instance, Pharoah's is referenced in the Outlaws' meeting and investigators recovered a banner from Pharoah's at the clubhouse. Also at the Outlaws' club house were

---

[5] This is evidenced by the government's representation—without motion from the defendants—that it does not intend to introduce any evidence of the Outlaws' white supremacist, Neo-Nazi ideology or memorabilia.

shirts bearing the logo "Snitches are a Dying Breed" and a rat hanging from a noose with the caption "Outlaw 1%ers." Against this backdrop, Mr. Gerace's comment that he has "serious people to tie up [his] loose ends" after detention proffers related to Crystal Quinn comes into focus when the defendant meets with the Outlaws' leader—Mr. Ermin—in the jail visitation room just before Crystal Quinn's death. After Crystal Quinn's death, Mr. Ermin would later go on to celebrate that there was no audio recording their conversation, because that meant the government had "nothing on him then." From this and other evidence, the jury may reasonably infer the defendant's awareness of the Outlaws' institutional commitment to engaging in witness intimidation.

### 5.   The cases Mr. Gerace relies upon are materially distinguishable.

*United States v. Desena* does not assist Mr. Gerace because the government is not submitting that the jury should infer Mr. Gerace's participation in the conspiracy solely from gang membership or association. In fact, it is readily distinguishable. There, the Second Circuit concluded that the government relied primarily on the defendant's nominal membership in the Pagans motorcycle club to infer participation in a conspiracy, while simultaneously emphasizing the absence of evidence tying the defendant to relevant meetings, discussion, coordinated conduct or operation involvement in the charged scheme. *See United States v. Desena*, 260 F.3d 150, 155-56 (2d Cir. 2001).

Likewise, in *Pappas*, the district court excluded gang affiliation evidence where its connection to the charged conduct was as motive evidence pursuant to Rule 404(b) and otherwise untethered to the mechanics of the conspiracy itself. *See United States v. Pappas*, No. 3:23-CR-62-12 (OAW), 2024 WL 4986172, at * 3 (D. Conn. Dec. 5, 2024) ("[G]ang evidence is far from necessary to explain to the jury that Mr. Pappas's garage was not a solvent business

. . . ."). And in *Roark*, the Eighth Circuit concluded that the government had effectively placed the Hells Angels "on trial" through extensive evidence concerning the organization's generalized criminality and reputation. *See United States v. Roark*, 924 F.2d 1426, 1430 (8th Cir. 1991).

That is not what is occurring here. The government does not rely on any defendant's membership in the Outlaws or the Outlaws' norms as generalized propensity evidence to place the organization itself on trial. Indeed, the government does not allege that Mr. Gerace was a member of the Outlaws at all. Rather, the government's evidence demonstrates Mr. Gerace's operational and personal connections to the Outlaws' leadership by way of employing Mr. Ermin. The anticipated evidence includes, among other things, that the Outlaws' leader—Mr. Ermin—worked for Mr. Gerace at Pharoah's, that the Outlaws operated out of Pharoah's, that the Pharoah's banner was recovered at the Outlaws' clubhouse, and that Mr. Ermin maintained a sufficiently close relationship with Mr. Gerace to visit him in jail.

Unlike in *Desena*, *Pappas*, or *Roark*, the government is not relying on abstract gang membership or generalized reputation evidence to suggest propensity. This evidence is independently probative of Mr. Gerace's relationship with the conspirators, his access to individuals capable of carrying out intimidation and violence and the way the charged conspiracy operated.

### 6.    Rule 403 does not warrant exclusion.

The government does not seek to "try" the gang as an uncharged enterprise. The evidence is relevant because Crystal Quinn's cooperation threatened the operation running out of Pharoah's and those connected to it. Evidence explaining why Crystal Quinn posed a danger to those individuals—and why they possessed the ability and motive to silence her—

is highly probative of the charged conspiracy. Any potential prejudice can be adequately addressed through limiting instructions.

### 7.    Mr. Gerace's alternative requests should be denied.

Mr. Gerace's request for a pretrial exhibit-by-exhibit admissibility ruling is unnecessary. The government has already provided its exhibit list and disclosed the basis for admission of evidence it believed would likely be challenged it its motion in limine. *See generally* Dkt. 862, 864. To the extent that Mr. Gerace objects to specific exhibits, those objections should have been addressed in his motions in limine. They can now be addressed in the ordinary course at trial.

The government does not oppose an appropriate limiting instruction advising the jury that the evidence may be considered only for permissible purposes such as motive, relationships among the conspirators, background, and intent, and not as proof of criminal propensity.

### VI.    The Court should admit evidence of Mr. Hinkle's possession of firearms and marijuana.

Relatedly, Mr. Knight moves to preclude the admission of evidence of Mr. Hinkle's possession of firearms and marijuana as "irrelevant to the crimes charged in this case." *Id.* at 13. Though Mr. Knight seems to concede that evidence of Mr. Hinkle's marijuana possession is relevant to show his relationship with the Rare Breed, *id.*, he argues that this association evidence is beside the point because "[t]he defendants are on trial for their conduct . . . as individuals, not as part of any organization." *Id.*  Once again, this argument is misguided. Though it is true the defendants are being tried as individuals, as nearly all defendants are, their individual conduct was facilitated through, and motivated by, their relationships to various organizations, including Pharoah's, the Outlaws, and the Rare Breed.

Mr. Hinkle's marijuana distribution, in particular, is necessary to understand how his relationship with the Rare Breed evolved from playing cards to a criminal partnership. *See United States v. Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006). As the government explained in its motion, Mr. Hinkle's drug distribution to the Rare Breed is an integral component of that story, and thus is admissible as background to the charged conspiracies. *See* Dkt. 925 at PDF pgs. 59–60. Accordingly, Mr. Hinkle's objection should be overruled.

### VII.   Evidence of the Outlaws' Institutional Commitment to Silencing Witnesses is Fundamental to Understanding Why Mr. Gerace Would Enlist John Ermin's Help to Silence Ms. Quinn.

Mr. Ermin argues that the government's motion to introduce evidence of the Outlaws' institutional commitment to silencing witnesses should be denied, as it reflects nothing more than "a theory of institutional propensity . . . to fill the gaping hole in its evidence. Ermin Resp. Opp. Gov. Mots. Lim., at 4, Dkt. 957, (dated May 15, 2023). On that point, Mr. Ermin contends that "there is no evidence, either direct or circumstantial . . . support[ing] . . . the government's central premise" that he, "either in his individual capacity or . . . his capacity as president of the OMC" directed others to retaliate against Ms. Quinn. *Id.* In addition to mischaracterizing the evidence in this case, these arguments misapprehend the purpose for which the government offers the "institutional evidence" in dispute here.

The jury will hear evidence that (1) Mr. Gerace stated "fuck the rats" and "I have powerful people to tie up my loose ends" after a detention proceeding before Judge Sinatra; (2) Mr. Ermin met with Mr. Gerace in-person at the Niagara County Jail in April 2023, shortly after Mr. Gerace was detained, and in July 2023, shortly before Ms. Quinn was killed; (3) Mr. Roncone, a president of an Outlaws support club, sought to talk with Ermin through other Outlaws intermediaries shortly after Ms. Quinn died; (4) Mr. Roncone called Mr. Ermin

on October 24, 2023, shortly after learning that the FBI executed search warrants at Frank Knight and Howard Hinkle's residences and questioned Mr. Knight about Ms. Quinn's death; and (5) that Mr. Ermin admitted that federal law enforcement did not have "anything" on him if his in-person meetings with Mr. Gerace were not audio-recorded.  Additionally, subject to rulings by this Court, the jury may hear evidence that Mr. Ermin, as the Outlaws' leader, shared Mr. Gerace's motivation to silence Ms. Quinn, who had incriminating evidence against the Outlaws.

Without this evidence, the jury cannot understand why Mr. Gerace viewed Mr. Ermin as "powerful" or why he would turn to him to fix the real and perceived problems prompted by Ms. Quinn's cooperation with federal law enforcement.  In truth, Mr. Ermin was powerful because he commanded legions of gang members, both through the Outlaws and the affiliate and support clubs loyal to them.  And Mr. Gerace would look to Mr. Ermin to help him silence Ms. Quinn because Mr. Ermin led an organization committed to extinguishing threats posed by cooperators, or, to borrow Mr. Ermin's parlance, "snitches."  Far from filling in holes, this evidence is necessary for the jury to assess why Mr. Ermin might have joined the conspiracy in the first place, evaluate the significance of his in-person meetings with Mr. Gerace, and appreciate the import of Ms. Quinn's involvement with Rare Breed associates.

Of course, stripping the trial of this important contextual evidence, sanitizing his role as the Outlaws president, silencing the truth, and narrowing the field of permissible inferences the jury can draw is precisely what Mr. Ermin hopes to accomplish.  To that end, Mr. Ermin relies on three cases, none of which support the wholesale exclusion of relevant gang-

32

membership or gang-mores evidence—be it through an expert or otherwise—that Mr. Ermin hopes this Court will embrace.[6]

Mr. Ermin first cites the Eighth Circuit's decision in *United States v. Roark*, 924 F.2d 1426 (8th Cir. 1991) for the proposition that reliance on "gang evidence" when proving association is reversible error. Dkt. 957 at 6. But reliance on gang evidence in that case— which alleged drug-trafficking violations—was prejudicial because it was unnecessary to prove that the drug charges against the defendant. *Roark*, 924 F.2d at 1432–33 (agreeing with the district court's assessment that it was "not necessary" for the government "to prove a case" using witnesses who testified about the defendant's involvement in the Hells Angels and the Hells Angels' involvement in drug trafficking across the country). Unlike in *Roark*, evidence of the Outlaws' institutional practices is essential to understanding Mr. Ermin's role in the obstruction conspiracies charged in Counts 1 through 3.

Mr. Ermin next turns to a second Eighth Circuit opinion, *United States v. Street*, 548 F.3d 618 (8th Cir. 2008), in support of his claim that evidence regarding gang association and gang norms should be excluded where a defendant's association has "no discernible connection" to his charges. Dkt. 957 at 6–7. *Street* is inapposite. There, the government introduced substantial evidence of a motorcycle gang's propensity for violence in support of its arguments that the gang's "violent, lawless propensities" had "rub[bed] off" on the

---

[6]     Mr. Ermin raised these cases in the context of his general contention that gang-association and gang-more evidence should not be admitted at trial. *See* Dkt. 957 at 1–7. Interspersed within that larger argument, Mr. Ermin posited that the government's proposed gang expert, ATF IOS Jeremy Scheetz, should not be permitted to testify because his testimony is insufficiently tailored to the Outlaws Motorcycle Club. *Id.* at 6–7. In its Supplemental Rule 16 Disclosure, the government identified 20 opinions that it sought to solicit from IOS Scheetz. The first five opinions offer more general background on the history of outlaw motorcycle gangs. *See* Dkt. 846 at 3–4. Nevertheless, as the Disclosure makes clear, each of these general opinions is applicable to the Outlaws Motorcycle Club. *See, e.g., id.* at 3 ¶ 2 ("OMGs, including the Outlaws, typically follow an established, consistent structure and hierarchy."). Moreover, the remaining opinions the government seeks to elicit from IOS Scheetz are specific to the Outlaws. Because this particular objection is unsupported by the facts of IOS Scheetz's proposed testimony, it should be overruled.

defendant, who was not a member, never expressed an interest in joining the gang, did not subscribe to the gang's philosophy, and only tenuously associated with the gang's members. *Street*, 548 F.3d at 629, 623, 630–632.   "None of this was tied to the actual crimes with which Street was charged or the particular facts of his case," and its "relevance . . . was not established."  *Id.* at 631. By contrast, evidence of Mr. Ermin's participation in the Outlaws, the Outlaws' institutional commitment to silencing cooperators, and its relationship with support clubs is integral to the crimes charged and understanding Mr. Ermin's role and participation in the conspiracy.  Stated otherwise, Mr. Ermin's role in the Outlaws and the Outlaws' institutional norms and mores are the gateways to Mr. Ermin's "connection" to the conspiracies charged in Counts 1 through 3.

Lastly, Mr. Ermin cites *United States v. Nelson*, 103 F.Supp.2d 512 (N.D.N.Y. 1999) for the following:

> "[E]vidence of a gang can be highly prejudicial and courts recognize that it may be appropriate to suppress that identification at trial. Citing Fed. R. Evid. 403 "evidence of gang membership when its probative value was minimal . . . served as a substitute for . . . direct evidence increasing the chance of guilt purely on association.

Dkt. 957 at 7 (citing *Nelson*, 103 F. Supp. 2d at 513).

Yet, as *Nelson* acknowledged in an omitted portion of the same sentence Mr. Ermin quoted, there are "few instances where a circuit has reversed a trial court's decision to admit such evidence," precisely because, in certain circumstances, the evidence is "likely to have substantial probative value."  *Id.* at 513–514.  Indeed, for that reason, the *Nelson* Court reserved on the defendant's motion to exclude such evidence, opting instead to see how the proof would come in during trial.  *Id.* at 514.

The evidence the government seeks to admit here is the very kind of substantially probative evidence that *Nelson* acknowledged would be admissible, that *Street*'s logic dictates is relevant, and that, unlike in *Roark*, is necessary to "complete the story" and "explain to the jury how the illegal relationship between the participants in the crime developed" as part of proving the crime. *United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000).

**VIII.    The Court should admit evidence of Mr. Gerace's prior bad acts with the Outlaws.**

Next, Mr. Ermin and Mr. Gerace both argue that the Court should preclude evidence of Mr. Gerace's admission to K.M. that the "bikers" got rid of the body of a dancer who overdosed at his club.  Dkt. 957 at 7–12; Gerace Resp. Opp. Gov. Mots. Lim., at 10–12, (dated May 15, 2026) (undocketed) (hereinafter "Gerace Response").  Without seeking any specific relief, Mr. Ermin devotes approximately 3 pages of his response brief explaining that the government has denied him access to K.M.'s 3500 material.  *See id.* at 7–10.  After becoming aware of this oversight, the government sent K.M.'s 3500 material to defense counsel on May 16, 2026.  Counsel for Mr. Ermin downloaded the material on May 18, 2026.  Accordingly, Mr. Ermin's counsel will have had access to the 3500 material for almost two weeks by the May 29, 2026, oral argument.

Mr. Ermin and Mr. Gerace both contend that the government is knowingly attempting to introduce "false" evidence into this trial.  *Id.* at 10; Gerace Response at 10–11.  In support of this outrageous and wrong claim, Mr. Ermin avers that "the Government searched a field, a nearby body of water, and other areas adjoining PGC for the body of the woman who allegedly overdosed, but found no evidence to support that any body had been disposed of."  Dkt. 957 at 10.  Mr. Ermin also points to evidence adduced from the 1:19-CR-

227 trial and investigation in which certain witnesses either testified or reported to calling 911 in response to overdosing dancers. *See id.* at 10–11.

True, the government searched a small portion of a nearby body of water and did not uncover a body. But the absence of a recovered body does not mean no fatal overdoses occurred at Pharoah's. Nor is it evidence that Mr. Gerace did not enlist his biker minions to help dispose of incriminating evidence. Mr. Gerace's admission *is* evidence—and "substantial independent evidence . . . tend[s] to establish the trustworthiness of the statement." *United States v. Bryce*, 208 F.3d 346, 354 (2d Cir. 1999) (internal quotations omitted).

Specifically, the trial and surrounding investigation in 1:19-CR-227 established that intravenous heroin use was so common at Pharoah's that used needles once clogged the toilets, Tr. Tran., at 8:18–9:19, *United States v. Gerace*, 1:19-CR-227, Test. Katrina Nigro, (dated Nov. 27, 2024), that Mr. Gerace administered cocaine to a dancer overdosing on opiates to "help" her "work", *see* Tr. Tran., at 16:01–21:12, Dkt. 1469, *United States v. Gerace*, 1:19-CR-227 (Test. E.H., dated Nov. 18, 2024), that Mr. Gerace directed one of his bouncers to dump an overdosing dancer on the front steps of a nearby hotel, as opposed to calling 911, *see* Tr. Tran., at 52:13–15, Dkt. 1604, *United States v. Gerace*, 1:19-CR-227 (Test. Doug Augustyniak, dated Dec. 10, 2024) (testifying that Gerace instructed him to "[d]rop . . . off" an overdosing dancer "at a hotel lobby somewhere"), and that Pharoah's was generally awash with lethal drugs where overdoses occurred on multiple occasions. Though the government does not seek to reintroduce this evidence in this trial, it directly undermines Mr. Gerace and Mr. Ermin's suggestion that K.M.'s testimony is untrustworthy. Moreover, the government is not offering Mr. Gerace's admission to prove his guilt in an uncharged overdose crime.

36

Rather, the government is offering it as to Mr. Gerace to show why he would look to the Outlaws to "tie up his loose ends."

Lastly, Mr. Ermin suggests, without directly arguing, that the overdose is not sufficiently similar to the current allegations. Dkt. 957 at 10. The government, however, offers this evidence not to show a distinctive *modus operandi* to prove the identity of Ms. Quinn's killer, but, rather, to explain why Mr. Gerace would trust the Outlaws. The Second Circuit has repeatedly affirmed the admission of such testimony. *See, e.g.*, *United States v. Blanco*, 811 F. App'x 696, 705 (2d Cir. 2020) (unpublished) (affirming the district court's admission of narcotics evidence in a bank robbery case to explain why a robbery co-conspirator "trusted" the defendant "to play a key role in planning a risky and dangerous bank robbery"); *United States v. Serrano*, 640 F. App'x 94, 97–98 (2d Cir. 2016) (unpublished) (affirming the district court's admission of narcotics evidence in a narcotics and robbery case because "[t]he challenged evidence permitted the jury to understand why . . . [the defendant] sufficiently trusted [his co-conspirator] to say that he 'wanted in' and, therefore, quickly entered into the charged robbery conspiracy"). Accordingly, the Court should grant the government's motion and overrule Mr. Ermin's objection.

### IX.    The Court should admit evidence of the Outlaws' organizational records.

Finally, Mr. Ermin argues that the Court should exclude "Outlaw phone lists, meeting minutes, and ledgers" pursuant to Rule 403. Dkt. 957 at 12–13. Specifically, he urges that this evidence, which he frames as relevant to the government's "institutional commitment" theory, is unfairly prejudicial because the indictment charges crimes against "individuals," not organizations, and does not allege any RICO offenses. *Id.* at 13. Taken to its logical conclusion, this argument would bar any organizational evidence in an individual prosecution, even if organizational evidence is relevant to the individual's opportunity,

37

motive, modus operandi, and intent to commit an offense. Mr. Ermin cites no authority in support for this inflexible rule.

Moreover, the records the government seeks to introduce, most of which were seized from Mr. Ermin's residence and include records from 1:19-CR-227, are highly probative of Mr. Ermin's commitment to identifying cooperators and zealously hunting for chinks in the Outlaws' organizational armor, irrespective of what norms and mores characterize the Outlaws, as a group. Accordingly, they make it more likely that Mr. Ermin had a stake in Mr. Gerace's prosecution in 1:19-CR-227, and thus was motivated to participate in the obstruction conspiracies charged in Counts 1 through 3. Accordingly, Mr. Ermin's objection should be overruled and the government's motions granted.

### X.    The Court should admit evidence of the Rare Breed's Institutional Commitments.

Mr. Roncone objects to the government's motion to admit evidence of the Rare Breed's institutional commitments to monitor law enforcement investigations and harm witnesses. Dkt. 959 at 9–11. Specifically, Mr. Roncone claims that the government is trying to criminalize non-criminal conduct, like monitoring law enforcement investigations. *Id.* The government is not offering the evidence as elemental to Mr. Roncone's guilt. Rather, the evidence is probative of why the Outlaws would trust the Rare Breed, which, through such monitoring, could reduce the likelihood of law enforcement successfully developing investigations into its own club short of ceasing criminal activity.

Mr. Roncone proceeds to attack as "absurd" the inferences the government seeks to draw from posters seized from the Rare Breed's clubhouse. One poster instructs that cell phones are not allowed in the clubhouse. Another pictures a person drowning next to the words, "Somebody talked." In the government's view, these posters reflect the organization's

38

consciousness of law enforcement investigative tactics and its commitment against law enforcement cooperation. In Mr. Roncone's view, the posters are not probative of anything, because cell phones are prohibited in Court, at libraries, at religious sites, and in jails, among other places. Dkt. 959 at 10. Each of those locations prohibits cell phones for their own reasons: courts prohibit cell phones for security reasons and to prevent the unauthorized recording of sensitive proceedings, libraries so that readers are not interrupted by telephonic conversation or music, religious sites so that technology does not distract from the sacred, jails so that incarcerated individuals do not commit any manner of crimes, and motorcycle gangs so that law enforcement cannot see what occurs behind the clubhouse door. Regardless, Mr. Roncone is free to argue to the jury that the government's interpretation is "absurd." His own opinion, however, has no bearing on whether the posters are admissible. Accordingly, Mr. Roncone's objections should be overruled.

## XI.    The Court should admit evidence of the Rare Breed's prior acts.

Mr. Roncone objects to the government soliciting testimony concerning the Rare Breed's prior acts done at the behest of the Outlaws. Dkt. 959 at 11–13. First, Mr. Roncone argues that "the [g]overnment is seeking to admit a broad category of evidence without any of the foundational evidentiary analyses occurring." *Id.* at 12. The government will lay the appropriate foundation for the evidence it seeks to introduce.

Second, Mr. Roncone argues that "[t]here is no nexus between any alleged prior bad acts and the current allegation against Mr. Roncone." *Id.* The government interprets Mr. Roncone to be arguing that none of the prior acts identified by the government are sufficiently similar to the allegations charged in this case. *See id.* But the government is not, first and foremost, offering the prior acts as Rule 404(b) evidence. Instead, it is offering "[e]vidence of the Rare Breed's historic compliance with the Outlaws directives, as well as their use of in-

39

person meetings amongst club leadership," as material "inextricably intertwined with the conspiracies charged in Counts 1 through 3." Dkt. 925 at PDF Pg. 41. This evidence, as the government argued, "explain[s] the development of the illegal relationship" between Mr. Ermin, who headed the Outlaws, and Mr. Roncone, who headed the Rare Breed. *Id.* (quoting *United States v. Guerrero*, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011)). Mr. Roncone offers no response to this argument.[7]

Lastly, Mr. Roncone argues that the government should not be permitted to introduce evidence relating to the Rare Breed's organizational acts because he—not the Rare Breed—is charged with a crime. Dkt. 959 at 12. As before, this argument confuses the standard of admissibility. The relevant question is not whether a defendant is on trial due to his involvement in a criminal enterprise, as might be the case in a RICO or VICAR prosecution. Rather, the issue is whether a fact is probative of a fact in dispute—here, whether the Outlaws enlisted the help of the Rare Breed to obstruct justice in 1:19-CR-227, as charged in Count 1. *Cf. Peete*, 781 F. App'x 427; *Payne-Owens*, 845 F.3d at 874. Mr. Roncone's leadership role in the Rare Breed and the Rare Breed's prior bad acts with the Outlaws is probative of why the Outlaws would trust the Rare Breed to obstruct justice. Accordingly, Mr. Roncone's objections should be overruled.

## XII. The Court should admit evidence of the Rare Breed's organizational records.

Mr. Roncone next argues that the Court should exclude the Rare Breed's organizational records, including meeting minutes, ledgers, and notes. This opposition

---

[7]    In its Motions in Limine, the government detailed why the Rare Breed's prior fulfillment of the Outlaws' directive is admissible under Rule 404(b). Dkt. 925 at PDF Pgs. 41–42. Beyond his conclusory statement that the acts lack a "nexus" to the charges here, Mr. Roncone does not respond to the government's arguments. The Court should thus conclude that Mr. Roncone forfeited or waived any further objection under Rule 404(b).

largely attacks arguments the government never made while ignoring the actual evidence foundation the government intends to present through witness testimony. The authorities the government cites support the legal principles for which they were offered; Mr. Roncone's attempts to distinguish those cases do not render the proposed evidence inadmissible. Accordingly, Mr. Roncone's request to preclude the RBMC and Outlaws' phone lists, meeting minutes, and ledgers, should be denied.

### 1.    The challenged evidence is relevant.

Mr. Roncone as a threshold issue contests the relevance of various club-related by-laws, phone lists, meeting minutes, sign-in sheets, and other ledgers recovered from search warrants.  These materials are plainly relevant: they constitute conspiracy and enterprise evidence and, in many cases, consist of rules, directives, and commands of the organizations. For instance, the by-laws constitute the written operating rules for the organization. Similarly, the meeting minutes reflect the organizational structure and chain of command, the regular control of information and directives. These minutes are particularly relevant to identifying important associations between members of the conspiracies charged in Counts 1 through 3, and the Rare Breed, the Rare Breed and Pharoah's, and the Rare Breed and the Outlaws.

### 2.    The defendant mischaracterizes the government's authorities and proposed foundation.

Mr. Roncone's response largely attacks a position the government did not take. The government cited cases such as *Bellomo*, *Conde*, and *Collins* for limited legal propositions—not because the facts are identical to the instant case. That those cases arise in distinguishable factual contexts is unsurprising and does not undermine the legal principles they articulate. The government never suggested otherwise.

41

Indeed, Mr. Roncone repeatedly attempts to refute arguments the government did not make by emphasizing factual differences between those cases and the instant matter. But the government cited those authorities for general evidentiary propositions: that commands are not hearsay, that electronic or documentary records may be authenticated through testimony, and that business record foundations may be established through witnesses familiar with the relevant recordkeeping system. None of those propositions depend upon the facts being identical to this case.

### 3.     The government has proposed an adequate evidentiary foundation.

Mr. Roncone incorrectly asserts that the government "has no authentication, no record custodian, and no certification." See Dkt. 959 at 14. The government anticipates presenting testimony from both a case agent and a member of the organization familiar with the contested records to authenticate the same.

Contrary to Mr. Roncone's characterization, Rule 803(6) does not require that the sponsoring witness be the individual who personally created the records, and does not does it require a formal title of "records custodian."  There is no requirement that the records be authenticated by a member of the organization. "The foundation for admitting evidence under Rule 803(6) 'may be laid, in whole or in part, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted.'" *United States v. Collins*, 799 F.3d 554, 584 (6th Cir. 2015) (quoting *United States v. Laster*, 258 F.3d 525, 529 (6th Cir. 2001)).  "The qualifying witness does not need to have any personal knowledge of the records' preparation." *Collins*, 799 F.3d at 584. Moreover, the phrase "other qualified witness" should be given the "broadest interpretation" in authenticating business records. *Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*, 621 F. Supp. 198, 217-18 (S.D.N.Y 1985) (holding

42

that meeting minutes qualified as business records through testimony of a former director who attended the meetings and testified it was the regular practice to maintain such records, notwithstanding that he was not the records custodian).

Thus the defendant's attempt to distinguish *United States v. Collins* actually reinforces the adequacy of the government's proposed foundation. There, the court approved admission where the foundation was established through witnesses familiar with the recordkeeping system and retrieval process. The government intends to offer that type of testimony here.

### 4. The defendant incorrectly imposes foundational requirements that go to weight, not admissibility.

Mr. Roncone further argues that the government cannot establish "how [the evidence] got there, when it got there, how it was created, when it was created, why it was created, who accessed it, [or] if it had been altered." Dkt. 959 at 15. But Rule 901 does not require the government to conclusively eliminate every theoretical possibility regarding provenance or alteration prior to admission. The government need only introduce sufficient evidence "to support a finding that the item is what the proponent claims it is." Fed R. Evid. 901(a).

Questions concerning the completeness of the chain of custody, the possibility of alteration, or the precise circumstances under which records were maintained generally go to the weight of the evidence—not its admissibility. Mr. Roncone's arguments therefore provide fertile ground for cross-examination, but they do not warrant wholesale preclusion.

Mr. Roncone's *Bellomo* argument also misses the mark. The defendant misreads both Bellomo and the government's argument. The government cited Bellomo for the unremarkable and well-established principle that commands, directives, and similar utterances offered for their verbal significance—not for the truth of the matter asserted—are

not hearsay. *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999). The government did not contend that the facts of Bellomo mirror those here in every respect.

Mr. Roncone improperly attempts to transform a factual circumstance present in *Bellomo*—namely, that a witness heard certain commands—into a categorical legal requirement for admissibility. The fact that witness in *Bellomo* personally heard the statements does not mean that direct percipient testimony is a  prerequisite where statements are offered for non-hearsay purposes.

Mr. Roncone conflates two separate inquiries: whether a statement constitutes hearsay under Rule 801, and whether the government can authenticate and contextualize the evidence under Rules 901 and 104(b).

The admissibility inquiry turns on the purpose for which the statements are offered and the foundation establishing their authenticity and relevance—not on whether every witness personally heard every statement uttered. To the extent Mr. Roncone disputes the factual foundation for particular exhibits, those are exhibit-specific objections appropriately resolved in context at trial, not a basis for categorical exclusion at this stage.

Mr. Roncone's argument that the government has not established that the documents were securely stored likewise fails to undermine admissibility under Rule 801(d)(2).  The government is not required to prove that the clubhouse or residences were accessible to no one else, nor must it conclusively establish exclusive possession before the documents may be admitted as statements or adoptive statements of members of the organization.

Rather, the government may rely on circumstantial evidence demonstrating that the documents were possessed, maintained, and relied upon by the defendants. Here, the anticipated evidence includes materials recovered from the clubhouse and the defendants'

residences which were maintained alongside other club-related materials bearing indica connecting them to motorcycle gang and their activities. Such circumstances permit the reasonable inference that the records were used, kept, or adopted by members of the organization within the meaning of Rule 801(d)(2). Accordingly, Mr. Roncone's objections should be overruled.

## CONCLUSION

For the reasons stated herein, the government respectfully asks the Court to grant the government's motions in limine (Dkt. 925).

DATED:  Buffalo, New York, May 29, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY:    s/CASEY L. CHALBECK
s/KATERINA POWERS
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716.843.5881
Casey.Chalbeck@usdoj.gov