**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

Case No. 1:19-cr-227

Plaintiff,                          1:23-cr-37

v.                                       (LJV)

**PETER GERACE, JR.,**                 November 27, 2024

Defendant.

_____

**TRANSCRIPT EXCERPT – EXAMINATION OF KATRINA NIGRO**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**      **TRINI E. ROSS, UNITED STATES ATTORNEY**
                      **BY: JOSEPH M. TRIPI, ESQ.**
                      **NICHOLAS T. COOPER, ESQ.**
                      **CASEY L. CHALBECK, ESQ.**
                      Assistant United States Attorneys
                      Federal Centre, 138 Delaware Avenue
                      Buffalo, New York 14202
                      For the Plaintiff

                      **THE FOTI LAW FIRM, P.C.**
                      **BY: MARK ANDREW FOTI, ESQ.**
                      16 West Main Street, Suite 100
                      Rochester, New York 14614
                        And
                      **SOEHNLEIN LAW**
                      **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
                      350 Main Street, Suite 2100
                      Buffalo, New York 14202
                      For the Defendant

**PRESENT:**          **KAREN A. CHAMPOUX, USA PARALEGAL**
                      **BRIAN A. BURNS, FBI SPECIAL AGENT**
                      **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**
                      **OLIVIA A. PROIA, J.D., PARALEGAL**

**LAW CLERK:**        **REBECCA FABIAN IZZO, ESQ.**

**COURT CLERK:**      **COLLEEN M. DEMMA**

**REPORTER:**         **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                      Robert H. Jackson Courthouse
                      2 Niagara Square Buffalo, New York 14202
                      Ann_Sawyer@nywd.uscourts.gov

(Excerpt commenced at 9:39 a.m.)

(Jury seated at 9:39 a.m.)

**THE COURT:** Good morning, everyone.

**THE JURORS:** Good morning.

**THE COURT:** The record will reflect that all our jurors are present.

I remind the witness that she's still under oath.

And, Mr. Tripi, you may continue.

**MR. TRIPI:** Thank you very much, Your Honor.

**K A T R I N A   N I G R O**, having been previously duly called and sworn, continued to testify as follows:

**DIRECT EXAMINATION BY MR. TRIPI:**

Q. Good morning, Ms. Nigro.

A. Good morning.

Q. Okay. Just like yesterday, I'm going to ask you to do your best to keep your voice up. Wait until I finish asking the question before you answer, because Ms. Sawyer is taking it down.

If at any time you become physically uncomfortable, let me know, we can ask the judge to give you a minute if that becomes necessary.

And when I'm asking you questions, and even when the other side is asking you questions later on, please contain

your answers to the question being asked.  And if you don't understand, let me know, and I'll ask more follow-up questions.  Okay?

A.   Okay.

MR. TRIPI:  Okay.  We have left off yesterday, Ms. Champoux, if we can pull up Government Exhibit 235A-28, please.

BY MR. TRIPI:

Q.   Yesterday we talked a little bit about this stairwell that leads to the upstairs; do you recall that?

A.   Yes.

Q.   Okay.  I want to show you two more photos that are not yet in evidence.  I want have you look at these, and see if you recognize the layout depicted in them, okay?

So for the record, I'm going to hand up 235A-34, and 235A-36.  Look at both of these, and when you're done, look back at me, okay?

Do you recognize what's depicted in each of those photos?

A.   Yes.

Q.   And what is it?

A.   One's a bathroom, and one's a room that clearly became storage.

Q.   Is that an area of the upstairs, the layout and structure of it, if one were to go up these stairs all the way to the upstairs, is that what you see?  You look down a hallway, you

pass a bathroom, and then at the far end there's another room?

A.   Yes.

Q.   And do Exhibits 235A-34 and 235A-36 fairly and accurately depict the layout of the upstairs?

A.   Yes.

MR. TRIPI:   The government offers 235A-34 and 235A-36, Your Honor.

MR. FOTI:   No objection.

THE COURT:   Received without objection.

**(GOV Exhibits 235A-34 and 36 were received in evidence.)**

MR. TRIPI:   All right.  Ms. Champoux, can we pull those up, and put 235A-34 on the left of the screen, and 235A-36 on the right.

BY MR. TRIPI:

Q.   Okay.  Now, as I understand it, once you go all the way up the stairs and you make a left, essentially there's a long hallway; is that right?

A.   Yes.

Q.   And if you were to keep walking towards what we see is Room H, down that hallway, do you pass the bathroom, what we see in this photo is labeled as Room J?

A.   Yes.

Q.   And for the record purposes, you see the H labelling in Exhibit 235A-34?

A.   Um-hum.

Q.   And you see the J labelling in Exhibit 235A-36?

A.   Yes.

Q.   And now we talked a little bit yesterday about how between 2009 and the end of 2016, early 2017, your time period with the defendant how the -- the things, or the furniture, or the things that were in this upstairs changed over time; do you remember that?

A.   Yes.

Q.   And these photos depicted here, is there a lot less furnishings up there?

A.   Yes.

        MR. TRIPI:  Okay.  Can you pull up -- we can take those down and pull up Exhibit 235A-35.

        BY MR. TRIPI:

Q.   Now, is this that room that all -- would have been all the way at the end of the hall that we were able to view from the prior photos?

A.   Yes.

Q.   Do you know what that is up on the wall?

A.   An air conditioner.

Q.   Okay.  This room, do you see how it's furnished as of the time of this photo?

A.   Yes.

Q.   Did there used to be more furnishings in there?

A.   Yes.

Q.   What else used to be in that room?

A.   It was a TV.  It was, like, a nice kind of bachelor pad apartment-type thing.

Q.   Okay.  Were there chairs?

A.   Chairs.

Q.   Okay.  So it had more furniture in it?

A.   It didn't have the hockey equipment and stuff in it.

Q.   Now, you said that a certain point, there was -- there were card tables up there?

A.   Yes.

Q.   Would the defendant host parties up there where they played cards?

A.   Yes.

Q.   At a certain point, you said there was a hot tub up there?

A.   Yes.

Q.   What type of hot tub was up there?

A.   It was a weird blow-up one.  It -- it didn't last that long up there.

Q.   It was a blow-up hot tub that you set up, you'd blow it up, and then --

A.   Yeah, it wasn't super long.  And there's also a gym.

Q.   Okay.  There was some gym equipment?

A.   Gym equipment and stuff like that.  At one point it was a

gym.

Q.  All right.  I'm going to just see if I can talk about a couple of other photos in terms of the structure of Pharaoh's, okay?

A.  Okay.

MR. TRIPI:  We're going to pull up 235A-38 next to 235A-40, please.

BY MR. TRIPI:

Q.  Do those two exhibits together generally depict different angles of the layout of the first floor?

A.  Yes.

Q.  And if you're focusing in on 235A-40, can you almost see where there was that adult store?

A.  That was my store.

Q.  That's what I'm referring to as the adult store.

A.  Yes.

MR. TRIPI:  Let's pull up 235A-44, A-45, and A-47, please.  44, not 34.  Thank you, Ms. Champoux.

MS. CHAMPOUX:  Can you repeat that?

MR. TRIPI:  235A-44, A-45 and A-47.

BY MR. TRIPI:

Q.  Do you see those three images up on your screen?

A.  Yes.

Q.  Does that generally depict the -- what would be referred to as the downstairs VIP area of Pharaoh's?

A.   Yes.

Q.   Okay.

MR. TRIPI:   We can take those down.  Now, could we pull up Government Exhibit 235A-58 next to 235A-61, please?

BY MR. TRIPI:

Q.   Now yesterday we talked a little bit about the dressing room for the dancers in the proximity to the DJ booth; do you remember that?

A.   Yes.

Q.   Was there also a bathroom in the downstairs dressing room area?

A.   Yes.

Q.   Is -- does A 235A-58 depict the women's dressing room?

A.   Yes.

Q.   And does 235A-61 depict the bathroom that was in that area?

A.   Yeah, there was also a shower in it.

Q.   Okay.  Now, I want to focus in on this bathroom for a moment.  And we may talk more about it later, but my specific question is:  During your time at Pharaoh's, do you recall a time where that toilet was plugged by something?

A.   Yes.

Q.   What do you recall it being plugged by?

A.   Needles.  Heroin needles that were used.

Q.   Okay.  I want to unpack that a little bit.  Hypodermic

needles?

A. Yes.

Q. In your life experience, working in Pharaoh's, and just existing in the world, are you aware that hypodermic needles are a means of ingesting heroin for people?

A. Yes.

Q. Describe -- did you see the needles when they were pulled out?

A. Yes.

Q. Describe for the jury, like, how many needles you saw pulled out of the toilet when it was plugged.

A. There were actually four toilets that they cleared it from. But in that specific one it was, like, buckets. It was hundreds. It was actually embarrassing. I even mentioned about having a sharps drop box, but --

Q. I would like to focus on the question, okay?

A. Um-hum.

Q. And were those needles plugging the toilet?

A. Yes.

Q. Now, over your time there, had you observed dancers going in and out of that bathroom, and had you made observations about the change in their physical appearance after they would come in and out of that bathroom?

A. Yes.

Q. Have you in your life observed people who you believed to

be under the influence of opiates including heroin?

A.   Yes.

Q.   When you would make those observations in Pharaoh's, did you form a conclusion that women and dancers were using heroin inside that bathroom?

A.   Yes.

Q.   Was that later confirmed by the number of needles pulled out of that toilet?

A.   Yes.

Q.   We'll talk more about drug use later on, okay?

A.   Okay.

Q.   Off of one of the hallways was there a doorway to a garage connected to Pharaoh's?

A.   Yes.

Q.   Did the defendant store things in that garage?

A.   Yes.

        **MR. TRIPI:**  Let's pull up 235A-67, please.

        **BY MR. TRIPI:**

Q.   Is this a garage where the defendant stored things inside Pharaoh's?

A.   Yes.

        **MR. TRIPI:**  Let's pull up 235A-68 next to A-69, please.

        **BY MR. TRIPI:**

Q.   Is that sort of the adult store that you started inside

Pharaoh's?

A.   That is not.  She took it over after me.

Q.   Okay.  Is this the location of the store that you started in Pharaoh's?

A.   Yes.

Q.   Not as it exists now, but that you started?

A.   Yes.

Q.   Okay.  Is there a downstairs office inside Pharaoh's?

A.   Yes.

Q.   Is that downstairs office in proximity to an employee entrance door?

A.   Yes.

         **MR. TRIPI:**  Can we pull up Government Exhibit 235A -- excuse me, A-83, next to A-84.

         **BY MR. TRIPI:**

Q.   Is this an area where the downstairs office is located?

A.   Yes.

Q.   Now, while we have these photos up, I'd like to ask you, during your time at Pharaoh's and with the defendant, what different job functions did you perform inside Pharaoh's?

     You've talked about -- Ms. Nigro -- you've talked about having the online -- or, excuse me, the store?

A.   Yes.

Q.   What other job functions did you serve inside Pharaoh's when you were with the defendant?

A.   I put together promotional events.  We had school girl parties, different -- cops and robbers, different theme nights.

Q.   So you did different theme party nights?

A.   Yes.

Q.   And you planned those?

A.   We had a contest --

Q.   And you planned those?  Yes or no?

A.   Yes.

Q.   My next question is:  You said you ran the Facebook page?

A.   Yes.

Q.   Okay.  You ran the store?

A.   Yes.

Q.   Did you act as a sort of de facto manager at times?

A.   Yes.

Q.   When you were with the defendant, did you do some bookkeeping?

A.   Yes.

Q.   Did you spend time in the office?

A.   Yes.

Q.   That's the office depicted in that exhibit, Exhibits 235A --

A.   Yes.

Q.   -- A-83 and A-84?

A.   Yes.

Q.  Did you pay vendors?

A.  Yes, sir.

Q.  In cash?

A.  Yes.

Q.  Typically when you would pay a vendor, how would you deliver the payments?

A.  Sometimes it's checks, sometimes it's cash.

Q.  And when it was a cash payment to a vendor, how would you deliver the cash?

A.  In an envelope.

Q.  And who set up or who got those envelopes ready?

A.  Peter put them all together.

Q.  And when you were to pay an individual or a vendor, whose instructions were you acting upon?

A.  Peter.

Q.  Is this a point in time when you're handling money and payments for his club when you and he were very close?

A.  Yes.

Q.  Now yesterday, we went through some photos that you had taken and turned over to the FBI.

    **MR. TRIPI:**  I'd like to pull up again Government Exhibit 241-E, please.

    **BY MR. TRIPI:**

Q.  And you indicated yesterday this is a photo of Peter with Darryl LaMont from No Limit Entertainment, the stag company?

A.    Um-hum.  Yes.

Q.    And yesterday you indicated a number of Pharaoh's dancers also worked back and forth with Darryl and No Limit, and back to Pharaoh's?

A.    Yes.

Q.    I'd like to hand you Government Exhibit 264A.  Take a moment to look at that.  When you're done, look up.

A.    Yes.

Q.    Do you recognize a number of the individuals depicted in that exhibit?

A.    Yes.

Q.    Do those -- does that fairly and accurately depict a number of individuals associated with Pharaoh's and No Limit Entertainment that you know?

A.    Yes.

Q.    Does it include Darryl LaMont?

A.    Yes.

        MR. TRIPI:  The government offers 564-A.

        MR. FOTI:  Judge, I have an objection to just part of the exhibit.  Could we approach with the exhibit?

        THE COURT:  Yeah, come on up.

        (Sidebar discussion held on the record.)

        MR. FOTI:  I don't object to the photograph.  The comments below it, I object to.  If those can be redacted or if -- if -- if the Court sustains my objection and they can be

redacted, I won't object to the remainder of the exhibit.

**THE COURT:**  You just want the photo; is that right?

**MR. TRIPI:**  Can I look at it for just a moment?  I thought I got rid of the comments.

There were no comments below.

**MR. FOTI:**  There were more comments below, but I also meant the caption.

**MR. TRIPI:**  Oh, yeah, when I publish it, Judge, before we show the jury I'll just zoom in on this and we'll redact the rest of it.

**MR. FOTI:**  That's fine.

**THE COURT:**  Great.

(End of sidebar discussion.)

**THE COURT:**  So the photograph is admitted without objection.  Any -- any words on that page are -- are gonna be redacted; is that right?

**MR. TRIPI:**  Yes.

**THE COURT:**  Is that right, Mr. Foti?

**MR. FOTI:**  Yes.

**(GOV Exhibit 564A was received in evidence.)**

**MR. TRIPI:**  Could we take it down for the jury just for a moment so we can get the exhibit prepared?

Ms. Champoux, can you pull up 564 in the manner the Court just described?  That's in evidence.  And can you zoom in on the photo portion?  Just the photo portion.

Okay?

THE COURT:  Good enough, Mr. Foti?

MR. FOTI:  Yeah, that's good.

MR. TRIPI:  Okay.

MR. FOTI:  Thank you.

MR. TRIPI:  If we can now publish for the jury.

THE CLERK:  You're all set.

BY MR. TRIPI:

Q.  Ms. Nigro, you see that image in front of you?  Can you see it clearly enough?

A.  Yes.

Q.  Okay.  If you tap your finger, you should just be able to leave, like, a tiny mark, okay?

A.  Um-hum.

Q.  Is that a yes?

A.  Yes.

Q.  I'd like to work my way through this.

Can you take your finger and tap on Darryl LaMont?

Okay.  Now do you recognize any other women who also danced at Pharaoh's in that photo?

A.  Yes.

Q.  Can you tap the next one who you recognize who danced at Pharaoh's?

Okay.  You've tapped on a woman who appears to be wearing a black flowery-type dress?

A.   Yes.

Q.   Who is that person?

A.   Winter.  Her real name is Megan.

        THE COURT:  Can you speak right into the microphone?

        THE WITNESS:  Winter.  Her real name is Megan.

        BY MR. TRIPI:

Q.   Do you know Megan's last name?

A.   She just got married.

Q.   What was the name that you knew, if you know it.  If you don't, that's okay.

A.   I don't.  I do have it on my phone which I don't have here.

Q.   Okay.  Tap on the next one who was a Pharaoh's dancer.

        MR. TRIPI:  Okay.  May the record reflect she's tapped on a woman next to that Megan, behind Darryl, wearing a white dress.

        BY MR. TRIPI:

Q.   Who is that?

A.   Shelby Johnston.

Q.   We'll get into this a little bit later, but was Shelby Johnston someone who would associate with a New York State Supreme Court judge at Pharaoh's?

A.   Yes.

Q.   Is that a young lady who you unlocked a door for to permit Judge Michalski to go upstairs with at Pharaoh's?

A.   Yes.

Q.   Okay.  We'll get into that more a little bit later.

Can you tap on the next Pharaoh's dancer that you see?

MR. TRIPI:  Okay.  May the record reflect she's tapped on a photo of a young woman wearing a brown or a tan dress and a white top.

BY MR. TRIPI:

Q.   What is that woman's name?

A.   Serena Shearer.

Q.   Can you say that louder?

A.   Serena Shearer.

THE COURT:  Move the microphone back a little bit.  Great.

BY MR. TRIPI:

Q.   And she also worked at Pharaoh's and No Limit?

A.   Yes.

Q.   Can you tap on the next Pharaoh's dancer that you recognize in that photo?

MR. TRIPI:  May the record reflect she's now indicated a woman to the far right of the photo wearing what appears to be a red dress, and a some type of top that shows some of her stomach.

BY MR. TRIPI:

Q.   Who's that?

A.   That's Mariah, her dancer name.  Stephanie Stenzel is her

real name.

Q.   And she worked at Pharaoh's and No Limit?

A.   Yep.

Q.   Do you see any other Pharaoh's dancers in this photo?

A.   None that I recognize.

Q.   Okay.  How about any of the other men in the photo, other than Darryl LaMont, do you recognize any of them?

A.   No.

Q.   Okay.

        MR. TRIPI:  If we take that entire exhibit down, will we be able to take it down all at once?  Or will we have to blackout the screen?

        MS. CHAMPOUX:  All at once.

        MR. TRIPI:  Okay.  Please take it down.

        BY MR. TRIPI:

Q.   So four of the women in that photo were Pharaoh's dancers and worked at No Limit?

A.   Yes.

Q.   How often was Darryl LaMont at Pharaoh's when you were there?

A.   Almost daily.  There was a span where they had a disagreement where he wasn't allowed for, like, two months, but --

Q.   Other than that two months, almost daily?

A.   Yes.

Q.  Did the defendant and Darryl LaMont interact frequently when you would see Darryl LaMont at Pharaoh's?

A.  Always greeted him.

Q.  If you know did they speak when the defendant -- did they speak when they were not physically together inside Pharaoh's?

A.  Yes.

Q.  Did Darryl LaMont ever visit at the house?

A.  Yes.

Q.  You went through four locations where you lived with the defendant yesterday, one of them being the upstairs at Pharaoh's, so let's put that aside.

A.  Yeah.

Q.  What different locations would -- what other residences has Darryl LaMont come in?

A.  Into Windsong, the apartment complex.

Q.  Okay.  Have you been present when Darryl and the defendant were discussing Pharaoh's dancers?

A.  Yes.

Q.  Have you heard their discussions about Pharaoh's dancers?

A.  Yes.

Q.  Have any of those discussions related to payments regarding women who were working for both of them?

        MR. FOTI:  Objection.

        THE COURT:  Basis?

MR. FOTI:  Hearsay.

MR. TRIPI:  If she's observing the conversation between the two of them, Judge, it's not hearsay and it's not --

THE COURT:  Let me just think about this for a second.

MR. TRIPI:  I'm sorry.

THE COURT:  Yeah, overruled.

BY MR. TRIPI:

Q.  Describe those discussions that -- regarding Pharaoh's dancers who both worked back and forth at No Limit that you heard between Darryl and the defendant.

A.  Well, Peter had a deal that the girls had to work at his club before they could do stags or they weren't allowed to go back and forth to it, because a lot of the girls would show up at 12 and the other girls would be angry about it.  So they deals then that they had to work certain days at his club, and then they were allowed to do stags and stuff like that.

And then he would bring them in, and he would promote them all as if they were higher end, like, they were stronger with skill sets than a lot of the other girls.  They were preferred to have at the club.

Q.  Have you heard Darryl and the defendant discuss dancers who worked for No Limit engaging in sex acts?

**MR. FOTI:**  Objection.

**THE COURT:**  Why don't you come up?

(Sidebar discussion held on the record.)

**THE COURT:**  So I don't think it's this hearsay objection works because I think there's a sufficient basis to find that all three of them are coconspirators.  So her overhearing a conversation between two coconspirators --

**MR. FOTI:**  If you're finding that there's a preponderance of the evidence to support Darryl LaMont's a coconspirator, then I agree that the hearsay objection wouldn't apply.

But I also believe at this point it's been established that the stag party is separate from Pharaoh's, even though there's dancers for both, it has not been established that there's any overlap in terms of the business dealings, or that there's any agreement between LaMont and Peter Gerace to further in sex trafficking or any other crime.

**MR. TRIPI:**  That's what she's discussing right now.

**THE COURT:**  I understand that.  I understand that. And I -- I -- and I think -- I may agree with you on that. There certainly is testimony that they shared dancers, and I think that that is enough to establish by a preponderance of the evidence they're coconspirators.

So -- so even if there's not a business relationship between them, and there is a business relationship between

them, they shared dancers, and so even if there's not a payment relationship, they don't share money, I think that there's enough there for that to be put through.

MR. TRIPI: I also think, Judge, that --

THE COURT: Go ahead.

MR. TRIPI: -- when three of them in the way that it's been set up right now, when the three of them are together, and she's -- there's no privilege because it's three people, right.

THE COURT: Right.

MR. TRIPI: And then what the defendant is saying is a statement of a party opponent.

THE COURT: Right.

MR. TRIPI: And whatever Darryl is saying is contextualizing the discussion. So also I think that it comes in that way as well.

THE COURT: Regardless, it comes in.

But the last question bothers me, they discuss sex acts being performed. What --

MR. TRIPI: I'm --

THE COURT: -- where is this going?

MR. TRIPI: Well, that's -- I'm trying to, under 611(c), focus the questions.

THE COURT: Yeah, I know.

MR. TRIPI: I know. And so I'm just trying to cabin

the question as best I can so that the answer remains responsive and it doesn't go into other areas.

And so if I focus in on a specific question like that, she's either going to say "yes" or "no", and then I'll follow up.

THE COURT:  And where are you going to go with this?

MR. TRIPI:  Well, if they're discussing sex acts being performed and any payment scheme, that just further strengthens the inferences that we'll argue later.

MR. COOPER:  Judge, if I could add to that.

THE COURT:  Go ahead.

MR. COOPER:  There's been witness testimony already that most I think -- I think testimony was that most of the women that worked at both PGC and No Limit Entertainment were drug addicted.  We've elicited testimony about that at the trial already.  And so a brick isn't a wall, and Katrina doesn't have to put all of the pieces together for the testimony to be relevant in the context of other evidence that there was commercial sex going on, and then that it was coercive commercial sex, given the environment that existed for those women.

And so, even if the testimony comes from different witnesses, and even if it's small pieces here and there, it's -- that doesn't make it not relevant.  She doesn't have to have all the information for the testimony to be relevant.

**THE COURT:** But the fact that they're discussing -- what's the relevance of the fact that they may discuss sex acts being performed by the dancers? I assume you mean at the stags? Is that what you're --

**MR. TRIPI:** At either. I don't have every word she's ever uttered committed to memory, but there's been a lot. But there may -- I have rattling around, as I asked the question, in the back of my brain, like, kickbacks. Like, I'm probing whether or not there was a monetary exchange of dancers at a stag, did Peter get a piece.

**THE COURT:** But why is it foundational for that there were sex acts.

**MR. TRIPI:** Well, because if Peter's certainly getting money and benefiting from that, that counters the argument they just made to you.

And so I'm probing, Judge, I opened that he had relationships with LaMont, and that some of the same acts that occurred in Pharaoh's extended beyond the walls through the association with LaMont. And so that's what I'm probing here.

**THE COURT:** I think that's good enough, yes. I will overrule the objection. I'll allow it.

(End of sidebar discussion.)

**BY MR. TRIPI:**

Q. So I want to walk through this slowly and one question at a time, okay?

A. Okay.

Q. So my first question is just "yes" or "no."

Did you hear conversations between Darryl LaMont and Peter Gerace about Pharaoh's dancers who would perform sex acts at stag parties?

A. Yes.

Q. Okay. What discussions did you hear between Darryl LaMont and Peter Gerace about dancers who performed sex acts at stag parties that were hosted by Darryl LaMont and No Limit Entertainment?

A. Several of them he did not want working there, because of -- some of the girls like that he didn't want working there because --

Q. I need names. When you say "he," who are you referencing?

A. Okay. Darryl did not want -- or, Peter did not want some of Darryl's girls working there because of conflict and activities that they performed.

Q. Okay. So are you saying Peter didn't want some of Darryl's girls working for him?

A. Yes.

Q. Okay. As it relates to the girls that -- we just went through a photo where there's, like, four dancers who did work for No Limit, right?

A. Um-hum.

Q.   Right?

A.   Yes.

Q.   Were you privy to an agreement or an arrangement between Darryl and Peter where Peter would get financial money from Darryl based upon the girls that worked for No Limit?

A.   Yes, he got financial --

Q.   Yes or no?

A.   Yes.

Q.   What was that agreement?

A.   He got financial money by having the girls be sent to work at his club exclusively, not allowed at other clubs in the area.

Q.   So, my -- would Darryl give Peter money based on the girls from Pharaoh's who worked for Darryl?

A.   Yes.

Q.   Okay.  Getting back to Exhibit 564A, we don't need to show it again.  Was Shelby Johnston one of those dancers that would go back and forth?

A.   Yes.

Q.   Okay.  I want to switch gears for a moment, and we're going to get back to Pharaoh's and No Limit and all of that in a moment.

A.   Okay.

Q.   But I want to talk a little bit about sort of what brought you to this moment where you're sitting here today,

okay?

A.    Okay.

Q.    Did you initially reach out to law enforcement about Pharaoh's and the defendant on or about December 13th, 2019?

A.    Yes.

Q.    Okay.  Was that sort of the day after you learned Pharaoh's was searched by federal law enforcement?

A.    Yes.

Q.    So, up to that point, prior to that moment in time, you had not been involved in any aspect of the federal investigation that led up to those search warrants; is that right?

A.    Right.

Q.    After you reached out to law enforcement, did members of the FBI get in contact with you and interview you?

A.    Yes.

Q.    After that, were you also interviewed with the FBI and prosecutors, and ultimately did you get an attorney assigned to you?

A.    Yes.

Q.    Is that attorney named Brian Comerford?

A.    Yes.

Q.    And was he here with you yesterday, and is he here today?

A.    Yes.

Q.    And after we got you an attorney assigned, Mr. Comerford,

did you and your attorney request what's called a proffer agreement? An agreement that was signed before you would talk further? Do you remember?

A. No, I don't remember.

Q. Okay. I'm going to hand you up Government Exhibit 3577C, and I'm just gonna ask you to -- I'm gonna ask you to take a look at it, and look back at me when you're done. And I'm going to ask you if it's a proffer agreement that you signed, okay?

A. Okay.

Q. You don't have to read it line by line, but if you can flip through the pages enough to see if it refreshes your recollection.

A. Okay.

Q. Does that refresh your recollection as to --

A. Yeah.

Q. -- whether you and your attorney sought and signed a proffer agreement? Yes?

A. Yes.

Q. Was that in February 2020?

A. Yes.

Q. And after that, did you testify before a federal grand jury?

A. Yes.

Q. After that, did you have additional meetings with the

government that your attorney was present for?

A.  Yes.

Q.  Over time, if you thought of additional information regarding the topics that were being asked of you, or if you thought of real names of dancers who might have information, did you sometimes text or -- or find a way to get that information to Special Agent Brian Burns of the FBI?

A.  Absolutely.

Q.  Was it explained to you, and do you understand that all your interviews and your text messages that you sent to Special Agent Burns were documented and provided to the defense?

A.  Yes.

Q.  The photos we looked at yesterday, Exhibit 241A through F, is that an example of items that you sent along?

A.  Yes.

Q.  In all of your meetings with the government, that included your attorney and agents, has everyone advised you that the most important thing, that even if you don't like the defendant, is to tell the truth?

A.  Yes.

Q.  And each meeting you had, did you answer the questions that were asked of you to the best of your ability?

A.  Yes.

Q.  From the time that you first spoke to law enforcement in

2019 to this moment in 2024, have you been working to improve yourself?

A. Yes.

Q. Have you been seeing treatment providers?

A. Yes.

Q. Have you been working through any issues you have -- I don't want to get too personal, but have you been working on those things?

A. I worked through intensive trauma therapy.

Q. So that's a yes?

A. Yes.

Q. And at each meeting you had you were asked questions. Do you possibly remember every question you were ever asked?

A. No.

Q. Okay. Prior to today, prior to today and I guess yesterday, prior to yesterday, have you testified under oath three times? Once in the grand jury, and in two other proceedings?

A. Yes.

Q. Now, just yes or no to my question: During the course of your relationship with the defendant, did you abuse alcohol?

A. Yes.

Q. Did you continue to abuse alcohol after your relationship with the defendant? Just yes or no.

A. Yes.

Q.  Did you have, as a result of your drinking, just a yes or a no, did you have alcohol-related criminal cases in state court?

Did you get in a car accident driving drunk and hurt some people?

A.  Yes, due to my poor actions.

Q.  And you were drinking, right?

A.  Yes.

Q.  And did one of those cases involve a serious car accident where people were injured?

A.  Yes, the person broke his wrist.

Q.  You were injured severely as well?

A.  Severely injured.

Q.  Is that sort of what we referenced yesterday, some of the injuries you suffered?

A.  Yes.

Q.  I started yesterday by asking you about physical ailments, right?

A.  Yeah.

Q.  Now, was that alcohol-related car crash, assault, was that case of yours -- what year was that?

A.  2019?

Q.  2019?

A.  2018?

Q.  That occurred before the searches at Pharaoh's, right?

A.   Yeah.

Q.   That occurred before you reached out to the FBI, right?

A.   Yeah.

Q.   Was that criminal case associated with that car accident initially assigned to New York State Supreme Court John Michalski?

A.   Yes.

Q.   And you had a state criminal defense lawyer, right?

A.   Yes.

Q.   Just yes or no:  By the time you had that criminal case in front of Judge Michalski, you had spent a lot of time with him and the defendant?

A.   Yes.

Q.   You had made a lot of observations pertaining to Michalski?

A.   Yes.

Q.   When your case was initially assigned there, though, you didn't mention any of that activity initially to your, to -- to anybody; is that right?

     When the case was initially assigned --

     That's a bad question, let me withdraw that.

     When the case was initially -- later on, after events with the defendant became public, did Judge Michalski recuse himself from your case?

A.   Yes.

Q.   Okay.  The case was in front of him for a decent amount of time before that, though, right?

A.   Yes.

Q.   And he had not recused himself, correct?

A.   Correct.

Q.   Did you, as your case was pending in front of him, believe that based upon the things you knew, it might benefit you to have Judge Michalski as your judge?

A.   Yes.

Q.   Explain why you thought, based on the things you knew, it might benefit you to have Judge Michalski as your judge. Explain it to them.

A.   Because there's a suspicious marriage, and I was hoping because of his connections with Peter, in order to drop it and all the drama going on, that he would have been kind, it would have worked really well, and he would have let me off, or very low punishment, or it would have been really bad because of it.

Q.   Did you believe you had information detrimental to Judge Michalski at that time?

A.   100 percent.

Q.   Did you believe, based on what you knew about him, he would go light on you in your case?

A.   Yes.

Q.   Once Judge Michalski recused himself, was that after the

defendant got arrested?  If you know.

A.  I don't think he -- he was already arrested.

Q.  And then Michalski recused?  Or was it before?

A.  I'm not positive.

Q.  Okay.  In any event, later, your case got transferred to another judge, right?

A.  Yes.

Q.  Did the government, the FBI, U.S. Attorney's Office, give you any assistance in any of your state cases?

A.  No.

Q.  At this point in your life, as you sit here today, would you rather not be here testifying?

A.  Absolutely.

Q.  Would you rather just move on with life?

A.  Yes.

Q.  Are you nervous?

A.  Yes.

Q.  All right.  You mentioned the marriage, so I want to get into that for a little bit.

A.  Okay.

Q.  Starting with Pharaoh's, I think we've established already through your testimony you spent a lot of time at Pharaoh's roughly between 2009 and the end of 2016; is that right?

A.  Yeah.

Q.   Yes or no:  Was Judge Michalski there relatively frequently?

A.   Yes.

Q.   When Judge Michalski would be there, was he typically with the defendant?

A.   Yes.

Q.   We'll get into some of those nights and those activities in more detail later on.  But I want to focus you in on or about September 18th, 2014, okay?

A.   Okay.

Q.   By that point in time, the defendant had control of Pharaoh's; is that right?

A.   Yes.

Q.   This was months and months after the grand reopening party, right?

A.   Yes.

Q.   Did Judge Michalski -- well, withdrawn.

On September 18th, 2014, were you at Pharaoh's with the defendant?

A.   Yes.

Q.   Was Judge Michalski there?

A.   Yes.

Q.   Were you drinking heavily?

A.   Yes.

Q.   Did you get severely intoxicated?

A.  Blackout drunk.  Yes.

Q.  In the context of that night, did the defendant, while you were intoxicated, ask you to marry him?

A.  Yes.

Q.  Do you remember what you said?

A.  I was excited.  It was through a series of dares, and just telling everyone I was getting married while people were telling me not to.

Q.  And was there, from the defendant's perspective of the conversations you were having, was there a rush to get married on September 18th, 2014?

A.  Yes.

Q.  Did the defendant say why he had to get married right away that day?

A.  Because it had to do with Papa T, his grandpa, the -- the last-known Don.

THE COURT:  Sorry?

MR. FOTI:  Objection to the last comment.

THE WITNESS:  I caught it, sorry.

MR. TRIPI:  If it's what the defendant said, I don't think it's objectionable.  If it's not, then I agree.

THE COURT:  We'll strike the last thing that she said, the last-known Don.

And you can follow up.

Folks, when I say "strike," you're not to consider it

as part of your deliberations, as part of your decision-making process.  It's unfair to do that.  I can't make you stop thinking about it, but I can ask you not to allow that to influence your decision.

Next question.

**BY MR. TRIPI:**

Q.  Just focus on what I'm asking you.

As close as you can to what the defendant said about why he wanted to get married right away, what were the defendant's words to you?

A.  It was 'cuz his grandfather, Papa T's, his last known -- it was his lucky number, it was his house number when he was in Sicily, it was also the last-known D.

Q.  His date of birth?

A.  Yes.

Q.  So let me break that down.  September 18th was Todaro Sr.'s date of birth?

A.  Yes.

Q.  18th, is that right?  Yes?

A.  Yes.

Q.  And you said it was also whose lucky number?

A.  It was Todaro's lucky number.

Q.  Okay.  And that will be helpful if you use names when you're answering so we know who you're talking about, okay?

A.  Okay.

Q.   Then it will -- I I'll have to ask less questions that way, all right?

A.   Yeah.

Q.   And during the context of that night, did you guys have a judge with you who had the ability to marry you?

A.   Yes.

Q.   So is this -- is this a night where it's, like, the 13th, and then it spills into the night of heavy drinking on the 14th?

A.   Yes.

Q.   Is that what we're talking about here?

A.   17th into the 18th.

Q.   Oh, I'm sorry, 17th into 18th.  I was thinking of the year.

So 17th into the 18th, there's a heavy night of drinking, you're drunk, this conversation is starting.  Pharaoh's closes at about 4 a.m.; is that right?

A.   Yes.

Q.   Okay.  From there, from the time Pharaoh's closes, now on the 18th, are -- is that day where you're now getting married essentially?

A.   Yes.

Q.   Where did you go?

A.   Key Bank to get paperwork or something signed.  And then to Glen Falls Park.

Q.   And who was present at Glen Falls Park?

A.   Judge Michalski, myself, and Peter, the defendant.

Q.   Okay.  So there were no witnesses to the marriage?

A.   None.

Q.   Is it your understanding that in New York, there needs to be witnesses?

A.   Yes.

Q.   Is it your understanding as you sit here today that in New York, there needs to be more than 24 hours before a marriage is official?

A.   Yes.

          **MR. FOTI:**  Objection.

          **THE COURT:**  Sustained.

          **BY MR. TRIPI:**

Q.   Well, what is your understanding about when a marriage is official?  That's a different question, you can answer.

A.   When everything's done correctly.

Q.   Do you have an understanding about whether or not there's a 24-hour waiting period?

          **MR. FOTI:**  Objection.

          **THE WITNESS:**  Yes.

          **MR. TRIPI:**  Judge, it's her life.

          **THE COURT:**  Okay.  I'll allow that.

          **BY MR. TRIPI:**

Q.   Do you have an understanding of whether there's a 24-hour

waiting period?

A.   Yes.

Q.   What is your understanding in that regard?

A.   Is that we did not follow through on the 24-hour waiting period.

Q.   Describe what happened when you got to Glen Falls.

A.   We got married.  We skipped the 24-hour waiting period for emergency medical surgery.  I didn't sign papers, it's all scrambled, nothing accurate.

There was no witness.  Peter's brother, Anthony Gerace, was supposed to be a witness, he was not there.  And Peter forged his name onto the document.

**MR. FOTI:**  Objection.  Objection, Judge.

**THE COURT:**  What's the basis of the objection?

**MR. FOTI:**  602.  This is speculation.

**MR. TRIPI:**  Judge, she's -- she's there.

**THE COURT:**  Overruled.

**BY MR. TRIPI:**

Q.   So Anthony Gerace was not there, right?

A.   Yes.

Q.   Anthony Gerace's was not a witness, right?

A.   Yes.

Q.   And Anthony Gerace's name is on the marriage certificate?

A.   Yes.

Q.   Who wrote Anthony Gerace's name on the marriage

certificate?

A. Peter Gerace.

Q. Okay. Now you said there was something written down about an excuse, a medical excuse --

A. Yes.

Q. -- as to why there was no 24-hour waiting period?

A. Yes.

Q. Who wrote on the piece of paper the medical excuse?

A. Judge Michalski.

Q. Okay. And whose medical excuse was it? Who said they had a medical emergency?

A. Peter said he had emergency, medical emergency.

Q. Was that true?

A. No.

Q. Okay. I'm going to hand you up Government Exhibit 467. I'm going to ask you to flip through each page of that. Take a look.

Is that a certified copy of the certified documents of the purported marriage?

A. Yes.

MR. TRIPI: The government offers Exhibit 467, Your Honor, certified public record.

MR. FOTI: I'm sorry, what was the exhibit number?

MR. TRIPI: 467. I can show it to you.

MR. FOTI: Yeah, do you mind?

10:30AM        No objection, Judge.

10:30AM        **THE COURT:** Received without objection.

10:30AM        **(GOV Exhibit 467 was received in evidence.)**

10:30AM        **MR. TRIPI:** All right. I'd like to work through this document a little bit. Can we please publish Exhibit 467.

10:30AM        All right. Ms. Champoux, let's try to zoom in on this part of it for now, and then we'll work through it.

10:31AM        **BY MR. TRIPI:**

10:31AM   Q. Okay. Do you see that information on there, Ms. Nigro?

10:31AM   A. Yeah.

10:31AM   Q. All right. It has the defendant's personal information on the left and yours on the right; is that correct?

10:31AM   A. Yes.

10:31AM   Q. Okay. In terms of your address, it has you both living at Overlook Drive; is that right?

10:31AM   A. Yes.

10:31AM   Q. It has the same occupation, self-employed, bar and restaurant?

10:31AM   A. Yes.

10:31AM   Q. And then it had the name of your respective parents; do you see that?

10:31AM   A. Yes.

10:31AM   Q. It had the dates of any prior divorces; is that right?

10:31AM   A. Yeah.

10:31AM        **MR. TRIPI:** And, Ms. Champoux, let's zoom out of

that.  And let's zoom in on the bottom portion.

**BY MR. TRIPI:**

Q.  All right.  Now, there's a box that says I duly swear/affirm, depose and say, to best of my knowledge and belief, that the information I provided is true, and that I declare that no legal impediment exists as to my right to enter into this marriage state.  Do you see that?

A.  Um-hum.

Q.  Whose signature is underneath that line?  Right here.  I marked a little green plus sign if you can see on your screen.  Right here.

A.  Yeah, Peter's.

Q.  And across from that there's another signature, and that line, who's that?

A.  Mine.

Q.  And this gets signed later by some kind of town clerk; is that right?

A.  Yes.

Q.  Okay.  And it's dated September 18th, 2014?

A.  Yes.

Q.  Okay.  Now, going down a little farther, we're going to start working on this part of it, okay?  Do you see that?

A.  Yes.

Q.  In box 26, it says solemnization occurred.  Do you see that?

A.   Yes.

Q.   September 18th, 2014, 3:30 p.m.  Is that approximately when you would have been in Glen Falls?

A.   I have no idea.

Q.   Is that because you were still --

A.   So inebriated.

Q.   Do you see below that there's a line number 29 for officiant?

A.   Yes.

Q.   Do you see that name?

A.   Yes.

Q.   Whose name is there?

A.   John Michalski.

Q.   What's his title?

A.   State judge.

Q.   And -- and under the name Mr. Michalski, underneath his name, do you see his signature?

A.   Yes.

Q.   And do you see the date there?

A.   Yes.

Q.   What date is that?

A.   September 18th, 2014.

Q.   Okay.  And then it has his mailing address, right?  25 Delaware Avenue?

A.   Yes.

Q. Is that a courthouse?

A. I'm not positive.

Q. Okay. And then there are two spaces at the bottom for witness to ceremony; do you see that?

A. Yes.

Q. Okay. Look at box 30. Whose name is there?

A. Anthony Gerace.

Q. Did Anthony Gerace sign that?

A. No.

Q. Who signed that?

A. Peter Gerace.

Q. So the same person who signed up above --

A. Yes.

Q. -- signed down below?

A. Yes.

Q. Do you see the last name Gerace there?

A. Yes.

Q. Do those look similar to you?

A. Yes.

Q. Is that because the same person wrote it?

A. Yes.

Q. I'm going to hold right here for a sec, I'm going to hand you two documents. Look at them for a second, and then I'll ask you some questions, okay?

A. Okay.

Q.   I've handed up two versions of Government Exhibit 80, one is redacted and one is unredacted.

Do me a favor, just look at the first page and the last page of each one, okay?

A.   Okay.

Q.   Do you see the caption name there, don't read it out loud, but do you see the caption name?

A.   Yeah.

Q.   Okay.  And flip to the back page.  To the last page.  Do you see some signatures there?

A.   Yes.

Q.   Okay.  The one you're holding in your hands, is that -- if you go back to the front page, is that a certified copy of a court document?

A.   Yes.

Q.   Okay.  Now I want you to pick up the other one.  Is that also marked Exhibit 80?

A.   Yes.

Q.   Is does it have the same caption on the front page?

A.   Yes.

Q.   And if you go to the back, the last page where the signatures are, is it the same signatures as the version you just looked at?

A.   Yes.

Q.   Okay.

MR. TRIPI:  Your Honor, the government offers Exhibit 80 in redacted format.

MR. FOTI:  Can I voir dire, Judge?

THE COURT:  Sure.


**VOIR DIRE EXAMINATION BY MR. FOTI:**

Q.  Ma'am, the document you just looked at indicated that there was a signature line on the last page?

A.  Yes.

Q.  Okay.  And you saw a signature on that document, correct?

A.  Yes.

Q.  You don't know who actually signed that document, correct?

A.  I'm sorry, what do you mean?  I know the signatures and I know who they are, who did it, but I didn't watch them sign it.

Q.  Yeah, you weren't there when that document was signed, correct?

A.  Correct.

Q.  Okay.  You weren't involved in any proceedings associated with that document?

A.  Correct.

Q.  In terms of watching an individual sign that document, you didn't do that?

A.  No.

Q.  Whether somebody signed the document himself or somebody signed on his behalf, you don't know, correct?

A.  No.

MR. FOTI:  Okay.  Judge, I would object to --

THE COURT:  Can I see them.

MR. TRIPI:  Yeah, Judge, do you want us to come up.

THE COURT:  I think I'm going to sustain the objection without further --

MR. TRIPI:  May I?

THE COURT:  -- foundation.

Do you want to come up?

MR. TRIPI:  Yeah.  Sorry.

(Sidebar discussion held on the record.)

MR. TRIPI:  Judge, it's self-authenticating.  I don't even need to lay a foundation.

THE COURT:  This -- (undecipherable.)

MR. TRIPI:  I can't redact -- I would have to hand redact this.  It's the -- you see it, this is the printout.  It's only like that so I could redact it.  Otherwise, I'll just move this one in which talks about his conviction.

If the question is authenticity, this is authentic.  Everyone in the world knows it because it comes through this courthouse.  You can take judicial notice of it.

THE COURT:  This would come in --

MR. TRIPI:  I tried to limit the prejudice.

**MR. FOTI:** There would be relevancy objections and other objections to that document separate from the authenticity. So --

**THE COURT:** Right. But we have an authentic document with his signature on it.

**MR. FOTI:** I understand that it's a -- I agree that it's an authentic document. I think it's being offered for the signature, and I don't think that there's foundation established that it's an authentic signature to Mr. Gerace.

**THE COURT:** Well, you can cross-examine on that.

**MR. FOTI:** I could theoretically cross-examine on it, but I still think on a foundational standpoint --

**THE COURT:** Your objection is not to the authenticity of the document, it's to the signature?

**MR. FOTI:** Yes.

**THE COURT:** Overruled.

**MR. TRIPI:** Can we use the redacted ones for the other concerns they have though? Will you admit --

**MR. FOTI:** If it's being admitted, I'm fine with the redacted version.

**THE COURT:** Great.

(End of sidebar discussion.)

**THE COURT:** Okay. So the objection is overruled as to the redacted document.

**(GOV Exhibit 80 was received in evidence.)**

MR. TRIPI: So for record purposes, Government Exhibit 80 in redacted format is in evidence, Your Honor?

THE COURT: Yes.

MR. TRIPI: All right. Ms. Champoux, can we keep this up, 467 up, and can we also put up the version of Exhibit 80 in evidence, and can you pull up the signature block on that?


**DIRECT EXAMINATION BY MR. TRIPI:**

Q. Okay. Go to the first page just to orient the jury for a moment.

Do you see, Ms. Nigro, that's a court document from the United States of America versus Anthony Gerace?

A. Yes.

Q. And without getting into any details, did you know at some point he had a case in federal court?

A. Yes.

MR. TRIPI: Let's go to the back page of that now, Ms. Champoux.

And if we could put the signature blocks next to one another.

BY MR. TRIPI:

Q. Okay. So the marriage certificate is on 467, and the other signature is on Exhibit 80. Exhibit 80 being on the top, and 467 being on the bottom; do you see that?

A. Yes.

Q. On Exhibit 467, is that Anthony Gerace's signature?

A. No.

Q. Now, at some point after this wedding ceremony, were you present for an argument between Anthony and Peter regarding Anthony's signature?

A. Yes.

Q. On this marriage certificate?

A. Absolutely, yes.

Q. Where did that argument occur?

A. It started at Pharaoh's when he found out, and then it just continued multiple times he fought with him.

Q. Okay. Describe for the jury, and attribute who said what, so Anthony, Peter, you've got to label it.

A. Okay.

Q. Describe the argument over Anthony's signature on the marriage certificate you saw between the defendant and his brother. Go ahead.

A. Anthony did not want anything to do with it. He didn't want to be involved. He didn't want his name -- he was pissed that it was forged, like, he was very upset about the whole incident.

Q. And what did Peter say?

A. Peter didn't care. Peter gets what Peter wants.

Q. Okay.

MR. TRIPI: You can take those down. And go back to 467, please. I'd like to get back to 467. Can we advance it to the third page? Okay.

BY MR. TRIPI:

Q. Now, a moment ago you discussed there was a medical excuse given for the 24-hour wait period; is that right?

A. Yes.

Q. Do you see this portion of the certified record affidavit for waiving time requirement?

A. Yes.

Q. Who filled this out?

A. Judge Michalski.

Q. Okay. And he says -- in the top it says in the matter of application, Peter Gerace and Katrina Nigro?

A. Yeah.

Q. And then I'm going to skip having you read more of the caption.

MR. TRIPI: But, Ms. Champoux, can we zoom in on that portion of the document, please, for everybody?

BY MR. TRIPI:

Q. So all of this writing here, this is Judge Michalski's writing?

A. Yes.

Q. Fast forwarding a bit, I'll have you read it in a minute, but is this medical excuse true or false?

A.   False.

Q.   Can you read beginning at paragraph 1 there, just read all the way through the document for the jury.

A.   1.   We plan to be married on September 18th, 2014.

2.   We have been issued a marriage license.

3.   We are advised that Section 13(b) of the Domestic Relations Law requires a passage of 24 hours from September 18, 2014 before solemnization of our prospective marriage can take place.

4.   A.   We made preparations for our wedding unaware of this provision.  Grave inconvenience will be caused to those subscribers and our families due to the 24-hour lapse allowing license issuance.

B.   Also I, Peter Gerace, am undergoing a surgical procedure tomorrow September 19, 2014.  This request constitutes a medical emergency.

MR. TRIPI:   Okay.  Let's zoom out of that.

Could we advance to the second page of the affidavit.

BY MR. TRIPI:

Q.   There's a paragraph 5, if you could keep reading.

MR. TRIPI:   Can we zoom in on that for her?

THE WITNESS:   We respectfully request this Court to sign the annexed order directing the waiver of the 24-hour waiting period so that we might be married immediately pursuant to such license for which no previous application has

been made.

Q.   Okay.  And who signed underneath that?

A.   Peter --

Q.   And --

A.   -- and myself.

Q.   -- and did you also sign?

A.   Yes.

Q.   Now this printed -- your printed version of your name under the signature, did you write that?

A.   No.

Q.   Okay.  And did the judge then sign an order consistent with the affidavit?

A.   Yes.

Q.   And where were all these documents being filled out?

A.   In the park.

Q.   Near where you were being married in Glen Falls Park?

A.   Like in a car, yeah.

Q.   For those who aren't familiar, in Williamsville there's a little park called Glen Falls, right?

A.   Um-hum.

Q.   Yes?

A.   Yes.

Q.   It has a little waterfall, right?

A.   Yes.

Q.   It has a -- it's a nice little park; is that fair?

A.   Yes.

Q.   There's some parking areas sort of behind the park; is that right?

A.   Yes.

Q.   So, where -- where were the -- where were you guys parked, and where was -- were these documents being filled out?

A.   We were parked by -- there's, like, a shelter or bathroom or something with all these wild colors and animals on it.

Q.   In a parking area?

A.   Yes.

Q.   Based on your observations in the time you spent with the defendant and Judge Michalski, was Judge Michalski also close with the defendant's parents?

A.   Yes.

        MR. TRIPI:   We can take that exhibit down, Ms. Champoux.

        BY MR. TRIPI:

Q.   While working at Pharaoh's and spending your time at Pharaoh's, and when you were still close with the defendant, have you observed the defendant permit Judge Michalski into the upstairs area of Pharaoh's?

A.   Yes.

Q.   On occasions, has the defendant asked you to unlock the door to allow Judge Michalski to go into the upstairs area of

Pharaoh's?

A.   Yes.

Q.   On those occasions, was Judge Michalski going upstairs with a dancer?

A.   Yes.

Q.   What dancer did he typically go upstairs with?

A.   Shelby.

Q.   And that's the Shelby we saw earlier?

A.   Yes.

Q.   I'm going to show you Government Exhibit 563.  Do you recognize that?

A.   Yes, that's Shelby.

Q.   Does that photo have some redactions on it?  In other words, some of her body's blocked out?

A.   Yes.

Q.   Other than that, based on what you can see of Shelby, does that fairly and accurately depict Shelby?

A.   Yes.

Q.   And you indicated earlier Pharaoh's has a Facebook page?

A.   Yes.

Q.   Sometimes would Pharaoh's promote things on their Facebook page?

A.   Yes.

Q.   And at one point in your life, you controlled what was on the Facebook page?

A.   Yes.

MR. TRIPI:   The government offers 563, Your Honor.

MR. FOTI:   No objection.

THE COURT:   Received without objection.

(GOV Exhibit 563 was received in evidence.)

MR. TRIPI:   If we can publish that.

BY MR. TRIPI:

Q.   Is that Shelby who was one of the women you identified earlier in 564A?

A.   Yes.

MR. TRIPI:   Okay.   We can take that down.

BY MR. TRIPI:

Q.   How many times would you estimate, based on your observations, Judge Michalski went upstairs with Shelby?

A.   Several.

Q.   Did they go alone?

A.   Yes.

Q.   When you unlocked the door, how many times did you unlock the door?

A.   For them, probably like once.

Q.   Okay.   Have you seen them accompany each other upstairs more than once?

A.   Yes.

Q.   Were there any other dancers other than Shelby that you observed Judge Michalski go to the upstairs to go upstairs

with?

A.   There were several.

Q.   Based on your time and your observations in the club, did it appear to you that Shelby was his favorite?

A.   Shelby was a favorite, but not always around.

Q.   On the -- on the occasion where you unlocked the door for them to go upstairs, who told you to do that?

A.   Peter.

Q.   By the time that you had observed Judge Michalski going upstairs with Shelby, on prior occasions had you seen the defendant and others do cocaine upstairs?

A.   Yes.

Q.   Was that a regular occurrence?

A.   Regular, yes.

Q.   By the time Judge Michalski was going upstairs with Shelby, had you observed sex acts occur in the upstairs?

A.   Yes.

Q.   Describe the situations where you would observe sex acts occurring in the upstairs.

A.   I walk up, and I'd actually have to sometimes clean after.  There would be condoms, odors, there would be lines, residue, tissues, someone got in the shower, towels used.

Q.   Based on those observations, did you form an opinion and conclude that sex acts had occurred upstairs?

A.   Yes.

Q.   Now, when you were unlocking the door, you didn't think they were going upstairs to have deep conversations, did you?

A.   No.

Q.   When you were unlocking the door, you didn't think they were going upstairs to play board games, did you?

A.   No.

Q.   Have you seen used condoms in the upstairs?

A.   Absolutely, yes.

Q.   On that score, did the defendant have an arrangement where nightly he would have someone clean Pharaoh's after a night's events?

A.   Yes.  In the morning, the cleaning guy came in the morning, around 5, 6, because they were open till 4.

Q.   Right.  So at one point, after the grand reopening party, was there a guy who ran the cleaning named Tommy O?

A.   Yes.

Q.   Who is Tommy O?

A.   He is a member of the Outlaws, president.

Q.   Over time, did Tommy O go from sort of cleaning the place to managing the place?

A.   Yes.

Q.   Okay.  When Tommy O went from cleaning the place, did he have people working for him cleaning the place, Tommy?

A.   He had people, he had associates from the clubhouse would be always there around him.

Q.   Okay.  Did people help him clean?

A.   Not too much.

Q.   Okay.  When Tommy went from the guy in charge of cleaning the place to helping manage the place, did somebody else replace him in those cleaning duties?

A.   I was not currently working there when that occurred.

Q.   Okay.  Thank you.  Just yes or no to this question:  By the time Judge Michalski was going upstairs with Shelby, had other dancers told you about their experiences about going upstairs with men?

A.   Yes.

Q.   By the time Judge Michalski was goings upstairs with Shelby, had you seen other Pharaoh's dancers over time go upstairs with other friends of the defendant?

A.   Yes.

Q.   Just yes or no to this:  By the time Judge Michalski was going upstairs with Shelby, had you heard comments other dancers made after having been upstairs with friends of the defendant's?  Have you heard other dancers go upstairs come downstairs and make comments?  Yes or no.

A.   Yes.

Q.   Do you know Crystal Quinn?

A.   Yes.

Q.   At one point, did you go upstairs and observe Ms. Quinn engaged in a sex act?

A.    Yes.

Q.    Who was she performing a sex act on?

A.    My ex-husband, Peter Gerace.

Q.    What did you observe transpiring?

A.    She was doing cocaine off of him.

Q.    Off of what part of him?

A.    His penis.

Q.    Sticking with Shelby for a moment, have you observed Shelby use drugs?

A.    Yes.

Q.    What type of drugs?

A.    Cocaine.

Q.    Has -- have you observed Shelby use cocaine inside Pharaoh's?

A.    Yes.

Q.    What part of Pharaoh's?

A.    Bathroom.

Q.    I'll get into this more a little bit later, but were there other friends of the defendant similar to Judge Michalski who went upstairs alone with Pharaoh's dancers, that you --

A.    Yes.

Q.    Are there other friends of the defendant's that you have unlocked the door for --

A.    Yes.

Q.   -- to enable them to go to the upstairs?

A.   Yeah.

Q.   When you unlocked the door on those occasions, who directed you to do so?

A.   Peter.

Q.   I'll get into a little more specifics later, and I don't necessarily want to use names right now unless I ask you specifically.  But generally, were some of those individuals friends of Peter's personal friends?

A.   Yes.

Q.   Were some of those people somewhat popular or famous?

A.   Yes.

Q.   Was there a particular actor when he was in town that would go upstairs?

A.   Yes.

Q.   Who was that?

A.   Lillo Brancato.

Q.   Okay.  We talked about Judge Michalski.  Were there other attorneys that would go upstairs?

A.   Yes.

Q.   Were there local athletes that would go upstairs?

A.   Yes.

Q.   Members of what sports team?

A.   Sabres.

Q.   And this is in the past, old versions of the Sabres,

correct?

A.   Yes.

Q.   Do you have one particular Buffalo Sabre in mind as I ask you that question?  I'm not asking you for the name right now.

A.   Yeah, I have three.

Q.   Okay.  Now, when you were unlocking the door and making these observations, putting yourself back in that time in your life, at that time in your life, you were close and loyal to the defendant, close with and loyal to him?

A.   Yes.

Q.   Okay.

MR. TRIPI:  We're going into a new area, Judge.  Are we doing 11 or 11:15?

THE COURT:  No, we can take our break now.  This is as good a time as any, so let's take our break now.

Remember my instructions about not talking about the case with anyone, including each other, and don't make up your mind.  See you back here in ten or 15 minutes.

(Jury excused at 10:58 a.m.)

THE COURT:  Okay.  Ma'am, you're not to talk to anybody about your testimony during the break.  You may step down and leave.

THE WITNESS:  Okay.

MR. TRIPI:  We're on about a 15-minute break, okay?

(Witness excused at 10:59 a.m.)

**THE COURT:**  Will you shut that door, please?

Okay.  So based on the testimony -- folks can sit.

Based on the testimony of the witness about the marriage, I'm satisfied that the marriage was not done properly.  That -- that there's a witness who wasn't there, that there's a forged signature.  I think you've established that.

But what I don't know is what impact that has on the privilege, so what impact that has on whether there was a valid marriage.

So my guess is that if you had a situation exactly like this, where there wasn't a witness there, and the marriage goes on for 40 years, and one of the spouses passes away, and there's a contest of the other spouse's entitlement to the estate that a judge is gonna say this is a marriage, you know, regardless that there was funny stuff that went on at the time the marriage was -- was entered into, this is a marriage.  The spouse gets the -- gets the estate.  That's my guess.

I don't know whether that, I mean, she put herself out there as his wife.  They had the marriage dissolved by a divorce.  So, what does this to do to the privilege?  I don't know.

**MR. TRIPI:**  I think we can put a pin in that for now,

Your Honor --

**THE COURT:**  Okay.

**MR. TRIPI:**  -- because I think a lot of the conversations -- if I'm going to get into a conversation that's just she and he, I'll pause, I'll hit the pause button. But I think -- I don't think, first of all, like the communication needs to be intended as a privilege, so I would think directives are not privileged, I would think conversations in front of other people are not privileged.

**THE COURT:**  Certainly conversations in front of other people.  I guess the directive would depend on what other people would have to be involved in the -- the -- the act that is being directed.

**MR. TRIPI:**  Well, it has to be intended as a privilege.  So if I say, hey, go over there, that's not something intended as a privilege.  Or, go do that.

If it's, hey, I killed three people, but don't ever tell anyone because I'm married to you, and I don't want you to talk about that.  Clearly different, right?

**THE COURT:**  I'm not so sure if it's -- if it's go get some cocaine out of the bedroom closet so I can take some, I think that might be privileged.

**MR. TRIPI:**  I think for the same reasons that you've been satisfied that there's a coconspirator relationship, I think that would apply to whether there's crime fraud, and

whether or not -- you can't -- you can't have your wife help you engage in --

THE COURT: Okay. I just wanted to tee this up for you folks --

MR. TRIPI: Yep.

THE COURT: -- with respect to the spousal privilege because I know that you did that so that I could make a decision about whether the spousal privilege applies.

And while I think you've done an effective job of establishing that there was no -- that the -- the marriage was not done properly, that there were significant gaps, I don't know what impact that has on the privilege when I've already said what I've said. I've already said what I said.

MR. TRIPI: I also think there's some relevance beyond just whether it was a valid marriage or not because presumably there's a motive for a supreme court judge to not follow the rules, right? And so that can be personal, that can be all kinds of things.

THE COURT: I get it. But what I'm saying, I mean, I gave that little hypothetical at the beginning where it happens exactly this way, but it's a happy 40-year marriage, and then one spouse dies. I don't think that that's going to effect the legitimacy of the marriage. Maybe I'm wrong.

Anything you want to say, Mr. Foti?

MR. FOTI: No, Judge, I just -- I guess I think what

we said yesterday, so I don't want to belabor it, but my understanding is she received a financial benefit from going through the divorce.  And obviously Mr. Gerace -- neither party claimed it was an invalid marriage at that time.  So there's that aspect of it, that she not only went through the divorce indicating she recognized in a legal proceeding that the marriage was legitimate, but there was some financial benefit as a result of the dissolution of the marriage.

But I think that that, it's already established the Court's position on it, we agree with it, I don't think there's anything else beyond that.

**THE COURT:**  Okay.  Anything more?

**MR. TRIPI:**  No.

**THE COURT:**  Anything else from the defense?

**MR. FOTI:**  No.

**THE COURT:**  Oh, one other thing.  That photo that was admitted and we redacted the words?  Let's get that exhibit redacted appropriately so we can give it to the jury.

**MS. CHAMPOUX:**  I did, I have it.

**THE COURT:**  You're already on it.  So you're just like Colleen.  I say things, and you've already done it.  Thank you.

**THE CLERK:**  All rise.

(Off the record at 11:04 a.m.)

(Back on the record at 11:19 a.m.)

(Jury not present.)

THE CLERK:  Please be seated.

THE CLERK:  We are back on the record for the continuation of the jury trial in case numbers 19-cr-227 and 23-cr-37, United States of America versus Peter Gerace, Jr.

All counsel and parties are present.

THE COURT:  Okay.  So, what I'd like to do is go about another hour, take a half hour for lunch, and then come back and go the rest of the day.

MR. TRIPI:  Sounds good.

THE COURT:  Make sense.

MR. TRIPI:  3 or 3:30, I just don't remember.

THE COURT:  3, and even a little early.

As Mr. Foti says, the courthouse is closing at 2, so, but I'm keeping everybody here a little later.

MR. TRIPI:  Thank you.

MR. COOPER:  If we're doing 12:30 to 1, maybe when we get back from lunch break, we can grab that witness out of order to make sure we get that person done?

THE COURT:  That's fine.  Great.  Okay.  Anything further?  The defense okay with that schedule?

MR. SOEHNLEIN:  Yeah, that's what I was weighing in, Judge.

THE COURT:  Okay.  Anything further from the defense?

MR. FOTI:  No, Judge.

THE COURT:  Okay.  We bring them in, please, Pat?

MR. TRIPI:  Can we get the witness?

(Jury seated at 11:22 a.m.)

THE COURT:  The record will reflect that all our jurors are present.  Folks, we're going to go for another hour, until about 12:20, and then come back and finish the day, okay?  Great.

I remind the witness she's still under oath.

Mr. Tripi, you may continue.

MR. TRIPI:  Thank you, Your Honor.

BY MR. TRIPI:

Q.  Ms. Nigro, I want to focus you back in on that grand reopening party for just a moment.  I'm going to hand you up some more photos, okay?

240B, 240C, 240D, 240E, 240F, 240G, 240H, 240I, 240J, 240K, 240L, and 240M.  I'm going to hand those up, and I'm going to ask you to look though them, okay?

A.  Okay.

Q.  Did you look at all of those?

A.  Yes.

Q.  Do you recognize the individuals and the scenes depicted in the photos from the activities of the night of the grand reopening party?

A.  Almost everyone.

Q.  Okay.  Regarding the depictions though, is that -- were

all those photos from people you saw in Pharaoh's the night of the -- regardless of whether you know them all?

A.   All right.

Q.   Were those individuals you saw the night of the grand reopening party?

A.   Yes.

Q.   Do they all fairly and accurately depict individuals and places within the club you saw people inside that day?

A.   Yes.

MR. TRIPI:   The government offers Exhibits 240B, through 240M, Your Honor.

MR. FOTI:   Briefly, Judge?

THE COURT:   Sure.

**VOIR DIRE EXAMINATION BY MR. FOTI:**

Q.   When you said almost everybody, you were referring to the fact that some of the people you don't know personally?

A.   Yes.

Q.   Do you recall having seen every single one of those people at the party, or --

A.   I've, like, seen them, but I couldn't say their name and stuff like that.  They were regulars through the club.

Q.   Okay.  That's okay.  Do you recall actually seeing each of those people at the party?

A.   Yes.

MR. FOTI:  All right.  No objection, Judge.

THE COURT:  All received without objection.

**(GOV Exhibits 240B thru M were received in evidence.)**

**DIRECT EXAMINATION BY MR. TRIPI:**

Q.  Okay.  Let's work through these briefly, okay?

MR. TRIPI:  Let's pull up 240B.

BY MR. TRIPI:

Q.  That's another photo of you, correct?

A.  Yeah.

Q.  Wearing the same outfit that we saw in the earlier photos from 241 --

A.  Yes.

Q.  -- D?

A.  Yes.

Q.  Same dress?

A.  Yeah.

Q.  Okay.

MR. TRIPI:  Let's go to 240C, please.

BY MR. TRIPI:

Q.  Is that another image that includes Darryl LaMont?

A.  Yes.

Q.  Is he with two other women?

A.  Yes.

Q.  Do you know those women?

A.   Yes.

Q.   Who are they?

A.   That's Megan Stabler, and that is Heavenleigh Becht.

Q.   Okay.  Which one is Megan Stabler?

A.   The blonde hair one.

Q.   Now, is she married to somebody?

A.   She was married to Rob Reed.

Q.   Okay.  So that's the DJ you talked about yesterday?

A.   Yes.

Q.   Was Megan Stabler, based upon your personal observations and interactions with her, was she involved in drugs?

A.   Yes, absolutely.

Q.   What type of drug was she involved in using?

A.   Cocaine, marijuana, and party pills.  Whatever, Molly, stuff, club pills.

Q.   Okay.  Next in the middle there is Heavenleigh Becht you said?

A.   Yeah, Raven.

Q.   Based upon -- so, that's a good distinction.  Are there some dancers who only -- you only know by their dancer name?

A.   Yes.

Q.   And some dancers you know by their first and last name?

A.   Yes.

Q.   So you indicated Raven, is that Heavenleigh Becht in the middle?

A.   Yes.

Q.   And so based on your time with her and your observations of her, did you know her to be involved in drugs?

A.   Yes.

Q.   What type of drug did you know her to be involved in?

A.   Cocaine.  They shifted, too, you know.

Q.   Have you observed both of those women using inside Pharaoh's?

A.   Yes.

Q.   Regarding Darryl LaMont, have you ever observed him using drugs?

A.   No.

MR. TRIPI:  Let's move on to 240D.

BY MR. TRIPI:

Q.   Okay.  What, in terms of geography, what portion of the club is this?

A.   That's the DJ booth.

Q.   And from left to right, who are the people in the DJ booth?

A.   Rob Reed, Brandon Carr, and Cherry Asher -- or, Nicole Asher, her dancer name is Cherry.

Q.   Could her first name be Autumn?

A.   Yes, Autumn Asher.

Q.   You indicated yesterday DJ Rob Reed is a DJ, you have observed him use drugs inside Pharaoh's?

A.   No.

Q.   Okay.   In the middle there is Brandon Carr, right?

A.   Yes.

Q.   Have you observed him use drugs inside Pharaoh's?

A.   Yes.

Q.   Where have you seen him use drugs?

A.   He used to be a DJ on a regular basis.   He would use it right in the booth.

Q.   He was formerly one of the DJs?

A.   Yes.

Q.   Was he close with Peter?

A.   Very.

Q.   And we've -- you mentioned Cherry, dancer name, right?

A.   Yes.

Q.   Autumn Asher?   Have you seen her involved in both cocaine use and distribution inside --

A.   Yes.

Q.   -- of Pharaoh's?

What type of drug would she use inside Pharaoh's?

A.   Cocaine, marijuana.

Q.   And what type of drug would she help distribute inside Pharaoh's?

A.   Cocaine, marijuana.

Q.   Was she a longtime, sort of, fixture dancer at Pharaoh's?

A.   Yes.

Q.   Was she -- was she someone who was close with Peter?

A.   Yes and no.  Peter said she's too fat to go on the stage, so she was reduced on the amount of dancing.

Q.   Okay.  But was she a longtime fixture at the club, so to speak?

A.   Yeah, she was.

Q.   Was she there a lot of years?

A.   She was there on and off a lot of years.

         MR. TRIPI:  Okay.  Let's go to 240E.

         BY MR. TRIPI:

Q.   Are those individuals you also saw inside Pharaoh's?

A.   I seen them, but I don't know them.

         MR. TRIPI:  Okay.  Let's go to Exhibit 240F.

         BY MR. TRIPI:

Q.   Does that include you and Ms. Asher who you mentioned a moment ago?

A.   Yes.

Q.   Do you know the young lady in the sort of maroon shirt?

A.   Yeah.

Q.   Who's that?

A.   That is Stacey, I believe it's Noah's best friend, wife, girlfriend.

Q.   Does she work at the club?

A.   She was not at the time.

         MR. TRIPI:  Display 240H, please.

**BY MR. TRIPI:**

Q.   In this image, do you see some individuals with sort of leather jackets on in the background?

A.   Yeah.

Q.   Now we'll get into it more later, but were there members of motorcycle clubs that would frequent the club?

A.   There were several.

Q.   Okay.  What were some of the motorcycle clubs that would frequent the club?

A.   It was the Outlaws, but then they had supporters who would also go.

Q.   Okay.  And the individuals sort of in the middle of the picture, is that an attorney you know?

A.   Yes.

Q.   Who's that?

A.   I know I've seen him 100 times, I'm blanking, it's one of Peter's attorneys.

Q.   Do you know the name, or no?

A.   Not offhand.

     **MR. TRIPI:**  Okay.  We'll go to 240I.

     **BY MR. TRIPI:**

Q.   Do you know any of those people?

A.   Yes.

Q.   Who do you know?

A.   The guy to the far left is Marcus Black.

Q.  Was Marcus Black someone who was at the club frequently?

A.  Yes.

Q.  Was Marcus Black involved in cocaine?

A.  Yes.

Q.  Was he a drug dealer?

A.  Yes.

Q.  Was he a well-known drug dealer, in your view?

A.  Yes.

Q.  Did he distribute cocaine to people inside Pharaoh's?

A.  Yes.

Q.  Did he distribute cocaine to the defendant?

A.  Yes.

Q.  Were they close?

A.  Yes.

Q.  Did Marcus Black sell cocaine to a lot of dancers?

A.  Yes.

Q.  Customers?

A.  Yes.

Q.  Other staff?

A.  I'm not positive on other staff.

        **MR. TRIPI:**  Let's go to -- jump to 240L.

        **BY MR. TRIPI:**

Q.  Looking at 240L, do we see Brandon Carr, Marcus Black, and Darryl LaMont, among others in the photo?

A.  Yes.

Q.  Can you tap on each of them?  One tap?

MR. TRIPI:  Okay.  Maybe the record reflect the witness has placed a dot on the person second from right, on the person crouched down in the front, and on the person in the middle of the photo with the pink shirt and the blue tie.

Okay.  We can take that down.

BY MR. TRIPI:

Q.  All right.  Now I'd like to switch gears from that, fast forward a little bit in time.  And I might do that sometimes, we might go back and forth in terms of events, okay, Ms. Nigro?

A.  Yes.

Q.  I'd like to fast forward to in or about June of 2016, okay?  In that year, do you recall an anniversary party that the defendant was hosting for his parents?

A.  Yes.

Q.  Where was that anniversary party going to be?

A.  It was going to be at Salvatore's.

Q.  And is there sort of like a banquet portion of Salvatore's restaurant?

A.  Yes.

Q.  Is that a restaurant out on Transit Road?

A.  Yes.

MR. TRIPI:  Okay.  I'm going to switch to the ELMO if that's okay, Ms. Demma.

THE CLERK:  Yep.

MR. TRIPI:  Publishing 252H, which is in evidence. I'm going to zoom it out so you can see.

BY MR. TRIPI:

Q.  All right.  Do you see this document in the sort of middle top, it says sort of Peter's list?

A.  Yes.

Q.  We're going to work through some of the names on here, okay?  Okay?

A.  Yes.

Q.  And I'm going to also ask you if these people were at the, as far as you recall, if they were at the anniversary, okay?

A.  Okay.

Q.  Does the defendant have a brother named David?

A.  Yes.

Q.  Okay.  Was David at the anniversary party?

A.  I was not at the anniversary party.  Peter ditched me three days prior and took another girl, so I'm not sure who was at it.  I was actually unaware that my family and I were on this list, it's a shocker.

Q.  I'm asking you questions, I'm glad you clarified, so maybe I assumed.  You were not at the anniversary party?

A.  I was not at it.

Q.  Okay.  I'm still going to work through this list.

A.  Okay.

Q.  And I'm going to divorce my questions from whether they were at the anniversary party --

A.  Okay.

Q.  -- so stick to my questions, okay?

A.  Yes.

Q.  Does the defendant have a brother named David?

A.  Yes.

Q.  Does the defendant have a brother named Anthony?

A.  Yes.

Q.  Do you know a woman with the last name Arida?

A.  Yes.

Q.  Who was that?

A.  That is the son's mother.

Q.  What's her name?

A.  It's RuthAnn Arida, is Peter's son's mom of Nick.  And then that's her parents.

Q.  Let me ask you this.  After you and the defendant had that purported marriage in Glen Falls, did you have any type of later gathering where people were invited?

A.  We went to Sienna.

Q.  That was it?

A.  Yeah.

Q.  How many people were at Sienna restaurant?

A.  Ten.

Q.  Okay.

A.  Eight to ten.

Q.  And so do you remember who was at Sienna.  Let's go there for a moment.  You don't have to look at that for a moment.  Who was at Sienna after the wedding?

A.  Judge Michalski, his wife, Peter's parents, myself, Peter, I feel like Anthony ended up coming.  An, or no, maybe Nick and his son, or David?  Actually, I'm blanking on that part.  I don't remember, it was such a horrifying experience.

Q.  My question was just who was there.

A.  Yeah, I.

Q.  Name as many as you can, and if you can't remember, say you can't remember.

A.  Yeah, I can't remember.

Q.  Okay.  You remember Judge Michalski being there though?

A.  Yes.

Q.  Did you take some pictures from around that time and later post them from being at Sienna?

A.  Yes.

Q.  Basically were they pictures of food?

A.  They were pictures of food.

Q.  Did you post those pictures a few days after the dinner?

A.  Yes.

Q.  Okay.  I'm going to hand up Exhibits 468A, 468B.

        **MR. TRIPI:**  Can we switch back to the computer for a

moment, Ms. Demma?  Thank you.

**BY MR. TRIPI:**

Q.  So we're back in 2014, I told you we were going to jump back and forth a little bit.  Do you recognize those photos?

A.  Yes.

Q.  Are those photos of the food that you ordered at Sienna?

A.  Yes, it is photos.

Q.  Do they fairly and accurately depict photos you took of what you ate and what you posted?

A.  Yes.

Q.  And would this accurately reflect the date that you posted it on to your Facebook?

A.  Yes.

        **MR. TRIPI:**  The government offers 468A and B, Your Honor.

        **MR. FOTI:**  No objection.

        **THE COURT:**  Received without objection.

   **(GOV Exhibits 468A and B were received in evidence.)**

        **MR. TRIPI:**  Thank you, Your Honor.

        Can we publish those side by side, Ms. Champoux?

        **BY MR. TRIPI:**

Q.  All right.  So, we have a date of September 21, 2014.  Is that about three days after the marriage ceremony at Glen Falls where you posted these?

A.  Yes.

Q.  Was the dinner the same night as the Glen Falls event or was it later?

A.  No, it was later.

Q.  How many days later?

A.  Two to three maybe.

Q.  Okay.  So it's sometime between the 18th and the 21st, fair to say --

A.  Yes.

Q.  -- of 2014?

What, if anything, did you observe the defendant give Judge Michalski at that dinner?

A.  An envelope.

Q.  Do you know -- just a yes or no to this -- do you know what the envelope contained?

A.  Peter said he was giving him --

MR. FOTI:  Objection.

THE COURT:  Ma'am, please.  Just answer -- when he says just answer the question, just answer the question.

BY MR. TRIPI:

Q.  Yes or no:  Do you know what the envelope contained?

A.  Yes.

Q.  How do you know what the envelope contained?

MR. FOTI:  Objection.

THE WITNESS:  Because I saw it arranged.

THE COURT:  How do you know?

THE WITNESS:  I --

THE COURT:  Hang on.

MR. FOTI:  I'm concerned that it's gonna call for a hearsay, based on the way the response was to the last question.

THE COURT:  Well, it may, but she's to answer just the question.

So, how do you know?

BY MR. TRIPI:

Q.  How do you know the envelope contained cash?

A.  I saw him put it together, and he told me.

Q.  Okay.  So both things?

A.  Both.

Q.  All right.  In terms of seeing him put the envelope together, where were you when that occurred?

A.  Started at the office, but I also saw him in the apartment putting it into his suit before he got -- left.

Q.  Okay.  So you referenced the office.  So at some point did he obtain cash from the office inside Pharaoh's?

A.  Yes.

Q.  And then did you get ready for the dinner somewhere?

A.  Yes.

Q.  Where did you get ready for the dinner with the defendant?

A.  At Windsong Apartments.

Q.  Okay.  So at your house?

A.  Yes.

Q.  Before you left to go to the Sienna dinner, what did you see the defendant do with the cash that he had obtained from the office in Pharaoh's?

A.  Put it in his suit coat.

Q.  Did you see the cash go into an envelope?

A.  Yes.

Q.  Did you develop an understanding of how much money was in the envelope?

A.  Yes.

Q.  Okay.  Now, was this a dinner that was supposed to be to celebrate your marriage?

A.  Yes.

Q.  Now typically, people give gifts to the people getting married, right?

A.  Yes.

Q.  Okay.  When you got to Sienna, what, if anything, did you observe the defendant do with that envelope that you saw with the cash?

A.  He gave it to Michalski.

Q.  Okay.

        **MR. TRIPI:**  Okay.  We can take those down, Ms. Champoux.

            If we can switch back to the ELMO now.

**BY MR. TRIPI:**

Q.   Now, again, I just want to work through this list, and I'm going to ask you some questions about just a couple of the names, okay?

A.   Okay.

Q.   Going to page 2 now.

All right.  Now you've seen the defendant's handwriting before?

A.   Yes.

Q.   Do you recognize this handwriting?

A.   Yes.

Q.   Whose handwriting do you think this is?

A.   Peter.

Q.   Okay.  Do you see a name at the top on the left-hand column?

A.   Yes.

Q.   What's that name?

A.   Daniel Derenda.

Q.   Were you familiar -- or, did you know the relationship between the defendant and Daniel Derenda?

A.   Yes.

Q.   What was Daniel Derenda's job or position at this time?

A.   Police commissioner.

Q.   Of Buffalo?

A.   Yes.

Q. What was the relationship between the defendant and Daniel Derenda?

A. Long-term friends. And the daughter of Danny Derenda, at the time she was 8, Mia is his goddaughter -- of Peter.

Q. So Peter's the godfather of --

A. Godfather.

Q. -- of Mr. Derenda's daughter?

A. Yes.

Q. Okay. Is -- is the former police commissioner someone that you would observe visit Pharaoh's?

A. He swung by events.

Q. I didn't hear you.

A. He has swung by at events to show support.

Q. So the answer is yes?

A. Yes.

Q. Below that is Judge Michalski; is that right?

A. Yes.

Q. And we've heard that already?

A. Yes.

Q. Do you know the name Aaron LaMarca?

A. Yes.

Q. Who is that?

A. He's a liquor distributor.

Q. And what is a liquor distributor?

A. They would come into the club every day and have sales on

liquor, see what you needed ordered, offered you deals if you displayed a new brand and shelving.

Q.   And I guess I should ask that question.  It might seem obvious, but does Pharaoh's sell alcohol?

A.   Yes.

Q.   Is that alcohol purchased through a vendor like a liquor distributor?

A.   Yes, several.

Q.   Does Pharaoh's sell beer, hard liquor, and all kinds of other drinks as a commercial establishment?

A.   Yes.

Q.   Did Aaron LaMarca work for a liquor distributor?

A.   Yes.

Q.   Do you remember what liquor distributor he worked for?

A.   It could have been Southern.

Q.   Okay.  Was Mr. LaMarca, beyond being a liquor distributor, did Mr. Gerace and Mr. LaMarca have any type of relationship based on your observations?

A.   They were very close friends.  They hung out on a regular basis.

Q.   Have you observed Mr. LaMarca at Pharaoh's?

A.   Yes.

Q.   How many times?

A.   All the time.  He was frequently because of his job as a distributor, he was there at least three-times-plus a week,

and they are personal friends so he would swing by almost daily.

Q. Okay. Yes or no: Have you observed Mr. LaMarca go upstairs alone with a Pharaoh's dancer?

A. Yes.

Q. Have you ever been the one who unlocked the downstairs door?

A. No.

Q. Okay. Was there a particular dancer that Mr. LaMarca would go upstairs there?

A. Gabby.

Q. Is Gabby a dancer name or a real name?

A. Dancer name.

Q. Now, there are some women who had the dancer name Gabby; is that right?

A. Yes.

Q. And other women who might have had a real name Gabby, right?

A. Yes, probably.

Q. And in terms of the dancers at Pharaoh's, on a weekend, on a weekend, what's an estimate number of dancers that would be working?

A. 30 to 50.

Q. Okay. Were there occasions when something called a feature dancer would come into town?

A.   Yes.

Q.   What is a feature dancer?

A.   It's a girl who's more established through magazines and put on a show, like a school girl or cop, had more effort.

Q.   Is this someone who's gained some level of notoriety?

A.   Yes.

Q.   Do they sometimes travel in from elsewhere?

A.   Yes.

Q.   Sometimes from other states?

A.   Yes.

Q.   Now, were there other dance -- some dancers on the regular roster who, when the weekend hit, would travel in from other states to work at Pharaoh's?

A.   Yes.

Q.   What other states were some of the dancers from?

A.   They're coming in from Pennsylvania, and sometimes from Ohio.

Q.   Okay.  Based on your experience in the industry, is that somewhat common where sometimes people will travel from where they live, not dance in the local town where they live, but go and dance elsewhere?

A.   Yes.

Q.   If you had to estimate, based on your personal observations, how many times you would estimate Mr. LaMarca has gone upstairs with a dancer inside Pharaoh's?

A.  He was, like, two times a week.  Pretty frequent. Probably at least 20 times in a course of years, too.

Q.  I'd like to get a little bit more into drugs that you've observed, used, or distributed inside Pharaoh's, okay?

A.  Okay.

Q.  Have you worked at Pharaoh's during the day?

A.  Yes.

Q.  Have you worked at Pharaoh's sometimes during the night?

A.  Yes.

Q.  Have you attended Pharaoh's socially at night?

A.  A few times, yes.

Q.  Okay.  For that short stretch in 2014, you actually were staying in the upstairs of Pharaoh's; is that right?

A.  Yes.

Q.  Okay.  You touched on it in several contexts already, but based on your observations and experience, was there drug use and distribution at Pharaoh's?

A.  Yes.

Q.  Was that, in your view, pervasive?  Was there a lot of it?

A.  Yes.

Q.  If I use a term and you're not sure about it, let me know, okay?

A.  Okay.

Q.  Have you, in your personal experience, have you

Q.  previously tried cocaine?

A.  Yes.

Q.  When you tried it, what effect did it have on you?

A.  Well, the first time I tried was actually with Peter. And I have ADHD, and I fell asleep.  I felt just really crappy and awful.  And it was an opposite experience of everyone who did it with me.

Q.  Okay.  And so you've observed other people under the influence of cocaine?

A.  Yes.

Q.  What characteristics do you associate with -- visual characteristics of others when you see them using cocaine?

A.  Their eyes dilate.  They sweat.  And they are very antsy. They're pasty.  They think situations are going on that they aren't, like, constantly at the blinds like someone's watching them.  Just erratic behavior.  They can't control sometimes bowel movements.

Q.  In your experience, we've talked a little bit about this already, have you observed people under the influence of opiates or heroin?

A.  Yes.

Q.  And what observations of their physical behaviors have you observed that you associate with people under the influence of opiates or heroin?

A.  They're calmer.  They tend to nod off.  They're more

sleeping.  They tend to hide.  They're not really on the floor trying to make money.  They're, like, slower.  Calmer music.  It's a whole different type of person.

Q.  And in terms of frequent heroin use, when it's intravenous, we talked about sort of the needles that were pulled out of the toilet; do you remember that?

A.  Yes.

Q.  Have you observed things like track marks before in your life?

A.  Yes.

Q.  What are track marks?

A.  They're marks that go up and down your arms, or could be on your legs and stuff, the needles in the vein slowly breaking, and stuff like that.  And if they take a while if they can ever recover and heal again.

Q.  Does it cause -- are tracks marks essentially scarring from needle marks?

A.  Scarring from needle marks.

Q.  Have you observed Pharaoh's dancers developing track marks?

A.  Yes.

Q.  When you were at Pharaoh's, when -- when -- when -- when dancers were under the influence of cocaine, heroin, or other opiates, in your view, was it obvious to you?

A.  Yes.

Q.  Have you observed people using and under the influence of marijuana in Pharaoh's?

A.  Yes.

Q.  Was there a particular spot where people frequently used marijuana on the premises?

A.  Yeah, there's a back smoking area.

Q.  Where is that located?

A.  Through the dressing room area, just like kind of step out.  It's right there next to the door.

Q.  And does marijuana have a distinctive smell?

A.  Yes.

Q.  Did a lot of people use marijuana at Pharaoh's?

A.  A lot.

Q.  Were you a marijuana user?

A.  Yes.

        MR. TRIPI:  Give me one moment, please.

        BY MR. TRIPI:

Q.  Now earlier we spoke about Anthony Gerace; do you remember him?

A.  Yes.

Q.  The defendant's brother?

A.  Yep.

Q.  Was he someone who had marijuana available?

A.  Yes.

Q.  Was he someone you've obtained marijuana from?

A.   Yes.

Q.   Was he -- what were the different places where you've obtained marijuana from him?

A.   I've had Peter grab it for me before.  And then we met him at a gas station before.  And he would bring it sometimes into the office.

Q.   In the -- in that sentence, who is the "he?"

A.   Anthony.

Q.   And in when you say in "the office," what --

A.   Of Pharaoh's.

Q.   Okay.  In other words, like a delivery --

A.   Yes.

Q.   -- or a drop-off?

A.   Drop-off.

Q.   Is that the same office we were looking at earlier that had the safe in it?

A.   Yes.

Q.   Okay.  Do you know whether or not, in addition to marijuana that you were obtaining or using, supplied by Anthony, do you know whether he supplied other members at Pharaoh's with marijuana?

A.   No.

Q.   Did Peter use marijuana?

A.   Absolutely not.  He hated it.

Q.   Okay.  So the marijuana that Anthony dropped off was for

Q. you?

A. Yes.

Q. Does it make you nervous answering questions about Anthony?

MR. FOTI: Objection.

THE WITNESS: No.

THE COURT: Hang on. Stop. Stop. Stop.

What's the basis of that objection?

MR. FOTI: I withdraw it based on the answer.

BY MR. TRIPI:

Q. So I've talked about cocaine, heroin, and marijuana.

Have you observed dancers and certain staff and employees under the influence of those drugs while at Pharaoh's?

A. Yes.

Q. Did you observe some type of use and distribution of all of those drugs virtually every day you were there?

A. Yes.

Q. Based upon your observations and experiences at Pharaoh's, was this defendant involved in distributing drugs to others at Pharaoh's?

A. Yes.

Q. What drug did the defendant typically distribute at Pharaoh's?

A. Cocaine.

Q. Before you were -- I'm going to air quote it -- married

to the defendant, were you aware of cocaine parties in the upstairs at Pharaoh's?  Or parties upstairs where cocaine was distributed?

A.  Yes, I've heard of it going on, but I was never quite involved with that all.

Q.  Did that change after you were with him?

A.  Yes.

Q.  Okay.  What types of activities related to cocaine have you seen the defendant engage in in the upstairs at Pharaoh's?

A.  It was a lot going on.  There would be, like, four or five girls, a lot of TVs, like, Wolf of Wall Street, cocaine on body parts, ongoing -- sometimes he would send girls down and new girls would come upstairs and it was a rotating cycle with the ladies.  It would go on for days of it, and it was just horrific, I -- you know.

Q.  Was the defendant distributing cocaine to dancers in the upstairs?

A.  Yes.

Q.  Did the defendant have friends in the upstairs that would -- he would give cocaine to?

A.  Yes.

Q.  Did you ever witness Judge Michalski engage in that activity?

A.  Yes.

Q.   Were some dancers heavily using Lortabs during your time at Pharaoh's?

A.   Yes.

Q.   Are Lortabs a drug that the defendant had access to?

A.   Yes.

Q.   Did you -- did you know or observe the defendant provide Lortabs to any dancers?

A.   At one time, specifically.

Q.   What did you observe?

A.   I watched him say that he had to give it to a girl because she's really sick and needed it.

Q.   Do you remember the dancer?

A.   Charlene.  He ended updating her.

Q.   Is her last name Caruso?

A.   Yes, and he drove it to her house.

Q.   I want to break that sentence down.

Is it your understanding that people who use opiates -- do you believe Lortabs to be an opiate?

A.   Yes.

Q.   Do they develop heavy addictions to that?

A.   Yes.

Q.   Based on your observations and awareness, can those withdrawals from that drug be painful?

A.   Yes.

Q.   And is the way to get rid of that, in your experience and

based upon your observations, using more of the drug?

A. Yes.

Q. Were there dancers at Pharaoh's who were involved in smoking crack cocaine?

A. Some. There was really not a lot of tolerance and we got rid of those girls quickly.

Q. Why the distinction between cocaine that's ingested in the nose or opiate users who use pills or heroin users who might use in the bathroom, what was the difference?

A. It's a smell. It's a very strong metallic smell, and it stinks up a large part of the building, and people are aware of what it is.

Q. So, is the distinction that the other drugs can be used more discreetly?

A. Yes.

Q. Break that down.

What odor do you associate with smoking crack cocaine?

A. I'm sorry, what?

Q. Describe that odor you talked about.

A. It's like a metallic burning smell. It's really hard to explain unless you've smelled it. But once you know, you know where it is, and --

Q. Okay. Did the defendant have a policy regarding whether or not people were allowed to call the police?

A. Yes.

Q.  What was his policy in that regard?

A.  No one as allowed to call the police.

Q.  Was there an explanation given by the defendant to you and other members of the staff as to why the police should not be called?

A.  Yes.  It was marks against the State Liquor Authority against keeping and maintaining the liquor license.

Q.  Did the defendant direct -- if you know, did the defendant direct people to contact him first as to determine whether or not to call?

A.  Yes.

Q.  So was the protocol there's a situation, call him, and get advice as to whether or not to call?

A.  Maybe get the manager first, and then call Peter, and then they tell you what to do.

Q.  We talked about some of the managers yesterday.  You said Chris Chudy was one?

A.  Yes.

Q.  Who was some of the others?

A.  Glenn Shaw.  Rob Reed.

Q.  We talked about Rob Reed as a DJ.

A.  Yes.

Q.  But did he also act as a manager?

A.  Yeah, he was kind of second in charge.

Q.  Okay.  Chris Chudy?

A.  Yes.

Q.  Anybody else?

A.  The evening managers rotated, like, kind of never lasted long, so I'm not 100 percent positive.

Q.  Okay.  Now I'd like to focus in on -- we touched on it, I'd like to focus on some other employees and their involvement selling controlled substances like cocaine or Lortabs or anything else, okay?

A.  Um-hum.

Q.  A few moments ago -- actually, withdrawn.

        MR. TRIPI:  One moment please, Judge.

        We're just going to pull up a photo that's in evidence already, Judge.

        Oops, can we go back to the computer, Ms. Demma?

        MS. CHAMPOUX:  It's 562.

        MR. TRIPI:  Thank you.

        BY MR. TRIPI:

Q.  All right.  We've pulled up a photograph that's in evidence as Exhibit 562?

A.  Yes.

Q.  Do you see the three people in that photo?

A.  Yes.

Q.  Obviously to the left is Peter; is that right?

A.  Yes.

Q.  Who's in the middle?

A.   Jessica Leyland.

Q.   And who's on the far, right?

A.   Rob Reed.

Q.   Okay.  What -- what was Jessica Leyland's relationship with the defendant?

A.   She did whatever he wanted.

Q.   Okay.  Did she --

        MR. FOTI:  Objection.

        THE COURT:  I'm sorry?

        MR. FOTI:  Objection.  Speculation.

        THE COURT:  Overruled.

        BY MR. TRIPI:

Q.   Were they close?

A.   They were close.  She worked with him.  She cleaned his house.  She hung out with him.  She would find girls for the stag company.  She did a lot.

Q.   Did she also sell cocaine?

A.   Yes.

Q.   Was she an individual you knew to distribute cocaine at Pharaoh's?

A.   Yes.

Q.   Based on your observations, did you -- did she also work with the defendant distributing cocaine at Pharaoh's?

A.   Yes.

Q.   Describe that for the jury.

A.  He knew what was going on, and he allowed it.

He took cuts for her to send girls over to the company.

Q.  What do you mean by that?

A.  She had a stag company, and she used to supply him with dancers and stuff, too.

Q.  We'll go there for a second.

What was her stag company?

A.  No -- no.  Extraordinaire Entertainment.

Q.  So she separately had a stag company?

A.  Yes.

Q.  Sort of like Darryl had No Limit?

A.  Yes.

Q.  Jessica had Extraordinaire?

A.  Yes.

Q.  And what was her dancer name?

A.  Charm.

Q.  Going way back, did she start -- as you understand it, did she start at Pharaoh's as a dancer?

A.  Yes.

Q.  Over the years, she became close with the defendant?

A.  Yeah, they were pretty close right off the bat.

Q.  Okay.  You were privy to the details of an agreement between Charm and the defendant regarding personnel that would go back and forth between Extraordinaire and Pharaoh's?

A.  Yes.

Q. What were the details of the agreement between them?

MR. FOTI: Objection. I think there's a lack of foundation, how she's privy to this and whether it's hearsay or whether there's some other --

THE COURT: Okay. Yeah, I think that's correct. So lay more of a foundation. I'll sustain the objection for now.

BY MR. TRIPI:

Q. Well, Jessica was selling drugs inside Pharaoh's, right?

A. Yes.

Q. The defendant was getting cocaine from Jessica and selling inside Pharaoh's?

A. Yes.

Q. They were working together to distribute cocaine?

A. Yes.

Q. You were there as well, right?

A. Yes.

Q. Sometimes you would see dancers, and would you alert them to the fact that they were obviously -- they had cocaine on their bodies?

A. Yes.

Q. What are the kinds of things you would do?

A. There would be, like, cocaine literally falling out of their noses. And under black lights on the stage, you could see the white. So when I would walk by and see it, I would be like that, nose check. Some of the customers, too,

because light changes everything.

Q. So would that be a signal to the dancer to clean your nose up?

A. Yeah, like nose check.

Q. Okay. And so, Ms. Nigro, so you would help make the drug use less discreet?

A. Yes.

Q. And would you have conversations with Charm over time?

A. Yeah.

Q. And you'd have conversations with the defendant over time?

A. Yes.

Q. And based on your experience at Pharaoh's, was there a nexus between the drug use that was going on there and the way that the business was being run?

A. Yes.

MR. FOTI: Objection.

MR. TRIPI: Judge, this is an obvious 701 Yanotti opinion.

THE COURT: Hang on. What's the objection.

MR. FOTI: Judge, I don't think it's proper 701. I don't think it's firsthand knowledge.

THE COURT: Overruled. Overruled.

MR. TRIPI: Can you repeat the question, please?

(The above-requested testimony was then read by the

reporter.)

            **BY MR. TRIPI:**

Q.  What was the nexus, describe it for the jury, between the drug use and the way the business was being run?

A.  I mean, it all worked together.  It was, like, all just hand in hand.  Like, most of the girls had to be impaired on drugs to be able to do their job, and they had to get it from someone.

Q.  What do you mean by that, they to be impaired on drugs to do their job?

A.  Yeah, it's really hard to do actually dance sober. Usually something had to have -- you have to drink, you have to have a vice, or something happened to you in your past. It's really hard just to go and do it.

Q.  And so through your time, being part of the fabric of that club for the time that you were --

A.  Yeah.

Q.  -- were you privy to the details of the arrangements between Charm and the defendant?

A.  Yes.

Q.  Okay.  What were the arrangements between Charm and the defendant as it related to Extraordinaire Entertainment and Pharaoh's?  Explain that to the jury.

A.  When Charm worked with Peter and they, like, exclusively sent the girls to his place, she was allowed to work and deal

there while she had that position.  Every once in a while, it would switch and Darryl would be in charge, but primarily Charm was.

Q.  Okay.

A.  And so --

Q.  Let me try to break that down.

Jessica's dancers, or Jessica's workers at her stag company --

A.  Yes.

Q.  -- would also work at Pharaoh's?

A.  Yes.

Q.  So she provided women for Pharaoh's?

A.  Yes.

Q.  And in exchange for that, she was allowed by the defendant to sell cocaine?

A.  Yes.  There were other clubs that she could be doing that, but she chose Pharaoh's.

Q.  Let me stop you.  Just stick to my questions, okay?

A.  Yes.

Q.  So that was the arrangement between them?

A.  Yes.

Q.  Now, based on your discussions with women who worked for Jessica, or with Jessica herself, are you aware of whether at her stag company, women were engaging in sexual activities with people?

A.   I've heard stories, I did not witness.

Q.   I'm asking you if you've had discussions about that.

A.   Yes.

Q.   Okay.  What were the discussions you had?

MR. FOTI:  Objection.

THE COURT:  Sustained.

BY MR. TRIPI:

Q.   Were there dancers who worked at Extraordinaire who you knew were engaging in sexual activity at Pharaoh's?

A.   Yes.

Q.   Who were the names of those dancers?

MR. FOTI:  Objection.

THE COURT:  Overruled.

BY MR. TRIPI:

Q.   To the best of your ability?

A.   Serena.  This girl Heidi, her name was Chase.  There was several that come in and out of work.

Q.   So you named Sabrina.  Who else?

A.   Serena.  There's this girl Heidi was her real name, and Chase was also her dancer name.

     There was a couple that she just -- in and out.

Q.   Okay.  Regarding -- regarding those dancers, have you -- were there times when you would go and check in on the VIP?  Would you --

A.   I used to, yeah.  I wasn't allowed to later on, but in

the beginning I was.

Q.  So my question was:  Were there times when you would go check in on the VIP?

A.  Yes.

Q.  In the VIP Room, did you observe sex acts occurring?

A.  Yes.

Q.  Okay.  Were there times that you went upstairs and saw sex acts occurring?

A.  Yes.

Q.  Okay.  In the downstairs VIP, what types of different sex acts have you observed occurring?

A.  Actual sex.  Oral sex.  Hand jobs.

Q.  Were some of the women that you observed engaging in that type of activity in the downstairs VIP, did some of them work for Jessica Leyland?

A.  Yes.

Q.  Did some of them work for Darryl LaMont?

A.  Yes.

Q.  Did all of them work for the defendant?

A.  Yes.

Q.  All right.  I'd like to move on and ask about a little bit more about Autumn Asher, Cherry, okay?

    You indicated earlier she helped to sell cocaine and marijuana?

A.  Yes.

Q.   Did you observe her supplying cocaine to others at various points around Pharaoh's?

A.   Yes.

Q.   What different places within Pharaoh's would you observe her distributing cocaine?

A.   Bathrooms, dark corners.

Q.   Bathrooms and dark corners?

A.   Dark corners, dressing rooms.

Q.   And do you know who was providing the cocaine to Asher that she was distributing?

A.   I'm not positive.

Q.   Okay.  Where within the club have you seen, if at all, where have you seen drug exchanges, cocaine exchanges, between Charm and the defendant?

A.   The office.

Q.   The downstairs office?

A.   Yes, the downstairs office.

Q.   Where in Pharaoh's have you seen cocaine exchanges between Autumn Asher and the defendant, if at all?

A.   She was kind of doing it on her own.  I don't -- she might have done a line with him or something, but I didn't witness that.

Q.   Would you agree that Autumn Asher would know better as to who she was working for?

A.   Yes, 100 percent.

Q.  Okay.  So were you speculating a second ago whether she was doing it alone?

A.  Yeah, no, she's getting it from someone and doing it for them, I don't know.

Q.  Okay.  Who's Melissa Meyers?

A.  Melissa Meyers is a bartender.

Q.  Based on your observations, was she involved in cocaine?

A.  Yes.

Q.  Was she someone who was close with the defendant?

A.  Extremely.

MR. TRIPI:  Can we put up on the screen 3694A-2. This is in evidence Your Honor.  Can we rotate?  Thank you.

BY MR. TRIPI:

Q.  Do you see this photo?

A.  Yes.

Q.  The defendant's in the middle; is that correct?

A.  Yes.

Q.  Just generally, do you know this setting here or not?

A.  Yes.

Q.  Do you know where that is?

A.  Russell's.

Q.  Have you been in that kitchen before?

A.  I worked at Russell's.

Q.  Okay.  Is Melissa Meyers in that photo?

A.  Yes.

Q.   Where is she?  Can you tap her?

Do you know any of the other women in the photo?

A.   Kayla, Elise, next to -- in between Melissa and Peter also in green.

Q.   Do you know a person named Matt Leinert?

A.   Leinert.

Q.   Leinert, I'm sorry.  Matt Leinert might have been a quarterback for USC.  Sorry about that.

Do you know Matt Leinert?

A.   Yes.

Q.   How do you know him?

A.   Longtime drinking friend of Peter.

Q.   Is he someone who has supplied cocaine?

A.   Yes.

Q.   Where have you seen that activity occur?

A.   At the club.  And to Peter, like, Peter's apartment and stuff like that.

Q.   We talked a little bit about Crystal Quinn earlier.  I want to delve into that relationship with the defendant a little bit more.

What was the nature of their relationship?  Obviously, you explained what was happening at the time you walked in on the upstairs, but what was their relationship?

A.   They had an ongoing sexual relationship for years.

Q.   Were they close?

**MR. FOTI:** Objection.

**THE COURT:** I'm sorry?

**MR. FOTI:** Objection, lack of foundation. I'm -- other than the one incident, I'm assuming that that's based on hearsay.

**MR. TRIPI:** Judge --

**THE COURT:** Hang on, let me -- just give me a second to think about it.

**MR. TRIPI:** Sorry.

**THE COURT:** Yeah. Establish more of a foundation.

So I will sustain the objection to the ongoing sexual relationship for years. You can lay a further foundation for that, and the jury will strike that.

**BY MR. TRIPI:**

Q. Did Crystal work at Pharaoh's?

A. Yes.

Q. Did you see her go upstairs with the defendant at Pharaoh's?

A. Yes.

Q. Did you see her go upstairs with the defendant often at Pharaoh's?

A. Yes.

Q. Did Crystal use cocaine that you've observed?

A. Yes.

Q. Did Crystal spend time at the defendant's residence?

A.   Yes.

Q.   Did -- did you know the defendant to use cocaine at his residence?

A.   Yes.

Q.   Did you know the defendant to have cocaine readily available at his residence?

A.   Yes.

Q.   When you lived with him, did he always have cocaine on hand?

A.   Yes.

Q.   Was he able to distribute it to anyone at any time?

A.   Yes.

Q.   Okay.  Was Crystal someone who at times was addicted to cocaine?

A.   I'm sorry, what did you say?

Q.   Was Crystal someone who at times was addicted to cocaine?

A.   Yes.

Q.   Did she use it frequently?

A.   Frequently, yes.

     **MR. TRIPI:**  I have sort of one more small section, Judge, and then it will be time for a break, I think; is that right?

     **THE COURT:**  Sounds good.

     **MR. TRIPI:**  Okay.

**BY MR. TRIPI:**

Q.   I want to focus you in on the subject of overdoses at Pharaoh's, okay, just to orient your mind for a second.

While working at Pharaoh's, have you had occasion to observe any of the dancers suffer from what you concluded in your mind was an overdose?

A.   Yes.

Q.   How many times would you estimate you personally observed that?

A.   At least eight.

Q.   Okay.  Have you previously testified in a prior proceeding?

A.   Yes.

Q.   And in a prior proceeding, at -- at -- not in the grand jury, I'm focusing on a different proceeding, okay?  We've established already you've testified three times, right?

A.   Yes.

Q.   Okay.  At the second proceeding, so after the grand jury --

A.   The first --

Q.   -- earlier this year, okay?  Did you testify about two overdoses that you personally observed?

A.   Yes.

Q.   Okay.  Was the year -- was the estimated year of those two overdoses 2015?

A.   Yes, I was hands-on with it.

Q.   Did those involve a woman named Fiona, and a woman named Brittany?

A.   Yes.

Q.   Were those two different events?

A.   Yes.

Q.   Okay.  Starting with the Fiona event, okay?  Can you tell the jury what transpired from your perspective?

A.   A bunch of girls ran out to me, and they're, like, oh, my God.  Oh, my God.  Something's wrong.

     And then I went and grabbed Narcan, and then I brought it in, and I Narcanned Brittany, and helped the situation and saved her life.

Q.   Were we talking about Fiona or Brittany?

A.   They're -- both it happened --

Q.   Okay.

A.   -- very similar.

Q.   Let me -- my question is about Fiona.

A.   Oh, I'm sorry.

Q.   One at a time.

     Well, let me ask you this.  Which one occurred first in that year?

A.   It would have been Fiona.

Q.   Let's stick with that one then.  We'll go in order.

     What happened as it relates to Fiona?

A.   It's the same thing.  A bunch of girls came out, she was in the bathroom.  I grabbed the Narcan.  The first time it failed, and then I had to Narcan her twice.  The second time it barely worked, but it did, so we didn't have to use it three times.

And then nothing was addressed.  No cops were called.  Like, nothing occurred.

Q.   When that was occurring, did anyone make Peter, this defendant, aware of the situation of the dancer overdosing?

A.   I am assuming someone did.  I told him after the fact, but at that point I don't know for sure.

Q.   Were other dancers present?

A.   Yes.

Q.   Were other managers present?

A.   Yes.

Q.   Were other staff members present?

A.   Yes.

Q.   Were other bouncers or security present?

A.   Yeah.

Q.   Now, I think you started to tell us a little bit about -- well, withdrawn.

Did you form an opinion as to what type of drug Fiona was under the influence of?

A.   Heroin.

Q.   Where -- what part of the club was this transpiring?

A.   The bathroom.   The -- not the one in the dressing room, that was smaller.   The bathroom that had the three stalls. Two or three stalls.

Q.   Are you talking about a first floor public restroom?

A.   Yes.

Q.   In terms of -- in terms of the second situation, I think you indicated it was a woman named Brittany?

A.   Yes.

Q.   What transpired on that occasion?

A.   Same thing.   Passed out.   People to came to tell me right away.   I'm Narcan certified, so I have all that stuff, so I tended to be the only one at the time who could help in the club.   So then I Narcanned her.   Peter was in the building.

Q.   On that occasion, was he informed of the situation?

A.   He was very aware.

Q.   Okay.   Now, over the years, are you aware of -- just yes or no -- other dancers who had overdosed?

A.   Yes.

Q.   Based upon your observations of the Brittany situation, in that whole scenario that you just described, did you have an opinion of what type of drugs she was under the influence of?

A.   Heroin.

Q.   Did either of them get fired after the fact?

A.   Yes.   Fiona did come back.   Brittany was permanently

fired.

Q.  Okay.  Now was, in your view, was it the problem that they were using drugs, or was the problem that it was indiscreet at that point?

A.  It was indiscreet, and they had to prove a point.

Q.  Are you aware, based upon your experience at Pharaoh's, of situations where dancers were fired because their looks started to diminish through drug use?

A.  Yes.

Q.  In those situations, in your view, were they fired because they used drugs, or because their looks started to diminish too far?

A.  Their looks --

        MR. FOTI:  Objection.

        THE WITNESS:  -- and behaviors.

        THE COURT:  Stop, ma'am, please.

        Basis of the objection lacks personal knowledge?

        MR. FOTI:  Yes.

        THE COURT:  Sustained.

        MR. TRIPI:  Judge --

        THE COURT:  You have to lay more of a foundation.

        BY MR. TRIPI:

Q.  Okay.  Have you had discussions with dancers, staff, and Peter about why certain people were fired?

A.  Yes.

MR. FOTI: Objection. Sorry. That's withdrawn.

BY MR. TRIPI:

Q. Did you have more than one discussion along those lines?

A. Yes.

Q. Did you also have your own eyes and brain to observe these women there one day and gone the next?

A. Yes.

Q. Did you observe these women and their looks decline over time?

A. Yes.

Q. Did you observe some of these women get really heavy track marks?

A. Yes.

Q. Based upon all of that, were you able to form an opinion as to why these particular women were let go?

A. Yes.

Q. Is that something that was hard for you to come up with in your brain?

A. No.

Q. Okay. What was your opinion as to why those particular types of women were let go?

A. Because it was obvious the drug use being, and we didn't want customers to see it because they didn't want that.

Q. Okay. So you think they were let go because they were too obvious in terms of their looks?

A.   Yes.

Q.   Okay.

MR. TRIPI:   Is this a good time, Judge?  I know we're a touch early.

THE COURT:   Is it a good time for you?

MR. TRIPI:   I think so.

THE COURT:   Great.  Okay.  So let's take our lunch break now, and it will be a short one.  Remember about not communicating about the case with anyone, not using tolls of technology to learn anything about the case, or to communicate about the case.  Don't read or watch or listen to any news coverage of the case if there is any while the trial is in progress, and don't make up your mind until you begin deliberating.

Let's try to keep it to a half hour so we can get as much proof in today as we can.  Thanks very much.

(Jury excused at 12:23 p.m.)

THE COURT:   Okay.  Ma'am, again you're not to talk to anybody during the break.

THE WITNESS:   Okay.

(Witness excused at 12:24 p.m.)

(Off the record at 12:24 p.m.)

(Back on the record at 1:41 p.m.)

THE COURT:   What is next, Mr. Tripi?

MR. TRIPI:   Your Honor, we can recall Ms. Nigro.

**K A T R I N A   N I G R O**, having been previously duly called and sworn, continued to testify as follows:

THE COURT:  Ms. Nigro, I remind you you're still under oath.

Mr. Tripi, you may continue.

MR. TRIPI:  Thank you, Your Honor.

**(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

Q.  All right.  Ms. Nigro, sort of the same ground rules apply.  If you don't understand a question I ask, just tell me that, okay, and I'll rephrase it.

A.  Okay.

Q.  And try to limit your answers to just the questions being asked, okay?

A.  Um-hum.

Q.  Yes?

A.  Yes.

Q.  Okay.  I guess that's the last ground rule, is we have to make sure we're being audible, okay?

A.  Yes.

Q.  All right.  I want to get back to Pharaoh's Gentlemen's Club if we could.

In terms of the sort of chain of command, did the defendant have control over the DJ?

A.  Yes.

Q. Did the DJ have a role in how much money a dancer can make?

A. Yes.

Q. Describe how.

A. He chose when to put them on stage, and it could be peak times where the girls made more.

Q. Have you ever seen a situation where the defendant directed the DJ not to the give a dancer a stage dance?

A. Yes.

Q. Can you describe situations or circumstances -- the circumstance in which you saw that?

A. If a girl was really inebriated or impaired, they did not want her on stage, therefore he wouldn't allow it.

If there was, like, a fight or something, or there was a punishment going on, she might not be allowed on stage for three days.

Q. Have you observed the defendant impose that type of discipline as a punishment?

A. Yes.

Q. Who controlled the bouncers and managers at this club?

A. Peter.

Q. Was the defendant's word final over the managers?

A. Yes.

Q. Did the bouncers and managers follow his directives?

A. Yes.

Q.   Did you follow his directives?

A.   Yes.

Q.   As part of your duties, were you involved in part of the bookkeeping between 2012 and 2015?

A.   Yes.

Q.   Describe what your role was in the bookkeeping of Pharaoh's.

A.   I did dance sheets, dance counts, cover charges of how many people came in and out of the door, all the accounting from, like, the registers and stuff.  I put them all together, and would take it to the bank and drop it off.

Q.   All right.  Is Pharaoh's largely a cash business?

A.   Yes.

Q.   You said dance sheets.  What are dance sheets?

A.   They had all the girls' names on it, and every time they went in a back room they had, like, a slash, which meant one song, and then they'd add them up.

Q.   So would someone -- are you familiar with the position of a VIP attendant?

A.   Yes.

Q.   Would that person keep track of how many times a dancer went in the back?

A.   Yes.

Q.   Would that individual make tally marks on a piece of paper?

A.   Yes.

Q.   Is that what you're describing?

A.   Yes.

Q.   And in those dances, did the dancer get a portion of the money from the dance, and the club get a portion of the money?

A.   Yes.

Q.   Is that what you were referring to as a dance sheet, the thing with the tally marks --

A.   Yes.

Q.   -- that the VIP attendant kept track of?

A.   Yes.

Q.   And then you used the phrase "dance counts."  What's a dance count?  Is that the same thing?

A.   Well, it was how much they did at the end of the night per girl, and we put them on sheets with their name specific. And then every night they worked, we tallied them up.

Q.   Okay.  And then were there cover charges to enter?

A.   Yes.

Q.   Do you remember what the cover charge was?

A.   They were various prices at different points and evenings or the day.  $5 was a standard, but eventually it went up to $10, and then some Mike Tyson games it was like $20 or higher.

Q.   So, like, if there were a sporting event --

A.   Yeah.

Q.   -- the price to increase at the door?

A.   Yes.

Q.   Was there a rule that patrons had to purchase drinks to stay in the building, if you know?

A.   That was always a rule.

Q.   So, yes?

A.   Yeah.

Q.   Okay.

A.   Or at least have to buy a drink to be in there.

Q.   Were certain people given VIP treatment allowed to not pay at the door?

A.   Yes.

Q.   How would the defendant alert the person at the door to let someone in for free?

A.   Some people had VIP cards that said Pharaoh's on it, so there was no debate or question.

Q.   Okay.  Let me ask a question about that.

Who handed out the VIP cards?

A.   Peter did.

Q.   Did the defendant also allow members of law enforcement to waive the cover charge?

A.   Yes.

Q.   Based on your observations, we've talked a little bit about it, did some of those members of law enforcement have a

personal relationship with the defendant?

A.   Yes.

Q.   So they would be let in for free?

A.   Yes.

Q.   Did the defendant have the control and final say over the dancers?

A.   Yes.

Q.   Whether they worked there?

A.   Yes.

Q.   Did the defendant ever get upset, just yes or no, with dancers?

A.   Yes.

Q.   Did you observe him impose financial discipline on dancers?

A.   Yes.

Q.   In what way?

A.   They've been fined before.

Q.   Did the defendant -- this is a "yes" or "no" question -- did the defendant ever send dancers he was upset with over to do parties at the Outlaws clubhouse?

        **MR. FOTI:**  Objection.  Can we approach?

        **THE COURT:**  Come on up.

        (Sidebar discussion held on the record.)

        **MR. FOTI:**  Judge, I would have raised this earlier, I just didn't think we were going there.

But the allegations regarding the Outlaws club is that he would send dancers there as a punishment.  Even though she later in another interview says it was voluntarily, the dancers would go there voluntarily.  At least in one interview, he says go as a punishment and that one of the dancers was sodomized by a pool cue, and then another dancer had a jar pushed into her vagina.  Things that she apparently heard afterwards.

So it's both a hearsay objection, and it's a 403 objection.  This is pretty gruesome allegations of motorcycle clubs essentially committing rape or other forced sexual assault.  And I don't think that she has any personal knowledge of it.

She's been inconsistent during her pretrial prep on the issue.  But she at least in the past has testified that way, so I'm expecting that she might testify that way here, and it could be extraordinarily prejudicial if something like that is attributed to Mr. Gerace.

**THE COURT:**  Is that where you're going with this?

**MR. TRIPI:**  I'm definitely going to go to the imposition of discipline by directing them to go to attend parties at the Outlaws clubhouse.  I'm going to go into people complaining about it, dancers complaining about it.

I don't think she was there to observe the things that Mr. Foti is talking about, so I can edge around some of

that.  But I think in terms of a coercive aspect of the case, or a punishment, if he's making dancers go over to the Outlaws clubhouse, I think that fits within the context of the conspiracy.  So I can edge around some of that.

THE COURT:  What is prejudicial about the fact that his discipline, they were told to go to the Outlaws clubhouse and dance?

MR. FOTI:  Even though I think she's been inconsistent on it in terms of that's her testimony, I don't think that alone satisfies the 403.  I don't -- let me rephrase that.

I don't think that that would be barred by admission under 403 if it's just that.

My concern is -- and there's been a couple times where we've had these arguments up here and the witness blurts something out that we can't undo.  This is way worse than --

MR. TRIPI:  And I will do my best to control it.  I'm going to ask some "yes" or "no" questions.  I would say, and I'm not going there, but I would say if she had had personal observations of that activity, that I would be going there. But I don't think -- I think it's after the fact she heard about it, because that that, obviously, would be pretty coercive as well, right?  That's the extreme type of discipline.

But I don't think, as I sit here today, in my brain,

I don't think she has made those personal observations.

THE COURT: So you're going to stay away from that --

MR. TRIPI: Yep.

THE COURT: -- and you have to keep her away from that. And I'll try to be attentive to it as well and jump in if I have to.

MR. FOTI: Thank you.

(End of sidebar discussion.)

THE COURT: Okay. So you're going to withdraw the last question and ask another, Mr. Tripi; is that correct?

MR. TRIPI: Yes, Judge. To the extent a question was asked, I'll rephrase. Okay?

BY MR. TRIPI:

Q. Okay. Based on your position in the club, your observations, and your interactions with the defendant and dancers, just answer this question yes or no.

A. Okay.

Q. Okay? Did the defendant send dancers he was upset with to do go do parties at the Outlaws clubhouse?

A. No.

Q. Okay. I'm going to -- you testified before a federal grand jury on February 13th, 2020, correct?

A. Yes.

MR. TRIPI: All right. I'm directing counsel's attention to page number 28.

MR. FOTI:  May I just have a second?

MR. TRIPI:  I'll let you get there.

I'm sorry, we're going to start at the bottom of 27 at line 21, Mr. Foti, and we're going to work our way to line 11 on page 28.  Let me know when you've seen it.

MR. FOTI:  Judge, I would object to what I believe is an improper impeachment.

THE COURT:  So let's come up, and bring up the transcript with you.

(Sidebar discussion held on the record.)

MR. TRIPI:  It goes to line 11 on the next page, the bottom there, Judge.

MR. FOTI:  Are you jumping ahead, or are you going to read the whole thing?

MR. TRIPI:  I'm sorry?

MR. FOTI:  Are you going to jump ahead to -- or, were you going to read the whole thing?

MR. TRIPI:  Can I look on your screen?  I'm sorry.

THE COURT:  So, 1 through 4 --

MR. TRIPI:  Line 21, and then 1 through --

Oh, I see the problem there.  Hang on.  I can skip over that.  I don't have a problem with that.

MR. FOTI:  Yep.

MR. TRIPI:  So I can do the bottom of 27, and then 5 through 11.

MR. FOTI:  I don't have a problem with the impeachment other than it's going to get into that.

THE COURT:  The ones before.

MR. TRIPI:  I can jump over that.

THE COURT:  Great.  Terrific.

MR. TRIPI:  Can I just mark it up real quick to make sure we have agreement here?  So I'll skip that.

MR. FOTI:  If go to 8, financial penalty --

MR. TRIPI:  Yeah.

MR. FOTI:  Yeah.  Yeah.  That's fine.

(End of sidebar discussion.)

BY MR. TRIPI:

Q.  All right.  Now, Ms. Nigro, you testified before a federal grand jury in this matter, correct?

A.  Yes.

Q.  Before I ask you those questions, yes or no, does talking about the Outlaws make you nervous?

A.  Yes.

Q.  Okay.  If you're nervous, you still have to tell the truth, okay?

A.  Yes.

Q.  All right.  On page 27, for counsel's edification, I'm just going to ask you a couple of questions.  Were you asked this question and did you give these answers:

    "Question:  Based upon your observations and experience,

did he appear to exert -- did Peter appear to exert control over the dancers at Pharaoh's?

"Answer:  Yes."

Were you asked that question and did you give that answer?

A.   Yes.

MR. TRIPI:  And then now moving to page 28, lines 8 through 11, counsel.

BY MR. TRIPI:

Q.   Were you asked this question, and did you give these answers:

"Question:  Would that be like a financial penalty to the dancer?

"Answer:  Yeah.  And then he would send you to do parties at the Outlaws clubhouse.

"Question:"  -- I'll stop it there.

Were you asked those questions, and did you give those answers?

A.   Yes.

Q.   And was that true?

A.   Yes.  I think the way I worded it --

Q.   Was that true?

A.   Yes.

Q.   Was the defendant close with the Outlaws?

A.   Yes.

Q. Did several of them work at Pharaoh's?

A. Yes.

Q. Did many of them visit Pharaoh's on a particular night of the week?

A. Yes.

Q. What night of the week was that?

A. Wednesday.

Q. Based on everything we've been talking about today, okay, based upon all of your experience at Pharaoh's, from 2009 to roughly the end of 2016, based on all the observations you've made in there, based upon all your discussions with the defendant, dancers, and other employees, did you form an opinion as to whether it was well known that sex acts occurred in Pharaoh's in the VIP Room and in upstairs?

A. Yes.

Q. What was your opinion?

A. It 100 percent went on.

Q. Was it well known?

A. Well known.

Q. Yes or no: Have you heard some dancers complain about having sex with the defendant's friends inside the upstairs of Pharaoh's?

A. Yes.

            MR. FOTI: Objection.

            THE COURT: I'm sorry?

MR. FOTI:  Hearsay, objection.

MR. TRIPI:  Complaints.

THE COURT:  Yeah, overruled.

BY MR. TRIPI:

Q.  You can answer.

A.  Yes.

Q.  We touched on it, I said I would circle back to it later.
I'm only going to ask you names -- I'm only going to ask names if I ask the name, okay?

A.  Okay.

Q.  All right?  Regarding the upstairs, did you observe individuals that were at times involved in politics?

A.  Yes.

Q.  Did you open the door for any of those individuals to go upstairs with dancers?

A.  Yes.

Q.  We talked about athletes.  You mentioned members of the Buffalo Sabres?

A.  Yes.

Q.  Not the current team, years and years ago?

A.  Years ago, yeah.

Q.  We talked about a liquor distributor?

A.  Yes.

Q.  Was that Aaron LaMarca?

A.  Yes, there were others.

Q.  Were there others?

A.  Two.

Q.  We talked about the actor, Lillo Brancato?

A.  Yes.

Q.  We talked about Judge Michalski?

A.  Yes.

Q.  I'd like to ask you a little bit about a particular attorney named Matthew Albert; do you know who that is?

A.  Yes.

Q.  Is that an attorney you had for -- you had retained with the help of the defendant for a DWI that you had in some town?

A.  Yes.

Q.  Basically, did you have a DWI in Fredonia?

A.  Yes.

Q.  Did Matt Albert essentially represent you and help get it dismissed?

A.  Yes.

Q.  Or did you win a trial?

A.  We won the trial.  It was dismissed.

Q.  After that -- withdrawn.  Was the defendant there supporting you at the trial?

A.  Yes.

Q.  Was it a bench trial?  Like a judge only?  If you remember?

A.   It turned into a trial, but it got excused really quick because no -- yeah.

Q.   So whatever it was, it was supposed to be a trial and the case got dismissed?

A.   Yeah, within 20 minutes.

Q.   Did you and Peter invite the attorney, Matt Albert, to celebrate?

A.   Yes.

Q.   Where did you and the defendant invite Matt Albert to go to celebrate?

A.   We went back to Pharaoh's.

Q.   Back at Pharaoh's, what, if any, role did the defendant play in helping to give cocaine to Matt Albert?

A.   We paid Matt Albert with cocaine, because he was my lawyer, and then we celebrated at Pharaoh's.

Q.   Who provided Matt Albert the cocaine?

A.   Peter.

Q.   At Pharaoh's, was Mr. Albert introduced to a Pharaoh's dancer?

A.   Yes.

Q.   Was this a Pharaoh's dancer that you and the defendant knew to be someone who also used cocaine?

A.   Yes.

Q.   Is that a dancer who you know to then later engaged in sex acts with Matt Albert?

A.   Yes.

Q.   Was that dancer someone who had an addiction to cocaine?

A.   Yes.

Q.   Did Matt Albert, the attorney, have an addiction to cocaine at that time?

A.   He had problems going on.  Several.

Q.   Was he a cocaine user?

A.   Yes.

Q.   If you know, did Matt Albert continue to get cocaine from the defendant?

A.   I'm not positive.

Q.   Okay.  So, whether or not that happened, you don't know?

A.   I don't know.

Q.   A moment ago I asked you about some of those categories of people who the defendant would enable to go upstairs; do you remember that?

A.   Yes.

Q.   On other occasions, did you observe those individuals -- some of those individuals using cocaine in the upstairs?

A.   Yes.

Q.   When it was cocaine use, as opposed to going upstairs with a dancer, who was the one supplying the cocaine?

A.   Peter almost always did.

Q.   Okay.

A.   Sometimes the Outlaws would be upstairs and they would

have their own product.

Q. All right. But who controlled access to the upstairs?

A. Peter.

Q. Have you observed in the context of Pharaoh's dancers being directed towards certain customers?

A. Yes.

Q. What was the characteristic about the customer that dancers would get directed towards?

A. They had a lot of money.

Q. Is there a term that was used around the clubs?

A. We called them whales.

Q. Was a "whale" a term around the club that was used for a someone who spent a lot of money?

A. Yes.

Q. Were there a number of those whales that's spent a lot of time in the downstairs VIP?

A. Yes.

Q. We've talked about Shelby already?

A. Yes.

Q. Based upon your involvement in the club, your observations, when you permitted her to go upstairs on that one occasion with Judge Michalski, was it your understanding for Shelby to engage in sex acts when she would go upstairs?

A. Yes.

Q. Do you know another dancer named Lindsay Loiacono?

A.   Yes.

Q.   Did she have heavy drug addictions?

A.   Heavy.

Q.   Was she a dancer that would go upstairs with individuals that were friends with the defendant?

A.   Yes.

Q.   Over time, did Lindsay develop heavy track marks?

A.   Yes.

Q.   Was she heavily addicted to drugs?

A.   Heavily, heavily addicted.

Q.   Are you familiar with a young lady whose real name is Christy Barns McHugh?

A.   Yes.

Q.   Now as of today, see's deceased; is that right?

A.   Yes.

Q.   Okay.  Prior to her -- her -- her unfortunate passing, did she dance at Pharaoh's?

A.   Yes.

Q.   Did she go into the downstairs VIP a lot?

A.   Yes.

Q.   Were you aware of her to engage in sex acts in the VIP?

A.   Yes.

Q.   Did she do that often?

A.   She got really messed up into it, yeah.

Q.   Was she heavily addicted to drugs?

A.   Heavily addicted to drugs.  Peter was the first one to give her coke.

MR. FOTI:  Objection.

THE COURT:  Sustained.

Ma'am, please don't volunteer things like that. Answer the questions, and just answer the question.

The jury will strike the comment about Peter was the first one to give her drugs.  Remember that's unfair to consider that as part of your deliberations.

Next question.

BY MR. TRIPI:

Q.   I see you're upset.  Do you need a minute?

A.   I'm -- she was my best friend and she died, and it was really upsetting, and I didn't know this was coming up today. But, yeah, I'm fine.

Q.   Okay.  Are you okay to continue?

A.   Yeah.

Q.   There's some tissues up there if you need them, okay?

Was there a Barbie who danced at the club?

A.   There was a couple.

Q.   Were there several Barbies?

A.   Several.

Q.   Was there a Barbie that would go upstairs?

A.   Yes.

Q.   How many Crystals did you know at the club?  Was it only

Crystal Quinn, or was there another?

A.   No, there was, like, probably three.

Crystal Quinn used her real name.

There's, like, a stripper name of actual Crystal.  And a shot girl, too.

Q.   Was there a Lexis who went upstairs at the club?

A.   Yes.

Q.   Did Lexis also, in your view, engage in extras in the downstairs?

A.   Yes.

Q.   Was there a Sierra who would go upstairs with friends of the defendant?

A.   Yes.

Q.   What's Sierra's real name?

A.   Nicole Alfieri.

Q.   Was there an attorney who was friendly with the defendant who had a preference for, like, flat-chested dancers?

**MR. FOTI:**  Objection.

**MR. TRIPI:**  I'm trying to figure out a way to ask this delicately, Your Honor, so --

**THE COURT:**  Well, I'm not sure that's the way.

**MR. TRIPI:**  I'm trying to distinguish from others, you know, and focus in on -- I don't know a better way to do it, I apologize.

**THE COURT:**  I'm going to sustain the objection.  You

can try to ask the question a different way.

**BY MR. TRIPI:**

Q. Was there -- without using names for now, was there more than one attorney friend of the defendant's that went upstairs?

A. Yes.

Q. Was there one that you've previously described as having a certain type?

A. Yes.

Q. Did that stand out in your mind?

A. Yeah.

Q. In your words, with -- what was the type that person liked to go upstairs with?

**MR. FOTI:** Judge, I object on relevance.

**THE COURT:** Yeah, if she knows who the person is, why do we need to get into the type? Sustained.

**BY MR. TRIPI:**

Q. Okay. Do you know Justin White?

A. Yes.

Q. Is he an attorney?

A. Yes.

Q. Is he friends with the defendant?

A. Yes, and he's also an attorney of the defendant.

Q. Did he go upstairs?

A. Yes.

**MR. SOEHNLEIN:** Objection.

**THE COURT:** Sustained. Again, ma'am, don't volunteer.

**THE WITNESS:** Okay.

**THE COURT:** He asked: Is he an attorney?

The answer to that question is: Yes.

The rest of it is volunteered, so don't volunteer please.

The jury will strike what the -- what the witness said after that. Okay?

Next question, Mr. Tripi.

**BY MR. TRIPI:**

Q. Have you observed the defendant supply Justin White with cocaine?

A. Yes.

Q. Have you observed Justin White go upstairs --

A. Yes.

Q. -- with Pharaoh's dancers?

A. Yes.

Q. When the defendant had friends going upstairs, did certain of those have preferences?

A. Yes.

Q. For example, we talked about Judge Michalski's preference with Shelby. What was Justin White's preference?

A. Gabby was one of them. Then Lindsay was another.

Q.   Were these dancer names?

A.   Dancer names.

Q.   Was Lindsay a real name or a dancer name?

A.   Lindsay, there's two.  One of the girl's real name, and one of the other's -- Lindsay is Fiona, and Lindsay can also be Gabby.

Q.   All right.  I'd like to switch gears a little bit, from that topic.  Okay?  Do you know an individual named Joseph Bongiovanni?

A.   Yes.

Q.   How do you know him?

A.   He was friends with Peter.

Q.   When he was friends with the defendant, when you knew him, what was his profession?

A.   He was a DEA agent.

Q.   How did you first meet Joseph Bongiovanni?

A.   At the club through Peter.  And then we went out.

Q.   Eventually, did you meet Mr. Bongiovanni's wife?

A.   Yes.

Q.   What was her name?

A.   Lindsay.

Q.   Describe the relationship as you know it between Mr. Bongiovanni and Mr. Gerace in terms of their friendship.

A.   Longtime friends.  Very close.

Q.   Did you observe -- did you know them to socialize

together?

A.   Yes.

Q.   Did they go to bars?

A.   Yes.

Q.   Did Mr. Bongiovanni come to Pharaoh's?

A.   Yes.

Q.   Have you seen Mr. Bongiovanni socializing, socially at Pharaoh's?

A.   No.

Q.   Okay.  I guess I'm going back to when you first met him. Was that a social situation at Pharaoh's?

A.   He was in, like, the office, and I met him through there. I met him with Peter.  He wasn't at the bar or anything.

Q.   Over the years, did you and Mr. Gerace socialize with Mr. Bongiovanni?

A.   Several times.

Q.   Approximately can you estimate how many times?  Do you recall?

A.   Maybe like eight.  Eight times.

Q.   At what different types of places would you go?

A.   We went to Dock of the Bay, it's a different name now, I don't remember.

Q.   Is that a bar/restaurant type place?

A.   It's a restaurant on the water, it changed names multiple times, near the Ford Stamping Plant.

We went to a bar restaurant, like, where all the -- the Labatt and all that, it's not downtown, it's by the water, it's a sports complex.

Q.   RiverWorks?

A.   RiverWorks, a couple places like that.

There's another -- a pig roast, in the Italian district, North Park area.

Q.   Hertel Avenue?

A.   Near where the hair salon that her sister and family were all involved with.

Q.   You referenced her sister and family, there's a hair salon on Hertel?

A.   Yeah, it's like a spa salon.  They did hair and different things.

Q.   Did you used to go there?

A.   Yes.

Q.   What was it called?

A.   Good to Glow.

Q.   Is that where you would get your hair done?

A.   Not anymore.

Q.   Back then?

A.   Back then, yes.

Q.   Now, while you were purportedly married to Mr. Gerace, did there come a point in time when you and he were invited to attend a birthday dinner at a place called Boss Restaurant

on Hertel Avenue?

A.   Yes.

Q.   Was this defendant there?

A.   Yes.

Q.   Did this defendant go there with you?

A.   Yes.

           MR. TRIPI:   Just a moment, Judge.

           Ms. Champoux, can we pull up Exhibit 310D.  Page 11, thank you.

           BY MR. TRIPI:

Q.   I want you to look at me for now and --

     Ms. Nigro, look at me for now.  I'm going to ask you a few more questions, and then we're going to go to this exhibit for just a second.  Okay?

A.   Okay.

Q.   At Boss Restaurant, whose birthday was it?

A.   Joe Bongiovanni's.

Q.   Okay.  And you attended with the defendant?

A.   Yes.

           MR. TRIPI:   And can we go to the next page, Ms. Champoux, for a second.

           Let's go to the next page after that.  Let's try page 13.  Keep scrolling, please.

           BY MR. TRIPI:

Q.   Okay.  Look at me, please.

Q.   When you went to the -- to the dinner that day, did you go straight to the restaurant if you recall?

A.   I think so.

Q.   Okay.

MR. TRIPI:   Let's go to the next page of this, Ms. Champoux.   I'm looking for something here.

Stop there.

BY MR. TRIPI:

Q.   Every summer, is there a Pharaoh's golf outing?

A.   Yes.

Q.   Do you know what month that is?

A.   August.   July, August.

Q.   July, August area?   Do you remember that the dinner that you were going to was sometime in proximity to when there was going to be a golf outing?

A.   Yes.

Q.   Who arranged the golf outings?

A.   Peter.

Q.   Were Pharaoh's dancers a big part of the draw or a feature of the golf outings?

A.   Yes.

Q.   Have you ever been invited to one of the golf outings?

A.   No, I was not allowed to go.

Q.   What do you mean by that?

A.   Peter would not permit me to go.

Q.   All right.  On your screen now --

MR. TRIPI:  Ms. Champoux, can we just zoom in on that?

BY MR. TRIPI:

Q.   Now you mentioned Mr. Bongiovanni's wife's name is Lindsay.

A.   Yes.

Q.   See that top message where it says to Boss, don't mention the golf tournament to Lindsay --

A.   Um-hum.

Q.   -- or Linday.

Two messages followed.  I know.  What time Boss?  I just woke up.

And there's a response, 6:30 p.m., do you see that?

A.   Yes.

MR. TRIPI:  Okay.  We can take that down.

BY MR. TRIPI:

Q.   Where were you with the defendant before that dinner at boss?  Were you guys at your house?

A.   Probably at some point at the office, then back to the house getting ready for the dinner.

Q.   Now, at that point, did you make some observations in terms of preparations the defendant made before going to that birthday dinner?

A.   Yes.

Q. Did any of those preparations relate to money?

A. Yes.

Q. Where were you when you made those observations?

A. At the office and then to the house.

Q. Okay. When you say "at the office," are you referring to the Pharaoh's office with the safe?

A. Yes.

Q. All right. One moment.

MR. TRIPI: Let's pull up Exhibit 235A-84, please.

BY MR. TRIPI:

Q. Is this -- do you recognize the setting here in this photo?

A. Yes.

Q. What is that?

A. It's a -- the safe.

Q. Is that safe located in the first floor office that you've referenced?

A. Yes.

Q. Is that where you observed the defendant making preparations related to money?

A. Yes.

Q. What did you observe the defendant do there?

A. He grabbed money, put it in his pocket. Grabbed an envelope. And then we headed home.

Q. Okay.

A. Went to get a birthday card.

Q. And did you go to get the birthday card after leaving Pharaoh's --

A. Yes.

Q. -- or after leaving the house?

A. After leaving Pharaoh's.

Q. So from Pharaoh's, you guys go get a birthday card?

A. We went to the mall where the bank was at the mall, deposited the money that we had from Pharaoh's from the night before, and then went to the Hallmark store and grabbed a card.

Q. Okay.

A. It was still around then.

Q. And then you proceeded home from there?

A. Yes.

Q. When you got home, where was home at the time?

A. It was at Windsong Apartments.

Q. And just on that note, let me stop there for a second. You never lived in the big house in Clarence that the defendant later --

A. No.

Q. Right? Okay.

At the -- at the apartment when you get back to the apartment, after the defendant takes the cash and then you guys get the birthday card, do you get ready to go to this

dinner?

A.   Yes.

Q.   Now, what -- what did you observe happen at the house?

A.   Well, he put money into the card.

Q.   And what did the money look like?

A.   And we both signed it.

Q.   What did the money look like?  Can you describe the amount it appeared to be?

A.   I was told it was $5,000, but I didn't count it.

            **MR. FOTI:**  Objection.

            **THE COURT:**  Sustained.

            The jury will strike what she was told.

            You said to describe what you saw.  That's what I --

            **MR. TRIPI:**  Oh, I understand, Judge.  My fault.

            **BY MR. TRIPI:**

Q.   We'll do it one stop at a time.

A.   Okay.

Q.   What did you see the defendant do with the cash?

A.   I saw a large stack of cash going into an envelope.

Q.   Was that envelope, did it contain the birthday card?

A.   Yes.

Q.   Was that the card you signed?

A.   Yes.

Q.   From your observation, what did the money look like?  Did it look like a single bill, or more than one bill?

A.  It was a stack of hundreds.

Q.  Okay.  Now, when you were doing that, did the defendant make a comment as to how much money it was?

A.  Yes.

Q.  What was that comment?

A.  He said it was $5,000.

**MR. FOTI:**  Objection.

**THE COURT:**  Too late, Mr. Foti.

**MR. FOTI:**  Well, I move to strike.  As long -- I think you can still timely move after the answer.

**MR. TRIPI:**  We can --

**THE COURT:**  Come on up.  Come on up.

(Sidebar discussion held on the record.)

**MR. TRIPI:**  Judge, I'm going to let Ms. Chalbeck -- we went back to our briefing and the research on the privilege issue.  I'm going to cede to her on this point, and let her argue it because she went back and looked.

**THE COURT:**  Go ahead, Ms. Chalbeck.

**MS. CHALBECK:**  Thanks, Judge.  So just for starters, I would note that it's the proponent of the privilege's burden to establish the privilege.  And our briefing previously covered that for the privilege to hold, they -- there needs to be a valid marriage.

I think Your Honor previously recognized that the government has shown by a preponderance of the evidence that

the marriage sits atop fraudulent documentation and a fraud.

Another witness just testified, Ms. Carter, that Ms. Nigro was blackout drunk, she didn't think she could even consent.

So just out the gate, I would say I think it's their job to show that it was a valid marriage.

But working with the facts that we have now, I was reviewing the Supreme Court's decision in Trammell.  And Trammell says, I've got it right here:  Privileges must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify, or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.

And so starting from that premise of the privilege needs promote a public good, what public good is being promoted here given Your Honor's recognition that by the preponderance this is a fraudulent marriage.  In fact, I would say it's just the opposite, that it's rewarding -- it's rewarding unlawful conduct.

And I was thinking about Your Honor's hypothetical from earlier about the estates law.  And here's why I don't think that really works.  In estates, as with like other forms of property law, there are like common law rights to property.

And with privileges, because they're strictly

construed, they reference positive law. Right? Like, what does the legal --

**MR. COOPER:** Rebecca.

**MR. TRIPI:** Rebecca, you're being summoned.

**MS. CHALBECK:** The validity of a privilege is measured -- do you want, I'm sorry, should I wait for Ms. Izzo?

**THE COURT:** She's here, go ahead.

**MS. CHALBECK:** Okay. So a privilege --

Just to get you up to speed, I was engaging with the judge's hypothetical about estates. And I was saying that in estates, like other areas of property law, there are common law rights to like property. Right?

So even if someone's not validly married, they might have a common law property right. Like, a common-law marriage is not one that is a marriage that a privilege --

**THE COURT:** New York doesn't recognize common law.

**MS. CHALBECK:** Right. But the Federal Rules of Evidence aren't judged in referenced to state property law, like, either -- or, state common law. I guess my point is that --

**THE COURT:** But privilege is, isn't it? Isn't privilege dependant on state law?

**MS. CHALBECK:** My understanding is that I'm not gonna -- I don't have a firm enough grasp of that to give

Your Honor an informed response. But just engaging with the estates. Right? You can have generally in other jurisdictions an estate claim even if you're not legally married.

THE COURT: Right, right, right.

MS. CHALBECK: And so here, though, you need have a valid marriage for the privilege to apply.

And going back to why do privileges exist? They exist to promote public goods.

The public good here is not promoted by rewarding fraudulent activity. Here, the fraudulent drunken marriage that Peter Gerace and Katrina Nigro purportedly entered into.

In fact, it's rewarding criminal activity.

THE COURT: Why isn't she right?

MR. FOTI: Judge, I understand the argument. It makes sense, the point that she's trying to make, but going forward --

MS. CHALBECK: Thank you.

MR. FOTI: -- going forward -- or, I guess, going back to some of what we talked about before, you gave one analogy, and there's another point that I made that I still come back to, that this was adjudicated. It was adjudicated as a lawful marriage. Nobody ever made a finding otherwise.

THE COURT: I mean, it's now been presented to me, there wasn't a witness at the wedding.

**MR. FOTI:** Well, you -- you -- you made a finding, but, Judge, I don't think -- respectfully, I don't think you reviewed New York State Law and made a finding based on --

**THE COURT:** Well, I know there needs to be a witness.

Rebecca, reviewed New York State Law and there has to be a witness.

**MR. FOTI:** Judge, we didn't brief the legality under New York State Law --

**THE COURT:** Let's cut through this for a second.

Why isn't this statement admissible as a coconspirator hearsay statement?

She's part of the conspiracy, he's part of the conspiracy, Bongiovanni's part of the conspiracy. Why isn't this a coconspirator statement.

**MR. FOTI:** I don't -- I never -- I don't think there's been any evidence that she was involved in the conspiracy to bribe or to engage in some sort of fraud on the U.S. government involving Mr. Bongiovanni.

**THE COURT:** She certainly -- go ahead, Mr. --

**MS. CHALBECK:** If I may, if I recall the testimony from Bongiovanni 1 and Bongiovanni 2, she gives at the defendant's direction envelopes to Bongiovanni, or, at least one envelope, separate from the birthday card at the defendant's direction to Bongiovanni, which would at least make her a participant --

(Simultaneous talking.)

**MS. CHALBECK:** -- believing that they contained cash, which would make her a participant in the conspiracy.

**THE COURT:** Now can I consider that testimony as part of the -- can I consider that as part of the foundation for a conspiracy in this case?

**MR. COOPER:** Yes, Judge, we can proffer to that to you.

**MS. CHALBECK:** Yes.

**MR. COOPER:** And you don't even need us to proffer it to you --

(Simultaneous talking.)

**MR. TRIPI:** And I'm going to get into that, too.

**THE COURT:** I think it comes in as a coconspirator statement. And I think it probably comes in because the spousal privilege does not apply because it's not a valid marriage.

Rebecca did some research over the lunch hour, and you do require a witness. So the fact that the 24-hour period was done away with, and the fact that the judge might have been involved with Mr. Gerace, and so and so forth, I that that might not undermine the marriage. But I think the fact that there was not a witness, though, because I have no reason to believe that there was, in fact, a witness there. I looked at the signatures, the signatures did not look the same.

The only testimony we have right now is Ms. Nigro's testimony that there were just the three of them and no witness. And the defense hasn't proffered to me anything that there was a witness.

So I think -- I think that the marriage probably is not a valid marriage. I think that the privilege probably does not apply for that reason. But even if it did, I think I would find this is a coconspirator statement for that reason.

**MR. FOTI:** Judge, can I just clarify so I understand?

The statement we're talking about, unless I forgot, this is a statement from Peter Gerace?

**THE COURT:** Yes.

**MR. FOTI:** So just I am not totally following the coconspirator -- the grounds under which it's being admitted. It's his statement. Obviously he's not a coconspirator to himself. I missed what -- it's being admitted as a coconspirator statement, even though it's from the defendant?

**THE COURT:** Okay. The defendant is telling her that there's $5,000 in the envelope. Yeah, I guess that's right. I guess it's his statement. It's his statement to her. So it's different than Bongiovanni, because it's the defendant's statement to her. So why isn't it admissible based on --

(Indecipherable.)

**THE COURT:** It would just be the spousal privilege.

**MS. CHALBECK:** Judge, if I may be heard on that

point?

THE COURT: Go ahead.

MS. CHALBECK: So I think Your Honor is absolutely correct that the privilege does not apply, but I would just further note that in light of the Court's findings so far about the -- the fraud in the marriage, it's the defendant's burden, and that burden has not been met.

THE COURT: Right. Can you proffer to me in good faith that there was a witness at the wedding?

MR. FOTI: I can't. I don't know the details. What I can proffer is that the -- that is what I've already said, is that the marriage was adjudicated as a marriage when it was dissolved. And so I think in New York State Supreme Court, that has jurisdiction over the matter, has only ever recognized it as a legitimate marriage, and I think that that --

THE COURT: I don't know that that binds me.

MS. CHALBECK: Yeah, I don't think --

(Simultaneous talking.)

THE COURT: This is not a collateral estoppel kind of a situation. The government wasn't a party to the dissolution of the marriage by divorce, so I don't know how we can bind the government based on that. And I'm finding facts now that the Court that dissolved the marriage may not have known about.

**MS. CHALBECK:** Your Honor, if I may be heard on that point. Mr. Foti is absolutely invoking implicitly a concept of collateral estoppel here.

We don't even know if the facts that have been presented to this Court and that this Court has made findings on were present before this New York State Court, and that if they were, to what extent, if any, that would have affected the adjudication.

**MR. FOTI:** I don't think -- I -- I understand. I understand why the argument was made that I'm invoking collateral estoppel, but that's not what I'm intending to make at this point.

The point I'm trying to make is there's a policy reason behind the privilege. The policy reason applies. These two individuals both intended to treat their relationship as a marriage. They recognized it as a marriage.

**THE COURT:** But that's true in a common-law marriage situation, right? That's true when people have a common-law marriage, and we know the privilege doesn't apply in a common-law marriage.

The fact that they intended to get married doesn't matter, it's whether they did get married that matters.

**MR. FOTI:** And I, in my position, and I understand that we -- we're moving towards a point where I'm going to lose on this --

**THE COURT:** That's okay, you make your record.

**MR. FOTI:** But my position is it -- it remains a marriage, that every court of jurisdiction -- and that's not to take anything away from this Court -- but every court of jurisdiction that would oversee the legitimacy of the marriage has always recognized it as such.

I don't believe this is a collateral estoppel issue. I think that's consistent with these two parties recognize it as a legitimate state-authorized marriage, and they took actions based on that going through the extremely painstaking process of the divorce proceeding, and there was also a financial benefit to the witness because of this.

**THE COURT:** And let me say this, and then I'm done.

So, Mr. Foti, I -- I agree with you. I think that the -- if -- if -- if I were the person who decided what New York -- and I guess I do decide what New York Law is, but if I were the New York Courts who decided this issue, or the New York legislature, I would find that common-law marriage is just as good as a solemnized marriage.

And I would also find that the failure to solemnize a marriage appropriately isn't good enough to undercut the privilege.

I think -- I think that the interest that we have in privilege is wanting to have husbands and wives be open and disclose to each other, whether it's a common-law marriage,

whether it's a real marriage, whether it's a faultily solemnized marriage, I think that the interest is the best.

But I think that based on the law, and based on the fact that this marriage was not a legal marriage, I don't have any choice but to allow it in because of the privilege.

So that's my ruling. You have your record. If I'm wrong, look it, and I'm making this based on half an hour's worth of research that my law clerk did at lunch.

**MR. FOTI:** Understood.

**THE COURT:** You know, this is why we have appellate courts. So if, you know, a 2nd Circuit judge with a benefit of, you know, three weeks to do the research says I'm wrong, I'm not going to feel badly about it because I only had half an hour, and he's gonna have or she's gonna have three weeks.

**MR. FOTI:** I understand. Thanks, Judge.

(End of sidebar discussion.)

**THE COURT:** Okay. The objection is overruled.

**BY MR. TRIPI:**

Q. Sort of forgot the question, so I'm going to re-ask it.

At the -- around the same time you observed the cash being placed into the birthday card, what, if anything, did the defendant say about the amount of money he was putting in the card?

A. He said he was giving $5,000.

Q. Now, when you and the defendant made your way to that

birthday dinner at Boss, just generally describe what happened when you got there, and then I'll ask some follow-up.  Go ahead.

A.   We went in, a big table was set on the patio outside.  That was primarily where the party was concentrated on.  And we just kind of joined, and everybody was sitting around.  And you could go back and forth to the bar and get drinks.  There was, like, a bunch of other friends there associating with them.

Q.   Okay.  Was defend -- was Joseph Bongiovanni there?

A.   Yes.

Q.   As the night wore on, was this a sort of a lengthy drawn-out dinner?

A.   Yeah, it was a while.  A lot of time consuming, drinking, gaps.

Q.   Now Boss at that time, they had an outdoor patio, but if you walked in, you would essentially be met by the bar?

A.   Yes, by the bar.

Q.   And at that time, that particular restaurant, if you were walking from the outside in past the bar, did you have to pass the bar to get to restrooms?

A.   Yes.

Q.   Okay.  Did you observe or form -- observe characteristics of the defendant as the night wore on that indicated to you he was using cocaine?

A.   Yes.

Q.   Did you make observations of others walking in and out of that bathroom area?

A.   Yes.

Q.   Did you -- did you, based on those observations and any physical characteristics, form an opinion as to whether others were using cocaine?

A.   Yes.

Q.   What was your opinion in that regard?

A.   It was pretty obvious, they had all the signs.  Eyes dilated, kept wiping their noses, just red in the face, more talking rapidly.

Q.   Was the defendant interacting with Mr. Bongiovanni while he was in that state?

A.   Absolutely.

Q.   Do you know who owned or ran the restaurant at the time?

A.   No, he did come over and introduce, but I don't honestly know.

Q.   You don't remember the name?

A.   Um-mmm.

Q.   That's a no?

A.   No.

Q.   Okay.  Did you observe the defendant hand that envelope, that birthday card envelope, to Mr. Bongiovanni?

A.   Yes.

Q.   Where was that done?  Outside?

A.   It was at the table.

Q.   How did they -- how did they greet each other or interact in that that moment?

A.   I mean, he already greeted him as they walked in, so that was, like, where the happy-birthday-hug-type thing was at the table.  Then he just handed it to him, and he stuck it inside his coat.

Q.   I guess what I was asking in terms of the greetings was, like, did they hug?  Did they physically interact?  Did they --

A.   Yeah.

Q.   -- like, what was the dynamic?

A.   Yeah, no, they hugged.  They physically reacted when we got there.  And then everybody was seated is when he handed that over.

Q.   Now, up to that point in your life, had you -- well, withdrawn.

     I think we talked about it earlier.  You indicated that there were times when you would work in the office, the downstairs office, and that you were responsible for paying people in cash?

A.   Yes.

Q.   And I think earlier you said that the defendant would sometimes pay by check and sometimes he would put cash in

envelopes for people; is that right?

A.   Yes.   Yes.

Q.   Now, Mr. Bongiovanni never had any official role working for Pharaoh's; is that right?

A.   Yes.

Q.   At any point while you were with the defendant, did he ever instruct you to give cash envelopes to Mr. Bongiovanni?

A.   Yes.

Q.   How many times did you personally do that?

A.   Two to three that I can truly recollect.

Q.   Okay.   When were those instances -- I'm going to ask more questions about the instances, but when were they in relation to this 2016 birthday?

A.   They were all around the same time he popped in the club before and gave him money.  All, like, around, yeah, give or take.  I was only closer with Bongiovanni -- with Peter in, like, the last six months of marriage.

Q.   Okay.  So, I'm just trying to get a time estimate here. So are you saying you handled envelopes, and correct me if I'm wrong, I'm trying to get it clear.

     Are you saying within six months of the dinner is when you handled envelopes that you gave to Bongiovanni?

A.   Yes.

Q.   Would it have been before the dinner?

A.   Before.

Q.   Okay.  And is that six months an estimate?

A.   Estimate, yes.

Q.   Describe the circumstances in the instances where you were directed by the defendant to give Bongiovanni an envelope with cash in it; do you understand my question?

A.   You said describe the incident?

Q.   Describe the circumstances.  So how would it work?

A.   When Peter wasn't in the building and I was in the office, he told me to run an envelope out to him, and we just met at the door.

Q.   What door would you meet Bongiovanni at?

A.   The side office -- door near the office.

Q.   Is that a door that would be characterized by you as the employee entrance?

A.   Yeah.  Usually the employees went through the front door, but I guess management and stuff would go in the side.

Q.   Is that door closer to Aero Drive?

A.   Yes.

Q.   At that point in time, the door area where the exchange was made, were there cameras at that location on those --

A.   No.

Q.   On the occasions where you handed Mr. Bongiovanni an envelope, did you form a belief that it was cash in the envelopes?

A.   Yes.

Q. How did you form that belief?

A. I felt it.

Q. Had you handled many envelopes of cash by that point in time?

A. Yes.

Q. What did Mr. Bongiovanni say in those meetings, if anything?

A. Just thanks.

Q. Did you ask the defendant any questions about what the payments were for?

A. No.

Q. Did you have any discussions with Mr. Bongiovanni about what the payments were for?

A. No.

Q. At any point while you were married to the defendant and those activities that you've described earlier today were occurring at Pharaoh's, did any federal law enforcement prior to this case shut down Pharaoh's?

A. No.

Q. Did the DEA ever arrest the defendant?

A. No.

Q. Did Joe Bongiovanni ever arrest the defendant?

A. No.

THE COURT: Are you moving into another area, Mr. Tripi?

MR. TRIPI: I'm going to finish up this area, Judge, I don't have too much more, but I am mindful of the time.

THE COURT: Do you think you're going to finish this afternoon?

MR. TRIPI: Outside shot maybe.

THE COURT: Let's try.

MR. TRIPI: Maybe.

THE COURT: Let's try.

BY MR. TRIPI:

Q. Earlier we talked about two women who overdosed; do you remember that?

A. Yes.

Q. Brittany and Fiona?

A. Yes.

Q. We've been talking in time estimates, so I want to ask a very specific question.

In terms of the first envelope you were directed by the defendant to provide Mr. Bongiovanni, was it the same approximate year as those activities with Brittany and Fiona?

A. Yeah, it was.

Q. Based upon all your personal interactions, your involvement in some of the activities we've talked about, your observations of the relationship between Bongiovanni and Gerace, did you form an understanding as to what those cash payments were for?

MR. FOTI:  Objection?

THE COURT:  Did you form an understanding?
Overruled.

BY MR. TRIPI:

Q.  What was your understanding?

THE COURT:  Hang on, hang on, I --

MR. TRIPI:  I thought you said overruled.

THE COURT:  Did she answer the question, did you form an understanding?

THE WITNESS:  Yes.

BY MR. TRIPI:

Q.  What was your understanding?

MR. FOTI:  Objection.

THE COURT:  Sustained.

MR. TRIPI:  I'll just make my best argument from here, Judge.  I'd argue 701, and U.S. versus Yanotti, which we briefed.

THE COURT:  Yeah, no.

MR. TRIPI:  Okay.

BY MR. TRIPI:

Q.  Until this case -- just let me circle back.

Was Mr. Gerace, from 2009 when you started there until the end of your relationship and beyond until this case, was he ever arrested for drug dealing?

Was Mr. Gerace ever arrested for anything at Pharaoh's?

A.    No, he was never arrested for anything at Pharaoh's.

Q.    Okay.  All right.  At the beginning of this, we talked about when you were -- when you first contacted law enforcement after the searches at Pharaoh's in December of 2019 became public; do you remember that?

A.    Yes.

Q.    By that point in time, by the time you contacted law enforcement, you were aware that Mr. Bongiovanni had been charged; is that right?

A.    Yes.

Q.    That was public?

A.    Yes.

Q.    All right.  After Mr. Bongiovanni was charged, but before the defendant was, so focusing in on that timeframe, okay?

A.    Okay.

Q.    In approximately the year 2020, were you sued by this defendant civilly?

A.    Yes.

Q.    Was another woman with a history at Pharaoh's also named and sued in that lawsuit?

A.    Yes.

Q.    Who was that woman?

A.    Phlycia.

Q.    Is that Phlycia Hunt?

A.    Hunt.

Q.   Did some of the allegations in the lawsuit relate to his claim that you made false statements about him to law enforcement?

A.   Yes.

Q.   Were some of the allegations in the lawsuit based on old Facebook posts going back to 2016?

A.   Yes.

Q.   Now, before Pharaoh's was searched in December 2019, you had not even spoken with law enforcement about any of this, correct?

A.   No, correct.  I'm sorry, correct.

Q.   No, that's was a bad question.

     In fact, to the extent that years earlier you had provided any information to the FBI, other agents, years and years earlier, it was not about Pharaoh's or Defendant Gerace, correct?

A.   Yes.

Q.   All right.  When you were with the defendant -- yes or no -- were you loyal to him?

A.   Yes.

Q.   Turning back to the lawsuit:  How did you feel when you were sued?

A.   Disgusted.

Q.   Did you have a lot of money at that time?

A.   No.

Q. Did you have -- were you living in a big house? Were you living in a mansion?

A. I was with my parents, but they were not covering all my bills.

Q. So my question was: Were you living in a mansion?

A. No.

Q. Did you have multiple vehicles?

A. No, I wasn't allowed to drive.

Q. Did you have a lot of money?

A. No.

Q. As you understood it, did the defendant have a lot of money at that time?

A. Absolutely.

Q. And did you form a belief as to why the defendant singled out you and Ms. Hunt for that lawsuit?

A. He did it so he could get evidence, I assumed and believed, for the court case.

MR. FOTI: Objection.

THE COURT: Sustained. The jury will strike that.

BY MR. TRIPI:

Q. Did you form -- you've got to listen to my question, and you've just got to answer my question, okay? And I'll ask followups.

Did you form a belief as to why he singled out you and Ms. Hunt for a civil lawsuit? Yes or no?

A.   Yes.

Q.   What was your belief in that regard?

A.   For evidence --

        MR. FOTI:  Objection.

        THE COURT:  Hang on, stop, stop, stop, stop.

        What was her belief about his state of mind?

        MR. TRIPI:  She can -- she can have a feeling about why she's getting sued, Your Honor, it's 701.

        THE COURT:  Well, I think that's right.  But I'm going to sustain the objection to the form.

        MR. TRIPI:  Form?

        BY MR. TRIPI:

Q.   I'm going to ask it more specifically.

     Do you believe you and Ms. Hunt were sued because -- to silence you?

A.   Yes.

        MR. FOTI:  Objection.

        THE COURT:  Overruled.

        MR. TRIPI:  One moment, please, Your Honor.  No further direct, Judge.

        THE COURT:  Okay.  Folks, we are going to break for the long weekend.  So remember my instructions now.  This is important because you're gonna be away for five days now, so do not discuss this case with anyone including each other. You're gonna be at dinner on Thanksgiving, people are going to

be asking you what have been doing the last month. Don't do it. Think of how angry this face is going to look if you folks do it. Seriously, don't do it. Don't talk to anybody about the case.

Don't use tools of technology to communicate with anyone about case or to learn anything about the case. Don't read, or watch, or listen to any news coverage at all about the case if there is any over the weekend or at any time during the trial. And don't make up your mind until you start deliberations.

Be back here at 9:30 on Monday. We're going to go until about 3:00 on Monday, and then we're going to be down Tuesday and Wednesday next week, remember, we'll be on Thursday and Friday of next week. Thursday and Friday.

So Monday, Thursday, and Friday next week, 9 until 3 -- or, 9:30 until 3 on Monday, and then all day Thursday and Friday. Okay?

Have a great Thanksgiving. Everybody drive carefully. Get a good night's sleep on Sunday night.

Thank you.

(Jury excused at 2:53 p.m.)

**THE COURT:** Okay. Ma'am, you're not to talk to anybody except your lawyer about your testimony over the weekend. Okay?

**THE WITNESS:** Okay.

THE COURT:  Great.

MR. TRIPI:  Ms. Nigro, I just want to follow up on that.  That includes, like, don't text message the agents, anybody.  Talk only to your lawyer.  I just want to be very explicit, okay?

THE COURT:  Don't say anything to anybody about the case unless your lawyer knows about it.  He will let you know whether you can do it or not, but don't do anything unless -- don't sneeze unless he knows about it.  Okay?

THE WITNESS:  Okay.

THE COURT:  Good.

MR. TRIPI:  Thank you.

(Witness excused at 2:54 p.m.)

(Excerpt concluded at 2:54 p.m.)

                *    *    *    *    *    *    *


                    **CERTIFICATE OF REPORTER**

     In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on November 27, 2024.


                              s/ Ann M. Sawyer
                              Ann M. Sawyer, FCRR, RPR, CRR
                              Official Court Reporter
                              U.S.D.C., W.D.N.Y.

**TRANSCRIPT INDEX**

**EXCERPT – EXAMINATION OF KATRINA NIGRO – DAY 2**

**NOVEMBER 27, 2024**

**W I T N E S S**                                    **P A G E**

**K A T R I N A   N I G R O**                              2

  DIRECT EXAMINATION BY MR. TRIPI:                    2

  VOIR DIRE EXAMINATION BY MR. FOTI:                  48

  DIRECT EXAMINATION BY MR. TRIPI:                    51

  VOIR DIRE EXAMINATION BY MR. FOTI:                  71

  DIRECT EXAMINATION BY MR. TRIPI:                    72

  (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:           123


**E X H I B I T S**                                  **P A G E**

GOV Exhibits 235A-34 and 36                           4

GOV Exhibit 564A                                     15

GOV Exhibit 467                                      43

GOV Exhibit 80                                       50

GOV Exhibit 563                                      58

GOV Exhibits 240B thru M                             72

GOV Exhibits 468A and B                              83