UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SIMON GOGOLACK,

Defendant.

**DECISION AND ORDER**

1:23-CR-00099 EAW

---

Defendant Simon Gogoack ("Gogolack") is charged by way of a second superseding

indictment ("SSI") with the following crimes:

- conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (count 1);

- witness tampering conspiracy, in violation of 18 U.S.C. § 1512(k) (count 2);

- witness retaliation conspiracy, in violation of 18 U.S.C. § 1513(f) (count 3);[1]

- distribution of fentanyl resulting in death, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) (count 4);

- narcotics conspiracy, in violation of 21 U.S.C. § 846 (count 6);

- maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (count 7);

- possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (count 8);

- felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (count 9);

- unlawful user of controlled substances in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(8) (count 10);

---

[1]     The government has filed a motion to dismiss counts one through three as alleged against Gogolack, pursuant to Federal Rule of Criminal Procedure 48(a). (Dkt. 1000).

- 1 -

- kidnapping victim 1, in violation of 18 U.S.C. § 1201(a)(1) and 2 (count 11);

- kidnapping victim 2, in violation of 18 U.S.C. § 1201(a)(1) and 2 (count 12);

- tampering with a witness (victim 1), in violation of 18 U.S.C. § 1512(b)(1) (count 13);

- tampering with a witness (victim 1), in violation of 18 U.S.C. § 1512(b)(2)(A) (count 14);

- tampering with a witness (victim 1), in violation of 18 U.S.C. § 1512(b)(3) (count 15);

- tampering with a witness (victim 2), in violation of 18 U.S.C. § 1512(b)(1) (count 16);

- tampering with a witness (victim 2), in violation of 18 U.S.C. § 1512(b)(2)(A) (count 17); and

- tampering with a witness (victim 2), in violation of 18 U.S.C. § 1512(b)(3) (count 18).

(Dkt. 24).

Pending before the undersigned are Gogolack's dispositive pre-trial motions, seeking the following relief: dismissal of the SSI based on constitutional speedy trial grounds; disclosure of *Brady* information; disclosure of grand jury minutes; severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure; dismissal of counts 13 through 18 of the SSI as multiplicitous; dismissal of count 10 for facial insufficiency; suppression of statements Gogolack made to law enforcement on August 2, 2023;[2] and

---

[2]    Gogolack also made statements to law enforcement on August 1, 2023, but his suppression motion did not expressly seek relief concerning those statements. (*See generally* Dkt. 694 at ¶¶ 79-84). In response to the motion, the government argued that Gogolack was never in custody on August 1, 2023, that all statements on August 1, 2023, were non-custodial and voluntary, and thus there was no basis to suppress any statements

suppression of physical evidence.  (Dkt. 694 (redacted pretrial motions); Dkt. 690 (sealed

unredacted pretrial motions)).[3]

For the reasons set forth below, the motions are granted in part and denied in part.

Specifically, Gogolack's motion to suppress statements made to law enforcement on

August 2, 2023 is granted to the extent set forth herein related to certain statements

Gogolack made in response to questions by a Depew police officer on that date, but the

---

made to law enforcement on August 1, 2023.  (Dkt. 723 at 53-54; Dkt. 724 at 53-54).  The
government further argued that to the extent Gogolack cited to his comment about speaking
to an attorney when presented with a supporting deposition, the Fifth Amendment was
inapplicable because he was not in custody, and the Sixth Amendment was similarly
inapplicable because no charges had been lodged against him.  (Dkt. 723 at 53-54; Dkt.
724 at 53-54).  In his reply to that submission, Gogolack offered no facts or arguments to
suggest that he was in custody on August 1, 2023, or that the statements were not voluntary.
(Dkt. 727 at ¶ 44).  The deficiencies were raised at oral argument held on January 7, 2026,
including when the Court indicated to defense counsel that he had not established that
Gogolack was in custody on August 1, 2023, but none of the subsequent filings, including
Gogolack's affidavit, addressed these issues.  (*See*, *e.g.*, Dkt. 736).  Yet, in his motion *in
limine* filed on April 17, 2026, Gogolack seeks to preclude the government from eliciting
evidence concerning his refusal to complete a deposition concerning Crystal Quinn's death
or that he requested an attorney.  (Dkt. 857 at 2).  The government argues against this
motion, including based in part on a claim that Gogolack forfeited any such argument by
failing to raise it in the suppression motion.  (Dkt. 931 at 21-23).  The Court will address
these issues raised about the August 1, 2023, statements, in Gogolack's motion *in limine*
separately.

[3]    Gogolack also filed an unspecified, boilerplate request for leave to join in his co-
defendants' motions.  (Dkt. 694 at 25).  That request is denied without prejudice.  *See
United States v. Cobb*, 544 F. Supp. 3d 310, 344-45 (W.D.N.Y. 2021) ("[I]t is prudent to
adopt a policy requiring each defense counsel to independently file motions on behalf of
their clients and not simply file boilerplate motions seeking to join in relevant motions of
co-counsel.  One of the reasons for this policy is that co-defendants may not pursue their
motions for a variety of reasons, including entering a plea of guilty." (citations omitted)).
As the Court has previously explained in connection with resolution of Gogolack's co-
defendants' motions, the Court will not entertain boilerplate and unspecified requests for
relief.

motion is otherwise denied.  Gogolack's motion to dismiss the SSI based on constitutional speedy trial violations, and his motions for disclosure of *Brady* information, disclosure of grand jury minutes, dismissal of counts 13 through 18 of the SSI as multiplicitous, dismissal of count 10 for facial insufficiency, and suppression of physical evidence, are denied.  As for Gogolack's motion for a severance, the Court continues to reserve decision on that motion because any resolution will likely be impacted by the government's recently-filed motion to dismiss pursuant to Federal Rule of Criminal Procedure 48(a) (Dkt. 1000) and Gogolack's response (Dkt. 1002).

## I.      BACKGROUND

Familiarity with the underlying background and procedural history of this case is presumed.  In summary, after being charged by way of criminal complaint on August 17, 2026 (*see United States v. Gogolack*, 1:23-mj-1115-JJM (Dkt. 1)), Gogolack was indicted on five drug and firearms-related counts, including narcotics conspiracy, maintaining a drug-involved premises, possession of firearms in furtherance of drug trafficking, felon in possession of a firearm and ammunition, and unlawful user of controlled substances in possession of a firearm and ammunition.  (Dkt. 12 (09/13/2023)).  Thereafter, on September 20, 2023, a grand jury returned a superseding indictment against Gogolack, which added two kidnapping and six witness tampering counts.  (Dkt. 18 (09/20/2023)).

A grand jury returned the current SSI against Gogolack and his co-defendants on January 5, 2024.  (Dkt. 24).  Gogolack filed the pending motions on December 2, 2025. The government filed opposition papers on December 23, 2025 (Dkt. 723 (redacted response); Dkt. 724 (sealed unredacted response)), and Gogolack filed reply papers on

January 2, 2026 (Dkt. 727 (redacted reply); Dkt. 731 (sealed unredacted reply)).  The Court held oral argument on Gogolack's motions on January 7, 2026, ordered that the parties make supplemental submissions on the speedy trial issue, and directed Gogolack to file any affidavit in support of his motion to suppress statements by January 16, 2026.  (Dkt. 730).

Gogolack filed his affidavit on January 16, 2026 (Dkt. 736), and the government filed a supplemental memorandum in opposition to Gogolack's speedy trial motion on January 21, 2026 (Dkt. 737; *see also* Dkt. 748 (sealed exhibits A and B to the government's supplemental memorandum in opposition to Gogolack's speedy trial motion)).  The Court held a status conference on January 21, 2026, and directed the parties to file supplemental briefing on Gogolack's motion to suppress statements.  (*See* Dkt. 740).

Thereafter, on February 6, 2026, Gogolack filed a supplemental brief in further support of his motion to suppress and for a speedy trial.  (Dkt. 755).  The government filed a response on February 21, 2026.  (Dkt. 767; *see also* Dkt. 771 (sealed Exhibit 3 to the government's response papers)).  The Court held further oral argument on the motion to suppress statements on February 24, 2026 (*see* Dkt. 773), and scheduled a suppression hearing to be held on March 27 and 30, 2026 (Dkt. 774).  Gogolack submitted a supplemental response in further support of his speedy trial motion to dismiss on March 10, 2026 (Dkt. 825; Dkt. 826), and the government filed a further supplemental response on March 24, 2026 (Dkt. 812).

The Court held the suppression hearing on March 27 and 30, 2026, to address Gogolack's argument that the government utilized a two-step interrogation process when

questioning Gogolack on August 2, 2023.  (Dkt. 774; *see also* Dkt. 815; Dkt. 819; Dkt. 835 (transcript from March 27, 2026 hearing); Dkt. 844 (transcript from March 30, 2026 hearing)).  The government called FBI Special Agent Adam Penna, FBI Special Agent Jason Kammeraad, and Depew Police Lieutenant Aleksander Wojciechowicz to testify at the hearing.  Various exhibits were introduced at the hearing (*see* Dkt. 835 at 2), and also submitted by the government by email on March 31, 2026, was a finalized version of the transcript of the interview of Gogolack by Agents Kammeraad and Penna (marked Exhibit 5), and by letter dated April 13, 2026, certain text messages between Agent Penna and Lieutenant Wojciechowicz (marked Exhibit 6).  The parties filed post-hearing submissions on April 24, 2026.  (*See* Dkt. 885 (government's post-hearing brief); Dkt. 886 (Gogolack's post-hearing brief)).

## II.    Motion to Suppress Statements

Gogolack contends that statements he made on August 2, 2023, should be suppressed as follows: (1) statements he made to Lieutenant Wojciechowicz, the Depew Police Officer who stopped him on August 2, 2023 (hereinafter, "Lieutenant Wojciechowicz," or "the Depew officer"), were non-Mirandized and the result of custodian interrogation; (2) statements made to Agent Penna and Agent Kammeraad, at the Depew Police Department (DPD) on August 2, 2023, should be suppressed because the government has not established that those statements were not the product of a deliberate two-step interrogation; and (3) statements made to Agent Penna and Agent Kammeraad at the DPD after Gogolack invoked his right to counsel should be suppressed.  (Dkt. 690 at

18-19; Dkt. 755 at 1-2; Dkt. 886).  In connection with his motion to suppress statements, Gogolack offered an affirmation stating as follows:

> I, SIMON GOGOLACK, state under penalty of perjury that on August 2, 2023 I was stopped by police taken into custody and interrogated by law enforcement without having been advised of my rights and/or given Miranda warnings.  I was then taken to the Depew Police Department where I remained in custody and continued to be interrogated.  While at the Depew Police Department law enforcement continued to question me after I invoked my right to counsel.

(Dkt. 736).

In response to Gogolack's motion to suppress statements, the government argues that Gogolack's statements to Lieutenant Wojciechowicz are recorded on his body-worn camera, and any statements made by Gogolack were not in response to interrogation.  (Dkt. 767 at 15-22).  The government further argues that Gogolack's statements to Agent Penna and Agent Kammeraad at the DPD were not the product of a two-step interrogation.  (*Id*. at 22-26).  The government also contends that Gogolack did not clearly and unequivocally invoke his right to counsel.  (*Id*. at 22; *see also* Dkt. 723).

###### A.    Statements to Agent Penna and Agent Kammeraad as Part of a Two-Step Interrogation Technique

As explained above, on March 27 and 30, 2026, the Court held a two-day suppression hearing for purposes of determining whether the government had deliberately engaged in a two-step interrogation technique in connection with obtaining statements from Gogolack on August 2, 2023.  The Court finds that the testimony provided at the hearing was credible, as summarized below.

### 1. Summary of Testimony at the Evidentiary Hearing

### a. Lieutenant Wojciechowicz

After describing his background and work history (Dkt. 835 at 15-21), Lieutenant Wojciechowicz explained that on August 2, 2023, he was working as a patrol officer with the DPD and received an assignment to assist members of the FBI (*id*. at 21). Specifically, Lieutenant Wojciechowicz received direction from his DPD supervisor that he was to meet with two FBI officers and conduct a traffic stop of a vehicle. (*Id*.). Lieutenant Wojciechowicz was informed that the individual driving the vehicle was named Simon Gogolack, and he was also provided with information regarding the vehicle, a 2008 Honda Accord. (*Id*. at 22-23). Lieutenant Wojciechowicz ran a check on Gogolack's name which revealed that his driver's license was revoked and suspended. (*Id*. at 24-25).

Lieutenant Wojciechowicz went to the area of Donna Court, located in Depew, New York, to wait for the vehicle. (*Id*. at 26). Lieutenant Wojciechowicz testified that he initially spoke with the FBI agents over the phone just prior to posting up in the Donna Court area (*id*. at 35), but then after reviewing his report recalled that he also met with the agents at Donna Court prior to making the traffic stop (*id*. at 55).

Around 7:05 p.m., Lieutenant Wojciechowicz observed Gogolack driving the vehicle and not properly signal before making a left-hand turn, and Lieutenant Wojciechowicz conducted a traffic stop. (*Id*. at 27-28, 30). Lieutenant Wojciechowicz's body-worn camera turned on automatically when he activated his sirens. (*Id*. at 28). Gogolack pulled over, was asked to step out of the vehicle, and was placed under arrest. (*Id*. at 30). During the stop, Lieutenant Wojciechowicz called the FBI agents to let them

know he had stopped Gogolack in front of Sharon Quinn's house, and thereafter the FBI agents called Lieutenant Wojciechowicz back to let him know that there was someone following Gogolack in another vehicle. (*Id*. at 36-37). Lieutenant Wojciechowicz testified that when he pulled Gogolack over, he did not provide Gogolack with Miranda warnings, he did not intend on conducting an interview with Gogolack or to question him about any criminal activity, and Lieutenant Wojciechowicz further confirmed that no one asked him to question Gogolack. (*Id*. at 31).

Once Lieutenant Wojciechowicz's encounter with Gogolack concluded and Gogolack was placed in the back of the police vehicle, Lieutenant Wojciechowicz manually deactivated his body-worn camera. (*Id*. at 32, 59). During the time the body-worn camera was off, Lieutenant Wojciechowicz conducted an inventory search of the vehicle. (*Id*. at 59-60).

Once Lieutenant Wojciechowicz returned to his vehicle, he manually reactivated his body-worn camera because he was transporting Gogolack, who was in custody. (*Id*. at 63). About 65 minutes passed between when he turned off the camera and when he re-activated it. (*Id*. at 38). Lieutenant Wojciechowicz testified that he was aware that Crystal Quinn ("Crystal") had died, and the FBI wanted to speak with Gogolack about her death. (*Id*. at 63). Lieutenant Wojciechowicz testified that during the time the body-worn camera was off, he did not conduct an interview of Gogolack or ask him questions about criminal activity, but he may have spoken with him about the logistics of the arrest and informed him that they were going back to the DPD. (*Id*. at 33). Lieutenant Wojciechowicz could not definitively remember if he had any conversations with Gogolack about anything in

particular during this time period. (*Id*. at 34). Lieutenant Wojciechowicz further testified that he did not recall the FBI giving him details regarding why they were interested in Gogolack, and he was confident that the FBI did not ask him to question Gogolack on their behalf. (*Id*.).

While transporting Gogolack back to the station, Lieutenant Wojciechowicz and Gogolack engaged in conversation, and Lieutenant Wojciechowicz responded to some of Gogolack's comments. (*Id*. at 45). Lieutenant Wojciechowicz described the encounter as non-confrontational and respectful. (*Id*. at 46). Once they arrived at the DPD, Lieutenant Wojciechowicz brought Gogolack to the booking room. (*Id*. at 47). Lieutenant Wojciechowicz collected information he needed for issuing Gogolack an appearance ticket and completed a police report. (*Id*. at 47-48). Lieutenant Wojciechowicz testified that during the booking process, he would have communicated with Gogolack to collect biographical information, but he was not interviewing Gogolack about any criminal activity. (*Id*. at 48). Lieutenant Wojciechowicz further testified that he did not recall the FBI agents interviewing Gogolack in the booking area about any criminal activity. (*Id*. at 49).

### b. Agent Penna

After providing his background and work history (*id*. at 85-89), Agent Penna testified that on August 2, 2023, he was assigned to an investigation into the death of Crystal Quinn (*id*. at 89). At the time of her death, Agent Penna and other agents, including FBI Special Agent Brian Burns, had been working on a case where Crystal was to serve as a cooperating witness for the government. (*Id*. at 90). They were notified about the death

- 10 -

by Crystal's mother, Sharon Quinn. (*Id*. at 91). Sharon Quinn advised Agent Burns that Gogolack and Crystal had driven her car to the Southern Tier, and Gogolack indicated that he was going to return the car to her home in Depew on August 2, 2023. (*Id*. at 93). Agent Penna testified that the FBI did not know exactly who Gogolack was at the time, but the FBI wanted the opportunity to speak with him because they believed Gogolack might have information helpful to understanding what had happened to Crystal. (*Id*. at 95). The FBI reached out to the DPD, advised them that Gogolack, who had a suspended license, would be driving through Depew, and asked that they conduct a traffic stop. (*Id*.). The FBI further advised the DPD that they wanted to have a conversation with Gogolack either before or after the traffic stop. (*Id*. at 95-96).

Agent Penna testified that once they learned that the Depew officer would arrest Gogolack because he was driving with a suspended license, Agent Penna and Agent Kammeraad started formulating a plan to conduct a custodial interrogation of Gogolack. (*Id*. at 99). Agent Penna described the custodial interview as a "fact finding" interview, and explained that the FBI did not have much information about Crystal's death at the time of the interview. (*Id*. at 99, 101).

Agent Penna testified that Sharon Quinn was keeping Agent Burns advised as to when she expected Gogolack to arrive at her home in Depew, and Agent Penna and Agent Kammeraad went to Donna Court (the area where the traffic stop occurred), around 7:00 p.m. (*Id*. at 97, 139-40). Agent Penna testified that when he arrived at the traffic stop, Gogolack was in the back seat of Lieutenant Wojciechowicz's vehicle. (*Id*. at 103). Agent Penna later found out that Agent Kammeraad "exchanged some words" with Gogolack at

the scene of the traffic stop, but Agent Penna was not aware of a report being prepared memorializing that conversation. (*Id*. at 104; *see also id*. at 150). Agent Penna could not recall if he met with Lieutenant Wojciechowicz prior to Gogolack's traffic stop, and he did not have any notes documenting any such interaction. (*Id*. at 132-33).

After Gogolack and Lieutenant Wojciechowicz left the scene, Agent Penna and Agent Kammeraad left Donna Court and proceeded to the DPD. (*Id*. at 112, 153). When they arrived, Gogolack was sitting in the booking area with Lieutenant Wojciechowicz, who was working through processing paperwork. (*Id*. at 112). Agent Penna could not recall if he spoke with Lieutenant Wojciechowicz about anything he may have done with Gogolack in the time that Agent Penna was not present, and recalled that Agent Kammeraad was the main line of communication between the FBI and Lieutenant Wojciechowicz. (*Id*. at 114). Agent Penna testified that, during the time Gogolack was in the booking area, he did not ask Gogolack any questions that he later asked in the interview room.[4] (*Id*. at 115). Agent Penna testified that a video from the booking area showed him and Agent Kammeraad engaged in an on-and-off conversation with Gogolack, which lasted about five-to-eight minutes, but there is no audio in the video nor any report documenting what was said during that time. (*Id*. at 154).

---

[4]     Agent Penna also submitted an affidavit confirming that he did not interrogate Gogolack while in the booking area of the DPD. (*See* Dkt. 767-2 (Agent Penna encountered Gogolack in the booking area of the DPD; he did not recall the interaction verbatim but advised Gogolack that they wanted to speak with him once Lieutenant Wojciechowicz was finished with the booking process and explained the logistics of a potential interview; and confirming he did not engage in a substantive interview of Gogolack in the booking area)).

After Gogolack was no longer needed in the booking process, Agent Penna and Agent Kammeraad explained to Gogolack that they were FBI agents and wanted to ask him some questions; Gogolack agreed and went with them to an interview room at the DPD. (*Id*. at 116). Agent Penna further explained that he wanted to conduct the interview of Gogolack outside the presence of Lieutenant Wojciechowicz, who was not involved, and they felt Gogolack might feel freer to speak with them if it was unrelated to the reason he was in custody with the DPD. (*Id*. at 116-17). Agent Penna advised Gogolack of his Miranda rights prior to questioning him in the interview room at the DPD. (*Id*. at 117-18). Agent Penna further testified that he did not devise any plan to circumvent giving Gogolack his Miranda warnings by effectuating a "two-step" interrogation. (*Id*. at 122).

### c. Agent Kammeraad

After providing his background and work history, Agent Kammeraad explained that in 2023, he was working on an investigation wherein Crystal Quinn was serving as a cooperating witness. (Dkt. 844 at 5-9).[5] In the morning on August 2, 2023, Agent Burns informed Agent Kammeraad that Crystal had been found dead in Wellsville, New York, the day prior. (*Id*. at 10). Agent Kammeraad learned from an individual named John Grieco, who was Sharon Quinn's roommate, that Gogolack would be returning Sharon Quinn's car to Depew, New York, later that day. (*Id*. at 11). Agent Kammeraad and Agent Burns had spoken with Grieco on the phone earlier that day, and Agent Kammeraad also

---

[5]     Page references to the transcript of Agent Kammeraad's testimony are to the CM/ECF generated page numbers, not the transcript page numbers.

received materials from the Wellsville Police Department, relating to their response to the scene of Crystal Quinn's death.  (*Id*. at 16, 50-51).

The FBI planned to make contact with Gogolack in Depew when he returned the car, and they reached out to the DPD for assistance.  (*Id*. at 13).  Agent Kammeraad and Agent Penna met with Lieutenant Wojciechowicz in the vicinity of Donna Court around 4:00 p.m. on August 2, 2023.  (*Id*. at 14, 16, 59).  Agent Kammeraad testified that he did not tell Lieutenant Wojciechowicz details about what he was investigating, as Agent Kammeraad did not know a lot of details about what had happened to Crystal at that time.  (*Id*. at 14).  There was no written report memorializing what occurred or was said during Agent Penna's and Agent Kammeraad's meeting with Lieutenant Wojciechowicz.  (*Id*. at 63).  Agent Kammeraad testified that if Gogolack was arrested, he and Agent Penna planned on interviewing Gogolack at the DPD.  (*Id*. at 18).

Agent Kammeraad testified that Lieutenant Wojciechowicz advised him and Agent Penna that Gogolack had been stopped, and they proceeded to the area of the stop, which took them 30 to 45 seconds.  (*Id*. at 17-18).  Agent Kammeraad observed Lieutenant Wojciechowicz talking to Gogolack, and then after Gogolack had been placed in the back seat of the police vehicle, Agent Kammeraad had a conversation with Lieutenant Wojciechowicz.  (*Id*. at 19).  Agent Kammeraad testified that he does not specifically recall what he said to Lieutenant Wojciechowicz at that time, but that he did not tell Lieutenant Wojciechowicz that he wanted him to try and acquire statements from Gogolack.  (*Id*. at 20).

Thereafter, Agent Kammeraad approached Gogolack in the vehicle. (*Id.* at 21). Agent Kammeraad testified that he wanted to introduce himself to Gogolack, and that he did not intend to interview him at the scene. (*Id.* at 21-22). Agent Kammeraad testified that he recalled introducing himself to Gogolack, that Gogolack told him that he knew who the FBI agents were, and that he knew Crystal was working with them. (*Id.* at 23). Agent Kammeraad did not remember how the conversation progressed from that point forward, and the only topics he remembered covering were that Gogolack knew that he was with the FBI, and that Crystal Quinn had been in Wellsville with him. (*Id*). Agent Kammeraad did not talk to Gogolack about any details about what occurred in Wellsville, and he described Gogolack's demeanor during this conversation as calm. (*Id.* at 24-25). Agent Kammeraad testified that, at some point during this interaction, he asked Gogolack questions, and that occurred organically during the conversation, that he did not take notes about what they talked about, and that the conversation could not have been longer than 15 minutes. (*Id.* at 25-26). Agent Kammeraad testified that Gogolack's answers to his questions were "rambling," and he did not Mirandize Gogolack prior to the conversation because he did not intend to ask him any questions that would elicit an incriminating response. (*Id.* at 27-28). Agent Kammeraad testified that he did not engage in a two-step interrogation process through his conversation with Gogolack when he was in the back of the Lieutenant Wojciechowicz's vehicle. (*Id.* at 28-29).

Agent Kammeraad testified that he and Agent Penna left Donna Court and traveled to the DPD to attempt to interview Gogoalck. (*Id.* at 35). They arrived at the station around 9:23 p.m. (*Id.* at 36). Agent Kammeraad and Agent Penna encountered Gogolack in the

booking room, where they engaged in some conversation with him. (*Id*. at 37). Agent Kammeraad could not remember exactly what was said during that time, but he recalled reiterating that he wanted to sit down and speak with Gogolack. (*Id*. at 37, 74).

Gogolack agreed to sit down for an interview with Agent Kammeraad and Agent Penna in the interview room at the DPD. (*Id*. at 41). They advised Gogolack of his Miranda rights. (*Id*. at 42). At some point during the early portion of the interview, Agent Kammeraad commented to Gogolack, "I'm just going to go off of what you've already told me," and at the suppression hearing, Agent Kammeraad testified as to what he meant by that statement:

> The basis of stating that was going back to the vehicle, the police vehicle, when I first introduced myself to Simon, I explained I'm an agent with the FBI, I would like to talk to you about Crystal. In sum and substance, Simon told me that he knew Crystal, who we were and that Crystal was talking with us. I wanted basically picking up from right there when I said that to Simon.

(*Id*.). Agent Kammeraad further testified that he remembered stating during the interview of Gogolack at the DPD, "from what I've got jotted down," while referencing Agent Penna's notepad, on which Agent Penna had taken notes earlier in the day when speaking with Sharon Quinn. (*Id*. at 43-44).

Agent Kammeraad testified that he covered various topics during the formal interview with Gogolak at the DPD—including a timeline leading up to Crystal's death, who Gogolack and Crystal interacted with in Wellsville over the weekend, and what substances Crystal had access to or ingested the weekend leading up to her death—all of which was not covered on scene at Donna Court. (*Id*. at 45-47).

## 2.  No Two-Step Interrogation Occurred

"Law enforcement may not circumvent Miranda by engaging in a two-step interrogation process whereby a person is questioned without the proper warnings, made to confess, Mirandized, and then questioned again."  *United States v. Pritchette*, 219 F. Supp. 3d 379, 383 (S.D.N.Y. 2016) (citing *Missouri v. Seibert*, 542 U.S. 600, 609 (2004)). In *Missouri v. Seibert*, the Supreme Court carved out an exception to the rule set forth in *Oregon v. Elstad*, 470 U.S. 298 (1985)[6], so that officers may not employ a "question first" strategy whereby they intentionally withhold Miranda warnings until a suspect has confessed and then give the warnings in the midst of a coordinated and continuing interrogation.  *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) ("*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain the postwarning confession.").

In considering whether law enforcement deliberately engaged in a two-step interrogation process, the court "should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." *Id.*  With respect to objective evidence, courts are guided by the following five factors:

> (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and the second," interrogations, (4) "the continuity of police personnel" doing the questioning, and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first."

---

[6]   In *Elstad*, the Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."  470 U.S. at 318.

*United States v. Medina*, 19 F. Supp. 3d 518, 543 (S.D.N.Y. 2014) (quoting *United States v. Moore,* 670 F.3d 222, 228 (2d Cir. 2012)). "As to subjective evidence of intent, a court should conduct 'a somewhat closer scrutiny of an investigator's testimony . . . when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the 'totality of the circumstances.'" *Id*. (quoting *v. Moore*, 670 F.3d at 229). "[T]he Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy." *Williams*, 681 F.3d at 41.

Here, the parties do not dispute that Lieutenant Wojciechowicz did not Mirandize Gogolack before transporting him to the DPD. Nor do the parties dispute that the Miranda warnings read to Gogolack at the police station were sufficient, or that Gogolack understood those rights before speaking with Agent Penna and Agent Kammeraad at the DPD. However, Gogolack argues that (1) the FBI directed Lieutenant Wojciechowicz to engage in non-Mirandized questioning of Gogolack on their behalf, and (2) Agent Kammeraad questioned Gogolack at Donna Court, without giving him Miranda warnings, and that these efforts were part of a deliberate two-step strategy used to obtain Gogolak's post-warning statements at the DPD. (*See* Dkt. 886 at 5). Gogolack contends that neither Lieutenant Wojciechowicz nor Agent Kammeraad could recall the specific details of their conversations with Gogolack during the time he was in the back of the police car at Donna Court, and "without this information, the Court cannot make the requisite independent assessment of whether the circumstances indicate an intentional two-step interrogation on the part of either law enforcement agent." (*Id*.).

In response, the government contends that the five-factor test weighs against the conclusion that a deliberate, two-step interrogation occurred, including because the topics covered with Gogolack at Donna Court were limited, there was very little overlapping content between the conversations at Donna Court and the formal interview at the DPD, and because approximately two hours passed between the conversations at Donna Court and the interview at the DPD.  (Dkt. 885 at 25-28).

The Court first turns to Gogolack's interactions with Lieutenant Wojciechowicz, and whether Lieutenant Wojciechowicz, in conjunction with Agent Kammeraad and Agent Penna, engaged an unlawful two-step interrogation when he conversed with Gogolack anytime at Donna Court and/or upon leaving Donna Court.  The Court finds that the government has carried its burden in demonstrating that no two-step interrogation occurred.  Lieutenant Wojciechowicz's testimony established the following: he did not intend to conduct an interview with Gogolack; he did not intend to question Gogolack about any criminal activity; and the FBI did not ask Lieutenant Wojciechowicz to question Gogolack on their behalf.  Both Agent Penna and Agent Kammeraad testified that they did not direct Lieutenant Wojciechowicz to question Gogolack on their behalf.  In other words, the evidence offered by the government on this issue—that the FBI did not direct Lieutenant Wojciechowicz to question Gogolack on their behalf—is credible and consistent.  Lieutenant Wojciechowicz further testified that his knowledge of the FBI's investigation of Gogolack was limited at the time of the traffic stop, and he described his interactions with Gogolack as non-confrontational and respectful.  In short, there is no evidence in the record supporting that the FBI deliberately engaged in a two-step

interrogation technique when it directed Lieutenant Wojciechowicz to stop Gogolack's vehicle on Donna Court.  In response to the proof offered by the government on this subject, Gogolack appears to take the position that FBI, during a meeting and phone calls between the FBI agents prior to and during the time they were at Donna Court, directed Lieutenant Wojciechowicz to interview Gogolack on their behalf, without giving Miranda warnings. But that argument is based on nothing other than Gogolack's unsupported speculation.

The Court turns next to Gogolack's interactions with Agent Kammeraad, and whether Agent Kammeraad engaged an unlawful two-step interrogation when he conversed with Gogolack at Donna Court, and then interviewed Gogolack at the DPD. Both Agent Kammeraad and Agent Penna unequivocally testified that they did not plan or intend to engage in an unlawful two-step interrogation technique.  With respect to the completeness and detail of the statements at Donna Court, Agent Kammeraad testified that the nature of his conversations with Gogolack were not detailed, and Agent Kammeraad described Gogolack's statements as rambling.  The only topics Agent Kammeraad recalled discussing at Donna Court were that Gogolack was aware of who he and Agent Penna were, that Crystal Quinn told Gogolack she was working with the FBI, and generally that Crystal had been with Gogolack in Wellsville.  Agent Kammeraad testified that although he did not remember all the specific details of his conversation with Gogolack at Donna Court, he did not ask Gogolack for any details as to what had occurred in Wellsville.[7]

---

[7]    Agent Kammeraad also submitted an affidavit communicating this same information; specifically, that he did not recall his conversation with Gogolack at Donna Court verbatim, he recalled advising Gogolack that the FBI wanted to find out what happened to Crystal Quinn while she was in Wellsville, that Gogolack gave long, rambling

Gogolack's affirmation submitted in support of his motion to suppress statements does not meaningfully dispute this testimony.

With respect to the overlapping nature of the two statements, Agent Kammeraad testified that the interview at the DPD was much longer and more detailed than his conversation with Gogolack at Donna Court. Specifically, at the DPD, the agents covered the following topics: (1) a specific timeline of what Gogolack and Crystal did while they were in Wellsville; (2) with whom and when Crystal and Gogolack interacted with others; and (3) what substances Crystal took while in Wellsville—all specific topics that Agent Kammeraad testified were not covered on scene at Donna Court. In other words, the second interview covered substantially more subjects than was covered at Donna Court. Again, Gogolack does not dispute this proposition.

With respect to the timing of the two statements, they were separated by approximately two hours and occurred in different settings. While the first statement occurred while Gogolack was in the back of a police car at Donna Court, the second statement occurred after Gogolack had been booked at the DPD. In terms of continuity of police personnel, Gogolack's first statement was given to Agent Kammeraad only, whereas both Agent Kammeraad and Agent Penna were present for the second statement at the DPD. And in fact, Agent Penna testified that he was not even aware that Agent Kammeraad had conversed with Gogolack at Donna Court.

---

answers to any questions, and that he did not give Gogolack any Miranda warning at that time or generate a formal report because nothing substantive was discussed. (Dkt. 767-1).

Defendants cite *United States v. Capers*, 627 F.3d 470 (2d Cir. 2010), for the proposition that the FBI engaged in a two-step interrogation technique.  In *Capers*, postal inspectors conducted a sting operation on the defendant, a postal carrier they suspected was stealing money orders from Express Mail envelopes, by equipping two envelopes with alarm devices.  *Id*. at 472.  Upon the defendant's taking the envelopes, the alarm sounded and the defendant was apprehended.  *Id*.  The postal inspectors handcuffed the defendant and another suspect, and instructed the defendant to follow them into a supervisor's office.  *Id*.  One of the postal inspectors told the defendant that he could talk to him or not, but that he would "do [his] best to make [him] go away," and that he had been watching the defendant and knew "everything [the defendant] did tonight."  *Id*.  The postal inspector then questioned the defendant about the cash that had been planted in the Express Mail envelope, including where it was located, asked for permission to remove the money orders from the defendant's pocket, and asked the defendant if the money orders belonged to him.  *Id*. at 473.  The postal inspector testified that he did not Mirandize the defendant "because he was in a hurry to track down the missing money orders so that they did not get lost in the large mail-sorting facility and because he needed to question Lopez, who was held handcuffed outside the supervisor's office, to determine his level of involvement in the crime."  *Id*.  The defendant was then transferred to another postal service facility, during which time he was in a van for 35 to 40 minutes, and then waited in an interview room for another 30 to 40 minutes.  *Id*.  The same postal inspector who had previously questioned the defendant about the Express Mail envelopes then interviewed the defendant again, making no mention of the prior statements the defendant had made.  *Id*.  The defendant

then signed a waiver of rights form, and the postal inspector questioned the defendant about the events of the evening, specifically asking about what he did with the Express Mail envelopes earlier that night. *Id.* The defendant confessed to taking the money orders. *Id.* The Second Circuit held that although the postal inspector's purpose in delaying giving *Miranda* warnings to the defendant was not to undermine the defendant's Fifth Amendment rights, that reason did not justify delaying a *Miranda* warning, and suppressed the second statement. *See id.* at 480 ("There is no exception to *Miranda* that allows a delay in giving *Miranda* warnings in order to preserve evanescent evidence. Neither is there an exception to *Miranda* that permits delaying the warnings in order to ascertain whether a suspected co-conspirator may be entitled to release.").

The situation presented here is vastly different. The FBI did not observe Gogolack committing a crime at the time they questioned him. Rather, they testified that they did not know precisely what had occurred or the extent of Gogolack's involvement, and they did not intend on asking Gogolack any questions that would have elicited an incriminating response. Further, none of the law enforcement officers who testified confirmed that they specifically elected not to Mirandize Gogolack on scene because they had some other priority—rather, as noted above, they testified that they never intended on asking him any questions by which Gogolack could incriminate himself. To that end, in the Court's view, the lack of a formal report from these interactions underscores that the FBI did not intend to and did not interrogate Gogolack when Agent Kammeraad conversed with him at Donna Court. Accordingly, Gogolack's reliance on the *Capers* decision is misplaced, and the Court does not find it to be analogous to the present situation.

- 23 -

Considering the totality of the circumstances, the government has carried its burden in demonstrating that there was no evidence of intent to engage in a two-step interrogation technique. The credible and consistent evidence from the hearing supports that Agent Penna and Agent Kammeraad intended to interview Gogolack only after he had been formally Mirandized, and they did not plan to interrogate him prior to doing so. (*See* Dkt. 835 at 98-99 (Agent Penna testifying that once he and Agent Kammeraad learned that the DPD could pull over Gogolack and arrest him, they started to formulate a plan to conduct a custodial interrogation of Gogolack, which involved coordinating with DPD about a recorded interview room); Dkt. 844 at 22 (testimony by Agent Kammeraad that when he introduced himself to Gogolack on scene at Donna Court, his intent was to interview Gogolack at a later time)). *See, e.g., United States v. Moore*, 670 F.3d 222, 230 (2d Cir. 2012) (concluding that there was no two-step interrogation technique where there was "no subjective evidence of intent here—no testimony, for example, by any officer of an intent to use a two-step technique, nor any evidence that such intent was reflected in a police report"); *Williams*, 681 F.3d at 41 (finding no intent to engage in two-step interrogation technique, where there was "no subjective evidence that D'Antonio asked Williams about the ownership of the guns, or the location of the missing guns or third gun trafficker, in a way calculated to undermine the *Miranda* warning given later at the station house," explaining that the relevant finding was whether there was "a deliberate strategy of trying to elicit incriminating statements that [D'Antonio] could then use later to cross-examine the defendant after administering *Miranda* warnings," and concluding that the "D'Antonio was simply 'waiting for a more appropriate time' formally to question Williams"). The

- 24 -

fact that Agent Kammeraad could not recall every statement exchanged with Gogolack on scene at Donna Court does not change the analysis. If anything, this demonstrates that the interactions between Agent Kammeraad and Gogolack at Donna Court were insignificant. Accordingly, suppression of Gogolack's statements made after he was Mirandized at the DPD is denied on this basis.

**B.     Gogolack's Statements to Federal Agents Following Alleged Invocation of the Right to Counsel**

**1.  Factual Background**

The Court has reviewed the August 2, 2023 video interview of Gogolack by Agent Penna and Agent Kammeraad at the DPD. The agents read Gogolack his Miranda rights and Gogolack agreed to speak with them. (Exhibit 5 (Gogolack Interview Transcript), pp. 3-4). After speaking with Agent Penna and Agent Kammeraad for several minutes, including detailing how he met up with Crystal Quinn, their plans to go to Wellsville, and what they did after arriving there, Gogolack (SG), Agent Kammeraad (JK), and Agent Penna (AP) had the following exchange (the Court has omitted any abbreviation to "overlapping voices" or "unintelligible"):

> SG: Um, from right, from right here, I'm saying lawyer, but I will answer your questions. Okay? So keep asking, but I'm just saying I'm just making sure. So I just, I'll answer all your shit though, so just keep, you can keep going.
>
> JK: I'm uh, I'm con--I'm confused because this is uh, legal stuff. So--
>
> SG: One of them can do it. I--
>
> JK: I'm, I--

SG: --want to speak to an attorney so I don't incriminate myself. I don't know.

JK: Okay, so you don't want to talk any further, and--

SG: and I really shouldn't t--

JK: I know, but y--

SG: Yeah, okay, yeah. I get--

JK: Simon, you can't, you can't say--

SG: yeah. Yeah.

AP: yeah.

JK: --I want a lawyer, but I'll keep talking to you.

SG: Well yeah, no problem. Yeah, well I have to have--

JK: When you--

SG: -- just like to uh, make sure that I don't incriminate myself in any way, if possible. W-whatever that can--You know, lawyer. That's all I'm saying is lawyer.

JK: Okay, so--

SG: But if I can help you out man . . .

JK: I know that--I-I tell you what . . . if you want to--

SG: See, I'm going to --I know how you f--motherfuckers, you're going to pull the old flim-flam. Next thing you know, I'm--

JK: It's--

SG: --going to be fucking--

AP: We're not trying to everybody out. We just want to find out.

SG: Well then, lawyer.

- 26 -

AP: Who, who--

SG: I mean, let's just keep asking to help your case, and I'll try to answer you.

(*Id*. at 23-24).

Gogolack then briefly continued answering Agent Kammeraad's questions. Agent Penna then said, "let's step out," at which time Gogolack continued talking. (*Id*. at 24). Agent Kammeraad told Gogolack that what he had provided so far had been helpful. (*Id*. at 25). The following exchange then took place:

SG: Basic, certain things I could help you on.

AP: It seems like--

SG: No problem.

AP: --it seems like you're kind of like on the fence, so we don't want to spook lawyers, like—

SG: Uh, yeah I know--

AP: --we got to talk--

SG: I'm not, I'm not on the fence. I, I don't want to--You know.

AP: --to talk and we don't want to, we don't want it to even look like we're trying to push you or anything like—cause--

JK: Yeah.

AP: --we're not.

JK: You've s--You said--

AP: Again--

JK: --you want a lawyer, but you--

SG: Well.

JK: --also said you want to continue to help out in any way.

SG: So then, I just—

JK:  I--

SG: --good for the record, but it, maybe if it helps in your investigation, cool.

JK: I-if you want to keep talking to us and help us out, I'll be more than w-willing to--
. . .

JK: --to have you--yeah.

SG: I mean we had the fucking schedule thing last time.  Knock yourself out.

AP: And yeah--

. . .

AP: --if there's a question you don't want to answer or something, like you don't got to answer.

SG: I just don't want you guys to trap me up for s--Who the fuck knows?  Next thing you know you're going to have me saying I'm--

AP: No, it's not--

SG: --doing who knows what.  But the old loop de loop and--

(*Id*. at 26-27).

Agent Penna and Agent Kammeraad then left the room, returning after an over 30-minute absence, at which point Agent Penna told Gogolack that although he had been helpful, Gogolack was "mixing words," and asked him if he had a lawyer he wanted them to call.  (*Id*. at 32-33).  The agents told Gogolack that they had a warrant for his phone but that he was free to leave.  (*Id*. at 33).  Gogolack again engaged with the agents, saying

"[y]eah, that's no problem.  And if there's anything I can seriously still help you, that's cool." (*Id.*).  After Agent Penna said to Gogolack, "Okay.  So y-you don't, you don't need a lawyer?  Can, can we keep talking about this? Or--," Gogolack responded, "That's fine with me." (*Id.*).  Agent Kammeraad again asked Gogolack, "So you don't have anybody you want us to call right now?" to which Gogolack responded, "No, no." (*Id.* at 34).  Agent Kammeraad then asked, "Okay.  Do you want us to find a lawyer for you right now, before we finish up," and Gogolack again responded, "No, I just it's," and Agent Kammeraad told Gogolack, "if that changes . . . just tell us." (*Id.* at 34-35).  The interview continued and Gogolack did not express any desire for an attorney or to stop the interview, until Agent Kammeraad expressed that he felt Gogolack was holding back some information, because "people don't die over Xanax," and that they "didn't think" Gogolack was "helping out." (*Id.* at 61-63).  At that point, Gogolack said, "Fuck you. Lawyer," and Agent Kammeraad said "you can say lawyer.  You're free to leave." (*Id.* at 63).  The interview terminated at that time and the three men exited the room.

### 2.  Gogolack did not Clearly Invoke his Right to Counsel

"[A] proper invocation of the right to have an attorney present at questioning 'requir[es] a *clear* assertion of the right to counsel.'" *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (second alteration in original).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. . . .  Rather, the suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459

(1994); *see also Medunjanin*, 752 F.3d at 586-57 ("The *Edwards* rule—[that] questioning must cease if the suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." 'Maybe I should talk to a lawyer' . . . [i]s not a request for counsel. Where the suspect makes 'an ambiguous or equivocal reference to an attorney' and his statement 'fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect,' or ask for clarification." (internal citations omitted)).

Having reviewed the entirety of Gogolack's interview with Agent Penna and Agent Kammeraad at the DPD, the Court concludes that Gogolack did not unambiguously or unequivocally invoke his right to counsel. Gogolack never unequivocally stated that he wanted a lawyer. Rather, he blurted out the word "lawyer" on several occasions without any additional context, and then conversely stated that he wanted to continue talking to Agent Kammeraad and Agent Penna. The closest Gogolack ever came to requesting an attorney was when he stated, "I . . . want to speak to an attorney so I don't incriminate myself." (*Id*. at 23). But then before either Agent Penna or Agent Kammeraad could even respond, Gogolack immediately followed up that statement with "I don't know." (*Id*.). Shortly thereafter, Gogolack stated "I want a lawyer, but I'll keep talking to you." (*Id*.). Agent Kammeraad and Agent Penna explained to Gogolack that he was "mixing words" in terms of whether he wanted to continue talking to them, and that he could not simultaneously say "lawyer," but then also express a desire to keep talking to them. The

agents also offered to call a lawyer for Gogolack, but Gogolack declined stating that he wanted to continue talking.

Based on the record before the Court, no reasonable officer would have understood Gogolack's statements to constitute an unequivocal request for counsel. *See United States v. Morris*, No. 24-CR-358 (JMF), 2024 WL 4699712, at *1-2 (S.D.N.Y. Nov. 6, 2024) (explaining that "[c]learly asserting the right requires speaking clearly enough that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," and concluding that the defendant's "initial reference to 'a lawyer' did not constitute a clear enough assertion of his constitutional right to counsel to mandate a halt to the interview," and further finding that even after the defendant said "then get me a lawyer," he continued speaking and continued being cooperative, and concluding that his "subsequent words, actions, or demeanor did not indicate that he had a desire to deal with the police only through counsel" (citations, quotations, and alteration omitted)).  Gogolack vacillated several times between saying "lawyer," and expressing his desire to continue speaking with Agent Penna and Agent Kammeraad.  Whenever he purported to make a request to speak to an attorney, he immediately backtracked from the request and contradicted the assertion.  Gogolack also declined the agents' offer for an attorney, saying that it was "fine" to continue the interview.  Under the circumstances, Gogolack's motion to suppress on the basis that he invoked his right to counsel during his interview at the DPD is denied because Gogolack never made a clear assertion of a request for counsel.  At best, his requests were ambiguous and equivocal.

### C.     Gogolack's Statements to Officer Wojciechowicz

Gogolack also moves to suppress statements he made to Officer Wojciechowicz while riding in the police vehicle from Donna Court to the DPD.  Gogolack contends that an interrogation occurred because Officer Wojciechowicz: (1) mentioned Crystal Quinn's mother; (2) asked "who was dusted off," in reference to Crystal; (3) asked if Gogolack was talking about Sharon Quinn; (4) asked Crystal's age; (5) asked Gogolack how he ran into Crystal; (5) asked how long Gogolack had known Crystal; and (6) asked Gogolack about living in Wellsville.  (Dkt. 755 at 2-3).

### 1.  Factual Background

The Court has reviewed the August 2, 2023 body camera footage from Lieutenant Wojciechowicz during his transport of Gogolack from Donna Court to the Depew Police Department.  The video is approximately eight minutes in length.  It is clear from the video footage that Gogolack initiated conversation with Lieutenant Wojciechowicz, saying, "wanna know what's really shitty?" after which Lieutenant Wojciechowicz responded, "what's up," to which Mr. Gogolack responded, "looking back, it seems like she just had her mind made up to do that."  Gogolack continued to make unsolicited statements about Crystal Quinn and her desire to commit suicide, including that her mother said that Crystal had tried to kill herself with pills a couple of weeks ago.[8]  After over three minutes passed,

---

[8]     At one point during this first portion of the conversation, Lieutenant Wojciechowicz appeared to be confused about who Gogolack was talking about.  Gogolack volunteered that even though Crystal was previously suicidal, they "found her and dusted her off I guess," and Officer Wojciechowicz asked, "they dusted who off," and Gogolack said "they acted like nothing happened," and then Officer Wojciechowicz clarified, "but you're

during which time Lieutenant Wojciechowicz largely listened to Gogolack talk and appeared to attempt to re-direct the conversation, such as by asking if Gogolack could feel the air conditioning in the vehicle, Lieutenant Wojciechowicz asked Gogolack the following questions, summarized below in sum and substance:

(1) Lieutenant Wojciechowicz asked Gogolack Crysal Quinn's age, to which Gogolack responded that she was born in 1986 or 1987, and then Gogolack continued that she was "wrapped up in that Peter Gerace case" and that Gogolack "ran into her randomly," and "had no idea about [what] . . . was going on," and Gogolack also made statements about "the feds" putting Crystal in bad situations, and that Crystal was a "stripper with a habit" ("item 1");

(2) Lieutenant Wojciechowicz asked, as a follow up question, "are you talking about Crystal, like you ran into her randomly," after which Gogolack stated that he ran into Crystal at Hoak's restaurant, which he was visiting with his friend's grandfather ("item 2");

(3) Lieutenant Wojciechowicz asked Gogolack, "So how back do you, how far back do you and Crystal go," and Gogolack responded that he knew her since elementary school ("item 3");

(4) Lieutenant Wojciechowicz asked Gogolack if he was "originally from around here," to which Gogolack responded that he grew up in Depew ("item 4"); and

(5) Lieutenant Wojciechowicz asked Gogolack, "and now you live in where, Wellsville," to which Gogolack responded, "yeah, I bought a house and got out of the damn city" ("item 5").

Gogolack then continued talking about Crystal Quinn, including that she was three years behind him in school, that she used to hang out with some of his friends, and that although

---

talking about Sharon," to which Gogolack responded, "not Sharon herself, they're talking about Crystal, Sharon was aware that Crystal tried to kill herself."

he went out to the country, "there's a bunch of weirdos out there too." The recording ends when Lieutenant Wojciechowicz reaches the DPD.

### 2. Some of Gogolack's Statements to Officer Wojciechowicz are Suppressed

The Court concludes some of Gogolack's statements to Officer Wojciechowicz made in the police vehicle on the way to the DPD should be suppressed. Specifically, for the reasons explained below, the statements Gogolack made in response to Lieutenant Wojciechowicz's questions about Crystal Quinn as outlined above at items 1 through 3, are suppressed, for the reasons explained below.

"Interrogation requires express questioning or its functional equivalent." *United States v. Miller*, 382 F. Supp. 2d 350, 370 (N.D.N.Y. 2005). As explained by the Supreme Court in *Rhode Island v. Innis*:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

446 U.S. 291, 301 (1980). To that end, questions that a reasonable officer could not have known would illicit an incriminating response do not amount to interrogation. *See, e.g.,*

- 34 -

*United States v. Casiano*, 862 F. Supp. 52, 54-55 (2d Cir. 1994) (denying motion to suppress statement where the agent's question was routine in nature, and he "could not reasonably be expected to have known that his question was reasonably likely to elicit an incriminating response"); *United States v. Balkum*, No. 22-CR-06188-FPG-MJP-2, 2024 WL 575330, at *5-6 (W.D.N.Y. Feb. 13, 2024) (explaining that "the mere fact that a defendant's statement ultimately provides incriminating information does not in itself render the question interrogative," and concluding that the officers' questions to the defendant about clothes she could wear during transport was not reasonably likely to elicit an incriminating response, including that the officers were not involved in the search of the premises, and "the relationship of the questions about Defendant's clothing to the crimes suspected is too attenuated to render the questions interrogative" (citations and quotations omitted)); *United States v. Widner*, No. 090-CR-6225L, 2010 WL 4861508, at *3 (W.D.N.Y. Nov. 30, 2010) (considering the officer's statement, "do you have any questions," and concluding that there was no interrogation where the officer could not have reasonably foreseen that the defendant would respond to her "facially innocuous" question in an incriminating manner).

Further, it is well-settled that "[n]othing in the Fifth Amendment prohibits the police from merely listening to volunteered statements, and then using those statements at trial." *Miller*, 382 F. Supp. 2d at 370 (citing *Edwards v. Arizona,* 451 U.S. 477, 485-86 (1981)); *see also United States v. Familetti*, 878 F.3d 53, 58 (2d Cir. 2017) (volunteered statements are not barred by the Fifth Amendment). Likewise, "[r]outine questions, innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check." *United*

*States v. Thomas*, 961 F. Supp. 43, 45 (W.D.N.Y. 1997) (citing *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989)).   In addition, the Second Circuit has recognized the general principle that "where a person in custody volunteers incriminating information to the police, simple clarifying questions do not necessarily constitute interrogation." *United States v. Rommy*, 506 F.3d 108, 133 (2d Cir. 2007) (quotation and citation omitted). However, as the Second Circuit has cautioned:

> In so holding, we recognize that follow-up questions can take a variety of forms.  Careful inquiry into the underlying facts and circumstances may thus be necessary to determine whether a suspect in a particular case would have reasonably understood that the follow-up questions were seeking only to clarify information already volunteered rather than to compel further incriminatory disclosures.   In this respect, absent extraordinary circumstances, a court may generally conclude that follow-up questions asking only for volunteered information to be repeated or spelled do not constitute interrogation.  The same conclusion might also easily apply to discrete questions seeking confirmation of what appears implicit in the volunteered disclosure.  But where questions seek to "expand the scope" of volunteered statements, a more searching inquiry may be necessary to determine whether they have moved beyond neutral clarification to interrogation.

*Id*.  Finally, "[b]ecause the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id*. at 132 (quotation and citation omitted).

The Court finds that Gogolack's responses to Lieutenant Wojciechowicz's questions about Crystal Quinn specifically—in other words, the questions outlined above at items 1 through 3—in which Lieutenant Wojciechowicz asked Gogolack about Crystal Quinn's age, about Gogolack running into her randomly, and his question about how long

Gogolack had known Crystal Quinn, should be suppressed.[9]  To be clear, this resolution is in part a very close call.  But in the Court's view, Lieutenant Wojciechowicz's first question about Crystal's age expanded the scope of Gogolack's volunteered statements about Crystal being suicidal, and similarly Lieutenant Wojciechowicz's question in item 3 asking Gogolack how long he had known Crystal expanded the scope of the conversation.  That said, in the response reflected in item 1, Gogolack arguably volunteered further information about Crystal's involvement in the Gerace case and running into her "randomly," and then Lieutenant Wojciechowicz's question in item 2 could be construed as a permissible follow-up question to information Gogolack volunteered.  On the other hand, by asking the question about Crystal Quinn's age, Lieutenant Wojciechowicz expanded the scope of Gogolack's volunteered disclosures and the additional information set forth in item 1 and item 2 flowed from that expanded scope.  Again, it is a very close call with respect to item 1 (latter part) and item 2, but on the whole, the Court concludes that the better approach is to suppress the entirety of the discussion in items 1 through 3.

In reaching this conclusion, the Court recognizes that many of Gogolack's statements to Lieutenant Wojciechowicz were made voluntarily, and many of his responses were rambling.  The Court does not believe that Lieutenant Wojciechowicz acted with any nefarious purpose when asking Gogolack these questions, and his testimony at the suppression hearing that he was trying to keep things cordial during transport to the DPD

---

[9]    The Court is <u>not</u> suppressing the statements made in response to Officer Wojciechowicz's questions referenced in footnote 8, *supra*, because it is apparent that these were simply clarifying questions based on Officer Wojciechowicz's confusion over Gogolack's volunteered information, as opposed to interrogation.

is credible.  Gogolack's statements can largely be described as rambling, with Lieutenant Wojciechowicz mostly simply acknowledging them.  That said, when viewed carefully and in the context of the ongoing conversation, the questions referenced above at items 1 through 3, appear to have "expanded the scope" of information Gogolack had previously volunteered, which were his volunteered and unsolicited comments that Crystal Quinn was previously suicidal.  In other words, Lieutenant Wojciechowicz's questions posed to Gogolack about Crystal Quinn did not relate to her alleged history of suicide attempts, and rather probed the extent of Gogolack's relationship with her.

On the other hand, the remainder of Lieutenant Wojciechowicz's questions about Gogolack originally being "from around here," and now living in Wellsville, were innocuous, and a reasonable officer could not have known they would illicit an incriminating response, including because at the time Lieutenant Wojciechowicz asked them, there is no indication that he knew Gogolack was allegedly maintaining his residence as a drug-involved premises.

Accordingly, the questions Lieutenant Wojciechowicz asked Gogolack about Crystal Quinn, and Gogolack's responses thereto, as referenced at items 1 through 3 above, are hereby suppressed, and the government may not offer this evidence at trial.  Gogolack's motion to suppress the remaining portions of the discussion with Lieutenant Wojciechowicz as reflected on the body-worn video is denied.

### III.   Motion to Dismiss on Constitutional Speedy Trial Grounds

Gogolack next contends that the almost three-year delay between the time he was indicted in August 2023, and his scheduled trial date of on or about June 8, 2026, is presumptively prejudicial and was caused by the government, and therefore the charges against him should be dismissed.[10]  (Dkt. 690 at 4-11).  Gogolack identifies three actions taken by the government that allegedly delayed the trial in his case: (1) the government's failure to timely provide discovery; (2) the government's alleged failure to timely provide *Brady* material; and (3) delay related to the government's death penalty determination.  (*Id*. at 8-11).

In response, the government argues that Gogolack's motion is premised on an inaccurate assessment of the facts, which "inflates the government's contribution to his trial delays while minimizing delays invited by the defendants."  (Dkt. 724 at 4).  Further, the government argues that the law in the Second Circuit establishes that the delay about which Gogolack complains does not rise to the level of a constitutional speedy trial violation, including because Gogolack has failed to demonstrate prejudice.  (*Id*. at 4).

"The Sixth Amendment guarantees that, in all criminal prosecutions, the accused shall enjoy the right to a speedy trial."  *Doggett v. United States*, 505 U.S. 647, 651 (1992) (internal quotation and alterations omitted).  The Supreme Court has set forth four factors for consideration in deciding whether the Sixth Amendment has been violated by a pre-

---

[10]   Gogolack's speedy trial argument is based on an alleged constitutional violation, not a violation of the Speedy Trial Act.  Indeed, the Court's understanding is that no time has elapsed from the speedy trial clock.

trial delay: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "These factors 'must be considered together with any other circumstances as may be relevant' and 'have no talismanic qualities.'" *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012) (quoting *Barker*, 407 U.S. at 533). In comparison to a statutory speedy trial violation, if a constitutional violation is established, dismissal of the charge with prejudice is the mandatory remedy. *See Strunk v. United States*, 412 U.S. 434, 439-40 (1973); *United States v. Pennick*, 713 F. App'x 33, 35 (2d Cir. 2017) ("When the [constitutional speedy trial] right is violated, the only remedy is dismissal of the charges with prejudice."). The Court examines each of the factors in turn.

**A. Length of Delay**

It is undisputed that Gogolack has been incarcerated and awaiting trial for a period of almost three years. "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 651-52 (internal citation omitted); *see also United States v. Tigano*, 880 F.3d 602, 612 (2d Cir. 2018) ("The length of the delay is to some extent a triggering mechanism, because until there exists some delay which is

presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (citation omitted)).

The Court notes that "lower courts have generally found post accusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett*, 505 U.S. at 652 n.1; *see also United States v. Tucker*, No. 1:18-cr-178, 2020 WL 1853488, at *7 (W.D.N.Y. Apr. 13, 2020) ("The *Doggett* opinion identified one year as a rough measure of excessive delay."). Accordingly, the almost three years during which Gogolack has been incarcerated and awaiting trial is presumptively prejudicial, sufficient to trigger further examination under the remaining *Barker* factors.

### B. Reason for Delay

#### 1. Delay in Providing Discovery

Gogolack argues that due to the government's delay in providing discovery, nine months and three weeks should be charged to the government for purposes of the speedy trial analysis. (Dkt. 690 at 6). Specifically, Gogolack notes that the government was previously sanctioned with five months of speedy trial time (accounting for the time from June 21, 2024, through November 21, 2024), and also that delays prior to June 21, 2024, should also be charged to the government, including (1) from October 16, 2023, which was the initial discovery deadline that the government failed to meet, through February 23, 2024, when the court granted the government's request for a 90-day extension, but ordered rolling discovery to the extent possible, which resulted in a delay of four months and one week, and (2) from May 23, 2024, the discovery deadline the government failed to meet,

through June 5, 2024, the date on which the government provided discovery to the defense. (*Id.*).[11]

In response, the government acknowledges the five-month delay charged against it as a sanction, but argues that it did not fail to provide discovery between October 16, 2023, and February 23, 2024.  The government argues that, contrary to Gogolack's assertion, it provided Gogolack with substantial discovery on August 30, 2023 (after he was charged by criminal complaint, but before he was indicted), which related to both charged and uncharged conduct, and it provided further early discovery on September 8, 2023, and then in a bates-stamped format on October 19, 2023.  (*See* Dkt. 724 at 19).

As evinced by the supplemental filings the Court received on this issue, the core of Gogolack's argument hinges on what discovery was provided by the government prior to the October 16, 2023 discovery deadline.  Following oral argument on this issue, the Court directed the parties to submit additional briefing, identifying when the government provided certain materials to Gogolack.  (*See* Dkt. 744).  In its supplemental briefing, the government confirmed that it produced discovery relating to the superseding indictment

---

[11]    The government argues that this second time period from May 23, 2024, through June 5, 2024—13 days total—should not be charged against it for purposes of the Court's speedy trial analysis.  The government points to the November 21, 2024 decision issued by the Hon. Lawrence J. Vilardo, the prior district judge assigned to the case, charging the government with five months' speedy trial time, which the government argues already accounts for discovery delays in the case.  (Dkt. 724 at 19-20).  Gogolack disagrees.  The Court has reviewed Judge Vilardo's decision imposing the five-month sanction, which plainly accounts for the delay caused by the government's failure to comply with a discovery deadline, but the decision is not clear as to whether it specifically accounts for the period between May 23 and June 5, 2024.  But even if it did not, this additional 13-day period of delay is insignificant and would not impact the constitutional speedy trial analysis.

against Gogolack in August, October, and December 2023. (Dkt. 737 at 1). Specifically, on August 30, 2023, the government produced material relevant to the superseding indictment's new kidnapping and witness tampering charges, and these documents were subsequently reproduced in a based-stamped format on October 19, 2023. (*Id.* at 2; *see also* Dkt. 748 (government's sealed Exhibit A)). Gogolack's position is that while the government "may well have provided some discovery on October 19, 2023 and December 26, 2023 . . . they did not provide **all** voluntary discovery by October 16, 2023 as ordered by the Court," and that "[i]n fact, there were thousands of pages of discovery relative to both the September 13, 2023 Indictment and the September 20, 2023 Superseding Indictment that were not provided until June 5, 2024." (Dkt. 755 at 7). As discussed below, after extensive briefing and discussion of the issue, the Court finds that Gogolack's statements in this regard are factually inaccurate.

Both the government and Gogolack have produced a discovery dispute workbook, in an effort to address Gogolack's argument that thousands of pages of discovery were not provided by the October 2023 deadline. (Dkt. 812-1 (government's discovery workbook); Dkt. 825-1 (Gogolack's discovery workbook)). The discovery workbooks make plain that the government did <u>not</u> neglect to produce thousands of pages of documents—rather, there are select documents about which the government and Gogolack disagree as to what should have been produced. According to the government, the only documents that should have been produced but were inadvertently excluded from the October 2023 production were 23 photographs of blankets and marijuana at an FBI facility (GOV-00012368-12391). (*See* Dkt. 812-1). According to the government, the items depicted in these photographs were

- 43 -

also depicted in photographs taken at Gogolack's residence, which were produced to the defense. And the discovery workbooks also establish that many of the documents Gogolack identified as documents that should have been produced as a "chain of custody document" are, in fact, not chain of custody documents. In other words, at best, there were 23 photographs of blankets and marijuana at an FBI facility that were inadvertently not timely produced, but in fact photographs reflecting these items at Gogolack's residence were timely produced.

"Government failure to comply with discovery rules can prevent exclusion of time from speedy trial calculations if that failure is chronic or in bad faith." *United States v. Esquilin*, 205 F.3d 1325, 2000 WL 232162, at *2 (2d Cir. 2000). The situation here does not come close to meeting that standard. Indeed, even Judge Vilardo concluded that the government's failure to provide discovery in a timely manner with respect to the five months that was previously charged against it, was not taken in bad faith. *See United States v. Gogolack*, No. 23-CR-LJV-JJM, 2024 WL 4851002, at *6 (W.D.N.Y. Nov. 21, 2024) (vacating magistrate judge's finding of bad faith). In addition, Gogolack has failed to articulate a connection between the production of these photographs and any delay in his ability to file motions. Accordingly, the Court concludes that the government's failure to produce them by the October 16, 2023 discovery deadline, does not amount to delay caused by the government that should be charged against it.

### 2. Alleged Failure to Provide *Brady* Information in a Timely Manner

Gogolack next argues that the government waited until June 13, 2025, almost two years after the magistrate judge issued a Rule 5F *Brady* disclosure order on August 23,

2023, to disclose exculpatory information.  (Dkt. 690 at 6-7).  As a result, the Federal Public Defender's Office ("FPD Office") was forced to withdraw as counsel after Gogolack had been incarcerated for two years, because they had a conflict arise as a result of the late disclosure of the *Brady* material.  Gogolack argues that the FPD Office's withdrawal caused a delay in the scheduling orders and briefing until December 1, 2025, to allow new counsel to come up to speed.  (*Id*. at 8).  In response, the government contends that although its early disclosure of 3500 material prompted Gogolack's former counsel to depart the case, an adjournment of a motions deadline does not, in itself, amount to an adjournment of the case.  (Dkt. 724 at 21).

The government's alleged *Brady* disclosure was addressed at a January 7, 2026 status conference, at which time it was discussed that the material at issue was not *Brady* material tending to exculpate Gogolack.  Rather, the material produced by the government amounted to early disclosure of 3500/Jencks Act material for witnesses.  Although the government's production of this material led Gogolack's prior attorneys to withdraw from the case, and therefore new counsel was granted an extension of time to file pretrial motions, the Court does not find that this extension delayed the trial.  Gogolack filed his pretrial motions on December 1, 2025, not long after his co-defendants made their initial motion filings in August and October 2025.  Soon after the filing of dispositive motions by most of the defendants, the Court set a trial date that was amenable to all counsel, and at the earliest date they could accommodate.[12]  (*See* Dkt. 567 (setting June 8, 2026 trial date

---

[12]    Indeed, the Court took steps to expedite the filing and resolution of pre-trial motions in this case so that Defendants could achieve a speedy trial.  For example, in October 2025,

at the August 20, 2025 status conference)).  Given the pretrial filings made by all the

defendants and the government even up until only days prior jury selection, the record here

does not support a conclusion that any defendant would have been prepared to proceed to

trial any earlier than June 8, 2026.  In fact, many defendants were seeking an adjournment

of that trial date because of the need to conduct further preparation (which the Court

ultimately denied). (*See* Dkt. 911).  In other words, no reasonable view of the facts supports

the conclusion that the trial was delayed by virtue of the withdrawal of Gogolack's original

counsel.

### 3.  Delay Resulting from the Death Penalty Decision

Gogolack also argues that the there were delays caused by the government

deliberating over whether to pursue the death penalty in the case, including that the

government's February 5, 2025 memorandum indicating that the government may pursue

the death penalty caused the court to adjourn the motions deadline from February 21, 2025,

through April 16, 2025, resulting in a two-month delay attributable to the government.  (*Id*.

at 9).  In response, the government argues that Gogolack sought an extension of the motions

deadline to bifurcate dispositive and non-dispositive issues due to the death penalty

decision.  (*Id*. at 12-13, 21).

---

the Court reversed the magistrate judge referral order and addressed the pretrial motions in
the first instance, without the filing of reports and recommendations, in an effort to
expeditiously move the case towards trial.  (*See* Dkt. 648).  In the interim, between
November 2025 and March 2026, the Court issued several decisions addressing dispositive
motions filed by all defendants—again, to expeditiously move the case towards trial.  (*See,
e.g.*, Dkt. 660; Dkt. 735; Dkt. 756; Dkt. 757; Dkt. 765; Dkt. 805).  And even then, this
decision is being issued on the date previously scheduled for jury selection.

The Court does not find any delay resulting from the government's consideration of whether to pursue the death penalty results in any time charged against the government. The Second Circuit has recognized that the decision to seek the death penalty is a serious one, and there is a public interest in a careful review of that decision that justifies a delay in the trial. *See United States v. Aquart*, 92 F.4th 77, 97 (2d Cir. 2024) ("As for the further eighteen-month interval between the Second Superseding Indictment and the prosecution's filing of formal death penalty notices, this court has recognized that the decision to seek the death penalty is necessarily a complex and appropriately deliberative process. There is an obvious public interest in such careful review that justifies a reasonable delay in trial." (quotations and citation omitted)). Gogolack offers no reason as to why the two-month delay due to the death penalty review is unreasonable.

Finally, to the extent Gogolack argues that the delay caused by the government's revisiting of the death penalty decision should be charged to the government, that argument is somewhat in contravention to his position at the February 10, 2025 status conference before the magistrate judge, wherein the government advocated against appointing additional learned counsel for the death penalty case at that juncture, given that the motions deadline was in 11 days and, should the court appoint new counsel, it would likely cause a delay. (Dkt. 357 at 10-11). Gogolack's counsel advocated for the appointment of learned counsel at that time, explaining "we're trying to avoid . . . a situation where six months from now, this does become a death penalty case," and that "resources need to be dedicated to it, such that it is." (*Id*. at 22). The magistrate judge held the February 21, 2025 motions deadline in abeyance pending a status conference on March 5, 2025 (*id*. at 35), and

Gogolack did not object to the government's motion to exclude speedy trial time until March 5, 2025, so that the defense could obtain learned counsel (*id*. at 47-48).  At a status conference on March 5, 2025, Defendants advocated for a briefing schedule bifurcating dispositive and non-dispositive motions, which the magistrate judge set over the government's objection. (Dkt. 371 at 30-32).  At the end of the proceeding, the government moved to exclude the time from March 5, 2025, through May 21, 2025, to enable Defendants to prepare non-dispositive pre-trial motions, and no defendant objected to the exclusion.  (*Id*. at 36).  Even if the Court concluded that the government's revisiting the death penalty determination should be charged to the government, as further explained below, Gogolack ultimately received the same trial date as his co-defendants, and he cannot demonstrate prejudice from any delay.

### C.  Gogolack's Assertion of his Right to a Speedy Trial

Gogolack argues that the defendants "regularly asserted" their rights to a speedy trial.  (Dkt. 690 at 9).  In support of this contention, Gogolack cites to eight docket entries purportedly demonstrating that he regularly asserted his right to a speedy trial.  (*Id*. at 9-10).  However, a review of these docket entries reveals that there was only one occasion on which Gogolack filed an affirmation in opposition to the government's request for exclusion of speedy trial time.  (*See* Dkt. 121 (affirmation by Gogolack's defense attorney, dated June 3, 2024, objecting to exclusion of time under the Speedy Trial Act); Dkt. 130 (affirmation by Gogolack's attorney in further opposition to the government's motion to exclude time)).  The remainder of the docket entries cited by Gogolack are motions filed by his co-defendants, or are motions filed by the government for exclusion of speedy trial

time.  Further, on June 9, 2025, in response to a motion by the government seeking to rescind the referral order and to set a trial date, Gogolack specifically opposed that relief. (*See* Dkt. 472 at 21, 23-24 (Gogolack's counsel stating that, in terms of setting a trial date, there would be issues with respect to severance motions and potentially multiple trials, that "all the moving parts" weighed in favor of putting the trial off, and that he did not want to "make this decision today" about when to set a trial)).  In response, Judge Vilardo explained that "[t]he defendants have asked me not to set a trial date.  I'm not going to do that.  But this certainly should not be – I'm saying this on the record right now -- *this certainly should not be to the disadvantage of the government, because the government is doing everything that it can and then some to get me to set a trial date today*.  (*Id*. at 25 (emphasis added)).  In other words, the record does not support Gogolack's contention that he was regularly asserting his right to a speedy trial—indeed, the opposite conclusion is supported.

### D.  Prejudice

Gogolack argues that the delay in the trial is prejudicial to his defense.  (Dkt. 690 at 10).  Specifically, Gogolack argues that he has been incarcerated for over two years, he remained incarcerated in a facility in Ohio at the time he filed his motion (he has since been moved to a facility in this District), which does not permit regular telephone communication with attorneys, and he has been "particularly impaired" by the government's suppression of *Brady* information.  (*Id*. at 10-11).

The prejudice factor should be analyzed "in the light of the interests of defendants which the speedy trial right was designed to protect," including: (1) "to prevent oppressive pretrial incarceration"; (2) "to minimize anxiety and concern of the accused"; and (3) "to

limit the possibility that the defense will be impaired," with the last consideration being "the most serious." *United States v. Swinton*, 797 F. App'x 589, 595 (2d Cir. 2019) (citations omitted). Other than the length of his pretrial incarceration, Gogolack does not identify any specific prejudice his case has suffered due to delay. For example, Gogolack does not cite the deterioration of any evidence he intended on offering in his defense, such as the fading of witness memories. Nor does Gogolack articulate how his defense has been impaired. As noted above, Gogolack proceeded to trial on the same timetable as planned for his co-defendants. Finally, Gogolack's contention that he has been housed at a facility in Ohio is of his own making, as a result of numerous behavioral issues at local facilities in and around the Western New York area. A defendant does not have the right to be housed in any particular facility, and Gogolack may not now use these behavioral shortcomings to his benefit. Accordingly, with the exception of the length of his incarceration (which is not unusual for a trial involving six defendants), Gogolack has failed to articulate any prejudice as a result of any pre-trial delay. And importantly, he has not provided any "evidence that the delay meaningfully impaired his defense." *Id*. at 596.

### E. Balancing of the *Barker* factors

Having considered each of the factors in the constitutional speedy trial analysis, the Court finds that Gogolack has failed to demonstrate that his constitutional speedy trial rights have been violated. The only factor that definitively weighs in favor of Gogolack is the length of the delay—although the Court notes that the Second Circuit has declined to find a speedy trial violation where the defendant has been incarcerated and awaiting trial for a longer period of time. *See, e.g., United States v. Ghailani*, 733 F.3d 29, 51-52 (2d

- 50 -

Cir. 2013) (delay of five years before trial did not violate constitutional speedy trial rights); *see also Swinton*, 797 F. App'x at 596 (57-month delay between the defendant's arrest and trial did not violate the Speedy Trial rights).

The reason for the delay is neutral—that is, while plainly the government is responsible for the five-month delay charged against it from June 21, 2024, through November 21, 2024, Gogolack has failed to demonstrate that the government caused any further meaningful delay that should be charged against it. And finally, as explained above, Gogolack has failed to demonstrate that he regularly asserted his right to a speedy trial or any trial prejudice. Accordingly, "[c]onsidering all of the circumstances, particularly the lack of significant prejudice of the sort that the Speedy Trial Clause was intended to prevent, the delay in this case did not materially infringe upon any interest protected by the right to a speedy trial," *Ghailani*, 733 F.3d at 51-52, and thus Gogolack's motion to dismiss for a constitutional speedy trial violation is denied.

## IV.    Disclosure of *Brady* Information

Gogolack further argues that the government is obligated to disclose all exculpatory and/or impeachment material in the government's possession, custody, or control. (Dkt. 690 at 11). Gogolack specifically identifies information relative to two cooperating witnesses, including a complete unredacted copy of any grand jury testimony related to either individual as it pertains to this case; any and all investigative files regarding the witnesses; DA files pertaining to the witnesses; U.S. Attorney's Office files regarding these individuals; and any and all material, including internal files relating to *Brady* material. (*Id*.). In response, the government states that it is "aware of its *Brady* obligations" and "has

liberally disclosed early 3500 material to the defendants."    (Dkt. 724 at 23-24).   The government further argues that, with respect to Gogolack's request for "all" the investigative files regarding the two witnesses reaches far past the confines of *Brady*, which compels production of only those files containing evidence favorable to the accused.  (*Id.* at 24).

"Because *Brady* and its progeny are grounded in the Due Process Clauses of the Constitution, the essential purpose of the rules enunciated in these cases is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him."  *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).   Indeed, "evidence is material in the *Brady* context only if 'its suppression undermines confidence in the outcome of the trial.'"  *Id.* at 141 (citation omitted).  As a result, the Second Circuit has "never interpreted due process of law as requiring more than that *Brady* material must be disclosed in time for its effective use at trial."  *Id.* at 142; *see United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("*Brady* information must be disclosed . . . in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial.").

The government has represented that it is aware of its *Brady* obligations, and that exculpatory information has been produced.  Gogolack points to no specific exculpatory information or materials he is missing with respect to these witnesses, nor does he explain

why is believes he is missing such materials as to these witnesses.    Accordingly, Gogolack's motion for production of *Brady* materials is denied.[13]

## V.    Disclosure of Grand Jury Minutes

Gogolack next argues that he is entitled to review of the grand jury minutes because the SSI, at paragraph 54, "falsely states 'on or about August 1, 2023, after members of the Wellsville Police Department and Allegany County Coroner left Gogolak's residence, **Gogolack faked his own overdose and went to a local hospital**.'"  (Dkt. 690 at 12). Gogolack points to evidence supporting that he actually suffered from an overdose, and that it is "unclear how the grand jury would have made this determination unless they were misled by the government, all of which is sufficient to justify disclosure of grand jury minutes as it may form a basis to dismiss the Indictment for prosecutorial misconduct before the grand jury." (*Id.*).

In response, the government argues that Gogolack has failed to meet the particularized need standard required for the production of grand jury minutes, and his argument is contravened by discovery, including that Gogolack admitted to faking his own overdoses on at least two prior occasions.  (Dkt. 724 at 25, 28).  Further, the government argues that Gogolack's motion is "not really challenging the specificity of the Indictment so much as the adequacy of the evidence upon which the Indictment is based."  (*Id.* at 29 (citation omitted)).

---

[13]    Gogolack filed a subsequent motion alleging *Brady* violations on April 27, 2026. (Dkt. 890).    That motion—along with the similar motions filed by Gogolack's co-defendants—was denied from the bench, and a written decision will be issued in due course. (*See* Dkt. 911; Dkt. 934).

Disclosure of grand jury proceedings is permitted upon a showing that a "ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). "[A] presumption of regularity attaches to grand jury proceedings. . . ." *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994). Accordingly, "a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations." *United States v. Forde*, 740 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (citing *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)); *see also Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959) ("The burden . . . is on the defense to show that a 'particularized need' exists for the minutes which outweighs the policy of secrecy."). "A party makes a showing of particularized need by proving 'that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.'" *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996) (quoting *Douglas Oil Co. v. Petrol Stops Nw.,* 441 U.S. 211, 222 (1979)). This requirement "extends to legal instructions given to the grand jury." *United States v. Hoey,* No. S3 11-cr-337 (PKC), 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (quoting *United States v. Jailall*, No. 00 Cr 069(RWS), 2000 WL 1368055, at *2 (S.D.N.Y. Sept. 22, 2000), *aff'd*, 23 F. App'x 94 (2d Cir. 2002)).

Gogolack has failed to meet the demanding standard of demonstrating a particularized need for the grand jury minutes. Gogolack's argument that he is entitled to grand jury minutes amounts to no more than a challenge to the sufficiency of the allegations

in the SSI.  The allegedly "false" allegation upon which Gogolack relies—the statement that Gogolack faked his own overdose and went to a local hospital—is supported by evidence in the record.  If Gogolack has evidence to the contrary, he is free to cross-examine any witnesses at trial and present his own proof.  But the fact that mixed proof exists on this point does not entitle Gogolack to inspection of the grand jury minutes.  *See United States v. Rodriguez*, 734 F. Supp. 116, 128 (S.D.N.Y. 1990) (denying motion to inspect grand jury minutes where the defendant failed to identify any particularized proof of irregularity before the grand jury), *aff'd*, 968 F.2d 130 (2d Cir. 1992).  Accordingly, Gogolack's motion for production of grand jury minutes is denied.

## VI.    Dismissal of Counts 13 through 18 as Multiplicitous

Gogolack argues that counts 13 through 15 are multiplicitous, and also that counts 16 through 18 are multiplicitous.  (Dkt. 690 at 16).  Specifically, Gogolack argues that counts 13 through 15 charge him with violating 18 U.S.C. § 1512(b)(1) for allegedly tampering with victim 1 on August 14, 2023, and that these counts all charge the same conduct and do not set forth any factual allegations that differentiate between the conduct alleged in each count.  (*Id*.).  Gogolack similarly argues that counts 16 through 18 charge him with tampering with victim 2 on August 14, 2023, and there are no facts set forth in these counts sufficient to differentiate his conduct as it relates to each count.  (*Id*.).

In response, the government contends that each of the three counts against victim 1 and each of the three counts against victim 2 charge different crimes, with different elements.  (Dkt. 724 at 31).  Specifically, the government argues:

- 55 -

> Each offense connected to Victim 1 (Counts 13-15) contains different elements and, thus, reflects a distinct crime. *Compare* 18 U.S.C. § 1512(b)(1) (referring to acts done with the intent to "influence, delay, or prevent the testimony any person in an official proceeding"), *with* § 1512(b)(2)(A) (referring to acts done with the intent to "cause or induce any person to [ ] withhold testimony or withhold a record, document or other object from an official proceeding") *and* § 1512(b)(3) (referring to acts done with the intent to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings"). The same is true as to the Victim 2 Counts—*viz.*, Counts 16 through 18.

(*Id.*).

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). In other words, "[a]n indictment is multiplicitous if it charges the same crime in two counts." *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004), *abrogated on other grounds by McFadden v. United States*, 576 U.S. 186 (2015). Punishment for a multiplicitous indictment "violates the Double Jeopardy clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once." *Chacko*, 169 F.3d at 145.

"It is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." *Id.* at 146. When the same statutory violation is charged multiple times, "the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution." *Ansaldi*, 372 F.3d at 124 (quoting *Bell v. United States*, 349 U.S. 81, 83-84 (1955)). "To assess

whether the two offenses charged separately in the indictment are really one offense charged twice, the 'same elements' test or the '*Blockburger*' test is applied. The *Blockburger* test examines whether each charged offense contains an element not contained in the other charged offense. If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." *Chacko*, 169 F.3d at 146 (internal citations omitted).

Further, that a count is multiplicitous is not necessarily fatal to that count, particularly when the indictment is not multiplicitous on its face. *United States v. Miller*, 26 F. Supp. 2d 415, 422-23 (N.D.N.Y. 1998). This is because "the Double Jeopardy clause does not prohibit simultaneous prosecutions for the same offense; it prohibits duplicative punishment." *United States v. Mostafa*, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013). "The appropriate post-trial remedy for overindictment through multiplicitous counts is, in most cases, vacatur of the redundant convictions and resentencing." *United States v. Polizzi*, 257 F.R.D. 33, 36 (E.D.N.Y. 2009). However, "the serious prejudicial impact of a multiplicitous indictment at trial in a case . . . warrants concern over trial prejudice," and "[d]istrict courts presented with what are recognized before or during trial to be multiplicitous indictments will avoid any problem by requiring the prosecution to elect between counts charged rather than by merging the counts at sentencing." *Id*. at 36-37. "Although district courts have the discretion to compel prosecutors to elect under which . . . multiplicitous counts they will seek to prosecute a defendant . . . *when inclusion of the multiplicitous counts will prejudice the defendant*, . . . that discretion must be balanced against the government's broad discretion to conduct criminal prosecutions, including its

power to select the charges to be brought in a particular case." *United States v. Ahmed*, 94 F. Supp. 3d 394, 434 (E.D.N.Y. 2015) (internal quotations and citation omitted) (emphasis in original), *reconsideration denied*, No. 12-CR-661 (SLT)(S-2), 2015 WL 1636827 (E.D.N.Y. Apr. 10, 2015).

In cases where the indictment is not multiplicitous on its face, the Court may allow the counts to proceed to the jury to see if the jury will convict on one count and acquit on the other count. *See United States v. Reed*, 639 F.2d 896, 904 n.6 (2d Cir. 1981) ("An indictment that is multiplicitous is not fatal and does not require dismissal. The defendant may move to have the prosecution elect among the multiplicitous counts, with all but the one elected dismissed. This is a matter for trial court discretion, and is most appropriate when the mere making of the charges would prejudice the defendant with the jury. The principal danger in multiplicity that the defendant will be given multiple sentences for the same offense can be remedied at any time by merging the convictions and permitting only a single sentence."). If the jury convicts on two multiplicitous counts, the court can enter judgment on only one of the two counts. As explained by the Second Circuit:

> [i]f, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense. If the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment. If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts. Or, if judgment of conviction has been entered on more than one such count, the district court should vacate the conviction on all but one.

*United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (internal quotations and citations omitted) (concluding that "the district court's dismissal of Count 16 prior to trial was at best premature"); *see also United States v. Chapline*, No. 18-CR-235, 2020 WL 2092422, at *1 (W.D.N.Y. May 1, 2020) (denying defendant's motion to dismiss counts 1 and 2 as multiplicitous without prejudice to his renewing motion after trial if the government failed to submit evidence of different underlying offenses for each count); *Mostafa,* 965 F. Supp. 2d at 464 ("[M]ultiplicity is properly addressed by the trial court at the sentencing stage.  At that time, the district court would be required to vacate one of the two convictions.").

Here, each set of counts against victim 1 and victim 2 charges crimes with distinct elements.  Specifically, a violation of 18 U.S.C. § 1512(b)(1) (as charged in count 13 as to victim 1 and count 16 as to victim 2) requires the use of intimidation or threats with the intent to "*influence, delay, or prevent the testimony of any person in an official proceeding,*" whereas a violation of § 1512(b)(2)(A) (as charged in count 14 as to victim 1 and count 17 as to victim 2) requires the use of intimidation or threats with the intent to cause a person to "*withhold testimony, or withhold a record, document, or other object, from an official proceeding,*" whereas § 1512(b)(3) (as charged in count 15 as to victim 1 and count 18 as to victim 2) requires the use of intimidation or threats to "*hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information* relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings."  In other words, each subsection charges distinct conduct on its face.  *See,*

- 59 -

*e.g., United States v. Bernhardt*, 903 F.3d 818, 825 (8th Cir. 2018) (concluding that the defendant's convictions for 18 U.S.C. § 1512(b)(2)(B) and 18 U.S.C. § 1512(b)(3) were not multiplicitous, since "each statutory subdivision requires proof of an element that the other does not").

Beyond his conclusory assertion that each of the three witness tampering counts pertaining to victim 1 and victim 2 charge the same crime (which, as explained above, they do not), Gogolack does not offer any meaningful argument as to why he believes the counts are multiplicitous. Further, as explained above, if the jury were to convict Gogolack on two multiplicitous counts, the Court can enter judgment on only one of those counts. Accordingly, Gogolack's motion to dismiss the counts as multiplicitous is denied as premature and without prejudice.

## VII. Facial Insufficiency

Gogolack next argues that count 10, which charges him with a violation 18 U.S.C. § 922(g)(3), does not recite facts constituting a crime and therefore should be dismissed. (Dkt. 690 at 16). Specifically, Gogolack contends that § 922(g)(3) requires that the user of controlled substances contemporaneously possess the firearm and ammunition, whereas count 10 charges that Gogolack "was" an unlawful user of controlled substances. (*Id*. at 16-17).

In response, the government argues that the Court should deny Gogolack's motion to dismiss due to facial insufficiency because count 10 tracks the statutory language of § 922(g)(3), and it specifies that Gogolack's possession of a firearm and use of controlled substances occurred during the period charged. (Dkt. 724 at 32). Further, the government

argues that the SSI's use of the word "was" is "nothing more than a reconciliation of a statute worded in the present tense and the fact that a charging document must be worded in the past tense" because charges always relate to past conduct. (*Id*. at 33 (citation omitted)).

Federal Rule of Criminal Procedure 7(c) requires that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ." Fed. R. Crim. P. 7(c)(1). An indictment is "sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *see also United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) ("An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."). The indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776.

Count 10 reads as follows:

> Between on or about July 21, 2023, and on or about August 8, 2023, the exact dates being unknown to the Grand Jury, in the Western District of New York, the defendant, **SIMON GOGOLACK**, knowing that he was an unlawful user of controlled substances as defined in Title 21, United States Code, Section 802, did knowingly possess in and affecting commerce, a firearm, namely, one KEL-TEC CNC Inc., Model KSG, 12-gauge pump action shotgun bearing serial number XXFD48, and ammunition, including, seven (7) 12-gauge rounds of ammunition labeled "AGUILA 12" on the headstamp; fourteen (14) 9mm LUGER caliber rounds of ammunition

labeled "G.F.L 9mm LUGER" on the headstamp; eight (8) 9mm caliber rounds of ammunition labeled "FC 9mm LUGER" on the headstamp; and one (1) 40 S&W caliber round of ammunition labeled "R-P 40 S&W" on the headstamp.

**All in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(8).**

(Dkt. 24 at 38).

Gogolack cites to no case law supporting his argument that this charge does not allege a crime simply because the charging language is phrased in the past tense. In the Court's view, it is clear from the SSI that the tense in the charging language was changed from the text of the statute to reflect that Gogolack allegedly committed this crime in the past. Further, it is clear from the face of the SSI that the government alleges that Gogolack's use of controlled substances and firearms occurred during the same period of time. Accordingly, Gogolack's motion for dismissal of count 10 of the SSI for facial insufficiency is denied.

## VIII. Suppression of Physical Evidence

Gogolack next argues that various search warrants, including for his phone associated with a number ending in 3061, and the search warrants for 296 Scott Avenue (dated August 5, 2023, and September 14, 2023), should be suppressed. (Dkt. 690 at 20-23). Gogolack also contends that the fruits of his August 2, 2023 traffic stop should be suppressed because the vehicle was stopped without probable cause. (*Id*. at 23).

In response, the government argues that, with respect to the search and seizure of Gogolack's phone, the DPD appropriately seized Gogolack's phone incident to his arrest, and the warrant was supported by probable cause. (Dkt. 724 at 58-59). With respect to the

searches of 296 Scott Avenue, the government argues that the affidavits established probable cause for each of the target offenses and the warrants were sufficiently particularized. (*Id*. at 63-69).

The Court has reviewed the search warrant application for Gogolack's cellular telephone. (Dkt. 724-19; Dkt. 724-20). Gogolack's cellphone was seized from him incident to his arrest. *See, e.g., United States v. Handler*, No. 23 Crim. 4 (JHR), 2023 WL 2584217, at *3 (S.D.N.Y. Mar. 21, 2023) ("Because the cellphones were seized from each Defendant's person during a lawfully conducted arrest, they were properly seized."). The search warrant properly describes the phone to be searched, includes a description of the items to be searched for and seized, and identifies the federal statues for which law enforcement expected to find evidence of crimes. (*See* Dkt. 724-19). The affidavit submitted in support of the search warrant is sworn by Agent Kammeraad, and describes the investigation and prosecution of Peter Gerace, Crystal Quinn's connection to that prosecution as a cooperating witness, and that she was found dead at Gogolack's residence on August 1, 2023. Local law enforcement observed Crystal Quinn deceased at Gogolack's residence, observed controlled substances in the residence and near her body, that Gogolack was exhibiting signs of intoxication, and they further observed Gogolack using a white smartphone. Based on this information, Agent Kammeraad stated that there was probable cause to believe that Gogolack's phone may contain evidence relating to the distribution of controlled substances related to Crystal Quinn's death. (*See* Dkt. 724-20). Having reviewed the search warrant application and affidavit, the Court concludes that the

search warrant application for Gogolack's cellphone is supported by probable cause. Accordingly, Gogolack's motion to suppress the search of his cellphone is denied.[14]

The Court has also reviewed the search warrant application for Gogolack's residence at 296 Scott Avenue, dated August 5, 2023. (Dkt. 724-21). The search warrant specifically identifies the place to be searched, describes the items to be seized, and identifies the federal statues for which law enforcement expected to find evidence of crimes. The Court has also reviewed the affidavit in support of the August 5, 2023 search warrant for 296 Scott Avenue, which is sworn by Agent Penna, and finds that it is supported by ample probable cause. The August 5, 2023 search warrant describes the background of the investigation and prosecution of Gerace and Joseph Bongiovanni, the fact that Crystal Quinn was a cooperating witness in that prosecution, and the death of Crystal Quinn and the circumstances surrounding her death, including that she died at 296 Scott Avenue. The search warrant also details the FBI's interview with Gogolack on Augst 2, 2023, during which time it was evident to investigators that Gogolack was withholding information regarding the time frame surrounding Crystal Quinn's death, and it also details information regarding Gogolack's prior drug trafficking activities and possession of firearms. In sum,

---

[14]    With respect to Gogolack's argument that he was stopped without probable cause on August 2, 2023, as noted above, Lieutenant Wojciechowicz testified that he pulled Gogolack over because he observed Gogolack neglect to signal the vehicle before turning. (Dkt. 835 at 27-28). Lieutenant Wojciechowicz further testified that at the time he saw Gogolack operating the vehicle, he knew that his license was both suspended and revoked. (*Id*. at 27). All of this constituted violations of New York law and provided Lieutenant Wojciechowicz a legal basis to stop the vehicle. (*Id*.). Gogolack does not offer any evidence disputing this testimony, and therefore he has failed to demonstrate that he was pulled over absent probable cause.

there was probable cause supporting that 296 Scott Avenue contained evidence relating to the commission of federal crimes. Accordingly, Gogolack's motion to suppress physical evidence seized from the execution of the August 5, 2023 search warrant is denied.

Finally, the Court has reviewed the search warrant for Gogolack's residence at 296 Scott Avenue, dated September 14, 2023. (Dkt. 724-23). The search warrant specifically identifies the place to be searched, describes the particular items to be seized, and identifies the federal statute for which law enforcement expected to find evidence of crimes. The search warrant affidavit for 296 Scott Avenue dated September 14, 2023, is sworn by Agent Penna and attaches the August 5, 2023 search warrant application. Agent Penna's affidavit details information learned by the FBI after their original search of 296 Scott Avenue, including information that Gogolack kidnapped individuals and held them in the basement at 296 Scott Avenue in March 2023, and that evidence of violations of 18 U.S.C. § 1201 (kidnapping) would be found at the premises. Given the FBI did not have information regarding the kidnappings at the time the first warrant was executed, it did not understand the evidentiary value of certain items that were photographed in Gogolack's basement (namely, plastic drop cloths, rubber floor mats, and a white chair) at 296 Scott Avenue. The Court concludes that the September 14, 2023 search warrant for 296 Scott Avenue is supported by probable cause.

Gogolack argues that the September 14, 2023 search warrant is stale, since it seeks evidence of a crime that allegedly occurred several months earlier in March 2023. (Dkt. 690 at 22-23). However, as explained by Agent Penna in the supporting affidavit, the FBI had photographs of the kidnapping evidence from August 8, 2023, when the FBI originally

- 65 -

searched 296 Scott Avenue—in other words, the kidnapping evidence was present during the first search, even several months after March 2023. Accordingly, it was reasonable for Agent Penna to conclude that evidence of the kidnapping would still be present at 296 Scott Avenue, and the Court finds that "the totality of circumstances indicates a fair probability that contraband or evidence of a crime w[ould] be found" at 296 Scott Avenue in September 2023. *See United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011). Accordingly, Gogolack's motion to suppress physical evidence seized from the execution of the September 14, 2023 search warrant is denied.

### CONCLUSION

For the foregoing reasons, Gogolack's dispositive pretrial motions are granted in part and denied in part. Gogolack's motion to suppress statements made to law enforcement on August 2, 2023 is granted in part and denied in part, as set forth herein. Further, Gogolack's motions to dismiss the SSI based on constitutional speedy trial violations, and his motions for disclosure of *Brady* information, disclosure of grand jury minutes, dismissal of counts 13 through 18 of the SSI as multiplicitous, dismissal of count 10 for facial insufficiency, and suppression of physical evidence, are denied. The Court will address Gogolack's motion for a severance under Rule 14 in a separate decision once it has had an opportunity to consider the pending motion to dismiss filed by the government (Dkt. 1000) and Gogolack's response (Dkt. 1002).

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:    June 9, 2026
          Rochester, New York