IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                    23-CR-99-EAW

SIMON GOGOLACK,

Defendant.

### GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR REJOINDER PURSUANT TO RULE 8(a)

On June 5, 2026, the government moved to rejoin Counts 6 through 18 with Count 4 as to defendant Simon Gogolack. Dkt. 1000. On June 12, 2026, the Court rejoined Counts 6 through 10 with Count 4, but reserved decision on whether to rejoin Counts 11 through 18 with the same. Text Order, Dkt. 1039, (dated June 12, 2026). At the Court's invitation, the government offers this supplemental memorandum in support of its motion to rejoin Counts 11 through 18 with Counts 4 and 6 through 10 pursuant to Rule 8(a).

### I.    LEGAL FRAMEWORK

Rule 8(a) provides that an "indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). Offenses are of the "same" or "similar" character if they are "[n]early corresponding; resembling in many respects; somewhat alike; [or] hav[e] a general likeness." *United States v. Little*, No. 19-CR-276-02 (NSR), 2020 WL 3869126, at *1 (S.D.N.Y. July 9, 2020) (quoting *United States v. Werner*, 620 F.2d 922, 926–27 (2d Cir. 1980) (internal citations omitted)). Offenses are "connected with" one another "where the same

evidence may be used to prove each count," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991), or if the counts have a "sufficient logical connection" to one another, *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990). *See United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) ("Counts that have a sufficient logical connection to each other can be tried together, as can those where the same evidence may be used to prove each count." (internal quotation marks and citation omitted)); *United States v. Kemp*, No. 21-1684-CR, 2023 WL 405763, at *7 (2d Cir. Jan. 26, 2023) (concluding that joinder under Rule 8(a) was proper where, in relevant part, "the testimony of several government witnesses . . . was necessary to prove the narcotics conspiracy, murder, and robbery counts"). Rule 8(a) is "a liberal standard" for the government to meet. *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977).

## II.    BACKGROUND & ANALYSIS

The Second Superseding Indictment ("SSI") charges Mr. Gogolack in the following counts:[1]

| Second Superseding Indictment Count Table | | | |
|---|---|---|---|
| Count No. | Description | Date Range | Charging Statute |
| Count 4 | Distribution of Fentanyl Resulting in Death | July 31, 2023 – August 1, 2023 | 21 U.S.C. §§ 841(a)(1) 841(b)(1)(C) |
| Count 6 | Narcotics Conspiracy | July 2, 2023 – October 17, 2023 | 21 U.S.C. § 846 |
| Count 7 | Maintaining a Drug-Involved Premises | July 2, 2023 – August 8, 2023 | 21 U.S.C. § 856(a)(1) |
| Count 8 | Possession of a Firearm in Furtherance of Drug Trafficking | July 2, 2023 – August 8, 2023 | 18 U.S.C. § 924(c)(1)(A)(i) |
| Count 9 | Felon in Possession of a Firearm and Ammunition | July 2, 2023 – August 8, 2023 | 18 U.S.C. § 922(g)(1) |

---

[1]    On the government's motion, the Court dismissed Counts 1 through 3 as to Mr. Gogolack. *See* Text Order, Dkt. 1039, (dated June 12, 2023).

| Count 10 | Unlawful User of Controlled Substances in Possession of a Firearm and Ammunition | July 21, 2023 – August 8, 2023 | 18 U.S.C. § 922(g)(3) |
|---|---|---|---|
| Count 11 | Kidnapping – Victim 1 | March 14, 2023 – March 15, 2023 | 18 U.S.C. § 1201(a)(1) and 2. |
| Count 12 | Kidnapping – Victim 2 | March 14, 2023 – March 15, 2023 | 18 U.S.C. § 1201(a)(1) and 2. |
| Count 13 | Witness Tampering – To Prevent Grand Jury Testimony – Victim 1 | August 14, 2023 | 18 U.S.C. § 1512(b)(1) |
| Count 14 | Witness Tampering – To Induce the Withholding of Grand Jury Testimony – Victim 1 | August 14, 2023 | 18 U.S.C. § 1512(b)(2)(A) |
| Count 15 | Witness Tampering – To Prevent Communication with a Law Enforcement Officer – Victim 1 | August 14, 2023 | 18 U.S.C. § 1512(b)(3) |
| Count 16 | Witness Tampering – To Prevent Grand Jury Testimony – Victim 2 | August 14, 2023 | 18 U.S.C. § 1512(b)(1) |
| Count 17 | Witness Tampering – To Induce the Withholding of Grand Jury Testimony – Victim 2 | August 14, 2023 | 18 U.S.C. § 1512(b)(2)(A) |
| Count 18 | Witness Tampering – To Prevent Communication with a Law Enforcement Officer – Victim 2 | August 14, 2023 | 18 U.S.C. § 1512(b)(3) |

The Court should rejoin Counts 11 through 18 with Counts 4 and 6 through 10 because, as detailed below, the same evidence—including witness testimony and exhibits—"may be used to prove" each of Mr. Gogolack's remaining counts. *Rivera*, 546 F.3d at 253. Moreover, the evidence supports the inference that Mr. Gogolack's narcotics activity served as the catalyst for his kidnapping of J.C. (Victim 1) and C.B. (Victim 2), and was facilitated by his unlawful possession of a firearm. Mr. Gogolack's subsequent tampering of J.C. and C.B. cannot be divorced from their knowledge of Mr. Gogolack's culpability vis-à-vis the narcotics, firearm, and kidnapping offenses with which Mr. Gogolack is charged.

3

Accordingly, because Count 4 and Counts 6 through 18 are unified by overlapping evidence and are logically connected to one another, joinder under Rule 8(a) is proper. *Id.*

### A. Joinder of Counts 11 and 12 to Count 4 is Proper Due to the Evidentiary Overlap Between the Counts.

The charged offenses should be joined because much of the evidence underlying the kidnapping counts and Count 4, distribution of fentanyl resulting in death, is substantially intertwined and cross-admissible in separate trials. Specifically, several electronic and physical exhibits, as well as the testimony of approximately 15 witnesses, are admissible to prove Counts 4, 11, and 12—including Mr. Gogolack's kidnapping victims, whose testimony will help prove that Mr. Gogolack was with Ms. Quinn during the weekend of her death.

### 1. Joinder is proper where the same electronic and physical exhibits are necessary to prove Counts 4, 11, and 12.

First, several electronic and physical exhibits relevant to proving Count 4 are also relevant to proving Counts 11 and 12. For example, in a trial on Count 4, the government would move to admit a photograph taken from Ms. Quinn's phone on July 29, 2023, that appears to depict Mr. Gogolack holding a Kel-Tec KSG shotgun and standing next to a bag of a white powdery substance and a piece of paper bearing what appears to be Mr. Gogolack's first and last name, as pictured below:






GOVERNMENT
EXHIBIT

437B-1

This photograph is relevant to proving Count 4 in two ways.  First, insofar as it depicts Mr. Gogolack, it disproves his "false exculpatory statements" to Wellsville Police Department officers who responded to Ms. Quinn's death—namely, that Ms. Quinn had spent the weekend with another individual, S.D., who Mr. Gogolack claimed lived at 296 Scott Avenue.  *United States v. Glenn*, 312 F.3d 58, 69 (2d Cir. 2002); *see id.* (recognizing that such statements are circumstantial evidence of a defendant's consciousness of guilt).  Second, the presence of a white powdery substance and a measuring spoon near a document appearing to bear Mr. Gogolack's name is further evidence that Mr. Gogolack possessed the knowledge and tools to distribute drugs when he was with Ms. Quinn, and thus is probative of his opportunity to distribute narcotics to Ms. Quinn.

To help identify Mr. Gogolack, whose face is not pictured in GX-437B-1, the government would call J.C. and C.B., Mr. Gogolack's kidnapping victims.  The government

anticipates that J.C. and C.B. will testify that Mr. Gogolack lived in the pictured space and brandished the pictured Kel-Tec KSG shotgun during the kidnappings that occurred approximately 3 ½ months earlier.  In that way, just as GX-437B-1 is probative of Mr. Gogolack's identity as the individual who was with Ms. Quinn during the weekend of her death, it is relevant to establishing his guilt as to Counts 11 and 12 because it corroborates J.C. and C.B.'s testimony that Mr. Gogolack brandished a shotgun with tactical spikes during the kidnappings.  Additionally, C.B. is expected to testify that he has observed Mr. Gogolack assume the identity of S.D. in the past, further proving the falsity of Mr. Gogolack's self-serving, exculpatory statements to the Wellsville Police Department.

Beyond GX-437B-1, the government would move to admit the following physical exhibits and associated photograph seized during the August 8, 2023 search of 296 Scott Avenue, Wellsville, New York to prove Counts 4, 11, and 12:

1. A white and blue plaid shirt resembling the one worn by the white male pictured in GX-437B-1;

2. Scale seized from the TV stand;

3. Foil with residue;

4. Plate with residue seized from the floor;

5. Plastic syringe on table in box;

6. Plastic container with white substance;

7. Needle cap in closet on floor;

8. Used needle on floor; and

9. White powdery substance on laptop with a blade.

The white and blue plaid shirt tends to identify Mr. Gogolack as the individual pictured in GX-437B-1, a fact probative of both Counts 4, 11, and 12, as well as Counts 8 through 10, as discussed *infra.* The scale seized from the TV stand located in 296 Scott Avenue tested positive for cocaine and fentanyl, both of which appear in Ms. Quinn's toxicology report. Other items—such as the syringes, needle caps, foil, plate, and blade—are all consistent with drug consumption and distribution. As such, they are probative of Mr. Gogolack's knowledge of fentanyl and drug distribution, intent to engage in drug distribution, and opportunity to distribute fentanyl to Ms. Quinn, as alleged in Count 4. These narcotics and associated materials are also relevant to proving Counts 11 and 12 insofar as they corroborate J.C. and C.B.'s testimony that Mr. Gogolack used his residence to store, distribute, and consume drugs—such that it was reasonable that they traveled to Mr. Gogolack's home to obtain a free fentanyl sample.

### 2. Joinder is proper where the same witnesses would offer duplicative testimony at two different trials.

If the kidnapping counts remained severed from the narcotics and firearm offenses, the government anticipates that several civilian and government witnesses would have to testify at both trials. For example, because Mr. Gogolack's intent to distribute fentanyl, knowledge of fentanyl, and opportunity to distribute fentanyl are all at issue in Count 4, Mr. Gogolack's past fentanyl dealing to J.C. and C.B. is probative of his guilt, especially considering that Mr. Gogolack's victims understood him to offer them fentanyl approximately 3 ½ months prior to Ms. Quinn's death. *Cf. United States v. McCallum*, 548 F.3d 471, 475–76 (2d Cir. 2009) (district court did not error in permitting similar acts evidence where the defendant's intent and knowledge were in dispute). Moreover, C.B. would likely testify at both trials if Count 4 remains severed from the kidnapping counts due to his distribution of cocaine base to Mr.

Gogolack during the weekend that Ms. Quinn died, his connection to Mr. Gogolack's narcotics conspiracy, and his knowledge of Mr. Gogolack's practice of mixing fentanyl with "benzos."[2] *See* GX-3520J at 3. Regarding the latter, considering Mr. Gogolack's admission to John Grieco that he gave Ms. Quinn Xanax before she died, and the presence of both Alprazolam and fentanyl in Ms. Quinn's toxicology report, C.B.'s testimony is inextricably intertwined with Count 4, or, alternatively, admissible under Rule 404(b) to show Mr. Gogolack's knowledge, intent, and opportunity to distribute fentanyl as charged in Count 4. J.C. would also testify about statements made by Mr. Gogolack during the kidnapping evincing his plan to distribute drugs and stage a crime scene to mislead law enforcement about a death that he was connected to.

J.C. and C.B.'s testimony about Mr. Gogolack's history of fentanyl distribution is also relevant to proving Counts 11 and 12. J.C. and C.B. are expected to testify that Mr. Gogolack lured them to 296 Scott Avenue before kidnapping them by offering them a free sample of fentanyl.[3] Because Mr. Gogolack was J.C. and C.B.'s fentanyl dealer, his offer of a free sample was a reasonable one for both men to pursue—and an effective trap to facilitate their kidnappings.

Other witnesses could also have to testify in both trials, were the charges to remain severed. On a trial for Count 4, E.B. would testify about picking up her son, B.B. from 296 Scott Avenue the weekend that Ms. Quinn was with Mr. Gogolack. For a trial on Counts 11

---

[2]    "Benzos" is slang for benzodiazepines, the class of drugs to which Xanax, also known as Alprazolam, belongs.

[3]    As depicted in GX-3536J, Mr. Gogolack texted J.C. on March 14, 2023, and stated "I want u to try something. Hmu [hit me up] when u can." Mr. Crowner testified before the Grand Jury that he interpreted that text message to be Mr. Gogolack offering him a sample of fentanyl to try. *See* GX-3536S at 27–28.

and 12, E.B. would also testify about her observations the day of the kidnappings. Likewise, for Count 4, B.B. would testify about his observations of Ms. Quinn while he was at Mr. Gogolack's residence the weekend she died. For Counts 11 and 12, B.B. would testify about statements Mr. Gogolack made indicating his belief that C.B. was cooperating with law enforcement, as well as derogatory remarks Mr. Gogolack made about C.B. because he was cooperating with law enforcement.[4]    Five members of law enforcement, including FBI Special Agents Jason "Jay" Breen, Laurie Johnson, Katey Tonzelli, and Adam Penna, as well as former FBI photograph Adam Sparks, may be called to testify about their participation in the August 8, 2023 search of 296 Scott Avenue in two trials. Special Agent Penna would also testify about his review of Ms. Quinn's cell phone and its contents, including the photograph reflected in GX-437B-1. Erie County Forensic Laboratory Forensic Chemist Casey Sotland would testify in both trials about fentanyl found at 296 Scott Avenue during the August 8, 2023, search. In total, approximately 15 witnesses would be called to offer the same or similar testimony at both trials if Counts 11 and 12 remained severed from Count 4.

As other courts have recognized when denying motions to sever, "[r]epeated presentation of th[e] same evidence in separate trials, with its corollary subjection of the Victim[s] to additional trauma and disclosure of evidence in advance of the second trial,

---

[4] For example, during a December 25, 2023 jail call between Mr. Gogolack and B.B., Mr. Gogolack stated, in sum and substance, "I am going to make it public who is snitching on me, and that's [C.B] and [J.C], um so don't hang around with fuckin, don't be caught in a car with [C.B.], don't be in between him, I don't want you to catch this, I don't want you to get in any altercation because of his misleading the police because of the fact that he just wanted to be afraid of going to fucking jail and he just made up stories and tell on people. So, like, now that I'm gonna make it public, that it's them two telling, you can't, I don't want you to get hurt dude. I don't want you to be like, don't hang around with them, don't anything because people found out it was them already and I didn't disclose it and like uh, and there's bigger things at work that might understand I guess." Mr. Gogolack further told B.B., "Hey, do me a favor, when you see [C.B.], um, tell him I wish him well, and uh, ask if he remembers the first conversation we ever had together, and tell him, ask him if he thinks I meant it. Ok? But then don't hang around him at all, and you know that like if someone is a snitch you don't want to hang out with them, right?"

would disserve the interests of judicial economy and the efficiency of the criminal justice system" that Rule 8 is designed to promote. *United States v. Riddles*, No. 12 CR. 556 LTS, 2013 WL 3975775, at *2 (S.D.N.Y. Aug. 5, 2013); *see id.* (denying motion to sever narcotics conspiracy offense from kidnapping offenses where "much of the evidence relating to the narcotics conspiracy will be introduced through testimony by the Victim, who will also be the primary source of information regarding the Kidnapping Offenses"). Thus, because similar sets of evidence will be offered to prove both Count 4 and Counts 11 and 12, joinder of the counts is proper under Rule 8(a). *See Kemp*, 2023 WL 405763, at *7 (concluding that joinder under Rule 8(a) was proper where, in relevant part, "the testimony of several government witnesses . . . was necessary to prove the narcotics conspiracy, murder, and robbery counts").

> **B.   Joinder of Counts 11 and 12 to Counts 6 through 10 is Proper Due to the Logical Connections and Evidentiary Overlap Between the Counts.**

The Court should also rejoin Counts 11 and 12 to Counts 6 through 10 because of the "logical connection[s]" and evidentiary overlap between the counts. *Ruiz*, 894 F.2d at 505. Specifically, (1) a threat to Mr. Gogolack's narcotics business was the catalyst for the kidnapping counts; (2) testimony concerning drug distribution and drug use during the kidnapping counts is directly probative of Count 7, the maintaining-a-premises charge; and (3) testimony relating to the kidnapping counts is directly probative of Counts 8 through 10.

> **1.   The stolen cell phone was the catalyst for the kidnapping counts and is independently admissible in the narcotics conspiracy count as evidence of a tool of the drug trade.**

Mr. Gogolack's kidnapping of J.C. and C.B. stemmed from the narcotics trafficking that eventually formed the basis of the narcotics conspiracy charged in Count 6. Specifically, as his text messages from July 2023 make clear, cellular communications served as the technological lifeline for Mr. Gogolack's drug-dealing business. Indeed, as evidence that Mr.

Gogolack used cell phones to facilitate his narcotics trade, Mr. Gogolack successfully inveigled J.C. and C.B. into his kidnapping trap when he sent them text messages advertising fentanyl samples.  After using a cell phone to lure his victims to 296 Scott Avenue, Mr. Gogolack brandished the Kel-Tec KSG at J.C., accusing him of stealing a package containing a cell phone.  Viewed in its totality, the evidence suggests that Mr. Gogolack kidnapped J.C. and C.B. to recover a well-recognized tool of narcotics trade—a cell phone—and to deter future acts that could endanger the narcotics operation reflected, in part, in Count 6.[5]  In that way, Mr. Gogolack's motivation to deter others from tampering with his narcotics operation speaks to his intent to carry out the narcotics conspiracy charged in Count 6 approximately 3 ½ months later.

> **2.    Testimony concerning drug distribution and usage during the kidnappings supports the maintaining-a-premises charge alleged in Count 7.**

Count 7, the maintaining-a-premises charge is also logically and evidentiarily connected to Counts 11 and 12.  As noted, Mr. Gogolack had previously distributed fentanyl to both J.C. and C.B., such that it was reasonable for them to travel to 296 Scott Avenue for the free fentanyl sample that Mr. Gogolack advertised to effectuate the kidnappings.  Mr. Gogolack's maintenance of 296 Scott Avenue as a drug-involved premises is thus an inextricable component of the kidnappings.  For that reason, in a trial on Count 7, the

---

[5]    On June 8, 2026, the Court referred to the package  as a purported "drug package."  Status Conf. Tran., at 31:06–09, (dated June 8, 2026).  The only evidence the government has to date is that, according to Mr. Gogolack, the package contained a cell phone.  The government's motions in limine did not specify the package's purported contents.  *See* Gov. Statement of Facts & Mots. Lim., at 47 ("On March 14, 2023, Mr. Gogolack texted his neighbor, Mr. Knight, asking whether anyone had stolen a package from his porch."), *id.* ("Mr. Gogolack then held the shotgun to [J.C.'s] head and began interrogating him about the missing package, striking him repeatedly in the head with the gun in between questions."), *id.* at 48 ("Mr. Gogolack interrogated [C.B.] in the same manner, demanding information about the allegedly stolen package.  As the interrogation intensified, Mr. Gogolack forced [C.B.] to go through [J.C.'s] phone in search of evidence that [J.C.] had stolen the package."), (dated Apr. 17, 2026).  Nevertheless, due to Mr. Gogolack's use of cell phones to conduct drug trafficking, the impetus for the kidnapping is still related to Mr. Gogolack's participation in a narcotics conspiracy.

government would move to admit testimony, as necessary background or under Rule 404(b), that Mr. Gogolack lured both J.C. and C.B. to 296 Scott Avenue under the premise of sampling drugs. Additionally, pursuant to Rule 404(b), the government would move to admit J.C.'s testimony that, during the kidnapping, Mr. Gogolack began using crack and fentanyl inside 296 Scott Avenue. GX-3536S at 46:04. Though predating the period charged in Count 7 by approximately three-and-a-half months, the kidnapping victims' testimony is probative of Mr. Gogolack's ownership, control, and knowing maintenance of 296 Scott Avenue to distribute and use controlled substances, such as crack cocaine and fentanyl, and thus would be admissible in both trials.

### 3. Testimony related to the kidnapping counts is direct evidence of Counts 8 through 10.

For Counts 8 through 10, the government must prove that Mr. Gogolack possessed a firearm, to wit, a Kel-Tec KSG shotgun, and did so in furtherance of drug trafficking (Count 8), when he knew he was a felon (Count 9), and while he used controlled substances (Count 10). *See* Dkt. 24 at 37–38.

Both J.C. and C.B. are expected to identify Mr. Gogolack as having possessed and owned the Kel-Tec KSG because Mr. Gogolack brandished it at them during the kidnappings:

```
Q.    How close is he to you when he's questioning you?
A.    Like right where this board is.  Right in my face.
Q.    Right in your face.  Is he holding the gun to you at that distance?
A.    To my head.
Q.    Was the gun touching your head?
A.    Yeah.  On the shotgun -- on the tip of the shotgun there's like spikes and it's so you can kind of, you know, assault with the tip of it, you know.  Well, he kept spiking me in the head with that.
```

GX-3536S at 29:16–25 (G.J. Test. J.C., dated Sept. 13, 2023); *see id.* at 30:14–18 (identifying the Kel-Tec KSG shotgun seized from the August 8, 2023, search of 296 Scott Avenue as the shotgun that Mr. Gogolack brandished at him and C.B. during the kidnappings).

The victims' identification of the shotgun will assist the jury in concluding that the individual pictured in GX-437B-1 is Mr. Gogolack. When viewed in connection with the bag of suspected narcotics photographed next to him, that identification will help prove that Mr. Gogolack maintained 296 Scott Avenue as a drug-involved premises (Count 7), possessed a firearm in furtherance of drug-trafficking (Count 8), as a felon (Count 9), and while habitually using controlled substances (Count 10).

13

Additionally, the government expects that J.C.'s testimony concerning the kidnapping will help establish that Mr. Gogolack knew he was not permitted to possess firearms—an inference logically connected to Mr. Gogolack's status as a felon, as charged in Count 10. Specifically, the government anticipates that J.C. will testify as to the following:



Q.    What happens next?

A.    We go upstairs and at that point the focus is mainly

DePAOLO-CROSBY REPORTING SERVICES, INC.
135 Delaware Avenue, Suite 301, Buffalo, New York 14202
716-853-5544

46

pointing on me, attacking me I feel like because we went upstairs and Simon got high.

Q.    What did he use?

A.    Crack cocaine and fentanyl.

Q.    Right in front of you?

A.    Yes.

Q.    Where was the gun when he's doing that?

A.    On his lap.

14

Q. Where were you positioned?

A. Right in front of him.

Q. Are you sitting, standing?

A. He made me stand. At that point he made me touch multiple different firearms and put my hands on multiple different firearms. He made me spit in a different -- in a couple different cloths. I don't understand why but he made me spit in stuff.

Q. Did he say anything about why you were touching different firearms?

A. Because they're hot firearms and if someone was to find them, my prints would then be on them instead of his.

Q. Is that what he said?

A. Yes.

*Id.* at 45:24–46:22.

Based on this testimony, a reasonable jury could infer that Mr. Gogolack "made [J.C.] touch multiple different firearms and put [his] hands on multiple different firearms" because he knew that he was not allowed to possess them—and the presence of another person's prints and DNA could weaken any claim that the firearms belonged to Mr. Gogolack. *See id.* In that way, Counts 11 and 12 are logically connected to Count 9. *Rivera*, 546 F.3d at 253.

In addition to J.C. and C.B., several other witnesses would offer testimony to prove Counts 6 through 10 and Counts 11 and 12. FBI Special Agent Jason Kammeraad would testify in both trials to the scoping of Mr. Gogolack's phone, which contains drug-related text messages between Mr. Gogolack and J.C. and C.B. Jail records custodians from Niagara

County Jail and/or Northeast Ohio Correctional Facility would testify about Mr. Gogolack's jail calls, which contain statements made by Mr. Gogolack that are probative to both the kidnapping counts and narcotics counts.[6]  FBI Special Agent Rebecca Gworek could also offer testimony regarding her review of Mr. Gogolack's jail calls.  ATF Special Agent William Farnham would offer testimony about the examination of the Kel-Tec KSG shotgun seized from Mr. Gogolack's residence in both trials.  And Paul Gogolack, who could testify about Mr. Gogolack's occupation of 296 Scott Avenue—a fact relevant to Counts 4, 6 through 10, and 11 through 12—could also testify at any kidnapping trial about statements Mr. Gogolack made to him concerning his efforts to discourage C.B. from testifying, a fact relevant to proving Counts 11 through 18.[7]

Furthermore, some of the same exhibits relevant to proving Counts 6 through 10 are also relevant to proving Counts 11 and 12.  Specifically, the government would move to introduce the following physical exhibits seized from the August 8, 2023 search:

1.  23 rounds of ammunition in pill bottle;

2.  7 12-gauge shotgun shells in a guitar case on the floor;

3.  1 shotgun shell under bed on floor;

4.  1 shotgun shell behind TV stand;

---

[6]    For example, on October 17, 2023, Mr. Gogolack told former co-defendant Cortnie Barber during a recorded jail call that Ms. Quinn died on the couch while he was asleep upstairs.  That jail call may be introduced in a trial on Count 4.  As another example, on October 23, 2023, Mr. Gogolack, arranged drug transactions with and through Ms. Barber.  In one such call, Mr. Gogolack asks Ms. Baber if she wanted "Deal's number", a reference to former co-defendant Byrnard Byrd, III.  Those jail calls may be introduced in a trial on Count 6.

[7]    For example, on October 4, 2023, Mr. Gogolack asked his father what the 6th *commandment* was. Paul Gogolack responded "thou shalt not kill."  Mr. Gogolack then indicated that he had meant to write 6th *commandment,* not 6th *amendment*, but that spell check must have changed the words.  Realizing that he just admitted to sending the threatening messages in a recorded call, Mr. Gogolack clarified that he did not send the message in question.  This call demonstrates Mr. Gogolack, in real time, creating a false exculpatory explanation for his threatening message to C.B.

5. 1 shotgun shell on table;

6. 1 shotgun shell on TV stand;

7. Kel-Tec KSG shotgun bearing serial number XXFD48; and

8. A physical blue and white plaid shirt.

Because firearms are important tools of the narcotics trade, the seized firearm and ammunition are relevant to proving the narcotics offenses charged in Counts 6 and 7. *See United States v. Page*, 657 F.3d 126, 130 (2d Cir. 2011) (recognizing that a gun is "an important 'tool' of . . . trafficking in narcotics"). The seizure of the firearm and ammunition is also plainly relevant to proving the firearm offenses charged in Counts 8 through 10. And, because they corroborate J.C. and C.B.'s testimony regarding the kidnapping, the government would offer these same exhibits to prove Counts 11 and 12, too.

In sum, owing to logical connections and evidentiary overlap between Counts 6 through 10 and Counts 11 and 12, joinder is proper under Rule 8(a). *Cf., e.g.*, *United States v. Scarpa*, 913 F.2d 993, 1015 (2d Cir. 1990) (denying severance motion over defendant's argument that his extortion charges were unrelated to a larger narcotics trafficking case when "much of the evidence admitted at trial relating to the [narcotics] activity would have been admissible against [defendant] even in a separate trial because . . . the victim of [defendant's] extortion, fell into debt as a result of his participation in that [narcotics] activity"); *United States v. Ghavami*, No. 10 Cr. 1217(KMW), 2012 WL 2878126, at *16 (S.D.N.Y. July 13, 2012) (denying severance motion and noting that, "although the Government would not have to prove that [the defendant] engaged in the underlying alleged criminal conduct that is the object of the obstruction charge, evidence of that underlying conduct is relevant and necessary to explain the background of the charge [and] much of the same evidence, including testimony

17

from the same witnesses, would have to be introduced at a separate trial of [the obstruction count]").

### C.    Joinder of Counts 13 Through 18 with the Remaining Counts is Proper Due to the Logical Connections and Evidentiary Overlap Between the Counts.

Joinder of Counts 13 through 18 with the remaining charges is also proper due to the logical connections and evidentiary overlap between the counts.  On August 2, 2023, the FBI provided Mr. Gogolack with a search warrant for his phone in connection with its investigation into Ms. Quinn's death (Count 4).  The warrant noted that the "search [was] related to a violation of Title 21, United States Code, Sections 841(a)(1)[] and 843(b)," and the Attachment B authorized law enforcement to search for evidence related to drug trafficking.  The ensuing search of Mr. Gogolack's phone revealed drug-related text messages between Mr. Gogolack and both J.C. and C.B from July 2023 that are probative of Mr. Gogolack's guilt on Count 6 (narcotics conspiracy).  *See* GX-423N (Cellebrite report; J.C. Conversation); GX-423AB (Cellebrite report;    +16074541033    Conversation).    Mr. Gogolack's text messages with C.B. also support the inference that C.B. dropped off drugs to 296 Scott Avenue during the period in which Mr. Gogolack is alleged to have maintained it as a drug-involved premises.  *Compare* GX-423AB at 4 (text messages concerning a drug drop-off on July 30, 2023), *with* Dkt. 24 at 36 (alleging in Count 7 that Mr. Gogolack maintained 296 Scott Avenue between approximately July 2, 2023, and August 8, 2023).  Then, less than one week after August 8, 2023—the approximate end date of Mr. Gogolack's conduct as alleged in Counts 7 through 10—Mr. Gogolack tampered with J.C. and C.B. by sending them a CashApp message stating, in sum and substance, "for 6th amendment."

This act formed the basis of Mr. Gogolack's witness tampering charges in Counts 13 through 18, and it is what logically connects those charges with Mr. Gogolack's remaining

18

offenses.  When Mr. Gogolack tampered with J.C. and C.B., he did so knowing that they possessed information inculpating him in (1) myriad drug offenses, including the narcotics conspiracy and maintaining-a-premises charges alleged in Counts 6 and 7, respectively; (2) the unlawful possession of firearms (Counts 8 through 10); and (3) two kidnapping offenses (Counts 11 and 12).  In that way, Mr. Gogolack's witness tampering is "connected with . . . a common scheme or plan"—that is, his overdose of Ms. Quinn and participation in a narcotics conspiracy, maintenance of 296 Scott Avenue as a drug-involved premises, possession of various firearms in connection with his drug offenses, and kidnapping of J.C. and C.B.  *See* FED. R. CRIM. P. 8(a); *see United States v. Bongiovanni*, No. 19CR227JLSMJR, 2023 WL 3143894, at *11 (W.D.N.Y. Apr. 28, 2023) (concluding that witness tampering that occurred less than three weeks after the grand jury returned an indictment offenses was "part of [the] common scheme or plan . . . alleged in the" indictment).  Accordingly, Counts 13 through 18 should be joined with Counts 4 and 6 through 12.

## CONCLUSION

In sum, as many as 15 witnesses could be called to testify at a trial for Counts 4 and 6 through 10, and a trial for Counts 11 through 18.  This would amount to approximately a week or more of duplicative trial proof.  Due to the degree of evidentiary overlap and the logical connections between the counts, the government respectfully asks this Court to grant the government's motion for rejoinder (Dkt. 1000) and order that all of Mr. Gogolack's pending counts be rejoined.

DATED:  Buffalo, New York, June 22, 2026.

        MICHAEL DIGIACOMO
        United States Attorney

BY:    s/CASEY L. CHALBECK
        s/NICHOLAS T. COOPER
        s/KATERINA F. POWERS
        Assistant United States Attorneys
        United States Attorney's Office
        Western District of New York
        138 Delaware Avenue
        Buffalo, New York 14202
        716.843.5881
        Casey.Chalbeck@usdoj.gov